# In the United States Court of Federal Claims

No. 95-468C

(Filed: August 22, 2006)

| | |
|---|---|
| ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION, Plaintiff, v. THE UNITED STATES, Defendant. | Winstar Damages; Summary Judgment; Expectancy Damages; Restitution; Reliance Damages; Genuine Issues of Material Fact. |

*Frank Eisenhart*, with whom were *Mariam A. Nawabi, J. Gregory Dyer,* and *Jennifer Arnold*, Dechert LLP, Washington, D.C., for Plaintiff.

*John Roberson*, with whom were *Stuart E. Schiffer*, Deputy Assistant Attorney General, *David M. Cohen*, Director, *Jeanne E. Davidson*, Deputy Director, and *William F. Ryan*, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., *Arlene Pianko Groner, John J. Todor,* and *James R. Whitman,* Of Counsel, for Defendant.

**OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

WHEELER, Judge.[1]

In this Winstar-related case, the Court has before it Defendant's Motion for Summary Judgment on Plaintiff's Damages Claims. Defendant filed this motion on July 22, 2003,

[1] This case was transferred to Judge Thomas C. Wheeler on June 1, 2006, pursuant to Rule 40.1(b) of the Rules of the Court of Federal Claims.

accompanied by extensive Proposed Findings of Uncontroverted Fact, and a two-volume Appendix (603 pages) of documentary evidence. On September 17, 2003, Plaintiff filed its Opposition to Defendant's Motion for Summary Judgment on Damages, along with detailed objections to many of Defendant's Proposed Findings of Uncontroverted Fact. Plaintiff also submitted its own two-volume Appendix (648 pages) of documentary evidence. In June 2005, the parties filed supplemental briefs with the Court, followed by oral argument on July 21, 2005. In a February 21, 2003 stipulation, Defendant agreed to the existence of a contract with the acquiring thrift institution, and to the Government's breach of that contract, as alleged in Count I of Plaintiff's Complaint. This stipulation established liability in Plaintiff's favor. The case is at the damages phase to determine the amount of Plaintiff's recovery.

Of greatest clarity from the parties' filings is the conclusion that many genuine issues of material fact exist. This is a fact-intensive case in which Plaintiff should be afforded the opportunity to prove its damages. While Defendant has identified a number of potential weaknesses in Plaintiff's claims, the Court cannot say at this stage that Defendant is entitled to judgment as a matter of law. All of Plaintiff's damages claims have some legal basis if the requisite proof can be shown. Accordingly, for the reasons explained in greater detail below, Defendant's Motion for Summary Judgment on Damages is DENIED.

## Background[2]

During the late 1970s and early 1980s, high interest rates impacted the nation's thrift savings and loan industry. The cost to a thrift of retaining and obtaining new deposits became substantially higher than the rate of return on long-term, fixed-rate mortgages. The high interest rates precipitated a financial crisis in the thrift industry. Compl. ¶ 12. Due to the negative spread between the thrift industry's cost of funds and the return on assets, many thrift institutions whose deposits were insured by the Federal Savings and Loan Insurance Corporation ("FSLIC") began to experience significant financial losses. FSLIC's insurance fund was faced with the potential for huge losses in claims by depositors of these troubled or insolvent thrifts. Id. ¶ 13.

Under the National Housing Act of 1934, as amended, Congress granted authority to FSLIC to facilitate, "in its sole discretion" and "upon such terms and conditions as the

[2] The background facts included herein are taken from Plaintiff's Complaint, and the parties' filings regarding Defendant's Motion for Summary Judgment on Damages. These background facts are not formal findings of fact, and the parties are not bound by them in presenting their respective positions and evidence at trial. Additional history on the origins of the thrift industry crisis of the early 1980s is recounted extensively in Winstar Corp. v. United States, 518 U.S. 839 (1996).

Corporation may determine," the merger of a failing FSLIC-insured thrift institution into a financially sound FSLIC-insured thrift institution. See 12 U.S.C. § 1724 et seq. (repealed 1989). Such terms and conditions included providing financial and other assistance to the healthy institution that preserved the Government's funds, so long as the cost of FSLIC's assistance did not exceed the expense that would have been incurred in liquidating the failing institution and paying the insurance claims on the depository accounts. Compl. ¶ 14.

