**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | ) | No. 95-468C<br>(Judge Wheeler) |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE EVIDENCE CONCERNING PLAINTIFF'S ABANDONED AND DISAVOWED DAMAGE CLAIMS**

Defendant, the United States, respectfully submits this reply in support of our motion to exclude evidence at trial concerning two damages theories – replacement costs of capital and the costs of a mutual to stock conversion – from plaintiff, Astoria Federal Savings and Loan Association ("Astoria"). Astoria concedes in its response that the replacement cost of capital claim is barred by Federal Circuit precedent, and that it has never made a claim for conversion costs. See Pl. Response (Dec. 13, 2006) ("Pl. Resp."). Nevertheless, Astoria seeks to preserve the option to present evidence relating to both of these issues at trial. This is improper. In order to streamline the issues for trial, as well as prevent the prejudice that would result from any new damages claims based upon this evidence, the Court should grant our motion *in limine*.

## I. Astoria Concedes That Its Replacement Cost Of Capital Claim Is Barred By Federal Circuit Precedent

Astoria disputes that it has "abandoned" its hypothetical cost of replacement capital claim, but concedes that "such a claim would presently be precluded by decisions of the Federal Circuit which are binding on this Court." Pl. Resp. at 1; see also Fifth Third Bank of W. Ohio v.

United States, 402 F.3d 1221, 1237 (Fed. Cir. 2005) (barring hypothetical cost of replacement capital claim as a matter of law). Despite this concession, Astoria seeks to preserve the option to "revisit its decision not to proceed with this claim" should it consider there to have been a "radical change in the law in this area" prior to trial. Id. Absent such a change, however, any cost of replacement capital claim is barred by existing precedent, and any evidence relating to that claim is thus irrelevant. The Court should thus exclude evidence relating to this claim.

Astoria's argument explains too much. In effect, Astoria asks the Court to keep the option of presenting evidence relating to an irrelevant claim at trial due to the possibility that the controlling precedent could undergo a radical change. But the potential for a change in law always exists. Claims that are barred by existing precedent prior to trial could always theoretically be revived by a later change in the law. However, a motion *in limine* enables the Court to streamline the issues for trial to the relevant issues based upon existing precedent. The Court should therefore exclude this irrelevant evidence. See, e.g., Inslaw, Inc. v. United States, 35 Fed. Cl. 295, 302-03 (1996).

Moreover, leaving the option open to present such evidence will prejudice the Government in practical terms because it would divert our trial resources to witnesses, expert opinions, and facts that would not otherwise have to be addressed if such evidence were excluded prior to trial. Astoria's cost of replacement capital model is theoretically distinct from Astoria's other damages claims, and was prepared by a different expert witness, Prof. Christopher James, from its other claims, which were prepared by Dr. Donald Kaplan. Our response to the replacement cost of capital model, too, involves different theories and facts, and involves additional expert testimony relating specifically to this claim.

In short, our trial preparation should not be made subject to whether Astoria will change its mind. Preparing to respond to this claim would divert financial resources and attorney time, and would inconvenience the additional witnesses we would call in terms of travel schedules and preparation time. Even if Astoria never presents any such evidence at trial, this diversion of resources will prejudice us prior to trial. Accordingly, we respectfully request that the Court exclude Astoria's presentation of any evidence relating to this claim at trial.

## II. Astoria Concedes That It Is Not Pursuing A Claim For Conversion Costs

With respect to any claim for the costs of its conversion from mutual to stock form in 1993, Astoria states that Astoria has "never made such a claim, so there would be nothing for it to 'abandon' or 'disavow.'" Pl. Resp. at 2. Astoria and its expert witness, Dr. Kaplan, have stated that Astoria is not claiming damages for conversion costs. See Pl. Resp. at 2; Report of Dr. Donald M. Kaplan (June 29, 2001) at ¶ 44 ("Irrespective of the breach, Fidelity would have converted during the same general time frame.") (attached as Exhibit A); Deposition of Donald M. Kaplan (Sept. 24, 2001) at 30-31 (attached as Exhibit B); Deposition of Donald M. Kaplan (Sept. 25, 2001) at 233-34 (attached as Exhibit C). Given that Astoria has reaffirmed that it is not seeking damages for the conversion costs, any evidence relating to the conversion costs is irrelevant and should be excluded. See Inslaw, 35 Fed. Cl. at 302-03. The Court should therefore grant the motion.

