# APPENDIX A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ASTORIA FEDERAL SAVINGS AND LOAN ASSOCIATION,<br>Plaintiff,<br><br>*v.*<br><br>THE UNITED STATES,<br>Defendant. | Court File No. 95-468 |

## EXPERT WITNESS REPORT BY DR. DONALD M. KAPLAN

### A. CREDENTIALS AND QUALIFICATIONS

1. My name is Donald M. Kaplan and I am Chairman, President and Managing Director of Kaplan Associates, Inc., a consulting firm that provides financial consulting and economic research services to banks, thrifts and other financial services companies throughout the United States on financial, regulatory and strategic issues. I have provided such consulting services for the past 23 years, first as President and Managing Director of Kaplan, Smith & Associates, Inc. ("Kaplan Smith") from 1978 to 1991, and then in my present position at Kaplan Associates since 1991. My resume is attached as Exhibit 1.

2. I received my Ph.D. in finance in 1969 from the Graduate School of Management (now known as the Anderson Graduate School of Management) at the University of California at Los Angeles. I then taught graduate level finance as an assistant professor at the Harvard Business School for several years. The courses and seminars I taught focused on corporate finance and financial institutions.

capital at December 1991, was far below the 2.0% tangible capital threshold for being deemed critically undercapitalized and therefore under FDICIA, was subject to mandatory regulatory intervention. Although Fidelity's capital position improved during 1992 as interest rates fell and assets were sold for gains, by mid-1992, it was becoming increasingly critical for Fidelity to achieve capital compliance. By year end 1992, Fidelity had achieved a 1.49% tangible capital ratio and a 2.49% core capital ratio, still well below the regulatory minimums, especially if the core ratio was calculated on a fully-phased in basis (*i.e.*, excluding all supervisory goodwill).

43. In October 1992, Fidelity's board authorized its conversion to a stock institution,[27] anticipating that the resulting proceeds would be sufficient to solve Fidelity's capital deficiency. Time was of the essence however, as Fidelity received a "Prompt Corrective Action" letter from the OTS in December 1992. In connection with the pending public offering, and in view of the fact that even qualifying supervisory goodwill would no longer count as regulatory capital after 1994, Fidelity eliminated approximately $40 million of goodwill through a restatement of the Suburbia amortization schedule and writing off the remaining balance of goodwill from Dollar.

44. Irrespective of the breach, Fidelity would have converted during approximately the same general time frame. By 1993, most of the large mutual thrifts in the country had already converted to stock form. By remaining a mutual, Fidelity's competitive posture would have been constrained because many of its competitors, including some of the largest commercial banks in the country, had significantly larger capital resources. In addition, stock thrifts are advantaged in their ability to acquire other companies, attract management with stock compensation, and access the capital markets. However, absent the breach, Fidelity likely would have raised a larger amount of capital through a conversion because it not only would have had additional earnings from its additional assets,

[27] October 16, 1991 Board Minutes (AST128071-6).

but also would have gone public as a well-capitalized company rather than a thrift that was dependent upon a successful conversion to achieve capital compliance.

45. On May 3, 1993 Fidelity's conversion was completed, resulting in $57 million of new capital. As a consequence, Fidelity achieved capital compliance and the OTS terminated the 1990 Capital Plan.[28]

*The Post-Conversion Period*

46. Following the conversion, management renewed their intentions to grow the Bank. Fidelity's September 1993 Business Plan projected in excess of 8% annual growth over the following three years and the 1993 Annual Report indicated that "*With regulatory capital restored... growth in the balance sheet can be resumed.*" Management continued to emphasize mortgage backed securities and other high quality liquid assets as the vehicle for growth so as to not jeopardize the continuation of Fidelity's franchise value. Between June 1993 and March 1994, total assets increased by approximately $200 million, a 14% annualized growth rate.

47. Although it had achieved capital compliance by converting, Fidelity could not return to where it would have been but for the breach. It had been unable to grow during the early 1990s when there were significant growth opportunities. For example, Astoria, which has not been breached and not suffered a loss of its capital, had grown from three to four billion in assets between December 1989 and 1993. For Fidelity, continuing its growth during this time period would have created both additional earnings and value.

48. Due to the limited proceeds raised in its breach-affected conversion offering, Fidelity's management and its investment banking advisors soon determined that Fidelity did not have sufficient capital to compete with other institutions in its market area, many of which had substantially greater resources. One example

[28] May 14, 1993 letter from A. Vigna (AST000081).

*The Plaintiff's Benefit and Additional Costs*

102. The same plaintiff's benefit offset and additional costs identified under the reliance damages described above are appropriate for restitution. That is, Fidelity had no recovery on its investment through the date of the breach (*i.e.*, no benefit offset) and it incurred $12.3 million of additional costs as a consequence of the acquisition of Suburbia.

*Net Restitution Damage*

103. Thus, Fidelity's net restitution damages are $128.2 million plus $12.3 million, or $140.6 million calculated on a present value basis and $82.9 million plus $12.3 million or $95.2 million calculated on a cash basis.

## G. CONCLUSION

104. It is my opinion that Fidelity suffered lost profits damages totaling at least $129.8 million, consisting of $41.3 million of damages through December 1994 and $88.5 million from December 1994 to the end of the contract in the year 2014. It is further my opinion that Fidelity's reliance claim damages is $152.7 million and its restitution damages are $140.6 million on a present value basis and $95.2 million on a cash basis.

105. The calculations in the attached exhibits were prepared for me at my direction and under my supervision for my review and use in this report. My work is ongoing, and I may as appropriate revise the opinions, assumptions and calculations set forth herein upon consideration of the reports or testimony of any other witness, new documents produced, or any other information that may be presented to me.

Respectfully submitted,

Donald M. Kaplan

Date: June 29, 2001