# APPENDIX B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

CERTIFIED COPY

ASTORIA FEDERAL SAVINGS AND :
LOAN ASSOCIATION :
Plaintiff, : Case No.95-468C
v. :
UNITED STATES OF AMERICA, :
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.

Monday, September 24, 2001

Videotaped deposition of DONALD M. KAPLAN, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, a Notary Public in and for the District of Columbia, taken at the offices of Department of Justice, 1100 L Street, N.W., Washington, D.C., at 9:35 a.m., Monday, September 24, 2001, and the proceedings being taken down by Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and transcribed under her direction.

some representative of the former management. I don't recall, you know, how that first contact came to pass. But I guess the way I would answer you is I wanted to talk to someone, and it may be that Mr. Eisenhart identified Mr. Wesp as being readily available, but it was certainly my desire to talk to someone.

Q. Did you identify Mr. Wesp as that someone that you wanted to talk to independently, or did somebody suggest that to you?

A. No. I didn't -- I didn't identify him as an independent matter. As I say, it is my practice to talk to some representative of the former management, and he was available, and I found that he was able to provide answers to the things that I wasn't able to glean from my review of the case documents.

Q. And who told you he was available and willing to talk to you?

A. Well, as I say, I believe it would have been Mr. Eisenhart.

Q. Okay. I thought -- okay.

A. Yes.

Q. And you didn't request a meeting with anybody else in management?

A. I don't recall having requested a meeting with anybody else.

Q. Did you discuss a meeting with anybody else, the possibility of a meeting with anybody else in Fidelity's former management?

A. I believe that I did not.

Q. Was it ever requested of you that you not include any of the opinions that were in a prior version of this report?

A. No.

Q. Did you form any preliminary opinions regarding the quantification of damages to Fidelity attributable to lost proceeds from its conversion in 1993?

A. Yes.

Q. And what were those opinions?

A. Well, I think it's expressed in the report that it is my opinion that had the institution not been breached, that it would have had higher proceeds, and I believe as to my recollection, I expressed that opinion in the report.

Q. That's correct. Did you ever make any attempt to quantify that number to that opinion?

A. No.

Q. Did you ever consider trying to quantify

that alleged damage?

A. I think that at some point, I probably gave it some thought, but I never undertook to do it.

Q. Why did you choose not to do it?

A. I think the reason that I chose not to do it is that it is a sophisticated type of an analysis to perform, and it is my view that the standard of proof required in the Court of Claims is a high standard of proof, and my conclusion was that, that that would not be the best use of my limited time.

Q. So is it fair to say then that you didn't quantify it because you were afraid it would not meet the high standard of proof required in the Court of Claims?

A. Certainly didn't use the word that you just did. Not that I was afraid, but it was a, it was a professional judgment that, and I think I have been clear, that it is a sophisticated kind of an analysis. There is a high burden of proof required, and I made a determination that in particular because I had limited time that it would not be a good decision to go down that path.

Q. Now, you have, you have done that type of analysis in other cases, haven't you?

A. Not that I'm recalling.

Q. Okay. Were you ever instructed not to quantify the damage attributable to lost proceeds in connection with Fidelity's conversion?

A. No.

Q. Was the decision not to pursue such a claim for lost proceeds one that you came up with independently or after consultation with others?

A. This decision to not pursue that analysis was my decision.

Q. Were there any other reasons other than the ones that you just mentioned about it being a sophisticated analysis and having limited time? Are there any other reasons that persuaded you not to pursue such a claim?

A. No.

Q. How much time have you put into this case, Dr. Kaplan?

A. I really, I really don't know.

Q. Well, let me ask you, personally, how much time have you spent on this case?

A. I just said, I really don't know.

Q. How much time has your firm spent on the case?

A. I -- I can't -- I don't have an ability to keep track of how much time I spend on the many