# APPENDIX C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

ASTORIA FEDERAL SAVINGS :

AND LOAN ASSOCIATION, :

Plaintiff, : Court File No.

vs. : 95-468

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - x

**CERTIFIED COPY**

V O L U M E II

Continuation of the videotaped deposition of DR. DONALD M. KAPLAN, held at the offices of Department of Justice, 1100 L Street, N.W., Washington, D.C., commencing at 9:35 a.m., Tuesday, September 25, 2001, before Elizabeth Mingione, Notary Public.

BY MR. McCLAIN:

Q. Well --

A. I think I can articulate what my opinion is.

Q. Okay.

A. Generally without regard to particular language. But my opinion is that, um, the breach caused Fidelity to sell a portion of their Freddie Mac stock sooner than they otherwise would have in the nonbreach case.

Q. Okay. In Exhibit 9, did you make any attempt to back out the proceeds that Fidelity realized from that alleged premature sale of Freddie Mac stock?

A. No. Once again, just as our preceding discussion about another indiv [illegible] balance sheet line item, I have not done any detailed balance sheet analysis on any asset or any liability category in Exhibit 9. This is solely applying a growth rate to a starting total asset balance. That's all that's going on in Exhibit 9.

Q. Okay. If you could turn to paragraph 44, sir, in your report?

A. Yes.

Q. And if you could read that paragraph to

yourself and just let me know when you have finished, I'll have a few questions --

A. Yes.

Q. -- for you.

\- - -

(The witness reviews a document)

\- - -

A. Okay.

Q. Okay. We talked about this yesterday. You are not attempting to quantify your opinion that Fidelity likely would have raised a larger amount of capital through conversion?

A. That is correct. I have not undertaken to do that analysis.

Q. And do you anticipate that you will undertake to do so?

A. Um, as of, um, as of this morning, I do not anticipate that. Of course, my analysis is ongoing, and we haven't seen what the government has done. And so I really don't know what I might yet do.

Q. Well, have you taken any steps to quantify it?

A. No. As of now, I have done nothing.

Q. Okay.

A. In that regard.

Q. Now, have you explored whether the existence of -- in your first sentence there, Dr. Kaplan, says that irrespective of the breach, Fidelity would have converted during approximately the same general time frame. Do you see that, sir?

A. Yeah, I do.

Q. And I think the basis for your opinion is set forth in that paragraph?

A. In summary fashion, yes.

Q. Okay. Have you reviewed the complaint in this matter, sir?

A. Um, I -- I did at some point but it's been some significant time ago.

Q. Okay. Have you investigated the question, sir, of what the "but for" bank's capital ratios would have been in the absence of a conversion?

A. In the absence of the conversion.

Q. Without their conversion?

A. Um, well, we went through an exercise where I demonstrated how I have calculated the capital ratios. Um, I have, um, I haven't actually performed the calculation with the subtraction of the IPO proceeds, but that's simple to do.

Q. Okay.
A. But, and if you want, we could drag ourselves through that.
Q. That's okay. Did you review the appraisal of Fidelity in connection with its conversion?
A. Um, yes.
Q. Okay. The appraisal was performed by I think at the time it was Kaplan Smith Associates?
A. Um, hold on just a second. Um, I think that's incorrect.
Q. Okay. Well, my question to you is really did you have any involvement in that appraisal?
A. Of course.
Q. And what was your involvement, sir?
A. Well, um, I, as president of my company ultimately is responsible for all of the work product that the firm produced.
Q. Okay. Do you remember anything about what you did in connection with the appraisal of Fidelity?
A. Well, my standard practice is to review, um, work product before it's finalized. Um, it's been quite a few years now, obviously. But I am sure that I would have done that at the time.

Q. But do you remember specifically here today whether -- what your particular involvement was with respect to the Fidelity appraisal?

A. Well, I think I just said. My standard practice was to review, um, my practice has always been to work with the staff during the -- the conduct of analyses and to review preliminary drafts before they are finalized. But if you have something more specific in mind, that's a description of my general practice.

Q. But I'm asking if you remember anything other than that about the Fidelity appraisal?

A. Um, if you have something particular in mind that you could identify.

Q. I don't.

A. That might help me. But just as a general matter, nothing else comes to mind sitting here right now.

Q. Okay. How is goodwill on the balance sheet treated during the valuation process? How do you evaluate that?

A. Um, well, it is recognized as an intangible and it's -- it's not singled out, um, as a, um, a separate item getting -- that gets a chapter unto itself. But, uh, I guess the way I

would respond is that, um, goodwill has been on the balance sheets of nearly every thrift institution that my firm has appraised, which numbers some approximately 350 of them.

