**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 95-468C<br>(Judge Wheeler) |

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Frank Eisenhart
*Counsel of Record*
Catherine Botticelli
Tara R. Kelly
Catherine Stahl

Dechert LLP
1775 I Street, N.W.
Washington, D.C. 20006
202.261.3306
202.261.3333 (Fax)

*Attorneys for Plaintiff*
*Astoria Federal Savings & Loan Association*

February 15, 2007

# TABLE OF CONTENTS


TABLE OF AUTHORITIES……………………………………………………………....................iii

INTRODUCTION………………………………………………………………………...1

CONTENTIONS OF FACT………………………………………………………………2

The Savings and Loan Crisis of the Early 1980s– Some Economic History……………...2

Fidelity New York, F.S.B…………………………………………………………………9

Suburbia Federal Savings and Loan Association………………………………………...10

Fidelity's Acquisition of Suburbia……………………………………………………….12

Operation of Fidelity Between 1984 and 1989…………………………………………..16

Fidelity's Capital is Decimated by FIRREA…………………………………………….20

Fidelity's January 1990 Capital Plan…………………………………………………….22

OTS Approval of the Capital Plan……………………………………………………….23

Life Under the Capital Plan……………………………………………………………...24

Fidelity Converts to a Stock Institution and Escapes the Capital Plan…………………..27

Merger with Astoria……………………………………………………………………...29

Astoria Files Suit Against the United States……………………………………………..30

CONTENTIONS OF LAW……………………………………………………………...31

I. Fidelity Is Entitled to Lost Profits………………………………………………..31

A. Fidelity's Lost Profits Were Foreseeable by the Parties When They Entered into the Contract………………………………………………...32

B. Fidelity's Lost Profits Were Proximately Caused by the Government's Breach…………………………………………………………………37

C. Fidelity's Lost Profits Are Established with Reasonable Certainty……...44

II. Fidelity Is Entitled to Restitution Damages to Restore It to Where It Would Have Been Had There Never Been a Contract……………………………………………50

III. Plaintiff Is Entitled to Wounded Bank Damages………………………………...53

IV. Plaintiff Is Entitled to Reliance Damages……………………………………..57

V. The Government's Actions Constitute a Taking of Fidelity's Property Rights Under the Takings Clause of the Fifth Amendment……………………………..62

A. Fidelity Had Valid and Enforceable Property Rights as a Result of Its Contract with the Government…………………………………………...63

B. The Government's Actions Constitute a Compensable Regulatory Taking……………………………………………………………………64

C. Plaintiff Is Entitled to Damages as a Result of the Taking of Fidelity's Property Without Just Compensation……………………………………67

CONCLUSION……………………………………………………………………………..68

# TABLE OF AUTHORITIES

## CASES

*Ambase Corp. v. United States*, 58 Fed. Cl. 32 (2003)…………………………………………..67

*American Capital Corp. v. United States*, 472 F.3d 859 (Fed. Cir. 2006)……………….50, 58, 61

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001)……32, 39, 44, 54

*Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995)……………………………………...67

*California Fed., F.S.B. v. United States*, 43 Fed. Cl. 445 (1999)…………………………...53, 57

*California Fed., F.S.B. v. United States*, 245 F.3d 1342 (Fed. Cir. 2001)………………..…34, 40

*California Fed., F.S.B. v. United States*, 395 F.3d 1263 (Fed. Cir. 2005)……………….39, 40, 44

*Castle v. United States*, 48 Fed. Cl. 187 (2000)…………………………………………………34

*Castle v. United States*, 301 F.3d 1328 (Fed. Cir. 2002)……………………………………...62

*Cinega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003)…………………………...64

*Citizens Fed. Bank, F.S.B. v. United States*, __ F.3d __, 2007 WL 162820 (Fed. Cir. 2007)…...38

*Citizens Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 507 (2004)…………………………….33

*Citizens Fin. Servs., F.S.B. v. United States*, 64 Fed. Cl. 498 (2005)………………………..33, 39

*Coast Fed. Bank F.S.B. v. United States*, 48 Fed. Cl. 402 (2000)……………………………….34

*Columbia First Bank, F.S.B., Inc. v. United States*, 60 Fed. Cl. 97 (2004)……………………...33

*Commercial Fed. v. United* States, 59 Fed. Cl. 338 (2004)……………………...32, 33, 34, 47, 48

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998)……………………………………………65

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)………………………...32

*First Fed. Lincoln Bank v. United States*, 73 Fed. Cl. 633 (2006)………36, 39, 41, 42, 43, 47, 48

*Glendale Fed. Bank, F.S.B. v. United States*, 43 Fed. Cl. 390 (1999)…………………………..34

*Glendale Fed. Bank, F.S.B. v. United States*, 378 F.3d 1308 (Fed. Cir. 2004)….44, 53, 54, 57, 61

*Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374 (Fed. Cir. 2001)…..…52, 57, 58, 60

*Glendale Fed. Bank, F.S.B. v. United States*, 54 Fed. Cl. 8 (2002) ……………………..54, 57, 58

*Globe Sav. Bank, F.S.B. v. United States*, 65 Fed. Cl. 330 (2005)………………………32, 39, 41

*Goldblatt v. Hempstead*, 369 US. 590 (1962)……………………………………………………66

*Hansen Bancorp, Inc. v. United States*, 53 Fed. Cl. 92 (2002)…………………………………..58

*Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297 (Fed. Cir. 2004)………………………..61

*Home Sav. of America, F.S.B. v. United States*, 57 Fed. Cl. 694 (2003)………………………...32

*Hughes v. United States*, 71 Fed. Cl. 284 (2006)……………………………………………44, 60

*Hughes Comm. Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001)………………....58

*Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed. Cir. 2001)…………………………58

*LaSalle Talman Bank, F.S.B. v. United States*, 64 Fed. Cl. 90 (2005)…………………..33, 36, 40

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003)……...…44, 50, 58

*LaVan v. United States*, 382 F.3d 1340 (Fed. Cir 2004)…………………………………………32

*Lingle v. Chevron*, 544 U.S. 528 (2005)……………………………………………………64, 65, 66

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960)……………………………………………44

*M&J Coal Co. v. United States*, 47 F.3d 1148 (Fed. Cir. 1995)…………………………………63

*Mobil Oil Exploration & Producing S.E., Inc. v. United States*, 530 U.S. 604 (2000)…………50

*NRG Co. v. United States*, 30 Fed. Cl. 460 (1994)……………………………………………68

*Nat'l Australia Bank v. United States*, 55 Fed. Cl. 782 (2003)…………………………………..63

*Old Stone Corp. v. United States*, 450 F.3d 1360, 1377 (Fed. Cir. 2006)………………………..58

*Penn Central Transp. Co. v. New York City*, 438 U.S.104 (1978)………………………64, 65, 66

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)……………………………………………65

*Precision Pine & Timber v. United States*, 72 Fed. Cl. 460 (2006)……………………………...32

*Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495 (2005)…………………………..63

*Seuss v. United States*, 74 Fed. Ct. 510 (2006)………………………………………………..39

*Slatterly v. United States*, 69 Fed. Cl. 573 (2006)……………………………………….44, 57, 58

*Southern Ca. Fed. Sav. & Loan Assoc. v. United States*, 57 Fed. Cl. 598 (2003)……………….54

*Southern Ca. Fed. Sav. & Loan Assoc. v. United States*, 422 F.3d 1319 (Fed. Cir. 2005)………55

*Stern v. Dunlap* Co., 228 F.2d 939 (10th Cir. 1955)……………………………………………...44

*System Fuels, Inc. v. United States*, 65 Fed. Cl. 163 (2005)…………………………………63, 64

*United States v. Winstar*, 518 U.S. 839 (1996)………………….……………………….30, 33, 34

*Westfed Holdings, Inc. v. United States*, 407 F.3d 1352 (Fed. Cir. 2005)……………….58, 59, 61

*Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577 (Fed. Cir. 1990)………………..68

## STATUTES AND RULES

Financial Institutions Reform, Recovery, and Enforcement Act, Pub. L. No. 101-73, 103 Stat. 183 (1989)…………………………………………………………………………………..20

Gran-St.Germain Depository Institutions Act of 1982, 12 U.S.C. § 266, Pub. L. No. 97-320……………………………………………………………………………………....6

## SECONDARY SOURCES

Arthur Linton Corbin, CORBIN ON CONTRACTS (2002)………………………………………35

Martin Lowy, HIGH ROLLERS: INSIDE THE SAVINGS AND LOAN DEBACLE, (1991)….……4, 5, 7, 8

E. Alan Farnsworth, FARNSWORTH ON CONTRACTS (3d ed 2004)………………………………40

RESTATEMENT (SECOND) OF CONTRACTS (1981)………...……………....31, 32, 50, 53, 57, 58, 61

RESTATEMENT OF THE LAW, RESTITUTION § 1………………………………………………50.

## INTRODUCTION

This action arises out of the 1984 acquisition by Fidelity New York, F.S.B. ("Fidelity") of Suburbia Federal Savings and Loan Association ("Suburbia"). Suburbia was a troubled thrift, teetering on the edge of insolvency, and the subject of deep regulatory concern. Fidelity was a moderately successful thrift that hoped to prosper by expanding its franchise.

Fidelity acquired Suburbia on October 31, 1984 in a supervisory merger, with the approval of the Federal Home Loan Bank Board ("FHLBB") and with assistance provided by the Federal Savings and Loan Insurance Corporation ("FSLIC"). Fidelity was permitted by regulators to book supervisory goodwill in the amount of $160 million as part of its accounting for the merger and to amortize that goodwill over 30 years. Without the goodwill, Fidelity would have been rendered insolvent by its merger with Suburbia. After the merger, Fidelity operated the merged institutions as a single entity under the Fidelity name.

With the passage of FIRREA in August 1989, Fidelity was deprived of the ability to count some $71 million of supervisory goodwill remaining from the Suburbia merger as regulatory capital, and Fidelity was rendered instantly insolvent. For the next three and one-half years, Fidelity struggled to survive under a highly conservative Capital Plan in an oppressive regulatory environment, while it sought to rebuild its capital account. Remarkably, Fidelity survived and was finally able, in 1993, to convert to a stock institution, selling sufficient stock to achieve capital compliance once again and to be free of the onerous Capital Plan.

While able to breathe again, however, Fidelity was far from vigorous. Its management concluded in late 1993 that Fidelity had been too wounded by its years under the Capital Plan to compete effectively with local institutions who had not been similarly hamstrung and who were

flush with cash from public offerings that were vastly more successful than Fidelity's had been. Management concluded that the only prudent course of action was to seek a buyer for Fidelity. They did so, and in 1994, Fidelity was acquired by Astoria, a local competitor.

Prior to its acquisition by Astoria, Fidelity's management had engaged counsel to investigate the filing of a lawsuit against the Government for the wrongful taking of Fidelity's capital. Subsequent to the merger, Astoria concluded that such a lawsuit had potential merit and that favorable developments in other *Winstar*-type cases warranted the filing of a claim. This action followed.

## CONTENTIONS OF FACTS

### The Savings and Loan Crisis of the Early 1980s– Some Economic History

The ills that beset the savings and loan industry generally, and Suburbia in particular, did not spring to life fully formed in 1984. To understand the forces that dragged Suburbia down, and which ultimately gave rise to this litigation, it is helpful to have some history.

On January 3, 1831, the Oxford Provident Building Association opened its doors in the Frankford section of Philadelphia. It was the Nation's first savings and loan association. A few months later the Association issued its first mortgage loan, in the princely sum of $500, to one Comly Rich for the purchase of a house at 4276 Orchard Street in Philadelphia.[1] Throughout the years that followed this humble beginning, the savings and loan industry was the engine that drove the American dream – ownership of one's own family home.

By its 150th anniversary, however, the savings and loan industry was an industry in crisis, the roots of which lie in part in the basic structure of the industry. Historically, S&Ls had always

---

1 Federal Home Loan Bank Board Journal Annual Report 1980, p. 2.

"borrowed short" and "lent long." They took in deposits which were considered "short-term money," since they could be withdrawn at any time at the election of the depositor. However, they lent out those deposits in the form of mortgages which returned a fixed rate of interest over a long (typically 30 years) period of time. Indeed, S&Ls were largely forbidden by law from long-term borrowing, just as they were largely forbidden by law from making anything other than long-term mortgage loans. The structural flaw of S&Ls was mandated by law.

For many years, however, this structural flaw was not problematic. Those who lend money typically demand a higher return when they lock up their funds for a long period of time, so long-term interest rates are usually higher than short-term interest rates. S&Ls could therefore earn a profit so long as interest rates either remained stable or did not rise too quickly. Their rate of return on the long-term mortgages would exceed the rate they had to pay to attract the short-term deposits needed to fund those mortgages. So long as this "spread" exceeded their operating costs, S&Ls would remain profitable. However, in the 1960s things began to change.

The Johnson Administration decided in the 1960s that America could afford both guns (the Vietnam War) and butter (the Great Society). The result was inflation and rising interest rates, just the scenario to play havoc with the structural flaw in the S&L industry. However, Congress thought it had the fix. In order to protect S&Ls from having to pay higher interest rates to attract deposits, Congress in 1966 instituted interest rate controls on savings deposits at all federally insured S&Ls. By putting a ceiling on the rates the S&Ls could pay to depositors, thereby eliminating any incentive for depositors to pull their funds and seek a higher return elsewhere, Congress in essence tried to allow the S&Ls to "borrow long" just as they "lent long." As a strategy, however, it would work only so long as the depositors who were earning the

capped interest rates (and who were thus bearing the cost of the entire arrangement) were content to leave their savings where they were.[2]

By the end of the 1970s it was clear that interest rate regulation no longer worked, if indeed it ever had worked. Inflation had driven interest rates well beyond the 5.5 percent cap on passbook accounts, and passbook savers were waking up and discovering that they had other options. By 1978, Treasury bills were paying over 9 percent, as were money market mutual funds, which had come into vogue in the 1970s. Money began to flow out of S&Ls. The regulators responded by letting S&Ls offer six-month Certificates of Deposit, with rates that floated a half percent over Treasury bills. While this helped stem the outward flow of funds, it substituted one problem for another. S&Ls were still locked in, on the asset side, to low-yielding, long-term, fixed rate mortgages. They could not afford to pay the market rates of interest required on the new CDs and still hope to earn a profit. Pertinent to this case, New York was one of the markets hardest hit. State usury laws kept down the rates S&Ls could charge to mortgage borrowers,[3] but sophisticated depositors quickly moved their savings to the higher yielding CDs. The S&Ls were caught in a squeeze.[4]

---

2 Martin Lowy, High Rollers: Inside the Savings and Loan Debacle, Praeger Publishers (1991), pp. 14-17. Of the various books written about the S&L crisis of the 1980s, books ranging from the tabloid sensational to the scholarly dense, Lowy's is probably the most readable and informative. Lowy, a New York lawyer, at various times represented banks and thrifts, as well as their trade associations and regulators. He also served from 1986 through 1989 as Vice-Chairman of a large New York bank.

