**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 95-468C** |
| | ) | **(Judge Thomas C. Wheeler)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

KENNETH M. DINTZER
Assistant Director

JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel. (202) 353-7972
Fax (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR

March 15, 2007

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . vi

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW . . . . . 1

INTRODUCTION . . . . . 1

DEFENDANT'S CONTENTIONS OF FACTS . . . . . 7

I. HISTORY OF THRIFT RESOLUTION OPTIONS AND LIQUIDATIONS . . . . . 7

II. FIDELITY'S ACQUISITION OF DOLLAR FEDERAL . . . . . 9

III. SUBURBIA FACED INTEREST RATE SPREAD PROBLEMS . . . . . 10

IV. THE BENEFITS OF THE FIDELITY AND SUBURBIA MERGER . . . . . 16

V. REGULATORY ASSESSMENT OF THE PROPOSED MERGER . . . . . 18

VI. FIDELITY MERGES WITH SUBURBIA . . . . . 19

VII. FIDELITY INVESTED IN RISKY ASSETS THAT RESULTED IN SIGNIFICANT LOSSES . . . . . 23

A. Fidelity Sold Suburbia Assets And Invested In Risky Commercial Real Estate Development Projects . . . . . 23

B. Regulators Warned Fidelity About Its High Concentrations Of Condominium And Cooperative Lending . . . . . 25

C. By 1986 Fidelity Had One-Fourth Of Its Assets In Highly Risky Commercial Real Estate Loans . . . . . 27

D. Fidelity's Concentrations Of Commercial Loans Began Collapsing In 1987 And, Facing Catastrophic Losses, Fidelity Belatedly Resolved To Exit That Risky Arena . . . . . 29

E. Given The Condition Of Its Assets, Fidelity Faced Growth Restrictions, Increased Examination Assessment Fees, and Increased Deposit Insurance Premiums . . . . . 32

F. Given Its Collapsing Loans And The Time Constraints These Imposed On Management, Fidelity Projects Minimal Growth In Its Budget For 1988 . . . . . 34

G. Fidelity's Problems Continued Into 1988 And In Late 1988 Fidelity Prepared A Three-Year Business Plan That Was Based On Unrealistic Assumptions Concerning Its Loan Losses And The Condition Of The General Economy . . . . . 36

H. Fidelity Planed To Sell Its Freddie Mac Stock For Capital Gains Due To A Planned Reduction To Realize Profits And A Correction In The Price Of The Stock . . . . . 38

I. By The Fall Of 1988, Fidelity Recognized The Numerous Proposals Being Considered To Ensure That Thrifts Were Adequately Capitalized . . . . . 39

J. During 1989 Fidelity's Classified Assets Increased In Size and Severity . . . . . 40

VIII. FIRREA WAS ENACTED AND FIDELITY FELL OUT OF CAPITAL COMPLIANCE . . . . . 41

A. The Initial FIRREA Legislation Is Proposed And Amendments Considered . . . . . 41

B. The Final FIRREA Bill Is Passed . . . . . 42

IX. FIDELITY'S CAPITAL PLAN PROJECTED A CONTINUATION OF THE SAME BUSINESS PLAN IT HAD FOLLOWED SINCE 1987 . . . . . 44

A. Fidelity's Capital Plan Was A Continuation Of What The Thrift Had Been Doing Since 1987 As A Result Of Its Disastrous Loan Portfolio . . . . . 44

B. Fidelity's High Level Of Classified Assets Continued Through 1991 . . . . . 48

C. Following The 1991 Report Of Examination, Fidelity Was Placed Under A Supervisory Agreement Due To Its Failure To Correct Its Deficiencies In Dealing With Its Problem Loans . . . . . . . . . . . . . . . . . . . . . . . . . 50

D. Fidelity's Bad Loans Were Reduced Only Slightly In 1992 . . . . . . . . . . . . . . . . 51

X. FIDELITY UNDERWENT A SUCCESSFUL CONVERSION, REGAINED CAPITAL COMPLIANCE, AND WAS BOUGHT BY ASTORIA FOR CASH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

XI. ASTORIA, LIKE FIDELITY, CONVERTED TO A STOCK INSTITUTION IN 1993 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

A. Pre-FIRREA Astoria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

B. The Real Estate Recession In The Early 1990s Affected Astoria . . . . . . . . . . . . 55

C. Astoria Converted In 1993 For Reasons Wholly Apart From A Need To Meet Regulatory Capital Requirements . . . . . . . . . . . . . . . . . . . . . . . . 56

XII. POST-CONVERSION FIDELITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

XIII. FIDELITY AND ASTORIA AGREED TO MERGE IN A PURCHASE ACCOUNTING MERGER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

DEFENDANT'S CONTENTIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

I. ASTORIA'S RELIANCE DAMAGES CLAIM IS FORECLOSED BY BINDING PRECEDENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

A. An Overview Of Astoria's Reliance Damages Claim . . . . . . . . . . . . . . . . . . . . . 64

B. The Legal Standards For Proving Reliance Damages . . . . . . . . . . . . . . . . . . . . . 65

C. Astoria Has Failed To Identify Any "Cost" Incurred By Fidelity . . . . . . . . . . . . 67

D. Dr. Kaplan Ignores The Significant Benefits That Fidelity And Astoria Received From Suburbia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

1. Astoria Improperly Ignores Economic Benefits That Fidelity And Astoria Received At The Time Of The Breach . . . . . . . . . . . . . . . . 71

2. Astoria Errs By Ignoring Substantial Direct Benefits Attributable To Suburbia Before The Breach . . . . . . . . . . . . . . . . . . . . . . 73

II. ASTORIA'S RESTITUTION CLAIMS ARE DIRECTLY FORECLOSED BY BINDING PRECEDENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

A. An Overview Of Astoria's Restitution Claims . . . . . . . . . . . . . . . . . . . . . . . . . . 75

B. Functionally Identical Restitution Claims Already Have Been Rejected By The Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

C. Dr. Kaplan Incorrectly Assumes That The FSLIC Would Have Liquidated Suburbia If Fidelity Had Not Acquired It . . . . . . . . . . . . . . . . . . . . . . 80

D. Fidelity Lacked The Economic Capacity To Provide A Benefit In The Amount Claimed By Astoria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

E. Any Award Of Restitution Is Inappropriate In This Case, But Astoria Also Ignores Easily Identifiable, Offsetting Benefits . . . . . . . . . . . . 82

III. ASTORIA'S EXPECTANCY CLAIMS ARE UNSUPPORTED . . . . . . . . . . . . . . . . . . 83

A. Astoria's Lost Profits Model . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

1. Fidelity "Lost Profits" From 1989 To 1994 . . . . . . . . . . . . . . . . . . . . . . . 84

2. Astoria "Lost Profits" From 1995 to 2014 . . . . . . . . . . . . . . . . . . . . . . . . 86

B. Astoria's Hypothetical "Lost Profits" Were Not An Immediate And Proximate Result Of The Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

C. Astoria's Hypothetical Lost Profits Were Not Reasonably Foreseeable . . . . . . . 95

D. Astoria's Hypothetical "Lost Profits" Are Not Reasonably Certain . . . . . . . . . . . 97

1. Fidelity's 1989-94 Lost Profits Are Speculative . . . . . . . . . . . . . . . . . . . 99

a. Dr. Kaplan's Growth Rate Assumption Is Unsupported . . . . . . 100

b. Dr. Kaplan's Spread Assumption Is Unsupported . . . . . . . . . . . 102

2. Astoria's 1995-2014 Lost Profits Are Speculative . . . . . . . . . . . . . . . . . 104

3. Dr. Kaplan's "Lost Profits" Calculations Erroneously Fail To Adjust For A Non-Breach World . . . . . . . . . . . . . . . . . . . . . . . . . . 106

4. Astoria's Attempts To Distinguish Prior Cases Are Unavailing . . . . . . 107

G. Astoria's Claim Of An Alleged Forced Sale Of Freddie Mac Stock Is Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

1. An Overview of Astoria's Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

2. Astoria's Claim Of Forced Freddie Mac Stock Claim Is Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

H. Astoria's Claims For Allegedly Excessive FDIC And OTS Assessments Are Speculative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

1. Astoria Is Not Entitled To An Award Based Upon Speculation About What Fidelity's OTS Examination Assessments Might Have Been Absent The Phase-Out Of Goodwill . . . . . . . . . . . . . 115

2. Astoria Is Not Entitled To An Award Based Upon Speculation About What Fidelity's Deposit Insurance Premiums Might Have Been Absent The Phase-Out Of Goodwill . . . . . . . . . . . . . 116

XX. PLAINTIFF'S TAKINGS CLAIM IS BARRED AS A MATTER OF LAW AND NO EXPERT TESTIMONY CAN BE GIVEN CONCERNING THE VALUATION OF ITS TAKINGS CLAIM AT TRIAL . . . . . . . . . . . . . . . . . . . . . . . 118

# TABLE OF AUTHORITIES

## FEDERAL CASES

A.G. Route Seen P'ship v. United States,
57 Fed. Cl. 521 (2003) .......... 121

Admiral Fin. Corp. v. United States,
378 F.3d 1336 (Fed. Cir. 2004) .......... 120, 121

Albert & Son v. Armstrong Rubber Co.,
178 F.2d 182 (2d Cir. 1949) .......... 66

American Fed. Bank, F.S.B. v. United States,
62 Fed. Cl. 185 (2004) .......... 98

Ariadne Fin. Servs., Pty. Ltd. v. United States,
133 F.3d 874 (Fed. Cir. 1998) .......... 90

Aurigemma v. Arco Petroleum Prods. Co.,
734 F. Supp. 1025 (D. Conn. 1990) .......... 82

Bailey v. United States,
341 F.3d 1342 (Fed. Cir. 2003) .......... 120, 121

Bank United of Texas, F.S.B. v. United States,
50 Fed. Cl. 645 (2001), rev'd in part, 80 Fed. Appx. 663,
2003 WL 22177282 (Fed. Cir.
2003), cert. denied, 543 U.S. 916 (2004) .......... 98

Bluebonnet Sav. Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001) .......... 84

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) .......... *passim*

Bohac v. Dep't of Agriculture,
239 F.3d 1334 (Fed. Cir. 2001) .......... 95

California Fed. Bank, FSB v. United States,
43 Fed. Cl. 445 (1999), rev'd on other grounds,
245 F.3d 1342 (Fed. Cir. 2001 .......... 23, 96

California Fed. Bank, F.S.B. v. United States,
54 Fed. Cl. 704 (2002), aff'd, 395 F.3d 1263
(Fed. Cir. 2005), cert. denied, 126 S.
Ct. 344 (2005) .......... 98, 99

California Fed. Bank, F.S.B. v. United States,
245 F.3d 1342 (Fed. Cir. 2001) .......... 78

California Fed. Bank, F.S.B. v. United States,
395 F.3d 1263 (Fed. Cir. 2005) .......... 84

Carley Capital Group v. City of Newport News,
709 F. Supp. 1387 (E.D. Va. 1989) .......... 66

Caroline Hunt Trust Estate v. United States,
65 Fed. Cl. 271 (2005) .......... 79

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd in part & rev'd in part,
301 F.3d 1328 (Fed. Cir. 2002), cert. denied, 539 U.S. 925 (2003) .......... 98

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002) .......... *passim*

Chain Belt Co.v. United States,
115 F. Supp. 701 (Ct. Cl. 1953) .......... 111

Citizens Fed. Bank v. United States, 52 Fed. Cl. 561 (2002)
aff'd, 474 F.3d 1314 (Fed. Cir. 2007) .......... 79

Citizens Fed. Bank v. United States,
474 F.3d 1314, 2007 WL 162820 (Fed. Cir. 2007) .......... 88, 89

Citizens Fin. Serv., F.S.B. v. United States,
64 Fed. Cl. 498 (2005), aff'd, 170 Fed.Appx. 129,
2006 WL 618792 (Fed. Cir. 2006)
(aff'd pursuant to Fed. Cir. Rule 36) .......... 98

Columbia First Bank, F.S.B. v. United States,
60 Fed. Cl. 97 (2004) .......... *passim*

Comm. Fed. Bank, F.S.B. v. United States,
59 Fed. Cl. 338 (2004), aff'd, 125 Fed. Appx. 1013
(Fed. Cir. 2005) (aff'd pursuant to Fed. Cir. Rule 36) ........ *passim*

Danzig v. AEC Corp.,
224 F.3d 1333 (Fed. Cir. 2000) ........ 90

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) ........ *passim*

Fed. Deposit Ins. Corp. v. United States,
342 F.3d 1313 (Fed. Cir. 2003) ........ 120

Fifth Third Bank v. United States,
55 Fed. Cl. 223 (2003) ........ *passim*

Finley v. Marathon Oil,
75 F.3d 1225 (7th Cir. 1996) ........ 76

First Fed. Lincoln Bank v. United States,
73 Fed. Cl. 633 (2006), appeals docketed No.07-5044 (Fed. Cir. 2007) ........ *passim*

First Fed. Savings Bank of Hegewisch v. United States,
57 Fed. Cl. 316 (2003) ........ 121

Franklin Fed. v. United States,
55 Fed. Cl. 108 (2003) ........ *passim*

Frazier v. United States,
67 Fed. Cl. 56 (2005) ........ 90

Glendale Fed. Bank, F.S.B. v. United States,
43 Fed. Cl. 390 (1999) aff'd in part, vacated in part,
& remanded, 239 F.3d 1374 (Fed. Cir. 2001) ........ 98

Glendale Fed. Bank, FSB v. United States,
54 Fed. Cl. 8 (2002) ........ 69

Glendale Fed. Bank F.S.B. v. United States,
378 F.3d 1308 (Fed. Cir. 2004) ........ *passim*

Glendale Fed. Bank, F.S.B. v. United States,
239 F.3d 1374 (Fed. Cir. 2001) ........ *passim*

Globe Savings Bank, F.S.B. v. United States,
65 Fed. Cl. 330 (2005) aff'd in part, vacated in part, No. 06-5001,
189 Fed.Appx. 964, 2006 WL 2045776 (Fed. Cir. 2006). .......... 98

Granite Mgmt. Corp. v. United States,
55 Fed. Cl. 164 (2003) .......... 121

Granite Mgmt. Corp. v. United States,
58 Fed. Cl. 766 (2003) .......... 67, 69

Granite Mgmt. Corp. v. United States,
416 F.3d 1373 (Fed. Cir. 2005) .......... 78

Granite Mgmt. Corp. v. United States,
74 Fed. Cl. 155 (2006) .......... *passim*

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) .......... 74, 89

Herman Schwabe, Inc. v. United Shoe Mach. Corp.,
297 F.2d 906 (2d Cir. 1962) .......... 97

Hughes Commc'n Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) .......... 112, 119

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 101 (1999) .......... 67, 98

LaSalle Talman Bank, F.S.B. v. United States,
64 Fed. Cl. 90 (2005), aff'd, 462 F.3d 1331 (Fed. Cir. 2006) .......... 98, 99

LaSalle Talman Bank, F.S.B v. United States,
317 F.3d 1363 (Fed. Cir. 2003) .......... *passim*

LaVan v. United States,
382 F.3d 1340 (Fed. Cir. 2004) .......... *passim*

Landmark Land Co. v. United States,
46 Fed. Cl. 261 (2000), aff'd in part, rev'd in part,
256 F.3d 1365 (Fed. Cir. 2001) .......... 22

Landmark Land Co. v. United States,
256 F.3d 1365 (Fed. Cir. 2001) ........................................................................ *passim*

Long Island Sav. Bank, FSB v. United States,
60 Fed. Cl. 80 (2004), rev'd on other grounds,
476 F.3d 917 (Fed. Cir. 2007) ........................................................................ 69, 79

Mobil Oil Exploration & Producing Southeast, Inc.,
503 U.S. 604 (2000) ........................................................................ 82

Mola Dev. Corp. v. United States,
74 Fed. Cl. 528 (Fed. Cl. 2006) ........................................................................ 121

Myerle v. United States, 33 Ct. Cl. 1 (1897) ........................................................ *passim*

N. Helex Co. v. United States, 225 Ct. Cl. 194, 634 F.2d 557 (1980) ........................ 66

Nat'l. Australia Bank v. United States,
55 Fed. Cl. 782 (2003) ........................................................................ 121

Resolution Trust Corp. v. FSLIC,
25 F.3d 1493 (10th Cir. 1994) ........................................................................ 43

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) ........................................................................ 97

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003) ........................................................................ 97

S. Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003) ........................................................................ *passim*

S. Pac. Comm. Co. v. AT&T,
556 F. Supp. 825 (D.D.C. 1982) ........................................................................ 97

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) ........................................................................ 97

S. Cal. Fed. Sav. & Loan Ass'n. v. United States,
57 Fed. Cl. 598 (2003), aff'd in part, rev'd in part, &
remanded, 422 F.3d 1319 (Fed. Cir. 2005), petition for cert. filed,
74 U.S.L.W. 3560 (U.S. Mar 21, 2006) (No. 05-1221) ............................................ 98

Standard Fed. Bank v. United States,
62 Fed. Cl. 285 (2004) ........................................................................ *passim*

Suess v. United States,
52 Fed. Cl. 221 (2002) reconsideration denied, 54 Fed. Cl. 606 (2002) .................................... 98

Sun Oil Co. v. United States, 215 Fed. Cl. 716, 572 F.2d 786 (1978) .................................... 120

Svendborg v. United States,
131 Ct. Cl. 130 F. Supp. 363 (Ct. Cl. 1955) ............................................................................. 81

Trilogy Comm. v. Times Fiber Comm.,
109 F.3d 739 (Fed. Cir. 1997) ...................................................................................................... 76

United States v. Winstar Corp.,
518 U.S. 839 (1996) ..................................................................................................................... 10

Wells Fargo Bank v. United States,
88 F.3d 1012 (Fed. Cir. 1996) .............................................................................................. *passim*

Westfed Holdings, Inc. v. United States,
407 F.3d 1352 (Fed. Cir. 2005) .................................................................................................... 67

**STATUTES**

12 U.S.C. § 1464 (t)(9)(c) ............................................................................................................ 42

FDIC Improvement Act of 1991, 12 U. S. C.§ 1464 ................................................................. 54

Financial Institutions Reform, Recovery and
Enforcement Act of 1989, 103 Stat. 183 (1989) ............................................................................ 3

Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085 ................................................... 27

**RULES & REGULATIONS**

12 C.F.R. § 567.5(a)(1-2) ............................................................................................................ 42

OTS Thrift Bulletin 38-2 ............................................................................................................... 42

Procedural Order No. 2: Discovery Plan (Aug. 7, 1997), § V(A)(1-4) ....................................... 76

Regulatory Bulletin 3a-1 ................................................................................................................ 91

RCFC Rule 37c)(1) ........................................................................................................................ 76

## MISCELLANEOUS

2 David B. Dobbs, Law of Remedies (2d ed. 1993)
§ 12.3(1), at 51-52 .......... 66

3 David B. Dobbs, Law of Remedies (2d ed. 1993)
§ 12.3(2) .......... 66, 72

5 Arthur Corbin. Corbin on Contracts, §1012 at 88 (1964) .......... 95

Charles T. McCormick, Damages,§ 142, at 584 (1935) .......... 66

John D. Calamari & Joseph M. Perillo, The Law of Contracts,
§ 14-9 (3d ed 1987) .......... 65

Restatement (Second) of Contracts § 344(a) (1981) .......... 82

Restatement (Second) of Contracts § (1) (1981) .......... 82

Restatement (Second) of Contracts § 344(b) .......... 65

Restatement (Second) of Contracts § 347 (1981) .......... 84

Restatement (Second) of Contracts § 347 cmt. b (1981) .......... 89

Restatement (Second) of Contracts § 349(b) (1979) .......... 65

Restatement (Second) of Contracts § 350 .......... 94

Restatement (Second) of Contracts § 351(2) .......... 95

Restatement (Second) of Contracts § 351, cmt.a .......... 95

Restatement (Second) of Contracts § 352 (1981) .......... 97

Restatement (Second) of Contracts § 371, cmt. a .......... 82

Restatement (Second) of Contracts § 384 (1), cmt. a .......... 82

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 95-468C<br>(Judge Thomas C. Wheeler) |

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## INTRODUCTION

In October 1984, Fidelity New York, F.S.B. ("Fidelity"), a thrift located in Long Island, New York, acquired Suburbia Federal Savings and Loan Association ("Suburbia"), another Long Island thrift. Like most thrifts at that time, Suburbia was struggling with interest-rate spread problems. While Suburbia required and was receiving regulatory assistance in 1984, its health was expected to improve dramatically with a decrease from the high level of interest rates prevailing at that time.

Fidelity's merger with Suburbia was voluntarily undertaken, as both thrifts anticipated enormous benefits from the transaction. Fidelity paid nothing to acquire Suburbia and obtained millions in assistance from the Federal Savings and Loan Insurance Corporation ("FSLIC"), tens of millions in tax benefits, a valuable banking franchise, savings from economies of scale, and increased banking capabilities -- and almost tripled in size. Furthermore, pursuant to the contract entered into between Fidelity and the FSLIC in connection with the merger, Fidelity was

permitted to utilize the unamortized balance of the goodwill created at the time of the acquisition toward its regulatory capital levels.

After acquiring Suburbia, however, Fidelity squandered the opportunities given to it with the Suburbia acquisition. Fidelity pursued a deliberate policy, begun with its earlier acquisition of another thrift, Dollar Federal Savings & Loan Association ("Dollar Federal"), of making high-risk commercial loans, concentrating its loans with just a handful of large developers. In pursuit of its high-risk loan policy, Fidelity sold off a large amount of the assets it acquired from Suburbia, traditional one to four family loans, and it reinvested the proceeds in the risky concentrations. Despite repeated warnings from thrift regulators, by 1986, fully one-fourth of Fidelity's assets were high-risk commercial loans. As late as April 1987, Fidelity continued making large-concentration loans, including, for example, a $24.5 million loan to Glick Development, which defaulted on its loan, requiring foreclosure and substantial losses by Fidelity. Another developer. Mr. Gerald Guterman, improperly provided Fidelity's two top officers and directors, Thomas D. Lovely and Bruno Greco with insider deals on condominium units. Mr. Guterman later defaulted on nearly $30 million in loans, requiring foreclosure, and more losses, by Fidelity. Years later when these insider deals were discovered by regulators, Messrs. Lovely and Greco were banned from the banking industry for life.

In 1987, the bottom fell out of the commercial real estate development market in New York, the result of an overextended market and the repeal of tax laws favorable to real estate investments. Within a year-and-a-half period, from June 1986 to September 1987, Fidelity's classified loans increased exponentially, from $16 to $84 million, with $46 million of these loans nonearning assets. Fidelity's decision to pursue concentrations in high-risk loans had more than

backfired; it had placed the institution in a position where regulators felt that, unless prompt action was taken, the "future viability" of the thrift was at risk.

The extent of Fidelity's problems was revealed in the 1987 examination of the thrift by the Federal Home Loan Bank Board ("FHLBB"), the predecessor to the Office of Thrift Supervision ("OTS"). At the conclusion of the examination, (which devoted nearly one hundred pages to Fidelity's criticized assets), the FHLBB assigned Fidelity the second lowest rating a thrift can receive, a "4," just one rating numeral above a "5" rating, which signifies that a thrift has an "extremely high immediate probability of failure." At that time -- almost two years before the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA") -- Fidelity had a high rating for its "capital," possessing the entire unamortized balance of goodwill created with the Suburbia acquisition. Thus, before FIRREA and wholly apart from its capital level, regulators found Fidelity to be in a highly unsatisfactory condition with "major and serious problems."

During 1986, Fidelity retained additional upper level management, but they, too, soon discovered the severity of Fidelity's asset problems. After a period of "pulling teeth," these new officers finally persuaded Messrs. Lovely and Greco to cease making additional high-risk loans. Unfortunately for Fidelity, however, things only got worse. Between October 1987 and November 1989, Fidelity's classified loans increase by another 20 percent, as the economy in New York continued to worsen. Fidelity's bad loans continued deteriorating through the early nineties. Ultimately, Fidelity had to set aside more than $80 million in loss allowances for losses incurred between January 1986 and December 1994.

In August 1989, FIRREA was passed by Congress, an act that breached plaintiff's contract with the Government. Plaintiff claims it was injured by the breach because it lost the opportunity to grow the thrift, was required to sell certain securities (beginning in early 1989), and was required to pay higher examination assessments and insurance premiums. Yet in presenting its contentions of fact and law, plaintiff completely ignores -- literally -- the findings of the FHLBB's 1987 report of examination. These findings with respect to Fidelity's asset quality, and the continuation of these problems through the OTS's 1993 examination of the thrift, are fatal to plaintiff's "lost profits" claims.

Given the problems uncovered in the 1987 examination, which resulted in a "4" rating at a time when the thrift had a high capital rating -- and given the continuation and exacerbation of those problems as the New York and national economies fell into recession through the end of 1991 -- Fidelity would have been a "4" rated institution regardless of the breach. As such, pursuant to a thrift regulation that required *all thrifts rated a "4"* to cease their growth, Fidelity would have been required to restrict its growth with or without the inclusion of goodwill toward its regulatory capital levels. Furthermore, OTS guidelines specifically prohibited "4" rated institutions from engaging in risk-controlled arbitrage transactions, the very type of growth Dr. Kaplan purports to have modeled for the "but-for Fidelity." Moreover, given its "4" rating prior to FIRREA and the certain continuation of that rating into the post-FIRREA period, even in a non-breach world, Fidelity would have been subject to the same level of examination assessments and insurance fees, and it would have presented the same risks to the insurance fund and same interest rate risk problems that concerned regulators.

During 1993, Fidelity converted from a mutual to stock institution, raising $57 million in the process. Moreover, by 1993, Fidelity's asset quality improved, in large part due through the write-offs of large portions of its loans. Accordingly, within days of the thrift's conversion, (an action Fidelity's expert admits it would have taken at about the same time irrespective of the breach), restrictions on its growth were lifted by regulators and it was free to grow as it saw fit.

Less than two years after it converted, Fidelity agreed to be purchased by Astoria, at great profit to Fidelity's shareholders and management. Astoria is an institution with a long history of being *over*-capitalized. Following Astoria's acquisition of Fidelity, it returned billions of capital to its shareholders through stock repurchases and dividends. These facts demonstrate that Astoria would have had no use for the hypothetical leverage that additional goodwill could have provided it -- assuming it could have been transferred from Fidelity to Astoria, which it could not, both as a matter of its contract with the FSLIC and generally accepted accounting principles.

Thus, any purported lost profits damages calculated after Fidelity's conversion or Astoria's acquisition of Fidelity fail the tests of causation. Fidelity faced no regulatory restriction on its growth after its conversion, and Astoria certainly never had any restriction on its growth due to the lack of leverage capacity based upon additional goodwill.

