IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------x

ASTORIA FEDERAL SAVINGS & LOAN,

ASSOCIATION,

COPY

Plaintiff,

No. 95-468 C

-against- (Chief Judge Smith)

UNITED STATES,

Defendant.

-----------------------------------x

May 23, 2000

9:47 a.m.

Videotaped Deposition of HENRY DREWITZ, taken by Defendant, pursuant to subpoena, at the offices of Astoria Federal Savings & Loan Association, One Astoria Plaza, Lake Success, New York, before Tracy Eckhoff, a Shorthand Reporter and Notary Public within and for the State of New York.

IT IS HEREBY STIPULATED AND AGREED by and among counsel for the respective parties hereto, that the sealing and certification of the within deposition shall be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

Drewitz

okay?

What's your full name, sir?

A. Henry Drewitz, D-r-e-w-i-t-z.

Q. Okay. And your home address?

A. 199 Nassau Boulevard, Garden City.

Q. Okay. Your telephone number?

A. (516), area code, 741-9196.

Q. Okay. How long have you lived there, Mr. Drewitz?

A. In that house, I think 37 years.

Q. Okay. Do you have any other current residences?

A. Yes, I do.

Q. Okay. Where is that?

A. My wife and I we own what was a farm property in Delaware County, New York.

Q. And what's that address?

A. RR 2, Box 132, East Brook Road, Walton, W-a-l-t-o-n, New York 13856.

Q. Do you have any other current residences?

A. No.

Q. Okay. Are you currently employed, Mr. Drewitz?

Drewitz

A. No.

Q. Okay.

A. I'm totally retired.

Q. Congratulations.

When is the last time you had any contact with anybody from Astoria?

A. Well, be a little more specific. In what way?

Q. When was the last time you spoke with anybody from Astoria?

A. That happens every once in a while.

Q. Okay.

A. For example, one of our directors had a little Christmas party in his home and George Engelke was there and two other directors and myself and it was strictly a social affair.

Q. Do you have any business dealings with anybody from Astoria anymore?

A. No, nothing.

Q. When was the last time you had any business dealings with somebody from Astoria?

A. Let me mention one thing. I -- I'm a depositor at Astoria Federal, and I renewed some CDs yesterday.

Drewitz

A. You know, we have a couple of new directors that I'm not really acquainted with. They came on board from the merger with Long Island Savings Bank. So he could be, but I have no -- I don't think the man was there at this affair.

Q. Did you speak with Mr. Powderly about this case at all?

A. Not at all.

Q. Okay.

A. Not a word.

Q. Not a word, okay.

Do you currently serve any role in the business operations of Astoria?

A. My role is totally zero.

Q. Totally zero.

A. Yeah.

Q. Do you have any investments in Astoria other than the depositary --

A. Well --

Q. -- depository?

A. I have a lot of stock.

Q. How much stock do you own there?

A. Close to -- I think it's 79,600

Drewitz

shares.

Q. Okay. Do you know how much that's worth today?

A. I'd say about $2 1/2 million.

Q. Do you have any investments in other savings and loans?

A. Yes, I do.

Q. Which -- which ones?

A. Well, I have stock in the Dime Savings Bank of Williamsburg. I have 3,500 shares there. And then I have stock in Roslyn Savings Bank. I have, I think, 14,600 shares there. And Independence Savings Bank, I have -- let's see, about 6,000 shares, I would say.

Q. Okay. Anything else?

A. Correction. I think that's too high. I think it's more like 3,000 shares. I wanted to get more, but at the initial public offering, I was limited.

Q. Okay.

A. Yeah.

Q. Why were you limited?

A. The size of my deposit wasn't that great.

Drewitz

Q. Okay. You said you're totally retired --

A. Yes.

Q. -- a few moments ago.

So do you serve as a consultant to any businesses?

