ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NO. 95-468C

(Senior Judge Loren A. Smith)

ASTORIA FEDERAL SAVINGS
& LOAN ASSOCIATION,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

_____________________________________/

DEPOSITION OF ANDREW KANE, JR.

Taken before Kerry A. Serey, Registered Professional Reporter, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed by the Defendant in the above cause.

\- - -

Thursday, July 27, 2000
505 South 2nd Street
Fort Pierce, Florida
9:54 a.m. - 12:25 p.m.

offered me the job, so I took it.
Q. So you came to Suburbia as an executive vice-president in 1974?
A. Yes.
Q. Did you later become president and CEO?
A. Yes.
Q. When was that, sir? About a year later?
A. Maybe two years, maybe.
Q. And were you a member of the board of directors of Suburbia, sir?
A. Yes, I was.
Q. When did you join the board of directors, do you remember?
A. I became president same time, '76 or so.
Q. And did you ultimately become chairman?
A. Yes.
Q. And do you remember when you became chairman?
A. No, I don't.
Q. Around 1980?

ANDREW KANE, JR.

A. Around 1980 I would guess, yes.

Q. And who was the president of Suburbia when you were chairman?

A. Robert Miller.

Q. Do you know if he's alive, sir?

A. He's dead.

Q. Do you keep in touch with any people from Suburbia?

A. No.

Q. Did you serve on any committees at Suburbia, sir?

A. Well, as the CEO an ex officio on every committee really.

Q. And when you became executive vice-president in 1974 what were your duties there?

A. Administrative basically.

Q. Do you remember what Suburbia's financial condition was in 1974?

A. No, I don't. I believe it was okay.

Q. And then Suburbia merged with Fidelity, didn't it, sir?

A. Yes.

Q. Did you take a position with

Fidelity?

A. Yes.

Q. What was your position with Fidelity after the merger?

A. I believe it was vice-chairman.

Q. What were your duties as vice-chairman, sir?

A. Basically administrative.

Q. Were you involved in the day-to-day operations of Fidelity, sir?

A. Yes.

Q. And how long were you vice-chairman of Fidelity, sir?

A. About a year and a half.

Q. And then did you take another position with Fidelity?

A. No, they offered me a consulting position, and I took that for maybe a month and then left there and went with a place called Central Federal.

Q. Do you remember when that was, sir?

A. I believe it was in 1986.

Q. Why did you decide not to take the consultant's position with Fidelity?

ANDREW KANE, JR.

BY MR. MCCLAIN:

Q. Do you remember what Suburbia's asset size was when you started in 1974?

A. Well, I would say close to 500 million maybe. That's only a guess.

Q. And do you remember what the asset composition was in 1974?

A. It was primarily first mortgage loans, for family mortgage loans.

Q. And again you said that Suburbia's condition was okay in 1974?

A. Yes.

Q. Did that ever change, sir?

A. Yes, it did over the years it changed.

Q. How did it change?

A. Because of the interest rate differential.

Q. And when you say, "interest rate differential," sir, I just want to know exactly what you mean by that?

A. Well, I mean mortgages were pulling out on the books at an average of about six percent and cost of savings was up around ten

percent.

Q. And the mortgages were long-term mortgages?

A. Thirty year mortgages.

Q. Was Suburbia alone in facing that problem, sir?

A. No, it was basically an industry problem.

Q. Did it affect Suburbia more than other industries or excuse me more than any other thrifts?

A. No. I would say no.

Q. So many other thrifts in the industry were facing the very same problems as Suburbia was facing?

A. Yes.

MR. MCCLAIN: I'd like to mark as an exhibit a document -- I think we are up to 109.

(Defendant's Exhibit No. 109 was marked for identification.)

BY MR. MCCLAIN:

Q. I've placed in front of you, sir, what's been marked as Defendant's Exhibit 109. It

ANDREW KANE, JR.

is a document Bates stamped OAA0052432 and 2433.

MR. EISENHART: I'm sorry, mine is actually --

MR. MCCLAIN: 2344?

MR. EISENHART: Yes. Off the record a second.

(A discussion was held off the record.)

BY MR. MCCLAIN:

Q. Can you tell me what this is, sir? Is this a letter that you wrote to Mr. Vigna?

A. Yes.

Q. And feel free to read as much of the letter as you like, sir, but I'm going to ask you questions about the third full paragraph and fourth full paragraph on the first page. You've read it, sir?

A. Yes, I have.

Q. Do you see the third full paragraph it refers to a negative trend in operating profitability? Do you see that, sir?

A. Yes.

Q. When did that trend begin? Was it right around 1979/1980?

ANDREW KANE, JR.

