ORIGINAL



UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,

Plaintiff,

- against - Case No. 95-468C

UNITED STATES OF AMERICA,

Defendant.

- - - - - - - - - - - - - - - - - - - - -x

August 7, 2000

9:50 a.m.

Deposition of Christopher Quackenbush, taken by Defendant, at the offices of Thacher Proffitt & Wood, Two World Trade Center, New York, New York, before Kelly Culen, a Shorthand Reporter and Notary Public within and for the State of New York.

Q. And you said you were talking about your analysis. What analysis was that?
A. Of the acquisition. I looked at the summary. I guess the one document that was there was a summary pro forma financial impact of the transaction. I just really wanted to try and remember the relative sizes of the companies. It's been a while.
Q. And what did you recall after having looked at this document?
A. There was a couple billion dollar -- Fidelity was a couple of billion in size, that we paid $29 for or thereabouts. That there was about a hundred million dollars in goodwill generated for the deal. Not much more than that. Pretty summary.
Q. What was your role in that merger?
A. Advising Astoria.
Q. What was your role in that?
A. Financial analysis of the pro forma impact but as importantly negotiating with the other side which was, I believe, Solomon Brothers.
Q. What do you recall about your analysis?

A. I mean, it was a pretty straightforward cash acquisition.
Q. Why cash?
A. Because we just converted -- Astoria converted. It was overcapitalized. Leveraged. Pretty straightforward for overcapitalized company that wanted to do a cash deal. I remember there was a pretty good mark to market in the portfolio meeting that some of the assets were underwater. They were below market value. I would know that from the negotiation. I remember that being the case and then our one issue we had with the deal was the impact of interest rates on the mark to market. That's about it. I knew we had to restructure. That we were planning on restructuring the portfolio.
Q. How so?
A. Just to sell some of the underwater assets and reinvest them. That was the bulk of it.
Q. What did you recall about the negotiations?
A. Not a lot of the details. Just the, you know, the usual give and take. I think the most

keep talking, it's coming back to me.
Q. I understand.
A. Sort of like a bad dream, you know? Or a good dream. A good dream in this case.
Q. Do you know if Fidelity was in fact talking to anybody else?
A. I should know that because it would have been in the proxy. I don't think -- I think we were under the impression that they were not. But I'm not sure. I don't recall.
Q. You were discussing the impact of interest rates. What impact were you referring to?
A. When you buy a company in a purchase accounting acquisition which this would be, you have to mark the entire balance sheet to market. And with a financial institution you often get, which is primarily a spread business that you're only allowed to mark the asset side or at least at that time that was the conventional wisdom.
So I just remember that there was a big mark to market which would have increased the goodwill which would have put a greater strain on capital and the problem was at that time again --

I think it's still the case that the mark -- the asset value is not done at the date of signing of the agreement, but as of the closing, so we had a six-plus month time period that we didn't know what the final mark was gonna be. So we were worried about what that would do to our capital position and what that would do to the earning stream going out.

Q. You said it would have put a strain on the goodwill. What did you mean by that?

A. It would have increased it. If interest rates continued to rise, it would have been an increase in the mark to market which would have increased the goodwill, which in financial institutions goodwill is a direct reduction from capital. I don't think we were capital tight at the time but it was just a question of the total goodwill relative to our capital position and it was starting to look a bit on the high side.

Q. Was Astoria interested in getting more goodwill out of the deal or less?

A. I think it was just a question of how much we were taking on. I mean, I don't know if it's more or less because in this case since it's

then just the total size of it.
Q. Do you recall what happened with the interest rates between the six months between the agreement and the closing?
A. Good question. I should know that. But no, I really don't recall that. My guess is -- when was this, '94?
Q. Yeah.
A. My guess is they were probably stable but coming down, but I don't remember.
Q. Do you know what effect goodwill would have on their capital ratios?
A. Yeah, goodwill is a deduction from their tangible equity, so I mean that's what I was saying. It's initially not a good thing from a capital perspective, but it has the positive and then it's a good kick to earnings and Astoria became a big proponent of cash earnings, which is basic capital generation when you look at the goodwill taken out.
Q. Do you know whether or not Astoria considered doing this as a pooling deal?
A. I know they didn't.
Q. Why?

