IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ASTORIA FEDERAL SAVINGS<br>& LOAN ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 95-468C<br>(Judge Thomas C. Wheeler) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION *IN LIMINE* TO BAR EVIDENCE OF THE OTS INVESTIGATION OF BRUNO GRECO AND THOMAS DIXON LOVELY AND THEIR VOLUNTARY SETTLEMENT WITH OTS**

Defendant, the United States, respectfully submits this response to the motion *in limine* filed by plaintiff, Astoria Federal Savings and Loan Association ("Astoria"), seeking to bar evidence of the investigation by the Office of Thrift Supervision ("OTS") of the former chief executive officer and president of Fidelity New York, F.S.B. ("Fidelity"), Thomas Dixon Lovely and Bruno Greco. See Pl. Mot. Bar Evid. (Mar. 14, 2007) ("Pl. Mot."); Pl. Mot. Supp. Mot. Bar Evid. (Mar. 22, 2007).

As explained in our contentions of fact and law, the relevant evidence concerns the OTS's discovery in its 1995 investigation that Messrs. Lovely and Greco had, undisclosed to Fidelity's board, obtained cooperative units for little or no downpayment in a development of one of Fidelity's major borrowers, Mr. Gerald Guterman. This development, Glen Oaks Village, was financed with loans from Fidelity. DX1105 at FAA008 0135-36. As the OTS determined through its investigations, "Lovely breach[ed] his fiduciary duties to Fidelity New York by entering into personal transactions, during the period from May 2, 1984, to June 21, 1985." DX

1105 at FAA008 0135. A similar determination was made by the OTS with respect to Mr. Greco, with his personal transactions occurring between May 6, 1984, and August 21, 1984. Due to this breach of their fiduciary duties, pursuant to statutory authority, regulators obtained a consent decree from Messrs. Lovely and Greco banning them from the banking industry for life, and requiring their payment of $190,000. DX 1105-08; see also Def. Contentions of Fact and Law (Mar. 14, 2007) ("Def. Cont.") at 26-27, ¶ 72.

Moreover, in February 1990, years before regulators discovered the improper arrangements between Messrs. Lovely and Greco and Mr. Guterman, Fidelity's board, including Messrs. Lovely and Greco, signed a certification, required in connection with Fidelity's application for a capital plan, stating that "Fidelity's management has not engaged in insider dealing, speculative practices, or other activities that have or may jeopardize the association's safety and soundness or contribute to impairing the association's capital." DX 79 at PAA012 1953, PAA012 1963; see also Def. Cont. at 27, ¶ 73. That certification was incorrect.

## I. Evidence Regarding The Investigation And Settlement Is Relevant To Fidelity's Financial Condition Before And After FIRREA

Astoria argues that the evidence regarding the investigation is not relevant because, "[t]he only issue currently before this Court is the amount of damages suffered by Fidelity as a result of the Government's admitted breach of contract. At no point in this litigation has the Department of Justice ever pleaded or alleged that Fidelity was aware of Mr. Greco and Mr. Lovely's conduct (prior to it being revealed in 1993) or that the conduct or the OTS settlement has any impact whatsoever on the issue of damages in this case." Pl. Mot. at 3. Astoria is mistaken. The "conduct" is relevant to Astoria's claims because it involved the same developer, Mr. Gerald

Guterman, who had several substantial nonperforming construction loans with Fidelity that eroded its asset quality, earnings, and capital. Messrs. Lovely and Greco's relationship with Mr. Guterman is also relevant to Fidelity's pre-breach lending practices. All of these factors contributed to Fidelity's overall rating of "4" in its 1987 report of examination, well before FIRREA. DX 69A.

In the 1987 report of examination, the regulators found that the Guterman loans, along with loans from other major borrowers, were part of a "substantial portion" of the bank's overall criticized assets, that Fidelity's relationship with Guterman had "severely deteriorated," and that Mr. Guterman had "defaulted on his total indebtedness . . . ." DX 69A at OOA002 0082. Mr. Greco also told the regulators that "all senior members of management devote[d] considerable time and effort to the monitoring of major borrowers." DX 69A at OAA002 0081. The fact that the same developer whose relationship with Messrs. Lovely and Greco was the source of the investigation also had numerous nonperforming loans makes the evidence of that relationship, and the investigation of it, relevant to Fidelity's pre-FIRREA condition.

