# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 95-468C
(Judge Thomas C. Wheeler)

## JOINT STIPULATION OF FACTS

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Assistant Director

JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Tel: (202) 353-7972
Fax: (202) 514-8640

Of Counsel:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR

Attorneys for Defendant

FRANK J. EISENHART
Counsel of Record
DECHERT LLP
1775 I Street, N.W.
Washington, DC 20006-2401
Tel: (202) 261-3306
Fax: (202) 261-3006

Attorneys for Plaintiff

# JOINT STIPULATION OF FACTS
# TABLE OF CONTENTS

Page

I. FIDELITY'S ACQUISITION OF DOLLAR FEDERAL .......... 1

II. FIDELITY'S ACQUISITION OF SUBURBIA .......... 1

III. PRE-FIRREA FIDELITY .......... 15

IV. FIRREA .......... 17

V. POST-FIRREA FIDELITY .......... 18

VI. FIDELITY'S CONVERSION .......... 22

# JOINT STIPULATION OF FACTS

## I. FIDELITY'S ACQUISITION OF DOLLAR FEDERAL

1. Fidelity New York Federal Savings Bank ("Fidelity") acquired Dollar Federal Savings & Loan Association ("Dollar Federal") on June 30, 1982. The acquisition of Dollar Federal consisted of a takeover of assets and the assumption of existing liabilities outstanding at the date of acquisition. No cash or other consideration was paid in connection with the acquisition.

2. At the time of the acquisition, Dollar Federal had approximately $105 million in assets. As a result of the acquisition, Fidelity increased its branches from 4 to 8, and increased its deposits from $204.7 million to $273.4 million.

3. Fidelity accounted for the acquisition of Dollar Federal as a purchase. The excess cost over fair market value of the net assets acquired was $25.815 million. This amount was to be amortized to expense over thirty years using the straight-line method.

4. Fidelity recorded $28.041 million in discounts on the mortgage loans acquired from Dollar Federal. These discounts were to be accreted into income over ten years using the sum-of-the-months digit method.

## II. FIDELITY'S ACQUISITION OF SUBURBIA

5. On December 20, 1982, the FSLIC held a bidder's conference to solicit proposals for the assisted acquisition of Suburbia. The Bank Board and/or FSLIC were represented by Angelo Vigna, Michael Simone, Richard Denby,

Hal Levy, Evelyn Bonhomme, and Doug Green. At the conference, bidders' packages for Suburbia were distributed to 22 associations and individuals. Subsequent to the conference, packages were also distributed to three other potential acquirers.

6. Four New York State thrift institutions submitted bids to acquire Surburbia; however, Suburbia became eligible for capital assistance before the FSLIC was able to negotiate a merger. Efforts to merge the association were then discontinued. The FLHBB and the FSLIC did not accept any of these four bids.

7. The four thrift institutions from New York State that had submitted bids to acquire Suburbia were: Albany Savings Bank, Anchor Savings Bank, Long Island Savings Bank, and Poughkeepsie Savings Bank.

8. According to the October 15, 1984 FHLBB Issues Memorandum prepared by Peter O. Stearns, the present value cost estimate of Albany Savings' proposal was $20.6 million.

9. In a January 21, 1983 letter to Angelo Vigna, Albany Savings indicated that it required assistance from FSLIC in the form of Promissory Notes, in exchange for which it would issue Income Capital Certificates (ICCs).

10. According to the October 15, 1984 FHLBB Issues Memorandum prepared by Peter O. Stearns, the present value cost estimate of Anchor Savings' proposal was $17.9 million.

11. In a January 18, 1983 letter to Angelo Vigna, Anchor Savings requested assistance from the FSLIC in the form of $25 million market-rate-variable FSLIC notes with interest payable quarterly. Anchor Savings stated that it would issue a corresponding amount of non-interest bearing ICCs.

12. According to the October 15, 1984 FHLBB Issues Memorandum prepared by Peter O. Stearns, the present value cost estimate of the Long Island Savings Bank ("LISB") proposal was $33.9 million.

13. In its January 20, 1983 letter to Angelo Vigna, LISB requested that the FSLIC "contribute to Suburbia $55 million of FSLIC notes, with a corresponding amount of FSLIC ICC's issued in review by Suburbia."

14. According to the October 15, 1984 FHLBB Issues Memorandum prepared by Peter O. Stearns, the present value cost estimate of Poughkeepsie Savings' bid was $25 million.

