**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,** | |
| **Plaintiff,** | |
| **v.** | **No. 95-468C** |
| | **(Judge Thomas C. Wheeler)** |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**DEFENDANT'S MOTION IN LIMINE TO PRECLUDE PLAINTIFF'S NEW AND PREVIOUSLY UNDISCLOSED EXPERT ANALYSIS**

Pursuant to Rule 7 and Appendix A of the Rules of the United States Court of Federal Claims, ("RCFC"), defendant, the United States, respectfully submits this motion in limine to prevent plaintiff's expert, Dr. Donald Kaplan, from testifying in support of a new and previously undisclosed damages theory. Because this analysis was first disclosed to us as of the end of the trial day on Monday, April 30, 2007, and we expect Dr. Kaplan's testimony to begin as early as Thursday, May 3, 2007, we respectfully request that the Court rule upon this motion prior to the start of Dr. Kaplan's direct examination.

**I. Plaintiff's Untimely Disclosure**

At 4:00 p.m. on Monday, April 30, 2007, we received from plaintiffs, Astoria Federal Savings & Loan Association ("Astoria"), copies of 107 demonstrative exhibits to be presented in conjunction with the testimony of their damages expert, Dr. Kaplan, numbered "PDX 1" to "PDX 107." Among these documents are calculations and explanations pertaining to a new, previously undisclosed lost profits damage calculation purportedly measuring the lost profits that

Fidelity, N.Y. ("Fidelity") suffered if, absent the phase-out of goodwill, it would not have merged with Astoria. These calculations and explanations are found at PDX 9, 59, 81, 83, 86, 95 and 107. See Exhibit 1. In these demonstratives, Dr. Kaplan appears to be trying to demonstrate that, assuming Fidelity would not have merged with Astoria absent the breach, Fidelity suffered $70.872 million in damages. This new claim appears to be an alternative to a previously disclosed lost profits damages calculation of $127.43 million – an amount of lost profits Dr. Kaplan contends Fidelity suffered if, absent the breach, it would have merged with Astoria.

We challenge the introduction of a new damages claim for a variety of reasons. We had no notice of any damage claim amounting to $70.872 million. We had not learned of any damage claim premised upon the assumption that Fidelity would not have merged with Astoria. We had no notice of Dr. Kaplan's new supporting analyses, e.g., the new "leverage ratio," which is not based upon Astoria's leverage ratio, the composition of Fidelity's presumed assets absent the acquisition by Astoria, or the spread Fidelity would have earned absent the merger with Astoria, among other things. We also lacked notice of other elements of the demonstratives.

In addition to this new damages calculation, it appears that Dr. Kaplan is planning to proffer several new opinions, reflected at PDX 45, 46, 72, 73, and 78, which appear to relate to the goodwill derived from Fidelity's acquisition of Dollar Federal Savings & Loan Association, and to risk-controlled arbitrage. See Exhibit 1. In addition, Dr. Kaplan's demonstratives include several new analyses, to which we also object, that will presumably be used to support Dr. Kaplan's damage theories. See PDX 7, 8, 30-34, 43-44, 53-57, 65, 71 and 79 (Exhibit 1).[1] As

---

[1] In addition to having provided these major new revisions to his existing opinions for the first time in his demonstratives, Dr. Kaplan has added several new and previously undisclosed minor changes to his existing analyses, mostly including previously undisclosed background

we demonstrate below, these disclosures of a new damages theory, new opinions, and new supporting analyses, reflects a flagrant violation of the rules, and prejudices our ability to gain information respecting the claim that we need to know in order to defend against it at trial.

## II. Plaintiff's New Calculations Were Not Previously Disclosed

### A. New Theory, Opinions, And Analyses Not Previously Disclosed

Dr. Kaplan filed an initial expert report on June 29, 2001. He was deposed following this report on September 24-26, 2001. Following this deposition, Dr. Kaplan submitted an affidavit revising his expert report on August 20, 2003. Following this affidavit, he was again deposed, on November 25, 2003, and then again on March 14, 2005.[2] In neither his report, nor his affidavit, nor his depositions, did Dr. Kaplan ever reveal that he believed either that Fidelity would not have been acquired by Astoria absent the breach, or that the lost profits Fidelity suffered as a consequence of the breach, assuming that Astoria did not acquire Fidelity, amounted to $70.872 million. Nor did Dr. Kaplan ever reveal his new opinions respecting the Dollar goodwill or risk-controlled arbitrage, or the supporting analyses we have identified above.[3] Accordingly, the first

---

numerical adjustments, at PDX 4, 6, 16, 19, 22, 23, 29, 35, 41, 42, 51, 52, 67, 68, and 74-76. See Exhibit 1. Moreover, PDX 85 reveals that Dr. Kaplan has updated his damage calculation for the post-Astoria acquisition period. See Exhibit 1. We do not object to these demonstratives.

