# EXHIBIT 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| ASTORIA FEDERAL SAVINGS | : | |
| AND LOAN ASSOCIATION, | : | |
| Plaintiff, | : | Court File No. |
| vs. | : | 95-468 |
| THE UNITED STATES, | : | |
| Defendant. | : | |

\- - - - - - - - - - - - - - - - - x

V O L U M E II

Continuation of the videotaped deposition of DR. DONALD M. KAPLAN, held at the offices of Department of Justice, 1100 L Street, N.W., Washington, D.C., commencing at 9:35 a.m., Tuesday, September 25, 2001, before Elizabeth Mingione, Notary Public.

Page 247

Astoria would have purchased Fidelity?
A. Um, I guess I think the -- what the point I was trying to articulate is I really, I don't because you don't need to. Um, I have presented my calculation, and my recollection is that there's nothing I've done that, um, goes one way or the other on that.
Q. Okay.
A. I did a calculation, um, that was designed to deal with the fact that I didn't have separate financials. And, um, if Mr. Wesp is right and they wouldn't have in the nonbreach world, that doesn't change the ability to do the calculation. Because in the breach world we don't have those separate financials.
Q. Okay. So this lost profits model is equally applicable to the scenario of Fidelity merging with Astoria as Fidelity operating independently?
A. It -- it abstracts from it but I do adopt, um, or identify, um, some things that, um, and in particular the leveraging assumption is I do explain that I looked at Fidelity -- looked at Astoria, um, as part of the process by which I selected my, um, my assumptions that I used in the

Page 248

model.
Q. But is it your opinion, sir, that the lost profits model is equally applicable to the scenario of Fidelity --
A. Yes.
Q. -- operating independently?
A. Yes.
Q. And did you form after your review of all the documents and financial data, did you form an opinion as to whether Fidelity would have operated independently in lieu of merging with Astoria?
A. I thought what my report says was that I didn't have a basis for forming such an opinion and so I made -- I have no opinion on that.
Q. Okay. Why didn't you decide to rely upon Mr. Wesp's opinion that Fidelity would have operated?
A. What I recall I said was, um, well, we are splitting hairs here. Um, I'm comfortable relying on Mr. Wesp's view that he believes that they wouldn't have. But what I tried to say was in any event it doesn't change the way I believe is the right way to compute the lost profits damages beginning in 1995.
So it really was sort of not a, um, not

Page 249

an essential opinion for me to develop. And so I didn't -- I don't believe I set forth an opinion on it because I didn't need to.
Q. Okay. Um, and under your lost profits model, Dr. Kaplan, Fidelity was able to grow from 1989 to 1994. And would you agree then that Fidelity would be more valuable as a thrift in 1994 in the "but for" world than it was in the actual world?
A. More valuable?
Q. Yes.
A. What do you mean?
Q. Would it have been worth more?
A. Well, what I have addressed is that it would have been larger. It would have had a stronger capital position. It would have been more profitable.
Q. Okay.
A. I haven't addressed in my report what its value would have been. Um, so I guess I don't have an, I mean, that's not an investigation I've undertaken.
Q. Okay. Let's assume that Astoria in the "but for" world would have bought Fidelity. If Fidelity in 1994 was bigger, more profitable, had a

Page 250

stronger capital position, then wouldn't Astoria have paid a higher price for this "but for" Fidelity bank than it did for the breached Fidelity?
A. Well, you know, you are treading into another area that I haven't investigated. I would direct you to speak with Mr. Engelke. I'm not sure I can tell you what his answer would be.
Q. Okay. In your experience, sir, you couldn't say whether the purchase price for stronger, a bank with a stronger capital position, larger, more profitable, would be higher than for a bank that didn't have?
A. Of course I can but that wasn't the question you asked me.
Q. Okay.
A. You asked me, I'm sure I heard you clearly, Mr. McClain. You asked me whether Astoria would have paid more. And that's a different question.
Q. Right.
A. And my answer is I can't answer that question. That's not the question you are now speaking about, so.
Q. Okay.
A. Tell me which one you --

Page 259

that the goodwill -- let me start over.
Are you saying, Dr. Kaplan, what types of assets would have been invested in using the goodwill, remaining balance of goodwill after the Astoria merger?
A. I think that what the report says is that the same 80 basis point incremental ROA would have been earned on the incremental assets. And I believe that's what the report says.
Q. But are you identifying what those incremental assets would have been?
A. No, I don't think I have done that.
Q. Okay. Did you consider doing that?
A. I think -- I think the answer is no from the outset. I did not, um, do that.
Q. Okay. So you made a decision early on not to do that? Is that fair?
A. Yes.
Q. Okay. Why did you decide early on not to identify what the incremental assets would be after the Astoria merger?
A. Um, mostly because I felt it wasn't necessary to do. I thought that, and I thought then and I think now that I have employed very conservative assumptions in my model and that, um,

Page 260

it was not necessary to, um, go beyond the level of modeling that I've done here. That was just where I came out.
Q. Okay. So are the incremental assets after the Astoria merger necessarily ARM MBSs funded by borrowings or can they be other things?
A. Well, I think the report basically says, um, what it says, which is that incremental assets will earn no less than an 80 basis point spread. That is -- could well be just a continuation of ARM MBS. Potentially it could be something else.
Q. So you are not --
A. Potentially it could have earned a lot more than that. But I was trying to simply do something very conservative.
Q. Okay.
A. But I really haven't addressed it.
Q. Okay. So the incremental assets are not necessarily ARM MBSs after the Astoria merger?
A. They may be. They could include something else.
Q. Okay. Could it include anything else or have you put any limit as to the type of assets that they could be?
A. Well, I guess -- I guess that the -- I

