**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 95-468C** |
| | ) | **(Judge Thomas C. Wheeler)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION FOR JUDGMENT BASED UPON PARTIAL FINDINGS**

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Assistant Director

JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel. (202) 353-7972
Fax (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR

May 15, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Astoria Has Failed To Prove Entitlement To An Award Of Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. Description Of Astoria's Restitution Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. The Federal Circuit Has Rejected Restitution Claims Premised Upon Avoided Liquidation Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C. No Record Evidence Renders Astoria's Restitution Claim Viable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

1. Astoria Has Failed To Distinguish The Economic Or Regulatory Environment Under Which Suburbia Was Operating From That Of Other Thrifts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

2. To The Extent Any Facts Distinguish Suburbia From Other Troubled Thrifts, They Show FSLIC Was Less Likely To Liquidate Suburbia . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D. Restitution Claim Fails To Meet Other Legal Requirements . . . . . . . . . . . . . . . 11

III. Astoria's Reliance Claim Fails As A Matter Of Law And Fact . . . . . . . . . . . . . . . . . . 12

A. Description Of Astoria's Reliance Damages Claim . . . . . . . . . . . . . . . . . . . . . 12

B. The Federal Circuit Has Rejected Reliance Claims Premised Upon Net Liabilities Assumed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

C. The Record Evidence Does Not Support Astoria's Claim That The Net Liabilities Assumed Represented A Cost To Fidelity . . . . . . . . . . 15

1. The Same General Scenario Applies To The Suburbia Acquisition As To The Other Cases Rejecting Identical Reliance Claims . . . . . . . . . . . . . . . . . . . . . . . 16

2. The Facts Demonstrate That Dr. Kaplan Ignores Significant Benefits That Constitute An Offset To His Claimed Reliance Damages . . . . . . . . . . . . . . . . . . . . 17

III. Astoria's Expectancy Claims Fail As A Matter Of Law And Fact . . . . . . . . . . . . . . . . 19

A. Overview Of Astoria's Expectancy Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B. Legal Standards For Expectancy Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C. Astoria's Lost Profits Claims Fail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1. Description Of Astoria's Lost Profits Claim . . . . . . . . . . . . . . . . . . . . . . 24

2. Dr. Kaplan's Post-Astoria Damages Are Speculative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

3. Dr. Kaplan's Pre-1994 Lost Profits Are Unsupported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

4. Dr. Kaplan's Pre-1994 Lost Profits Fail For Lack Of Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

a. No Causation For Pre-FIRREA Damages . . . . . . . . . . . . . . . . . . 28

b. Fidelity Would Not Have Grown Absent The Breach . . . . . . . . . 29

c. Regulators Would Have Barred Dr. Kaplan's Growth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

d. Economic Constraints Barred Dr. Kaplan's Growth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

e. Fidelity Never Grew Wholesale Portfolio When Unconstrained . . . . . . . . . . . . . . . . . . . . . . . . . . 36

f. Dr. Kaplan Omits Benefits To Fidelity Caused By The Breach . . . . . . . . . . . . . . . . . . . . . . . . . . 37

5. Dr. Kaplan's Lost Profits Claims Fail For Lack Of Foreseeability . . . . . 37

a. Precedent Indicates Damages Nearing The Goodwill Amount Are Unforeseeable . . . . . 37

b. Fidelity's Operations Gave Regulators No Reason To Foresee The Scale Or The Source Of The Damages Dr. Kaplan Posits . . . . . 38

6. Dr. Kaplan's Lost Profits Claims Are Not Reasonably Certain . . . . . 39

a. Dr. Kaplan's Assumed Growth Rate Is Unsupportable . . . . . 39

b. Dr. Kaplan's Reliance Upon The October 1988 Business Plan Creates Uncertainty . . . . . 39

c. Dr. Kaplan's Use Of Pre-FIRREA Growth Rate Creates Uncertainty . . . . . 41

d. Dr. Kaplan's Calculation Of An Assumed Spread Is Baseless . . . . . 42

e. Dr. Kaplan's Post-Astoria Merger Damages Are Unexplained . . . . . 42

f. Dr. Kaplan's Post-Astoria Damages Fail To Adjust For A Non-Breach World . . . . . 43

B. Dr. Kaplan's "Wounded Bank" Claims Fail . . . . . 44

1. OTS Assessment Claim Is Speculative . . . . . 44

2. FDIC Insurance Premium Claim Is Speculative . . . . . 45

IV. Astoria Is Not Entitled To "Jury Verdict" Damages . . . . . 46

CONCLUSION . . . . . 48

## TABLE OF AUTHORITIES

## CASES

Page

Aktieselskabet Dampskibsselskabet Svenborg v. United States,
131 Ct. Cl. 399, 130 F. Supp. 363 (1955) ........ 11

Ariadne Fin. Servs. Pty. Ltd. v. United States,
133 F.3d 874 (Fed. Cir. 1998) ........ 28

Astoria Fed. Sav. & Loan Ass'n v. United States,
72 Fed. Cl. 712 (2006) ........ 3, 12

Aurigemma v. Arco Petroleum Prods. Co.,
734 F. Supp. 1025 (D. Conn. 1990) ........ 11

Bluebonnet Sav. Bank v. United States,
266 F.3d 1348 (Fed. Cir. 2001) ........ 46

Bohac v. Dep't of Agriculture,
239 F.3d 1339 (Fed. Cir. 2001) ........ 20

California Fed. Bank v. United States,
43 Fed. Cl. 445 (1999), vacated in part,
245 F.3d 1342 (Fed. Cir. 2001), cert. denied, 534 U.S. 1113 (2002) ........ 37

California Fed. Bank, v. United States,
245 F.3d 1342 (Fed. Cir. 2001), cert. denied, 534 U.S. 1113 (2002) ........ 5, 8, 13

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 344 (2005) ........ 19

Carley Capital Group v. City of Newport News,
709 F. Supp. 1387 (E.D. Va. 1989) ........ 15

Capitol Elec. Inc. V. United States, 729 F.2d 746 (Fed. Cir. 1984) ........ 20

Caroline Hunt Trust Estate v. United States,
65 Fed. Cl. 271 (2005), aff'd in part, rev'd in part
and remanded, 470 F.3d 1044 (Fed. Cir. 2006) ........ 5

Citizens Fed. Bank v. United States,
52 Fed. Cl. 561 (2002), aff'd, 474 F.3d 1314 (Fed. Cir. 2007) ........ 5

Citizens Fed. Bank v. United States,
474 F.3d 1314 (Fed. Cir. 2007) .......... 19

Citizens Fin. Servs., Inc. v. United States,
64 Fed. Cl. 498 (2004) .......... 21, 47

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004) .......... passim

Commercial Fed. Bank, F.S.B. v. United States,
59 Fed. Cl. 338 (2004), aff'd, 125 Fed. Appx.
1013 (Fed. Cir. 2005) .......... 43, 44

Cooper v. United States,
37 Fed. Cl. 28 (1996) .......... 2

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) .......... 42

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) .......... 20

Fifth Third Bank of W. Ohio v. United States,
55 Fed. Cl. 223 (2003) .......... 5, 14

First Fed. Lincoln Bank v. United States,
73 Fed. Cl. 633 (2006), appeal docketed, No. 07-5044 (Fed. Cir. 2007) .......... 43, 44

Franklin Fed. Sav. Bank v. United States,
431 F.3d 1360 (Fed. Cir. 2005) .......... 5, 14

Franklin Fed. Sav. Bank v. United States,
55 Fed. Cl. 108 (2003) .......... 5, 14

Glendale Fed. Bank, FSB v. United States,
54 Fed. Cl. 8 (2002), aff'd, 378 F.3d 1308
(Fed. Cir. 2004), cert. denied, 544 U.S. 904 (2005) .......... 5, 14

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) .......... passim

Glendale Fed. Bank, FSB v. United States,
378 F.3d 1308 (Fed. Cir. 2004), cert. denied, 544 U.S. 904 (2005) .......... 5, 13, 21

Granite Mgmt. Corp. v. United States,
58 Fed. Cl. 766 (2003), aff'd in part, vacated
in part, & remanded, 416 F.3d 1373 (Fed. Cir. 2005) .......... 14, 15

Granite Mgmt. Corp. v. United States,
73 Fed. Cl. 155 (2006) (appeal pending) .......... 26

Granite Mgmt. Corp. v. United States,
416 F.3d 1373 (Fed. Cir. 2005) .......... 5, 15

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) .......... 15, 20

Howard Indus. v. United States,
126 Ct. Cl. 283, 115 F. Supp. 481 (1953) .......... 3

LaSalle Talman Bank, F.S.B. v. United States,
317 F.3d 1363 (Fed. Cir. 2003) .......... 5, 13

Landmark Land Co. v. United States,
256 F.3d 1365 (Fed. Cir. 2001) .......... 15, 20

Long Island Sav. Bank, FSB v. United States,
60 Fed. Cl. 80 (2004), rev'd on other grounds,
476 F.3d 917 (Fed. Cir. 2007) .......... 5, 14

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) .......... 20

Rumsfeld v. Applied Cos., Inc.,
325 F.3d 1328 (Fed. Cir. 2003) .......... 20

S. Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003) .......... 14, 43

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) .......... 20

Standard Fed. Bank v. United States,
62 Fed. Cl. 265 (2004) .......... 14

Westfed Holdings, Inc. v. United States,
407 F.3d 1352 (Fed. Cir. 2005) .......... 13

## STATUTES

Financial Institutions Reform, Recovery and
Enforcement Act, Pub. L. 101-73, 103 Stat. 83 (1989) ........ 2

## RULES AND REGULATIONS

Office of Thrift Supervision Regulatory Bulletin 3a-1 ........ 34

RCFC, Rule 52(c) ........ 1, 2

## MISCELLANEOUS

3 Daniel B. Dobbs, Law of Remedies, §12.3(1) (2d ed. 1993) ........ 15

Charles T. McCormick, Damages §142 (1935) ........ 15

Restatement (Second) of Contracts § 347, cmt. b (1981) ........ 20

Restatement (Second) of Contracts § 352 (1981) ........ 20

Restatement (Second) of Contracts § 384(1), cmt. a ........ 11

Restatement (Second) of Contracts § 371, cmt. a ........ 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,** | |
| **Plaintiff,** | |
| **v.** | **No. 95-468C** |
| | **(Judge Thomas C. Wheeler)** |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**DEFENDANT'S MOTION**
**FOR JUDGMENT BASED UPON PARTIAL FINDINGS**

Defendant, the United States, respectfully requests the Court to enter judgment pursuant to Rule 52(c) for the Rules of the United States Court of Federal Claims ("RCFC") against plaintiff, Astoria Federal Savings & Loan Association ("Astoria"). Based upon the applicable precedent and the record Astoria has presented, Astoria cannot prevail upon any of its claims. Accordingly, we are entitled to judgment as a matter of law with respect to Astoria's restitution, reliance, and expectancy damages claims. In support of this motion, we rely upon the record established at trial, the parties' deposition designations, the parties' joint stipulations of fact ("Stip."), and the following brief.

**INTRODUCTION**

Rule 52(c) allows for the entry of judgment upon partial findings at the close of a party's case if that party has been fully heard and the Court finds that the party is not entitled to judgment as a matter of law. Here, Astoria has made a detailed presentation of its claims and has been fully heard.

Astoria has raised four claims, all of which fail. First, Astoria's restitution claim – premised upon the idea that the Government avoided the cost of liquidating Suburbia Federal Savings and Loan Association ("Suburbia") – fails as a matter of law under binding precedent, as Astoria has not demonstrated why the facts it has entered into the record in its case-in-chief somehow render its restitution claim distinguishable from the restitution claims denied in other cases. Second, Astoria's reliance claim – premised upon the notion that Suburbia's net liabilities at the time of its acquisition by Fidelity New York, F.S.B. ("Fidelity") represented a cost to Fidelity – is also barred as a matter of law under binding precedent, as Astoria cannot show that any facts it has placed on the record render that claim viable either. Third, Astoria's lost profits claim fails because it (1) is entirely hypothetical, (2) bears no relation to Fidelity's pre-breach plans, or to its earnings history, (3) begins calculating damages prior to the enactment of the Financial Institutions Reform, Recovery and Enforcement Act, Pub. L. 101-73, 103 Stat. 83 (1989) ("FIRREA"), and (4) fails to cease calculating damages upon Astoria's acquisition of Fidelity, which rendered all further alleged lost profits remote. Finally, Astoria's claimed wounded bank damages are unrelated to the breach and speculative.

