IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 95-468C<br>(Judge Thomas C. Wheeler) |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE A RESPONSE TO DEFENDANT'S NOTICE OF STATUS OF ITS SEARCH FOR EVIDENCE, INCLUDING PLAINTIFF'S MOTION TO COMPEL**

Plaintiff moves for leave to file the attached Plaintiff's Response to Defendant's Notice of Status of Its Search for Evidence, Including Plaintiff's Motion to Compel.

/s/ Frank J. Eisenhart
Frank J. Eisenhart
Counsel of Record
Catherine Botticelli
Tara R. Kelly
Dechert LLP
1775 I Street, NW
Washington, DC 20006

Attorneys for Plaintiff
Astoria Federal Savings and
Loan Association

July 12, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2007, a copy of the foregoing **Plaintiff's Motion For Leave To File A Response To Defendant's Notice Of Status Of Its Search For Evidence, Including Plaintiff's Motion To Compel** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Frank J. Eisenhart
Frank J. Eisenhart

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 95-468C<br>(Judge Thomas C. Wheeler) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S NOTICE OF STATUS OF ITS SEARCH FOR EVIDENCE, INCLUDING PLAINTIFF'S MOTION TO COMPEL**

On June 29, 2007 the Department of Justice filed a document reporting on its search for the TAPA Analysis said to have been done with respect to Fidelity New York, FSB.[1] The Department says it can find no evidence that such an analysis was ever performed. The Department's report makes it clear that the Department did not do all it was directed to do on June 6, 2007, and Plaintiff does not believe this report is sufficient to put this matter to rest.

The report states that "we" (presumably one of the Department of Justice lawyers working on this case) spoke directly to Angelo Vigna. However, the report indicates that the job of speaking to others who might have had relevant knowledge was delegated to an unnamed person or persons at the FDIC. The report says "the FDIC" had discussions with Simon Levy

---

1 The Department was ordered on June 6, 2007 to report within 30 days its progress in locating the Fidelity TAPA Analysis or cost test report. A copy of the portion of the June 6 hearing transcript dealing with this issue is attached as Exhibit 3. Also attached, for the Court's convenience, are Exhibit 1, the March 21, 1990 Letter (PX 2000), Exhibit 2, an excerpt from the May 25, 2007 transcript where the issue was first discussed and Exhibit 4, an excerpt from Mr. Dionne's testimony in the LISB case.

(the FDIC Supervisory Liquidation Specialist who prepared the LISB TAPA Analysis), Thomas Beshara (the FDIC Regional Director for Liquidation, to whom Mr. Levy sent the LISB TAPA Analysis), Steven Fritts (a name not familiar to the Plaintiff) and Daniel Dionne (the FDIC representative who testified in the LISB case that he believed TAPA analyses were done for all institutions on the list attached to the March 21, 1990 letter, which included Fidelity). No details of these interviews are given. There is merely a conclusory statement to the effect that the FDIC reported none of them is aware of a TAPA Analysis having been performed for Fidelity. There is no indication that these persons were even asked about a cost test report or about any other type of report which might contain a projected liquidation cost for Fidelity. There is similarly no indication that any of these individuals was confronted with the sworn testimony of Mr. Dionne that he believed such an analysis was done.

The Department's report makes no mention of any contact with Nicholas Ketcha, the FDIC Regional Director who sent the March 21, 1990 letter to Mr. Vigna and who received the LISB TAPA Analysis on April 17, 1990. The Department's report makes no mention of any contact with William H. Leatham, the FDIC Liquidation Specialist who passed the LISB TAPA Analysis along to Mr. Ketcha. The Department's report makes no mention of any contact with FDIC Regional Manager Joseph Palladino who is mentioned in the Memorandum forwarding the LISB TAPA Analysis and who is copied on the March 21, 1990 letter to Mr. Vigna. And, most significantly, the Department's report makes no effort to explain why Mr. Dionne now apparently contradicts his testimony under oath in the LISB case where he testified that he believed a TAPA Analysis was performed for Centereach (the institution at issue in LISB) "[b]ecause all those banks that were on the list – on this list that you showed me earlier would

have been – typically had a TAPA analysis." LISB Tr. 1996, line 24 to p. 1997, line 5 (copy attached as Exhibit 4) Fidelity is , of course, one of the institutions on the list that Mr. Dionne referred to. The Department's status report gives no assurance that the search the Department was directed to make was done thoroughly or aggressively. Indeed, it seems to suggest the opposite.

Plaintiff therefore moves the Court to issue an order compelling the Defendant to do the following:

1. On or before July 19, 2007, identify for the Plaintiff the FDIC person or persons who interviewed Messrs. Beshara, Levy, Fritts and Dionne and produce to Plaintiff all notes, memoranda or reports of such interviews;

2. Unless the information is disclosed in material produced pursuant to paragraph 1, on or before July 19, 2007 identify Steven Fritts and explain why he was interviewed in connection with this matter; and,

3. On or before July 26, 2007 produce, at mutually agreeable times and places, for deposition by Plaintiff the person or persons identified pursuant to paragraph 1, Nicholas Ketcha, William H. Leatham, Thomas Beshara, Steven Fritts, Daniel Dionne and Joseph Palladino, said depositions to be limited to the subject matter of the March 21, 1990 letter from Mr. Ketcha to Mr. Vigna (and Mr. Dionne's testimony about that letter in LISB), the LISB TAPA Analysis, the existence of TAPA analyses, cost test reports, or other reports containing projected liquidation costs for institutions listed on the attachment to the March 21, 1990 letter, and the

search within the FDIC for a Fidelity TAPA Analysis, call test report or other document projecting liquidation costs for Fidelity.

/s/ Frank J. Eisenhart
Frank J. Eisenhart
Counsel of Record
Catherine Botticelli
Tara R. Kelly
Dechert LLP
1775 I Street, NW
Washington, DC 20006

Attorneys for Plaintiff
Astoria Federal Savings and
Loan Association

July 12, 2007

# EXHIBIT 1

**FDIC**
Federal Deposit Insurance Corporation
Division of Supervision
452 Fifth Avenue, 21st Floor, New York, New York 10018-2796 New York Regional Office

March 21, 1990

NY/DOS/S&L:WLPollack:ev:03-22-90
cc: RD File
DRD Zamorski
ARD Dionne, Piracci
SLS (DOL) J. Palladino
File - OTS New York

Mr. Angelo A. Vigna
District Director
Office of Thrift Supervision
One World Trade Center, 103rd Floor
New York, New York 10048

Dear Mr. Vigna:

Enclosed is a listing of savings and loan associations in your district which the New York Office of the FDIC is currently projecting will be channelled to Resolution Trust Corporation in the next three years. We are attempting to project if any of these institution might be viable candidates for FDIC/RTC assistance either under 13 (c) or 13 (k) of the Federal Deposit Insurance Act. In both instances, we would require that the institution have core profitability (after assistance), have well regarded management and have a low risk profile. We would also be interested in institutions that do not presently meet the capital guidelines, but could survive with regulatory forebearance.

