# EXHIBIT 3

P R O C E E D I N G S

THE COURT: Nice to see you all again. We're on the record in the case of Astoria Federal Savings and Loan in a hopefully concluding event today.

The first thing I would like to do, I believe, is to address this issue of the document that may have been missing from discovery. How does that turn out? Maybe we should hear from Mr. Roberson.

MR. ROBERSON: Sure. The quick answer is that we haven't found the document, but let me tell you what we've done to try to find the document. And I think what we're looking at ultimately is we're trying to find whether or not a needle exists in a haystack as opposed to whether a needle even exists and is in a haystack.

But let me tell you what we've done.

THE COURT: Okay.

MR. ROBERSON: We have an extensive electronic database that covers not only this case but every other case that's been put through on the Winstar cases, so we have a database for every other Winstar case where we've loaded documents in our database. And we have a database for common discovery. There was a period of common discovery where documents that were common to multiple parties, those documents were produced. And there were three different waves, as you may understand. There was initial tranche,

second tranche and third tranche of Winstar cases.

We've searched all of our electronic database and we can't find the Vigna/Ketcha letter in any other database, any response to that letter or any TAPA analysis with respect to Fidelity.

With respect to Astoria specifically, there are also documents obviously that weren't electronically stored. I mean, there's huge productions and attorneys would choose which -- as the case was progressing, they would choose which documents to load into the electronic database.

For Astoria we've searched through 200,000 pages that weren't searchable electronically, we did those by hand and don't find the document.

What we have concluded is that this Vigna/Ketcha letter appears to have only been produced in Long Island. And the way we determined that was we located the box that it was produced in and traced back whether that box was later produced, because it was -- the Long Island case, I think, was a different wave than this case.

So we traced back to whether that box was actually produced in this case, and it wasn't. So that -- I can say that particular box with that particular copy of the document was not produced in this case.

So we searched that. We've searched all of the depositions in all the Winstar cases to see if there's been

any discussion of the TAPA analysis and the cost test report. What we found was we found the Long Island case, again, where we found -- in fact, I think it was an exhibit where they had this asset review analysis of what the purported costs of liquidation as of early 1990 would be. So we have the LISB one, and obviously LISB wasn't liquidated.

We also found two other examples, one was in Statesman and one was in a case called Syntex, I think it was -- it also went by the moniker Anderson Wallace.

In both of those cases in which the thrifts were liquidated, there was this asset review and TAPA analysis. And in those two cases, you know, those documents we did locate. Obviously it has nothing to do with Fidelity other than the fact that in two liquidations, the analysis we found was performed.

We have asked the FDIC to look into the issue and the OTS. The FDIC has looked -- has tried to do some electronic searches in the manner in which they store documents.

And what they do is they have boxes and they have folders obviously, red wells, folders in each box. What they do, when they store things for their searchable -- you -- search their records, they can search the file headings on each file in a box.

So far they haven't located any such document with respect to Astoria, but their search is not completed on that. So that's still outstanding.

They have also contacted the person who did the LISB analysis, a man by the name of Simon Levy. On the asset review for LISB, he's the person sending the memo out to another FDIC person who has since retired. And he doesn't recall any analysis for Fidelity.

It's not conclusive because I can't say that he would have been responsible for all the analysis on Long Island or not, but just that piece of the thread has been pulled and there's nothing there. He recalls no analysis for Fidelity.

So the FDIC search is ongoing. I've contacted the OTS attorneys and asked them to look into this analysis.

But just so you know, your Honor, what we did, all the OTS documents that were produced in this case were loaded by us electronically. So the notion would be that if the document existed, it wouldn't be in the documents that the OTS produced so far.

So unless it exists in some other file somewhere, you know, which they're still checking into, I couldn't make a representation one way or another on that. That's where we're at.

So unfortunately it's not concluded at this point

in time because we still have the FDIC analysis.

Now, like I said, really what we're trying to do is prove a negative, that the document wasn't produced or that the document doesn't exist. No one has any institutional recollection, the FDIC attorneys don't have any recollection of this. So it's trying to prove a negative, and I -- at the end of the day, if they want to -- you know, the big unknown too is we have these 409 boxes of FDIC documents that weren't scanned into the databases that would have to be searched by hand, which we made available in initial discovery to the Plaintiffs.

As I indicated last time we met, Plaintiffs selected 119 pages out of those 409 boxes. So I mean, the burden shouldn't be on us if they did that kind of search of the documents to find this document. At the end of the day, if we can't find the document through searching electronically and searching these folders and so forth, then my suggestion would be either that we call it a day, or if the Plaintiffs are really intent on following this, because I think it's a complete red herring and wild-goose chase, then we will make the boxes available to them and they can look through them.

THE COURT: I was wondering if you could check with Mr. Vigna. He seemed to have a pretty good recall.

MR. ROBERSON: I'll check in with him, your Honor.

THE COURT: Thank you, Mr. Roberson.

