IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION, | ) | |
| Plaintiff, | ) | No. 95-468C |
| | ) | (Judge Thomas C. Wheeler) |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PROPOSED FINDINGS OF FACT**
**OF PLAINTIFF**
**ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION**

Frank J. Eisenhart
Counsel of Record
Catherine Botticelli
Tara R. Kelly
Catherine E. Stahl
Craig Falls
Dechert LLP
1775 I Street, NW
Washington, DC 20006

Attorneys for Plaintiff
Astoria Federal Savings and
Loan Association

August 6, 2007

# TABLE OF CONTENTS

**Page**


I. THE SAVINGS AND LOAN INDUSTRY AND SUBURBIA FEDERAL SAVINGS AND LOAN ASSOCIATION: BACKGROUND ........ 1

- A. The Savings And Loan Industry In The 1980's Was In Economic Distress ........ 1
- B. The Federal Savings & Loan Insurance Corporation Was Charged With Insuring The Viability Of The Thrift Industry ........ 4
- C. The FSLIC Fund Had Sufficient Capital To Cover The Costs Of Liquidating Suburbia In 1984. ........ 5
- D. The FSLIC Developed Several Low-Cost Strategies, In Addition To Liquidation, To Resolve Failing Thrifts ........ 5
- E. The FHLBB And The FSLIC Pursued Regulatory Initiatives To Address The Troubled Savings And Loan Industry, Resulting In The Garn-St Germain Depository Institutions Act Of 1982. Among Other Measures, The Garn-St Germain Act Permitted The Use Of Net Worth Certificates And Appraised Equity Capital Programs ........ 9
- F. The FSLIC Always Took Action With Troubled Thrifts Before The Thrift's Capital-To-Asset Ratio Reached Zero ........ 10
- G. The Number Of Thrifts Liquidated And The Aggregate Value Of Deposits Paid By The FSLIC Increased Significantly In The 1980's ........ 11
- H. The Capital Condition Of Suburbia Federal Savings And Loan Association Suffered Under Negative Interest Rate Spreads ........ 13
- I. Suburbia Became A Troubled Institution In The Late 1970s And A Serious Regulatory Concern By 1980 ........ 15
- J. Suburbia Was Being Kept "Solvent" With Artificial Capital: Net Worth Certificates And Appraised Equity Capital ........ 24
- K. Suburbia's Eligibility For Future Net Worth Certificates Was Questionable ........ 26
- L. Regulators Shopped Suburbia To Prospective Merger Partners ........ 28
- M. The Options Available To Regulators For Suburbia In 1984 Were The Fidelity Merger, Liquidation, Or Re-Bidding ........ 33
- N. The Fidelity Merger Was The Only Reasonable Option For Resolving Suburbia ........ 35
- O. The Regulators Determined That The Surviving Institution Was Viable ........ 37
- P. Despite Fidelity's Loan Problems, Regulators Chose Fidelity To Be Suburbia's Acquirer ........ 39

**TABLE OF CONTENTS**
(continued)

**Page**


Q. Besides The Fidelity Merger, Liquidation Was The Only Other Alternative For Suburbia's Resolution For Which Regulators Performed A Cost Analysis.......... 40

II. THE FIDELITY-SUBURBIA MERGER.......... 42

A. The FHLBB Accepted Fidelity New York's Proposal To Acquire Suburbia In 1984.......... 42

B. The Fidelity-Suburbia Merger Was Done Using The Purchase Accounting Method.......... 48

C. Peat Marwick's Opinion Approved The Terms Of The Fidelity-Suburbia Merger.......... 52

D. Goodwill Must Be Amortized Against Real Cash Earnings.......... 54

III. POST-MERGER OPERATIONS AT FIDELITY.......... 59

A. After Its Merger With Suburbia, Fidelity Strengthened Its Management Team. .......... 59

B. Mr. Powderly And Mr. Wesp Were Well Qualified To Guide Fidelity Through Its Challenges. .......... 60

C. Fidelity's Actual Growth Experience Before FIRREA And After It Was Released From The Capital Plan Was Robust And Impressive.......... 62

D. Like Many Savings And Loan Institutions At The Time, Fidelity Became Active In Commercial Real Estate Lending .......... 65

E. New Directions: Fidelity Projected Its Strategies For The Future In February And October 1988 Business Plans .......... 73

F. Fidelity Began To Engage In A "Wholesale" Financial Strategy.......... 85

IV. FINANCIAL INSTITUTIONS RECOVERY, REFORM, AND ENFORCEMENT ACT OF 1989 ("FIRREA") .......... 93

A. Anticipation Of FIRREA: The Savings And Loan Industry, The Regulators, And Fidelity Had Anticipated Regulatory Changes In The Time Leading Up To FIRREA's Enactment .......... 93

B. In Anticipation Of FIRREA, Fidelity Sought To Restructure Its Balance Sheet And Increase Capital.......... 99

C. The Technical Requirements Of FIRREA.......... 103

D. FIRREA Had An Immediate And Devastating Effect On Fidelity.......... 110

E. There Is A Stark Contrast In Fidelity's Capital Position Before And After FIRREA .......... 114

F. FIRREA's Effects On Fidelity Were Not All Institutional.......... 116

**TABLE OF CONTENTS**
(continued)

**Page**


G. Fidelity Intended To Grow Its Home Equity Portfolio, But FIRREA Prevented It From Fulfilling Its Business Goal. ... 117

V. FIDELITY'S POST-FIRREA OPERATIONS ... 122

A. Fidelity's Capital Plan Imposed Draconian Restrictions. ... 122

B. After FIRREA, Fidelity Operated In A Harsh Regulatory Environment ... 146

C. Fidelity Succeeded With Its Capital Plan, While Many Of Its Peers Failed ... 168

D. Fidelity Had To Increase Its Pace Of Goodwill Amortization Significantly In Order To Achieve The Capital Targets In Fidelity's Capital Plan. ... 169

E. Mr. Powderly's Management Of Fidelity's Troubled Real Estate Loans After FIRREA Would Have Been Much More Effective If Fidelity Still Had A Capital Cushion ... 171

F. Fidelity Converted To A Stock Institution Through An Initial Public Offering In May 1993, And Its Subsequent Merger With Astoria Occurred In January 1995 ... 175

G. While Fidelity's Stock Conversion Enabled Fidelity To Achieve Full Capital Compliance, It Did Not Result In The Level Of Capital Required For Fidelity To Be Competitive After Surviving FIRREA ... 186

VI. FIDELITY'S MERGER WITH ASTORIA ... 189

A. Astoria Acquired Fidelity In January 1995 ... 189

B. Astoria Federal Savings And Loan Association: Background. ... 190

C. At The Time Of Astoria's Acquisition Of Fidelity, It Was Not Possible To Assign A Value To Fidelity's Goodwill Claim. ... 195

VII. FIDELITY'S LEGAL CLAIMS ... 196

A. Dr. Kaplan's Qualifications ... 196

B. The Evidence Supporting Fidelity's Claim For Lost Profits Satisfies The Legal Requirements Of Causation, Forseeability, And Reasonable Certainty ... 201

C. The Testimony And Exhibits Admitted At Trial Support Fidelity's Claim For "Wounded Bank" Damages ... 212

D. Fidelity's Restitution And Reliance Damages Claims ... 214

# I. <u>THE SAVINGS AND LOAN INDUSTRY AND SUBURBIA FEDERAL SAVINGS AND LOAN ASSOCIATION: BACKGROUND.</u>

## A. THE SAVINGS AND LOAN INDUSTRY IN THE 1980'S WAS IN ECONOMIC DISTRESS.

1. Beginning in approximately October 1979 and lasting until approximately 1981, then-chairman of the Federal Reserve Paul Volcker permitted interest rates to rise in an effort to combat inflation. (Beesley, Tr. 1147, line 14 to p. 1149, lines 25).

2. When interest rates started to rise, depositors began to withdraw their money from banks and savings and loan institutions to invest in money market and other investment options. (Beesley, Tr. 1147, line 14 to p. 1149, line 25).

3. To attract more depositors' funds, thrifts raised deposit interest rates. (Beesley, Tr. 1147, line 14 to p. 1149, line 25). The thrifts soon began paying more money in depositors' rates than they were earning on their long-term loans. (Beesley, Tr. 1147, line 14 to p. 1149, line 25).

4. During the early 1980s, as the costs of savings increased, disintermediation progressed, and interest rates remained high, thrifts paid substantial amounts for their money in relation to what they could earn. (Pratt, Tr. 69, lines 1-16).

5. Interest rates peaked at their all-time historical highs in late 1981--early 1982. They then fell dramatically until 1983, when they started to go back up. In 1985 they began to fall again, bottoming out in 1986, then starting to rise again in 1987 and 1988. This spike upward in 1987 and 1988 caused spreads to narrow and put additional pressure on institutions that were in a weakened state or had impaired capital. (Kaplan, Tr. 2714, line 8 to p. 2715, line 12; Tr. 2723, line 8 to p. 2726, line 9; PDX 5 and PDX 6).

6. The regulations of the Federal Home Loan Bank Board ("FHLBB") required thrifts to carry a minimum capital level and prohibited thrifts from operating with a negative capital account. (Beesley, Tr. 1150, line 25 to p. 1151, line 7).

7. The Federal Savings and Loan Insurance Corporation ("FSLIC") evaluated thrifts' solvency by determining the percentage of capital held in relation to its assets. (Beesley, Tr. 1151, lines 8-24).

8. Richard Pratt was appointed by Ronald Reagan as chairman of the FHLBB in April 1981. (Pratt, 47, lines 10-13). He earned a bachelor's degree in business and an MBA from University of Utah, as well as a doctorate in business administration from University of Indiana. (Pratt, Tr. 47, lines 3-9).

9. According to Dr. Pratt, the industry was "massively insolvent" in an accounting sense in 1980. (Pratt, Tr. 66, lines 7-23; Pratt, Tr. 76, lines 18-22).

10. The savings and loan industry sustained damage due to the high interest rates of the era. Dr. Pratt testified at trial that if the interest rates did not fall, the thrift industry would have failed en masse. (Pratt, Tr.115, line 2 to p. 116, line 7).

11. Horace Brent Beesley was the director of the FSLIC from Spring 1981 through early 1983. (Beesley, Tr. 1142, lines 3-13). He earned a bachelor's degree in economics from Brigham Young University, and MBA and JD degrees from Harvard University. (Beesley, Tr. 1141, line 20 to p. 1142, line 2).

12. The only solutions that Mr. Beesley believed could address the savings and loan industry's woes were a massive bailout from Congress or falling interest rates. (Beesley, Tr. 1152, line 24 to p. 1154, line 2).

13. In the early 1980s many of the thrifts insured by the FSLIC had no real capital. Even though the institution's books indicated that there was some capital, if the assets were marked to market, there would be a deficit of assets to liabilities. (Beesley, Tr. 1154, line 21 to p. 1155, line 16).

14. If the assets of the thrift industry had been marked to market in the spring of 1981, the approximate deficit would have been between $300 and $400 billion. (Beesley, Tr. 1153, lines 3-13).

15. The asset figure on the balance sheets of thrifts during the early 1980s was not an accurate reflection of the assets' true value. (Beesley, Tr. 1150, lines 9-17). The thrifts carried the loans on their balance sheets as the original book value or historical cost, instead of their fair market value. (Beesley, Tr. 1150, lines 18-24). Most thrifts' capital to asset ratios during the early 1980s would have been substantially negative, if they were evaluated using the true value of assets and liabilities. (Beesley, Tr. 1151, lines 17-24). Despite the use of historical cost valuation, the interest rate mismatch ate into thrifts' net capital. (Beesley, Tr. 1150, lines 18-24).

16. Prior to 1983, the majority of FSLIC problem cases involved interest-rate spread difficulties, but asset quality problems predominated thereafter. (Stearns, Tr. 5846, line 18 to p. 5847, line 5; DX 197 at p. 23).

17. Decreased interest rates would not have solved spread problems for all thrifts. (Beesley, Tr. 1241, lines 7-14). The passage of time, by itself, would not cure the thrift industry's asset-quality problems. (Beesley, Tr. 1237, line 15 to p. 1238, line 14).

18. Mr. Beesley noted at the time that, despite a generally positive outlook for the savings and loan industry in 1983, "the weakest [institutions] will continue to slide toward failure." (Beesley, Tr. 1194, lines 3-12; PX 113 at p. 13). Some institutions had been so weakened by the stress of the interest rate volatility that their survival remained precarious even when interest rates began to fall. (Beesley, Tr. 1193, lines 3-8).

## B. THE FEDERAL SAVINGS & LOAN INSURANCE CORPORATION WAS CHARGED WITH INSURING THE VIABILITY OF THE THRIFT INDUSTRY.

19. The FSLIC's primary responsibility was to insure the deposits of depositors in savings and loan institutions, so that the depositors would not suffer a loss in the event that the insured institution failed. It managed the capital within the insurance fund and provided supervision to the insured institutions. (Beesley, Tr. 1144, line 18 to p. 1145, line 9). The FSLIC also resolved troubled institutions. (Beesley, Tr. 1147, lines 3-13).

20. The FSLIC's insurance fund was created in the 1930s and funded by insurance premiums that the member-insured institutions paid in. (Beesley, Tr. 1152, lines 6-16).

21. The payment of annual insurance premiums and the income earned from its invested funds were the two sources of the FSLIC's income. (Beesley, Tr. 1188, lines 5-13). The fund did not contain any government funds or taxpayer funds. (Beesley, Tr. 1152, lines 6-16).

22. The total number of cases resolved by the FSLIC were increasing in both number and value of assets by 1984. (Stearns, Tr. 5855, line 16 to p. 5856, line 1; PX 375 at p. 26).

**C. THE FSLIC FUND HAD SUFFICIENT CAPITAL TO COVER THE COSTS OF LIQUIDATING SUBURBIA IN 1984.**

23. The FSLIC had a net worth of $6.4 billion in 1983, $5.6 billion in 1984, and $4.6 billion in 1985. (Stearns, Tr. 3942, lines 5-6; Stearns, Tr. 3955, lines 14-15; DX 197 at p. 23; PX 375 at p. 25).

24. The $1 billion decrease in the fund between 1984 and 1985 was due to the FSLIC's taking a contingent estimated loss expense of $1.6 billion for the first time in its history as opposed to an actual decrease in funds available to pay out depositors. (PX 375 at p. 25).

25. Even though the insurance fund was decreasing during this period, the FSLIC was still financially able to cover the costs of liquidation when it was necessary to resort to that solution. (Stearns, Tr. 5848, line 16 to p. 5849, line 4).

26. The FSLIC's Analysis and Evaluation Division in 1984 prepared an estimate based in part on the assumptions contained therein that the present value of the total cost to the FSLIC of liquidating Suburbia was $147.9 million. (Joint Stipulation of Facts, April 2, 2007, ¶ 40; PX 210 at WFZ009 021).

**D. THE FSLIC DEVELOPED SEVERAL LOW-COST STRATEGIES, IN ADDITION TO LIQUIDATION, TO RESOLVE FAILING THRIFTS.**

27. Liquidation was the last option in FSLIC's arsenal of potential tools for addressing problem thrifts. (PX 35 at p.2; Beesley, Tr. 1170, lines 16-20).

28. At the time of the Suburbia-Fidelity merger, the FSLIC would conduct "a traditional liquidation accompanied by the cash payment of insurance…when and if there is no less costly or less disruptive alternative available." (PX 112 at D3-0006243).

29. The 1981 FHLBB Annual Report stated, "FSLIC handled 30 default prevention cases and effected its first case of actual payment of insurance in almost 10 years." (PX 42 at p. 6; Pratt, Tr. 150, line 25 to p. 151, line 21). Dr. Pratt testified that the phrase "payment of insurance" meant the use of funds to pay depositors so that they were made whole on their insured deposits. The process is not technically a liquidation, but it has hallmarks of liquidation. (Pratt, Tr. 150, line 25 to p.151, line 21; Stearns, Tr. 5842, lines 12-17; PX 286 at p. 18).

30. The cost of liquidation was the benchmark against which the bids for a proposed supervisory merger were judged. (Beesley, Tr. 1179, lines 3-14; PX 83 at WIN-111197-POI-11B2/3-008070). The benchmark cost for resolution of Suburbia was the liquidation cost which the FSLIC calculated. Had Fidelity not acquired Suburbia and successfully discharged its liabilities, it is highly likely that the Government's cost of resolving Suburbia would have been greater than what it spent in connection with the Fidelity acquisition and might well have involved the ultimate cost of liquidation at a price higher than that which was estimated in 1984. (Kaplan, Tr. 3780, line 24 to p. 3783, line 11).

31. According to the FHLBB Annual Report for 1981, during the last 7 months of 1981, the FSLIC resolved 23 cases involving assets of $12.3 billion at an estimate present value cost of $663 million, or 5.1% of assets. (Pratt, Tr. 131, 132; PX 42 at p. 8).

32. In 1982, FSLIC oversaw 446 mergers. Of those, 230 were voluntary, 167 were supervisory (directed by the FHLBB), and 49 mergers involved the FSLIC's financial assistance, for a total of $1.1 billion (Pratt, Tr. 150, lines 3-8; PX 113 at p. 4).

33. The tools and strategies that the FSLIC used to resolve troubled institutions are memorialized in a memo dated February 2, 1982 from H. Brent Beesley and D. James Croft and Thomas P. Vartanian. (Beesley, Tr. 1159, lines 1-23; *see generally* PX 35).

34. The FHLBB did not apply the straight sequential order of preferences from the preference memos to each case, because it recognized that one or more options may not be feasible. "…[T]he situation is much more complex than just applying sequential lists to these circumstances." (Pratt, Tr. 153, lines 2-21). The sequential order of preference was "subject to special circumstances." (PX 1341 at p. 1235; Pratt, Tr. 152, lines 2-21).

35. One of the tools at FSLIC's disposal for resolving troubled thrifts was "new capital," which involved an entity infusing cash or other real assets into the troubled institution to enhance the asset side of the balance sheet and reduce the negative real capital. (PX 35 at p.1; Beesley, Tr. 1159, line 24 to p. 1160, line 6). There were very few investors interested in giving new capital to troubled thrifts during Mr. Beesley's tenure at the FSLIC. (Beesley, Tr. 1160, lines 7-10; Beesley, Tr. 1160, line 24 to p. 1161, line 2).

36. Another tool that the FSLIC used to help troubled thrifts were arranging private, non-government-assisted acquisitions. (Beesley, Tr. 1160, lines 3-20).

37. The FSLIC also coordinated mergers of weak institutions into "strong" FSLIC-insured associations. (Beesley, Tr. 1161, line 21 to p. 1162, line 7). Describing the continuing institution as "strong" actually meant "less weak." (Beesley, Tr. 1161, line 21 to p. 1162, line 7; Beesley, Tr. 1206, line 20 to p. 1207, line 2).

38. When it coordinated the mergers of two FSLIC-insured institutions, the FSLIC's order of preferred merger method was: (1) voluntary non-supervisory in-state mergers; (2)

voluntary unassisted in-state mergers; (3) involuntary unassisted in-state mergers; (4) "marginally" assisted in-state mergers; (5) unassisted interstate mergers; (6) "marginally assisted interstate mergers; (7) conditionally approved supervisory mergers; and (8) assisted mergers. (PX 35 at pp.1-2).

39. In "non-supervisory" mergers, the parties merge without any assistance from the FSLIC; "supervisory" mergers are ones in which the FSLIC has provided certain non-cash inducements (such as waiving certain rules) to encourage the merger. (Beesley, Tr. 1163, lines 2-13). An "assisted" merger is one in which the Government pays money to facilitate the merger. (Beesley, Tr. 1164, lines 20-25). An assisted merger may be either voluntary or supervisory. (Beesley, Tr. 1165, lines 1-3).

40. When conducting a supervisory merger, the FSLIC typically required the board of a troubled institution to sign a resolution giving the FSLIC broad powers over the institution. (Beesley, Tr. 1176, line 22 to p. 1177, line 25).

41. Purchase accounting was a method that the FHLBB used to address the large number of failing institutions without having to dedicate significant funds. (Pratt, Tr. 114, line 14 to p. 115, line 1).

42. The FSLIC held bidder's conferences to encourage proposals from less weak institutions to acquire troubled institutions. (Beesley, Tr. 1178, lines 1-15). However, not all bidder's conferences resulted in successful or viable bids. (Beesley, Tr. 1214, lines 9-21). If a bidder's conference produced some proposals, the FSLIC would evaluate their proposed costs and the viability of the surviving entity. (Beesley, Tr. 1178, lines 16-20).

**E. THE FHLBB AND THE FSLIC PURSUED REGULATORY INITIATIVES TO ADDRESS THE TROUBLED SAVINGS AND LOAN INDUSTRY, RESULTING IN THE GARN-ST GERMAIN DEPOSITORY INSTITUTIONS ACT OF 1982. AMONG OTHER MEASURES, THE GARN-ST GERMAIN ACT PERMITTED THE USE OF NET WORTH CERTIFICATES AND APPRAISED EQUITY CAPITAL PROGRAMS.**

43. Dr. Pratt represented the FHLBB before Congress in July 1981 to request help in the form of, among other things, extending corporate checking power to thrifts; broadening thrifts' real estate powers; expanding consumer and commercial lending; expanding equipment lending; increasing service corporation investments; and increasing flexibility for mutual / stock conversion forms. (Pratt, Tr. 85, line 9 to p. 89, line 20; PX 1336 at pp. 51-56).

44. The regulatory initiatives that Dr. Pratt and the FHLBB pursued were necessary goals for the viability of the industry. (Pratt, Tr. 98, line 14 to p. 99, line 1).

45. There was a significant amount of resistance by the banking industry and other interested parties to the FSLIC's suggestions of giving thrifts expanded powers. (Pratt, Tr. 97, lines 9-17).

46. The changes that Dr. Pratt advocated for Congress to adopt eventually became codified in a bill called the "Garn-St Germain Depository Institutions Act of 1982." (Pratt, Tr. 92, lines 12-18; Pratt, Tr. 101, lines 10-16; PX 1352 B). The Garn-St Germain Act was originally known as the Pratt Act. (Pratt, Tr. 89, line 21 to p. 90, line 6).

47. The FHLBB created Net Worth Certificates, which were issued by thrifts in exchange for notes from the FSLIC, for thrifts to use as capital. "We didn't have the cash to inject, so we created paper, that's what the net worth certificates were." (Pratt, Tr. 107, lines 5-14).

48. Under the Net Worth Certificate program, the FSLIC issued Net Worth Certificates as IOUs to a failing thrift. The thrift could count the certificate as an asset to help the thrift avoid reaching a zero capital balance. In return for the certificate, the recipient institution had to agree to certain FSLIC requests. (Beesley, Tr. 1171, line 23 to p. 1173, line 13). The program's terms required that the FSLIC ultimately had to repay the certificates in cash. (Beesley, Tr. 1173, line 14 to p. 1174, line 1). The program was a way of "papering over" the capital problems of struggling thrifts. It was not real money. The use of net worth certificates did not change the thrift industry's economic status as "massively insolvent." (Pratt, Tr. 107, lines 15-23).

49. The FSLIC created a new category of asset, Appraised Equity Capital, to permit thrifts to book the appreciation of value that existed on real property without having to sell the property. (Beesley, Tr. 1174, line 15 to p. 1175, line 16). It was another strategy that the FSLIC employed to keep institutions from reaching a zero capital balance. (Beesley, Tr. 1175, lines 17-20).

50. Dr. Pratt testified that when he appealed to Congress for help in the early 1980s, even if Congress granted expanded lending powers to the thrift industry, there would still remain a great number of thrifts that would likely not survive. (Pratt, Tr. 98, line 14 to p. 99, line 1).

## F. THE FSLIC ALWAYS TOOK ACTION WITH TROUBLED THRIFTS BEFORE THE THRIFT'S CAPITAL-TO-ASSET RATIO REACHED ZERO.

51. The FSLIC was statutorily required to intervene before a thrift's capital level reached zero. (Beesley, Tr. 1155, line 14 to p. 1156, line 18; p. 1157, line 14 to p. 1158, line 1; p. 1175, line 21 to p. 1176, line 4).

52. When an institution reached the 2% capital-to-asset ratio level, the FSLIC placed it on a priority list. (Beesley, Tr. 1155, line 24 to p. 1156, line 18). If a thrift's capital ratio continued dropping to 1%, it was expected that the FSLIC had begun a process to resolve the problem. (Beesley, Tr. 1155, line 24 to p. 1156, line 18).

53. The FSLIC never let an institution fall to zero regulatory capital. (Beesley, Tr. 1156, line 19 to p. 1157, line 2).

## G. THE NUMBER OF THRIFTS LIQUIDATED AND THE AGGREGATE VALUE OF DEPOSITS PAID BY THE FSLIC INCREASED SIGNIFICANTLY IN THE 1980'S.

54. The liquidation of Economy Savings & Loan in Chicago, which occurred in 1981, was the largest payout that had ever been made. (Beesley, Tr. 1171, lines 4-19).

55. In the last seven months of 1981, the FSLIC resolved 23 cases involving assets of $12.3 billion at an estimated present value cost of $662 million, or 5.1% of assets. (PX 42 at p. 8; Beesley, Tr. 1189, lines 9-19). These were, historically speaking, high levels for FSLIC. (Beesley, Tr. 1189, lines 20-23).

56. In 1982, the FSLIC placed 14 institutions with 751,000 savings accounts totaling $3.7 billion into receivership. (PX 113 at p. 13; Beesley, Tr. 1190, line 20 to p. 1191, line 21). Mr. Beesley testified that 14 institutions in receivership is a high number for the FSLIC. (Beesley, Tr. 1191, lines 18-21).

57. In 1983, the FSLIC liquidated 6 institutions with aggregate deposits of $295 million. (Stearns, Tr. 5848, lines 3-10; DX 197 at p. 24). The 6 institutions liquidated during the year 1983 reflected one-third of all insurance settlement cases in the FSLIC's history. (Beesley, Tr. 1231, line 25 to p. 1232, line 13; PX 286 at 14).

58. Peter O. Stearns was appointed director of the FSLIC by President Reagan in August 1984. (Stearns, Tr. 3935, line 19 to p. 3936, line 5). He left the position a short time later in November 1985. (Stearns, Tr. 3938, lines 1-3). He earned a bachelor's degree in economics from Dartmouth, an MBA from Wharton, and a master's degree in history from New York University. (Stearns, 3934, line 23 to p. 3925, line 1).

59. Whereas the largest thrift liquidated by the FSLIC in 1983 had assets of $118 million, in 1984 the FSLIC liquidated an institution with $306 million in assets, the largest case in FSLIC history at the time and a 160% increase from the prior year. (Stearns, Tr. 3944, lines 20-24; Stearns, Tr. 3945 lines 17-20; DX 197 at p. 24).

60. The costs of liquidating a thrift were increasing significantly after 1983 and assets were becoming significantly more worthless as time went on. (Stearns, Tr. 5849, line 20 to p. 5850, line 7; Stearns, Tr. 5854, lines 4-17).

61. In 1984, the FSLIC placed 9 thrifts into liquidating receiverships, paying an aggregate of $829 million in deposits. (Stearns, Tr. 3943, lines 8-14; Stearns, Tr. 3944, lines 10-24; DX 197 at p. 24).

62. In 1985, the FSLIC liquidated another 10 institutions, paying an aggregate of $42.2 billion in cash payouts to depositors. (Stearns, Tr. 3956, lines 24-25; PX 375 at p. 27, Table 5). Five of the ten thrifts liquidated in 1985 had deposits in excess of $270 million. The largest thrift liquidated in 1985 had assets of $463 million. (Stearns, Tr. 3957, lines 4-19; PX 375 at p. 27, Table 6).

63. The FSLIC's sale or merger of 25 problem cases in 1985 involved an average savings of 52% over the cost of liquidation, and this level of savings was likely understated. (Stearns, Tr. 5854, lines 4-22; PX 375 at p. 25).

64. The average cost of liquidations had grown exponentially between 1983 and 1985, approximately doubling each year from $49 million in 1983 to $92 million in 1984 and $189 million in 1985. (Stearns, Tr. 3944, lines 18-24; Stearns, Tr. 3957, lines 4-8; DX 197 at p. 24; PX 375 at p. 27).

## H. THE CAPITAL CONDITION OF SUBURBIA FEDERAL SAVINGS AND LOAN ASSOCIATION SUFFERED UNDER NEGATIVE INTEREST RATE SPREADS.

65. Angelo Vigna received a Bachelor's degree in Accounting from St. Peter's College in 1963 and graduated from the Savings and Loan Banking School at Indiana University in 1975. He went to work for the Federal Deposit Insurance Corporation as a Field Examiner in 1964. In 1968 he joined the Federal Home Loan Bank of New York ("FHLB-NY") as a Supervisory Analyst and progressed through the ranks until in 1990 he held the position of Senior Executive Vice President and Director of Agency Functions. In 1990 he moved with the regulatory staff of the FHLB-NY to the newly created Office of Thrift Supervision as District Director for what had formerly been Federal Home Loan Bank District 2 (New York, New Jersey, Puerto Rico and the Virgin Islands). A year later he was appointed Regional Director for the Northeast Region of Office of Thrift Supervision ("OTS"), a position he held until retiring from government service in 1996. Since leaving the Government, Mr. Vigna has worked as a Managing Director of Sandler O'Neill Partners in New York City. (Vigna, Tr. 1243, line 1 to p. 1245, line 22; Vigna, Tr. 1402, line 12 to p. 1403, line 13).

66. The FHLB-NY was one of twelve district banks in the Federal Home Loan Bank system that provided credit and regulatory oversight to the savings and loan industry. It performed a supervisory function over thrifts in New York, New Jersey, Puerto Rico and the Virgin Islands. (Vigna, Tr. 1245, line 23 to p. 1246, line 25)

67. In the late 1970s and early 1980s Mr. Vigna was the Supervisory Agent for the FHLB-NY. He reported to the President of the Bank, who was the Principal Supervisory Agent. Mr. Vigna supervised the day-to-day operations of the supervisory staff, and he became personally involved with institutions where there was a "problem situation." (Vigna, Tr. 1248, line 17 to p. 1249, line 19).

68. Suburbia Federal Savings and Loan Association ("Suburbia") was located in and around Garden City, Long Island. This was a high cost area in the sense that depositors in the area were more sophisticated than the average depositor. They paid attention to what was going on in the markets. They tended to gravitate toward certificates of deposit over passbook savings accounts, and they would move their funds to where they thought they would get a higher rate. This was a problem for Suburbia, as it was for most institutions in urban areas. (Vigna, Tr. 1251, line 7 to p. 1252, line 11).

69. Suburbia's assets were a traditional thrift portfolio, 1-to-4 family, long term (25 to 30 year) fixed rated mortgages. Suburbia's liabilities were passbook savings accounts and "an ever growing number or ratio of certificates of deposit." The cost of these certificates was a concern relative to the low rate of return on Suburbia's assets. (Vigna, Tr. 1250, lines 6-25).

70. Mr. Robert Albanese served as the supervisory agent for both Suburbia and Fidelity in the 1980s. (Albanese, Tr. 4116, lines 2-15).

71. Suburbia had "the traditional savings and loan problem at the time, negative interest spreads." Its cost of funds exceeded the return on its assets, and the continuing losses were "fairly rapidly eroding capital." (Vigna, Tr. 1249, line 23 to p. 1250, line 5).

72. Although consumer lending was profitable for Suburbia, it faced intense competition from commercial banks with years of consumer lending experience. (Kane, Dep. Tr. 64, lines 2-16).

73. Suburbia attempted to restore profitability by controlling growth to match earning potential, but it was very difficult. (Kane, Dep. Tr. 20, line 11 to p. 21, line 8). It was especially arduous because Suburbia was in the extremely competitive Long Island market. (Kane, Dep. Tr. 21, line 9 to p.22, line 2).

74. Suburbia contemplated converting to a stock institution in the early 1980s, but it was difficult to find investors, and the regulators did not allow thrifts to convert to stock institutions at the time. (Kane, Dep. Tr. 36, line 25 to p. 37, line 17).

75. Suburbia also failed in its attempts to obtain an infusion of capital from outside the thrift industry. (Kane, Dep. Tr. 39, line 13 to p. 40, line 15).

## I. SUBURBIA BECAME A TROUBLED INSTITUTION IN THE LATE 1970S AND A SERIOUS REGULATORY CONCERN BY 1980. ITS FINANCIAL DECLINE WAS DRAMATIC AND PRECIPITOUS.

76. Suburbia had sustained net losses in each of the fiscal years 1980 through 1984. The losses were as follows:

| | |
|---|---|
| 1980 | $1.666 million |
| 1981 | $6.869 million |
| 1982 | $17.547 million |

1983 $9.167 million
1984 $7.427 million

(Joint Stipulation of Facts, April 2, 2007, ¶ 35).

77. Each of the net losses suffered by Suburbia in the years 1980 through 1984 reduced Suburbia's capital. (Joint Stipulation of Facts, April 2, 2007, ¶ 36).

78. During the second half of 1979, Suburbia suffered a net operating loss of $510,000, as compared to a net operating profit of $337,000 for the preceding 6 month period. In the first month of 1980, Suburbia suffered a net operating deficit of $996,000, a fairly significant loss. This unfavorable trend in financial operations was the result of substantial growth in high-interest-bearing savings certificates and on a larger dependence on borrowings to fund commitments. The "borrowings" referred to were assumed by Mr. Vigna to be Federal Home Loan Bank advances or Wall Street borrowings, either of which would carry essentially a market rate of interest. (Vigna, Tr. 1252, line 12 to p. 1255, line 7; DX 362A at AST0132430).

79. Suburbia appeared to have been in capital compliance as of August 31, 1979. While the Examination Report was not completely clear on this, Mr. Vigna believed that, had Suburbia not been in compliance, the examiner would have cited that in his report. (Vigna, Tr. 1256, line 5 to p. 1257, line 8; DX 362A at PAA113 2666).

80. As of March 14, 1980, the date of the letter which is Exhibit DX 362A, Suburbia was becoming, in Mr. Vigna's mind, "a troubled institution." (Vigna, Tr. 1255, line 20 to p. 1256, line 4; *see generally* DX 362A).

81. On May 16, 1980, Andrew Kane, then the Chairman and CEO of Suburbia, replied to Mr. Vigna's letter of March 14, 1980 (DX 362A). In his letter Mr. Kane said that

management had been instructed to reduce expenses as much as possible. Mr. Vigna thought this would help, but he did not think Suburbia's problems could be cured simply by reducing expenses. (Vigna, Tr. 1257, line 9 to p. 1259, line 13; PX 4 at AST 023094).

82. Mr. Kane also talked in his letter of May 16, 1980 about Suburbia reducing the average life of its assets by investing in short-term renegotiable mortgages and consumer loans. While loans of this sort would result in Suburbia's funds being locked up for periods less than 30 years and might yield returns more closely approximating a market rate of interest, Mr. Vigna was skeptical about this as a solution for Suburbia's problems. Given such a severe negative spread, unless there was "a magical and rapid decline in interest rates," Suburbia would not have enough time for such a plan to resolve its problems. (Vigna, Tr. 1259, line 23 to p. 1260, line 25; PX 4 at AST 023094).

83. Looking at the plan proposed by Mr. Kane in his letter of May 16, 1980, Mr. Vigna recalled thinking that "it was probably about all they could do at the time." (Vigna, Tr. 1262, lines 2-15; *see generally* PX 4).

84. Beginning in 1981, Suburbia's interest expense exceeded its interest income every year. This is significant, because net interest income is the primary driver of earnings for a thrift institution. These are considered a thrift's "core earnings." If a thrift institution cannot produce net interest income, it will be very difficult for that institution to generate bottom line earnings. (Kaplan, Tr. 2894, line 22 to p. 2896, line 25; PDX 17).

85. Suburbia's position was further exacerbated by the fact that its fee income (non-interest income) and its net gains on sale of loans and securities from 1979 to 1984 were never sufficient in any year to offset its operating expenses. Therefore, in addition to its

inability to realize net interest income, Suburbia was experiencing additional losses in its non-interest operations. (Kaplan, Tr. 2897, lines 4-22; PDX 17).

86. On May 5, 1981, Mr. Vigna wrote a letter to Suburbia's Board of Directors informing the Board that Suburbia was not in compliance with its minimum net worth requirement. As a consequence of its failure to maintain minimum net worth, Suburbia could be subjected to corrective action under the insurance regulations. Suburbia had therefore gone from being capital compliant at the end of 1979 to being capital deficient by May 1981. (Vigna, Tr. 1262, line 16 to p. 1264, line 1; PX 11).

87. As of July 1981, Suburbia projected an additional net loss of 2.49 % of assets for the second half of 1981. This, according to Mr. Vigna, would significantly worsen Suburbia's capital position. Suburbia had lost $73 million in savings deposits since July 1, 1979, and it had to replace these liabilities with borrowed funds, further increasing its cost of funds. Mr. Kane outlined in a July 20, 1981 letter to Mr. Vigna a series of steps Suburbia planned to take to help deal with its problems. Mr. Vigna thought that neither these steps nor anything else Suburbia could do in the short run was likely to solve Suburbia's problems. (Vigna, Tr. 1274, line 23 to p. 1278, line 25; PX 22 at AST 022647-49).

88. By October 1981, Suburbia's condition was such that Mr. Vigna planned to urge its Board to seek a voluntary merger with a suitable partner. Failing that, he planned to have the Board execute a Resolution that would authorize the FSLIC to take steps on Suburbia's behalf. Such steps could include an involuntary merger and a merger requiring Government assistance. (Vigna, Tr. 1279, line 1 to p. 1282, line 18; PX 26).

89. On October 19, 1981, Mr. Vigna wrote to the Suburbia Board of Directors summarizing Suburbia's operating results and capital position for the first three quarters of 1981. Suburbia had lost $5.0 million in 1980. In the first half of 1981 Suburbia lost $7.8 million, and it lost an additional $5.6 million during the third quarter. These losses caused its net worth to drop in nine months from $24.3 million to $10.9 million, a 55 % decrease. As of September 30, 1981, Suburbia's net worth represented 1.5 % of assets and 2.0 % of savings. If this trend of operations continued, Suburbia's capital would be depleted before April 30, 1982. (Vigna, Tr. 1282, line 19 to p. 1286, line 5; PX 27 at pp. 1-2).

90. On December 29, 1981, Mr. Kane wrote to Mr. Vigna outlining a number of steps Suburbia was taking in an effort to improve earnings. He outlined a series of steps Suburbia was taking to reduce its cost of operations. Mr. Vigna believed that while each of these would be helpful, neither individually nor in the aggregate would they solve Suburbia's problems. Mr. Kane also described a number of sales of assets by Suburbia. Mr. Vigna agreed that, while each of these asset sales would generate needed cash for Suburbia, each resulted in a loss of future income. (Vigna, Tr. 1289, line 1 to p. 1292, line 18; *see generally* PX 31).

91. Suburbia's net loss for the second quarter of 1983 was $1.6 million. At the end of the first quarter of 1983, Suburbia's net worth was a negative $3.8 million, so its capital position at the end of the second quarter, absent assistance, would have been negative $5.4 million. Suburbia's actual regulatory capital as of June 30, 1983 was $5,153,000. This reflects capital assistance in the form of $5,450,000 in Net Worth Certificates and

$5,086,000 in Appraised Equity Capital. (Vigna, Tr. 1346, line 9 to p. 1347, line 15; PX 132 at OAA005 2590).

92. Suburbia deferred loan losses of $35.9 million in 1982 and $9.18 million in 1984. In 1983, Suburbia realized a gain on loan sales in the amount of $618 thousand. Suburbia was changing its accounting treatment period by period as part of its survival strategy. It was deferring losses on loan sales to avoid taking a current hit to its earnings, but it was immediately recognizing gains on loan sales. This was part of Suburbia's survival strategy. (Kaplan, Tr. 2897, line 7 to p. 2898, line 12).

93. In changing its accounting strategy to defer loan sale losses while immediately recognizing gains, Suburbia was being opportunistic and was trying to stay above the 0.5 % regulatory capital level necessary to continue to receive Garn St Germain capital assistance. (Kaplan, Tr. 2897, line 7 to p. 2899, line 7).

94. Suburbia suffered an additional $4 million dollar net operating loss for the second half of 1983. Its regulatory net worth at the end of 1983 was $4 million, which represented 0.6 % of assets. However, this number included $8.3 million in FSLIC Notes issued in return for Net Worth Certificates and some $5 million in Appraised Equity Capital. (Vigna, Tr. 1348, line 3 to p. 1349, line 24; PX 159 at AST 035716-17).

95. Under Regulatory Accounting Principles (RAP), certain adjustments are made to GAAP capital. As of March 31, 1984 Suburbia's GAAP capital was a negative $57.679 million. For RAP purposes, however, it is necessary to add to the GAAP capital deferred losses on sales of loans and securities ($44.531 million), Appraised Equity Capital ($5.078 million), Net Worth Certificates ($9.525 million) and miscellaneous items ($1.876

million). It was only with these adjustments that Suburbia's RAP capital as of March 31, 1984 was $3.331 million. (Kaplan, Tr. 2903, line 10 to p. 2905, line 15; PDX 19).

96. As of March 31, 1984, Suburbia's minimum regulatory net worth requirement was approximately $19.2 million. On a RAP basis Suburbia's capital deficit on March 31, 1984 was $15.869 million. On a GAAP basis, Suburbia's capital deficit on March 31, 1984 was $76.879 million. (Kaplan, Tr. 2905, line 16 to p. 2906, line 21; PDX 19).

97. On April 18, 1984, Mr. Kane reported to Mr. Vigna that Suburbia was discussing a merger with "another Long Island based Federal Savings and Loan Association." However, he said, this merger would require an infusion of additional capital to bring the net worth of the combined institutions to 3 % of assets. Mr. Vigna understood that to mean that the two institutions standing alone would not have sufficient capital to get the merger approved and would need additional capital to make any merger work. He also noted that even 3 % capital would not necessarily establish viability of the combined institutions, and the regulators, before approving the merger, would want to look at how the business plan of the surviving institution planned to take its capital to a higher level. (Vigna, Tr. 1353, line 2 to p. 1354, line 15; PX 163 at AST 035713).

98. As of June 30, 1984, Suburbia had a regulatory net worth of $3.5 million, equivalent to 0.5 % of assets. (Albanese, Tr. 4178, lines 16-23; PX 232 (S Memo) at WOL315 0201). At that time, its interest-bearing liabilities exceeded earning assets by approximately $52 million. (Albanese, Tr. 4178, line 24 to p. 4179, line 2; PX 232 (S Memo) at WOL315 0201).

99. If Suburbia's Net Worth Certificates and Appraised Equity Capital were excluded from the calculation of Suburbia's net worth, Suburbia's regulatory net worth as of August 31, 1984 would have been negative $12.4 million. (Joint Stipulation of Facts, April 2, 2007, ¶ 38). On a market value basis, Suburbia was clearly insolvent because the value of its liabilities exceeded its assets by $153.8 million. (Albanese, Tr. 4185, lines 12-19; PX 237 (I Memo) at AA 0000178).

100. Suburbia's balance sheet data from 1979 to 1984 depict (in the "Loans Receivable" and "Total Asset" lines) Suburbia's unsuccessful attempts to "grow out of its problems" and generate additional earnings. From 1982 to 1984, Suburbia consistently had more interest-bearing liabilities than interest-earning assets, indicating that it could not produce the earnings necessary to pay the cost of the liabilities needed to finance its growth. By 1984, that gap was $68 million. On a $650 million company, assuming a costing number of 10 percent, that would indicate nearly a one percent negative return on assets, which illustrates the dilemma Suburbia was in. Further illustrating this dilemma is the fact that the ratio of Suburbia's net worth to its liabilities in 1984 was a negative 8.96%. (Kaplan, Tr. 2899, line 8 to p. 2901, line 6; PDX 18).

101. When an institution adds assets in an effort to generate earnings needed to "grow out of its problems" that often has a negative effect on the thrift's capital. The cost of the loans hits the books immediately, but the earnings, if they come at all, do not begin to materialize for some months. (Kaplan, Tr. 2901, line 23 to p. 2902, line 8).

102. The loans Suburbia added to its books in an effort to grow out of its problems were not "plain vanilla" single family mortgages. Suburbia was pursuing more aggressive loans

that would allow them to book fee income and higher returns. These loans had increased credit risk. (Kaplan, Tr. 2901, lines 7-22).

103. Suburbia's consistent operating losses between 1980 and 1984 steadily reduced Suburbia's capital. By March 31, 1984, Suburbia's capital, on a GAAP basis, had declined to a negative $57.7 million. This deficit capital position, which existed well before the merger with Fidelity, is what Fidelity took on independent of any merger accounting. (Kaplan, Tr. 2892, line 25 to p. 2893, line 25; Tr. 2903, line 10 to p. 2904, line 7; PDX 16 and PDX 19).

104. In Dr. Kaplan's opinion, Suburbia's $57.7 million deficit GAAP capital position as of March 31, 1984, would have been an insurmountable obstacle to any attempt by Suburbia to continue to operate as a stand-alone institution. This is not the sort of deficit that could be overcome simply by working a little harder. The annual carrying cost of Suburbia's $57.9 million accumulated deficit exceeded what many healthy institutions were able to earn. Suburbia was a "cadaver" and could not resurrect itself. (Kaplan, Tr. 2894, lines 1-16; Tr. 2903, line 13 to p. 2904, line 7; Tr. 2923, line 22 to p. 2925, line 2; PDX 16, PDX 19 and PDX 24).

105. If Suburbia had not merged with Fidelity, it was inevitable that Suburbia's capital level would have eventually gone negative. (Kane, Dep. Tr. 109, lines 7-15).

106. As of October 4, 1984, Mr. Vigna did not believe the FHLBB and the FSLIC had the option with Suburbia of just waiting to see if interest rates came down. (Vigna, Tr. 1381, lines 11-19). In 1984, regulators recognized that Suburbia had "already been shopped extensively" and that it "continues to deteriorate." (PX 237 (I Memo) at AA 0000180).

**J. SUBURBIA WAS BEING KEPT "SOLVENT" WITH ARTIFICIAL CAPITAL: NET WORTH CERTIFICATES AND APPRAISED EQUITY CAPITAL**

107. In late 1982, Suburbia became eligible for assistance under the 1982 Garn-St Germaine Act in the form of Net Worth Certificates. This could allow Suburbia to continue to exist for some period of time as an independent institution, although the regulators could also proceed with a merger if they thought that was an alternative that would be less costly than the cost of assistance. (Vigna, Tr. 1330, line 8 to p. 1331, line 7; PX 102 at OAA005 0465).

108. Net Worth Certificates were capital certificates that were issued to the FSLIC in exchange for promissory notes that counted toward the troubled institution's capital requirements. (Albanese, Tr. 4116, line 22 to p. 4117, line 10).

109. As a participant in the Garn-St Germain Net Worth Capital Assistance Program, Suburbia issued Net Worth Certificates totaling $9.2 million through August 31, 1984. (Joint Stipulation of Facts, April 2, 2007, ¶ 21; Spaid, Tr. 219, lines 4-10; PX 237 (I Memo) at AA 0000177).

110. Net Worth Certificates were issued on a semiannual basis. (Albanese, Tr. 4119, lines 5-7). Suburbia issued Net Worth Certificates for each semiannual period beginning in December, 1982 through the Fidelity-Suburbia merger. (*See generally* DX 3128; DX 3141; PX 184; DX 3187; PX 310).

111. On December 7, 1982, Suburbia informed the FHLB-NY that it was beginning the process of qualifying for and obtaining assistance in the form of Net Worth Certificates authorized under the Garn-St Germaine Act. (Vigna, Tr. 1340, line 20 to p. 1342, line 11; DX 1986).

112. On March 21, 1983, Suburbia entered into a Master Agreement with the FSLIC for Issuance of Net Worth Certificates. (Joint Stipulation of Facts, April 2, 2007, ¶ 17).

113. On June 3, 1983, Suburbia received $2.5 million of capital assistance in the form of an FSLIC Note issued in exchange for a like amount of Net Worth Certificates. (Vigna, Tr. 1342, line 12 to p. 1343, line 14; PX 132 at OAA005 2587).

114. By letter dated July 29, 1983, the FHLBB informed Suburbia's Andrew Kane that Suburbia was required to complete a new application to issue Net Worth Certificates for the June 1983 cycle. (Joint Stipulation of Facts, April 2, 2007, ¶19).

115. In a November 1, 1983 letter to Suburbia's Andrew Kane, the FHLBB stated that, subject to the satisfactory completion of certain legal documents, Suburbia's application to Issue Net Worth Certificates to the FSLIC in the amount of $2,950,000 had been accepted. (Joint Stipulation of Facts, April 2, 2007, ¶ 20).

116. The FHLBB continued to issue Net Worth Certificates to Suburbia because Suburbia continued to sustain operating losses. (Albanese, Tr. 4122, lines 14-17; Albanese, Tr. 4127, lines 18-21).

117. On August 20, 1984, Suburbia applied for additional Net Worth Certificate assistance in the amount of $925,000. Mr. Vigna noted on the application that Suburbia was not eligible to receive such assistance while the merger transaction was pending. Mr. Vigna did not recall if he knew whether Suburbia's net worth had at that point dipped below a half percent of assets. If it had, Suburbia would not be eligible for further assistance in any event. (Vigna, Tr. 1372, line 9 to p. 1374, line 2; PX 197 at WON758 0022).

118. Appraised Equity Capital allowed a bank to count as capital any market value in its buildings that was above book value. (Spaid, Tr. 221, lines 9-20).

119. On a market value basis, Suburbia was insolvent. (Spaid, Tr. 222, lines 16-19; PX 237 (I Memo) at AA 0000178).

120. Even with FSLIC assistance in the form of Net Worth Certificates, Suburbia continued to suffer losses prior to the Fidelity-Suburbia merger. (Spaid, Tr. 204, lines 20-25; DX 406A (A Memo) at WOL315 0368).

## K. SUBURBIA'S ELIGIBILITY FOR FUTURE NET WORTH CERTIFICATES WAS QUESTIONABLE.

121. Suburbia's debilitated capital position at the end of 1983, notwithstanding more than $8 million of FSLIC assistance, was a matter of serious regulatory concern. Mr. Vigna told Suburbia on February 17, 1984 that if interest rates remained at current levels, Suburbia's viability would depend on obtaining either a significant capital infusion (a prospect Mr. Vigna considered unlikely) or continued regulatory assistance. In this latter regard, Mr. Vigna expressed concern that projected losses for Suburbia in 1984 would cause its net worth to decline to a level "dangerously close to 0.5 % of assets, the threshold level for eligibility in the Bank Board's Capital Assistance Program." (Vigna, Tr. 1349, line 25 to p. 1351, line 17; PX 159 at pp. 1-2).

122. As of March 31, 1984, Suburbia had received $9.5 million in FSLIC Notes issued in exchange for Net Worth Certificates under the Garn-St Germain Capital Assistance Program. However, despite this assistance and an additional $5.1 million in Appraised Equity Capital, Suburbia's regulatory net worth was only $3.3 million or 0.52 % of assets. Without the regulatory assistance, Suburbia's net worth would have been a

negative $11.3 million or a negative 1.7 % of assets. Suburbia was therefore hovering just above the level at which it would continue to be eligible for further FSLIC assistance under the Garn-St Germain Capital Assistance Program. If interest rates did not decline, Suburbia was expected to sustain further operating losses which would cause its net worth to fall below a half percent of assets. If that happened, Mr. Vigna wrote to the Director of the FSLIC, "It would disqualify [Suburbia] from the Capital Assistance Program, and virtually ensure its insolvency." (Vigna, Tr. 1354, line 16 to p. 1357, line 9; PX 169 at pp. 1-2).

123. On August 20, 1984, Suburbia applied for $925,000 of Net Worth Certificates for the June 1984 cycle. Mr. Vigna considered this application unusual, since at that time Suburbia was in the process of being acquired by Fidelity, and he so noted in a handwritten note on the cover letter for the application. Suburbia's application showed that its ratio of capital to assets at that time was 0.39%. This was below the 0.5 %threshold required for such capital assistance by the Garn-St Germain Act. Mr. Vigna believes Fidelity asked that these certificates be issued, and as part of the merger agreement, the regulators agreed to do so. (Vigna, Tr. 2846, line 20 to p. 2847, line 12; PX 197 at WON 758 0022-WON 758 0023).

124. Had Suburbia not merged with Fidelity, in all likelihood the certificates it received as a result of its August 20, 1984 application would have been the last it would have received, since its capital ratio was below that specified in the statute for issuance of further certificates. (Vigna, Tr. 2848, lines 13-20; PX 197 at WON 758 0023).

125. As of August 31, 1984, Suburbia's net worth had fallen to 0.25 % of its assets. As a consequence, it would not be eligible for any further Garn-St Germain financial assistance. (Vigna, Tr. 1389, line 25 to p. 1390, line 14; PX 237 (I Memo) at AA0000177).

126. In the S Memo, Mr. Vigna states that "the association's eligibility for continued capital assistance is doubtful, since current budget projections indicate that operating losses will reduce net worth by year-end below the half a percent of assets qualifying threshold." (PX 232 (S Memo) at WOL315 0201).

127. Mr. Vigna's bottom line assessment of Suburbia's position at the time he signed the S Memo on October 4, 1984 was that its situation was critical and required immediate resolution. (Vigna, Tr. 1381, lines 11-19).

## L. REGULATORS SHOPPED SUBURBIA TO PROSPECTIVE MERGER PARTNERS.

128. As of early 1982, Mr. Vigna thought the most likely solution for Suburbia was a merger with another institution. Suburbia's attractiveness to a merger partner would have to be the fact that it was in a good market of middle-end to high-end communities. An institution with good capital and a strong balance sheet could probably market those communities successfully. However, there was certainly nothing in Suburbia's balance sheet that made it attractive. (Vigna, Tr. 1297, line 18 to p. 1299, line 3).

129. On February 5, 1982, Mr. Vigna sent to Suburbia a Consent Resolution for execution by its Board of Directors. This resolution authorized the FSLIC to act on behalf of Suburbia to negotiate a merger or take such other action as it deems necessary to resolve Suburbia's problem status. Such resolutions are used only in very serious cases. The

effect of such a resolution is that the institution turns itself over to the FSLIC and must abide by whatever the agency does. (Vigna, Tr. 1293, line 16 to p. 1296, line 13; *see generally* PX 36).

130. In connection with its consideration of the Consent Resolution, the Suburbia Board asked the FHLB-NY whether the officers and directors of Suburbia would be held liable for acts associated with the operation of Suburbia once its net worth reached zero or became negative. In answer to that inquiry, Mr. Vigna said that it would be impossible to speculate what liability officers or directors might have for specific acts taken under such circumstance. He went on to say, however, that it was the intention of the FHLB-NY to achieve a solution to Suburbia's financial problems prior to depletion of its net worth. (Vigna, Tr. 1299, line 4 to p. 1302, line 22; PX 45 at AST 021822 and PX 52 at AST 021839).

131. Suburbia's Board of Directors executed the Consent Resolution and returned it to Mr. Vigna on June 15, 1982. With the execution of this Consent Resolution, the FHLBB and the FSLIC were empowered to seek a supervisory solution for Suburbia. (Vigna, Tr. 1302, line 23 to p. 1303, line 17; *see generally* DX 373A).

132. On September 24, 1982, Suburbia submitted to the FHLB-NY a proposed Plan of Merger with Heritage Federal Savings and Loan Association. This was to be a voluntary merger with no regulatory assistance. Suburbia represented that a viability analysis performed by it and Heritage showed that the resulting institution would be profitable in each of the five years following the merger. (Vigna, Tr. 1310, line 15 to p. 1312, line 6; PX 76 at AST 022024-25).

133. Following receipt of the Suburbia/Heritage merger proposal, the regulators performed their own viability analysis, which showed that the resulting institution would not be viable. The regulators therefore refused to approve the merger. (Vigna, Tr. 1312, lines 7-24; Vigna, Tr. 1345, lines 8-16; PX 132 at OAA005 2588).

134. In fact, Heritage Federal Savings and Loan Association was itself one of four severely troubled institutions (Suburbia being another of the four) for which, in October 1982, the FHLB-NY began a nationwide search for potential merger partners. (Vigna, Tr. 1313, line 5 to p. 1315, line 19; PX 102 at OAA005 0462).

135. The search for merger partners for these four institutions culminated in a Bidders' Conference hosted by the FHLB-NY in New York City on December 20, 1982. Prior to the conference the Bank sent solicitations to more than 200 banks, savings and loans and non-depository institutions that were either identified on a list provided by the FSLIC or were known by the Bank to be potential acquirers. Only 27 of these expressed interest in one or more of the four institutions. (Vigna, Tr. 1315, line 20 to p. 1318, line 6; PX 102 at OAA005 0462-63).

136. Of the attendees at the Bidders' Conference, 22 requested and were given bid packages for Suburbia. Another 3 potential bidders were provided bid packages for Suburbia subsequent to the Bidders' Conference. (PX 102, Exhibit D at WOB017 1812).

137. The FHLB-NY received only four bids for Suburbia as a result of the Bidders' Conference. These were from Albany Savings Bank, Anchor Savings Bank, Long Island Savings Bank and Poughkeepsie Savings Bank. Based on analysis done by the FSLIC's quantitative analysis division, it was determined that the Anchor Savings bid should

provide the least costly alternative, though the Long Island and Poughkeepsie bids were competitive. It was also determined that the Albany Savings bid appeared excessive. (Vigna, Tr. 1329, line 13 to p. 1331, line 19; PX 102 at OAA005 0464-65).

138. The four proposals elicited by the 1982 bidders' conference ranged from $17.9 million to $33.9 million. (Spaid, Tr. 202, lines 5-7; DX 406A (A Memo) at WOL315 0368).

139. The bid submitted by Anchor Savings Bank was set forth in a January 18, 1983 letter from Anchor's Chairman to Mr. Vigna. Anchor wanted $25 million in market rate variable FSLIC notes with interest payable quarterly. Anchor would issue a like amount of non-interest-bearing Income Capital Certificates ("ICCs"). The FSLIC notes would come due in five equal installments starting at the end of the fifth year. The ICCs would be repaid in the same manner. Anchor's bid was contingent on Suburbia not having negative net worth at the time of the merger, and Anchor wanted indemnification for certain losses and contingencies. The FHLB-NY later estimated the present value cost of this bid to be $17.9 million. (Vigna, Tr. 1331, line 20 to p. 1334, line 20; DX 3117 at WOL315 0549, PX 169 at OAA005 2714).

140. The bid submitted by Long Island Savings Bank was set forth in a January 20, 1983 letter from the LISB's attorney to Mr. Vigna. The LISB bid called for the issuance by the FSLIC of $55 million in Notes to Suburbia, the notes to have a 10 year maturity and to count as regulatory capital. A like amount of Income Capital Certificates and Net Worth Certificates would be issued by LISB and Suburbia. Goodwill from the transaction would be amortized over 40 years and loan discounts would accrete over 15 years. There were a number of additional terms and forbearances requested as well. LISB calculated

the net present value cost to the FSLIC of its bid at $30,015,000, and the FHLB-NY concurred in this estimate. (Vigna, Tr. 1334, line 21 to p. 1336, line 25; *see generally* DX 3118 and PX 169 at OAA005 2714).

141. The FHLB-NY estimated the present value cost of the Albany Savings bid to exceed $20 million, and it noted that Poughkeepsie Savings wanted cash assistance in the amount of $25 million. (PX 169 at OAA005 2714).

142. Suburbia became eligible for capital assistance before the FSLIC was able to negotiate a merger with any of the four institutions that submitted bids following the Bidders' Conference. Efforts to merge Suburbia were then discontinued, and those bids were not pursued. (Vigna, Tr. 1381, line 20 to p. 1382, line 12; PX 232 (S Memo) at WOL 315 0206).

143. On May 4, 1984, Mr. Vigna wrote to Dr. David Glenn, Director of the FSLIC concerning Suburbia. He described the prior efforts to shop Suburbia in late 1982 and early 1983 and the institution's steady decline since then. He noted that there were presently only four FSLIC-insured, New York-domiciled institutions that would be capable of an unassisted acquisition of Suburbia. He believed none of these four institutions would consider the acquisition of Suburbia without financial assistance. He recommended that the FSLIC authorize a maximum $16 million assistance allocation. (Vigna, Tr. 1354, line 16 to p. 1361, line 25; *see generally* PX 169).

144. By 1984, Suburbia had sustained additional operating losses in excess of $10 million after the 1982 bidders' conference. (Spaid, Tr. 210, lines 12-16; DX 406A (A Memo) at WOL315 0369).

145. As a result of Suburbia's deteriorating financial condition and an increasing interest rate scenario, the FSLIC staff did not believe that rebidding Suburbia in 1984 would result in less costly proposals. (Spaid, Tr. 210, lines 17-25; Spaid, Tr. 211, lines 1-5; Spaid, Tr. 224, lines 14-21; DX 406A (A Memo) at WOL315 0369; PX 237 (I Memo) at AA 0000178).

146. Mr. Spaid agreed that in 1984, the FSLIC would not get proposals that were as good as the proposals received at the 1982 bidders' conference if it re-bid Suburbia. (Spaid, Tr. 211, line 15 to p. 212, line 1).

## M. THE OPTIONS AVAILABLE TO REGULATORS FOR SUBURBIA IN 1984 WERE THE FIDELITY MERGER, LIQUIDATION, OR RE-BIDDING.

147. When the FHLBB received a proposal to take action regarding a troubled thrift, the proposed actions were well documented; the staff would present supporting documents showing that the action's cost was less than the cost of liquidation. (Pratt, Tr. 118, line 24 to p. 119, line 4).

148. The four possible solutions for resolving Suburbia in 1984 were the Fidelity merger, re-bidding, liquidation, and "doing nothing." (Spaid, Tr. 175, lines 8-14). Costs were associated with each of the alternatives. (Spaid, Tr. 175, lines 12-14). However, the FSLIC only calculated the cost of the Fidelity deal and liquidation. (Spaid, Tr. 240, lines 10-13). No one at the FSLIC attempted to determine the cost of doing nothing with regard to Suburbia. (Spaid, Tr. 213, lines 2-4).

149. The FHLBB created the Phoenix program in the early 1980s to address problem thrifts whose management could not weather the changing economy and the difficult economic conditions. (Pratt, Tr. 110, line 21 to p. 111, line 15). The Phoenix program created

institutions to assimilate the failing thrifts. The resulting entities created by the program were headed by management that the FHLBB had determined were capable of dealing with issues effectively. (Pratt, Tr. 110, line 21 to p. 111, line 15).

150. The Phoenix programs were coming to an end during 1984. (Stearns, Tr. 5851, line 23 to p. 5852, line 2). The Issues Memorandum for the Fidelity-Suburbia merger was a "totally complete" document. If a "Phoenix" had been a viable alternative for Suburbia, it would have been discussed in the memorandum. (Stearns, Tr. 5852, lines 13-22).

151. One option for dealing with a problem thrift was to find an investor who would be willing to put cash or assets into a thrift. That was one of the options specifically mentioned in the FSLIC Consent resolution (PX 36) and was an option favored by the FHLBB and the FSLIC. However, by early 1982 there were not very many investors who were willing to infuse new capital into failing savings and loans. (Vigna, Tr. 1296, line 25 to p. 1297, line 17; PX 36 at AST 021741-42).

152. In 1984, Mr. Michael Spaid was a financial analyst in the Mergers and Acquisitions Division of the FSLIC. (Spaid, Tr. 156, lines 9-18).

153. Mr. Spaid was directly involved in the merger between Fidelity and Suburbia. (Spaid, Tr. 160, lines 2-5) He reviewed Fidelity's proposal, negotiated with Fidelity, and worked with the district banks, the FSLIC, and the FHLBB to assemble the appropriate merger documentation and approvals. (Spaid, Tr. 160, line 20 to p. 161, line 2).

154. In 1984, Mr. Carlos Fiol was a financial analyst in the Analysis and Evaluation Division of the FSLIC. (Fiol, Tr. 290, lines 3-5).

155. In 1984, Mr. Fiol prepared an Institution Analysis for Suburbia ("Institutional Analysis"). (Spaid, Tr. 165, lines 12-21; *see generally* PX 1243). Mr. Fiol relied on several assumptions to calculate the cost of liquidating Suburbia including insured and uninsured savings, the number of insured accounts, the cost of insurance for each account, the receivership life, the opportunity cost to the FSLIC, Suburbia's assets and net worth as of April 30, 1984, and the mortgage market yield. (Spaid, Tr. 167, lines 17-24; PX 1243 at EZ009 0021). Relying on these assumptions, the present value cost of liquidating Suburbia in 1984 was $147,936,000. (Spaid, Tr. 170, lines 6-11; PX 1243 at EX009 0021).

156. The Institution Analysis also calculated the cost to the FSLIC of the Fidelity merger proposal. (Spaid, Tr. 171, lines 3-5; PX 1243 at EZ009 0022). The cost to the FSLIC included $16 million in cash assistance and the interest the FSLIC would have to pay Suburbia for its net worth certificates. (Spaid, Tr. 171, lines 9-18; Spaid, Tr. 173, lines 15-25; Spaid, Tr. 174, line 1; PX 1243 at EZ009 0022). The present value cost to the FSLIC of Fidelity's proposal in 1984 was $15,906,000. (Spaid, Tr. 174, lines 10-16; PX 1243 at EZ009 0022).

157. The FSLIC evaluated whether rebidding was an appropriate alternative to the Fidelity deal, but it never formally calculated the amount it would have cost to rebid Suburbia. (Spaid, Tr. 178, lines 12-17; Spaid, Tr. 179, lines 17-21).

## N. THE FIDELITY MERGER WAS THE ONLY REASONABLE OPTION FOR RESOLVING SUBURBIA.

158. Mr. Spaid prepared the Issues Memorandum ("I Memo") as part of the FSLIC's recommendation to the FHLBB. (Spaid, Tr. 217, lines 13-20). The Issues Memorandum

provided background information on Suburbia, the terms of FSLIC assistance, the alternatives for resolving the institution, and the advantages and disadvantages for each alternative. (Spaid, Tr. 217, lines 21-24; *see generally* PX 237 (I Memo)).

159. The I Memo does not list Suburbia's continued participation in the Net Worth Certificate program as an alternative to the Fidelity deal, rebidding, or liquidation. (Albanese, Tr. 4188, lines 8-13; PX 237 (I Memo) at AA 0000180).

160. By law, any solution short of liquidation that the FSLIC pursued had to be less than the cost of liquidation. (Spaid, Tr. 180, lines 3-5).

161. The advantage to liquidation was that it was a full solution. (Spaid, Tr. 225, lines 12-22; PX 237 (I Memo) at AA 0000180). The disadvantages were that the cost of liquidation ($147 million) exceeded the cost of the Fidelity deal by $131.9 million and that liquidation might weaken public confidence in the savings and loan system. (Spaid, Tr. 225, line 23 to p. 227, line 1; PX 1243 at EZ009 0021; PX 237 (I Memo) at AA 0000180).

162. A liquidation cost estimate will change with the passage of time. However, many components of the cost will change, only one of which is interest rates. Had the liquidation cost analysis for Suburbia been performed in years subsequent to 1984, it may have benefited from reduced interest rates, but changes in other aspects of the calculation might have reduced or even offset completely any benefit from lower interest rates. (Kaplan, Tr. 3344, line 22 to p. 3351, line 22).

163. The advantages to the Fidelity deal were that it was a low-cost solution compared to the other alternatives at the time, it avoided the disruptive effects of liquidation, it was

projected viable, and that the merged institution would take in-state mutual form. (Spaid, Tr. 228, lines 4-16; PX 237 (I Memo) at AA 0000180). The only disadvantage was that a lower cost bid might be received. (Spaid, Tr. 229, lines 5-8; PX 237 (I Memo) at AA 0000180). However, Suburbia had already been shopped extensively, Suburbia continued to deteriorate, and there was a possibility of losing the Fidelity deal and gaining a higher cost deal. (Spaid, Tr. 232, lines 1-12; PX 237 (I Memo) at AA 0000180).

164. Accordingly, the Issues Memorandum recommended that the FHLBB accept Fidelity's proposal to acquire Suburbia because it was the least costly alternative and the resulting institution was projected viable. (Spaid, Tr. 232, lines 13-16; PX 237 (I Memo) at AA 0000181).

165. The supervisory merger with Fidelity was Suburbia's only option for a capital infusion as of April 1984. (Kane, Dep. Tr. 115, lines 8-17).

## O. THE REGULATORS DETERMINED THAT THE SURVIVING INSTITUTION WAS VIABLE.

166. When the FSLIC reviewed proposals for supervisory mergers, it examined the future viability of the proposed combined entity because it wanted to create a new entity that had a good chance of surviving. (Beesley, Tr. 1178, line 21 to p. 1179, line 2; Beesley, Tr. 1184, lines 16-21; Beesley, Tr. 1216, line 24 to p. 1217, line 10). A viability analysis had to be performed for every resolution that involved an acquisition rather than a payout. (Fiol, Tr. 296, lines 2-6).

167. On or about September 4, 1984, Mr. Fiol performed a viability analysis, at the request of the Mergers and Acquisition Division of the FSLIC, to determine whether the merger of

Suburbia into Fidelity would be viable under regulatory accounting principles. (Fiol, Tr. 291, line 21 to p. 292, line 6; Fiol, Tr. 295, lines 8-16; Fiol, Tr. 297, line 8 to p. 298, line 5; DX 406A (A Memo) at Exhibit A-6).

168. The viability analysis projected whether or not the resulting merged institution would meet its capital ratios and continue to be profitable. (Spaid, Tr. 181, lines 14-20; PX 1243 at EZ009 0023).

169. In conducting the analysis, Mr. Fiol assumed that purchase accounting would be applied to the assets of Suburbia and that the goodwill would be amortized over 30 years. He also understood that supervisory goodwill would be counted toward regulatory capital. (Fiol, Tr. 300, line 23 to p. 301, line 12; lines 17-21; Fiol, Tr. 303, lines 16-23). The viability analysis also assumed that a mortgage discount rate of 14.34% would be used to discount the performing Suburbia portfolio of mortgages; that a discount rate of 14.23% would be used to discount the other (non-mortgage) performing loans in the Suburbia portfolio; and that the FSLIC would infuse $16 million cash at acquisition. (Fiol, Tr. 301, lines 2-5; 17-25 to p. 302, line 18; DX 406A (A Memo) at Exhibit A-6).

170. The viability analysis relied on balance sheet date for Suburbia as of June 1984 and used a ten-year time horizon. (Fiol, Tr. 300, line 20 to p. 301, line 16; DX 406A (A Memo) at Exhibit A-6).

171. The analysis projected that immediately following the merger Fidelity would have net worth equal to 3.22 % of assets and by year 10, net worth equal to 5.6% of assets. (DX 406A (A Memo) at WOL3150369-70; Exhibit A-6; Spaid, Tr. 238, lines 917).

172. The viability analysis concluded that the merger of Suburbia into Fidelity was viable. (Fiol, Tr. 306, lines 10-13; DX 406A (A Memo) at WOL3150369; Exhibit A-6).

173. Mr. Fiol testified that if, in preparing the viability analysis, OFSLIC had relied on a shorter amortization period for the goodwill (*i.e.*, less than 30 years), the merger might not have been viable. This is the case because the resulting entity, Fidelity, would have been required to absorb a larger write down each year. (Fiol, Tr. 303, line 24 to p. 305, line 3).

**P. DESPITE FIDELITY'S LOAN PROBLEMS, REGULATORS CHOSE FIDELITY TO BE SUBURBIA'S ACQUIRER.**

174. Regulators were aware of Fidelity's alleged commercial real estate lending problems prior to Fidelity's acquisition of Suburbia. (Albanese, Tr. 4143, lines 1-20; Albanese, Tr. 4197, lines 6-19; Albanese, Tr. 4197, lines 7-10). Nevertheless, there is no mention in the I Memo of Fidelity's condo and co-op lending concentration. (Albanese, Tr. 4198, line 13 to p. 4199, line 4; PX 237 at AA 0000180-AA 0000181). Even through Mr. Albanese testified that Fidelity did a "lousy job" making loans and there were several red flags, Fidelity was still permitted to acquire Suburbia. (Albanese, Tr. 4200, line 10 to p. 4201, line 5).

175. Although regulators were commenting on certain Fidelity loans as early as 1982, the regulators did not raise any concerns about these loans with Fidelity at the time of the Suburbia merger. In fact, Fidelity was told by the federal regulators that it was a relatively strong institution. (Lovely, Tr. 1711, line 3 to p. 1712, line 2).

176. At the time he reviewed Fidelity's proposal, Mr. Vigna, who was also involved in the supervision of Fidelity, believed Fidelity had had the financial wherewithal to acquire Suburbia and had no reservations about Fidelity as a potential acquirer. (Vigna, Tr. 1370, lines 4-14).

177. Regulators approved the Fidelity-Suburbia merger because the transaction distanced the Government from Suburbia's risk of failure. (Carron, Tr. 5807, line 19 to p. 5808, line 1).

**Q. BESIDES THE FIDELITY MERGER, LIQUIDATION WAS THE ONLY OTHER ALTERNATIVE FOR SUBURBIA'S RESOLUTION FOR WHICH REGULATORS PERFORMED A COST ANALYSIS.**

178. Before the merger was approved, Mr. Fiol also performed a liquidation analysis to determine whether Fidelity's bid was less than the cost of liquidating Suburbia. (Fiol, Tr. 307, line 4 to p. 308, line 2; Fiol, Tr. 313, lines 9-23; DX 406A (A Memo) at Exhibit A-5).

179. The liquidation analysis concluded that the present value cost to the FSLIC of liquidating Suburbia would have been $147,936,000 while the present value cost of the Fidelity bid was $15,906,000, which amount assumed a $16,000,000 cash infusion by FSLIC and the assumption by Fidelity of $9,175,000 in Suburbia Net Worth Certificates. (DX 406A (A Memo) at Exhibit A-5).

180. The liquidation analysis assumed a receivership life of three years which was a standard assumption for such analyses at that time. (Fiol, Tr. 308, lines 13-25).

181. The difference between the cost of liquidation and the Fidelity bid was approximately $131,900,000. (Fiol, Tr. 313, lines 14-23). Mr. Fiol testified that if OFSLIC had used a longer receivership life than three years, the present value cost of the liquidation to the FSLIC would have increased. (Fiol, Tr. 309, lines 10-14). In later years, the standard assumption period increased to four or five years because it was taking longer to dispose of assets. (Fiol, Tr. 309, lines 1-9).

182. On October 15, 1984, OFSLIC Director Peter Stearns wrote to the FHLBB and recommended that the merger be approved, "[g]iven the low cost (11% of liquidation cost, or 2.3% of Suburbia's assets) of Fidelity's proposal and the strong viability projection." (DX 406A (A Memo) at WOL3150370).

183. In that same memorandum, OFSLIC Director Stearns does not include the rebidding of Suburbia as an "alternative solution" because: "[d]ue to Suburbia's deteriorating financial condition and an increasing interest rate scenario, the OFSLIC staff believes that rebidding will not result in less costly proposals." Accordingly, the only two solutions for which a cost analysis is provided are liquidation (at a projected cost of $147.6 million) and the Fidelity bid, at $16 million. (DX 406A (A Memo) at WOL3150369).

## II. THE FIDELITY-SUBURBIA MERGER

### A. THE FHLBB ACCEPTED FIDELITY NEW YORK'S PROPOSAL TO ACQUIRE SUBURBIA IN 1984.

184. During Suburbia's February 17, 1984 Board of Directors meeting, a resolution was unanimously carried authorizing management to continue investigating a proposed merger with another financial institution. (Joint Stipulation of Facts, April 2, 2007, ¶ 27).

185. The minutes of Fidelity's April 25, 1984 Board of Directors meeting note, among other things, that the Board unanimously resolved to continue to pursue with Suburbia the objective of a merger or acquisition of Suburbia by Fidelity under the Voluntary Assisted Merger Program ("VAMP"). (Joint Stipulation of Facts, April 2, 2007, ¶ 28).

186. By letter dated May 4, 1984, Mr. Vigna of the FHLBB recommended to David Glenn of FSLIC that Suburbia be designated eligible for the FSLIC's VAMP. (Joint Stipulation of Facts, April 2, 2007, ¶ 29; PX 169).

187. Mr. Vigna's May 4, 1984 letter said that the FHLBB believed there were only four FSLIC-insured, New York domiciled institutions which were capable of an unassisted acquisition of Suburbia. These were the Anchor, Long Island, and Poughkeepsie Federal Savings Banks and the Astoria Federal Savings and Loan Association. The FHLBB believed, however, that none of these institutions would be willing to acquire Suburbia without financial assistance. The FHLBB therefore recommended a maximum assistance allocation of $16 million or 2.5% of Suburbia's assets, an amount which it believed would be sufficient to interest one or more potential acquirer of Suburbia and which it

believed would reasonably assure the long-term viability of the institution following such an acquisition. (Joint Stipulation of Facts, April 2, 2007, ¶ 30; PX 169).

188. In May 1984, Suburbia and Fidelity submitted to the FHLBB Supervisory Agent a proposal for a voluntary merger. (Joint Stipulation of Facts, April 2, 2007, ¶ 31).

189. The voluntary merger proposal submitted by Fidelity and Suburbia in May 1984 was not approved because Fidelity requested certain accounting forbearances which were not among the forbearances the Principal Supervisory Agent ("PSA") could grant. Specifically, as set forth by Insurance Regulation 572a.5(c), the PSA was not permitted to approve Fidelity's request that the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method be amortized by the straight line method over 30 years. Nor could the PSA approve the request that FSLIC's cash contribution to the resulting association by booked as a credit to net worth. (Joint Stipulation of Facts, April 2, 2007, ¶ 32).

190. On July 12, 1984, Mr. Lovely, the Chairman and President of Fidelity New York, wrote to Mr. Vigna of the FHLB-NY, outlining Fidelity's proposal to acquire Suburbia in an assisted merger. Although Fidelity's July 12, 1984 was to be an assisted merger, it was based on the VAMP proposal and its related business plan. (Vigna, Tr. 1362, line 24 to p. 1365, line 3; PX 185 at OAA005 0820).

191. Fidelity proposed to merge Suburbia into Fidelity. It requested $16 million cash assistance from the FSLIC, such cash to count as a credit toward Fidelity's regulatory net worth. It proposed that, for regulatory accounting purposes, any intangible assets (goodwill) acquired from Suburbia would be amortized on a "straight line" basis (i.e.,

expensing the same amount of goodwill every year) over a period not to exceed 30 years. It proposed that, for regulatory accounting purposes, any discount arising from the process of marking Suburbia's assets to market will be taken into income on a "level yield" basis (i.e., taking the same amount of loan discount into income every year) over 30 years regardless of the actual repayment characteristics of the loans over time. Fidelity also requested various standard indemnifications and forbearances. (Vigna, Tr. 1365, line 4 to p. 1369, line 3; *see generally* PX 185).

192. Fidelity was willing to merge with Suburbia, despite the fact that Suburbia's liabilities exceeded its assets, because of the favorable treatment of the goodwill. (Greco, Dep. Tr. 66, lines 9-25).

193. The Fidelity-Suburbia merger was a supervisory merger, in which the FHLBB merged a strong institution with a failing institution in exchange for financial assistance from the Government. (Teurfs, Tr. 1024, lines 11-24).

194. On October 4, 1984, Mr. Vigna submitted to the FHLBB a Memorandum, known as the S Memorandum which presented the views and recommendations from a supervisory perspective on the proposed supervisory merger of Fidelity and Suburbia. This is one of several Memoranda submitted to the Bank Board in such transactions. Another memorandum will present the views and recommendations from a legal perspective, and yet another memorandum will present the views and recommendations of the FSLIC. (Vigna, Tr. 1375, line 25 to p. 1377, line 24; *see generally* PX 232 (S Memo)).

195. The S Memorandum described Suburbia's financial condition as of June 30, 1984. Suburbia had $656.1 million of assets and regulatory net worth of $3.5 million, exactly a

half percent of assets. It was therefore right at the limit of eligibility for further financial assistance, and further losses would put it below that limit. Suburbia's interest bearing liabilities exceeded its interest earning assets by $52 million, creating an earnings gap that, in Mr. Vigna's opinion, would be "pretty tough" to overcome and pretty much guaranteed continuing losses. (Vigna, Tr. 1377, line 25 to p. 1379, line 14; PX 232 (S Memo) at WOL315 0201).

196. Suburbia had positive net worth as of June 30, 1984 only by virtue of $9.2 million in Net Worth Certificates, $5 million of Appraised Equity Capital and $44.2 million in Deferred Loan Losses. Without these, Suburbia would have a negative net worth of $55 million, or negative 8.3 % of assets. This was, in Mr. Vigna's opinion, a very critical institution. (Vigna, Tr. 1379, line 15 -21; Vigna, Tr. p. 1380, line 20 to p. 1381, line 2; PX 232 (S Memo) at WOL315 0201).

197. The "Deferred Loan Losses" mentioned in the S Memorandum referred to a program initiated by the FHLBB in 1981 or 1982 in which a thrift could sell "underwater" assets and set up the resulting loss in a deferred account and amortize the loss over a long term period of time (the term of the new assets acquired). This allowed the thrift to spread the negative effect the loss would have on income and capital over a period of years rather than having to take it all in the year of the asset sale. (Vigna, Tr. 1379, line 22 to p. 1380, line 19).

198. At the time Mr. Vigna submitted the S Memorandum, Fidelity had assets of $475.2 million and capital of $21.4 million or 4.5 % of assets. Mr. Vigna thought that level of capital "wasn't bad" during that era. Fidelity had net income of $2.4 million for the first

half of 1984, which Mr. Vigna viewed as "positive." Fidelity had received a "2" composite rating on its 1983 examination, which was a good rating. From a supervisory standpoint, Fidelity was viewed as an acceptable acquirer for Suburbia. (Vigna, Tr. 1382, line 13 to p. 1384, line 25 to p. 1385, line 1; PX 232 (S Memo) at WOL315 0207).

199. Mr. Vigna, in his capacity as Supervisory Agent at the FHLB-NY, recommended to the FHLBB approval of the acquisition of Suburbia by Fidelity. Concurring in his recommendation were Edward J. O'Connell III, Assistant Director of Regional Operations for the Bank Board's Office of Examination and Supervision ("OES") and William J. Schilling, Director of OES. (Vigna, Tr. 1383, line 24 to p. 1384, line 9; PX 232 (S Memo) at WOL 315 0214).

200. On October 15, 1984, Mr. Stearns, Director of the Office of the Federal Savings and Loan Insurance Corporation ("OFSLIC") wrote a Memorandum entitled "Issues Memorandum" (sometimes known as "the I Memorandum") to the FHLBB which presented the views and recommendations of the FSLIC on the proposed supervisory merger of Fidelity and Suburbia. Mr. Vigna saw this memorandum at or about the time it was prepared, and his staff provided to Mr. Stearns a lot of the information in the memorandum concerning the supervisory history of Suburbia and efforts made to find a solution for that institution. (Vigna, Tr. 1384, line 17 to p. 1385, line 11; *see generally* PX 237 (I Memo)).

201. On page 4 of the I Memorandum there is a discussion of the alternatives for resolving Suburbia. The alternatives presented are "Liquidation," "Fidelity," or "Rebid." (Vigna, Tr. 1385, lines 12-15; PX 237 (I Memo) at AA0000180).

202. "Liquidation" referred to placing an institution into a conservatorship or receivership, selling its assets and settling its liabilities. As part of a liquidation, the FSLIC would pay off the institution's depositors. The I Memorandum says the advantage of a liquidation is that it represents a "full solution." It says the disadvantages are that its projected cost exceeds the least expensive alternative by $131.9 million, and that a liquidation "could weaken public confidence in the savings and loan system. (Vigna, Tr. 1385, line 16 to p. 1386, line 24; PX 237 (I Memo) at AA0000180).

203. "Fidelity" referred to the proposed supervisory acquisition of Suburbia by Fidelity, i.e., the proposal being brought before the Bank Board. The I Memorandum says its advantages are that it is the "low cost" solution, it avoids the disruptive effects of liquidation, it is projected to be a viable solution, and it entails the acquisition of a mutual institution by another mutual institution in the same state. The only disadvantage noted is the possibility that a lower cost bid might be received. However, with respect to this potential disadvantage, Mr. Vigna thought it was unlikely that any lower cost bid would be received and that the $16 million cost of the Fidelity deal was a very reasonable solution for Suburbia. (Vigna Tr. 1386, line 25 to p. 1388, line 22; PX 237 (I Memo) at AA0000180).

204. "Rebid" referred to the possibility of deferring the Fidelity acquisition of Suburbia and trying to find a lower cost bid. The only advantage noted was the possibility of finding a lower cost bid. The disadvantages noted were that Suburbia had already been extensively shopped, Suburbia was continuing to deteriorate, and the possibility that the regulators might lose the Fidelity deal and wind up with a higher cost deal. Mr. Vigna viewed this

last potential disadvantage as a very real possibility. (Vigna, Tr. 1388, line 23 to p. 1389, line 20; PX 237 (I Memo) at AA0000180).

205. Mr. Vigna did not recall discussion of any alternative solutions to Suburbia that were considered in October 1984 other than the three alternatives listed in the I Memorandum. (Vigna, Tr. 1389, lines 21-24; PX 237 (I Memo) at AA0000180).

206. When loan discounts are taken into income faster than goodwill is amortized, it tends to produce a positive impact on income for a period of time. However, the loan discount will then be fully accreted at a time when there is still a large amount of goodwill left on the books. After this point, which is known as "the crossover point," the continued amortization of the goodwill will have a negative effect on income. (Vigna, Tr. 1369, line 3 to p. 1370, line 3).

207. The FHLBB approved the plan of merger of Suburbia into Fidelity through its Resolution No. 84-582, dated October 25, 1984. (Joint Stipulation of Facts, April 2, 2007, ¶ 46).

208. The FHLBB determined that it would be necessary to provide financial assistance to prevent the probable default of Suburbia, as stated in FHLBB Resolution No. 84-582. The FSLIC agreed to contribute $16 million in cash to Fidelity, as stated in the Assistance Agreement executed by the FSLIC and Fidelity on October 31, 1984. (Joint Stipulation of Facts, April 2, 2007, ¶ 48).

## B. THE FIDELITY-SUBURBIA MERGER WAS DONE USING THE PURCHASE ACCOUNTING METHOD.

209. The merger transaction between Suburbia and Fidelity was accounted for under the purchase method of accounting. Suburbia's assets and liabilities acquired by Fidelity

were re-priced according to their market value. (Joint Stipulation of Facts, April 2, 2007, ¶ 59).

210. Mr. Roger Teurfs worked as an accountant at Peat Marwick from 1967 to 1991. (Teurfs, Tr. 1017, line 25 to p. 1018, line 6). Both Fidelity and Suburbia were Peat Marwick clients. (Teurfs, Tr. 1018, lines 7-10). In 1976, Mr. Teurfs became the Peat Marwick audit partner on both the Fidelity and Suburbia accounts. (Teurfs, Tr. 1019, lines 2-16).

211. Generally Accepted Accounting Principles ("GAAP") is the body of knowledge accepted by the accounting profession for proper treatment of various accounting issues. (Teurfs, Tr. 1022, lines 2-8).

212. Purchase accounting was the required treatment for mergers under GAAP. (Teurfs, Tr. 1023, lines 6-15).

213. However, the Government allowed savings and loans to use Regulatory Accounting Procedures ("RAP"), which afforded more liberal treatment than GAAP, to keep technically insolvent institutions in business. (Teurfs, Tr. 1033, lines 1-9).

214. Under GAAP accounting, Suburbia was insolvent on the date of its acquisition by Fidelity. (Teurfs, Tr. 1032, lines 23-24; PX 1247B).

215. Acquiring institutions received a benefit from the use of purchase accounting in supervisory mergers because of goodwill. (Beesley, Tr. 1182, line 11 to p. 1184, line 3). It was the FSLIC's objective in its use of purchase accounting to buy enough time for the acquiring institution in a supervisory merger to succeed and amortize all the goodwill on its books from the merger. (Beesley, Tr. 1185, lines 9-13). Purchase accounting

provided an incentive for stronger, better-managed institutions to take over weaker institutions. (Pratt, Tr., 114, line 14 to p. 115, line 1).

216. Acquisitions featuring goodwill, under purchase accounting treatment, result in the combined institution having more income, for a certain time, than the two institutions standing separately did before their merger. (Pratt, Tr. 113, line 12 to p. 114, line 13).

217. In 1984, Suburbia was much larger than Fidelity with approximately $750 million in assets to Fidelity's $500 million. (Teurfs, Tr. 1020, line 23 to p. 1021, line 2).

218. As of November 30, 1984, Suburbia's balance sheet showed a substantial discount on its mortgage loans and an artificially inflated level of capital due to deferred losses, net worth certificates, and appraised equity capital. (Teurfs, Tr. 1031, line 19 to p. 1032, line 18; PX 1247B).

219. In an acquisition done under purchase accounting, all assets and liabilities of the institution being acquired are valued at their current market value ("marked to market"). This can involve: getting a current price quote, for assets that have a quoted market price, doing a discounted cash flow analysis for assets without readily available market prices, determining the present value of future cash flows for liabilities such as savings accounts and borrowings, and getting current appraisals for non-performing assets. The difference between the market value of the liabilities and the market value of the assets is recorded as goodwill. (Kaplan, Tr. 2910, line 18 to p. 2913, line 20; PDX 21).

220. The key terms of Fidelity's acquisition of Suburbia were:

- Fidelity received a $16 million cash payment from the Government;
- Fidelity was permitted to count the $16 million cash payment as regulatory capital instead of treating it as a deduction from goodwill (as GAAP would have required);

- $9.2 million of capital notes issued to Suburbia and corresponding Net Worth Certificates were transferred to Fidelity and counted toward Fidelity's regulatory capital;

- The $160 million in goodwill created by use of purchase accounting was to be amortized to expense on a straight line basis over 30 years, a significant departure from GAAP accounting which would have required faster amortization;

- Goodwill was not to be deducted from Fidelity's net worth for purposes of determining capital compliance;

- $105 million of discounts on loans and securities (reduced to $102 million by various credits and adjustments) resulting from the mark-to-market were to be accreted to income over the remaining lives of the corresponding assets; and,

- The Government would indemnify Fidelity for undisclosed losses

(Kaplan, Tr. 2907, line 1 to p. 2910, line 13; Tr. 2916, lines 10-21; PDX 20 and PDX 22).

221. The sum of Suburbia's GAAP capital deficit at the time of the merger, $57.679 million, and the mark-to-market discount taken on its assets in the process of the merger, $102.414 million, is $160.093 million. That is the amount of the goodwill Fidelity put on its books as a result of its acquisition of Suburbia. (Kaplan, Tr. 2916, line 10 to p. 2917, line 5; Tr. 2922, line 2 to p. 2923, line 17; PDX 22 and PDX 23).

222. The treatment of the $160 million of goodwill arising out of the acquisition of Suburbia resulted in unamortized goodwill counting as capital for all capital compliance purposes. The goodwill was "first class capital." For regulatory purposes, it was as good as any other kind of capital Fidelity had. (Kaplan, Tr. 2908, lines 7-19).

223. At the time of its acquisition of Suburbia, Fidelity had $24.3 million of goodwill on its books from its acquisition of Dollar Federal several years earlier. (Kaplan, Tr. 2918, lines 7-12; PDX 22).

224. If Fidelity had acquired Suburbia without any government assistance, the combined institution would have had total assets in excess of $1 billion, but capital of only $20.2 million, for a capital ratio of 1.85 percent. This would have been well below the then-applicable minimum capital requirement of 3 percent. It is only by adding to Fidelity's capital the $16 million of cash assistance and the $9 million in FSLIC notes resulting from the Net Worth Certificates that Fidelity is able to achieve a capital ratio of 4.15 percent. That is why the Fidelity acquisition of Suburbia had to go forward as an assisted supervisory merger. (Kaplan, Tr. 2918, line 14 to p. 2920, line 7; PDX 22).

**C. PEAT MARWICK'S OPINION APPROVED THE TERMS OF THE FIDELITY-SUBURBIA MERGER.**

225. The Government required that Peat Marwick submit an opinion regarding the key components of the Fidelity-Suburbia merger. (Teurfs, Tr. 1021, lines 17-23; PX 1247 A at KPMG 007226). The three areas the Peat Marwick opinion focused on were that the $16 million in cash assistance was to be credited to net worth, the amortization of intangible assets (goodwill) over a thirty-year period using the straight line method, and the accretion of the loan discount over thirty years using the level yield method. (Teurfs, Tr. 1027, lines 5-17; Teurfs, Tr. 1042, line 22 to p. 1043, line 6; PX 1247A at KPMG 007226).

226. In preparing the Peat Marwick opinion letter, Mr. Teurfs relied on APB Opinion No. 16 (Accounting for Business Combinations), APB Opinion 17 (Accounting for Intangible Assets), FASB Interpretations No. 9 (Applying APB Opinion No. 16 and 17: When a Savings and Loan Association or a Similar Institution Is Acquired in a Business Combination Accounted for by the Purchase Method), and SFAS No. 72 (Accounting for

Certain Acquisitions of Banking or Thrift Institutions). (Teurfs, Tr. 1044, line 7 to p. 1045, line 25; PX 313 at AST 122827).

227. Peat Marwick reached the conclusion that the $16 million FSLIC cash contribution to net worth and the 30 year goodwill amortization using the straight line method were not in accordance with GAAP. (Teurfs, Tr. 1046, lines 11-13; Teurfs, Tr. 1047, lines 5-17; PX 212 at AST 122827-AST122828). Under GAAP, goodwill should have been amortized and charged to earnings more rapidly. (Teurfs, Tr. 1047, lines 11-13).

228. Fidelity's accountants, Peat, Marwick, Mitchell & Company, reviewed the accounting for Fidelity's acquisition of Suburbia. In their letter of February 13, 1985, they stated the following:

- The purchase method of accounting is appropriate for the Fidelity acquisition of Suburbia.
- Suburbia's assets and liabilities will be recorded at market value as of the date of the merger, and the difference will be allocated to goodwill which will be amortized to expense on a straight line basis over 30 years.
- Amortization of goodwill in this fashion is not in accordance with GAAP, but Peat Marwick will not take exception on that basis in reporting on Fidelity's financial statements prepared in accordance with Regulatory Accounting Procedures.
- Fidelity will accrete to income the discount resulting from the adjustment of Suburbia's mortgage loan portfolio to fair market value over the contractual maturity of the loans by the level yield method, adjusted for actual repayment experience.
- Accretion of loan discount in this fashion is in accordance with GAAP.
- Fidelity will receive $16 million from the FSLIC which is to be treated as an addition to net worth under the Assistance Agreement.
- Treatment of the $16 million dollar payment in this fashion is not in accordance with GAAP, which would require that it be treated as a reduction of goodwill.

(Vigna, Tr. 1394, line 22 to p. 1396, line 4; *see generally* PX 318).

229. The method of loan discount accretion over 30 years using the level yield method, adjusted for actual repayments was in accordance with GAAP. (PX 313 at AST 122828).

230. Subsequent to its merger with Suburbia, Fidelity requested, and the FHLBB approved, a change in the way Fidelity would account for the accretion of the loan discount arising out of the merger. Fidelity had originally proposed to accrete the loan discount into income on a level yield basis (the same amount every year) over a 30 year period. Instead, Fidelity was permitted to accrete the loan discount into income by the level yield method over the contractual maturity of the loans, adjusted for actual loan repayment experience. By making this change, Fidelity would account for the loan discount in accordance with GAAP accounting principles. Fidelity requested the change because adherence to the original process "would adversely affect the viability of the resulting institution." (PX 303 at OAA005 1754). The regulators were aware that the effect of this change was that Fidelity would realize income in excess of its goodwill amortization expense for several years until the loan discount was fully accreted, but thereafter Fidelity would incur only goodwill amortization expense with no income offset from loan discount accretion. (Vigna, Tr. 1390, line 15 to p. 1394, line 21; *see generally* PX 303 and PX 311).

## D. GOODWILL MUST BE AMORTIZED AGAINST REAL CASH EARNINGS

231. Fidelity's total goodwill balances at year-end from 1985-1994 were as follows:

- March 31, 1985: $181,318,376.00 (PX 1283 at AST060055; AST060059).
- March 31, 1986: $175,121,433.00 (PX 1283 at AST060055).
- March 31, 1987: $164,118,223.00 (PX 1283 at AST060055).

- March 31, 1988: $158,038,860.00 (PX 1284 at AST059550).
- March 31, 1989: $100,591,000.00 (PX 476 at AST058782).
- March 31, 1990: $87,460,000.00 (PX 1285 at AST058861).
- March 31, 1991: $76,784,000.00 (PX 707 at WON730 1792).
- March 31, 1992: $63,325,000.00 (PX 887 at AST059669).
- December 31, 1992: $13,965,000.00 (PX 986 at AST064181).
- December 31, 1993: $11,108,000.00 (PX 1323 at KPMG 012407).
- December 31, 1994: $9,780,000.00 (PX 1323 at KPMG 012407).

232. Fidelity’s year-end balances for the Suburbia goodwill from 1985-1994 were as follows:

- March 31, 1985: $157,797,000.00 (PX 1283 at AST060055, AST060059, AST060063-AST060064).
- March 31, 1986: $152,497,000.00 (PX 1283 at AST060055, AST060059, AST060063-AST060064).
- March 31, 1987: $142,391,000.00 (PX 1283 at AST060055, AST060063-AST060064).
- March 31, 1988: $137,173,000.00 (PX 1284 at AST059550, AST059559-AST059560).
- March 31, 1989: $80,586,000.00 (PX 476 at AST058782, AST058792-AST058795).
- March 31, 1990: $68,316,000.00 (PX 1285 at AST0058861, AST058869-AST058870, AST058882).
- March 31, 1991: $58,501,000.00 (PX 707 at WON730 1792, WON730 1801).
- March 31, 1992: $45,903,000.00 (PX 887 at AST059669, AST059678).
- December 31, 1992: $13,965,000.00 (PX 986 at AST064181, AST064205-AST064207).
- December 31, 1993: $11,108,000.00 (PX 1323 at KPMG 012407).

- December 31, 1994: $9,780,000.00 (PX 1323 at KPMG 012407).

233. Goodwill is carried on the balance sheet of an institution as an asset. Since the institution's net worth (or capital) is the difference between its assets and its liabilities, all other things being equal, a dollar of goodwill equates to a dollar of capital. When the institution suffers an adverse event, such as a write-down of an asset against its net worth position or absorption of a loss which impacts earnings, that dollar of goodwill provides a benefit to the institution, since it counts as a dollar for capital purposes. (Kaplan, Tr. 2863, line 11 to p. 2864, line 14; PDX 11).

234. When Fidelity used its earnings to amortize the goodwill from the Suburbia transaction, eventually amortizing all of the goodwill, that is a real cost in an economic sense. Fidelity reduced both its earnings and its capital, thereby losing the opportunity to undertake other transactions. These are opportunity costs. (Kaplan, Tr. 3777, line 17 to p. 3780, line 23).

235. Although goodwill is an intangible asset, it still has value, and this value was essential to the viability of the Fidelity-Suburbia supervisory merger. As Mr. Lovely testified, "Goodwill is goodwill. It doesn't jingle in your pocket, but it's there in your drawer. When I first learned about it, I thought it was phantom money, but it made the deal possible." (Lovely, Tr. 1623, lines 9-14).

236. Despite Suburbia's attractive branch network and franchise value, Suburbia's financial condition was so poor that the merger would be profitable to Fidelity only if Fidelity could amortize the goodwill over a 30-year period and grow Fidelity's assets to such a

level that the goodwill would no longer have a significant impact on earnings. (Lovely, Tr. 1621, line 8 to p. 1624, line 6).

237. When Fidelity acquired Suburbia, Bryce Curry, then-President of the Federal Home Loan Bank, explained the function of supervisory goodwill to Mr. Lovely by using the analogy of a home mortgage, stating in effect that, like purchasing a home by making monthly mortgage payments over a period of 30 years, Fidelity purchased a bank that Fidelity would pay for by amortizing the goodwill over 20 to 30 years. (Lovely, Tr. 1565, lines 6-23).

238. Mr. Curry further explained to Mr. Lovely that the ultimate effect of the transaction was that Fidelity obtained a bank and the Government avoided a liability. (Lovely, Tr. 1565, lines 6-23).

239. Supervisory goodwill was a mechanism that allowed the Government to save money upfront when faced with an impaired institution. It was a delaying tactic that the Government employed to avoid having to put out lots of cash. (Engelke, Tr. 4349, line 11 to p. 4350, line 11).

240. Dr. Pratt testified that his understanding of the term “goodwill” was that, if, during an acquisition, the acquiring entity pays more than book value of assets, then the extra money creates an account called goodwill. The goodwill reflects what amount the going-concern value of the firm exceeded the individual accounting sums on its balance sheet. (Pratt, Tr. 113, line 12 to p.114, line 13).

241. The goodwill generated as a result of the Fidelity-Suburbia merger was in excess of $160 million. (Teurfs, Tr. 1033, lines 10-15; Teurfs, Tr. 1136, lines 8-13; Teurfs, Tr. 1051,

lines 4-9; Teurfs, Tr. 1054, lines 1-5; PX 1247B; PX 1283 at AST 060063-AST 060064; PX 569).

242. Fidelity's acquisition of Dollar Federal in 1982 had generated $25,815,000 of goodwill. (Teurfs, Tr. 1050, lines 23-25; PX 1283 at AST 060064).

243. In order to amortize the goodwill, Fidelity had to charge the goodwill against earnings and reduce the net worth of the company. (Teurfs, Tr. 1033, line 19-25; Teurfs, Tr. 1138, lines 1-8). As a result, Fidelity had to generate income greater than the amount of goodwill amortized each year. (Teurfs, Tr. 1034, lines 3-6).

244. There is an opportunity cost when an institution has to amortize goodwill, because earnings must be used to cover the amortization of goodwill. (Teurfs, Tr. 1035, lines 3-13). The money used to amortize goodwill cannot be used for other types of investments, such as loans. (Teurfs, Tr. 1138, lines 9-12).

245. Fidelity, the Government, and Peat Marwick were all aware that goodwill is a non-earning asset. (Teurfs, Tr. 1035, lines 6-9).

246. As of fiscal year 1988, Fidelity restated its financials to bring them into conformity with GAAP. (Teurfs, Tr. 1052, line 15 to p. 1053, line 2; PX 476 at AST 058793). The restatement accelerated the goodwill amortization. (Teurfs, Tr. 1053, lines 3-7). The acceleration resulted in a charge to earnings and a decrease in Fidelity's net worth. (Teurfs, Tr. 1053, lines 13-16).

247. By the end of 1994, Fidelity had written off approximately $150 million of goodwill, leaving a balance of $9 million on December 31, 1994. (Teurfs, Tr. 1137, lines 11-20; PX 1323 at KPMG 012407).

## III. POST-MERGER OPERATIONS AT FIDELITY

### A. AFTER ITS MERGER WITH SUBURBIA, FIDELITY STRENGTHENED ITS MANAGEMENT TEAM.

248. Mr. Lovely recognized the need to strengthen Fidelity's management as soon as he became CEO. (Lovely, Tr. 1556, line 13 to p. 1557, line 19).

249. In mid-1986, Fidelity hired Thomas V. Powderly, William A. Wesp, and Frederick J. Meyer, who brought expertise in commercial real estate management, development and lending, investment portfolio management and retail banking. (Joint Stipulation of Facts, April 2, 2007, ¶ 62).

250. Mr. Powderly was hired in June 1985 as Executive Vice President in charge of retail banking, operations, investment, and accounting. Mr. Powderly later became President and CEO. (Joint Stipulation of Facts, April 2, 2007, ¶ 63).

251. Fidelity hired Mr. Meyer in July 1986. Mr. Meyer became Executive Vice President in December 1986. As Executive Vice President, Mr. Meyer was responsible for the savings division, facilities management, office services, and marketing functions. (Joint Stipulation of Facts, April 2, 2007, ¶ 64).

252. Fidelity hired Mr. Wesp in June 1986 as a Senior Vice President in charge of investments and financial planning. (Joint Stipulation of Facts, April 2, 2007, ¶ 65).

253. Fidelity hired Vito L. Caporusso in September 1986 as Vice President. (Joint Stipulation of Facts, April 2, 2007, ¶ 66).

**B. MR. POWDERLY AND MR. WESP WERE WELL QUALIFIED TO GUIDE FIDELITY THROUGH ITS CHALLENGES.**

254. Mr. Wesp was a 1971 graduate of Hamilton College, where he was an English and Economics major. After graduating from Hamilton College, Mr. Wesp joined American Express in New York having interned there previously. Within a very short period after joining American Express, Mr. Wesp became an assistant to the CEO of the company. (Wesp, Tr. 1723, lines 11-23). In that role, Mr. Wesp had wide ranging responsibilities which included doing anything the CEO asked of him. (Wesp, Tr. 1723, line 24 to p. 1724, line 10).

255. One of Mr. Wesp's responsibilities at American Express had to do with planning and budgeting. There was a very sophisticated planning and budgeting process at American Express that was driven by the CEO. Mr. Wesp was intricately involved in the process because he was charged with reading every plan that was submitted from offices around the world. He would then highlight for the CEO the portions of the various plans that might be of particular interest. Mr. Wesp also sat in on each of the meetings with every member of the senior management of every American Express division and of every operating subsidiary when each of the plans was reviewed. (Wesp, Tr. 1766, line 14 to p. 1767, line 24).

256. In 1976 or 1977, when the CEO of American Express resigned, Mr. Wesp had the opportunity to select any job he wanted in the company. He chose the investment group and became one of six people who ran a $14 billion portfolio of global company assets, which was a sizeable portfolio at that time. Mr. Wesp remained with American Express through the early 1980s and then left after a management change. At that time, Mr. Wesp joined

Central Federal Savings, a small thrift on Long Island and, in June 1986, he moved to Fidelity. (Wesp, Tr. 1723, line 24 to p. 1725, line 14).

257. Mr. Wesp learned of the job opening at Fidelity after Mr. Lovely had put out the word in the Long Island thrift community that Fidelity was looking for someone with an expertise in investments. (Wesp, Tr. 1725, lines 15-23).

258. Messrs. Powderly, Wesp and Meyer were all hired right around the same time. Mr. Wesp testified that it is unusual for an organization to hire simultaneously three very senior people who become very good friends and are not really competitive with each other. Each appreciated the others expertise. Mr. Powderly's background was in real estate and Mr. Meyer knew the retail side of the banking business. These three talked quite frequently and reached the point where they met almost every morning for coffee to discuss what was coming down the pike. (Wesp, Tr. 1743, line 8 to p. 1744, line 5). In later years, when Mr. Powderly was appointed CEO of Fidelity, Mr. Powderly, along with Messrs. Wesp and Meyer, ran the institution as a management committee and never made unilateral decisions. (Wesp, Tr. 1997, lines 16-22).

259. After the Astoria acquisition of Fidelity, Mr. Wesp became a consultant to Astoria for three years, from 1995 to 1998. After spending approximately two years traveling he joined Lehman Brothers and stayed there for approximately a year and a half and then retired again. (Wesp, Tr. 1846, line 11 to p. 1847, line 9).

260. Mr. Powderly earned a degree in mathematics from Fordham University. (Powderly, Tr. 329, lines 19-25).

261. As executive vice president of the East River Savings Bank, Mr. Powderly had been in charge of the thrift's real estate operations in the early 1980s. (Powderly, Tr. 330, line 19 to p. 331, line 9).

262. Mr. Powderly was the head of operations for a real estate firm, the Edward S. Gordon Company, where he managed approximately 10 million square feet of Manhattan real estate in the mid 1980s. (Powderly, Tr. 331, line 10 to p. 332, line 6).

263. The Edward S. Gordon company was a sizable a leading real estate firm. Its successor company, CBRE, is now the largest real estate firm in the world. (Powderly, Tr. 331, lines 20-24).

## C. FIDELITY'S ACTUAL GROWTH EXPERIENCE BEFORE FIRREA AND AFTER IT WAS RELEASED FROM THE CAPITAL PLAN WAS ROBUST AND IMPRESSIVE. THIS CONTRASTS SHARPLY WITH ITS LACK OF GROWTH DURING THE PERIOD IT OPERATED UNDER THE CAPITAL PLAN.

264. In December 1979, Fidelity was approximately a $200 million institution, measured in terms of its assets. By the end of 1988, it was a $2 billion institution. Fidelity's compound annual growth rate from December 1979 to June 1989 was 28.9%. Even without the growth achieved through the Dollar Federal and Suburbia mergers, Fidelity still achieved during this period an internal growth from its operations in the range of 14 to 15 %. (Kaplan, Tr. 2701, line 4 to p. 2704 line 4; PDX 4).

265. In the Viability Analysis done prior to the Fidelity/Suburbia merger, the FSLIC projected that the combined institution would grow at a rate of 6.8 to 8.5 % per year for the ten years following the merger. In actuality, from the merger through the end of 1988, Fidelity's growth consistently exceeded the FSLIC's projections. (Kaplan, Tr. 2936, line 9 to p. 2941, line 16; PDX 30 and PX 210 at EZ009 0028).

266. Fidelity's earnings also exceeded the FSLIC's projections for each of the years 1985 through 1989. However, as Dr. Kaplan noted, the FSLIC's projections were most likely done on the assumption that the loan discount would be accreted on a level yield basis over 30 years, as originally planned, rather than over the life of the loans, as was finally done. The change in accounting for the loan discount had the effect of accelerating income recognition into the earlier years. (Kaplan, Tr. 2942, line 1 to p. 2944, line 6).

267. Fidelity's capital ratios also exceeded the FSLIC's projections in each of the years 1984 through 1988. As with the earnings, the FSLIC's capital ratio projections would probably have been higher had Mr. Fiol used the accelerated accretion of the loan discount, though Dr. Kaplan believes they would not have been significantly higher and would, in any event, still have been below the levels Fidelity actually achieved. (Kaplan, Tr. 2944, line 11 to p. 2946, line 2).

268. From December 31, 1984 through December 31, 1988, Fidelity's total assets grew an average of 12.6 % annually. Its tangible assets grew during that same period an average of 14.7 % annually. Its deposits and borrowings grew an average of 11.9 % annually. Its mortgage-backed securities (all types) grew an average of 41 % annually. (Kaplan, Tr. 2952, line 25 to p. 2954, line 3; PDX 35).

269. Fidelity's size measured by assets reached its high point pre-FIRREA in the period ending December 31, 1988. There then followed a small decrease in asset size until the enactment of FIRREA. This was the period of time when information began to circulate within the thrift industry concerning the possibility of legislation that would include some sort of punitive treatment of goodwill counted as regulatory capital. The people at

Fidelity were paying attention to this situation and were monitoring developments. (Kaplan, Tr. 2704, line 25 to p. 2706, line 24; PDX 4).

270. Between the passage of FIRREA in August 1989 and Fidelity's conversion in May 1993, Fidelity was not permitted to grow. Its growth curve during that period is accordingly flat, with actually some modest shrinkage in the months immediately prior to the conversion. (Kaplan, Tr. 2704, lines 5-24; PDX 4).

271. Following its stock conversion in May 1993 and its release from the strictures of the Capital Plan, Fidelity immediately began to grow again, building on the roughly $57 million of net proceeds it received from its stock offering. Its assets hit an all time high at approximately the first quarter of 1994. At that time it entered into merger discussions with Astoria, and by agreement its growth was limited and adjustments made which caused it to shrink somewhat before the acquisition by Astoria. (Kaplan, Tr. 2706, line 25 to p. 2709, line 5).

272. Earnings in the thrift industry tend to be cyclical, meaning they fluctuate up and down over time, and they tend to correlate to interest rate movements. When interest rates were at historical highs in 1981 and 1982, industry earnings were significantly negative. When interest rates fell, industry earnings again went positive The same was true when interest rates spiked back up in 1987 through 1990. Industry earnings again went negative and did not turn positive until interest rates again started to fall. (Kaplan, Tr. 2731, line 10 to p. 2733, line 9; PDX 7).

273. In contrast to the industry's experience, however, Fidelity's earnings were positive each and every year from 1980 through 1993. The profitability varied from year to year, and

in some years it included a positive effect from purchase accounting, but Fidelity consistently found a way to stay profitable even in years in which the industry as a whole was not profitable. (Kaplan, Tr. 2735, line 23 to p. 2738, line 20; PDX 7 and PDX 8).

## D. LIKE MANY SAVINGS AND LOAN INSTITUTIONS AT THE TIME, FIDELITY BECAME ACTIVE IN COMMERCIAL REAL ESTATE LENDING.

**Regulators Encouraged Asset Diversification.**

274. The regulators encouraged joint ventures with developers in which thrift institutions could be lenders as well as general partners, in effect, in subsidiary corporations of condominium developments and shopping center developments. (Wesp, Tr. 1740, line 11 to p. 1741, line 3; Greco, Dep. Tr. 170, lines 4-15).

275. Congress and the regulators encouraged thrifts to take advantage of new regulations and seek opportunities that had previously only been open to commercial banks. (Greco, Dep. Tr. 93, lines 15-21).

276. At banking conventions in the early 1980s, thrift regulators would chair panels that showcased the success of California thrifts in construction lending in attempts to encourage other thrifts to also engage in this type of lending to increase income. (Powderly, Tr. 339, lines 12-25; Powderly, Tr. 340, lines 1-18). Many of the same California thrifts that regulators held out as examples of success later failed. (Powderly, Tr. 339, lines 12-22).

277. In the 1980s, there also were no rules that limited the amount of capital that could be loaned to one borrower. (Wesp, Tr. 1745, line 25 to p. 1746, line 8).

278. Fidelity's management team in the early 1980s, Dick Lovely and Bruno Greco, were pushed by regulators into making commercial real-estate loans when Mr. Lovely and Mr. Greco had little experience in this area. (Powderly, Tr. 830, line 10 to p. 831, line 12).

279. Commercial real-estate lending in condominiums and cooperative units was not a practice unique to Fidelity but one that many thrifts, including Astoria, were engaging in during the mid-1980s. (Finn, Tr. 4017, line 14 to p. 4018, line 13).

280. The losses taken on Fidelity's non-performing commercial real-estate loans were characteristic of many other institutions in the late 1980s. (Finn, Tr. 4004, line 8 to p. 4005, line 13).

**After Its Acquisition Of Dollar Federal, Fidelity Became Active In The Condominium / Co-op Conversion Lending Market.**

281. On June 30, 1982, Fidelity acquired by merger Dollar Federal Savings & Loan Association, a relatively small institution. As a result of that merger, Fidelity came to have relationships with condominium and co-op developers, and this area of lending became a large part of their operations. This was a permissible area of lending for Fidelity. In the Garn-St Germain legislation, Congress had recognized that savings and loans needed expanded lending powers, so, according to Mr. Vigna, it was understood that institutions would reach out to borrowers such as condo or co-op converters to try to make loans that were different from 30 year fixed-rate mortgage loans. (Vigna, Tr. 1396, line 5 to p. 1399, line 14; *see generally* DX 1988).

282. On May 12, 1983, Mr. Lovely wrote to Mr. Vigna presenting the Board's response to Mr. Vigna's comments on Fidelity's 1982 Examination Report. In that letter Mr. Lovely noted that Fidelity planned to take advantage of the expanded lending powers afforded by

the Garn-St Germain Act and was looking to the "commercial arena" to provide short-term lending possibilities. These statements did not cause Mr. Vigna any concern. (Vigna, Tr. 1399, line 15 to p. 1401, line 2; PX 115 at AST 029174).

283. Walter Amend graduated from Iona College in New Rochelle, New York with a Bachelor's degree in Economics. He subsequently attended the Baruch Division of City University of New York where he completed the course work for a Master's Degree in Finance but did not complete his thesis. (Amend, Tr. 4223, line 17 to p. 4224, line 1).

284. Mr. Amend worked for two years as an auditor for Banker's Trust. In 1972 he went to work for the FHLBB as an Examiner Trainee. Over a seven-year period he rose to the position of Senior Thrift Regulator. In approximately 1980 he became a Field Manager. Two years later he voluntarily left this position and returned to the field as a Senior Examiner. In 1985 the Federal Home Loan Bank examiner staff transitioned to the FHLB-NY. In 1987 he was reappointed as a Field Manager. In August 1989 FIRREA created the Office of Thrift Supervision, and he moved with the rest of the staff to that agency. In 1990 he became an Assistant Director, a position he held until 1994. By that time, due to RTC resolutions and thrift consolidations, the industry had downsized, and OTS personnel numbers downsized as well. Mr. Amend again became a Field Manager, which position he held at the time of his trial testimony. (Amend, Tr. 4224, line 2 to p. 4225, line 7).

285. Mr. Amend first participated in an examination of Fidelity in 1983. He was the Examiner in Charge for the 1985 and 1986 examinations. He was a Field Manager for 1987

through 1990, and then from 1990 through the conclusion of the Capital Plan until Fidelity was acquired by Astoria. (Amend, Tr. 4228 at 18 to p. 4229, line 4).

286. Walter Amend, a field examiner for the FHLBB at the time, thought that the Lovely/ Greco management team at Fidelity made a business decision in or about 1985 to increase its exposure to condo/co-op lending, an area which had been performing well up to then. This was done as part of a restructuring of Fidelity's assets and development of a business plan that management felt could overcome the drag of the substantial goodwill on Fidelity's books. Fidelity was not the only institution doing this type of lending. Mr. Amend, however, believed that Fidelity came to be overexposed in this area. When the market turned against these types of loans, Fidelity's financial capacity was such that it was less able to deal with its exposure than institutions that had better capital and a better earnings posture. (Amend, Tr. 4708, line 11 to p. 4711, line 17; Amend, Tr. 4238, line 25 to p. 4239, line 6; PX 40 at AST 029137-38).

287. Fidelity inherited loans to Gerald Guterman from Fidelity's acquisition of Dollar Federal. (Lovely, Tr. 1568, lines 15-22). Mr. Guterman was Dollar Federal's chief borrower. (Lovely, Tr. 1673, line 25 to p. 1674, line 3).

288. After Fidelity acquired Suburbia, it became clear that Suburbia had some significant problem loans and serious managerial deficiencies. (Lovely, Tr. 1622, line 7 to p. 1623, line 5).

**The Tax Reform Act Of 1986 Affected Real Estate Lending, Particularly Condominium and Conversion Lending.**

289. The commercial real estate business in the New York metropolitan area was lucrative up until the mid-1980s. (Powderly, Tr. 332, line 3-13).

290. Thrifts in the mid-1980s engaged in commercial real estate lending under the reasonable assumption that tax incentives would continue to drive demand for the properties developed by those loans, but the sudden revocation of these tax incentives in 1986 rapidly converted once profitable ventures into nonviable projects. (Finn, Tr. 4004, lines 18-25).

291. The Tax Reform Act of 1986 made it less attractive to hold highly leveraged commercial real estate which in turn caused the commercial real estate market in New York City to start to roll over. (Wesp, Tr. 1742, lines 12-24).

292. The Tax Reform Act of 1986 took away the tax advantages for investors who purchased co-operative units, driving those investors out of the market for such units. (Powderly, Tr. 332, line 25 to p. 333, line 9; PX 986 at AST064174; DX 69A at OAA0002 0080).

293. The "number one reason" why commercial real estate loans became problem assets in the late 1980s was that the 1986 Tax Act rapidly changed the economic viability of the projects funded by the loans. (Finn, Tr. 4004, lines 8 -17).

294. The deterioration in commercial real estate loans was not unique to Fidelity's underwriting practices, but was experienced by many institutions at that time. (Finn, Tr. 4004, line 18 to p. 4005, line 2).

295. This problem was not strictly confined to New York but was an extensive problem throughout the country. (Finn, Tr. 4005, lines 3-10).

296. In an August 12, 1988 letter, regulators from the FHLBB acknowledged that the Tax Reform Act of 1986 contributed to a serious decline in the condominium/co-op market, causing Fidelity's loans to become non-performing. (PX 436 at AST0129682).

**Mr. Powderly Had The Expertise To Deal With Bad Loans, And He Managed Them Effectively In The Time Leading Up To FIRREA'S Enactment.**

297. After joining Fidelity in June 1986, Mr. Powderly reviewed Fidelity's loan portfolio and decided that Fidelity should get out of commercial real estate lending as quickly as it possibly could. (Joint Stipulation of Facts, April 2, 2007, ¶ 67).

298. All of Fidelity's commercial real estate lending was stopped by 1987, with the exception of a small amount of lending that was compelled by contractual obligations, which continued only until late 1987. (Powderly, Tr. 348, line 1 to p. 349, line 4; Powderly, Tr. 668, lines 1-5).

299. Although Mr. Lovely and Mr. Greco initially resisted Mr. Powderly's efforts to stop Fidelity's commercial real estate lending, Mr. Powderly gained the full support of Fidelity's board of directors and was eventually promoted to president in 1990 to replace Mr. Greco. (Powderly, Tr. 453, line 20 to p. 455, line 20; Powderly, Tr. 655, lines 14-16).

300. Through Mr. Powderly's efforts, Fidelity reduced its commercial loan portfolio by $160 million from $370.9 million in September 1986 to only $207 million at the start of FIRREA in December 1989. (PX 986 at AST064174).

301. In the first year after joining Fidelity, Mr. Powderly refused to renew any of Fidelity's five-year balloon loans, thereby removing $150 million in commercial real estate assets from Fidelity's books. (Powderly, Tr. 341, line 5 to p. 342, line 9). When Mr. Powderly refused to renew balloon loans to commercial real estate borrowers, starting in late 1986, many of these borrowers were able to obtain financing from other thrifts who were still willing at that time to engage in this type of lending. (Powderly, Tr. 342, lines 6-18). By calling in Fidelity's balloon loans, Mr. Powderly permanently cut off relationships with

commercial real estate borrowers, and forced them to find financing elsewhere. (Powderly, Tr. 341, line 5 to p. 342, line 18; PX 986 at AST064174).

302. Fidelity's real estate exposure to particular developers may have been overstated in the examination reports because of Fidelity's role as lead lender on certain loans. (Greco, Dep. Tr. 95, lines 7-25). Mr. Greco used the example of the Garden City Hotel loan, which was a $32 million loan, but Fidelity had only lent $5 million with various participatory institutions contributing the remainder. (Greco, Dep. Tr. 95, lines 16-25).

303. Even as late as February 1989, some thrifts, but not Fidelity, believed that diversification away from residential mortgages was the only way that thrifts would remain profitable in the future. (Powderly, Tr. 369, lines 8-13; PX 465 at AST0703799). For example, because Dime Savings was still interested in commercial real estate lending at a time when Fidelity had already decided to reduce its commercial real estate portfolio, Fidelity was able to convince Dime Savings to take over as the lead lender for one of Fidelity's loans. (Powderly, Tr. 347, line 11-17).

304. Even as late as 1993, all of Fidelity's problem assets were created by loans made prior to 1988 when Fidelity stopped its program of commercial real estate lending. (Powderly, Tr. 654, line 18 to p. 656, line 6; PX 711 at AST002898).

305. Between 1989 and 1990, despite the soft real-estate market at the time, Fidelity decreased net classified assets from $97,660,000 to $84,100,000 by completing construction on the Hunt Club loan and selling off some of its units. (Powderly, Tr. 397, line 7 to p. 398, line 14; PX 618 at AST001651; Powderly, Tr. 825, line 13 to p. 826, line 8).

306. Between 1989 and 1990, Fidelity reduced its overall commercial loan portfolio from $171,000,000 to $135,760,958 in part by convincing Dime Savings, another lender in the area, to assume the lead position on a large development loan. (Powderly, Tr. 347, lines 3-17; Powderly, Tr. 398, line 15 to p. 399, line 2; Powderly, Tr. 465 line 12 to p. 466, line 14). When market conditions prevent a thrift from selling a piece of real estate owned at an acceptable price, the thrift can try to develop or otherwise improve the quality of the property to raise its sale price. (Powderly, Tr. 352, lines 4-7).

307. By removing the manager of the 58th Street apartment building, a development financed by a Fidelity loan to Gerald Guterman, and making other changes, Mr. Powderly was able to raise the prices of the units and sell all of them, thereby salvaging at least Fidelity's principal on the loan. (Powderly, Tr. 344, line 24 to p. 345, line 9; Powderly, Tr. 352, lines 4-13).

308. Fidelity improved the 58th Street apartment building, which enabled Fidelity to find buyers to purchase the units at a higher price, thereby salvaging at least Fidelity's principal on the loan. (Powderly, Tr. 344, line 24 to p. 345, line 9; Powderly, Tr. 352, lines 8-13).

309. Fidelity also completed the development of the third section of the Hunt Club development and sold units to bring the loan financing that property back to "current" status. (PX 618 at AST001651; Powderly, Tr. 397, line 24 to p. 398, line 14).

310. While Fidelity lost a significant amount of money on loans to Gerald Guterman, Fidelity was able to recover all of the money owed by Louis Evangelista and by Calvin Danzig. (Powderly, Tr. 671, line 22 to p. 673, line 4). Fidelity also was ultimately able to make

some of its money back on real estate owned. (Powderly, Tr. 663, line 16 to p. 664, line 8).

311. Even before Mr. Powderly joined Fidelity, and while he was still employed with the Edward S. Gordon Company in the mid-1980s, he saw that the New York commercial real estate market was heading into a downward part of its natural real estate cycle, as indicated by falling rents and increasing vacancies. (Powderly, Tr. 332, lines 3-24).

312. Even at the Edward S. Gordon Company, Mr. Powderly was shutting down commercial real estate lending. (Powderly, Tr. 332, lines 7-13; Powderly Tr. 340, line 19 to p. 341, line 2).

313. Although it took Mr. Powderly some time to figure out the nature of Fidelity's commercial real estate portfolio, Mr. Powderly had already made up his mind to get Fidelity out of commercial real estate lending when he first joined Fidelity in 1986. (Powderly, Tr. 338, lines 11-24; Powderly, Tr. 340, lines 19-23).

## E. NEW DIRECTIONS: FIDELITY PROJECTED ITS STRATEGIES FOR THE FUTURE IN FEBRUARY AND OCTOBER 1988 BUSINESS PLANS

314. When Mr. Wesp joined Fidelity, there was no formal financial planning process and the regulators did not require one. The regulators did require Fidelity to produce a budget and a business plan, but there were no parameters regarding how serious and meaningful those documents had to be. (Wesp, Tr. 1746, line 17 to p. 1748, line 12). The annual budget process that was in place at that time was not at a level of sophistication that satisfied Messrs. Wesp, Powderly and Meyer, who had to deal with the operating decisions of the institution. (Wesp, Tr. 1773, line 17 to p. 1774, line 13).

**February 1988 Business Plan**

315. On February 1, 1988, Mr. Greco transmitted a business plan for the period January 1, 1988 to December 31, 1988 to Fidelity's Board of Directors. (*See generally* DX 1203).

316. Mr. Wesp was not directly involved in drafting the February 1988 Business Plan, and, based on his past experience at American Express, he considered it to be a bit amateurish in the way it was put together. However, he did agree with the goals and plans set out in the Business Plan. (Wesp, Tr. 1774, line 14 to p. 1777, line 10).

317. The February 1988 Business Plan established goals for Asset/ Liability Management, Portfolio Restructure, Liquidity Management, Fee Income, Planned Deposit / Asset Growth and Cost Containment / Improvement. (DX 1203 at AST004702).

318. The highlights of the February 1988 Business Plan included a projection that commercial/line of credit loans would increase by approximately $33 million with $24 million of this increase in home equity loans, Mortgage-Backed Securities ("MBS") would increase by $74 million, and the consumer loan portfolio would grow by 20%. (DX 1203 at PAA010 1838; Wesp, Tr. 1776, line 17 to p. 1778, line 16).

319. The February 1988 Business Plan also placed a greater emphasis on commercial and consumer lending, such as auto and home equity and other types of consumer products. (Caporusso, Tr. 3856, lines 12-20).

320. The budget that Fidelity prepared for the February 1988 Business Plan projected that consumer credit loans would reach $34,308,000 by the end of 1988, which represented an increase of $10 million, or a 36% increase, exclusive of home equity. (Caporusso, Tr. 3848, line 10 to p. 3849. line 10; DX 1203 at PAA 0101831).

321. The February 1988 Business Plan budget projected a 52% increase in home equity loans. (DX 1203 at PAA 0101831; Caporusso, Tr. 3850, line 11 to p. 3852, line 10). It also projected a 34% increase in automatic and business credit lines. (DX 1203 at PAA 0101831; Caporusso, Tr. 3852, line 11 to p. 3853, line 2).

322. The aggressive goals set forth in the February 1988 Business Plan relied heavily on advertising, strengthening the branch system, developing new programs and products, and support from management. (Caporusso, Tr. 3849, line 11 to p. 3850, line 10; DX 1203 at AST 004718-19). Management support was necessary because Fidelity's goals required funding, personnel, equipment, systems, and sufficient space. (Caporusso, Tr. 3855, line 21 to p. 3856, line 1).

323. Mr. Caporusso projected in the February 1988 Business Plan the development of a customer service and telemarketing unit at Fidelity to handle customer inquiries, increase sales potential, and maximize the return on advertising. (Caporusso, Tr. 3853, line 20 to p. 3855, line 10; DX 1203 at AST004716). Fidelity was never able to fully implement this program as a result of FIRREA. (Caporusso, Tr. 3855, lines 11-16).

324. Fidelity projected in the February 1988 Business Plan that it would grow its balance sheet through investments by $175,000,000. (DX 1203 at AST004706).

325. The February 1988 Business Plan projected that Fidelity would continue its efforts to successfully remove all undesirable loan relationships and to hopefully strengthen and upgrade the loans into improved categories. (DX 1203 at AST 004708).

326. The February 1988 Business Plan contemplated an 8 % increase in salaries. (DX 1203 at AST 004723).

**October 1988 Business Plan**

327. On August 12, 1988, Martin Lavelle, a Supervisory Agent with the FHLBB wrote to Fidelity and requested that Fidelity provide a business plan to the FHLBB. Mr. Lavelle attached a suggested business plan format and instructions. (PX 436 at AST0129688; Wesp, Tr. 1789, lines 4-25).

328. Mr. Wesp was largely responsible for preparing the business plan requested by Mr. Lavelle. (Wesp, Tr. 1788, line 18 to p. 1789, line 25). On October 12, 1988, Fidelity forwarded its Three Year Business Plan for the period 1989 to 1992 to the FHLBB. There were four overall objectives of the October 1988 Business Plan. (PX 447 at OAA005 1315).

329. The **first** overall objective of the October 1988 Business Plan was to "[i]ncrease capital, particularly GAAP capital." (PX 447 at OAA005 1315). This was one of Fidelity's goals because it was clear by 1988 that ultimately the industry was going to be moving to GAAP accounting which would have the effect of wiping out Fidelity's goodwill. Consequently, Mr. Wesp had started to request that Fidelity's comptroller provide crude but accurate GAAP accounting financial statements on a quarterly basis to Fidelity's board. (Wesp, Tr. 1790, line 16 to p. 1791, line 25; Wesp, Tr. 1827, lines 15-24).

330. Fidelity planned to increase GAAP capital under the October 1988 Business Plan by maintaining a safe but positive spread on earnings. (Powderly, Tr. 358, line 21 to p. 359, line 21; PX 447 at OAA005 1315).

331. The **second** overall objective of the October 1988 Business Plan was to "[g]row the balance sheet at approximately 8 – 10% per annum." (PX 447 at OAA005 1315). Mr. Wesp analogized an 8 to 10% growth rate, which has been the historical average of growth for the

banking industry over time, to "hitting one right down the middle." It was not an extraordinary growth rate one way or the other and was one that could be achieved by running a "plain vanilla banking operation." (Wesp, Tr. 2534, lines 1-22).

332. Fidelity's goal in the October 1988 Business Plan of growing the balance sheet 8 to 10 % a year was a realistic goal. Fidelity had exceeded that growth rate in the years prior to 1988, and 8 to 10 % annual growth is fairly average, typical growth in the thrift industry. (Kaplan, Tr. 2956, lines 3-25). Fidelity considered an eight to ten % growth rate to be a modest and easily achievable rate of growth. (PX 447 at OAA005 1315; Powderly, Tr. 361, line 20 to p. 362, line 21; Powderly, Tr. 648, line 21 to p. 649, line 7).

333. Growth of Fidelity's balance sheet was necessary because Fidelity wanted to create a sufficient level of earnings to minimize the impact of Fidelity's goodwill amortization expense, and Fidelity could not increase earnings without growing the balance sheet. (Powderly, Tr. 361, line 20 to p. 362, line 1; Powderly, Tr. 394, line 15 to p. 395, line 25; PX 618 at AST001646; PX 703 at AA005 1639).

334. Fidelity believed that an eight to ten percent growth was achievable even by investing in more traditional one-to-four family mortgages and mortgage-backed securities and making only a conservative 50 to 70 basis point spread. (Powderly, Tr. 365, lines 7-18). In fact, when Fidelity resumed a 10% growth rate after emerging from the Capital Plan, OTS examiners characterized this level of growth as modest in the 1994 Report of Examination. (PX 1065 at OAA002 1278).

335. The **third** overall objective of the October 1988 Business Plan was to "[r]educe loan concentrations and increase credit quality." (PX 447 at OAA005 1315). The loans

referenced included principally the commercial and joint venture projects where the credit quality was declining. (Wesp, Tr. 1794, line 18 to p. 1795, line 7). The problem loans were "almost exclusively" in Manhattan and mainly involved developers. (Wesp, Tr. 1744, lines 6-10; Wesp, Tr. 1998, line 6 to p. 1999, line 1).

336. After the Tax Reform Act of 1986 was passed, Messrs. Wesp, Powderly and Meyer anticipated that there might be a downturn in the real estate cycle and they understood that they needed to investigate what Fidelity's sensitivities might be. (Wesp, Tr. 1742, line 12 to p. 1743, line 7). Mr. Powderly was tasked with dealing with the thrift's real estate issues because he "knew commercial real estate inside out." (Wesp, Tr. 1743, line 8 to p. 1744, line 5).

337. Fidelity's management team agreed with the regulators that the commercial loan concentrations had to come down and, by 1988, had already stopped making any more of these types of loans. (Wesp, Tr. 1795, line 8 to p. 1796, line 5). Indeed, in the FHLBB's August 12, 1988 letter to Fidelity, Mr. Lavelle acknowledged that his office understood that it was "the deterioration of co-operative/condominium loans originated in the 1983-85 period which [was] substantially responsible for the increase in [Fidelity's] classified assets." Mr. Lavelle also acknowledged that Fidelity had already stopped this type of lending and thus "a discussion concerning the bank's involvement in this market would not serve any useful purpose." (PX 436 at AST0129682).

338. At the time the October 1988 Business Plan was written, Fidelity had been maintaining a positive earnings spread by: (1) borrowing from depositors, Wall Street, or the Federal Home Loan Bank at attractively low levels of interest; (2) making safe returns on

investments in residential mortgages either through loan origination or the purchase of mortgage-backed securities; and (3) significantly reducing operating expenses. (Powderly, Tr. 359, line 13 to p. 361, line 19).

339. Fidelity planned to further stabilize earnings in October of 1988 by continuing to reduce loan concentrations and Fidelity's exposure to losses on its commercial real estate portfolio, avoiding new areas of business, and investing more in traditional one-to-four family mortgages. (PX 447 at OAA005 1315; Powderly Tr. 362, line 22 to p. 364, line 14).

340. The **fourth** overall objective of the October 1988 Business Plan was to "[i]ncrease [the] return on assets to a stable 50-70 basis point range." (PX 447 at OAA005 1315). This objective was likely a direct response to a comment in the FHLBB's August 12, 1988 letter about Fidelity's net interest margins having been less than the peer group average during the past several quarters. (Wesp, Tr. 1796, lines 6-15).

341. Mr. Wesp understood that, at a 50 basis point net return, Fidelity would likely underperform its peer group. However, because the 50 basis point figure included the amortization of significant amounts of goodwill, he considered the planned performance to be solid. (PX 447 at OAA005 1315; Wesp, Tr. 1799, line 17 to p. 1800, line 11).

342. Increasing profitability (return on assets) to a stable 50 to 70 basis point range was a readily achievable goal. Fidelity had already been meeting that goal and was positioned to do it on a going forward basis. Some of the steps taken in this direction included working on their problem loans, increasing the efficiency of their operation, and developing an effective wholesale strategy. (Kaplan, Tr. 2957, lines 7-22).

343. There is a reference in the October 1988 Business Plan to the current management team and organizational structure being well-suited to attaining the goals of the plan. (PX 447 at OAA005 1315). This comment was meant to refer to Messrs. Wesp, Powderly and Meyer, as well as Jim Russell, the comptroller of Fidelity, Vito Caporusso, who was responsible for consumer lending and home equity lending, and Robert Miller, the former president of Suburbia who Fidelity engaged as a consultant to run its software modeling operations for earnings and budgeting purposes and for static and cumulative gap. (Wesp, Tr. 1797, line 12 to p. 1798, line 11; PX 447 at OAA005 1320).

344. The October 1988 Business Plan called for "no quantum leaps forward, just steady growth." (PX 447 at OAA005 1315). Mr. Wesp added this comment to the plan because he wanted to communicate to the FHLBB that Fidelity did not intend to mimic those thrifts, some of which were in California, that were growing too big too fast and likely would need to be bailed out. (Wesp, Tr. 1798, line 20 to p. 1799, line 16).

345. Fidelity's change in management, beginning with the arrival of Messrs. Powderly, Wesp and Meyer, had already started Fidelity down the road to reducing loan concentrations and improving asset quality. (Kaplan, Tr. 2957, lines 1-6).

346. The October 1988 Business Plan noted that the most significant risk to achieving the goals of the plan was the possibility of "unfavorable treatment of goodwill" which could have a "significant negative impact on capital levels and thus plan results." (Kaplan, Tr. 2957, line 22 to p. 2958, line 13; PDX 36 and PX 447 at OAA005 1316).

347. The October 1988 Business Plan noted that overall balance sheet growth was viewed by Fidelity's Board and Management as the key to dealing with the negative effect of

goodwill amortization. It also noted that "other liability" growth, i.e., borrowings, is a critical part of that balance sheet growth. Fidelity was acutely aware of the burden of goodwill amortization, and their planned growth was a reasonable strategy for dealing with that. (Kaplan, Tr. 2959, line 8 to p. 2960, line 5; PDX 36 and PX 447 at OAA005 1319).

**Use of Wholesale Markets**

348. In the October 1988 Business Plan, Fidelity addressed its intention to utilize the wholesale markets. When commenting on the economic environment that Fidelity was likely to face over the next three years, the Plan states, "[e]ither the wholesale or retail market can be used to add assets to the balance sheet. For instance, there will be periods when it is more cost efficient to buy mortgage backed securities rather than to originate [loans] at punitive teaser rates. It is our intention to utilize the more efficient market." (PX 447 at OAA005 1316). Mr. Wesp's market expertise allowed Fidelity to be "very opportunistic and flexible." (Wesp, Tr. 1815, line to p. 1816, line 18).

349. As projected, Fidelity, in fact, did add $50 to $75 million in MBS to its securities portfolios with a like amount of borrowings from Wall Street or the Federal Home Loan Bank. (Wesp, Tr. 1800, line 12 to p. 1801, line 6).

350. The October 1988 Business Plan also projected $7.2 million of pretax capital gains from the orderly reduction of a portion of the institution's holdings of FHLMC stock. (PX 447 at OAA005 1315; Wesp, Tr. 1802, lines 5-20). Fidelity was able to take advantage of these gains because of Mr. Wesp's business acumen in understanding the long-term value of the FHLMC stock at a time when other thrifts failed to recognize what a potential

source of income the stock could be. All thrifts received an allocation of 10,000 shares of FHLMC at a time when the stock was not publicly traded. They also received a 7 or 8% annual dividend. As the FHLMC became more successful and began trading on the pink sheets, which is the over the counter ("OTC") market, the value of the stock began to increase in anticipation of the initial public offering and New York Stock Exchange listing. Over time, Fidelity made $35 to $40 million in profits on the stock because Mr. Wesp had the foresight to accumulate a sizable position. (Wesp, Tr. 1802, line 5 to p. 1808, line 14).

**Lending**

351. The October 1988 Business Plan also contained various projections with respect to anticipated lending activities. The two major areas that Fidelity intended to grow were home equity loans and consumer lending. (PX 447 at OAA005 1317). Mr. Caporusso, who was an excellent loan underwriter and had worked closely with Mr. Meyer over the years, had been hired by Fidelity to expand the home equity and consumer lending business. (Wesp, Tr. 1819, line 17 to p. 1820, line 6).

352. The October 1988 Business Plan called for an increase of $10.5 million per quarter in home equity loans. This projection was based on the expectation that the Tax Reform Act of 1986 would continue to drive the consumer towards this product because this legislation made consumer loan interest non-deductible for the first time. So, for example, car loans and credit card loans could no longer be deducted from one's personal tax returns, but home equity loans were still tax deductible. (PX 447 at OAA005 1317; Wesp, Tr. 1818, line 24 to p. 1819, line 16).

353. Fidelity also saw an opportunity to increase consumer lending by $11.25 million per quarter with a mix of personal, auto and home improvement loans given the "high profile, high per capita income consumer profile" of the Nassau/Suffolk market. (PX 447 at OAA005 1317; Wesp, Tr. 1823, lines 14-25).

354. The October 1988 Business Plan projected that fixed rate mortgages would only be originated on terms and conditions that would allow them to be sold in the secondary market. (PX 447 at OAA005 1317). Mr. Wesp explained that this item was added to address Fidelity's interest rate profile. Fidelity did not want 30 year fixed rate mortgages sitting on its books that it did not have the flexibility to sell in the secondary market to Freddie Mac or Fannie Mae at a break-even price or for a profit. (Wesp, Tr. 1820, line 16 to p. 1821, line 9).

355. Fidelity projected that it would only accept new originations in the commercial loan portfolio that equaled maturities. This was in response to the concerns expressed in the FHLBB's August 12, 1988 letter about the credit quality of the commercial loan portfolio. One way to deal with the credit concerns was to let the existing loans start to run off and not to make any new loans until the old existing loans matured. (Wesp, Tr. 1821, line 10 to p. 1822, line 4).

356. Fidelity similarly planned to have its construction loans run off, but it projected that, due entirely to pre-existing commitments, the construction loan portfolio would experience a modest increase of $5 million per quarter in new loans after the second quarter of 1989. (PX 447 at OAA005 1317; Wesp, Tr. 1822, line 5 to p. 1823, line 2).

357. The other salient points in the October 1988 Business Plan included:

- No new lines of business and no untested earning streams (PX 447 at OAA005 1315 & OAA005 1322).
- Regulatory net worth to increase to $122.7 million (5% of assets) (PX 447 at OAA005 1318).
- GAAP net worth to increase from $33.4 million to $48.25 million from retained earnings (PX 447 at OAA005 1318).
- Deposits to grow 8.8% over the three years to $1.5 billion (PX 447 at OAA005 1319).
- Total borrowings, including Federal Home Loan Bank borrowings, to grow to $794.48 million, 32% of liabilities. (PX 447 at OAA005 1319).

358. Fidelity's performance in the real world pre-FIRREA was consistent with its goal in the October 1988 Business Plan of increasing capital, and particularly GAAP capital. (Kaplan, Tr. 2955, line 17 to p. 2956, line 2).

359. In a conference hosted by Salomon Brothers in early February 1989, thrift executives generally agreed that thrifts would need to grow their balance sheets to reduce the impact of goodwill; raise net worth to support growth; and maintain a profitable spread, all of which were consistent with Fidelity's October 1988 Business Plan. (PX 465 at AST0703799; Powderly, Tr. 369, line 20 to p. 370, line 3).

360. Any business plan is a living document that needs to change as circumstances change. Thrift institutions regularly re-evaluate business plans when unanticipated events occur. (Powderly, Tr. 970, lines 16-19). Re-evaluations of business plans do not necessarily result in a change of the plan and when a thrift has capital, it is typically protected from having to change course as a result of unanticipated events. (Powderly, Tr. 971, line 14 to p. 973, line 5). However, in Fidelity's case at the time it drafted the October 1988 Business

Plan, and all things being equal, Fidelity intended to operate in accordance with its terms. (Wesp, Tr. 1824, line 1 to p. 1825, line 2). Fidelity's October 1988 Business Plan was a serious business plan under which Fidelity planned to operate for the next three years. (Powderly, Tr. 365, lines 19-25).

**F. FIDELITY BEGAN TO ENGAGE IN A "WHOLESALE" FINANCIAL STRATEGY. MR. WESP APPLIED HIS EXPERIENCE AND EXPERTISE TO WRING CREDIT RISK AND INTEREST RATE RISK OUT OF FIDELITY'S BALANCE SHEET BY USING THE WHOLESALE STRATEGY.**

361. Mr. Wesp was hired to build an investment operation at Fidelity basically from the ground up. Fidelity needed someone, like Mr. Wesp, who had a fair amount of background in the investment business and in the controls, back office and accounting operations that are needed to support a securities portfolio. (Wesp Tr. 1726, lines 2-19; Wesp, Tr. 1728, line 23 to p. 1729, line 14).

362. Prior to Mr. Wesp's arrival, Fidelity did not have a formal investment function and Fidelity held very few securities. Essentially, the only securities that Fidelity held at the time were securities that would have allowed the thrift to meet the FHLBB requirements for liquidity. The FHLBB required that a thrift institution maintain a certain percentage of its balance sheet in cash and cash equivalents which typically included Treasury bills, very short corporate notes, very high quality CD's and were very garden variety short-term investments. (Wesp Tr. 1726, line 22 to p. 1728, line 11). Fidelity also held a small portfolio of Ginnie Maes and some Freddie Macs. (Wesp, Tr. 1728, lines 12-22).

363. One of the first things that Mr. Wesp was asked to do when he joined Fidelity was to come up with a plan to invest the $100 million in proceeds that Fidelity had acquired as a result of a recent sale of Suburbia loans. (Wesp, Tr. 1728, line 23 to p. 1729, line 17). Mr. Wesp

devised a conservative plan to invest these funds in a portfolio of laddered securities which included, among other things, corporate AA rated notes and bonds from organizations like General Motors, IBM and General Electric. Mr. Wesp's plan was approved by Messrs. Lovely and Greco and ultimately the Fidelity Board of Directors. (Wesp, Tr. 1729, line 20 to p. 1731, line 7).

364. Once the plan was approved to invest the $100 million, Mr. Wesp began to focus his energies on setting up the controls, back office systems and accounting operations that were needed to support the investment department. (Wesp, Tr. 1731, line 10 to 1732, line 9).

365. As time went on and Mr. Wesp became more familiar with Fidelity's balance sheet, it became clear to him that Fidelity had to grow. If a financial institution does not grow, it will become stagnant. Moreover, as a consequence of the merger with Suburbia, Fidelity had no choice but to grow, and this fact should have been obvious to the FHLBB, because of the accounting that had been used at the time of the merger which required the amortization of the goodwill and the loan discounts on a going forward basis. (Wesp, Tr. 1746, line 17 to p. 1748, line 20).

366. The Fidelity-Suburbia merger was structured so that after 10 years the amortization of the goodwill would start to exceed the income from the loan discounts. Accordingly, once Fidelity reached that crossover point, it had to have the earnings and revenue stream to cover the deficit, and to achieve this level of earnings, Fidelity had to grow its balance sheet. Fidelity did not need to grow explosively but it needed to grow at a reasonable rate of 8-10%, which was the 20th century historical norm for financial institutions. (Wesp, Tr. 1748, line 21 to p. 1750, line 17).

367. At that time, Fidelity had approximately $1.2 billion in assets so 10% growth was approximately $120 million a year, which was a large sum of money to put on the balance sheet each year. Fidelity wanted to grow in an orderly way, without assuming a lot of new risks and in areas where it already had in-house expertise, like in the home equity and consumer lending areas, as well as the wholesale securities markets. Given the percentage growth that Fidelity needed, the thrift did not look to the local one-to-four family real estate market for growth because Long Island was one of the most competitive retail mortgage markets in the country. (Wesp, Tr. 1750, line 18 to p. 1753, line 12).

368. Therefore, in 1987 and 1988, Fidelity began embarking on a strategy where it would make as many consumer loans and as many adjustable rate mortgage home equity loans as it could and to the extent that any of those areas fell short, Mr. Wesp would fill that shortfall with investments in securities. (Wesp, Tr. 1758, line 7 to p. 1759, line 2; Wesp, Tr. 1763, lines 12-18).

369. Mr. Wesp was tapped to run the securities portfolios because of his expertise in the capital markets. Mr. Wesp testified that a wholesale strategy made sense because the thrift could buy whatever amounts of an asset that it wanted, with whatever kind of credit or interest rate profiles that it wanted, and it could do it in a sizeable way with very low overhead and expenses. (Wesp, Tr. 1751, line 16 to p. 1753, line 12).

370. Mortgage-backed securities are marketable securities that are secured by a pool of mortgages. The Government National Mortgage Association ("GNMA" or "Ginnie Mae"), Federal Home Loan Mortgage Corporation ("FHLMC" or Freddie Mac"), and Federal

National Mortgage Association ("FNMA" or "Fannie Mae") are all issuers of MBS. (Wesp, Tr. 1756, line 3 to p. 1758, line 6).

371. Investing in mortgage-backed securities allowed Fidelity to add a fair amount of earnings to its balance sheet very quickly with no increase in overhead and no increase in credit risk because they were backed by GNMA, FHLMC and FNMA. (Wesp, Tr. 1758, line 7 to p. 1759, line 2; Wesp, Tr. 1759, line 25 to p. 1761, line 20).

372. Because the market for MBS was deep and liquid, there were always MBS available for purchase. (Wesp, Tr. 1756, line 3 to p. 1757, line 24; Wesp, Tr. 2240, line 22 to p. 2241, line 7).

373. Mortgage-backed securities have the same interest rate risk as any other note or bond, whether it is a U.S. government security or a corporate security, because anything that has a coupon interest rate attached to it will have the same interest rate risk. (Wesp, Tr. 1759, lines 3-24).

374. In early 1987, Fidelity's augmented management team recognized the potential for problems to develop in Fidelity's commercial real estate, construction, and commercial business loan portfolios, in part as a result of the Tax Reform Act of 1986. As a result, Fidelity decided to cease such lending. (Joint Stipulation of Facts, April 2, 2007, ¶ 68).

375. Beginning in 1987, Fidelity began to phase out its practice of originating loans with deposits and instead began purchasing securitized mortgages with a mix of Federal Home Loan Bank advances and Wall Street borrowings. (PX 618 at AST001646; PX 986 at AST064174; PX 462 at AST0703558).

376. In 1987, Fidelity's management began to invest available funds no longer being used in commercial real estate, construction, and commercial business lending in high quality mortgage-backed and mortgage-related securities and U.S. Government obligations. This practice was in contrast with the traditional thrift practice of originating residential mortgage loans. Fidelity's management chose this strategy as a means of controlling its overall credit risk and managing interest rate risk. At the same time, Fidelity's management decided to de-emphasize traditional one-to-four family mortgage lending as a result of severe competition in its market area, which made the returns generated by securitize mortgage assets more attractive. (Joint Stipulation of Facts, April 2, 2007, ¶ 69).

377. Fidelity would choose its source of funds based on how market conditions affected the cost of those borrowings. Although the interest rate paid to depositors is often lower than the interest rates paid for Federal Home Loan Bank advances or Wall Street borrowings, the actual cost of borrowing from depositors could be higher when considering the additional costs of maintaining branch operations. Thus, Fidelity would engage in a number of calculations to determine the best source of funds for a particular investment rather than locking into one type of borrowing. (Powderly, Tr. 987, line 24 to p. 989, line 20; Powderly, Tr. 996, line 16 to p. 997, line 7; Powderly, Tr. 1002, line 23 to p. 1003, line 17; Powderly, Tr. 1007, line 17 to p. 1008, line 7).

378. At first, Fidelity continued to look for opportunities to originate loans, but this activity was increasingly replaced by purchases of MBS to the point that Fidelity effectively

ceased loan origination activity by 1993. (Powderly, Tr. 769, line 12 to p. 770, line 21; PX 986 at AST064174).

379. By engaging in this wholesale strategy, Fidelity was able to obtain higher returns because Fidelity did not have to reduce the interest rates of its loans to compete for local market share. (Powderly, Tr. 396, line 1 to p. 397, line 6).

380. By purchasing adjustable rate mortgage backed securities, Fidelity was also able to significantly reduce both its credit and interest rate risk. (PX 618 at AST001646; Powderly, Tr. 396, line 1 to p. 397, line 6; PX 986 at AST064174). For example, buying shorter duration assets, like 15 year mortgages instead of 30 year mortgages, will lessen any interest rate risk. (Wesp, Tr. 1778, line 17 to p. 1779, line 9).

381. Unlike other securities, however, MBS also have prepayment risk because the pool of mortgages that underlie the MBS can be paid off at any time. It is because of prepayment risk that MBS trade at higher interest rates than U.S. government bonds, and it is precisely the higher interest rates which make MBS an attractive option because prepayment risk is something that, if you understand it, can be easily managed. (Wesp, Tr. 1759, line 25 to p. 1761, line 20). Fidelity funded its additional purchases of MBS, after the investment of the $100 million in proceeds that Fidelity had acquired as a result of a sale of Suburbia loans, with customer deposits and borrowings from the Federal Home Loan Bank and Wall Street. (Wesp, Tr. 1761, line 21 to p. 1762, line 20; Wesp, Tr. 1787, lines 5-22).

382. As between the two sources of wholesale borrowings, Federal Home Loan Bank and Wall Street, the two compared favorably in terms of cost because all interest rates, regardless of the instrument, assuming it's in U.S. dollars, are derived from the base rates set by U.S.

Treasury securities. However, if a thrift wished to borrow funds for five years or longer, the Federal Home Loan Bank was a better source because the Federal Home Loan Bank was willing to lend money for much longer periods than the thrift could otherwise efficiently borrow either in the bond market or from Wall Street. (Wesp, Tr. 1763, line 19 to p. 1765, line 21).

383. Deposits were generally a more expensive funding source because in addition to the interest that the thrift must pay on the deposits, there are overhead costs associated with deposits that you do not have with wholesale borrowings. As Mr. Wesp testified: "[t]o raise a deposit in the branch, obviously, there's an interest rate that's involved … [b]ut there's also the entire infrastructure cost of the branch. There's the building, there's the lights, there's the landscapers, there's the tellers and all the back office accounting and all that stuff that goes with it. And there is a cost attendant to that." (Wesp, Tr. 1763, line 19 to p. 1765, line 21).

384. For the year 1988, Fidelity was projecting that it would increase MBS by $74 million, of which $10 million would be purchased in January, $20 million in February and $20 million in March at a fixed rate of 10% for fifteen years as well as $2 million per month in Freddie Mac ARM mortgage backed securities. (DX 1203 at PAA010 1838).

385. According to Mr. Wesp, these were reasonable projections. Instead of creating a mortgage banking operation and making $10 million worth of mortgages a month, Mr. Wesp could buy MBS in the market with little or no overhead. Fidelity also had the ability to purchase MBS with 15 year maturities and with adjustable rates, which would not have been a realistic option if Fidelity was originating the mortgages because mortgages in the Northeast were still traditionally 30 year mortgages. The ability to buy MBS with shorter durations

helped Fidelity manage its interest rate risk. Moreover, as Mr. Wesp testified, "[e]ven if we had created a mortgage banking operation and had aggressively been trying to make mortgages locally, we could never have made this kind of size in these kinds of loans. So this was another benefit to this securities strategy that we were going down – beginning to go down the road of." (Wesp, Tr. 1777, line 11 to p. 1779, line 9).

**Fidelity's Wholesale Strategy Was Not Risk-Controlled Arbitrage.**

386. The regulatory definition of "risk controlled arbitrage" involved not just the matching of assets and liabilities, but hedging as well. (Vigna, Tr. 2844, line 11 to p. 2845, line 8).

387. As of 1988, regulators could prevent a thrift from growing thorough risk controlled arbitrage if the thrift had received a 4 or a 5 rating on its previous exam. (Moran, Tr. 4941, line 15 to p. 4946, line 2). Although Fidelity was consistently increasing its portfolio of mortgage-backed securities through wholesale borrowings after 1987, regulators never described this activity as risk-controlled arbitrage, nor did they ever attempt to restrict Fidelity's growth on that basis. (Moran, Tr. 4946, line 19 to p. 4949, line 4). Fidelity's management did not consider the operation of its wholesale strategy to constitute risk-controlled arbitrage. (Powderly, Tr. 800, lines 5-11; Powderly, Tr. 935, lines 6-20).

388. Although hedging was not featured in every case of risk-controlled arbitrage, the theme of eliminating risk through duration matching and hedging was essential to risk-controlled arbitrage. (Moran, Tr. 4949, line 5 to p. 4950, line 9).

## IV. FINANCIAL INSTITUTIONS RECOVERY, REFORM, AND ENFORCEMENT ACT OF 1989 ("FIRREA")

### A. ANTICIPATION OF FIRREA: THE SAVINGS AND LOAN INDUSTRY, THE REGULATORS, AND FIDELITY HAD ANTICIPATED REGULATORY CHANGES IN THE TIME LEADING UP TO FIRREA'S ENACTMENT.

389. The new capital standards of FIRREA, though published on November 7, 1989, were based on a notice of proposed rulemaking issued on December 15, 1988, as modified to reflect public comments and the requirements of FIRREA. Those regulations had therefore existed in some form or another for the better part of the year and during that time had been the subject of discussion between the industry and the regulators. Although the industry would not necessarily have known for a year precisely what from the final regulations would take, it had known for a year that there were going to be some changes in the capital requirements. In Mr. Vigna's words, "Something was coming, like a train, you know, at the end of the tunnel." (Vigna, Tr. 1409, line 15 to p. 1413, line 12; *see generally* PX 511).

390. In 1988 the thrift industry expected FIRREA to have some detrimental impact on the treatment of supervisory goodwill. (Powderly, Tr. 353, line 12 to p. 355, line 10).

391. It is clear from the face of the October 1988 Business Plan, and the testimony of Mr. Wesp and others, that Fidelity was aware of and closely monitoring the debates in the Congress regarding the state of the thrift industry and the early drafts of the legislation that came to be known as FIRREA. Fidelity understood that the biggest single risk to successful implementation of the plan was the potential regulatory treatment of goodwill. (PX 447 at OAA005 1316). Mr. Wesp testified that management knew something was

coming on the regulatory front and they were beginning to prepare for it by October 1988. (Wesp, Tr. 1810, lines 8-21; Wesp, Tr. 1813, line 3 to p. 1814, line 19).

392. In this regard, the October Plan states in relevant part: "We view the area of most significant risk to the forecast to [be those] issues dominated by the U.S. Congress as it grapples with the recapitalization of the FSLIC in the spring of 1989. At this time it is impossible to forecast what quid pro quo's [*sic*] might be extracted from the thrift industry but almost certainly, the agenda will include new regulation and additional financial support for the FSLIC. We will follow these developments closely." (PX 447 at OAA005 1316).

393. The October 1988 Business Plan also makes clear that management "anticipate[d] that at some point during the plan period the Federal Home Loan Bank will adopt in total or in a somewhat modified version, the new BIS/Federal Reserve capital guidelines." (PX 447 at OAA005 1319). BIS refers to the Bank for International Settlement, which is located in Europe. At the time that Fidelity was preparing its October 1988 Business Plan, there was a joint BIS/Federal Reserve taskforce that was working on a new set of risk-adjusted capital requirements in reaction to the growing number of exotic financial instruments that were being traded around the world. Drafts of the BIS/Federal Reserve proposal were being circulated around the Wall Street firms and, therefore, Mr. Wesp had some idea what the likely outcome was going to be. Mr. Wesp understood from the early drafts of both FIRREA and the BIS/Federal Reserve proposal that securities would receive more favorable treatment than other types of assets (*i.e.*, would require lower incremental capital increases under the risk-based standards than other asset categories). This fact

reinforced for Mr. Wesp the importance of the October 1988 Business Plan's emphasis on a wholesale strategy because Fidelity could add very high quality and risk manageable assets like mortgage basked securities to the balance sheet with minimal capital requirements. (Wesp, Tr. 1811, line 6 to p. 1813, line 13). In the Fall of 1988 there were proposed regulations with regard to capital and in particular with regard to risk-based capital. These were proposed at an open Bank Board meeting in October 1988, were discussed in November 1988, and were then published as proposed regulations in December 1988. Under these proposed rules there was a punitive treatment for supervisory goodwill. It assigned a 200 % risk factor for supervisory goodwill, meaning that two dollars of capital would be required for every dollar of supervisory goodwill. This was a signal to everyone in the industry that regulation providing for adverse treatment of goodwill was coming. (Kaplan, Tr. 2705, line 12 to p. 2706, line 9; Tr. 2715, line 13 to p. 2716, line 5).

394. In fact, it was even possible, because of Fidelity's planned asset mix, that after the risk based standards were adopted Fidelity's GAAP net worth ratio could improve. The big unknown, however, was the goodwill piece of the pending regulatory proposals. By October 1988, Fidelity was anticipating the possibility of some unfavorable treatment of goodwill and understood that "any unfavorable treatment of goodwill could have a significant negative impact on capital levels and thus plan results" because "you have to write off the asset and the capital that goes with it." (PX 447 at OAA005 1316; Wesp, Tr. 1813, line 5 to p. 1814, line 7).

395. From December 1988 until the passage of FIRREA in August 1989, management at Fidelity closely monitored the progress of pending legislation and legislative proposals that might affect capital requirements. They attended industry meetings where these things were discussed, and these developments were the subject of regular reports to Fidelity's Board. (Kaplan, Tr. 2962, line 8 to p. 2965, line 12; PDX 38).

396. In January 1989, Richard Breedon was appointed by President Bush to devise a plan to deal with the ailing thrift industry. (Wesp, Tr. 1815, lines 11-19). After Mr. Breedon's appointment, Mr. Wesp testified that "[t]he press was in a constant state of speculation. The American Banker every day was speculating about what was to come. Congress was holding press conference after press conference about what was being drafted in the new legislation." Mr. Wesp was privy to much of the inner workings of the Breedon task force because "Breedon took down to Washington with him a whole bunch of people from [Wall] [S]treet to work on a number of these problems. So investment bankers had a lot of information flowing back to them as to where a lot of this was going to go. So a lot of that was coming back to me, as a Wall Street client." (Wesp, Tr. 1827, lines 9-24; Wesp, Tr. 1828, line 6-8; Wesp, Tr. 1828, line 11 to p. 1829, line 8).

397. Based on what he was hearing, throughout early 1989, Mr. Wesp continued to have the same concerns he had had in mid-to-late 1988, at the time he was drafting the October Plan, that "there was going to be a bill, and we knew that there was going to be a whole raft of things that we would not find particularly pleasant." (Wesp, Tr. 1829, lines 8-23, Wesp, Tr. 1830, lines 2-19).

398. The President of the United States made an announcement shortly before February 1989 in which he announced that there would be new capital regulations that would apply to all Federal Home Loan Bank insured institutions. (PX 465 at AST0703799).

399. The legislation which eventually became FIRREA was announced by the White House in late January 1989. The legislation proposed new capital standards for thrift institutions, specifically three standards known as “Tangible Capital,” “Core Capital“ and “Risk Based Capital.” (Kaplan, Tr. 2717, line 10 to p. 2718, line 5).

400. By early 1989, Fidelity’s Investment Committee was discussing the proposed capital regulations drafted by the FHLBB and the effects of these regulations on the operation of Fidelity. (PX 461 at AST056172; DX 539 at AST056074).

401. Mr. Wesp testified that he recalled first seeing a draft of the “Bush program work product” in May or June of 1989. (Wesp, Tr. 1828, lines 6-8; Wesp, Tr. 1828, line 11 to p. 1829, line 7).

402. Mr. Amend would have expected there to be talk within the industry about possible legislative changes even before the FIRREA legislation was introduced. This was being talked about among the regulators, so he imagined that it was being talked about in the industry as well. (Amend, Tr. 4806, lines 7-17).

403. At Fidelity’s March 15, 1989 Board of Directors meeting, there was a discussion of the status of the thrift industry, including the effects of the Bush Administration’s thrift reform proposal upon the industry and Fidelity. Mr. Lovely discussed meetings held with Presidential Assistant Richard Breedon and FDIC Chairman William Seedman. The Board also discussed sending correspondence to state and federal legislators concerning

proposals affecting the thrift industry. (Joint Stipulation of Facts, April 2, 2007, ¶ 71; DX 2343A at AST127602).

404. At Fidelity's April 19, 1989 Board of Directors meeting, Mr. Lovely discussed actions then being taken by Congress affecting the savings and loan industry and the effect of these actions upon Fidelity and other similar institutions. (Joint Stipulation of Facts, April 2, 2007, ¶ 72; DX 2347).

405. The anticipated effects of FIRREA and its new capital requirements were again discussed in Fidelity's August 1989 board meeting. (DX 73 at AST127877-78).

406. In addition to the board meetings, Fidelity's management team engaged in many other discussions throughout 1989 about the potential impact of FIRREA on Fidelity's capital, but such discussions were not formally recorded in board meeting minutes. (Powderly, Tr. 980, line 5 to p. 981, line 22).

407. Although FIRREA was passed in August of 1989, Fidelity still did not know exactly what FIRREA's implementing regulations would be until they were issued in December 1989, but expecting ill treatment, Mr. Powderly urged Fidelity's management in the August board meeting to "operate from a position of strength for whatever our future may hold." (Powderly, Tr. 786, line 9 to p. 787, line 18; DX 73 at AST12878).

408. Mr. Powderly expected that FIRREA's treatment of supervisory goodwill would be draconian, and he therefore expected that all the goodwill forbearances would be taken away. (Powderly, Tr. 353, line 12-23; Powderly, Tr. 354, line 21 to p. 355, line 10).

## B. IN ANTICIPATION OF FIRREA, FIDELITY SOUGHT TO RESTRUCTURE ITS BALANCE SHEET AND INCREASE CAPITAL.

409. Mr. Wesp testified that anything that Fidelity was doing in the spring, summer, and fall of 1989 was aimed at a year-end balance sheet. By September 1989, Fidelity knew that it was going to have to file a Capital Plan in January 1990 and Fidelity had only one focus: "to create what we think is the maximum starting point at December 31, 1989 to start this capital plan process." Mr. Wesp saw no point in waiting to see what the actual bill and regulations required before restructuring the balance sheet because by June and July 1989, they had a pretty good idea what was coming and by August, they knew what the bill said. (Wesp, Tr. 1838, line 5 to p. 1841, line 6). The rumor mill was relatively effective, so Fidelity had some idea what to expect. Moreover, it was obvious to Mr. Wesp that any capital plan had to address essentially the four main points in his October Plan: (1) reducing credit exposure, (2) increasing capital, (3) increasing earnings, and (4) amortizing goodwill. Fidelity created four or five strategies (*e.g.*, hiring a larger staff to do mortgage banking or consumer lending) which they then modeled to see which ones would survive big swings in interest rates. Accordingly, by the time the capital plan instructions were issued, Fidelity was very far along in the process. (Wesp, Tr. 1842, line 12 to p. 1843, line 19).

410. Expecting that it would lose its regulatory capital as a result of FIRREA, Fidelity abandoned the October 1988 Business Plan's goal of 8 to 10 % growth and instead began making only the lowest risk loans. (Powderly, Tr. 355, line 17 to p. 357, line 3; Powderly, Tr. 797, lines 6-18).

411. Throughout 1989, Fidelity attempted to adhere to the October 1988 Business Plan, but it had to modify the plan to put Fidelity in a position of strength to deal with the expectedly

draconian FIRREA implementing regulations. (DX 73 at AST12878; Powderly, Tr. 791, line 6 to p. 792, line 19; Powderly, Tr. 797, lines 6-18).

412. Fidelity fully abandoned the October 1988 Business Plan in November 1989 and concentrated on a new plan to focus primarily on raising capital. (Powderly, Tr. 366, line 1 to p. 367, line 4; Powderly, Tr. 791, line 6 to p. 793, line 2; DX 75 at AST127900).

413. By the end of December 1989, Fidelity had already finished drafting the new five-year plan to achieve capital compliance. (PX 533 at AST127912).

414. In light of Fidelity's balance sheet restructuring in anticipation of FIRREA, by the time FIRREA was enacted and became law, Fidelity had a fairly conservative balance sheet that was highly liquid. Fidelity had worked through some of the problem commercial loans. Those that had not yet been resolved were being impacted negatively by the actions of the RTC which was driving down the valuations of all New York real estate. (Wesp, Tr. 1841, line 7 to p. 1842, line 11; Wesp, Tr. 2543, lines 1-23).

415. Fidelity had anticipated most of what was in the final legislation including the new set of capital requirements that would mirror the BIS/Federal Reserve requirements, and the fact that they would now be required to use GAAP accounting. However, Fidelity did not anticipate that they were going to be required to write off all of the goodwill in one transaction at one time with essentially no phase-in period. (Wesp, Tr. 1841, line 7 to p.1842, line 11; Wesp, Tr. 1814, line 14 to p. 1815, line 10).

**Settlement of Net Worth Certificates**

416. In the Spring of 1989, Fidelity wrote to the FHLBB in an effort to jump start its negotiations with the regulators regarding a potential settlement of its claims with respect to the Net

Worth Certificates that had been issued to Suburbia in the early 1980s when its capital was declining and which Fidelity later inherited at the Suburbia acquisition. (PX 482 at AST 033409-410, Wesp, Tr. 1831, lines 13-21).

417. The June 8, 1989 letter from Fidelity to the FHLBB regarding the Net Worth Certificates states in relevant part: "[i]n view of the new capital requirements that will be included in President Bush's FSLIC Program, RAP items such as NWCs[,] which were [integral] to Fidelity's assisted acquisition of Suburbia[,] will become meaningless. In order to insure Fidelity's compliance with New Capital Regulations, a restructuring of its balance sheet, which resulted from the FSLIC assisted merger with Suburbia, is necessary." (PX 482 at AST033409; Wesp, Tr. 1826, line 17 to p. 1827, line 8).

418. Mr. Wesp was the principal negotiator on Fidelity's side in negotiating a settlement with the regulators regarding the Net Worth Certificates. (Wesp, Tr. 1825, lines 3-11; Wesp, Tr. 1825, line 24 to p. 1826, line 5).

419. The regulators hired Donaldson Lufkin Jenrette ("DLJ") to represent them as to the valuations of the Net Worth Certificates. After negotiations which included representatives of the OTS and the FDIC, as well as DLJ, they reached a final settlement in December 1989. Mr. Wesp recalls that Fidelity received about 50 cents on the dollar. The fact that the final settlement was reached during a meeting in Washington, while the FDIC staff was having a Christmas Party, seemed appropriate to Mr. Wesp because he had never expected to receive any money from the regulators with respect to the Net Worth Certificates. (Wesp, Tr. 1831, line 22 to p. 1833, line 7).

420. The amount that Fidelity received in settlement of the Net Worth Certificates helped to increase Fidelity's capital account because that cash went straight through to the bottom line as GAAP capital whereas the Net Worth Certificates themselves were counted only towards RAP capital and, as such, were useless after FIRREA . (Wesp, Tr. 1837, line 21 to p. 1838, line 4).

421. On October 16, 1990, the OTS informed the FDIC that it approved Fidelity's redemption of the Net Worth Certificate in the amount of $5,750,000 as a consequence of which Fidelity would receive a net cash payment of $2,990,000. These were Net Worth Certificates that Fidelity had received from Suburbia. (Amend, Tr. 4623, line 11 to p. 4625, line 12; PX 648).

**Sales of Freddie Mac and Fannie Mae Stock Positions**

422. By 1989, both Freddie Mac and Fannie Mae stock were publicly traded, and both were considered eligible equity investments for thrifts. (Wesp, Tr. 1834, line 21 to p. 1835, line 8; PX 461 at AST056171-72).

423. Throughout 1989, Fidelity made money buying and selling these stocks. For example, on August 15, 1989, Mr. Wesp reported to the Investment Committee that "purchases and sales of FNMA and FHLMC stock over the past six-week period has earned Fidelity … approximately $1 million." (PX 493 at AST055625). Likewise, on September 19, 1989, Mr. Wesp advised the Investment Committee that "[t]he FHLMC and FNMA stock is up significantly since the last meeting. $4.3 million in profit has been taken and the [u]nrealized [g]ain is at $15.6 million." (PX 497 at AST055581; Wesp, Tr. 1836, line 18 to p. 1837, line 10).

424. During the October 16, 1989 Investment Committee meeting, Mr. Wesp advised that Fidelity had taken an additional $2.5 million in gains on the sale of Freddie Mac and Fannie Mae stock and went on to describe "the manner in which Fidelity's activity in the stock is related to the new capital requirements." (DX 2380 at AST055532).

425. Even though Fidelity had made money on its holdings of Freddie Mac and Fannie Mae stock, the trading of these stocks was not an integral component of the Capital Plan because the Capital Plan had narrow margins of error and these stocks could trade up or down 10 to 20%. Accordingly, in December of 1989, Fidelity sold some of its Fannie Mae stock in anticipation of the December 31, 1989 financial statements that would be the basis for the Capital Plan. (Wesp, Tr. 2088, lines 18-25; Wesp, Tr. 2092, line 3 to p. 2094, line 4; Wesp, Tr. 2174, lines 2-18).

## C. THE TECHNICAL REQUIREMENTS OF FIRREA

### FIRREA Required New Capital Levels.

426. The Financial Institutions Recovery, Reform, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA") and its implementing regulations (which were promulgated on November 8, 1989, and became effective on December 7, 1989) required a savings institution to maintain tangible capital in an amount not less than 1.5 percent of the institution's adjusted total assets. 12 U.S.C. § 1464(t)(2)(B); 12 C.F.R. § 567.9(a). ((Joint Stipulation of Facts, April 2, 2007, ¶ 73).

427. FIRREA's capital requirements can be summarized as follows:

- <u>Tangible Capital</u> must be a minimum of 1.5 % of tangible assets. All goodwill is excluded from the calculation of Tangible Capital.

- Core Capital must be a minimum of 3 % of assets. It includes the Tangible Capital plus a small amount of "qualifying supervisory goodwill." The amount of qualifying supervisory goodwill was 1.5 percent of tangible assets initially, then to 1 percent as of January 1, 1992, then to 0.75 % as of January 1, 1993, then to 0.375 % as of January 1, 1994, then to zero as of January 1, 1995. So, at the end of the phase-out period there would effectively be a 3 % tangible capital requirement.

- Risk-Based Capital must be a minimum of 6.4 % of the institution's assets weighted according to their perceived risk. Under the weighting formula, government securities were assigned zero weight, high quality mortgage-backed securities and other securities were rated at 20 % of book value, qualifying single family home mortgages were weighted at 50 % of book value, real estate acquired through foreclosure were weighted at 200 % of value, and all other assets were weighted at 100 % of value. The risk-based capital requirement increased to 7.2 % of risk-weighted assets as of January 1, 1992, and to 8 % as of January 1, 1993.

(Vigna, Tr. 1418, line 7 to p. 1421, line 6; PX 520 at AST0704317-AST0704326; Kaplan, Tr. 2969, line 11 to p. 2972, line 2; PDX 40).

428. Per the regulatory requirements put in place as a result of FIRREA, tangible capital did not include any intangible assets, such as goodwill. 12 U.S.C. § 1464(t)(9)(C). (Joint Stipulation of Facts, April 2, 2007, ¶ 74).

429. FIRREA required savings institutions to maintain risk-based capital in an amount greater than or equal to 6.4 % of risk-weighted assets at December 31, 1989, 7.2 % of risk-weighted assets as of December 31, 1990 and 8.0 % of risk-weighted assets a of December 31, 1992. 12 U.S.C. § 1464(t)(2)(C); 12 C.F.R. § 567.2(a)(1)-(b). (Joint Stipulation of Facts, April 2, 2007, ¶ 78).

430. As was the case with the core capital requirement put in place as a result of FIRREA and its implementing regulations, specified amounts of qualifying supervisory goodwill could initially be counted towards the risk-based capital requirement; the amount allowed to count towards risk-based capital would phase out over five years. 12 U.S.C. § 1464(t)(2)(C). (Joint Stipulation of Facts, April 2, 2007, ¶ 79).

431. The FIRREA legislation, which was passed in August 1989, also created the Resolution Trust Corporation ("RTC") and caused the FSLIC to be folded into the FDIC. It also would eliminate the FHLBB and replace it with the Office of Thrift Supervision, an agency within the Department of the Treasury. The FDIC now administered two separate insurance funds, one for banks and one for thrifts. The FDIC also acquired for the first time a degree of regulatory authority over thrifts, in that it had the power to grant deposit insurance to new thrifts and to remove insurance coverage from existing thrifts. (Kaplan, Tr. 2718, line 23 to p. 2720, line 25).

432. No sooner was FIRREA passed than there developed a sense in Congress that its capital standards were not tough enough. This lead to the passage in December 1991 of the Federal Deposit Insurance Corporation Improvement Act ("FDICIA"). FDICIA mandated higher capital standards which took effect in December 1992. It also set three levels of capital compliance. Institutions at 3 % capital were "marginally capitalized." Institutions at 4 % were "adequately capitalized," and institutions at 5 % were "well-capitalized." (Kaplan, Tr. 2721, line 1 to p. 2722, line 12).

433. On or about November 13, 1989, Fidelity received from Mr. Vigna, now District Director of the newly formed OTS, a copy of the new minimum capital regulations that had been issued on November 7, 1989 and were set to take effect on December 7, 1989. The regulations required each thrift institution to hold sufficient capital to meet three requirements: tangible capital, core capital and risk-based capital. (*See generally* PX 511). These were the three capital levels that Fidelity had been anticipating. (Wesp, Tr. 1843, line 20 to p. 1845, line 9).

434. Mr. Vigna further advised Fidelity that based on the thrift's financial information as of June 30, 1989, Fidelity would fail one or more of the capital requirements that were set to go into effect on December 7, 1989. (PX 511 at AST 0704526). That fact came as no surprise to Fidelity. (Wesp, Tr. 1845, lines 10-17). While Fidelity's GAAP capital had increased $45 million since 1985, Fidelity still estimated that on December 7, 1989, as a result of FIRREA, its tangible capital was negative $29.6 million, its core capital was negative $2.2 million, and its risk based capital was negative $2.2 million. (DX 78 at AST0705437, AST0705445; Wesp Tr. 1861, lines 13-21).

**FIRREA Required That Fidelity Submit A Capital Plan.**

435. On December 18, 1989, OTS sent to each institution that was projected by it to fail one or more of the new capital standards a memorandum outlining the need for such institutions to file capital restoration plans. Attached to the memorandum were OTS New York guidelines for the preparation of a Capital Plan, Thrift Bulletin 36-1, providing guidance on interest rates, prepayment rates and loan origination rates which could be used in preparing a Capital Plan, and Thrift Bulletin 36, which contained specific instructions for preparation of a Capital Plan or a request for an exception or exemptions. (Vigna Tr. 1419, line 4 to p. 1423, line 1; *see generally* PX 520).

436. Fidelity was required to file a Capital Plan on or before January 7, 1990. (Vigna, Tr. 1423, line 2 to p. 1424, line 10; PX 520 at AST0704305).

437. An institution could accompany its Capital Plan with a request for an exception from the capital requirements. Thrift Bulletin 36 required that exceptions be ruled on by the OTS Director (absent some delegation by the Director), and it stated that exceptions will only

be granted in "extraordinary situations." (Vigna, Tr. 1424, line 11 to p. 1425, line 6; PX 520 at AST0704311).

438. An institution could also apply to an OTS District Director for an exemption from the capital requirements. Mr. Vigna, who was a District Director of OTS for a year after FIRREA did not recall what the criteria for an exemption were, nor could he recall having granted or even received any requests for exemptions. (Vigna, Tr. 1425, line 7 to p. 1426, line 6; PX 520 at AST0704311).

439. Thrift Bulletin 36 specified that a thrift filing a Capital Plan must show that it could achieve capital compliance operating in a safe and sound manner within a reasonable time period, but in no event later than December 31, 1994. It indicated a preference for plans which achieved capital compliance by steady increases in capital, progressing through achieving attainable goals and meeting interim targets on a quarterly basis, with no growth until capital compliance is achieved. There was also a preference that a plan not rely on significant transactions such as an acquisition, merger, conversion or branch purchase and not include any request for exemption from rules or regulations. Thrifts were cautioned not to rely on consultants to develop these plans. OTS wanted to the plan to be the result of "strategic, in-depth planning on the part of the savings association's board of directors and management." Thrifts also had to use specific assumptions concerning interest rates and regional economic environments. When it submitted a plan, the thrift's board and management had to agree that if targets were not met the plan could be terminated, they could be asked to resign, and the thrift could be merged or otherwise dealt with by the regulators. Finally, a thrift operating under a Capital Plan was required

to submit a report to OTS within 20 days after the end of each quarter listing variances from the plan and comparing actual capital to target capital. (Vigna, Tr. 1430, line 10 to p. 1437, line 4; PX 520 at AST0704311-AST0704314).

440. Fidelity filed its Capital Plan on January 8, 1990. Fidelity's plan requested an exception from the capital requirements based on its agreement with the Government in connection with the Suburbia acquisition. Because this request could only be granted by the OTS Director in Washington, Fidelity's Capital Plan had to be forwarded to Washington for review. Fidelity's Capital Plan had in fact already been selected and sent to Washington for concurrent review because of the size of the institution. Mr. Vigna could not recall if the OTS district or regional offices ever took a position on whether Fidelity's request for an exception should be granted. In fact, the request was not granted. (Vigna, Tr. 1437, line 5 to p. 1439, line 11; *see generally* PX 539).

441. Mr. Vigna recalled that there was considerable debate in Congress during the passage of FIRREA about what should be done with respect to goodwill arising out of supervisory mergers. There were people in Congress who thought something should be done to preserve this goodwill and who expressed a view that it was unfair to take it away. (Vigna, Tr. 1439, lines 12-24).

**FIRREA Prohibited Fidelity's Growth.**

442. On February 2, 1990, OTS notified Fidelity that it was "insolvent" as that term was defined in Regulatory Bulletin 3a-1 ("RB 3a-1"). As an insolvent institution, Fidelity was restricted in its growth and was not, without permission of the OTS District Director,

permitted to make any new loans or investments during the time its Capital Plan was under review by the OTS. (Vigna, Tr. 1439, line 25 to p. 1441, line 24).

443. Subsequent to receiving the OTS February 2, 1990 notice, Mr. Powderly, then Fidelity's Executive Vice President, reached an agreement with Mr. Vigna that Fidelity could operate under the principles outlined in its Capital Plan until such time as OTS completed its review of the Capital Plan. Fidelity was particularly concerned that compliance with RB 3a-1 would not allow it to renew reverse repurchase agreements it was using to finance mortgage backed securities. Inability to renew these loans would have required Fidelity to shrink its balance sheet by $300 million, thereby jeopardizing its ability to achieve the goals outlined in its Capital Plan. (*See generally* PX 545).

444. When an institution was restricted in its growth by RB 3a-1, the institution could always come to the OTS Regional Director or District Director and request a waiver of the restriction. OTS would consider such a request in light of what had happened to the institution since the restriction was implemented. (Amend, Tr. 4614, line 5 to p. 4616, line 23).

445. On December 18, 1989, Fidelity received a regulatory release from Mr. Vigna that set forth guidelines for preparing Fidelity's Capital Plan. (*See generally* PX 520).

446. If OTS approved the plan, Fidelity could continue to exist subject to the strictures of the plan. If OTS did not approve the plan, or if Fidelity did not comply with any aspect of an approved plan, Fidelity was subject to regulatory seizure and liquidation. (PX 986 at AST064176, AST064193; Wesp, Tr. 1847, line 13 to p. 1848, line 2; Wesp, Tr. 1879, line 12 to p. 1880, line 16).

**D. FIRREA HAD AN IMMEDIATE AND DEVASTATING EFFECT ON FIDELITY.**

447. Prior to the August 9, 1989 passage of FIRREA, Fidelity was in full compliance with capital regulations, having a capital-to-assets ratio of 5.44%. (PX 618 at AST001642; Powderly, Tr. 392, lines 1-7).

448. On December 6, 1989, the day before FIRREA's capital requirements became effective, Fidelity had $125 million in regulatory capital and $62 million of GAAP capital. (DX 78 at AST0705445).

449. As a direct result of FIRREA's punitive treatment of Fidelity's supervisory goodwill, Fidelity did not meet any of the three capital requirements on December 7, 1989, having significant negative capital in each category. (Powderly, Tr. 408, line 8 to p. 408, line 20; DX 78 at AST0705445; Powderly, Tr. 379, line 24 to p. 380, line 3; PX 509 at AST001966; Powderly, Tr. 392, line 1 to 393, line 18; PX 618 at AST001642-43).

450. FIRREA instantly turned Fidelity from a profitable institution into an unprofitable institution. (Greco, Dep. Tr. 89, lines 8-11). Overnight, Fidelity went from profitable to capital deficient and subject to restrictions and the constant scrutiny of the OTS. (Greco, Dep. Tr. 171, lines 2-8).

451. Fidelity's opportunity to borrow in the capital markets was also jeopardized by FIRREA because Fidelity lacked sufficient net worth. (Greco, Dep. Tr. 164, lines 14-19).

452. The Government "enticed" Fidelity to acquire Suburbia by promising Fidelity that it would be stronger as a result of the merger, but then, through FIRREA, took away the benefits of the deal, leaving Fidelity with the burden of Suburbia's excess liabilities, but not the offsetting supervisory goodwill necessary for Fidelity to avoid an immediate

violation of capital requirements as a result of the merger. Fidelity would not have participated in the Suburbia merger had it know that the Government would later take away Fidelity's ability to count the goodwill towards capital requirements. (Lovely, Tr. 1572, line 4 to p. 1573, line 9).

453. Fidelity would not have been able to acquire Suburbia if the goodwill generated had been amortized in accordance with GAAP and had not counted towards its regulatory capital requirements. (Teurfs, Tr. 1048, lines 2-6, 12-18).

454. Institutions that had supervisory goodwill on their books pre-FIRREA (when they could count it as regulatory capital) still had that goodwill on their books post-FIRREA (when, except for very small amounts which phased out in a short period of time, they could not count it as regulatory capital). However, those institutions still had to amortize the goodwill post-FIRREA. The goodwill therefore continued to reduce earnings post-FIRREA, even though it provided little, and eventually no benefit as regulatory capital. (Vigna, Tr. 1404, line 18 to p. 1406, line 20). After FIRREA, Fidelity could continue to count a small portion of the supervisory goodwill from the Suburbia transaction as regulatory capital for a short period of time. The rest of that goodwill, though it remained on Fidelity's books after FIRREA, was of no benefit to Fidelity whatsoever. (Amend, Tr. 4782, line 20 to p. 4784, line 9). After FIRREA, Fidelity still had to use earnings to amortize the supervisory goodwill from the Suburbia transaction. However, instead of amortizing the goodwill over 25 years, as its contract with the Government would have allowed, it was in Fidelity's best interest after FIRREA to amortize the Suburbia goodwill

and get it off the books as quickly as possible. (Amend, Tr. 4785, line 21 to p. 4786, line 24).

455. After FIRREA, Fidelity could not achieve the objectives of the October 1988 Business Plan because Fidelity no longer had sufficient capital to sustain the growth levels required under the plan. (Powderly, Tr. 366, lines 1-9).

456. On October 30, 1989, Mr. Greco, then President of Fidelity, wrote to Mr. Vigna concerning the effects of FIRREA on Fidelity. He noted that Fidelity had assumed excess liabilities in the Suburbia merger in the amount of $160,093,066 (the amount of goodwill Fidelity had put on its books in that transaction), that Fidelity had remained profitable, and that Fidelity had reduced the amount of this goodwill by $70 million. He also noted that Fidelity had fully abided by the provisions of the Assistance Agreement, the Bank Board Resolution, and the Forbearance Letter entered into or issued as part of the Suburbia acquisition. He further noted that, despite this performance, Fidelity anticipated that it would be capital deficient when the implementing capital regulations of FIRREA took effect in December 1989. He asked Mr. Vigna to grant Fidelity a forbearance which would allow it to continue to count supervisory goodwill as part of its regulatory capital. Mr. Vigna did not disagree with any of the points made by Mr. Greco. However, OTS had no power to grant forbearances from FIRREA's capital requirements. (Vigna, Tr. 1401, line 3 to p. 1409, line 14; *see generally* PX 508).

457. On November 15, 1989, Mr. Vigna responded to Mr. Greco's letter of October 30, 1989. He informed Mr. Greco that OTS could not grant the requested forbearance. FIRREA does allow the OTS to grant certain types of exceptions and exemptions. However, these

can only be considered when accompanied by a capital restoration plan. (Vigna, Tr. 1418, line 7 to p. 1419, line 3; PX 516).

458. On November 13, 1989, OTS issued Regulatory Release No. 89-61, and Fidelity received this document the following day. The Release noted that OTS had issued regulations describing the new capital requirements mandated by FIRREA on November 7, 1989 and that these regulations would take effect on December 7, 1989. The Release noted that any institution that failed to meet these new capital requirements would be subject to growth and other restrictions as set forth in Regulatory Bulletin 3a ("RB-3a"). In addition, each such institution would have to submit a capital restoration plan to OTS by the first business day after January 6, 1990. The capital restoration plan would have to meet the requirements of Thrift Bulletin 36 ("TB 36"). Finally, the Release notified Fidelity that OTS projected, based on data from Fidelity's Thrift Financial Reports, that Fidelity would fail to meet one or more of the new capital requirements. (*See generally* PX 511).

459. Fidelity's composite examination rating fell after FIRREA from a "4" in 1987 to a "5" in 1989. This was a result of FIRREA causing the "Capital" component of Fidelity's rating to fall from a "2" to a "5." (Vigna, Tr. 2764, line 1 to p. 2765, line 1; Vigna, Tr. 2766, lines 6-16; Vigna, Tr. 2832, line 18 to p. 2833, line 6; DX 1411 at WON722 419). A "5" composite rating indicates an institution "with an extremely high, immediate, or near-term probability of failure." (Vigna, Tr. 2778, lines 9-15).

460. Although an examiner has discretion when he assigns a composite rating, "Capital is considered a key indicator. If, for example, an institution had a "4" in "Capital," its

composite rating would be a "4" even if it was rated a "2" on all other components of the MACRO Rating. (Vigna, Tr. 2797, line 8 to p. 2798, line 12).

461. In its 1991 OTS examination, Fidelity was rated a "5" on Capital and received a "5" composite rating. Its Assets were rated a "4" in that examination. (Vigna, Tr. 2833, lines 10-19; DX 1448 at WON732 0834).

462. In its 1992 examination, Fidelity's composite rating rose from a "5" to a "4." This improvement resulted from improvements in Asset Quality and Earnings, but in fact Fidelity improved in every one of the rating categories except capital. Capital remained a "5" because Fidelity was still severely out of compliance with its capital requirements. (Vigna, Tr. 2833, line 20 to p. 2835, line 3; DX 1448 at WON732 0834).

463. In its 1993 examination, Fidelity's composite rating improved from a "4" to a "3." This was the result of its conversion and public offering, which put it back into capital compliance. The capital component was the only one of the individual rating components ratings that changed from the prior examination. Vigna, Tr. p. 2835, lines 4-24; DX 1448 at WON732 0834, WON732 0841).

## E. THERE IS A STARK CONTRAST IN FIDELITY'S CAPITAL POSITION BEFORE AND AFTER FIRREA.

464. As of December 31, 1984, two months after the Suburbia merger, Fidelity had regulatory capital of $49.564 million, which represented 3.96 % of assets and 4.12 % of liabilities. However, its GAAP capital (net of the FSLIC cash contribution, net worth certificates and some deferred loan losses) was only $20.646 million, which represented 1.65 % of assets and 1.72 % of liabilities. Its tangible capital (GAAP capital less goodwill from the Suburbia and Dollar Federal acquisitions) was negative 146.222 million, representing a

minus 11.67 % of assets and a minus 12.16 % of liabilities. (Kaplan, Tr. 2928, line 3 to p. 2931, line 22; PDX 28).

465. From the beginning of 1985 through the end of 1989, Fidelity was consistently profitable, and its tangible capital steadily improved. By the end of 1989, Fidelity's tangible capital was still negative, but only by approximately $25 million, a significant improvement from its negative $146 million tangible capital at the end of 1984. Its tangible capital improvement during this period averaged some $23 million or 1.6 % of assets per year. (Kaplan, Tr. 2932, line 2 to p. 2934, line 3; PDX 29).

466. Using (on a *pro forma* basis) the numbers from Fidelity's March 31, 1989 financial statements, one can understand the magnitude of FIRREA's impact on Fidelity's capital. Fidelity's total regulatory capital as of March 31, 1989 was $121 million. Fidelity was only required to have capital of $64 million, so it had surplus capital of $57 million. Using the same March 31, 1989 numbers, but applying the FIRREA capital requirements (including the limitations on the use of supervisory goodwill), Fidelity would have had core and tangible capital deficits of $73 million. However, had the Government not breached its contract and had Fidelity been able to count as capital the supervisory goodwill and the net worth certificates from the Suburbia transaction, Fidelity would have had capital surpluses in all three FIRREA categories – a $62 million surplus in tangible capital, and $53 surpluses in both core and risk-based capital. (Kaplan, Tr. 2972, line 7 to p. 2986, line 7; PDX 41, PDX 42, PDX 43 and PDX 44).

467. As of December 31, 1989, Fidelity's was deficient in all three of FIRREA's capital requirements:

| Capital Type | Requirement | Actual | Deficit |
|---|---|---|---|
| Tangible | $27.456 million | (29.686 million) | ($57.142 million) |
| Core | $54.912 million | ($2.230 million) | ($57.142 million) |
| Risk-Based | $59.271 million | ($2.230 million) | ($61.501 million) |

(Kaplan, Tr. 3004, line 21 to p. 3006, line 22; PDX 51).

468. After the passage of FIRREA, Fidelity continued to have positive earnings and to improve its tangible capital, though the rate of improvement slowed somewhat due to the growth constraints imposed as a result of FIRREA. Fidelity's tangible capital reached zero at the end of 1991, and it continued to increase steadily until the time of Fidelity's conversion and public offering. Tangible capital then jumped by $57 million, the net cash proceeds of the public offering. At the end of 1994, just before its acquisition by Astoria, Fidelity had tangible capital of about $100 million. (Kaplan, Tr. 2932, line 2 to p. 2936, line 4; PDX 29).

469. Had the Government not breached its contract, Fidelity would have been able to amortize the $160.093 million in goodwill from the Suburbia merger on a straight line basis over a 30 year period. Exhibit 15 to Dr. Kaplan's Report sets forth a schedule of that goodwill amortization, adjusted for Net Operating Losses utilized by Fidelity in 1987 and 1989 (the NOLs, when used, reduce the amount of the unamortized goodwill). (Kaplan, Tr. 2989, line 18 to p. 2993, line 5; PDX 48 and PX 1314A, Exhibit 15).

## F. FIRREA'S EFFECTS ON FIDELITY WERE NOT ALL INSTITUTIONAL. THERE WAS A HUMAN DIMENSION AS WELL.

470. Fidelity's employees sharply felt the effects of FIRREA. Mr. Caporusso testified that FIRREA cost him personally: "It meant I couldn't get increases in salary. I had to lay off people. Survival was the name of the game." (Caporusso, Tr. 3897, line 2 to p. 3898, line

18). FIRREA's effects had a human toll at Fidelity. "But the government made a contract with Fidelity. The contract was that goodwill would be paid down over 25 years. And then arbitrarily you say no, you've got to pay it down in five. A lot of the problems could have been worked out, but we had to lay off people, restrain our lending capacity and go into a defense mode. That's what it was all about." (Caporusso, Tr. 3898, line 19 to p. 3899, line 5).

471. Many of the Fidelity employees who lost their jobs as a result of FIRREA had a difficult time finding new employment. (Powderly, Tr. 380, lines 4-15).

472. Because Fidelity had deficient capital after FIRREA, Fidelity was not able to give the retained employees bonuses or salary increases, nor was Fidelity able to pay fees to its directors. (Powderly, Tr. 389, lines 7-22; Powderly, Tr. 430, line 22 to p. 431, line 24; Powderly Tr. 433, lines 3-10; PX 590 at AST000359-60 and AST000364; *see generally* PX 813).

473. As a result of the compensation restrictions in Fidelity's Capital Plan, Fidelity paid its executives much less than did thrifts not operating under a Capital Plan. (Powderly, Tr. 529, line 6 to p. 530, line 4; Powderly, Tr. 968, line 11 to p. 969, line 13).

## G. FIDELITY INTENDED TO GROW ITS HOME EQUITY PORTFOLIO, BUT FIRREA PREVENTED IT FROM FULFILLING ITS BUSINESS GOAL.

474. Mr. Caporusso worked in the banking industry for over 30 years before joining Fidelity in September 1986. (Caporusso, Tr. 3839, lines 18-24; Caporusso, Tr. 3846, lines 19-21). Before his position at Fidelity, Mr. Caporusso worked at Meadow Brook National Bank, Franklin National Bank, and European American Bank, in various positions

including commercial lending and consumer credit lending. (Caporusso, Tr. 3841, line 13 through p. 3842, line 19).

475. Mr. Caporusso was hired specifically to expand Fidelity's consumer credit department. (Caporusso, Tr. 3845, line 16 to p. 3846, line 18). Fidelity's senior management, Mr. Powderly and Mr. Greco, made clear to him at his job interview that his duty would be to expand consumer lending. (Caporusso, Tr. 3847, lines 4-13).

476. Mr. Caporusso understood Fidelity's desire to develop its consumer credit lending as part of an industry-wide movement to profit from providing more services to customers. At the time, the savings and loans were beginning to compete with commercial banks for consumer credit services. (Caporusso, Tr. 3845, line 16 to p. 3846, line 18).

477. Mr. Caporusso's job duties were to train and establish systems to handle increased consumer credit business, to polish and streamline procedures for efficient functioning, and to provide management with guidance on growing the consumer credit services. (Caporusso, Tr. 3847, lines 15-24).

478. Between the date of his hiring and the time FIRREA was enacted, Mr. Caporusso had grown the consumer lending department to 24 employees, and the bank had dedicated an entire renovated floor of its office to the consumer lending department. (Caporusso, Tr. 3847, line 25 to p. 3848, line 9).

479. Mr. Caporusso received a promotion in 1989 because he had been so successful in achieving the bank's goals for the consumer credit portfolio. (Caporusso, Tr. 3859, lines 14-19).

480. As noted above, Fidelity's commitment to developing its consumer lending portfolio is evident in the aggressive goals it set for that department in its February 1988 Business Plan. The February 1988 budget contained a memo by Mr. Caporusso stating that consumer credit loans are projected to increase by 36 % over the year. (Caporusso, Tr. 3849, line 23; DX 1203 at PAA 01011831). It also projected a 52 % growth in home equity loans over the same time period. (Caporusso, Tr. 3850, line 11 to p. 3852, line 10; DX 1203 at PAA 0101831).

481. Mr. Caporusso considered the 1988 consumer lending goals to be "aggressive" and heavily dependent on advertising, new programs and products, and support from management. (Caporusso, Tr. 3849, lines 11-23; Caporusso, Tr. 3859, lines 9-13; DX 1203 at PAA 0101831).

482. Advertising was essential to Fidelity's aggressive goals in the consumer lending area. (Caporusso, Tr. 3849, lines 11-23). In the 1987-1988 time period, Fidelity aspired to establish a telephone hotline to process loan applications and address customer service issues quickly, like some of its competitors. (Caporusso, Tr. 3853, line 20 to p. 3855, line 16).

483. Fidelity planned to place a greater emphasis on commercial and consumer lending, such as auto and home equity and other types of consumer products in 1988. (Caporusso, Tr. 3856, lines 8-20; DX 1203 at PAA 0101818).

484. To streamline the efficacy of its lending operations with a plan toward growth, Fidelity outsourced the servicing of certain loans, such as student loans, in its portfolio in the 1987-1988 time period. (DX 620; Caporusso, Tr. 3857, line 10 to p. 3858, line 5).

485. The three-year Business Plan from October 1988 that Fidelity circulated to the FHLBB forecasted that consumer lending is to grow at $11,250 per quarter. (PX 447 at p. 1317; Caporusso, Tr. 3858, line 12 to p. 3859, line 1).

486. Mr. Caporusso testified that, after FIRREA, his job was to concentrate on reducing Fidelity's loan portfolio to become as liquid as possible. The loans that Fidelity had in its portfolio pre-FIRREA were continuing to make money for the bank, but it had to become very restrictive in adding new loans to its portfolio. (Caporusso, Tr. 3861, line 17 to p. 3862, line 17).

487. Mr. Powderly met with Mr. Caporusso and described how FIRREA was going to affect Fidelity's consumer loan portfolio. (Caporusso, Tr. 3860, lines 3-25). After FIRREA, Fidelity severely curtailed its growth in consumer lending. (Caporusso, Tr. 3860, lines 3-16).

488. The regulators' demands for large reserves on potential loan losses hindered Fidelity's ability to generate profits and replace its depleted capital. In addition, Fidelity was forced to sell assets to generate earnings. (Wesp, Tr. 2374, lines 16 – 20; PX 996 at FAA005 1053). In the summer of 1991, for example, Fidelity sold a sizable portion of its home equity loan portfolio to Shawmut Bank. (PX 744; Caporusso, Tr. 3886, line 12 to p. 3887, line 25). These were quality loans that were underwritten properly by Mr. Caporusso so there were very little delinquencies. They also were adjustable rate loans so there was no interest rate risk. Mr. Wesp would have liked to have grown the portfolio even more, as evidenced in the October Plan, but could not do so because of the growth restrictions under FIRREA. (Wesp, Tr. 1891, lines 1 – 20; Wesp, Tr. 1895, 22 to p. 1897,

line 3). The transaction netted a five percent premium on the portfolio for Fidelity. (Caporusso, Tr. 3886, line 12 to p. 3887, line 25).

489. Fidelity intended to pay down the goodwill with income it generated through its securities portfolio. By abandoning its consumer lending plans, Fidelity hoped to reduce risk, reduce expenses, and reduce advertising costs. (Caporusso, Tr. 3861, line 1 to p. 3862, line 17).

490. Although Fidelity was pleased with earning the five percent premium on the portfolio, Fidelity realized that selling the portfolio meant parting with an ongoing earning asset. (Caporusso, Tr. 3886, line 12 to p. 3887, line 25). Fidelity discovered that another downside of the transaction was customers who were unhappy to have their loans serviced by an out-of-state owner. (Caporusso, Tr. 3886, line 12 to p. 3887, line 25).

491. The home equity portfolio that Fidelity created and ultimately sold was high-quality in the marketplace. After the sale, Shawmut Bank approached Mr. Caporusso about purchasing the rest of Fidelity's home equity portfolio, because, Shawmut's senior vice president told Mr. Caporusso, it was one of the best home equity portfolios he had purchased. (Caporusso, Tr. 3886, line 12 to p. 3887, line 25).

## V. FIDELITY'S POST-FIRREA OPERATIONS.

## A. FIDELITY'S CAPITAL PLAN IMPOSED DRACONIAN RESTRICTIONS.

### After FIRREA, Fidelity Had To Obtain The Regulators' Approval To Stay In Business By Submitting A Capital Plan.

492. Because Fidelity was capital deficient after FIRREA, Fidelity was forced by regulators to replace its former Business Plan with a new "Capital Plan," which was a five-year operating plan focused on rapid achievement of capital compliance. (Powderly, Tr. 385, lines 3-23).

493. Fidelity's Capital Plan was written with the intent of obtaining the approval of regulators. The regulators would put Fidelity out of business if they rejected the plan. As such, the plan did not focus on maximizing profit or growing earnings, but solely on rapidly increasing capital to avoid liquidation. (Powderly, Tr. 385, line 24 to p. 386, line 17; Powderly, Tr. 404, lines 12-23).

494. At the time Fidelity submitted its capital restoration plan on January 3, 1990, there was nothing fundamentally wrong with the institution. Fidelity had been profitable for every one of the last ten years. (DX 78 at AST05437; Wesp, Tr. 1859, line 23 to p. 1860, line 25).

495. However, FIRREA created a capital problem for the institution. Fidelity had $93 million of supervisory goodwill that could no longer be accorded full regulatory capital treatment. Only $19.3 million of that amount related to the Dollar Federal merger; the rest was attributable to the Suburbia merger. (DX 78 at AST05437 & AST05439; Wesp, Tr. 1853, line 19 to p. 1854, line 15; Wesp, Tr. 2439, lines 2-4).

496. In preparing its Capital Plan, which called for Fidelity to achieve capital compliance within the five year regulatory time frame, Fidelity did exactly what the instructions said to do.

This was a matter of "life and death" for the institution, so management did not take any liberties. (Wesp, Tr. 1847, lines 13-21; Wesp, Tr. 1856, lines 16-20).

497. In keeping with the instructions they had received from Mr. Vigna, Fidelity did not hire outside consultants to write the business plan for the institution. The Capital Plan was conceived and produced by management and the financial forecasts were generated on internal systems. (DX 78 at AST0705437; Wesp, Tr. 1862, lines 8-22).

498. Mr. Wesp was the primary drafter of the Capital Plan, but it was a team effort which required input and buy-in from everyone at the institution. Mr. Wesp met with the entire employee base of Fidelity, both before submitting the Capital Plan and after it was approved, to make sure that "everyone knew what we were up against and everybody knew where we were going." (Wesp, Tr. 1850, line 25 to p. 1852, line 15).

499. Mr. Wesp thought that the plan absolutely adhered to what the regulators wanted to see and that it had a high statistical probability of succeeding absent any huge event over which neither Fidelity nor the regulators had any control. Fidelity's management would not have submitted a plan that they thought could not work. (Wesp, Tr. 1848, line 3 to p. 1849, line 7).

500. The Capital Plan called for Fidelity to achieve capital compliance by the end of 1994 "by retaining earnings and amortizing goodwill." (DX 78 at AST0705437).

501. Fidelity had reduced goodwill by over $90 million since 1985, and the Capital Plan projected an additional decrease of "$40 million over the plan period through amortization and earnings retention." (DX 78 at AST0705437; Wesp Tr. 1861, lines 1-9).

502. The key features of Fidelity's Capital Plan were:

- Fidelity would achieve capital compliance by December 1993;
- There would be no balance sheet growth and would be some slight shrinkage in 1993 to achieve capital compliance;
- Fidelity would eliminate risk by continuing to reduce non-performing assets, undertaking no new commercial real estate or business lending, increasing holdings of short term and adjustable rate assets, and avoiding new lines of business;
- Reduce retail mortgage lending and emphasize a wholesale strategy of purchasing short term and adjustable rate securities;
- Control operating expenses;
- Manage assets and liabilities to reduce earnings variability and keep earnings within tight tolerances; and
- Reject as strategies: asset growth, more profitable but higher risk lending, shrinking the balance sheet, raising capital through private or public sources, or merging with another institution.

(Kaplan, Tr. 3002, line 20 to p. 3004, line 16; PDX 50).

503. At its core, the Capital Plan strategy was to chase all of the credit risk out of the institution and to operate on modest interest rates at very tight spreads. Fidelity hoped to reduce credit risk by essentially making no new loans and not buying any securities that were rated less than an A or AA, and it intended to keep interest rate risk as minimal as possible by not adding any long-duration assets. Mr. Wesp testified that it was his intent to create "the simplest plain vanilla banking strategy" of adding short-term borrowings and short-term adjustable rate securities to the balance sheet so that earnings would keep going up and so that it could keep amortizing the goodwill on the other side of the balance sheet. (Wesp, Tr. 1856, line 21 to p. 1859, line 7; Wesp, Tr. 2198, line 13 to p. 2199, line 8; Wesp, Tr. 2223, lines 2-10).

504. This wholesale strategy predominated over a retail strategy in the Capital Plan for a number of reasons. First, even when a thrift is not growing, there is a massive amount of cash flow in any given quarter in an $1.7 billion institution like Fidelity, and a wholesale strategy allows you to predictably buy an asset when the funds were available. Second, government securities, unlike a loan, have no risk-based capital requirement. Third, a wholesale strategy allows an institution to be opportunistic. For example, during the first Gulf War, Fidelity was able to make "a lot of money" in just one evening by buying Ginnie Mae's in London, during the evening when Iraq was invading Kuwait, and selling them the next day. Those opportunities are not available when dealing with one-to-four family loans. Finally, a wholesale strategy is generally immune to event risk, including recessions. (Wesp, Tr. 1876, line 17 to p. 1877, line 25; Wesp, Tr. 2149, line 12 to p. 2150, line 22; Wesp, Tr. 2157, line 11 to p. 2158, line 1; Wesp, Tr. 2240, line 22 to p. 2241, line 7; Wesp, Tr. 2292, line 15 to p. 2293, line 13; Wesp, Tr. 2295, lines 4-20; Wesp, Tr. 2352, line 25 to p. 2353, line 7; Wesp, Tr. 2521, line 25 to p. 2522, line 12).

505. The fact that Fidelity had low expense ratios during the Capital Plan period also helped Fidelity to produce earnings. (Wesp, Tr. 1856, line 21 to p. 1859, line 7).

506. In devising its Capital Plan, Fidelity projected an interest rate forecast that was more conservative than allowed under TB 36-1. Had Fidelity relied on TB 36-1, the interest rate forecast would have produced an additional $10 million in earnings and accelerated compliance by almost a year. Given the inherent lack of reliability in any five-year interest rate forecast, Fidelity opted to use a more conservative forecast than the one supplied in TB 36-1 because Fidelity wanted more room to maneuver so that it could be sure to stay within

the quarterly variances provided for in the plan. (DX 78 at AST0705437; Wesp, Tr. 1862, line 23 to p. 1863, line 20).

507. Mr. Wesp was optimistic that the actual interest rate yield curve over the plan period might turn out to be even better than what was contemplated by the OTS-required assumptions of five years of a flat yield curve and flat economic activity. As Fidelity expected, the actual interest rate yield curve and economic activity turned out to be better than assumed in the Capital Plan. (DX 78 at AST0705446; Wesp, Tr. 1865, line 25 to p. 1867, line 2).

508. Fidelity also was conservative in estimating earnings for the five-year period covered by the plan at a level below Fidelity's prior five-year historical level. (DX 78 at AST0705445; Wesp, Tr. 1864, line 20 to p. 1865, line 12).

509. There were no new lines of business and no untested earning streams projected under the Capital Plan. Instead, Fidelity was focused on reducing its exposure to venture and commercial lending and devoting its resources to more traditional lines of business. (DX 78 at AST0705445; Wesp, Tr. 1864, lines 2-19).

510. It was Fidelity's hope, as expressed in the Capital Plan, that when its tangible capital became positive and the negativism surrounding thrifts abated, that it could convert to a stock institution. However, the success of the Capital Plan was not dependent on Fidelity's conversion. (DX 78 at AST0705446; Wesp, Tr. 1867, lines 3-11; Wesp, Tr. 1868, line 21 to p. 1869, line 9).

511. Fidelity had explored a conversion in the late fall or early winter of 1986, shortly after Mr. Wesp arrived at the thrift, but the investment bankers who they consulted felt that the timing was not right for a conversion. Fidelity was not yet sophisticated enough as an

institution. In addition, the real estate cycle was turning, and Fidelity had a little too much commercial real estate exposure. However, over time Fidelity continued to think about the possibility of converting and going public. (Wesp, Tr. 1867, line 12 to p. 1868, line 11; Wesp, Tr. 1936, line 20 to p. 1937, line 20).

512. There were a series of strategies that Fidelity's Board of Directors and management considered and rejected when devising the Capital Plan, including *inter alia*, growing the balance sheet to dilute the goodwill component and entering new lines of business. They ultimately settled on an approach that called for them to "continue doing what we are doing." By this comment, Fidelity's management meant to refer to the efforts that Fidelity had already been undertaking throughout much of 1989, in anticipation of FIRREA, to get the "ultimate balance sheet to start [the] [capital] plan." (Wesp, Tr. 1870, line 22 to p. 1871, line 19; Wesp, Tr. 1838, line 5 to p. 1841, line 6).

513. The nine strategies Fidelity considered and rejected when formulating its Capital Plan were not strategies that would have been appropriate for an institution that was trying to work through capital troubles and get back on a growth track. It is unlikely that a Capital Plan based on any of these strategies would have been approved. (Amend, Tr. 4809, line 19 to p. 4811, line 5; DX 78 at PAA052 2701-PAA052 2702).

514. Strategy No. 10, which Fidelity accepted, was, in Mr. Amend's opinion, "a regulator's dream." It relies on reducing interest rate and credit risk, improving assets, generating and retaining earnings, containing costs and taking measured capital gains. It is a prudent plan if the institution can execute it. (Amend, Tr. 4811, lines 6-19; DX 78 at PAA052 2702).

**The OTS Approved Fidelity's Capital Plan, But The FDIC Was Vehemently Opposed And Wanted To Shut Fidelity Down.**

515. The letter from OTS approving Fidelity's Capital Plan outlined a series of exceedingly stringent restrictions on Fidelity's activities while the Plan remained in effect. For example, Fidelity could not, without advance approval by the OTS District Director:

- Increase its assets in excess of the levels in the plan and in no event by more than interest credited;
- Make capital distributions;
- Pay executive officers and directors more than $900 per month without regulatory approval;
- Pay bonuses;
- Make or extend any loans secured by real estate;
- Make any commercial loans;
- Make any investments in real estate or equity securities;
- Enter into joint ventures or limited partnerships;
- Enter into any contract or purchase anything, even in the ordinary course of business, in excess of $10,000;
- Borrow money, except to maintain liquidity;
- Incur any material obligation or contingent liability not specifically permitted;
- Employ any new officers, directors or senior managers;
- Hire any employee whose employment was not terminable at will;
- Open any new branch office; nor
- Accept any uninsured deposits.

(PX 590 at AST000358-64).

516. The OTS approved Fidelity's Capital Plan because it addressed the issues the regulators wanted to see addressed, it was a safe and sound plan, and the OTS had confidence in Fidelity's management. (Amend, Tr. 4812, lines 15-24). There was a feeling within the OTS Northeast Region that Fidelity had a reasonable chance of executing its Capital Plan and becoming a survivor. Mr. Powderly and Mr. Wesp were doing all the right things, and the plan was a prudent plan. (Amend, Tr. 4812, line 25 to p. 4813, line 13). Even though the OTS was facing regulatory pressures of its own, Mr. Vigna was supportive of the Capital Plan and hoped Fidelity could achieve its goals. (Wesp, Tr. 1849, line 16 to p. 1850, line 24; Wesp, Tr. 1882, line 11 to p. 1883, line 15). Mr. Vigna viewed Fidelity's Capital Plan as conservative and as a Plan that presented a fairly low level of risk to the Government and the insurance fund. (Vigna, Tr. 1461, line 24 to p. 1462, line 5).

517. The FDIC, however, had a different view. On May 8, 1990, Mr. Ketcha of the FDIC wrote to Mr. Vigna urging the OTS not to approve Fidelity's Capital Plan. The FDIC was, following FIRREA, the backup regulator for thrifts. OTS did not need the FDIC's approval to approve Fidelity's Capital Plan, but it had agreed to coordinate its approvals and activities with the FDIC. The FDIC thought Fidelity's near term probability of failure was high. Mr. Vigna did not agree with that assessment and would not have approved Fidelity's plan if he thought that was true. The FDIC felt Fidelity needed an infusion of outside capital. Mr. Vigna thought an infusion of new capital in the short term would be "wonderful" but not realistic. What he thought was a more realistic hope was that Fidelity could clean up its balance sheet and stabilize its earnings, it might get to the point where it could raise money in the capital markets. He thought that if anybody

could pull this off, the Fidelity management team, Mr. Powderly and Mr. Wesp, were the ones who could do it. Mr. Vigna therefore disagreed with Mr. Ketcha's pessimistic assessment of Fidelity's prospects. (Vigna, Tr. 1443, line 22 to p. 1449, line 18; *see generally* DX 687).

518. When Mr. Vigna received Mr. Ketcha's May 8, 1990 letter, he had an OTS analyst compare the OTS analysis of Fidelity's Capital Plan to the concerns raised in Mr. Ketcha's letter. This analysis was sent to the FDIC on May 21, 1990 and was discussed prior to then in a conference call between the two agencies. The analysis demonstrated that the agencies shared many of the same concerns. However, Mr. Vigna also stressed factors such as Fidelity's progress in dealing with its problem real estate loans, Fidelity's emphasis on traditional thrift lending and investments in ARM pass-through securities, Fidelity's favorable results in its first quarter of operation under the Capital Plan, and the quality of Fidelity's management. Following the discussions between the two agencies, the FDIC dropped its opposition to the approval of Fidelity's Capital Plan. (Vigna, Tr. 1449, line 19 to p. 1452, line 15; *see generally* PX 591).

519. On May 18, 1990, OTS notified Fidelity that its Capital Plan was approved. However, the approval was contingent on Fidelity complying with a number of conditions. These included restrictions on growth, restrictions on lending, restrictions on salary and pay raises, and a large number of operating restrictions. Fidelity was also required to meet all plan targets within relatively small tolerance allowances and to make quarterly reports to OTS on compliance with (and variance from) Plan goals. Material failure to comply with restrictions or meet goals may result in termination of the Plan, appointment of a

conservator or receiver, or other supervisory or enforcement action. (Vigna, Tr. 1455, line 3-11; *see generally* PX 590).

520. The OTS had primary responsibility for monitoring Fidelity's performance under the Capital Plan. It planned to keep the FDIC informed of Fidelity's progress, including forwarding to the FDIC copies of the quarterly reports Fidelity was required to file. (Vigna, Tr. 1452, lines 16-25).

521. Mr. Vigna does not recall if any analysis was ever done of what it would have cost the Government if Fidelity's Capital Plan was rejected and the institution was turned over to the RTC for liquidation. The OTS did not estimate such costs as part of its consideration of Fidelity's Capital Plan. (Vigna, Tr. 1456, line 4 to p. 1457, line 4).

**Fidelity Had Little Margin For Error Under The Capital Plan.**

522. Fidelity took the threat of liquidation seriously, which was a possibility if its Capital Plan was not approved. Fidelity was only one of approximately three thrifts in the Northeast whose capital plan was approved. (Powderly, Tr. 386, lines 2-17).

523. Fidelity's Capital Plan included specific quarterly targets that Fidelity had to achieve for each of the three post-FIRREA capital requirements to avoid termination of the plan. (Powderly, Tr. 404, line 18 to p. 405, line 21; Powderly, Tr. 430, lines 9-12; PX 590 at AST000357).

524. There was little room under the plan for Fidelity to take any risk or do anything that would result in a variance from one of the Capital Plan's interim targets or other material conditions. (Powderly, Tr. 410, lines 5-17; DX 78 at AST0705445; Powderly, Tr. 432, lines 4-16). Fidelity's operations under the Capital Plan could not deviate from the plan without

approval of the OTS District Director. (Powderly, Tr. 429, line 23 to p. 430, line 8; PX 590 at AST000356).

525. Fidelity was only allowed a five percent variance for each of its interim targets in each of the 20 quarters covered in the plan. Fidelity's management knew that it would be very difficult to adhere to such tight parameters because that essentially meant that the institution's results could not vary from the projected numbers more than plus or minus five percent in any given quarter. (Wesp, Tr. 1841, line 7 to p. 1842, line 11; Wesp, Tr. 1849, line 16 to p. 1850, line 24; Wesp, Tr. 1875, lines 7-21; Wesp, Tr. 1879, line 12 to p. 1880, line 16).

526. In addition to filing its usual quarterly financial reports, while operating under the Capital Plan, Fidelity was required to file a quarterly performance review against its Capital Plan objectives. Although not required, Messrs. Wesp and Powderly would make an appointment to meet with Mr. Vigna each quarter to lead him through what they felt to be the pertinent events of the prior quarter and to share with him what they foresaw in the coming quarter. (Wesp. Tr. 1875, line 7 to p. 1876, line 16).

**In A Significant Departure From Fidelity's Pre-FIRREA Business Plans, The Capital Plan Restricted Fidelity's Growth To Zero.**

527. Unlike the pre-FIRREA October Plan that called for Fidelity to "[g]row the balance sheet at approximately 8 to 10% per annum," (PX 447 at OAA005 1315), the Capital Plan projected no growth in early years and modest shrinkage of the balance sheet in 1993/94. (DX 78 at AST0705437). After FIRREA was enacted, Fidelity was no longer in a "normal banking environment," so the growth projections in the pre-FIRREA October Plan were largely "off the table." (Wesp, Tr. 1859, lines 8-22). Moreover, Fidelity was restricted, without the prior written approval of the District Director, from growing beyond interest

credited. (DX 78 at AST0705446; Wesp, Tr. 1869, lines 10-17). If, as a result of FIRREA, Fidelity had not had to operate under a Capital Plan, it would have grown at a rate of 8-10% per year. (Wesp, Tr. 1874, lines 15-22).

528. Fidelity was explicitly directed not to grow by more than the amounts set forth in the Capital Plan, and, in any event, after January 1, 1991, it could not grow by more than interest credited unless it was in capital compliance. (Vigna, Tr. 1455, line 12 to p. 1456, line 3; PX 590 at AST000358-AST000359). Because Fidelity had negative capital as a result of FIRREA, Fidelity was also restricted under Thrift Bulletin 36 from growing beyond interest credited without approval of the OTS District Director. (DX 78 at AST0705446).

529. Mr. Wesp testified that, had FIRREA been enacted so that Fidelity did not have to take the goodwill hit to its capital account "all at once," Fidelity still would have grown because:

> "I could have put that many more ARMS on, adjustable rate mortgage securities, on the balance sheet. Our earnings could have been that much higher. But we need the capital to support it because we didn't have the capital to support any growth, under the terms of the Capital Plan as they were written and under the terms of FIRREA as it was implemented, any hope of growing was out the window."

(Wesp, Tr. 1873, line 15 to p. 1874, line 13).

530. If Fidelity did grow its assets while under the Capital Plan, that growth would have constituted a material violation of the plan's conditions. (PX 590 at AST000358-359).

**The Capital Plan Required Fidelity To Reduce Significantly Its Staff In Order To Decrease Operating Expenses.**

531. A key component of the Capital Plan was to contain costs by reducing staffing levels. (DX 78 at AST0705446; Powderly, Tr. 417, line 22 to p. 418, line 5).

532. Fidelity had to reduce staff by approximately twenty-five percent to lower expenses. (Powderly, Tr. 380, lines 4-15). Fidelity reduced its payroll expense by $800,000 in 1990 by reducing staff from approximately 400 to 300 employees. (Powderly, Tr. 469, lines 2-19; PX 686 at WON737 0660).

533. Fidelity's staffing reductions made it very difficult for Fidelity to continue operating, especially relating to the operation of Fidelity's branches. Fidelity would not have made these staffing cuts absent FIRREA's impact on Fidelity's regulatory capital. (Powderly, Tr. 862, lines 9-22).

534. Fidelity decided in June 1989 to sell its Manhattan branch because Fidelity knew that it would not be able to afford the attendant marketing and operating expenses. (Powderly, Tr. 821, lines 6-19; DX 78 at AST0705500).

**Fidelity Was Able To Meet Each Of The Capital Plan's Interim Targets Without A Material Negative Variance.**

535. On April 12, 1990, Mr. Powderly sent to Mr. Vigna a report of Fidelity's first quarter of operation under the Capital Plan. Fidelity met all of its balance sheet and capital goals for the quarter and in fact slightly exceeded them. It also reported favorable developments in connection with its real estate lending portfolio and its non-earning assets. Mr. Powderly made sure that Mr. Vigna got these reports promptly after the end of each quarter, and he would often supplement the report with a personal meeting with

Mr. Vigna to make sure he was up to date on Fidelity's progress. (Vigna, Tr. 1442, line 13 to p. 1443, line 14; *see generally* PX 562).

536. On July 20, 1990, Fidelity reported to OTS the results of its first 6 months of operation under the Capital Plan. As of June 30, 1990, Fidelity had no material variances from the assets or capital level targets specified by the Capital Plan. (Vigna, Tr. 1457, line 5-25; *see generally* PX 611).

537. Fidelity sent to OTS a letter and quarterly report in approximately the same format as PX 611, an operating report, after the conclusion of every quarter of its operation under the Capital Plan. (Vigna, Tr. 1457, line 5 to p. 1458, line 5).

538. Despite having to post an additional $10 million to its general valuation allowance in the second quarter of 1990, Fidelity was ahead of all Capital Plan interim targets by the third quarter of 1990. (Powderly, Tr. 457, line 19 to p. 460, line 13; *see generally* DX 2035; PX 509 at AST001983).

539. Despite having to cover an additional $9.6 million in valuation allowances following the second quarter of 1991, Fidelity again achieved positive variances for all three capital categories in the third quarter of 1991. (PX 785 at WON725 1403; Powderly, Tr. 510, line 13 to p. 511, line 22).

540. On December 27, 1991, Mr. Powderly reported to Mr. Vigna on Fidelity's second year of operation under the Capital Plan. He reported that Fidelity's tangible capital was now positive, having come back from a $50 million deficit, exacerbated by the need to add over $14 million in reserves in 1991 alone. Fidelity was $3 million ahead of the Capital Plan on tangible capital. From that point onward, he noted, Fidelity could achieve capital

compliance even if its net earnings were zero, simply by amortizing its remaining goodwill. He also reported that Fidelity continued to improve its asset quality and was current on the posting of loan loss reserves. (Vigna, Tr. 1469, line 10 to p. 1474, line 3; *see generally* PX 806A).

541. Fidelity was permitted to have some small level of deviation from plan targets and still be considered to be in compliance. These small deviations were not considered to be material to overall Plan compliance. Subject to the possibility of such immaterial deviations, it was Mr. Vigna's recollection that Fidelity met its targets for every quarter during which it operated under the Capital Plan. (Vigna, Tr. 1458, line 6 to p. 1459, line 24).

542. Fidelity had positive variances in all there capital categories in the first quarter of 1991. (Powderly, Tr. 486, line 22 to p. 487, line 8; PX 725 at WON732 1360).

543. Because of an error in Fidelity's method for calculating risk-based capital, Fidelity did not realize that it had a negative variance in risk-based capital at the end of 1991, but after an OTS field visit in February 1992 discovered and corrected for the error, the OTS concluded that Fidelity still met the minimum tolerance levels for risk-based capital under the Capital Plan. (PX 825 at WON736 0730-32; Powderly, Tr. 532, line 25 to p. 536, line 5).

544. At the end of the first quarter of 1992, Fidelity again achieved positive variances for all three capital requirements, including a $4 million positive variance in risk-based capital which had been a point of concern in the recent OTS field exam. (Powderly, Tr. 539, line 25 to p. 541, line 8; PX 852 at AST098029; *see generally* PX 864).

545. Although the OTS placed Fidelity under a supervisory agreement in March of 1992, it did not have any significant impact on the way Fidelity was already operating under the Capital Plan. (Powderly, Tr. 537, line 2 to p. 538, line 2; *see generally* DX 2953).

546. Fidelity maintained positive variances in all three capital categories as of the end of the second quarter 1992, despite having to post an additional $1.8 million in reserves. (PX 894 at WON 736 0673; Powderly, Tr. 556, lines 2-19; PX 851 at OAA002 0005).

547. At the end of the third quarter of 1992, Fidelity still had positive variances in all three capital categories. (PX 923 at WON736 1266).

548. Fidelity retained positive variances in all three capital categories at the end of the fourth quarter of 1992. (PX 958 at AST034443).

549. Fidelity was relieved of the OTS supervisory agreement in January 1993 because Fidelity had already taken the corrective actions detailed in the agreement and the supervisory agreement was therefore unnecessary. (PX 1270A).

550. Fidelity had increased tangible capital by $19 million as of April 1991. (PX 716 at WON743 0042).

551. By November 1991, Fidelity had increased tangible capital by $25,483,192 since December 1989. (PX 795 at WON725 1393).

552. By June 30, 1992, Fidelity had increased tangible capital by $31.4 million since June 30, 1990. (PX 851 at OAA002 0005).

**To Supplement Earnings Under The Capital Plan, Fidelity Sold Assets At Strategic Times To Weather Write-Downs And Increased Valuation Allowances. Fidelity's Capital Plan Was Not Dependent On Asset Sales.**

553. Despite some of the regulators' misconceptions to the contrary, Fidelity had sufficiently strong earnings to raise capital without having to rely on asset sales, which were conducted only to cover the regulator's requests for additional write-downs or valuation allowances. (PX 689 at AST001814; Powderly Tr. 474, lines 13-20; Powderly, Tr. 541, line 9 to p. 542, line 1; PX 852 at AST098029; Powderly, Tr. 549, line 24 to p. 550, line 2; PX 866 at AST 097644; PX 876 at WON736 1091; Powderly, Tr. 554, line 21 to p. 556, line 1).

554. Fidelity's core earnings would have been even higher, but Fidelity had to take significant expenses to rapidly amortize goodwill. Additionally, Fidelity operated entirely to increase capital as opposed to maximizing earnings. (PX 876 at WON736 1090; Powderly, Tr. 553, line 7 to p. 554, line 7).

555. Regulators eventually acknowledged that Fidelity's capital replenishment plans were sustainable, based solely on Fidelity's core earnings. (PX 851 at OAA002 0005).

556. Regulators also eventually acknowledged that Fidelity's capital gains were not meant to drive earnings but used only to "offset operating losses resulting from provisions for loan losses." (PX 1020 at AST062720).

557. During the years 1990 through 1994, which included Fidelity's years of operation under the Capital Plan, Fidelity's average annual return on tangible assets (before taxes and purchase accounting) was 0.85 % (85 basis points). This is a measure of profitability of

Fidelity, even as a breached bank. (Kaplan, Tr. 3038, line 19 to p. 3044, line 11; PDX 60 and PX 1314A, Exhibit 6).

558. During the time it operated under the Capital Plan, Fidelity restructured its assets by originating fewer loans and emphasizing investment in mortgage-backed securities. This helped Fidelity lower its ratio of classified assets to total assets and lower both its credit risk and its interest rate risk. (Amend, Tr. 4847, line 15 to p. 4850, line 24; PX 851 at OAA002 0005, OAA002 0010, and OAA002 0016).

559. During their period of operation under the Capital Plan, Fidelity's management prudently kept interest rate risk to a minimum and largely eliminated credit risk by curtailing lending and focusing on wholesale activities. They also continued to work on their problem assets. They did not create any additional risk to the FDIC insurance fund. They did a good job and saved the taxpayers money. (Amend, Tr. 4850, line 25 to p. 4852, line 2).

**Fidelity Effectively Resolved Its Real Estate Portfolio While It was Under The Capital Plan.**

560. Fidelity had significant real estate problems at the time it began operating under the Capital Plan. Mr. Vigna thought Mr. Powderly was making adequate progress dealing with these. He was getting repayments on some loans. Other loans were being restructured. Mr. Powderly understood where the developers were coming from. He was very experienced in dealing with developers, and he was diligent in making sure the institution was on top of the issues. He knew how to talk to the developers in their own language. (Vigna, Tr. 1453, line 7 to p. 1454, line 3).

561. Fidelity's ability to work out loans was not a simple matter of collections. New York law favored borrowers, and the loan work out process was complex. (PX 876 at WON736 1091; Powderly, Tr. 382, line 7 to 17; PX 1249 at WON738 0780). Fidelity nonetheless reduced the size of its commercial loan portfolio by $20,350,000 in 1990, the first year of operation under the Capital Plan. (PX 686 at WON737 0660).

562. Fidelity nonetheless had reduced its commercial loan portfolio by $40 million from $171 million at the passage of FIRREA to $132 million in June 1991. (PX 733 at AST002763). Further, despite difficult market conditions, Fidelity reduced its criticized assets by $8 million during the examination period ending in June 1991; by another $9 million as of October 1991; and by another $10 million as of May 1992. (PX 795 at WON725 1394; Powderly, Tr. 525, line 17 -21; PX 876 at WON736 1091).

563. By May 1992, Fidelity had reduced its commercial loan portfolio nearly $300 million from over $350 million in late 1986 to only $56.4 million as of the first quarter of 1992, and the remaining balance was adequately covered by Fidelity's reserves. (PX 876 at WON736 1096; Powderly, Tr. 551, line 17 to p. 552, line 13).

564. Fidelity's ability to work through its commercial loan problems was also impacted by the actions of the RTC, which had been set up by Congress to assume the assets of the thrift institutions that were being liquidated after FIRREA, caused the New York real estate market to become ever further depressed because large numbers of properties were being liquidated by the RTC in concentrated neighborhoods. The RTC would then hold a bid process for those properties which were generally sold at very low prices. This, in turn, caused the OTS examiners to ask thrifts to post reserves for properties that the thrift was

holding in the same neighborhood as those properties that had been sold at auction by the RTC. In essence, the thrift was being asked to write down the asset to where the RTC had bid a comparable property. Thus, the RTC liquidations not only lowered the actual market values of a thrift's properties, but also forced the thrift to write down those properties below market value to the value that the property would receive in a RTC distress sale. Mr. Wesp recalled this scenario playing out with regard to a specific piece of real estate that Fidelity owned in Manhattan on 14th Street that had been the site of Luchow's restaurant. (Wesp, Tr. 1885, line 16 to p. 1888, lines 6 -25).

565. By early 1992, Fidelity's efforts to work out its criticized assets, along with Fidelity's write-downs and increased valuation allowances, left the insurance fund and taxpayers with virtually no remaining exposure to losses on Fidelity's assets. (PX 795 at WON725 1394; Powderly, Tr. 526, line 18 to p. 527, line 11; Powderly, Tr. 543, lines 9-25).

566. Fidelity was successful in reducing classified assets by $11 million down to $75.3 million during the 1992 examination period. (PX 851 at OAA002 0005).

567. In Fidelity's 1993 Report of Examination, the OTS credited Fidelity with making "substantial progress in reducing problem assets." (PX 1020 at AST062717).

568. By July 1993, Fidelity had reduced nonperforming loans to 3.4% of assets, which compared favorably to its peer group average of 7.8%. (PX 1029 at AST062093).

569. The sale of the home equity loans (referenced above) generated a $1.5 million profit for Fidelity, which Fidelity needed in order to meet a demand by the regulators for increased reserves on certain commercial loans. (Wesp, Tr. 1892, line 11 to p. 1895, line 22; PX 773 at AST0307026; PX 744 at WON 7432257).

570. Fidelity would have had more options to manage its classified assets if it had owned more capital. Even with the loss of capital due to FIRREA, Fidelity successfully managed its classified assets and was able to survive. (Powderly, Tr. 648, line 21 to p. 649, line 7; Powderly, Tr. 807, lines 1-12; Powderly, Tr. 912, line 2 to p. 913, line 2).

**Fidelity's Ability To Compete Was Constrained By The Capital Plan, But Fidelity Managed To Stay In Survival Mode And Work Through This Difficult Period.**

571. Fidelity was permitted to engage only in the specific types of activities specified in its Capital Plan and these only to the extent contemplated in the Plan (subject to a five percent tolerance factor) without advance approval of the OTS District Director. (PX 590 at AST000356).

572. Since January 1990, Fidelity's management, in accordance with its Capital Plan, focused primarily on enhancing operating results and strengthening capital. Fidelity sought to accomplish this strategy principally by concentrating on controlling costs; increasing fee income; maintaining net interest margin through investments in mortgage-backed securities; and mortgage-related securities and reducing non-performing loans and REO. (Joint Stipulation of Facts, April 2, 2007, ¶ 103).

573. In the years immediately following FIRREA, Fidelity deliberately made its rates for unsecured loans higher than market, with the intention to discourage customers from requesting those loans. (PX 595 at AST 030195; Caporusso, Tr. 3867, line 20 to p. 3868, line 17). Fidelity wanted to avoid the risks of delinquency and the requirement for reserves that accompany unsecured loans. (Caporusso, Tr. 3867, line 20 to p. 3868, line 17).

574. After FIRREA rendered Fidelity a negative-capital institution, First Wachovia discontinued its practice of purchasing student loans from Fidelity. (DX 630; Caporusso, Tr. 3863, line 10 to p. 3864, line 13). First Wachovia stopped purchasing student loans from Fidelity after FIRREA because First Wachovia had concerns that, if Fidelity's uncertain financial footing ultimately failed, First Wachovia would be without any recourse for any potential deficiencies in the student loans. (Caporusso, Tr. 3863, line 10 to p. 3864, line 13; DX 630).

575. Fidelity also lost the business of two automobile leasing companies, JJM and MTP Leasing Lines, to competitors because of FIRREA's effects. (Caporusso, Tr. 3877, line 4 to p. 3878, line 16; PX 595at AST 030195).

576. In August 1990, Fidelity denied loan applications that were inconsistent with the institution's conservative lending parameters. (DX 2448 at AST 030217; Caporusso, Tr. 3879, line 19 to p. 3880, line 12; DX 2467 at AST 030243; Caporusso, Tr. 3883, line 9 to p. 3884, line 4). Fidelity's goal to stay liquid resulted in very stringent, conservative underwriting standards for credit applications in the years after FIRREA. (*See generally* DX 2448; Caporusso, Tr. 3879, line 19 to p. 3880, line 12: Caporusso, Tr. 3901, lines 11-17).

577. The FDIC and OTS examiners also regularly demanded huge reserves on prospective loan losses, which put a strain on Fidelity's ability to generate profits and replace its depleted capital. (Wesp, Tr. 2374, lines 16 – 20; PX 996 at FAA005 1053).

578. In the years after FIRREA, Fidelity gradually dissolved its advertising department and outsourced advertising projects it needed. (Caporusso, Tr. 3912, lines 9-24).

579. To survive after FIRREA, Fidelity had to stay liquid. (Caporusso, Tr. 3881, lines 7-21; Caporusso, Tr. 3882, lines 1-17). Making loans increased risk, so Fidelity curtailed its lending operations. (Caporusso, Tr. 3881, lines 7-21; Caporusso, Tr. 3882, lines 1-17; *see generally* PX 620; Caporusso, Tr. 3882, line 18 to p. 3883, line 8; Caporusso, Tr. 3906, line 18 to p. 3907, line 4). Fidelity's ability to compete in its geographical area was hindered by FIRREA. (Caporusso, Tr. 3908, line 24 to p. 3909, line 6).

580. On or about December 10, 1990, Mr. Greco completely retired, and Mr. Powderly replaced him as President of Fidelity. Mr. Wesp was, in or about that same time period, promoted to Executive Vice President of Fidelity. Mr. Vigna viewed these changes as a positive step forward for Fidelity. He was counting on the leadership of Messrs. Powderly and Wesp to see Fidelity through to the successful completion of its Capital Plan. (Vigna Tr. 1459, line 25 to p. 1461, line 5; PX 659).

581. On January 24, 1991, Mr. Powderly sent to Mr. Vigna a summary of Fidelity's achievements during its first year of operation under the Capital Plan. During 1990 Fidelity reduced goodwill by $11,750,000 and increased its tangible capital by $15.3 million, while also increasing reserves by $5 million. It reduced interest rate risk and increased the credit quality of its assets. It reduced its real estate risk exposure by more than $20 million. At the start of 1991, more than 50 % of Fidelity's assets were in short duration, liquid, marketable securities. This minimized balance sheet risk and gave Fidelity great flexibility to react quickly to economic or regulatory changes. Mr. Vigna agreed Fidelity had made progress in 1990. (Vigna, Tr. 1461, lines 6-23; PX 686 at WON737 0660).

582. By November, 1991, Fidelity had also passed an important milestone – its tangible capital went positive for the first time. As of that date, there was no longer any risk to the insurance fund because the institution could have been liquidated at market. Fidelity shared this good news in a letter to FDIC, dated December 13, 1991. (PX 802 at WON732 1171; Wesp, Tr. 1905, line 6 to p. 1906, line 13).

583. At various points during the Capital Plan, when Mr. Wesp saw an opportunity in the market and, with the approval of the OTS, he would swap out of Fannie or Freddie Mac ARMS and purchase AA rated ARMS with the same yield and a very slight increase in credit risk. This was a way to take out capital gains and have no impact on future income. (Wesp, Tr. 2180, line 8 to p. 2181, line 5; PX 721 at AST0308769; PX 773 at AST0307024).

584. In June 1992, for example, Mr. Wesp wrote to Mr. Amend requesting his approval to sell three pools of Freddie Mac ARM MBS. The sale was again prompted by an anomaly in the market whereby there was such a demand for ARMs by mutual funds that prices were rising rather dramatically. Mr. Wesp realized that he could sell the three pools at a profit while using the sale proceeds to purchase AA-rated corporate floating rate securities that had almost identical collateral, for 5 basis points cheaper and with the same yield. (PX 882; Wesp, Tr. 1923, line 11 to p. 1926, line 16). After requesting and being provided with further information, Mr. Amend approved the sale of two of the three pools. (DX 628; PX 886; Wesp, Tr. 1927, line 9 to p. 1928, line 23; Wesp, Tr. 1929, line 23 to p. 1930, line 19; Wesp, Tr. 2350, line 2 to p. 2351, line 11).

585. On December 19, 1991, Fidelity provided both the OTS and FDIC with an annual budget for the period December 1, 1991 through November 30, 1992. The budget was based on the

Capital Plan assumptions. The budget projected that there would be no growth on either side of the balance sheet and that all new, net investments would run to ARM securities. Accordingly, 100% of the cash flow from the institution would be invested in adjustable rate mortgage securities. (PX 805 at FAA007 0507-509; Wesp, Tr. 1908, line 4 to p. 1910, line 14).

586. On February 28, 1992, Mr. Lovely informed Mr. Vigna that he planned to step down as CEO of Fidelity, although he would continue as Chairman. The Board had approved his recommendation that Mr. Powderly succeed him as CEO. Mr. Vigna approved this management transition and believed this was a positive step forward for Fidelity. (Vigna, Tr. 1474, line 7 to p. 1475, line 8; PX 830 at AST099002-03).

## B. AFTER FIRREA, FIDELITY OPERATED IN A HARSH REGULATORY ENVIRONMENT.

### The FDIC Repeatedly Threatened Fidelity And Sought To Obstruct Its Efforts To Implement The Capital Plan.

587. The FDIC urged the OTS not to approve Fidelity's Capital Plan proposal. The FDIC expressed skepticism that Fidelity could not generate sufficient earnings to make the capital plan work and predicted that "the probability of near term failure [of Fidelity] is extremely high. (DX 687 at FAA 005 2191-92).

588. By January 23, 1992, Fidelity had been operating under the Capital Plan for slightly more than two years and had not missed its quarterly goals under the Capital Plan since the plan's inception, with the exception of one quarter when Fidelity had to sell assets in order to post additional real estate reserves. According to Mr. Wesp, this fact did not seem to resonate with the FDIC. (Wesp, Tr. 1919, line 11 to p. 1920, line 9).

589. On January 23, 1992, Fidelity wrote to the FDIC to provide an update on the financial condition of the institution -- Fidelity's tangible capital was now $3.1 million ahead of the plan and $4.17 million ahead of the minimum requirement of the plan -- and to inquire about the status of the FDIC's recommendation to Washington that Fidelity's deposit insurance be pulled. This was one of a series of inquiries as to which Fidelity received no response. If the FDIC had revoked Fidelity's deposit insurance, Fidelity would have been out of business. (PX 822 at WON736 0202; Wesp, Tr. 1913, line 25 to p. 1915, line 24).

590. On February 10, 1992, Fidelity again wrote to the FDIC to provide them with current financial information and also to advise them that Fidelity remained ahead of schedule with regard to the Capital Plan targets. (*See generally* PX 826; Wesp, Tr. 1920, line 15 to p. 1921, line 9).

**The FDIC Was Always Well Behind The OTS In Issuing Fidelity's Examination Reports.**

591. Both the OTS and the FDIC conducted examinations of Fidelity. Often both sets of examiners were on the premises at the same time and reviewing the same documents. (Wesp, Tr. 1883, line 16 to p. 1884, line 23).

592. Even though the Capital Plan was approved by the OTS, the FDIC continued to be harsh in its dealings with Fidelity. Mr. Wesp described the conduct of the FDIC staff personnel who were on site conducting audits of Fidelity as "mean or mean-spirited" and recalled that they were "quite candid" about the fact that their mission was to revoke Fidelity's deposit insurance and put it out of business. (Wesp, Tr. 1883, line 16 to p. 1884, line 23).

593. Mr. Powderly believed that the FDIC was about "nine months behind the curve" in their assessments of Fidelity, and that the FDIC's assessments were therefore irrelevant by the

time Fidelity received them. (Powderly, Tr. 519, line 23 to p. 520, line 1; Powderly, Tr. 548, line 3 to p. 551, line 16). Fidelity would send letters to the FDIC examiners after each examination to bring the examiners up to speed on recent developments because of the FDIC's delayed assessments of Fidelity. (Powderly, Tr. 519, line 23 to p. 520, line 4).

594. The FDIC examination reports were not particularly helpful to Fidelity because the FDIC examiners were always delivering their reports a year or 18 months after the fact, by which time the findings in the reports were stale. For example, shortly after Fidelity's tangible capital went positive for the first time during the plan period -- a memorable and important event for Fidelity -- Fidelity received an obviously stale report from the FDIC complaining about Fidelity's negative capital position. The FDIC examiners, because of their commercial bank background, also were not generally experienced in dealing with mortgage assets, were not particularly helpful in looking at mortgage securities and didn't have a great understanding of ARM MBS. (Wesp, Tr. 1899, 20 to p. 1901, line 9; Powderly, Tr. 548, line 3 to p. 551, line 16).

595. The FDIC's 1989 Report of Examination for Fidelity, despite being conducted concurrently with the OTS examination in the fall of 1989, was not delivered to Fidelity until February 13, 1991, more than a year after Fidelity began operating under its Capital Plan, and more than six months after the OTS examination was delivered in July 1990. (Powderly, Tr. 472, line 10 to p. 474, line 3; PX 689 at AST001814; PX 509 at AST001960). That Report of Examination doubted the viability of Fidelity's plan of relying on earnings retention to achieve capital compliance, but Fidelity had already been exceeding all Capital Plan interim targets through earnings retention for a year by the

time the FDIC reached that conclusion in February of 1991. (Powderly, Tr. 473, line 24 to p. 474, line 12; *see generally* PX 689; PX 671 at AST0704139).

596. The FDIC concluded in October of 1991 that, due to the need for additional valuation allowances, Fidelity was out of compliance with the Capital Plan and that this warranted termination of Fidelity's insurance. However, Fidelity had already posted those valuation allowances and was ahead of all Capital Plan targets by September 1991, one month prior to the FDIC's report. (*See generally* PX 790; PX 785 at WON725 1403; Powderly, Tr. 513, line 6 to p. 514, line 13; Powderly, Tr. 516, line 19 to p. 517, line 13).

**From October 1991 Through September 1992, The FDIC Repeatedly Threatened To Cancel Fidelity's Deposit Insurance.**

597. Even though the FDIC was not Fidelity's primary regulator, the FDIC had the power to terminate Fidelity's deposit insurance, which would effectively put Fidelity out of business. (Powderly, Tr. 482, line 8 to p. 483, line 6).

598. In October 1991, the FDIC concluded that Fidelity was a high-risk institution that should be required to have capital well above regulatory minimums, and thus demanded an immediate capital infusion of $96 million to prevent termination of Fidelity's deposit insurance. (PX 790 at AST 097648).

599. At the time the FDIC reached this conclusion, Fidelity had actually been consistently reducing its risk level for years through investments in high-quality adjustable rate mortgage backed securities, which had virtually no credit risk and which also minimized interest rate risk because they could easily be sold on the market unlike loans. (Powderly, Tr. 379, lines 2-19; Powderly, Tr. 466 lines 15-23; Powderly, Tr. 470, lines 2- 23; *see generally* PX 686; Powderly, Tr. 492, line 8 to p. 493, line 8).

600. The OTS Report of Examination for the same 1991 examination period noted Fidelity's efforts to reduce risk through restructuring its balance sheet and reflected that Fidelity's risk profile "stems primarily from the institution's deficient capital position rather than the composition of its assets and liabilities." (PX 770 at AST002882-83 and AST002910; Powderly, Tr. 515, lines 18-24).

601. If Fidelity did have a problem of a high-risk profile, it would have been reflected in Fidelity's risk-based capital levels, but Fidelity had been successfully increasing its risk-based capital every quarter since FIRREA. (Powderly, Tr. 514, line 14 to p. 515, line 17).

602. The FDIC's Report of Examination as of June 11, 1991 was not presented to the Fidelity Board of Directors until October 16, 1991, and a formal copy was not provided to Fidelity until October 24, 1991. The Report of Examination included a recommendation from the FDIC's Assistant Regional Director, Daniel Dionne, to the FDIC's Washington Office, that a Section 8(a) formal enforcement action be commenced. On November 20, 1991, Fidelity wrote a very strong rebuttal in response to the report hoping that it could "clarify the facts and refocus the [FDIC's] conclusions to those more consistent with the true long term trends for the institution and … bring the FDIC's understanding closer to, and more consistent with, that of the [OTS]." Fidelity also committed to keeping the FDIC updated on the institution's progress so as to avoid any misunderstandings in the future. (PX 735 at AST001855; PX 798 at AST002105; Wesp, Tr. 1898, line 15 to p. 1899, line 19).

603. A copy of Fidelity's rebuttal was sent to the OTS because Fidelity wanted to make sure that its primary regulators were "in the loop all the time," particularly during this time period

when "the FDIC was lobbying to have Fidelity's] deposit insurance removed and [Mr. Vigna] was fighting that …." (Wesp, Tr. 1901, lines 10 – 22; PX 798 at AST097647).

604. On April 21, 1982, the FDIC sent a letter to Fidelity's Board of Directors in which it threatened to revoke Fidelity's deposit insurance. It noted, among other things, that it did not view retained earnings as "a reasonable means of recapitalizing the institution." (Vigna, Tr. 1475, line 9 to p. 1477, line 24; PX 866 at AST097644).

605. On May 22, 1992, Mr. Ketcha of the FDIC reported that its Director of Supervision, John Stone, had notified John Downey, OTS Deputy Director for Regional Operations, that it was recommending commencement of proceedings to revoke Fidelity's deposit insurance. (Vigna, Tr. 1478, line 6 to p. 1480, line 22; PX 877).

606. On June 2, 1992, Mr. Vigna wrote to Mr. Downey recommending that no supervisory action be taken against Fidelity. He noted that Fidelity had made good progress under the Capital Plan, had substantially improved its capital position, and had successfully dealt with its real estate problems. He felt that Fidelity should be allowed to continue under its Capital Plan, and he believed there was a "reasonable prospect" that they could achieve capital compliance. (Vigna, Tr. 1480, line 23 to p. 1482, line 18; *see generally* PX 881).

607. The FDIC continued to threaten as late as September 18, 1992 to cancel Fidelity's deposit insurance. (Vigna, Tr. 1484, line 7 to p. 1487, line 15; PX 912 at WON736 0004-05).

**The OTS And The FDIC Differed In Their Assessments Of Fidelity's Performance And Prospects.**

608. The OTS was generally supportive in Fidelity's dealings with the FDIC. On October 29, 1991, for example, Messrs. Wesp and Powderly met with representatives of the FDIC to discuss the June 1991 FDIC Exam Report findings. Representatives of the OTS, including

Mr. Amend, also were present at the meeting and their comments "added immeasurably to the credibility of Fidelity's comments regarding asset quality, earnings, etc." (PX 798 at AST002110; DX 641; Wesp, Tr. 1902, line 18 to p. 1903, line 25).

609. In the 1991 Examination Report, the OTS examiners note that Fidelity's level of problem assets remained high and that there was a continuing need to set up additional loss reserves in amounts higher than had been anticipated. However, the examiners also noted Fidelity's ability to generate core profitability that helped meet the goals of the Capital Plan. The OTS was happy with the way the Fidelity was being run by Messrs. Powderly and Wesp. Mr. Amend and Mr. Vigna thought that they were prudent managers and were doing the best they could with what they had to work with. They recognized that it was unrealistic to expect an institution to be managed to a Capital Plan with tight variances for five years. They recognized that there would be changes in circumstances, and they were willing to give Fidelity as much flexibility as possible to deal with those changes. (Amend, Tr. 4635, line 1 to p. 4637, line 11; PX 711 at AST 002882-83).

610. When the FDIC reviewed Fidelity's 1991 OTS Examination Report, it focused on the continuing high level of non-performing assets, the need for additional reserves, and the fact that some of Fidelity's income came from non-recurring sources. The FDIC always had doubts that Fidelity could succeed with its Capital Plan, and, in its view, things such as a need for additional valuation allowances or non-recurring income items "didn't fit nicely into the boxes that the Capital Plan had." (Amend, Tr. 4635, line 1 to p. 4637, line 11).

611. The FDIC tended to focus on the same problem areas at Fidelity as the OTS. However, the FDIC generally took a harsher position. The FDIC thought that the OTS was being too easy on Fidelity. (Amend, Tr. 4767, line 15 to p. 4770, line 24; *see generally* DX 1415).

612. Despite arriving at the same numbers as the OTS in their Reports of Examination, the FDIC was much more reluctant than the OTS to acknowledge any of Fidelity's progress under the Capital Plan. (Powderly, Tr. 471, line 25 to p. 475, line 16; Powderly, Tr. 478, line 9 to p. 479, line 8).

613. The FDIC refused to give Fidelity any credit for the fact that Fidelity's capital problems were caused by FIRREA's breach of the Suburbia-Fidelity merger contract. (Powderly, Tr. 521, lines 17-25; PX 795 at WON725 1392; PX 866 at AST097644).

614. Although Fidelity had made good progress in 1990, the FDIC continued to voice dissatisfaction with Fidelity's progress toward capital compliance. It asserted that Fidelity had failed to meet interim Capital Plan goals, an assertion that was contrary to Mr. Vigna's recollection. In a letter dated September 27, 1991, the FDIC said it was considering the possibility of "supervisory action" against Fidelity. (Vigna, Tr. 1462, line 6 to p. 1468, line 11; PX 687 and *see generally* PX 774).

615. The FDIC concluded in its 1989 Report of Examination that virtually all of the increase in Fidelity's classified assets since the OTS's 1987 examination were due to the FDIC's classification of CMO residuals. (PX 689 at AST001816). Whereas the FDIC classified CMO residuals as unacceptable assets, the OTS did not. (PX 795 at WON725 1396).

616. Despite the FDIC's belief that CMO residuals were unacceptable investments, Fidelity was making double-digit returns on its CMO residual portfolio, which did not suffer from market depreciation because they were intended to be held to maturity. (Powderly, Tr. 475, line 17 to p. 476, line 3; PX 703 at AA005 1638; PX 795 at WON725 1396).

617. The FDIC was generally not responsive to Fidelity's attempts to engage in a dialogue about the FDIC's conclusions in their Reports of Examination. (Powderly, Tr. 480, line 6 to p. 483, line 12).

618. In a letter sent to the FDIC in November 1991, Fidelity referenced a recent meeting with Mr. Dionne of the FDIC about the termination of Fidelity's insurance and suggested that future discussions with Mr. Dionne could open the way for a more frequent flow of information to the FDIC to avoid future misunderstandings. (PX 795 at WON725 1397). The FDIC did not respond to Fidelity's November 1991 letter until nearly five months later and did not mention the possibility of more frequent face-to-face meetings in the reply letter. (Powderly, Tr. 547, line 21 to p. 548, line 10; *see generally* PX 866).

619. Because the FDIC's response letter in April 1992 was generally still relying on outdated data from its last examination in March 1991, Fidelity sent a second reply letter to update the FDIC on recent progress. (PX 876 at WON736 1090).

620. Fidelity's management believed that Mr. Ketcha was already convinced by 1990 that Fidelity would not survive FIRREA. (Powderly, Tr. 471, line 17 to p. 473, line 10).

621. The FDIC Examination Reports consistently expressed the FDIC's doubts about Fidelity's viability and the FDIC's objections to Fidelity's continued operation. (PX 689 at AST001814 and AST001816; *see generally* PX 790).

**Regulators Criticized Fidelity For Interest Rate Risk, But The Criticism Was Based On A Faulty Model. Both Before And After FIRREA, Fidelity Actively Managed Its Investments To Reduce Interest Rate Risk and Credit Risk.**

622. Prior to FIRREA, regulators assessed interest-rate risk by conducting a gap analysis, which compared, over various time periods, how fast a thrift's interest-earning assets could adjust to changes in a thrift's interest-bearing liabilities. (Moran, Tr. 4898, line 2 to p. 4900, line 2).

623. After FIRREA, the OTS assessed interest-rate risk by measuring the potential change in a thrift's Market Value of Portfolio Equity ("MVPE") due to an instantaneous change in interest rates of one, two, three, and four percent. (Moran, Tr. 4885, lines 4-21; Moran, Tr. 4969, line 1 to p. 4970, line 9).

624. MVPE is calculated by subtracting the present value of the thrift's liabilities from the present value of the thrift's assets plus the present value of off-balance-sheet activity. (Moran, Tr. 4885, lines 4-21).

625. Regulators were not only concerned with the amount that a thrift's MVPE might change in response to various theoretical interest rate shocks, but also with a thrift's capacity to absorb the potential changes. (Moran, Tr. 4886, line 12 to p. 4887, line 8).

626. Since the late 1980s, the Federal Reserve has tended to change interest rates by small increments and never by 2, 3, or 4 % at one time. (Moran, Tr. 4953, line 18 to p. 4956, line 21).

627. Because instantaneous interest rate movements of one percent or higher are historically unprecedented, the scenarios produced by the OTS MVPE model were just stylized

scenarios that gave a general idea of risk sensitivity but did not serve as a predictor of actual interest rate risk. (Moran, Tr. 4952, line 18 to p. 4953, line 17).

628. The interest-rate risk assessments under the OTS MVPE model would generally improve as interest rates fell and generally get worse as interest rates rose. (DX 3361 at OAA010 1349; Moran, Tr. 4918, lines 15-23).

629. The OTS criticized its own model on the grounds that quarter-to-quarter volatility detracted from the model's reliability. (DX 2053 at WOL458 0430).

630. The OTS noted that both reporting errors by thrifts and the level of detail called for in the OTS reporting forms could cause the MVPE model to inaccurately record interest rate risk, particularly when thrifts owned mortgage derivatives, such as collateral mortgage obligations. (DX 2053; Moran, Tr. 4960, line 13 to p. 4963, line 21).

631. Under the MVPE model, any thrift operating with zero tangible capital would necessarily have an unacceptable level of interest-rate risk even when the thrift was maintaining only the minimum level of risk required to generate earnings as called for in its approved Capital Plan. (PX 787 at AST002756).

632. In its 1992 OTS Examination Report, Fidelity was criticized by the examiner for excess interest rate risk. This criticism was based solely on an internal analysis, the MVPE Analysis, performed by OTS. (Vigna, Tr. 2839, line 9 to p. 2841, line 10; PX 711 at AST002883).

633. On February 12, 1992, however, Neal Moran, the Capital Markets Manager for the OTS Northeast Region, sent a Memorandum to Angelo Vigna, Regional Director, in which he criticized the MVPE Analysis for producing false positives in 8 of 14 institutions in the

Northeast region found to have "excessive" interest rate exposure. Fidelity was not one of the 14 institutions identified as having excessive interest rate exposure. Mr. Moran went on to note that the MVPE Analysis was still being refined and that currently "problems with reliability inhibit its effectiveness." (Vigna, Tr. 2842, line 6 to p. 2843, line 23; *see generally* DX 2053). Because the OTS MVPE risk model measured both a thrift's sensitivity to interest rate changes and its ability to avoid losses due to those changes, the model did not produce accurate results when a thrift had negative tangible capital, such as thrifts like Fidelity that assumed the excess liabilities of another thrift in a supervisory merger. (PX 787 at AST002756; Powderly, Tr. 983, line 11 to p. 985, line 24).

634. MVPE Analysis reliability was a particular concern with institutions that were capital deficient. They would show positive in the analysis because of their capital deficiency and not because there was a significant mismatch between their assets and liabilities. Mr. Vigna shared Mr. Moran's assessment that there were problems with the reliability of the MVPE Analysis. (Vigna, Tr. 2843, line 14 to p. 2844 line 10; DX 2053).

635. Since 1987, Fidelity was taking steps to reduce its credit risk to virtually zero by switching its assets from commercial real estate to residential mortgages and mortgage-backed securities. (Powderly, Tr. 379, lines 2-19; Powderly, Tr. 492, line 8 to p. 493, line 8).

636. By switching to adjustable rate mortgage backed securities, Fidelity was also able to reduce its interest rate risk. (PX 618 at AST001646; Powderly, Tr. 437, line 6 to p. 438, line 4; PX 770 at AST002887; Powderly, Tr. 769, lines 7-11).

637. Fidelity continued to reduce its credit and interest rate risk throughout 1990, the first year of the Capital Plan, by investing over 50% of assets in liquid and marketable adjustable rate mortgage backed securities of short duration. (Powderly, Tr. 466 lines 19-23; Powderly, Tr. 470, lines 2- 23; PX 686).

638. Unlike mortgage loans, mortgage backed securities could quickly and easily be sold if Fidelity believed that the market was not in its favor. (Powderly, Tr. 470, lines 2-18).

639. Regulators in 1991 recognized that Fidelity's interest rate risk "stems primarily from the institution's deficient capital position rather than the composition of its assets and liabilities." (PX 770 at AST002883).

640. Regulators noted in 1991 that Fidelity's projected change in MVPE as a percentage of assets was well below national averages, but that due to Fidelity's lack of capital, Fidelity's change in MVPE as a percentage of its already low MVPE was significantly high. Regulators thus stated that Fidelity's interest rate risk stems primarily from its lack of capital "rather than the composition of its assets and liabilities" and "the institutions; level of interest rate sensitivity would be considered acceptable for a well-capitalized institution." (PX 753 at WON743 1491; Moran, Tr. 4885, line 22 to p. 4887, line 8; Moran, Tr. 4889, line 23 to p. 4890, line 5; PX 770 at AST002883, AST002908-10; Moran, Tr. 4966, line 24 to p. 4968, line 21).

641. Regulators also noted in 1991 that Fidelity's one-year and three-year gap ratios indicated that Fidelity's short-term earnings will not be severely affected by a rise in interest rates. (PX 753 at WON743 1491; PX 770 at AST002909).

642. Whereas most thrifts employed a third-party risk assessment to temper the regulators' analysis, Fidelity employed a model designed by Salomon Brothers in 1991 that was even

less favorable in assessing Fidelity's level of risk. (Moran, Tr. 4891, line 5 to p. 4893, line 4)

643. In 1992, regulators concluded that Fidelity's interest-rate risk, as measured by the MVPE model, was greatly improved due to the fact that Fidelity raised its capital levels, stating, "the improving capital level and an increased investment in adjustable-rate mortgages, ARMs, has lowered the effect of the projected changes on MVPE" and "Fidelity's interest rate risk exposure continues to be based primarily on its low capital position rather than on the composition of its assets and liabilities." (PX 851 at OAA002 0016; Moran, Tr. 4971, line 21 to p. 4973, line 10). In 1992, the OTS concluded that "Fidelity's levels of interest rate risk and liquidity indicate no areas of supervisory concern." (PX 851 at OAA002 0005).

644. Regulators also noted in 1992 that Fidelity's one-year and three-year gap ratios indicated that Fidelity's short-term earnings will not be severely affected by a change in interest rates. (PX 851 at OAA002 0016).

645. Again in 1993, regulators attributed Fidelity's improved interest-rate risk to be based on Fidelity's increased level of equity capital and found that Fidelity's interest-rate sensitivity remained very low, ranking Fidelity among the best performers nationwide. (PX 1020 at AST062718).

646. In 1993, the OTS concluded that "the bank's interest rate risk exposure is minimal," and that Fidelity's overall interest rate risk had improved because of Fidelity's increased level of equity capital. (PX 1020 at AST062707 and AST062718).

647. Despite a low interest rate sensitivity that "ranks among the best performers according to OTS national statistics," regulators were still concerned in 1993 about Fidelity's ability to absorb interest rate shocks, but expected this to improve after Fidelity's conversion to stock form. (PX 1020 at AST062718-19).

648. Fidelity's capital was sufficiently high in 1994 to exclude the need for a calculation of the newly effective interest rate risk component of capital. (PX 1065 at OAA002 1278).

**Fidelity's Rating Post-FIRREA**

649. Thrift examiners rated institutions using initially the MACRO and later the CAMEL systems. Both measure essentially the same factors: management, asset quality, capital adequacy, risk management and liquidity, and operational results or earnings. Ratings are assigned by the Examiner to each of these factors, and there is also an overall or composite rating. Ratings are assigned on a scale of 1 to 5, with "1" being the highest rating and indicating no cause for supervisory concern and "5" being the lowest rating and indicating that regulators are concerned about the institution's imminent failure. (Amend, Tr. 4225, line 11 to p. 4226, line 14).

650. The field examiner and manager exercise significant judgment in determining the composite rating from the component ratings. (Albanese, Tr. 4164, line 17 to p. 4165, line 14).

651. In Mr. Albanese's view, management is the most important component of a composite rating. Liquidity and interest rate risk management are the least important. Asset quality, capital, and operating results are equally important. (Albanese, Tr. 4165, lines 15-25).

652. Examiners routinely throughout the course of an examination discuss their findings with the institution's senior management and often with individuals responsible for operational areas within the institution. It has always been the practice to hold an exit meeting with the institution's senior management. It somewhat later became the practice to hold a meeting with the institution's Board of Directors after the Examination Report was issued. (Amend, Tr. 4226, line 15 to p. 4227, line 14).

653. The change in Fidelity's Capital rating from "2" in its 1987 examination to a "5" in its 1989 examination was entirely due to FIRREA. Fidelity was deficient in all three of the new capital standards, and that is why it was rated a "5" on Capital. (Amend, Tr. 4613, lines 3-13; Tr. 4740, line 3 to p. 4741, line 3).

654. Although Fidelity's operating income during the 1989 exam period was negatively impacted by the change from regulatory to GAAP accounting, and increased valuation allowance methodologies that were applied to Fidelity's commercial real estate portfolio, Fidelity's current core business of investing in mortgage-backed securities was operating fine. (Powderly, Tr. 449, line 24 to p. 453, line 2; PX 618 at AST001655-57; PX 509 at AST001987-89).

655. Fidelity received a composite rating of "5" for the April 1991 OTS Report of Examination. (PX 770 at AST002886). Fidelity had positive earnings in the amount of $1,425,000 during the 1991 examination period. (PX 770 at AST002882). Fidelity's earnings included $6.8 million of asset sales. Without these expenses and accelerated goodwill amortization in the amount of $14 million, Fidelity's core earnings would have

been much higher. (PX 770 at AST002882 and AST002912; Powderly, Tr. 498, line 3 to p. 500, line 2).

656. The OTS examiners concluded in the April 1991 Report of Examination that Fidelity had the "ability to generate sufficient core profitability to amortize goodwill and enhance regulatory capital." (PX 770 at AST002882).

657. The OTS examiners noted that Fidelity failed all three capital requirements as of June 30, 1991 and that, because of the need for additional valuation allowances, Fidelity was out of compliance with the Capital Plan at the time of the 1991 Report of Examination. (PX 770 at AST002890 and AST002907).

658. In its 1992 OTS examination Fidelity was rated a "4" even though the capital component of its rating was still a "5." If Fidelity's capital rating had been a "2" (as it was in Fidelity's last pre-FIRREA examination), its overall rating in the 1992 examination would have been a "3" instead of a "4." (Amend, Tr. 4738, line 7 to p. 4742, line 14; DX 1448 at WON732 0834).

659. Fidelity's management expected to receive a higher rating given its ability to control the real estate problems at the time but believed that the "4" rating was given because Fidelity was still capital deficient under the regulations. (Powderly, Tr. 562, line 4 to p. 563, line 18).

660. The OTS defined a "4" composite rating as applying to institutions that generally have an inadequate level of capital. (PX 851 at OAA002 0006). Thrifts that would typically receive a "4" composite rating were those institutions that had positive net worth but did not meet the required minimal capital requirements. (PX 851 at OAA002 0006).

**Fidelity's Composite Examination Rating Was Determined By Its Level Of Capital.**

661. Fidelity received a composite rating of "3" in both the OTS and FDIC's 1993 Reports of Examination. (PX 1020 at AST062707; PX 995 at WON738 0675). The FDIC and OTS defined a "3" composite rating similarly as applying to institutions that are only nominally resistant to the onset of adverse business conditions. (PX 1020 at AST062707).

662. As in the prior examinations, regulators remained critical of Fidelity's level of non-earning assets and Fidelity's insufficient loan loss allowances, requiring Fidelity to post an additional $3.7 million of specific and $4.9 million of general valuation allowances. (PX 1020 at AST062707 -708; PX 995 at WON738 0674).

663. Fidelity received a composite rating of "2" in 1994 despite the OTS examiner's findings that Fidelity was required to post an additional $5.9 million of general and $6.1 million of specific reserves. (PX 1065 at OAA002 1275-76).

664. In 1994, bank examiners noted with approval Fidelity's dramatic increase in capital ratios. (PX 1065 at OAA002 1278).

**Regulators' Overall Assessments Of Thrifts With Asset Quality Problems Were Strongly Influenced By The Thrift's Level Of Capital. Astoria Federal Savings And Loan Association, For Example, Received Satisfactory Composite Ratings Despite Having Asset Quality Problems Similar To Fidelity's.**

665. The FDIC noted in Astoria's 1989 Report of Examination that "[t]he volume of problem assets is disturbing but the likelihood of failure is remote due to the substantial level of tangible capital." (Finn, Tr. 402, line 14 to p. 4023, line 6; DX 3031 at FAA009 0025). The FDIC criticized Astoria in 1989 for "weak and inadequate" loan monitoring and underwriting standards. (Finn, Tr. 4025, lines 12-24; DX 3031 at FAA009 0026).

666. Astoria's management also was criticized in 1989 by the FDIC for being reluctant to recognize asset problems and unwilling to take corrective actions. (Finn, Tr. 4044, lines 5-22; DX 3031 at FAA009 0025). Regulators, however, also noted that "Astoria's current capital cushion is strong." (Finn, Tr. 4023, lines 13-18; DX 3031 at FAA009 0025).

667. Ultimately, despite its asset quality and underwriting problems, Astoria was given a composite rating of 3 and would have received a better rating if not for its management's perceived refusal to acknowledge these problems. "Although the association is well-capitalized and has satisfactory earnings, Astoria is accorded a composite rating of 3. In assigning this rating, emphasis is placed on the management factor, in particular Mr. Engelke, the CEO, who is unwilling to recognize asset quality problems and is not receptive to many comments and recommendations for improvements." (DX 3031 at FAA009 0030; Finn Tr. 4047, lines 7-15).

668. Astoria's asset quality deteriorated significantly in 1991, resulting in classified assets representing 5.93% of all assets and 87% of total capital, which Mr. Finn viewed as a significant amount. (Finn, Tr. 4028, lines 2-7; DX 3034 at FAA009 0003).

669. These asset quality problems caused Astoria to post significantly large loan loss provisions, which resulted in a net operating loss of $5.1 million in 1990 and the regulators' prediction that further net losses would be sustained in 1991. (DX 3034 at FAA009 0002).

670. Despite posting such large loan loss reserves, regulators found these reserves to be inadequate by $12.7 million dollars. (DX 3034 at FAA009 0002). Nonetheless,

regulators also found Astoria's capital to be well above minimum regulatory requirements (DX 3034 at FAA009 0002). Consequently, Astoria received a composite rating of 3 for the 1991 examination. (Finn, Tr. 4029, lines 10-19; DX 3034 at FAA009 0006).

671. In 1992, while regulators noted Astoria's progress in reducing classified assets, regulators were still concerned about Astoria's overall volume of adverse classifications and non-performing assets. (Finn, Tr. 4031, lines 2-14; DX 3332 at FAA008 1524).

672. Regulators also criticized Astoria in 1992 for Astoria's marginally acceptable earnings, deficient appraisals, and failure to keep adequate loan loss reserves, which the regulators believed to be underfunded by $17 million. (Finn, Tr. 4031, line 22 to p. 4032, line 7; DX 3332 at FAA008 1524-1525).

673. Because of these criticisms, the FDIC was inclined to give Astoria a composite rating of 3, but Astoria's management convinced regulators to change the rating to 2 by presenting financial information showing that Astoria was "insulated to a great extent to all but the most severe adverse business conditions" in significant part by virtue of its excess capital. (Finn, Tr. 4033, line 12 to p. 4034, line 17; DX 3332 at FAA008 1526).

**Fidelity Was Committed To Keeping OTS Informed.**

674. Mr. Powderly both reported to in writing and met personally with OTS District Director Vigna on a quarterly basis to report Fidelity's progress under the Capital Plan. (Powderly, Tr. 406, line 2 to p. 407, line 21; Powderly, Tr. 460, lines 14-17; Powderly, Tr. 463; lines 10-22).

675. In quarterly reports, Mr. Powderly noted Fidelity's progress against the Capital Plan's interim targets, and showed any variances from the targets. (Powderly, Tr. 457, line 19 to p. 460, line 17; *see generally* DX 2035; PX 671, PX 725).

676. Mr. Powderly believed that Mr. Amend, the OTS examiner assigned to Fidelity, was amenable to discussions about potential problems. (Powderly, Tr. 484, line 25 to p. 485, line 16).

677. Mr. Powderly made sure that Fidelity responded to any regulatory criticism to make sure that there were no misunderstandings between Fidelity and the regulators. (Powderly, Tr. 501, line 16 to p. 502, line 8; Powderly, Tr. 505, line 6 to p. 507, line 8).

**Messrs. Vigna and Amend Were Very Complimentary Of Fidelity's Management Under Messrs. Wesp and Powderly.**

678. Mr. Albanese generally approved of how Mr. Powderly and Mr. Wesp ran Fidelity because they moved away from taking credit risk, which was a significant regulatory concern. (Albanese, Tr. 4213, lines 6-16).

679. Mr. Vigna had a favorable opinion of Mr. Powderly. He found him to be extremely knowledgeable, with a strong personality. He had considerable commercial real estate workout experience, which became important to Fidelity. He was "a hard worker, tenacious in terms of doing what was in the best interest of the institution." (Vigna, Tr. 1443, lines 15-21).

680. Mr. Powderly replaced Mr. Lovely as Chairman of Fidelity's Board of Directors on September 23, 1993. (PX 1038; Powderly, Tr. 635, line 22-25).

681. Mr. Vigna also had a high regard for Mr. Wesp. He thought him a "very, very sound portfolio manager" with an ability to squeeze earnings out of Fidelity's securities

portfolio without taking undue risk. This was very important to Fidelity at the time, since it needed to squeeze every possible ounce of earnings from its balance sheet. Mr. Wesp also worked with Mr. Powderly to find ways to reduce expenses. (Vigna, Tr. 1454, line 4 to p. 1455, line 2).

682. Mr. Amend considered Mr. Wesp to be "a very knowledgeable CFO, maybe the most knowledgeable CFO I had come across." The on-site examiners seemed to have a lot of respect for him. He had to come up with a lot of income for Fidelity, and he managed to do that. Mr. Wesp helped Fidelity "dramatically." Mr. Amend learned a lot from Mr. Wesp. (Amend, Tr. 4621, line 24 to p. 4622, line 21).

683. On April 5, 1991, Mr. Powderly sent a letter to Mr. Amend summarizing Fidelity's performance to date under the Capital Plan. Mr. Amend was glad to get this letter. This was a period of time when the FDIC was very critical of Fidelity and very skeptical of its ability to implement the Capital Plan. However, Mr. Amend thought Messrs. Powderly and Wesp were doing as good a job as they could do. They were working through the problems that had surfaced in the 1986-1988 timeframe, and they were markedly improving the health of Fidelity as an institution. (Amend, Tr. 4631, line 13 to p. 4632, line 14; *see generally* PX 716).

684. Mr. Amend thought that "it was a watershed mark in the history of Fidelity when Tom Powderly and Bill Wesp arrived." They were able to turn the bank around, and they "did everybody a big favor by saving the bank. "They did a good job, [a] very good job." (Amend, Tr. 4708, line 11 to p. 4711, line 17).

## C. FIDELITY SUCCEEDED WITH ITS CAPITAL PLAN, WHILE MANY OF ITS PEERS FAILED.

685. Mr. Vigna's overall impression of Fidelity's management and the job it did working through Fidelity's problems under the Capital Plan was that they "did an outstanding job." He noted that Fidelity could simply have been transferred to the RTC "and they could have liquidated it probably at a cost in the hundreds of millions of dollars." He believed the hard work of Fidelity's management, "led by Tom Powderly and Bill Wesp," and the support and oversight of OTS "resulted in a substantial savings to the American taxpayer." He thought that in the history of savings and loans in that era, where "a lot of taxpayer money was spent for the insolvent institutions . . . [t]his was a great success story." (Vigna, Tr. 1500, line 10 to p. 1501, line 2). If Fidelity had failed after FIRREA, that taxpayers would have been responsible for the loss. (Albanese, Tr. 4219, lines 6-14).

686. On November 17, 1992, William Wesp wrote to Mr. Vigna informing him that Fidelity planned to convert to stock form. In that regard, he asked Mr. Vigna to approve contracts with four outside advisers who were being retained to assist in the conversion and public offering of Fidelity's stock. Mr. Vigna approved the contracts and was supportive of Fidelity's efforts to convert and do a public offering. He believed they had reached the stage in their performance under the Capital Plan where this was a realistic step to take. (Vigna, Tr. 1488, line 13 to p. 1491, line 8; *see generally* PX 927 and PX932).

687. On March 15, 1993, the OTS informed Fidelity that, upon successful completion of its planned recapitalization, the Capital Plan will cease. (Vigna, Tr. 1496, line 23 to p. 1497, line 14; PX 974).

688. On March 23, 1993, Mr. Vigna notified the Corporate and Securities Division of OTS that he recommended approval of Fidelity's plan of conversion. (Vigna, Tr. 1497, line 15 to p. 1498, line 13; PX 1018).

689. On May 3, 1993 Mr. Powderly wrote to Mr. Vigna to tell him that Fidelity's stock offering had closed that day. He reported that Fidelity sold 5,170,839 shares of stock at $11.50 per share. He reported that Fidelity anticipated net proceeds from the sale of about $57 million which would complete Fidelity's recapitalization. He requested that the Capital Plan be terminated and its restrictions removed. (Vigna, Tr. 1498, line 20 to p. 1499, line 8; PX 1012).

690. On May 14, 1993, Mr. Vigna notified Fidelity that, due to its successful recapitalization, the Capital Plan and all related operating restrictions were terminated. (Vigna, Tr. 1500, lines 3-9; PX 1015).

691. Fidelity succeed in issuing stock in contrast to the many other institutions that failed after FIRREA. (Albanese, Tr. 4217, line 10 to p. 4218, line 7).

## D. FIDELITY HAD TO INCREASE ITS PACE OF GOODWILL AMORTIZATION SIGNIFICANTLY IN ORDER TO ACHIEVE THE CAPITAL TARGETS IN FIDELITY'S CAPITAL PLAN.

692. Even though Fidelity's goodwill could no longer be counted towards capital, it remained on Fidelity's books and Fidelity had to take an amortization expense for the goodwill each quarter. (Powderly, Tr. 394, line 15 to p. 395, line 25; Powderly, Tr. 416, lines 16 – 21; Teurfs, Tr. 1033, lines 19-25; Teurfs, Tr. 1138, lines 1-8).

693. A key component of Fidelity's Capital Plan was to amortize goodwill at an accelerated pace to aggressively decrease Fidelity's intangible assets and thereby increase capital as a

proportion of total assets. (DX 78 at AST0705437 and AST0705445; Powderly, Tr. 414, line 16 to p. 417, line 8; PX 770 at AST002890; Powderly, Tr. 502, line 25 to p. 503, line 13).

694. Whereas Fidelity had been reducing goodwill steadily in small amounts prior to its anticipation of FIRREA, Fidelity radically increased the pace of amortization starting in 1989 in an attempt to increase tangible capital levels. (PX 795 at WON 725 1399; PX 876 at WON736 1089).

695. The accelerated pace of goodwill amortization had a significant negative impact on Fidelity's earnings. (PX 770 at AST0002882 and AST002912; Powderly, Tr. 499, line 7 to p. 500, line 2; PX 716 at WON743 0043; Powderly, Tr. 553, line 7 to p. 554, line 7). Fidelity had to make sufficient earnings to absorb the cost of amortizing its goodwill to avoid any further deterioration of capital. (Powderly, Tr. 394, line 15 to p. 395, line 25; Teurfs, Tr. 1034, lines 3-6).

696. Whereas Fidelity's goodwill was valuable prior to FIRREA when it could be counted towards capital, the goodwill was useless to Fidelity after FIRREA. (Powderly, Tr. 416, lines 2-15).

697. Between March 1986 and the third quarter of 1991, Fidelity had reduced goodwill by more than $100 million from $170 million in 1986 to less than $70 million in 1991. (PX 795 at WON725 1399; Powderly, Tr. 524, lines 8-23).

698. Fidelity reduced goodwill by $11,750,000 in 1990 by taking that amount as an expense against earnings. (Powderly, Tr. 464, line 2 to p. 465, line 7; PX 686 at WON737 0660).

699. By April 1991, Fidelity's goodwill had been reduced by over $14,000,000 since FIRREA. (PX 716 at WON743 0042).

700. In 1991 and 1992, Fidelity's pace of goodwill amortization was approximately $8 million a year, a pace which would have significantly increased tangible capital even if Fidelity had no retained earnings. (PX 795 at WON725 1393; Powderly, Tr. 522, line 24 to p. 523, line 10; Powderly, Tr. 543, lines 2-8; PX 852 at AST098029).

701. Fidelity wrote off another $39.4 million of goodwill in September 1992, based on the advice of Fidelity's accountants in interpreting a new accounting standard. (PX 1020 at AST062721).

702. As of April 1993, Fidelity had written down its supervisory goodwill to only $13.5 million. (PX 1020 at AST062721).

**E. MR. POWDERLY'S MANAGEMENT OF FIDELITY'S TROUBLED REAL ESTATE LOANS AFTER FIRREA WOULD HAVE BEEN MUCH MORE EFFECTIVE IF FIDELITY STILL HAD A CAPITAL CUSHION.**

703. After FIRREA, Fidelity did not have enough capital to allow it to develop Fidelity's real estate owned. (Powderly, Tr. 352, lines 14-22).

704. Mr. Vigna acknowledged that institutions with excess capital are better able to manage troubled real estate assets than institutions with just adequate or inadequate capital. With more capital, the troubled loan has a lesser impact. The excess capital will help to absorb losses. Also, institutions with excess capital sometimes chose just to write the loan off its books by taking a charge to its capital. When it does that, the loan is no longer a matter of regulatory concern. This also allows the institution to hold onto real estate or other collateral taken for the loan and sell it at a later date on terms that might be more

favorable than terms available in the present market. (Vigna, Tr. 2827, line 25 to p. 2830, line 7).

705. The purpose of capital in a thrift organization is to assimilate shocks in the operation of the business, in the event that there is a time when revenues fall short of costs. It is a defense against the risks of an organization. (Pratt, Tr. 65, lines 13-21). The capital of an institution absorbs losses and creates a buffer between assets and liabilities. An institution's losses are absorbed by capital. (Beesley, Tr. 1154, lines 11-20). Capital helps to minimize the loss on a non-performing loan by giving the thrift the flexibility to hold on to the collateral longer and avoid a distress sale. (Finn, Tr. 4022, line 24 to p. 4023, line 6).

706. An institution that has capital in excess of regulatory requirements has the ability to use that excess capital to more aggressively manage its asset quality profile. It can use the capital to work the assets in a different fashion or to write them off in a different time frame. (Kaplan, Tr. 3775, line 13 to p. 3776, line 5).

707. Had Fidelity had the capital that was taken away by FIRREA, it could, as Mr. Powderly suggested, have reduced its problem assets to a level that would have earned it a "3" in its MACRO rating in the years in which it in fact received a "4." (Kaplan, Tr. 3776, line 6 to p. 3777, line 15).

708. Thrifts with a substantial level of capital can better weather a downturn in the market and wait for property values to revive. (Finn, Tr. 4025, lines 5-11; Finn, Tr. 4034, line 8). Capital provides a thrift with more of a cushion to absorb losses on loans because the thrift is better able to put up additional reserves to cover the loss. (Finn, Tr. 4022, lines

20-23). Additional capital would have helped Fidelity when its loans were going bad. (Albanese, Tr. 4213, lines 2-5).

709. An institution with sufficient capital has a greater opportunity to absorb losses and write bad loans off the books. (Albanese, Tr. 4205, line 13 to p. 4206, line 23). A thrift could take possession of a piece of real estate securing a non-performing loan through foreclosure, and if the real estate could not be sold in the current market at an acceptable price, a thrift could attempt to hold on to the property until the market rebounded. (Powderly, Tr. 346, lines 14-20; Powderly, Tr. 349, lines 5-13; Powderly, Tr. 352, line 23 to p. 353, line 5).

710. Real estate owned by thrifts would be subject to periodical appraisals by regulators, who typically assessed the value of the property significantly lower than the thrift. (Powderly, Tr. 349, line 14 to p. 350, line 4; Powderly, Tr. 383, line 25 to p. 384, line 17).

711. If regulators assess a thrift's real estate values lower than the thrift, the regulators ask the thrift to take a write-down, which is an expense that the thrift must take against income and against the thrift's capital levels. (Powderly, Tr. 349, line 14 to p. 351, line 2; Powderly, Tr. 384, lines 18-24).

712. The effect of a write-down on income and capital can be devastating to a thrift's viability. (Powderly, Tr. 350, lines 13-17). Write-downs were particularly difficult for Fidelity because it did not have sufficient capital. (Powderly, Tr. 349, line 23 to p. 350, line 12).

713. When a thrift cannot afford a write-down on real estate owned, the thrift's only option is to sell the property, which will likely be for a loss. (Powderly, Tr. 351, lines 3-24).

714. In addition to write-downs of the value of real estate owned, thrifts must set aside cash for both general and specific valuation allowances to cover potential losses on active loans. (Powderly, Tr. 387, line 13 to p. 389, line 6). Like write-downs on real estate owned, regulators typically calculated the required valuation allowances higher than did the thrifts. (Powderly, Tr. 401, line 16 to p. 402, line 5).

715. The effect of increasing a valuation allowance is that earnings and capital are reduced, because a thrift must come up with cash from earnings and then set it aside for the allowance. (Powderly, Tr. 388, line 1 to p. 389, line 6; Powderly, Tr. 554, lines 12-20).

716. Although regulators always had the power to insist on a write-down of a loan or real estate owned, after FIRREA eliminated Fidelity's capital, regulators became more aggressive in calculating the amount of write-downs Fidelity was required to make, and because Fidelity was allowed to continue operating in a deficient capital position only at the blessing of the regulators, Fidelity was in no position to dispute the write-downs. (Powderly, Tr. 805, line 1 to p. 806, line 8; Powderly, Tr. 812, line 19 to p. 813, line 20; Powderly, Tr. 973, line 9 to p. 974, line 10).

717. In 1990, the Office of Thrift Supervision ("OTS") required Fidelity to increase valuation allowances by $10,062,000. (PX 509 at AST001967; Powderly, Tr. 475, lines 1-12; PX 733 at AST 002761).

718. Because Fidelity was without a capital cushion after FIRREA, Fidelity had a limited ability to cover the regulator's required valuation allowances, and thus sold securities or other income-producing assets to generate the necessary cash. (Powderly, Tr. 400, line 10 to p. 402, line 5; PX 733 at AST002763; Powderly, Tr. 489, line 21 to p. 491, line 15;

Powderly, Tr. 474, lines 13-20; Powderly, Tr. 554, line 21 to p. 556, line 1; Powderly, Tr. 813, lines 7-20).

719. The OTS again asked Fidelity to increase its valuation allowances in June of 1991, this time by $9.6 million. (DX 1427 at WON732 1530; PX 770 at AST002882).

720. Fidelity was able to meet all of the regulators' requested write-downs even without its regulatory capital and despite the regulator's more aggressive write-down requests, which indicates that Fidelity would have only been more successful absent FIRREA's effect on Fidelity's capital. (Powderly, Tr. 795, lines 4-14).

## F. FIDELITY CONVERTED TO A STOCK INSTITUTION THROUGH AN INITIAL PUBLIC OFFERING IN MAY 1993, AND ITS SUBSEQUENT MERGER WITH ASTORIA OCCURRED IN JANUARY 1995.

### Many Thrifts Were Converting From Mutual To Stock Institutions In The Early 1990s.

721. The primary reason that thrifts convert to stock form is to raise capital. (Powderly, Tr. 585, line 20 to p. 586, line 2; PX 915 at WON736 0572).

722. Thrift stock conversions increased dramatically in 1992, doubling in number from the prior year. (PX915 at WON736 0571). Thrifts at that time were benefiting from the high level of interest in the market, receiving large increases in capital and high offering multiples. (PX 915 at WON736 0571-72; Kaplan, Tr. 3026, line 20 to p. 3028, line 7; PDX 58). A strong market for thrift stock conversions existed in between 1990 and 1992, because investors who subscribed in the initial public offering were benefiting from median aftermarket stock price increases as high as 127.5%. (Powderly, Tr. 582, line 12 to p. 583, line 20; PX 915 at WON736 0571-72). Stock conversions were

performing increasingly well into 1992, with only four of thirty-one offerings in 1992 receiving less than a full subscription. (Powderly, Tr. 586, line 20 to p. 587, line 7).

723. According to a December 1992 Salomon Brothers presentation to Fidelity, thrift mutual-to-stock conversion activity had increased dramatically over the previous several months, raising $802.1 million of equity capital for the industry in 1992 and providing to conversion stock investors an average market return of 60.8%. Since the beginning of 1991, 36 thrifts had converted to public ownership, representing the highest level of conversion activity in five years and more than twice the number of conversions in all of 1991. (Joint Stipulation of Facts, April 2, 2007, ¶ 100).

724. According to a December 1992 Salomon Brothers presentation to Fidelity, after issuance, the stock of converting institutions tended to outperform the market. The stocks of a selected group of thrifts with initial conversion stock offerings of at least $25 million achieved approximately 35% appreciation since the beginning of 1992, in contract to the S+P 500, the Dow Jones Industrial Average, and the Salomon Brothers Thrift Index, each of which increased by approximately 3% to 4% over the same time period. (Joint Stipulation of Facts, April 2, 2007, ¶ 101).

725. Nearly all of the thrifts that had converted between1990 and 1992 were well capitalized because, unlike Fidelity, they had not assumed the liabilities of a failing thrift prior to FIRREA. (Powderly, Tr. 582, line 12 to p.585, line 19; PX 915 at WON736 0574).

726. Fidelity was worried that because of the restrictions of the ongoing Capital Plan, the FDIC's continued threat to pull Fidelity's deposit insurance, and the corresponding caveats that Fidelity would have to place in its subscription offering circular, Fidelity

would not achieve a full subscription for its offered shares. (Powderly, Tr. 587, lines 4-16; PX 986 at AST064183-85).

727. Fidelity's management believed that it could have asked for two to three times the price it eventually offered in the stock sale if Fidelity was not under the restrictions of the Capital Plan and did not face the possibility of termination of deposit insurance. (Powderly, Tr. 646, line 24 to p. 647, line 15).

728. Because of the increased pace of conversions in the marketplace in 1992, Fidelity was concerned about the possibility that the market would be oversaturated by the time that Fidelity was finally in a position to convert. (PX915 at WON736 0573; Powderly, Tr. 592, line 3 to p. 593, line 3).

729. Fidelity had a valuation conducted by Kaplan & Associates to determine the range for Fidelity's offering price, which was calculated at \$8.50 as a minimum price to \$11.50 as a maximum price. (Powderly, Tr. 603, line 9 to p. 604, line 9; PX 986 at AST064170). Within the range calculated by Kaplan & Associates, the FDIC determined the final offering price. (Powderly, Tr. 604, lines 10- 24).

730. Despite the FDIC's negative assessments of Fidelity, the FDIC wanted Fidelity's stock offering to be priced higher than did Fidelity because the FDIC wanted Fidelity to raise extra capital. (Powderly, Tr. 588, line 9 to p. 589, line 1; Powderly, Tr. 605, line 1 to p. 607, line 19). Fidelity was concerned that the FDIC's preferred price was too high and would cause Fidelity's offering to be undersubscribed. (Powderly, Tr. 589, lines 2 – 10; Powderly, Tr. 605, lines 1-6). An under subscription would not only affect Fidelity's potential capital levels, but also its reputation going forward. (Powderly, Tr. 605, line 19

to p. 606, line 13). Fidelity was so concerned about the FDIC's price, that Fidelity threatened to postpone its conversion plans if the FDIC chose a price outside of the range calculated by Kaplan & Associates. (Powderly, Tr. 605, lines 1-18).

731. Because Fidelity was concerned about being undersubscribed, Fidelity paid investment bankers, Salomon Brothers and Merrill Lynch, to be available to underwrite the offering should there be insufficient interest from Fidelity's depositors to purchase the shares. (Powderly, Tr. 589, line 2 to p. 590, line 19).

732. Fidelity had considered converting from mutual to stock form as early as 1986, and had discussed the subject with investment bankers. The conclusion reached was that it was not feasible for Fidelity to convert at that time for a variety of market-related reasons. (Kaplan, Tr. 3026, line 4 to p. 3027, line 8). Fidelity had been seeking to convert to stock form as early as 1987, but could not because of its deficient tangible capital level caused by the supervisory mergers. (Powderly, Tr. 413, line 15 to p. 414, line 2).

733. Management believed that a stock conversion was possible when Fidelity had positive tangible capital, but that a capital infusion either from conversion to stock form or an individual investor was not possible prior to becoming well-capitalized at a level of at least five percent. (Powderly, Tr. 418, line 6 to p. 419, line 1; DX 78 at AST0705446 and AST0705448).

734. Fidelity's management did not detail its plan for a stock conversion in its Capital Plan because they did not believe that the regulators would approve a Capital Plan that was contingent on a stock conversion to reach full capital compliance. (Powderly, Tr. 412, line 25 to p. 413, line 9).

735. After FIRREA, Fidelity's Capital Plan forecasted full capital compliance by the end of 1994 through the retention of earnings and amortization of goodwill, but Mr. Powderly expected that Fidelity would achieve capital compliance earlier by reaching a capital level that would allow the company to convert to stock form and thereby obtain a capital infusion that would put Fidelity in full capital compliance. (DX 78 at AST0705437; Powderly, Tr. 412, line 2 to p. 414, line 15; Powderly, Tr. 420, line 25 to p. 421, line 6; DX 78 at AST0705446).

736. During the time that Fidelity was operating under the Capital Plan, there was an understanding within the organization, and it was implicit in their conversations with the OTS, that once the institution had positive tangible capital of some amount and the marketplace was receptive to thrift and bank equity, Fidelity would covert from a mutual savings bank to a stock savings bank and do a public offering. (Wesp, Tr. 1937, line 21 to p. 1939, line 10).

737. While operating under the Capital Plan, Mr. Wesp stayed in touch with Salomon Brothers. Fidelity was doing a lot of business with Salomon Brothers sales and trading desk, and Fidelity also was assigned a contact in Salomon Brothers' investment banking unit. (Wesp, Tr. 1939, lines 11-19). Fidelity was also monitoring the other mutual to stock conversions and initial public offerings that were taking place in the industry in order to gauge what the ultimate pricing of any Fidelity IPO should be. (Wesp, Tr. 1939, line 20 to p. 1940, line 8). Fidelity began to discuss the possibility of a stock conversion with Salomon Brothers in October 1992. (Powderly, Tr. 580, line 19 to p. 582, line 11; *see generally* PX 915).

738. By November 1992, Fidelity's management had reached the point where they thought that the institution had attained sufficient tangible capital and that it was a good time from a market perspective to covert and go public. On November 17, 1992, Mr. Wesp wrote to Mr. Vigna and requested permission to hire various consultants to assist with the conversion. (Wesp, Tr. 1940, line 14 to p. 1942, line 18; PX 932 at WON736 1234). Fidelity's board of directors approved Fidelity's conversion plan on December 9, 1992. (PX 941 at AST127684-85; Powderly, Tr. 594, line 10 to p. 596, line 11; PX 943A).

739. Salomon Brothers acted as lead underwriter on the offering and Merrill Lynch was later hired to act as co-manager of the offering. Kaplan Associates, Inc. was the appraiser. Cleary Gottlieb was outside counsel, and KPMG Peat Marwick were retained as the independent auditors. (Wesp, Tr. 1941, line 16 to p. 1942, line 9; Wesp, Tr. 1947, line 9 to p. 1948, line 5; *see generally* PX 932).

740. Fidelity submitted an Application for Conversion to the OTS on January 28, 1993. (Joint Stipulation of Facts, April 2, 2007, ¶ 102).

741. Regulators confirmed to Fidelity on March 15, 1993 that Fidelity would be released from its Capital Plan if Fidelity achieved a capital infusion from the stock conversion that would be sufficient to meet the definition of "adequately capitalized" as defined in the Federal Deposit Insurance Act. (PX 974; Powderly, Tr. 600, lines 4-24).

742. In connection with the public offering, Fidelity obtained regulator approval on February 2, 1993 to change Fidelity's audit date from March 31 to December 31 in order to provide a better year-over-year comparison to potential subscribers. (PX 965; Powderly, Tr. 599, line 17 to p. 600, line 3).

743. Despite Fidelity's concerns about being undersubscribed, Fidelity found that it was oversubscribed in its conversion. (Powderly, Tr. 611, line 11 to p. 613, line 17). While Fidelity's management was pleased to have avoided under subscription, the oversubscription indicated that Fidelity lost the opportunity to bring in more capital. (Powderly, Tr. 613, line 18 to p. 614, line 16).

744. Mr. Powderly estimated that Fidelity could have earned two to three times more capital in its conversion if Fidelity had not been under the restrictions of the Capital Plan. (Powderly, Tr. 647, lines 5-11).

745. Because it was oversubscribed, Fidelity had Kaplan & Associates conduct a revised valuation and based on this valuation, Fidelity increased the number of shares offered from 4,500,000 shares, as initially detailed in the subscription offering circular, to 5,170,839 shares. (PX 986 at AST064170; Powderly, Tr. 602, line 24 to p. 603, line 8; PX 1010 at WOL353 0772; Powderly, Tr. 611, line 7 to p. 612, line 1; Powderly, Tr. 614, line 17 to p. 616, line 4).

746. Fidelity proceeded to convert, and on May 3, 1993 it sold common stock totaling approximately $59.4 million. After expenses, Fidelity raised approximately $56.9 million of new capital. (Kaplan, Tr. 3026, line 9 to p. 3029, line 3; PX 991 at AST062528; PDX 58; PX 1012; Powderly, Tr. 617, line 12-24; PX 991 at AST062528; Powderly Tr. 621, line 19 to p. 622, line 18). Fidelity sold all 5,170,839 shares offered at the maximum price of $11.50 per share. (PX 991 at AST062528). The capital that Fidelity raised was sufficient for Fidelity to be considered "well-capitalized" under the Federal Deposit Insurance Act and to reach the minimum capital requirements under

FIRREA. (PX 1012; Powderly, Tr. 617, line 12-24; PX 991 at AST062528; Powderly Tr. 621, line 19 to p. 622, line 18).

747. Depositors of a mutual thrift institution are given first priority rights in any conversion to subscribe for stock based on having a deposit account at the institution. (Wesp, Tr. 1945, line 3 to p. 1946, line 11). If the depositors do not purchase all of the offered shares, however, the thrifts can sell the shares on the open market. (Powderly, Tr. 589, line 17 to p. 590, line 16). At the time that Fidelity was working on the transaction documents to convert and go public, conversions by mutual thrifts were very attractive and so subscription offerings were fully subscribed. (Wesp, Tr. 1945, line 3 to p. 1946, line 11). In arriving at the amount and price of the shares that should be offered, Fidelity sought input from its various outside consultants and also looked at how comparable deals had been priced and whether they were accepted in the marketplace. (Wesp, Tr. 1948, line 6 to p. 1950, line 8).

748. Kaplan Associates, Inc., an experienced conversion appraisal firm, estimated the aggregate pro forma market value of the thrift to range from $38,250,000 to $51,750,000, or assuming the issuance of 4,500,000 shares, between $8.50 and $11.50 per share. (PX 986 at AST064179; Wesp Tr. 1958, line 1 to p. 1959, line 1).

749. On March 24, 1993, Fidelity issued to its depositors and certain other holders of accounts and borrowers a Subscription Offering Circular which offered for sale 4,500,000 shares of Fidelity common stock at a minimum per share subscription price of $8.50 and a maximum per share subscription price of $11.50. There was more demand than there were shares so the offering was oversubscribed. (*See generally* PX 986; Wesp Tr. 1950, line 15 to p. 1954, line 4).

750. Those thrifts operating under a Capital Plan that sought to convert to stock form had to obtain the approval of regulators for the caveats and conditions expressed in the thrift's subscription offering circular. (Powderly, Tr. 587, line 25 to p. 588, line 8). A converting thrift also had to obtain the FDIC's approval for the offering price. (Powderly, Tr. 588, lines 9-21).

751. In conjunction with the conversion process, Mr. Wesp and others at the company conducted "road shows" for institutional investors in order to build up some prospective demand for the stock in advance of its beginning to trade on NASDAQ. (Wesp, Tr. 1954, line 20 to p. 1956, line 4; Wesp Tr. 1957, lines 12 to 25).

752. After some contentious negotiations with Mr. Ketcha of the FDIC, Fidelity eventually offered its shares at $11.50, the highest price of the range calculated by Kaplan & Associates. (Powderly, Tr. 605, line 1 to p. 607, line 19).

753. In recognition of the fact that Fidelity's employees had been put through the wringer, having suffered through salary freezes, layoffs, frozen benefit packages and all the standard things that go on with companies that are under stress, Fidelity's management made sure that it allocated stock options to its employees, as far down as branch managers, in connection with the subscription offering. (Wesp, Tr. 1966, line 2 to p. 1968, line 5).

754. As a result of Fidelity's recapitalization, the OTS released Fidelity from Fidelity's Capital Plan and its associated restrictions on May 14, 1993. (PX 1015).

755. By extinguishing Fidelity's ability to count supervisory goodwill as capital, FIRREA diminished the value of Fidelity, forced Fidelity to change its operations and inhibited Fidelity's ability to grow. (Engelke, Tr. 5255, line 10 to p. 5256, line 11; Engelke, Tr. 5298,

line 17 to p. 5299, line 11). But for the loss of the supervisory goodwill, Fidelity would have been a more valuable company and would have had a more successful public offering. (Engelke, Tr. 5255, line 10 to p. 5256, line 11; Engelke, Tr. 5298, line 17 to p. 5300, line 1; Engelke, Tr. 5302, lines 1-12).

**Post-Conversion, Fidelity's Operations Improved As The Capital Plan Was Lifted.**

756. At the time of its conversion Fidelity was still operating under the Capital Plan, which would not have been the case had the Government not breached its contract with Fidelity. Dr. Kaplan, whose firm was involved in more than 300 thrift conversions, including some 24 in New York, has no doubt that a non-breached Fidelity would have raised significantly more capital than the $57 million it in fact did raise. In this regard, Dr. Kaplan notes that Fidelity's neighbor, Astoria Financial Corporation, which was only slightly larger than Fidelity, and which converted in roughly the same time period, raised $330 million in its public offering, nearly six times the amount raised by Fidelity. (Kaplan, Tr. 3026, line 4 to p. 3034, line 11; PDX 58).

757. Although Fidelity did resume growing after the conversion, and although it was considered "well-capitalized" under the standards set out in the Federal Deposit Insurance Corporation Improvement Act ("FDICIA"), Fidelity had no meaningful capital cushion and was limited in its operating and strategic options. (Kaplan, Tr. 3034, line 18 to p. 3035, line 8; PDX 59).

758. Fidelity made an attempt following its conversion to acquire another institution. However, that attempt was unsuccessful, largely because Fidelity did not have sufficient

excess capital to make a successful offer. (Kaplan, Tr. 3034, line 18 to p. 3037, line 10; PDX 59).

759. After assessing their strategic options, Fidelity's management concluded that the best strategy for maximizing shareholder value was for Fidelity to be acquired by another institution. Fidelity then instituted merger discussions with Astoria and in July 1994 reached an agreement whereby it would be acquired by Astoria for $29 a share. (Kaplan, Tr. 3036, line 7 to p. 3037, line 10; PDX 59).

760. Dr. Kaplan believes that if the Government had not breached its contract with Fidelity, Fidelity would have been a stronger, better capitalized company. It would either have been a more attractive company that would command a higher price from any potential acquirer, or it would have been sufficiently strong and competitive that it could go forward as an independent company. (Kaplan, Tr. 3036, line 7 to p. 3038, line 13; PDX 59).

761. After the public offering, Fidelity began to grow again and do the things that it could not do while it was operating under the Capital Plan. Under the Capital Plan, Fidelity had essentially been operating as a "tightly wound short-term bond fund" and now it had the ability to begin operating like a bank again. (Wesp. Tr. 1960, line 24 to p. 1962, line 8).

762. Fidelity was able to reduce classified assets by $20 million in the 1994 examination period by taking write-downs and selling off real estate. (PX 1080 at FAA005 0910).

763. Fidelity was able to achieve this reduction despite the fact that property values were still declining, causing regulators to require Fidelity to post an additional $6 million in valuation allowances. (PX 1080 at FAA005 0911).

## G. WHILE FIDELITY'S STOCK CONVERSION ENABLED FIDELITY TO ACHIEVE FULL CAPITAL COMPLIANCE, IT DID NOT RESULT IN THE LEVEL OF CAPITAL REQUIRED FOR FIDELITY TO BE COMPETITIVE AFTER SURVIVING FIRREA.

764. If Fidelity had not had its capital taken away by FIRREA, the future of the institution would have been very different because Fidelity would have been in capital compliance and would not have been subjected to a Capital Plan. Like its competitors, Astoria Federal Savings Bank or Roslyn Savings Bank, which were not burdened with having to operate under a Capital Plan, Fidelity would have been in a position to raise twice as much capital in its IPO than it did, and would be a significant player in the Long Island marketplace. (Wesp, Tr. 1962, line 9 to p. 1963, line 10; Wesp, Tr. 1972, line 22 to p. 1974, line 5; Wesp, Tr. 1975, line 8 to p. 1976, line 4; Wesp, Tr. 2477, lines 1-18).

765. Although Fidelity had adequate capital for regulatory purposes after the conversion, Fidelity's management soon realized that it would be difficult for the institution to compete with other banks in the area that had excess capital, like Astoria Federal Savings Bank or Roslyn Savings Bank. While Fidelity had a capital ratio of 6 or 7%, these other institutions came out of their public offerings with capital ratios of 12 or 13%. With twice the capital, these institutions had twice the flexibility to take advantage of opportunities in the marketplace, for example, doing acquisitions, buying a mortgage bank, starting a new product line or starting a mortgage origination operation from scratch. (Wesp, Tr. 1962, line 9 to p. 1964, line 5).

766. Fidelity met the definition of "well-capitalized" under the Federal Deposit Insurance Act after its stock conversion, but Fidelity's management did not consider Fidelity's 5% level of capitalization to be sufficient for Fidelity to compete in the marketplace, where other

thrifts had much higher levels of core capital in the range of 14 to 17%. (Powderly, Tr. 622, line 19 to p. 623, line 15; PX 1155 at AST036416).

767. The FDIC concluded after Fidelity's stock conversion that, "[n]otwithstanding the improvement, the Tier 1 capital levels achieved are only slightly above the OTS's minimum capital requirement, leaving the capital position unduly limited to cushion the bank from any unexpected reversals." (PX 995 at WON738 0673).

768. Although regulators stopped placing restrictions on Fidelity's level of growth after Fidelity became "well-capitalized," Fidelity's growth was still limited by the small amount of capital that Fidelity had relative to capital requirements. (Powderly, Tr. 917, lines 8-24). Thrifts with higher core capital levels than Fidelity were able to grow through acquisitions of other institutions. (Powderly, Tr. 623, line 16 to p. 624, line 2).

769. Because post-conversion, it did not have enough capital to go and make a cash offer for another institution, Fidelity instead explored opportunities for a potential merger. However, those discussions did not get very far. (Wesp, Tr. 1964, lines 6 -18). Because Fidelity had a much lower level of capital after FIRREA relative to its peers, Fidelity became a target of acquisition instead of a potential buyer. (Powderly, Tr. 419, line 22 to p. 420, line 9; Powderly, Tr. 624, line 2 to p. 626, line 2; PX 1155 at AST036415-16; Powderly, Tr. 998, lines 15 to p. 999, line 10).

770. By the summer of 1994, Messrs. Wesp, Powderly and Meyer reached the conclusion that it would be difficult to compete on a long-term basis with their "big neighbors" in such a competitive marketplace and that, although it was not in their personal best interests, it was in the best interests of Fidelity's depositors, shareholders, employees and the community

that Fidelity become a seller and merge with another bank. (Wesp, Tr. 1964, line 19 to p. 1965, line 14).

771. After Fidelity's stock conversion and emergence from Fidelity's Capital Plan, Fidelity was an attractive target for acquisition, because Fidelity had a clean balance sheet and good franchise value. (Powderly, Tr. 625, line 5 to p. 626, line 2; Powderly, Tr. 937, lines 5-18; Powderly, Tr. 989, line 15 to p. 999, line 10). Although hostile takeovers in the thrift industry were rare, Fidelity's management was concerned that Fidelity's employees might be poorly treated even in a friendly merger. (Powderly, Tr. 626, line 18 to p. 627, line 10).

772. Mr. Wesp anticipated that many of Fidelity's employees would be retained by any acquiring institution because by that time Fidelity's management ranks were so thin. As Mr. Wesp testified, "We didn't have a marketing department … there were a lot of things that normally in merger consolidations get wiped right off the map on day one. We didn't have any of those things. So all the branch people, many of the accounting people … would have been retained." Nevertheless, prior to any sale, Fidelity put in place a generous retention and severance policy for its employees to ensure that if the bank was sold, their employees would have a financial bridge to finding a new job if necessary. (Wesp, Tr. 1966, line 2 to p. 1968, line 5).

## VI. FIDELITY'S MERGER WITH ASTORIA

### A. ASTORIA ACQUIRED FIDELITY IN JANUARY 1995.

773. Messrs. Wesp, Powderly and Meyer concluded that the best acquirer for the institution was Astoria and Mr. Powderly was tasked with approaching the CEO of Astoria, George Engelke, to see whether he would have any interest acquiring Fidelity. (Wesp. Tr. 1968, lines 6 to 20).

774. Fidelity's management believed that Astoria treated its employees well and was therefore likely to treat Fidelity's employees better than other potential acquirers. (Powderly, Tr. 627, lines 5-10; Powderly, Tr. 628, line 25 to p. 629, line 12).

775. Fidelity began negotiations with Astoria in June or July 1994. There was then a period of several months for due diligence and to make some balance sheet adjustments. By July 1994, Fidelity and Astoria started managing their respective company balances sheets so that the accounting, when they put the two balances sheets together, would be as seamless as possible. For example, Fidelity downsized its balance sheet in preparation for the write-off of goodwill in order to keep regulatory capital ratios at the well-capitalized level. (Wesp, Tr.1971, lines 2-7; Wesp, Tr. 2525, line 7 to p. 2527, line 17; PX 1117 at AST0130002).

776. Mr. Powderly negotiated severances and other transitional compensation for Fidelity's employees who would not continue to have employment with Astoria after the merger. (Powderly, Tr. 645, line 5 to p. 646, line 13).

777. Fidelity signed a definitive merger agreement with Astoria on July 12, 1994, which was announced by a press release issued on July 13, 1994. (PX 1109 at WON749 2309-10;

Powderly, Tr. 637, line 21 to p. 638, line 3; PX 1065 at OAA002 1275; *see generally* PX 1113).

778. The price paid by Astoria to acquire Fidelity was $29.00 in cash per each Fidelity share. (PX 1109 at WON749 2309; Powderly, Tr. 641, lines 11-25; PX 1113 at AST037675).

779. The acquisition closed in January 1995. The deal was structured as a cash deal at $29 per share. (Wesp, Tr. 1968, line 21 to p. 1969, line 13; Wesp, Tr. 1971, lines 2-7; Wesp, Tr. 2529, lines 3-10).

780. Although the acquisition was accounted for as a purchase transaction, Astoria could have acquired Fidelity by doing a pooling of interests. (Engelke, Tr. 5291, line 22 to p. 5292, line 4).

## B. ASTORIA FEDERAL SAVINGS AND LOAN ASSOCIATION: BACKGROUND.

### Astoria's Maintained High Levels Of Capital And Invested In Mortgage-Backed Securities.

781. Notwithstanding their geographic proximity, Astoria and Fidelity were in 1994 very different institutions in terms of size, capital, profitability, management and focus. Had Astoria not acquired Fidelity in 1994, it would have been reasonable to expect significant differences in how the institutions would operate on a going forward basis. (Kaplan, Tr. 3791, line 25 to p. 3793, line 18).

782. Even when the real estate markets are in decline and the ability to attract loans is difficult, Astoria always has "choices" and will invest primarily in mortgage-backed securities that are guaranteed, and some private issues. (Engelke, Tr. 5320, lines 6-21).

783. Astoria's Chairman, George Engelke, described Astoria's view of capital as "more is better." He said that Astoria would take more capital any time it could get it and would

always have found a use for more capital. (Engelke, Tr. 4493, line 24 to p. 4495, line 7; Engelke, Tr. 4444, line 17 to p. 4446, line 1; Engelke, Tr. 4473, lines 8-17).

784. Mortgage-backed securities are essentially baskets of loans that have been securitized. As Mr. Engelke testified, the purchase of a mortgage-backed security is the same thing as lending money without having to go through the process of closing the loan. (Engelke, Tr. 5320, lines 6-21). MBS were widely available in the marketplace and could be purchased at any time if they fit into a thrift's business strategy. (Engelke, Tr. 4507, line 19 to p. 4508, line 5; Engelke, Tr. 5320, lines 6-21).

785. In 1993, for example, Astoria supplemented its loan originations by increasing its investments in mortgage-backed and mortgage-related securities and investment securities. (Engelke, Tr. 5319, lines 7-25; DX 2373 at p. 301).

786. Astoria has always maintained a sizable portfolio of mortgage-backed securities. Currently, Astoria owns upwards of $5 billion of mortgage-backed securities on a $21 billion balance sheet. In 1999, Astoria had a $12 billion portfolio of mortgage-backed securities. (Engelke, Tr. 5327, line 18 to p. 5328, line 11).

787. When Astoria acquired Fidelity, Astoria sold some mortgage-backed securities that were owned by Fidelity because Astoria only held AAA rated securities, but Astoria used the net proceeds from that sale to invest in a securities portfolio of comparable credit quality but higher yield. (Engelke, Tr. 5322, line 13 to p. 5323 line 2; Engelke, Tr. 5272, line 17 to p. 5273, line 4; Engelke, Tr. 5294, lines 4-14; PX 1076 at p. 1216).

**Astoria's Conversion To A Stock Company In 1993 Was Highly Successful.**

788. Astoria's conversion from a mutual association to a stock institution, in November 1993, provided Astoria with a significant amount of capital. (Engelke, Tr. 4469, line 13 to p. 4470, line 19; PX 1048 at WON727-0454). Astoria raised over $300 million in capital when it converted. (Engelke, Tr. 4484, lines 8-19; Engelke, Tr. 5315, line 20 to p. 5316, line 19; PX 1048 at WON727-0454). Astoria issued 13,180,852 shares at $25 per share. (PX 1048 at WON727-0454).

789. Mr. Engelke testified that the main reason for the conversion was to raise capital in order to better Astoria's business because "capital was king." (Engelke, Tr. 4470, line 20 to p. 4471, line 1; Engelke, Tr. 4473, lines 8-17; Engelke, Tr. 4495, lines 3-7; Engelke, Tr. 4498, lines 19-22). The additional capital would allow Astoria to acquire other companies and to intelligently grow the Astoria franchise. (Engelke, Tr. 4470, line 20 to p. 4471, line 1; Engelke, Tr. 4498, lines 19-24).

790. Astoria also used some of the capital that it raised in the conversion to buy mortgage-backed securities. (Engelke, Tr. 4474, line 15 to p. 4475, line 10).

**Astoria Had Asset Problems Similar To Those Experienced By Fidelity. However, Astoria Was Better Able To Manage Its Real Estate Problems Because, Unlike Fidelity, It Had Capitalized.**

791. No thrift that originates loans is immune from a downturn in its local real estate market. (Finn, Tr. 4025, lines 1-11). The real estate problems of the late 1980s impacted even those institutions with fairly conservative lending practices, such as Astoria. (Finn, Tr. 4017, line 14 to p. 4018, line 13; DX 253 at AST 735296). In 1989, regulators noted that

Astoria's commercial loan portfolio was "plagued by softness in the local real estate market." (Finn, Tr. 4024, line 22 to p. 4025, line 7; DX 3031 at FAA009 0026).

792. In about 1983 or 1984, Astoria, like many other thrifts at the time, began to engage in commercial real estate lending, featuring development loans for condominium and cooperative units. (Finn, Tr. 4018, lines 2-10; Engelke, Tr. 4346, lines 1-20). By 1989 regulators began criticizing Astoria for its disturbing volume of problem assets, which regulators noted were concentrated primarily in construction lending and joint real estate developments. (Finn, Tr. 4022, lines 1 – 17, DX 3031 at FAA009 0025). Astoria's $125 of classified assets in 1989 was not an insignificant figure, but 4% of Astoria's total assets. (DX 3031 at FAA009 0026). Similar to Fidelity's experience, Astoria's regulators in 1989 noted that Astoria's "criticized loans are principally construction and development mortgages that were originated for residential condominium and cooperative apartments, as well as 1-4 family dwellings and office buildings." (Finn, Tr. 4024, lines 7-21; DX 3031 at FAA009 0026).

793. In 1992, regulators attributed Astoria's asset problems to loans originated in the late 1980s as construction loans that had been "severely impacted by the depressed real estate market which has undermined collateral values and/or anticipated income from the various projects." (Finn, Tr. 4028, line 8 to p. 4029, line 1; DX 3332 at FAA008 1524).

794. Astoria's nonperforming loans as a percentage of total loans or as a percentage of total assets increased significantly from the period 1989 through 1993, compared with the year-end ratios from 1988. (Engelke, Tr. 4388, lines 1-5; DX 2962 at AA1001-0395). This increase in non-performing assets was due to the Tax Reform Act of 1986 and the recession.

(Engelke, Tr. 4342, lines 4-7; Engelke, Tr. 4388, lines 1-5; Engelke, Tr. 4388, line 10 to p. 4390, line 19). All thrifts that engaged in commercial real estate lending in the condominium area were affected by the Tax Reform Act of 1986, the stock market crash of 1987, and the overall state of the economy at that time. (Engelke, Tr.4342, lines 8-16; Engelke, Tr. 4344, lines 16-20; Engelke, Tr. 4345, lines 2-24).

795. Writing down an asset or increasing a loan loss reserve causes a thrift's capital to decrease. (Finn, Tr. 4032, lines 8 – 15).

796. Astoria purposely maintained excess capital so that it could deal with its real estate problems if they got worse. (Engelke, Tr. 4481, lines 8-22).

797. In 1991, Astoria took charge-offs and posted specific loan loss reserves in a total amount of $39 million in an attempt to manage its asset quality problems. (DX 3034 at FAA009 003).

798. In 1992, Astoria was able to reduce adversely classified assets by $26 million or 13.7% from the prior examination, in part by taking additional charge-offs, but regulators sought and Astoria agreed to post an additional $17 million in loan loss reserves. (DX 3332 at FAA008 1524-1526).

799. Astoria was able to absorb these decreases to capital because it had capital above the regulatory minimums, which insulated it from its asset quality problems. (Finn, Tr. 4037, line 19 to p. 4038, line 5; DX 3034 at FAA009 0002; DX 3332 at FAA008 1526; DX 253 at AST 735296).

## C. AT THE TIME OF ASTORIA'S ACQUISITION OF FIDELITY, IT WAS NOT POSSIBLE TO ASSIGN A VALUE TO FIDELITY'S GOODWILL CLAIM.

800. During the course of negotiations with Astoria, there were discussions about a potential claim that Fidelity might have against the Government. However, no dollar amount was assigned to the claim because there was not enough information at the time to know how to statistically value such a claim. (Wesp, Tr. 1969, line 17 to p. 1971, line 1). Mr. Christopher Quackenbush of Sandler O'Neil conducted the financial analysis of the Fidelity-Astoria merger on behalf of Astoria. (Quackenbush, Dep. Tr. 9, lines 18-24). Neither Fidelity nor Astoria ascribed any value to the goodwill claim at the time of the acquisition because at that time, there was no way they could value the claim. (Engelke, Tr. 5298, line 17 to p. 5300, line 1; Engelke, Tr. 5323, lines 8-10; Quackenbush, Dep. Tr. 28, lines 13-21; Powderly, Tr. 642, line 13 to p. 643, line 2).

801. Mr. Powderly expected to get some value out of Fidelity's goodwill claim. (Powderly, Tr. 642, lines 13-21).

802. Astoria made the decision to file a complaint based on Fidelity's goodwill claim subsequent to the merger. (Finn, Tr. 4042, lines 9 -12).

## VII. FIDELITY'S LEGAL CLAIMS

### A. DR. KAPLAN'S QUALIFICATIONS.

803. Dr. Donald Kaplan was educated at the University of California, Los Angeles. He received a Bachelor of Science degree in 1965, a Masters degree in Business Administration (MBA) in 1966, and was awarded a doctorate in Finance in 1969. Dr. Kaplan then accepted a position as a member of the faculty at the Harvard Business School. His primary focus at Harvard was in its MBA program, where he taught corporate financial management. He also did a number of doctoral seminars in the financial institutions area. He also began doing consulting work in the financial institutions area in addition to his teaching. (Kaplan, Tr. 2631, line 3 to p. 2632, line 19; PX 1314A, Exhibit 1).

804. Beginning in 1970, while he was still on the faculty at the Harvard Business School, Dr. Kaplan started doing consulting work at the FHLBB. He and Dr. Richard Pratt participated in an instructional program for financial analysts who were slated to become examiners. He had other small consulting projects as well. (Kaplan, Tr. 2632, line 20 to p. 2633, line 16).

805. In 1973 Dr. Kaplan took a leave of absence from the Harvard Business School and joined the FHLBB as the Deputy Director of the Office of Economic Research. That office was responsible for all economic and financial research for the Board and was also responsible for legislation affecting the mortgage markets and the housing and savings markets. That office also monitored the safety and soundness of the thrift industry by analyzing financial data in the call reports (later called Thrift Financial Reports) filed by

individual thrift institutions. It produced a monthly journal that included statistical information on industry performance and which was the primary source document at the time for information on the operation, profitability and health of the thrift industry. Dr. Kaplan also served as senior adviser to the Bank Board's members and to the FSLIC on economic and financial matters. (Kaplan, Tr. 2632, line 20 to p. 2635, line 18; PX 1314A, Exhibit 1).

806. After two years as Deputy Director of the Office of Economic Research, Dr. Kaplan resigned his faculty position at Harvard and stayed on at the Bank Board as Director of the Office of Economic Research and Chief Economist. In addition to the duties he had undertaken as Deputy Director, he also became responsible for representing the agency before industry conferences and meetings. He also attended all meetings of the Bank Board and of the District Banks and was consulted on economic and financial issues that came up both in a policy context and in connection with special supervisory situations. He continued to participate in research programs, and he became the liaison for financial and economic matters with his counterparts at the Federal Reserve Board of Governors, the Federal Deposit Insurance Corporation, the Controller of the Currency, and the Government National Mortgage Association ("Ginnie Mae"). The Office of Economic Research also continued to conduct special studies and publish research papers and articles and to interact with the academic world and with economists at banking institutions. (Kaplan, Tr. 2635, line 19 to p. 2638, line 6; PX 1314A, Exhibit 1 at p. 2).

807. At the end of 1977, Dr. Kaplan left the Bank Board and started his own consulting business, Kaplan Smith & Associates. That firm focused on financial institutions,

particularly thrift institutions. It worked with thrift institutions on business strategies, growth plans, geographic expansion, branch network expansion, profitability and capital compliance. (Kaplan, Tr. 2639, line 12 to p. 2641, line 6; PX 1314A, Exhibit 2).

808. In 1987 Kaplan Smith & Associates was acquired by First Boston Corporation, a New York investment bank. The firm had become involved in capital raising transactions for thrifts, principally doing conversion appraisals. After the acquisition by First Boston, this involvement increased, as did the size of the transactions and the institutions involved. This continued until 1991, when the firm ended its affiliation with First Boston. (Kaplan, Tr. 2641, line 7 to p. 2643, line 11; PX 1314A, Exhibit 2).

809. In 1991, the decision was made within what was then Credit Suisse First Boston to sever its ties with Dr. Kaplan's firm. This was accomplished by way of a liquidation, immediately following which the firm reconstituted itself as two independent entities. Dr. Kaplan and his partner decided to go their separate ways. Dr. Kaplan's firm became Kaplan Associates. His former partner's firm became Smith Banking. Dr. Kaplan has remained with Kaplan Associates to the present time. (Kaplan, Tr. 2648, line 16 to p. 2650, line 5; PX 1314A, Exhibit 1).

810. Under regulations of the FHLBB (and later of the Office of Thrift Supervision) a mutual institution that wants to convert to stock form and sell its stock must be appraised by an appraisal firm independent of the investment banker who will handle the public sale of stock if the issue is not fully subscribed by depositors. The appraiser looks at all aspects of the institution and its performance as well as the equity markets in general and thrifts in particular. He then reaches a conclusion as to what would be a fair and reasonable

value for this institution. Sale of the institutions stock, whether to depositors or, through the underwrite, to investors is based on this appraised value. (Kaplan, Tr. 2643, line 12 to p. 2645, line 2).

811. Dr. Kaplan's firm has also been involved over the years in 130 or so merger transactions involving thrift institutions. It has advised both buyers and sellers. This work sometimes involves identifying a prospective buyer or seller, but fundamentally it involves analyzing the institution to be acquired and determining what would be a fair price for the transaction. In many of the transactions, the firm also did the mark-to-market of the acquired institution's assets, which would then be used by the accountants to produce financial statements for the combined institutions. (Kaplan, Tr. 2645, line 3 to p. 2646, line 25; PX 1314A, Exhibit 2).

812. There are two ways of accounting for a merger. Using the "pooling" method of accounting, the balance sheets of the two institutions are simply added together, line by line, with no significant adjustments. Using the "purchase" method of accounting, the assets and liabilities of the acquired institution are restated to current market value ("marked-to-market") and then combined with the (not marked-to-market) assets and liabilities of the acquiring institution. There are then a number of special adjustments to the balance sheet of the combined institutions. (Kaplan, Tr. 2647, line 1 to p. 2648, line 1).

813. Although Dr. Kaplan is not an accountant, he has spent his entire career working with regulatory accounting concepts and the financial statements of financial institutions. This

has given him a working understanding of the accounting principles and techniques used in mergers of financial institutions. (Kaplan, Tr. 2648, lines 2-15).

814. During his entire tenure in the private sector, Dr. Kaplan's firm (in its various iterations) has also been involved in a number of specialized financial and economic research studies. The majority of these were done for Government agencies, but some were done for private firms. (Kaplan, Tr. 2650, lines 6-21; PX 1314A, Exhibit 1 at 5 and 6).

815. Other areas in which Dr. Kaplan and his firm have been involved over the years include: the purchase and sale of bank or thrift branches, fairness opinions on various types of transactions, preparation of business plans and (after FIRREA) capital plans for thrift institutions, and mortgage banking. (Kaplan, Tr. 2657, line 6 to p. 2663, line 11; PX 1314A, Exhibit 2).

816. Government agencies that have retained Dr. Kaplan and his firm include the FSLIC, the FHLBB, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development and, in one instance, the Department of Justice. (Kaplan, Tr. 2663, line 12 to p. 2665, line 20; PX 1314A, Exhibit 2).

817. Dr. Kaplan has been retained on a number of occasions over the years in litigation support capacities and as an expert witness in litigation. Many of the instances in which he has served as an expert witness have involved supervisory issues for financial institutions. This work has been done both for private litigants and for Government agencies. Some of it has involved issues arising out of FIRREA. (Kaplan, Tr. 2650, line 22 to p. 2653, line 22; PX 1314A, Exhibit 1 at 7-10).

818. Dr. Kaplan has also been retained and has testified as an expert witness in other *Winstar* cases. His firm has been retained in approximately a dozen such cases. In four or five of these cases Dr. Kaplan has actually testified as an expert witness. In the remaining cases, his firm provided litigation support or analysis, but he did not testify as an expert. Dr. Kaplan has been accepted as an expert witness in every *Winstar* case in which his expert testimony was offered. (Kaplan, Tr. 2653, line 23 to p. 2655, line 5; PX 1314A, Exhibit 1 at 7-8).

## B. THE EVIDENCE SUPPORTING FIDELITY'S CLAIM FOR LOST PROFITS SATISFIES THE LEGAL REQUIREMENTS OF CAUSATION, FORSEEABILITY, AND REASONABLE CERTAINTY.

819. Dr. Kaplan's lost profits model is based on four underlying assumptions:

- The volume of the incremental assets that could have been added if the breach of contract had not occurred and Fidelity had more capital than it did (i.e., the assumed growth rate);
- The composition of the incremental assets and the source of the funds used to purchase those assets;
- The profitability of the incremental assets (i.e., the interest rate "spread" between the rate of return on the assets and the interest rate associated with the cost of funds used to purchase the assets); and,
- The availability of the incremental assets.

(Kaplan, Tr. 3044, line 24 to p. 3047, line 22).

820. Dr. Kaplan's lost profits model was not constructed, and is not offered in this case, as a strategy for running an entire institution. It is offered simply to quantify the incremental earnings Fidelity could have earned had it not lost capital as a result of the breach. (Kaplan, Tr. 3396, line 3 to p. 3398, line 9; Tr., p. 3422, line 3 to p. 3423, line 6).

821. The incremental lost profits portfolio is not a "risk controlled arbitrage" ("RCA") as that term is used in the financial industry. An RCA is a strategy in which longer maturity assets are funded with shorter maturity liabilities and a hedging strategy is used to adjust for the difference in maturities. (Kaplan, Tr. 3476, line 11 to p. 3477, line 3)

822. Dr. Kaplan calculates the volume of incremental assets by subtracting Fidelity's actual tangible assets for a specific period from the tangible assets it would have had if the breach had not occurred ("the but-for tangible assets). To calculate the "but-for tangible assets," Dr. Kaplan uses an assumed rate of growth. (Kaplan, Tr. 3052, line 19 to p. 3053, line 23; PDX 63).

823. The net interest spread used by Dr. Kaplan in his calculation is a rate chosen by him to represent a conservative estimate of the minimum rate of return Fidelity would have earned for the period on the incremental assets. Dr. Kaplan did not preclude the possibility that Fidelity would earn a higher rate of return, but he based his calculation on the minimum rate Fidelity would expect to earn. (Kaplan, Tr. 3053, line 24 to p. 3054, line 8).

824. Multiplying the incremental assets for a particular period times the interest rate spread yields the lost profits for that period. (Kaplan, Tr. 3054, lines 1-12).

825. The composition of the incremental assets is assumed by Dr. Kaplan to be "ARM MBS" (i.e., adjustable rate mortgage-backed securities). Dr. Kaplan does not preclude the possibility that Fidelity would choose to invest in other types of tangible assets on which it might earn a higher rate of return, but he chose ARM MBS because of testimony to the

effect that these were always available at the making of a phone call. (Kaplan, Tr. 3046, line 15 to p. 3047, line 2).

826. There are two way of looking at Fidelity's growth rate from the end of 1979 to June 1989 (the last quarter prior to the passage of FIRREA). One way is to look simply at the actual size of the institution at the beginning and the end of the period. Looked at in this fashion, Fidelity's Compound Annual Growth Rate from December 1979 to June 1989 was 28.2 %. However, this includes growth by acquisition – the Dollar Federal acquisition on July 1, 1982 and the Suburbia acquisition on October 31, 1984 – as well as growth from operations. If one ignores the growth from acquisitions and looks only at growth from operations, Fidelity grew at the annual rate of 16.5 % from December 1979 to the date of the Dollar Federal acquisition. It then grew at the rate of 13.9 % post July 1, 1982 to the date of the Suburbia acquisition. It then grew at 14.7 % post October 31, 1984 to June 1989. (Kaplan, Tr. 3055, line 24 to p. 3061, line 15; PDX 64 and PX 1314A, ¶¶ 53 and 54).

827. The growth rate which Dr. Kaplan used in his lost profits model was 2 % per quarter. This was based on Fidelity's October 1988 Business Plan which had called for 8 to 10 % annual growth. It was also consistent with the growth rate for tangible assets contained in budget projections done by Fidelity in January 1989. (Kaplan, Tr. 3062, line 2 to p. 3070, line 16; PDX 65 and PX 1314A, ¶¶ 32 and 33).

828. Originally, Dr. Kaplan had applied the 2 % quarterly growth rate to all assets. However, in 2003 he revised his report by applying the 2003 growth rate only to tangible assets.

This is a more accurate calculation of lost profits. (Kaplan, Tr. 3075, line 12 to p. 3076, line 19).

829. Prepayment risk exists in both loans and mortgage-backed securities. However a good thrift manager knows such risk exists and manages the institution's portfolio of mortgage assets to minimize this risk. It is because prepayment and other risks exist that Dr. Kaplan selected an 80 basis point spread for his incremental portfolio rather than the higher spreads that Fidelity had historically achieved. (Kaplan, Tr. 3402, line 12 to p. 3403, line 14; Tr., p. 3473, line 17 to p. 3474, line 15).

830. The industry's understanding of the phenomenon of prepayment risk had evolved tremendously over time from the introduction of mortgage-backed securities to the late 1980s and early 1990s. Models and sophisticated software were developed to help portfolio managers understand and cope with prepayment risk. (Kaplan, Tr. 3785, line 23 to p. 3789, line 7).

831. Dr. Kaplan's use of a conservative 80 basis point spread for the lost profits analysis after Fidelity was acquired by Astoria was intended to control for market conditions and market volatility. (Kaplan, Tr. 3637, line 10 to p. 3638, line 4; Tr., p. 3642, lines 12-25).

832. The mortgage market experienced four surges of prepayment activity between 1991 and 1994. Despite this, and despite being hamstrung by having to operate under the Capital Plan during 1991, 1992 and 1993, Fidelity achieved significant profitability. This is indicative of the ability of a seasoned financial manager like Mr. Wesp to deal successfully with the known phenomenon of prepayment risk. (Kaplan, Tr. 3415, line 5 to p. 3418, line 8; DX 666, p. 4930).

833. A “teaser rate” is a low introductory rate on an adjustable rate mortgage loan. They are typically 50 to 200 basis points below the fully indexed rate and adjust upward at the first rate reset date. Teaser rates are a known phenomenon in the mortgage market, and they are taken into account in the pricing of mortgage-backed securities. The price of the security will adjust as the teaser rates evaporate. Institutions regularly manage their portfolios for teaser rates, just as they manage them for prepayments. (Kaplan, Tr. 3507, line 4 to p. 3510, line 22).

834. Dr, Kaplan originally did his lost profits damage calculation using a January 1, 1989 start date. He did so because the legislation that eventually became FIRREA was introduced in January 1989 and because more and more information emerged about this legislative effort as 1989 progressed. He later offered, as a demonstration, a second calculation which using a January 1, 1990 start date. He did so to demonstrate that when the start date for the calculation is set to a later date lost profit damages decrease, but they do not decrease to zero. Dr. Kaplan also did and offered a third lost profits calculation in which he used a July 1, 1989 start date. The Department objected to this as a “new damage theory,” and the Court sustained its objection. The calculation using a July 1, 1989 start date lowers the damages calculated by using the January 1, 1989 start date, but it does not lower then by as much as the calculation using the January 1, 1990 start date. It falls roughly midway between the two. (Kaplan, Tr. 3076, line 2 to p. 3078, line 18).

835. From March 1988 to December 1994, which includes the entire period Fidelity was under the Capital Plan, Fidelity’s mix of earning assets changed. While its overall level of earning assets did not appreciate significantly (and did not appreciate at all under the

Capital Plan), Fidelity increased its investment in adjustable rate mortgage-backed securities from 18 % to 55 % of its earning assets. There was a corresponding decrease in its portfolio of mortgage and other loans. (Kaplan, Tr. 3080, line 24 to p. 3082, line 25; PDX 67).

836. The change in asset mix described in the preceding paragraph and illustrated on PDX 67 reflected Fidelity's increased reliance on a "wholesale strategy." Increasing its investment in ARM MBS relative to whole loans reduced Fidelity's credit risk and made it less vulnerable to war, recession and other economic disruptions. (Kaplan, Tr. 3083, lines 1-10; PDX 67).

837. Dr. Kaplan wanted the asset composition of his hypothetical lost profits portfolio to represent more of something Fidelity was already doing instead of some new type of asset or new business strategy. For that reason, Dr. Kaplan chose adjustable rate mortgage-backed securities ("ARM MBS"). (Kaplan, Tr. 3084, lines 2-19;. PDX 67).

838. In selecting ARM MBS as the composition of his hypothetical lost profits portfolio, Dr. Kaplan was not saying that was the only type of incremental asset Fidelity would add in a non-breach world. To the extent the institution invested in other types of assets, which were higher yielding, its earnings on the incremental portfolio would exceed the earnings of Dr. Kaplan's portfolio. Dr. Kaplan chose ARM MBS because it was always readily available. (Kaplan, Tr. 3084, line 20 to p. 3087, line 17; PDX 67).

839. In basing his hypothetical lost profits portfolio on ARM MBS and by assuming a low rate of profitability on that portfolio, Dr. Kaplan was being conservative. He was constructing a floor or a minimum lower boundary. Fidelity might have made other

choices and earned more, but it was unlikely it would have earned less that the lost profits calculated by Dr. Kaplan. (Kaplan, Tr. 3085, line 19 to p. 3086, line 7; Tr. 3093, lines 5-23; PDX 70).

840. Dr. Kaplan chose as the funding source for his hypothetical portfolio of incremental assets borrowings from the Federal Home Loan Bank. These borrowings are more expensive than reverse repurchase agreements, however the longer maturities of the Federal Home Loan Bank borrowings are a better match to the maturities of the ARM MBS. As was the case with asset selection, Dr. Kaplan chose a funding source that matched a funding source Fidelity was already using. (Kaplan, Tr. 3087, line 23 to p. 3091, line 13; PDX 68).

841. Dr. Kaplan minimized credit risk in the hypothetical lost profits portfolio by using government agency and AA-rated ARM MBS. He minimized interest rate risk in the portfolio by using a funding source that was not the least costly but whose loans were of a duration that closely matched that of the assets purchased. (Kaplan, Tr. 3090, line 20 to p. 3091, line 9).

842. From March 1990 to September 1994 Fidelity's wholesale spread, i.e., the yield on its MBS less the cost of all of its borrowings averaged 1.14 % or 114 basis points. (Kaplan, Tr. 3095, line 18 through p. 3102, line 2; PDX 71).

843. From July 1989 to December 1994, Fidelity's actual spread on its adjustable rate mortgage-backed securities and the cost of one-year advances from the Federal Home Loan Bank of Des Moines was 1.53 % or 153 basis points. Dr. Kaplan used the rates from the Federal Home Loan Bank of Des Moines because it had published data for the

complete period, whereas the FHLB-NY had not. Dr. Kaplan determined that there was no significant difference between the rates of the two banks. (Kaplan, Tr. 3106, line 15 to p. 3112, line 6; PDX 72 and PDX 73).

844. Taking into account Fidelity's 85 basis point return on all of its tangible assets, Fidelity's 114 basis point return on all of its mortgage-backed securities, and the 153 basis point spread between adjustable rate mortgage-backed securities and one-year FHLB borrowings, Dr. Kaplan made the judgment that 80 basis points was the appropriate rate of return to use for his hypothetical portfolio of incremental assets. (Kaplan, Tr. 3112, line 14 to p. 3118, line 12; PX 1314A, ¶ 59).

845. By using an 80 basis point spread on the hypothetical portfolio of incremental assets, a spread which is lower than the 153 basis point spread available on ARM MBS financed with Federal Home Loan Bank borrowings, Dr. Kaplan was making allowance for factors beyond the control of Fidelity such as the economic effects of the First Gulf War, a recession, local events, retail competition, the phenomenon of prepayment, etc. (Kaplan, Tr. 3115, line 18 to p. 3117, line 20).

846. The 80 basis point spread used by Dr. Kaplan as the profitability of his hypothetical incremental portfolio is fair, reasonable and conservative. It constitutes the minimum amount Fidelity could have been expected to earn on incremental assets. Very likely Fidelity would have earned more. (Kaplan, Tr. 3118, lines 5-12).

847. Dr. Kaplan concluded that Fidelity would have had no difficulty in purchasing up to a billion dollars of incremental ARM MBS to implement his hypothetical incremental portfolio. Over and above the ARM MBS it owned, Fidelity had owned and sold over a

billion dollars of ARM MBS, so clearly at least that much capacity existed. (Kaplan, Tr. 3118, line 13 to p. 3124, line 16).

848. Fidelity's Capital Plan and 1994 Business Plan call for cash flow in excess of loan origination to be invested in MBS. Fidelity considered "cash flow" to include wholesale borrowings. (DX 78 at AST0705450; PX 1081 at WON759 1064).

849. The capital markets provided an adequate supply of mortgage-backed securities to meet Fidelity's investment needs. (PX 1081 at WON759 1064; Powderly, Tr. 1006, lines 17 to 24).

850. As a result of the Government's breach of contract and the consequent inability of Fidelity to count the Suburbia goodwill as capital, Fidelity's lost profits through 1994 were:

- $22.3 million if damages are measured from January 1, 1989;
- $18 million if damages are measured from July 1, 1989; and,
- $14.3 million if damages are measured from January 1, 1990.

(Kaplan, Tr. 3132, line 20 to p. 3146, line 14; . PDX 80, PDX 1314A, Exhibits 9A (Revised) and 9B (Revised).

851. The damage figures set forth in the previous paragraph are calculated on a quarter by quarter basis. The calculation starts with Fidelity's actual tangible assets at the beginning of the quarter. It then assumes that those assets would grow by 2 percent as a result of the hypothetical incremental portfolio. The difference between the actual tangible assets and the hypothetical or non-breach tangible assets if the "foregone assets." These are the assets Fidelity had to forego as a result of the breach. These are averaged over the quarter, and an 80 basis point spread, or profitability factor, is then applied. The resulting

figure is the lost profits for that quarter attributable to the Government's breach. Those quarterly totals are then summed to give the total for the entire period. (Kaplan, Tr. 3137, line 23 to p. 3143, line 13; PDX 80 and 1314A, Exhibits 9A (Revised) and 9B (Revised).

852. As between the January 1, 1989 and January 1, 1990 starting dates for the lost profit calculation, it is Dr. Kaplan's opinion that the January 1, 1989 starting date is the more reasonable because of the evidence that Fidelity was aware of and was reacting to legislative developments even before the enactment of FIRREA. (Kaplan, Tr. 3144, lines 12-23).

853. Should the Court conclude that a start date midway between those two dates is a more reasonable start date for the lost profits calculation, the Department, through its counsel, admitted that the damages calculation that was done using the July 1, 1989 start date is $3.5 million higher than the damages calculation using the January 1, 1990 start date. (Roberson, Tr. 3080, lines 11-20).

854. Dr. Kaplan stopped the first part of his calculation of Fidelity's lost profits damages at December 1994. He had to do this because Fidelity was acquired by Astoria at the end of January 1995. Following that acquisition, Fidelity ceased to exist as an independent entity, so it was not possible to do a calculation that requires that Fidelity's actual tangible assets be known. A different methodology was therefore used to calculate lost profits attributable to the Government's breach of its contract with Fidelity after the Astoria acquisition of Fidelity. (Kaplan, Tr. 3146, lines 1-14).

855. The methodology used to calculate lost profits from 1995 onward (through 2014, the end of the contractual period) starts with the knowledge that, in a non-breach world, Fidelity

would have had $98.783 million of additional capital which Astoria could leverage to put on additional assets and earn additional profits, using the same 80 basis point spread as a measure of profitability. (Kaplan, Tr. 3146, line 15 to p. 3148, line 19; Tr. 3156, lines 17-23; PDX 81).

856. A leverage ratio for an institution is determined by using the amount of its capital as the numerator and an appropriate base, either assets or liabilities, as the denominator. The resulting ratio, which will vary from institution to institution, is a way of expressing how much growth can be expected in that institution from a dollar of capital. So, for example, an institution with a 5 percent leverage ratio can be expected to support twenty dollars of assets or liabilities with a dollar of capital. (Kaplan, Tr. 3148, line 20 to p. 3150, line 19).

857. Dr. Kaplan calculated lost profits from January 1 1995 through 2014 on an annual basis by dividing the average remaining contractual goodwill balance by Astoria's leverage ratio (its actual ratio through 2001 and an assumed ratio thereafter) and then subtracting from that total the average amount of the goodwill (since goodwill is a non-earning asset). The result of that calculation is the incremental earning assets which could be supported by the remaining contractual capital. This figure is then multiplied by an assumed 80 basis point spread to give the lost profits for that year. Annual lost profits for the years 1995 through 2007 are added, as are the present values of annual lost profits for the years 2008 through 2014. The result is the total profits lost by Astoria on the remaining Fidelity contractual goodwill from 2005 to 2014. (Kaplan, Tr. 3157, line 3 to p. 3166, line 22; . PDX 82, PDX 84, PDX, 85 and PX 1314A, Exhibit 16).

858. As a result of the Government's breach of contract and the consequent inability of Astoria to utilize Fidelity's remaining contractual goodwill as capital, Astoria's lost profits for the years 1995 through 2014 were $97.161 million. (Kaplan, Tr. 3166, line 23 to p. 3167, line 8; PDX 85 and PX 1314A, Exhibit 16).

859. The total lost profits attributable to the Government's breach of contract, assuming a January 1, 1989 starting date, is $119.462 million. The total lost profits attributable to the Government's breach of contract, assuming a January 1, 1990 starting date, is $111.462 million. (Kaplan, Tr. 3167, line 20 to p. 3170, line 2; PDX 86, PX 1314A, Exhibits 9A, 9B and 16).

**C. THE TESTIMONY AND EXHIBITS ADMITTED AT TRIAL SUPPORT FIDELITY'S CLAIM FOR "WOUNDED BANK" DAMAGES.**

860. Fidelity's claim for "wounded bank" damages is based on higher assessments by the Office of Thrift Supervision and higher insurance premiums by the Federal Deposit Insurance Corporation. The higher assessments and higher insurance premiums resulted from the fact that, as a result of the Government's breach of contract, Fidelity was undercapitalized and considered to be a "troubled" institution. (Kaplan, Tr. 3170, line 19 to p. 3171, line 20; PDX 87).

861. Between October 1, 1990 and June 30, 1993 the Office of Thrift Supervision made assessments for examination at two levels, a General Rate and a Premium Rate. Because of the Government's breach of contract and Fidelity's consequent loss of the ability to treat remaining supervisory goodwill as regulatory capital, Fidelity was deemed a troubled institution and was charged for its examination assessments at the Premium Rate. Had Fidelity been allowed to count its remaining supervisory goodwill as capital,

Fidelity would not have been undercapitalized, would not have been deemed a troubled institution and would have been charged at the General Rate. The difference between the two rates, for the period October 1, 1990 and June 30, 1993 is $436,804. (Kaplan, Tr. 3170, line 19 to p. 3175, line 19; PDX 89 and PX 1314A, Exhibit 10).

862. Had Fidelity been able to continue to count its supervisory goodwill as regulatory capital, it would have had the flexibility to deal with its problem real estate assets differently than it in fact did. Fidelity would have used this capital to manage these assets such that Fidelity would not have been deemed a troubled institution on the basis of its real estate problems. Kaplan, Tr. 3175, line 19 to p. 3178, line 12).

863. The Federal Deposit Insurance Corporation SAIF ("Savings Association Insurance Fund") premiums are based on a combination of the institution's capitalization status and the overall CAMEL rating the institution received in its most recent OTS examination. (Kaplan, Tr. 3179, line 10 to p. 3180, line 6; PDX 90).

864. Because of the Government's breach of contract, Fidelity was deemed to be "undercapitalized" for the SAIF assessment periods January to June 1993 and July to December 1993. Had the Government not breached its contract, Fidelity would have been deemed "well-capitalized" for each of those periods. Also, had the Government not breached its contract, Fidelity's CAMEL rating would have been at least one level higher in each of the five assessment periods from January 1993 through June 1995. (Kaplan, Tr. 3179, line 10 to p. 3182, line 11; PDX 90, PDX 91 and PX 1314A, Exhibit 11).

865. Because of the Government's breach of contract, Fidelity paid higher SAIF assessments in each of the four assessment periods from January 1993 to December 1994. The total

of the excess assessments paid by Fidelity was $994,926. Kaplan, Tr. 3179, line 10 to p. 3182, line 11; PDX 90, PDX 91 and PX 1314A, Exhibit 11).

**D. FIDELITY'S RESTITUTION AND RELIANCE DAMAGES CLAIMS.**

866. The Government received a benefit when Fidelity put onto its books $160.093 of goodwill generated by the Suburbia acquisition and then completely amortized that goodwill by charging it against earnings. By performing as it had promised to perform, Fidelity eliminated the possibility that Suburbia's $160.093 in excess liabilities would come back to the FSLIC or FDIC and constitute a claim or a charge against the insurance fund. (Kaplan, Tr. 3184, line 18 to p. 31898, line 21).

867. The only outlays the Government made as a consequence of the takeover of Suburbia by Fidelity were the $16 million cash payment made as part of the transaction and the subsequent payment of approximately $3.7 million to retire Suburbia's Net Worth Certificates. (Kaplan Tr. 3187, lines 15-23; PDX 97).

868. No portion of Suburbia's net liabilities ever came back to the FSLIC or the FDIC as a claim or charge against the insurance fund. (Kaplan, Tr. 3187, lines 12-23).

869. Fidelity's efforts to work out its criticized assets while simultaneously increasing valuation reserves left the insurance fund and taxpayers with virtually no risk of having to pay for Fidelity's liquidation. (PX 795 at WON725 1394; Powderly, Tr. 526, line 18 to p. 527, line 11).

870. Part of the goodwill Fidelity put onto its books from the Suburbia transaction and fully amortized was Suburbia's $57.5 million capital deficit. Neither the FSLIC nor the FDIC

ever became liable for, or had to make payments on account of, any portion of this capital deficit. (Kaplan, Tr. 3188, line 15 to p. 3189, line 21).

871. Fidelity reduced its supervisory goodwill by $90 million, from $184 million to $93 million between 1985 and the passage of FIRREA. (DX 78 at AST0705437).

872. Fidelity further reduced supervisory goodwill to $13.5 million by April 1993. (PX 1020 at AST062721).

873. Fidelity continued to reduce the risk to the Government after FIRREA, increasing tangible capital by $15,300,000 in 1990, the first year of operation under the Capital Plan. (PX 686 at WON737 0660; PX 703 at AA005 1635).

874. When Fidelity successfully performed under the Capital Plan and then completed its recapitalization by converting and selling stock, Fidelity replaced all of the intangible goodwill it acquired in the Suburbia transaction with tangible capital. That tangible capital represented the accumulation of earnings over a period of years plus the cash raised in the public offering of Fidelity's stock. Fidelity therefore full alleviated the concern of the regulators that Suburbia's excess liabilities and capital deficits would become a charge against the insurance fund and require a costly liquidation. After Fidelity recapitalized, the chances of any of those things happening was nil. (Kaplan, Tr. 3189, line 22 to p. 3192, line 18; PDX 97).

875. After Fidelity successfully recapitalized, Suburbia's net liabilities ceased to exist. (Kaplan, Tr. 3192, lines 19-23).

876. Had the Fidelity acquisition of Suburbia not gone forward, the cost to the Government of resolving Suburbia would have risen. Suburbia's condition continued to decline after the

December 1992 bidders' conference, despite dramatic declines in interest rates between 1982 and 1984. Suburbia did not have the potential to turn itself around, and any strategy of simply biding time would simply increase the cost of the eventual sale or liquidation. (Kaplan, Tr. 3194, line 25 to p. 3201, line 10; PDX 98 and PDX 99).

877. Fidelity conferred a benefit on the Government in that it allowed the Government to avoid a cost of at least $147.963 million to liquidate Suburbia. That benefit is composed of Suburbia's negative net worth (capital deficit or accumulated losses) of $57.756 million and the estimated loss on the sale of Suburbia's assets, payoff of liabilities and receivership costs in the amount of $90.207 million. (Kaplan, Tr. 3201, line 22 to p. 3203, line 11; PDX 100 and PX 1314A, Exhibit 22).

878. Fidelity incurred a cost as a result of fully performing its obligations undertaken in the Suburbia transaction. It assumed and fully amortized goodwill in the amount of $160.093 million. This cost is composed of Suburbia's negative net worth (capital deficit or accumulated losses) of $57.756 million and the difference between the Market Value and Book Value of Suburbia's Assets and Liabilities (Net Liabilities) in the amount of $102.337 million. (Kaplan, Tr. 3201, line 22 to p. 3203, line 11; PDX 100 and PX 1314A, Exhibit 18).

879. Dr. Kaplan does not believe it is proper as a matter of economics to allow the Government to offset against restitution or reliance damages transitory accounting benefits or benefits received, if at all, only after the Government has ceased to honor the contract. (Kaplan, Tr. 3203, line 16 to p. 3211, line 10; PDX 101, PDX 102, PDX 103 and PDX 104).

880. The Plaintiff is entitled to Restitution damages in the amount of $129.691 million. This is composed of the benefit conferred by Fidelity on the Government in the amount of $147.936 million (minimum avoided Suburbia liquidation cost), plus Wounded Bank damages of $1.432 million, less cash assistance of $16 million and $3.677 paid to liquidate Suburbia's Net Worth Certificates. (Kaplan, Tr. 3211, line 24 to p. 3212, line 22; PDX 105 and PX 1314, Exhibit 22).

881. Alternatively, Plaintiff is entitled to Reliance damages in the amount of $141.848 million. This is composed of the cost fully assumed and discharged by Fidelity of $160.093 million, plus Wounded Bank damages of $1.432 million, less cash assistance of $16 million and $3.677 paid to liquidate Suburbia's Net Worth Certificates. (Kaplan, Tr. 3213, lines 2-16; PDX 106 and PX 1314, Exhibit 18).

882. As an alternative to either Restitution or Reliance damages, Plaintiff is entitled to Lost Profits in the amount of $120.912 million. This is composed of lost profits from 1989 to 1984 in the amount of $22.318 million, lost profits from 1995 to 2014 in the amount of $97.162 million, and Wounded Bank damages in the amount of $1.432 million. (Kaplan, Tr. 3213, line 21 to p. 3215, line 6; PDX 107 (Revised)).

**Mere Acquisition of Suburbia's Branches Conferred No Measurable Benefit On Fidelity. If Anything, FIRREA Negatively Impacted Fidelity's Franchise Value.**

883. The value of a thrift's branches can only be realized when the acquiring thrift makes the necessary investments by staffing and managing the branch, paying associated real-estate expenses, paying taxes and paying for advertising to attract both lenders and borrowers. (Powderly, Tr. 975, line 18 to p. 977, line 3; Powderly Tr. 821, lines 6-19; DX 78 at AST0705500).

884. It is important for a thrift institution to protect and grow the value of its franchise. The retail deposits generated in the form of demand accounts and savings accounts are a cheap source of money for a thrift institution as compared to borrowed funds. To preserve and grow its franchise, a thrift must manage its branches. It must serve its customers, offer products and services, deliver those products and services efficiently, and offer competitive rates. If it does not do those things, customers will leave. (Amend, Tr. 4774, line 13 to p. 4775, line 25).

885. After Fidelity acquired branches from its mergers with Dollar Federal and Suburbia, Fidelity had to pay expenses to manage and maintain the branches, including rent and maintenance on the buildings, employee costs, upgrading of equipment, product promotions, and marketing expenses. (Lovely, Tr. 1714, line 10 to p. 1715, line 10).

886. There are significant costs and expenses associated with maintaining branches. On a regular basis, Astoria spent money remodeling and maintaining the branches. Astoria also incurred costs associated with hiring and training employees. (Engelke, Tr. 5317, lines 2-11; Engelke, Tr. 5317, line 19 to p. 5318, line 16).

887. Mr. Engelke testified that whenever Astoria did an acquisition there were substantial maintenance costs for branch "makeovers" and "do-overs." This was especially true with acquisitions, because the last year or so before a company is acquired, the company typically does not spend a lot of money on maintenance. (Engelke, Tr. 5317, lines 2-11; Engelke, Tr. 5318, lines 19-24). There are also computer conversions at the branches that have to take place when you do an acquisition. (Engelke, Tr. 5317, line 19 to p. 5318, line 16).

888. In order to realize value from the former Suburbia branches, Fidelity, and later Astoria, had to invest in those branches and manage them on an ongoing basis. Had they not done so, it is reasonable to expect that the value of the deposits acquired from Suburbia would dissipate over time. (Kaplan, Tr. 3783, line 12 to p. 3785, line 7).

889. After FIRREA, Fidelity was not able to afford many of the operating expenses associated with branch management and so lost franchise value as a result. (Powderly, Tr. 821, lines 6-19; DX 78 at AST0705500; Powderly, Tr. 862, lines 9-22; Powderly, Tr. 433, lines 18-23; Powderly, Tr. 817, line 9-14).

890. Quite apart from any of the merger accounting, when Fidelity acquired Suburbia it acquired a $57.7 million accumulated deficit that Suburbia had amassed through repeated losses. (Kaplan, Tr. 3271, lines 7-20).

891. Given Suburbia's history of continuing losses, and given the expectation on the part of government regulators at the time of the merger that Suburbia was likely to continue to lose money in the foreseeable future, there is no basis on which one could conclude that any significant portion of Fidelity's post-merger income was attributable to its acquisition of Suburbia. (Kaplan, Tr. 3289, line 13 to p. 3292, line 6).

892. It was Dr. Kaplan's opinion that the acquisition of Suburbia did not provide any significant benefit to Fidelity and that, in the years following the acquisition up to the date of the breach, Suburbia constituted a significant "drag" on Fidelity. (Kaplan, Tr. 3369, line 24 to p. 3370, line 6).

August 6, 2007

Respectfully submitted,

/s/ Frank J. Eisenhart

Frank J. Eisenhart
*Counsel of Record*
Catherine Botticelli
Tara R. Kelly
Catherine E. Stahl
Craig Falls
Dechert LLP
1775 I Street, NW
Washington, DC 20006
202.261.3300
202.261.3333 (Fax)

*Attorneys for Plaintiff*
*Astoria Federal Savings & Loan Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2007, a copy of the foregoing **Proposed Findings of Fact of Plaintiff Astoria Federal Savings & Loan Association** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Frank J. Eisenhart

August 6, 2007