IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION, Plaintiff, | ) | No. 95-468C |
| v. | ) | (Judge Thomas C. Wheeler) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

**PROPOSED CONCLUSIONS OF LAW**
**OF PLAINTIFF**
**ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION**

Frank J. Eisenhart
Counsel of Record
Catherine Botticelli
Tara R. Kelly
Catherine E. Stahl
Craig Falls
Dechert LLP
1775 I Street, NW
Washington, DC 20006

Attorneys for Plaintiff
Astoria Federal Savings and
Loan Association

August 6, 2007

# TABLE OF AUTHORITIES

## CASES

*American Capital Corp. v. FDIC*, 472 F.3d 859 (Fed. Cir. 2006)........................................ 13, 19

*Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001).... 6, 10, 16, 17

*California FederalBank, F.S.B. v. United States*, 395 F.3d 1263 (Fed. Cir. 2005).................. 6, 7

*California Federal Bank, F.S.B. v. United States*, 245 F.3d 1342 (Fed. Cir. 2001)...................... 4

*California Federal Bank, F.S.B. v. United States*, 43 Fed. Cl. 445 (1999). .......................... 16, 18

*Castle v. United States*, 48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part*, 301 F.3d 1328 (Fed. Cir. 2002)................................................................................................................ 4

*Citizens Financial Services, F.S.B. v. United States*, 64 Fed. Cl. 498 (2005) ............................... 3

*Citizens Federal Bank, F.S.B. v. United States*, 474 F.3d 1314 (Fed. Cir. 2007)..................... 5, 6

*Commercial Federal v. United States*, 59 Fed. Cl. 338 (2004) ................................. 2, 4, 8, 12, 13

*First Federal Lincoln Bank v. United States*, 73 Fed. Cl. 633 (2006)............... 4, 5, 6, 8, 9, 10, 12

*First Federal Savings & Loan Ass'n of Rochester v. United States*, 76 Fed. Cl. 106 (2007)…………………………………………………………………………6, 7, 11

*Glass v. United States*, 47 Fed. Cl. 316 (2000)............................................................................ 11

*Glendale Federal Bank, F.S.B. v. United States*, 378 F.3d 1308 (Fed. Cir. 2004)................ 16, 18

*Glendale Federal Bank, F.S.B. v. United States*, 239 F.3d 1374 (Fed. Cir. 2001)................ 15, 19

*Glendale Federal Bank, F.S.B. v. United States*, 54 Fed. Cl. 8 (2002) ................................ 17, 18

*Globe Savings Bank, F.S.B. v. United States*, 65 Fed. Cl. 330 (2005)......................... 2, 6, 7, 8, 13

*Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297 (Fed. Cir. 2004)......................... 13, 20, 21

*Hansen Bancorp, Inc. v. United States*, 53 Fed. Cl. 92 (2002)........................................................ 19

*Holland v. United States*, 75 Fed. Cl. 483 (2007)........................................................................ 2

*Home Savings of America, F.S.B. v. United States*, 57 Fed. Cl. 694 (2003) .................................. 3

*Hughes Comm. Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001). .......................... 19

*Hughes v. United States*, 71 Fed. Cl. 284 (2006)................................................................. 10, 20

*La Salle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003).................. 10, 18

*LaSalle Talman Bank, F.S.B. v. United States*, 64 Fed. Cl. 90 (2005) .............................. 2, 3, 4, 5

*La Van v. United States*, 382 F.3d 1340 (Fed. Cir. 2004)............................................................ 2

*Locke v. United States*, 283 F. 2d 521 (Fed. Cir. 1960)........................................................ 10, 11

*Mobil Oil Exploration & Producing S.E., Inc. v. United States*, 530 U.S. 604 (2000). ............... 13

*Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006). ........................................... 19

*Precision Pine & Timber v. United States*, 72 Fed. Cl. 460 (2006)............................................... 3

*Seuss v. United States*, 74 Fed. Cl. 510 (2006) ............................................................................ 6

*Slatterly v. United States*, 69 Fed. Cl. 573 (2006). .............................................................. 10, 18

*Southern California Federal Savings & Loan Ass'n v. United States*, 422 F.3d 1319, 1336 (Fed. Cir. 2005). ........................................................................................................... 17

*Southern California Federal Savings & Loan Ass'n v. United States*, 57 Fed. Cl. 598 (2003), *aff'd in part, vacated in part on another issue*, 422 F.3d 1319, 1336-1338 (Fed. Cir. 2005) .. 17

*Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555 (1931).......................... 11

*United States v. Winstar Corp.*, 518 U.S. 839 (1996).................................................................... 3

*Westfed Holdings, Inc. v. United States*, 407 F.3d 1352 (Fed. Cir. 2005)............................. 19, 20

## SECONDARY SOURCES

RESTATEMENT (SECOND) OF CONTRACTS § 352, comment a ........................................................ 19

RESTATEMENT (SECOND) OF CONTRACTS § 371, comment a ........................................................ 13

RESTATEMENT (SECOND) OF CONTRACTS § 384 comment a ......................................................... 21

**PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW**

1. Three types of damages are available to a party injured by a breach of contract: (1) expectancy damages, which are intended to put the injured party in as good a position as it would have been in had the contract been performed; (2) restitution damages, which are intended to restore to the injured party the benefit that it has conferred on the other party; and (3) reliance damages, which are intended to put the injured party in as good a position as it would have been in had the contract not been made. *Globe Savings Bank, F.S.B. v. United States*, 65 Fed. Cl. 330, 345 (2005) (citing RESTATEMENT (SECOND) OF CONTRACTS § 344 (1981)).

**EXPECTANCY DAMAGES – RECOVERY FOR LOST PROFITS**

2. Damages for lost profits are recoverable where a plaintiff demonstrates that: (1) the loss was the proximate result of the breach; (2) the loss of profits resulting from the breach was foreseeable; and (3) the damages can be proved with reasonable certainty. *Holland v. United States*, 75 Fed. Cl. 483, 489 (2007); *Globe Savings Bank, F.S.B. v. United States*, 65 Fed. Cl. 330 (2005); *Commercial Fed. v. United States*, 59 Fed. Cl. 338, 34 (2004); *La Van v. United States*, 382 F.3d 1340, 1351 (Fed. Cir. 2004).

3. Damages are foreseeable if they "follow from the breach of contract in the ordinary course of events" or if they are the result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know. *LaSalle Talman Bank, F.S.B. v. United States*, 64 Fed. Cl. 90, 98 (2005); *Home Sav. of America, F.S.B. v. United States*, 57 Fed. Cl. 694, 706 (2003).

4. "The rule does not require that anything should have been foreseeable to a dead certainty . . . . The rule merely requires that the injury must be one of such a kind and amount as a prudent person would have realized to be a probable result of the breach." *Precision Pine & Timber v. United States*, 72 Fed. Cl. 460, 480 (2006) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 351 comment a, and 11 CORBIN ON CONTRACTS § 56.7)). It is sufficient to prove that the loss was foreseeable as a probable — rather than as a necessary — result of the defendant's breach. *Id.*

5. The Supreme Court has called the use of supervisory goodwill "essential" and "indispensable" to the acquisition of an insolvent thrift by a healthy thrift; without supervisory goodwill to bolster its capital, the acquiring institution would instantly be rendered insolvent by the debts of its unhealthy acquiree. *United States v. Winstar Corp.*, 518 U.S. 839, 839, 849, 850, 891-903 & n.52 (1996).

6. The Court of Federal Claims has held that the foreseeability requirement is satisfied where regulators knew or should have known that a bank intended to leverage its supervisory goodwill and capital credit. *Citizens Fin. Servs., F.S.B. v. United States*, 64 Fed. Cl. 498, 504 (2005). The breaching party need not have foreseen the breach itself. It is sufficient that it recognized the potential for damage if there *were* a breach. That potential is inherent in a supervisory goodwill case.

7. The Court of Federal Claims and the Federal Circuit agree that government regulators expected thrifts to profit from the use of supervisory goodwill on their books after government-assisted mergers. *LaSalle Talman Bank, F.S.B. v. United States*, 64 Fed. Cl.

90, 98 (2005); *Commercial Fed.*, 59 Fed. Cl. at 354-55. In *Commercial Federal*, for example, the court held that it was "foreseeable that as a result of the elimination of goodwill from regulatory capital, plaintiff would need either to replace the supervisory goodwill with another form of capital or shrink its assets to maintain its capital cushion. These consequences were not only foreseeable, they were a basic reason for the enactment of the breaching provisions of FIRREA." *Commercial Fed.*, 59 Fed. Cl. at 354.