Faced with a large number of failing thrift institutions, the Federal Home Loan Bank Board ("FHLBB") adopted and implemented a policy in the early 1980s of requiring insolvent or troubled thrift institutions to merge into financially sound acquiring institutions. In many "supervisory" mergers, FSLIC exercised its authority under the National Housing Act to provide assistance to induce financially sound institutions to acquire by merger insolvent or troubled thrifts. Compl. ¶ 15. One form of assistance, allowed under the "purchase method" of accounting, was to identify the recorded or book value of the assets and liabilities of the acquired thrift institution and adjust it to fair market value. Any excess in the cost of the acquisition, including liabilities assumed by the acquirer, over the fair market value of the acquired assets could be separately recorded as "goodwill." Id. ¶ 17. Goodwill recorded in connection with a supervisory merger was known as "supervisory goodwill." Id. ¶ 18. The merged institution could record supervisory goodwill on its balance sheet as an asset. The ability to include supervisory goodwill as capital for purposes of satisfying FHLBB's minimum capital requirements was essential to inducing healthy acquirer institutions to merge with insolvent or troubled thrifts. Id. ¶ 19.

Suburbia Federal Savings & Loan Association ("Suburbia") was a federally chartered mutual association founded in 1935 as Lynbrook Federal Savings and Loan Association, headquartered in Garden City, New York. Suburbia operated through branch offices located in Nassau and Suffolk County, New York. Beginning in September 1981, the Federal Home Loan Bank Board of New York identified Suburbia as a "problem institution." Plaintiff's Appendix ("Pltf's App.") at 22. In 1982, Suburbia had a net loss of approximately $16.4 million, and in 1983, a net loss of approximately $8.2 million. Compl. ¶ 22. As of June 30, 1984, Suburbia had an adjusted net worth of negative $55.0 million. Pltf's App. at 6. Due to Suburbia's impaired financial condition, Federal regulators determined that some action was needed. Continued inaction might have resulted in Suburbia's insolvency.

Suburbia searched for a merger partner or investor to make a significant capital infusion, but none could be found. Pltf's App. at 30-31. FSLIC held a bidders' conference for Suburbia on December 20, 1982. Four New York-based savings institutions submitted proposals to acquire Suburbia at a cost to the FSLIC ranging from $17.9 million to $33.9 million, but these proposals were not pursued. By 1984, as Suburbia's operating losses

mounted, FSLIC concluded that soliciting additional bids on Suburbia was not likely to result in less costly proposals. Id. at 23.

On February 17, 1984, FHLBB advised the Suburbia Board of Directors that the bank's "debilitated capital position . . . [was] a matter of serious supervisory concern." Compl. ¶ 24. FHLLB noted that Suburbia's "viability will depend upon its ability to obtain a significant capital infusion, and (or) continued regulatory assistance." Id.

In April 1984, Suburbia and Fidelity New York, F.A. ("Fidelity") submitted a merger proposal to regulators under the Voluntary Assisted Merger Program ("VAMP"). Fidelity was founded in 1924 as Floral Park Co-operative Savings & Loan Association, headquartered in Floral Park, Long Island, New York. After a series of name changes, it came to be known as "Fidelity New York, F.S.B." Pltf's App. at 2. As of June1984, Fidelity had branch offices in Nassau County and New York City. It had assets of $475.2 million, and a net worth of $21.4 million or 4.5 percent of assets. Id. at 12. The local FHLBB regulators in New York could not approve the Fidelity/Suburbia merger, because it involved accounting forbearances, including supervisory goodwill, which could not be authorized at the district level. Fidelity and Suburbia submitted the proposal to the FHLBB and FSLIC in Washington as a request for an assisted supervisory merger. Id. at 23-24.

Fidelity acquired Suburbia on October 31, 1984. The FHLBB authorized $16 million of FSLIC cash assistance which was booked as a credit to Fidelity's net worth, and it authorized intangible assets resulting from the merger (supervisory goodwill) to be amortized over 30 years. Pltf's App. at 61-62, 73, 77. Fidelity put on its books supervisory goodwill from the Suburbia merger of $160,093,066. Id. at 95. If Fidelity had not received the right to count supervisory goodwill and contributed cash for regulatory capital purposes, Fidelity would not have agreed to acquire Suburbia. Compl. ¶ 35.

In 1989, Congress enacted the Financial Institutions, Reform, Recovery, and Enforcement Act ("FIRREA"), Pub. L. No.101-73, 103 Stat. 183 (Aug. 9, 1989) (codified in scattered sections of 12 U.S.C.). FIRREA and its implementing regulations established new capital requirements for savings institutions and eliminated the ability of thrifts to use supervisory goodwill to meet these requirements. The Office of Thrift Supervision ("OTS"), the Bank Board's successor under FIRREA,[3] adopted interim regulations implementing FIRREA's new capital requirements on November 8, 1989, to be effective December 7, 1989. 54 Fed. Reg. 46,845 (Nov. 8, 1989).