Still, Astoria not only opposes the motion to exclude evidence regarding conversion costs, but also signals its intention to present evidence relating to another potential claim that it had previously abandoned, that for reduced conversion proceeds. Astoria states in its response that the conversion will be a "subject of a presentation of evidence" because "[o]ne of the claims Astoria

has made is that the Government's admitted breach of contract and the damage Fidelity suffered as a result of this breach seriously delayed Fidelity's conversion and stock offering." Pl. Resp. at 2. Astoria states that, "[a]s a result of that delay, Fidelity was unable to raise an amount of capital comparable to the amounts raised by Astoria and other peer institutions that had not undergone an ordeal similar to that undergone by Fidelity." Id. This response, which suggests that Astoria may seek to change its mind at trial and present yet another previously-disavowed damages claim, illustrates the need for the motion *in limine*.

Astoria points to no evidence in its response, or elsewhere, to quantify any claim of reduced conversion proceeds. Indeed, the premise to this newly articulated damage theory – that the breach caused a delay in Fidelity's conversion – is contradicted by Astoria's own damage expert, Dr. Kaplan. Dr. Kaplan specifically stated in his report and his deposition that the conversion would have occurred in the "same general time frame" with or without the breach. See Report of Dr. Donald M. Kaplan (June 29, 2001) (Exhibit A) at § 44; Deposition of Donald M. Kaplan (Sept. 25, 2001) (Exhibit C) at 227, 233-34.

Furthermore, while Dr. Kaplan stated in his expert report that, absent the breach, Fidelity likely would have raised a larger amount of capital through a conversion due to the lost profits he claimed Fidelity would have earned prior to the conversion, he chose not to quantify this figure. During his deposition, he admitted that he did not attempt to quantify this figure because he did not believe he could make a showing that could meet this Court's burden of proof:

Q. That's correct. Did you ever make any attempt to quantify that number to that opinion?
A. No.
Q. Did you ever consider trying to quantify that alleged damage?

> A. I think that at some point, I probably gave it some thought, but I never undertook to do it.
>
> Q. Why did you choose not to do it?
>
> A. I think the reason that I chose not to do it is that it is a sophisticated type of an analysis to perform, and it is my view that the standard of proof required in the Court of Claims is a high standard of proof, and my conclusion was that, that that would not be the best use of my limited time.

Deposition of Donald M. Kaplan (Sept. 24, 2001) (Exhibit B) at 30-31; see also Deposition of Donald M. Kaplan (Sept. 25, 2001) (Exhibit C) at 226, 230-31.

Astoria thus suggests that it intends to produce evidence on a claim its expert chose not to quantify, using a factual basis its expert specifically rejected. All of this proposed evidence directly counters the damages theories put forth in Astoria's previous briefing and its expert's report and deposition. The Court should therefore exclude such evidence as irrelevant.

Similarly, Astoria's own executives have confirmed the difficulty of timing the conversion market for thrifts. Henry Drewitz, Astoria's former President and Chairman of the Board, testified that, although he voted in favor of Astoria's conversion from mutual to stock form in 1993 (the same period in which Fidelity converted), he had previously voted against conversion. See Deposition of Henry Drewitz (May 23, 2000) at 116-20 (attached as Exhibit D). Mr. Drewitz testified that, "in hindsight it was probably a mistake" not to have converted earlier, but that he had previously been "leaning on the fence" and voted against conversion. Id. at 117-18. The inability of the management of Astoria, a better-capitalized thrift than Fidelity, to time the market for its own conversion underscores the difficulty of timing the conversion market. The Court should therefore exclude evidence relating to such a claim of delay in conversion.

Indeed, Astoria's suggestion that it intends to present evidence regarding alleged lost conversion proceeds creates not only confusion, but also prejudice to the Government. The rules of this Court require that an expert's "report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor . . . ." RCFC 26(a)(2)(B). An expert's failure to present all opinions in his expert report bars that expert from presenting any such undisclosed testimony at trial. See Procedural Order No. 2: Discovery Plan at § V(A)(4) (Aug. 7, 1997, Ct. Fed. Cl.); RCFC 37(c)(1).