And so, um, it was in that sense there was nothing, uh, all that out of the ordinary about Fidelity. It's just one more example of a thrift that had goodwill in its balance sheet.

Q. You said in paragraph 44, sir, that Fidelity likely would have raised a larger amount of capital through a conversion because it not only would have had additional earnings from its additional assets, but also would have gone public as a well-capitalized company rather than a thrift that was dependent upon a successful conversion to achieve capital compliance?

What are you talking about, sir, when you talk about additional earnings from its additional assets? Are you talking about the same assets?

A. I'm talking about the lost profits.

Q. Okay.

A. I'm talking about Fidelity converting as a nonbreached company. And two major themes that I identify in this paragraph are the two themes we've spent our time on. As a nonbreach company, this

institution would have had a strong capital position, and it would have had lost profits, and it would have been that much more attractive to the marketplace, and it clearly would have raised, um, larger IPO proceeds than it did.

Q. In your experience, sir, is it relevant at all as to what a thrift's regulatory capital position is to when or whether it will convert?

A. It, on a case-by-case basis it may be relevant to some institutions and it may not be relevant to others.

Q. Was it relevant to Fidelity?

A. I don't know how else to answer this other than to sort of go back to what I said yesterday which is the thrift industry is, if it's nothing else, it's a highly regulated industry. And so, and capital is a central tenant of all of the regulation that goes on. So at some level of course it's relevant.

Um, I guess that's how I would answer you. It's relevant to all institutions, um, breached or nonbreached.

Q. Do you recall what the effect of the conversion had on Fidelity's regulatory capital position?

A. Well, from memory the only statistic that is just sort of on the tip of my tongue is that I believe, if I'm remembering correctly, they raised, um, 59 million in change of gross proceeds. And I think it turned out to be 57 million in change of net proceeds. That's the statistic that I do recall.

Q. And didn't that enable Fidelity to become well capitalized under the FDICIA standards?

A. It, approximately it did. That was, um, enough to improve its capital position. It also resulted in the -- the Capital Plan being --

Q. Lifted?

A. Lifted, if that's the right verb.

Q. And Fidelity -- did Fidelity resume growth?

A. It did.

Q. After? Okay.

A. It did.

Q. Did you undertake to determine whether Fidelity would have written off its goodwill prior to the conversion irrespective of whether it was contractual goodwill?

A. Um, I don't believe I did any analysis. Um, I think the -- the obvious point is that in the

nonbreach world that goodwill would have been valuable. And, um, I believe that the institution would not have written off something that had significant value to it.

Q. Okay. What value would it have had to Fidelity after the conversion?

A. It's additional capital that can be leveraged.

Q. But wasn't Fidelity well-capitalized after the conversion anyway?

MR. EISENHART: I think we are talking past each other here, Mr. McClain. I think Dr. Kaplan is talking about absent FIRREA a nonbreach world. And you are talking about the breach world.

THE WITNESS: That's correct. That's what I was talking about.

MR. EISENHART: Yes. But I think Mr. McClain was talking about a different world.

BY MR. McCLAIN:

Q. Well, Dr. Kaplan, you said that irrespective of the breach, Fidelity would have converted during approximately the same general time frame; correct?

A. That is -- that is right. What we know

as a factual matter is that essentially, um, with only less than a handful of exceptions, um, by that point, um, the majority of large mutual thrifts in New York, um, either had completed or were completing their conversions.

That was, um, a trend on a nationwide basis, um, that, um, I think is sort of undeniable that -- for all kinds of other reasons.

Q. Okay.

A. Not simply for augmenting capital, for other benefits.

Q. So in the "but for" world, Fidelity would have converted around the same time?

A. There's -- there's no doubt in my mind that in the "but for" world it would have.

Q. Okay. And I think we talked earlier about you said in the "but for" world that Fidelity would have been fully capitalized with --

A. Correct.

Q. -- supervisory goodwill?

A. Correct.

Q. My question to you is this. Did you -- and I think you have also said here that Fidelity would have raised a larger amount of capital through a conversion in the "but for" world?

A. Something larger than it did raise. I believe that but I haven't quantified it.

Q. Okay. And I'm asking you now is have you taken an opinion as to whether Fidelity would have written off its supervisory goodwill before its conversion if it knew that after its conversion --

A. I thought I just said no.

Q. Okay.

A. That -- I thought I said I believe it would not have.

Q. Right.

A. So I thought I answered that. Yes.

Q. You did, but I added another element to it which is that if you knew that Fidelity would have been well-capitalized even after the conversion?

A. Sure. That doesn't matter.

Q. Okay. Why does that not matter to you, sir?

A. Just means it would have had some -- some further leverageable capital.

Q. Okay.

A. So, I mean, if one looks out in the marketplace, lots of institutions run their operations at capital levels in excess of the