3 Relief from state usury laws came in March 1980 when Congress passed the Deposit Institutions Deregulation and Monetary Control Act of 1980. Among other things it preempted state usury laws for residential mortgage loans. The Act also provided for a gradual phaseout of deposit interest rate regulation and gave S&Ls the power to offer NOW accounts and to make various types of consumer loans which carried higher rates of return than traditional mortgages. While these stabs at deregulation on both sides of

The final leg of the crisis fell into place in 1979 when Paul Volker, the new Chairman of the Federal Reserve, introduced a marked change in monetary policy. The Fed began to place less weight on controlling interest rates and more emphasis on shrinking the money supply to choke off inflation. The end result was highly volatile interest rates, which soared to new highs in 1980.[5] The prime rate increased sharply, reaching a record 20 percent in early April. After declining to a low point of 10.75 percent in July, it again surged upward to a new record 21.5 percent in December.[6]

Richard Pratt, Chairman of the Federal Home Loan Bank Board, described the situation in 1980 in these words:

> The behavior of the Nation's economy during 1980 can best be described as erratic. Continued inflation and unprecedented fluctuations in interest rates spelled difficult times for the savings and loan industry, times in which both the numbers of loans originated and the total earnings of the industry fell substantially. . . .
>
> The situation is exacerbated by the fact that most S&Ls carry a volume of seasoned low-yielding loans, carrying interest rates which were fixed in less inflationary times and which may have many years of life remaining. The ability of associations to function is being put to the test as they face competition for savings capital from money market funds, Treasury securities, and other investments yielding current market rates. Savers are more sophisticated; they shy away from accepting interest rates that are not competitive and do not keep pace with inflation. Deposit flows in the industry remain depressed, particularly in relationship to demands for housing credit."[7]

---

the balance sheet made good policy sense, they were too little, too late in terms of preventing the thrift industry crisis than soon ensued. *Id.* at pp. 19-20.

4 *Id.* at pp. 14-17.

5 *Id.*; Federal Home Loan Bank Board Journal Annual Report 1980, p. 6.

6 Federal Home Loan Bank Board Journal Annual Report 1980, p. 20.

7 *Id.*, p. 6.

These conditions began to take a toll on the Nation's S&Ls. In 1980, the FSLIC had to intervene in 11 institutions and was appointed conservator or receiver of insured savings institutions in five cases.[8] During the last seven months of 1981, the FSLIC was called upon to resolve 23 problem S&Ls with assets totaling $12.3 billion.[9]

The year 1982 started out looking bleak. Interest rates, which had begun to decline in the second half of 1981, spiked upward again, and during the first half of 1982 net operating losses of the S&L industry reached $3.2 billion. As Chairman Pratt noted in his 1982 Annual Report: "At that rate of decline, the virtual elimination of the S&L industry as a main provider of financial services became more than a theoretical possibility."[10] Relief came in the second half of 1982, with lower inflation and a dramatic downturn in interest rates. This reversed the trend, and by December the industry as a whole was again profitable (though industry losses for the year were about $1.5 billion).[11]

While the 1982 decline in interest rates allowed short-run survival, longer term survival was addressed through the passage of the Garn-St.Germain Act.[12] This Act removed all federal and state law restrictions on the conversion of mutual thrifts to federal stock S&Ls.[13] Between 1983 and 1989, over 300 mutual S&Ls insured by the FSLIC converted to stock form and raised an aggregate of $5 billion of new capital – an amount greater than the whole industry's tangible

---

8 *Id.*, pp. 12-14.

9 Federal Home Loan Bank Board 1981 Annual Report, p. 8.

10 Federal Home Loan Bank Board Annual Report 1982, pp. 4, 19.

11 *Id.*, p. 4.

12 *Id.*

13 Gran-St.Germain Depository Institutions Act of 1982, 12 U.S.C. § 266, Pub. L. No. 97-320.

capital in 1982. More significantly, however, the Act also gave expanded powers to S&Ls to make commercial loans, commercial real estate loans and consumer loans.[14] These new powers, it was hoped, would add zest in the form of higher rates of return to the asset side of the S&L balance sheet. Other measures intended by the FHLBB to relieve the pressure on undercapitalized S&Ls included the Appraised Equity Capital rules, which allowed thrifts to count as part of their capital the appraised equity in buildings owned by the thrift, various new rules regarding amortization of loan premiums, discounts and credits and the treatment of gains and losses in the sale of real estate,[15] and Net Worth Certificates, which allowed an institution with less than three percent capital to secure promissory notes from the FSLIC that it could then use to raise its regulatory capital level sufficiently to allow it to stay in business.[16]

Interest rates continued their decline during the early part of 1983, and there seemed to be cause for optimism. The industry was again profitable, S&Ls were growing, and the number of S&L failures was down sharply from the prior year.[17] However, despite the rosy overall outlook, trouble persisted in the bottom half of the industry. Fifty percent of S&Ls lost money overall in 1983, and 35 percent lost money in the second half of 1983, when the positive impact of declining interest rates should have been fully recognized.[18] The industry's profits, it turned out, were not coming from operations. The industry's spread for the year was a mere 130 basis

---

[14] Lowy, *supra* note 2, at p. 49-50.

[15] Federal Home Loan Bank Board Annual Report 1982, p. 4.

[16] Federal Home Loan Bank Board 1984 Annual Report, p. 6.

[17] Lowy, *supra* note 2, at p. 59.

[18] *Id.* at p. 61.

points – not enough to cover operating expenses. The profits, it turned out, were coming from the sale of loans and securities that had appreciated when rates came down.[19]

The FSLIC was required in 1983 to resolve 53 problem institutions, with assets totaling $17.6. This represented almost 37 percent of all assets ever resolved up to that time with FSLIC assistance. In six of these institutions, the FSLIC was required to appoint itself as Receiver to liquidate the institution and transfer its assets to other institutions. This represented a third of all insurance settlement cases in the FSLIC's history up to date.[20] Indeed, by the end of 1983, the number of institutions that were insolvent under regulatory accounting principles ("RAP") was back to about what it had been at the end of 1982, and 900 institutions, with $263 billion in assets (almost a third of the industry), had under 3 percent net worth according to generally accepted accounting principles ("GAAP").[21] So, while 1983 had seemed on the surface to be a good year, in reality it had been anything but.

Thrifts grew in 1984 at their fastest pace since the early 1950s. Taking advantage of deregulation and using their new powers acquired under the Garn-St.Germain Act, thrifts increased both deposits and borrowings and used these funds to significantly expand their asset base. Unfortunately, many of these assets proved to be substandard, and many thrifts were unable to manage effectively their rapid growth. In the process of increasing their assets, many thrifts increased their credit risk by lowering underwriting standards. Overall, thrift industry profitability declined in 1984, proving both the fragility of the industry's recovery from the large

---

[19] *Id.*

[20] 1983 Federal Home Loan Bank Board Annual Report, pp. 17-18.

[21] Lowy, *supra* note 2, at p. 61.

operating losses of 1981 and 1982 and the industry's continued vulnerability to increases in market interest rates.[22]

As thrifts tried to use their new powers to grow their way out of the hole, the FSLIC began to see increasing numbers of institutions with asset quality problems in addition to the interest rate imbalance problems common throughout the early 1980s. As a result, the FSLIC was in 1984 forced to place nine institutions – a third of all the problem cases resolved in 1984 – into liquidating receiverships. Together with the six such receiverships instituted in 1983, these 15 cases equaled the total number of liquidating receiverships in FSLIC's entire previous history.[23]

Such then was the history of America's savings and loan industry in the time periods relevant to this lawsuit. Against this backdrop, let us now look at the institutions directly involved in this litigation.

**Fidelity New York, F.S.B.**

Fidelity was founded in 1924 as Floral Park Co-operative Savings and Loan Association, a New York chartered co-operative association, headquartered in Floral Park, a Long Island suburb of New York City. It converted to a federal charter in 1934 and, after a series of name changes, came, in 1986, to be known as "Fidelity New York, F.S.B."[24] As of 1984, Fidelity had 8 branches, 6 in Nassau County and 2 in New York City. As of June 30, 1984, Fidelity had

---

22 Federal Home Loan Bank Board 1984 Annual Report, p. 7.

23 *Id.*, p. 23.

24 Fidelity Subscription Offering Circular (Mar. 24, 1993), AST064170-318, at AST064189.

assets of $475.2 million and net worth of $21.4 million or 4.5% of assets. Its net income for the six months ending June 30, 1984 was $2.4 million.[25]

Historically, Fidelity, like most thrifts, had operated as a financial intermediary, taking in deposits from members of its community, and lending those back in the form of long-term, fixed-rate mortgage loans. By the early 1980s, it had become apparent that such a strategy was problematic in an era of deregulation and volatile interest rates. Fidelity therefore began to diversify its loan portfolio into a more interest-rate sensitive portfolio of one-to four-family adjustable rate mortgages and, to a lesser extent, prime rate multi-family, commercial real estate loans, and construction loans.[26]

**Suburbia Federal Savings and Loan Association**

Suburbia was a federally chartered mutual association founded in 1935 as Lynbrook Federal Savings and Loan Association. It was headquartered in Garden City, another Long Island suburb of New York City, and it had 12 branches, 7 in Nassau County and 5 in Suffolk County.[27]

Suburbia had been a supervisory concern to the Federal Home Loan Bank of New York ("FHLB-NY") since 1981 because of continuing losses caused by high interest rates. Suburbia experienced the classic interest rate mismatch between returns on its portfolio of fixed-rate, long term mortgages and its cost of funds.[28] Between July 1, 1981 and June 30, 1984, Suburbia had

---

[25] FHLB-NY S-Memorandum (Oct. 5, 1984), AA 0000193-208, at AA 0000193.

[26] Fidelity Subscription Offering Circular (Mar. 24, 1993), AST064170-318, at AST64189-90.

[27] FHLB-NY S-Memorandum, (Oct. 5, 1984), AA 0000193-208, at AA 0000198.

[28] FSLIC I-Memorandum (Oct. 15, 1984), AA0000177-81, at AA 0000177.

sustained operating losses totaling $37.5 million.[29] Suburbia's asset portfolio was mainly thirty-year single family mortgage loans.[30]

As of June 30, 1984, Suburbia had assets of $656.1 million and a regulatory net worth of $3.5 million or 0.5 % of assets.[31] By August 1984, Suburbia's assets had grown to $696 million, but its net worth had declined to $1.8 million, a mere 0.25 % of assets. However, even that miniscule capital level overstated Suburbia's true condition. Suburbia's net worth included $5.0 million of Appraised Equity Capital and $9.2 million of Net Worth Certificates. Without these, Suburbia's net worth was a negative $12.4 million or negative 1.8 % of assets.[32] Taking into account as well deferred losses of $44.2 million, Suburbia would have had a $55 million capital deficit.[33] On June 30, 1984, Suburbia had a $360 million negative gap position for the upcoming year, meaning that its maturing liabilities in that year would exceed its maturing assets by $360 million.[34] The regulators recognized that Suburbia's management was making an effort to lessen this negative gap by restructuring assets and reducing interest rate risk. However, their ultimate

---

29 FHLB-NY S-Memorandum (Oct. 15, 1984), AA 0000193-208, at AA 0000193.

30 Deposition, Andrew Kane, Jr. (July 27, 2000), pp. 16-17. Suburbia did attempt in the early 1980s to do some consumer lending, because these loans carried higher interest rates and were of shorter duration than mortgage loans. However, it met stiff competition in this area from commercial banks, and the results of the program were disappointing. *Id.* at pp. 63-64.

31 FHLB-NY S-Memorandum (Oct. 15, 1984), AA 0000193-208, at AA 0000193.

32 FSLIC I-Memorandum (Oct. 15, 1984), AA0000177-81, at AA 0000177.

33 FHLB-NY S-Memorandum (Oct. 15, 1984), AA 0000193-208, at AA 0000193.

34 *Id.*, at AA 0000194.

conclusion was that "Suburbia's impaired financial condition present[ed] a seemingly insurmountable obstacle to successful completion of this goal."[35]

Brent Beesley, who headed up the FSLIC in the early 1980s, testified in his deposition, and is expected to testify at trial, that the regulators could not indefinitely postpone dealing with an institution whose capital was depleted. Once an institution's capital approached zero ("I don't think we actually ever let an institution get to zero"), it was incumbent on the regulators to act.[36] As noted, by August 1984 Suburbia's regulatory capital had fallen to 0.25 percent of assets, only 25 basis points above zero, and if one were to strip away its Net Worth Certificates and Appraised Equity Capital, Suburbia's capital position was decidedly negative. Clearly the regulators were at the point where they had to take action with respect to Suburbia.

**Fidelity's Acquisition of Suburbia**

The FHLB-NY had urged Suburbia as early as 1981, in light of its operating deficits and depleted net worth, to try to find a merger partner or an investor capable of making a major capital infusion.[37] None could be found.[38] Andrew Kane, Suburbia's Chairman and CEO in the early 1980s, recalled that potential investors did not see a way Suburbia could become a profitable venture so long as interest rates stayed high.[39] Plaintiff will prove at trial that even falling interest rates, such as were experienced in 1982 could not have saved Suburbia, so deep was the hole in which it found itself.

---

35 *Id.*

36 Deposition, Horace Brent Beesley (July 26, 1999), pp. 33-34.

37 FHLB-NY S-Memorandum (Oct. 15, 1984), AA 0000193-208, at AA 0000198.

38 Deposition, Andrew Kane, Jr. (July 27, 2000), pp. 39-40.

39 *Id.*

The FSLIC held a bidder's conference for Suburbia on December 20, 1982. At the conference, information packets giving details about Suburbia were given to 22 institutions and individuals, and subsequent to the conference to an additional three potential acquirors. This resulted in proposals by four New York savings institutions to acquire Suburbia at a cost to the FSLIC ranging from $17.9 million to $33.9 million. However, because Suburbia had become eligible for capital assistance in the form of Net Worth Certificates, the regulators did not pursue any of these proposals.[40] The regulators thus opted for the "cheap fix." Rather than spend the money at the end of 1982 to merge Suburbia into another institution, the regulators opted simply to paper over its capital deficiencies. Another proposal to merge Suburbia was received in March 1983, but the regulators did not deem this proposal to be viable.[41]

In April 1984, Suburbia and Fidelity submitted a merger proposal to the regulators under the Voluntary Assisted Merger Program ("VAMP"). The FHLB-NY could not approve this proposal, because it required accounting forbearances, including supervisory goodwill, which could not be authorized at the district level. The proposal was therefore resubmitted as a request for an assisted supervisory merger to the FSLIC/FHLBB in Washington.[42]

In its evaluation of the Fidelity merger proposal, the FSLIC calculated that the cost savings to the Government over the present value liquidation cost was $131.9 million ($147.9 million present value liquidation cost minus $16 million cash assistance to Fidelity).[43] The

---

40 FSLIC I-Memorandum (Oct. 15, 1984), AA0000177-81, at AA 0000178.

41 *Id.*

42 *Id.*, at AA 0000178-79.

43 *Id.* at AA 0000180; FHLBB Institution Analysis 1984, WFZ009 0020-28, at WFZ009 0021.