Not only do Fidelity's lost profits claims fail the test of causation (and, accordingly, foreseeability), the methodology presented by plaintiff's expert is grossly speculative and cannot form the bases for any lost profits award. For example, plaintiff's expert, Dr. Kaplan, calculates damages beginning in January 1989, almost a year before FIRREA's implementing regulations took effect. Furthermore, he proposes a wholly speculative but-for thrift whose growth rates and rates of return do not correspond to the actual whole bank's assets or liabilities. Nor does the

type of growth proposed by Dr. Kaplan correspond to the thrift's business plans, which indicated the type of assets the thrift would have pursued but for the downturn in the economy and the thrift's preoccupation with its huge portfolio of failing loans. Instead, Dr. Kaplan purports to model, for the period 1989 through 1994, a portfolio of a vaguely defined class of mortgage-backed securities ("MBS"), funded by similarly vaguely identified wholesale liabilities. Even here, however, Dr. Kaplan hypothesizes holdings of MBS that disregard the full array of MBS actually held by Fidelity. For the period 1995 through 2014, Dr. Kaplan makes no representation concerning the assets or liabilities he purports to model, making his model wholly speculative. Indeed, Dr. Kaplan's modeling of lost profits has been rejected before by this Court in another Winstar-related case -- where Dr. Kaplan also projected hypothetical leveraging of goodwill into purchases of MBS -- precisely because he proposed a but-for thrift that deviated from the actual thrift's performance and plans and because, as here, his damage claim amounted to nothing more than an unsupported assumption that increased leverage capacity results, necessarily, in profits.

In addition to its lost profits claims, Fidelity asserts three other theories of damages: restitution, calculated as costs of liquidation purportedly avoided by the Government; reliance calculated in relation to the net liabilities assumed by Fidelity at the time of its acquisition of Suburbia; and takings damages. All three theories are precluded by repeated binding decisions of the Court of Appeals for the Federal Circuit.

**DEFENDANT'S CONTENTIONS OF FACTS**

## I. HISTORY OF THRIFT RESOLUTION OPTIONS AND LIQUIDATIONS

1. Traditionally, the FSLIC used three primary mechanisms to prevent the default of institutions: the purchase of problem assets; assisted mergers; and capital contributions from the Government. DX 195 at FGC 016 1248.

2. By 1981, however, the FSLIC understood that its capital reserves were not adequate to deal with the magnitude of problem thrifts with these methods alone. Accordingly, it introduced new alternatives to avoid the default of thrifts: various forms of mergers, including interstate and inter-industry mergers and the use of income capital certificates. Id.

3. In March 24, 1983, the FHLBB and FSLIC issued a memorandum (revising a similar memorandum issued in 1982) to facilitate the most efficient resolution of supervisory cases. DX 312 at D3-0006238. Those guidelines, which remained in place until 1986, set forth the mechanisms by which the FSLIC and FHLBB intended to resolve thrifts whose problems required regulatory supervision. The resolution solutions were arranged in order of desirability. The preferred method of resolving thrifts was the introduction of new capital into the thrift from outside the Government. Following that were methods involving various forms of mergers, whereby weak institutions would merge into stronger institutions; the introduction of new capital assistance from the Government; mergers involving Government assistance; and inclusion in the so-called Phoenix program, where several troubled thrifts were combined into a new thrift. The last option considered to resolve a troubled thrift was a liquidation. DX 312 at D3-0006238-42.[1]

[1] The revised guidelines issued in 1986 maintained the basic preference order for resolving troubled institutions, again placing liquidation as the least preferable method for resolving a supervisory case. PX 370 at 1-6.

4. In the early 1980s (and for all relevant time periods with respect to the FSLIC's resolution of Suburbia), it was well known that FSLIC had very little capital available to liquidate thrifts. [Eggleston Tr. 181]. For example, in 1983, FSLIC noted that it had 53 cases requiring supervisory resolution with total assets of $17.6 billion, while it had a primary reserve of only $5.7 billion. DX 195 at FGC 016 1248, 1308.[2] Given its outstanding assistance commitments at that time, and given the continuing decline of the health of a large number of thrifts, the FSLIC was effectively near-insolvent. DX 195 at FGC016 1308. Government policy in the early 1980s operated on the assumption that market interest rates would decline and alleviate, at least partially, the problems of the thrift industry. DX 1147 at 25 [Carron].

5. In fact, in 1983, at a time when Suburbia had $700 million in assets, the FSLIC liquidated only six small institutions in the entire United States, whose assets cumulatively totaled $295 million, with the average asset size totaling only $49 million. DX 195 at FGC016 1250. None of these institutions were located in the Northeast United States, and the problems that predominated were asset quality problems (e.g., loans that were not being repaid), not interest rate differential or interest "spread" problems.[3] Id.; DX 197 at FGC016 1353.

6. In 1984, for the entire United States, the FSLIC liquidated only nine institutions, with combined deposits of $829 million, with the size of the average thrift totaling $92 million. DX 197 at FGC016 1356. As the FSLIC noted, "severe asset quality problems, which are much

---

[2] In a paper published in February 1992, Dr. Carron, one of the Government's experts in this case, predicted that the liquidation costs of the thrift industry would be $44.1 billion, whereas assistance costs would be just $6.14 billion. DX 1147 at 26.

[3] "Spread" problems were caused by the high price of short-duration funding sources (e.g., deposits), relative to the low returns on long-term assets (e.g., fixed rate mortgage loans).

more complex and expensive to resolve [than thrifts with spread problems]" predominated as the FSLIC undertook resolution actions in 1984. DX 197 at FGC016 1353. None of the thrifts that were liquidated were located in the Northeast United States. DX 197 at FGC016 1356.

7. In 1985, for the entire United States, the FSLIC liquidated only ten institutions, with the average institution liquidated holding $189 million in deposits. PX 375 at 27. None of these institutions were located in the Northeast. Id.

8. Indeed, in the ten years from 1980 to 1989, there were no savings and loan associations in the states of Connecticut, Delaware, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont that were disposed of via "payoffs" or liquidations. DX 3063 at 1-4.

9. Where the FSLIC did liquidate thrifts during this time period, it did so primarily where a thrift had bad assets, rather than a mere interest spread problem, which affected the majority of thrifts in the United States at that time.

## II. FIDELITY'S ACQUISITION OF DOLLAR FEDERAL

10. Fidelity acquired Dollar Federal Savings & Loan Association ("Dollar Federal") on June 30, 1982. The acquisition of Dollar Federal consisted of a takeover of assets and the assumption of existing liabilities outstanding at the date of acquisition. Fidelity paid no cash or other consideration in connection with the acquisition. PX 1283 at AST060064.

11. Fidelity acquired approximately $105 million in assets from Dollar Federal; it increased its branches from 4 to 8; and it increased its deposits by almost $70 million, to a total of $273.4 million. PX 1283 at AST060064; PX 985 at AST064173.

12. Fidelity accounted for the acquisition of Dollar Federal as a purchase. The goodwill, or excess cost over fair market value of the net assets acquired was $25.8 million. This amount was being amortized to expense over thirty years using the straight-line method. PX 1283 at AST060064. Regulations existing at the time of the Dollar acquisition permitted Fidelity to utilize this goodwill toward its regulatory capital computations. United States v. Winstar Corp., 518 U.S. 839, 850 (1996).

13. Fidelity recorded $28 million in discounts on the mortgage loans acquired from Dollar Federal. These discounts were to be accreted into income over ten years using the sum-of-the-months digit method. PX 1283 at AST060064. Accordingly, when Fidelity undertook its acquisition of Dollar, it understood that -- at the latest -- ten years after its acquisition, or by 1992, it would face as an expense the continued amortization of the Dollar goodwill without any corresponding accretion of income from the loan discounts to offset that expense.

14. With the implementation of FIRREA's capital rules, Fidelity was required to phase out the remaining Dollar goodwill on its books as a component of regulatory capital, or approximately $19.3 million by the end of 1994. DX 79 at PAA012 1965. At that time, the Dollar goodwill, for which plaintiff has no contractual claim, constituted 13.5 percent of the total goodwill set forth on Fidelity's books. PX 1314 at Ex. 15.

## III. SUBURBIA FACED INTEREST RATE SPREAD PROBLEMS

15. Like Fidelity, Suburbia was a Long Island thrift, but, with almost $700 million in assets, was substantially larger than Fidelity in terms of asset size, deposits and branches. DX 3148 at PAA090 0102.

16. Suburbia was not a thrift with bad assets. As plaintiff admits: "Suburbia's asset portfolio was mainly thirty-year single family mortgage loans." Pl. Mem. (Feb. 15, 2007) at 11. Suburbia had been profitable until around 1979 or 1980, when a negative trend in operating profitability developed due to the high cost of funds, or short term liabilities, relative to the low interest income received on its long-term loans, or assets. This caused an interest spread problem. As a result, Suburbia's net worth had gradually declined since 1982. Other than its spread problems, Suburbia had no other problem that significantly affected its performance. [Kane Tr. at 15-19, 24-25]. [4/]

17. Suburbia had operated relatively free of supervisory concern prior to the precipitous upturn in market interest rates in 1979-1980. PX 235 at AA 0000198. Mr. Kane, Suburbia's CEO and chairman of its board, testified that, if interest rates had come down in the early 1980s, Suburbia would no longer have faced an operating deficit and would have started to return to favorable operating results. [Kane Tr. at 22].

18. Lower and stable interest rates in 1983 provided a more favorable operating environment for the savings and loan industry. Approximately two-thirds of District II FSLIC-insured institutions operated profitably in the second half of 1983 and the first quarter of 1984, compared to 25% or less in late 1981 to early 1982. The proportion of institutions reporting profits increased during the second quarter of 1984. PX 235 at AA 0000196.

19. Despite these improved operating prospects, the Federal Home Loan Bank of New York ("FHLB of NY") found that many institutions remained vulnerable to fluctuations in short-term interest rates. This exposure was expected to continue until institutions were able to

[4] All cites to transcripts herein are in reference to depositions taken in this case.

add additional adjustable rate assets to their portfolios and reduce the disparity between rate sensitive assets and liabilities.

20. Suburbia was confident that, given a stabilized economic environment, a restructuring of the asset side of its balance sheet and an enactment of a prudent but aggressive capital acquisition program, it could return to profitability within one and a half to two years. DX 3126. Indeed, Suburbia projected in its Business Plan dated January 1, 1984, that Suburbia would again have positive net income by 1985. PX 148 at OAA005 2781.

21. In short, Suburbia's problem "wasn't a credit problem," but was an "interest rate" problem. Accordingly, regulators did not feel that there was a crisis with respect to Suburbia but they realized some FSLIC assistance would be needed for the thrift. [Spaid Tr. at 7, 74]; PX 237 at AA 0000177; DX 3113 at OAA005 2534.

22. As of July 1982, the FSLIC was reviewing a proposal to consolidate four Long Island associations, including Suburbia, with assistance. At the same time, the supervisory agent planned to continue to search for merger partners for Suburbia. The FHLBB stated, however, that if an acceptable bid was not received, or if the FSLIC did not approve the consolidation proposal, Suburbia would likely be merged into the Suffolk County FS&LA, the Long Island "Phoenix." DX 3113 at OAA005 2533-34; DX 3114 at OAA005 2525.

23. By the end of July 1982, Suburbia had submitted a proposal, along with three other Long Island based associations, for a FSLIC-assisted consolidation. PX 44 at AST0301912; DX 3114 at OAA005 2525.

24. In December 1982, the FSLIC held a bidder's conference to solicit proposals for an assisted acquisition of Suburbia. PX 235. Bidders' packages for Suburbia were distributed to 25 potential acquirers. PX 235 at AA 0000198; PX 102 at OAA005 0463; PX 237 at AA 0000178.

25. Four thrift institutions from New York submitted bids to acquire Suburbia. PX 237 at AA 0000178. The present value cost estimate of the lowest cost bidder at that time, Anchor Savings Bank, was $17.9 million. PX 237 at AA 0000178. The present value cost estimate of the proposal of the second lowest bidder at that time, Albany Savings Bank, was $20.6 million. PX 237 at AA 0000178.

26. After the bidder's conference, new legislation became effective in early 1983 (the Garn-St Germain Net Worth Capital Assistance Program) providing FSLIC with additional mechanisms to assist thrifts without the expenditure of FSLIC's limited cash resources. Following from the new legislation, Suburbia applied for and began receiving millions in capital in the form of promissory notes from the FSLIC. In return, Suburbia issued Net Worth Certificates ("NWCs") to the FSLIC. PX 237. These net worth certificates were issued during 1983 and continued throughout 1984 pursuant to the FSLIC's ready grant of NWCs in response to Suburbia's applications. Through the NWC program, the FSLIC provide Suburbia with $9.2 million in regulatory capital during 1983 and 1984. Given this new assistance from the FSLIC, Suburbia chose to continue operating independently, thus rendering a merger with another thrift in 1982 unnecessary. As a result, efforts to merge the association by the FSLIC were discontinued. PX 235 at AA 0000198.

27. Suburbia, however, continued to search for voluntary merger partners on its own. Thus, three months after the bidders conference in December 1982, Suburbia was exploring a voluntary merger with another institution, Heritage Federal Savings & Loan Association ("Heritage"), which was eventually unsuccessful. PX 102 at OAA005 0462; DX 518 at PAA050 0940; PX 125 at OAA005 2603.

28. At the end of 1983, Suburbia was in discussion with another entity, Coronet Properties Company "Coronet"), concerning a proposed conversion of Suburbia to a stock form and a purchase by Coronet Properties. DX 517 at PAA050 1243. After discussions, however, Chairman Kane broke off further discussions with Coronet. DX 119 at PAA050 1277.

29. Suburbia continued to seek out potential merger partners. DX 521 at PAA050 0211. Indeed, as Mr. Lovely admitted, at the time of Suburbia's merger with Fidelity, "West Coast and other institutions [] were interested in acquiring Suburbia." [Lovely Tr. at 14].

30. In April 1984, Fidelity resolved to pursue a merger with Suburbia under the FSLIC's Voluntary Assisted Merger Program ("VAMP") and Suburbia approached regulators concerning the possibility of a voluntary merger with Fidelity. PX 164 at AST110570. Mr. Kane testified that he did not fear that Suburbia would be liquidated if it did not merge with Fidelity. [Kane Tr. at 40]. Indeed, Mr. Kane never seriously thought that Suburbia would be liquidated. Id. Instead, Mr. Kane explained, "maybe we would have an unfriendly merger set up by the efforts of the FSLIC, [and] have no control over any of our destinies." [Kane Tr. at 98]. Indeed, since Suburbia's problems were primarily due to an interest rate mismatch, Mr. Kane explained, once interest rates declined, Suburbia's operating results were expected to turn positive. [Kane Tr. at 24-25].

31. Mr. Kane viewed a merger with Fidelity as a "friendly merger," in which "we were going to have some of our directors on a combined board" and "all our management would stay in place." Id. Furthermore, Mr. Lovely was "very good friends" with Suburbia's Bob Miller. [Lovely Tr. at 13-14].

32. Mr. Vigna believed that Suburbia would be eligible for the FSLIC's VAMP, and he recommended a maximum assistance allocation of $16 million or 2.5% Suburbia's assets, which he felt would be sufficient to interest one or more potential acquirers and reasonably assure the resultant institution's long-term viability. PX 169 at OAA005 2713-14. Given the FHLBB's recommendation, Fidelity and Suburbia submitted a VAMP proposal in May 1984. PX 186 at OAA005 1793; PX 235 at AA 0000198.

33. After further consideration, the FHLBB decided that Fidelity could not acquire Suburbia under the VAMP because, by regulation, where certain FSLIC assistance (e.g., permission to amortize the value of any intangible assets resulting from the merger over 30 years) would be given in connection with the acquisition, the VAMP was not permitted. PX 237 at AA0000178-79; DX 406A at WOL315 0368-69.

34. In July 1984, Fidelity submitted another proposal to merge with Suburbia. PX 185 at OAA005 0820. This second proposal was based upon the earlier VAMP proposal and the related business plan which had been reviewed previously by the FHLBB. Id.; PX 186 at OAA005 1793; PX 193 at AST069476.

35. In connection with this second proposal, Fidelity requested the same amount of FSLIC cash assistance infusion, $16 million, as had been proposed for the VAMP deal. PX 185 at OAA005 0821.

36. The Agreement of Merger between Fidelity and Suburbia was signed and dated August 24, 1984. PX 204 at AST068956, AST068968.

37. No cash or other consideration was paid by Fidelity in connection with its acquisition of Suburbia. PX 1283 at AST060063.

38. According to Fidelity's July 5, 1985 Report of Examination, Fidelity's total regulatory net worth as of September 30, 1984 was $22.429 million. PX 335 at AST002387. It had less than $23 million in book capital. Id. On a mark-to-market basis, there can be little doubt that its value was far lower than $22 million. DX 1147 at 27; [Carron]. Thus, Fidelity lacked the capacity to relieve the FSLIC of the burden of protecting insured depositors. Id.

## IV. THE BENEFITS OF THE FIDELITY AND SUBURBIA MERGER

39. Fidelity and Suburbia felt that there were a number of benefits to be obtained through the merger. For example, according to the "Proposed Merger Plan" between Fidelity and Suburbia, the thrifts believed that, by combining the two institutions, services to depositors would be expanded and increased by introducing new services of both institutions to each other's depositors such as: discount brokerage, life insurance, debit cards, statement savings, mortgage banking, consumer loans, business loans, various plans of home improvement loans, student loans, and I.R.A. loans. DX 3148 at PAA090 0101. By offering these additional services, Fidelity felt it could better compete with commercial banks and money market funds and therefore, attract more capital into the thrift. Id.; DX 3195 at OAA005 0514. Thus, acquiring Suburbia benefitted Fidelity by permitting it to grow as it desired in its market. [Greco Tr. at 42].

40. Furthermore, Fidelity stated that the management team resulting from the merger of the two associations would be "significantly strengthened." DX 3148 at PAA090 0102. Mr. Kane, for one, believed that Fidelity had weak management, a concern that regulators later shared with respect to Messrs. Lovely and Greco, and the Fidelity management team then underneath them. [Kane Tr. at 98-99].

41. The merger of Fidelity and Suburbia was a good fit because there was no overlap of markets. [Lovely Tr. at 81, 111]. Further, Suburbia "had a terrific branch network" [Lovely Tr. at 77], which gave Fidelity a foothold in a new market that Fidelity hoped would make it "a premier institution in the Long Island area." [Lovely Tr. at 81-82, 111-12]

42. Moreover, the combined institution stood to benefit because economies to be achieved by the merger were planned at a minimum of $1.0 million annually in overhead, including the attrition of personnel. DX 3148 at PAA090 0102; [Greco Tr. at 59]; DX 3195 at OAA005 0515.

43. At the time of its merger, Fidelity intended to pursue mortgage banking, increased joint venture activity, commercial and consumer lending, discount brokerage, and equipment leasing. DX 3148 at PAA090 0109. It did not have a plan to increase its holdings of mortgage-backed securities ("MBS"), which totaled only $67.8 million out of total assets of $521.6 million as of February 1984. DX 3148 at PAA090 0118. Nor did it plan to increase its wholesale borrowings, which totaled only about $54 million at that time. Id.

44. In addition to the operational and management benefits from the merger, Fidelity stood to gain by the merger through its use of Suburbia's significant amount of net operating loss carryovers ("NOLs"). DX 3148 at PAA090 0196. Fidelity inherited more than $74.8 million in

NOLs from Suburbia. These NOLs could be (and were) used to shield future profits of Fidelity from taxes. DX 3204 at PAA048 0216; DX 3201 at PAA048 0001; DX 3153 at PAA 112 1202; PX 277 at AST068399-400; DX 3202. In fact, between 1987 and 1993 alone, Fidelity used $18.5 million of its NOLs. PX 1283 at AST060064; PX 476 at AST058804; PX 887 at AST59673; PX 1323 at KPMG 012429.

45. Fidelity also stood to benefit through the accretion into income of the loan discounts recognized with the mark-to-market of Suburbia's loans. DX 3148 at PAA090 0197.

46. In its proposed merger plan, Fidelity informed regulators that it intended to "completely restructure" its assets and liabilities following the merger. DX 3148 at PAA090 0109. Fidelity described its "overall investment plan" for the new institution as emphasizing "mortgage banking, increased joint venture activity, commercial and consumer lending, discount brokerage, and equipment leasing." Id.

## V. REGULATORY ASSESSMENT OF THE PROPOSED MERGER

47. The present value cost to the FSLIC resulting from the proposed Suburbia and Fidelity merger was $15.9 million. PX210 at WFZ009 0022. In contrast, it was estimated that the present value cost of liquidating Suburbia would have totaled approximately $150 million.

48. Regulators were required to assess resolution mechanisms against the cost of liquidation. Thus, it is unsurprising that the FSLIC's assistance costs in connection with the Suburbia/Fidelity merger were put in comparison to liquidation costs. That did not mean, however, that the FSLIC's liquidation of Suburbia was either contemplated or a realistic possibility.

49. The most plausible alternative to the Fidelity acquisition of Suburbia was for the FSLIC to solicit bids from other potential acquirors; i.e. to "rebid" the institution. Indeed, in listing the disadvantages of approving Fidelity's request to acquire Suburbia, regulators noted that there was a chance that it would have received a bid with a lower cost to the FSLIC than that connected with Fidelity's request. PX 237 at AA 0000180-81. With the sharp decline in short term interest rates, beginning in November 1984, the chance that a lower cost bidder would have been found was not an unrealistic possibility.

50. In assessing the advantages of Fidelity's request to merge with Suburbia, regulators noted that it was the low cost solution (relative to the bids received in 1982); that it was projected to be a viable solution for Suburbia; that the acquisition would involve two mutual form institutions, located in the same state; that Suburbia had been previously shopped and there was a possibility of losing the Fidelity deal if not acted upon, and; that it avoided the disruptive effect of liquidation. PX 237 at AA 0000180-81. These disruptive effects included the likely loss of Suburbia's franchise value. Moreover, if FSLIC had pursued the implausible alternative of liquidating Suburbia, a $700 million institution which suffered from mere spread problems, the signal to the thrift industry and its customers concerning the type of institutions the FSLIC would liquidate would have been highly negative.

51. In short, the FHLBB stated that liquidation of Suburbia was not a "viable or realistic option" and that liquidation was always "the option of last resort." DX 192 at 446-47.

## VI. FIDELITY MERGES WITH SUBURBIA

52. Fidelity acquired Suburbia on October 31, 1984. PX 985 at AST064173.

53. As part of the regulatory approval of the merger, the FHLBB approved the assumption by Fidelity of Suburbia's NWCs, which survived the merger and were included in Fidelity's regulatory capital computations. PX 246 at WOF003 0482, PX 235 at AA0000204.

54. In addition, FSLIC provided Fidelity a cash contribution of $16 million. PX 253 at AST000039; PX 1283 at AST060052; DX 61 at PAA047 0826.

55. In a forbearance letter sent by the FHLBB to Fidelity after the merger had been approved, the FHLBB notified Fidelity that it could report the value of any intangible assets resulting from the accounting for the merger pursuant to the purchase method. This value could be amortized by Fidelity over a period not to exceed 30 years. DX 61 at PAA047 0826.

56. The Assistance Agreement, however, also provided that no right under it could be transferred or vested to any other party "through merger, consolidation or otherwise," without the prior written consent of the FSLIC. PX 253 at AST000059. Moreover, it expressly stated that all of the provisions of the Assistance Agreement were for the sole benefit of Fidelity and the FSLIC, and that no other entity or person would have "any legal or equitable right, remedy, or claim under, or in respect to this Agreement or any of its provisions." PX 253 at AST000059-60. Thus, the goodwill created in the Suburbia acquisition could not be sold and had no value except to the entity for which it was created. [Greco Tr. at 63; Engelke Tr. at 67; see Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 162-64 (2006).

57. Immediately after Fidelity's acquisition of Suburbia, interest rates started to plummet. Indeed, in the one-month period between October and November 1984, interest rates declined by more than one hundred basis points (i.e., one percent). DX 514 at 1; DX 512 at 7; DX 513 at 7. By November 1985, interest rates had declined by an additional two hundred basis

points (i.e., by another 2 percent). Id. Given that Suburbia's problems were caused by an interest rate spread mismatch, this dramatic decline in interest rates had a dramatic positive effect on the value of its assets now held by Fidelity, and this would have been the case with or without the Fidelity acquisition. This interest rate decline facilitated the sale of Suburbia's assets by Fidelity for gains that it could book toward earnings.

58. At the time of the acquisition of Fidelity, FSLIC insurance was calculated in relation to the size of a thrift's deposits, and not in relation to the riskiness of a thrift's assets.

59. As a result of its acquisition of Suburbia, Fidelity more than doubled in size: its assets mushroomed from $556.3 million to $1.3 billion, its deposits grew from $393.2 million to 1.0 billion, and it added 12 branches, giving it 20 total branches. PX 985 at AST064173.

60. Fidelity accounted for the acquisition of Suburbia under the "purchase" method, by which Suburbia's assets and liabilities were re-priced according to their market value, and then recorded on the balance sheet of Fidelity. PX 1283 at AST060063. As noted above, high interest rates, which affected most thrifts in the early 1980s, caused the market value of Suburbia's liabilities to exceed the market value of its assets. Fidelity recorded $105.5 million in discounts on the first mortgage loans acquired from Suburbia. These discounts were to be accreted to income using the level-yield method over the estimated remaining life of the loans. PX 1283 at AST060064. Fidelity recorded the amount of Suburbia's net liabilities as "goodwill," an intangible asset. Fidelity counted this goodwill -- approximately $160 million -- toward its regulatory capital requirements. PX 1283 at AST060063-64.

61. Under then-existing regulatory accounting rules, Fidelity was permitted to amortize goodwill over thirty years, or longer than the offsetting discount accretion period, allowing Fidelity, like other acquirers around this time, to record a "net paper profit" over the initial years following the acquisition. See Winstar, 518 U.S. at 853.[5] Indeed, Fidelity projected that its loan discount accretion income from the Suburbia acquisition would exceed the goodwill amortization from the Suburbia acquisition in each of the first eight years following the merger for a cumulative total of $27.3 million. DX 3148 at PAA090 0106. Fidelity's net purchase accounting adjustments for its acquisition of Suburbia were, however, forecasted to be negative from the ninth year following the acquisition forward. DX 3148 at PAA090 0199. Altogether, Fidelity realized discount accretion income of over $60 million as a direct result of the Suburbia merger, and solely as a result of purchase accounting. DX 1150 at 33 [Kennedy].

62. The goodwill created when Suburbia was acquired was not equivalent to real, i.e., tangible, capital. In contrast to the goodwill used to meet Fidelity's regulatory capital requirements, "real" capital protects the deposit insurer from loss and encourages owners of thrifts, whose real capital is at stake, to operate their thrifts prudently. Landmark Land Co. v. United States, 46 Fed. Cl. 261, 273 (2000) ("While goodwill may provide leverage to magnify

---

[5] Accretion is the accounting flip-side of amortization. Under the purchase method of accounting, the discount on an acquired thrift's below-market loans (the amount by which those loans are marked down to reflect their actual value) is "accreted" -- taken into income -- over the estimated life of the loans. In the 1980s, thrifts were sometimes permitted to accrete the loan discounts at a faster rate than they were required to amortize their goodwill, creating income in the years immediately following a merger. This process is explained in great detail in the Supreme Court's decision in Winstar, 518 U.S. at 851-53. Accretion and amortization periods normally match, so that "income" is accreted as goodwill is expensed, and no paper income is generated. See id.

gains (or losses) from lending operations, it cannot protect a thrift against actual losses as capital does."), aff'd in part, vacated and remanded, 256 F.3d 1365 (Fed. Cir. 2001). Goodwill could not serve those traditional functions of capital, because it was not a "real asset;" instead, it was merely a plug figure, representing the amount by which the acquired thrift's liabilities exceeded its assets. See Cal. Fed. Bank v. United States, 43 Fed. Cl. 445, 459 (1999) (describing goodwill as mere accounting "gimmick"); vacated in part on other grounds, 245 F.3d 1342 (Fed. Cir. 2001).