A. None at all.

Q. You're not a director of any savings and loan?

A. I'm no director. I have no business involvement at all.

Q. Do you receive a paycheck from Astoria?

A. I get a pension check, yeah.

Q. A pension check, okay.

A. Yeah.

Q. Do you serve on any industry boards or anything like that?

A. No.

Q. Now, you said you met with Mr. Eisenhart and Mr. Eggleston. Was that in preparation for this deposition?

A. Yes.

Q. Okay. When was that?

Drewitz

Q. Okay. How did you destroy it, just throw it out?

A. In my farm house, I have an oil burner with a second fire box that burns wood, and I throw it in the wood furnace.

Q. Okay. And you didn't destroy those documents as a result of this lawsuit?

A. No.

Q. Okay. When did you first become involved with Astoria, Mr. Drewitz?

A. Well, I started working with Astoria April 1, 1947. April Fool's Day. I never served in the military because I had contracted tuberculosis as a young man, and I have a -- I had a period of almost four years in recovery; meaning I had pneumothorax therapy; meaning they collapsed my right lung and -- so there would be no movement of the lung tissue, and that gave the lung a chance to heal. Fortunately for me, it was discovered at a very early age. It was never positive or so, and my total hospitalization in -- in this illness was three days. And the rest of the time for a period of -- I guess for about six months I didn't do anything. I stayed

Drewitz

at home, living with my folks.

And then I looked for a job, and I had a job with a real estate company for a while that sort of petered out. And I met with the former president, a fella by the name of Edward J. Reisbeck. And he was an attorney and he said if ever I'm looking for a position -- he sort of took a fancy to me in some way -- he said I should come in to see him. And I did and I got a job at Astoria strictly as a clerical position, never thinking that I would spend 50 years with Astoria Federal.

Q. And you became president of Astoria, didn't you?

A. Yes. Yes.

Q. In 1971?

A. No. I became a director in 1971.

Q. You became a director in 1971.

A. And then in '74, when the president passed away -- he had a cancer situation -- I was made president.

Q. Okay. Was there a chairman of the board at that time in 1974?

A. Yes.

Drewitz

Q. Who was that?

A. Dr. Robert Burr, B-u-r-r.

Q. Did you become both president and chairman of the board at some point?

A. Yes, I did.

Q. Okay.

A. I think I was president for perhaps a year when Dr. Burr approached me and he said he was well on in years and he would like to be relieved of the position of chairman of the board. So I said all right. We brought it up in the next meeting, and I asked that the board consider giving me the additional title of chairman of the board, which was unanimously approved. So I wore two hats.

And I retired as president, I think it was April 1, 1998 -- no. Wait a minute. Not '98. 1989. Excuse me. And then I continued as chairman of the board until -- my last meeting was April 1997. In May I -- that was my 75 birthday, and the minutes -- our regulations require that once you reach 75, you're totally out. And if you're a director, the meeting preceding your 75 birthday is the last meeting

Drewitz

that you attend. So I became 75 May 18, 1997.

Q. That's right. Happy belated birthday.

What were your duties as president when you first became president in 1974? What did you do?

A. Well, just be a little more specific.

Q. Well, what were your job responsibilities?

A. Total overview of the operation of the -- of the Astoria Federal.

Q. How did that differ from what the chairman of the board did?

A. Well, this chairman of the board was elderly, and, frankly, he did almost zero, and it really served no purpose to have him as chairman, because outside of coming in monthly to collect his check, he did nothing.

Q. Now, when you say you had -- and what did you do when you were chairman of the board? What were your job responsibilities then in 1989, if there was?

A. Well, as chairman I made all the format for the monthly directors' meeting. I had total responsibility to look into any area of

Drewitz

concern for Astoria Federal, negotiate mergers, and whatever's necessary.