A. Yes.

Q. Prior to that time had Suburbia been operating profitably?

A. Yes.

Q. And do you remember what the profits were per year prior to that time?

A. No.

Q. Ballpark estimate?

A. No.

Q. It's a long time ago, wasn't it?

A. Yes.

Q. And you said that the negative trend was due primarily to the high cost of savings and borrowed money. Is that that interest rate differential that you were referring to before?

A. Right.

Q. Now, in that fourth full paragraph, sir, you said that the long range plans to restore profitability included controlling the association's growth to match the earnings potential.

How did you expect that to restore profitability, sir?

A. I don't know really. Might have been

something I just wrote.

Q. You were chairman and CEO at this time, sir?

A. Yes.

Q. Did you have your subordinates draft letters to regulators for you at that time? Like say Mr. Miller?

A. I would say we might have done it in conjunction drafted it together.

Q. Can you think of any ways that controlling Suburbia's growth to match earnings potential would restore profitability?

A. Well, it would reduce the cost of money, which savings and borrowed money which was -- savings was I guess about nine or ten percent, borrowed money was around the same range maybe.

Q. So by having less borrowings and savings, you wouldn't have to pay as much out?

A. That's right.

Q. And by having less savings and borrowings, of course, that would control your growth?

A. Yes.

Q. And did you in fact attempt to do

ANDREW KANE, JR.

that, sir?

A. Yes, we did, but it was difficult.

Q. Why was it difficult, sir?

A. It was difficult in that we kept losing savings you know because of the high cost of money, and to kind of cut that down was -- you know it was very difficult to do.

Q. Would you say that the Long Island -- what was the market in which Suburbia was competing at that time?

A. In Long Island, Nassau, Suffolk County.

Q. Was that a competitive market, sir?

A. Very competitive.

Q. So if Suburbia lowered the rate it paid on its savings or borrowings, then other thrifts would step up to the plate and offer more?

A. Well, other thrifts and also the brokerage houses.

Q. So you weren't just competing with thrifts?

A. No, we were competing with the brokerage houses.

Q. Would you consider the Long Island

ANDREW KANE, JR.

market one of the most competitive in the nation?

A. I would, yes.

Q. Did you at the time that you wrote that letter, sir, did you expect Suburbia to return to profitability?

A. The only way I probably expected it was if things changed I mean.

Q. When you say, "things changed "--

A. The cost of borrowing and the cost of savings would go down.

Q. So if interest rates fell --

A. We would but you know.

Q. Is it fair to say that other thrifts had similar hopes that if interest rates came down that they would also come back to profitability?

A. Yes.

MR. MCCLAIN: I'll mark this as Exhibit 110.

(Defendant's Exhibit No. 110 was marked for identification.)

MR. MCCLAIN: I've marked as Exhibit 110 and handed it to the witness a document Bates stamped OAA0052225 to 2360.

BY MR. MCCLAIN:

A. Just that he was I thought a fair examiner. I think he left and went somewhere with the industry.

Q. Do you remember meeting with him after this report of examination?

A. I don't remember, no.

Q. You just remember him?

A. I remember him.

Q. And you don't remember discussing with him the financial condition of Suburbia?

A. I don't remember, no.

Q. Do you see on that same page, sir, there is a section called operating results at the bottom of the page on the report summary?

A. Yes.

Q. Do you see that during the last three semi-annual periods Suburbia reported deficit operating results of about five and a half million dollars?

A. Yes.

Q. And what was the principal cause of that, sir?

A. The interest rate differential.

Q. Were there any other factors that

ANDREW KANE, JR.

played a significant role in this deficit?

A. No.

Q. So interest rate differential was basically the primary cause of this?

A. Yes.

Q. And did you expect that if interest rates came down that you would no longer be faced with a deficit in operating results?

A. Yes.

Q. Should be starting to return to favorable operating results?

A. Yes.

Q. Now I'll refer to you, sir, again on the bottom right-hand corner 2355 please. Do you see this page, sir, refers to a wholly-owned service corporation Suburbia?

A. Yes.

Q. And it's SFS Resources Corporation?

A. Yes.

Q. And do you see there is a description of activities there, sir, in the middle of the page?

A. Yes.

Q. Is that a fair description of what

ANDREW KANE, JR.

that were explored by Suburbia as of September 18, 1981?

A. No, I don't.

Q. What were the various options referring to? Were they referring to the declining net worth position that Suburbia was facing?

A. I don't recall.

Q. Do you see the next sentence? The chairman was authorized to explore the availability of an appropriate merger partner.

Do you think that was one of the options that Suburbia explored at that time?

A. Yes.

Q. Do you remember any of the -- what you did to explore the availability of a appropriate merger partner?

A. Yes, we had discussions with other institutions.

Q. Do you remember what other institutions you discussed the possible merger with?

MR. EISENHART: I'll place on the record my objection to this line of

ANDREW KANE, JR.

questioning. I believe that this does not go to issues of damages in the case. To the extent it is relevant at all it goes to liability issues.