A. Because it's a cash acquisition.
Q. They just weren't interested in that?
A. Didn't make sense financially for us. The turn of leverage on the capital.
Q. Do you recall who you negotiated with?
A. I should. Let's see, Solly. Was David Head there? I don't remember. It was David Head and -- I think David was there then, I don't remember.
Q. Do you recall Dick Shapiro?
A. Oh, yeah, okay. Sorry, Dick. David's there now, I think.
Q. With respect to this whole merger, what was your role? Were you point person for Sandler?
A. Yeah.
Q. You were? And is Astoria your client at Sandler?
A. Not really. I mean, I guess at the time they were. But we have a number of people who work with Astoria in different capacities, but if it turns to the merger business, it's myself and then -- well, now it would be Bill Hickey, but at that time it was me.

Q. And do you still have Astoria as a client?

A. You have to ask George that. I mean yes, we do business in other areas. They have used other advisors.

In fact, what was interesting at that time was they were using Merrill Lynch on a competing deal, but it's pretty typical for people to use other advisors. I would like to think of them as a client, but that would be optimistic.

Q. Okay. If you wouldn't mind, would you mind telling me your educational history.

A. I don't mind at all. You tell me when to stop. I'll go backwards from most recent. I went to law school at NYU. I went to undergraduate at North Carolina Chapel Hill. And keep going? High school at Bay Shore. Grammar school in Bay Shore.

Q. How about since college your work history?

A. I started at Skadden Arps as a lawyer, corporate work, and went to Merrill Lynch in their merger and acquisition group for financial

institutions and started Sandler Hills Investment Banking Group when the firm started.

Q. When was that?

A. Actually about six months after that. The firm was formed in August of '88. I came over in February of '89 to start the investment banking side.

Q. Okay.

MR. BROWN: Please mark this as Defendant's Exhibit 127.

(Handing.)

(Defendant's Exhibit 127, engagement letter, marked for identification, as of this date.)

Q. Let the record reflect I've placed what's been marked Defendant's Exhibit 127 before the witness.

Do you recognize this document Mr. Quackenbush?

A. It looks like -- it's an engagement letter, I'm sorry.

Q. Can you describe it for me, please.

A. Let me read it.

Q. Sure.

A. It looks like our reasonably standard engagement letter.
Q. And is that your signature on the last page?
A. Yes.
Q. Or a bad facsimile copy thereof?
A. A bad facsimile of a bad signature, yes.
Q. I would like to direct your attention to the first page. Take a moment to review the second full paragraph on that page.
A. Um-hum.
Q. I would like to go through each one of these steps and have you review each one and then what I'm going to be asking you is what tasks you performed and what conclusions you've reached and why with respect to each.
The first services it says you provided was "Performing financial analyses of the company and the second party in the context of a possible business combination." Do you recall what role Sandler and yourself played in that?
A. In general, we will provide a financial -- historical financial analysis, a current period financial analysis of the buyer

and seller and then show the impact on the acquisition transaction, what the accounting adjustments are and what the impact on earnings capital and all of that. And I assume that's what we did here.

In fact, I -- one of the documents I looked at was sort of a summary of that analysis.

Q. And with respect to this transaction, do you recall what conclusions you've reached with respect to that?

A. Not really. I mean, I know it was -- I think I recall it was slightly earnings accreted and obviously it would have reduced the capital. Probably improve the ROE, return on equity. But I don't recall any more detail than that.

Q. Was that something Astoria was interested in doing at this time?

A. Yes.

Q. Do you recall what their capitalization was at that time?

A. No, I don't.

Q. Turning to the second matter listed as a service, "assisting the company in its determination of appropriate and desirable values

to be exchanged in a business combination." Do you recall what tasks you performed there?