The Guterman loans, and the relationship between Messrs. Lovely and Greco and Mr. Guterman, are also relevant to Fidelity's post-FIRREA condition. Fidelity's new managers who joined in mid-1986, most notably Thomas Powderly, shifted Fidelity away from these construction loans. Nevertheless, the volume and severity of Fidelity's classified assets, a significant portion of which came from the Guterman loans, worsened in Fidelity's subsequent examinations. DX 69A; PX 509; PX 711; PX 851. This resulted in several instructions from the regulators either to write-down loans, increase general valuation allowances, or take other actions. Id. The regulators also found that "extensive time and effort is required for the

resolution of the problem loan situations," particularly for Mr. Powderly, who was placed in charge of real estate lending upon his arrival. DX 69A at OAA002 0081; see also PX 509. Thus, evidence regarding the Guterman loans, including the OTS investigation and underlying conduct, are also relevant to Fidelity's post-FIRREA condition.

## II. Evidence Regarding The Investigation And Settlement Is Probative Of Truthfulness

As we have discussed above, the evidence of the underlying conduct leading to the OTS investigation is relevant to Fidelity's financial condition before and after FIRREA, and is admissible on that basis alone. In addition, this same evidence is also probative of Messrs. Lovely and Greco's character for truthfulness, and is admissible on that independent basis. Astoria's challenge to the relevance of this information on this basis is flawed both in its interpretation of the evidentiary rules and in its projection of how we would use this information at trial.

Astoria argues that, pursuant to Federal Rules of Evidence 608(b), "[s]pecific instances of the conduct of a witness, for the purpose of attacking . . . the witness' character for truthfulness, may not be provided by extrinsic evidence," and that the rule "would prohibit the Department from employing any documentary or testimonial evidence related to the OTS investigation and the subsequent settlement to impeach the testimony of Mr. Greco and Mr. Lovely." Pl. Mot. at 4-5. This is incorrect, both as a reading of the rule and as a projection of how we would use such evidence at trial. We will use such evidence in the manner specifically provided for in Rule 608(b), which provides that, "[specific instances] may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning *the witness' character for truthfulness or untruthfulness* . . . ." Fed. R. Evid.

608(b) (emphasis added).[1] The Federal Rules of Evidence thus specifically permit us to use evidence concerning the witness' character for truthfulness, such as the OTS investigation and underlying conduct, on cross-examination.

The underlying conduct leading to the OTS investigation is probative of Mr. Lovely and Mr. Greco's truthfulness or untruthfulness because it involves their undisclosed relationship with an important borrower from whom they obtained units in a development without informing the board. The OTS determined that this relationship involved a breach of fiduciary duty to Fidelity by Messrs. Lovely and Greco, which is in turn probative of truthfulness. DX 1105; DX 1107.

Furthermore, this evidence is relevant because Fidelity's board, including Messrs. Lovely and Greco, signed a certification as part of Fidelity's application for its capital plan stating that its management had not "engaged in insider dealing . . . ." DX 79 at PAA012 1953, PAA012 1963. Because the underlying conduct giving rise to the OTS investigation took place before this application, the findings of the investigation are directly relevant to Messrs. Lovely and Greco's truthfulness in making this statement in the capital plan. The evidence of the underlying conduct in the investigation is therefore relevant not only to Messrs. Lovely and Greco's truthfulness on the witness stand, but also when making this important application.

As a fallback position, Astoria argues, pursuant to Federal Rule of Evidence 403, that the probative value of the evidence is outweighed by the passage of time and the potential for "harassment or undue embarrassment." Pl. Mot. at 5-6 (quotation omitted). As for the passage of time, although the investigation itself did not occur until after Messrs. Lovely and Greco had

---

[1] Astoria acknowledges this provision in a footnote after stating that the rule prohibited us from using such evidence "to impeach the testimony of Mr. Greco and Mr. Lovely." Pl. Mot. at 5, 5 n.6.

ceased executive responsibilities at Fidelity, the underlying conduct occurred while they were in executive positions, thus making their conduct relevant to their actions at the time. Moreover, the underlying conduct also preceded their statement in the capital plan application, making the evidence relevant to those statements as well.

As for the claims of "harassment or undue embarrassment," such claims are both speculative and premature at this stage. As we have discussed above, the underlying conduct leading to the investigation is relevant and involved a relationship with a major borrower whose nonperforming loans contributed to Fidelity's criticized assets and loan losses before and after FIRREA. The probative value of this evidence is not "substantially outweighed" by the potential embarrassment resulting from the disclosure of these witnesses' voluntary settlements with the OTS – whereby they were banned from the banking industry for life – and the underlying conduct leading to those settlements. Fed. R. Evid. 403. Moreover, the Court will be in a better position to evaluate the evidence and to weigh the probative value at trial, as opposed to doing so at this stage.

## CONCLUSION

For these reasons, we respectfully request that the Court deny Astoria's motion.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel. (202) 353-7972
Fax (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR

March 30, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of March, 2007, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION *IN LIMINE* TO BAR EVIDENCE OF THE OTS INVESTIGATION OF BRUNO GRECO AND THOMAS DIXON LOVELY AND THEIR VOLUNTARY SETTLEMENT WITH OTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John H. Roberson
John H. Roberson