15. In its undated bid proposal, Poughkeepsie Savings requested an injection of $24.85 million in cash by the FSLIC. [TX 3195 at OAA005 0513]

16. On February 18, 1983, Suburbia's Board of Directors passed a resolution stating that Suburbia was eligible for assistance pursuant to the Net Worth Certificate Act and that it was in the best interest of the Association to apply for that assistance and to issue Net Worth Certificates in conjunction with that assistance.

17. On March 21, 1983, Suburbia entered into a Master Agreement with the FSLIC for Issuance of Net Worth Certificates.

18. In a May 19, 1983 letter to Suburbia's Andrew Kane, the FHLBB stated that, as of December 31, 1982, subject to the satisfactory completion of certain legal documents, Suburbia's application to issue net worth certificates to the FSLIC in the amount of $2,500,000 had been approved.

19. By letter dated July 29, 1983, the FHLBB informed Suburbia's Andrew Kane that Suburbia was required to complete a new application to issue net worth certificates for the June 1983 cycle.

20. In a November 1, 1983 letter to Suburbia's Andrew Kane, the FHLBB stated that, subject to the satisfactory completion of certain legal documents, Suburbia's application to issue net worth certificates to the FSLIC in the amount of $2,950,000 had been accepted.

21. As a participant in the Garn-St Germain Net Worth Capital Assistance Program, Suburbia issued Net Worth Certificates ("NWCs") totaling $9.2 million through August 31, 1984.

22. The prospect of a merger with Heritage Federal Savings & Loan Association was explored by Suburbia's Board of Directors as early as September 1982.

23. At Suburbia's March 18, 1983 Board of Directors regular monthly meeting, which occurred three months after the bidders' conference on December 20, 1982, Chairman Kane reported to the Board on the progress of the Suburbia-Heritage merger application.

24. On June 1, 1983 Linda C. Mercurio, Supervisory Agent of the FHLBB, notified Suburbia that the FHLBB had issued a Resolution denying the Suburbia-Heritage merger application.

25. At the December 16, 1983 Suburbia Board of Directors regular monthly meeting, Chairman Andrew Kane discussed with the Board the current status of a proposal under which Suburbia would convert from mutual to stock form and be purchased by Coronet Properties.

26. On December 23, 1983 Suburbia's Andrew Kane wrote to Norman Dansker of Coronet Properties, stating that Suburbia had been contacted by Angelo Vigna, the Supervisory Agent of the FHLBB concerning Coronet Properties' interest in acquiring Suburbia, and that Suburbia did not believe that any further discussions with Coronet would be fruitful.

27. During Suburbia's February 17, 1984 Board of Directors meeting a resolution was unanimously carried authorizing Management to continue investigating a proposed merger with another financial institution.

28. The minutes of Fidelity's April 25, 1984 Board of Directors meeting note, among other things, that the Board unanimously resolved to continue to pursue with Suburbia the objective of a merger or acquisition of Suburbia by Fidelity under the Voluntary Assisted Merger Program (VAMP).

29. By letter dated May 4, 1984 Angelo Vigna of the FHLBB recommended to David Glenn of FSLIC that Suburbia be designated eligible for the Corporation's VAMP.

30. Mr. Vigna's May 4, 1984 letter said that the FHLBB believed there were only four FSLIC-insured, New York domiciled institutions which were capable of an unassisted acquisition of Suburbia. These were the Anchor, Long Island and Poughkeepsie Federal Savings Banks and the Astoria Federal Savings and Loan Association ("Astoria"). The FHLBB believed, however, that none of these institutions would be willing to acquire Suburbia without financial assistance. The FHLBB therefore recommended a maximum assistance allocation of $16 million or 2.5% of Suburbia's assets, an amount which it believed would be sufficient to interest one or more potential acquirers of Suburbia and which it believed would reasonably assure the long-term viability of the institution following such an acquisition.

31. In May 1984 Suburbia and Fidelity submitted to the FHLBB Supervisory Agent a proposal for a voluntary ("VAMP") merger.

32. The voluntary ("VAMP") merger proposal submitted by Fidelity and Suburbia in May 1984 was not approved because Fidelity requested certain accounting forbearances which were not among the forbearances the Principle Supervisory Agent ("PSA") could grant. Specifically, as set forth by Insurance Regulation 572a.5(c), the PSA was not permitted to approve Fidelity's request that the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method be amortized by the straight line method over 30 years. Nor could the Supervisory Agent approve the request that

FSLIC's cash contribution to the resulting association be booked as a credit to net worth.