[2] Dr. Kaplan's original report began the lost profits calculation during the first quarter of 1989. See PX 1314 (Kaplan Original Report) at Exh. 9 (attached at Exhibit 3). Dr. Kaplan's affidavit measured lost profits beginning in both the first quarter of 1989 and the first quarter of 1990. See DX 1233 (Kaplan Affidavit) at Exh. A, B (attached at Exhibit 3). We note that Dr. Kaplan's demonstratives reveal that his pre-Astoria merger lost profits calculation begins in the third quarter of 1989. See PDX 79 (Exhibit 1).

[3] Specifically, with regard to the supporting analyses, we note that in his original report, Dr. Kaplan's opinion that Fidelity's actual wholesale spread "was always greater than 78 basis points" for each post-breach period. PX 1314 at ¶ 61 (attached at Exhibit 3). Dr. Kaplan, however, failed to measure Fidelity's spreads during the fiscal year ended 1990 and the quarter

time that we had notice of these new analyses was at 4:00 p.m., eleven days after trial began, and three days before Dr. Kaplan plans to testify.

**B. Damages Based Upon No Astoria Merger Not Disclosed**

To the extent that Dr. Kaplan ever addressed the question of whether Fidelity would have been acquired by Astoria absent the breach, he addressed it in regards to the lost profits calculation that he previously disclosed, which results in $127.43 million in damages. At first, Dr. Kaplan took no position respecting whether that merger would have occurred absent the breach, but later disclosed that his $127.43 million lost profits model assumed that the acquisition would have taken place.

In his original report, Dr. Kaplan opined that he could not "determine whether Fidelity would have merged with Astoria in the absence of the breach." PX 1314 at ¶ 56 (attached at Exhibit 3). During his September 25, 2001 deposition, in response to our questions regarding this topic, Dr. Kaplan confirmed this opinion:

> Q. But is it your opinion, sir, that the lost profits model is equally applicable to the scenario of Fidelity –
> A. Yes.
> Q. – operating independently?
> A. Yes.
> Q. And did you form after your review of all the documents and financial data, did you form an opinion as to whether Fidelity would have operated independently in lieu of merging with Astoria?
> A. I thought what my report says was that I didn't have a basis for forming such an opinion and so I made – I have no opinion on that.

---

ended December 1994. See PX 1314 at Exh. 8A (attached at Exhibit 3). Dr. Kaplan's demonstratives reveal that he has revised his calculation to include those missing periods. See PDX 71 (Exhibit 1). This new analysis appears to confirm that Fidelity's actual wholesale spread did not always exceed 78 basis points as Dr. Kaplan originally opined.

Deposition Tr. 248:2-14 (Sept. 25, 2001) (attached at Exhibit 2). Accordingly, Dr. Kaplan at first took no position, in his $127.43 million damages model, as to whether the merger would have occurred absent the breach.

In his latest deposition, however, Dr. Kaplan stated that, in calculating his $127.43 million lost profits number, he assumed Astoria would have acquired Fidelity absent the breach, Dr. Kaplan appeared to indicate that his model assumed the merger would have taken place:

> Q. So it could be an increase of assets of mortgage loans? It wouldn't make any difference to you?
> MR. EISENHART: Objection, argumentative.
> A. Mr. Roberson, I have to say, you seem to still not understand, the $963 million of assets reflected in column D on Exhibit 16 is a quantification of the leveraging by Astoria, and you're asking about the composition of those assets, and my answer continues to be that's not critical for my lost profits calculation, no.

Deposition Tr. 57:22-58:7 (Mar. 14, 2005) (emphasis added); see also Deposition Tr. 55:18-57:4; 60:25-61:24 (attached at Exhibit 2). Dr. Kaplan also testified at the end of his latest deposition that he did not contemplate making any additional changes to his expert report or affidavit:

> Q. You're not saving us a minute. You're costing us a minute, so let me repeat the question again. Have you contemplated making any additional changes to your expert report other than those set forth in your affidavit dated August 20th, 2003?
> MR. EISENHART: Fine, that would have been about a two-second clarification. Go ahead, answer the question subject to my objection.
> THE WITNESS: I haven't, no.