Page 261

guess what's really in my head is that they are, um, ARM MBS.
Q. Okay.
A. And I just, um, really what you are focusing me on is that I didn't simply say it but that's what, um, that's what I was effectively considering.
Q. Okay.
A. But -- but now that you are asking the question, I don't know that it -- that it necessarily has to be constrained to that. But I think that's what I have in mind in building the model.
Q. Okay. So you had in mind ARM MBSs but it doesn't necessarily have to be comprised of ARM MBSs. Is that -- is that right?
A. Well, let me back up. I have said that I cannot and I have not taken a position of whether for this period of time Fidelity would have merged with Astoria. We know that in the real world they actually did.
In a world in which they are merged and part of Astoria, the incremental assets at the end of the day could be anything Astoria chooses for them to be. And that's why I stopped and didn't

Page 262

articulate anything further specifically about it other than to conclude as I have that I believe that the minimum profitability assumption of an 80 basis points is extremely conservative.
It may well have been higher than that. The assets could very well have been just more ARM MBS. But I can't preclude the possibility that it might have been something more than that.
But my -- my process here was to go down a path where I was picking an extremely conservative number, um, that I think, um, is clearly supportable whatever the details might be.
Q. Paragraph 71, sir.
A. I've read it.
Q. Okay. I am going to ask you questions about the sentence that states, "While it is uncertain whether Fidelity would have merged with Astoria in the absence of the breach, it is clear that Fidelity's contract and thus its supervisory goodwill would still have counted as regulatory capital, merger or no merger."
What is the basis for that -- that statement, sir?
A. Well, that's my view. That's my opinion.
Q. Okay. Why do you hold that opinion?

Page 275

compare Astoria with the "but for" Fidelity during this period?
A. The post '95?
Q. 1994 to 2001, yes, after the merger?
A. I think -- pardon me. My sense is that that's just what we said in the most immediately preceding question. No.
Q. Okay.
A. I said many times I've -- was unable to conduct any such investigation, so I haven't.
Q. Okay. Paragraph 73, sir.
A. Yes.
Q. You point to Fidelity's 80 basis points return on assets or 80 -- point 80 percent return on assets as conservative as an estimate of long-term earnings capacity because it primarily includes a period when it was still struggling to deal with the effects of the breach.
In what specific ways, sir, was Fidelity still struggling to deal with the effects of the breach?
A. Well, take your pick. You know, we -- in 1990 they are spending their time preparing a Capital Plan, meeting and discussing things with regulators. And everything that ensued, it's

Page 276

everything that took place subsequent to FIRREA. It's all of that.
Q. Did you -- did you do any specific analysis other than just your review of the documents in this case?
A. I've done all the analyses that are in this report.
Q. But did you do anything particular to look at how particular effects of the breach affected Fidelity's return on assets?
A. Nothing that's not in the report.
Q. Did you make any attempt, sir, to determine what wholesale asset spreads would be during the post 1994 period?
A. No.
Q. Okay. Why did you not do that, sir?
A. I didn't feel it was necessary.
Q. Why didn't you feel it was necessary?
A. I believe the 80 basis points figure I've come up with, um, is conservative and appropriate and would have, um, continued to be a reasonable profitability parameter in the post -- post-'94 period as well as in the pre-'94 period.
Q. Did you consider looking at wholesale asset spreads in this case?

Page 277

A. We discussed before lunch that I didn't investigate specific spreads in the post-'94 period.
Q. I understand.
A. We discussed that in a world in which Fidelity would have been acquired by Astoria that it's not clear necessarily that Astoria would have utilized MBS for the incremental assets, although it could have. For all of these reasons, I've -- did not feel that it was, um, necessary to perform that kind of an analysis.
Q. Okay. Did you consider doing an analysis of wholesale asset spreads from 1994 period on, in the event that Fidelity stayed as an independent company and did not merge with Astoria?
A. I didn't perform that analysis.
Q. I understand. But did you consider performing that analysis?
A. Um, I don't know how else to answer you other than I made an affirmative conclusion not to do that. I -- if -- maybe the way to answer you is that's a consideration and I made a conclusion not to do it.
Q. And the conclusion was because you could not tell whether Fidelity would have merged with Astoria or not?

Page 278

A. That's certainly part of it.
Q. Okay.
A. As I've discussed it with you. Yes.
Q. And what else was part of that?
A. I think that's more than sufficient.
Q. So there was nothing else?
A. That's all I recall now.
Q. Okay. Let me ask you, sir, if you would agree with this statement, "It is hard to make or lose money by smart or stupid financing strategies. In other words, it is difficult to find financing schemes with net present values significantly different from zero?"
MR. EISENHART: May I hear that again?
MR. McCLAIN: Sure.
MR. EISENHART: I'm not quite sure I followed that at all.
BY MR. McCLAIN:
Q. It is hard to make or lose money by smart or stupid financing strategies. In other words, it is difficult to find financing schemes with net present values significantly different from zero.
MR. EISENHART: You can answer the question.
MR. McCLAIN: He's answered it before.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - x
ASTORIA FEDERAL SAVINGS :
& LOAN ASSOCIATION, :
Plaintiff, :
vs. : No. 95-468C
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - x

Washington, D.C.
Monday, March 14, 2005

Deposition of DONALD M. KAPLAN, PH.D., a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by KAREN YOUNG, a Notary Public in and for the District of Columbia, taken at the offices of the U.S. Department of Justice, 1100 L Street, Northwest, Washington, D.C., at 10:24 a.m. on Monday, March 14, 2005, and the proceedings being taken down by Stenotype by KAREN YOUNG, and transcribed under her direction.