## ARGUMENT

### I. Standard Of Review

Rule 52(c) provides that, during trial, the Court may enter judgment against a party when it determines that an issue must be decided against that party under controlling law. See Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 101-02 (2004). The applicable standard is not whether the plaintiff has made a prima facie case, as it would be for a directed verdict motion in a jury trial. See Cooper v. United States, 37 Fed. Cl. 28, 35 (1996). Instead,

because the Court serves "as both the trier of fact and the trier of law," Rule 52(c) "permits the judge to weigh evidence and does not require that the judge resolve all credibility determinations in favor of the plaintiff." Id. "A plaintiff who has had full opportunity to put on his case and has failed to convince the judge, as trier of facts, of a right to relief, has no legal right . . . to hear the defendant's case." Howard Indus. v. United States, 126 Ct. Cl. 283, 289-90, 115 F. Supp. 481, 484-85 (1953).[1]

## II. Astoria Has Failed To Prove Entitlement To An Award Of Restitution

In denying the Government's motion for summary judgment respecting Astoria's restitution claim, the Court noted that "Plaintiff contends with documentary support that the facts of this case are more compelling than in other Winstar-related cases, and that an opportunity to present this evidence should not be foreclosed." Astoria Fed. Sav. & Loan Ass'n v. United States, 72 Fed. Cl. 712, 718 (2006). Having been given the opportunity to present its best case, Astoria has demonstrated no evidence of any kind to distinguish its restitution claim from those raised in the cases that reject such claims in Winstar cases.

### A. Description Of Astoria's Restitution Claim

Astoria's expert, Dr. Donald Kaplan, admits that the $128.259 million in restitution he describes is premised upon the notion that the Government, specifically the Federal Savings and Loan Insurance Corporation ("FSLIC"), avoided the cost of liquidating Suburbia. This cost is essentially equivalent to the goodwill that was estimated to arise from the Suburbia acquisition. PDX 105; Tr. 3344-45 (Kaplan); compare Stip. ¶ 40 with Stip. ¶ 61. Dr. Kaplan also admits that

[1] Contrary to the Court's comments at trial transcript ("Tr.") 2628, the Court need not "construe all the evidence thus far in plaintiff's favor and determine whether there's any possibility that they can prevail."

his restitution claim runs explicitly counter to repeated Federal Circuit decisions. PX 1314A ¶ 93. Nevertheless, Dr. Kaplan assumes that FSLIC received a $147.936 million economic benefit, which is the estimated amount of the liquidation costs. He then offsets this gross amount with selected benefits Fidelity gained from acquiring Suburbia: $16 million in cash assistance from FSLIC and $3.7 million in cash paid to Fidelity in 1990 for redemption of Suburbia's net worth certificates ("NWCs"). Finally, he concludes that the Government owes Astoria $128.259 million in restitution, in addition to his $1.4 million wounded bank claim. PDX 105. For the reasons given below, Dr. Kaplan's restitution claim fails.

**B. The Federal Circuit Has Rejected Restitution Claims Premised Upon Avoided Liquidation Costs**

The Federal Circuit has repeatedly rejected the use of liquidation costs as a basis for a restitution claim. In Glendale Fed. Bank, F.S.B. v. United States, 239 F.3d 1374 (Fed. Cir. 2001), the Federal Circuit stated that "the action taken by the purchasing S&L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift. What the Government received in exchange for its promise was time – time to deal with other failing S&Ls, time to see what the market would do before having to commit substantial resources to the problem. Though the value of time was more than zero, there is no proof of what in fact it was worth." Id. at 1382. The Glendale Court further stated, "[i]t is important to remember that, even after Glendale's merger with Broward [the acquired thrift], the Government was not free of potential liability for the failing thrift." Id. "Had interest rates not come down, and Broward, and perhaps Glendale as well, failed, the Government's contingent liability would have matured, and the FSLIC would have had to step in at that time

and assume the very losses that Glendale now claims were benefits the Government received." Id. The Federal Circuit also noted that FSLIC had several options other than liquidation it could have pursued. For all of these reasons, the Federal Circuit concluded that a restitution award based upon the supposed liquidation costs of the acquired thrift was merely a "speculative assessment of what might have been" and therefore vacated the trial court's award based upon that theory. Id.

While no restitution claim premised upon liquidation costs in the Winstar context has ever been sustained, this Court and the Federal Circuit have repeatedly followed the Glendale decision. See California Fed. Bank, v. United States, 245 F.3d 1342, 1351-52 (Fed. Cir. 2000); Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1380-81 (Fed. Cir. 2005); Glendale Fed. Bank, F.S.B. v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1366-67 (Fed. Cir. 2003); Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 298 (2005), aff'd in part, rev'd in part and remanded, 470 F.3d 1044 (Fed. Cir. 2006); Long Island Sav. Bank, FSB v. United States, 60 Fed. Cl. 80, 96 (2004), rev'd on other grounds, 476 F.3d 917 (Fed. Cir. 2007); Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223, 245 (2003) (appeal pending on other issues); Franklin Fed. Bank v. United States, 55 Fed. Cl. 108, 120 (2003); Citizens Fed. Bank v. United States, 52 Fed. Cl. 561, 566 (2002), aff'd, 474 F.3d 1314 (Fed. Cir. 2007).

### C. No Record Evidence Renders Astoria's Restitution Claim Viable

Nothing distinguishes this case from the cases rejecting restitution claims premised upon avoided liquidation costs. Indeed, to the extent any factual distinctions exist, those distinctions show that Suburbia was less likely to be liquidated than the average thrift.

### 1. Astoria Has Failed To Distinguish The Economic Or Regulatory Environment Under Which Suburbia Was Operating From That Of Other Thrifts

Like all of the restitution claims rejected by the Federal Circuit and by this Court, Astoria's claim erroneously assumes liquidation was FSLIC's only option had Fidelity not merged voluntarily, Tr. 209-10 (Spaid); Tr. 1364 (Vigna), with Suburbia. Kane Depo. 40-41; 109-10. In fact, liquidation was the regulators' last of eight options, and there were several forms of liquidation that were less costly than a payout of funds to depositors, the option upon which the Astoria bases its liquidation cost estimate, including FSLIC's keeping Suburbia's franchise. Tr. 292 (Fiol); Tr. 1316-17 (Vigna); Tr. 1159-65, 1224-26 (Beesley); PX 1341 at 1235; PX 986 at AST064190; PX 112 (explained at Tr. 1512 (Vigna); PX 370); see also Tr. 3360 (Kaplan).

Liquidation was a last option because the entire thrift industry was insolvent on a mark-to-market basis. Tr. 1737, 1748-49 (Wesp); Tr. 2713 (Kaplan). In the early 1980s, FSLIC could not afford to liquidate thrifts given its lack of funds and the fact that those funds were tied up in long-term investments. Tr. 114, 128 (Pratt); Tr. 1151-53; 1233-34 (Beesley); PX 286 at 14, 16, 76; see also Tr. 2712-13, 3373 (Kaplan). Dr. Kaplan acknowledged that after the Economy Savings payout in 1980, no liquidations that actually cost FSLIC the entire estimated liquidation cost were undertaken ever again. Tr. 3360 (Kaplan) (no payout after 1980). Testimony from regulators acknowledged that, had interest rates fallen, contrary to FSLIC's contemporaneous interest rate assumptions, FSLIC's liquidation and viability analyses would have been inaccurate. Tr. 247-48, 249-50 (Spaid); Tr. 315, 318 (Fiol); Tr. 1215-17 (Beesley); see also Tr. 3347, 3351 (Kaplan) (admitting that interest rates may affect liquidation cost analyses, and that the cost would have been lower with an interest rate assumption of lower than 14.73%). Interest rates are

notoriously difficult to project, Tr. 279 (Fiol), and in the year following the liquidation analysis in this case, short term Treasury rates – which mirror rates on short-term deposits, Tr. 317 (Fiol) – fell 300 basis points, severely altering the cost of liquidation. Tr. 251, 261 (Fiol); Tr. 2725, 3353 (Kaplan) (interest rates fell "dramatically").

As with the restitution claims rejected in other cases, Astoria's claim ignores FSLIC's contingent liability for insuring deposits after the merger. Tr. 1217-18 (Beesley); Tr. 1506 (Vigna); Tr. 3368 (Kaplan). It also ignores the speculative nature of the contingent liability, which never came to pass. Tr. 1220-22, 1238-40 (Beesley). Further, the restitution claim ignores the fact that liquidation would have lowered public confidence in the thrift system, so FSLIC wished to avoid liquidation as an overall policy matter for that reason as well. Tr. 225-27 (Spaid); Tr. 1386 (Vigna). Indeed, it also ignores the reality that, had interest rates not fallen, no thrifts would have survived, Tr. 129 (Pratt), thus saving FSLIC nothing.

The approval of Suburbia's acquisition by Fidelity was, like all such approvals, merely a stop-gap measure intended to buy FSLIC time for interest rates to fall so that thrifts' asset values would no longer be exceeded by their liabilities' costs industry-wide. Tr. 115, 116, 120 (Pratt); see also Tr. 85 (Pratt) (interest rates are beyond FSLIC's control). The fact that all resolutions of troubled thrifts were accompanied by cost comparisons to liquidation did not mean FSLIC was actually considering liquidation. Such comparisons were required by law. Tr. 117 (Pratt); Tr. 265 (Spaid); Tr. 307 (Fiol); Tr. 3362 (Kaplan). All of these facts are common to both Astoria's claim and the rejected restitution claims in other cases.

### 2. To The Extent Any Facts Distinguish Suburbia From Other Troubled Thrifts, They Show FSLIC Was Less Likely To Liquidate Suburbia

All of the facts that show any deviation between Suburbia's status and that of the average troubled thrift make Suburbia a less likely liquidation candidate.

Although the evidence reveals that, at the time of the merger, Suburbia was not insolvent on a regulatory accounting basis, Tr. 195 (Spaid) (Suburbia regulatory net worth as of August 31, 1984 was $1.8 million); Tr. 1024 (Teurfs), Dr. Kaplan emphasizes that Suburbia was insolvent on a book, or GAAP, accounting basis (subtracting the deferred loan losses, appraised equity capital, and net worth certificates that FHLBB permitted Suburbia to count towards its regulatory net worth) with a negative book net worth of $57,756,000. PDX 100; Tr. 3194, 3356-57 (Kaplan). He claims this fact distinguishes this case from all the others in which restitution damages have been rejected. Tr. 3194 (Kaplan). That argument fails to comprehend the nature of Suburbia's situation. Suburbia, apart from the inflated (though negative) net worth it had on a book basis, was $160.093 million insolvent on a marked-to-market basis. PDX 100. That is the liability FSLIC sought to avoid. Yet that $160.093 million amount pales in comparison to the amounts of the mark-to-market capital deficits in other cases where restitution was rejected. In Glendale, 239 F.3d at 1377, the Federal Circuit rejected a restitution claim where the liabilities exceeded the assets as of November 1981 by $734 million; that amount is larger than all of Suburbia. In CalFed, 245 F.3d at 1345, 1351, the Federal Circuit rejected a restitution claim where the liabilities exceeded the assets in two transactions, both in 1982, by a total amount of $620 million. Restitution is no more warranted in this case because of an irrelevant negative book capital amount. Moreover, other Winstar-related cases indicate that institutions with

negative book net worth were not liquidated, contrary to Dr. Kaplan's argument. See, e.g., Franklin Fed. Sav. Bank v. United States, 431 F.3d 1360, 1361 (Fed. Cir. 2005).