We would appreciate if you and your staff would review this list and make any recommendations along the following guidelines:

(a) Banks that are not included that you believe might be recommended to RTC in the next three years.

(b) Banks on the list that could be given 13 (c) assistance. Institutions in this category would tend to have low capital positions due to economic conditions and problems that were not brought about by high risk policies of management.

(c) Banks on the list that could be given 13 (k) assistance. Institutions in this category would tend to have low capital positions brought about by deducting goodwill acquired in mergers with other failing associations.

(d) Banks on the list that could be given non-financial assistance. Institutions in this category would be those whose capital plans have been or most likely will be approved.

We would appreciate if you could fax your response to Review Examiner William L. Pollack (fax 212 704-1343) at the earliest possible opportunity. If there are any questions, Mr. Pollack can be reached at 212 704-1457.

Very truly yours,

Nicholas J. Ketcha, Jr.

Nicholas J. Ketcha, Jr.
Regional Director

Enclosure

PLAINTIFF'S EXHIBIT
tabbies
2000
6-8-07

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
C-LI-A-0021037

PLAINTIFF'S EXHIBIT
LISB v. USA
Ex. 10
ALL-STATE LEGAL

GTP0104945

OFFICE OF THRIFT SUPERVISION
NEW YORK

| | | |
|---|---|---|
| 7814 | Anchor Savings Bank | Northport, NY |
| 2810 | Beacon Federal S/B | Baldwin, NY |
| 4153 | Central Federal Savings, FSB | Long Beach, NY |
| 1462 | Champlain Valley FS&LA of Plattsburgh | Plattsburgh, NY |
| 4209 | Columbia Banking FS&LA | Rochester, NY |
| 3671 | Eastern Federal S&L Association of Sayville | Sayville, NY |
| 2750 | Edison Federal Savings & Loan Association | New York, NY |
| 7966 | Ensign Bank, FSB | New York, NY |
| 0650 | Fidelity New York, FSB | Floral Park, NY |
| 2125 | First FS&LA of Rochester | Rochester, NY |
| 3444 | Flatbush Federal S&LA of Brooklyn | Brooklyn, NY |
| 5059 | Mohawk Valley, FSB | Ilion, NY |
| 1473 | Saranac Lake FS&LA | Saranac, NY |
| 3552 | Seneca FS&LA | Baldwinsville, NY |
| 3511 | The Homestead Savings, FA | Utica, NY |
| 2811 | The Long Island Savings Bank of Centereach, FSB | Centereach, NY |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
C-LI-A-0021038

| | | |
|---|---|---|
| 3032 | AmeriFederal S/B | Lawrenceville, NJ |
| 4895 | Berkeley Federal Savings & Loan | Millburn, NJ |
| 6230 | Cenlar Federal S/B | Princeton, NJ |
| 4881 | Center Savings & Loan Association | Clifton, NJ |
| 6944 | Chatham Savings & Loan Assoc. | Chatham, NJ |
| 4248 | Community Federal Savings & Loan Association | Ramsey, NJ |
| 0997 | First Jersey S&LA | Wyckoff, NJ |
| 6268 | Hansen Savings Bank, SLA | East Brunswick, NJ |
| 4825 | Irving Savings & Loan Association | Paterson, NJ |
| 5020 | Jersey Shore Savings & Loan Association | Toms River, NJ |
| 4964 | Monarch FS&LA | Kearney, NJ |
| 4809 | Mutual Aid Savings & Loan Assoc. | Manasquan, NJ |
| 6497 | Newton Savings Bank, SLA | Newton, NJ |
| 2264 | Nutley Savings Bank, SLA | Nutley, NJ |
| 5679 | Old Borough Savings & Loan Association | Trenton, NJ |
| 4545 | Palisades Savings Bank, SLA | Ridgefield Park, NJ |
| 5606 | Riverside Savings Bank, SLA | Riverside, NJ |
| 4980 | Security Savings Bank, SLA | Vineland, NJ |
| 4613 | Shadow Lawn Savings Bank, SLA | Long Branch, NJ |
| 5015 | Statewide Savings Bank, SLA | Jersey City, NJ |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
C-LI-A-0021039

| | | |
|---|---|---|
| 0005 | The United S&LA of Trenton, NJ | Trenton, NJ |
| 0182 | Volunteer S&LA of of Little Ferry, NJ | Clifton, NJ |
| 6344 | Caguas-Central Federal Savings Bank of PR | Caguas, PR |
| 7971 | Guaynabo Federal S/B | Guaynabo, PR |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
C-LI-A-0021040

# EXHIBIT 2

P R O C E E D I N G S

THE COURT: We are on the record this morning for day 27 of the trial in Astoria Federal Savings and Loan.

Mr. Eisenhart.

MR. EISENHART: I have something to take up with the Court, your Honor.

MR. ROBERSON: Your Honor, if this is with regard to the document that Plaintiffs produced to us last night at 6:30, I would just ask that we be given a little bit more time and maybe have this discussion at the midmorning break, because I have to trace down a few things with my paralegals with respect to document production in this case.

THE COURT: Well, let me just hear what this is about.

MR. ROBERSON: Okay.

MR. EISENHART: Your Honor, as you know, up until yesterday afternoon, the Department of Justice had planned to call Mr. Dionne of the FDIC as their last witness. In the course of getting ready for Mr. Dionne, Ms. Botticelli, who was going to do his cross-examination, sent out a request to the other goodwill Plaintiffs, asking if he had testified in any other trials and, if so, could we get copies of the -- his trial testimony.

THE COURT: What do you mean by "the other goodwill Plaintiffs"?

MR. EISENHART: Well, as your Honor knows, there were about 120 of these cases. There is a mailing list of Plaintiffs' counsel. And we can send out requests like this, and sometimes we even get a response.

THE COURT: To 100 different parties or so?

MR. EISENHART: Yeah, the numbers have dwindled over the years, but it's like about a 50- or 60-lawyer mailing list. And frankly, you don't often get much of a response. But in this case we did get one response. The Milbank lawyers who handled the Long Island Savings Bank case said yes, he testified in our case, and they sent us over the trial testimony.

As Ms. Botticelli was going through the trial testimony -- and I should say, Mr. Dionne didn't actually appear at the trial but they read into the record portions of his deposition transcript.