Mr. Eisenhart, do you have a reaction to all of this?

MR. EISENHART: Several reactions. Let me just say the one occasional piece of information we've developed since we last spoke about this subject is we did get a copy of the TAPA analysis that was done on the Long Island Savings Bank case. And in addition to the name of Mr. Levy, who was the person who did the analysis, there are at least two other people that they probably should be talking to as well.

One is a Thomas Beshara, who was the regional director for liquidation of the New York regional office of the FDIC. He's the person that Mr. Levy sent the TAPA analysis to.

And then there is a William H. Leatham, whose title is bank liquidation specialist, and he is the one who passed the analysis along to Mr. Ketcha. So we have kind of a train within the FDIC.

The only other things I would point out, and this is really by way of repetition rather than anything else, is that we also have the sworn testimony by Mr. Dionne in the Long Island Savings Bank case that to his knowledge, TAPA analyses were done on all the institutions listed in the March 21, 1990 letter. So I think at the very minimum, I

take what Mr. Roberson said at face value. Obviously, they have been looking for it, but there ought to be a bunch of these things out there somewhere if Mr. Dionne's testimony was accurate.

THE COURT: All right.

MR. EISENHART: And the only other thing I would observe is, looking at the LISB analysis, now, I have to say on the face of it, I don't completely understand it. I would -- it's the kind of thing where you would really want to get the person -- somebody who is knowledgeable about this and you need to ask them what some of these things mean.

But I would say that on the face of it, it would support a liquidation -- you know, an estimated liquidation number by the FDIC for LISB. And I would expect a TAPA analysis for Fidelity to show the same thing.

THE COURT: All right. Thank you, Mr. Eisenhart.

I think under the circumstances, it might be best, first of all, not to hold anything up pending the outcome of this inquiry. I think we should move ahead with our briefing schedule and all of that.

Mr. Roberson, do you think 30 days would be enough time to tie up these loose ends and to conclude the search for the document?

MR. ROBERSON: Oh, I think so, yes.

THE COURT: All right. Well, why don't we do that. Why don't you continue to pursue the items you've identified, as well as those suggested this morning, perhaps checking with the people that have been identified.

And if you learn something sooner, please inform both Plaintiff and the Court of your findings. And if there's anything that needs to be done as a result of the outcome, you can simply let me know and we can decide if anything further needs to be done.

If you want to move to reopen the record because of some discovery, that's fine, we'll consider that.

But failing the location of the document, we'll just treat the matter as closed. Is that -- does that seem fair to both sides?

MR. ROBERSON: Yes, your Honor.

MS. BOTTICELLI: Your Honor, one thing we'd like to do, though, is move in at least the letter to Mr. Vigna.

THE COURT: Come forward, Ms. Botticelli.

MS. BOTTICELLI: Oh, I'm sorry.

THE COURT: That's fine.

MS. BOTTICELLI: Can we at least move into the record this letter that went to Mr. Vigna from Mr. Ketcha, which is kind of the letter that started things?

THE COURT: Any objection?

MR. ROBERSON: Well, I would object that there's

not a foundation with respect to Mr. Ketcha is not here. So on a formal matter, I'll object, your Honor.

THE COURT: Well, I think we'll not admit it for the purpose of the truth of the matters asserted but just for the sake of a clear record so that we have in the exhibits a document that identifies the reason for this search. I think that would be fine.

So for the limited purpose that the document exists and says what it says, that's fine.

MS. BOTTICELLI: We should designate it PX, and I don't know where we are in the numbering.

THE COURT: Presumably the next item of business is going to be the exhibit list, so if that's a help.

MR. EISENHART: We could call it the last exhibit -- the last Plaintiff's Exhibit that was admitted was PX 1359. So we can call this PX 1360.

THE COURT: Do you all agree with that on the Defendant's side?

MR. ROBERSON: We'll have to check and see. The concern is that if there was another 1360 that wasn't admitted, so you might want to choose a number that's well above your range. 2000 or something like that.

MR. EISENHART: PX 2000 is fine with me.

THE COURT: All right.

(The document referred to was marked for identification as Plaintiffs' Exhibit No. PX 2000.)

MS. BOTTICELLI: Your Honor, I move in Plaintiff's Exhibit 2000.

THE COURT: Okay. Plaintiff's Exhibit 2000 is admitted.

(The document referred to, previously identified as Plaintiff's Exhibit No. PX 2000, was received in evidence.)

THE COURT: And if you can -- if you have a copy with an exhibit sticker on that, if you can forward that up to my clerk, that would be great.

MS. BOTTICELLI: Okay. While I'm up here, there's one other housekeeping issue I should probably raise.

THE COURT: Sure.

MS. BOTTICELLI: There was an exhibit that I moved in with Mr. Albanese, DX 3389. There were a series of objections and ultimately the Court said move -- you know, go ahead, basically, but the document was never formally accepted. And I think that the Government is taking issue