8. Because the stated objective was to restore failing thrifts to profitability, "the government cannot credibly maintain that the potential for profit, without which plaintiffs would have had no incentive to complete the deal, was not within its contemplation." *Castle v. United States*, 48 Fed. Cl. 187, 205 (2000), *aff'd in part, rev'd in part*, 301 F.3d 1328 (Fed. Cir. 2002). Thus, the Federal Circuit held, "Profits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages." *California Federal, F.S.B. v. United States*, 245 F.3d 1342, 1359 (Fed. Cir. 2001) (citations omitted).

9. This Court has acknowledged that lost profits arising from the dissolution of supervisory goodwill is foreseeable in cases similar to Fidelity's. The *First Federal Lincoln* court, for example, held that:

> "it was therefore foreseeable that as a result of the elimination of supervisory goodwill from regulatory capital, [the acquiring thrift] would need to either replace the supervisory goodwill with another form of capital or shrink its assets to improve its capital position, in order to be as well off as it would have been had

> the contract been fully performed." *First Fed. Lincoln Bank v. United States*, 73 Fed. Cl. 633, 650 (2006).

10. FIRREA's elimination of supervisory goodwill caused many acquiring thrifts to fall out of capital compliance. It was foreseeable that Fidelity would fail to meet minimum capital requirements if its ability to use supervisory goodwill as capital was eliminated, requiring it either to sell off profit-earning assets or to forego profit-making opportunities. "It should have been equally foreseeable to the parties at the time they entered into these agreements that curtailment of supervisory goodwill could render the thrifts noncompliant with capital requirements, and . . . either put them out of business altogether or shrink their operations." *LaSalle Talman*, 64 Fed. Cl. at 89.

11. Just as it is clear that lost profits were a foreseeable consequence of Fidelity's loss of the ability to use supervisory goodwill as capital, it is equally clear that the lost profits Fidelity claims were proximately caused by the Government's admitted breach and the loss of capital that resulted from it.

12. The Federal Circuit has held that the "but-for," "substantial factor," and "definitely established" causation standards are all appropriate in *Winstar* cases. The Court wrote:

> "There have been a number of *Winstar*-related cases in which this court, in sustaining the Court of Federal Claims' award or rejection of lost profit damages, approved that court's use of the "but-for" theory of causation. We do not read those cases, however, as announcing any broad rule that the "but-for" theory of causation must always, or even generally, be used in determining damages in *Winstar*-related cases or prohibiting the trial court from using the "substantial factor" test in appropriate cases. *California Federal Bank v. United States* is not inconsistent with this analysis and

> conclusion. There the Court of Federal Claims applied a "definitely established" standard of causation."

*Citizens Fed. Bank, F.S.B. v. United States*, 474 F.3d 1314, 1319 (Fed. Cir. 2007).

13. The Federal Circuit has made clear that the Court of Federal Claims has discretion to choose the causation theory that best suits a particular case. *Id.* at 1318 (the causation standard in *Winstar* cases "lies largely within the trial court's discretion."); *see First Fed. Sav. & Loan Ass'n of Rochester v. United States*, 76 Fed. Cl. 106, 113 (2007) (noting the discretion).

14. Some cases have been evaluated under the "substantial factor" standard, under which a breaching party is liable for damages where the breach was a substantial factor in causing them. *Citizens Federal*, 474 F.3d at 1318. *Citizens Federal* affirmed the Court of Federal Claims's use of that standard for establishing that Citizens had proved the causation of lost profits. *Id.* at 1319-1320.

15. However, some recent cases seem to have employed a blend of the "definitely established" and "substantial factor" standard, holding that once the causal link is "definitely established," the breach need not be the sole factor or cause of the harm. *Seuss v. United States*, 74 Fed. Cl. 510 (2006); *California Federal v. United States*, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005); *Bluebonnet Sav. Bank F.S.B. v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001); *Globe Savings*, 65 Fed. Cl. at 346; *First Federal Lincoln* , 73 Fed. Cl. at 635-36. In *Globe Savings*, the court wrote that it relied on a "definitely established" causation standard. 65 Fed. Cl. at 346. Later, however, it described the

breach as " the definite, direct, and primary cause" of the plaintiff's damages. *Id.* at 347. The court's use of the phrase "*primary* cause" rather than "cause" or "sole cause," suggests that it applied a standard that contains an element of the "substantial factor" test.