[3] Under FIRREA, the Office of Thrift Supervision replaced the FHLBB and the FSLIC, and Congress created the Federal Deposit Insurance Corporation ("FDIC") as a new thrift deposit insurance fund.

As a result of FIRREA, Fidelity claims to have suffered the loss of $93 million in regulatory capital, rendering it immediately capital deficient and insolvent. Pltf's App. at 301, 314. Fidelity alleges that it operated under a highly restrictive Capital Plan for the next four years (1990-1994), and that it eventually agreed in July 1994 to be acquired by one of its local competitors, Astoria Federal Savings & Loan Association ("Astoria"). Id. at 382. Astoria is the successor by merger to Fidelity, and filed this action on July 21, 1995.

In the Complaint, Astoria alleged as a result of FIRREA's enactment, "breach of contract, breach of implied-in-fact contract, promissory estoppel, failure of consideration and frustration of purpose, and a taking of property without just compensation in violation of the Fifth Amendment." Compl. ¶ 1. Based upon the parties' February 21, 2003 stipulation, only the breach of contract and Fifth Amendment taking claims remain. Astoria claimed damages in the Complaint "in excess of $250 million." Id. at ¶¶ 57, 76.

Through its expert witnesses, Astoria advances five expectancy damages claims: (1) lost profits during 1989 to 1994; (2) lost profits during 1995 to 2014; (3) a "wounded bank" claim for a forced sale of Freddie Mac stock; (4) a "wounded bank" claim for excessive payments to the OTS and the FDIC because of poor capitalization; and (5) hypothetical replacement costs of goodwill.[4] Astoria presents an alternative claim for restitution damages to recover the net costs avoided by the Government when Fidelity acquired Suburbia. Astoria also claims reliance damages, which are another alternative to expectancy and restitution claims.

## Discussion

### A. Standard of Review

RCFC 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986); Adickes v. Kress & Co., 398 U.S. 144, 157 (1970); Telemax Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001); Avenal v. United States, 100 F.3d 933, 936 (Fed. Cir. 1996); Creppel v. United States, 41 F.3d 627, 630-31 (Fed. Cir. 1994). "Only disputes over facts that might affect the

[4] Based upon Fifth Third Bank of Western Ohio v. United States, 402 F.3d 1221, 1237 (Fed. Cir. 2005), Astoria has withdrawn its claim for the cost of replacement capital. Pltf's Supp. Brief in Opp. To Deft's Mot. For Sum. Jdgmt., June 15, 2005, at 2.

outcome of the suit under governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the non-moving party." Id. See also Eli Lilly and Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001); General Electric Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999). If the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, the motion for summary judgment should be denied. Any doubt regarding factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir. 1998).

### B. Analysis of Plaintiff's Claims

As a starting point, the Court notes the size and substance of the record before it. Defendant filed 133 paragraphs of proposed findings of fact to support its July 22, 2003 motion for summary judgment on damages. Defendant submitted a lengthy two-volume Appendix to accompany its proposed findings. In opposing Defendant's motion, Plaintiff filed a 75-page response to Defendant's proposed findings, disputing many of Defendant's 133 paragraphs, and offering its own two-volume Appendix of exhibits. Included among the Appendices are selected pages of evidentiary documents, excerpts of deposition transcripts, and expert witness reports. Supplemental briefs in June 2005 added to the already ample record. Both parties have addressed in depth the damages issues of foreseeability, causation, and amount, all of which are fact issues. See Bluebonnet Sav. Bank, FSB v. United States, 266 F.3d 1348, 1355-56 (Fed. Cir. 2001) (causation and foreseeability are questions of fact that the Circuit Court reviews under the clear error standard); Hodosh v. Block Drug Co., 786 F.2d 1136, 1143 (Fed. Cir. 1986) (stating strong preference for trial testimony and cross-examination where partisan experts are involved). The Court cannot yet say which party may have the prevailing arguments, but it can say that genuine issues of material fact exist.

#### 1. Expectancy Damages

As the Federal Circuit recently observed, "[c]ontract remedies are designed to make the nonbreaching party whole." California Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005). In Winstar-related cases, one way to achieve this objective is to award "expectancy damages," defined as "the benefits the nonbreaching party expected to receive

in the absence of a breach." Id. (citing Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001)).