As shown above, Astoria's expert witness expressly chose not to quantify any claim of lost conversion proceeds, making any evidence on that claim irrelevant to Astoria's damages theories. For Astoria to present such evidence at trial, whether through expert or fact testimony, would be prejudicial because it would introduce a new damages theory that we would not have had the opportunity to examine or to respond to with affirmative evidence. See Procedural Order No. 2: Discovery Plan at § V(A)(4) (Aug. 7, 1997, Ct. Fed. Cl.); RCFC 37(c)(1). The Court should therefore foreclose the possibility of such prejudice at this point.

## CONCLUSION

For these reasons, we respectfully request that the Court grant our motion *in limine*.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

s/ William F. Ryan
WILLIAM F. RYAN
Assistant Director

s/ John H. Roberson by John J. Todor
JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel. (202) 353-7972
Fax (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER P. YERAWADEKAR

December 20, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of December, 2006, a copy of the foregoing "DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE EVIDENCE CONCERNING PLAINTIFF'S ABANDONED AND DISAVOWED DAMAGE CLAIMS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John H. Roberson by John J. Todor
John H. Roberson by John J. Todor

# APPENDIX A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ASTORIA FEDERAL SAVINGS AND LOAN ASSOCIATION,<br>Plaintiff,<br><br>*v.*<br><br>THE UNITED STATES,<br>Defendant. | Court File No. 95-468 |

EXPERT WITNESS REPORT BY DR. DONALD M. KAPLAN

A. CREDENTIALS AND QUALIFICATIONS

1. My name is Donald M. Kaplan and I am Chairman, President and Managing Director of Kaplan Associates, Inc., a consulting firm that provides financial consulting and economic research services to banks, thrifts and other financial services companies throughout the United States on financial, regulatory and strategic issues. I have provided such consulting services for the past 23 years, first as President and Managing Director of Kaplan, Smith & Associates, Inc. ("Kaplan Smith") from 1978 to 1991, and then in my present position at Kaplan Associates since 1991. My resume is attached as Exhibit 1.

2. I received my Ph.D. in finance in 1969 from the Graduate School of Management (now known as the Anderson Graduate School of Management) at the University of California at Los Angeles. I then taught graduate level finance as an assistant professor at the Harvard Business School for several years. The courses and seminars I taught focused on corporate finance and financial institutions.

capital at December 1991, was far below the 2.0% tangible capital threshold for being deemed critically undercapitalized and therefore under FDICIA, was subject to mandatory regulatory intervention. Although Fidelity's capital position improved during 1992 as interest rates fell and assets were sold for gains, by mid-1992, it was becoming increasingly critical for Fidelity to achieve capital compliance. By year end 1992, Fidelity had achieved a 1.49% tangible capital ratio and a 2.49% core capital ratio, still well below the regulatory minimums, especially if the core ratio was calculated on a fully-phased in basis (*i.e.*, excluding all supervisory goodwill).

43. In October 1992, Fidelity's board authorized its conversion to a stock institution,[27] anticipating that the resulting proceeds would be sufficient to solve Fidelity's capital deficiency. Time was of the essence however, as Fidelity received a "Prompt Corrective Action" letter from the OTS in December 1992. In connection with the pending public offering, and in view of the fact that even qualifying supervisory goodwill would no longer count as regulatory capital after 1994, Fidelity eliminated approximately $40 million of goodwill through a restatement of the Suburbia amortization schedule and writing off the remaining balance of goodwill from Dollar.

44. Irrespective of the breach, Fidelity would have converted during approximately the same general time frame. By 1993, most of the large mutual thrifts in the country had already converted to stock form. By remaining a mutual, Fidelity's competitive posture would have been constrained because many of its competitors, including some of the largest commercial banks in the country, had significantly larger capital resources. In addition, stock thrifts are advantaged in their ability to acquire other companies, attract management with stock compensation, and access the capital markets. However, absent the breach, Fidelity likely would have raised a larger amount of capital through a conversion because it not only would have had additional earnings from its additional assets,

[27] October 16, 1991 Board Minutes (AST128071-6).

but also would have gone public as a well-capitalized company rather than a thrift that was dependent upon a successful conversion to achieve capital compliance.