FSLIC listed the alternatives to the Fidelity proposal as either liquidation, which it rejected as too costly, or soliciting other bids.[44]

Noting that Suburbia had incurred additional operating losses in excess of $10 million since 1982, the FSLIC concluded that soliciting additional bids or re-bids on Suburbia was not likely to result in proposals more favorable (less costly) than the Fidelity proposal.[45] Suburbia had already been extensively shopped, and the FSLIC thought there was no reason to believe that another bid, should one materialize, would be less costly than Fidelity's bid. There was additionally the risk that the Fidelity bid might come off the table in the meantime.[46]

Neither the FSLIC nor the FHLBB suggested or attempted to calculate the cost of any solutions for Suburbia other than the Fidelity merger or liquidation. The Department has a favorite shell game that it plays in the Goodwill litigation when it comes to comparing the actual cost of resolving a troubled institution to estimated liquidation costs. It has consistently maintained throughout the Goodwill litigation that the FSLIC never liquidated institutions, and that there were always alternative solutions for a problem institution other than liquidation (though it usually declines to say what these were or what they cost). Plaintiff expects the Department to repeat this mantra in this case. Plaintiff will prove at trial that the FSLIC did in fact liquidate institutions in the early 1980s. Plaintiff will also prove that the FSLIC regularly tracked its average actual cost of "resolving" problem institutions and compared this on both an absolute and a percentage basis to the estimated cost of liquidation. The Court will therefore

---

44 FSLIC I Memorandum (Oct. 15, 1984), AA0000177-81, at AA 0000180.

45 *Id.* at AA 0000178.

46 *Id.* at AA 0000180. Andrew Kane, Suburbia's Chairman, also agreed that by 1984 Suburbia had exhausted every possibility for raising capital other than the Fidelity merger. Deposition, Andrew Kane Jr. (July 27, 2000), pp. 39-40, 115.

have evidence available with which it can compare the cost of the Fidelity merger to both the FSLIC's calculated cost of liquidating Suburbia (the only alternative it considered in 1984) and to the FSLIC's actual cost of all resolutions of problem institutions in the relevant time periods.

Fidelity merged with (acquired) Suburbia as of 11:59 PM on October 31, 1984. The merger was deemed by the FHLBB in Resolution No. 84-582 to be for supervisory reasons. The FHLBB authorized $16 million of FSLIC cash assistance which could be booked as a direct credit to Fidelity's net worth, and it authorized any intangible assets resulting from the merger (goodwill) to be amortized over thirty years.[47] Fidelity put on its books supervisory goodwill from the Suburbia merger in the amount of $160,093,066.[48] The Resolution permitted Fidelity to accrete the loan discount over a thirty year period as well. However, Fidelity came back after the fact and asked that it be allowed to accrete the loan discount over the estimated life of the loans, i.e., according to Generally Authorized Accounting Principles ("GAAP"). The FHLBB approved this change, which it found to be less liberal than what it had been prepared to approve.[49]

The ability to book Suburbia's excess liabilities as supervisory goodwill and count that goodwill as part of its capital was an essential part of the deal as far as Fidelity, and its accountants at Peat, Marwick, Mitchell, and Company were concerned. Without it, the merger with Suburbia would have destroyed Fidelity.[50] The regulators felt the same way. One of the

47 FHLBB Resolution No. 84-582, (Oct. 25, 1984), WOF003 0481-82; Assistance Agreement (Oct. 31, 1984), AST122791-20.

48 Letter, Bruno Greco to Angelo Vigna (Oct. 30, 1989), WON730 0525-26.

49 Memorandum, Edward J. O'Connell, III to Angelo Vigna (Jan. 8, 1985), AA005 1754-55.

50 Deposition, Thomas Dixon Lovely (July 10-11, 2000), pp. 75-81.

officials at the FHLB-NY likened the thirty-year amortization period for the goodwill to buying a house with a thirty-year mortgage. Mr. Lovely recalled his words:

> "Mr. Lovely, you bought yourself a bank. You're gonna pay it off in a 30-year mortgage like a house and you've done the government a favor and you now have a new . . . bank."[51]

Mr. Lovely, who will testify at trial, will explain why he thought that made perfect sense.

**Operation of Fidelity Between 1984 and 1989**

Fidelity's Chairman and CEO at the time of the merger with Suburbia was Thomas Dixon Lovely. Mr. Lovely had an academic background and had joined Fidelity's Board in the 1970s. By 1980, he had become CEO of Fidelity.[52] Fidelity's President and COO was Bruno Greco. Both Mr. Lovely and Mr. Greco will testify at trial.

Mr. Lovely and Mr. Greco, with the encouragement of the regulators, embarked Fidelity on a program of commercial lending, including acquisition, development and construction loans on condominium and co-operative units. Fidelity encountered problems with some of these commercial loans, and it was eventually required by the regulators to establish sizable reserves against losses from these activities.[53]

Fidelity was not unique in this respect. Richard Pratt, who served as Chairman of the FHLBB from 1981 to 1983, and who will testify at trial, testified in his 1998 "common deposition" (and is expected to testify at trial) that there were two distinct problems that afflicted the thrift industry in the 1980s. The first was the interest rate mismatch in the early 1980s

---

[51] *Id.* at 76.

[52] *Id.* at 10-11.

[53] Deposition, Thomas V. Powderly (July 20, 2000), pp. 58-63.

between high-rate, short-term deposits and low-rate, long-term mortgages. The second occurred when a conscious effort was made by the Government to beef up the deposit base in the thrift industry in order to help thrifts "grow out" of their problems. This effort led the industry to grow from $600 billion at the end of 1982 to some $1.4 trillion by 1988 or 1989. However, Mr. Pratt noted, there were not enough quality assets to absorb this deposit growth, and the flood of money tended to depreciate the value of all assets to the point where even well-conceived and well-executed loans could face problems. So, in the late 1980s, many thrifts started to experience problems related to asset quality.[54]

Angelo Vigna, Fidelity's Principal Supervisory Agent at the FHLB-NY, who will also testify at trial, noted in his deposition that he had always had some reservations about the strength of Fidelity's management team and thought that Mr. Lovely and Mr. Greco needed to strengthen the senior management team.[55] In mid-1986, Fidelity added three new members to its senior management team, Thomas Powderly, William Wesp and Frederick Meyer.[56] Mr. Powderly had considerable commercial real estate experience and took over the running of Fidelity's real estate division, including supervision of Fidelity's troubled commercial loan and real estate portfolio.[57] Mr. Wesp came to Fidelity from another thrift where he had been Senior

---

54 Deposition, Richard T. Pratt (Dec. 2, 1998), pp. 143-45. *See also* Federal Home Loan Bank Board Journal Annual Report 1984, p. ii, where then FHLBB Chairman Edwin Gray discusses measures taken by the Board "to arrest the skyrocketing growth undertaken by too many institutions."

55 Deposition, Angelo A. Vigna (Aug. 2, 2000), p. 400.

56 Fidelity Subscription Offering Circular (Mar. 24, 1993), AST064170-318, at AST064190.

57 Deposition, Thomas V. Powderly (July 20, 2000), pp. 12-14.

Vice President and Investment Officer. He took over Fidelity's investment operations.[58] Mr. Meyer took over the retail side of the bank.[59]

Mr. Powderly determined, after reviewing the commercial loan portfolio, that Fidelity should cease commercial real estate lending, which had been hit hard by the Tax Reform Act of 1986.[60] As he will explain in detail at trial, once Mr. Powderly got the green light to implement this change, commercial loans were not renewed and developers with lines of credit were urged to go elsewhere. In addition to curtailing loan originations, Fidelity reduced its existing commercial loan portfolio from $370.9 million at September 30, 1986, to $207.9 million at December 31, 1989. They did this by discouraging loan renewals and selling loan participations.[61]

In the financial area, the key player was Mr. Wesp. He will explain at trial the strategy he conceived and implemented to rely less on the origination of mortgage loans and more on the purchase of those loans in the form of mortgage-backed securities. This was a means both of controlling the bank's credit risk and managing its interest rate risk. Buying mortgages "in bulk" in this fashion also offered Fidelity a way to deal with the intense competition in its geographic

---

58 Deposition, William E. Wesp (July 19, 2000), pp. 12-13.

59 Deposition, Fredrick J. Meyer (July 24, 2000), pp. 8-10. There initially was some overlap between Mr. Meyer and Mr. Powderly in the supervision of Fidelity's lending functions. This was eliminated in time, with Mr. Powderly taking on all responsibility for the commercial lending portfolios and Mr. Meyer retaining responsibility only for consumer lending. *Id.*; Thomas V. Powderly (June 20, 2000), pp. 69-71.

60 Thomas V. Powderly (June 20, 2000), pp. 27-28; Fidelity Subscription Offering Circular (Mar. 24, 1993), AST064170-318, at AST064190.

61 Fidelity Subscription Offering Circular (Mar. 24, 1993), AST064170-318, at AST064190.

area for origination of one- to four-family mortgage loans.[62] Mr. Wesp observed that there were times when he could buy AA rated or agency mortgage-backed securities with yields higher than those on mortgages originated in the local market.[63]

In October 1988, Fidelity adopted a Three Year Business Plan for 1989 to 1992.[64] This was put together by Messrs. Powderly, Wesp, and Meyer.[65] The plan called for "no quantum leaps forward, just steady growth." The salient points were:

- Increase capital, particularly GAAP capital.
- Grow the balance sheet at approximately 8 to 10% per annum.
- Reduce loan concentrations and increase credit quality.
- Increase return on assets to a stable 50 to 70 basis point range.
- No new lines of business and no untested earning streams.
- Reduce exposure to venture and commercial lending.
- $7.2 million in pretax capital gains from Freddie Mac stock.
- Increase of $10.5 million per quarter in Home Equity loans.
- Increase of $11.25 million per quarter in consumer lending.
- Reduce overhead and marketing expenses, with any consequent shortfall in asset growth to be made up by purchases of securities of like maturity, duration, and collateral.

62 *Id.* at AST064190-91.

63 Deposition, William E. Wesp (July 19, 2000), p. 116.

64 Fidelity Three Year Business Plan (Oct. 1988), AST056376-93.

65 Deposition, William E. Wesp (July 19, 2000), pp. 23-24.

- Regulatory net worth to increase to $122.7 million (5% of assets).
- GAAP net worth to increase from $33.4 million to $48.25 million from retained earnings.
- Deposits to grow 8.8% over the three years to $1.5 billion.
- Total borrowings, including FHLB borrowings, to grow to $794.48 million, 32% of liabilities.

Management noted that the biggest single risk to successful implementation of the plan was potential regulatory treatment of capital.[66] Mr. Powderly and Mr. Wesp will both testify that they were concerned about this as early as 1988 and anticipated in all of their planning that there would likely be some punitive treatment of supervisory goodwill.[67] They also began to be opportunistic in selling appreciated assets to bolster capital. This was all done in anticipation of what eventually emerged as FIRREA.[68]

**Fidelity's Capital is Decimated by FIRREA**

FIRREA was enacted on August 1, 1989; its implementing regulations took effect on December 6, 1989. At the stroke of the Governmental pen, Fidelity could no longer count $93 million of supervisory goodwill as regulatory capital.[69] Fidelity was instantly rendered capital

---

66 Fidelity Three Year Business Plan (Oct. 1988), AST056376-93, at AST056379.

67 Deposition, William E. Wesp (July 19, 2000), pp. 26-27., July 19, 2000; Deposition, Thomas V. Powderly (July 20, 2000), pp. 58-62, 196-97.

68 *See e.g.*, Deposition, William E. Wesp (July 19, 2000), pp. 26, 70; Deposition, Thomas V. Powderly (July 20, 2000), pp. 58-62.

69 Letter, Thomas Dixon Lovely to Walter Amend (Oct. 18, 1991), AST002747-59, at AST002747.

deficient and insolvent.[70] On December 6, 1989, Fidelity had regulatory capital of $125 million and GAAP capital of $62 million. The next day, as a result of FIRREA, it estimated that its tangible capital was negative $29.6 million, its core capital was negative $2.2 million, and its risk based capital was negative $2.2 million.[71] The Department has admitted in this litigation that the taking of Fidelity's capital related to the Suburbia acquisition by FIRREA was a breach of the contract Fidelity made with the FHLBB and FSLIC when it acquired Suburbia in 1984.

On February 2, 1990, Fidelity received formal notice from Angelo Vigna, now District Director of the new Office of Thrift Supervision ("OTS"),[72] stating that the agency considered Fidelity to be insolvent.[73] The letter notified Fidelity that it was now subject to heightened regulatory scrutiny and directed Fidelity to make no new loans or investments without the prior written approval of the District Director unless they fell within certain narrow guidelines.

Fidelity's only recourse was to submit a Capital Plan to OTS. If OTS approved the plan, Fidelity could continue to exist subject to the strictures of the plan. If OTS did not approve the plan, or if Fidelity did not comply with any aspect of an approved plan, Fidelity was subject to regulatory seizure and liquidation.[74]

---

[70] Letter, Angelo Vigna to Fidelity Board of Directors (Feb. 2, 1990), AST0704292-95; Fidelity Subscription Offering Circular (Mar. 24, 1993), AST064170-318, at AST064191.

[71] Fidelity New York, F.S.B., Capital Compliance Plan (Jan.1990), AST0705436-5624, at AST0705445.

[72] As part of FIRREA, OTS replaced the old FHLBB as the primary regulator of thrifts.

[73] Letter, Angelo Vigna to Fidelity Board of Directors (Feb. 2, 1990), AST0704292-95.

[74] Fidelity Subscription Offering Circular (Mar. 24, 1993), AST064170-318, at AST064193; Deposition, William E. Wesp (July 19, 2000), pp. 55-56.

**Fidelity's January 1990 Capital Plan**

Fidelity submitted its Capital Plan on January 3, 1990.[75] Mr. Wesp, who was the primary author of the Plan, will describe at trial the process by which it was put together and by which it was to be implemented. Fidelity's Capital Plan was a conservative, no-growth plan. It set very specific capital goals for each quarter for the next five years.[76] Fidelity would have to meet each and every one of those goals if it wanted to continue to operate. As Mr. Wesp noted, "the alternative was the extinction of the institution."[77]

The Capital Plan aimed to achieve capital compliance by the end of 1994 by retaining earnings while amortizing goodwill. The Plan projected no growth in early years and modest shrinkage of the balance sheet in 1993/94. Fidelity had reduced goodwill by over $90 million since 1985, and it projected an additional decrease of "$40 million over the plan period through amortization and earnings retention."[78]

The Capital Plan does at one point state that Fidelity would continue doing what it had been doing. The Department pounces on this one line and uses it to argue that Fidelity was in no way damaged by FIRREA and the loss of its capital – after all, says the Department, "it was going to keep right on doing what it had been doing." Even the most cursory comparison of the Capital Plan to Fidelity's pre-FIRREA Three Year Business Plan puts the lie to this argument.

---

[75] Letter, Thomas Dixon Lovely to Linda Mercurio-Swan (Jan. 3, 1990), enclosing Fidelity New York, F.S.B., Capital Compliance Plan (Jan.1990) and related documents, AST0705432-5624.

[76] *Id.* at AST0705453-57.

[77] Deposition, William E. Wesp (July 19, 2000), pp. 55-56.

[78] Fidelity New York, F.S.B., Capital Compliance Plan (Jan. 1990), AST0705432-5624 at AST0705437.