## VII. FIDELITY INVESTED IN RISKY ASSETS THAT RESULTED IN SIGNIFICANT LOSSES

### A. Fidelity Sold Suburbia Assets And Invested In Risky Commercial Real Estate Development Projects

63. Not only did Fidelity record paper profits solely through the mechanism of purchase accounting, it also sold many of Suburbia's assets at a profit after they had been heavily discounted as part of the "mark-to-market" of Suburbia's assets in the acquisition. See PX 985 at AST064173; [Eggleston Tr. at 210]. Indeed, it was Fidelity's plan from the outset to restructure the assets it received in the Suburbia acquisition. DX 3148 at PAA090 0109; [Greco Tr. at 57].

64. In 1985 and 1986, for example, Fidelity sold $16.5 million of Freddie Mac securities acquired from Suburbia. DX 3026 at PAA006 1365. During fiscal years 1986, 1988, and 1990, Fidelity sold approximately $179,894,000 of loans acquired from Suburbia. The net purchase discounts associated with these sold loans totaled approximately $44,735,000, and the cumulative gain on the sales was approximately $19,920,000. PX 1283 at AST060066; DX 1934 at PAA036 0111; DX 1936 at WON730 0140. Thus, in Fidelity's sale of Suburbia's loans, it

realized nearly $20 million in immediate profits in this manner, but it did so by sacrificing over $45 million in future profits that Fidelity would have earned through the accretion of the $45 million in loan discounts associated with the assets sold. DX 1150 at 34 Table 6 [Kennedy]. Fidelity then funneled the cash generated by the asset sales into risky lending areas, like commercial real estate, construction and business lending. PX 985 at AST064173. Fidelity continued its sale of Suburbia loans for profits through 1992. PX 707 at WON730 1806; PX 887 at AST059684.

65. Fidelity had a much greater concentration in construction loans -- which were riskier loans than single family mortgages -- compared to Suburbia. As of October 31, 1984, (excluding Suburbia), the balance of Fidelity's construction loans outstanding was $74.2 million relative to total assets of $487 million. The ratio of Fidelity's construction loans to total assets as of October 31, 1984, was 15.24 percent. DX 3222 at PAA019 0056. On the other hand, at the same time, the ratio of Suburbia's construction loans to total assets as of October 31, 1984, was only 2.59 percent, with only $19 million in construction loans. DX 3222 at PAA019 0057.

66. Fidelity's net operating income following the Suburbia acquisition increased. Its net operating income for the twelve-month period ended December 31, 1983, was $6.463 million, while its net operating income for the twelve-month period ended June 30, 1985, was $9,559,000, and for the twelve-month period ended June 30, 1986, was $19,283,000. PX 1242 at AST029188; DX 3026 at PAA006 1365.

**B. Regulators Warned Fidelity About Its High Concentrations Of Condominium And Cooperative Lending**

67. Even before Fidelity's acquisition of Suburbia, the FHLBB wrote to Fidelity expressing concern about Fidelity's high concentration of condominium and cooperative lending among three borrowers. PX 183 at AST029213; [Greco Tr. at 28].

68. Beginning in 1985, however, with an enhanced cash position that resulted principally from the sale of discounted assets acquired in the Dollar Federal and Suburbia acquisitions, Fidelity accelerated its program of diversifying into commercial real estate, construction and commercial business. PX 985 at AST064218.

69. In the 1980s, Fidelity made concentrations of loans to Gerald Guterman, Coronet, the Minskoff Group ("Minskoff"), and Louis Evangelista. The majority of these loans were concentrated in condominium and cooperative conversion projects in Manhattan. [Greco Tr. at 80, 99-100]; DX 63 at WON725 1296. The outstanding loans to just these four developers were equal to approximately 156 percent of Fidelity's net worth at the time. Id.

70. The FHLBB's July 5, 1985 Report of Examination of Fidelity found that, since the its last examination in December 1983, Fidelity had become heavily engaged in the origination of acquisition, development and construction ("ADC") loans secured by condominium or cooperative units. DX63 at WON725 1296. Regulators noted that ADC loans were highly speculative type of investments and involved much higher risks due to the requirement for initial heavy outlays of capital and their inherently volatile nature. Id. These loans also typically require a minimum period of two years for construction completion and successful sellout, during which time market conditions can change. PX 335 at AST002375.

Regulators further reiterated that concentrations in lending exposed Fidelity's financial condition to excessive risk. PX 335 at AST002374.

71. In response to examiners' concerns in 1985 regarding Fidelity's origination of ADC loans, President Greco, who was in charge of the loan department (but admitted he did not monitor the loans himself), stated that Fidelity had concentrated its condominium and cooperative lending on a small number of borrowers "by design." [Greco Tr. at 23, 97-98]; PX 335 at AST002381. Mr. Greco attempted to assure regulators that Fidelity had not sought any new involvements that would add to the concentrations of construction loans. Id. However, during the month of September 1986 alone, loans totaling $6.8 million were approved by Fidelity's board to Messrs. Guterman and Evangelista. DX3344. Moreover, in 1986 and 1987, Fidelity made two loans totaling $32 million to Glick Development, another large developer, for development of a major tract of Manhattan real estate, and for the development of a shopping center in Queens, New York. Both loans eventually failed, Fidelity foreclosed, and the properties eventually became real estate owned ("REO") by Fidelity. PX 711 at AST002941-42.

72. Regulators would later learn that Mr. Greco and Fidelity's chief executive officer, Mr. Lovely, had, undisclosed to Fidelity's board, obtained units for little or no downpayment in a development of Mr. Guterman's, Glen Oaks Village, which was financed with loans from Fidelity. DX1105 at FAA008 0135-36; DX 1107 at FAA008 0122. As the OTS determined through its investigations, "Lovely breach his fiduciary duties to Fidelity New York by entering into personal transactions, during the period from May 2, 1984, to June 21, 1985." DX 1105 at FAA008 0135. A similar determination was made by the OTS with respect to Mr. Greco, with his personal transactions occurring between May 6, 1984, and August 21, 1984. DX1107 at

FAA008 0122. Due to this breach of their fiduciary duties, pursuant to statutory authority, regulators obtained a consent decree from Messrs. Lovely and Greco banning them from the banking industry for life, and requiring their payment of $190,000. DX1107; DX1108; DX 1105; DX 1106.

73. In February 1990, years before regulators discovered the improper arrangements between Messrs. Lovely and Greco and Mr. Guterman, Fidelity's board, including Messrs. Lovely and Greco, signed a certification, required in connection with Fidelity's application for its capital plan, stating that "Fidelity New York's management has not engaged in insider dealing, speculative practices, or other activities that have or may jeopardize the association's safety and soundness or contribute to impairing the association's capital." DX 79 at PAA012 1953, PAA012 1963.

### C. By 1986 Fidelity Had One-Fourth Of Its Assets In Highly Risky Commercial Real Estate Loans

74. By September 30, 1986, Fidelity had approximately $370.9 million -- or about a quarter of the entire thrift -- invested in commercial real estate, construction and commercial business loans. PX 985 at AST064173. In mid-1986 the Bank added to its management team Thomas V. Powderly, William A. Wesp, and Frederick J. Meyer, who brought expertise in commercial real estate management, development and lending, investment portfolio management and retail banking. PX 985 at AST064190.

75. After joining Fidelity in June 1986, Mr. Powderly reviewed Fidelity's loan portfolio and decided that Fidelity should get out of commercial real estate lending as quickly as it possibly could. [Powderly Tr. at 26-28]. Mr. Powderly claims that the Tax Reform Act of

1986 “ruined the real estate market.” [Powderly Tr. at 35]. The Tax Reform Act of 1986 changed the depreciation deduction on real estate investments, thus rendering these investments far less attractive, particularly for high-priced units. Whatever the cause, there is no dispute that New York was in the throes of a real estate recession during the late 1980s and early 1990s. PX 985 at AST064174. Mr. Lovely and Mr. Greco ultimately agreed with this decision -- after fighting it “tooth and nail,” [Wesp Tr. at 138] -- but not in time to spare Fidelity’s operations from the severe effect of its bad loans.

76. In September 1986, Fidelity hired Vito L. Caporusso, a banker with more than twenty-five years as a collection manager, as a Vice President. PX 985 at AST064264; DX 626.

77. In July 1986, regulators noted that Fidelity had net operating income of $19 million for the twelve month period ended June 30, 1986. Over $11 million of this, though, was due to purchase accounting adjustments for discount accretion. The remainder of Fidelity’s operating profits was due primarily to two factors, the favorable impact of declining market interest rates on its cost of money and increased loan fee income. DX 3026 at PAA006 1365.

78. Regulators further determined, however, that other factors would limit the improvement in Fidelity’s operating results: the narrowing of the spread between discount accretion and goodwill amortization, and the effects, including the deferral of interest income on ADC loans, caused by the bank’s asset-restructuring into riskier assets, including its substantial concentration in the condo/coop conversion real estate development. DX 3026 at PAA006 1363, 1365. In connection with the FHLBB’s warnings about Fidelity’s concentration of loans, regulators found that Fidelity was inadequately monitoring the financial capabilities of its major borrowers. DX 3026 at PAA006 1364.

**D. Fidelity's Concentrations Of Commercial Loans Began Collapsing In 1987 And, Facing Catastrophic Losses, Fidelity Belatedly Resolved To Exit That Risky Arena**

79. By early 1987, given the grave problems it faced as a result of its commercial loan concentrations, Fidelity determined to cease such lending. PX 985 at AST064174.

80. Fidelity's decision was made, however, too late. The die had long-ago been cast on its ill-advised concentrations of commercial loans, undertaken intentionally by Fidelity in disregard of the warnings from the FHLBB. Beginning in 1987 and continuing through until its acquisition by Astoria, Fidelity suffered greatly both financially, and in terms of management focus, as a result of its huge portfolio of non-performing commercial real estate loans.

81. The FHLBB's October 1987 examination of the thrift revealed the extent of the troubles facing Fidelity as a result of its extraordinarily poor underwriting decisions. Regulators assigned Fidelity a "4" composite "MACRO" rating. This composite figure represented regulators' assessment of the five components of a thrift's health: **M**anagement, **A**sset quality, **C**apital, **R**isk management, and **O**perating results, cumulatively referred to as the "MACRO" factors.[6] Each of these MACRO factors was assigned a number from "1" to "5," with "5 " being the worst rating a thrift could received. The composite rating was also on a "1" to "5" scale,

[6] In 1994, the OTS switched from a MACRO composite rating system to a CAMEL ("**C**apital, **A**ssets, **M**anagement, **E**arnings, and **L**iquidity), a change that had little effect upon the focus of examiners in determining the safety and soundness of institutions. DX 515; DX 516. The OTS's 1994 Regulatory plan for Fidelity sets forth the corresponding CAMEL ratings for the thrift (showing the rating for each component) between 1993 and 1987. DX 1448 at WON732 0834.

with "5" being the worst rating.[7] A "4" composite rating meant that regulators considered a thrift to have "Major and serious problems or unsafe and unsound conditions . . . which are not being satisfactorily resolved by the institution." PX 509 at AST001970; PX 908 at WON 733 0829; DX 1448 at WON732 0834. Furthermore, regulators stated that: "Unless prompt action is taken to correct these conditions, they could reasonably develop into a situation that could impair future viability." Id.

82. Remarkably, in plaintiff's contentions of fact and law, Astoria completely ignores the FHLBB's 1987 examination of the thrift and its critical findings.[8] The 1987 RoE describes, however, the catastrophe that was unfolding at Fidelity.

83. Indeed, the opening sentences of the FHLBB's 1987 examination spell out the imprudent lending practices and disregard of prior regulator warnings, which resulted in Fidelity having a level of criticized assets well above its peers:

> Despite the various assurances made by management and noted in the previous report of examination, a significant number of major project loans showed no substantial improvement in performance during the review period and are subject to classification or special comment in the current examination report. Also of concern is that loans to a number of major borrowers have significantly deteriorated in performance so that the establishment of specific reserves against several loans were required. Furthermore, a review of several major loan files disclosed a number of imprudent practices utilized by management including extensions of matured loans to avoid delinquency, the granting of various types of

---

[7] A "5" rating was given to "institutions with an extremely high immediate or near-term probability of failure." DX 1448 at WON732 0834; PX 509 at AST001970.

[8] Plaintiff's only mention of 1987 in connection with a report of examination in its contentions of fact and law is with regard to the *1986* report of examination that was *delivered* to Fidelity in 1987. Pl. Mem. (Feb. 15, 2007) at 42.

> concessions to major borrowers, and the granting of loans which are not in accordance with sound underwriting policies.

DX 69A at OAA002 0079.

84. The 1987 RoE found that Fidelity's total criticized assets increased 79.1 percent, from approximately $66,282,000 to $118,684,000 during the fifteen month review period from June 30, 1986, to September 30, 1987. During this same time period, classified assets increased $68.4 million, from $16.2 million to $84.6 million. DX 69A at OAA002 0082, 0086.

85. As of September 1987, Fidelity had approximately $46.3 million in nonearning assets. Regulators found that, if one assumed an average rate of return of 9.0 percent on these assets, the impact on Fidelity's earnings from lost interest income alone on these loans exceeded $4.0 million on an annual basis. DX 69A at OAA002 0086.

86. Regulators reiterated their criticisms of Fidelity's decision to concentrate its lending in just a handful of investors, noting that $72.5 million of the total classified assets was attributable to just five borrowers, including Coronet and Messrs. Guterman and Evangelista. Regulators noted that Mr. Guterman had, by this time, defaulted on his total indebtedness. DX 69A at OAA002 0082.[9] The high level of substandard, non-earning assets was, regulators concluded, "having an adverse impact on the bank's operating results." Id.

87. Also having a negative effect on the thrift's results was its declining accretion income from the Dollar and Suburbia acquisitions. In just one year, that income declined by 50 percent, from $6 million to $4 million, and regulators noted that this accretion income would

---

[9] The bad loans to Mr. Guterman were not an isolated incident; even Fidelity's management described internal procedures to monitor the resources of borrowing developers as of 1986 as "nonexistent." [Powderly Tr. at 27].

"continue to decline until 1990 when the bank will eventually have no benefit at all." DX 69A at OAA002 0086.

88. Also affecting the thrift's future profitability was its decision to sell a substantial amount ($33.5 million) of its high yielding assets, an action undertaken -- like its later asset sales -- "to help mitigate the impact of establishing substantial loan [loss] reserves on earnings." Id. Thus, regulators concluded, "management was willing to recognize immediate profits at the expense of adversely affecting the future income stream." Id.

89. Fidelity's problems in 1987, however, were not capital related. Indeed, given the inclusion of goodwill in the thrift's regulatory capital computations, its "capital" component was rated a "2." DX 1448 at WON732 0834. Its problems were primarily the result of its extraordinarily poor asset quality. Indeed, Fidelity received a "4" rating for its assets, while it received a "2" rating for capital. Id.

90. During the next four years, the severity of Fidelity's asset quality problems deteriorated even further from the already disastrous condition in 1987. DX 1199 at WON738 0780. Accordingly, with or without the inclusion of goodwill in its regulatory capital computations, Fidelity would have been assigned a composite MACRO rating of at least a "4," if not a "5," until its asset quality problems were resolved.

### E. Given The Condition Of Its Assets, Fidelity Faced Growth Restrictions, Increased Examination Assessment Fees, and Increased Deposit Insurance Premiums

91. In January 1990, regulators issued a regulation, RB3a-1, which required *all* "4" rated institutions -- regardless of the cause of the "4" rating -- to cease all growth. PX 542 at AST0704294; PX 542 at AST0704292-93; PX 535 at AST0704245-48. Under RB3a-1,

associations “requiring more than normal supervision” or “subject to greater restrictions” were permitted little to no growth. Id. [10] Regulatory bulletin RB3a-1 defined associations "requiring more than normal supervision" as including "those with a composite MACRO rating of 4 or 5.” Id. Accordingly, irrespective of its loss of goodwill, Fidelity would have been precluded from any growth, beginning in January 1990 and continuing until it obtained a composite rating of at least “3.”[11]

92. Furthermore, as of June 1990, OTS regulatory guidelines prohibited a “4” rated institution from engaging in risk controlled arbitrage investment schemes (i.e., the type of but-for investment scheme proposed by plaintiff’s expert here). DX 664 at 450.5.

93. In September 1990, for the first time, OTS set forth a schedule of assessment fees (TB 48-1) for its examination of thrifts based upon the degree of difficulty in examining a thrift. Troubled institutions (defined as associations having a composite rating of “4” or “5”), were assessed at a “premium” rate, which was 50 percent higher than the general rate. The premium assessment was higher because troubled institutions required longer and more involved examination and supervision. DX 3407 at p. 1. Following the issuance of TB 48-1, Fidelity was assessed at a premium rate until mid-1993. DX 228 at OAA009 0001-0009; DX 524 at OAA013

---

[10] Mr. Vigna provided Fidelity with a copy of RB3a-1, informing it that, because it was insolvent, it was required to cease any growth. Even if the insolvency criteria would not have been invoked (as in a non-breach scenario), the “4” rating trigger for the application of growth restrictions upon Fidelity pursuant to RB3a-1 would have been applicable to Fidelity.

[11] Of course, there was nothing in the Fidelity’s Assistance Agreement with the FSLIC that prevented regulators from holding the thrift accountable for improper, risky, and non-performing loans. Accordingly, plaintiff cannot complain about non-contractual restraints on its growth resulting from its own poor underwriting decisions and management.

0071. Given Fidelity's "4" rating in 1987 -- which would have continued until the severity of Fidelity's bad loans were resolved well below the 1987 levels – Fidelity would have been assessed at the premium rate through the early 1990s. Moreover, given that the assessments were calculated in reference to an institution's total assets, if Fidelity had grown more than it actually did, it would have been assessed a higher assessment. DX 3407 at 1-2.

94. Similarly, the FDIC's deposit insurance premiums, which did not become calculated in reference to risk until the beginning of 1993 (following from the passage of FDICIA), were based, in part, upon the component ratings a thrift received in its examination, with increased premiums charged for institutions that received less than satisfactory ratings for asset quality, among other MACRO components. DX 3071 at PAA014 2034; DX 1199 at WON 738 0795. Accordingly, given the institution's continued assets problems into 1993 (asset quality was considered "marginal" by the OTS in its April 1993 examination) (PX 995 at WON738 0681-85), even with the addition of goodwill to its regulatory capital, Fidelity would have likely been assessed an increased insurance premium for its deposits.

### F. Given Its Collapsing Loans And The Time Constraints These Imposed On Management, Fidelity Projects Minimal Growth In Its Budget For 1988

95. Given the deterioration of the Fidelity's financial condition, regulators noted that Fidelity's "budget for 1988 anticipates minimal asset growth to $1.8 billion (an increase of only $132,000 from year end 1987) and net income of $6.7 million." DX 69A OAA002 0087. Fidelity anticipated this minimal asset growth because, as Mr. Powderly explained, Fidelity "couldn't afford to grow the bank and take any risk . . . [b]ecause of the real estate." [Powderly Tr. at 43-44]. Apart from the direct impact on its finances, Fidelity's poor loan portfolio was

taking up considerable time and effort of Fidelity's entire senior management, as they attempted to monitor major borrowers. DX 69A at OAA002 0081.[12] Given the impact of the thrift's substantial amount of nonearning assets, regulators concluded that "[t]his budget is deemed realistic" because it "incorporate[s] the impact of the substantial amount of nonearning assets." DX 69A at OAA002 0087. Notably, the thrift's budget was substantially more constrained than its business plan for 1988, which called for a four percent increase in assets. Id.; DX 1203 at PAA010 1843.

96. In addition to its bad loans among major borrowers, Fidelity saw its growth being restrained by the "severe competition" facing it in its core operation of traditional one-to-four family mortgage lending.[13] Accordingly, Fidelity began to invest "available funds no longer being used in commercial real estate, construction and commercial lending" in mortgage-backed securities, mortgage-related securities, and United States obligations. PX 985 at AST064174. While this practice was in contrast with the traditional thrift practice of originating residential mortgage loans, Fidelity chose this strategy as a means of controlling its overall credit risk and managing interest rate risk.

---

[12] As Mr. Powderly put it, Fidelity was in "a crisis" as a result of its high levels of classified assets classified and non-performing loans, and was forced to "run a very conservative shop." [Powderly Tr. at 38]. Mr. Powderly acknowledged that the time he spent working out Fidelity's bad loans was time that he otherwise could have devoted to other aspects of Fidelity's operations. [Id. at 40]; DX 69A at OAA002 0081.

[13] For example, Fidelity closed its two branches in Manhattan because it lacked a strong presence in the New York City market, could not effectively compete in that market, and could not withstand the rent increases on its branches. PX 509 at AST001989. By the time Fidelity exited Manhattan in December 1993, its total deposits in Manhattan had decreased from over $90 million to just $26.6 million. DX 3071 at PAA014 2130.

**G. Fidelity's Problems Continued Into 1988 And In Late 1988 Fidelity Prepared A Three-Year Business Plan That Was Based Upon Unrealistic Assumptions Concerning Its Loan Losses And The Condition Of The General Economy**

97. Although Fidelity was not subject to a formal examination in 1988, in August 1988, regulators again criticized Fidelity for "numerous examples" of loan monitoring deficiencies, imprudent lending practices and underwriting weaknesses, while questioning Fidelity's ability to effectively manage its problem assets. PX 436 at AST0129681.

98. On October 12, 1988, Fidelity forwarded its Three Year Business Plan for 1989, 1990, and 1991, ("October 1988 Three Year Business Plan") to the FHLBB. PX 447 at OAA005 1312. Fidelity's October 1988 Three Year Business Plan calls for an increase in capital and in particular GAAP capital, balance sheet growth of 8 to 10 percent per year, reduced loan concentrations and increased credit quality, and an increased return on assets to a stable 50-70 basis points range. PX 447 at OAA005 1315.

99. Fidelity's October 1988 Three Year Business Plan forecasted total assets to increase by $652.442 million during the following three years. That increase was projected to be accomplished primarily by increases in retail assets, specifically, adjustable rate residential mortgages ($330 million) and home equity lines of credit ($126 million), with only a far lesser amount of growth in wholesale assets, specifically, mortgage-backed securities ($73.5 million). Thus, seventy percent of this increase consisted of retail assets. PX 444 at WON725 1162-64.

100. In its October 1988 Three Year Business plan, Fidelity forecasted no earnings from risk controlled arbitrage transactions. Fidelity decided not to include them in the plan because it did not wish to become overly dependent on transactions of this nature "in an environment of volatility and uncertainty." PX 444 at WON725 1135.

101. In any event, increasing assets and liabilities does not, however, guarantee profits. Indeed, while Fidelity's assets increased each year from 1986 to 1989, its net interest income, operating income, return on average tangible assets and income before taxes declined each year. PX 1283 at AST060055-57; PX 476 at AST058782-84; DX 506 at Exhibit 5.

102. As its most critical failure, Fidelity's October 1988 Three Year Business Plan completely underestimated the impact that Fidelity's poor portfolio of loans would have on the institution in the future. Indeed, the plan anticipated bad debt expense of only $600,000 for the quarters ended September 30, 1988 and December 31, 1988, and it projected *no bad debt expense from January 1, 1989 through June 30, 1991.* PX 444 at WON725 1169. Fidelity's prediction of the future performance of its bad loans was off by tens of millions of dollars. In fact, its aggregate provisions for loan losses from 1989 through 1991 totaled over $34 million, while its cumulative annual loan loss provisions from 1985 through 1994 totaled $82 million. DX 650. [Amend]. These figures do not even include the many millions in lost interest income on the nonperforming loans.

103. Moreover, the plan incorrectly predicted the macro and local economic conditions that would affect its future performance. Indeed, Fidelity predicted that the New York metro regional economy would remain robust with below national average unemployment rates. PX 444 at WON725 1136. This would not prove to be the case.

104. Nor did Fidelity accurately predict the future movement of interest rates. In fact, in 1989, an inverted yield curve developed, and as a result, Fidelity ceased growing and ceased its purchase of certain types of securities. For example, during a board meeting in April 1989,

Fidelity admitted that it had not grown the balance sheet within the first quarter of 1989 as a direct result of the inverted yield curve. DX 2345 at AST056030.

### H. Fidelity Planned To Sell Its Freddie Mac Stock For Capital Gains Due To A Planned Reduction To Realize Profits And A Correction In The Price Of The Stock

105. As part of its 1988 Business Plan, Fidelity recognized that, while its primary emphasis was to create dependable operating earnings, it planned to sell $7.2 million of Freddie Mac Stock. This was to be done as an orderly reduction, with Fidelity "monitoring closely" its Freddie Mac stock position in order to "obtain the most attractive gains possible." PX 444 at WON 725 1135; PX 1333 at AST0129799. Fidelity sold its Freddie Mac stock because it accrued to a profit. The stock was a "great profit maker" for Fidelity. [Greco Tr. at 154].

106. As of November 30, 1988, Fidelity owned approximately 943,000 shares of Freddie Mac stock. PX 1332 at AST056334. These holdings had been reduced to 522,000 shares by the end of March 1989. DX 1936 at WON730 0138. By the end of June 1989, Fidelity's Freddie Mac stock had been further reduced to 277,000 shares, with the reduction coming, in part, because Fidelity had been selling call options which would have required them to deliver the stock if the market price of the Freddie Mac stock exceeded the strike price of the call option. PX 509 at AST001988; DX 2352 at AST055896-97, 5927; PX 486 at AST055847-49, 5883.

107. Despite its planned sale of Freddie Mac stock, Fidelity began repurchasing Freddie Mac stock in September 1989, purchasing 160,000 shares by the end of October 1989. DX 2372 at AST055583-87, 5615; DX2380 at AST055534-38. Fidelity continued both buying and selling Freddie Mac stock in November and December 1989. PX 519 at AST0129824.

108. In November 1989, Fidelity's board recognized that there had been a "massive sell off" of Freddie Mac stock, due to publicity concerning the likelihood of mortgage delinquencies affecting these stocks. Id. at AST0124825.

109. While Fidelity's January 1990 Capital Compliance Plan projected that Fidelity's FHLMC stock holdings would remain constant at $20,633,000 from December 31, 1989, to December 31, 1992, (DX 1945 at WON732 1762, 1738, 1741, 1744), Fidelity's board apparently felt otherwise. During a board meeting, Fidelity recognized that the Freddie Mac stock was "vulnerable," that the price might further decline, and that it was in the process of "continu[ing to lighten its holdings of FNMA and [Freddie Mac] stock." DX 2397 at PAA033 1256.

110. With the real estate recession in full swing by 1991, Fidelity noted that it was in no hurry to repurchase the stock because the "real estate recession makes this an inopportune time to begin purchasing [Freddie Mac and FNMA] stocks." PX 679 at AST0308389.