Q. So were you involved in merger talks?

A. Oh, yes.

Q. Okay. Both as president and as chairman?

A. That's right.

Q. Okay.

A. At the time I was president of the -- I mean director of the Home Loan Bank of New York, I had been there for a four-year term, and there was -- if you're interested, I'll tell you about it. There was a savings and loan in big trouble, the Citizens Savings & Loan in Woodside. And I was strongly in favor of Astoria acquiring it; although some of my directors didn't agree with me on it for the simple reason there were a lot of rumors around there's all kinds of hankie-pankie going on in that shop. Bryce Curry, who was president of the Home Loan Bank at the time, he told me that he strongly recommends that we take it because it's an ideal fit for Astoria. And of course, I agreed on that. I knew that. And I felt very strongly on

A. -- '79.

Q. Okay. Now, how did you first identify Citizens as a potential merger partner, Mr. Drewitz?

A. Well, when you're in the business for quite some years, you know, you acquire certain knowledges and skills of certain institutions, and I'd say that's the best way I can describe it.

Q. Okay. I think you had mentioned that you were -- something about acquiring knowledge for the Federal Home Loan Bank of New York.

A. Well, I was a director of the Federal Home Loan Bank of New York for four years.

Q. When was that?

A. Well, it had to be around this 1979 date, but truthfully I can't recall exactly.

Q. Why was Citizens looking for an acquirer?

A. As a matter of fact --

MR. EISENHART: I don't think he said they were, did he?

A. They were not looking for an acquirer. The institution was taken over by the New York

Drewitz

Q. Now, is good-will a tangible asset in that instance or is it an intangible asset?

Do you know what a tangible asset is?

A. Yeah. A real asset.

Q. Okay. And is good-will a real asset?

A. Well, until the Insurance Corporation determined otherwise, it was always a real asset.

Q. Okay. So before the Insurance Corporation decided it was not a real asset, it was a real asset?

A. That's right.

Q. So could you sell good-will like regular real assets?

A. You mean is it a saleable commodity?

Q. Yes.

A. I don't think so.

Q. Okay. If a thrift went into bankruptcy or dissolved, would the RTC be able to sell off good-will?

A. I doubt it.

Q. Okay. Does good-will have any value then?

A. In the illustrations that you have, I'd say no.

Drewitz

that was closed. And the deal was all wrapped up, in plain English.

Q. Okay. Who first identified Fidelity as a potential merger partner with Astoria?

A. Well, George Engelke was president at the time, and I know he had lunch meetings with Tom Powderly, and they discussed that, the possibility of a merger, and he would report it to the board.

Q. Okay.

A. How many meetings he had with George -- I mean with Tom Powderly, I can't say. I have no idea. You'd have to check with him on that.

Q. So you think Mr. Engelke was the person who first identified Fidelity as a potential merger partner for Astoria?

A. Yes.

Q. Did you ever meet with Mr. Powderly prior to the consummation of the merger in connection with a potential merger?

A. No, I never did.

Q. Okay. So is it fair to say then that you think the first time the potential merger

with Fidelity was presented to you was as chairman of the board at a board meeting?

A. That's right.

Q. Okay. Do you remember how it was first presented to you?

A. It was so many years ago. I can't remember.

Q. Do you remember thinking it was a good thing or a bad thing?

A. I thought it was a good thing. I have nothing to add to why I did, but based on some of the statistics that George had, it sounded like it could be a good thing.

Q. What were the things that Mr. Engelke said?

A. Well, he gave us -- he gave all the board members the highlights of his -- his discussions with Tom Powderly, his reasons why he thought it was a good thing. They had to do a due diligence on it before any action was taken by the board to approve it. And I sort of agreed that in my humble opinion that it could be something good for Astoria based on the facts that were available at that time.

Drewitz

Q. Okay.

A. But that was before any vote was made by the Astoria board members.

Q. Did you later change your mind about whether Fidelity was a good merger partner?

A. No, I never did.

Q. Okay. Did you participate in the due diligence review at all of Fidelity?

A. I'm sorry?

Q. Did you participate in the due diligence review of Fidelity?

A. No. That was strictly the accounting people at Astoria and whatnot. I was not involved in that.

Q. Who were the accounting people at Astoria who were involved in the due diligence review of Fidelity?

A. Good question. Monte Redman was one that I know definitely, and he had some backup with others. But, you know, I've been out of the association for some years and I'm really not that familiar with some of the names.