MR. MCCLAIN: My question is not directed to liability issues. It is to damages, Frank.

MR. EISENHART: Well, I'm simply objecting because I think you would be very hard pressed to define, and I'm not asking you to do it, but I'm simply saying you would be very hard pressed to define how this relates in any way to damage issues in the case. But I'm simply putting my objection on the record. Go ahead.

BY MR. MCCLAIN:

Q. Do you remember what the other institutions were?

A. Yes, Island Federal, Southshore Federal, Heritage Federal, they were the specific ones. I discussed with a number of other associations also. Everybody was discussing at the time mergers.

Q. Were those institutions interested in

ANDREW KANE, JR.

merging with Suburbia?

A. Yes.

Q. Why do you think they were interested in merging with Suburbia?

A. I think -- I really can't give you any reason why.

Q. Do you remember what Suburbia's size was around this time?

A. Maybe 800 million.

Q. Was Suburbia one of the larger thrifts in Long Island?

A. Yes.

Q. Did Suburbia have any franchise value, sir?

A. I don't believe so.

Q. Did Suburbia have one of the larger deposit bases in Long Island?

A. I would think so, yes.

Q. Do you think that would be valuable to other thrifts having access to that deposit base?

A. No.

Q. Why not, sir?

A. It was basically we were all in

ANDREW KANE, JR.

A. Yes.

Q. And what did you conclude?

A. We couldn't find an investor.

Q. Did you remember contacting any investors?

A. We contacted a number of them.

Q. Do you remember any of them?

A. The only one I remember is Allen and Company.

Q. And why did they not infuse capital?

A. I don't know, but I assume they thought it was not going to be a profitable venture as long as interest rates stayed high even if they put capital in.

Q. Do you remember Mr. Beesley ever saying anything about liquidating weak thrifts at that meeting?

A. No.

Q. Did any regulators ever say to you that Suburbia was going to be liquidated?

A. No.

Q. Did you ever seriously think that Suburbia would be liquidated?

A. No.

Q. Why not? The government wasn't liquidating thrifts at that point?

MR. EISENHART: I object to the form of the question. It's leading.

THE WITNESS: I don't remember.

BY MR. MCCLAIN:

Q. Do you see the various possibilities that Mr. Beesley mentioned and/or noted in this paragraph three? It says he mentioned unassisted mergers, mergers with infusion, outside capital, FSLIC assistance.

MR. EISENHART: What's the question?

BY MR. MCCLAIN:

Q. The question is: Is it fair to say, sir, that at this time FSLIC was considering about every step possible to keep thrifts afloat besides liquidating?

A. Yes.

MR. EISENHART: Object to the form of the question.

BY MR. MCCLAIN:

Q. Do you remember what alternatives that you reviewed at that point?

A. No.

ANDREW KANE, JR.

(Defendant's Exhibit No. 115 was marked for identification.)

BY MR. MCCLAIN:

Q. Is this a message that you gave to the annual -- at the annual report?

A. I believe so.

MR. EISENHART: Did you mean to say at the annual meeting?

MR. MCCLAIN: Yes, I'm sorry.

BY MR. MCCLAIN:

Q. And do you see in the first paragraph, sir, that while Suburbia lost money in 1982, it was about one half of the net loss for the prior year, 1981?

A. Yes.

Q. And why was Suburbia still operating under a net loss?

A. Because it still had the interest rate differential.

Q. And do you see in the third full paragraph, sir, you note that the first half of 1982 was marked by uncertainty and continuing high interest rates. Was that true, sir?

A. Yes.

ANDREW KANE, JR.

Q. What was the uncertainty that you referred to?

A. Whether they were going to go up or down.

Q. Uncertainty about interest rates?

A. Yes.

Q. And the first half of 1982 they continued to go up or they continued to be high at least?

A. Yes.

Q. And it says in your next sentence that by late September, or excuse me, by late summer however interest rates began to decline.

Did that in fact happen, sir?

A. If I said so, it did.

Q. But you don't independently recollect that it happened?

A. No.

Q. Do you recall interest rates declining during that period of time?

A. I don't know.

Q. And the fourth full paragraph, sir, it said if interest rates continue their decline, Suburbia should be able to show a profit sometime

ANDREW KANE, JR.

in the fourth quarter of 1983.

Why did you think that, sir?

A. Again, the high cost of money wouldn't be -- cost us as much as it had been costing us. The cost of money, the high cost of money, I believe the prime rate was about 15 percent at that time.

Q. And is it fair to say that the decline in interest rates would probably help other thrifts too?

A. Yes.

Q. Do you remember if you did post a profit at some time?

A. I don't remember.

Q. Do you see in the fifth full paragraph on that page, sir, the last paragraph on that page it refers to a law signed by President Reagan, comprehensive legislation affecting savings and loan associations?