A. Main idea there is figuring out what's the preferable form of consideration, cash or stock. And I think both of us had agreed that cash made the most sense at that time. And then just how much to pay.

Q. Why did cash make most sense?

A. Again because they were overcapitalized at the time.

Q. Do you recall whether or not you looked into your discounting of cash flow analysis?

A. There is a standard part of our presentation that does a discounting cash flow analysis of both the target company. Usually we do it with our client as well if it's the buyer and then the pro forma company. So yeah, that was probably part of it.

Q. Do you recall the results of that analysis?

A. No.

Q. What other merger partners did you look at at this time for Astoria?

A. I don't remember.

ratios look like; here's the range in prices we're talking about; here's the impact of it.

Q. And with respect to those elements, do you recall what your conclusions were that you presented to the board?

A. Well, we gave a fairness opinion in the deal, so I'm sure the conclusion was it's a fair transaction for them.

Q. The next element says you participated in counseling with the company and any approaches to or discussions or negotiations with the second party. Do you recall what your role in that was and what did --

A. That was basically negotiating with Solly and the lawyers.

Q. For the record, what is Solly?

A. Solomon Brothers, I'm sorry. I believe that's its advisor to Fidelity.

Q. Do you recall how those negotiations went?

A. Not really. I mean, I know that they -- there was a series of meetings, some of them I think here at Thacher. I believe Thacher was Astoria's counsel.

equity. And in this case, I think it was -- it did on both counts, improved our earnings, improved our return on equity. Tangible equity anyway.

Q. Are there any other factors you can think of that went into your determination that $29 was fair?

A. I mean, there's a host of intangibles that you look at as possible values, franchise value. There's the obvious, you know, the goodwill issue was raised.

Q. What goodwill issue?

A. The goodwill claim that they had as one possible thing.

Q. Did you value that?

A. No.

Q. Why?

A. Didn't have a way to. Didn't really -- didn't really think it had a value that we could ascertain at that time.

Q. So the $29 figure that --

The goodwill for whatever reason played no role in your decision of $29?

A. I can say that -- I don't know if it

says no role. I said it wasn't a major factor to us. It was something that Solomon was touting but our negotiating factor was prove it. You know.

Q. Were --

A. Was it a factor in the mix? You know, we didn't place a tremendous value on it.

Q. After the merger was completed, did you feel that it had a positive impact that you had projected, return on investments and whatnot?

A. Yeah. I think it had the impact of leveraging Astoria's capital. I think it established Astoria as a credible buyer. Not that they weren't before, but it was just another step and this is not Sandler O'Neill doing it. This is Astoria doing it. I think it was a lot of goodwill that was absorbed. So it put Astoria in the position of having to be a poster child for cash earnings which had mixed results over time. But I think on balance has been okay

Q. Turning to the next factor, it indicates that you had been requested by the company to render an opinion. Do you recall rendering that opinion?

this was -- this Fidelity purchase was an exciting opportunity. Why exciting?
A. Like I said that was the word when I just said I'm not sure these are my words. I don't think I would ever say it was exciting. I wouldn't use that phrase. But we thought it was a good acquisition.
Q. You thought it was a good opportunity?
A. Yes.
Q. Why is that?
A. A billion and a quarter of deposits in their backyard. That was basically it.
Q. And you discussed the potential benefits associated with the acquisition. Could you tell me what those were?
A. A billion in deposits in your backyard.
Q. Anything else?
A. I think if there was a driving force here, it was picking up a billion of deposits in your backyard.
Q. Do you recall any other factors that would be driving it, if any --
A. What is driving it?
Q. Factor into the deal?

A. Yeah, it was leveraging your capital position, but if you had to say was there one thing driving, I would say it was a good acquisition in your backyard with reasonably low execution risk.