33. The Federal Home Loan Bank Board ("FHLBB") received Fidelity's July 12, 1984 Proposal to acquire Suburbia. Fidelity later amended its proposal by letters dated August 16, 1984 and September 17, 1984.

34. The FHLBB and the FSLIC requested the adoption of a Consent Resolution by Suburbia, as stated in the August 27, 1984 letter from Andrew Kane, Chairman and Chief Executive of Suburbia, to Angelo Vigna, Supervisory Agent, Federal Home Loan Bank of New York. Suburbia responded that it "believed[d] that adoption of a Consent Resolution is inconsistent with the Garn-St. German Act of 1982" and asserted that "Suburbia is an eligible institution under the Net Worth Certificate Program." Nevertheless, Suburbia adopted a resolution providing among other things, that "FSLIC . . . is hereby authorized to negotiate a merger" of Suburbia.

35. Suburbia had sustained net losses in each of its fiscal years 1980 through 1984. The losses were as follows:

| | |
|---|---|
| 1980 | $1.666 million |
| 1981 | $6.869 million |
| 1982 | $17.547 million |
| 1983 | $9.167 million |
| 1984 | $7.427 million |

36. Each of the net losses suffered by Suburbia in the years 1980 through 1984 reduced Suburbia's capital.

37. Suburbia's regulatory net worth would have been negative as of August 31, 1984, if its Net Worth Certificates and Appraised Equity Capital were excluded from the calculation of Suburbia's net worth.

38. If Suburbia's Net Worth Certificates and Appraised Equity Capital were excluded from the calculation of Suburbia's net worth, Suburbia's regulatory net worth as of August 31, 1984 would have been negative $12.4 million.

39. According to a 1984 FHLBB Institution Analysis, the present value cost of merging Suburbia with Fidelity totaled $15,906,000.

40. FSLIC's Analysis and Evaluation Division in 1984 prepared an estimate based in part on the assumptions contained therein that the present value of the total cost to the FSLIC of liquidating Suburbia was $147.9 million.

41. On October 15, 1984, the Director of the Office of the Federal Savings and Loan Insurance Corporation ("OFSLIC"), in a memorandum known as the "Issues Memorandum," recommended to the FHLBB that the Board approve Fidelity's proposal for the reasons memorialized therein, including but not limited to the conclusion that Fidelity's proposal was the least costly option currently available to the Government for resolving Suburbia.

42. The October 15, 1984 Issues Memorandum lists "Liquidation" as an option to resolve the financial problems of Suburbia. As disadvantages of the liquidation option, the memorandum lists the fact that the cost of liquidation exceeds present value cost of the least expensive option by $131.9 million and that

liquidation could weaken public confidence in the savings and loan system. The only advantage listed for liquidation is that it would be a "[f]ull solution."

43. The October 15, 1984 Issues Memorandum lists "Fidelity" as a second option to resolve the financial problems of Suburbia. The memorandum notes that the chance of receiving a lower cost bid was a disadvantage of the Fidelity alternative. The memorandum also lists the advantages of the Fidelity alternative, noting that it was the low cost solution, it avoided the disruptive effect of liquidation, it was a projected viable solution, and that Fidelity was an in-state, mutual form similar to Suburbia.

44. The October 15, 1984 Issues Memorandum lists "Rebid" as a third option to resolve the financial problems of Suburbia. The memorandum cites several disadvantages of the rebid alternative, noting that Suburbia had already been shopped extensively, that it continued to deteriorate and that there was a possibility of losing the Fidelity deal and gaining a higher cost deal. The memorandum notes, however, that the chance of lower cost bid being received was an advantage of the alternative to rebid the acquisition of Suburbia.

45. According to the October 5, 1984 S-Memorandum, the outstanding Net Worth Certificates of Suburbia would survive its merger into Fidelity and be included in the net worth of the resulting association.

46. The FHLBB approved the plan of merger of Suburbia into Fidelity through its Resolution No, 84-582, dated October 25, 1984.

47. In FHLBB Resolution No. 84-582 dated October 25, 1984, the FHLBB, as operating head of the FSLIC, approved the assumption by Fidelity of Suburbia's Net Worth certificates, Series 2317, Nos. 1, 2, 3 and 4 issued by the FSLIC to Suburbia.