Deposition Tr. 75:2-10 (Mar. 14, 2005) (attached at Exhibit 2). Given these statements, Dr. Kaplan had represented that Fidelity would have been acquired by Astoria absent the breach, and that any lost profits model he sponsored would so reflect. Accordingly, we had no notice that

any alternative lost profits model would be sponsored, let alone any models assuming that, absent the breach, Fidelity would not have been acquired by Astoria.

### C. Leverage Ratio And Spread Analyses Not Disclosed

In addition to failing to disclose the existence of any expert opinion calculating lost damages in the amount of $70.872 million, and in addition to failing to disclose any lost profits model premised upon a non-breach world in which Fidelity is not acquired by Astoria, Astoria did not disclose until 4:00 p.m. on Monday, April 30, 2007, that Dr. Kaplan was planning to present new analyses revealed in his demonstratives.

First, Dr. Kaplan did not previously reveal that if Fidelity remained independent, it would have leveraged the goodwill at a ratio of 15.8 percent. See PDX 81 (Exhibit 1). This calculation contrasts with Dr. Kaplan's deposition testimony in which he testified that he made no attempt to determine what Fidelity's leverage ratio would have been absent the breach:

> Q. Okay. But I think you said earlier you didn't make any attempt to determine what Fidelity's actual leverage ratios would have been from 1994 to 2001?
> A. That's correct. But nonetheless I still am responding to your question.

Deposition Tr. 273:18-23 (Sept. 25, 2001). Second, Dr. Kaplan also never revealed that the foregone assets after 1994 would have continued to be incremental adjustable rate mortgage backed securities. See PDX 81 (Exhibit 1). In fact, during his September 25, 2001 deposition, he testified that not only did he fail to identify what the foregone assets would have been after the Astoria acquisition, but he did not even consider doing so:

> Q. Are you saying, Dr. Kaplan, what types of assets would have been invested in using the
> goodwill, remaining balance of goodwill after the Astoria

merger?
A. I think that what the report says is that the same 80 basis point incremental ROA would have been earned on the incremental assets. And I believe that's what the report says.
Q. But are you identifying what those incremental assets would have been?
A. No, I don't think I have done that.
Q. Okay. Did you consider doing that?
A. I think -- I think the answer is no from the outset. I did not, um, do that.

Deposition Tr. 259:3-15 (Sept. 25, 2001) (attached at Exhibit 2). In addition, Dr. Kaplan now apparently plans to opine that if Fidelity had remained independent, it would have earned a "spread of at least 80 basis points" on the incremental assets. PDX 81 (Exhibit 1). This is quite a contrast to his testimony during his September 25, 2001 deposition, where he specifically testified that he did not do an analysis of the spread that Fidelity would have earned after 1994 if it had remained independent:

Q. Did you make any attempt, sir, to determine what wholesale asset spreads would be during the post 1994 period?
A. No.

Deposition Tr. 276:12-15 (Sept. 25, 2001) (attached at Exhibit 2).

Q. Okay. Did you consider doing an analysis of wholesale asset spreads from 1994 period on, in the event that Fidelity stayed as an independent company and did not merge with Astoria?
A. I didn't perform that analysis.

Deposition Tr. 277:11-15 (Sept. 25, 2001) (attached at Exhibit 2). Accordingly, with respect to each of these new analyses, the first notice provided to defendants was at 4:00 p.m. on Monday, April 30, 2007.

## III. Plaintiff's Untimely Disclosure Violates The Applicable Rules And Precedent

Under RCFC 26(a)(1)(C), a party is required to disclose as part of its initial disclosures "a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under RCFC 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of the injuries suffered." Under RCFC26(a)(2)(B), a party who proffers an expert must submit a report prepared by that expert, which "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; [and] any data or other information considered by the witness in forming the opinions[,]" among other things. Under RCFC 26(b)(4)(B), an opposing party is entitled to depose a proffered expert "whose opinions may be presented at trial. If a report from the expert is required under subdivision (a)(2)(B), the deposition shall not be conducted until after the report is provided." RCFC 26(e)(1) imposes a duty upon a party proffering an expert who has filed a report to supplement incomplete or incorrect information, including "information contained in the report and . . . information provided through a deposition of an expert." Finally, RCFC 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by RCFC 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing or on a motion any witness or information not so disclosed."