Page 74

A. The only thing I can add, Mr. Roberson, is given my over 25 years of work in this industry and as part of that, my knowledge of regulatory matters, that's in my head, so what I'm aware of I'm aware of. With regard to this paragraph, we seem to have gone far, far beyond what I was really doing here, which was simply trying to make clear by an illustration, by an example, that one can change the start date and one doesn't get a zero damage result, and it was really a relatively simple straightforward point, and I don't know what else I can say to be clear on that.

Q. Dr. Kaplan, have you contemplated making any additional changes to your expert report other than those set forth in your affidavit dated August 20th, 2003?

MR. EISENHART: Objection, beyond the scope of the deposition. You can answer. I'm sorry. Did you say additional changes to the affidavit or the report?

MR. ROBERSON: Can you read back -- I'll just read it again. I mean, you're not answering the questions. He's the one who's answering.

MR. EISENHART: Well, I was trying to save us a minute.

Page 75

BY MR. ROBERSON:

Q. You're not saving us a minute. You're costing us a minute, so let me repeat the question again. Have you contemplated making any additional changes to your expert report other than those set forth in your affidavit dated August 20th, 2003?

MR. EISENHART: Fine, that would have been about a two-second clarification. Go ahead, answer the question subject to my objection.

THE WITNESS: I haven't, no.

MR. ROBERSON: No further questions.

MR. EISENHART: This concludes the deposition of Dr. Kaplan.

(Whereupon, at 12:34 p.m., the taking of the instant deposition ceased.)

Page 76

______________________
Signature of the Witness

SUBSCRIBED AND SWORN TO before me this ______ day of__________, 200__.

______________________
NOTARY PUBLIC

My Commission Expires __________________.

Page 77

UNITED STATES OF AMERICA )
ss:
DISTRICT OF COLUMBIA )

I, KAREN YOUNG, a Notary Public within and for the District of Columbia, do hereby certify that the witness whose deposition is hereinbefore set forth was duly sworn and that the within transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this _______day of__________, 200__.

______________________

My Commission Expires:
July 31, 2009

Page 58

A. Mr. Roberson, I have to say, you seem to still not understand, the $963 million of assets reflected in column D on Exhibit 16 is a quantification of the leveraging by Astoria, and you're asking about the composition of those Astoria assets, and the answer continues to be that's not critical for my lost profits calculation, no.
Q. How would the 226 million in additional assets have been funded?
A. I think -- the assets would have been funded the way Astoria funded all of its other assets, utilizing the funding sources that Astoria was utilizing at the time.
Q. In the exact same proportions?
MR. EISENHART: Objection, calls for speculation. You can answer it.
A. The detail -- an institution has a portfolio of assets and a portfolio of liabilities, and how Astoria would have funded these incremental assets in each time period, my answer is for an institution of Astoria's size, generally it would have been in the same fashion as it was funding all of the rest of its many billions of dollars of assets.
Q. My question was in the exact same

Page 59

proportion it's funding relative to the rest of its bank?
MR. EISENHART: Same objection.
THE WITNESS: I haven't performed a calculation with regard to the particular proportions, but generally it would have been with the same mix of liabilities. That's what I believe is the right way to understand this.
MR. EISENHART: Mr. Roberson, I'd also point out that we're now getting into the methodology of Exhibit 16 and of the post-1995 lost profits calculation. This has been covered at length, and here we don't even go back to the 2003 deposition. We're back to the 2001 deposition now, and it has nothing to do -- since Exhibit 16 wasn't part of the affidavit, the questions we're getting into now have nothing to do with the scope of this deposition.
MR. ROBERSON: You're absolutely incorrect. The court permitted us to ask questions about how the changes in his Exhibit 9A would affect his prior report. We're asking him about the change, the comparison between 9A and 16. The $226 million is a figure that only comes about with regard to the comparison between Exhibit 9A and

Page 60

Exhibit -- original Exhibit 16. I am asking him questions about the composition of the assets and liabilities of the incremental changes that suddenly appear, totally within the scope. If you disagree, we should go to the court right now.
MR. EISENHART: Well, Mr. Roberson, if you had not interrupted me, I was about to say that you've already questioned him and you're free to continue questioning him about the relationship between the changes he made to Exhibit 9 and what's on Exhibit 16. Your last series of questions had nothing to do with that issue. You're getting into effectively arguing with him about his methodology for Exhibit 16 and that really doesn't have anything to do with this deposition.
MR. ROBERSON: All right, Mr. Eisenhart, I'm not going to argue with you. We're going to go to the court right now.
MR. EISENHART: Suit yourself, Mr. Roberson.
(Discussion off the record)
(Whereupon, there was a telephone conference with the Court.)
BY MR. ROBERSON:
Q. Now, did you consider when you issued your

Page 61

Exhibit 9A and 9B, did you consider what effect those changes would have on Exhibit 16?
A. Yes.
Q. And what did you -- what was your conclusion with regard to that?
A. Basically that, after I thought it through just to be sure that I was being complete, I reaffirmed in my thinking that these are two very different methodological approaches, that it is inappropriate to strike a comparison between Fidelity's forgone assets derived in the early period calculation and Astoria's leveraged incremental assets in the latter period, and in fact, the $226 million figure that you keep talking about is a calculation I never made. It doesn't appear in any of my work or in any of my earlier discussions. It's really something that you have focused on.
So the bottom line is that this 737 figure and the 963 figure in fact are, if you will, an apple and an orange. They are different intermediate steps in different methodological approaches and should not be connected and I think I've explained my view on that.
Q. And is that true too with your Exhibit 9B,