Facts in the record that are relevant to the question of whether Suburbia would have been liquidated indicate that Suburbia was less likely than the average troubled thrift. Suburbia was repeatedly found to be a troubled institution prior to the merger with Fidelity, but FSLIC repeatedly gave Suburbia assistance in the form of NWCs and approved equity capital ("AEC") to boost its regulatory net worth and allow it to buy time until interest rates declined. Tr. 1346-47, 1349, 2753-54, 2755, 2757-58, 2850 (Vigna) (had Fidelity not acquired Suburbia, FSLIC could still have provided it more NWCs); DX 3187 at WOH020 0330; DX 3159; PX 132 at 2590; see also Tr. 2875 (Kaplan) (discussing Suburbia's use of another regulatory accounting tool – deferred loan losses).

Regulators also approached Suburbia for participation in the voluntary assisted merger program ("VAMP") in another effort to prevent liquidation. Tr. 1344 (Vigna); PX 132. Astoria's claim ignores the fact that, in the absence of Fidelity's offer, FSLIC could and would have re-bid Suburbia, choosing to approve the Fidelity offer only because, while a re-bid could still have resulted in a lower cost offer, Fidelity's voluntary proposal was on the table and was good enough to approve, and FSLIC did not want to risk losing it. Tr. 212, 229, 232, 241, 265, 272 (Spaid); Tr. 1213-15 (Beesley); PX 112 at 9-10; see also Tr. 282-83 (Spaid) (could have been lower cost bids given that each thrift would have its own perspective on the value of Suburbia). Indeed, Mr. Lovely testified that out-of-state acquirers were interested in Suburbia. Tr. 1625-26 (Lovely).

Also, given that Suburbia had spread problems, and not asset quality or fraud issues, FSLIC could have simply done nothing had the Fidelity offer not materialized, or prolonged Suburbia's independent existence through issuance of NWCs, hoping for interest rates to drop. Tr. 212, 214-15, 223, 235, 266-67 (Spaid); Tr. 1272, 1278, 1298 (Vigna); Tr. 3362 (Kaplan); see also Tr. 1237-38 (Beesley) (spread problems solved with reduction in interest rates, unlike asset quality problems). Because Suburbia's problems were spread problems, its resolution was hardly urgent for FSLIC. Tr. 162-63 (Spaid); see also Tr. 1272, 1306, 1502-03, 1506 (Vigna) (despite deteriorating condition of Suburbia, FSLIC did not liquidate when the only problems were spread-related); Tr. 1727 (Wesp). In addition, Suburbia had an asset size larger than the norm in the early 1980s, which meant that FSLIC was less likely to liquidate it. Tr. 1236-37 (Beesley).

Astoria's claim also ignores Fidelity's inability to have saved Suburbia had interest rates not fallen, given its own mark-to-market insolvency. Tr. 1184-85 (Beesley). Not only was Fidelity not being asked to, but it could not afford to cover the gap between Suburbia's liabilities and assets with a payment. Tr. 263 (Spaid); Tr. 3234 (Kaplan). Fidelity certainly lacked the economic capacity to provide a benefit in the amount claimed by Astoria. As of August 31, 1984, Fidelity had only $22.1 million in book capital, PX 237 at AA0000177, and that figure was almost certainly overstated. Tr. 1737, 1748-49 (Wesp); Tr. 2713 (Kaplan) (all thrifts insolvent on a mark-to-market basis). Fidelity could not have provided any benefit to the Government.

Moreover, any such benefit would not have been foreseeable: had interest rates dropped, Suburbia would not have required liquidation, but if they rose, FSLIC would have remained liable for the losses of Suburbia, as well as those of Fidelity. Tr. 1506 (Vigna) (Government still

insured deposits of Suburbia after Fidelity acquisition). In reality, following the acquisition, interest rates fell, reducing FSLIC's exposure to any losses.

FSLIC also did not liquidate thrifts which, like Fidelity, had prospects for growth. Tr. 1243 (Beesley); Tr. 1298 (Vigna); see also Tr. 1506 (Vigna) (Suburbia buyer would be found given Suburbia's franchise value). FSLIC liquidated zero New York thrifts from 1980 through 1989. Tr. 1503 (Vigna). Indeed, FSLIC even informed Suburbia's board that it would be expected to continue to operate even if it became insolvent on a regulatory basis. Tr. 1301-02 (Vigna); PX 52 at 2. For all of these reasons, Suburbia was less likely to be liquidated than the average thrift. Indeed, Dr. Kaplan has testified that he could not say that FSLIC would have liquidated Suburbia absent the merger. Tr. 3363 (Kaplan).

### D. Restitution Claim Fails To Meet Other Legal Requirements

Another obstacle to Astoria's claim is that, to obtain restitution, Astoria must return the benefits it has received from the contract. See Restatement (Second) of Contracts § 384(1), cmt. a; accord Aktieselskabet Dampskibsselskabet Svenborg v. United States, 131 Ct. Cl. 399, 130 F. Supp. 363, 367 (1955). If those benefits to be returned have been "substantially altered in character," restitution is generally unavailable. See Restatement (Second) of Contracts § 384, cmt. a, § 371, cmt. a; accord Aurigemma v. Arco Petroleum Prods. Co., 734 F. Supp. 1025, 1032-33 (D. Conn. 1990). Here, Astoria's restitution claim fails for both reasons.

First, Fidelity received millions of dollars in direct, identifiable benefits from acquiring Suburbia, in the form of accretion of discounts, Stip. ¶ 60, DX 3026 at PAA006 1365 ($8.2 million in accretion income in 1987 alone); see also Tr. 676 (Powderly), gains on asset sales, DX 3026 at PAA006 1385 (sale of Suburbia's conventional and mortgage-backed securities for a

profit); PX 986 at 4, and tax benefits. DX 3205 at 1 ($74 million in net operating loss tax deductions inherited from Suburbia). Astoria also currently retains deposits from former Suburbia branches that are extremely valuable. Tr. 821-22 (Powderly); see also Tr. 1561-62, 1566-67, 1604-05, 1608, 1611-12 (Lovely) (Suburbia's branch network "impressive"). These benefits combine to exceed any alleged benefit Fidelity conferred upon the Government.

Second, to quantify all of Fidelity's and Astoria's benefits from the acquisition is impossible: it would require the Court to unwind nearly two decades of Fidelity's and Astoria's business decisions. Dr. Kaplan testified that after the Suburbia merger with Fidelity, "the eggs had been scrambled, and there was no unscrambling of the eggs." Tr. 3192 (Kaplan); see also Tr. 3264 (Kaplan). Here, the Government conferred benefits which have been altered beyond recognition. For these reasons as well, Astoria's restitution claim fails.

## III. Astoria's Reliance Claim Fails As A Matter Of Law And Fact

In denying our motion for summary judgment respecting Astoria's reliance claim, the Court recognized that "existing precedent may tilt in Defendant's favor," but that "[t]he issues to be addressed are decidedly factual, and therefore a trial is necessary." Astoria, 72 Fed. Cl. at 718. Astoria has now had its chance to present all of the evidentiary support for its reliance claim, and has failed to distinguish its case from those of the numerous plaintiffs whose net liabilities assumed reliance claims were rejected.

### A. Description Of Astoria's Reliance Damages Claim

Dr. Kaplan's reliance damage claim begins with an assumption that, when Fidelity assumed the $160.093 million in net liabilities by acquiring Suburbia, the liabilities represented a cost to Fidelity. PDX 106. From this assumed "cost," Dr. Kaplan deducts $16.1 million in

FSLIC's direct cash assistance and $3.7 million in cash provided to Fidelity by the Federal Deposit Insurance Corporation ("FDIC") in December 1990, upon retirement of Fidelity's NWCs. This left leaving $140.416 million in costs, according to Dr. Kaplan. PDX 106. To that amount, Dr. Kaplan adds the $1.432 million in wounded bank damages, for a total of $141.848 million. PDX 106. As we explain below, because Astoria's claim is barred by binding precedent, and also ignores other required offsets, it is barred.

### B. The Federal Circuit Has Rejected Reliance Claims Premised Upon Net Liabilities Assumed

The Federal Circuit has repeatedly rejected reliance damages claims premised upon the net liabilities assumed by an acquiring thrift. The Federal Circuit has foreclosed reliance damages premised upon net liabilities assumed because the assumption of net liabilities represented only a potential cost, represented by a paper calculation, and not an actual expenditure. See Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1371 (Fed. Cir. 2005); Glendale, 378 F.3d at 1313; CalFed, 245 F.3d at 1351; Glendale, 239 F.3d at 1382-84.

As stated by the Federal Circuit in LaSalle, which addressed a net liabilities assumed restitution claim, "[a]lthough the assumed liabilities are indeed an accounting cost, . . . we agree with the Court of Federal Claims they are not a usable measure of either cost to the thrift or benefit to the government, and thus not an appropriate threshold for restitution damages." LaSalle, 317 F.3d at 1376. "[T]he accounting rearrangement whereby net liabilities are designated a paper asset does not create a 'cost' subject to restitution for full cash value, reduced only by real cash infusions and real cash profits." Id. at 1377. As the Federal Circuit stated, the same prohibition bars reliance as well as restitution claims premised upon net liabilities assumed

because in this context, prohibited restitution claims premised upon net liabilities assumed can be seen as reliance claims: "When restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages, wherein the non-breaching party is restored to its pre-contract position by returning as damages the costs incurred in reliance on the contract." Id. at 1376; see also Tr. 3341 (Kaplan) (liquidation cost and net liabilities assumed just a matter of "flip[ping] the coin"). Based upon Federal Circuit precedent, this Court has repeatedly dismissed both restitution and reliance claims premised upon the notion that assumed net liabilities represent a cost. See Standard Fed. Bank v. United States, 62 Fed. Cl. 265, 295-99 (2004); Long Island, 60 Fed. Cl. at 96; Granite Mgmt. Corp. v. United States, 58 Fed. Cl. 766, 776 (2003); S. Nat'l Corp. v. United States, 57 Fed. Cl. 294, 300 (2003); Fifth Third, 55 Fed. Cl. at 245-46; Franklin, 55 Fed. Cl. at 120-21; Glendale Fed. Bank, FSB v. United States, 54 Fed. Cl. 8, 13 (2002).

The argument that the net liabilities represent costs actually paid falls flat, as other plaintiffs failed when advancing that same argument. As stated by this Court in Granite:

> It is inappropriate, however, to argue that the liabilities were paid as they came due and yet include the entire amount of net liabilities assumed on the date of acquisitions in the cost of performance calculation. . . . While it is possible that plaintiff may have paid off some of the liabilities, it is impossible to discern what portion was actually paid out when the entire amount of net liabilities is included as a cost.

Granite, 58 Fed. Cl. at 775-76. Accordingly, because Dr. Kaplan has not identified any actual "cost" as the basis for his claim in this case, it fails. See also Standard Fed., 62 Fed. Cl. at 298 (denying same claim brought by Dr. Kaplan).

Finally, the Federal Circuit has ruled that, even if the net liabilities assumed did constitute a cost to the acquirer, that cost was incurred prior to FIRREA, and accordingly was unrelated to the breach, making awarding such an amount an impermissible windfall. See Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1380 (Fed. Cir. 2005).[2]

Moreover, any claimed reliance damages must be offset by any benefits the plaintiff received from the contract. See 3 Daniel B. Dobbs, Law of Remedies § 12.3(1), at 51-52 (2d ed. 1993); Carley Capital Group v. City of Newport News, 709 F. Supp. 1387, 1399 (E.D. Va. 1989); Charles T. McCormick, Damages § 142, at 584 (1935). Reliance damages are subject to the ordinary limitations upon contract remedies, including causation, certainty, and foreseeability. See Granite, 58 Fed. Cl. at 774. In order to be entitled "to recover reliance damages, plaintiffs must prove that both the magnitude and type of damages were foreseeable" at the time the contract was made. Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (emphasis added). Accordingly, reliance is also barred because Astoria did not and, indeed, cannot show that Fidelity made net out-of-pocket expenditures that were caused by the phase-out of goodwill, were reasonably certain, and were foreseeable at the time of the Suburbia acquisition.