As she went through it, and I can give the Court copies of this, if you wish, she saw a reference to a document. And this is the document -- let me just hand up the document so you can have it in front of you as we're doing this.

This is what appears in the transcript. This document is introduced, and it bears the same Bates number as the copy you have. We got that copy from the Milbank people after we began to think this might be important. We

asked them to go back, and they had to call it back from storage. They provided us with that yesterday at about noontime.

And it's described in the transcript as follows. It says "would you look at the first paragraph, first paragraph on the first page of Dionne 2. It states 'enclosed is a listing of savings and loan associations in your district which the New York office of the FDIC is currently projecting will be channeled to the Resolution Trust Corporation in the next three years.'

And you can see the document is dated March 1990, so this is the period of time when Fidelity's capital plan is still under review by the OTS, hasn't yet been approved.

MR. ROBERSON: Your Honor, I'm going to object now. He's reading into the record a document that's not in evidence, and it's one thing to have the discussion about the document. It's another thing to read into the record the contents of the document.

So therefore, I would move to strike the content that was just read into the record. And in addition, just -- we can have the discussion about the document, but the contents shouldn't be discussed on the record if it's not been admitted into evidence.

THE COURT: I get the gist of what's going on here. I don't think it's necessary to read anything into

the record right now.

MR. EISENHART: Fine.

THE COURT: Tell me what you'd like to do under the circumstances.

MR. EISENHART: This document is in and of itself significant, because as you can see, Fidelity is one of the institutions on the list. It also is significant because there is, we learned in the course of this, something called a TAPA analysis. It's an acronym, I think it stands for something like transfer of assets and something. I could give you the title of it.

And it -- there is later a reference in the transcript to that analysis having been done for all of the 14 institutions on this list, which would include Fidelity.

This is very important. First, that document should have been produced for us, and I am virtually certain it was not, because the way we handle document -- the documents that the Government gave us is they were in no discernible order, so we went through them and we put them into subject matter files and witness files.

That document, had it been produced, would have gone into three separate witness files. It would have gone into Mr. Vigna's file, Mr. Dionne's file and Mr. Ketcha's file. Those were all people we anticipated would be witnesses in this case. We have witness files on all three

of them. That document would have gone through all three. We checked. It's not in any of them.

And we had never heard, frankly, until we read this transcript, of a TAPA analysis. I've since learned a little bit about what it is, but I had never heard of this before. Apparently, such an analysis was done for Fidelity. It's -- we've never seen it.

There are two -- on the where do we go, there are two thoughts that occurred to me. One would be we could go ahead and complete the trial as planned, which sounds like it's going to happen on Tuesday, according to the current projections, but leave the record open and give us a chance to get these documents and do some discovery on them and then, if need be, reopen the Plaintiff's case to put in the relevant evidence that we would get from them. That would be one possibility.

The other possibility, I suppose, is to require that the Government produce this document, any analysis that gave rise to this document and, just looking at the document, it does appear to be the subject to have been produced as a result of some analysis, and to produce this TAPA analysis, if that's, in fact, not the analysis that's referred to in the document.

If they can produce those on Tuesday, have Mr. Dionne attend and we'll put Mr. Dionne on, if the

Government doesn't want to, and we'll go through this with him.

THE COURT: All right. Well, I think the best approach here is to give the Government a chance to pin down what may have happened here and hear from them, as Mr. Roberson suggests. You could even have until after lunch, if you'd like.

MR. ROBERSON: Your Honor, okay. Why don't we do that. What I'm trying to pin down is just the document production issues. But I can go ahead and argue the rest of the issues that I think are dispositive of this issue altogether. So since we're having the argument, I can do that and then we'll tie down the actual document production issues.

THE COURT: The outcome here may depend on whether you think you produced it or not.

MR. ROBERSON: It may be. Let me just say this right off the bat, your Honor. Astoria has been in possession of this document since July of 1999. They were referring to a different Plaintiff, Long Island Savings Bank, as though it was some other entity. Long Island Savings Bank, as you may recall, your Honor, was acquired by Astoria.

So Astoria's attorneys that were representing Long Island, because the case was filed by Fidelity because the

statute of limitations of these cases expired in '95, so Long Island filed the lawsuit under its name and then was subsequently acquired by Astoria in '98.

In '99 there's a deposition of Mr. Dionne, and this document is introduced by the attorneys representing Astoria's Long Island lawsuit. And they produced the document, and they deposed Mr. Dionne about the document. That occurred in July of 1999.

THE COURT: So this document is from the Long Island case?

MR. ROBERSON: That's correct.

MR. EISENHART: That's where we got it, yeah.

MR. ROBERSON: So to suggest that Astoria doesn't -- the right hand of Astoria, one lawsuit Astoria has, doesn't know what the left hand of Astoria has in its possession is ludicrous.

So the notion that this -- the notion that they don't have -- they haven't had the document is just -- it's incorrect. That's the first thing.

THE COURT: I'd like to know whether the Government thinks they produced the document or not during this case.

MR. ROBERSON: Clearly, we produced the document because it was produced in the Long Island case.

THE COURT: But in this case I want to know

whether it was produced.

MR. ROBERSON: That's what we're going to try to tie down is the issue with respect to -- there were different kinds of discovery, your Honor. Common discovery, case-specific discovery and a multiparty discovery. When a document was applicable to multiple parties, the documents were made available and it -- basically, Plaintiffs were informed that they could come down to the FDIC's offices and trace down the documents.

So that's what I'm trying to tie down. But the fact of the matter is that Astoria has had the document in its possession since July of 1999.

The other thing is that now they want to suggest they want to bring Dionne in, and I think honestly this is what this is all about, that they really want Dionne to come in and testify. The fact of the matter is they deposed Mr. Ketcha in this case, they deposed Mr. Dionne in this case, both FDIC officers. They deposed an FDIC -- two of the FDIC examiners, and they chose not to bring any FDIC witnesses because they didn't think the FDIC witnesses were important.

Third thing to keep in mind, your Honor, is that this document they're referring to is dated in March of 1990. In May of 1990, there's a document introduced in this case that indicates that the FDIC is going along with the

capital plan. Let me find the exact document. PX 591. There's a document that's admitted in this case that's a letter from Vigna to Mr. Ketcha. And in it, there's a discussion of a May 15 telephone conversation between the FDIC's analyst and supervisory -- George Herger and supervisory analyst John Muzilla. Mr. Herger stated the FDIC will not take exception to our approval of Fidelity's capital plan as our approval is predicated on the savings bank's achievement of specific targets."