16. Both the *Commercial Federal* and *California Federal* courts have used a causation standard that resembled a "but for" standard. Yet as the *California Federal* court explained, even that seemingly high standard had a "substantial factor" element to it. The court noted that the "but for" standard does not strictly preclude lost profits that are the result of a breach and other elements "operating in confluence with the breach." *California Federal*, 395 F.3d at 1268, citing E. Allan Farnsworth, CONTRACTS § 12.1, at 150-151 (3d ed. 2004). The court also noted that the breach need not be the sole factor or sole cause of the loss of profits. *Id.*

17. The causal link between Plaintiff's lost profits and the Government's admitted breach has been definitely established through testimony by Fidelity's senior managers, Mr. Wesp and Mr. Powderly, *see generally*, Proposed Findings of Fact, Sections III and IV, and its expert witness Dr. Kaplan, *see generally* Proposed Findings of Fact, Section VII (B), about Fidelity's pre-FIRREA operations and business plans and the comparison with post-FIRREA life under the Capital Plan. (This Court recently noted that Dr. Kaplan was a "knowledgeable, thorough, and credible witness" whose demeanor under "vigorous (not to say hostile)" cross-examination was "calm, business-like, confident, and careful." *First Fed. Sav. & Loan Ass'n of Rochester*, 76 Fed. Cl. at 121).

18. In *Globe Savings*, the Court found that plaintiff's damages were "definitely established" because the Regulators themselves admitted (in examination reports) that the enactment of FIRREA had made the thrift's capital position "grossly inadequate," and that the thrift had to shrink its assets because it was out of capital compliance. *Globe Savings*, 65 Fed. Cl. at 346. Similar comments were made in Fidelity examination reports, and the Record contains letters from regulators complaining repeatedly that Fidelity's problem (post-FIRREA) was that it was under-capitalized. *See, e.g.*, Proposed Findings of Fact 616 and 776, The Court of Federal Claims most recently awarded lost profits in *First Federal Lincoln Bank v. United States*, 73 Fed. Cl. 633. First Federal Lincoln contended that FIRREA caused it to shrink through the early 1990s by closing branches and running off deposits to shrink its balance sheet in order to satisfy the new capital requirements of FIRREA. *Id.*, 73 Fed. Cl. at 636. The Court held that plaintiff's lost capital was "more than a substantial factor contributing to" and in fact "definitely caused" the thrift's lost profits damages. The court held that "given the intertwined relationship of capital, asset quality, and earnings performance, the extent of Lincoln's post-breach shrink . . . would have lessened if the thrift's capital account was increased by $13.9 million" (the amount of goodwill it lost through FIRREA). *Id.* at 642. In so holding, the court relied on evidence that the thrift was healthy and profitable before FIRREA, and that post-FIRREA, the thrift's capital levels plummeted and resulted in restrictions on the types of assets the thrift could hold, and adversely affected its growth plan. *Id.* at 636-38.

19. The Record shows that pre-FIRREA, Fidelity was healthy and well-managed and was dealing with its real estate challenges. *See generally,* Proposed Findings of Fact, Section

III. The record further shows that after FIRREA, Fidelity was unhealthy, capital deficient, and existing at the whim of its regulators. *See generally*, Proposed Findings of Fact, Sections IV and V. Although Fidelity was still dealing with its real estate problems, it now had to do so in a hostile regulatory environment where regulators wanted huge, unprecedented reserves against potential real estate losses and were not hesitant to use Fidelity's capital weakness as an excuse to shut it down. *See generally*, Proposed Findings of Fact, Sections III (E), V (A) and V (C).

20. Like *First Federal Lincoln*, Fidelity was soundly criticized about its capital asset ratios as soon as FIRREA took effect. The first exam report issued after FIRREA assigned to Fidelity a composite rating of "5," the lowest possible score, indicating a "high immediate or near-term probability of failure." *See*, Proposed Findings of Fact 649 and 655. The *First Federal Lincoln* court concluded that "because the Government's breach reduced the thrift's capital account through the elimination of …supervisory goodwill, it heightened the regulators' criticisms of Lincoln's classified assets and core earnings." 73 Fed. Cl. at 640. The *First Federal Lincoln* court noted that the regulators' criticisms "flowed from, and were intertwined with, Lincoln's reduced capital position following the breach." *Id.* at 639. As in that case, Fidelity's regulator's criticisms flowed from and were intertwined with its reduced capital position in the wake of the Government's breach. *See*, Proposed Findings of Fact 665-673.