In order to establish expectancy damages, including lost profits, the plaintiff must satisfy three requirements. First, the plaintiff must show that the lost profits were within the contemplation of the parties because the loss was foreseeable, or because the breaching party had knowledge of special circumstances at the time of contracting. Cal. Fed., 395 F.3d at 1267 (citing La Van v. United States, 382 F.3d 1340, 1351 (Fed. Cir. 2004)); Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002)); Restatement (Second) of Contracts, § 351(1) (1981). Second, the plaintiff must show that there would have been a profit but for the breach. Cal. Fed., 395 F.3d at 1267 (citing Rumsfeld v. Applied Cos., 325 F.3d 1328, 1339 (Fed. Cir. 2003)). Third, the measure of damages must be reasonably certain, although if "a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." Cal. Fed., 395 F.3d at 1267 (citing Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004), quoting Locke v. United States, 151 Ct. Cl. 262, 283 F.2d 521, 524 (1960)).

The determination of the existence and the amount of lost profits are factual matters that should not be decided on summary judgment if material facts are in dispute. RCFC 56(c); California Fed. Bank, FSB v. United States, 245 F.3d 1342, 1350 (Fed. Cir. 2001). Following Cal. Fed., this Court often has rejected the use of summary judgment in considering claims for expectancy damages. See, e.g., Long Island Sav. Bank, FSB v. United States, 60 Fed. Cl. 80 (2004); Globe Sav. Bank, FSB v. United States, 59 Fed. Cl. 86 (2003); Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108 (2003); Columbia First Bank, FSB v. United States, 54 Fed. Cl. 693 (2002); Citizens Fed. Bank, FSB v. United States, 52 Fed. Cl. 561 (2002). The Court has noted that, based upon the admonition in Cal. Fed., "it would be the *rara avis* [rare bird], indeed, that could merit summary judgment." Fifth Third Bank of Western Ohio v. United States, 55 Fed. Cl. 223, 236 (2003) (noting that "a court never errs by declining to grant summary judgment when the better, or more prudent, course is to proceed to trial.").

Defendant argues that Astoria's lost profits claims are speculative and hypothetical, and are based upon unreasonable assumptions.[5] Defendant attacks the expert report of Dr. Donald Kaplan, questioning many of his premises, calculations and conclusions, and asserts that Dr. Kaplan "ignores a host of real-world problems" relying upon a model that is "completely hypothetical." Deft's Motion at 33. Despite the length of Dr. Kaplan's report,

---

[5] Defendant notes that theoretical lost profit models in Winstar-related cases have been disapproved, but are not precluded as a matter of law. Fifth Third Bank, 402 F.3d at 1236; Cal. Fed., 395 F.3d at 1270; Glendale , 378 F.3d at 1308.

Defendant contends that the report is lacking critical details regarding the investments that Fidelity would have made, the liabilities that Fidelity would have used to fund them, or the returns that Fidelity would have realized. Defendant notes that Dr. Kaplan began the lost profits calculation in January 1989, seven months before Congress enacted FIRREA. Id. at 33-34.

Plaintiff counters by asserting that its expert necessarily must base the lost profits claim on hypothetical assumptions, because the expert's task is to reconstruct what would have happened if Defendant had not breached the contract. Pltf's Opposition at 31. According to Plaintiff, the question is whether Dr. Kaplan's assumptions are reasonable, which presents a complex fact question requiring trial. Plaintiff argues that Dr. Kaplan has provided sufficient detail to support his assumptions and conclusions. Plaintiff alleges that all of its lost profits damages were foreseeable at the time of contracting, but this too is a fact question requiring trial.

On the "wounded bank" claims, Defendant again contends that they are based on speculation and unreasonable assumptions, while Plaintiff vigorously asserts that Dr. Kaplan's assumptions are reasonable. The outcome of these claims must be determined on the evidence presented at trial. The same is true for Plaintiff's cost of goodwill replacement, contained in a model presented by another expert, Dr. Christopher James. The Court must evaluate the testimony, and assess the theories and assumptions of the expert witnesses before reaching a conclusion on the facts. See Hodosh, 786 F.2d at 1143.