45. On May 3, 1993 Fidelity's conversion was completed, resulting in $57 million of new capital. As a consequence, Fidelity achieved capital compliance and the OTS terminated the 1990 Capital Plan.[28]

*The Post-Conversion Period*

46. Following the conversion, management renewed their intentions to grow the Bank. Fidelity's September 1993 Business Plan projected in excess of 8% annual growth over the following three years and the 1993 Annual Report indicated that "*With regulatory capital restored... growth in the balance sheet can be resumed.*" Management continued to emphasize mortgage backed securities and other high quality liquid assets as the vehicle for growth so as to not jeopardize the continuation of Fidelity's franchise value. Between June 1993 and March 1994, total assets increased by approximately $200 million, a 14% annualized growth rate.

47. Although it had achieved capital compliance by converting, Fidelity could not return to where it would have been but for the breach. It had been unable to grow during the early 1990s when there were significant growth opportunities. For example, Astoria, which has not been breached and not suffered a loss of its capital, had grown from three to four billion in assets between December 1989 and 1993. For Fidelity, continuing its growth during this time period would have created both additional earnings and value.

48. Due to the limited proceeds raised in its breach-affected conversion offering, Fidelity's management and its investment banking advisors soon determined that Fidelity did not have sufficient capital to compete with other institutions in its market area, many of which had substantially greater resources. One example

[28] May 14, 1993 letter from A. Vigna (AST000081).

*The Plaintiff's Benefit and Additional Costs*

102. The same plaintiff's benefit offset and additional costs identified under the reliance damages described above are appropriate for restitution. That is, Fidelity had no recovery on its investment through the date of the breach (*i.e.*, no benefit offset) and it incurred $12.3 million of additional costs as a consequence of the acquisition of Suburbia.

*Net Restitution Damage*

103. Thus, Fidelity's net restitution damages are $128.2 million plus $12.3 million, or $140.6 million calculated on a present value basis and $82.9 million plus $12.3 million or $95.2 million calculated on a cash basis.

## G. CONCLUSION

104. It is my opinion that Fidelity suffered lost profits damages totaling at least $129.8 million, consisting of $41.3 million of damages through December 1994 and $88.5 million from December 1994 to the end of the contract in the year 2014. It is further my opinion that Fidelity's reliance claim damages is $152.7 million and its restitution damages are $140.6 million on a present value basis and $95.2 million on a cash basis.

105. The calculations in the attached exhibits were prepared for me at my direction and under my supervision for my review and use in this report. My work is ongoing, and I may as appropriate revise the opinions, assumptions and calculations set forth herein upon consideration of the reports or testimony of any other witness, new documents produced, or any other information that may be presented to me.

Respectfully submitted,

Donald M. Kaplan

Donald M. Kaplan

Date: June 29, 2001

# APPENDIX B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

- - - - - - - - - - - - - - - X

ASTORIA FEDERAL SAVINGS AND :
LOAN ASSOCIATION :
Plaintiff, : Case No.95-468C
v. :
UNITED STATES OF AMERICA, :
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.

Monday, September 24, 2001

Videotaped deposition of DONALD M. KAPLAN, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, a Notary Public in and for the District of Columbia, taken at the offices of Department of Justice, 1100 L Street, N.W., Washington, D.C., at 9:35 a.m., Monday, September 24, 2001, and the proceedings being taken down by Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and transcribed under her direction.

some representative of the former management. I don't recall, you know, how that first contact came to pass. But I guess the way I would answer you is I wanted to talk to someone, and it may be that Mr. Eisenhart identified Mr. Wesp as being readily available, but it was certainly my desire to talk to someone.

Q. Did you identify Mr. Wesp as that someone that you wanted to talk to independently, or did somebody suggest that to you?

A. No. I didn't -- I didn't identify him as an independent matter. As I say, it is my practice to talk to some representative of the former management, and he was available, and I found that he was able to provide answers to the things that I wasn't able to glean from my review of the case documents.

Q. And who told you he was available and willing to talk to you?

A. Well, as I say, I believe it would have been Mr. Eisenhart.

Q. Okay. I thought -- okay.

A. Yes.

Q. And you didn't request a meeting with anybody else in management?

A. I don't recall having requested a meeting with anybody else.

Q. Did you discuss a meeting with anybody else, the possibility of a meeting with anybody else in Fidelity's former management?

A. I believe that I did not.

Q. Was it ever requested of you that you not include any of the opinions that were in a prior version of this report?

A. No.

Q. Did you form any preliminary opinions regarding the quantification of damages to Fidelity attributable to lost proceeds from its conversion in 1993?

A. Yes.

Q. And what were those opinions?

A. Well, I think it's expressed in the report that it is my opinion that had the institution not been breached, that it would have had higher proceeds, and I believe as to my recollection, I expressed that opinion in the report.