The Capital Plan was based on "zero growth and modest shrinkage."[79] Compare this to the pre-FIRREA Three Year Business Plan which called for Fidelity to "[g]row the balance sheet at approximately 8 to 10% per annum."[80] There are other significant differences as well, and Mr. Wesp, Mr. Powderly and others will address these differences in their trial testimony.

**OTS Approval of the Capital Plan**

Fidelity engaged in a dialogue with the OTS concerning its Capital Plan. On February 21, 1990, Fidelity provided OTS with some additional information, clarifying aspects of its Capital Plan. It did not expect any significant outflow of deposits, because its deposit base was fairly stable. It did not have brokered CDs[81] or significant amounts of jumbo CD's. Its contemplated sales of investments would result simply from taking a "value" approach to mortgage-backed securities, selling when there appeared to be significant value that might deteriorate over time. It noted that its portfolio was $950,000,000, and it was only budgeting $750,000 a quarter for income from sales of investment securities.[82]

Angelo Vigna, the newly appointed Northeast Regional Director of OTS, in fact, thought Fidelity might be a survivor. As early as May 1990, he sought to mitigate concerns expressed by

---

79 *Id.*

80 Fidelity Three Year Business Plan (Oct. 1988), AST056376-93 at AST056378.

81 Brokered Certificates of Deposit – CDs placed with an institution by an investment broker on behalf of customers – had become troublesome. They tended to fuel rapid deposit growth that sometimes resulted in lower quality investments. They were also "hot money" in that such deposits were purely rate-driven and could disappear as fast as they appeared. *See*, Chairman's Report of Edwin J. Gray, Federal Home Loan Bank Board Journal Annual Report 1985, p. iv.

82 Letter, Thomas Dixon Lovely to John Griffin (Feb. 21, 1990), INT01634-43 at INT01634-35.

the Federal Deposit Insurance Corporation ("FDIC")[83] about Fidelity's Capital Plan, a plan which he thought had a reasonable chance of success.[84] In his words, Fidelity was not "going to be doing anything that would create any additional losses and in fact, [was] on a monthly and quarterly basis actually reducing the deficit."[85] Fidelity's Capital Plan was approved by OTS on May 18, 1990.[86]

**Life Under the Capital Plan**

The letter from OTS approving Fidelity's Capital Plan outlined a series of exceedingly harsh restrictions on Fidelity's activities while the Plan remained in effect. For example, Fidelity could not:

- Without advance approval by the OTS District Director, engage in an activity not specifically allowed by the plan;[87]

---

83 As part of FIRREA, the FDIC, which had long insured national banks, absorbed the FSLIC and was now responsible for insuring S&Ls as well as banks. The FDIC did not know thrifts and did not particularly welcome its new role as the insurer of thrifts. This will become apparent from the testimony and documentary evidence concerning Fidelity's operation under the Capital Plan. The contrast between the supportive attitude of the OTS (which knew and understood thrifts) and the hostile attitude of the FDIC (which did not) is stark.

84 Letter, Angelo Vigna, to Nicholas Ketcha (May 21, 1990), WON732 1915-16; Deposition, Angelo A. Vigna (Aug. 2, 2000), pp. 413-14.

85 Deposition, Angelo A. Vigna (Aug. 2, 2000), p. 414.

86 Letter, Angelo Vigna to Fidelity Board of Directors (May 18, 1990), AST007677-89.

87 For example, if the plan said a certain type of loan would comprise 5 % of Fidelity's assets, it would be a "material violation" for Fidelity to exceed that planned percentage by more than 5 %, i.e., to allow that type of loan to exceed 5.25 % of its assets. *Id.*, at AST007678.

- Increase its assets in excess of the levels in the plan and in no event by more than interest credited;
- Make capital distributions;
- Pay executive officers and directors more than $900 per month without regulatory approval;
- Pay bonuses;
- Make or extend any loans secured by real estate;
- Make any commercial loans;
- Make any investments in real estate or equity securities;
- Enter into joint ventures or limited partnerships;
- Enter into any contract or purchase anything, even in the ordinary course of business, in excess of $10,000;
- Borrow money, except to maintain liquidity;
- Incur any material obligation or contingent liability not specifically permitted;
- Employ any new officers, directors or senior managers;
- Hire any employee whose employment was not terminable at will;
- Open any new branch office;
- Accept any uninsured deposits.

Manifestly, and as Plaintiff's witnesses will explain in some detail, this was not "business as usual." Indeed, Fidelity CFO (later President) Mr. Wesp would note in 1993, looking back on

the years of operation under the Capital Plan, "we had basically been out of business since '89."[88]

Life for Fidelity under the Capital Plan was made even more difficult by the harsh regulatory environment in which it operated. While Mr. Vigna was supportive and thought Fidelity had a good chance to be "a survivor,"[89] the same could not be said for his counterparts at the FDIC, which, after FIRREA, had backup regulatory authority over Fidelity. The FDIC urged OTS not to approve Fidelity's Capital Plan, expressing skepticism that Fidelity could generate sufficient earnings to make the plan work, and predicting that "the probability of near term failure [of Fidelity] is extremely high."[90] FDIC examiners (and OTS examiners too) regularly demanded huge reserves on prospective loan losses, putting severe strains on Fidelity's ability to generate profits and replace its depleted capital, and forcing Fidelity to sell assets (its home equity portfolio and investment securities, for example) to generate earnings. While these assets were profitable, they would have become even more profitable, and Fidelity would not have sold them when it did, but for the intense regulatory pressure.[91]

The FDIC was relentless. In an April 1992 letter, remarkable for its vindictive and petty tone, the FDIC notified Fidelity that it was considering revocation of Fidelity's deposit insurance, a virtual "death sentence" since without deposit insurance Fidelity would be out of business. The letter dismissed as irrelevant Fidelity's loss of $93 million of capital through FIRREA. It likewise dismissed as irrelevant the fact that Fidelity had met every one of its

---

[88] Deposition, William E. Wesp (July 19, 2000), p.150.

[89] Deposition, Angelo A. Vigna (Aug. 2, 2000), pp. 413-14.

[90] Letter, Nicholas Ketcha to Angelo Vigna (May 8, 1990), EAA005 2166-67.

[91] Deposition, Thomas V. Powderly (July 20, 2000), pp. 75-78, 87-88.

quarterly targets under the Capital Plan.[92] Mr. Vigna thought the FDIC position on Fidelity was "ultra-conservative" and wrong. He thought the threat to terminate deposit insurance was, to some degree, bureaucratic "cover" for the FDIC if things went wrong, but he had to take the threat seriously, because of the potentially dire consequences for Fidelity.[93] It took strong intervention by OTS at very senior levels to persuade the FDIC to back down.[94]

**Fidelity Converts to a Stock Institution and Escapes the Capital Plan**

One of the fundamental weaknesses of the thrift industry in the years leading up to the 1980s was the large number of mutual institutions and the capital weakness of those institutions. Mutual institutions were theoretically owned by their depositors. Unlike stock institutions that had the benefit of capital invested by their shareholders, mutuals had no source of capital other than retained earnings. Thrift regulators had consequently never required mutuals to have much in the way of capital, and those institutions consequently had little capital cushion to fall back on when problems arose.[95] One cure for this systemic weakness was to convert mutual thrifts to a stock form of ownership. Stockholders provided stock institutions with much-needed capital. Operation in stock form also provided opportunities for profit incentives to flow to thrift management. Mr. Pratt believed strongly that one of the ways to deal with the capital

---

92 Letter, Nicholas Ketcha to Fidelity Board of Directors, Fidelity (April 21, 1992), AST097644-66.

93 Deposition, Angelo A. Vigna (Aug. 2, 2000), pp. 427-30.

94 Letter, Angelo Vigna to John Downey (Jun. 2, 1992), WON736 0996-98; Letter, John F. Downey to John Stone (Aug. 5, 1992), WON736 0107-08.

95 Deposition, Richard T. Pratt (Dec. 2, 1998), pp. 22-26.

inadequacy of the thrift industry was to make it easier for mutual thrifts to convert to stock form.[96]

As Fidelity met or exceeded its Capital Plan goals and its tangible capital grew, its management began to look again at the possibility of converting from a mutual to a stock institution.[97] Fidelity had previously considered converting in the years prior to FIRREA, but problems in its commercial real estate portfolio and, later, the effects of FIRREA (on Fidelity in particular and the thrift industry in general) made conversion impossible.[98]

At its October 21, 1992 meeting, the Fidelity Board approved the retention of Merrill Lynch and Salomon Brothers as underwriters for a potential public offering and adopted a resolution directing the CEO and his designees to pursue the prospect of raising capital by converting from mutual to stock form. The resolution noted the capital impact of FIRREA and the fact that, even though Fidelity had successfully operated in accordance with its Capital Plan, it still found itself in need of additional capital.[99] At a special meeting on December 9, 1982, the Fidelity Board approved a Plan of Conversion.[100] The offering proceeded, and on May 3, 1993,

---

96 *Id.*

97 Deposition, Thomas V. Powderly (July 20, 2000), pp. 148-150; Deposition, William E. Wesp (July 19, 2000), pp. 100-02. OTS would not approve a capital plan that was dependent on conversion to achieve capital compliance. Deposition, William E. Wesp (July 19, 2000), p. 101. However, once OTS had determined that a capital plan was viable, as Fidelity's was, and once the institution had made good progress toward compliance, as Fidelity had, OTS would permit the institution to convert and use the infusion of capital from conversion to complete its goal of capital compliance. Deposition, Angelo A. Vigna, (Aug. 2, 2000), pp. 442-44.

98 Deposition, Thomas Dixon Lovely (July 10-11, 2000), pp. 123-25.

99 Minutes, Fidelity Board of Directors Meeting (Oct. 21, 1992), AST127673-79, at AST127678-79.

100 Minutes, Special Fidelity Board of Directors Meeting (Dec. 9, 1992), AST127683-85.

Fidelity converted from mutual to stock form. It issued 5,170,839 shares of common stock at $11.50 per share, raising over $57 million of new capital.[101]

On May 14, 1993, Angelo Vigna advised Fidelity that, as a result of the successful public offering, Fidelity was now considered "well capitalized" under the capital regulations, and the Capital Plan and all related operating restrictions were terminated.[102]

**Merger with Astoria**

Although Fidelity had survived, emerged from under its Capital Plan, and achieved "well capitalized" status under regulatory guidelines, it was not a strong company, certainly not as strong as it would have been absent the breach. Shortly after Labor Day 1993, Mr. Powderly, Mr. Wesp and Mr. Meyer met in Fred Meyer's office to talk about where the company ought to go. Fidelity now had capital, but it did not have much excess capital. It was an institution that for more than three years had been severely precluded in its operations, to the point of being virtually non-functioning. It operated in a highly competitive environment, and its management could look at local institutions, such as Astoria, that had had highly successful public offerings and were flush with cash. The three, who now were Fidelity's senior management,[103] did not

---

101 Fidelity Proxy Statement (Nov. 16, 1994), AST0732630-722, at AST0732637; Deposition, Angelo A. Vigna (Aug. 2, 2000), pp. 444-45.

102 Letter, Angelo Vigna to Fidelity Board of Directors (May 14, 1993), AST000082; Deposition, Angelo A. Vigna (Aug. 2, 2000), pp. 444-45.

103 Mr. Lovely and Mr. Greco had resigned prior to 1993.

believe Fidelity could compete in that market. They determined that day that the only way to maximize value for Fidelity's shareholders was to sell the company.[104]

Aided by Salomon Brothers, Fidelity began to explore merger possibilities. In June 1994, Powderly reported to the Board on merger possibilities, and the Board authorized him to explore these further and bring a proposition to the Board.[105] This culminated in an announcement on July 13, 1994 that Fidelity would be acquired by Astoria for $29 a share, approximately a $160 million transaction.[106]

**Astoria Files Suit Against the United States**

During the negotiations, Mr. Powderly and Salomon Brothers urged Astoria to consider the value of Fidelity's supervisory goodwill claim against the Government.[107] Astoria declined to ascribe any specific value to that claim, because at that time, well before the Supreme Court's 1996 ruling in the *Winstar*[108] case, they did not know how to value it.[109] Astoria was well aware

---

[104] Deposition, William E. Wesp (July 19, 2000), pp. 150-52. Mr. Powderly was willing for Fidelity to be either a Buyer (of another institution) or a Seller (of Fidelity), whichever made sense from the standpoint of maximizing shareholder value. However, given Fidelity's still weak capital position, he realized that Fidelity was in no position to be a Buyer, and, unless it could negotiate a merger of equals, it would have to be a Seller. If Fidelity still had the capital that was taken from it by FIRREA, it would have been a very different story; Fidelity could then have been a Buyer. Deposition, Thomas V. Powderly (July 20, 2000), pp. 172-77, 193-95.

[105] Minutes, Fidelity Board of Directors Meeting (Jun. 22, 1994), AST127814-17, at AST127816-17.

[106] Press Release, Astoria Financial Corporation (Jul. 12, 1994), AST037675-77.

[107] Deposition, Alan Eggleston (May 24, 2000), pp. 123-26.

[108] *United States v. Winstar Corp.*, 518 U.S. 839 (1996).

[109] Deposition, Christopher Quackenbush (Aug. 7, 2000), pp. 28-29; Deposition, Alan Eggleston (May 24, 2000), pp. 135-36.

of the potential claim, however, and it knew Fidelity had engaged outside counsel to monitor the goodwill litigation and to advise Fidelity on the time constraints for filing a claim.[110] The fact that Astoria did not try to assign value to the goodwill claim in the course of the merger negotiations did not mean that Astoria viewed the claim as valueless.[111] Astoria filed this action, asserting Fidelity's supervisory goodwill claim, on July 21, 1995.

## CONTENTIONS OF LAW

Three types of contractual damages are potentially available to a party injured by a contract breach: (1) **expectancy damages**, the amount representing the benefit of the bargain, which is intended to put the injured party in as good a position as it would have been in had the contract been performed; (2) **restitution damages**, the amount which is intended to restore to the injured party of any benefit that it has conferred on the other party; and (3) **reliance damages**, the amount representing reimbursement for loss caused by reliance on the contract which is intended to put the injured party in as good a position as it would have been in had the contract not been made."[112]

### I. Fidelity Is Entitled To Expectancy Damages in the Form of Lost Profits.

Damages for lost profits are recoverable where the plaintiff demonstrates that: (1) the loss was the proximate result of the breach; (2) the loss of profits resulting from the breach was

---

110 Deposition, Alan Eggleston (May 24, 2000), pp. 123-136; *see also* Deposition, William E. Wesp (July 19, 2000), pp. 10-11.

111 Deposition, Alan Eggleston (May 24, 2000), p. 149.

112 RESTATEMENT (SECOND) OF CONTRACTS § 344 (1981), *quoted in Globe Savings Bank, F.S.B. v. United States*, 65 Fed. Cl. 330, 345 (2005) (internal quotations omitted).

foreseeable; and (3) the damages can be proved with reasonable certainty.[113] Under recent Court of Federal Claims and Federal Circuit case law, Plaintiff's lost profits were foreseeable, reasonably certain, and proximately caused by the Government's admitted breach.