### I. By The Fall Of 1988, Fidelity Recognized The Numerous Proposals Being Considered To Ensure That Thrifts Were Adequately Capitalized

111. During 1988, numerous proposals were being discussed by regulators and the thrift industry to improve the financial condition of thrifts. In the "Economic Environment" section of its October 1988 Three Year Business Plan, Fidelity stated that it anticipated that at some point during the plan period the FHLB would adopt in total or in a somewhat modified version, new BIS/Federal Reserve capital guidelines. PX 444 at WON725 1136.

112. On December 15, 1988, the FHLBB proposed to amend its capital guidelines in accord with the BIS/Federal Reserve guidelines. The proposed rule was, to a greater extent than the then current capital regulations, a risk-based rule. The goal of a risk-based rule was to ensure

that sufficient capital supported activities that are riskier to thrifts and to the FSLIC as insurer. DX 537 at OAA014 0693. Specifically, the FHLBB proposed the assignment of goodwill to a risk category of 200 percent as a means of recognizing that goodwill offered little value as protection to the FSLIC. DX 537 at OAA014 0700.

**J. During 1989 Fidelity's Classified Assets Increased In Size And Severity**

113. By October 1989, Fidelity's operations had significantly deteriorated since the FHLBB's previous examination. Classified assets totaled $97.7 million, or 5.1 percent of total assets. PX 509 at AST001980. This was an increase of 20 percent from the amount of classifications the FHLBB had discovered with its 1987 examination of the thrift. Id. at AST001966, AST002000. Fidelity's level of classified assets was well above its peer group average of 2.1 percent and plagued Fidelity's operations. Id. These classified assets were due to Fidelity's "prior involvement in [ADC] projects, condominium/cooperative conversions and land loans." Id. at AST001980. Due to its high level of classified assets and the "declining economic and real estate market within" its lending area, Fidelity was required to record a loan loss provision of over $10 million. Id. at AST001983. Furthermore, Fidelity, like other thrifts in the New York, faced a declining economic and real estate market. Id.

114. The FDIC's assessment of the thrift was even worse than the OTS, in large part because the FDIC, as a matter of its internal policy consistent with its oversight of banks, classified Fidelity's collateralized mortgage obligations ("CMO") residuals, whereas the OTS did not. Accordingly, in its September 1989 report of examination, the FDIC found that Fidelity's adverse classifications totaled $134.094 million. PX 689 at AST001816.

115. The FDIC also found that, had Fidelity not enjoyed the benefits derived from two

nonrecurring sources of income, Fidelity would have incurred a net loss for the period. The FDIC found that earnings continued to be hindered by the large volume of nonperforming loans, decreasing net interest margins and rising overhead expenses. PX 689 at AST001817.

116. The OTS and the FDIC both assigned Fidelity a composite rating of 5 in their November 6, 1989 and September 30, 1989 examinations, respectively. PX 509 at AST001969; PX 689 at AST001818. Fidelity's individual CAMEL ratings for the OTS's November 6, 1989 examination were as follows: "Capital" - 5, "Asset Quality" - 4, "Management" - 3, "Earnings" - 3, "Liquidity-Asset/Liability Management" - 2. DX 1448 at WON732 0834.

## VIII. FIRREA WAS ENACTED AND FIDELITY FELL OUT OF CAPITAL COMPLIANCE

### A. The Initial FIRREA Legislation Is Proposed And Amendments Considered

117. While Fidelity claims damages for the Government's breach starting in January 1989, the earliest formulation of the FIRREA legislation was not even sent to the Senate by the Bush Administration until February 22, 1989. DX 559. The companion bill in the house was not introduced until March 6, 1989. DX 560.

118. Between April and August 1989, various permutations of the bills were discussed in reports and committees, resulting in substantially revised versions of the bill. DX 558; DX 551 at AA-NAV-001631; DX 555 at AA-NAV-002437; DX 552 at AA-NAV-001902-03; DX 550 at AA-NAV-000670, AA-NAV-001101. Some of the proposals included amendments (ultimately unsuccessful) that would have required an administrative hearing before enforcement of the new capital standards. DX 556 at 14. Indeed, it was not until August 4, 1989, that the

differences between the Senate and House Bills were resolved. DX 553 at AA-NAV-001921; DX 554 at AA-NAV-002360; DX 582 at AA-NAV-004522; DX 583 at AA-NAV-04645-46.

B. **The Final FIRREA Bill Is Passed**

119. On August 9, 1989, Congress enacted FIRREA. DX 557.[14] FIRREA required the Director of the OTS to promulgate regulations establishing a "tangible" capital requirement, a "leverage" or "core" capital requirement, and a "risk-based" capital requirement for thrifts. DX557 at 121. These implementing regulations were not promulgated until November 6, 1989, and they did not become effective until December 7, 1989. DX 564; PX 554 at AST007959.

120. Tangible capital did not include any intangible assets, such as goodwill. 12 U.S.C. § 1464 (t)(9)(c). Nevertheless, FIRREA and the regulations permitted a thrift to include certain amounts of "qualifying supervisory goodwill" in the calculation of core capital. This limit was initially 1.5 percent of total assets. The limit declined each year and was phased-out entirely by December 31, 1994. 12 U.S.C. § 1464(t)(3)(A); 12 C.F.R. § 567.5(a)(1-2).

121. On January 9, 1990, the OTS issued a Thrift Bulletin 38-2, responding to questions raised concerning the status of previously granted forbearances and waivers as well as the treatment of FSLIC-owned warrants and other capital instruments. The bulletin instructed that these previously granted accounting forbearances would be eliminated. DX 563 at 1.

---

[14] Plaintiff incorrectly claims that FIRREA was enacted on August 1, 1989. Pl. Contentions (Feb. 15, 2007) at 20. It also incorrectly cites the date upon which FIRREA's implementing regulations took place. Id. As noted above, the correct date is December 7, 1989.

122. In addition to its phase-out and elimination of goodwill, FIRREA eliminated $34.21 million in non-goodwill, pre-FIRREA regulatory capital from Fidelity's tangible and core capital, and $30.2 million from Fidelity's risk-based capital. DX 1150 at 13 [Kennedy].

123. After these deductions, Fidelity failed all three of the new FIRREA regulatory capital standards. Fidelity reported tangible capital of negative $29.4 million as of December 31, 1989, which left it $57.1 million short of its $27.7 million requirement. Fidelity's core capital, which included a portion of Fidelity's goodwill, was a negative $1.7 million, again leaving it $57.1 million short of its requirement of $55.4 million. Fidelity's risk-based capital, which also included a portion of Fidelity's goodwill, was negative $1.7 million, leaving it $67.5 million short of its requirement of $65.8 million. PX 509 at AST001984.

124. According to Mr. Lovely, Fidelity's goodwill related to the Dollar Federal merger was $19.33 million at December 31, 1989. DX 79 at PAA012 1965. As of the end of September 1989, Fidelity reported other regulatory capital components on its books that are not the subject of its lawsuit, including $2.266 million in loan discounts, $2.851 million in deferred losses, $1.086 million in loan origination and commitment fees, and general valuation allowances of $4.010 million. PX 502 at WON722 0259-60. It also had net worth certificates of $4.664 million, which Fidelity redeemed in December 1990, in an agreement with the FDIC, as manager of the FRF (the successor in interest to the FSLIC's Assistance Agreements).[15/] PX 664. As part of that agreement, Fidelity agreed to release "any claims that Fidelity may have under the Notes."

---

[15] Pursuant to Section 215 of FIRREA, all of the promises contained in the FSLIC Assistance Agreement transferred to the FRF. See Resolution Trust Corp. v. FSLIC, 25 F.3d 1493, 1505-06 (10th Cir. 1994).

Id. at AST033204.[16] Adding these five items to the balance of Fidelity's goodwill from the Dollar Federal acquisition demonstrates that, as of approximately December 1989, Fidelity held $34.207 million in non-contractual regulatory capital, or approximately 25 percent of the total regulatory capital held by the thrift at that time. DX 79 at PAA012 1965; PX 502 at WON722 0259-60. FIRREA eliminated the inclusion of these items from Fidelity's regulatory capital computations. Accordingly, to the degree that Fidelity felt an effect from FIRREA's phase out of regulatory capital, 25 percent of that effect can be attributed to its loss of capital not attributable to its contract with the Government.

## IX. FIDELITY'S CAPITAL PLAN PROJECTED A CONTINUATION OF THE SAME BUSINESS PLAN IT HAD FOLLOWED SINCE 1987

### A. Fidelity's Capital Plan Was A Continuation Of What The Thrift Had Been Doing Since 1987 As A Result Of Its Disastrous Loan Portfolio

125. Despite Fidelity's fall out of capital compliance, the OTS permitted Fidelity to continue to operate while it filed a plan explaining how it intended to regain compliance. In January 1990, Fidelity submitted a Capital Compliance Plan (the "Capital Plan") for approval by regulators. DX 1945; PX 534 at AST0705432. The Capital Plan was conceived and produced by Fidelity's management. Id.; PX 985 at AST064176.

[16] Prior to their redemption, Fidelity earned $1.25 million in interest income from the FSLIC on its net worth certificates. PX 335 at AST002389; PX 1283 at AST060056; DX 506 at Ex. 5. As part of the redemption agreement, the FSLIC paid Fidelity $2.99 million, and related accrued income payments of $.687 million were cancelled, so that Fidelity recorded a $4.7 total direct increase to retained earnings as a result of the redemption agreement. PX 664 at AST033204-05; PX 707 at WON730 1816.

126. Fidelity's Capital Plan set forth a strategy to increase its capital that included no or little growth followed by moderate shrinkage in calendar year 1994.[17] PX 985 at AST064176.

127. The Capital Plan states that Fidelity's management and board of directors considered and rejected nine strategies before deciding upon a tenth strategy: "Continue doing what we are doing." DX 1945 at WON732 1704-05. Fidelity's publicly-filed documents all confirmed that the Capital Plan was merely a continuation of a business plan that Fidelity had formulated in 1987. In its subscription offering circular contained in its application to the OTS for permission to convert to a stock institution, for example, Fidelity described the strategy contained in the Capital Plan as "effectively the same business plan under which the Bank had been operating since 1987." PX 964 at OAA004 2541. Elsewhere in that application, Fidelity wrote that the capital plan "in effect formalized a business plan under which the Bank had generally been operating since 1987 . . ." Id. at OAA004 2483. Similarly, Fidelity explained to potential purchasers of its stock (and the Securities and Exchange Commission ("SEC")) that the strategy in the Capital Plan "to a significant degree formalized policies under which the Bank had been operating since 1987." PX 985 at AST064176, AST064193. Fidelity used almost identical language to describe its Capital Plan in its 10-Ks. DX 3071 at PAA014 2007.

128. In its contentions of fact and law, Astoria argues that Fidelity's 1988 Business Plan, which projects growth of at least 8 percent per year, demonstrates that the description of the Capital Plan set forth in numerous formal filings with various regulatory agencies cannot mean that the Capital Plan was a continuation of "policies under which the Bank had been operating

---

[17] Given its conversion in 1993, this moderate shrinkage never occurred.

since 1987." Pl. Mem. (Feb. 15, 2007) at 22-23. There is no discrepancy between the words set forth in Fidelity's numerous filings, however, and the reality that, as a result of its huge volume of classified loans, Fidelity had, in fact, been in a caretaking mode since 1987. One need look no further than Fidelity's *budget* for 1988, which did not set forth a flowery dream of vibrant growth as did its 1988 Business Plan. Fidelity's budget for 1988 forecast growth of only $138,000 on an institution of $1.8 billion. With the continued worsening of its bad loans, and the overall economy in 1989, plaintiff cannot explain how Fidelity realistically anticipated suddenly growing 8 percent in 1989, continuing through until 1991. In short, Fidelity's numerous statements to regulators were, indeed, accurate: Fidelity's Capital Plan was essentially a continuation of the thrift's actual operating strategy since 1987.

129. According to Fidelity, its management reviewed in detail many possible business strategies for inclusion in its Capital Plan. The plan lists ten available strategies which were reviewed. The tenth strategy of "[c]ontinue doing what we are doing" was accepted. "Continue doing what we are doing" consisted of the following items: A) retain earnings; B) amortize goodwill; C) accrete discounts; D) take measured capital gains; E) reduce credit and interest rate risk; F) reinstate non-earnings assets; G) contain operating costs; H) reduce asset size to a modest degree. DX 1945 at WON732 1704-05.

130. By following its plan, Fidelity planned to end the Capital Plan period with a stronger capital base, improved operating earnings, a high degree of asset quality, and a firm foundation to support its operations into the 1990's and beyond. DX 1945 at WON732 1702.

131. In other words, Fidelity did not plan to shrink its balance sheet significantly, shed branches or assets, or sell Freddie Mac stock for gains as a result of the goodwill phase-out; instead, Fidelity planned to improve its capital by retaining earnings, amortizing goodwill, accreting discounts, taking measured capital gains, containing operating costs, modestly reducing its asset size, and improving the credit quality of its assets. DX 1945 at WON732 1704-05; see also id. at WON732 1738, 1796, 1855 (reflecting Fidelity's $20.6 million position in Freddie Mac stock through the fourth quarter of 1993).

132. Nevertheless, Fidelity readily acknowledged that its Capital Plan did not contemplate the adverse economic environment that Fidelity was to face over the next several years, which included, among other things, a major war in the Middle East, a recession in the United States, an "uncertain global economic environment," and declining real estate values. PX 787 at AST002748. Indeed, the New York economy was particularly hard-hit; in 1993, Fidelity told potential shareholders that "[i]n recent years, the New York City metropolitan area has experienced significant downturns in the market value of real estate, resulting, in part, from layoffs in the financial services industry and corporate relocations, a general weakening in real estate values and a slowdown in home sales and construction." PX 985 at AST064185.

133. On May 18, 1990, the OTS informed Fidelity that its Capital Plan had been approved. PX 589 at AST007677.

134. While Astoria may now complain that FIRREA caused Fidelity to forego growth, the facts remain that the loan restrictions placed on Fidelity after FIRREA by OTS did not prevent Fidelity from engaging in the loan activity it preferred because Fidelity was already out of the market for the restricted loans. [Greco Tr. at 166-167]. Moreover, as Astoria's counsel

has admitted, Fidelity forewent no specific business opportunities as a result of FIRREA's elimination of regulatory capital. [Eggleston Tr. at 221].

### B. Fidelity's High Level Of Classified Assets Continued Through 1991

135. As of June 30, 1991, Fidelity had criticized assets totaling $89.7 million, or 4.7 percent of assets. Of these, $76 million were commercial real estate and multi-family mortgage loans which were originated prior to 1988. PX 711 at AST002883, AST002898.

136. During the fifteen month period ended March 31, 1991, Fidelity reported net income of only $1,425,000, but even this small figure included the effect of $6.8 million in net gains from the sale of assets. Id. at AST002912. In short, without the sale of assets, Fidelity would have reported no positive income for that fifteen month period.

137. The OTS also found that Fidelity faced unacceptable interest rate risk. PX 711 at AST002908-10. Indeed, as of March 1991, Fidelity stood to lose almost its entire equity (i.e., its market value portfolio equity), if interest rates rose by only 100 basis points. Id. at AST002908. Because goodwill was not included in assessments of interest rate risk, either before or after FIRREA, Fidelity would have faced this interest rate risk with or without the breach. Accordingly, in order to reduce its grossly precarious interest rate risk, Fidelity needed desperately to raise its capital levels; that is, its real, tangible capital levels, which is the only type of capital that can absorb actual losses caused by interest rate changes. The reason, of course, that Fidelity had little equity capital was that it had lost tens of million of dollars in its risky concentrations of commercial loans.

138. The composite rating assigned to Fidelity by the OTS in its April 5, 1991 Report of Examination was "5." Asset quality remained mired at a "4" rating, while capital remained at the same "5" rating as had existed in 1989. DX 1448 at WON732 0834.

139. The FDIC, too, in its June 11, 1991 Report of Examination, determined that Fidelity's asset quality remained unsatisfactory and objectionable, with excessive volumes of adversely classified assets and past due loans. DX 3330 at FAA005 1545. The report also found that the severity of the loan problems had increased, with Doubtful and Loss classifications exceeding $34 million as compared to $8 million shown for like classifications during the 1989 examination. Id. The FDIC also recognized a depressed real estate market that forced many real estate borrowers to effectively abandon control of their collateral. Id.

140. In its June 11, 1991 examination of Fidelity, the FDIC assigned Fidelity a composite rating of "5." Id. at FAA005 1546.

141. During 1991 and 1992, Fidelity continued to sell assets, primarily to reduce the thrift's exposure to credit risk. DX 1427 at WON732 1530-1531; PX 985 at AST064204. The credit risks developed from a downturn in the economy and the real estate market. Between 1987 and 1991, New York City was firmly in a real estate recession. Id. at AST064174. Due to these asset sales, the OTS determined that Fidelity's net income for the years ended 1990 and 1991 was inflated. In fact, Fidelity's net operating income was negative for years ending December 31, 1990, and December 31, 1991. PX 851 at OAA002 0018.

142. In an October 18, 1991 letter from Thomas Lovely to Walter Amend, Mr. Lovely explained that when the Capital Plan was written during December 1989, it was impossible to contemplate the following factors: a major war in the Middle East, a recession in the United

States, the disintegration of the U.S.S.R., an uncertain global economic environment, declining real estate values, and a very harsh regulatory environment. PX 787 at AST002747-48.

### C. Following The 1991 Report Of Examination, Fidelity Was Placed Under A Supervisory Agreement Due To Its Failure To Correct Its Deficiencies In Dealing With Its Problem Loans

143. On May 21, 1992, Fidelity entered into a Supervisory Agreement with the OTS. PX 874 at WON736 1015, 1026. The Supervisory Agreement resulted from the OTS's finding, based on its Report of Examination dated April 5, 1991, that Fidelity had violated laws or regulations and had engaged in unsafe and unsound practices. PX 874 at WON 736 1015.

144. These violations included a failure to obtain appraisals for properties when transferred to real estate owned or when considered in-substance foreclosures; a failure to adjust the book value of real estate owned properties to reflect the fair market value; a failure to establish valuation allowances to the level required at the previous examination; and a failure to establish specific and general valuation allowances totaling $7,565,000 and $2,059,000, respectively. PX 711 at AST002883, AST002972. As a result of these violations, the OTS found that Fidelity had overvalued its assets. Id.

145. In accordance with the Supervisory Agreement, Fidelity agreed to correct these deficiencies and to (1) comply with all applicable laws and regulations; (2) engage in safe and sound practices; and (3) maintain the Association in a safe and sound condition. PX 874 at WON736 1015.

146. The Supervisory Agreement was terminated in January 1993 after the OTS determined that Fidelity had taken corrective actions and had complied with the terms and conditions of the Supervisory Agreement. DX 3371.

**D. Fidelity's Bad Loans Were Reduced Only Slightly In 1992**

147. As of March 1992, the OTS found that Fidelity's classified assets remained high, totaling $75.3 million. More importantly, the severity of the problems with Fidelity's loans had deepened. Fidelity's non-performing assets increased from $44 million in March 1989 to $66 million as of March 1992. PX 985 at AST064227. As of December 1992, Fidelity still reported over $46 million in real estate owned, which was net of nearly $18 million in losses already recorded.[18] Id. at AST064227-28. The OTS also found that Fidelity's ratio of classified assets to tangible capital and general valuation allowances (prior to adjustments in that report) was 430.3 percent, "a very high ratio." PX 851 at OAA002 0010.

148. The FDIC, in its April 1992 report of examination, found that Fidelity's classified assets stood at $103,401,000, or 705 percent of core capital and reserves at March 31, 1992. The FDIC noted that although classifications had decreased from the last examination's total of $133,759,000, this reduction was attributed solely to the write-down of criticized assets rather than to an improvement in the quality of these assets. PX 912 at WON736 0009.

149. The FDIC continued to criticize the CMO residuals held by Fidelity, stating that "[w]hen held as stand-alone investments, residuals are considered highly speculative because of their substantial prepayment risk characteristics and volatile market values." The FDIC went on to note that if prepayment rates continued to accelerate, the value of the income stream would diminish, resulting in additional loss to Fidelity. Id.

[18] Real estate owned represents properties the thrift has acquired through foreclosure. Because this real estate generally does not produce any income, the more real estate owned by a thrift, the less profitable it is.

150. The FDIC assigned Fidelity a composite rating of "5" as a result of its April 13, 1992 examination. PX 912 at WON736 0010. The FDIC's composite rating of "5" was based on Fidelity's severely low capital levels, its excessive level of classified assets in relation to capital and the negative factors adversely affecting earnings performance.

151. The OTS's April 8, 1992 examination assigned Fidelity a composite rating of 4. PX 851 at OAA002 0006; DX 1448 at WON732 0834. The OTS rating was "4" based on the existence of the capital plan and the bank's compliance with the projected levels in the capital plan. PX 912 at WON736 0040.

## X. FIDELITY UNDERWENT A SUCCESSFUL CONVERSION, REGAINED CAPITAL COMPLIANCE, AND WAS BOUGHT BY ASTORIA FOR CASH

152. In December 1992, Fidelity's Board of Directors approved the conversion of Fidelity from a mutual form to a stock form of ownership. Fidelity completed its conversion in May 1993 by raising $57 million at $11.50 per share. DX 3071 at PAA014 2007. This influx of capital made Fidelity "well-capitalized" under OTS guidelines, and within days of the conversion Fidelity's capital plan was lifted and it was free to operate its business as it saw fit. Id.; PX 973; DX 3371 at PAA051 1367; PX 1015.

153. Fidelity's decision to access the public markets was an evolutionary process. Fidelity carried on conversations with Salomon on a fairly regular basis. To access the public markets, Fidelity needed positive tangible capital as well as market conditions that were favorable. When those two things happened, Fidelity started considering converting in earnest. [Wesp Tr. at 101-102].

154. Fidelity's decision to convert was in line with many in the thrift industry. Indeed, as of October 1992, 31 thrifts had converted to public ownership, representing the highest level of conversion activity in five years and nearly twice the number of conversions in all of 1991. DX 534 at PAA051 1556. The rush of conversions were not by accident. As of October 1992, the market's receptivity to mutual conversions, as well as the general level of the equity market, had translated into healthy offering multiples. Id. at PAA051 1557. Accordingly, as Dr. Kaplan acknowledged, with or without the loss of goodwill, "Fidelity would have converted during approximately the same general time frame." DX 506 at ¶ 44. Dr. Kaplan explained that: "By 1993, most of the large mutual thrifts in the country had already converted to stock form. By remaining a mutual, Fidelity's competitive posture would have been constrained." Id.

155. As part of its stock offering circular issued in March 1993, Fidelity acknowledged a number of factors that had negatively affected its performance during recent years. These included the fact that the New York City metropolitan area had recently experienced reduced employment as a result of layoffs in the financial services industry and corporate relocations, a general weakening in real estate values and a slowdown in home sales and construction. PX 985 at AST064185. As the underlying values of properties securing non-performing loans declined, there had been, in some cases, substantial loan losses for financial institutions. Fidelity further noted that the weakness in the area's real estate market, and the related loan losses, resulted in large part from speculative commercial and residential construction projects. Fidelity noted that project failures have been attributable to a surplus in commercial and residential space and a reduced demand for such space. As a result, the underlying values of properties securing non-performing loans declined, and "in some cases," this resulted in substantial loan losses for such

lending institutions. Id. at AST064220-21. In fact, Fidelity admitted in its stock offering circular that its operating results over the last several years had been adversely affected by its significant levels of non-performing assets, primarily in its commercial real estate, construction and commercial business loan portfolios. Id. at AST064186.

156. On December 19, 1991, the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") became law. DX 3071 at PAA014 2141. FDICIA established five capital zones (well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized and critically undercapitalized). Id. As of December 31, 1993, Fidelity exceeded all regulatory capital requirements and was deemed to be "well-capitalized" under FDICIA's standards. Id. at PAA014 2033, 2141.

## XI. ASTORIA, LIKE FIDELITY, CONVERTED TO A STOCK INSTITUTION IN 1993

### A. Pre-FIRREA Astoria

157. During the 1980s, Astoria avoided engaging in transactions that resulted in the creation of supervisory goodwill because President Engelke believed that the use of supervisory goodwill was not intelligent or in line with accounting principles. [Engelke Tr. at 25, 26]

158. Astoria did not become financially troubled in the 1980s because, unlike other thrifts, it did not suffer from management selection issues, or poor credit quality. [Engelke Tr. at 28]. Rather than pursue loans in commercial real estate, Astoria focused on one-to-four family mortgages, thus keeping its credit quality high throughout the 1980s. Id. at 28-29, 44-45.

### B. <u>The Real Estate Recession In The Early 1990s Affected Astoria</u>

159. Astoria was soundly capitalized at the time FIRREA's regulations went into effect. Indeed, as of March 1990, Astoria's tangible capital exceeded its tangible capital requirement by $199 million. DX 3237 at FAA006 1741.

160. During the early 1990s, Astoria's loan originations decreased due to the recession and softening of the real estate market. [Engelke Tr. at 64]. Astoria suffered increases in loan delinquencies and foreclosures resulting in an increased level of real estate owned. DX 254 at PAA116 0469-70; DX 257 at PAA116 0931; DX 259 at PAA116 1397. Nonetheless, as President Engelke emphasized, "during this very difficult period, [Astoria's] capital adequacy [was] outstanding." DX 2399 at AA4008 0248, 0250. Astoria attributed the real estate market's woes on "the direct result of the cumulative impact of 1986 changes in real estate tax laws, the 1987 stock market crash, and worsening general business conditions." DX 253 at PAA116 0260. In addition, Astoria believed that "the cost of the Persian Gulf war weigh[ed] heavily in economic predictions as to the depth and length of the [] recession." <u>Id.</u> By December 1990, Astoria's mortgage flows remained slow, reflecting the overall malaise in the real estate markets in the Northeast. DX 251 at PAA116 0093; DX 252 at PAA116 0144.

161. Astoria lost approximately $8.5 million in interest income in 1990 due to non-performing assets. Its net spread on earning investments and the net spread on all investments for year 1990 was 29 basis points compared to 7 basis points for 1989. Mr. Engelke stated that this adverse increase was reflective of the impact of the non-performing assets on Astoria's financial statements and on its future earnings potential. DX 252 at PAA116 0145.

162. Despite the fact that it was not capital constrained, in its December 1991 Business Plan, Astoria, which had $3.36 billion in assets, forecast growth of only $72 million over a three year period, an annualized growth rate of less than one percent. DX 1949 at FAAA008 0967; DX 255 at PAA116 0727-28.

163. Looking back at 1991, Astoria considered the Northeast to have been in a "severe recession," while "real estate market conditions, particularly with respect to new construction, condominiums, commercial real estate and land, deteriorated significantly, [with] many banks and thrifts in the Northeast experienc[ing] increases in loan delinquencies and a severe deterioration in the value of real estate acquired through foreclosure." DX 256 at PAA116 0831.

164. For 1992, Astoria noted that its "primary service areas continue in the economic doldrums" with high unemployment and low consumer confidence causing a lethargic demand for new homes. DX 259 at PAA116 1397-98.

165. During 1993, Astoria experienced higher levels of prepayments in its loan portfolio due to the relatively low interest rate environment, an effect that extended to its mortgage-backed and mortgage-related securities. DX 2962 at AA1001 0396, 0414.

### C. Astoria Converted In 1993 For Reasons Wholly Apart From A Need To Meet Regulatory Capital Requirements

166. Like Fidelity, Astoria converted to a stock institution in 1993. It did not convert to meet regulatory capital compliance; instead, it converted to raise capital so that it could acquire other thrifts. [Engelke Tr. at 47-48, 75-77].