Q. Okay. Did he report --

A. Frank Fusco was another one. Frank

Drewitz

board.

Q. Okay. Did you attend all the board meetings at the time?

A. Yes.

Q. Do you remember him discussing it with the board?

A. Yes, I do.

Q. Do you remember what he said?

A. Well, you know, a lot of water went over the damn. I can't give you a verbatim idea of what it was all about, but it was discussed at the board level, and George Engelke thought it would be -- could be a very favorable transaction for Astoria.

Q. Did he say why it could be a favorable transaction?

A. Well, it's compatibility of branches. Garden City is a -- we had no branches in Garden City and Garden City is a rather affluent area, and he liked the idea of having offices in Garden City. And all in all, whatever he discussed on it, it all was favorable. I don't think there was anything negative that he brought up except the final price, what we're going to pay for

Drewitz

the -- for the Fidelity operation.

Q. Okay. And why was that negative? He felt the price was too high?

A. I didn't say it was negative.

Q. Well, I think -- I think you said that the only thing that was troubling was the price that you would have to pay for Fidelity's --

A. Oh, yes.

Q. -- share.

A. Well, yes. You try to make it -- buy it at the best possibly price. That's what I'm referring to.

Q. Do you know if Fidelity was meeting its regulatory capital requirements at that time?

A. I think it was, but barely.

Q. But barely?

A. As a matter of fact, what they did, they sold their executive office building in Garden City, which is on Franklin Avenue, and then leased it back in order to increase their capital base.

Q. Do you know when that happened?

A. No.

Q. Okay.

Drewitz

A. No. But this was prior to our getting involved with the -- with the -- with Fidelity.

Q. Right. So your understanding was that they were meeting the regulatory capital requirements?

A. As far as I know, yes.

Q. Okay.

A. It might be barely, but they were.

Q. Okay.

A. And in order to comply, they had to sell that office building and then lease it back.

Q. Okay. Is there anything else that you know that you think that they had to do in order to comply with regulatory capital requirements?

A. No. That's the only thing.

Q. So they sold this office building?

A. That's right. If you ask me how much they got for it, I don't know.

Q. I won't ask you that.

Now, it says that in the proxy statement and I think you testified earlier that Astoria then commenced a due diligence review of Fidelity's holdings.

A. Uh-huh.

Drewitz

A. No. As far as I know, it was 100 percent in favor.

Q. Okay. And you thought the price that Astoria paid for the Fidelity merger was fair?

A. Yes, we thought it was fair.

Q. Otherwise --

A. If you ask me what the price ended up, I couldn't tell you right at this minute. I'm only sorry I didn't own Fidelity stock.

Q. If you could turn -- okay. I'm sorry.

What services did Salomon Brothers perform for Astoria in connection with the merger with Fidelity?

A. Well, I think Salomon represented Fidelity.

Q. I'm sorry. You're correct, sir.

A. Yeah. We had the other firm.

Q. Sandler O'Neill?

A. Sandler & O'Neill and partners.

Q. And who was the person from Sandler O'Neill that worked on the account for Astoria?

A. Dan, that's a good question. I don't know at this point.

Q. Okay.

Drewitz

knowledge. I had a gut feeling it would be a good merger for Astoria.

Q. Okay. I want you to tell me all the things that made Fidelity a good merger partner for Astoria. What were the things that made Fidelity a good merger partner for Astoria?

A. Based on, No.1, the -- the office location, which was very complementary to us. I know we liked the idea of getting an office in Garden City because of its attractiveness as a deposit base. Also the numbers worked out very favorably.

Q. What about the numbers worked out favorably?

A. Meaning it was a good transaction. When we would take over Fidelity and add it to our asset base, it was a favorable deal.