A. Yes.

Q. Do you remember what that law was?

A. No.

Q. The Garn-St. Germain Act?

A. Could have been.

ANDREW KANE, JR.

Q. Do you know what the Garn-St. Germain Act was?

A. I remember it but I don't know exactly what it was.

Q. Did it give thrifts new powers?

A. It gave us a chance to have checking accounts, which I think was a big power we had.

Q. Did it enable you to make more types of consumer loans and commercial loans?

A. I don't remember.

Q. The next page, sir, the second full paragraph and the first full paragraph refers to capital assistance program.

A. Yes.

Q. Do you remember what that capital assistance program was?

A. No.

Q. Do you remember if Suburbia received capital assistance?

A. I believe so.

Q. And in what form did Suburbia receive capital assistance?

A. I don't remember.

Q. The net worth certificates?

A. Sounds like probably could be it, yes.

Q. Do you remember what net worth certificates were?

A. No.

Q. You don't remember how net worth certificates were treated on balance sheets?

A. No, I don't remember.

Q. And do you remember if Suburbia did receive net worth certificates?

A. I believe we did, yes.

Q. Do you remember how much in net worth certificates it received?

A. No.

Q. Do you see the second to last paragraph, sir?

A. Yes.

Q. Did you feel that at the time?

A. If I wrote it, I felt it, yes.

Q. Do you remember feeling that Suburbia could remain viable and continue to meet the investments and housing needs of our community at that time?

A. Yes.

ANDREW KANE, JR.

Q. And did Suburbia remain viable?
A. Not as viable as we -- I would have liked to try to say here.
Q. What were you trying to say here, sir?
A. Well, if economic inflation declined and interest rates declined, that we would be able to, but it had to happen fast and didn't happen as fast as I was hoping it would.
Q. And what happened to Suburbia when that did not happen as fast as it could, economic conditions did not improve as fast as you had hoped?
A. We continued looking for merger partners.
Q. Did you explore any other methods of raising capital at that time?
MR. EISENHART: Other than what?
MR. MCCLAIN: Other than merger partners.
THE WITNESS: As I said before, we looked for outside capital but it didn't work.
BY MR. MCCLAIN:

ANDREW KANE, JR.

Q. Any other ways of raising capital that you explored?

A. No.

(Defendant's Exhibit No. 116 was marked for identification.)

MR. MCCLAIN: Defendant's 116 is Bates stamped PAA0500642 through 43. These are minutes from the regular monthly meeting board of directors of Suburbia, dated September 16, 1983.

BY MR. MCCLAIN:

Q. I'll ask to you turn to the second page on paragraphs eight and nine. Let me know when you've finished reading, sir.

A. Okay.

Q. Do you remember this meeting with Mr. Lovely?

A. No.

Q. Do you remember Mr. Lovely ever outlining a plan of merger for Fidelity and Suburbia in a conversion to a stock association?

A. No.

Q. Do you remember discussing with Mr. Lovely converting to a stock in connection

with Allen and Company was prior to this.

Q. Do you remember if Fidelity was smaller than Astoria at this time?

MR. EISENHART: Astoria or Fidelity?

MR. MCCLAIN: Suburbia, excuse me.

MR. EISENHART: I'm sorry, that question came out --

BY MR. MCCLAIN:

Q. Do you remember if Fidelity was smaller than Suburbia at this time?

A. Yes.

Q. And it was smaller?

A. Yes.

Q. Do you remember how much smaller?

A. I would guess about half the size.

Q. Do you remember why Fidelity was interested in merging with Suburbia at that time?

A. No.

Q. Why do you think Fidelity was interested in merging with Suburbia at that time?

MR. EISENHART: Object to the form of the question, calls for speculation.

THE WITNESS: I really can't -- everybody was talking mergers at that time.

ANDREW KANE, JR.

I'm sure Fidelity was talking with a lot of other people also.

BY MR. MCCLAIN:

Q. Do you remember if you were talking to other institutions too about a possible merger at that time?

A. I was constantly talking to other institutions.

Q. What other institutions were you talking to at that time?

A. Maybe Suffolk County Federal, County Federal, we were talking -- everybody was talking to each other. We had meetings, regional meetings and we'd discuss it at those meetings.

Q. Do you remember any other institutions other than the ones that you just mentioned?

A. No. Well other than the ones I had an agreement with at one time.

Q. Heritage?

A. Heritage Island and Southshore.

Q. And this is after that fell through, isn't it?

A. I'm not sure.

ANDREW KANE, JR.

document Bates stamped WOL3150758 through 0786. This is a report of examination, dated October 7, 1983. I'd like you to turn to page 2.1, sir.