Q. What would a million in deposits --

A. A billion.

Q. A billion enable --

A. Just leveraging your balance sheet. Poor funding so you can go ahead and make loans, develop customer relationships with more customers. I mean, that's their business. But it's more customers, more deposits, more core funding, greater leverage without too much of the strain on management.

Q. And you say in that same sentence or they summarize in that same sentence that you stated that these benefits are not without risk. What risk did you see inherent in the deal?

A. Big wholesale portfolio that would be mark to market at some future date. I think that was probably the biggest risk.

Q. Why is that a risk?

A. Bigger mark to market. Bigger strain on

Q. Okay.
A. I don't mean to sound redundant.
Q. I understand.
A. That's really -- if I recall, although I may be recalling this because I read it here, that they were big branches, but I think that was the case which means it's simple, low cost, easy to run.
Q. Do you know if those branches were complementary to Astoria's existing branches?
A. Roughly in the same market so complementary, sure.
Q. Do you recall if there was any overlap?
A. No, I don't recall.
Q. Do you recall if this would indeed lead to eliminating a competitor? Was that a factor?
A. A lessor factor, probably. There's so many competitors.
Q. The next thing you mention is a good deposit mix. What about the deposit mix seemed attractive?
A. I don't remember. Usually that means if there's more savings accounts as opposed to CDs.
Q. The next sentence you mention due

operations?
A. On their operations?
Q. Yeah, if any.
A. I don't remember.
Q. In that paragraph that you just reviewed, it's discussing a number of meetings July 8th and July 10. Do you recall what role you played in those meetings?
A. No.
Q. Do you recall what issues were discussed?
A. No.
Q. Do you recall the results of those meetings?
A. A deal got done. I just don't remember the specific meeting. I assume that's the series of give and take.
Q. I would like to ask you a number of general questions now off the document. Do you recall -- I know you mentioned that they had a lot of tangible cash and that they wanted to invest that.
A. Astoria you're referring to?
Q. Yes. Do you recall any other reasons

Astoria was interested in acquiring other institutions at this time?

A. I think the main reason for a company to make acquisitions is to improve earnings. Astoria had recently converted, recently, a couple of years before that, and had a lot of excess capital and was trying to build a franchise, leverage the capital, increase their earnings, increase their stock price. So that was their general drive.

Q. Do you recall what importance Astoria placed on economies of scale in the reduction of expenses?

A. It's always a factor in terms of how much you can afford to pay because that's how you earned back premiums that you've got.

Q. I would like to direct your attention to Exhibit 15, which should be the last one you have there. Take a moment just to glance at it. Do you recognize this document?

A. Not really. It looks like a regulatory file. I mean, I don't recognize it specifically, but it's an application for approval for the transaction.

Q. It mentions in the second to next full paragraph "the merger will strengthen FSL franchise." Do you recall if the merger did in fact strengthen Astoria's franchise?
A. That's a matter of opinion. I think it did, but I don't know what that word means.
Q. Why do you recall it did?
A. Well, I think that more presence, more poor funding, more customers.
Q. Do you recall whether or not Astoria realized any increases in revenues from the Nassau County and Suffolk County due to the acquisition?
A. Yeah, I think it did. I don't know for sure, but I'm sure -- I'm just adding a billion of deposits in Nassau and Suffolk, they had to increase their revenue.
Q. Do you know if these increases continued to the present day?
A. I certainly hope so. I believe so.
Q. Do you know what returns were estimated from the expanded customer base?
A. No.
Q. Do you know if Astoria realized any

efficiencies from the Fidelity acquisition?
A. I'm sure they did.
Q. Do you recall what they were?
A. I don't recall exactly what they were. But I know they did. Efficiencies meaning cost reductions, yes.
Q. Yes.
A. Yes.
Q. Do you recall what impacts the accretion of Fidelity's earnings had on Astoria?
A. Just that it probably increased their earnings. I don't recall specifically what it was.
Q. Directing your attention to page 54 of the document. I would like to have you take a moment to look at the balance sheet enhancements paragraph.
A. Um-hum.
Q. Do you recall what Fidelity's portfolio yields were at the time?
A. Not the specific yield, no.
Q. Do you recall whether or not they were high or low?
A. I don't recall specifically this