48. The FHLBB determined that it would be necessary to provide financial assistance to prevent the probable default of Suburbia, as stated in FHLBB Resolution No. 84-582. The FSLIC agreed to contribute $16 million in cash to Fidelity, as stated in the Assistance Agreement executed by the FSLIC and Fidelity on October 31, 1984.

49. On October 31, 1984, the FSLIC and Fidelity entered into an Assistance Agreement in connection with the supervisory merger of Fidelity and Suburbia.

50. The October 31, 1984 Assistance Agreement between Fidelity and the FSLIC stated that "The [FSLIC] has decided . . . to provide financial assistance and indemnification as set forth in this Agreement, having determined that [Suburbia] is in danger of default and that the amount of such assistance and indemnification would be less than the losses the [FSLIC] would sustain upon the liquidation of [Suburbia] through a receivership accompanied by the payment of insurance of accounts."

51. Under section 3(a) of the Assistance Agreement, which is titled "Cash Contribution," the FSLIC was obligated to provide Fidelity a cash contribution in the amount of sixteen million dollars.

52. As noted in Fidelity's March 31, 1987 Consolidated Financial Statements, Fidelity received FSLIC assistance of $16,000,000 in cash in connection with its acquisition of Suburbia.

53. On November 5, 1984, the FHLBB sent a letter ("Forbearance Letter") to Fidelity, confirming the understanding that the FHLBB and the FSLIC would waive, or forbear from taking actions to enforce, certain requirements applicable to Fidelity.

54. The Forbearance Letter explained that it is "the FSLIC's intention that the [$16 million] cash contribution to be made to Fidelity pursuant to an assistance agreement . . . is to be a credit to Fidelity's net worth; therefore, for regulatory accounting purposes, Fidelity may book such contribution as a direct addition to its net worth." [DX 61 at PAA047 0826]. Section 3(a)(2) of the Assistance Agreement provided that all cash contributions made under that section shall be credited to Fidelity's net worth account. [PX246 at WOF003 0039].

55. The November 5, 1984 J.J. Finn Forbearance Letter to the Fidelity Board specified that, for purposes of reporting to the FHLBB, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method could be amortized by Fidelity over a period not to exceed 30 years by the straight line method.

56. Goodwill generated by the Fidelity / Suburbia merger was an "intangible asset," as the term is used in Stipulation No. 105.

57. The forbearances the FHLBB and FSLIC promised to grant to Fidelity, pursuant to J.J. Finn's letter to the Fidelity Board dated November 5, 1984, included, but were not limited to, the following provision: that any discount arising from the adjustment of Suburbia's mortgage loan portfolio to fair value be amortized to income, for regulatory accounting purposes, by the level yield method assuming contractually required payments would be made for 30 years. However, Fidelity sought and obtained permission to accelerate the rate at which loan discounts could be accreted into its income. Fidelity recorded $105.5 million in discounts on the first mortgage loans acquired from Suburbia. These discounts were to be accreted to income using the level-yield method over the estimated remaining life of the loans (as distinguished from 30 years).

58. Fidelity’s acquisition of Suburbia on October 31, 1984, caused its assets to increase from $556.6 million to $1.3 billion and its deposits from $393.2 million to $1.0 billion. Fidelity also added 12 branches, giving it 20 total branches.

59. The merger transaction between Suburbia and Fidelity was accounted for under the purchase method of accounting. Suburbia’s assets and liabilities acquired by Fidelity were re-priced according to their market value.

60. Fidelity recorded $105.5 million in discounts on the first mortgage loans acquired from Suburbia. These discounts were to be accreted to income using the level-yield method over the estimated remaining life of the loans.

61. Fidelity recorded $160.093 million of goodwill as a result of the merger with Suburbia. This amount represented the excess cost over fair market value of net assets acquired. The goodwill recorded was to be amortized over thirty years.

## III. PRE-FIRREA FIDELITY

62. In mid-1986 the Bank added to its management team Thomas V. Powderly, William A. Wesp, and Frederick J. Meyer, who brought expertise in commercial real estate management, development and lending, investment portfolio management and retail banking.

63. Thomas Powderly was hired in June 1986 as Executive Vice President in charge of retail banking, operations, investments, and accounting. Mr. Powderly later became President and CEO.