The specific rules applicable to Winstar-related cases positively preclude this Court from hearing expert testimony respecting an opinion that was not disclosed in an expert report:

> 2. Absent agreement of the parties, each plaintiff shall deliver to

> defendant a final written report prepared and signed by each [expert] witness . . . within 60 days after identification. The written report shall contain: (a) a complete statement of all opinions to be expressed by the witness and the basis and reasons for all opinions; (b) the data or other information considered by the witness in forming the opinions; and (c) all exhibits to be used as a summary of or in support for the opinions of the witness . . .
> 4. If a plaintiff fails to comply with the provisions of this section with regard to any expert witness it proposes to call, no opinion testimony will be received from the witness of that plaintiff.

Procedural Order No. 2 ("Discovery Plan") (Aug. 7, 1997) (attached at Exhibit 4). The Discovery Plan provided for a single round of expert discovery. Indeed, in La Van v. United States, Discovery Judge Hodges found that, although an expert in a Winstar-related case may make non-substantive, typographical, or simple arithmetic changes, experts are not permitted to raise new theories or opinions following the close of discovery. See La Van v. United States, No. 90-581C, Orders (Fed. Cl. Jul. 13, 2000) and (Fed. Cl. Aug. 2, 2000) (attached at Exhibit 4).

Cases support the exclusion of untimely disclosed expert testimony. In United States v. Diaz, 189 F.3d 1239 (10th Cir. 1999), the United States Court of Appeals for the Tenth Circuit affirmed the exclusion of expert testimony that was disclosed five months after the deadline for motions to introduce expert testimony had expired. Id. at 1247; see also Essence, Inc. v. City of Federal Heights, 285 F.3d 1272, 1288-89 (10th Cir. 2002) (upholding exclusion of untimely disclosed expert disclosure). In MRO Communications, Inc. v. American Telephone & Telegraph Co., 1999 WL 1178964 (9th Cir. Dec. 13, 1994) (table), the Ninth Circuit affirmed exclusion of untimely an submitted exhibit and expert testimony that established a new damages theory. Id. at *7. This Court's predecessor, in Owen v. United States, 20 Cl. Ct. 574 (1990), refused to accept testimony from an untimely disclosed expert witness. Id. at 589 n.12.

The purpose of these rules, as demonstrated by the cases cited above, is to prevent trial by ambush. Expert discovery permits an opposing party to learn in advance of trial what an expert's opinions are so that the opposing party can assess their merit, probe their validity at deposition, and be able to effectively defend itself against the expert's claims at trial. By providing new damages calculations not only late, but during trial, and only three days before the expert is to testify, Astoria has committed an egregious violation of the rules. Astoria's actions have rendered obsolete its prior disclosures and the depositions of Dr. Kaplan, and Astoria has prevented the Government from gaining any fair benefit from the process.

## IV. Plaintiff's Untimely Disclosure Prejudices The Government

By providing its new damages analyses at such a late time, Astoria has prejudiced us from being able to defend against them. In addition to receiving new damage theories, opinions, and analyses, the demonstratives do not tell us crucial information respecting Dr. Kaplan's new claim, which we must therefore learn for the first time at trial: 1) What are the start and end dates of the new damage calculation? 2) Would Fidelity have been acquired by Astoria? 3) What benefit offsets are incorporated into the new damages calculation, if any, and why? 4) What analyses did Dr. Kaplan perform respecting the mortgage-backed securities market after 1994? More generally, we do not know the bases for many of the assumptions Dr. Kaplan has made regarding his new analyses and his newly disclosed opinions, nor is it clear how some demonstratives even relate to his damages theories.[4]

---

[4]Absent having had the opportunity to ascertain the answers to these and other questions, and absent sufficient time to analyze those answers, our ability to defend against these claims has been prejudiced. Moreover, Dr. Kaplan's new analyses also prejudice us because they will require additional analyses by our experts and additional expenses to be incurred. See Godley v. United States, 5 F.3d 1473, 1476 (Fed. Cir. 1993) (noting that incurring additional expenses

**CONCLUSION**

For the foregoing reasons, we respectfully request that the Court preclude Dr. Kaplan from testifying regarding any of the new and previously undisclosed damages analyses identified in this motion.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson

JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 353-7972
Fax: (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR

May 1, 2007

---

constitutes prejudice); see also Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 230 (2d Cir. 2001) ("undue delay or expense" is a "form of recognized prejudice").

## CERTIFICATE OF FILING

I hereby certify that on this 1st day of May, 2007, a copy of the foregoing "DEFENDANT'S MOTION IN LIMINE TO PRECLUDE PLAINTIFF'S NEW AND PREVIOUSLY UNDISCLOSED EXPERT ANALYSIS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson
John H. Roberson