Mr. Roberson.
BY MR. ROBERSON:
Q. Is it because you don't know what the assets would be composed of?
MR. EISENHART: Object to the form of the question.
A. No, that is not the explanation.
Q. What is the explanation?
A. The explanation is in all candor, I believe you don't understand the difference between the two exhibits, and hence the question doesn't make sense.
Q. Dr. Kaplan, what we're doing here today is trying to understand so we can explain to the court the severity of the disconnect between your Exhibit 9A and your Exhibit 16. There are huge disconnects, including a $226 million asset increase between one portion of your expert report and in another portion, so I'm trying to understand how it is that you can explain to the court why or what these additional $226 million in assets would be composed of as the court looks at the beginning point on your Exhibit 16.
MR. EISENHART: I object to the form of the question. It's argumentative. The question's



been asked and answered and it's beyond the scope of this deposition.
A. Could you clarify for me your usage of the word "disconnect"? Because that may help us resolve this.
Q. Well, you said before they weren't connected, right? So I'm using the same sense that you used the word "not connected." I'm using the same word. I just used the word "disconnect."
A. By -- when I used the word "not connected," I meant they were two different formulations, two methodological approaches on two different exhibits. To me, these numbers are supposed to be different, and you seem to be implying by usage of the word "disconnect" that they should be the same, and I'm just trying to understand what you're really asking about.
Q. In your modeling of damages in this case, do the assets increase by 226 million between 1994 and 1995?
A. Let me try and explain it to you this way, Mr. Roberson. On Exhibit 9, what is going on here is I have a lost profits methodology that is driven by a growth rate process, and in columns C and D, what we are looking at there is the resulting



intermediate calculation of Fidelity's forgone assets in each time period.
Assuming that's clear, when you move over to Exhibit 16, it's essential that you understand that there's no more Fidelity when we're focusing on Exhibit 16. It went out of existence as a consequence of being acquired and merged into Astoria. As I explain in my original report and as I explained to Mr. McClain in my original deposition, this is a different methodology and it focuses on Astoria's ability to continue to utilize the valuable remaining regulatory capital, namely the goodwill and the capital credit, and the entire methodology in Exhibit 16 has to do with determining lost profits in these periods by means of applying Astoria's leveraging behavior to the remaining goodwill. And in column D, although it's labeled forgone earning assets, it needs to be clear that it's not Fidelity's forgone assets. It can't be. There is no Fidelity. These in reality are best understood as Astoria's incremental assets.
So you have Fidelity's forgone assets reflected in Exhibit 9, you have Astoria's incremental assets reflected in Exhibit 16. They in fact are two different things, and for you to look



for a connection between the two I believe reflects a misunderstanding. They are different intermediate steps in two very different methodological approaches.
Q. Dr. Kaplan, I don't misunderstand your method. I have problems with your method, okay? Now, with regard to the $226 million increase between 1994 and 1995, is it relevant at all to you what the composition of those additional $226 million in assets would be?
A. You're referring to the 963 million?
Q. I'm referring to the $226 million increase. There's -- between 1994 as set forth in Exhibit 9A, and your Exhibit 16, there's an increase in $226 million in assets. Is it relevant at all to your opinion what the composition of those assets would be?
MR. EISENHART: I object to the form of the question and I object on the grounds that's been asked and answered. Answer it again.
A. No.
Q. So it could be an increase of assets of mortgage loans? It wouldn't make any difference to you?
MR. EISENHART: Objection, argumentative.

# EXHIBIT 3

FINAL EXPERT REPORT
(CORRECTED)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ASTORIA FEDERAL SAVINGS AND LOAN ASSOCIATION,

Plaintiff,

*v.*

THE UNITED STATES,

Defendant.

Court File No. 95-468

Volume 1

Expert Witness Report of Dr. Donald M. Kaplan

with

Exhibits 3 through 22

(See Volume 2 for Exhibits 1 and 2)

PLAINTIFF'S EXHIBIT 1314

*pieces of the operation are sold.*"[33] As William Wesp indicated in his deposition, growth is essentially synonymous with success in the banking business.[34]

55. Absent the breach, Fidelity clearly would have grown at no less than 8% per year, or 2% per quarter, during the 1989 to March 1994 time period. Management intended to grow Fidelity and given the nature of the additional assets and liabilities that would have been added (as described further below), there was no market impediment to such growth. Fidelity would have had a cushion of surplus regulatory capital to support this growth.

56. Immediately after March 1994, Fidelity's actual assets decreased slightly in anticipation of the pending merger with Astoria. In the absence of the breach, Fidelity would have been operating with a significantly larger amount of regulatory capital from supervisory goodwill, its capital credit and, as well, additional retained earnings and additional capital that would have been raised in a larger, non-breach tainted conversion IPO. It would have been a larger organization with greater resources, and therefore may well have determined that it could continue to grow as an independent company. However, I cannot determine whether Fidelity would have merged with Astoria in the absence of the breach. For this reason, after March 1994 the non-breached assets are assumed to decrease the same amount as the breached assets. Exhibit 7 graphically displays Fidelity's actual and non-breach assets level between 1989 and 1994.

57. While Fidelity certainly would have been able to continue growing its deposits in the absence of the breach, in my damages analysis, I have assumed incremental growth is funded with additional borrowings. Similarly, in the absence of the breach, Fidelity would have been able to generate additional high quality retail assets, including single family loans. However, for the purpose of the damage calculation, incremental assets are assumed to be purchases of wholesale securities (primarily MBS).