### C. The Record Evidence Does Not Support Astoria's Claim That The Net Liabilities Assumed Represented A Cost To Fidelity

The evidence fails to distinguish Astoria's net-liabilities-assumed reliance claim from identical claims rejected in other cases.

[2] As windfalls are not permitted for restitution either, this rationale also bars a restitution award for net liabilities assumed. See Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1315 (Fed. Cir. 2004).

**1. The Same General Scenario Applies To The Suburbia Acquisition As To The Other Cases Rejecting Identical Reliance Claims**

Dr. Kaplan admitted that the concept behind Astoria's reliance claim was no different from that in the reliance claims in every other case and was unrelated to the specific facts of the thrift involved. Tr. 3256 (Kaplan) ("[Goodwill] is not an item that gets adjusted over time because of any behavior with regard to the loans that were on the books that were in the mark-to-market."). As witness testimony repeatedly confirmed, the dollar amount of net liabilities assumed at the time of the merger represented only a paper calculation, Tr. 1566-67, 1623 (Lovely) ("phantom" money), not an actual payment. Tr. 1044-45, 1113 (Teurfs) (no cash payment in Suburbia transaction); Tr. 2053-54 (Wesp) (goodwill insensitive to interest rates, has no impact on net income or asset value); Tr. 3234 (Kaplan). Moreover, it is undisputed that Suburbia's liabilities out-valued its assets at the time of the merger solely due to interest rates being high; when interest rates dramatically declined following the merger, the values of the assets grew and were capable of covering the lessened costs of the liabilities, preventing Fidelity from ever needing to incur any cost to pay them. Tr. 263 (Spaid) (Fidelity not expected to pay the gap between Suburbia's liabilities and assets); Tr. 1103-04, 1105-06 (Teurfs) (asset and liability values change over time with interest rates and mortgage prepayment rates); Tr. 1220-22 (Beesley); Tr. 1906 (Wesp); Tr. 3273 (Kaplan); Kane Depo. 16-17, 24-25, 48-49, 49-50, 52-54, 59, 82. The calculation of actual costs paid – Suburbia's liabilities paid when they came due versus the value of the proceeds from Suburbia's assets – is admittedly impossible, Tr. 1105 (Teurfs), and Dr. Kaplan did not premise his calculated reliance cost upon the liabilities having been paid. Tr. 3233, 3330 (Kaplan); see also Tr. 3235-38, 3244 (Kaplan) (reliance model

contains no calculation of deposits being paid). Moreover, as Suburbia was acquired for fair market value, no evidence exists to suggest that Fidelity paid any cost when it voluntarily acquired Suburbia.

To the extent that Astoria argues that the goodwill expense after the "cross-over point" leading to net negative purchase accounting income reflected a "payment" by Fidelity, Rough Tr. (May 14, 2007) 131 (Kaplan), that "payment" was merely a paper offset to income that did not reflect any economic reality, and occurred because of an accounting change specifically requested by Fidelity in conjunction with the Suburbia acquisition. Compare PX 185 with PX 303; Tr. 1392 (Vigna); Tr. 2909 (Kaplan); see also Tr. 1406 (Vigna) (goodwill expense not a "drain"); Tr. 3234 (Kaplan) (goodwill amortization bore no relation to liabilities actually being paid). Accordingly, nothing presented by the plaintiffs permits the reliance claim to survive.

**2. The Facts Demonstrate That Dr. Kaplan Ignores Significant Benefits That Constitute An Offset To His Claimed Reliance Damages**

In addition to being foreclosed by precedent and conceptually flawed, Dr. Kaplan's model omits several obvious benefits that are required to be offset against the "cost" Fidelity allegedly suffered in acquiring Suburbia. The model ignores tens of millions of dollars in net operating loss ("NOL") tax deductions Fidelity received from Suburbia, Tr. 885-86 (Powderly); Tr. 1110 (Teurfs); Stip. ¶ 60, – net operating loss deductions which, when taken, reduce the outstanding balance of goodwill. Tr. 1114, 1135 (Teurfs); see also Tr. 2991 (Kaplan) (NOL exercise reduces goodwill balance). The model also ignores cash derived from the sale of discounted Suburbia assets. Tr. 1111 (Teurfs) ($128 million in Suburbia mortgages sold by Suburbia); Tr. 1729 (Wesp) ($100 million in cash from sale of Suburbia assets); DX 3478 at AST0129893 ($2.8

million profit in sale of Suburbia assets in 1991). Similarly, the model ignores income Fidelity enjoyed as the result of discount accretion – which represented real cash repayments of interest and principal on loans. Tr. 1030 (Teurfs) (Fidelity "appreciated" purchase accounting income benefit); Tr. 2736, 3256 (Kaplan) (thrift profits high in mid-1980s due to purchase accounting income); see also Tr. 1046-47, 1107, 1109-10 (Teurfs). In addition, the model ignores $1 million in annual economies of scale. DX 3148 at 0102; Tr. 1516 (Vigna); Tr. 1632-33 (Lovely). Most egregiously, Dr. Kaplan's model ignores the benefit to Astoria from retaining Suburbia's valuable franchise. Tr. 1517 (Vigna); Tr. 3263, 3264, 3326 (Kaplan) (no attempt to calculate benefit from Suburbia franchise); PX 986 at AST064190, Stip. ¶ 58. Dr. Kaplan omitted this offset despite admitting that calculating Suburbia's franchise value was possible, and that the Suburbia franchise had value to Fidelity. Tr. 3334, 3338 (Kaplan). These ignored offsets render Dr. Kaplan's model unreliable, and likely swamp Dr. Kaplan's claimed "costs."

Dr. Kaplan argues that, because Suburbia was insolvent at the time of the merger, no benefits could be derived from acquiring it until it regained solvency. Tr. 3264 (Kaplan) (off set is an "all-in" concept). This is illogical because the initial cost against which the benefits offset (the net liabilities assumed) reflect the measure of the insolvency. Dr. Kaplan's argument means that either (1) Fidelity derived more than the amount of the net liabilities assumed in benefits from Suburbia, in which case there are no damages, or (2) it derived less in benefits than the net liabilities assumed, in which case there are not only damages, but no offset. Because that result runs contrary to the Federal Circuit cases that require offsets be taken into account even where they do not wipe out the entire amount of claimed damages, Dr. Kaplan's argument, like the rest of his reliance damage claim, fails.

## III. Astoria's Expectancy Claims Fail As A Matter Of Law And Fact

Astoria claims it lost over a hundred million dollars in lost profits as well as wounded bank damages when goodwill no longer counted as capital for regulatory purposes. These claims fail.

### A. Overview Of Astoria's Expectancy Claims

Astoria advances three separate expectancy claims: (1) a claim for allegedly lost profits from 1989 to 1994; (2) a claim for allegedly lost profits from 1995 to 2014; and (3) a "wounded bank" claim for allegedly excessive assessments paid to the Office of Thrift Supervision ("OTS") and the FDIC.

### B. Legal Standards For Expectancy Damages

To recover expectancy damages, including lost profits, a plaintiff must prove three elements: (1) the lost profits were within the contemplation of the parties because the loss was foreseeable; (2) there would have been a profit but for the breach; and (3) the measure of damages must be reasonably certain. See California Fed. Bank v. United States, 395 F.3d 1263, 1266 (Fed. Cir. 2005).

With respect to causation, the plaintiff must prove that "profits would have been made but for the breach," Id. at 1268, "the causal connection between the breach and the loss of profits must be 'definitely established[,]'" id., and the lost profits must have "inevitably and naturally, not possibly or even probably, flow[ed] from the defendant's breach." Id. at 1267 (citation omitted).[3] Under Federal Circuit precedent, because a lost profits award should not place the

---

[3] We respectfully disagree with the Federal Circuit's decision in Citizens Federal Bank v. United States, 474 F.3d 1314 (Fed. Cir. 2007), which indicated that the trial court possessed discretion to impose a "substantial factor" test for causation. We are currently pursuing

plaintiff in a better position than it would have occupied absent the breach, costs that were caused to be borne by factors other than the breach must be subtracted from damages. See Hansen, 367 F.3d at 1315; Restatement (Second) of Contracts § 347, cmt. b (1981).

With respect to foreseeability, the Court examines whether the alleged loss was foreseeable at the time of contracting. Bohac v. Dep't of Agriculture, 239 F.3d 1339, 1340 (Fed. Cir. 2001). "Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Landmark, 256 F.3d at 1378 (citation omitted). Astoria must prove "both the magnitude and the type of damages were foreseeable." Id. (emphasis added).

In addition, Astoria must establish the fact of lost profits and prove the amount with reasonable certainty. See Rumsfeld v. Applied Cos., Inc., 325 F.3d 1328, 1340 (Fed. Cir. 2003) (citation omitted); Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002); Restatement (Second) of Contracts § 352 (1981). Unreliable lost profits models cannot give rise to recovery. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997); Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992). Because nearly every lost profits claim in Winstar-related cases has failed, the Federal Circuit has noted that these claims are often "inherently unreliable" and that lost profits models are largely a

---

rehearing of this decision. Regardless, the panel decision in Citizens Federal cannot be understood to overrule the previous panel decision in CalFed. Capitol Elec. Inc. v. United States, 729 F.2d 746 (Fed. Cir. 1984) (only Court sitting en banc can overrule earlier panel decision). To the extent that Citizens Federal permits this Court to apply the "substantial factor" causation standard at its discretion, this standard does not provide a lower standard of causation that the but-for test.

"waste of time and effort." Glendale, 378 F.3d at 1313. Moreover, where, as here, plaintiff's expert has failed to identify with specificity the investments the thrift would have made in the "but-for" world, this Court has rejected plaintiffs' lost profits claims. See, e.g., Citizens Fin. Servs., Inc. v. United States, 64 Fed. Cl. 498, 514 (2004). Similarly, the Federal Circuit has found that it is appropriate to deny lost profits claims in Winstar-related cases that assume that growth would have automatically led to profits. See, e.g., Glendale, 239 F.3d at 1378. Under these standards, all of Astoria's expectancy claims fail.

### C. Astoria's Lost Profits Claims Fail

Astoria's lost profits calculations from 1989 to 1994, and from 1995 to 2014, are factually speculative and legally insufficient. Messrs. Powderly and Wesp both provided testimony so utterly inconsistent with the premises of Dr. Kaplan's lost profits model that the testimony alone should be sufficient to defeat Astoria's claim. Specifically, Mr. Powderly testified on re-direct examination that the Capital Plan, which, contrary to Dr. Kaplan's model, provided for no asset growth, "formalized policies under which the bank generally had been operating since 1987." He testified:

> Q. Now I'd like you to go ahead in that same document to page 7. Mr. Todor referred you to I guess it's the third full paragraph on that page and the – it's all one sentence, the last sentence in that paragraph that begins "the capital plan, which was developed by Messrs. Powderly, Wesp and Meyer." Do you see that I referred to?
> A. Which is the one – number 7?
> Q. It's on page 7, and it's the third full paragraph on that page. And in the second half of the paragraph –
> A. Yes, I see it.
> Q. Okay. And that talks about the capital plan being "to a significant degree" – strike that, let me start that over again. The sentence says the capital plan, which was developed by

you, Mr. Wesp and Mr. Meyer, "to a significant degree formalized policies under which the bank generally had been operating since 1987." Was the capital plan in all respects something you had been operating under since 1987?