So the notion that this March document indicates that there was a liquidation planned and that the FDIC was going forward doesn't make any sense anyway, based on the chronology that in May, the FDIC is communicating saying we're going to go on with the capital plan. And that document is admitted into evidence.

So the notion that it provides any relevant information that hasn't already been discussed in this case is incorrect in addition to that.

THE COURT: I mean, it may be relevant to the Court to know that Fidelity may have been targeted for the trash heap in March of 1990.

MR. ROBERSON: And I think that if you looked in the deposition of Mr. Dionne in the Long Island case, he explains that, that simply when thrifts didn't meet their capital targets, that they were tangibly insolvent, they got

on the list. It's no more complicated than that. And that's in the Dionne deposition that was in Long Island.

THE COURT: Well, as I say, I'm grateful to have this information, but why don't you find out what happened regarding this document in the document production in this case, not in the Long Island case. I'd be interested to know that.

MR. ROBERSON: I'll try to trace that down.

THE COURT: We can take it up right after lunch. I think would be a good time.

MR. ROBERSON: Okay.

MR. EISENHART: Thank you, your Honor.

THE COURT: Thank you.

Dr. Carron, I think it's your time again.

Welcome back, Ms. Groner.

MS. GRONER: Thank you. And I appreciate the Court's courtesy in letting me resume the examination.

THE COURT: It's not a problem. We also extend that Mr. Eisenhart, who raised no objection.

MS. GRONER: I appreciate that, Mr. Eisenhart.

THE COURT: Dr. Carron, do you understand that you are still under oath this morning?

THE WITNESS: Yes, sir.

THE COURT: Thank you.

Please go ahead.

AFTERNOON SESSION (1:33 p.m.)

Whereupon,

ANDREW CARRON

resumed the stand and, having been previously duly sworn, was examined and testified further as follows:

THE COURT: We're on the record for our afternoon session. I think we'll take up the issue of this newly discovered document as a preliminary matter. And I think we'll start with Mr. Roberson.

Maybe you can tell us what, if anything, you have learned.

MR. ROBERSON: Okay. I've learned some things, and with regard to the document production itself, it's inconclusive as of right now. And let me tell you the steps that I've made.

I've contacted my paralegals and said can you trace the production of this document in not only this case but in other cases. And because there is a number of cases that would have appeared on that list. Maybe that's the first thing I can do -- is, Plaintiffs gave you an incomplete copy of that document. Can I get a complete copy of the document to hand out at this stage?

May I approach?

THE COURT: Sure.

MR. ROBERSON: As your Honor can see, it's not a

list of what Mr. Eisenhart characterized as 14 thrifts that appeared on this list, but I think it's closer to if my accounting is right, 39 thrifts. This is not a list of thrifts that were eventually liquidated. I personally worked on a couple of these, statewide and New Jersey on the second page, not liquidated, obviously, Long Island was not liquidated. First, be clear about what this document is.

The second thing, to be clear about what this document is, you can see it talks about assistance. It's looking at documents that -- you see the second sentence of the document says "we are attempting to project if any of these institutions might be viable candidates for FDIC assistance under this Federal Deposit Insurance Act."

Mr. Eisenhart was referring to something called TAPA analysis, and he brought that up with regard to Mr. Kennedy yesterday. So we've never put on any case with regard to TAPA analysis. Let me just step back for a second and tell you what TAPA analysis is. That is a publicly available -- it was a regulation or statute -- do we have copies of that?

This is a document you can get on Westlaw. And not only can you get it on Westlaw -- may I approach? Not only can you get it on Westlaw, you can see Mr. Ketcha is referenced on the document. As you know, your Honor, Mr. Ketcha was the head of the FDIC in that section.

So the notion that there's some sort of secret policy here or some sort of secret goings-on is simply incorrect. And Mr. Eisenhart said he was unaware of this. It's simply you have to search on Westlaw to find it.

MR. EISENHART: Well --

MR. ROBERSON: Let me do my presentation, if you don't mind.

MR. EISENHART: All right. You interrupted mine but --

THE COURT: It's okay. Go ahead, Mr. Roberson.

MR. ROBERSON: Let's be clear what this is and isn't. It's a publicly available program. This was in a list of 40 institutions, not 14. It's a document that concerns assistance.

I understand a similar document was also sent to other regions as well, so there was a large list of institutions. The third thing to understand about what happens in this document is that Mr. Dionne was deposed in Long Island with respect to this document. And in Long Island -- do we have a copy of his transcript in that?

THE COURT: Not to suggest what you may want to argue, I'm not overly impressed with what may have happened or not happened in the Long Island case. You can still go through this and point it out. But that's a different case. Even though you could say it's an Astoria case just like

this one is, it's a different set of lawyers and I'm not sure that this set of lawyers in our Fidelity Astoria case should somehow be charged with knowledge of what happened in Long Island. But go ahead.

MR. ROBERSON: I understand. And if you will turn to page -- first, the reference to this document comes up at page 31 to 32 -- actually, 30 to 32. Mr. Dionne gives an explanation why this -- why the thrift there is Centereach, would have appeared on this list, meaning the document that Plaintiffs have alerted you to. What he says, it's because it's either at, slightly above or below zero percent tangible-tier-level capital.

There's no argument in this case that Fidelity was above tangible capital. Everyone admits that it was below tangible capital at the time. So by definition here, he's saying it would have been on the list.

Now, this TAPA analysis shows up at pages 84 through 85. And I think he's referencing back to this document. And if they asked him what he knows about the result of the TAPA analysis, and he says he doesn't recall.

Well, you can imagine why he wouldn't recall when there's a list of 40 institutions that might have been analyzed by the TAPA analysis.

So the notion that we're going to advance the ball here with Mr. Dionne, I think we should take off the table

right now. I think if there's going to be any further discovery, and if you go to Mr. Ketcha, Mr. Ketcha was on our, you know, initial disclosures. They deposed him in this case. So if we're going to do anything, it's Mr. Ketcha who is sending out this letter. And as you can see on the policy publicly available, it's Mr. Ketcha who was, you know -- I didn't show you.

At the last page of the FDIC Westlaw, you can see there's a contact list. About three pages from the back it says, you know, there's this regional offices, and you see on the last page, Mr. Ketcha's referenced as -- I'm sorry, second-to-last page, Mr. Ketcha is referenced from the New York regional office.

THE COURT: Yes.

MR. ROBERSON: That's setting the context of what this document is about and who may have better further knowledge about it.

Now, in terms of the actual production, here's what I found out. As I said, I contacted my paralegals this morning and said tell me what you know about this document production and what happened.

What we do know is that this document was produced to Long Island in a box, all right. So these cases usually have -- and I'm trying to get a number on it. Maybe it's come in, how many boxes were produced in this case.