21. First Federal Lincoln's management scrambled to meet capital requirements post-FIRREA, facing threats of regulatory action, by drafting a plan to reduce expenses

associated with its branch network, closing branches, reducing its staff, and discontinuing its agricultural property lending services, among others. *Id.* at 641-42. So too did Fidelity draft a plan of rigid non-growth, drastic expense cutting, and the discontinuance of certain types of lending in response to threatened regulatory intervention. *See generally*, Proposed Findings of Fact, Section V (A). These factors "definitely establish" that Fidelity's losses were caused by the Government's breach. Just as in *Federal First Lincoln*, these factors prove that the Government's breach was "more than a substantial factor" in Fidelity's losses.

22. A plaintiff establishes a claim for lost profits with reasonable certainty "if the evidence adduced enables the court to make a fair and reasonable approximation of the damages." *Slatterly v. United States*, 69 Fed. Cl. 573, 576 (2006). "The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision. *Bluebonnet Sav.*, 266 F.3d at 1355, *quoted in Hughes v. United States*, 71 Fed. Cl. 284, 304 (2006). This Court "embraces the principle that when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *La Salle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003), *quoted in Hughes v. United States*, 71 Fed. Cl. 284, 303 (2006).

23. Proof with reasonable certainty is not the same as proof with absolute certainty. If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery. *Locke v. United States*, 283 F. 2d 521, 524 (Fed. Cir. 1960).

The Federal Circuit has stated that where the breach itself prevents determination of the amount of damages with precision, “it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.” *Glass v. United States*, 47 Fed. Cl. 316, 330 (2000) (citing *Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)) (noting that while *Story Parchment* was a tort case, the standard applied the same in breach of contract cases)(citation omitted), *rev’d on other grounds*, 258 F.3d 1349 (Fed. Cir. 2001). A defendant cannot “insist[] on proof which by reason of his breach is unobtainable.” *Locke*, 283 F.2d at 524 (Cl. Ct. 1960). In such cases, it is enough for the plaintiff to “show the extent of damages as a matter of just and reasonable inference, although the result be only approximate.” *Glass*, 47 Fed. Cl. at 330 (citing *Story Parchment*, 282 U.S. at 563 )(citations omitted).

24. Damages for a breach of contract are more often than not determined in a “but for” world – *i.e.*, a world in which it is assumed the breach of contract did not occur. Any damages inquiry which seeks to put a party in the position it would have been but for the breach of contract will necessarily be hypothetical. *See First Fed. Sav. & Loan Ass’n of Rochester*, 76 Fed. Cl. at 123 (noting that Dr. Kaplan’s testimony about “what would have happened in a world that never was” was a “sufficient and sound basis” for the court’s assessment of lost profits).

25. Courts have approved lost profits models as “reasonably certain” where the projected growth rate used in the model is based on actual demonstrated performance. In

*Commercial Federal*, for example, the lost profits model projected a 10% growth rate for the time immediately proceeding FIRREA through mid-1994. The model projected the plaintiff's lost profits based on actual earnings through fiscal year 1994. The model used the percentage composition of plaintiff's actual asset pool to establish the proportion of "but for" assets that would be leveraged and earning profits through 2011. The court awarded lost profits after holding that "[a]lthough plaintiff's model uses a process of projection, it is grounded in the actual performance of the bank both pre-FIRREA and post-conversion." *Commercial Federal*, 59 Fed. Cl. at 351 (internal citations omitted).

26. Dr. Kaplan based his projected 8% growth rate on Fidelity's historical experience. In his efforts to determine Fidelity's growth rate in the lost profits model, Dr. Kaplan examined Fidelity's status back to 1980, its past business plans, and its pre-FIRREA business plan which stated Fidelity's intention to "[g]row the balance sheet at approximately 8 to 10% per annum." Dr. Kaplan found that Fidelity's growth pre-FIRREA contrasted sharply with is post-FIRREA period of non-growth. *See* Proposed Findings of Fact 527 to 530, and 826-828.

27. This Court approved the use of adjustable rate mortgage-backed securities ("MBS") in the *Commercial Federal* lost profits model. There the Court determined that the plaintiff's projection of the profit yield on foregone assets in the form of MBS was reasonable, because it was based on the performance of investments the thrift actually maintained after the breach. *First Federal Lincoln*, 73 Fed. Cl. at 645 (citing to *Commercial Federal*, 59 Fed. Cl. at 351).

28. In *Globe Savings Bank, F.S.B. v. United States*, 65 Fed. Cl. 330, 351 (2005) and *Commercial Federal*, 59 Fed. Cl. at 342-43, this court emphasized the importance of the acquiring thrift's pre-breach growth to the reasonable certainty inquiry relating to an expert's projection of a thrift's post-breach growth.