2. Restitution

Restitution is a damages theory intended "to restore the non-breaching party to the position it would have been in had there never been a contract to breach." Cal. Fed., 245 F.3d at 1350-51 (citing Glendale, 239 F.3d at 1380). Plaintiff's restitution claim here is based upon the net cost avoided by the Government when Fidelity acquired Suburbia in 1984. To establish this claim, Plaintiff intends to examine the alternatives available to the Government in dealing with Suburbia in 1984. Plaintiff expects to show the benefit conferred on the Government by acquiring a failing thrift.

Defendant argues that restitution claims in Winstar-related cases have been uniformly rejected, and must also be denied here as a matter of law. Glendale, 239 F.3d 1374; Cal. Fed., 245 F.3d 1342. See also Fifth Third, 55 Fed. Cl. at 245 (rejecting restitution claim, calling it a "paper calculation removed from the reality of events as they impacted plaintiff," and "exhibiting a barely discernible association with plaintiff's actual experience"); Franklin Fed., 55 Fed. Cl. at 120 ("whether the FSLIC or FDIC would have been forced to liquidate Morristown but for the goodwill contract is at best a guess"); Citizens, 52 Fed. Cl. at 565-66

(rejecting plaintiff's attempt to distinguish Glendale and Cal Fed on purported basis that interest rates did not decline after merger, in part because "the Government may not have ended up having to bail out [the thrift], as another acquirer may have done so, or alternatively the Government may have hired better management that could have potentially made [the thrift] profitable").

In response, Plaintiff contends with documentary support that the facts of this case are more compelling than in other Winstar-related cases, and that an opportunity to present this evidence should not be foreclosed. While Plaintiff may have an uphill battle and is sure to face stiff opposition from Defendant, the restitution claim has a legal basis, and may be grounds for award if properly proven. The cited precedent does not reject restitution claims as a matter of law, but only because the requisite factual support could not be shown. Plaintiff should be afforded its chance to make a case for restitution.

3. Reliance Damages

Plaintiff offers a claim for reliance damages as an alternative to its expectancy and restitution claims. Reliance damages seek to place the non-breaching party in the position he would have been in had he not entered into the contract by awarding him the costs incurred in reliance on the contract. See Cal. Fed., 245 F.3d at 1351-52; Glendale, 239 F.3d at 1380. See also Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001). A plaintiff may pursue expectancy and reliance damages in the alternative, and is entitled to recover the highest amount it can prove under any measure of damages. Restatement (Second) of Contracts, § 344 at 635-36, § 378 at 640 (1981); accord, Petrofsky v. United States, 203 Ct. Cl. 347, 366-67, 488 F.2d 1394, 1405 (1973).

Defendant once again questions the underlying premises for this claim, arguing that Dr. Kaplan's assumptions are unreasonable and unfounded. Defendant asserts that the proper measure for reliance damages is not simply expenditures, but that the expenditures must be offset by any benefits received under the contract. See 3 Daniel B. Dobbs, Law of Remedies § 12.3(1), at 51-52 (2d ed. 1993) ("[T]he reliance damages recovery is a recovery for net reliance loss, so that the defendant is credited with any benefit the plaintiff receives from the expenditures in reliance."). Defendant also notes that damages should not place a party in a better position than it would have otherwise occupied absent the breach. See Northern Helex Co. v. United States, 225 Ct. Cl. 194, 203, 634 F.2d 557, 563 (1980).

The focus of the parties' dispute is whether the amount of goodwill recorded by Fidelity due to its acquisition of Suburbia represents an actual cost or a regulatory accounting

entry,[6] and to what extent there were offsetting benefits that Plaintiff received from its expenditures. Once again, while the existing precedent may tilt in Defendant's favor, the case law does not foreclose Plaintiff's recovery as a matter of law. The issues to be addressed are decidedly factual, and therefore a trial is necessary.

## Conclusion

Based upon the foregoing, the Court finds that genuine issues of material fact exist as to Plaintiff's damages claims. To be sure, Defendant has identified what appear to be significant weaknesses in some of Plaintiff's assumptions and conclusions, but the Court cannot say that Defendant is entitled to judgment on these fact-intensive claims as a matter of law. Accordingly, Defendant's Motion for Summary Judgment on Damages is DENIED. The Court will promptly schedule a pretrial conference to arrange for further proceedings and trial.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge

[6] See LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1376 (Fed. Cir. 2003); Cal. Fed. Bank, 245 F.3d at 1351; Glendale, 239 F.3d at 1382-83; Citizens Fin. Services v. United States, 57 Fed. Cl. 64, 71 (2003); Franklin Fed., 55 Fed. Cl. at 120-21 (2003).