Q. That's correct. Did you ever make any attempt to quantify that number to that opinion?

A. No.

Q. Did you ever consider trying to quantify

that alleged damage?
A. I think that at some point, I probably gave it some thought, but I never undertook to do it.
Q. Why did you choose not to do it?
A. I think the reason that I chose not to do it is that it is a sophisticated type of an analysis to perform, and it is my view that the standard of proof required in the Court of Claims is a high standard of proof, and my conclusion was that, that that would not be the best use of my limited time.
Q. So is it fair to say then that you didn't quantify it because you were afraid it would not meet the high standard of proof required in the Court of Claims?
A. Certainly didn't use the word that you just did. Not that I was afraid, but it was a, it was a professional judgment that, and I think I have been clear, that it is a sophisticated kind of an analysis. There is a high burden of proof required, and I made a determination that in particular because I had limited time that it would not be a good decision to go down that path.
Q. Now, you have, you have done that type of analysis in other cases, haven't you?
A. Not that I'm recalling.

Q. Okay. Were you ever instructed not to quantify the damage attributable to lost proceeds in connection with Fidelity's conversion?

A. No.

Q. Was the decision not to pursue such a claim for lost proceeds one that you came up with independently or after consultation with others?

A. This decision to not pursue that analysis was my decision.

Q. Were there any other reasons other than the ones that you just mentioned about it being a sophisticated analysis and having limited time? Are there any other reasons that persuaded you not to pursue such a claim?

A. No.

Q. How much time have you put into this case, Dr. Kaplan?

A. I really, I really don't know.

Q. Well, let me ask you, personally, how much time have you spent on this case?

A. I just said, I really don't know.

Q. How much time has your firm spent on the case?

A. I -- I can't -- I don't have an ability to keep track of how much time I spend on the many

# APPENDIX C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x

ASTORIA FEDERAL SAVINGS : **CERTIFIED COPY**

AND LOAN ASSOCIATION, :

Plaintiff, : Court File No.

vs. : 95-468

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - - - x

V O L U M E II

Continuation of the videotaped deposition of DR. DONALD M. KAPLAN, held at the offices of Department of Justice, 1100 L Street, N.W., Washington, D.C., commencing at 9:35 a.m., Tuesday, September 25, 2001, before Elizabeth Mingione, Notary Public.

BY MR. McCLAIN:

Q. Well --

A. I think I can articulate what my opinion is.

Q. Okay.

A. Generally without regard to particular language. But my opinion is that, um, the breach caused Fidelity to sell a portion of their Freddie Mac stock sooner than they otherwise would have in the nonbreach case.

Q. Okay. In Exhibit 9, did you make any attempt to back out the proceeds that Fidelity realized from that alleged premature sale of Freddie Mac stock?

A. No. Once again, just as our preceding discussion about another indiv .. .. balance sheet line item, I have not done any detailed balance sheet analysis on any asset or any liability category in Exhibit 9. This is solely applying a growth rate to a starting total asset balance. That's all that's going on in Exhibit 9.

Q. Okay. If you could turn to paragraph 44, sir, in your report?

A. Yes.

Q. And if you could read that paragraph to

yourself and just let me know when you have finished, I'll have a few questions --

A. Yes.

Q. -- for you.

- - -

(The witness reviews a document)

- - -

A. Okay.

Q. Okay. We talked about this yesterday. You are not attempting to quantify your opinion that Fidelity likely would have raised a larger amount of capital through conversion?

A. That is correct. I have not undertaken to do that analysis.

Q. And do you anticipate that you will undertake to do so?

A. Um, as of, um, as of this morning, I do not anticipate that. Of course, my analysis is ongoing, and we haven't seen what the government has done. And so I really don't know what I might yet do.

Q. Well, have you taken any steps to quantify it?

A. No. As of now, I have done nothing.

Q. Okay.

A. In that regard.

Q. Now, have you explored whether the existence of -- in your first sentence there, Dr. Kaplan, says that irrespective of the breach, Fidelity would have converted during approximately the same general time frame. Do you see that, sir?

A. Yeah, I do.

Q. And I think the basis for your opinion is set forth in that paragraph?

A. In summary fashion, yes.

Q. Okay. Have you reviewed the complaint in this matter, sir?

A. Um, I -- I did at some point but it's been some significant time ago.

Q. Okay. Have you investigated the question, sir, of what the "but for" bank's capital ratios would have been in the absence of a conversion?