### A. Fidelity's Lost Profits Were Foreseeable By The Parties When They Entered Into The Contract.

According to the standards established by the Court of Federal Claims and the Federal Circuit, damages are foreseeable if they "follow from the breach of contract in the ordinary course of events" or if they are the result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.[114]

"The rule does not require that anything should have been foreseeable to a dead certainty; seldom can anything be predicted with such assurance as that. The rule merely requires that the injury must be one of such a kind and amount as a prudent person would have realized to be a probable result of the breach."[115] It is sufficient to prove that the loss was foreseeable as a probable—rather than as a necessary—result of the defendant's breach. *Id.* Whether or not lost

---

113 *Globe Savings Bank, F.S.B. v. United States*, 65 Fed. Cl. 330 (2005); *Commercial Fed. v. United States*, 59 Fed. Cl. 338, 34 (2004); *La Van v. United States*, 382 F.3d 1340, 1351 (Fed. Cir. 2004) (quoting *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed. Cir. 2002) (citing *Bluebonnet Sav. Bank, F.S.B. v United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001)).

114 *LaSalle Talman Bank, F.S.B. v. United States*, 64 Fed. Cl. 90, 98 (2005); *Home Sav. of America, F.S.B. v. United States*, 57 Fed. Cl. 694, 706 (2003); and *Globe Sav.*,65 Fed. Cl. 330, 347 (2005) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 351(2)(1981)).

115 *Precision Pine & Timber v. United States*, 72 Fed. Cl. 460, 480 (2006) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 351 comment a, and 11 CORBIN ON CONTRACTS § 56.7)).

profits were within the contemplation of the parties at the time of the contract depends on the facts of each case.[116]

The Supreme Court, in its *Winstar* decision, described the use of supervisory goodwill as "essential" and "indispensable" to the acquisition of an insolvent thrift by a healthy thrift.[117] The reason for this is obvious. Without the use of supervisory goodwill to bolster its capital, the acquiring institution would instantly be dragged down and rendered insolvent by the debts of its unhealthy acquiree. The Court of Federal Claims has found that the foreseeability requirement is satisfied where regulators knew or should have known that a bank intended to leverage its supervisory goodwill and capital credit.[118] The breaching party need not have foreseen the breach itself. It is sufficient that it recognized the potential for damage if there *were* a breach. That potential, as the Supreme Court observed, is inherent in a supervisory goodwill case.

The Court of Federal Claims and the Federal Circuit agree that Government regulators expected thrifts to profit from the use of supervisory goodwill on their books after government-assisted mergers.[119] It was the use of goodwill as capital which would allow the acquiring thrift to invest and leverage its earnings to grow and earn additional profit. In the *Commercial Federal* case, for example, the court held that it was "foreseeable that as a result of the elimination of

---

116 *Columbia First Bank, F.S.B. Inc. v. United States*, 60 Fed. Cl. 97, 105 (2004); *Citizens Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 507, 514, 519 (2004).

117 *Winstar*, 518 U.S. at 839, 849,850, 891-903 and footnote 52.

118 *Citizens Fin. Servs., F.S.B. v. United States*, 64 Fed. Cl. 498, 504 (2005). "So long as the government had reason to know that Citizens intended to leverage its supervisory goodwill and capital credit, it had reason to know that if Citizens' supervisory goodwill and capital credit were taken away that Citizens would lose potential profits from leveraging that capital."

119 *LaSalle Talman Bank, F.S.B. v. United States*, 64 Fed. Cl. 90, 98 (2005); *Commercial Fed.*, 59 Fed. Cl. at 354-55.

goodwill from regulatory capital, plaintiff would need either to replace the supervisory goodwill with another form of capital or shrink its assets to maintain its capital cushion. These consequences were not only foreseeable, they were a basic reason for the enactment of the breaching provisions of FIRREA."[120]

The Supreme Court in *Winstar* noted that supervisory goodwill "allow[ed] the thrift to leverage more loans (and it hoped, more profits)."[121] Acquiring institutions could thereby "replace the amortizing goodwill and, ultimately, make the whole enterprise profitable."[122] Because the stated objective was to restore failing thrifts to profitability, "the government cannot credibly maintain that the potential for profit, without which plaintiffs would have had no incentive to complete the deal, was not within its contemplation."[123] Thus, the Federal Circuit held, "Profits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages."[124]

The Department argues that Fidelity's lost profits were not foreseeable, because neither the "magnitude nor the type of damages was in the contemplation of the parties at the time of the contract." [125] This reflects a basic misunderstanding about the requirement of forseeability and

---

[120] *Commercial Fed.*, 59 Fed. Cl. at 354.

[121] 517 U.S. at 851 (citations omitted).

[122] *Glendale Fed. Bank v. United States*, 43 Fed. Cl. 390, 394 (1999).

[123] *Castle v. United States*, 48 Fed. Cl. 187, 205 (2000), *aff'd in part, rev'd in part*, 301 F.3d 1328 (Fed. Cir. 2002); *see generally Coast Fed. Bank F.S.B. v. United States*, 48 Fed. Cl. 402, 425 (2000).

[124] *California Fed., F.S.B. v. United States*, 245 F.3d 1342, 1359 (Fed. Cir. 2001) (citations omitted).

[125] Defendant's Supplemental Brief in Support of its Motion for Summary Judgment Upon Plaintiff's Damages Claims, June 15, 2000, p.17.

the use of lost profits as a remedy. There is no requirement -- not in black-letter contract law and not in *Winstar*-related case law -- that the parties have envisioned and contemplated the precise consequences of a breach. Corbin notes:

> The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefore in case of breach. It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in the contemplation of the parties at the time they made the contract."[126]

According to Mr. Lovely, Fidelity's Chairman at the time of the merger with Suburbia, the Regulators knew full well that it was critical to reinforce Fidelity's capital with supervisory goodwill and that the absence of that goodwill would doom Fidelity. Mr. Lovely told in his deposition how the Regulators spelled out to him the importance of supervisory goodwill and the fact that, without it, Fidelity would be rendered insolvent: "They said you're gonna bring Fidelity down if you merge with [Suburbia] without the supervisory goodwill."[127] The Regulators knew that the use of supervisory goodwill to bolster capital would allow Fidelity to keep its doors open, which would in turn allow it to make a profit and then use those earnings to grow and prosper, gradually paying off the goodwill over time. Just as they could contemplate the importance of goodwill in allowing Fidelity to earn profits, the Regulators could contemplate how the loss of the goodwill could deprive Fidelity of the ability to earn profits. Whether they ever so contemplated is not the test. The important thing is that they could and should have so contemplated.

---

126 Arthur Linton Corbin, CORBIN ON CONTRACTS § 1009, at 66 (2002).

127 Deposition, Thomas D. Lovely (July 10, 2000), p. 75.

This Court has acknowledged that lost profits arising from the dissolution of supervisory goodwill is foreseeable in cases similar to Fidelity's. The *First Federal Lincoln* court, for example, held that

> "it was therefore foreseeable that as a result of the elimination of supervisory goodwill from regulatory capital, [the acquiring thrift] would need to either replace the supervisory goodwill with another form of capital or shrink its assets to improve its capital position, in order to be as well off as it would have been had the contract been fully performed."[128]

This is not rocket science. If an institution is fully capitalized, it can take its earnings and invest them to grow (obtain more assets) and prosper (earn more profits). However, if a portion of its capital is suddenly taken away, the institution now has to retain earnings (earnings it would otherwise invest) to replace the lost capital, and if it remains capital deficient, it might have to shed assets and shrink in size until its depleted capital equals the required percentage of assets. Loss of capital equals the loss of opportunity to earn profits. It is really that simple.

FIRREA's elimination of supervisory goodwill caused many acquiring thrifts to fall out of capital compliance. It was foreseeable that Fidelity would fail to meet minimum capital requirements if its ability to use supervisory goodwill as capital was eliminated, requiring it either to sell off profit-earning assets or to forego profit-making opportunities. "It should have been equally foreseeable to the parties at the time they entered into these agreements that curtailment of supervisory goodwill could render the thrifts noncompliant with capital requirements, and . . . either put them out of business altogether or shrink their operations."[129]

---

[128] *First Fed. Lincoln Bank v. United States*, 73 Fed. Cl. 633, 650 (2006).

[129] *LaSalle Talman*, 64 Fed. Cl. at 89.

When the Government breached its contract and took away a substantial portion of Fidelity's capital, Fidelity was instantly capital deficient and insolvent. It could keep its doors open only by special agreement with the Regulators – an agreement which was spelled out in its Capital Plan. Fidelity could not grow. It had to retain all of its earnings to replace its lost capital. Fidelity's inability to use these earnings to grow and earn profits lies at the very heart of its "lost profits" claim.[130] There is nothing about this claim that was unforeseeable, just as there is nothing about it that is speculative. Fidelity was harmed in precisely the way the Regulators could and should have contemplated it would be harmed when they made their contract with Fidelity in 1984.

### B. Fidelity's Lost Profits Were Proximately Caused By The Government's Breach.

Just as it is clear that lost profits were a foreseeable consequence of Fidelity's loss of the ability to use supervisory goodwill as capital, it is equally clear that the lost profits Fidelity claims were proximately caused by the Government's admitted breach and the loss of capital that resulted from it.

#### 1. The Causation Standard Applicable To Fidelity's Case Should Include At Least Some Element Of A "Substantial Factor" Standard.

---

[130] William Wesp, Fidelity's CFO and later its President testified in his deposition: "So clearly, if left to our own devices in the early 1990s, if we had the kind of capital that we would have retained if FIRREA didn't show up, we would have leveraged the balance sheet more." Deposition, William E. Wesp (July 19, 2000), pp. 72-73. Growth through leverage and additional profits was part of Fidelity's plan, and that growth did not occur because of the Government's admitted breach of contract.

The Federal Circuit has recently stated that the "but-for", "substantial factor", and "definitely established" causation standards are all appropriate in *Winstar* cases for evaluation of the causal link between the breach of contract and lost profits. The Court wrote:

> "There have been a number of *Winstar*-related cases in which this court, in sustaining the Court of Federal Claims' award or rejection of lost profit damages, approved that court's use of the "but-for" theory of causation. We do not read those cases, however, as announcing any broad rule that the "but-for" theory of causation must always, or even generally, be used in determining damages in *Winstar*-related cases or prohibiting the trial court from using the "substantial factor" test in appropriate cases. *California Federal Bank v. United States* is not inconsistent with this analysis and conclusion. There the Court of Federal Claims applied a "definitely established" standard of causation."[131]

The Federal Circuit has made clear that the Court of Federal Claims has discretion to choose the causation theory that best suits a particular case.[132]

Some cases have been evaluated under the "substantial factor" standard.[133] Under the "substantial factor" standard, a breaching party is liable for damages suffered for which the breach was a substantial factor in causing the damages.[134] The *Citizens Federal* court noted that the "substantial factor" standard has been treated with approval by the Federal Circuit and had been adopted in many *Winstar* cases; it affirmed the Court of Federal Claims use of that standard for establishing that Citizens had proved the causation of lost profits in that case.[135]

---

131 *Citizens Fed. Bank, F.S.B. v. United States*, __ F.3d __, 2007 WL 162820, at *4 (Fed. Cir. Jan. 24, 2007).

132 *Id.* at *3 (holding that the causation standard in *Winstar* cases "lies largely within the trial court's discretion.")

133 *Id.* at *5.

134 *Id.* at *3.

135 *Id. at* *5 ("The "substantial factor" standard has been reviewed with approval by the Federal Circuit….Because the Federal Circuit has accepted this standard, it is consistent

However, some recent cases seem to have employed a blend of the "definitely established" and "substantial factor" standard: holding that once the causal link is "definitely established," the breach need not be the sole factor or cause of the harm.[136] In *Globe Savings*, the court wrote that it relied on a "definitely established" causation standard.[137] However, later in its opinion, it described the breach as " the definite, direct, and primary cause" of the plaintiff's damages.[138] The court's use of the phrase "primary cause" rather than "cause" or "sole cause," suggests that it is applying a causation standard that contains an element of the "substantial factor" test.

Both the *Commercial Federal* and *California Federal* courts have used a causation standard that resembled a "but for" standard. However, as the *California Federal* court explained, even that seemingly high standard had a "substantial factor" element to it. The court noted that the "but for" standard does not strictly preclude lost profits that are the result of a

---

with this Court's analysis in *Energy Capital*, and because the standard has been adopted in numerous *Winstar*-related cases before other judges on this Court, this Court concludes that it is the appropriate standard to be applied in the present case.")

136 *Seuss v. United States*, 74 Fed. Cl. 510 (2006); *California Federal v. United States*, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005); *Bluebonnet Sav.*, 266 F.3d at 1356; *Globe Savings*, 65 Fed. Cl. at 346; *First Federal Lincoln* , 73 Fed. Cl. at 635-36. Some courts have held that the breach must have been "more than a substantial factor" in the plaintiff's damages. *Federal First Lincoln*, 73 Fed. Cl. at 642; *Citizens Fin. Servs.*, 64 Fed. Cl. at 509.

137 *Globe Savings*, 65 Fed. Cl. at 346 ("[T]he causal connection between the breach and those losses has been 'definitely established'.")

138 *Id.* at 347.

breach and other elements "operating in confluence with the breach."[139] The court also noted that the breach need not be the sole factor or sole cause of the loss of profits. *Id.*

### 2. Fidelity's Lost Profits Were Caused By The Government's Breach, Under A "Definitely Established / Substantial Factor" Causation Standard.

The causal link between Plaintiff's lost profits and the Government's admitted breach will be definitely established through testimony by Fidelity's senior managers, Mr. Wesp and Mr. Powderly, and its expert witness Dr. Kaplan about Fidelity's pre-FIRREA operations and business plans and the comparison with post-FIRREA life under the infamous Capital Plan.[140] If not for the Government's breach, Fidelity would have been able to deal with the net liabilities it absorbed from Suburbia over a 30-year period, as it contracted to do, and the earnings that Fidelity was forced by FIRREA to divert to capital to make up for the loss of goodwill would have been leveraged to earn profits.

The Department is expected to stress its argument that Fidelity's capital difficulties were caused by the declining real estate market in the New York area in the early 1990's. Certainly many thrift institutions in the New York area, and Fidelity was no exception, were pinched by the slowing real estate market and the effects of the 1986 Tax Reform Act which exacerbated the real estate slump. This was not, however, the source of Fidelity's post-FIRREA problems. As Mr. Powderly will explain, he had already begun to deal with the real estate issues well before

---

139 *California Federal*, 395 F.3d at 1268, citing E. Allan Farnsworth, CONTRACTS § 12.1, at 150-151 (3d ed. 2004).

140 The existence and amount of lost profits are decisions to be made distinctly from the evaluation of causation. *LaSalle Talman*, 64 Fed. Cl. at 100; *California Federal*, 245 F.3d at 1350.

FIRREA, and Fidelity's exposure to this market had been significantly reduced. Fidelity's problems, it will be shown, resulted directly from its loss of regulatory capital and its consequent vulnerability to regulatory whim as a result of being capital deficient and forced to operate under the strictures of the Capital Plan. The real estate problems were transient and were fixable. The loss of capital was a far more serious matter, and that is what threatened to drag Fidelity under.