167. As part of the conversion, a holding company for Astoria was created, Astoria Financial Corporation ("Astoria Financial"), which became the sole owner of the thrift. Astoria Financial then issued stock, raising net proceeds of $322.58 million, of which it contributed $165.5 million to the thrift. PX 1048 at WON727 0454.

168. Both before and after the conversion, Astoria was extremely overcapitalized, exceeding its capital requirements by enormous margins. [Engelke Tr. at 190]. As of December 1993, Astoria's tangible capital was 10.45 percent of its total adjusted assets, while its requirement was only 1.5 percent. DX 3070 at PAA039 0240. Astoria's core capital was 10.56 percent of total adjusted assets, compared to a 3 percent requirement, and its risk-based capital stood at 29.99 percent of risk-weighted assets, when only 8 percent was required. Astoria reported at least $300 million in excess regulatory capital under each capital requirement. Id.

169. As part of its conversion, Astoria wrote off all the goodwill it had on its books for the purposes of GAAP. [Eggleston Tr. at 101-102]

## XII. POST-CONVERSION FIDELITY

170. The OTS examined Fidelity as of April 5, 1993, although the thrift's condition was assessed taking into account the receipt of the conversion proceeds. The OTS found that Fidelity's overall condition was still in need of improvement, with specific improvement needed in "management's assessment of classified assets and analysis of valuation allowances." The OTS also found that Fidelity's asset quality was only marginal, as it continued to be hampered by the nonearning real estate owned portfolio. The OTS specifically directed Fidelity to focus on reducing the level of its foreclosed holdings or real estate owned. PX 1013 at OAA002 1318.

171. Accordingly, even though Fidelity's capital was adequate, the OTS determined that Fidelity's operating results were still marginal, with net operating income continuing to be largely represented by noninterest income. Id.

172. The FDIC also examined Fidelity in April 1993. It again noted its classification of Fidelity's CMO residuals. PX 995 at WON738 0674. It also noted that Fidelity's non-interest income had been substantially enhanced by gains on sales of securities of $9.3 million. The FDIC expressed doubt that Fidelity could continue to realize gains on sales of securities in the future. The FDIC also noted that Fidelity's net interest margins from December 1992 and March 1993 of 2.39% and 2.33%, respectively, remained significantly below peer group figures. Id. at WON738 0673.

173. Both the OTS and the FDIC assigned Fidelity a composite rating of "3" for their April 1993 reports of examination. Id. at WON738 0675; DX 1448 at WON732 0834.

174. As of December 1993, Fidelity's ratio of non-performing assets to total assets had decreased to 1.96% , from 3.23% at December 31, 1992. Fidelity recognized that this was the lowest level of non-performing assets since 1987. DX 1199 at WON738 0780.

175. Wholly apart from its losses before 1989, Fidelity experienced significant expenses between 1989 and 1994 as a result of its poor loans. For the period between March 31, 1989, and December 31, 1994, Fidelity's provision for loan losses was $16,015,000 and the net loan charge-offs totaled $26,367,000. Fidelity's provision for valuation allowance on its REO during this period was $32,252,000 and the net charge-offs for its REO totaled $13,585,000. PX 985 at AST064231; PX 1323 at KPMG 012423.

176. Furthermore, for each of the nonperforming loans, Fidelity lost significant amounts of interest income. For example, for the years ended March 31, 1991 and 1992, foregone interest on non-accrual loans amounted to approximately $5.9 million and $3.4 million respectively. PX 985 at AST064227.

## XIII. FIDELITY AND ASTORIA AGREED TO MERGE IN A PURCHASE ACCOUNTING MERGER

177. Shortly after converting, Fidelity considered acquiring another financial institution in the competitive Long Island market, and made informal inquiries to the management of one financial institution on two occasions. [Wesp Tr. at 155-57]. Despite a follow-up contact in February 1994, Fidelity's efforts proved fruitless, when management of the targeted financial institution halted merger discussions.

178. In March 1994, Fidelity's senior management determined that Astoria had the resources and probable desire to acquire Fidelity. In late March 1994, then, or less than one year after it converted, Fidelity began merger discussions with Astoria. TX 2965 at WOL487 0705.

179. In July 1994, Fidelity and Astoria agreed to merge. DX 1123. Astoria was interested in acquiring Fidelity because it had a very good branch franchise. [Engelke Tr. at 90, 144]. Astoria purchased in cash all of Fidelity's stock at $29.00 per share, and its merger with Fidelity was effective as of February 1, 1995. PX 1155 at AST036412(02); PX 1228 at WON735 0090. In other words, Fidelity shareholders who acquired stock in the initial offering at $11.50 received over 2.5 times their purchase price from Astoria in little more than a year.

180. Fidelity's shareholders were not the only ones who profited handsomely from Astoria's purchase. Fidelity's top officers, Messrs. Powderly, Wesp, and Meyer received $4.85, $3.42, and $2.73 million respectively in cash and other benefits as part of the merger. DX 2965 at WOL487 0721-24.

181. Like Fidelity's shareholders and management, Astoria realized significant economic benefits as a result of its merger with Fidelity. First, Astoria recognized over $7 million in annual cost savings from the integration of back-office operations and systems and staff reductions. PX 1228 at WON735 0073; PX 1076 at WON739 1169. Indeed, Astoria achieved great cost efficiencies (32 percent) in general and administrative expenses as a result of the merger, thus helping to make the Fidelity acquisition immediately accretive to Astoria. PX 1076 at WON739 1180; [Engelke Tr. at 129, 150-51].

182. Astoria also told the regulators that the merger would "result in a more profitable utilization of the funds of [Fidelity] than would otherwise be the case given the enhanced market presence of [Astoria] and the economies expected to be realized as a result of the merger." PX 1076 at WON739 1176; PX 1076 at WON739 1204.[19/] Moreover, Astoria believed that the balance sheet restructuring contemplated in connection with its acquisition of Fidelity would benefit the Fidelity portfolio's yield, net interest margin, and overall profitability. PX 1076 at WON739 1216. For example, Astoria restructured Fidelity's adjustable rate mortgage securities to CMO REMIC securities. [Engelke Tr. at 157-58].

---

[19] Astoria did not escape the remainder of Fidelity's bad loans, however. It took significant write-offs and set aside significant reserves to cover some of the loans it obtained from Fidelity. DX2772 at AA4009 1336.

183. Astoria has continued to enjoy the benefits of the Fidelity assets it acquired, including the benefits of the original Suburbia branches held by Fidelity. On June 2001, sixteen of the original Suburbia and Fidelity branches remained open, with the number remaining the same as of June 2006. DX 587, DX 586.

184. Astoria and its investment bankers, as well as Fidelity's investment bankers, valued a potential goodwill lawsuit by Fidelity against the Government at zero. [Engelke Tr. at 106-07; Eggleston Tr. 135; Quackenbush Tr. at 28-29]; PX 528. Nevertheless, in 1995, and just before the statute of limitations expired, Astoria filed its "protective litigation" claim. DX 18 at PAA114 0018.

185. Astoria accounted for the Fidelity merger as a purchase, and, as with Suburbia, Fidelity's assets and liabilities were marked to their market value. PX 1228 at WON735 0090. The goodwill carried on Fidelity's books, which had no market value as an intangible asset, was written off, and did not transfer to Astoria's books. [Engelke Tr. at 176-183]. It was a requisite condition of Astoria's that purchase accounting be utilized because Astoria had a large amount of capital that it needed to deploy. [Quackenbush Tr. at 9 - 10; 20-21; 24, 64-65]. Accordingly, even if Fidelity had kept its goodwill in a non-breach world, in no event would that goodwill have survived the Astoria acquisition, because, pursuant to purchase accounting, Fidelity's goodwill had to be written off.[20] DX 538 at ¶ 88; [Engelke Tr. at 120-21].

---

[20] Moreover, Fidelity's Assistance Agreement prohibited the transfer of its rights under the contract (e.g., regulatory goodwill) without regulatory approval.

186. Even after purchasing Fidelity with cash, Astoria still had huge amounts of excess capital. For example, as of December 1995 (after Astoria acquired Fidelity), Astoria reported tangible, core and risk-based capital ratios of 6.08 percent, 6.08 percent, and 18.72 percent, respectively. These ratios exceeded their requirements by 4.58 percent, 3.08 percent, and 10.72 percent, respectively. DX 3083 at PAA083 1479. After 1995, Astoria continued to maintain huge amounts of excess capital. For example, in 1999, Astoria reported over $1 billion in excess tangible capital, and nearly $500 million and $700 million in excess core and risk-based capital, respectively. DX 1845 at AA0001545.

187. These substantial levels of excess capital demonstrate that Astoria was never constrained from investing in perceived profitable opportunities by any need for capital after its merger with Fidelity. Indeed, Astoria explicitly acknowledged that leveraging its excess capital might not produce the best return for Astoria or its shareholders. Instead of investing in mortgage-related securities, for example, or otherwise deploying its excess capital in outside investments, Astoria opted to re-purchase its own stock.

188. By April 1999, Astoria had begun its sixth stock repurchase program since it converted in November 1993. DX 1150 at 22-23; [Kennedy]. This sixth stock repurchase involved 4.3 million shares and cost Astoria $159.4 million. DX 1845 at AA0001516, AA0001534. Further, as of 1999, Astoria viewed "the repurchase of stock as a desirable alternative to growth." DX 1845 at AA0001420. As Astoria's President put it: "[T]he best return we could get for our shareholders is to buy our own stock . . . and the investors earn more than if I had taken that same money and let's say levered it up . . . let's say 10 times or whatever I

could lever it up and borrowed and bought securities and put that all on the bottom line." [Engelke Tr. at 185-86].

189. Astoria's stock repurchases continued in a robust fashion after 1999, with a cost of $1.185 billion between 2000 and year-end 2005. DX3109 at WAA004 0087, 0106; DX 3110 at WAA004 0227,0252; DX 3111 at WAA004 0374, 0396; DX 3112 at WAA004 0522, 0545; DX 281 at WAA005 0538; DX 285 at WAA005 0755, 0772; DX 289 at WAA005 1029, 1046. Astoria viewed repurchasing its stock as a "favorable long-term investment and a prudent use of capital as an alternative to asset growth." DX 273 at WAA005 281.

190. In addition to its stock purchase program, Astoria sought to deploy its capital through dividends to its holding company. Between 1995 and 2005, Astoria paid $1.756 billion in dividends to its holding company. DX 32 at PAA083 1372; DX 1845 at AA0001549; DX 3110 at WAA004 0274; DX3112 at WAA004 0567; DX 289 at WAA005 1061.

191. In short, Astoria had all the capital it needed or could profitably deploy and accordingly had no need for any goodwill, even assuming (incorrectly), that, but for the breach, Fidelity's goodwill could have transferred to Astoria. Therefore, Astoria would not have placed a value on Fidelity's goodwill and would not have paid an additional amount for it, even if it had been on Fidelity's books at the time of Astoria's acquisition and was transferable. See Granite, 74 Fed. Cl. at 163-64.

# DEFENDANT'S CONTENTIONS OF LAW

## I. ASTORIA'S RELIANCE DAMAGES CLAIM IS FORECLOSED BY BINDING PRECEDENT

### A. An Overview Of Astoria's Reliance Damages Claim

192. Astoria asks for a reliance damages award in excess of $150 million, which Dr. Kaplan argues represents costs incurred by Fidelity in connection with its acquisition of Suburbia. Dr. Kaplan begins his reliance damages calculation with the net liabilities assumed by Fidelity (represented by goodwill) when Fidelity acquired Suburbia -- $160.1 million. DX 506 at ¶ 77. Dr. Kaplan calls this goodwill figure a "cost," and then deducts $16.1 million in direct cash assistance provided by the FSLIC, and $3.7 million in cash Fidelity received from the FDIC in December 1990 when the FDIC retired Fidelity's net worth certificates. Id. By deducting these payments, Dr. Kaplan calculates that Fidelity's net "cost" was $140.4 million. Id. To that amount, Dr. Kaplan adds Astoria's $12.3 million claim for Fidelity's allegedly "forced sale" of Freddie Mac stock, and Astoria's claims for allegedly excessive OTS exam assessments and FDIC deposit insurance premiums. All told, Dr. Kaplan calculates Astoria's reliance damages claim at $152.7 million.

193. Other than the two direct cash payments above, Dr. Kaplan did not deduct any offsetting benefits to Astoria or Fidelity. Dr. Kaplan said that it was "not possible to determine how much income Fidelity earned from Suburbia" because "Fidelity did not maintain separate financial records for Suburbia." DX 506 at ¶ 79. He nevertheless felt free to conclude that Suburbia did not provide any "net benefit" to Fidelity prior to the breach. Id. Counsel for Astoria instructed Dr. Kaplan not to consider any benefits after the breach. DX 506 at ¶ 86.

194. Dr. Kaplan admitted that Fidelity realized gains from the sale of Suburbia assets, income from the FSLIC promissory notes, and other income. But he refused to offset this income against Fidelity's $160.1 goodwill-based "cost." He attempts to justify this refusal by arguing that these earnings were not sufficient to restore Suburbia to a solvent position (even though Suburbia no longer existed as an independent entity). Dr. Kaplan therefore concludes that "there was no net financial benefit to Fidelity contributed from Suburbia between October 1984 and December 1989." DX 506 at ¶ 85 (emphasis added).

195. For the reasons set forth below, Dr. Kaplan's reliance "cost" claim is indistinguishable from claims based upon goodwill amounts already rejected numerous times by the United States Court of Appeals for the Federal Circuit and this Court.

**B. The Legal Standards For Proving Reliance Damages**

196. "The purpose of reliance damages is to compensate the plaintiff 'for loss caused by reliance on the contract.'" Landmark Land Co. v. F.D.I.C., 256 F.3d 1365, 1378 (Fed. Cir. 2001) (quoting Restatement (Second) Contracts § 344(b)). Reliance damages are intended to place the non-breaching party "in as good a position as he would have been in had the contract not been made." Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1383 (Fed. Cir. 2001) (quoting Restatement (Second) Contracts § 344(b)). Reliance damages include "expenditures made in preparation for performance or in performance" of the contract, id. (quoting Restatement (Second) Contracts § 349(b) (1979)), and may include "other foreseeable expenses incurred in reliance upon the contract[,]" id. (quoting John D. Calamari & Joseph M. Perillo, The Law of Contracts, § 14-9 at 603 (3d ed. 1987)).

197. In calculating reliance damages, the proper measure is net expenditures. Any claimed reliance damages must be offset by any benefits it received under the contract. See 3 Daniel B. Dobbs, Law of Remedies § 12.3(1), at 51-52 (2d ed. 1993) ("[T]he reliance damages recovery is a recovery for net reliance loss, so that the defendant is credited with any benefit the plaintiff receives from the expenditures in reliance."); see also Carley Capital Group v. City of Newport News, 709 F. Supp. 1387, 1399 (E.D. Va. 1989); Charles T. McCormick, Damages § 142, at 584 (1935) (recognizing that "[o]nly the net expense can be recovered").

198. This is consistent with the rationale that damages should not place a party in a better position than it would have otherwise occupied absent the breach. See N. Helex Co. v. United States, 225 Ct. Cl. 194, 203, 634 F.2d 557, 563 (1980) (noting that plaintiff has "entitlement . . . to be made whole for the damages it suffered from, but not to make a profit from, the breach"); Albert & Son v. Armstrong Rubber Co., 178 F.2d 182, 191 (2d Cir. 1950).

199. Finally, reliance damages are subject to the ordinary limitations upon contract remedies, including causation, certainty, and foreseeability. Granite, 58 Fed. Cl. at 774. In order to be entitled "to recover reliance damages, plaintiffs must prove that both the magnitude and type of damages were foreseeable" at the time the contract was made. Landmark, 256 F.3d at 1378 (emphasis added).

200. To establish reliance damages, then, Astoria bears the burden of proving that Fidelity made net out-of-pocket expenditures that were caused by the phase-out of goodwill, reasonably certain, and foreseeable at the time of the Suburbia acquisition. Astoria cannot meet this burden. Indeed, as we show below, the very premise of its reliance damages calculation --

that goodwill recorded by an acquiring thrift was an actual "cost" -- has already been explicitly rejected by the Court of Appeals for the Federal Circuit.

## C. Astoria Has Failed To Identify Any "Cost" Incurred By Fidelity

201. The lynchpin of Dr. Kaplan's reliance damages calculation is that the amount of goodwill recorded by Fidelity as a result of its acquisition of Suburbia represents an actual "cost." Everything else in Dr. Kaplan's analysis flows from this threshold assumption. But this threshold assumption is wrong. The Federal Circuit has repeatedly rejected the notion that goodwill, or net liabilities assumed, represents an actual "cost" for purposes of damages awards and it has repeatedly held that, without proof of actual out-of-pocket costs (i.e., costs which are more than mere paper calculations), a Winstar-plaintiff's reliance claim is invalid as a matter of law. See Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1371 (Fed. Cir. 2005); Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1376 (Fed. Cir. 2003); Cal. Fed., 245 F.3d at 1351; Glendale, 239 F.3d at 1382-84.

202. For example, in LaSalle, the Federal Circuit confronted a claim identical to the one made by Astoria here -- that the thrift's cost of performance could be measured by the net liabilities assumed (represented by goodwill) by the acquiring thrift. The trial court had found that the thrift's claim for goodwill "is not a meaningful measure of plaintiff's cost" of performance, because it did not represent "actual costs." LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 119 (1999). On appeal, the thrift challenged that conclusion, arguing that "assumed liabilities are a standard accounting cost, that [the thrift] was obligated to pay the assumed liabilities as they became due and did so pay, and that [the thrift] did substantially

reduce these liabilities, either through payment or by sale of the underlying asset, before the breach." LaSalle, 317 F.3d at 1376.

203. The Federal Circuit rejected the thrift's argument, and affirmed the trial court's dismissal of the thrift's "net liabilities assumed" claim. "[T]he calculation of restitution damages based on the treatment of assumed 'goodwill' liabilities as a cost of performance was generally resolved in Glendale, 239 F.3d at 1382-83," the court of appeals noted, "where this court held that damages are not properly keyed to 'a liability that was at most a paper calculation.'" Id. The Federal Circuit re-affirmed that "[a]lthough the assumed liabilities are indeed an *accounting cost*, . . . we agree with the Court of Federal Claims they are not a usable measure of either cost to the thrift or benefit to the government, and thus not an appropriate threshold for restitution damages." Id. (emphasis added). Indeed, the court could not have been much more emphatic: "the accounting rearrangement whereby net liabilities are designated a paper asset *does not* create a 'cost' subject to restitution for full cash value, reduced only by real cash infusions and real cash profits." Id. at 1377 (emphasis added).

204. The Federal Circuit appellate court also made clear that its holding equally applies to reliance damages claims. Id. at 1376 ("When restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages, wherein the non-breaching party is restored to its pre-contract position by returning as damages the costs incurred in reliance on the contract.").

205. Following the binding precedent of the Federal Circuit, this Court has repeatedly dismissed plaintiff's "paper-cost" damage claims regardless of whether the plaintiff calls its claim "restitution" or "reliance." Standard Fed. Bank v. United States, 62 Fed. Cl. 265, 295-99

(2004) ("this court interprets the Federal Circuit's prohibition against premising a restitution award on assumed net liabilities as applying with equal force to a reliance calculation based on the same principle."); Long Island Sav. Bank, FSB v. United States, 60 Fed. Cl. 80, 96 (2004), rev'd on other grounds, 476 F.3d 917 (Fed. Cir. 2007); Granite Mgmt. Corp. v. United States, 58 Fed. Cl. 766, 776 (2003) ("If a restitution cost of performance claim premised on net liabilities assumed is precluded, and that claim can be viewed as a form of reliance damages, it follows that a reliance claim based on net liabilities assumed is likewise barred.") (internal quotation marks omitted); S. Nat'l Corp. v. United States, 57 Fed. Cl. 294, 300 (2003); Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223, 245-46 (2003); Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108, 120-21 (2003); Glendale Fed. Bank, FSB v. United States, 54 Fed. Cl. 8, 13 (2002) (rejecting reliance damages claim based upon net liabilities assumed because "neither Glendale nor the Government was called upon to pay the potential losses . . .") (quoting Glendale, 239 F.3d at 1382 (emphasis omitted)).

206. This Court's opinion in Granite, describes just one of the many fatal and illogical notions connected with plaintiff's reliance claim. There, as here, plaintiff claimed reliance damages based upon the net liabilities calculated at the date of the acquisition, yet claimed at the same time to have only paid those liabilities as they came due:

> It is inappropriate, however, to argue that the liabilities were paid as they came due and yet include the entire amount of net liabilities assumed on the date of acquisitions in the cost of performance calculation. . . . While it is possible that plaintiff may have paid off some of the liabilities, it is impossible to discern what portion was actually paid out when the entire amount of net liabilities is included as a cost.

Granite, 58 Fed. Cl. at 775-76.

207. Thus, as a matter of law, Astoria's claim must meet the same fate as the numerous Winstar-related cases where plaintiffs have sought, through one mechanism or another, to obtain paper accounting costs based upon net liabilities assumed, however characterized (e.g., "net liabilities dispatched"). Here, Dr. Kaplan has failed to identify an actual "cost" to serve as the basis for his reliance damages calculation. Indeed, in Standard Federal, this Court addressed a near-identical reliance damage claim proposed by Dr. Kaplan, who was also hired by the plaintiff in that case to set forth a reliance damage claim. The Court concluded that "the failure of plaintiff's reliance damages model to measure 'losses actually sustained' renders it deficient as a matter of law." Standard Federal, 62 Fed. Cl. at 298 (quoting Glendale, 239 F.3d at 1382).

208. Even if it were not directly foreclosed by binding precedent, Astoria's reliance claim would still fail because it is clear that Fidelity's goodwill was a regulatory accounting entry, not an actual cost. Neither Fidelity, nor the Government, was ever called upon to pay off Suburbia's "excess liabilities." Indeed, it is undisputed that Suburbia's problems were largely interest-rate related, and that even Suburbia's CEO, Mr. Kane, expected Suburbia's operations to improve once interest rates declined, which they did in dramatic fashion: by 300 basis points in the year following Fidelity's acquisition. [Kane Tr. at 22, 49-50, 79-80, 82]. As interest rates fluctuated on a daily basis, the "excess liabilities" recorded by Fidelity would also change. See Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108, at 119-20 (2003) ("Though that [goodwill] figure may have been the amount of Morristown's excess liabilities when the goodwill contract was executed in January 1989, the thrift's net liabilities changed almost daily due to interest rate fluctuations and other factors.").

209. Further, it is certain that Astoria -- the plaintiff in this action -- never suffered any cost in connection with any "net liabilities assumed" of Suburbia. Astoria purchased Fidelity in 1995, for fair-market value and after scouring Fidelity's books as part of its due diligence. The "excess liabilities" of Suburbia did not reflect an actual "cost" in 1984; they were certainly not a cost to Astoria in 1995.

210. The remainder of the "costs" identified by Dr. Kaplan -- the allegedly "forced sale" of Freddie Mac stock and the allegedly excessive assessments and deposit insurance premiums -- are treated separately in this brief. For the reasons identified in those respective sections, these claimed "costs" are flawed and cannot serve as the basis for reliance damages.

**D. Dr. Kaplan Ignores The Significant Benefits That Fidelity And Astoria Received From Suburbia**

211. Dr. Kaplan's reliance damages calculation should be rejected as a matter of law for the additional reason that he ignores hundreds of millions of dollars in direct and substantial benefits that Fidelity received, and Astoria receives to this day. In fact, to the extent that Fidelity or Astoria could be construed to have incurred any minimal cost in performing the contract, that cost is vastly outweighed by the benefits it cannot deny it received.

**1. Astoria Improperly Ignores Economic Benefits That Fidelity And Astoria Received At The Time Of The Breach**

212. Astoria's reliance damages calculations expressly disregard economic reality. Dr. Kaplan ignores significant benefits that Fidelity derived from the Suburbia acquisition, such as tens of millions of dollars in NOLs, cash derived by Fidelity from the sale of discounted Suburbia assets, income Fidelity enjoyed as the result of discount accretion, and income on

FSLIC notes. Indeed, Astoria ignores the fact that it still retains, through its purchase of Fidelity, a valuable Long Island franchise that Fidelity acquired in Suburbia.

213. Dr. Kaplan does not even try to justify his refusal to consider benefits Fidelity and Astoria garnered from the Suburbia acquisition after the breach on an economic basis; instead, he refuses to consider benefits after the breach because he was instructed by Astoria's attorney not to do so. But there is no legal basis for this refusal. In fact, the law is clear that any benefit must be offset against the plaintiff's claimed reliance damages -- not just benefits that accrued before the breach. See 3 Dobbs, Law of Remedies § 12.3(1), at 51-52 ("[T]he defendant is credited with any benefit the plaintiff receives from the expenditures in reliance.") (emphasis added).

214. Astoria's insistence on ignoring all benefits after the breach seeks to place Astoria in a better position than it would have otherwise occupied absent the breach. Because Fidelity did not return the Suburbia branches to the Government at the time of the breach, Astoria continues to hold these branches, which have become quite valuable, and derives a substantial benefit from them to this day. [Rochester]. Further, through 1994, Fidelity derived $99 million in direct, identifiable benefits from its acquisition of Suburbia in the form of accretion of discounts, gains on asset sales, income on FSLIC notes, and tax benefits. DX 1150 at 36.

215. Astoria ignores all this because these undisputed facts make plain that a rational attribution of continuing benefits would reduce any potential reliance recovery to less than zero.

**2. Astoria Errs By Ignoring Substantial Direct Benefits Attributable To Suburbia Before The Breach**

216. Dr. Kaplan concludes that Fidelity received no offsetting benefits even before the breach. The undisputed facts, however, demonstrate that this conclusion is erroneous as a matter of law, and logic. Dr. Kaplan manipulates the data, and his calculations, in order to fit his pre-ordained conclusion that Astoria is entitled to hundreds of millions of dollars in damages.

217. First, Fidelity derived direct benefits of at least $85 million from Suburbia between October 1984 and December 1989 in the form of accretion of discounts, gains on asset sales, income on FSLIC notes, and tax benefits. DX 1150 at 36. These benefits are undisputed.

218. So for Dr. Kaplan's conclusion to be valid, Fidelity must have suffered in excess of $85 million in cash losses from October 1984 and December 1989 that are directly attributable to Suburbia's operations. On an annual basis, then, Suburbia's losses would have to equal nearly $17 million per year from 1984 to 1989. This is utterly implausible.

219. Suburbia's CEO, Mr. Kane, testified that once interest rates declined, he expected Suburbia to return to profitability. [Kane Tr. at 22, 49-50, 79-80, 82]. Even prior to its acquisition by Fidelity, Suburbia was projecting losses of fewer than $2.5 million for the last six months of 1984 -- a pace far short of the $17 million per year contemplated by Dr. Kaplan. DX 1150 at 37. Finally, Fidelity had $16 million in FSLIC cash to invest as a result of the Suburbia acquisition; if the cash were invested at a rate of return 10 percent, then any Suburbia losses would be reduced by $1.6 million. Id.