Q. Okay.

A. At least we thought it was, yes. And history will show that it was.

Q. Did it strengthen the core deposit base of Astoria?

A. Yes.

Q. Did it provide for an opportunity --

Drewitz

provide an opportunity for the generation of new deposit growth?

A. For new deposit, yes, it did.

Q. Okay. Were regulators involved at all in this merger, sir, other than approving it?

A. I'm sorry?

Q. Were federal regulators involved in this merger at all other than approving it?

A. I think that was right.

Q. Okay.

A. They just approved it.

Q. They weren't involved in negotiating the terms?

A. No. No.

Q. All right.

A. See, getting back to Citizens, that was an entirely different ball game. But this here, as long as the managements of both associations were in favor of the merger and all the documentation was sent to the bank board, if they saw it was good, they just automatically approved it.

Q. And did those items -- those things about Fidelity that made it a good merger partner

Drewitz

that you just listed for me, did those impel you to or did those prompt you to vote for the merger?

A. Say that again.

Q. I'm sorry. That was awkward.

Those items that you just listed for me, did those items that you said made Fidelity a good merger for Astoria, did those items lead you to believe that the price that Astoria was paying for Fidelity was a fair price?

A. Yes.

Q. Okay. And did the possible value of any potential claim against the United States Government have any impact on your opinion about whether that was a fair price?

MR. EISENHART: Objection. Asked and answered.

Go ahead. You can answer it again.

THE WITNESS: I should or I don't have to answer that?

MR. EISENHART: No. You can answer it again. You've answered it once already, but go ahead and answer it again.

A. We had -- I'm sure we had hopes that

Drewitz

we would get some money out of that transaction; meaning that good-will agreement, and --

Q. I'm sorry, sir. But you said you don't remember any discussions of that --

MR. EISENHART: Mr. McClain, I'm not sure he had finished his prior answer when you had --

Q. I apologize for cutting you off, sir, if you need to --

A. No. There was -- it was reported by George Engelke as a fact, we're buying the association based on what we see, and we had hopes that something would come out of that, and so far we haven't collected two cents.

Q. Do you remember if Fidelity was a mutual or stock institution, sir?

MR. EISENHART: At what point in time?

MR. McCLAIN: At the time of the merger.

A. It was a mutual institution converted into a stock association.

Q. Okay.

A. Just as was Astoria Federal.

Q. Okay. Do you remember at the time of

Drewitz

Q. Okay. How did FIRREA affect Astoria at all?

A. Be a little more specific.

Q. Okay.

A. I can just say Astoria was not a troubled association.

Q. Okay.

A. And I would say offhand it had very -- in fact, no affect on Astoria.

Q. Okay. It didn't cause Astoria to fail regulatory capital requirements?

A. No, we never had any problems about that.

Q. And in fact, Astoria was comfortably exceeding its regulatory capital requirements?

A. Correct.

Q. Both before and after FIRREA?

A. Correct.

MR. McCLAIN: I think now is probably a good time to break for lunch. We've only got five minutes left on the tape or less than five minutes now.

THE VIDEO OPERATOR: Going off the record. The time now is 11:55.

Drewitz

institutions in the Long Island market?

A. Yeah, there was quite a number of them, but there was always room for a good, strong competitive institution such as Astoria. See, I'm still gung-ho for Astoria.

Q. That's admirable.

If there were a high density of financial institutions, then is it true there were a lot of competing thrifts for the same market that Astoria was in?

A. Yes.

Q. Is that one of the reasons that Astoria was interested in acquiring other financial institutions, because it removes competitors?

A. That's right.

Q. Okay.

A. That's right.

Q. Now, we talked a little bit about phaseout of good-will. Was that a result of FIRREA? Do you know?

A. Well, FIRREA threw the cold water on that issue entirely.

Q. Okay. And how did it throw the cold

water on that issue?