A. Yes.

Q. And the first paragraph says that the association experienced operating losses of $16,420,000 for the year-ended December 31, 1982 and just under six millions dollars for nine months ending September 30, 1983. So operating losses were down from the year before?

A. Yes.

Q. And why is that, sir?

A. Because of interest rates primarily.

Q. Any other factors? Service corporation income?

A. A little bit of this but primarily the interest rate differential.

Q. Do you see in the fourth paragraph of that page, sir, it says management's been following the business plan it submitted to the Federal Home Loan Bank Board in June of 1983. Do you see that, sir?

A. Yes.

Q. Were you involved at all in

Q. Was the consumer lending operation greatly expanded?

A. I don't think so, no.

Q. Why not?

A. Because of the competition in the area with commercial banks.

Q. What do you mean by competition, sir?

A. Well, there is only so much consumer lending available, and the commercial banks were in it for years. And we'd just started in it, and we had to start from scratch, so it didn't work as well as we might have hoped.

Q. Did consumer lending prove to be profitable for Suburbia?

A. Yes.

Q. Who was the new vice-president hired for consumer lending?

A. I don't remember.

Q. The second to last sentence on that page, sir, says that the major project to improve net worth is a planned sale of branch offices. Do you remember if branch offices were sold by Suburbia?

A. No, they weren't.

Q. Why not?
A. I assume we couldn't get any buyers.
Q. Was Fidelity interested in those branch offices?
A. I don't think so.
Q. Do you remember what Fidelity did with the branch offices after they were acquired in the merger?
MR. EISENHART: I think you've just made your prior question very ambiguous. You asked him if Fidelity was interested in the branch offices, and I think he answered in the context of this report of examination of October 7, 1983. You've now jumped ahead to the merger.
MR. MCCLAIN: Did you understand my question, sir?
THE WITNESS: I understand it to be this (indicating,) yes.
MR. EISENHART: Referring to the report.
BY MR. MCCLAIN:
Q. Do you remember, sir, if Fidelity sold the branches?

ANDREW KANE, JR.

A. No, they maintained all branches.

Q. Do you remember after the merger Fidelity ever discussing selling branch offices of Suburbia?

A. No.

Q. Do you remember which branch offices you contemplated selling?

A. No, no idea.

Q. If you could turn to again going to the bottom right-hand corner of 765.

A. Okay.

Q. The bottom of the page has a reference to Shoreham Development and SFS Resources Corporation. Do you see that, sir?

A. Yes.

Q. And it shows retained earnings of 931 and are those thousands of dollars?

A. Yes.

Q. And 600. Does that indicate to you that these service corporations were profitable, sir?

A. Yes.

Q. And all told those two service corporations were profitable to the tune of 1.8

ANDREW KANE, JR.

Q. All the same operation?

A. It was all part of the lending division.

Q. And do you see under mortgage banking on the next page, sir, it says this would afford us considerable servicing income on an ongoing basis? And I think it's talking about your selling strategy to Freddie Mac?

A. Yes.

Q. And did that give you considerable servicing income?

A. We had some; I don't know how much.

Q. And that became Fidelity's part of the merger, didn't it, sir?

A. Yes.

Q. Is it fair so say, sir, this business plan anticipated a road to profitability?

MR. EISENHART: Object to the form of the question.

THE WITNESS: I don't understand the question.

BY MR. MCCLAIN:

Q. Let's take a look again at page 271, and we looked at these different indicia before.

And is it fair to say that Suburbia anticipated that it would become more profitable in 1985?

MR. EISENHART: Object to the form of the question.

THE WITNESS: This was our plan.

BY MR. MCCLAIN:

Q. So the plan indicates or the plan contains what you anticipated Suburbia would do in the following year?

A. Yes.

Q. And there is no mention in here that you anticipated that you would become insolvent and liquidate, is there?

MR. EISENHART: Object to the form of the question.

THE WITNESS: No.

(Defendant's Exhibit No. 121 was marked for identification.)

MR. MCCLAIN: Defendant's Exhibit 121 is a document that's been Bates stamped PAA0920066 and 0067.

BY MR. MCCLAIN:

Q. Do you see in the second paragraph, sir, if you could just read that a moment and I'll

second full paragraph on that page beginning with interest rates stabilize or decline slightly, 1984 should be a better year for Suburbia Federal.

A. Yes.

Q. And you anticipated in 1984 it would be a better year for Suburbia?

A. Yes.

Q. Why did you think that the interest rate stabilization or decline would result in a better year for Suburbia?

A. Because our cost of money would go down.

Q. And did interest rates stabilize or decline slightly in 1984?

A. I don't recall.

Q. Do you see also on that second page that Suburbia has enacted a number of programs which should improve earnings in 1984 and future years?