paragraph. It suggests they were low. To the best of my recollection, they were invested in very short-term, high-credit quality securities which would have had a somewhat lesser yield than your average portfolio.
Q. Do you recall how Astoria was planning to increase the yields?
A. Probably going into a mix of somewhat longer term assets maybe with not the same kind of pristine government guarantee. That's pretty typical.
Q. Do you recall why Fidelity was invested in those types of things?
A. No. Their call.
Q. Do you recall what Fidelity's net interest margin was?
A. No.
Q. Do you know if Astoria was successful in increasing portfolio yields?
A. I don't know for sure, but I would hope so.
Q. Do you know what their plan was to do that?
A. From reading this, it's suggested that

they were going to blow out their arms and invest in again somewhat longer term securities.

Q. But you don't recall if that was implemented?

A. I'm sure it was. I'm not -- you know, I wouldn't bet my children's life on it, but I might bet people in this room. No offense, I'm just saying I'm pretty sure it happened.

Q. Do you know if Astoria was successful in diverting a significant portion of Fidelity's existing adjustable rate mortgage securities?

A. No, I don't.

MR. BROWN: Let's take a five-minute break.

A. Your call.

(A short recess was taken.)

Q. We have been discussing today Astoria looking to acquire thrifts. Do you recall whether or not at this time if Fidelity was looking to acquire any thrifts?

A. I don't know.

MR. BROWN: May I have this marked as Defendant's Exhibit 128.

(Handing.)

don't -- hold is a much more typical category.
MR. BROWN: A two-minute break.
(A short recess was taken.)
Q. After this merger, were you involved with Astoria at all in any other mergers?
A. Yeah.
Q. What?
A. Well, on the same side of the table, you know, I don't remember. I know we were across the table from them in Greater New York.
Q. When you say "across the table"?
A. We represented the Greater New York in sell to Astoria financial. You tell me.
Q. Do you know if you were involved in Long Island, LISB?
A. We didn't represent Astoria. We represented a competing bidder.
Q. Do you recall whether or not you were involved at all in any preparation of business plans for Astoria?
A. I don't believe so. That would be unusual for us to do a business plan.
Q. Are you familiar at all with FIRREA?
A. Yeah.

Q. What was your assessment of its impact on the thrift industry from your analysis?
A. From my recollection, writing off the goodwill hurt some companies.
Q. Were there benefits of FIRREA?
A. Sandler O'Neill because there's a lot of mergers.
Q. How about for the industry as well?
A. I don't remember all the specifics of FIRREA, but I think the strengthening of the thrift industry in general is good. But if I recall, I mean, bigger impact was just rates -- bigger positive to the industry was rates starting to come back down. And I don't recall specifically. But I know some people it made capital raising a necessary component, but --
Q. Would capital raising be considered a bad thing?
A. No. It depends. It depends on what level you raise it at. I mean, capital -- to raise capital, if you're a public company, you know, you want to raise capital when your stock is high because it dilutes it. It has less of a diluted impact on the rest of your shareholders.

Is raising capital a bad thing in general? It depends. But I don't think you can say it was good or bad, necessarily.

Q. You mention that as a result of FIRREA, there were a lot of mergers. Why was that?

A. Well, I don't know. I can't say specifically FIRREA. We've got an industry that's consolidated, so that was probably too broad a statement.

MR. BROWN: No further questions.

MR. EISENHART: I don't have any questions.

MR. FORSTOT: I just want to, as I've warned counsel for the government I would do, this is not the only case Sandler O'Neill's been subpoenaed in and Sandler O'Neill who has produced voluminous documents partly, of course, that they would be paid for their copying costs and in none of those cases have we received a dime and so we ask -- I ask that the lawyers here from the Department of Justice do what they can to see that we get the promised payments.

THE WITNESS: And we thank you very