64. Fidelity hired Frederick Meyer in July 1986. Mr. Meyer became Executive Vice President in December 1986. As Executive Vice President, Mr. Meyer was responsible for the savings division, facilities management, office services, and marketing functions.

65. Fidelity hired William Wesp in June 1986 as a Senior Vice President in charge of investments and financial planning.

66. Fidelity hired Vito L. Caporusso in September 1986 as a Vice President.

67. After joining Fidelity in June 1986, Mr. Powderly reviewed Fidelity's loan portfolio and decided that Fidelity should get out of commercial real estate lending as quickly as it possibly could.

68. In early 1987, Fidelity's augmented management team recognized the potential for problems to develop in Fidelity's commercial real estate, construction, and commercial business loan portfolios, in part as a result of the Tax Reform Act of 1986. As a result, Fidelity decided to cease such lending.

69. In 1987, Fidelity's management began to invest available funds no longer being used in commercial real estate, construction, and commercial business lending in high quality mortgage-backed and mortgage-related securities and U.S. Government obligations. This practice was in contrast with the traditional thrift practice of originating residential mortgage loans. Fidelity's management chose this strategy as a means of controlling its overall credit risk and managing interest rate risk. At the same time, Fidelity's management decided to deemphasize traditional one-to-four-family mortgage lending as a result of severe competition in its market area, which made the returns generated by securitized mortgage assets more attractive.

70. In October 1988, Fidelity adopted a Three Year Business Plan that had as its principal objectives:

- an increase in capital and in particular GAAP capital,
- balance sheet growth of 8 to 10 percent per year,
- reduced loan concentrations and increased credit quality, and
- an increased return on assets to a stable 50-70 basis points range.

## IV. FIRREA

71. At Fidelity's March 15, 1989 Board of Directors meeting there was a discussion of the status of the thrift industry, including the effects of the Bush Administration's thrift reform proposal upon the industry and Fidelity. Mr. Lovely discussed meetings held with Presidential Assistant Richard Breedon and FDIC Chairman William Seedman. The Board also discussed sending correspondence to state and federal legislators concerning proposals affecting the thrift industry.

72. At Fidelity's April 19, 1989 Board of Directors meeting, Mr. Lovely discussed actions then being taken by Congress affecting the savings and loan industry and the effect of these actions upon Fidelity and other similar institution.

73. The Financial Institutions Recovery, Reform, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA") and its implementing regulations (which were promulgated on November 8, 1989, and became effective on December 7, 1989) required a savings institution to maintain tangible capital in an amount not less than 1.5 percent of the institution's adjusted total assets. 12 U.S.C. § 1464(t)(2)(B); 12 C.F.R. § 567.9(a).

74. Per the regulatory requirements put in place as a result of FIRREA, tangible capital did not include any intangible assets, such as goodwill. 12 U.S.C. § 1464(t)(9)(C).

75. FIRREA and its implementing regulations required an institution to maintain core capital of three percent of its adjusted total assets. 12 U.S.C. § 1464(t)(2)(A); 12 C.F.R. § 567.8.

76. Per the regulatory requirements put in place as a result of FIRREA, core capital was defined to exclude any unidentifiable intangible assets, including goodwill. 12 U.S.C. § 1464(t)(9)(A); 12 C.F.R. § 567.5(a)(1-2).

77. FIRREA and its accompanying regulations permitted a thrift to include specified amounts of "qualifying supervisory goodwill" in the calculation of core capital. Such goodwill was initially limited to 1.5 percent of total assets. The permitted amount of goodwill declined gradually each succeeding year and was phased out entirely by December 31, 1994. 12 U.S.C. § 1464(t)(3)(A); 12 C.F.R. § 567.5(a)(1), (2).

78. FIRREA required savings institutions to maintain risk-based capital in an amount greater than or equal to 6.4 percent of risk-weighted assets at December 31, 1989, 7.2 percent of risk-weighted assets as of December 31, 1990, and 8.0 percent of risk-weighted assets as of December 31, 1992. 12 U.S.C. § 1464(t)(2)(C); 12 C.F.R. § 567.2(a)(1)-(b), 567.6.

79. As was the case with the core capital requirement put in place as a result of FIRREA and its implementing regulations, specified amounts of qualifying supervisory goodwill could initially be counted towards the risk-based capital requirement; the amount allowed to count towards risk-based capital would phase out over five years. 12 U.S.C. § 1464(t)(2)(c).