---

[33] August 22, 1989 letter to Fidelity Board from M. Lavelle (AST0704984-5).
[34] July 19, 2000 deposition of William Wesp (69:21-25).

58. This use of wholesale incremental activity in the non-breach bank is consistent with both Fidelity and Astoria's actual operations. As shown in Exhibits 5 and 6, Fidelity's growth, particularly in 1987 and 1988, and beginning again in 1993, was significantly focused on wholesale activity. Likewise, Astoria was a high growth company with an increasingly larger use of wholesale assets and reliance on wholesale borrowings.

59. At a minimum, the incremental wholesale assets would have generated a 0.80% annual return on a pretax basis. This profitability assumption is confirmed by (a) a review of Fidelity's actual overall profitability, (b) Fidelity's actual spreads earned on wholesale activity and (c) returns generally available in the marketplace at that time.

60. First, as shown in Exhibits 5 and 6, Fidelity's average pretax return on average assets before purchase accounting was 0.90% from fiscal 1986 through 1989 and 0.80% between 1990 and 1994. Included in the whole bank returns are reserves for credit problems, which would not be relevant to the forgone wholesale assets. Also included in these whole bank returns are operating expenses which would be minimal for incremental wholesale activity.

61. Next, Exhibit 8A displays Fidelity's actual yield on mortgage-backed securities and costs of borrowings. For each post-breach period, the actual spread was always greater than 78 basis points.

62. Finally, during this time period, one year treasury based adjustable rate mortgage-backed securities ("ARM MBS") carried net margins ranging from 150 to 225 basis points,[35] or a median spread of 187.5 basis points over the one-year Treasury bill. The constant-maturity, one-year Treasury bill is the index upon which virtually all one-year mortgage-backed securities are priced. The 187.5 basis point margin represents the spread over the index that is actually paid, or "passed through," to the investor after servicing costs and guarantor fees are deducted. This margin is approximately equal to a 275 basis point gross margin

[35] Through December 1993, "Agency Adjustable-Rate Mortgage Securities," Jeffrey Biby, The Handbook of Mortgage-Backed Securities, Frank J. Fabozzi, McGraw-Hill, p. 71.

# Exhibit 8A
# Fidelity New York, FSB
# Wholesale Spreads Earned

| | Yield on MBS | Cost of Borrowing | Spread |
|---|---|---|---|
| 12 Mos - 3/91 | 9.13% | 8.26% | 0.87% |
| 12 Mos - 3/92 | 8.15% | 6.34% | 1.81% |
| 9 Mos - 12/92 | 6.56% | 5.20% | 1.36% |
| 12 Mos - 12/93 | 5.56% | 4.71% | 0.85% |
| 9 Mos - 9/94 | 5.38% | 4.60% | 0.78% |

Sources: Subscription Offering Circular, pgs 57, 58
1993 Annual Report, pg 14
September 1994 10Q

Exhibit 9
Fidelity New York, FSB
Lost Profits Damages Before Astoria Merger
1989 to 1994
(Dollars in Millions)

| | Ending Balance Total Assets | | | Average Balance Forgone Assets | Return on Forgone Assets | Lost Profits on Forgone Assets |
|---|---|---|---|---|---|---|
| | Actual | Non-Breach | Forgone | | | |
| | (a) | (b) | (c) | (d) | (e) | (f) |
| Dec-88 | 2,000 | 2,000 | - | | 0.80% | 0.0 |
| Mar-89 | 1,965 | 2,040 | 75 | 37 | 0.80% | 0.1 |
| Jun-89 | 1,943 | 2,081 | 137 | 106 | 0.80% | 0.2 |
| Sep-89 | 1,911 | 2,122 | 211 | 174 | 0.80% | 0.3 |
| Dec-89 | 1,937 | 2,165 | 227 | 219 | 0.80% | 0.4 |
| Mar-90 | 1,903 | 2,208 | 305 | 266 | 0.80% | 0.5 |
| Jun-90 | 1,912 | 2,252 | 340 | 322 | 0.80% | 0.6 |
| Sep-90 | 1,915 | 2,297 | 382 | 361 | 0.80% | 0.7 |
| Dec-90 | 1,914 | 2,343 | 430 | 406 | 0.80% | 0.8 |
| Mar-91 | 1,921 | 2,390 | 468 | 449 | 0.80% | 0.9 |
| Jun-91 | 1,928 | 2,438 | 509 | 489 | 0.80% | 1.0 |
| Sep-91 | 1,923 | 2,486 | 563 | 536 | 0.80% | 1.1 |
| Dec-91 | 1,923 | 2,536 | 614 | 589 | 0.80% | 1.2 |
| Mar-92 | 1,929 | 2,587 | 658 | 636 | 0.80% | 1.3 |
| Jun-92 | 1,921 | 2,639 | 717 | 688 | 0.80% | 1.4 |
| Sep-92 | 1,920 | 2,691 | 771 | 744 | 0.80% | 1.5 |
| Dec-92 | 1,871 | 2,745 | 874 | 822 | 0.80% | 1.6 |
| Mar-93 | 1,849 | 2,800 | 951 | 913 | 0.80% | 1.8 |
| Jun-93 | 1,870 | 2,856 | 986 | 969 | 0.80% | 1.9 |
| Sep-93 | 1,965 | 2,913 | 948 | 967 | 0.80% | 1.9 |
| Dec-93 | 2,018 | 2,972 | 953 | 951 | 0.80% | 1.9 |
| Mar-94 | 2,072 | 3,031 | 959 | 956 | 0.80% | 1.9 |
| Jun-94 | 1,993 | 2,952 | 959 | 959 | 0.80% | 1.9 |
| Sep-94 | 1,993 | 2,951 | 959 | 959 | 0.80% | 1.9 |
| Dec-94 | 1,926 | 2,885 | 959 | 959 | 0.80% | 1.9 |
| Total | | | | | | 29.0 |

(a) From Thrift Financial Reports
(b) Assumes 8% annual growth rate (2% per quarter) through March 1994, actual dollar change in assets thereafter.
(c) Column (b) minus (a).
(d) Average balance of column (c)
(e) Annual rate.
(f) Columns (d) times (e) divided by four (quarterly).