A. In many respects, yes.
Q. In all respects?
A. Yes, I believe so.
Q. With respect to your real estate operations, when was it that you began cutting off the real estate lending and sending the developers elsewhere?
A. As soon as I – as soon as I got the job of running that portfolio. I would say it was mid-'87.
Q. And does the reference there to 1987 refer to aspects of the bank's operation other than the real estate operations?
MR. TODOR: Objection; leading.
BY MR. EISENHART:
Q. If you know.
THE COURT: I'll allow it.
THE WITNESS: What was the question again?
BY MR. EISENHART:
Q. Does the reference there to the bank's operations since 1987 refer to things other than the real estate operations?
A. Yes.

Tr. 989-91 (Powderly) (discussing page 7 of PX 986 (AST064176), which projects: "No or little growth followed by moderate shrinkage in calendar year 1994."). Plainly, if Fidelity's Chief Executive Officer testified that Fidelity, since 1987, was not planning to grow, and given the corroboration of that statement in numerous formal filings of the company, PX 964 at OAA004 2506, 2541; PX 985 at AST064176, AST064193; PX 986 at AST064176, the Court must reject Dr. Kaplan's lost profits model, which is premised upon significant asset growth, must be rejected.

Moreover, Mr. Wesp testified that the Capital Plan saved Fidelity by permitting it to survive in desperate economic times. He testified:

> Q. Now, if Fidelity had its goodwill restored at this point in time in a but-for world, would it have abandoned its stated goal here of purchasing five- to seven-year duration balloon securities?
>
> A. The only way I can answer that question is we're getting close here to offering time. We're getting close to compliance. We're in '92, right? 1992?
>
> Q. September '92.
>
> A. So we're getting close to the point where we're coming – there's light at the end of the tunnel. And so rather than have the goodwill restored, we had the capital markets restore our capital. And when that happened, these remained our goals for the foreseeable future, as we talked about yesterday or the day before, I forget which. We had done road shows, we had indicated to the Street what we had been doing, which is run a short duration bond fund. Until they heard from us, until our institutional investors heard from us, when we did an institutional presentation about some other business that we wanted to be in, this was the way we were going to operate. We had a lot more latitude, a lot more flexibility and we could change our minds on a dime now, but on the day after the offering, we behaved the same way. If the goodwill had been reinstated the day after, we would have behaved the same way. By pure luck, this turned out to be a great strategy to survive one of the worst periods of economic recession and volatility in the post-war history.

Tr. 2359-61 (Wesp); see also Tr. 2301-02 (Wesp) (annual budgets and long-term strategic plans are immune to goodwill, which does not affect them). Plainly, if Fidelity would have behaved the same way with or without the goodwill, and moreover if the Capital Plan strategy that restricted growth "by pure luck" helped Fidelity survive "one of the worst periods of economic recession and volatility in post-war history," Astoria cannot claim that, with the goodwill, Fidelity would have grown, or that it would have survived had it tried.

**1. Description Of Astoria's Lost Profits Claims**

Looking first at the 1989-1994 claim, starting with Fidelity's December 31, 1988 tangible assets, Dr. Kaplan's model – what he describes as a "very simple calculation," Tr. 3045 (Kaplan) – assumes a two percent per quarter growth rate to calculate the but-for bank's tangible asset size. He subtracts Fidelity's actual tangible assets to calculate foregone assets. PX 1314A at Exh. 9A. Between December 1988 and March 1994, Dr. Kaplan assumes Fidelity's non-breach assets would have increased at his assumed growth rate from December 1988 levels, resulting in a total of $737 million in "foregone assets." PX 1314A at Exh. 9A. After March 1994, Dr. Kaplan stops this growth in "foregone assets" in accordance with Fidelity's real-world constant asset size in anticipation of merging into Astoria. PX 1314A at Exh. 9A. Finally, Dr. Kaplan multiplies foregone assets by an assumed 80 basis point, or 0.80 percent, earnings rate, to calculate lost profits. PX 1314A at Exh. 9A. Also, Dr. Kaplan purports to exclude non-earning assets from his foregone assets figure. PX 1314A at Exh. 9A, note a. Dr. Kaplan's model concludes that Fidelity forewent $22.3 million in lost profits it would have earned had it retained the right to use goodwill in regulatory capital, because it could have grown a profitable wholesale portfolio, involving "primarily" one-year adjustable rate mortgage backed securities ("ARM" "MBS") funded by one-year Federal Home Loan Bank ("FHLB") advances. PX 1314A at Exh. 9A; PDX 72; Tr. 3389 (Kaplan). Moreover, Dr. Kaplan provides an alternative calculation as a "demonstration" beginning January 1, 1990, using the same methodology and resulting in a $14.3 million damages figure. PX 1314A at Exh. 9B; Tr. 3076, 3134 (Kaplan). Dr. Kaplan makes all of these assertions while admitting that it would have been "speculative" to say what Fidelity

would have done absent the breach. Tr. 3094 (Kaplan). Dr. Kaplan further admits that he did not model a "but-for" world. Tr. 3524 (Kaplan).

Dr. Kaplan's lost profits claim for the period from 1995 through 2014 is similar to the model for his earlier damages period, although even less detailed respecting the basis for his calculations. Assuming, as he does, that Fidelity would have merged with Astoria absent the breach, Tr. 3147 (Kaplan), he uses Astoria's average leverage between 1995 and 2000 as the factor by which he divides the average balance of goodwill for each of those years. PDX 85. After 2000, he assumes the remaining balance of goodwill would be leveraged at seven percent per year. PDX 85. By dividing the average goodwill balance by the "leverage ratio," Dr. Kaplan arrives at what he terms "foregone earning assets." PDX 85. Dr. Kaplan multiplies the "foregone earning assets" by a hypothetical return on foregone assets of 0.80 percent per year, without any explanation of the identity of the assets purchased or the liabilities funding these assets. PDX 81, 85; see also Tr. 2231-32 (Wesp) (cost of funds relevant to determine spread, along with other factors). Dr. Kaplan's calculations result in "lost profits" of $87.687 million from 1995 through 2007, and $9.475 million in lost profits from 2008 through 2014 (discounted to 2007 dollars at a 10.5 percent rate), for a total of $97.161 million in lost profits from 1995 through 2014. PDX 85.[4]

---

[4] Dr. Kaplan testified: "My standard practice in this kind of analytic exercise is to try and build up a basis of support for a conclusion that I'm going to reach and adopt." Tr. 3099 (Kaplan). Dr. Kaplan's analytical method is exactly backwards, reaching his conclusion first and then seeking to justify it. This is the antithesis of scientific analysis. Moreover, given that Dr. Kaplan's model remains unsupported, he failed to live up to the standards of his conclusory methodology.

### 2. Dr. Kaplan's Post-Astoria Damages Are Speculative

With respect to Dr. Kaplan's damage calculation from 1995 onward, Dr. Kaplan cannot explain how Astoria would have received the benefit of Fidelity's goodwill absent the breach. One year after the conversion, in which Fidelity's shares sold at $11.50 per share, Astoria paid $29 in cash per share for Fidelity, Tr. 541 (Powderly), out of a desire to use the excess cash it obtained from its own conversion. Tr. 641-42 (Powderly); Quackenbush Depo. at 9-10, 21. Fidelity also wanted a cash transaction. Tr. 940 (Powderly). The use of cash required that the transaction be classified a "purchase" under generally accepted accounting principles ("GAAP"), which required a write-off of any goodwill on the books of the acquired entity. Tr. 1523 (Vigna) ("you can't transfer goodwill"), Tr. 1526 (Vigna) (discussing DX 294 – goodwill forbearance cannot be transferred), Tr. 2809-10 (Vigna) (goodwill created in new transaction; old goodwill doesn't have any real value). No evidence supports the assumption that any goodwill forbearance, let alone any goodwill, would have survived the acquisition. Granite Mgmt. Corp. v. United States, 73 Fed. Cl. 155, 161-64 (2006) (appeal pending) (goodwill not transferable in purchase accounting merger).[5]

Regulatory approval was required for transfer of the right to use goodwill as regulatory capital to Astoria, PX 268 at § 18, Rough Tr. (May 14, 2007) 26 (Kaplan), but such permission would not have been granted, as Mr. Vigna testified. Tr. 1522-23 (Vigna).

Dr. Kaplan cannot explain why he could ignore the costs Astoria would have incurred to acquire a much larger Fidelity absent the breach. Tr. 3610 (Kaplan).

---

[5] We note that Fidelity and Astoria did not place any value on this lawsuit in their price negotiations. Tr. 647, 966-67 (Powderly); Tr. 1970 (Wesp).

Finally, Astoria was flush with capital, Tr. 956 (Powderly); Tr. 1962-63 (Wesp) (Astoria had "excess capital"); Tr. 2793, 2794, 2801 (Vigna) (Astoria repurchased shares, which reduces capital); see also Tr. 1969 (Wesp) (Fidelity acquisition "solved" Astoria's "over-capitalization problem"). Had Astoria wished to engage in the kind of growth in a wholesale portfolio that Dr. Kaplan posits, it easily could have done so. Rough Tr. (May 14, 2007) 22 (Kaplan). That it did not undermines the assumption that Astoria would have pursued such growth absent the breach.

### 3. Dr. Kaplan's Pre-1994 Lost Profits Are Unsupported

Dr. Kaplan's wholesale portfolio is entirely unsubstantiated. While Dr. Kaplan claims he attributed the 0.80 percent annual return to mortgage-backed securities ("MBS") that Fidelity would have purchased, PX 1314A at Exh. 9A; PDX 85, he never specifies which securities Fidelity would have purchased. Tr. 3420-21, 3422, 3426 (Kaplan) (never modeled a specific securities portfolio); Tr. 764, 768-69 (Powderly), PX 447 at OAA005 1346; PX 599 at AST049054 (Fidelity had different kinds of MBS on its books). Nor is it clear whether one-year FHLB advances represent the only funding sources. Tr. 3452 (Kaplan).

In any event, contrary to Dr. Kaplan's idea that Fidelity would have used wholesale funding sources, the evidence appears to support the conclusion that MBS would have been purchased by Fidelity using ordinary deposits that could not be invested in one-to-four family mortgages. Tr. 728-32, 769-70, 796 (Powderly); Tr. 1758 (Wesp). Dr. Kaplan's alleged support for the 0.80 percent annual return is also faulty: none of the various spreads Dr. Kaplan identifies actually equal 0.80 percent; instead, Dr. Kaplan contends that 0.80 percent is a conservative spread because it is lower than the spreads he identifies. Tr. 3116-17. This 0.80 percent "conservative" spread allegedly takes into account all economic and other global factors,

and would have been earned regardless of any of them, Tr. 3382-84 (Kaplan) (would have been earned regardless of Gulf War, economic recession, unavailability of desired investments), despite the fact that any real portfolio would have been affected by these factors. Tr. 3642-44 (Kaplan). Such a guaranteed money-machine, Tr. 3451-52 (Kaplan), is utterly implausible. Indeed, Dr. Kaplan's lost profits methodology is no better than a black box in which, he pronounces, all variables affecting investment risk and return have been taken into account, nonetheless leading to a guaranteed net positive return on assets of 0.80 percent.

### 4. Dr. Kaplan's Pre-1994 Lost Profits Fail For Lack Of Causation

Astoria's pre-1994 lost profits suffers from three fundamental failures regarding causation. First, Dr. Kaplan cannot explain how alleged pre-FIRREA lost profits could possibly have been caused by the breach. Second, Dr. Kaplan ignores real-world problems constraining Fidelity's growth that were not caused by the breach. Finally, Dr. Kaplan cannot show that, after Fidelity's conversion in 1993, it faced any constraints on its growth. Accordingly, any decision not to grow and make use of a wholesale strategy after 1993 was not caused by the phase-out of goodwill from regulatory capital, but rather from Fidelity's independent business decisions.

#### a. No Causation For Pre-FIRREA Damages

First, while the Federal Circuit has not decided the precise accrual date of breaches caused by FIRREA, no court has held that FIRREA somehow caused a breach before Congress enacted the statute. See Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 880 (Fed. Cir. 1998). To the extent Dr. Kaplan continues to believe that damages should be calculated for any pre-FIRREA periods, the model fails for lack of causation.