Somebody handed me a note and I've already misplaced it.

THE COURT: It wouldn't surprise me if there's a large volume of documents.

MR. ROBERSON: It's usually around 200 boxes. And so the notion is, the way the document production has worked with the Winstar cases, was we would make available, let's say the FDIC in this case would make available, all its documents, and Plaintiffs would come by and choose certain documents. And we would go by and choose certain documents.

Maybe out of that 200 boxes, how many were actually chosen? I'm not sure how many they chose. And so I don't have that information. But it's usually a significant portion less than the amount that were made available. And the same way with us.

Now, when we got the documents, typically but not always, we would -- of our selections, we would then put them into electronic database so that we make them searchable.

Now, what we do know is, from our search this morning, is that that particular document -- I mean that box of documents that was produced in Long Island was not put into that format. So I can't ask my paralegals, you know, press a button and try to find where that document existed in the boxes of documents that were produced.

So for me to give the Court a firm answer that the

document was produced or that it was not produced would take me -- we can start the process, but it would require me to have the FDIC literally go back and pull that document out of storage and see if in a subsequent case -- because Long Island was a first 30 case and Astoria is a second 30 case. I don't know if the Court is aware, there were different tranches of discovery that corresponded to the different tranches of cases.

So for me to figure out what happened with that box, we need to pull that box out, literally out, of storage and then see if it was subsequently after the Long Island production put it into what I think they are calling ARMs or remaps format which would permit them to see where it was later produced.

If you see, your Honor, on this list of potential thrifts that potentially could be liquidated, there are a number of cases of thrifts here that brought Winstar cases against the government. First one, Anchor, obviously we have Fidelity, First Federal of Rochester. I was on Statewide, I said, on the next page. I think Hansen was a plaintiff, Jersey Shore was a plaintiff. So there was a number of these that it might have been produced in, but the first step for us to have that knowledge is to actually pull that box out, determine if it was later converted into an electronic-like header and footers, or searchable with the

box.

So I can't -- inasmuch as I can't say to you, your Honor, this was definitely produced to Astoria, neither can Astoria say it was not produced to them, because it's just too big a needle in a haystack. But we can start that process.

Now, I understand just talking to my paralegals that to pull the box of documents out and to try to do this process, we're probably talking about a week's time. So if that's the way your Honor would like us to proceed, I think we're talking about it's not something I can give you an answer, you know, right now, although I tried my best with my paralegals.

THE COURT: Sure.

MR. ROBERSON: So in terms of whether this document was produced or not, we can't make that determination right now. I suspect that it probably was, but -- in the sense that no one went around choosing all the documents that were made available.

Now, the other thing is with regard to whether the Plaintiffs even requested this type of a document in their document request, I haven't had time to look at what their document requests were. So the other issue is whether if this is even applicable to the request that they set forth.

So then the other thing is, if we were just

talking about this document, although I would object to it on the first blush, on second blush, I don't care if the document comes in. So if it's just we're going to bring in this document, doesn't make any difference.

Why? Because as I mentioned earlier, this is a March document. We've already shown that it's a calculation done simply when you're tangibly insolvent. And we know that in May, the capital plan is being discussed with the FDIC and the OTS, and indeed the FDIC signs on, I think I mentioned it to you, PX 591.

So anything that happens in the capital plan now, any restriction that happens in the capital plan, that's under the capital plan. So it's not an issue that the -- you know, the FDIC was going to -- that this earlier analysis is relevant to what actually happened in this case, which was that it was put under the capital plan, the FDIC agreed for it to be put in the capital plan.

The third thing is, the whole notion that there was a liquidation possibility out there has not been disputed by -- there's been plenty of discussion with the OTS regulators that said yes, you know, there was a difference of opinion between the FDIC and the OTS. We're the primary regulators, and the FDIC had difference of opinions.

Now, we've also shown too in the case that part of

the reason for the FDIC's differences, one part is that they read the CMO -- rated the CMOs completely different. One time it was a difference of maybe $40 million, maybe 50, somewhere in that range.

No doubt, there's a difference in analysis, no doubt the FDIC -- that's not the issue. This case is what happened under the capital plan. The capital plan was put in after this document was submitted and circulated around the FDIC.

THE COURT: Let me hear from Mr. Eisenhart at this point. I understand your position and how this document fits into the total scheme of things. I want to hear from Plaintiff about its position after hearing your presentation.

MR. EISENHART: Yes, your Honor. I never really got a chance to state our full concern this morning before Mr. Roberson took over. But let me tell you, it is more than just this document, I'm looking at a portion of the trial transcript from the LISB case. And by the way, Mr. Roberson is the one who is doing -- reading -- they were reading the deposition and Mr. Roberson was reading it in for the Government.

But they put this document into evidence and then a little later on Mr. Dionne is asked the following question. "Do you know whether a TAPA analysis was

conducted on Centereach?" Centereach was the basket case, the institution there that Long Island Savings Bank took over.

"Answer: I believe it was.

"Question: Why?

"Answer: Because all those banks that were on the list, on this list that you showed me earlier," meaning this document, "would have been typically had a TAPA analysis."

Now, what is a TAPA analysis? We did a little Googling this morning, or Mr. Falls did, and we found a GAO report on failed banks done in 1991. There's some interesting things in here.

It says when banks fail, FDIC as insurer usually conducts a total asset purchase and assumption, which is TAPA, review, and always prepares a cost test report, there are two documents, the TAPA analysis, the cost test report. "These are done so that the FDIC can estimate the amount it can realize from the sales of the bank's assets. TAPA reviews are not prepared for all failed banks. However, FDIC will prepare a cost test report, which estimates its net outlays without an estimate of asset values."

So what they're doing with these two reports is estimating the cost that it's going to take the FDIC to liquidate this institution, which is a highly important piece of evidence in this case. This is what the government

is going to lay out if Fidelity's capital plan isn't approved or if Fidelity can't execute the capital plan.

As far as the way they treat the TAPA analyses, I think Mr. Roberson is just dead wrong when he says you can go on the Internet and get these. Again, I'm quoting from the GAO report. "When OCC or a state regulatory agency declares a bank insolvent and decides to close it, it informs FDIC, upon receipt of this notification, FDIC initiate an examination by its division of bank supervision." "In addition, staff and the FDIC's division of liquidation begin a review. This procedure is conducted without informing the bank, often under the guise of a regular bank examination."

So they take plans -- they take some pains to keep these things secret. What struck me when I first got this letter -- by the way, the letter I got from Milbank was two pages, I accept that there may have been two other pages that they didn't send us for some reason.

But the thing that struck me is the letter says "enclosed is a listing of the savings and loan institutions in your district which the FDIC is currently projecting."