**RESTITUTION DAMAGES – RETURN OF BENEFIT CONFDERED ON THE GOVERNMENT**

29. Restitution is a contract remedy that restores a party injured by a breach of contract to where it would have been had there been no contract. This Court has expressly held that restitution claims are available and appropriate for *Winstar* cases. *See American Capital Corp. v. FDIC*, 472 F.3d 859, 870 (Fed. Cir. 2006); *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1316-17 (Fed. Cir. 2004). Restitution permits a plaintiff to recover "any benefit that he has conferred on the repudiating party by way of part performance or reliance." *American Capital*, 472 F.3d 859, 870 (Fed. Cir. 2006) (quoting *Mobil Oil Exploration & Producing S.E., Inc. v. United States*, 530 U.S. 604, 608 (2000). To the extent that the benefit may reasonably be measured in different ways, the choice of measurement is within the discretion of the court. RESTATEMENT (SECOND) OF CONTRACTS § 371, comment a.

30. Plaintiff seeks restitution damages based on the net costs that the Government avoided when Fidelity merged with Suburbia. The calculation of these damages is based on what the Government's alternatives were in 1984 for resolving the Suburbia problem.

31. The Record shows that the Government regulators viewed Suburbia as a serious regulatory concern that, in 1984, required immediate action. Suburbia had suffered repeated operating losses and depletion of capital, and its financial structure suggested little prospect of turnaround in the immediate future no matter what happened to interest rates. Suburbia had been propped up at a minimal level of capital only through repeated use of Net Worth Certificates, and by mid-1984 it appeared that Suburbia was or soon would be ineligible for any additional net worth certificates. The regulators never calculated the cost of any alternative solution for Suburbia other than liquidation, and the Record does not suggest that the regulators had or ever seriously considered, as a solution for Suburbia, any alternative to the Fidelity acquisition other than liquidation. *See generally,* Proposed Findings of Fact, Sections I (H) through (N).

32. The usual argument made against a claim of restitution based on avoided cost of liquidation is to say that liquidation was not an option the regulators used in 1984, so the calculated cost of restitution is meaningless as a cost comparison. However, the Record in this case belies that argument. The FSLIC's own reports document liquidations throughout the 1980s in increasing frequency and size. *See generally,* Proposed Findings of Fact, Sections I (D) and (G). Further, the Record documents no serious consideration of an alternative to liquidation, even in the elaborate memos to the FHLBB which purport to list all of the alternatives. *See generally,* Proposed Findings of Fact, Sections I (H) through (N).

33. A frequent reaction by the Courts to restitution claims based on avoided liquidation costs is that the acquiring institution conferred no benefit on the FSLIC when it took the troubled thrift, because the FSLIC would still be liable for the excess liabilities if the acquiring thrift failed. *See, e.g., Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1382 (Fed. Cir. 2001). In this case, however, there is no need to speculate on whether the FSLIC who would ever have had to pay off Suburbia's excess liabilities. Fidelity paid off Suburbia's net liabilities by completely amortizing, with cash earnings, all of the supervisory goodwill put onto its books as a result of the Suburbia acquisition. Neither the FSLIC nor its successor the FDIC ever had to pay (or will have to pay) a penny on account of Suburbia's excess liabilities, *because Fidelity assumed and paid those liabilities*. *See generally*, Proposed Findings of Fact, Section V (D).

34. Another potential methodology for calculating Plaintiff's restitution damages would be to examine the alternative, as the Government declined to do in 1984, of again shopping around for another acquirer for Suburbia. The Government never calculated this cost. However, the Record discloses the cost of the four other bids for Suburbia received but not acted upon by the regulators prior to the Fidelity bid. Four prospective bidders in 1982 responded with bids that would have cost the FSLIC from $17.9 million to $33.9 million (the average cost to FSLIC would have been $24.35 million). Because Suburbia had further deteriorated in the two years since these bids were received, any new bid in 1984 would have almost certainly resulted in a higher cost to the FSLIC. *See generally,* Proposed Findings of Fact, Section I (L) through (N).

35. So, the Government did in fact avoid a sizable net cost and reap a substantial benefit when Fidelity acquired Suburbia. Under ordinary principles of restitution, it should return that benefit to the Plaintiff.