A. In the absence of the conversion.

Q. Without their conversion?

A. Um, well, we went through an exercise where I demonstrated how I have calculated the capital ratios. Um, I have, um, I haven't actually performed the calculation with the subtraction of the IPO proceeds, but that's simple to do.

Q. Okay.
A. But, and if you want, we could drag ourselves through that.
Q. That's okay. Did you review the appraisal of Fidelity in connection with its conversion?
A. Um, yes.
Q. Okay. The appraisal was performed by I think at the time it was Kaplan Smith Associates?
A. Um, hold on just a second. Um, I think that's incorrect.
Q. Okay. Well, my question to you is really did you have any involvement in that appraisal?
A. Of course.
Q. And what was your involvement, sir?
A. Well, um, I, as president of my company ultimately is responsible for all of the work product that the firm produced.
Q. Okay. Do you remember anything about what you did in connection with the appraisal of Fidelity?
A. Well, my standard practice is to review, um, work product before it's finalized. Um, it's been quite a few years now, obviously. But I am sure that I would have done that at the time.

Q. But do you remember specifically here today whether -- what your particular involvement was with respect to the Fidelity appraisal?

A. Well, I think I just said. My standard practice was to review, um, my practice has always been to work with the staff during the -- the conduct of analyses and to review preliminary drafts before they are finalized. But if you have something more specific in mind, that's a description of my general practice.

Q. But I'm asking if you remember anything other than that about the Fidelity appraisal?

A. Um, if you have something particular in mind that you could identify.

Q. I don't.

A. That might help me. But just as a general matter, nothing else comes to mind sitting here right now.

Q. Okay. How is goodwill on the balance sheet treated during the valuation process? How do you evaluate that?

A. Um, well, it is recognized as an intangible and it's -- it's not singled out, um, as a, um, a separate item getting -- that gets a chapter unto itself. But, uh, I guess the way I

would respond is that, um, goodwill has been on the balance sheets of nearly every thrift institution that my firm has appraised, which numbers some approximately 350 of them.

And so, um, it was in that sense there was nothing, uh, all that out of the ordinary about Fidelity. It's just one more example of a thrift that had goodwill in its balance sheet.

Q. You said in paragraph 44, sir, that Fidelity likely would have raised a larger amount of capital through a conversion because it not only would have had additional earnings from its additional assets, but also would have gone public as a well-capitalized company rather than a thrift that was dependent upon a successful conversion to achieve capital compliance?

What are you talking about, sir, when you talk about additional earnings from its additional assets? Are you talking about the same assets?

A. I'm talking about the lost profits.

Q. Okay.

A. I'm talking about Fidelity converting as a nonbreached company. And two major themes that I identify in this paragraph are the two themes we've spent our time on. As a nonbreach company, this

institution would have had a strong capital position, and it would have had lost profits, and it would have been that much more attractive to the marketplace, and it clearly would have raised, um, larger IPO proceeds than it did.

Q. In your experience, sir, is it relevant at all as to what a thrift's regulatory capital position is to when or whether it will convert?

A. It, on a case-by-case basis it may be relevant to some institutions and it may not be relevant to others.

Q. Was it relevant to Fidelity?

A. I don't know how else to answer this other than to sort of go back to what I said yesterday which is the thrift industry is, if it's nothing else, it's a highly regulated industry. And so, and capital is a central tenant of all of the regulation that goes on. So at some level of course it's relevant.

Um, I guess that's how I would answer you. It's relevant to all institutions, um, breached or nonbreached.

Q. Do you recall what the effect of the conversion had on Fidelity's regulatory capital position?

A. Well, from memory the only statistic that is just sort of on the tip of my tongue is that I believe, if I'm remembering correctly, they raised, um, 59 million in change of gross proceeds. And I think it turned out to be 57 million in change of net proceeds. That's the statistic that I do recall.

Q. And didn't that enable Fidelity to become well capitalized under the FDICIA standards?

A. It, approximately it did. That was, um, enough to improve its capital position. It also resulted in the -- the Capital Plan being --

Q. Lifted?

A. Lifted, if that's the right verb.

Q. And Fidelity -- did Fidelity resume growth?

A. It did.

Q. After? Okay.

A. It did.

Q. Did you undertake to determine whether Fidelity would have written off its goodwill prior to the conversion irrespective of whether it was contractual goodwill?