In *Globe Savings,* the Court found that plaintiff's damages were "definitely established" because the Regulators themselves admitted (in examination reports) that the enactment of FIRREA had made the thrift's capital position "grossly inadequate" and that the thrift had to shrink its assets because it was out of capital compliance.[141] Similar comments were made in Fidelity examination reports, and Plaintiff will produce letters from regulators complaining repeatedly that Fidelity's problem (post-FIRREA) was that it was under-capitalized.

The Court of Federal Claims most recently awarded lost profits in *First Federal Lincoln Bank v. United States*.[142] First Federal Lincoln contended that FIRREA caused it to shrink through the early 1990s by closing branches and running off deposits to shrink its balance sheet in order to satisfy the new capital requirements of FIRREA.[143] The Court found plaintiff's lost capital was "more than a substantial factor contributing to" and in fact "definitely caused" the thrift's lost profits damages. The court found that the regulators' post-breach criticisms were a reflection of the damage caused by FIRREA, and it found that "given the intertwined relationship of capital, asset quality, and earnings performance, the extent of Lincoln's post-breach shrink…would have lessened if the thrift's capital account was increased by $13.9

---

141 *Globe Savings*, 65 Fed. Cl. at 346.

142 73 Fed. Cl. 633.

143 *Id.*, 73 Fed. Cl. at 636.

million" (the amount of goodwill it lost through FIRREA).[144] The court relied upon evidence that the thrift was healthy and profitable before FIRREA, and that post-FIRREA, the thrift's capital levels plummeted and resulted in restrictions on the types of assets the thrift could hold, and adversely affected its growth plan. *Id.* at 636-38.

Plaintiff in this case will present ample evidence that, pre-FIRREA, Fidelity was healthy and well-managed and was dealing with its real estate challenges. Plaintiff will also prove that, after FIRREA, Fidelity was unhealthy, capital deficient, and existing at the whim of its regulators. Although Fidelity was still dealing with its real estate problems, it now had to do so in a hostile regulatory environment where regulators wanted huge, unprecedented reserves against potential real estate losses and were not hesitant to use Fidelity's capital weakness as an excuse to shut it down.

Like in the *First Federal Lincoln* case, Fidelity enjoyed generally positive examination reports from the Regulators in the years leading up to FIRREA. For example, in the FHLBB exam reports transmitted on October 31, 1985 and February 24, 1987, in 4 out of the 5 categories tested Fidelity rated a "2" on a scale of 1-5.[145]

---

144 *Id.* at 642.

145 On the FHLBB scale, a "1" is the top score, and a "5" is the worst. Fidelity received "2" ratings in the Management, Capital Adequacy, Risk Management, and Operating Results elements of the MACRO assessment. The composite rating for the 1985 exam was a "3" on the 1-5 scale, which reflected primarily the minor asset quality problems that plagued Fidelity at the time. The report noted the institution's "successful history of condo/coop lending" and made some suggestions to shore up its lending practices. WON 725 0878. The exam from the following year, 1986, notes an improvement in the Asset Quality (increasing from "4" to "3" in that category on the report evaluation form). The composite rating from the 1986 exam remained the same score as the previous year. The same regulator, Walter Amend, was the examiner-in-charge for both years. The *First Federal Lincoln* court attached significance to the fact that that institution had received

Like *First Federal Lincoln*, Fidelity was soundly criticized about its capital asset ratios as soon as FIRREA took effect.[146] The *First Federal Lincoln* court concluded that "because the Government's breach reduced the thrift's capital account through the elimination of …supervisory goodwill, it heightened the regulators' criticisms of Lincoln's classified assets and core earnings."[147] The *First Federal Lincoln* court noted that the regulators' criticisms "flowed from, and were intertwined with, Lincoln's reduced capital position following the breach."[148] As in that case, Fidelity's regulator's criticism flowed from and were intertwined with its reduced capital position in the wake of the Government's breach.

First Federal Lincoln's management scrambled to meet capital requirements post-FIRREA, facing threats of regulatory action, by drafting a plan to reduce expenses associated with its branch network, closing branches, reducing its staff, and discontinuing its agricultural property lending services, among others.[149] So too did Fidelity draft a plan of rigid non-growth, drastic expense cutting, and the discontinuance of certain types of lending in response to threatened regulatory intervention.[150] These factors "definitely establish" that Fidelity's losses were caused by the Government's breach. Just as in *Federal First Lincoln*, these factors prove that the Government's breach was "more than a substantial factor" in Fidelity's losses.

---

positive evaluation reports from regulators in the years before FIRREA. *First Federal Lincoln*, 73 Fed. Cl. at 636-37.

146 The first exam report issued after FIRREA assigned to Fidelity a composite rating of "5," the lowest possible score, indicating a "high immediate or near-term probability of failure." AST001968.

147 73 Fed. Cl. at 640.

148 *Id.* at 639

149 *Id.* at 641-42.

150 Fidelity New York, F.S.B., Capital Compliance Plan (Jan.1990), AST0705436-5624.

**C. Fidelity's Lost Profits Are Established With Reasonable Certainty.**

A claim for lost profits has been established with reasonable certainty "if the evidence adduced enables the court to make a fair and reasonable approximation of the damages."[151] If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.[152] "The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision.[153] This Court "embraces the principle that when damages are hard to estimate, the burden of imprecision does not fall on the innocent party."[154] The lost profits evidence that Plaintiff will present at trial meets this standard.

**1. Use Of A Hypothetical Model To Establish Lost Profits Is Both Expected And Entirely Appropriate.**

Damages for a breach of contract are more often than not determined in a "but for" world – *i.e.*, a world in which it is assumed the breach of contract did not occur. The Department challenges the basic concept of a hypothetical "but for" world, while simultaneously arguing that such a world must be in all aspects perfectly defined and constructed. These views are unrealistic and have no foundation in law.

---

151 *Slatterly v. United States*, 69 Fed. Cl. 573, 576 (2006) (citing *Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521, 524 (1960) and *Stern v. Dunlap Co*., 228 F.2d 939 (10th Cir. 1955)).

152 *California Federal*, 395 F.3d at 1267 (citing *Glendale Fed. Bank, F.S.B. v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004) and *Locke*,151 Ct. Cl. 262).

153 *Bluebonnet Sav.*, 266 F.3d at 1355, *quoted in Hughes v. United States*, 71 Fed. Cl. 284, 304 (2006).

154 *La Salle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003), *quoted in Hughes v. United States*, 71 Fed. Cl. 284, 303 (2006).

The Department criticizes Fidelity's expert for calculating lost profits based on "hypothetical" transactions. This is silly. Reliance on hypothetical transactions to prove lost profits in a "but for" world is hardly controversial. Any damages inquiry which seeks to put a party in the position it would have been but for the breach of contract will necessarily be hypothetical.

Every day, in courtrooms across this country, judges and juries award contract damages based on necessarily hypothetical estimates of what it would cost to repair the harm caused by a breach and put the aggrieved party in the position it would be in had there been no breach. Plaintiff's experts have used reasonable assumptions in a necessarily hypothetical world to measure the damages that Fidelity suffered. This violates no principle of contract law.

**2. The Evidence At Trial Will Sufficiently Demonstrate That Fidelity Had Opportunity For Growth And Will Show How And With What Types Of Assets Fidelity Would Have Achieved That Growth.**

Dr. Kaplan's lost profits model is grounded on established economic principles. It uses conservative assumptions regarding rates of growth and rates of return, based on Fidelity's *actual* past performance. These assumptions will be fully supported by documentary evidence and by the testimony of fact witnesses.

Dr. Kaplan projects lost profits by assuming that Fidelity would have leveraged its capital to put on and maintain a portfolio of mortgage-backed securities, which would return a profit based on the "spread" between the return on the securities and the cost of the funds used to purchase them. There is nothing new or speculative about Fidelity's use of mortgage-backed securities. As noted in the Contentions of Fact, William Wesp was, even before FIRREA, moving Fidelity increasingly away from mortgage origination and into the purchase of

mortgages in the form of mortgage-backed securities, which often offered higher rates of return.[155] One of Fidelity's Regulators, Robert Albanese, in fact described Mr. Wesp's transformation of Fidelity as akin to moving Fidelity to the point where "they almost ran it like a leveraged bond fund."[156] It is precisely this "leveraged bond fund" model that Dr. Kaplan uses as the basis for his lost profits calculation.

The 80 basis point spread that Dr. Kaplan uses to project lost profits is also based upon Fidelity's actual experience. It reflects Fidelity's actual spread income on its wholesale activity and the returns Fidelity actually achieved in the marketplace at the time.[157] Even if Fidelity's actual pre-tax return on average assets for the first period of 1989 are included, Fidelity's actual spread averages to be 82 basis points. Dr. Kaplan has used a conservative basis point spread with foundation clearly in Fidelity's actual experience.

**3. The Growth Rate In Dr. Kaplan's Lost Profit Model Is Conservative And Appropriate.**

The Courts have approved lost profits models as "reasonably certain" where the projected growth rate used in the model is based on actual demonstrated performance.

In *Commercial Federal*, for example, the lost profits model projected a 10% growth rate for the time immediately proceeding FIRREA through mid-1994. The model projected the plaintiff's lost profits based on actual earnings through fiscal year 1994. The model used the percentage composition of plaintiff's actual asset pool to establish the proportion of "but for" assets that would be leveraged and earning profits through 2011. Contrast this with *First*

155 Deposition, William E. Wesp (July 19, 2000), p. 116.

156 Deposition, Robert Albanese (July 31, 2000), pp. 155-56, 205-206.

157 Expert Witness Report of Dr. Donald M. Kaplan, ¶ 59.

*Federal Lincoln*, where the court rejected the expert's projections regarding the thrift's post-breach rate of growth, because they deviated from the acquiring thrift's actual pre-breach performance.[158]

The *Commercial Federal* court awarded lost profits after holding that "[a]lthough plaintiff's model uses a process of projection, it is grounded in the actual performance of the bank both pre-FIRREA and post-conversion. Similar to *Energy Capital*…the court believes this is a case in which the court can properly draw reasonable inferences based upon the evidence about the likelihood that plaintiff would gave earned profits in the amount specified but for the breach."[159] The evidence in this case will be more than sufficient to allow the Court to make an award of lost profits with similar assurance.

Dr. Kaplan also based his projected 8% growth rate on Fidelity's historical experience. In his efforts to determine Fidelity's growth rate in the lost profits model, Dr. Kaplan examined Fidelity's status back to 1980 and its past business plans;[160] spoke with Mr. Wesp (one of the

---

158 *First Federal Lincoln*, 73 Fed. Cl. at 644. First Federal Lincoln had reported declines in deposits every year except one from 1985 through 1990, which cast doubts upon its argument that it did intend to grow. In contrast, the evidence will show that Fidelity's deposits grew during each of the years leading up to FIRREA -- 6.4% from October 31, 1984, the date of the Suburbia acquisition, until December 1988. Fidelity had a compound annual growth rate of 25.1% from December 1979 through June 1989. Veribanc, Inc., Thrift Financial Reports CD-ROM, 1979-1997.

159 *Commercial Federal*, 59 Fed. Cl. at 351 (internal citations omitted).

160 Fidelity's pre-FIRREA business plan stated Fidelity's intention to "[g]row the balance sheet at approximately 8 to 10% per annum." Fidelity Three Year Business Plan, October 1988, AST056376-93.

senior executives at Fidelity at the time of the breach);[161] and evaluated the capital position Fidelity would have been in absent the breach.[162] Dr. Kaplan found that Fidelity's growth pre-FIRREA amounted to an increase of over $2 billion, which contrasted sharply with is post-FIRREA five year period of non-growth.[163]

The evidence that will be presented at trial on Fidelity's planned growth and actual growth will provide a full and sufficient base of support for the growth projections in Dr. Kaplan's lost profits model.

#### 4. Fidelity's Projected Profit Yield On Foregone Assets Is Reasonable And Based On Actual Experience.

This Court approved the use of adjustable rate mortgage-backed securities ("MBS") in the *Commercial Federal* lost profits model. There the Court determined that the plaintiff's projection of the profit yield on foregone assets in the form of MBS was reasonable, because it was based on the performance of investments the thrift actually maintained after the breach.[164]

Plaintiff's lost profits evidence will similarly be based on Fidelity's actual experience -- profitability at the time of breach and a clear record of pre-breach growth[165] using the same type of MBS assumed in the lost profits model.

---

161 Mr. Wesp testified, for example, that, "In June of '86 when I got there, the first thing I did was to start growing the balance sheet." Deposition, William E. Wesp (July 19, 2000), p. 80.

162 Deposition, Dr. Donald M. Kaplan (Sept. 24, 2001), pp. 160-61.

163 *Id.* at pp. 71-72, 131.

164 *First Federal Lincoln*, 73 Fed. Cl. at 645 (citing to *Commercial Federal*, 59 Fed. Cl. at 351).

165 Describing the performance of Mr. Wesp's leveraged bond fund, Mr. Albanese, said, "The bottom line is the institution's earnings performance improved significantly and I

In *Globe Savings Bank, F.S.B. v. United States*, 65 Fed. Cl. 330, 351 (2005) and *Commercial Federal*, 59 Fed Cl at 342-43, this court emphasized the importance of the acquiring thrift's pre-breach growth—to the reasonable certainty inquiry relating to an expert's projection of a thrift's post-breach growth.

Fidelity was profitable at the time of the breach. This profitability, consistent with the Court of Federal Claims' opinions, supports Dr. Kaplan's projection of Fidelity's post-breach growth. Dr. Kaplan states in his report that the incremental assets are assumed to be purchases of wholesale securities, primarily mortgage-backed securities.[166] Dr. Kaplan states that the use of wholesale incremental activity in the non-breach bank is consistent with Fidelity's actual operations.[167] As evident in Exhibits 5 and 6 of Dr. Kaplan's report, Fidelity's growth, particularly in 1987 and 1988, was significantly focused on wholesale activity. Fidelity's management also testified that it used wholesale securities, particularly mortgage-backed securities, to leverage its assets.[168] The Government itself conceded that between 1986 and 1989 (after the acquisition of Suburbia and prior to FIRREA), "Fidelity's asset growth…was fueled by purchases of investment securities and [mortgage-backed securities], funded primarily by wholesale borrowing."[169] The category of foregone assets is reasonably certain because it is entirely consistent with Fidelity's actual experience.

---

believe the capital position improved significantly." Deposition, Robert Albanese (July 31, 2000), p. 156.

166 Expert Witness Report of Dr. Donald M. Kaplan, ¶ 57.

167 Id. at ¶ 58.

168 Deposition, William E. Wesp (July 19, 2000), p. 128 .

169 Defendant's Motion for Summary Judgment, p. 52 (July 3, 2003).

## II. Fidelity Is Entitled To Restitution Damages To Restore It To Where It Would Have Been Had There Never Been A Contract.

Restitution is a theory of contract remedial law which provides that a party aggrieved by a contractual breach is entitled to be restored to where it would have been had there been no contract.[170] It flows from the notion that one who has been unjustly enriched at the expense of another is required to make restitution to the other.[171] Restitution, in the context of a breached contract, permits the plaintiff to recover "any benefit that he has conferred on the repudiating party by way of part performance or reliance."[172] The applicability of restitution damages varies with the particular facts of each case.[173] To the extent that the benefit may reasonably be measured in different ways, the choice of measurement is within the discretion of the court.[174] Plaintiff seeks restitution damages based on the net costs that the Government avoided when Fidelity merged with Suburbia. The calculation of these damages is based on what the Government's alternatives were in 1984 for resolving the Suburbia problem.