220. Second, Dr. Kaplan concludes that Suburbia was still insolvent in 1989, and therefore none of the benefits realized by Fidelity should be offset against the $160.1 million "cost." But this is illogical. According to Dr. Kaplan, no offset is appropriate until Suburbia is restored to solvency, which would only happen once Fidelity realized $160 million in benefits from Suburbia. But this $160 million is also the initial "cost" used by Dr. Kaplan in his reliance damages calculation. So Dr. Kaplan's offset analysis therefore becomes an all-or-nothing game: either Fidelity derived more than $160 million in benefits from Suburbia, in which case there is an offset and no damages, or Fidelity derived less than $160 million in benefits from Suburbia, in which case there is no offset at all. Even if Fidelity derived $159 million in benefits, damages are still $160 million (offset approximately $20 million for the FSLIC cash assistance and NWCs benefits that, apparently, Dr. Kaplan cannot deny were received by Fidelity).

221. The defects in this approach are obvious, and fatal. A plaintiff is not entitled to windfall damages, nor is it entitled to be placed in a better position with the award of damages than it would have been if there had been no breach. Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1315 (Fed. Cir. 2004); Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003). The calculations presented by Dr. Kaplan cannot suffice to serve as the basis for any reliance damages award. In short, Astoria's reliance damage claim is "deficient as a matter of law." Standard Fed., 62 Fed. Cl. at 298 (quoting Glendale, 239 F.3d at 1382).

## II. ASTORIA'S RESTITUTION CLAIMS ARE DIRECTLY FORECLOSED BY BINDING PRECEDENT

### A. An Overview Of Astoria's Restitution Claims

222. Dr. Kaplan also presents what he calls "[a]n alternative method of measuring Fidelity's damages" through a restitution claim. DX 506 at ¶ 88. Dr. Kaplan purports to measure restitution by the "liquidation costs" supposedly "avoided by FSLIC" when Fidelity acquired Suburbia. He admits that his measure of restitution, based upon the supposed avoided liquidation cost to the FSLIC, is essentially equivalent to the goodwill that was estimated before the Suburbia acquisition. [Kaplan Tr. at 15].

223. At the outset, Dr. Kaplan admits that this claim has already been repeatedly rejected by the Federal Circuit because "the action taken by the purchasing S&L in acquiring the failing thrift did not result in the Government . . . saving the dollar value of the net obligations of the thrift." DX 506 at ¶ 93. After acknowledging this legal bar, though, Dr. Kaplan ignores it; he states that "[n]otwithstanding this legal decision, it is my opinion that as an economic matter, FSLIC's anticipated cost of liquidation for Suburbia represents an economic savings from the Suburbia transaction." Id.

224. Dr. Kaplan assumes that the FSLIC received an economic benefit of $147.936 million. He then offsets this claim with the $16 million in cash assistance provided by FSLIC to Fidelity at the time of the acquisition, and $3.7 million in cash paid to Fidelity in 1990 for redemption of the NWCs. With these offsets, Dr. Kaplan's restitution calculation is $128.3 million. DX 506 at ¶ 101.

225. In Dr. Kaplan's expert report, he presented an alternative damage theory based upon a percentage of the avoided cost of liquidation. Given the absence of this theory in plaintiff's contentions of fact and law, that theory has now been abandoned. Instead, plaintiff now sets forth "another potential methodology" for a restitution claim based upon the average of the cost to the FSLIC of four bids received for Suburbia in 1982. Nowhere, however, has Dr. Kaplan opined about such a methodology -- and it is now too late for him to provide testimony concerning this theory. The procedural orders applicable to the Winstar-related cases filed by this Court state that no testimony shall be received by plaintiff's expert if it has not been properly disclosed in a written report, annexing all data or information considered by the expert in forming his opinion, and served upon defendant within 60 days of the initial identification of plaintiff's expert. See Procedural Order No. 2: Discovery Plan (Aug. 7, 1997) at § V(A)(1-4) ("If a plaintiff fails to comply with the provisions of this section with regard to any expert witness it proposes to call, no opinion will be received from that witness on behalf of that plaintiff"); see also RCFC Rule 37(c)(1). Accordingly, no expert testimony can be presented to support this claim now. See Trilogy Commc'n Inc. v. Times Fiber Commc'n, Inc., 109 F.3d 739, 744 (Fed. Cir. 1997); Finley v. Marathon Oil, 75 F.3d 1225, 1230 (7th Cir. 1996).

226. Dr. Kaplan also argues that his calculations of Astoria's reliance damages are "appropriate for restitution." So he adds $12.3 million in "additional costs" -- comprising the "forced sale" of Freddie Mac stock claim, and the excess assessments and deposit insurance claims -- to each restitution claim. DX 506 at ¶ 102. All told, then, Astoria seeks $128.2 million plus $12.3 million, or $140.6 million, in restitution.

227. As we show below, the Court need go no further than what Dr. Kaplan has already acknowledged: his restitution calculations have already been rejected by the Court of Appeals for the Federal Circuit. Whatever Dr. Kaplan's personal opinions may be about the underlying economics of these restitution claims, they are foreclosed by binding precedent.

**B. Functionally Identical Restitution Claims Already Have Been Rejected By The Court of Appeals**

228. As Dr. Kaplan admits, the Court of Appeals for the Federal Circuit already has rejected restitution claims based upon the FSLIC's supposed "avoided cost of liquidation" of an acquired thrift. In Glendale, the thrift argued that it saved the FSLIC the dollar value of the net obligations of a failing thrift by acquiring it, and that it should be awarded this supposed benefit in the form of restitution. The appellate court disagreed.

229. The Glendale Court first noted the purpose of restitution -- "to restore the non-breaching party to the position he would have been in had there never been a contract to breach." Glendale, 239 F.3d at 1380. The Court noted that "the action taken by the purchasing S&L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift." Id. at 1382. Instead, the Court held, "[w]hat the Government received in exchange for its promise was time -- time to deal with other failing S&Ls, time to see what the market would do before having to commit substantial resources to the problem." Id. at 1382. The appellate court further determined that "[t]hough the value of time was more than zero, there is no proof of what in fact it was worth." Id.

230. The Glendale Court also stressed that "[i]t is important to remember that, even after Glendale's merger with Broward, the Government was not free of potential liability for the failing thrift." Id. Indeed, the appellate court noted, "[h]ad interest rates not come down, and Broward, and perhaps Glendale as well, failed, the Government's contingent liability would have matured, and the FSLIC would have had to step in at that time and assume the very losses that Glendale now claims were benefits the Government received." Id. Finally, the Court noted that the FSLIC had options other than liquidating the failing thrift absent the merger. Id. For all these reasons, the Federal Circuit concluded that a restitution award based upon the supposed liquidation of the acquired thrift was merely a "speculative assessment of what might have been" and therefore vacated the trial court's damages award based upon that theory. Id.

231. In Cal Fed, the appellate court affirmed its holding in Glendale, and again rejected a claim by a thrift based upon the benefit supposedly conferred upon the Government by an acquisition of a failing thrift. California Fed. Bank v. United States, 245 F.3d 1342, 1351-52 (Fed. Cir. 2000). Echoing the Glendale Court, the Cal Fed Court called the thrift's restitution claim "speculative" and measured "in terms of a liability that never came to pass." Id. at 1351.

232. After the issuance of the Glendale and Cal Fed decisions, the Federal Circuit has issued three other opinions, reinforcing the notion that liquidation costs calculated in reference to net liabilities assumed at the time of a thrift's acquisition cannot form a viable mechanism for assessing restitution damages. See Granite Mgmt. Corp. v. United States, 416 F.3d 1373. 1380-81 (Fed. Cir. 2003); Glendale, 378 F.3d at 1313; LaSalle, 317 F.3d at 1376-77.

233. Faithfully applying the holdings in Glendale and Cal Fed, this Court has repeatedly acknowledged the invalidity, as a matter of law, of restitution claims by thrift plaintiffs based upon the supposed benefit conferred upon the Government by the acquisition of an ailing thrift. See Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 298 (2005) aff'd in part, rev'd in part and remanded, 470 F.3d 1044 (Fed. Cir. 2006); Long Island, 60 Fed. Cl. at 96; Fifth Third, 55 Fed. Cl. at 245 (rejecting restitution claim using same method used by Dr. Kaplan here, calling it a "paper calculation removed from the reality of events"); Franklin Fed., 55 Fed. Cl. at 120 ("whether the FSLIC or FDIC would have been forced to liquidate [the thrift] but for the goodwill contract is at best a guess"); Citizens Fed. Bank v. United States, 52 Fed. Cl. 561, 566 (2002), aff'd, 474 F.3d 1314 (Fed. Cir. 2007) ("the Government may not have ended up having to bail out [the thrift], as another acquirer may have done so, or alternatively the Government may have hired better management that could have potentially made [the thrift] profitable").

234. Contrary to Astoria's claim, the numerous prior decisions in this Court and the Federal Circuit did not suffer from a lack of evidence concerning the capabilities or status of the FSLIC with respect to liquidating thrifts. This is not, in short, the first time that a Winstar-plaintiff has made a restitution claim based upon liquidated costs avoided. In fact, the restitution claims advanced by Astoria in this case are no less speculative and indeterminate than the claims advanced, and rejected, in Glendale and Cal Fed. All are premised upon the notion that, absent the merger, the ailing thrift (in this case, Suburbia) would have been liquidated by the FSLIC. Each claim ignored the fact that the FSLIC had many other options at its disposal absent liquidation. Each claim ignored the contingent liability of the FSLIC for insuring deposits. Each

claim was measured in "terms of a liability that never came to pass." And each claim was deemed to be speculative as a matter of law.

### C. Dr. Kaplan Incorrectly Assumes That The FSLIC Would Have Liquidated Suburbia If Fidelity Had Not Acquired It

235. The premise of Dr. Kaplan's restitution analysis is that the FSLIC would have undertaken the most radical form of liquidation of Suburbia if Fidelity had not acquired it -- that the FSLIC would have paid off all insured depositors in cash, disposed of Suburbia's assets, and then closed the institution. This is speculation. The undisputed facts demonstrate that liquidation of Suburbia was not the only alternative to its acquisition by Fidelity.

236. In May 1984, regulators acknowledged that four other bids had been received for Suburbia, and they calculated the present value cost estimates of those earlier bids. PX 169. Suburbia and Fidelity, however, voluntarily approached regulators for approval of their self-initiated merger proposal. Id.; PX 185; PX 235 at AA 0000198; PX 186 at OAA005 1793. In an admission that is fatal to plaintiff's restitution theory, Suburbia's CEO, Mr. Kane, testified that he never seriously thought Suburbia would be liquidated by the FSLIC. [Kane Tr. 40-41, 79-80, 97-98]; DX 1147 at 24-26.

237. In fact, liquidation was clearly the last available option for regulators. There were no liquidations in the Second Federal Home Loan Bank District, which included New York, before FIRREA was enacted in 1989. DX 1147 at ¶ 83. This was, in part, due to the FSLIC's inability to fund a large-scale liquidation of the thrift industry, and the Government policies of promoting the thrift industry and home ownership. DX 1147 at ¶ 84.

238. It is even less likely that the FSLIC would have engaged in the most radical form of liquidation for Suburbia, as Dr. Kaplan assumes. An institution's franchise value evaporates when insured depositors are simply paid off, and the institution is shuttered. DX 1147 at ¶ 82. And it is clear Suburbia had substantial franchise value; this is why Fidelity prized it. Id. Any Governmental resolution, then, would attempt to capture Suburbia's franchise value -- just as Fidelity's acquisition of Suburbia did.

239. In short, the FSLIC could have employed a variety of other means of resolving Suburbia -- such as soliciting further bidders for Suburbia, continuing to issue additional NWCs, or biding time until interest rates fell -- short of a drastic, full-scale liquidation of the thrift. Yet Astoria's restitution claims are premised upon just such a far-fetched scenario.

### D. Fidelity Lacked The Economic Capacity To Provide A Benefit In The Amount Claimed By Astoria

240. Dr. Kaplan argues that Fidelity conferred a benefit upon the Government in the amount of approximately $128 million by acquiring Suburbia. Fidelity, however, lacked the economic capacity to provide a benefit in that amount. As of September 30, 1984, Fidelity had only $22.4 million of book capital. As was the case for most thrifts at that time, that figure almost certainly overstated its actual, market value. DX 1147 at ¶ 92. Fidelity could not have conferred a benefit, then, even if it had absorbed Suburbia's inchoate losses. Accordingly, for this reason alone, Astoria is not entitled to the restitution awards it has requested.

241. Nor was there any set of foreseeable circumstances in which Fidelity could confer such a benefit upon the Government. If interest rates rose, any positive net worth of Fidelity would be erased, along with any ability of Fidelity to reduce FSLIC assistance costs. If interest

rates declined (as they did, in reality), then Suburbia would not require liquidation. Accordingly, the FSLIC's exposure to losses with respect to Suburbia diminished, but because interest rates fell, not because Fidelity assumed any liabilities. DX 1147 at ¶ 93.

242. For all these reasons, Astoria's restitution claims should be rejected.

**E. Any Award Of Restitution Is Inappropriate In This Case, But Astoria Also Ignores Easily Identifiable, Offsetting Benefits**

243. To obtain restitution, Astoria not only must quantify the value of its performance under the contract, it also must return the benefits it has received from the contract. See Restatement (Second) Contracts § 384(1), cmt. a; accord Aktieselskabet Dampskibsselskabet Svendborg v. United States, 131 Ct. Cl. 399, 130 F. Supp. 363, 367 (1955). The task of restoring a plaintiff to its pre-contract position may occasionally be simple, such as when it has made an up-front cash payment under a contract to a party that subsequently effects a breach. In such a case, the plaintiff is entitled to the return of its payment, less any benefits it has received from the contract. See Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 608-09 (2000).

244. But if those benefits have been "substantially altered in character," restitution is generally unavailable. Restatement (Second) Contracts § 384, cmt. a; see Restatement (Second) Contracts § 371, cmt. a. (recognizing that where "the benefit consists of something [aside from a sum of money], such as services or property, its measurement in terms of money may pose serious problems"); accord Aurigemma v. Arco Petroleum Prods. Co., 734 F. Supp. 1025, 1032-33 (D. Conn. 1990). This is just such a case where restitution is unavailable.

245. To quantify accurately all of Fidelity and Astoria's benefits from the acquisition would require the impossible: the unwinding of nearly two decades of business decisions by Fidelity, and then Astoria. In contrast to the straightforward measurement issue presented in Mobil, here, the benefits Fidelity initially received have been altered beyond recognition.

246. Nevertheless, there are some easily identified, offsetting benefits derived by Fidelity and Astoria from the Suburbia acquisition. Those benefits run in the hundreds of millions of dollars, and are realized by Astoria to this day.

247. Not only did Fidelity derive $99 million in direct, identifiable benefits from its acquisition of Suburbia, in the form of accretion of discounts, gains on asset sales, income on FSLIC notes, and tax benefits, [DX 1150 at 36], but Astoria still maintains deposits from former Suburbia branches that are extremely valuable. These amounts far exceed any alleged benefit conferred upon the Government by Fidelity's acquisition of Suburbia. [Rochester].

248. Restitution is inappropriate in this case; it is impossible to unwind the transaction here after it has been performed for over twenty years. Moreover, by failing to consider easily identified, offsetting benefits, Dr. Kaplan's restitution calculations are unreliable.

## III. ASTORIA'S EXPECTANCY CLAIMS ARE UNSUPPORTED

249. Astoria advances four separate expectancy claims: (1) a claim for allegedly lost profits from 1989 to 1994; (2) a claim for allegedly lost profits from 1995 to 2014; (3) a "wounded bank" claim that consists of an alleged forced sale of Freddie Mac stock; and (4) a "wounded bank"claim for allegedly excessive assessments paid to the OTS and the FDIC. For the reasons discussed below, we will demonstrate at trial that none of Astoria's claims merit expectancy damages.

250. "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." Glendale, 239 F.3d at 1380 (citing Restatement (Second) of Contracts § 344(a) (1981)); see also Energy Capital Corp. v. United States, 302 F.3d 1314, 1324 (Fed. Cir. 2002); Cal Fed, 245 F.3d at 1349. Astoria's expectation interest is the "interest in having the benefit of [its] bargain by being put in as good a position as [it] would have been in had the contract been performed.." Restatement (Second) of Contracts § 344(a) (1981); see also Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001). Expectancy damages are often equated with "lost profits." Glendale, 239 F.3d at 1379 (citing Restatement (Second) of Contracts § 347); see also Energy Capital, 302 F.3d at 1324.

251. To recover expectancy damages, including lost profits, a plaintiff must prove three elements: (1) the lost profits were within the contemplation of the parties because the loss was foreseeable; (2) there would have been a profit but for the breach; and (3) the measure of damages must be reasonably certain. California Fed. Bank v. United States, 395 F.3d 1263, 1266 (Fed. Cir. 2005). Astoria has not met any of these requirements.

## A. Astoria's Lost Profits Model

### 1. Fidelity "Lost Profits" From 1989 To 1994

252. Astoria presents a calculation of profits that Fidelity allegedly lost as a result of the phase-out of goodwill. Dr. Kaplan set forth a report, as corrected by a supplemental affidavit, purporting to calculate lost profits for the 1989-94 period. His methodology is simple. He essentially grows Fidelity's actual December 31, 1988, tangible assets at a growth rate of two percent per quarter to calculate his but-for tangible assets. He then subtracts Fidelity's actual

tangible assets to arrive at foregone assets. He then multiples the foregone assets by the 80 basis point rate. See DX 506; DX 1233. Dr. Kaplan's affidavit purports to correct the figures for lost profits utilized in his initial expert report by removing the non-earning assets from his foregone assets figures (a task he did not, in fact, accomplish) and by including an alternative calculation of lost profits dating from January 1, 1990, as opposed to January 1, 1989. DX 1233.

253. Dr. Kaplan asserts in his report that in the absence of the breach, Fidelity would have realized $22.3 million in hypothetical lost profits between January 1, 1989, and December 31, 1994. According to Dr. Kaplan, Fidelity would have generated these $22.3 million in hypothetical profits by pursuing a risk-controlled arbitrage scheme. Dr. Kaplan's entire calculation of the $22.3 million in hypothetical lost profits can be found on one page -- Exhibit 9 to his report (as revised by Exhibit 9A to his affidavit). See DX 506 at Ex. 9; DX 1233 at Ex. 9A. Dr. Kaplan estimates that between December 1988 and March 1994, Fidelity's "non-breach" assets would have increased by a compounded 2 percent per quarter from December 1988 levels, resulting in a total of $737 million in "forgone assets." After March 1994, Dr. Kaplan stops this growth in "forgone assets" in accordance with the fact that Fidelity's assets remained relatively constant between June 1994 and December 1994 because of its impending merger with Astoria.

254. According to Dr. Kaplan, Fidelity would have earned a "minimum" annual pre-tax return of 0.80 percent (80 basis points) on these "forgone assets." Dr. Kaplan states that he derived this figure from the return earned upon purchases of MBS by Fidelity, but he does not specify which securities Fidelity would have purchased or how it would have funded them. Dr. Kaplan cites as support for this figure that Fidelity's average pretax return on tangible assets between 1990 and 1994 was 0.80 percent, and ranged from 0.50 percent in 1994, to 1.43 percent

in 1992. DX 506 at Ex. 6. Dr. Kaplan applies this figure to the annual "forgone assets" totals to calculate lost profits for the 1989-94 period of $22.3 million. DX 1233 at Ex. 9A.

255. Dr. Kaplan revised his report with his August 20, 2003 affidavit. According to his affidavit, he "revised the calculation of 'forgone assets'" by "the substitution of tangible assets for total assets," so as to remove "non-earning intangible assets" from the calculation. This resulted in a downward revision of damages from $29.0 million in the original report to $22.3 million. Id.

256. Additionally, his affidavit includes an "alternative calculation" beginning lost profits on January 1990 rather than January 1989 as in his original report. Id. at Ex. 9B. Although he presents this alternative figure, Dr. Kaplan states that "I continue believe January 1989 is an appropriate date on which to start the lost profits damages calculation." DX 1233. Dr. Kaplan's alternative calculation "reduces lost profits damages to $14.3 million."

**2. Astoria "Lost Profits" From1995 to 2014**

257. Dr. Kaplan also purports to project hypothetical lost profits through December 31, 2014, using similar estimations, but providing even less detail. Dr. Kaplan originally stated that "it is uncertain whether Fidelity would have merged with Astoria in the absence of the breach," but later stated in deposition that, "Exhibit 16 is a quantification of the leveraging by *Astoria* . . . ." See DX 656 at 58:3-4 (emphasis added); see also DX 581 at § 5.4. Thus, Dr. Kaplan now assumes that Astoria would have acquired Fidelity even absent the breach.

258. As with his first lost profits calculation, Dr. Kaplan's computations are contained on one page -- Exhibit 16a to his report. DX 506 at Ex. 16A. Dr. Kaplan's affidavit did not modify his post-Astoria acquisition calculations. Dr. Kaplan uses Astoria's average leverage

between 1995 and 2000 as the factor by which he divides the unidentified thrift's average balance of goodwill for each year. After 2000, Dr. Kaplan assumes the remaining balance of goodwill would be leveraged at 7 percent per year. By dividing the average goodwill balance by the "leverage ratio," Dr. Kaplan arrives at what he calls "forgone earning assets."

259. The next step in Dr. Kaplan's arithmetic is to multiply the "forgone earning assets" by a hypothetical return on forgone assets, which he estimates at a steady 80 basis points per year. Dr. Kaplan provides no detail at all about the assets that he assumes Astoria would purchase, nor does he state how they would be funded.

260. Between 1995 and 2001, Dr. Kaplan estimates that Astoria's "lost profits" would have been $56.5 million. He performs the same calculation through 2014, then discounts the results back to 2001 at 10.5 percent, to arrive at a figure of $28.2 million, for a total of $84.7 million in lost profits between 1995 and 2014.

**B. Astoria's Hypothetical "Lost Profits" Were Not An Immediate And Proximate Result Of The Breach**

261. The hypothetical "lost profits" Astoria seeks through Dr. Kaplan's calculations do not meet the causation standards set forth by the Federal Circuit and this Court. Dr. Kaplan ignores a host of real-world problems that faced Fidelity that would have prevented the growth and return rates Dr. Kaplan projects for the 1989-94 period. Dr. Kaplan also fails to demonstrate that Fidelity faced any capital-related constraint on its growth after its successful 1993 conversion, nor does he show that Astoria faced any capital-related restraint on its growth after it acquired Fidelity as of 1995. Dr. Kaplan also does not demonstrate that the regulators would have permitted Fidelity to transfer any supervisory goodwill to Astoria after their merger.

262. In Cal Fed, the Federal Circuit clarified that plaintiffs must do more than demonstrate that the breach was a "substantial factor" leading to the damages claimed. See Cal Fed, 395 F.3d at 1267-68. "The inability to prove by a preponderance of the evidence that profits would have been made but for the breach will therefore preclude recovery on a lost profits theory." Id. at 1268 (emphasis added). The "but for" standard is consistent with elementary principles of the law of expectancy damages.

263. As the Federal Circuit further explained in Cal Fed, for the plaintiff to prevail, "the causal connection between the breach and the loss of profits must be 'definitely established.'" Id. at 1268 (quoting LaVan v. United States, 382 F.3d 1340, 1351 (Fed. Cir. 2004)). In addition, the claimed lost profits must have "inevitably and naturally, not possibly or even probably, flow[ed] from the defendant's breach." Id. at 1267 (quoting Myerle v. United States, 33 Ct. Cl. 1, 27 (1897).

264. Astoria relies upon the Federal Circuit's recent decision in Citizens Federal Bank v. United States, 474 F.3d 1314 (Fed. Cir. 2007),[21] in support of a different causation standard: a "substantial factor" test. Pl. Mem. (Feb. 15, 2007) at 37-40. We point out at the outset that the Citizens Federal panel did not state (nor could it) that it was overruling the previous panel's decision in Cal Fed that the "the Court of Federal Claims correctly rejected the 'substantial factor' test advocated by CalFed. " Cal Fed, 395 F.3d at 1268. The Citizens Federal court also did not hold that the substantial factor test was required to be applied in any case, but only that, "this court has upheld the causation standard for a particular case as within the court's

---

[21] We respectfully disagree with the Citizens Federal decision, and the deadline for seeking reconsideration and suggestion for rehearing *en banc* has not yet elapsed.

discretion." Citizens Fed., 474 F.3d at 1319. At most, the majority panel decision in Citizens Federal stands for the proposition (with which we respectfully disagree) that the selection of an appropriate causation standard depends upon the facts of a particular case, and lies within the trial court's discretion. Notably, the panel majority cited to no legal support for this proposition. Therefore, Astoria's contention that "[t]he causation standard applicable to Fidelity's case should include at least some element of a "substantial factor" standard," Pl. Mem. at 37, is unsupported by both Cal Fed and Citizens Federal.

265. This Circuit has recently reinforced the core causation principle that "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Hansen, 367 F.3d at 1315 (quoting Bluebonnet, 339 F.3d at 1345). "Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement." Id. (citing LaSalle, 317 F.3d at 1371). This rule necessitates segregating those costs realized as a result of the breach from those costs caused by other factors. See Restatement (Second) of Contracts § 347 (1981), cmt b ("If defective or partial performance is rendered, the loss in value caused by the breach is equal to the difference between the value that the performance would have had if there had been no breach and the value of such performance as was actually rendered."); S. Nat'l Corp., 57 Fed. Cl. at 305 (rejecting plaintiffs' lost profits claim because it did not reflect "categories of activities, opportunities, or lines of businesses that the thrift would have undertaken in the but-for world.").

266. Dr. Kaplan's opinion is that the breach caused Fidelity to forego growth as of January 1, 1989, seven months before FIRREA's passage and eleven months before the implementing regulations, is unsupported on its face. Although the Court of Appeals for the

Federal Circuit has not decided the precise accrual date of breaches caused by FIRREA, no court has held that a breach was caused by FIRREA before the statute ever existed. See Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 880 (Fed. Cir. 1998) (declining to determine whether cause of action accrued on date of enactment of statute, date of implementation of regulations, or some other date).[22] Although Dr. Kaplan attempts to compensate for this error by including an alternative calculation in his affidavit that begins on January 1, 1990, (thereby reducing damages from $22.3 million to $14.3 million), he "continue[s] [to] believe January 1989 is an appropriate date on which to start the lost profits damages calculation."

267. There are no contemporaneous documents showing that Fidelity would have used a risk-controlled arbitrage scheme to grow aggressively -- and solely -- in wholesale securities absent the breach, as Dr. Kaplan assumes. Fidelity's October 1988 Business Plan, the very document upon which Dr. Kaplan bases his 8 percent per year growth assumption, states that Fidelity had "no forecasted earnings from Risk Controlled Arbitrage transactions." PX 444 at WON725 1135. In its Capital Plan, Fidelity told regulators that it considered a number of alternatives to regain capital compliance, before deciding to "[c]ontinue doing what we are doing." DX 78 at PAA052 2701-02. Even after FIRREA, Fidelity repeatedly affirmed that the Capital Plan simply continued -- and was "effectively the same" as -- a business plan that Fidelity

[22] Moreover, Congress's debate on legislation does not constitute an anticipatory breach. In the case of FIRREA, any of the terms of the legislation, including the phase-out of supervisory goodwill, could have been changed until final passage. Moreover, Fidelity never requested from FHLBB or OTS that they provide assurances that there would be no breach. See generally Danzig v. AEC Corp., 224 F.3d 1333, 1337 (Fed. Cir. 2000); Frazier v. United States, 67 Fed. Cl. 56, 62 (2005) (setting forth standards for anticipatory breach).

had been following since 1987. PX 964 at OAA004 2506, 2541; PX 985 at AST064176, AST064193; DX 3071 at 4; [Powderly Tr. at 152].