A. Well, they eliminated -- the institution had to eliminate it from their books as an asset.

Q. Did FIRREA have other effects on the thrift industry other than the elimination of good-will?

A. I'm sure they did, but I would say that had to be close to the top, if it wasn't.

Q. And by throwing cold water on the issue, as you put it, did that harm a lot of financial institutions?

A. Yes.

Q. Did it cause them to shut down?

A. Uh-huh.

Q. Please respond yes or no for the benefit of the court reporter.

A. Yes.

Q. Thank you, sir.

A. I might add that some of the thrifts in California, they had some of the biggest dollar values of good-will on their books, much larger than here in New York.

Q. Did it -- did any thrifts in New York,

Drewitz

in the Long Island market particularly, have to close their doors because of the loss of good-will?

A. That's a tough question for me to answer. There probably could have been some forced mergers --

Q. Okay.

A. -- because of this very volatile issue.

Q. Do you remember any closing?

A. Not really.

Q. Do you remember in particular any forced mergers?

A. I think ours with Fidelity was -- could be in that category.

Q. Why?

A. Fidelity, they took that drastic step of selling their executive office building in order to raise capital. Now, how well they were capitalized after that, I can't say, but I would say expressing an opinion, it was still a very close to the borderline issue.

Q. So you think that FIRREA -- as a result of FIRREA, Fidelity had to sell to

Astoria?

A. Yes.

Q. Okay.

A. Whether it was Astoria or it would have been somebody else. But Astoria always had a solid reputation as a strong financial institution and they liked the idea of joining Astoria for that reason.

Q. Okay. I think you talked about this earlier, but to your knowledge, did Fidelity exceed its capital regulatory requirements at the time of the merger with Astoria?

MR. EISENHART: You did answer that question earlier.

A. I think I did. I said perhaps, just barely.

Q. What makes you say that?

A. Well, just my opinion that if they had to sell their building to raise some capital. I have no idea what they obtained in cash for the building, but if you look through their records, I'm sure you'll find an answer to that.

Q. Okay.

A. But it certainly wasn't a billion

Drewitz

dollars or anywhere close to that kind of a number.

Q. I'm not sure I understand what you mean by a billion dollars.

A. Well, meaning that they were able to sell that building for a billion dollars.

Q. I see.

A. I'm being a little facetious there. I don't even know if they got a hundred million dollars for it.

I found out subsequently that that building was sold to a woman in -- that lives in Brussels, Belgium. That has no bearing as far as the case is concerned, but just for whatever it's worth.

Q. Would you turn to page 8, sir, of the proxy statement? I believe that's 4 -- is it?

MR. EISENHART: Yes, D-4. Oh, I'm sorry. The proxy statement is D-3.

MR. McCLAIN: Oh, it's D-3?

MR. EISENHART: Yeah.

A. Here we are, page 8.

Q. Page 8, please. That's Bates stamped AST 0732644 and the DOJ Bates number is

Drewitz

A. There has to be some -- some other facts which I'm not aware of. If you just look at it from this way, it doesn't appear that it should --

Q. Okay.

A. -- but --

Q. Do you know if Fidelity converted from a mutual to a stock in about 1993?

A. I'd have to guess. That could be right.

Q. Okay.

A. It could be.

Q. And if they infused capital as a result of that conversion, a substantial amount, then they might be exceeding their capital requirements by these amounts?

A. Uh-huh.

Q. Okay.

A. But the fact remains, Dan, they had to sell their building in order to raise additional capital.

Q. Okay.

A. So how does that fit in?

Q. Well, I don't know.

Drewitz

When did they sell the building, sir?

A. You'd have to find it in there from your records.

Q. Okay. Do you know of any way in which Fidelity was harmed other than the sale of their building?

MR. EISENHART: Harmed by FIRREA?

MR. McCLAIN: Yes, by FIRREA.