A. Yes.

Q. And do you remember what those programs were?

A. No.

Q. The equipment leasing program, was

that one of them?

A. I don't recall.

Q. Who's Mr. Joseph A. O'Connor?

A. I don't remember.

(Defendant's Exhibit No. 122 was marked for identification.)

MR. MCCLAIN: I've placed in front of the witness a document that has been marked as Defendant's Exhibit 122. It's Bates stamped OAA0052722 to 2723.

BY MR. MCCLAIN:

Q. It says that you're aware that -- very much aware if interest rates remain at current market levels, the association's liability will depend upon its ability to obtain a significant capital infusion and/or continued regulatory assistance.

What type of regulatory assistance were you referring to? Net worth certificates?

A. I assume net worth certificates.

Q. Do you see in the fourth paragraph you're talking about -- talk about a merger with another Long Island based federal savings and loan association. Do you remember who that --

ANDREW KANE, JR.

Q. Now, is it fair to say that if you mark the assets of most thrifts in the industry at that period of time, 1982/1983, the book value of assets would exceed the market value of the assets?

MR. EISENHART: Object to the form of the question. You can answer.

THE WITNESS: I assume so.

BY MR. MCCLAIN:

Q. And who was ultimately responsible for the difference between the book value and the market value of the assets in the event of a liquidation?

MR. EISENHART: Object to the form of the question. You can answer it.

THE WITNESS: I don't know.

BY MR. MCCLAIN:

Q. Let's take a liquidation scenario. A thrift is liquidated, what happens to its assets?

A. Probably would be taken over by the FSLIC.

Q. And what would FSLIC do with the assets? Sell them?

A. They would sell them.

preparation of this proposed merger plan?

A. I don't remember.

Q. Do you remember if you were involved at all in discussions in what direction the resulting association would take after the merger?

A. No.

MR. EISENHART: I'm not sure I understood your answer. No, you don't recall or --

THE WITNESS: No, I don't remember. I don't recall.

BY MR. MCCLAIN:

Q. Did you have any role in the administration of Suburbia's assets after the merger?

A. No.

Q. That was all Fidelity?

A. Everything was Fidelity after the merger.

Q. And you didn't play any role in assisting Fidelity's management in what business operations it should undertake?

A. I was part of Fidelity's management.

Q. You were part, right. Did you

personally have any role in deciding what Fidelity would do with Suburbia's assets?

MR. EISENHART: He just said after the merger they were Fidelity's assets. I object to the form of the question. I'm not sure what you're asking him.

BY MR. MCCLAIN:

Q. You can answer.

A. I had responsibility for the total assets of the association, which was Fidelity, which was Suburbia's and Fidelity's.

Q. So Fidelity's assets included assets that were formerly Suburbia's, correct?

A. Yes.

Q. Now did you have any role in administering the assets of Fidelity that once were Suburbia's assets?

MR. EISENHART: He just answered that question. Go ahead, you can answer it again.

THE WITNESS: They were all the same. Merged and everything was together. We didn't say this is Suburbia and this is Fidelity. Everything was all merged.

ANDREW KANE, JR.

BY MR. MCCLAIN:

Q. So you didn't segregate the assets in any way?

A. No.

Q. Did you have any role in directing the operations of Fidelity after the merger?

A. Yes.

Q. What was that role?

A. Basically an administrative role.

Q. What do you mean by an administrative role?

A. Well, the operations, day-to-day operations of the institution.

Q. And what about the day-to-day operations of the institution were you involved?

A. I don't remember exactly.

Q. Before the merger, do you remember discussing with Mr. Lovely or any of Fidelity's management about how the resulting association would be run?

A. No.

Q. Did you have any discussions with Mr. Lovely about what investments the resulting association would make?

ANDREW KANE, JR.

A. Not really, no.

Q. What do you mean by not really?

A. Well, I don't remember I'll put it that way.

Q. If you could take a look at this Exhibit 62 again, sir. I'll ask you again, do you think you had any involvement in the preparation of this proposed merger plan?

MR. EISENHART: Objection, asked and answered.

THE WITNESS: Yes, I did.

BY MR. MCCLAIN:

Q. You did?

A. To what extent I don't remember.

Q. If you could turn to the second page, the page after that, sir. It's Bate's stamped 0483 in the corner.

A. Okay.

Q. The first paragraph says: By combining the two institutions, the services to depositors will be expanded and increased by introducing new services at both institutions to each others depositors; such as, discount brokerage in all offices, life insurance in all

A. Yes.

Q. Do you remember if Fidelity was prior to the merger?

A. I don't remember.

Q. How about student loans, was Suburbia offering student loans?

A. Yes.

Q. Do you remember if Fidelity was?

A. I don't remember.

Q. How about business loans, was Suburbia offering business loans prior to the merger?

A. I don't know.

Q. How about home improvement loans?

A. Yes.

Q. Was Fidelity offering home improvements loans?

A. I don't remember.

Q. Let me ask you this: Did Fidelity pay anything for Suburbia?

A. No. To whom would they pay?

Q. Well, I don't know. Why did you merge with Fidelity?

A. Because it seemed like an opportunity

ANDREW KANE, JR.

at the time. We were going to have some of our directors on a combined board, all our management would stay in place, and it seemed the right thing to do.