## V. POST-FIRREA FIDELITY

80. Following the passage of FIRREA in August, 1989, the Federal Deposit Insurance Corporation (“FDIC”) determined that as of September 30, 1989 a $57.8 million capital infusion would be necessary to bring Fidelity into compliance with the tangible and core capital requirements prescribed by FIRREA.

81. The FDIC gave Fidelity a Composite Uniform Bank Rating of '5' in its Report of Examination dated September 30, 1989, placing Fidelity in a category reserved for institutions with an "extremely high" immediate or near term probability of failure.

82. As reported in Fidelity’s Capital Plan, as of December 31, 1989, Fidelity’s tangible capital was negative $29.686 million. Under FIRREA and its implementing regulations, Fidelity was required to have tangible capital of $27.456 million. Fidelity’s tangible capital deficit was therefore $57.142 million.

83. As reported in Fidelity’s Capital Plan, as of December 31, 1989, with the FIRREA-mandated exclusion of supervisory goodwill, Fidelity’s core capital (including the permitted portion of supervisory goodwill) was negative $2.230 million. Under FIRREA and its implementing regulations, Fidelity was required to have core capital of $54.912 million. Fidelity’s core capital deficit was therefore $57.142 million.

84. As reported in Fidelity's Capital Plan, as of December 31, 1989, with the FIRREA-mandated exclusion of supervisory goodwill, Fidelity's risk-based capital (including the permitted portion of supervisory goodwill) was negative $2.230 million. Under FIRREA and its implementing regulations, Fidelity was required to have risk-based capital of $59.271 million. Fidelity's risk-based capital deficit was therefore $61.501 million.

85. Fidelity's Capital Compliance Plan was adopted by Fidelity's Board of Directors on January 3, 1990.

86. Fidelity submitted a Capital Compliance Plan to the Office of Thrift Supervision ("OTS") on January 3, 1990, which Plan described how Fidelity intended to comply with the capital requirements of FIRREA.

87. The Capital Compliance Plan submitted to the OTS by Fidelity stated that "[t]he Plan <u>contains zero growth</u> and modest shrinkage in 1993/94."

88. On January 9, 1990, the OTS issued RB3a-1 which was titled "Policy Statement on Growth for Savings Associations."

89. Under RB3a-1, "associations 'requiring more than normal supervision' or 'subject to greater restrictions' will be permitted little to no growth under this policy, subject to District Director discretion and waiver authority."

90. RB3A-1 defined associations "requiring more than normal supervision" as "those with a composite MACRO rating of 4 or 5, associations failing any one of their minimum regulatory capital requirements, or associations otherwise

identified as in need of more than normal supervision by supervisory personnel."

91. RB3A-1, defined associations "subject to greater restrictions" as associations that were insolvent among other things.

92. On May 18, 1990, the OTS informed Fidelity that its January 1990 Capital Compliance Plan had been approved. The OTS approved Fidelity's capital plan subject to certain provisions, including a requirement that Fidelity comply with certain specified "Conditions of Approval" delineated in a copy of Angelo Vigna's letter to Fidelity's board of directors dated May 18, 1990. The Conditions of Approval were to remain in effect until the district director determined that Fidelity had met its capital requirements two consecutive quarters.

93. On September 6th, 1990, Fidelity closed the sale of $42,000,000 in home equity loans, producing a gain of $1.25 million.

94. On December 19, 1991, the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") became law.

95. FDICIA established five capital zones (well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized and critically undercapitalized).

96. Under the OTS regulations issued pursuant to FDICIA, a thrift institution that had a Tier 1 (core capital) leverage ratio of at least 5.0%, a Tier 1 risk-based ratio of at least 6.0%, and a total risk-based capital ratio of at least 10% was deemed to be "well-capitalized" *if* the institution was not subject to any written

agreement, order, capital directive, or prompt corrective action directive issued by the OTS to meet and maintain a specific capital level for any capital measure.

97. As of December 31, 1993, Fidelity's Tier 1 leverage, Tier 1 risk-based, and total risk-based ratios were 5.46 percent, 18.06 percent, and 18.26 percent respectively. At that time Fidelity exceeded all regulatory capital requirements.