Dechert LLP

Frank J. Eisenhart
Direct Tel: 202.261.3306
frank.eisenhart@dechert.com

September 12, 2003

VIA FACSIMILE AND FIRST CLASS MAIL

BOSTON
BRUSSELS
FRANKFURT
HARRISBURG
HARTFORD
LONDON
LUXEMBOURG
NEW YORK
NEWPORT BEACH
PARIS
PHILADELPHIA
PRINCETON
SAN FRANCISCO
WASHINGTON

Daniel D. McClain, Esquire
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street, NW
Washington, DC 20530

Re: *Astoria Federal Savings & Loan Association v. United States*
Court of Federal Claims, No. 95-468C

Dear Mr. McClain:

Please find enclosed an Affidavit of Dr. Donald M. Kaplan, an expert witness for Plaintiff Astoria Federal Savings & Loan Association, in the above-referenced case.

Very truly yours,

Frank J. Eisenhart

FJE:cmy

DEFENDANT'S EXHIBIT
DX 1233
Astoria v. US
PENGAD-Bayonne, N.J.

DISTRICT OF COLUMBIA :
: ss
CITY OF WASHINGTON :

## AFFIDAVIT

This Affidavit relates to the economic analysis of contract damages that I performed in the matter of Astoria Federal Savings and Loan Association *v.* United States, Case No. 95-468. The date of my expert report which presents my damages analysis in this case is June 29, 2001. The purpose of this Affidavit is to provide a revision to one of the calculations in my expert report.

The calculation I have revised is one of several calculations comprising my lost profits damages analysis. Specifically, I have revised the calculation of "forgone assets" (which is explained briefly in paragraph 64 on page 20 of my report and displayed numerically in column (c) in Exhibit 9 of my report, copy attached).

The specific revision is the substitution of tangible assets for total assets in columns (a), (b) and (c) in the lost profits damages calculation. The reason for the revision is that by making this change, the forgone assets in column (c) will not include any non-earning intangible assets, thereby improving the accuracy of the lost profits calculation. As shown in Revised Exhibit 9A, making this change reduces lost profits damages by $6.7 million, from an original figure of $29.0 million to a revised figure of $22.3 million.

As a separate matter, the Government makes much of the point that I start my lost profits damages calculation in January 1989 (the same month when the Administration publicly

announced the FIRREA legislation), rather than starting the calculation later that year when the legislation was passed by the Congress or later still when the implementing regulations became effective. Based on information from Fidelity's management (see, for example, pages 26-27, 62-63, 70, 184-86 and 190 of Mr. Wesp's deposition), I continue to believe January 1989 is an appropriate date on which to start the lost profits damages calculation.

Notwithstanding my opinion that January 1989 is an appropriate damages start date, I have now performed the same calculation utilizing a later start date. That alternative calculation is displayed in Revised Exhibit 9B, which indicates that starting the damages calculation one year later -- in January 1990 -- reduces lost profits damages to $14.3 million. This is what one would expect, a lower damages figure but not zero damages. Either set of calculations could be an appropriate choice, based on one's view of the evidence.

Donald M. Kaplan

Donald M. Kaplan

Dated: August 20, 2003

Sworn and subscribed
before me this 20th day
of August, 2003.

Vicki Parnell

Notary Public

My Commission Expires:

Vicki L. Parnell
Notary Public, District of Columbia
My Commission Expires October 31, 2003

# Exhibit A
## Kaplan Exhibit 9 (Revised)
## Lost Profits Damages Calculated on Tangible Non-Breach Assets
## Damages Begin in 1989
(Dollars in Millions)