If Fidelity was concerned about changing capital regulations before FIRREA, which its board minutes do not seem to indicate, see DX 2334, 2338, 2343A, 3348, 2353, 73; Tr. 1001-02 (Powderly), it was concerned about the imposition of risk-based capital requirements, not the phaseout of goodwill. PX 447 at OAA005 1315; Tr. 720, 743 (Powderly); Tr. 1811-13, 1828-30 (Wesp); Tr. 2705, 2715 (Kaplan). Whether goodwill would be phased out under any legislation was not known until final regulations came out. Tr. 1411-12 (Vigna); Tr. 2037-38. Because Fidelity never foresaw the phase-out of goodwill from regulatory capital, that is, the breach of contract, Tr. 1814-15 (Wesp) (never expected termination of goodwill as part of FIRREA), the breach could not have been motivated any pre-FIRREA activity.

**b. Fidelity Would Not Have Grown Absent The Breach**

Second, the evidence does not support the argument that absent the breach, Fidelity would have used an aggressive growth strategy in wholesale MBS assets and wholesale liabilities. Mr. Powderly repeatedly admitted on re-direct examination that Fidelity's capital plan – a no-growth plan – reflected Fidelity's strategy after 1987 "in all respects." Tr. 990-91 (Powderly) (emphasis added).

Transactions involving MBS investments were too risky to be undertaken in times of great economic distress. MBS transactions contained interest rate risk, especially when the market faced an inverted yield curve at varying points after the breach. Tr. 733-34 (Powderly); Tr. 2043-35, 2091 (Wesp); see also Tr. 1787 (Wesp) (RCA transactions involving MBS ruined New York institutions).[6] The inverted yield curve was unrelated to FIRREA. Tr. 2058 (Wesp).

[6] To the extent that Mr. Wesp testified that Fidelity was engaged in "risk-controlled arbitrage" ("RCA") in the late 1980s, Tr. 1788 (Wesp), he admitted that he never considered his strategy to be an RCA at the time. Accordingly, using RCA was not a conscious strategy.

Mr. Powderly admitted any growth would have likely been in one-to-four family mortgages, not in MBS. Tr. 396 (Powderly). To the extent MBS purchases were envisioned, they filled a gap in investments from available funding sources when one-to-four family mortgages were unavailable. PX 986 at AST064174; PX 1081 at WON759 1064; Tr. 935 (Powderly). Later, in its Capital Plan, Fidelity told regulators it rejected a number of alternatives before deciding to "[c]ontinue doing what we are doing." Tr. 423-24, 804 (Powderly); DX 78 at PAA052 2701-02. After FIRREA, Fidelity repeatedly affirmed that the Capital Plan strategy was "effectively the same" as a business plan that Fidelity had been following since 1987. PX 964 at OAA004 2506, 2541; PX 985 at AST064176, AST064193; PX 986 at AST064176; Tr. 935 (Powderly).[7]

In addition, fatal to the notion that any wholesale portfolio Fidelity would have utilized would have been as profitable as Dr. Kaplan contends, Mr. Powderly admitted that any funding source would have had to match the durations of any MBS purchases to keep interest rate risk low, Tr. 988-89 (Powderly); see also Tr. 2325 (Wesp) ("prudent" to go between short and long term borrowings); Tr. 2453-54 (Wesp) (7-10 year FHLB borrowings also purchased by Fidelity), and indeed, Mr. Wesp agreed that to fund longer term ARM MBS that he purchased in the early

---

Indeed, Mr. Wesp admitted Fidelity never wanted to be "overly dependent" on RCA, Tr. 1800-01 (Wesp), and later stated that merely obtaining a spread from assets and liabilities absent a hedge was not his idea of an RCA, which he never kept on the books, but represented "normal banking operations." Tr. 2285, 2287 (Wesp). Further complicating matters, Dr. Kaplan claims his model is not an RCA. Tr. 3476-77 (Kaplan).

[7] Mr. Powderly's argument that securities sales were needed to cover loan losses, Tr. 399, 400, 474, 489-90, 542, 560, 705-06, demonstrates by itself why any harm resulting from these sales harm is not traceable to the breach. Fidelity would have required the loan losses regardless of FIRREA due to Fidelity's history of bad commercial real estate loans.

1990s, Fidelity used long-term funding sources such as 15-year FHLB borrowings. Tr. 2018, 2282 (Wesp). Contrary to his assertion that his model generates profits without taking on any interest rate risk by matching asset-liability durations, Tr. 3470 (Kaplan), for Dr. Kaplan's model to generate the kind of spectacular returns he posits, there would have to be a major mismatch in durations between assets and liabilities to take advantage of falling interest rates. This would have significantly increased Fidelity's risk.

Dr. Kaplan noted that Fidelity could have simply kept $1 billion in MBS that it sold following the breach if it wanted to build a wholesale portfolio, but that Mr. Wesp did not "cho[ose] to rely on it." Tr. 3122 (Kaplan). Plainly, the fact that Mr. Wesp chose not to rely on MBS holdings, instead selling $1 billion worth of such securities, demonstrates that Fidelity was not interested in building the wholesale portfolio Dr. Kaplan posits.

**c. Regulators Would Have Barred Dr. Kaplan's Growth**

In addition to the evidence demonstrating that Fidelity did not want to grow, let alone grow using a wholesale strategy, the evidence demonstrates that, absent the breach the regulators would not have permitted Fidelity to grow using a wholesale strategy. Fidelity's October 5, 1987 Report of Examination rated Fidelity a "4" on the five-point MACRO rating scale; it received a "4" for asset quality and a "2" for capital, indicating that asset quality was the driving force behind the rating. Tr. 2798-99 (Vigna); DX 1448 at WON732 0834.

Fidelity's poor asset quality rating responded to a long-term strategy by Messrs. Lovely and Greco, Fidelity's top executives in the mid-1980s. The testimony unequivocally supports the conclusion that Messrs. Greco and Lovely were both inexperienced bankers, Tr. 1621 (Lovely); Tr. 2001-02 (Wesp); see also Tr. 1730 (Wesp) (board not sophisticated), and hands-off managers,

Tr. 1567-68 (Lovely) (only rule for loans is that they had to meet the "Doomsday scenario"), and both were the subjects of OTS fines for inappropriate insider dealings with borrowers. Tr. 931, 965-66 (Powderly); Tr. 1541 (Lovely) (held co-op units obtained from borrower Gerald Guterman for "several months" before selling for profits). Despite their knowledge of Fidelity's earlier bad experiences with commercial real estate lending, Tr. 1670 (Lovely), Messrs. Lovely and Greco decided to concentrate up to 150 percent of Fidelity's net worth in risky real estate lending to a small group of as few as four borrowers. Tr. 343, 347 (problem loans from Fidelity, not from Suburbia), 348, 667-68, 673 (Powderly); Tr. 1682-83 (Lovely); Tr. 1743-44 (Wesp); PX 335 at 1213 (Mr. Greco explains to regulators that he purposely chose to concentrate loans to a small number of borrowers); DX 63. Dr. Kaplan measured Fidelity's non-merger-related growth rate during this period at 14.8 percent, PDX 64, a growth rate that Mr. Wesp testified was "extraordinary," and one at which a "light bulb would go off." Tr. 2534 (Wesp). That strategy resulted in massive losses and foreclosures. Tr. 1509-11 (Vigna); PX 90 at AST029158.[8]

Later Fidelity executives agreed that this course of investment was overly risky. In 1987 they tried to get out of the commercial real estate business, independent of FIRREA, because they believed a return to traditional thrift activity was less risky and would generate earnings. Fidelity officially adopted this course when it replaced Mr. Greco with Mr. Powderly as

[8] Contrary to Astoria's insinuations, the deregulation of the thrift industry in the early 1980s was not intended to permit or encourage thrifts to pursue risky loans with insufficient underwriting. Tr. 124 (Pratt); see also Tr. 94 (Pratt) (noting that the success of commercial lending depends upon the intelligence and execution of business strategy); Tr. 1261, 1368 (Vigna) (regulators were not "pushing" thrifts to engage in diversification of assets; regulators were not opposed to diversification of assets if done "appropriately").

president. Tr. 338, 343-44, 348, 349, 357, 362-63, 365, 368-69, 398, 402, 432, 454-55, 492, 857, 860 (Powderly); PX 447 at 4.

In the late 1980s and early 1990s, the regulators were concerned about the deteriorating condition of these loans. They demanded that Fidelity take one-time expenses in the form of loan value write-downs and create loan loss reserves, all of which lowered Fidelity's earnings. Tr. 342, 345, 350, 699-700, 701, 702, 788 (Powderly); Tr. 1447 (Vigna) (problem loans "very, very severe"); PX 1242 at AST029196; PX 183; PX 335 at 1206-07. These problem loans, as they deteriorated, left Fidelity with very slim net interest margins in the years preceding FIRREA. This left Fidelity vulnerable to even one percent swings in interest rates – a factor that had nothing to do with goodwill. PX 509 at PAA006 0816-17; Tr. 847-49, 852, 872-73 (Powderly).

The problem loans generated by Messrs. Lovely and Greco took years to work out, and some remained on Fidelity's books through the Astoria acquisition. Tr. 869 (Powderly); PX 509 at AST001967 ($10.662 million in additional general valuation allowances in early 1990); see also Tr. 841 (Powderly) (lower amounts of classified assets in 1992 due to write-downs previously taken did not mean that the loans improved following the write-downs); DX 2595 at AST030347 (listing nine major loans from middle '80s); PX 996 at 1 (3.4 percent of assets classified as of April 5, 1993), at FAA005 1087 (classified asset writedowns lowered return on assets from 0.5 to 0.2 percent); PX 1166 at AST037540. Many problem loans resulted in lawsuits between Fidelity and its borrowers. Tr. 695, 858 (Powderly) (Guterman and Evangelista lawsuits). In sum, the notion in Dr. Kaplan's model that unspecified growth automatically generates profits, Tr. 3594 (Kaplan), is belied by Fidelity's growth in the mid-1980s, which generated losses. Tr. 825 (Powderly); PX 476 at AST0528782-83; see also Tr. 2219, 2274

(Wesp) (not all growth profitable); Tr. 2305 (Wesp) (when neighboring thrifts Anchor and Crosslands shrank, they increased in profitability).[9]

In January 1990, a new regulation, Regulatory Bulletin 3a-1 ("RB3a-1"), required all "4" rated institutions to cease all growth. Tr. 2774 (Vigna), Stip. ¶¶ 88-91; PX 542 at AST0704292-94; DX 69A at OAA002 0101; Tr. 709-10 (Powderly). Because Fidelity's asset quality worsened between October 1987 and September 1989, Tr. 2775-76 (Vigna), Fidelity would have continued to receive at best a "4" rating even absent the breach. Fidelity would accordingly have been precluded from growth starting in January 1990 until it obtained a "3" MACRO rating. Fidelity's asset quality problems had nothing to do with the loss of goodwill from regulatory capital. Tr. 1986-87 (Wesp).

To the extent that Fidelity felt constrained to live up to the highest capitalization categories set forth in the Federal Deposit Insurance Corporation Improvement Act ("FDICIA"), Tr. 2344 (Wesp); see also Tr. 3398 (Kaplan) (prudent thrifts operate with capital cushion), this too was a non-breach event whose effect was ignored by Dr. Kaplan. In these circumstances, regulators would have restricted the $737 million in asset growth Dr. Kaplan posits Fidelity would have engaged in absent the breach.

---

[9] Contrary to the view expressed by Mr. Powderly, law and regulation, and not the lack of goodwill, required regulators to apply stringent valuation allowance guidelines against Fidelity's problem loans. DX 509 at PAA006 0812 (Competitive Equality Banking Act); PX 711 at AST002902 (OTS regulation 563.182(c) requiring general valuation allowances); DX 2971 and DX 2971A (Thrift Bulletin 13 interest rate risk calculation and limitations); see also Tr. 1519-20 (Vigna) (no forbearances granted against risk-based capital requirements, growth restrictions based on examination results, FDIC regulation, change in deposit insurance requirements, levels of capital increasing, or new statutes).