When I looked at those words, I said oh, somebody is doing an analysis. We've never seen any such analysis. We've of course never seen this letter. Then when we get the information from the trial transcript, we realize one of

the analyses being done is clearly the TAPA examination, or at least so Mr. Dionne thought. We have never seen that either.

So I don't think it's just a question of the one document. I think there are several documents right in around this crucial time period that we have never seen.

As far as whether we asked for them, I pulled -- this is Plaintiff's first request for production of documents.

Request number 6. "All documents concerning supervisory review of the financial condition, capital liquidity, asset quality, management, business plans, operation, business activities or earnings of Fidelity by the government, including FHLBB, FSLIC, OTS and FDIC." This document was clearly -- falls clearly within the scope of that request.

There are actually at least two others that would call for it as well, number 20 and number 84. I won't go into them. But clearly, it's a document we requested. We are confident we did not receive these. Even if somebody made a mistake with one of the documents, you would expect to see at least some of them in these witness binders, which is where they should have gone. We don't have them in any of them. We've gotten back our boxes, or at least as many of them as we can locate, of the Government's original

production. They're in no order and I don't even know the magic of the Government's system. So we have not done a document-by-document review. But I don't think we really have to do it. We're pretty confident we don't have these.

THE COURT: Based upon what I've heard, the absence of the TAPA analysis may be even more significant than this particular letter that you showed me this morning. The letter by itself seems that indicate that Fidelity was on a watch list of some kind, as an institution that had capital that was near zero or thereabouts.

MR. EISENHART: You are absolutely right. If I had seen nothing other than this letter, and the letter had not had the words in it "is currently projecting," I don't think I would have gotten excited about it, because all that tells me is the FDIC has Fidelity on a list, which wouldn't have been any surprise to me.

THE COURT: But the TAPA analysis, assuming one exists with regard to Fidelity, seems to be in a different category. First of all, I don't understand why it was not produced, if that's the case. It seems to be obvious if you have a TAPA analysis relating to Fidelity, it surely should have been produced.

And secondly, it may obviously have importance with regard to the Plaintiff's damages claim. There could be a way to look at that to calculate any number of things

about how the numbers should factor into their claims.

So I don't think this is going to go away, at least not this afternoon. I think we need to understand a little more about the status here. We need to know whether there was a TAPA analysis related to Fidelity, and I think that needs to be produced if it does exist.

I recognize we're at the later stages of trial here. This is not a discovery proceeding. But nevertheless, fairness would dictate that we not close the record on these matters right now.

So I'm going to -- if we're not -- if we don't have the answers to these things by the close of the other testimony next week, I think we'll have to leave the record open.

Mr. Roberson, do you have any further views about this?

MR. ROBERSON: Your Honor, my further view is if you do step back and think about what the damage claims are in this case, their liquidation cost avoided claim is with regard to Suburbia in 1984. It's not with regard to the avoided liquidation costs of Fidelity in 1990. There's no such claim in this case.

In fact, if you're talking about restitution claim, you always go back to the time of the contract. So it doesn't -- in a certain sense, it doesn't make any sense

anyway. We'd be introducing -- we'd have to have a completely new type of damage theory, and --

THE COURT: Well, I hope we don't. And you might be right. I mean, who knows at this point? But I'm just saying, with the talented experts we've heard from in this case, who knows what they might think is material.

MR. ROBERSON: Your Honor, we're happy to -- I mean, I think we're chasing a red herring, but we're happy to do whatever the Court would request of us in terms of further document productions. Maybe the Plaintiffs can give us a list of specific document requests that they want us to present to the FDIC, and we'd be happy to pursue it in that regard.

Obviously, we'd just ask that it would be restricted to the regional -- region that's appropriate because obviously the FDIC has a number of regions. As you can see from the FDIC analysis we gave you, there was a number of different regions.

And so I mean, if we're going to proceed, let's go with the documents first, because I don't -- I mean honestly, I think this is we're chasing a red herring. But the documents would be the way to go first.

THE COURT: I think we want to approach this issue on a step-by-step basis. I don't want to open things wide up -- open wide for further proceedings, unless I'm

confident that it's really going to go somewhere.

So I think step one is to find out if there is a TAPA analysis performed with regard to Fidelity.

MR. ROBERSON: Okay.

THE COURT: Then let's go from there.

MR. ROBERSON: Okay. So I will take that as a charge to inquire of the FDIC whether a TAPA analysis was done with respect specifically to Fidelity, and if so, any work papers or related documents with that.

THE COURT: Yes.

MR. ROBERSON: Is that a correct charge, your Honor?

MR. EISENHART: Your Honor, I think it's actually two documents. I think looking at the GAO report, it talks about a TAPA review, and it also talks about a cost-test report.

THE COURT: I think both of those categories.

MR. ROBERSON: Fair enough, your Honor. We'll undertake that.

THE COURT: Let's see where we are after that, and then we'll decide about the future.

MR. ROBERSON: Okay. And in the meantime too, we will find out whether these documents were -- whether the general documents or whatever they were produced. For instance, this particular document with regard to Long

Island Savings Bank.

THE COURT: Wonderful. That will be great.

MR. ROBERSON: Thank you, your Honor.

MR. EISENHART: Thank you, your Honor.

THE COURT: Dr. Carron, sorry for the interruption. Please come forward.

BY MS. GRONER:

Q Dr. Carron, would you turn to PX 237, which was the issues memorandum of October 15, 1984.

A I have it.

Q Okay. Does this memorandum discuss any relationship between interest rates and Suburbia's problems?

A Yes. On the first page where it says "background," the second line says "its financial problems are caused by a negative spread between its cost of funds and its earning assets."

So that is consistent with what we saw in the S-memorandum and with my testimony about the condition of thrift institutions more broadly during that time period.

Q What would have happened to Suburbia if the acquisition by Fidelity had not occurred and interest rates came down as they did?

MR. EISENHART: Your Honor, I'm going to object to that, on two grounds. One, I don't think there's been a foundation laid for Dr. Carron having the kind of regulatory

have anything else today. We have Mr. Stearns, the cross will resume by video testimony on Tuesday morning at 9:30, and then we intend to rest. So I think we're near the end.

THE COURT: All right. Is the Plaintiff contemplating any rebuttal at this point?

MR. EISENHART: We are not, your Honor.

THE COURT: All right. So Tuesday might be it.

MR. ROBERSON: Yes.

THE COURT: At least pending the outcome of our document issues.

MR. ROBERSON: Right. And I did get some more information, your Honor. We produced 409 FDIC boxes that were made available to the Plaintiffs, and they reviewed 24 boxes.