36. Even the Government regulators acknowledge that Fidelity's assumption of Suburbia's liabilities saved the Government significant capital. Mr. Vigna noted in his testimony that Fidelity's hard work with the OTS under the Capital Plan "resulted in a substantial savings to the American taxpayer." Proposed Finding Of Fact 714. Mr. Vigna testified that, in light of the amount of money spent on insolvent institutions in that era, Fidelity was "a great success story." *Id.*

**EXPECTANCY DAMAGES – "WOUNDED BANK" DAMAGES**

37. Wounded bank damages are a category of expectancy damages consisting of the increased costs that the plaintiff incurred due to a breach. In the *Winstar* context, wounded bank damages are the higher costs that a thrift encounters in conducting its general business after FIRREA and because of FIRREA. *Glendale*, 378 F.3d 1308, 1311 (Fed. Cir. 2004). The court has held that damages can include expenses made in preparing to perform or in forgoing opportunities. *California Federal Bank, F.S.B. v. United States*, 43 Fed. Cl. 445, 450 (1999).

38. In the *Glendale*, *Bluebonnet*, and *Southern California Federal Savings & Loan Association* cases, the courts awarded – and affirmed – damages for excess FDIC deposit insurance premiums and excess OTS assessments related to the plaintiffs' FIRREA-created undercapitalized status. *Glendale*, 378 F.3d at 1311-12; *Bluebonnet Sav.*, 266

F.3d at 1355-56; *Southern Cal. Fed. Sav. & Loan Ass'n. v. United States*, 57 Fed. Cl. 598 (2003), *aff'd in part, vacated in part on another issue*, 422 F.3d 1319, 1336-1338 (Fed. Cir. 2005).

39. *Glendale* described the wounded bank damages as "the increase in the cost of funds Glendale allegedly incurred as a result of its having been wounded by the Government's breach." 378 F.3d at 1311-12. The Court of Federal Claims awarded $381 million in wounded bank damages to Glendale. *Glendale Fed. Bank, F.S.B. v. United States,* 54 Fed. Cl. 8 (2002), *aff'd*, 378 F.3d 1308.

40. The *Southern California* court awarded wounded bank damages for increases in the thrift's costs due to being identified as a "troubled" institution, such as excess costs of funds, legal, consulting, and filing fees, deposit insurance premiums, FHLBB collateral delivery fees, FDIC deposit insurance premiums and excess assessments paid to the OTS. 57 Fed. Cl. at 598. In affirming the trial court's award of wounded bank damages, the Federal Circuit rejected the Department's arguments that the damages were too remote from the breach to be recoverable, that the wounded bank damages were not foreseeable, and that the damages methodology was flawed. *Southern Cal. Fed. Sav. & Loan Ass'n. v. United States*, 422 F.3d 1319, 1336 (Fed. Cir. 2005). The court wondered "why it would be unforeseeable that the loss of the contracted-for benefits would impact the health of Southern California and increase its costs of doing business, particularly since the regulatory treatment at issue was designed to foster the recovery of ailing thrifts." *Id.* at 1337.

41. Wounded bank damages in this case consist of higher deposit insurance premiums and increased OTS fees and assessments in the amount of $1,431,730. *See* PDX 89, PDX 91. Plaintiff's wounded bank claims satisfy the foreseeability, causation, and reasonable certainty standards required for expectancy damages. *See generally*, Proposed Findings of Fact, Section VII (B).

**RELIANCE DAMAGES – COSTS INCURRED IN RELIANCE ON THE CONTRACT**

42. Reliance damages are an alternative to Plaintiff's expectancy and restitution damage claims. Reliance damages place the non-breaching party in the position it would have been had it not entered the contract by awarding the injured party the costs it incurred in reliance on the contract. *California Federal,* 43 Fed. Cl. at 450; *see also Glendale*, 54 Fed. Cl. at 11. The Federal Circuit generally looks favorably on reliance damages and has stated that "[r]eliance is an ideal recovery in *Winstar* cases." *Glendale*, 378 F.3d at 1313.

43. A party that relies on another party's promise, made binding through a contract, is entitled to damages for any losses actually sustained as a result of the breach of that promise. *Slatterly,* 69 Fed. Cl. at 576. In the Supervisory Goodwill context, reliance damages should equal "the total amount of cash spent in [managing the acquired thrift], less the total amount of cash received. *Id.*, at 577 (citing *Glendale*, 54 Fed. Cl. at 13-14 and *LaSalle Talman*, 317 F.3d at 1380). Reliance damages are available for injuries that thrifts incurred both before and after the breach. *Glendale*, 54 Fed. Cl. at 11.