A. Um, I don't believe I did any analysis. Um, I think the -- the obvious point is that in the

nonbreach world that goodwill would have been valuable. And, um, I believe that the institution would not have written off something that had significant value to it.

Q. Okay. What value would it have had to Fidelity after the conversion?

A. It's additional capital that can be leveraged.

Q. But wasn't Fidelity well-capitalized after the conversion anyway?

MR. EISENHART: I think we are talking past each other here, Mr. McClain. I think Dr. Kaplan is talking about absent FIRREA a nonbreach world. And you are talking about the breach world.

THE WITNESS: That's correct. That's what I was talking about.

MR. EISENHART: Yes. But I think Mr. McClain was talking about a different world.

BY MR. McCLAIN:

Q. Well, Dr. Kaplan, you said that irrespective of the breach, Fidelity would have converted during approximately the same general time frame; correct?

A. That is -- that is right. What we know

as a factual matter is that essentially, um, with only less than a handful of exceptions, um, by that point, um, the majority of large mutual thrifts in New York, um, either had completed or were completing their conversions.

That was, um, a trend on a nationwide basis, um, that, um, I think is sort of undeniable that -- for all kinds of other reasons.

Q. Okay.

A. Not simply for augmenting capital, for other benefits.

Q. So in the "but for" world, Fidelity would have converted around the same time?

A. There's -- there's no doubt in my mind that in the "but for" world it would have.

Q. Okay. And I think we talked earlier about you said in the "but for" world that Fidelity would have been fully capitalized with --

A. Correct.

Q. -- supervisory goodwill?

A. Correct.

Q. My question to you is this. Did you -- and I think you have also said here that Fidelity would have raised a larger amount of capital through a conversion in the "but for" world?

A. Something larger than it did raise. I believe that but I haven't quantified it.

Q. Okay. And I'm asking you now is have you taken an opinion as to whether Fidelity would have written off its supervisory goodwill before its conversion if it knew that after its conversion --

A. I thought I just said no.

Q. Okay.

A. That -- I thought I said I believe it would not have.

Q. Right.

A. So I thought I answered that. Yes.

Q. You did, but I added another element to it which is that if you knew that Fidelity would have been well-capitalized even after the conversion?

A. Sure. That doesn't matter.

Q. Okay. Why does that not matter to you, sir?

A. Just means it would have had some -- some further leverageable capital.

Q. Okay.

A. So, I mean, if one looks out in the marketplace, lots of institutions run their operations at capital levels in excess of the

# APPENDIX D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------x

ASTORIA FEDERAL SAVINGS & LOAN,

ASSOCIATION,

COPY

Plaintiff,

No. 95-468 C

-against- (Chief Judge Smith)

UNITED STATES,

Defendant.

-----------------------------------x

May 23, 2000

9:47 a.m.

Videotaped Deposition of HENRY DREWITZ, taken by Defendant, pursuant to subpoena, at the offices of Astoria Federal Savings & Loan Association, One Astoria Plaza, Lake Success, New York, before Tracy Eckhoff, a Shorthand Reporter and Notary Public within and for the State of New York.

Drewitz

A. I don't recall that I've seen it before. This could be the first time.

Q. It's a business plan prepared by Kaplan Associates for the board of directors of Astoria Federal Savings & Loan. Do you remember receiving this, sir?

A. Truthfully, Dan, I don't recall seeing this before.

Q. Do you remember if this was prepared in connection with a conversion by Astoria from a mutual to a stock form of organization?

A. I'm sure it was.

Q. Okay. Do you remember why Astoria converted to a stock institution in 1993?

A. That's a good way to grow.

Q. How is it a good way to grow?

A. Well, first of all, you can attract new capital in the sale of stock, and sometimes -- in fact, many times it can give you better opportunities to -- if you were looking for mergers. So many institutions have converted to stock. Astoria was not a pioneer in the conversion race, as you probably know. We were almost Johnny-come-latelies.

Drewitz

Q. Were a lot of the thrifts converting to stock?

A. Yes.

Q. In 1993?

A. Yeah.

Q. Why was that?

A. Better investment possibilities, raising capital, attracting better-qualified personnel by offering some stock incentives, you know.