---

170 This Court has expressly held that restitution claims are available and appropriate for *Winstar* cases. *See American Capital Corp. v. FDIC*, 472 F.3d 859, 870 (Fed. Cir. 2006); *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1316-17 (Fed. Cir. 2004).

171 RESTATEMENT OF THE LAW, RESTITUTION § 1.

172 *American Capital*, 472 F.3d 859, 870 (Fed. Cir. 2006), (*quoting Mobil Oil Exploration & Producing S.E., Inc. v. United States*, 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (citing RESTATEMENT § 373)).

173 *LaSalle Talman*, 317 F.3d at 1376. The court notes that the classical views on restitution differ, but are not incompatible. That is, there is no tension necessarily in courts relying on those precepts articulated in RESTATEMENT OF CONTRACTS § 347 (that restitution is intended to restore the innocent party to pre-contract status quo) and RESTATEMENT OF CONTRACTS § 344 (that restitution is intended to prevent the unjust enrichment of the breaching party). *Id.; Glendale*, 239 F.3d at 1379-80.

174 RESTATEMENT (SECOND) OF CONTRACTS § 371, comment a.

The Department dips deeply into its vast reserves of scorn and opprobrium whenever a Goodwill Plaintiff has the temerity to assert a restitution claim. And it is not surprising that it does so, since the Federal Circuit, and to a somewhat lesser extent this Court, has not treated restitution claims very kindly. However, Fidelity's "avoided costs" restitution claims are very different from those that have appeared to date. Fidelity's claim is based on a substantial body of evidence, most of it the Government's own documents, that not only substantiate Fidelity's claims, but that also eliminate in this case the concerns, real and conceptual, that have led the Courts to be unreceptive to prior restitution claims.

As discussed in some detail in the Contentions of Fact, the Regulators (FHLBB and FSLIC) in 1984 were confronted with a Suburbia that had been a serious regulatory concern for three years and was by any test, insolvent, and if not seriously insolvent. They no longer had the luxury of time in dealing with the problems Suburbia presented. The Regulators had previously shopped Suburbia but had gotten no bids they found attractive. They themselves described their options in 1984 as "the Fidelity deal" or liquidation. They analyzed these alternatives and concluded that the present value cost of liquidating Suburbia was $147.6 million. The cost of the Fidelity deal was a $16 million cash contribution, so, by their own calculations, the Regulators concluded that they avoided costs of $131.6 million by allowing Fidelity to acquire Suburbia in the proposed supervisory merger instead of liquidating Suburbia.

The Department's usual argument against a claim of this sort is to say that liquidation was not an option the Regulators used in 1984, so the calculated cost of restitution is meaningless as a cost comparison. It will be interesting to see if the Department actually produces any evidence to back up this contention, since, as noted earlier, the FSLIC's own

reports document some 14 liquidations in 1983 and 1984 alone, and since there is absolutely no evidence of any consideration of an alternative to liquidation, even in the elaborate memos to the FHLBB which purport to list all of the alternatives.

A frequent reaction by the Courts to restitution claims based on avoided liquidation costs is that the acquiring institution conferred no benefit on the FSLIC when it took the troubled thrift, because the FSLIC would still be liable for the excess liabilities if the acquiring thrift failed.[175] In Fidelity's case, though, there is no need to speculate on whether it would be Fidelity or the FSLIC who would pay of Suburbia's excess liabilities. The story is told, and the facts are known. Fidelity paid off Suburbia's net liabilities by completely amortizing, with cash earnings, all of the supervisory goodwill put onto its books as a result of the Suburbia acquisition. It fought and struggled its way back into fiscal health and capital compliance, reducing the goodwill through retained earnings every year as it was required to do and accelerating that reduction post-FIRREA. Neither the FSLIC nor its successor the FDIC ever had to pay (or will have to pay) a penny on account of Suburbia's excess liabilities, *because Fidelity assumed and paid those liabilities*.[176] To borrow one of the Department's favorite mantras, any argument that the FSLIC might still have been called upon to discharge Suburbia's net liabilities is speculative, hypothetical, and contradicted by the facts.

Another potential methodology for calculating Plaintiff's restitution damages would be to examine the alternative, as the Government declined to do in 1984, of again shopping around for

---

175 *See Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1382 (Fed. Cir. 2001), for example.

176 Fidelity's restitution claim is therefore based on "net liabilities discharged," not "net liabilities assumed." Prior Court of Federal Claims and Federal Circuit cases rejecting restitution claims based on "net liabilities assumed" are not pertinent in this case.

another acquirer for Suburbia. We do not know what the cost of this would have been or even whether a less expensive deal could have been found. There is evidence, however, of four other bids received and rejected by the Regulators prior to the Fidelity bid. Four prospective bidders in 1982 responded with bids that would cost the FSLIC from $17.9 million to $33.9 million (the average cost to FSLIC was $24.35 million).[177] Because Suburbia had further deteriorated in the two years since its first foray onto the market, any new bid in 1984 would have almost certainly resulted in a higher cost to the FSLIC. However, even based on these out-of-date bids, it is clear that the Government received a benefit of at least $8.35 million—the difference between the $16 million cost of the Fidelity deal to the $24.35 million average of the earlier acquisition bids.

So, the Government did in fact avoid a sizable net cost and reap a substantial benefit when Fidelity acquired Suburbia. Under ordinary principles of restitution, it should return that benefit to the Plaintiff.

## III. Plaintiff Is Entitled To Wounded Bank Damages.

Wounded bank damages are a category of expectancy damages consisting of the increased costs that the plaintiff incurred due to a breach. In the *Winstar* context, wounded bank damages are the higher costs that a thrift encounters in conducting its general business after FIRREA and because of FIRREA.[178] The court has held that damages can include expenses made in preparing to perform or in foregoing opportunities.[179]

---

177 FSLIC I-Memorandum (Oct. 15, 1984), AA0000177-81, at AA 0000177.

178 *Glendale*, 378 F.3d at 1311.

179 *California Federal Bank, F.S.B. v. United States*, 43 Fed. Cl. 445, 450 (1999) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 344 comment a).

In the *Glendale*, *Bluebonnet*, and *Southern California Federal Savings & Loan Association* cases, the courts have awarded—and affirmed—damages for increased costs such as legal, consulting, and filing fees, excess FDIC deposit insurance premiums, and excess OTS assessments related to the plaintiffs' FIRREA-created undercapitalized status.[180]

The *Glendale* court characterized the wounded bank damages as "the increase in the cost of funds Glendale allegedly incurred as a result of its having been wounded by the Government's breach."[181] The Federal Circuit's description of the circumstances giving rise to wounded bank damages addresses the foreseeability, causation, and reasonable certainty of the damage: "[T]hree years after, and as a result of, the breach, Glendale fell out of capital compliance; depositors and others became nervous about placing funds with it; the bank was required to pay more interest to attract depositors; and it was required to pay higher fees for deposit insurance.[182] The Court of Federal Claims awarded $381 million in wounded bank damages to Glendale.[183]

The *Southern California* court awarded wounded bank damages for increases in the thrift's costs due to being identified as a "troubled" institution, such as excess costs of funds, legal, consulting, and filing fees, deposit insurance premiums, FHLBB collateral delivery fees, FDIC deposit insurance premiums and excess assessments paid to the OTS.[184] In affirming the trial court's award of wounded bank damages in the *Southern California* case, the Federal

---

180 *Glendale*, 378 F.3d at 1311-12; *Bluebonnet Sav.*, 266 F.3d at 1355-56; *Southern Ca. Fed. Sav. & Loan Assoc. v. United States*, 57 Fed. Cl. 598 (2003), *affirmed in part, vacated in part on another issue*, 422 F.3d 1319, 1336-1338 (Fed.Cir. 2005).

181 378 F.3d at 1311.

182 *Id.* at 1312.

183 *Glendale Fed. Bank, F.S.B. v. United States*, 54 Fed. Cl. 8 (2002), *aff'd*, 378 F.3d 1308.

184 57 Fed. Cl. at 598.

Circuit dismissed the Department's arguments that the damages were too remote from the breach to be recoverable, that the wounded bank damages were not foreseeable, and that the damages methodology was flawed.[185]

In rejecting the Department's appeal, the *Southern California* court wondered "why it would be unforeseeable that the loss of the contracted-for benefits would impact the health of Southern California and increase its costs of doing business, particularly since the regulatory treatment at issue was designed to foster the recovery of ailing thrifts." *Id.* at 1337. The Federal Circuit affirmed the lower court's process of evaluating the causation and damages methodology. *Id.*

The same question might be asked in this case. The Government has acknowledged that supervisory mergers were intended to convert failing thrifts into profitable ones and that the accounting forbearances granted in those mergers were designed to protect the acquiring thrift from what would otherwise be drastic consequences. It is eminently foreseeable that losing the contractually-promised capital benefit of supervisory goodwill would have consequences for Fidelity in terms of higher general business costs. Plaintiff's evidence will establish that its wounded bank damages are specific and certain, and were proximately caused by the Government's breach.

Wounded bank damages in this case consist of higher deposit insurance premiums; increased OTS fees and assessments; and lost profits on the sale of Freddie Mac stock.

---

185 *Southern Ca. Fed. Sav. & Loan Assoc. v. United States*, 422 F.3d 1319, 1336 (Fed. Cir. 2005).

The excess deposit insurance premiums and OTS assessments paid by Fidelity total $1,432,000.[186] OTS imposed these additional costs and fees solely because Fidelity was, post-FIRREA, below minimum capital requirements. Absent the loss of capital due to the breach, Fidelity would have been a well-capitalized institution and would not have had to incur these costs.

Fidelity incurred wounded bank damages on the losses it sustained from the sale of Freddie Mac stock. In 1986 and 1987, Fidelity purchased a large position in the common stock of Freddie Mac. Fidelity's holdings were just under 944,000 on November 1, 1988.[187] At that time, Fidelity had planned to conduct an orderly reduction of a portion of its Freddie Mac stock in 1988, by which time Fidelity had $20 million in unrealized gains in its holdings.[188] Instead of following its deliberate plan to sell a small portion of the stock, Fidelity—in an effort to raise capital in anticipation of FIRREA—rapidly liquidated the stock during the first half of 1989. Fidelity management had discussed the effects that the proposed FIRREA legislation would have on its Freddie Mac holdings in an Investment Committee Meeting in January 1989.[189] Following the meeting, Fidelity took steps to rapidly liquidate the Freddie Mac stock holdings. Between the dates of March 31, 1989 and August 31, 1989, Fidelity liquidated a significant portion of its holdings.[190] According to the conservative calculations in Dr. Kaplan's report, the difference

---

186 Expert Witness Report of Donald M. Kaplan, at ¶ 66; Exhibit 10, Exhibit 11.

187 Expert Witness Report of Donald M. Kaplan, at ¶ 67.

188 *Id.* at ¶ 68.

189 Minutes of the Investment Committee Meeting, Fidelity (Jan. 17, 1989).

190 Expert Witness Report of Donald M. Kaplan, at ¶ 68.

between what Fidelity would have earned had it held on to the 522,000 shares that it owned as of March 31, 1989 until August 2, 1991 instead of selling the shares is $10.86 million.[191]

Plaintiff's wounded bank claims satisfy the foreseeability, causation, and reasonable certainty standards required for expectancy damages.

## IV. Plaintiff Is Entitled To Reliance Damages.

Although Plaintiff believes that expectancy claims and restitution damages are the most appropriate avenue of relief for the Government's breach, it will present evidence supporting reliance damages at trial. Plaintiff's reliance damages claim are an alternative to its expectancy and restitution damage claims. Reliance damages place the non-breaching party in the position it would have been had it not entered the contract by awarding the injured party the costs it incurred in reliance on the contract.[192] The Federal Circuit generally looks favorably on reliance damages, and it has stated, "Reliance is an ideal recovery in *Winstar* cases."[193]

A party that relies on another party's promise, made binding through a contract, is entitled to damages for any losses actually sustained as a result of the breach of that promise.[194] In the Supervisory Goodwill context, reliance damages should equal "the total amount of cash

---

191 *Id.* at ¶ 69; Exhibit 12.

192 *California Federal,* 43 Fed. Cl. at 450 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 344(b) (1981)); *see also Glendale,* 54 Fed. Cl. at 11 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 344(b)) .

193 *Glendale*, 378 F.3d at 1313. The Federal Circuit expressed this positive view during an evaluation of the various merits of damage theories available to *Winstar* plaintiffs. Particularly appealing to the Federal Circuit is the idea that reliance damages may be more precise than other theories. Reliance damages, it held, "can be ascertainable and fixed." *Id.*

194 *Slatterly,* 69 Fed. Cl. at 567 (citing to *Glendale*, 239 F.3d at 1382).

spent in [managing the acquired thrift], less the total amount of cash received.[195] Reliance damages are available for injuries that thrifts incurred both before and after the breach.[196]

The damages evaluation for a reliance claim differs slightly from the lost profits and restitution determinations. To prevail on its reliance claim, Plaintiff is not required to show that the Government actually benefited from Fidelity's expenditures.[197] A party injured by the breach does not have the burden of proving that its losses would not have occurred in spite of the breach. *Id*. Additionally, when courts contemplate reliance damages, "[d]oubts are generally resolved against the party in breach."[198]

In order to be recoverable as reliance damages, plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation[199] and must be proximately caused by the breach.[200] The Federal Circuit has noted that the need to replace regulatory capital, or the failure of a thrift due to deficiency in regulatory capital, is a foreseeable result of the Government's breach of its promise of regulatory forbearance.[201]

---

195 *Slatterly*, 69 Fed. Cl. at 577 (citing *Glendale*, 54 Fed. Cl. at 13-14 and *LaSalle Talman*, 317 F.3d at 1380).

196 *Glendale*, 54 Fed. Cl. at 11.

197 *Hansen Bancorp, Inc. v. United States*, 53 Fed. Cl. 92, 98 (2002) (citing *Glendale*, 239 F.3d at 1382-83).

198 RESTATEMENT (SECOND) OF CONTRACTS § 352 comment a, *quoted by American Capital*, 472 F.3d at 869.

199 *American Capital Corp.*, 472 F.3d at 869; *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1365 (Fed. Cir. 2005), *quoting Landmark Land Co. v. United States*, 256 F.3d 1365, 1378 (Fed. Cir. 2001).

200 *Hughes Comm. Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2001).

201 *Old Stone Corp. v. United States*, 450 F.3d 1360, 1377 (Fed. Cir. 2006).