268. Indeed, due to Fidelity's substantial asset problems, regulators would have prohibited Fidelity from growing after the breach regardless of the treatment of goodwill. After Fidelity's October 5, 1987 report of examination, close to two years before FIRREA's implementing regulations, the FHLBB rated Fidelity a thrift composite rating of "4" on the 5-point MACRO scale. Fidelity received a "4" for asset quality and a "2" in capital, thus showing that Fidelity's poor asset quality caused its "4" rating. PX 908 at WON733 0829; DX 1448 at WON732 0834. In January 1990, regulators issued a regulation, RB3a-1, which required *all* "4" rated institutions -- regardless of the cause of the "4" rating -- to cease all growth. PX 542 at AST0704292-94; PX 535 at AST0704245-46. Under RB3a-1, associations "requiring more than normal supervision" or "subject to greater restrictions" were permitted little to no growth. Id. Regulatory bulletin RB3a-1 defined associations "requiring more than normal supervision" as including "those with a composite MACRO rating of "4"or "5." Id. Fidelity's asset quality worsened in severity between October 1987 and September 1989, and thus, irrespective of the breach, Fidelity would have continued to receive a "4" rating. Accordingly, irrespective of its loss of goodwill, Fidelity would have been precluded from any growth, beginning in January 1990 and continuing until it obtained a composite rating of at least "3."

269. In addition to RB3a-1, OTS regulatory guidelines prohibited any institution with a "4" rating, or which was "otherwise identified as troubled," from utilizing a risk controlled arbitrage scheme. DX 664 at 450.5. For this reason, too, Astoria would have been precluded from pursuing the growth strategy Dr. Kaplan proposes for the non-breach thrift.

270. Fidelity's growth would have been restricted irrespective of the breach due to its lack of tangible capital. Indeed, given its lack of tangible capital – a condition that would have existed irrespective of the breach, Fidelity faced potentially catastrophic interest rate risk. As of 1991, an increase of interest rates of only one hundred basis points would have wiped out the market value of the thrift's portfolio equity. PX 711 at AST002908-10. This interest rate risk problem would have existed irrespective of the phase out of goodwill. Both before and after FIRREA, interest rate risk analysis by regulators did not calculate interest rate risk in relation to the amount of goodwill held by a thrift. This makes sense: goodwill cannot protect against actual investment losses.

271. Additionally, the FDIC would not have permitted Fidelity to add $737 million in assets without additional tangible capital. Given the risk to the insurance fund, even if FIRREA did not cause a phase-out of Fidelity's supervisory goodwill, the FDIC would have required a higher tangible capital level before permitting such growth.

272. In addition, the projections in Fidelity's October 1988 Business Plan included approximately $34.21 million in non-contractual capital that was eliminated from Fidelity's tangible and core capital, and $30.2 million that was eliminated from its risk-based capital after the passage of FIRREA. See DX 1150 at 13, § 3.1.1. Dr. Kaplan did not consider what impact this elimination of non-breach capital would have on Fidelity's ability or desire to grow at his assumed growth rate. Assuming that Fidelity could have added $737 million in assets without effect from this loss of non-contractual capital would violate the principle that "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet, 339 F.3d at 1345.

273. Fidelity's asset problems would also have prevented its management from adding $737 million in MBS after FIRREA, regardless of the treatment of goodwill. As of September 30, 1989, Fidelity had nearly $100 million in classified assets, contributing to a significant deterioration in Fidelity's operations since 1987. PX 509 at AST0020000. Fidelity was in a "crisis" mode, with management devoting most of its time towards working out problem loans. [Powderly Tr. at 38, 40]. Furthermore, apart from its real estate loans, regulators harshly criticized Fidelity for its investments in certain mortgage-related securities, in particular, pointing to Fidelity's lack of internal guidelines and controls. PX 509 at AST001974-76. Dr. Kaplan does not account for these non-breach factors.

274. Furthermore, market conditions after FIRREA's passage also would have prevented Fidelity from adding an additional $737 million in assets between 1989 and 1994. After FIRREA, although Fidelity's substitution of MBS for commercial real estate loans decreased its credit risk, "the amount of market risk and interest rate risk were both increased in the area of other investments since the price of stock is subject to potentially sharp fluctuations of price . . . ." PX 509 at AST001974. This rate risk was exacerbated by a flat or inverted yield curve in 1989-90, followed by volatile movements in interest rates. These interest rate risk difficulties would have made massive investments in mortgage-backed securities highly risky, and in many cases unprofitable.

275. Furthermore, Dr. Kaplan fails to account for the fact that after it converted in 1993, Fidelity became well-capitalized, and faced no regulatory restrictions on its growth. Thus, after its conversion, regardless of the phase-out of goodwill, Fidelity's capital position did not

prevent it from pursuing any investment opportunities -- including a risk-controlled arbitrage scheme, as hypothesized by Dr. Kaplan. See DX 1147 at 14, ¶¶ 45-48; DX 1150 at 12, § 3.1.1.

276. The conversion also had the effect of mitigating the breach. Not only may a plaintiff not recover "for loss that [it] could have avoided without undue risk, burden or humiliation,"(Restatement (Second) Contracts § 350) it cannot recover for losses it actually did avoid. Fidelity reached "well-capitalized" status after the breach and no longer faced the regulatory constraints upon its growth that it claims it suffered following the breach. Dr. Kaplan has admitted that "irrespective of the breach, Fidelity would have converted during the same general time frame," because, "most of the large mutual thrifts in the country had already converted to stock form" by 1993. DX 506 at 14, ¶ 44. Regardless of whether Fidelity intended the conversion as an act of mitigation, its conversion still had the effect of mitigating the breach. See DX 1147 at 14, ¶¶ 45-48.

277. Astoria's causation case becomes even more attenuated after Astoria acquisition. Dr. Kaplan assumes that the goodwill and capital credits would have survived Astoria's accounting for the Fidelity acquisition. Dr. Kaplan is not an accountant, however. Because Astoria paid cash for Fidelity, purchase accounting rules would have required Astoria to write-off all of Fidelity's goodwill as part of the acquisition. See DX 1150 at 20, § 3.2.2. Astoria also does not show why regulators would have granted forbearance for the supervisory goodwill to transfer to Astoria, particularly given Astoria's excess capital. Even if the goodwill survived the acquisition, though, Astoria had ample excess capital and bought back its own stock numerous times after the Fidelity acquisition, thus making Dr. Kaplan's assumption that it would have fully

leveraged or valued the goodwill speculative. See DX 1147 at 16, ¶ 55; DX 1150 at 21-23, Section 3.2.3.

### C. Astoria's Hypothetical Lost Profits Were Not Reasonably Foreseeable

278. The question whether plaintiff's alleged lost profits were foreseeable entails a two-part test: "'Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.'" Landmark, 256 F.3d at 1378 (quoting Restatement (Second) of Contracts § 351(2)). Astoria bears the burden of proving "both the magnitude and the type of damages were foreseeable." Landmark, 256 F.3d at 1378. The court examines whether the alleged loss was foreseeable at the time of contracting, not at the time of breach. Bohac v. Dep't of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001).

279. "'[In order to have been foreseeable,] the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach.'" Landmark, 256 F.3d at 1378 (quoting 5 Arthur Corbin, Corbin on Contracts, § 1012 at 88 (1964)). The actual loss alleged by plaintiff must be foreseeable: "'The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable.'" Id. (quoting Restatement (Second) of Contracts, § 351, cmt. a). Astoria's claim fails this test, for three reasons.

280. First, there is no possibility the Government could have foreseen the magnitude of the damages calculated by Dr. Kaplan. The breach required an expedited phase-out of an intangible asset which, according to Dr. Kaplan, had a regulatory-accounting, book value of approximately $124 million, but no market value. Astoria claims that this intangible capital had

some value, but even if this is correct, its economic value (upon which a damages award must be based) was substantially smaller than its stated, regulatory-accounting value. One dollar of real cash had a substantially higher value than one dollar of regulatory accounting -- or "gimmick" -- capital. Cal Fed, 43 Fed. Cl. at 459; see also Fifth Third, 55 Fed. Cl. at 240. Indeed, real cash would have served the same regulatory capital function, and would have given Fidelity the ability to invest in interest-earning assets. Thus, damages that even approach (much less exceed) the book value of the regulatory intangible capital were not reasonably foreseeable.

281. Second, Astoria cannot show that the lost profits assumed by Dr. Kaplan were foreseeable when Fidelity acquired Suburbia. Fidelity's merger plan, which it submitted to the regulators, stated how it intended to operate the combined institution. The plan does not mention a risk-controlled arbitrage scheme, much less one of the magnitude of Dr. Kaplan's. Instead, Fidelity contemplated "completely restructur[ing]" the assets of the combined institution, with an emphasis on "mortgage banking, increased joint venture activity, commercial and consumer lending, discount brokerage, and equipment leasing." DX 3148 at PAA090 0109. Similarly, the plan made no mention of Fidelity itself being acquired.

282. Nor did Fidelity's operations demonstrate any intent by Fidelity to launch a massive risk-controlled arbitrage program. As of February 1984, for example, Fidelity had only $67.8 million in mortgage-backed securities, out of total assets of $521.6 million. In addition, Fidelity only had $30.9 million in FHLB advances, and $23 million in other borrowings. DX 3148 at PAA090 0118. Instead, Fidelity prized Suburbia because of its "terrific branch network" and "expanded deposit base" that would enable Fidelity to enhance its franchise on Long Island. [Lovely Tr. at 77, 81-81, 111-12].

283. Third, the type of damages tallied by Dr. Kaplan from 1995 through 2014 could not have been foreseeable to regulators in 1984, because Dr. Kaplan does not state with any degree of specificity how those damages were allegedly incurred, or even who would have allegedly incurred them. Nor could the regulators have foreseen that Fidelity's intangible capital would somehow transfer to any thrift that purchased Fidelity for cash, as discussed supra.

**D. Astoria's Hypothetical "Lost Profits" Are Not Reasonably Certain**

284. To recover the lost profits it alleges, plaintiff must prove both the fact of lost profits, and the amount of lost profits, with reasonable certainty. "[I]n order to recover anticipatory profits, it must be 'definitely established' that without the government's breach there would have been a profit." Rumsfeld v. Applied Cos. Inc., 325 F.3d 1328, 1340 (Fed. Cir. 2003) (quoting Cal Fed, 245 F.3d at 1349); see also Energy Capital., 302 F.3d at 1325; Restatement (Second) of Contracts § 352 (1981).

285. Alleged lost profits may not be recovered if they emerge from a lost profits model that is unreliable. San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997); Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992). The Federal Circuit has cautioned that "the proof problems [associated with expectancy claims] can in some cases prove to be insurmountable." Glendale I, 239 F.3d at 1380. Because Astoria's expectancy models are based upon a number of "critical assumptions, . . . [t]he failure to establish the reasonableness of these assumptions is fatal not only to the damages claim, but to plaintiffs' entire case." S. Pac. Commc'n Co. v. American Tel. & Tel. Co., 556 F. Supp. 825, 1076 (D.D.C. 1982); see Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 911-13 (2d Cir. 1962).

286. In nearly every instance in which this Court or the Federal Circuit has considered a lost profits claim, the claim has been rejected.[23] The Federal Circuit, after surveying the expectancy damage claims in Winstar-related litigation, has observed that the models upon which these claims rest have been "inherently unreliable," and that, although lost profits models have not been barred as a matter of law, such models are largely a "waste of time and effort" Glendale, 378 F.3d at 1313; see also Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1023 (Fed. Cir. 1996) (lost profits based on hypothetical leverage capacity are "too uncertain and remote").

287. This Court has uniformly rejected expectancy damage claims in Winstar-related cases wherein the plaintiff's expert, as here, failed to identify with specificity the investments the thrift would have made in the "but-for" world. See Citizens Fin., 64 Fed. Cl. at 514 (rejecting

---

[23] See, e.g., Citizens Fin. Serv., F.S.B. v. United States, 64 Fed. Cl. 498, 514 (2005), aff'd, 170 Fed.Appx. 129, 2006 WL 618792 (Fed. Cir. 2006) (affirmed pursuant to Fed. Cir. Rule 36); LaSalle Talman Bank, F.S.B. v. United States, 64 Fed. Cl. 90, 106 (2005), aff'd, 462 F.3d 1331 (Fed. Cir. 2006); Standard Fed., 62 Fed. Cl. at 285-89; LaSalle, 45 Fed. Cl. at 101; Glendale Fed. Bank, F.S.B. v. United States, 43 Fed. Cl. 390, 400-02 (1999), aff'd in part, vacated in part, & remanded, 239 F.3d 1374 (Fed. Cir. 2001); Castle v. United States, 48 Fed. Cl. 187, 206, 214 (2000), aff'd in part & rev'd in part, 301 F.3d 1328 (Fed. Cir. 2002), cert. denied, 539 U.S. 925 (2003); Bank United of Texas, F.S.B. v. United States, 50 Fed. Cl. 645, 654 (2001), rev'd in part, 80 Fed. Appx. 663, 2003 WL 22177282 (Fed. Cir. 2003), cert. denied, 543 U.S. 916 (2004); Suess v. United States, 52 Fed. Cl. 221, 228 (2002), reconsideration denied, 54 Fed. Cl. 606 (2002); California Fed. Bank v. United States, 54 Fed. Cl. 704, 716 (2002), aff'd, 395 F.3d 1263 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 344 (2005); Southern Cal. Fed. Sav. & Loan Ass'n v. United States, 57 Fed. Cl. 598, 622 (2003) ("SoCal"), aff'd in part, rev'd in part, & remanded, 422 F.3d 1319 (Fed. Cir. 2005); see also Fifth Third, 55 Fed. Cl. at 242, aff'd in relevant part, 402 F.3d 1221 (Fed. Cir. 2005); S. Nat'l Corp., 57 Fed. Cl. at 306; Columbia First Bank, F.S.B. v. United States, 60 Fed. Cl. 97, 126 (2004); American Fed. Bank, FSB v. United States, 68 Fed. Cl. 346, 350-59 (2005); but see Commercial Fed. Bank, FSB v. United States, 59 Fed. Cl. 338, 347-55 (2004), aff'd, 125 Fed. Appx. 1013 (Fed. Cir. 2005) (pursuant to Fed. Cir. Rule 36); Globe Savings Bank, F.S.B. v. United States, 65 Fed. Cl. 330, 347-48 (2005), aff'd in part, vacated in part, and remanded, 189 Fed. Appx. 964, 2006 WL 2045776 (Fed. Cir. 2006).

lost profits claim because, "absent proof of specific investments that would have been held in the world absent FIRREA, a lost profits claim is too speculative"); LaSalle, 64 Fed. Cl. at 106; Standard Fed., 62 Fed. Cl. at 285 (rejecting lost profits claims where the expert did not analyze data underlying "no-breach" assumptions); Cal Fed, 54 Fed. Cl. at 712 (failure to identify specific "but-for"assets); Fifth Third, 55 Fed. Cl. at 228 (plaintiff's expert did "not identify specific opportunities"). This Court has recognized that the "[l]oss of leverage capacity for an investment that plaintiff has not shown it would have made absent the breach is not sufficient support for a lost profits damages claim." Columbia First, 60 Fed. Cl. at 112 (citing Bank United, 50 Fed. Cl. at 655, 664); So. Cal., 57 Fed. Cl. at 626; S. Nat'l Corp., 57 Fed. Cl. at 306.

288. Similarly, the courts of this Circuit have rejected as speculative claims which proceed upon the assumption that growth will necessarily result in profits. For example, in Glendale, the Federal Circuit determined that Glendale "reduced its losses" by shrinking to meet capital requirements. Glendale, 239 F.3d at 1378; see also Wells Fargo, 88 F.3d at 1023; So. Cal., 57 Fed. Cl. at 626 ("most importantly, growth does not necessarily equal profits"); Cal Fed, 54 Fed. Cl. at 706.

### 1. Fidelity's 1989-94 Lost Profits Are Speculative

289. As discussed above, the two basic assumptions of Dr. Kaplan's calculations of Fidelity's "lost profits" from January 1989 to December 31, 1994 are: (1) a growth rate of two percent per quarter, resulting in "forgone assets" of $737 million, and (2) a spread of 80 basis points on the "forgone assets." The facts to be presented at trial, many of which are undisputed, contradict both assumptions. As a result, Fidelity's lost profits are speculative.

### a. Dr. Kaplan's Growth Rate Assumption Is Unsupported

290. Dr. Kaplan bases his two percent per quarter growth assumption upon three factors: (a) Astoria's growth rate between December 1989 and December 1993; (b) Fidelity's October 1988 business plan; and (c) Fidelity's pre-FIRREA and post-conversion growth rates. See DX 506 at ¶¶ 47, 53. None of these three factors supports this assumption.

291. First, the actual growth rate for Astoria demonstrates that the 8.25 percent growth rate projected by Dr. Kaplan for Fidelity is implausible. Unlike Fidelity, Astoria had hundreds of millions of dollars in tangible capital. Yet even Astoria increased its total assets at a compounded annual rate of just 5.77 percent between December 31, 1988 (the date Dr. Kaplan begins calculating growth for Fidelity absent the breach) and December 31, 1993 -- from $3.075 billion to $4.072 billion. See DX 2962 at AA1001 0394 and DX 1132 at WON735 1585. Further, excluding the $281.5 million in assets acquired by Astoria from another thrift in November 1990, Astoria's assets increased by only $63.5 million from December 1988 to December 1992. DX 2962 at AA1001 0514. Moreover, between December 31, 1989 (the start date for Dr. Kaplan's alternate calculation in Exhibit 9B to his affidavit) and Fidelity's conversion in May 1993, Astoria's adjusted total assets had grown at a compound annual growth rate of 1.49%. See DX 1150 at 9, § 3.1.1. Astoria's modest growth despite ample excess capital thus belies Dr. Kaplan's growth assumption for the less-capitalized Fidelity.

292. Second, the October 1988 Business Plan relied upon by Dr. Kaplan contradicts his model, because that plan did not focus upon substantial growth through risk-controlled arbitrage ("RCA"). Indeed, the October 1988 Business Plan contained "no forecasted earnings from Risk Controlled Arbitrage transactions." PX 444 at WON725 1135. Fidelity also acknowledged that

RCA transactions were not always profitable and that yield curves and market spreads might not allow it to invest profitably in RCA transactions. Id. While the October 1988 Business plan projected that Fidelity would grow between June 1988 and June 1991, over 70 percent of this growth was projected to come from investments in retail assets (such as mortgage loans, consumer loans, and home equity lending), not wholesale assets. See PX 444 at WON725 1164. Similarly, Fidelity anticipated relying on an increase in deposits to fund this growth, not exclusively wholesale liabilities, as Dr. Kaplan's calculations assume. PX 444 at WON725 1135, 1165. Even where Fidelity did pursue MBS investments, it invested in a wide array of MBS, including long-term fixed rate MBS, and not simply the one-year ARM securities Dr. Kaplan hypothesizes.

293. Further, Dr. Kaplan demonstrates a blind faith in the feasibility of the growth projected in the October 1988 Business Plan, in the face of overwhelming evidence to the contrary. The October 1988 Business Plan did not anticipate macroeconomic events such as a major recession lasting through 1991, war in the Middle East, and a slumping real estate market -- all of which Fidelity described as "impossible to contemplate" when it submitted its capital plan in *January 1990.* PX 787 at AST002748; see also DX 1147 at 13, ¶¶ 42-44. Nor did Dr. Kaplan consider the admissions made by Fidelity to regulators that its previous budget for 1988 envisioned "minimal" asset growth because of the thrift's tremendous asset quality problems. [Powderly Tr. at 33-34]. Also, as discussed above, the October 1988 business plan did not contemplate the approximately $34.21 million in non-contractual capital that was eliminated from Fidelity's tangible and core capital, and $30.2 million that was eliminated from its risk-based capital, after the passage of FIRREA. As its most critical failure, however, the October

1988 Business Plan did not forecast any bad debt expenses from January 1989 through June 1991. In reality, the provisions for loan losses between 1985 and 1991 totaled over $34 million (DX 65) – and this failure does not include the many millions in lost interest income.

294. Third, Dr. Kaplan purports to base his hypothetical 8.25 percent annual growth rate upon Fidelity's track record of growth. While Dr. Kaplan is correct that Fidelity grew rapidly after its acquisition of Suburbia, that growth – in commercial real estate, construction, and commercial business loans – was disastrous for the thrift. When the real estate market soured, those loans resulted in tremendous losses, leading to a "crisis." [Powderly Tr. at 38]. In fact, as Fidelity grew, its net interest income, operating income, net income, net spread, and return on average assets declined precipitously. DX 1150 at 2, 8, 17, Ex. 3.0.

295. Lastly, even by its own terms, Dr. Kaplan's model overstates the growth in "forgone assets." Contrary to Dr. Kaplan's statement that he had removed the non-earning assets from his calculations in his affidavit, his calculations still include non-earning assets. DX 581 at 6-7, § 4.0. These non-earning assets in Dr. Kaplan's revised model result in his damages figures remaining overstated, even by the standards set forth in his model.

**b. Dr. Kaplan's Spread Assumption Is Unsupported**

296. As support for his assumed 80 basis point spread, Dr. Kaplan cites three factors: (1) Fidelity's actual whole-bank profitability; (2) the wholesale spreads earned by Fidelity; and (3) returns available to Fidelity in the marketplace. None of these three factors supports Dr. Kaplan's assumption. Moreover, Dr. Kaplan's model also ignores the additional costs Fidelity would have incurred absent the breach.

297. First, Fidelity's whole bank profitability -- its net interest income, operating income, and income before taxes -- declined each year from March 1986 to March 1989, even as it was growing from $1.322 billion to $1.936 billion, or by $600 million. Fidelity's return on average assets also decreased for each fiscal year during this period. DX 1150 at 16-18, § 3.1.3.

298. But even further, Fidelity's asset growth during this time period was fueled by purchases of investment securities and MBS, funded primarily by wholesale borrowing -- the same wholesale strategy assumed by Dr. Kaplan in his hypothetical model. For example, Fidelity's investment securities and MBS increased by $743.676 million from March 31, 1986 ($160.266 million) to March 31, 1989 ($903.942 million), while its wholesale borrowings increased by $462.387 million. DX 506 at Ex. 5. Nevertheless, in the actual world this increase in wholesale assets funded by wholesale borrowings did not result in increased profits, or, for that matter, even increased net interest income. DX 506 at Ex. 5; DX 1150 at 17.

299. Second, Dr. Kaplan cherry-picks the data regarding Fidelity's wholesale spreads in an effort to maintain his hypothetical 80-basis point spread. Dr. Kaplan calculates Fidelity's actual wholesale spread in Exhibit 8A of his report, claiming that, "for each post-breach period," Fidelity's actual wholesale spread "was always greater than 78 basis points." DX 506 at ¶ 61. But he does not examine Fidelity's spreads for the entire post-breach period. Instead, he cites Fidelity's actual spread for only a portion of his damages period -- from March 31, 1991 to September 30, 1994. DX 174 at 168-69. In other words, Dr. Kaplan ignores spreads from fiscal years 1989, 1990, and 1994 -- even though these years comprise half of his damages period.

300. The reason Dr. Kaplan ignores Fidelity's actual spreads during relevant time periods is obvious: Fidelity's wholesale net spread was negative for both fiscal years 1989 and 1990 -- negative 37 basis points in 1989 and negative 30 basis points in 1990. DX 1150 at 17; DX 1147 at 15, ¶¶ 49-52. Considering the severity of the recession in New York at that time, this lack of profitability is unsurprising. In addition, while Fidelity's spread for year-end 1994 was positive, it was less than 80 basis points. Id.

301. Third, Dr. Kaplan claims that wholesale spreads of 80 basis points were generally available in the marketplace. But this claim is meaningless, because Dr. Kaplan refuses to identify either the wholesale assets or funding -- among the trillion-dollar markets that make up both categories -- that would generate those spreads. Even narrowing the relevant market to one-year adjustable-rate ARMs, as Dr. Kaplan has indicated Fidelity might have done does not support such a spread, particularly given the volatility in interest rates during the relevant time period. His model also ignores the variation in MBS investments, increasing marginal cost of borrowing and prepayment risks. See DX 1147 at 15, ¶¶ 49-52; DX 1150 at 16-18, § 3.1.3.

**2. Astoria's 1995-2014 Lost Profits Are Speculative**

302. Dr. Kaplan's "lost profits" calculation from 1995 to 2014 is even more speculative, and falls far short of the reasonable certainty standard, for several reasons.

303. First, as discussed above, Dr. Kaplan fails to explain how any remaining goodwill would transfer to an acquiring thrift, even absent the breach. As discussed above, purchase accounting rules, as well as the lack of regulatory forbearance, would have doomed any such transfer. See Def. Mot. Sum. Judg. (July 3, 2003) at 31; see also DX 1150 at 20, § 3.2.2.

304. Second, Dr. Kaplan simply assumes that Astoria would have invested profitably, without any more detail. He does not identify what type of assets – not even narrowing it to MBS – and liabilities Astoria would have added. Such application of a hypothetical return to a leverage-based incremental asset base has been repeatedly rejected by this Circuit as a basis for damages. See, e.g., Glendale, 378 F.3d at 1313; Wells Fargo, 88 F.3d at 1023.

305. Third, as discussed above, even if the goodwill survived the acquisition, Astoria had ample excess capital and bought back its own stock numerous times after the Fidelity acquisition, thus making Dr. Kaplan's assumption that it would have fully leveraged the goodwill speculative. See DX 1147 at 16, ¶ 55; DX 1150 at 21-23, § 3.2.3. As Astoria's President, George Engelke, put it: "[T]he best return we could get for our shareholders is to buy our own stock . . . and the investors earn more than if I had taken that same money and let's say levered it up . . . let's say 10 times or whatever I could lever it up and borrowed and bought securities and put that all on the bottom line." [Engelke Tr. at 185-86]. Accordingly, Astoria would have placed no value on Fidelity's goodwill. See Granite, 74 Fed. Cl. at 163-64.

306. Fourth, in addition to not remedying the faults in the pre-acquisition calculations, the Kaplan Affidavit introduces new speculative assumptions with respect to the post-acquisition period. In his original report, Dr. Kaplan's foregone assets increased by $4 million between December 1994 and January 1995.[24/] Depending upon whether the start date of Dr. Kaplan's updated lost profits calculation is January 1989 or January 1990, Dr. Kaplan's December 1994

---

[24] [$963 million (DX 506, Ex. 16) less $959 million (DX 506, Ex. 9)]. The increase occurred by January 1995 because the $963 million is the average for the entire year. Therefore, assets have to increase by $4 million in January otherwise they would not average $963 million for the year. See DX 581 at § 5.0.

foregone assets are now either $737 million or $524 million, respectively. See DX 1233 at Ex. 9A, 9B; see also DX 581at 8, § 5.0, DX 3453 at 5, ¶ 16-17. Based upon Dr. Kaplan's own revised figures, rather than foregone assets increasing by $4 million between December 1994 and January 1995, as he originally calculated, Dr. Kaplan now assumes that the foregone assets would increase by at least either $226 million or $439 million during the same one month interval.[25] Id. This unsupported leap in assets makes Dr. Kaplan's model even more speculative.