A. Harmed by the sale of their building? Actually, it didn't harm them, because it gave them an infusion of capital.

Q. Okay.

A. And that was their intention.

Q. Okay. Do you know of any way in which Fidelity was harmed by the passage of FIRREA or enactment?

A. I can't answer the question.

Q. Why not? You just don't know?

A. I just don't know.

Q. I think you said before, Mr. Drewitz, that FIRREA threw cold water on the good-will issue and caused either forced mergers or thrifts to close in around -- in the period of time after FIRREA.

Drewitz

A. That's a reasonable assumption.

Q. Okay. So if FIRREA eliminated some of Astoria's competitors, wouldn't that be good for Astoria?

MR. EISENHART: Objection. No foundation.

A. Yeah, that's a -- that's one I really can't answer with any substance.

Q. Why not?

A. 'Cause I'm not -- you know, I've been out of the business for some time.

Q. Right. But I'm talking about the period of time in which you were in business.

A. Yeah.

Q. You were president in -- as of -- at some point in 1989; is that correct?

A. That's right. That's right.

Q. And then you were chairman of the board after that, correct?

A. That's right.

Q. So wouldn't the elimination of competitors be viewed positively by Astoria?

MR. EISENHART: Same objection.

A. It could to a degree, yes.

Drewitz

Q. To the degree that there are fewer competitors for the same market share?

MR. EISENHART: Same objection.

A. Yeah, that -- that could be.

Q. Okay. Do you know if Astoria had to change its business practices at all as a result of FIRREA?

A. If there was some changes, I'm not aware of it.

Q. Okay. How would you describe Astoria's loan portfolio as of the time of 1989, 1990?

A. Well, we were heavy in lending on one- to four-family homes. We were not heavy in commercial loans. Some of the experience in commercial lending turned out to be a little unsatisfactory, so the loss ratio, I think, on the smaller homes was more favorable to the institutions.

Q. Did you have any hand in dictating what the loan portfolio would be comprised of?

MR. EISENHART: At what point in time?

MR. McCLAIN: I'm sorry. As of this time we're talking about, 1989, 1990.

Drewitz

A. Prior to 1989. 1989, from then on I was -- I was out as far as loan lending is concerned.

Q. And did Mr. Engelke take that over then?

A. Well, he had a new man who was the senior lending officer.

Q. Who was that, sir?

A. Tom Drennan.

Q. Did Astoria change the composition of its Astoria -- excuse me.

Did Astoria change the composition of its loan portfolio?

A. Basically --

Q. After -- I'm sorry. Go ahead, sir.

A. I'm sorry. I interrupted you.

Q. I was going to say after that period of time we're talking about, 1989, 1990.

A. No. They continued as what we call a small-home lender.

Q. Okay.

A. And predominantly now, of course, the availability of good mortgage investments or in quantity on one- to four-family houses is

Drewitz

somewhat limited, so they're spreading their area into some selected larger-type loans.

Q. Okay. When do you think -- when did that start?

A. I'd say two, perhaps three years ago.

Q. Okay.

A. And they're very selective in whatever they take.

Q. How long had Astoria's loan portfolio been primarily comprised of mortgages on one- to four-family residences?

A. Historically always.

Q. Always when you were there?

A. That's right. That's right.

Q. When you became president?

A. That's right.

Q. Would you agree with me that there are finite number of one- to four-family residences in the Long Island market?

A. Be a little more specific, Dan.

Q. Well, I think you said earlier that Astoria two or three years ago started to spread -- spread its loan portfolio because there weren't that many originations of -- so wouldn't

Drewitz

Q. Were a lot of the thrifts converting to stock?

A. Yes.

Q. In 1993?

A. Yeah.

Q. Why was that?

A. Better investment possibilities, raising capital, attracting better-qualified personnel by offering some stock incentives, you know.

Q. Do you remember a presentation by Kaplan Associates at all in connection with the conversion from a mutual to a stock form of organization?

A. It might sound strange, but I don't.

Q. Do you know anybody from Kaplan Associates?

A. Not a worsen -- not a person.

Q. Not a person --

A. Nobody.

Q. -- okay.

Had Astoria discussed converting to a stock form before 1993?