Q. Did you fear that you would be liquidated if you didn't do the merger?

A. Not necessarily liquidated, but I thought maybe we would have an unfriendly merger set up by the efforts of FSLIC, which would have no control over any of our destinies.

Q. And this you regarded as a friendly merger?

A. Yes.

Q. Had you known management of Fidelity prior to the negotiations regarding the possible merger?

A. Yes.

Q. And what was your opinion of Fidelity's management?

A. It was rather shallow and that was one of the reasons I thought it would be a good merger, because I thought we had good management and it would be a good mix.

Q. You say you thought that Fidelity's

management was rather shallow?

A. Yes.

Q. What did you mean by that?

A. Outside of Dick Lovely and Bruno Greco, it was never -- really no other top management what I would consider top management.

Q. Who from Suburbia's management stayed on as a result of the association. You, Mr. Miller --

A. Mr. Miller stayed on, Mr. Steine, Mr. Ogera.

Q. Mr. Ryan?

A. Who?

Q. Ryan?

A. He was not management. He was a board director.

Q. How long did Mr. Miller stay at Fidelity?

A. He stayed for about a couple of months and took a consulting position with them.

Q. Why did he only stay for a couple of months?

A. I don't think he and Bruno Greco got along.

ANDREW KANE, JR.

Q. Why do you say that, sir?

A. Just a feeling, that's all.

Q. Was Mr. Miller criticized as being too active in board of directors meetings?

A. No.

Q. Was he criticized for being too critical of Mr. Greco?

A. No.

Q. What was it about them that didn't match?

A. I have no idea.

Q. If you will turn to the next page, sir, introduction, 0484, do you see that?

A. Yes.

Q. And there is a profile to merging associations, and it appears that Suburbia is bigger in assets, savings and mortgages and has more branches than Suburbia, correct? Or had more than Fidelity, correct?

A. Yes.

Q. Do you see above that there is a sentence that says that there is no overlap of markets and economy is to be achieved by the merger planned of 1.0 million dollars in overhead,

ANDREW KANE, JR.

including the attrition of personnel requirements.

Is it true that there's no overlap of markets, sir?

A. Yes.

Q. And that was a benefit to Fidelity and the resulting association?

A. Yes.

Q. Do you know if the economies ever achieved by the merger were at a minimum of 1.0 million dollars?

A. I don't know.

Q. Were there economies that were achieved by the merger?

A. I don't remember.

Q. You don't remember if there were any operating economies?

A. I don't remember.

Q. Do you see on that page, sir, the last sentence of that paragraph above profile of merging associations it says, the resulting association must be allowed to use purchase method accounting in order for it to be beneficial.

A. Yes.

ANDREW KANE, JR.

going forward?

A. Yes.

Q. Do you know if Fidelity was caught in the same interest rate intermediation?

MR. EISENHART: At what time?

MR. MCCLAIN: Sir.

MR. EISENHART: Object to the form of the question unless you define a time.

THE WITNESS: Prior to the merger?

BY MR. MCCLAIN:

Q. Yes. Well, do you think they were caught in the intermediation when the interest rates fell?

A. They had more assets on short-term money than they did in mortgage loans. That short-term money went over three, four, five months.

Q. And so that enabled them to acquire Astoria?

A. Acquire Suburbia.

Q. Acquire Suburbia, excuse me. Do you know if Fidelity sold any assets that formerly were on Suburbia's book after the merger?

A. Yes.

Q. Which assets?
A. Some of the mortgage loans.
Q. Do you know if Fidelity realized a profit on those?
A. I don't recall.
Q. Do you know if they sold any other assets aside from those mortgage loans?
A. Not that I know of.
MR. MCCLAIN: Let's take a five-minute break, and I'll see what I have left and then be ready.
(A recess was taken.)
BY MR. MCCLAIN:
Q. If you could turn, sir, to 488 of that exhibit. Were you involved at all in analyzing what the purchase accounting adjustments would be for the merger?
A. I don't recall.
Q. Do you see at the bottom of the page, sir, there is a column for discount accretion, goodwill amortization and net adjustments for Suburbia's adjustment? Do you see that?
A. Uh huh.
Q. And there are rows corresponding to

ANDREW KANE, JR.

years; do you see that, sir?