98. On May 21, 1992, Fidelity entered into a Supervisory Agreement with the OTS. The agreement was signed by Angelo Vigna of the OTS as well as Thomas Lovely and seven other directors of Fidelity. The agreement contained provisions that, among other things, required compliance with conditions of the Capital Plan.

99. By letter dated January 26, 1993, the OTS notified Fidelity that it terminated the May 20, 1992 Supervisory Agreement. The Supervisory Agreement was terminated because the findings of the April 8, 1992 examination and the subsequent results from the monitoring of the Examination Comment Status Reports indicated that Fidelity had complied with the terms and conditions of the Supervisory Agreement. Because Fidelity had taken appropriate corrective actions, the OTS deemed the continued existence of the Agreement unnecessary.

## VI. FIDELITY'S CONVERSION

100. According to a December 1992 Salomon Brothers presentation to Fidelity, thrift mutual-to-stock conversion activity had increased dramatically over the

previous several months, raising $802.1 million of equity capital for the industry in 1992 and providing to conversion stock investors an average market return of 60.8%. Since the beginning of 1991, 36 thrifts had converted to public ownership, representing the highest level of conversion activity in five years and more than twice the number of conversions in all of 1991.

101. According to a December 1992 Salomon Brothers presentation to Fidelity, after issuance, the stock of converting institutions tended to outperform the market. The stocks of a selected group of thrifts with initial conversion stock offerings of at least $25 million achieved approximately 35% appreciation since the beginning of 1992, in contrast to the S&P 500, the Dow Jones Industrial Average, and the Salomon Brothers Thrift Index, each of which increased by approximately 3% to 4% over the same time period.

102. Fidelity submitted an Application for Conversion to the OTS on January 28, 1993.

103. Since January 1990, Fidelity's management, in accordance with its Capital Plan, focused primarily on enhancing operating results and strengthening capital. Fidelity sought to accomplish this strategy principally by concentrating on controlling costs; increasing fee income; maintaining net interest margin through investments in mortgage-backed securities; and mortgage-related securities and reducing non-performing loans and REO.

104. Kaplan Associates Inc. valued Fidelity, as of January 25, 1993, between $38,250,000 and $51,750,000. The per-share valuation range contained an

$8.50 minimum, $10.00 at the midpoint, and an $11.50 maximum. This per-share valuation range was based upon 4,500,000 shares of common stock outstanding.

105. Kaplan Associates Inc. valued Fidelity, as of March 19, 1993, between $38,250,000 and $51,750,000, with a $45,000,000 midpoint. The per-share valuation range contained an $8.50 minimum, $10.00 at the midpoint, and an $11.50 maximum, and was based upon 4,500,000 shares of common stock outstanding.

106. Fidelity's application for conversion was approved by the OTS.

107. Kaplan Associates Inc., valued Fidelity as of April 22, 1993, between $43,987,500 and $59,512,000, with a $51,750,000 midpoint. The per-share valuation range contained an $8.50 minimum, $10.00 at the midpoint, and an $11.50 maximum, and was based upon 5,175,000 shares outstanding.

108. Following its conversion from mutual to stock form, Fidelity issued 5,170,839 shares of its stock at an offering price of $11.50 per share.

109. On January 26, 1993, OTS informed Fidelity that, upon successful recapitalization of the institution, OTS would terminate the operating restrictions imposed upon Fidelity under the terms of the Capital Plan and Capital Plan approval letter.

110. On May 3, 1993 Mr. Powderly wrote to Angelo Vigna of the OTS requesting that OTS terminate Fidelity's Capital Plan and the restrictions imposed upon Fidelity under the Capital Plan's Conditions of Approval.

111. On May 14, 1993 Angelo Vigna of the OTS notified Fidelity by letter that as a result of its successful conversion from mutual to stock form of ownership, resulting in full compliance with the capital standards approved in the capital plan, the OTS terminated the Conditional Approval of the capital plan and all the related operating restrictions.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, DC 20530
Tel: (202) 353-7972
Fax: (202) 514-8640

Of Counsel:
ARLENE PIANKO-GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR

Attorneys for Defendant

/s/ Frank J. Eisenhart
FRANK J. EISENHART
Counsel of Record
DECHERT LLP
1775 I Street, N.W.
Washington, DC 20006-2401
Tel: (202) 261-3306
Fax: (202) 261-3006

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2007, a copy of the foregoing "JOINT STIPULATION OF FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson
JOHN H. ROBERSON