| | Ending Balance Total Tangible Assets | | | Average Balance Forgone Assets | Return on Forgone Assets | Lost Profits on Forgone Assets |
|---|---|---|---|---|---|---|
| | Actual | Non-Breach | Forgone | | | |
| | (a) | (b) | (c) | (d) | (e) | (f) |
| Dec-88 | 1,846 | 1,846 | - | | 0.80% | 0.0 |
| Mar-89 | 1,850 | 1,883 | 33 | 17 | 0.80% | 0.0 |
| Jun-89 | 1,844 | 1,921 | 77 | 55 | 0.80% | 0.1 |
| Sep-89 | 1,820 | 1,959 | 140 | 108 | 0.80% | 0.2 |
| Dec-89 | 1,847 | 1,998 | 152 | 146 | 0.80% | 0.3 |
| Mar-90 | 1,814 | 2,038 | 224 | 188 | 0.80% | 0.4 |
| Jun-90 | 1,825 | 2,079 | 254 | 239 | 0.80% | 0.5 |
| Sep-90 | 1,830 | 2,121 | 291 | 272 | 0.80% | 0.5 |
| Dec-90 | 1,835 | 2,163 | 328 | 310 | 0.80% | 0.6 |
| Mar-91 | 1,846 | 2,206 | 361 | 345 | 0.80% | 0.7 |
| Jun-91 | 1,856 | 2,251 | 394 | 377 | 0.80% | 0.8 |
| Sep-91 | 1,854 | 2,296 | 442 | 418 | 0.80% | 0.8 |
| Dec-91 | 1,857 | 2,342 | 484 | 463 | 0.80% | 0.9 |
| Mar-92 | 1,867 | 2,388 | 522 | 503 | 0.80% | 1.0 |
| Jun-92 | 1,861 | 2,436 | 575 | 548 | 0.80% | 1.1 |
| Sep-92 | 1,862 | 2,485 | 623 | 599 | 0.80% | 1.2 |
| Dec-92 | 1,853 | 2,535 | 682 | 652 | 0.80% | 1.3 |
| Mar-93 | 1,835 | 2,585 | 750 | 716 | 0.80% | 1.4 |
| Jun-93 | 1,858 | 2,637 | 779 | 764 | 0.80% | 1.5 |
| Sep-93 | 1,954 | 2,690 | 736 | 757 | 0.80% | 1.5 |
| Dec-93 | 2,007 | 2,743 | 736 | 736 | 0.80% | 1.5 |
| Mar-94 | 2,062 | 2,798 | 737 | 736 | 0.80% | 1.5 |
| Jun-94 | 1,983 | 2,719 | 737 | 737 | 0.80% | 1.5 |
| Sep-94 | 1,983 | 2,719 | 737 | 737 | 0.80% | 1.5 |
| Dec-94 | 1,917 | 2,653 | 737 | 737 | 0.80% | 1.5 |
| Total | | | | | | 22.3 |

(a) From Thrift Financial Reports. Total assets minus intangible assets.
(b) Assumes 8% annual growth rate (2% per quarter) through March 1994, actual dollar change in assets thereafter.
(c) Column (b) minus (a).
(d) Average balance of column (c)
(e) Annual rate.
(f) Columns (d) times (e) divided by four (quarterly).

# Exhibit B
## Kaplan Exhibit 9 (Revised)
## Lost Profits Damages Calculated on Tangible Non-Breach Assets
## Damages Begin in 1990
(Dollars in Millions)

| | Ending Balance Total Tangible Assets | | | Average Balance Forgone | Return on Forgone | Lost Profits on Forgone |
|---|---|---|---|---|---|---|
| | Actual | Non-Breach | Forgone | Assets | Assets | Assets |
| | (a) | (b) | (c) | (d) | (e) | (f) |
| Dec-89 | 1,847 | 1,847 | - | | 0.80% | 0.0 |
| Mar-90 | 1,814 | 1,884 | 69 | 35 | 0.80% | 0.1 |
| Jun-90 | 1,825 | 1,921 | 96 | 83 | 0.80% | 0.2 |
| Sep-90 | 1,830 | 1,960 | 130 | 113 | 0.80% | 0.2 |
| Dec-90 | 1,835 | 1,999 | 164 | 147 | 0.80% | 0.3 |
| Mar-91 | 1,846 | 2,039 | 193 | 179 | 0.80% | 0.4 |
| Jun-91 | 1,856 | 2,080 | 223 | 208 | 0.80% | 0.4 |
| Sep-91 | 1,854 | 2,121 | 267 | 245 | 0.80% | 0.5 |
| Dec-91 | 1,857 | 2,164 | 306 | 287 | 0.80% | 0.6 |
| Mar-92 | 1,867 | 2,207 | 340 | 323 | 0.80% | 0.6 |
| Jun-92 | 1,861 | 2,251 | 390 | 365 | 0.80% | 0.7 |
| Sep-92 | 1,862 | 2,296 | 434 | 412 | 0.80% | 0.8 |
| Dec-92 | 1,853 | 2,342 | 489 | 462 | 0.80% | 0.9 |
| Mar-93 | 1,835 | 2,389 | 554 | 521 | 0.80% | 1.0 |
| Jun-93 | 1,858 | 2,437 | 578 | 566 | 0.80% | 1.1 |
| Sep-93 | 1,954 | 2,486 | 532 | 555 | 0.80% | 1.1 |
| Dec-93 | 2,007 | 2,535 | 528 | 530 | 0.80% | 1.1 |
| Mar-94 | 2,062 | 2,586 | 524 | 526 | 0.80% | 1.1 |
| Jun-94 | 1,983 | 2,507 | 524 | 524 | 0.80% | 1.0 |
| Sep-94 | 1,983 | 2,507 | 524 | 524 | 0.80% | 1.0 |
| Dec-94 | 1,917 | 2,441 | 524 | 524 | 0.80% | 1.0 |
| Total | | | | | | 14.3 |

(a) From Thrift Financial Reports. Total assets minus intangible assets.
(b) Assumes 8% annual growth rate (2% per quarter) through March 1994, actual dollar change in assets thereafter.
(c) Column (b) minus (a).
(d) Average balance of column (c)
(e) Annual rate.
(f) Columns (d) times (e) divided by four (quarterly).

# EXHIBIT 4

# In the United States Court of Federal Claims
(Filed: August 7, 1997)

| | |
|---|---|
| PLAINTIFFS IN ALL WINSTAR-RELATED CASES AT THE COURT,<br><br>Plaintiffs.<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 90-8 C, et al. |

## PROCEDURAL ORDER NO. 2: DISCOVERY PLAN

Pursuant to Rules 1, 16, 77 and 77.1 of the Rules of the United States Court of Federal Claims, and to the Omnibus Case Management Order entered by the Court on September 18, 1996, ("Case Management Order" or "CMO"), the Court ORDERS as follows:

I. SCOPE OF THIS ORDER AND GENERAL PROVISIONS

A. This Discovery Plan governs discovery in all *Winstar*-related cases before the court except for (a) the *Glendale* and *Statesman* cases, and (b) the Priority Cases identified in Appendix D to the CMO. In the event that a case is removed from the list of Priority Cases it shall thereafter be subject to the terms of this Order.