Finally, Dr. Kaplan did not consider the impact of the elimination of $34.21 million in non-contractual goodwill, upon Fidelity's desire to grow or its desired growth rate. The $34.21 million in non-contractual goodwill included $25.815 million in goodwill from Fidelity's acquisition of Dollar Federal Savings and Loan Association, Tr. 1050 (Teurfs); PX 1283 at AST060064, for example, as set forth in the October 1988 business plan. Tr. 354, 704-05 (Powderly). Dr. Kaplan's assumption that the $737 million in asset growth he projects would have occurred anyway would permit Fidelity to obtain a windfall from a lost profits award.

**d. Economic Constraints Barred Dr. Kaplan's Growth**

In addition to regulatory constraints, Fidelity was facing both specific and general economic constraints that would not have permitted the growth Dr. Kaplan projects. As of September 30, 1989, Fidelity had nearly $100 million in classified assets, contributing to a significant deterioration in Fidelity's economic vitality since 1987. PX 509 at AST002000. Even as late as the Astoria merger, these problem loans remained on Fidelity's books, prompting Astoria to demand further write-downs of their value. DX 2748 ($5.9 million in additional general reserves on mid-1980s loans); DX 2762 at AA4009 1685 (additional loan loss reserves required by Astoria on 1980s loans as of January 6, 1995); Tr. 664 (Powderly). The Suburbia goodwill phase-out had no bearing upon the deteriorating conditions of these loans. Tr. 690, 722 (Powderly).

In addition to its real estate loan problems, the regulators had harshly criticized Fidelity for its investments in certain mortgage-related securities, in particular pointing to Fidelity's lack of internal guidelines and controls. PX 509 at AST001974-76; PX 335 at 1207. Given its internal problems, Mr. Powderly admitted that even with the goodwill, Fidelity would only have

leveraged "slightly" under the harsh economic conditions of the early 1990s. Tr. 795 (Powderly). Dr. Kaplan ignores all of these constraints on growth.[10]

General market conditions also would have constrained Fidelity's growth absent the breach. Although some periods were even worse than others, Tr. 2238, 2242 (Wesp) ("the whole world froze for 90 days" before the invasion of Iraq; "worse than a recession"), the entire period from 1990 through 1993 was characterized by Fidelity's own documents as being a recession. PX 564; PX 595; DX 2428 at PAA022 0178; DX 2470 at AST0129858-59; DX 2478 at AST030254; DX 2486; DX 2510 at AST0300289; DX 2582 at AST030340; PX 899. In the early 1990s, "[t]he amount of market risk and interest rate risk were both increased in the area of other investments since the price of stock is subject to potentially sharp fluctuations of price[.]" PX 509 at AST0001974. The interest rate risk was exacerbated by a flat or inverted yield curve from 1989 through 1990, followed by volatile movements in interest rates. Tr. 733-34 (Powderly); Tr. 2043-45, 2091 (Wesp). These interest rate risks would have made massive investments in MBS highly risky and in many cases unprofitable. Tr. 3402 (Kaplan) (MBS "absolutely" affected by prepayment risk). Moreover, Fidelity voluntarily stopped growing in anticipation of its conversion and later, its merger with Astoria – both factors unrelated to the breach. Tr. 2367, 2394 (Wesp).

#### e. <u>Fidelity Never Grew Wholesale Portfolio When Unconstrained</u>

In addition to fact that Fidelity likely would not and could not have engaged in the growth that Dr. Kaplan posits from 1989 through 1994, Dr. Kaplan fails to account for the fact that,

---

[10] To the extent Mr. Powderly believed that absent the breach, Fidelity would have been the acquirer of other thrifts, he acknowledged that goodwill would not have helped in acquisitions, because acquirers are expected to have tangible capital. Tr. 947 (Powderly).

having relieved itself of any capital constraints by converting to a stock institution in 1993, Tr. 2478-79 (Wesp), Fidelity could at that point have invested in Dr. Kaplan's wholesale portfolio had it so desired. Tr. 2149, 2309, 2360 (Wesp). The fact that it chose not to do so renders speculative Dr. Kaplan's assumption that Fidelity was interested in aggressive wholesale portfolio growth.

#### f. Dr. Kaplan Omits Benefits To Fidelity Caused By The Breach

In addition to its other flaws, Dr. Kaplan's lost profits model fails to account for costs that Fidelity would have borne but for the breach, including annual advertising costs and $800,000 in annual salary costs that Fidelity saved as a result of its capital constraints following FIRREA. Tr. 380, 433, 549, 816 (Powderly); Tr. 1858 (Wesp); DX 1203 at PAA010 1839; see also Tr. 2958 (Kaplan) (Fidelity always looking for more efficiency). Dr. Kaplan's profitability of the non-breach bank simply ignores these avoided costs because his focus is selectively limited to a hypothetical wholesale investment strategy.

### 5. Dr. Kaplan's Lost Profits Claims Fail For Lack Of Foreseeability

Astoria's lost profits claims fail for lack of foreseeability as well as lack of causation.

#### a. Precedent Indicates Damages Nearing The Goodwill Amount Are Unforeseeable

The Government could not have foreseen at the time of the contract the magnitude of damage calculated by Dr. Kaplan. One real dollar had a substantially higher value than one dollar of "gimmick" capital – goodwill. California Fed. Bank v. United States, 43 Fed. Cl. 445, 459 (1999), vacated in part, 245 F.3d 1342 (Fed. Cir. 2001). Real cash would not only have served the same regulatory function as goodwill, but could have been invested, unlike goodwill.

Damages approaching, or, as in this case, exceeding, the book value of goodwill, are unforeseeable.

Moreover, at the time of the contract, no mention was made of any plan to engage in a wholesale investment strategy as envisioned by Dr. Kaplan. Rather, Fidelity said it would completely restructure Suburbia's assets and emphasize "mortgage banking, increased joint venture activity, commercial and consumer lending, discount brokerage, and equipment leasing." DX 3148 at PAA090 0109. Also, no mention was made of Fidelity being acquired.

**b. Fidelity's Operations Gave Regulators No Reason To Foresee The Scale Or The Source Of The Damages Dr. Kaplan Posits**

Fidelity's pre-acquisition operations did not suggest that it would launch massive wholesale portfolio growth. As of February 1984, Fidelity had only $67.8 million in MBS, $30.9 million in Federal Home Loan Bank advances, and $23 million in other borrowings, out of total assets of $521.6 million. DX 3148 at PAA090 0109, 0118. Fidelity was not interested in acquiring Suburbia so as to engage in a wholesale growth strategy, but rather to enable Fidelity to enhance its Long Island franchise with Suburbia's valuable branch network. Stip. ¶ 58, PX 986 at AST064190. Moreover, Mr. Wesp testified that as late as 1988, Fidelity had seriously considered several options in response to suggestions by regulators. All of these options were different from the wholesale strategy Dr. Kaplan outlines. Tr. 1781-85 (Wesp); PX 436 at 7. Finally, regarding the post-1994 damages, the regulators could not have foreseen that Fidelity's goodwill would have transferred to a cash purchaser in violation of GAAP accounting rules. For all of these reasons, Dr. Kaplan's lost profits were unforeseeable.

### 6. Dr. Kaplan's Lost Profits Claims Are Not Reasonably Certain

Just as Mr. Wesp testified that projecting an amount of income in a three-year business plan is "ridiculous," Tr. 1775 (Wesp), Dr. Kaplan's lost profits calculations covering 25 years are not reasonably certain because they are speculative.

#### a. Dr. Kaplan's Assumed Growth Rate Is Unsupportable

Dr. Kaplan's two percent per quarter growth rate from 1989 through 1994 is unsupported by any of the cites to which he alludes.

Astoria, which had a far greater percentage of tangible capital than Fidelity, increased its total assets from December 31, 1988 through December 31, 1993, at a compounded annual rate of just 5.77 percent. DX 2962 at AA1001 0394. Excluding the $281.5 million in assets acquired by Astoria from another thrift in November 1990, Astoria's assets increased by only $63.5 million from December 1988 through December 1992. DX 2962 at AA1001 0514. Astoria's modest growth despite ample excess capital belies Dr. Kaplan's growth assumption for the less-capitalized Fidelity.

#### b. Dr. Kaplan's Reliance Upon The October 1988 Business Plan Creates Uncertainty

Fidelity's October 1988 Business Plan, upon which Dr. Kaplan relies for his growth rate, projects growth in retail, not wholesale, assets to be funded by increased deposits. Tr. 502-03 (Powderly). Even where Fidelity did pursue MBS, it invested – and sold – a broad array of such instruments in varying amounts and at different times, including long-term fixed rate MBS, not the one-year ARM securities Dr. Kaplan hypothesizes as the predominant wholesale investment. Tr. 2014, 2032-33 (Wesp); Tr. 2389 (Wesp) (would have purchased more long-term securities

with more capital); DX 590 at PAA033 1506 (long-term ARM security investment as explained at Tr. 2124-25 (Wesp)); DX 590 at PAA038 1202 ($10 million in long-term bonds purchased), id. at PAA038 0276-77 (large numbers of 5-7 year ARM securities purchased); PX 581 at AST049028 (Fidelity a "selective seller" of ARM MBS); PX 599 at AST048966 ("shortage of available ARM securities"); DX 2454 at AST048512 (generally, late 1990 a bad time to purchase MBS); DX 2463 at PAA113 0064 (long-term Ginnie Mae securities purchased); DX 2487 at AST0308527-28 (long-term Fannie Mae stock purchase plan); PX 728 at AST0308702 (MBS sold to cover loan loss reserves); DX 2541 at AST0300431 (7-year agency balloons purchased); PX 766 at AST030734); PX 1061, page 4; Tr. 2524-25 (Wesp) (Fidelity purchasing ARM securities of all kinds).[11]

The growth projections in the October 1988 business plan were plainly unrealistic, as they did not anticipate a major recession, the Gulf War, and a slumping real estate market, all of which Fidelity later identified as "impossible to contemplate." PX 787 at AST002748; Tr. 526 (Powderly); PX 795 at page 3 of letter; PX 986 at AST 064185; Tr. 741-42, 798, 881, 911 (Powderly); Tr. 1751, 1790, 1808, 1824, 1991, 1993, 1994-95 (Wesp) (three-year business plans are repeatedly revised); see also Tr. 2168 (Wesp) (October 1988 business plan an "intellectual exercise"); Tr. 2174 (Wesp) (discussing "event risk"); Tr. 2426 (Wesp) (business plan a "living document"). Fidelity's October 1988 business plan did not contemplate the inverted yield curve in the late 1980s, which required Fidelity to be more careful, and limited the thrift's growth. PX 734; Tr. 875, 884-85 (Powderly); Tr. 2058-60 (Wesp). Absent the breach, the inverted yield

[11] Mr. Wesp testified that MBS represented a "plug" to be purchased when other assets were unavailable – not a part of a free-standing wholesale portfolio growth strategy. Tr. 2524-25 (Wesp).

curve would have led to a reevaluation of the business plan as economic conditions changed. Tr. 741-42, 798 (Powderly). Moreover, Fidelity's previous budget for 1988 envisioned minimal asset growth due to Fidelity's asset quality problems. Tr. 707-08 (Powderly); DX69A at OAA002 0087.

The October 1988 business plan also assumed that $34.21 million in non-contractual goodwill – representing 15 percent of total regulatory capital and 27 percent of excess capital as of September 1989 would have been usable a regulatory capital. FIRREA, of course, later eliminated this non-contractual goodwill from tangible and core capital. Fidelity may have had lower growth projections if this non-breach event were foreseen. Tr. 748, 756, 758 (Powderly); Tr. 2430, 2439, 2441 (Wesp).