MS. BOTTICELLI: Your Honor, if I could just say something.

THE COURT: Absolutely, please come forward.

MS. BOTTICELLI: Just to clear things up a little bit. If you look at the letter, the letter sent from the FDIC to the OTS, Mr. Vigna is with the OTS, so it's not just what may be in the FDIC files, but it's also what may be or should have been in the OTS files.

So in terms of this TAPA analysis, you know, I think we need to be asking the OTS as well whether or not they ever received a copy of that. Because the letter does

contemplate a back and forth, if you look at the last paragraph.

THE COURT: We'll just await further information and see where this leads. That's all I can say right now. All right.

Another subject we'll take up on Tuesday, you can be thinking about it, I'd be interested in knowing about what post-trial briefing conventions have typically been used in these cases. I have my own thoughts about how I like to see post-trial findings of fact and so forth. And think about the timing of when we're going to do all this. I'll entertain your thoughts about that next week.

All right. If there's nothing further, we'll adjourn until 9:30 a.m. on Tuesday.

(Whereupon, at 3:06 p.m., the hearing was adjourned, to be reconvened at 9:30 a.m., on Tuesday, May 29, 2007.)

# EXHIBIT 3

P R O C E E D I N G S

THE COURT: Nice to see you all again. We're on the record in the case of Astoria Federal Savings and Loan in a hopefully concluding event today.

The first thing I would like to do, I believe, is to address this issue of the document that may have been missing from discovery. How does that turn out? Maybe we should hear from Mr. Roberson.

MR. ROBERSON: Sure. The quick answer is that we haven't found the document, but let me tell you what we've done to try to find the document. And I think what we're looking at ultimately is we're trying to find whether or not a needle exists in a haystack as opposed to whether a needle even exists and is in a haystack.

But let me tell you what we've done.

THE COURT: Okay.

MR. ROBERSON: We have an extensive electronic database that covers not only this case but every other case that's been put through on the Winstar cases, so we have a database for every other Winstar case where we've loaded documents in our database. And we have a database for common discovery. There was a period of common discovery where documents that were common to multiple parties, those documents were produced. And there were three different waves, as you may understand. There was initial tranche,

second tranche and third tranche of Winstar cases.

We've searched all of our electronic database and we can't find the Vigna/Ketcha letter in any other database, any response to that letter or any TAPA analysis with respect to Fidelity.

With respect to Astoria specifically, there are also documents obviously that weren't electronically stored. I mean, there's huge productions and attorneys would choose which -- as the case was progressing, they would choose which documents to load into the electronic database.

For Astoria we've searched through 200,000 pages that weren't searchable electronically, we did those by hand and don't find the document.

What we have concluded is that this Vigna/Ketcha letter appears to have only been produced in Long Island. And the way we determined that was we located the box that it was produced in and traced back whether that box was later produced, because it was -- the Long Island case, I think, was a different wave than this case.

So we traced back to whether that box was actually produced in this case, and it wasn't. So that -- I can say that particular box with that particular copy of the document was not produced in this case.

So we searched that. We've searched all of the depositions in all the Winstar cases to see if there's been

any discussion of the TAPA analysis and the cost test report. What we found was we found the Long Island case, again, where we found -- in fact, I think it was an exhibit where they had this asset review analysis of what the purported costs of liquidation as of early 1990 would be. So we have the LISB one, and obviously LISB wasn't liquidated.

We also found two other examples, one was in Statesman and one was in a case called Syntex, I think it was -- it also went by the moniker Anderson Wallace.

In both of those cases in which the thrifts were liquidated, there was this asset review and TAPA analysis. And in those two cases, you know, those documents we did locate. Obviously it has nothing to do with Fidelity other than the fact that in two liquidations, the analysis we found was performed.

We have asked the FDIC to look into the issue and the OTS. The FDIC has looked -- has tried to do some electronic searches in the manner in which they store documents.

And what they do is they have boxes and they have folders obviously, red wells, folders in each box. What they do, when they store things for their searchable -- you -- search their records, they can search the file headings on each file in a box.

So far they haven't located any such document with respect to Astoria, but their search is not completed on that. So that's still outstanding.

They have also contacted the person who did the LISB analysis, a man by the name of Simon Levy. On the asset review for LISB, he's the person sending the memo out to another FDIC person who has since retired. And he doesn't recall any analysis for Fidelity.

It's not conclusive because I can't say that he would have been responsible for all the analysis on Long Island or not, but just that piece of the thread has been pulled and there's nothing there. He recalls no analysis for Fidelity.

So the FDIC search is ongoing. I've contacted the OTS attorneys and asked them to look into this analysis.

But just so you know, your Honor, what we did, all the OTS documents that were produced in this case were loaded by us electronically. So the notion would be that if the document existed, it wouldn't be in the documents that the OTS produced so far.

So unless it exists in some other file somewhere, you know, which they're still checking into, I couldn't make a representation one way or another on that. That's where we're at.

So unfortunately it's not concluded at this point

in time because we still have the FDIC analysis.

Now, like I said, really what we're trying to do is prove a negative, that the document wasn't produced or that the document doesn't exist. No one has any institutional recollection, the FDIC attorneys don't have any recollection of this. So it's trying to prove a negative, and I -- at the end of the day, if they want to -- you know, the big unknown too is we have these 409 boxes of FDIC documents that weren't scanned into the databases that would have to be searched by hand, which we made available in initial discovery to the Plaintiffs.

As I indicated last time we met, Plaintiffs selected 119 pages out of those 409 boxes. So I mean, the burden shouldn't be on us if they did that kind of search of the documents to find this document. At the end of the day, if we can't find the document through searching electronically and searching these folders and so forth, then my suggestion would be either that we call it a day, or if the Plaintiffs are really intent on following this, because I think it's a complete red herring and wild-goose chase, then we will make the boxes available to them and they can look through them.

THE COURT: I was wondering if you could check with Mr. Vigna. He seemed to have a pretty good recall.

MR. ROBERSON: I'll check in with him, your Honor.

THE COURT: Thank you, Mr. Roberson.

Mr. Eisenhart, do you have a reaction to all of this?

MR. EISENHART: Several reactions. Let me just say the one occasional piece of information we've developed since we last spoke about this subject is we did get a copy of the TAPA analysis that was done on the Long Island Savings Bank case. And in addition to the name of Mr. Levy, who was the person who did the analysis, there are at least two other people that they probably should be talking to as well.

One is a Thomas Beshara, who was the regional director for liquidation of the New York regional office of the FDIC. He's the person that Mr. Levy sent the TAPA analysis to.

And then there is a William H. Leatham, whose title is bank liquidation specialist, and he is the one who passed the analysis along to Mr. Ketcha. So we have kind of a train within the FDIC.