44. The damages evaluation for a reliance claim differs slightly from the lost profits and restitution determinations. To prevail on its reliance claim, Plaintiff is not required to show that the Government actually benefited from Fidelity's expenditures. *Hansen Bancorp, Inc. v. United States*, 53 Fed. Cl. 92, 98 (2002) (citing *Glendale*, 239 F.3d at 1382-83). Nor does Plaintiff have to prove that its losses would not have occurred in spite of the breach. *Id*. In addition, "[d]oubts are generally resolved against the party in breach." RESTATEMENT (SECOND) OF CONTRACTS § 352 comment a, *quoted by American Capital*, 472 F.3d at 869.

45. In order to be recoverable as reliance damages, Plaintiff's loss must have been foreseeable to the government at the time of contract formation *American Capital Corp.*, 472 F.3d at 869; *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1365 (Fed. Cir. 2005), and must be proximately caused by the breach, *Hughes Comm. Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2001). The Federal Circuit has noted that the need to replace regulatory capital, or the failure of a thrift due to deficiency in regulatory capital, is a foreseeable result of the Government's breach of its promise of regulatory forbearance. *Old Stone Corp. v. United States*, 450 F.3d 1360, 1377 (Fed. Cir. 2006).

46. In *Westfed Holdings, Inc. v. United States*, 407 F.3d at 1363, the causation standard was satisfied primarily by three pieces of evidence: (1) the acquiring institution's 1988 business plan, which called for aggressive growth; (2) the OTS's restrictions that stunted the bank's growth post-FIRREA; and (3) the capital restoration plan that OTS forced the

thrift to follow in lieu of its 1988 business plan. *Id.* The Federal Circuit implicitly acknowledged and affirmed the same definitely established/substantial factor blended causation standard that has emerged in Supervisory Goodwill lost profits claims. *See id.* at 1364.

47. In *Hughes v. United States*, the court analyzed the plaintiff's reliance and restitution claims simultaneously, noting that they were related concepts. 71 Fed. Cl. at 309. The court found that the two requirements of a successful reliance claim—foreseeability and proximate cause—were satisfied. *Id.* The court awarded the plaintiff reliance damages for the assets that it contributed to the acquired thrift.

48. Plaintiff's reliance damages were real, realized, and recoverable. Plaintiff's damages arise not from merely *assuming* Suburbia's net liabilities, but from actually *discharging* them—dollar by dollar, and at great cost to its regulatory standing and marketplace competitiveness. *See generally*, Proposed Findings of Fact, Section V (D).

**THE GOVERNMENT CAN CLAIM NO OFFSET TO RESTITUTION OR RELIANCE DAMAGES EXCEPT FOR BENEFITS IT DIRECTLY CONFERRED ON FIDELITY.**

49. "[G]enerally, any award of restitution to a plaintiff should be offset by the benefits he or she already has received from the defendant…. However…*Landmark* makes clear that offset is only proper where the benefits at issue were received directly from the breaching party." That court refused to find an offset where the plaintiff had received a $1.2 million dividend from the sale of the thrift because the dividend did not issue from the Government, nor pursuant to any requirement of the contract. *Hansen Bancorp, Inc. v.*

*United States*, 367 F.3d 1297, 1315-16 (Fed. Cir. 2004) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 384 comment a).

50. The Government has failed to prove an offset in this case beyond the $16 million cash payment made to Fidelity at the time of the merger and the subsequent $2,990,000 paid to retire Suburbia's Net Worth Certificates (assumed by Fidelity at the time of the merger). Offsets alleged by the Government such as the alleged franchise value of Suburbia or the loan discount recorded at the time of the merger are not benefits provided by the Government or conferred by contract.

August 6, 2007

Respectfully submitted,

/s/ Frank J. Eisenhart
Frank J. Eisenhart
*Counsel of Record*
Catherine Botticelli
Tara R. Kelly
Catherine E. Stahl
Craig Falls
Dechert LLP
1775 I Street, NW
Washington, DC 20006
202.261.3300
202.261.3333 (Fax)

*Attorneys for Plaintiff*
*Astoria Federal Savings & Loan Association*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 6, 2007, a copy of the foregoing **Proposed Conclusions of Law of Plaintiff Astoria Federal Savings & Loan Association** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Frank J. Eisenhart

August 6, 2007