Q. Do you remember a presentation by Kaplan Associates at all in connection with the conversion from a mutual to a stock form of organization?

A. It might sound strange, but I don't.

Q. Do you know anybody from Kaplan Associates?

A. Not a worsen -- not a person.

Q. Not a person --

A. Nobody.

Q. -- okay.

Had Astoria discussed converting to a stock form before 1993?

A. Yes. As a matter of fact, even during

Drewitz

my tenure as the president, we at the board level just spoke about it casually, and the decision of the directors at that time was to retain our status as a mutual institution.

Q. Why did you decide to do that?

A. I'd say in hindsight it probably was a mistake. We should have converted earlier.

Q. Why is that?

A. Well, we probably would have had more opportunities to raise capital to be in the -- in the -- let's say in the forefront of a well-run capitalized stock association.

Q. Now, Astoria was never poorly capitalized --

A. No, it was not.

Q. -- or thinly capitalized?

A. We were always very well capitalized. But, you know, it gives us opportunities in an acquisition as stock to a stock is always an easier deal than trying to work out a deal with us as a stock and somebody else as a mutual. So it's better to do it that way.

Q. Okay. Do you remember why Astoria decided to do it in 1993 as opposed to previous

years?

A. I think George Engelke might had more -- better ammunition than I did. I was sort of leaning on the fence on conversion, and -- but after giving it -- you know, you're reading about what's happening in the industry and these trade publications. It seems to me that going to stock was the way to -- was the way to fly. And although I voted for staying -- maintaining our mutual status, if it I had to do it all over again, I would have voted otherwise.

Q. So you voted against --

THE VIDEO OPERATOR: I'm sorry. Can we go off the record for one second?

MR. McCLAIN: Sure.

MR. EISENHART: Sure.

THE VIDEO OPERATOR: Going off the record. The time now is 1:12.

(A recess was taken.)

THE VIDEO OPERATOR: Back on the record. The time now is 1:13.

MR. EISENHART: The video operator has informed us that he may have lost the audio feed in the middle of the last question.

Drewitz

We're therefore going to ask the court reporter if she would read back on the record the last question and Mr. Drewitz's answer.

(Requested portion of record read.)

Q. So you did not vote in favor of converting from a mutual to a stock, sir, in 1993?

A. The initial discussion that we had at the board level -- and George Engelke was not a director at the time -- the decision was to maintain our status as a mutual. And as I said, in hindsight, I -- if I had to do it all over again, I would have voted for converting it to a stock.

MR. EISENHART: Mr. McClain, I think there was a disconnect between you and the witness on that. You were talking about 1993. I think he was referring to the prior time they had considered it.

MR. McCLAIN: I think that's right.

Q. Mr. Drewitz, I thought we had -- didn't we agree that Astoria did convert from a mutual to a stock in 1993?

Drewitz

A. Yes.

Q. Okay.

MR. EISENHART: And did you vote for the conversion at the time?

THE WITNESS: Yes. Absolutely.

Q. Okay. At that point you thought conversion was a good thing?

A. Absolutely.

Q. Okay. I'll ask you to take a look at the exhibit in front of you, sir. It's marked D-5, and if you could, look at the Roman numeral I, page 2.

A. Page 2.

Q. It's actually identified as Roman numeral I 2 at the bottom?

A. Oh, Roman numeral I, okay. Let's see.

MR. EISENHART: It's 301.

THE WITNESS: I see.

MR. McCLAIN: Yes. Thank you.

Q. I'd like you to look -- read the sentence that begins at the very top of that page. In fact, it begins on the sentence -- or the page prior to that page.

MR. EISENHART: Beginning with the

Drewitz

words "the association's."

Q. Correct, beginning the words "the associations."

A. Yeah, I got it.

Q. If you can, read the rest of that paragraph which runs onto the following page.

A. I'm ending here the reading where it says "improving operating efficiency." Is that as far as you want me to go?

Q. Yes, sir. Thank you.

A. Okay.

Q. Now, that passage you just read, it talks about management seeking to fulfill goals by pursuing the following strategies, and then it goes through five different strategies that you just read, and it ends in operating efficiency, correct? Actually, it's improving operating efficiency. Is that an accurate statement of management strategies at that time, 1993?

A. Just repeat that again.

Q. Is that an accurate statement?

A. I would say so, yes.

Q. Do you know if management had any other strategies that aren't listed on this page