In the case of *Westfed Holdings, Inc. v. United States,* [202] the causation standard was satisfied primarily by three pieces of evidence: (1) the acquiring institution's 1988 business plan, which called for aggressive growth; (2) the OTS's restrictions that stunted the bank's growth post-FIRREA; and (3) the capital restoration plan that OTS forced the thrift to follow in lieu of its 1988 business plan.[203]

Just as in *Westfed*, the cause of Fidelity's reliance damages is clearly established through its business plan, which as previously noted called for 8 to 10% growth per annum;[204] the evidence of the post-FIRREA restrictions that OTS imposed on Fidelity; and the Capital Plan, which imposed stagnating restraints on Fidelity's growth.[205]

Despite the Department's arguments, the Courts have awarded reliance damages in cases similar to Plaintiff's. In *Glendale*, for example, the Court of Federal Claims awarded what it termed "reliance/wounded bank" damages to reimburse the plaintiff for several categories of costs: lost historic costs of funds advantage over its competitors, increased deposit insurance premiums, increased OTS assessments, transaction costs from the sale of a branch; transaction

---

202 *Westfed*, 407 F.3d at 1363.

203 *Id.* The Federal Circuit in *Westfed* implicitly acknowledged and affirmed the same definitely established / substantial factor blended causation standard that has emerged in Supervisory Goodwill lost profits claims: "In conclusion, the trial court found that the defendant's breach was a **substantial factor** in causing Westfed's downfall….The trial court further determined…that **but for** defendant's breach, New Western would not have been seized…We are not persuaded that the trail court was clearly erroneous in concluding that a causal connection had been **definitely established** between the breach and the loss claimed by Westfed." *Id.* at 1364 (internal citations omitted; emphasis added). *See also* foreseeability discussion, supra text I.A.

204 Fidelity Three Year Business Plan (October 1988), AST056376-93.

205 Fidelity New York, F.S.B. Capital Compliance Plan (January 1990), AST 0705432-5624.

costs from a post-breach recapitalization, and custodial fees paid to the FHLB.[206] The court noted that, although it had awarded reliance claims only for post-breach costs, "there is nothing inherent in the concept to prevent a court from awarding reliance damages for pre-breach activities from which ascertainable losses as a result of the breach can be shown. *Id.*

In *Hughes v. United States*, a case with slightly different facts (for example, the Government's breach through FIRREA was based not on supervisory goodwill, but negative net worth that Government had promised to permit before FIRREA, and the acquisition contract had required certain contributions of real property), the court analyzed the plaintiff's reliance and restitution claims simultaneously, noting that they were related concepts.[207] The court found that the two requirements of a successful reliance claim—foreseeability and proximate cause—were satisfied. *Id.* The court awarded the plaintiff reliance damages for the assets that it contributed to the acquired thrift. Although the *Hughes* facts are different than those in the present case, Plaintiff's reliance—that is, "the cash spent in managing the thrift"—is a common theme. Just as the *Hughes* plaintiff set aside its own capital and resources to revive a failing thrift, so too did Fidelity set aside its own capital and resources to revive Suburbia.

Plaintiff's reliance damages were real, realized, and recoverable. Although the Government has argued that Plaintiff's reliance claim is based on "net liabilities assumed," Plaintiff's damages arise not from merely *assuming* Suburbia's net liabilities, but from actually *discharging* them—dollar by dollar, and at great cost to its regulatory standing and marketplace

---

206 *Glendale*, 239 F.3d at 1383.

207 *Hughes*, 71 Fed. Cl. at 309.

competitiveness. At trial Plaintiff will prove that its reliance damages claims are based not on net liabilities assumed, but net liabilities discharged.[208]

**The Plaintiff's Restitution and Reliance Damages Are Not Properly Subject to Offset**

Damages for the injured party's reliance on a contract are recoverable minus "any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed."[209] Once the injured party has shown that its loss on the breached contract was foreseeable, then the burden shifts to the breaching party to prove what expenses would have been lost despite the breach. *Id.*

The *Hansen Bancorp* court stated that "generally, any award of restitution to a plaintiff should be offset by the benefits he or she already has received from the defendant…. However…*Landmark* makes clear that offset is only proper where the benefits at issue were received directly from the breaching party." That court refused to find an offset where the plaintiff had received a $1.2 million dividend from the sale of the thrift because the dividend did not issue from the Government, nor pursuant to any requirement of the contract.[210]

The Government will have a difficult challenge in proving that there is an offset in this case. To prove that an offset should be deducted from reliance or restitution damages, the

---

208 See *supra* note 175 and corresponding discussion.

209 *Westfed*, 407 F.3d at 1369-70 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 349) *cited in American Capital*, 472 F.3d at 869.

210 *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1315-16 (Fed. Cir. 2004) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 384 comment a).

breaching party is required to prove that the non breaching party received a net benefit.[211] Fidelity undertook a tremendous financial burden when it acquired Suburbia.[212] Suburbia's deep negative net worth deficit meant that Fidelity did not gain any capital benefit from the acquisition: instead, it undertook significant capital liabilities. The Government recognized that it would take an extended length of time before Fidelity would have been able to realize any benefit from the Suburbia acquisition: hence the Government's promise that Fidelity could amortize Suburbia's net liabilities as supervisory goodwill over a thirty-year period. The Government therefore expressly acknowledged that it would be decades before Suburbia would provide any net benefit to Fidelity.

Because of the breach, Fidelity was prohibited from amortizing the goodwill for 25 of the 30 years. As there was no net benefit to Fidelity from Suburbia at the time of the beach, an offset to Fidelity's reliance or restitution damages is inappropriate here.[213]

## V. The Government's Actions Constitute A Taking Of Fidelity's Property Rights Under The Takings Clause Of The Fifth Amendment.

Plaintiff's takings claim is currently before this Court.[214] In the event that the Court determines that all of Plaintiff's contract damages are untenable and that Plaintiff has no remedy under the law of contracts, Plaintiff renews its request that the Court consider its takings claim.[215]

---

211 *Glendale*, 378 F.3d at 1312.

212 *See* FSLIC I-Memorandum (Oct. 15, 1984), AA0000177-81. Suburbia was in extreme distress.

213 Expert Witness Report of Donald M. Kaplan at ¶ 79-86.

214 The Court's September 19, 2006 Pretrial Order states that "[t]he trial will encompass all issues of damages pending in this action." Plaintiff interprets this language to include its takings claim as one of the issues to be determined at trial.

The Takings Clause of the Fifth Amendment of the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. CONST., AMEND. V. In order to establish its takings claim before this Court, Plaintiff must first assert a valid property interest and then demonstrate that the Government's actions constituted a compensable taking of that property. [216]

**A. Fidelity Had Valid And Enforceable Property Rights As A Result Of Its Contract With The Government.**

Fidelity's right to treat the goodwill created by its merger with Suburbia as an asset for regulatory capital purposes, to amortize that goodwill over 30 years on a straight-line basis, and to count the cash contributed by FSLIC towards its regulatory capital, constitute property protected by the Fifth Amendment to the United States Constitution. Fidelity acquired these rights as the result of a valid contract with the United States in exchange for its acquisition of Suburbia, a failing institution that had long been a serious concern to the federal regulators.

---

[215] Plaintiff understands that precedent binding on the Court of Federal Claims precludes recovery under a Fifth Amendment takings theory when a contract remedy is available. *Castle v. United States*, 301 F.3d 1328 (Fed. Cir. 2002). In the *Winstar* context, the Court of Federal Claims has previously ruled that "a takings claim is 'conceptually foreclosed' by the finding of a breach of contract." *National Australia Bank v. United States*, 55 Fed. Cl. 782, 789 (2003). However, in a recent decision, the Court of Federal Claims held that it was appropriate to proceed with both a contract claim and a takings claim until the contract claim was fully litigated because it was otherwise impossible to tell if the contract claim was viable. *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 172 (2005). The Court then explained that takings claims have been preserved after a finding of breach of contract when damages remained an outstanding issue. *Id.* (citing *Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495, 501 (2005)). Until the Court of Appeals for the Federal Circuit resolves this issue, Plaintiff will proceed with its takings claim until the Court reaches a final judgment on the issue of damages.

[216] *M&J Coal Company v. United States*, 47 F.3d 1148, 1153-54 (Fed. Cir. 1995).

In this case, the Government has previously argued that Fidelity did not have a valid property interest because reasonable expectations cannot justify such a right in the highly regulated field of banking.[217] Given intervening decisions in the Federal Circuit, Plaintiff argues that reasonable expectations can support a valid property interest, even in a heavily regulated industry. "[T]he abrogation by legislation of clear, unqualified contract rights requires a remedy, even in a highly regulated industry, [such as banking], because the contracts embodied the commitments of the contracting parties." [218]

That the Government contracted with a party who operated in a highly regulated industry does not give the Government the right to refuse to honor its obligations without repercussions. As a result, Plaintiff possesses valid and enforceable property rights based on Fidelity's contract with the Government.

**B. The Government's Actions Constitute A Compensable Regulatory Taking.**

"[G]overnment regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster [and] such 'regulatory takings' may be compensable under the Fifth Amendment."[219] Courts analyze regulatory takings applying the standard set forth in *Penn Central Transp. Co. v. New York City*.[220] Although the Court in *Penn*

---

217 Defendant's Motion to Dismiss Counts III, IV and V of Plaintiff's Complaint and Defendant's Motion for Summary Judgment Regarding Counts I and II of Plaintiff's Complaint at 17 (Oct. 10, 2000).

218 *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 172 (2005) (citing *Cinega Gardens v. United States*, 331 F.3d 1319, 1334 (Fed. Cir. 2003)).

219 *Lingle v. Chevron*, 544 U.S. 528, 537 (2005).

220 438 U.S. 104 (1978). *Lingle*, 544 U.S. at 538-39 (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)).

*Central* was "unable to develop any 'set formula' for evaluating regulatory takings claims," the Supreme Court identified several important factors including "the character of the governmental action," "the economic impact of the regulation on the claimant," and "the extent to which the regulation has interfered with distinct investment-backed expectations." Addressing each factor in turn, Plaintiff has a strong claim to recover just compensation for the Government's taking of its property and contract rights.

### 1. Although Congress Intended FIRREA To Benefit The Public, Its Effect On Fidelity Constitutes A Regulatory Taking.

Notwithstanding the good intentions Congress may have had when enacting FIRREA, its effect has been harsh to Plaintiff and other acquiring thrifts. A "statute that substantially furthers important public policies may so frustrate distinct investment-backed expectations as to amount to a "taking."[221] Although the "paradigmatic taking" involves a direct government appropriation or physical invasion of property, an economic regulation that "adjusts the benefits and burdens of public life" can also constitute a taking under the Takings Clause of the Fifth Amendment.[222]

Plaintiff asserts that the provisions of FIRREA that ended the favorable treatment of supervisory goodwill and changed the regulatory capital requirements went "too far" and should be recognized at a taking of Fidelity's property without just compensation.[223]

---

221 *Penn Central*, 438 U.S. at 127 (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)).

222 *Lingle*, 544 U.S., at 537; *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998).

223 In *Pennsylvania Coal*, Justice Holmes explained that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. at 415.

### 2. FIRREA's Economic Impact On Fidelity Was Severe And Substantial.

"The *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests."[224] Plaintiff contends that the enactment of FIRREA and its resulting effect on Fidelity is a situation where "justice and fairness require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons."[225]

The impact of FIRREA on Fidelity was particularly severe because the legislation instantly rendered Fidelity capital deficient and insolvent.[226] This caused Fidelity to submit to an onerous and restrictive capital plan with the only alternative being regulatory seizure and liquidation.[227] The passage of FIRREA imposed an instant and substantial burden on Fidelity beginning the day it was enacted on December 6, 1989, from which Fidelity was never able to fully recover. Despite Fidelity's numerous attempts at post-FIRREA survival, the damage was too great and its acquisition by Astoria was inevitable.

---

224 *Lingle*, 544 U.S. at 540.

225 *Penn Central*, 438 U.S. at 124 (citing *Goldblatt v. Hempstead*, 369 U.S. 590, 594 (1962)).

226 Letter from Angelo A. Vigna, District Director, OTS, to Board of Directors, Fidelity (Feb. 2, 1990); Fidelity Subscription Offering Circular (Mar. 24, 1993).

227 Fidelity Subscription Offering Circular (Mar. 24, 1993).

### 3. The Regulation Has Interfered Substantially With Investment-Backed Expectations.

Fidelity had the reasonable expectation, based on its contract with the Government, that it would be allowed to count the FSLIC cash contribution and supervisory goodwill toward its regulatory capital requirements, and that it would be able to amortize the goodwill using the straight-line method over a 30 year period. Fidelity's expectation that the Government would honor its contract was reasonable, despite the high level of regulation in the banking industry.

The Court of Federal Claims has acknowledged that the concept of investment-backed expectations in a regulated industry has been frequently misinterpreted to the point that it appeared that "no taking claim may be brought in an area such as banking because the investors should expect 'any' regulatory exaction."[228] The Court explained that "investment-backed expectations always depend on the underlying restrictions at the time of purchase" and "even in an area regulated as heavily as banking, numerous possible government actions would invoke the Fifth Amendment." *Id.* at 51.

Fidelity took responsibility for Suburbia, a troubled institution that had been a long-standing source of concern for the federal regulators. In exchange, the Government promised Fidelity favorable treatment of the supervisory goodwill and provided cash assistance in connection with the merger. As a result of its contract with the Government, Fidelity had reasonable investment-backed expectations that the Government would honor its obligations.

---

228 *Ambase Corp. v. United States*, 58 Fed. Cl. 32, 50 (2003). In *Ambase*, the Court of Federal Claims, specifically highlighted the holding in a case frequently cited by the Government, *Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995), as an oft misinterpreted decision. *Id.*

### C. Plaintiff Is Entitled To Damages as a Result of the Taking of Fidelity's Property Without Just Compensation.

The *Penn Central* factors weigh in favor of Plaintiff's claim for an uncompensated taking of its property and contract rights. As a result, the United States is required to pay just compensation for the value of the property so extinguished. The traditional damages remedy for a Fifth Amendment taking is the value of the property at the time the taking occurred.[229] Plaintiff will present evidence of this claim at trial.

## CONCLUSION

The Government admits that it breached it contract with Fidelity. While the Government would persuade the Court that the breach, in fact, caused no damages at all, Plaintiff's documentary evidence and witnesses will tell a very different reality. The breach rendered the Plaintiff insolvent, cobbled the bank's capital position, destroyed the bank's modest plans for growth and leveraged investments, and removed its ability to thrive in the marketplace. The Government's breach caused Fidelity millions of dollars in lost profits, restitution, and wounded bank damages. Moreover, Fidelity's reliance on the contract caused further damage to its fiscal

---

229 *NRG Co. v. United States*, 30 Fed. Cl. 460, 467 (1994) (citing *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1580 (Fed. Cir. 1990)). In *NRG*, the Court of Federal Claims awarded damages of the value of coal exploration permits at the time of cancellation, which the court determined was the amount plaintiffs had initially paid for the permits.

health. Plaintiff is entitled to be made whole, under any measure of fairness, the standards of black-letter contract law, and judicial precedent.

Respectfully submitted,

s/ Frank J. Eisenhart by s/ Tara R. Kelly
Frank J. Eisenhart
*Counsel of Record*
Catherine Botticelli
Tara R. Kelly
Catherine Stahl
Dechert LLP
1775 I St., N.W.
Washington, DC 20006
202.261.3306
202.261.3333 (Fax)

*Attorneys for Plaintiff*
*Astoria Federal Savings & Loan Association*

February 15, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2007, a copy of the foregoing **Plaintiff's Memorandum of Contentions of Fact and Law** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Tara R. Kelly
Tara R. Kelly