### 3. Dr. Kaplan's "Lost Profits" Calculations Erroneously Fail To Adjust For A Non-Breach World

307. Dr. Kaplan did not consider it relevant whether other thrifts would have been able to count goodwill as capital absent the breach, as he assumes Fidelity could. DX 174 at 91. This is fatal to his model. This Circuit has consistently rejected expectancy damage models as speculative where they did not assess the effect of external factors. See S. Nat'l, 57 Fed. Cl. at 305 (model failed to address impact of competition); So. Cal., 57 Fed. Cl. at 626 (model failed to assess impact of recession); Fifth Third, 55 Fed. Cl. at 241 (model that "ignores the presence of competitors similarly unfettered by the breaching provision of FIRREA").

308. Dr. Kaplan's model also ignores the additional costs that Fidelity would have incurred absent the breach. Fidelity's management have testified that they greatly reduced their advertising budget in the New York City market after the breach. [Powderly Tr. at 92, 96]. Thus, absent the breach, Fidelity would have had greater costs for advertising and other deposit-related activities than it did in the non-breach world. Dr. Kaplan ignores these but-for costs.

[25] [$963 million (DX 506, Ex. 16) minus $737 million (DX 1233, Ex. 9A)] or $524 million (DX 1233, Ex. 9A).

309. Finally, Dr. Kaplan's lost profits calculations fail to consider the $7 million in annual recurring cost-savings that Astoria admitted it would realize after acquiring Fidelity. In a non-breach world, where Astoria does not acquire Fidelity, neither Astoria nor Fidelity would realize these cost savings. Between 1995 and 2014, the annual cost savings would total at least $140 million (20 years of $7 million in cost-savings). This amount far exceeds Dr. Kaplan's lost profits of $84.7 million during that same time period.

**4. Astoria's Attempts To Distinguish Prior Cases Are Unavailing**

310. In order to shore up its reliance upon Dr. Kaplan's damages model, Astoria relies upon two recent decisions from this Court concerning lost profits models prepared by Dr. Kaplan: Com. Fed., 59 Fed. Cl. 338, and First Federal Lincoln Bank v. United States, 73 Fed. Cl. 633 (2006), appeals docketed, No. 07-5044 (Fed. Cir. 2007).[26] See Pl. Mem. (Feb. 15, 2007) at 46-49. Upon closer inspection, however, neither of these decisions supports Astoria's damages model.

311. In Com. Fed., the trial court granted $5.6 million in lost profits damages based upon the plaintiff thrift's modeling of its "whole bank" portfolio. In Com. Fed., unlike here, the model projected a lower growth rate after FIRREA than had been the case before FIRREA, and had a return on assets assumption that was "consistent with the average returns experienced by plaintiff from 1990-97." Com. Fed., 59 Fed. Cl. at 350. The Court thus found that the calculation of lost profits was "grounded in the actual performance of the bank both pre-FIRREA and post-conversion." Id. at 351.

---

[26] We respectfully disagree with the trial court's damages decision in First Federal Lincoln, and the matter is currently on appeal.

312. Here, by contrast, Dr. Kaplan's calculations of Fidelity's growth rates and return on assets for unidentified mortgage-backed securities are not consistent with Fidelity's actual performance before or after the breach. This makes this case analogous to Columbia First, where the Court distinguished Com. Fed. using terms equally applicable here. See Columbia First, 60 Fed. Cl. at 120 ("In Com Fed, the plaintiff offered credible evidence of the availability of investment opportunities, 59 Fed. Cl. at 349 n.29, the history of investment practices, id. at 349, and the bank managers' ability to invest for growth, id. at 345, 349. Here, plaintiff's model does not reflect the diversity of its real-world portfolio."). Dr. Kaplan's model here does not match the diversity of the thrift's real-world portfolio or the thrift's performance before or after the breach, making even the pre-conversion lost profits more speculative than those in Com. Fed.

313. The Com. Fed. court also rejected the entirety of plaintiff's lost profits claim after the thrift's conversion to stock form in 1994. That conversion, like Fidelity's, left the thrift with "well-capitalized" status. "If it can be shown that the goodwill would not or could not have been put to use under the actual circumstances by the institution, then despite there being a breach and a loss of goodwill, there is no harm." Com. Fed., 59 Fed. Cl. at 352. Due to the thrift's excess capital following the conversion, the court found that, "there was no evidence or reason persuasive to the court to believe that plaintiff would have continued to earn a one percent ROA on the $220,000,000 of "but-for" assets *in addition* to what it did earn on its actual assets for this period. The court concludes, therefore, that the elimination of the supervisory goodwill caused no actual harm in the period from July 1994 to September 1997." Id. at 353. Here, the same expert as in Com. Fed. is again ignoring a conversion's effect upon his growth model.

314. Furthermore, in First Federal Lincoln, the Court rejected the damages model presented by Dr. Kaplan based upon lost leverage of goodwill. Despite Astoria's claim that the Court "awarded lost profits," Pl. App. A Br. at 41, the only damages awarded by the Court were a "franchise premium" measured by the actual decline in the thrift's deposit levels over a three-year time span, multiplied by a median premium derived from sales of certain Midwest thrift branches. First Federal, 73 Fed. Cl. at 646. Here, by contrast, Fidelity's deposits did not decline after the breach. The Court specifically distinguished this measure, based on an actual decline in deposits, from Dr. Kaplan's calculation of "foregone deposits due to missed growth opportunities," which the Court found to be "speculative and therefore cannot be factored into the calculation." Id. Although Astoria states that this case is distinguishable from First Federal Lincoln where the Court "rejected the expert's (i.e., Dr. Kaplan's) projections regarding the thrift's post-breach rate of growth, because they deviated from the acquiring thrift's actual pre-breach performance," here the same expert is propounding another model that similarly deviates from Fidelity's, and later Astoria's, actual performance.

315. Moreover, the First Federal Lincoln court rejected as speculative Dr. Kaplan's projected rate of return, which, like his model here, was based upon hypothetical investments in adjustable-rate MBS. "[N]or does Dr. Kaplan explain how Lincoln's portfolio would be structured, the availability of the adjustable rate MBS for Lincoln to invest in, and the impact of risk on Lincoln's investment strategy. The court therefore concludes that the use of the adjustable rate MBS as a proxy in this case does not provide a reasonably certain basis upon which to project Lincoln's yield on foregone deposits following the breach." Id. at 645. Dr. Kaplan's hypothetical Fidelity MBS investments here are as speculative as those in First Federal Lincoln.

### G. Astoria's Claim Of An Alleged Forced Sale Of Freddie Mac Stock Is Without Merit

#### 1. An Overview of Astoria's Claim

316. Dr. Kaplan presents yet another lost profits claim -- that Fidelity was allegedly forced by the phase-out of goodwill to sell its portfolio of Freddie Mac stock prematurely.[27/]

317. After selling 135,000 shares of Freddie Mac stock in December 1988, Fidelity still owned 808,544 shares of Freddie Mac stock at the end of 1988. DX 2329 at KAP0005988, 6004. During the first quarter of 1989, Fidelity sold another 286,544 shares of Freddie Mac stock, so that by March 31, 1989, Fidelity had 522,000 shares remaining. Dr. Kaplan argues that "absent the pending adverse treatment of supervisory goodwill as regulatory capital, Fidelity would not have sold as much stock as it did by that date [March 31, 1989], and the Bank clearly would not have continued to sell shares in the subsequent month." DX 506 at ¶ 68.[28/]

318. In Dr. Kaplan's opinion, absent the breach "Fidelity would have held the 522,000 shares [of Freddie Mac stock] it owned as of March 31, 1989 through at least August 2, 1991," but to be "conservative," Dr. Kaplan assumes that Fidelity would have sold all 522,000 shares on August 2, 1991. DX 506 at ¶ 69. According to Dr. Kaplan, this would have resulted in an additional $21 per share appreciation, or $10.86 million in additional proceeds. Id. As with his

---

[27] Dr. Kaplan also calls this claim a "wounded bank" claim. Whatever he chooses to call it, it is an expectancy claim, and must meet the burden of proof associated with these claims.

[28] Although Dr. Kaplan begins lost profits calculations as of January 1, 1989, he does not attempt to quantify damages for the 286,544 Freddie Mac shares that were actually sold during the first quarter of 1989.

other lost profits claim, Dr. Kaplan begins toting up damage numbers well before FIRREA was even passed, much less implemented into law by regulations.

319. Plaintiff's damages claims with regard to an alleged forced sale of Freddie Mac stock have no basis in the undisputed documentary evidence, and are wholly speculative.

### 2. Astoria's Claim Of Forced Freddie Mac Stock Claim Is Without Merit

320. Dr. Kaplan's argument that Fidelity would have gamed the stock market, held Freddie Mac stock until an opportune moment, and then sold it for greater profit absent the breach, is pure speculation. In addition, his argument that Fidelity was forced to sell its Freddie Mac stock prematurely as a result of a phase-out of goodwill is farcical; there is not a single document to support this claim, and an overwhelming body of evidence refutes it.

321. As an initial matter, Dr. Kaplan starts his damages calculations over eight months before FIRREA was implemented and over four months before FIRREA was even passed. As a matter of law and logic, then, these purported damages were not "an immediate and proximate result of the breach." Chain Belt Co., 115 F. Supp. at 714; see also Myerle, 33 Ct. Cl. 1.

322. Further, Dr. Kaplan admits that Fidelity was actively trading FHLMC shares after the breach, from March 31, 1989, to August 31, 1991: "the Bank continued to purchase shares even as it sold shares during this time period." DX 506 at ¶ 69. In fact, during the second half of 1989 -- when FIRREA was passed and implemented -- Fidelity sold 177,000 shares of Freddie Mac stock at an aggregate price of $14.37 million, and purchased 204,100 shares at an aggregate cost of $18.49 million. In October 1989 alone, Fidelity purchased 149,100 shares. DX 1150 at

27-28. By December 1989, Fidelity had actually increased its Freddie Mac stock position to 304,100 shares from its June 1989 position of 277,000 shares.

323. All told, Fidelity purchased 219,00 shares of Freddie Mac stock after the passage of FIRREA, at an aggregate cost of $19.5 million, or $89 per share. DX 1150 at 28. As a result, approximately $4.6 million of the $10.86 million in Dr. Kaplan's calculation of damages relates exclusively to stock purchased by Fidelity after FIRREA.

324. Fidelity's Investment Committee Meeting minutes further prove that Fidelity was trading Freddie Mac stock not because of any phase-out of goodwill, but because of what Fidelity perceived to be the prospects for the stock. On January 14, 1991, for example, Mr. Wesp "noted that the current real estate recession makes this an inopportune time to begin purchasing these [Freddie Mac and FHNMA] stocks." PX 679 at AST0308389. In fact, the Investment Committee discussed Freddie Mac stock on a monthly basis, and cited numerous market-related facts that caused Fidelity to sell the stock. None of the minutes even mentions the phase-out of goodwill in connection with Freddie Mac stock.

325. Independent business decisions, such as Fidelity's decisions to trade Freddie Mac stock based upon its perception of the value of that stock, preclude any finding that lost profits were caused by a breach. See Hughes Commc'n Galaxy, Inc. v. United States, 271 F.3d 1060, 1071 (Fed. Cir. 2001) ("Hughes made the independent business decision to obtain launch insurance. This intervening cause precludes the award of increased insurance costs as direct damages."); see also Myerle, 33 Ct. Cl. at 18 (barring recovery of lost profits "such as would have been realized by the party from other independent and collateral undertakings") (quotations omitted); accord Wells Fargo, 88 F.3d at 1022-23.

326. During the period for which Dr. Kaplan purports to measure damages, the value of Freddie Mac stock ranged from over $100 a share in October 1989 -- when Fidelity purchased 149,100 shares -- to approximately $30 per share in October 1990. DX 506 at Ex. 13. Yet Dr. Kaplan assumes that, absent the phase-out of goodwill, Fidelity would have continued to hold the stock through this precipitous decline, in the perfect knowledge that the price of Freddie Mac stock would recover (the price of Freddie Mac stock did not reach $100 a share again until September 1991). In fact, as plaintiff admits, it was Fidelity's policy to sell mortgage-backed securities "when there appeared to be significant value that might deteriorate over time." Pl. Mem. (Feb. 15, 2007) at 23. Thus, Dr. Kaplan's assumption that Fidelity would have simply held the Freddie Mac stock throughout its roller-coaster price changes is simply wishful thinking; it is not the stuff of expectancy damages.

327. Dr. Kaplan cites only one contemporaneous document to support his opinion that Fidelity was forced to sell Freddie Mac stock as a result of the breach: Fidelity's January 17, 1989 Investment Committee Meeting Minutes. PX 461. But those minutes are from a meeting that took place before the initial FIRREA legislation was even submitted to Congress. They make no mention at all of FIRREA, much less any potential effect it might have on Freddie Mac stock. In fact, we are aware of no contemporaneous Fidelity document stating that it was forced to sell Freddie Mac stock as a result of FIRREA. Indeed, Fidelity's own Capital Plan, which was filed with the regulators in January 1990, after FIRREA was implemented and when Fidelity's management was acutely aware of the effect of the phase-out, did not call for the rapid liquidation of Freddie Mac stock. Instead, Fidelity was to hold its Freddie Mac stock until the fourth quarter of 1993. DX 78 at PAA052 2827. In fact, the evidence suggests that Fidelity sold

the Freddie Mac stock primarily because of its assessment of the stocks' future performance. For example, *in December 1988*, it stated that it was monitoring its Freddie Mac stock closely so "that Fidelity may obtain the most attractive gains possible." PX 1333 at AST0129799.

328. In any event, the very premise of Dr. Kaplan's argument is flawed as a simple matter of economics. Even if there were any evidence (and there is not) that Fidelity was somehow forced to liquidate its Freddie Mac stock to realize gains when it believed the value of Freddie Mac stock would continue to rise, then nothing prevented Fidelity from simply re-investing the sales proceeds in purchases of more Freddie Mac stock. DX 1147 at 17-19.

### H. Astoria's Claims For Allegedly Excessive FDIC And OTS Assessments Are Speculative

329. Astoria also makes an expectancy claim for allegedly excessive examination assessments and deposit insurance premiums paid to the OTS and the FDIC, respectively, that, Dr. Kaplan opines, Fidelity would have not made absent the breach. According to Dr. Kaplan, absent the phase-out of goodwill, "it is clear that Fidelity would not have paid a premium rate for deposit insurance and OTS assessments, since it would have been a well capitalized institution." DX 506 at ¶ 66. Dr. Kaplan attributes $436,800 to allegedly excessive OTS examination assessments paid by Fidelity from October 1990 to June 30, 1993, and $994,926 for allegedly excessive deposit insurance assessments paid from January 1993 to December 1994.

330. Dr. Kaplan's calculations are speculative, and cannot form the basis of an award.

### 1. Astoria Is Not Entitled To An Award Based Upon Speculation About What Fidelity's OTS Examination Assessments Might Have Been Absent The Phase-Out Of Goodwill

331. The OTS assessment rate of a thrift was based upon whether the thrift was considered troubled. Troubled institutions were assessed a premium rate, while non-troubled thrifts were assessed a general rate. A troubled thrift is generally defined as one that is in conservatorship that requires heightened supervision and examination, or that has a MACRO rating of "4" or "5." DX 3407. The assessment rate is then applied to the thrift's total assets, including any subsidiaries.

332. Dr. Kaplan's "excess assessment" damages model is premised upon the assumption that Fidelity would not have been assessed at a premium rate absent the phase-out of goodwill. Dr. Kaplan's sole support for this assumption is his statement that Fidelity "would have been a well capitalized institution." DX 506 at ¶ 66. Dr. Kaplan is incorrect. Fidelity would have been at least a "4" rated institution irrespective of the breach. Dr. Kaplan ignores the other four elements of the MACRO rating for Fidelity in the "non-breach world" -- that is, he ignores the factors of Management, Asset Quality, Risk Management, and Operations.

333. In reality, Fidelity had serious problems in several MACRO categories, especially Asset Quality, but also Risk management, Management, and Operations.

334. Dr. Kaplan ignores all these factors, however, and effectively converts the MACRO rating system to a C rating system, in which only capital is considered by regulators, and in which regulators treat intangible capital with equal deference, although only tangible capital protected the Insurance Fund. See DX 1150 at 24-26, § 3.3.2.

335. In addition, Dr. Kaplan's excess assessments calculation is incompatible with his "lost profits" calculations. Dr. Kaplan presumes that Fidelity would have added nearly $740 million dollars in assets by 1994 absent the phase-out of goodwill. As an institution that would have been at least a "4" rated institution irrespective of the breach, Fidelity would have incurred additional assessments as a result of these additional assets. These additional assessment would be deducted from any potential lost profits claim. Moreover, if it added several hundred million more in assets, its risk profile would have changed dramatically, which would have caused Fidelity's MACRO rating to decline even further. Dr. Kaplan utterly ignores these factors.

336. For these reasons, then, Astoria's claim premised upon supposedly excessive OTS assessments paid by Fidelity is deficient as a matter of law and undisputed fact.

**2. Astoria Is Not Entitled To An Award Based Upon Speculation About What Fidelity's Deposit Insurance Premiums Might Have Been Absent The Phase-Out Of Goodwill**

337. As with Astoria's claim for OTS assessments, Dr. Kaplan assumes that Fidelity paid more deposit insurance premiums to the FDIC than it would have paid in the absence of the breach. Again, as with Dr. Kaplan's claim for OTS assessments, the sole underpinning for his opinion that Fidelity paid excessive deposit insurance premiums is that Fidelity "would have been a well capitalized institution" and would have received a higher MACRO rating in the absence of the phase-out of goodwill. DX 506 at ¶ 66. Dr. Kaplan assumes that Fidelity incurred $994,926 in allegedly excessive deposit insurance premiums to the FDIC. DX 506 at Ex. 11.

338. To determine premiums for institutions, the FDIC uses nine risk categories, which are based upon three categories of capital ratios: (1) well-capitalized; (2) adequately capitalized; and (3) undercapitalized. The FDIC further evaluates institutions based upon three supervisory

subgroup assignments: (1) subgroup A, for thrifts with a MACRO rating of 1 or 2; (2) subgroup B, for thrifts with a composite rating of 3; and (3) subgroup C, for thrifts with a composite rating of 4 or 5. DX 2948A.

339. Dr. Kaplan ignores all factors other than the phase-out of goodwill from Fidelity's regulatory capital computations. Regulators had the discretion to re-classify an institution from "well" to "adequately" capitalized, even if Fidelity were allowed to include goodwill in its core and risk capital requirements. For example, regulators could re-classify an institution if it were engaging in an "unsafe and unsound practice by virtue of having received a less-than satisfactory rating for asset quality, management, earnings or liquidity (or the equivalent MACRO categories) . . . ." DX 1199 at WON738 0795; see also DX1150 at 24-26, §3.3.2.

340. Dr. Kaplan ignores Fidelity's sizable asset-quality problems, and whether that would have caused the regulators to re-classify Fidelity. Dr. Kaplan ignores regulatory criticism of Fidelity's record-keeping of its investments. Dr. Kaplan ignores the Supervisory Agreement Fidelity entered into in May 1992 because the OTS viewed Fidelity as "unsafe and unsound." These failures are all fatal to Dr. Kaplan's calculations.

341. In an illustration of how empty his calculations are, Dr. Kaplan accumulates damages for the period in which Fidelity was, in actuality, considered "well-capitalized." After its conversion, between January 1, 1994, and December 31, 1994, Fidelity was considered "well-capitalized." Yet Dr. Kaplan argues that Fidelity would have paid fewer premiums because Fidelity would have been given a composite rating of 2 absent the breach, while, in reality, Fidelity merited a composite rating of only 3. Dr. Kaplan thus attributes 100 percent of this

difference in composite ratings to the phase-out of goodwill, which, after all, affected only an intangible asset, and did not impact the value of Fidelity's tangible assets.

342. Again, Dr. Kaplan ignores all other factors in an effort to pin more damages upon the phase-out of goodwill. Indeed, this demonstrates that regulators considered much more than just capital in formulating a MACRO rating; Fidelity was "well capitalized" in 1993 -- with tangible capital, no less -- yet the thrift only earned a MACRO composite rating of 3. Ratings for the thrift's composite factors reveal why: "Assets" was rated a "3," "Management was rated a "3," and "Earnings" was rated a "3." DX 1448 at WON732 0834. It is implausible to contend, that if Fidelity, as an already well-capitalized institution had more goodwill "capital," it would have earned a better MACRO rating.

343. In short, Dr. Kaplan fails to account for factors other than capital in his excess premiums claims. His calculations are speculative.

344. Moreover, plaintiff's claim for insurance premiums fails the test of foreseeability. At the time of the contract, insurance premiums for thrifts were not calculated in relation to risk, but merely size. Accordingly, at the time of the contract, neither plaintiff nor thrift regulators could have foreseen that insurance premiums would become risk-based, much less that a breach many years later would place the thrift in one particular risk-based category versus another.

## XX. PLAINTIFF'S TAKINGS CLAIM IS BARRED AS A MATTER OF LAW AND NO EXPERT TESTIMONY CAN BE GIVEN CONCERNING THE VALUATION OF ITS TAKINGS CLAIM AT TRIAL

345. In its recently filed Memorandum of Contentions of Fact and Law, plaintiff, citing the opinion of the Federal Circuit in Castle v. United States, 301 F.3d 1328 (Fed. Cir. 2002), recognized "that precedent binding on the Court of Federal Claims precludes recovery under a

Fifth Amendment takings theory when a contract remedy is available." Pl. Mem. (Feb. 15, 2007) at 63 n.215.[29]

346. Nonetheless, plaintiff cites two *non*-Winstar-related decisions, claiming that its takings claim is "preserved after a finding of breach of contract when damages remain[] an outstanding issue." Pl. Mem. (Feb. 15, 2007) at 63 n.215.

347. In its six-page discussion of its takings claim, plaintiff makes no attempt to distinguish Castle and its binding precedent from the circumstances in this case. Nor could it. In Castle, the Federal Circuit affirmed the dismissal of plaintiffs' takings claim. The denial of plaintiffs' takings claim there was not affected by the court's other findings that plaintiffs "were not entitled to damages due to the alleged breach of contract" (Castle, 301 F.3d at 1339), "even assuming the enactment and enforcement of FIRREA breached a contract the government had with [plaintiffs]." Id. at 1342. Thus, plaintiff's attempt to justify its assertion of a takings claim here based on the possibility that it might not receive any damage award pursuant to the damage theories *it chose to present* at trial adds nothing to a proper takings analysis. Plaintiff's argument that takings claims should be preserved when there is an "outstanding issue" of breach of contract damages is, in fact, a red herring.[30]

---

[29] On March 6, 2007, we filed a motion to dismiss plaintiff's takings claim. We reprise our arguments here. In the alternative, we argued that if the takings claim was not dismissed, plaintiff should be precluded from introducing expert testimony concerning this claim given plaintiff's failure to disclose the method or amount of its valuation of its takings claim. We will not repeat that argument here, but refer the Court to the arguments set forth in our filing dated March 6, 2007.

[30] Moreover, plaintiff's argument explains too much. If its position was correct, "then nearly all Government contract breaches would give rise to compensation under the Fifth Amendment." Hughes, 271 F.3d at 1070. Instead, the Federal Circuit "has cautioned against commingling takings compensation and contract damages," noting that "'the concept of a taking

348. The proper analytical focus concerning a takings claim in the Winstar-context has been resolved by the Federal Circuit. The issue is not whether a plaintiff can obtain the breach of contract damages remedies it chooses to present to the trial court. Instead, properly considered, the issue is whether a Winstar-plaintiff's contract-based takings claim can be based upon a reasonable investment-backed expectation. The Federal Circuit instructs that, due to the extensively regulated nature of the banking industry, it cannot:

> The breach-of-contract based takings claim fails because even assuming it was breached, the alleged contract did not create a reasonable expectation that the government would cease regulating the thrift industry, or any particular thrift therein. . . . Thus, by enacting FIRREA, the government did not deprive the plaintiffs from a contractual remedy – injunctive relief – to which they otherwise might have been entitled against a private defendant. Nor did FIRREA remove the plaintiffs' cause of action for damages.

Castle, 301 F.3d at 1342 (citations omitted).

349. The bases of the Federal Circuit's takings claims analysis in the Winstar-related cases set forth in Castle -- that plaintiff thrifts could not have had an expectation that banking regulations would not change and that FIRREA let remain the same type of contractual remedies plaintiffs would have had against a private defendant -- has been recognized repeatedly by the Federal Circuit. See LaVan, 382 F.3d at 1351-52; Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1340 (Fed. Cir. 2004); Fed. Deposit Ins. Corp. v. United States, 342 F.3d 1313, 1320 (Fed. Cir. 2003) ("Karnes"); Bailey v. United States, 341 F.3d 1342, 1347 (Fed. Cir. 2003). In short,

---

as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim.'" Id. (quoting Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978)).

the Castle decision is dispositive of a takings claim brought by a thrift based upon a breach of contract caused by the passage of FIRREA. Indeed, the Federal Circuit itself has recognized that *it* is bound by the Castle decision. See Karnes, 342 F.3d at 1320 ("This panel, however, is bound by Castle and cannot overrule it.").

350. Given the Federal Circuit's recognition that *it* is bound by the Castle decision, it follows that this Court has repeatedly held that it, too, is bound by the Castle decision: "After the Castle opinion was issued, this Court has routinely dismissed all Winstar-related takings claims." Mola Dev. Corp. v. United States, 74 Fed. Cl. 528, 546 (Fed. Cl. 2006). In support of this proposition, the Mola Court cited AG Route Seen Partnership v. United States, 57 Fed. Cl. 521, 535 (2003), First Federal Savings Bank of Hegewisch v. United States, 57 Fed. Cl. 316, 318-19 (2003), National Australia Bank v. United States, 55 Fed. Cl. 782, 789 (2003), and Granite, 55 Fed. Cl. at 166-67, all decisions issued since Castle was issued dismissing plaintiffs' takings claims.

351. Thus, plaintiff's citations to two non-Winstar cases are beside the point. Those cases do not concern the issue of a thrift's reasonable expectations concerning the regulation of the banking industry, nor do they concern the fact that FIRREA let remain plaintiffs' breach of contract claims against the Government. Accordingly, this Court should adhere to the binding precedent -- which Astoria both candidly admits exists and then proceeds to ignore -- requiring the dismissal of its takings claim. See LaVan, 382 F.3d at 1351-52; Admiral, 378 F.3d at 1340; Karnes, 342 F.3d at 1320; Bailey, 341 F.3d at 1347; Mola, 74 Fed. Cl. at 546; AG Route, 57 Fed. Cl. at 535; Hegewisch, 57 Fed. Cl. at 318-19; Nat'l Australia Bank, 55 Fed. Cl. at 789; Granite, 55 Fed. Cl. at 166-67.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson

JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel. (202) 353-7972
Fax (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR

March 15, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of March 2007, a copy of the foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson
John H. Roberson