A. Yes. As a matter of fact, even during

Drewitz

my tenure as the president, we at the board level just spoke about it casually, and the decision of the directors at that time was to retain our status as a mutual institution.

Q. Why did you decide to do that?

A. I'd say in hindsight it probably was a mistake. We should have converted earlier.

Q. Why is that?

A. Well, we probably would have had more opportunities to raise capital to be in the -- in the -- let's say in the forefront of a well-run capitalized stock association.

Q. Now, Astoria was never poorly capitalized --

A. No, it was not.

Q. -- or thinly capitalized?

A. We were always very well capitalized. But, you know, it gives us opportunities in an acquisition as stock to a stock is always an easier deal than trying to work out a deal with us as a stock and somebody else as a mutual. So it's better to do it that way.

Q. Okay. Do you remember why Astoria decided to do it in 1993 as opposed to previous

Drewitz

years?

A. I think George Engelke might had more -- better ammunition than I did. I was sort of leaning on the fence on conversion, and -- but after giving it -- you know, you're reading about what's happening in the industry and these trade publications. It seems to me that going to stock was the way to -- was the way to fly. And although I voted for staying -- maintaining our mutual status, if it I had to do it all over again, I would have voted otherwise.

Q. So you voted against --

THE VIDEO OPERATOR: I'm sorry. Can we go off the record for one second?

MR. McCLAIN: Sure.

MR. EISENHART: Sure.

THE VIDEO OPERATOR: Going off the record. The time now is 1:12.

(A recess was taken.)

THE VIDEO OPERATOR: Back on the record. The time now is 1:13.

MR. EISENHART: The video operator has informed us that he may have lost the audio feed in the middle of the last question.

Drewitz

in 1993?

A. No. I think that was the -- that was the number of our strategies.

Q. Okay. Now, we talked earlier about where the association had concentrated in its lending, and I think you said it was primarily focused on lending mortgages based on or collateralized by one- to four-family residences, correct?

A. Correct, yes.

Q. At that point had Astoria virtually ceased its construction in land lending?

A. We at one time were a significant construction lender, yes. And then all of a sudden, under the new management they -- with George Engelke and Tom Drennan, they stopped making construction loans. Just recently I found out they are taking -- going selectively and making some construction loans again.

Q. Do you know why they had ceased construction lending?

A. They felt that they were kind of risky. And although we really didn't have any -- as far as I can recall, we never had any -- any

Drewitz

significant problems with losses on construction loans. We -- I know one time I can think of one builder that had ran into financial trouble, and we had to foreclose the construction loans, but we sold them to another builder who finished the job, and we ended up making money.

It's a little bit of a different expertise required than typical straight mortgage loans, you know, making a mortgage loan on a one- or two-family house, give the fellow a-hundred-thousand-dollar mortgage, and you close the thing in 30 days or less. On a construction loan, that could be dragged out for three, six, nine, ten months.

Q. Okay. So as a result, Astoria had ceased -- virtually ceased making construction lending for a period of time?

A. For a period of time of time, yes, that's true.

Q. And only recently have they --

A. I understand they are being very, very selective in making some construction loans.

Q. Okay. So it is fair to say then, sir, that Astoria was fairly conservative in its

Drewitz

Q. Why not?

A. I didn't think that was my area of concern. I left that up to the operating management.

Q. Did operating management ever say how Fidelity was damaged as a result of FIRREA?

A. I think you'd have to ask George Engelke that question.

Q. But do you remember him ever saying anything to you about how Fidelity was damaged, if at all, by FIRREA?

A. I never had a conversation with him on that subject.

Q. Okay. Did you ever determine whether Astoria was damaged as a result of FIRREA?

A. I think we were not damaged.

Q. Okay. Did you ever determine if Astoria was damaged as a result of its succession in interest to Fidelity?

A. I would say no.

Q. Okay. Have you ever seen the complaint in this case, sir?

A. Did I ever --

Q. Seen the complaint that was filed in