A. Yes.

Q. What is your understanding of what discount accretion is, sir?

A. I'm not sure.

Q. Did you have any involvement in deciding what the discount accretion and goodwill amortization of Suburbia would be, of Suburbia's assets would be?

MR. EISENHART: In the mergers that took place as distinguished from the one that's discussed on this page?

MR. MCCLAIN: Yes. I'll think you'll see, Frank, it's the same.

THE WITNESS: I was involved in a lot of this. I don't specifically recall being involved in this particular discussion.

BY MR. MCCLAIN:

Q. Were you involved at all in the negotiations with regulators in connection with the merger?

A. I believe so, yes.

Q. Do you remember any of the negotiations?

ANDREW KANE, JR.

A. No.

Q. Do you remember any discussions about financial assistance?

A. No.

MR. MCCLAIN: I have no further questions.

CROSS-EXAMINATION

BY MR. EISENHART:

Q. Mr. Kane, for some period of years prior to its merger with Fidelity, Suburbia was suffering losses on a regular basis, was it not?

A. Yes.

Q. And in fact we've seen from the documents Mr. McClain showed you you were suffering those losses every quarter?

A. Yes.

Q. When Suburbia would suffer those losses on a quarterly basis, what effect did that have on the institution's capital?

A. Reduced it.

Q. So as a result of these losses that occurred on a regular basis for a number of years prior to the merger, what was Suburbia's capital situation at the time that it finally merged with

Fidelity?
A. It was below regulatory requirements.
Q. And in fact were you virtually out of capital by the time you merged?
A. Yes.
Q. Now if Suburbia had not merged with Fidelity and had kept on posting regular losses, would there have come a time when its capital would have gone negative?
A. Yes.
Q. That was inevitable, wasn't it?
A. Yes.
Q. Simple mathematics?
A. Yes.
Q. What in your experience did the regulators typically do to institutions when their capital dipped below regulatory minimums?
MR. MCCLAIN: Objection.
THE WITNESS: They merged them with another institution.
BY MR. EISENHART:
Q. What in your experience did the regulators typically do to institutions that had no capital left or were in a negative capital

situation?

MR. MCCLAIN: Objection, asked and answered.

THE WITNESS: As I said, they merged and went through some savings institution of their choice.

BY MR. EISENHART:

Q. And what alternatives did the regulators have in your experience if they were not able to merge such an institution into another institution?

A. I don't know what their alternatives were. I would assume it would be liquidated.

Q. Now, Mr. McClain asked you about your definition of goodwill, and you said I think that it was the difference between the market value and the book value of the institution's assets?

A. Yes.

Q. Is it safe to say that you haven't practiced accounting for a number of years?

A. Yes.

Q. Might you be wrong about that?

A. Yes.

Q. I want to show you Exhibit D121.

ANDREW KANE, JR.

Q. And you believed that in April 1984?

A. Yes.

Q. When you say if interest rates were to remain at current market levels, you mean if they don't come down?

A. Yes.

Q. So as of April 1984 you either needed those interest rates to move downward or you needed a capital infusion or you needed a continued regulatory assistance?

A. Yes.

Q. And if you didn't get one of those things, you weren't going to survive?

A. Yes.

Q. Now you go on to say, The board has instructed management to explore every area for a possible capital infusion. Were you in fact doing that?

A. Yes, from a merger, from investors.

Q. Since October 1983 management has had discussions with a number of potential investors. Did you have such discussions?

A. Yes, we did.

Q. It says, At this time, meaning in

April of '84, one potential investor is reviewing our financial statements and we expect to hear from him in the near future regarding a capital infusion. Did that ever happen?

MR. MCCLAIN: Did what ever happen?

BY MR. EISENHART:

Q. Did you ever hear from him?

A. I don't recall.

Q. Did you ever get a capital infusion from him?

A. No.

Q. It says here you're discussing a merger with another Long Island based federal savings and loan, and I think you said you didn't remember which one that was?

A. I don't remember.

Q. And you said you're looking to raise additional capital through preferred stock through a financial service corporation, and I guess that didn't happen?

A. Didn't happen, no.

Q. And it said you were looking for the sale of branch offices to help you raise capital and that didn't happen?

A. No.

Q. So is it fair to say, safe to say, is it accurate to say in April of 1984 you were looking at every possible avenue to try to get a capital infusion to stay alive?

A. That's correct.

Q. And in the end the only thing that you were able to do was effect a merger with Fidelity?

A. That's correct.

Q. And that was done with the full knowledge of the regulators?

A. Yes, it was.

Q. And that was done at the instigation of the regulators?

A. Yes, it was.

MR. EISENHART: Thank you, Mr. Kane. I don't have any other questions.

MR. MCCLAIN: I have no follow-up. Thank you very much for your time, Mr. Kane.

MR. EISENHART: Let's state for the record I will retain the original exhibits that were marked during this deposition and