B. The Discovery Plan is subject to the CMO, Procedural Order Number One ("Procedural Order No. 1"), the Master Order Concerning De Bene Esse Depositions, the Master Protective Order ("MPO"), and other procedural orders of the Managing Judge. The Rules of the Court of Federal

2. Absent agreement of the parties, each plaintiff shall deliver to defendant a final written report prepared and signed by each witness identified pursuant to Paragraph V.A.1. within 60 days after identification. The written report shall contain: (a) a complete statement of all opinions to be expressed by the witness and the basis and reasons for all opinions; (b) the data or other information considered by the witness in forming the opinions; and (c) all exhibits to be used as a summary of or in support for the opinions of the witness.

3. Absent agreement of the parties, defendant shall depose each of plaintiff's expert witnesses within 90 days after receiving the expert's final written report. Each plaintiff shall cooperate in scheduling such depositions and in making each expert witness available for deposition.

4. If a plaintiff fails to comply with the provisions of this section with regard to any expert witness it proposes to call, no opinion testimony will be received from that witness on behalf of that plaintiff.

B. Discovery of Defendant's Expert Witnesses

1. Thirty days after defendant receives a plaintiffs' expert reports pursuant to Paragraph V.A.2. defendant shall provide such plaintiff with the identity of each witness whom defendant intends to call at trial to offer opinion testimony pursuant to Rule 702 of the Federal Rules of Evidence. The identifying information shall include (a) the witnesses' qualifications, including a curriculum vitae; (b) a list of all publications authored by each witness within the last ten years; (c) the compensation to be paid for each witnesses' study and testimony; and (d) a listing of any other cases in which each witness has testified at trial or by deposition, declaration or affidavit within the preceding four years.

2. Absent agreement of the parties, defendant shall deliver to each plaintiff a final written report prepared and signed by each witness identified pursuant to Paragraph V.B.1. within

90 days after identification. The written report shall contain: (a) a complete statement of all opinions to be expressed by the witness and the basis and reasons for all opinions; (b) the data or other information considered by the witness in forming the opinions; and (c) all exhibits to be used as a summary of or in support for the opinions of the witness.

3. Absent agreement of the parties, a plaintiff shall depose defendant's expert witnesses within 60 days after receiving the experts' final report. The defendant shall cooperate in scheduling such depositions and in making each expert witness available for deposition.

4. If defendant fails to comply with the provisions of this section with regard to any expert witness it proposes to call, no opinion testimony will be received from that witness on behalf of defendant.

VI. DISCOVERY DISPUTES

A. All discovery motions shall hereafter be filed with and resolved by the Discovery Judge, unless otherwise directed by the Managing Judge, Issue Judge or the Motion Judge.

B. In the event that a discovery dispute (a) appears to raise generic issues that may be relevant to a significant number of *Winstar*-related cases, or (b) raises concerns regarding a risk of substantial and burdensome duplication of discovery among different cases, the parties shall bring (or the Discovery Judge may refer) the dispute to the attention of the Coordinating Committees and the FDIC to consider whether the dispute should be subject to "common issue" treatment.

LOREN A. SMITH
CHIEF JUDGE

Davidson, J.
Brown, G.

# In the United States Court of Federal Claims

FILED
JUL 1 3 2000
U.S. COURT OF
FEDERAL CLAIMS

* * * * * * * *

LA VAN, et al., *

Plaintiffs, *

and *

FEDERAL DEPOSIT INSURANCE CORPORATION, * No. 90-581C

Plaintiff-Intervenor, * Filed: July 13, 2000

v. *

UNITED STATES OF AMERICA, *

Defendant. *

* * * * * * * *

## ORDER

FDIC seeks leave to amend its expert report beyond the 60 day period permitted by Procedural Order 2, §V.A.2. Defendant opposes any amendments to the expert report. §V.A.2. does not provide for amendments to the expert report. The agreement states, "each plaintiff shall deliver to defendant a final written report . . . within 60 days after identification." While we encourage the parties to permit reasonable requests for exceptions that are in the interest of justice, we cannot require it in this case, given this language. Counsel may appeal to the Chief Judge or request clarification if they wish.

Robert H. Hodges, Jr.
Judge

ORIGINAL

# In the United States Court of Federal Claims

FILED
AUG 0 2 2000
U.S. COURT OF FEDERAL CLAIMS

* * * * * * * *

LA VAN, et al., *

Plaintiffs, *

and *

FEDERAL DEPOSIT INSURANCE CORPORATION, * No. 90-581C

Plaintiff-Intervenor, * Filed: August 2, 2000

v. *

UNITED STATES OF AMERICA, *

Defendant. *

* * * * * * * *

## ORDER

We ruled on plaintiff FDIC's request that it be permitted to amend the expert report of Dr. Litan based on the representations made to the court by the United States. While the hearing was not recorded, we recall stating that experts always are permitted to revise and extend their reports, and indeed are required to do so. Defendant's representation was that this expert addressed new issues that resulted in new causes of action. That is the basis upon which we denied plaintiff's supplemental report. Defendant represented to the court that it would be impossibly prejudiced by these new causes of action because the expert already had been deposed. If any of these representations were not correct, we will reconsider. Defendant will respond within the time allowed by applicable rules of this court.

Robert H. Hodges, Jr.
Judge