Finally, the October 1988 business plan was demonstrably incorrect in its understanding of Fidelity's financial condition. For example, the business plan forecast no bad debt expenses from January 1989 through June 1991, but provisions from loan losses between 1985 and 1991 actually totaled over $34 million, not including lost interest income. DX 69A at OAA002 0083 (unforeseen bad debt write-offs were taken following October 1988 business plan); Tr. 765 (Powderly).

#### c. Dr. Kaplan's Use Of Pre-FIRREA Growth Rate Creates Uncertainty

Dr. Kaplan also errs in premising his growth rate upon Fidelity's pre-FIRREA growth rate, because that growth was in the very assets that caused Fidelity tremendous losses, as discussed above.

**d. Dr. Kaplan's Calculation Of An Assumed Spread Is Baseless**

Dr. Kaplan's constant 0.80 percent spread assumption is also unsupported by the evidence. Because Dr. Kaplan's model lacks any specificity respecting the kind of wholesale assets and liabilities it includes, his statement that 0.80 percent spreads could be obtained using products that were readily available in the marketplace is meaningless considering the volatility of interest rates from 1989 through 1994, the differences between available MBS investments, the increased marginal costs of borrowing, and the existence of prepayment risk. Tr. 1760-61, 2208-09, 2287-88 (Wesp); see also Tr. 2274 (Wesp) (need right timing to be profitable with MBS); Tr. 2392 (Wesp) (can lose money with MBS investments); Tr. 2457-58 (Wesp). The assumption is effectively untestable, unverifiable, and unreasonable, and thus must be rejected. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149 (1999).

**e. Dr. Kaplan's Post-Astoria Merger Damages Are Unexplained**

Turning to Dr. Kaplan's lost profits calculation from 1995 through 2014, these damages are even less supported, and thus even more speculative than the lost profits from 1989 through 1994. As explained above, no evidence supports Dr. Kaplan's assumption that Fidelity's goodwill or its goodwill forbearance could have transferred to Astoria. Tr. 2526-27 (Wesp) (cash transaction would have meant "eradication" of goodwill); Tr. 2913 (Kaplan) (net worth of acquired institution extinguished in mark to market). This Court has already concluded in another case that goodwill is not transferrable, Granite, 74 Fed. Cl. at 161-64, and nothing Astoria has presented in this case undermines that conclusion here.

Moreover, Dr. Kaplan identifies neither the assets nor liabilities – even in general terms – that would have permitted Astoria to use Fidelity's goodwill profitably, rendering his lost profits analysis speculative. In addition, Astoria had excess capital in the real world, absent any of Fidelity's goodwill, but declined to use it to grow aggressively using Dr. Kaplan's wholesale strategy, indicating that more capital would not have led to greater profits. Tr. 956 (Powderly); Tr. 1962-63 (Wesp); Tr. 2793, 2794, 2801 (Vigna). In fact, Fidelity, following the conversion, when "well-capitalized," did not turn to growth in the wholesale portfolio Dr. Kaplan projects. Tr. 2167 (Wesp). Moreover, the fact that Dr. Kaplan's foregone assets increase by either $226 million or $439 million in just one month – January 1995, PX 1314A at Exh. 9A, 9B – renders his model inherently inexplicable.

**f. Dr. Kaplan's Post-Astoria Damages Fail To Adjust For A Non-Breach World**

In addition, Dr. Kaplan's post-1995 lost profits model fails to describe the entire non-breach world. In a non-breach world, other thrifts would have been able to count their goodwill as regulatory capital, and fewer thrifts would have been seized, leading to greater competition in Long Island, one of the country's most competitive thrift markets. PX 1249 at WON738 0779; PX 1155 at AST036415; Tr. 926, 946 (Powderly); Tr. 1752, 1965 (Wesp). Such external factors must be taken into account for a lost profits model to meet the reasonable certainty requirement. See, e.g., S. Nat'l, 57 Fed. Cl. at 305. These errors and lacunas are fatal to Dr. Kaplan's lost profits claims.[12]

[12] Contrary to Astoria's assertions, this Court's decisions in Commercial Fed. Bank, F.S.B. v. United States, 59 Fed. Cl. 338 (2004), aff'd, 125 Fed. Appx. 1013 (Fed. Cir. 2005), and First Fed. Lincoln Bank v. United States, 73 Fed. Cl. 633 (2006), appeal docketed, No. 07-5044 (Fed. Cir. 2007), do not support Dr. Kaplan's model here. The trial court awarded lost profits in

### B. Dr. Kaplan's "Wounded Bank" Claims Fail

Dr. Kaplan's "wounded bank" claims fail for lack of evidentiary support as well.

#### 1. OTS Assessment Claim Is Speculative

Dr. Kaplan attributes $436,800 to allegedly excessive OTS examination assessments and $994,926 to allegedly excessive deposit insurance premiums following Congress's enactment of FIRREA. PDX 90, 91. Respecting the OTS assessments, Dr. Kaplan asserts that Fidelity would have had a MACRO rating of at least a "3" absent the breach, which would have resulted in lower OTS assessments, because absent the breach Fidelity would have been a "well-capitalized" institution. PDX 89.

Dr. Kaplan, however, fails to consider that the MACRO rating included considerations of management, asset quality, risk management and operations, in addition to consideration capital levels. Fidelity had suffered problems with respect to these parameters prior to and following the breach. Tr. 2798-99, 2851-53 (Vigna); DX 1448 at WON732 0834. Moreover, to the extent that the regulators considered capital, because only tangible capital protected the insurance fund, the existence of goodwill in regulatory capital would not have necessarily led the regulators to conclude that Fidelity had no capital problems. Finally, if, as Dr. Kaplan posits, Fidelity would have grown its asset size by $737 million absent the breach, Fidelity would have incurred

---

ComFed based upon a lower post-FIRREA growth rate than the thrift had actually employed pre-FIRREA and upon the thrift's actual portfolio, and were not awarded for periods after the thrift engaged in a conversion that resulted in excess capital it chose not to employ. In First Fed. Lincoln, the Court did not award lost profits, concluding that the lost profits projected by Dr. Kaplan were speculative because he did "not explain how Lincoln's portfolio would be structured, the availability of the adjustable rate MBS for Lincoln to invest in, and the impact on Lincoln's investment strategy." Id. at 645. Rather, the Court awarded a "franchise premium" based upon a post-FIRREA decline in deposits that Fidelity did not incur; the Court explicitly rejected a lost profits claim premised upon a hypothetical wholesale portfolio.

additional OTS assessments because of its asset size. Tr. 2498-99 (Wesp); DX 3071 at PAA014 2035. Thus, these additional assessments should be deducted from any "wounded bank" claim.

### 2. FDIC Insurance Premium Claim Is Speculative

As with Dr. Kaplan's OTS assessment claim, his claim for allegedly excessive FDIC insurance premiums are speculative. As with the OTS assessments, Dr. Kaplan assumes that absent the breach, Fidelity's FDIC insurance premiums would have been lower because Fidelity would have been "well-capitalized." PDX 90, 91.

Again, Dr. Kaplan ignores all of the other parameters upon which FDIC insurance premiums are based, focusing solely upon capital, despite the existence of nine risk categories and regulatory discretion to re-classify thrifts for engaging in any "unsafe and unsound practice by virtue of having received a less-than satisfactory rating for asset quality, management, earnings or liquidity (or the equivalent MACRO categories)[.]" PX 1249 at WON738 0795; Tr. 2498-99 (Wesp); DX 3071 at PAA014 2034-39. Mr. Wesp admitted that FDIC considered Fidelity's collateralized mortgage obligation ("CMO") investments risky, an attitude that FDIC would have had regardless of the goodwill phaseout. Tr. 2106 (Wesp). Dr. Kaplan ignores Fidelity's significant asset quality problems and the criticism it received from regulators concerning Fidelity's record-keeping. These criticisms, however, forced Fidelity to enter into a Supervisory Agreement in May 1992 because it was viewed as being "unsafe and unsound." Tr. 2780-81 (Vigna); PX 874; Stip. ¶ 98.

Dr. Kaplan's assertions are rendered more speculative by his determination that, absent the breach, Fidelity's MACRO rating would have been a "2" between January 1, 1994, and December 31, 1994. During this time, Fidelity's MACRO rating was a "3." PDX 91. Dr.

Kaplan attributes the entirety of this hypothetical upgrade in rating in the but-for world to the capital factor in the MACRO framework, ignoring Fidelity's asset quality problems and all other subfactors in the MACRO rating. Accordingly, even with more capital, it cannot be said that Fidelity would have been assessed lower FDIC insurance premiums. Finally, because, at the time of the contract, neither the plaintiff nor regulators could have foreseen that insurance premiums would have become risk-based, and that a breach of contract would allegedly change the risk-based rating of the thrift in future years, Dr. Kaplan's FDIC insurance claim is also unforeseeable.

## IV. Astoria Is Not Entitled To "Jury Verdict" Damages

Because all of its damage theories are flawed, Astoria requests that this Court nevertheless award it damages under a "jury verdict" theory. The Court should deny this request. The Federal Circuit has held that "[w]e have also allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation." Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1357 (Fed. Cir. 2001) (emphasis added). Astoria cannot meet any of these requirements.

As explained by this Court in Columbia First: "Plaintiff bears the burden, under the jury verdict method, of proving that 'no more reliable method for computing damages' exists, which in essence requires that plaintiff justify its inability to substantiate the amount of its lost profits damages." Columbia First, 60 Fed. Cl. at 108 (citation omitted). Astoria has not met this burden, nor has it shown why its methodological flaws should be excused. As in Columbia First,

Astoria "did not justify its inability to substantiate lost profits damages and thus show that there is no more reliable method of calculating damages." Id. at 126.

Moreover, Astoria's apparent request that its inability to demonstrate damages to a reasonable certainty should be excused by its request for a "jury verdict" award is undercut by its inability to prove causation of damages. As stated by this Court in Citizens Financial:

> Because the court has already found that Citizens did not establish causation, there is no need to address plaintiff's plea for a "jury verdict" award. If the plaintiff had proven that lost profits were caused by the government's breach, then this court would have been authorized to return a so-called "jury verdict." . . . A jury verdict is not utilized until "clear proof of injury exists." Where, as here, Citizens failed to prove an injury, the jury verdict method is not appropriate.

Citizens Fin., 64 Fed. Cl. at 514 n.17 (citations omitted). As explained above, Astoria has failed to prove causation of damages in addition to failing to establish alleged damages to a reasonable certainty. Astoria set forth several of its damages calculations in which damages began before the passage of FIRREA, vitiating any claim that those alleged damages were caused by the breach. Additionally, with respect to lost profits, Astoria ignores the fact that its own Capital Plan said it would "[c]ontinue doing what [it was] doing" before the passage of FIRREA, DX 78 at PAA052 2701-02, indicating that any lost profits were caused by Fidelity's independent decision not to pursue the wholesale strategy Dr. Kaplan posits. Astoria's reliance and restitution claims, which are based upon the net liabilities assumed and alleged liquidation costs, also fail the causation test because they measure liabilities that the Federal Circuit has described as "speculative and indeterminative." Glendale, 239 F.3d at 1382. Astoria's failure to establish

causation, together with its failure to prove damages to a reasonable certainty, make the "jury verdict" method inapplicable in this case.

## CONCLUSION

At this point, after having had a full opportunity to be heard, it is amply evident that Astoria has not met the burden of establishing the right to any of its claimed damages. As such, the Court should discontinue further proceedings and enter judgment for the Government. For the reasons stated above, we respectfully request that the Court grant our motion for judgment upon partial findings.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson
by /s/ Sameer Yerawadekar

JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 353-7972
Fax: (202) 514-8640
Attorneys for Defendant

OF COUNSEL:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR

May 15, 2007

## CERTIFICATE OF FILING

I hereby certify that on this 15th day of May, 2007, a copy of the foregoing "DEFENDANT'S MOTION FOR JUDGMENT BASED UPON PARTIAL FINDINGS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Sameer Yerawadekar
Sameer Yerawadekar