The only other things I would point out, and this is really by way of repetition rather than anything else, is that we also have the sworn testimony by Mr. Dionne in the Long Island Savings Bank case that to his knowledge, TAPA analyses were done on all the institutions listed in the March 21, 1990 letter. So I think at the very minimum, I

take what Mr. Roberson said at face value. Obviously, they have been looking for it, but there ought to be a bunch of these things out there somewhere if Mr. Dionne's testimony was accurate.

THE COURT: All right.

MR. EISENHART: And the only other thing I would observe is, looking at the LISB analysis, now, I have to say on the face of it, I don't completely understand it. I would -- it's the kind of thing where you would really want to get the person -- somebody who is knowledgeable about this and you need to ask them what some of these things mean.

But I would say that on the face of it, it would support a liquidation -- you know, an estimated liquidation number by the FDIC for LISB. And I would expect a TAPA analysis for Fidelity to show the same thing.

THE COURT: All right. Thank you, Mr. Eisenhart.

I think under the circumstances, it might be best, first of all, not to hold anything up pending the outcome of this inquiry. I think we should move ahead with our briefing schedule and all of that.

Mr. Roberson, do you think 30 days would be enough time to tie up these loose ends and to conclude the search for the document?

MR. ROBERSON: Oh, I think so, yes.

THE COURT: All right. Well, why don't we do that. Why don't you continue to pursue the items you've identified, as well as those suggested this morning, perhaps checking with the people that have been identified.

And if you learn something sooner, please inform both Plaintiff and the Court of your findings. And if there's anything that needs to be done as a result of the outcome, you can simply let me know and we can decide if anything further needs to be done.

If you want to move to reopen the record because of some discovery, that's fine, we'll consider that.

But failing the location of the document, we'll just treat the matter as closed. Is that -- does that seem fair to both sides?

MR. ROBERSON: Yes, your Honor.

MS. BOTTICELLI: Your Honor, one thing we'd like to do, though, is move in at least the letter to Mr. Vigna.

THE COURT: Come forward, Ms. Botticelli.

MS. BOTTICELLI: Oh, I'm sorry.

THE COURT: That's fine.

MS. BOTTICELLI: Can we at least move into the record this letter that went to Mr. Vigna from Mr. Ketcha, which is kind of the letter that started things?

THE COURT: Any objection?

MR. ROBERSON: Well, I would object that there's

not a foundation with respect to Mr. Ketcha is not here. So on a formal matter, I'll object, your Honor.

THE COURT: Well, I think we'll not admit it for the purpose of the truth of the matters asserted but just for the sake of a clear record so that we have in the exhibits a document that identifies the reason for this search. I think that would be fine.

So for the limited purpose that the document exists and says what it says, that's fine.

MS. BOTTICELLI: We should designate it PX, and I don't know where we are in the numbering.

THE COURT: Presumably the next item of business is going to be the exhibit list, so if that's a help.

MR. EISENHART: We could call it the last exhibit -- the last Plaintiff's Exhibit that was admitted was PX 1359. So we can call this PX 1360.

THE COURT: Do you all agree with that on the Defendant's side?

MR. ROBERSON: We'll have to check and see. The concern is that if there was another 1360 that wasn't admitted, so you might want to choose a number that's well above your range. 2000 or something like that.

MR. EISENHART: PX 2000 is fine with me.

THE COURT: All right.

(The document referred to was marked for identification as Plaintiffs' Exhibit No. PX 2000.)

MS. BOTTICELLI: Your Honor, I move in Plaintiff's Exhibit 2000.

THE COURT: Okay. Plaintiff's Exhibit 2000 is admitted.

(The document referred to, previously identified as Plaintiff's Exhibit No. PX 2000, was received in evidence.)

THE COURT: And if you can -- if you have a copy with an exhibit sticker on that, if you can forward that up to my clerk, that would be great.

MS. BOTTICELLI: Okay. While I'm up here, there's one other housekeeping issue I should probably raise.

THE COURT: Sure.

MS. BOTTICELLI: There was an exhibit that I moved in with Mr. Albanese, DX 3389. There were a series of objections and ultimately the Court said move -- you know, go ahead, basically, but the document was never formally accepted. And I think that the Government is taking issue

# EXHIBIT 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - x
LONG ISLAND SAVINGS BANK    :
and                         :
LONG ISLAND SAVINGS BANK OF :
CENTEREACH,                 :
          Plaintiffs,       :    Number 92-517
     vs.                    :
THE UNITED STATES OF AMERICA:
          Defendant.        :
- - - - - - - - - - - - - - - - x
```

HEARING, Volume 9

Courtroom 7
Court of Federal Claims
717 Madison Place NW
Washington, DC

Monday, February 14, 2005

The hearing commenced, pursuant to notice of the Judge, at 9:32 a.m., before the Honorable Charles F. Lettow, Judge for the United States Court of Federal Claims.

A I don't know exactly what it means, but I know what it is.
Q What is it?
A It's a cost analysis.
Q What type of cost analysis?
A In a failing bank situation.
Q Under what circumstances would a TAPA analysis have been undertaken?
A In the event of closure of the bank, or sale of the bank, I should say. Could have been closed.
Q Would that analysis have been undertaken in any other circumstances?
A I'm not sure what you're asking me.
Q Other than a closure or sale of the bank, which I believe you testified was when --
A Or anticipation of perhaps a sale or closure of a bank at some future date, it might have been done.
Q Other than the actual closure or sale or the anticipation of closure, would there have been any other reason to undertake that analysis?
A No.
Q Do you know --
A Not that I'm aware of.
Q Do you know whether a TAPA analysis was conducted on Centereach?



A I believe it was.
Q Why?
A Because all those banks that were on the list -- on this list that you showed me earlier would have been -- typically had a TAPA analysis.
Q Do you know what the result of the TAPA analysis for Centereach was?
A I don't recall.
MR. LEBLANC: That completes that section, your Honor. If you wanted to rule on the relevancy objection.
MR. OWSLEY: Still not sure I understand the relevance, your Honor.
THE COURT: It may or may not be material. I have my doubts. But within the broad range of relevancy, the Court will accept the testimony and not strike the answers.
MR. LEBLANC: Page 94. This is in reference, your Honor, back to tab 2, DX 89, LIP 119818, second paragraph. And I will actually just skip ahead to line 13, to avoid the issue with talking about this document.
BY MR. LEBLANC:
Q Do you recall telling Mr. Conway that in hindsight, not merging the banks was a wise decision?
A Yes.
Q Why do you believe that to be true?
A I said it with somewhat of a chuckle at the time,