**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,** | |
| **Plaintiff,** | |
| **v.** | **No. 95-468C** |
| | **(Judge Thomas C. Wheeler)** |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**DEFENDANT'S POST TRIAL MEMORANDUM OF FACTS AND LAW**

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Assistant Director

JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel. (202) 353-7972
Fax (202) 514-8640

OF COUNSEL:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR

August 6, 2007

Attorneys for Defendant

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . x

DEFENDANT'S POST TRIAL MEMORANDUM OF FACTS AND LAW . . . . . . . . . . 1

SUMMARY OF AGREEMENT . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . 11

DEFENDANT'S PROPOSED FINDINGS OF FACTS . . . . . . . . . . 18

I. WITNESSES WHO TESTIFIED AT TRIAL . . . . . . . . . . 18

II. HISTORY OF THRIFT RESOLUTION OPTIONS AND LIQUIDATIONS . . . . . . . . . . 23

III. FIDELITY'S ACQUISITION OF DOLLAR FEDERAL . . . . . . . . . . 30

IV. SUBURBIA FACED INTEREST RATE SPREAD PROBLEMS . . . . . . . . . . 31

V. THE BENEFITS OF THE FIDELITY AND SUBURBIA MERGER . . . . . . . . . . 39

VI. REGULATORY ASSESSMENT OF THE PROPOSED MERGER . . . . . . . . . . 46

VII. FIDELITY MERGES WITH SUBURBIA . . . . . . . . . . 55

VIII. FIDELITY INVESTED IN RISKY ASSETS THAT RESULTED IN SIGNIFICANT LOSSES . . . . . . . . . . 61

A. Fidelity Sold Suburbia Assets And Invested In Risky Commercial Real Estate Development Projects . . . . . . . . . . 61

B. Regulators Warned Fidelity About Its High Concentrations Of Condominium And Cooperative Lending . . . . . . . . . . 62

C. By 1986 Fidelity Had One-Fourth Of Its Assets In Highly Risky Commercial Real Estate Loans . . . . . . . . . . 69

D. Fidelity's Concentrations Of Commercial Loans Began Collapsing In 1987 And, Facing Catastrophic Losses, Fidelity Belatedly Resolved To Exit That Risky Arena . . . . . . . . . . 71

E. Due To Its Collapsing Loans, Fidelity Projects Minimal Growth In Its 1988 Budget . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

F. Fidelity's Problems Continued Into 1988 And In Late 1988 Fidelity Prepared A Three-Year Business Plan That Was Based Upon Unrealistic Assumptions Concerning Its Loan Losses And The Condition Of The General Economy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

G. By The Fall Of 1988, Fidelity Recognized The Numerous Proposals Being Considered To Ensure That Thrifts Were Adequately Capitalized . . . . . . 86

H. During 1989 Fidelity's Classified Assets Increased In Size And Severity . . . . . . 88

IX. FIRREA WAS ENACTED AND FIDELITY FELL OUT OF CAPITAL COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

A. Fidelity Did Not Have Prior Knowledge Of The Content Of FIRREA . . . . . . . . 91

X. FIDELITY'S CAPITAL PLAN PROJECTED A CONTINUATION OF THE SAME BUSINESS PLAN IT HAD FOLLOWED SINCE 1987 . . . . . . . . . . . . 95

A. Fidelity's Capital Plan Was A Continuation Of What The Thrift Had Been Doing Since 1987 Due To Its Loan Problems . . . . . . . . . . . . . . . . . . . 95

B. Fidelity's Business Problems and High Level Of Classified Assets Continued Through 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

1. Fidelity Experienced Business Problems Due To The Slowing Economy in 1990 and 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

2. Fidelity's Reports Of Examination Found Problems With Its Bad Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

3. Fidelity Faced Further Economic Weakness In 1991 and 1992 . . . . . . . 110

C. Following The 1991 Report Of Examination, Fidelity Was Placed Under A Supervisory Agreement Due To Its Failure To Correct Its Deficiencies In Dealing With Its Problem Loans . . . . . . . . . . . . . . . . . . . . . . . . 111

D. Fidelity's Bad Loans Were Reduced Only Slightly In 1992 . . . . . . . . . . . . . . . . 112

XI. FIDELITY UNDERWENT A SUCCESSFUL CONVERSION AND REGAINED CAPITAL COMPLIANCE . . . . . . . . . . 114

XII. ASTORIA, LIKE FIDELITY, CONVERTED TO A STOCK INSTITUTION IN 1993 . . . . . . . . . . 115

A. Pre-FIRREA Astoria . . . . . . . . . . 115

B. The Real Estate Recession In The Early 1990s Affected Astoria . . . . . . . . . . 117

1. Astoria Operated Conservatively Following FIRREA . . . . . . . . . . 117

2. Conservative Operations Did Not Shield Astoria From The Recession . . . . . . . . . . 118

3. Astoria Chose Not to Grow To Handle Non-Performing Loan Issues . . . . . . . . . . 119

a. Astoria's Statements Respecting The Economy in 1990 . . . . . . 120

b. Astoria's Statements Respecting The Economy in 1991 . . . . . . 121

c. Astoria's Statements Respecting The Economy in 1992 . . . . . 122

d. Astoria's Statements Respecting The Economy in 1993 . . . . . . 123

4. FIRREA Did Not Affect Astoria . . . . . . . . . . 124

C. Astoria Converted In 1993 For Reasons Wholly Apart From A Need To Meet Regulatory Capital Requirements .. . . . . . . . . . 124

1. Astoria's Capital Position Immediately Prior To Conversion . . . . . . . . 124

2. The Conversion Transaction . . . . . . . . . . 124

3. Astoria's Post-Conversion Operations . . . . . . . . . . 125

a. Capital Position .. . . . . . . . . . 125

b. Share Repurchases . . . . . . . . . . 126

c. Measurement Of Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

d. Dividends to AFC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

e. Conservative Retail Business Strategy . . . . . . . . . . . . . . . . . . . . 128

f. Decision Not To Grow By Investment . . . . . . . . . . . . . . . . . . . . 128

XIII. POST-CONVERSION FIDELITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

XIV. FIDELITY AND ASTORIA AGREED TO MERGE IN A PURCHASE ACCOUNTING MERGER .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

A. Negotiations And Structure Of Transaction . . . . . . . . . . . . . . . . . . . . . . 133

B. Astoria Deals With Fidelity's Problem Loans During Merger . . . . . . . . 134

C. Treatment of Fidelity's Goodwill In Merger .. . . . . . . . . . . . . . . . . . . . . 136

D. Astoria Placed No Value On Fidelity's Goodwill Plan . . . . . . . . . . . . . 137

E. Effect of Fidelity Merger on Astoria .. . . . . . . . . . . . . . . . . . . . . . . . . . 138

F. Astoria's Capital Position Following Fidelity Merger . . . . . . . . . . . . . . 141

DEFENDANT'S CONTENTIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

I. ASTORIA HAS FAILED TO PROVE ENTITLEMENT TO AN AWARD OF RESTITUTION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

A. Description Of Astoria's Restitution Claim . . . . . . . . . . . . . . . . . . . . . . 142

B. Precedent Has Rejected Restitution Claims Premised Upon Avoided Liquidation Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

C. No Record Evidence Renders Astoria's Restitution Claim Viable .. . . . 144

1. There Was Nothing In The Record To Distinguish The Economic Or Regulatory Environment Under Which Suburbia Was Operating From That Of The Thrifts In The Other Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

2. To The Extent Any Facts Distinguish Suburbia From Other Troubled Thrifts, They Show FSLIC Was Less Likely To Liquidate Suburbia . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

a. The Record Does Not Support Dr. Kaplan's Assumption That FSLIC Would Have Liquidated Suburbia Had Fidelity Not Acquired It . . . . . . . . . . . . . . 148

(1) FSLIC Did Not Liquidate Thrifts At The Time . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

(2) Interest Rates Declined After The Suburbia Acquisition . . . . . . . . . . . . . . . . . . . . . . 150

(3) Suburbia Would Not Have Been Liquidated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

b. Fidelity Lacked The Economic Capacity To Provide A Benefit In The Amount Claimed By Astoria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

c. Dr. Kaplan Errs By Ignoring Easily Identifiable Offsetting Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

(1) Dr. Kaplan's Had No Basis To Ignore Offsets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

(2) Dr. Kaplan Ignored Many Of Fidelity's Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

(3) Suburbia's Franchise Was Valuable . . . . . . . . . . 161

D. Astoria's Restitution Claim Also Fails To Meet Other Legal Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

II. ASTORIA'S RELIANCE CLAIM FAILS AS A MATTER OF LAW AND FACT .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

A. Description Of Astoria's Reliance Damages Claim . . . . . . . . . . . . . . . . . . . . . . . 166

B. Precedent Has Rejected Reliance Claims Premised Upon Net Liabilities Assumed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

C. The Record Evidence Does Not Support Astoria's Claim That The Net Liabilities Assumed Represented A Cost To Fidelity. . . . . . . . . . . . . . 171

1. Same General Factual Scenario Applied To Suburbia Acquisition As The Other Cases Rejecting Identical Reliance Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

2. The Facts Demonstrate That Dr. Kaplan Ignores Significant Benefits That Constitute An Offset To His Claimed Reliance Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

a. Dr. Kaplan Errs By Ignoring Substantial Direct Benefits Attributable To Suburbia Before The Breach . . . . . . . 178

b. Dr. Kaplan Improperly Ignores Economic Benefits That Fidelity And Astoria Received After The Breach . . . . . . . . . . . 183

IV. ASTORIA'S EXPECTANCY CLAIMS FAIL AS A MATTER OF LAW AND FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

A. Overview Of Astoria's Expectancy Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

B. Legal Standards For Expectancy Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

C. Astoria's Lost Profits Claims Fail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

1. Description Of Astoria's Lost Profits Claims . . . . . . . . . . . . . . . . . . . . . 192

a. Fidelity's Lost Profits From 1989 To 1994 . . . . . . . . . . . . . . . . . 192

b. Astoria's Lost Profits From 1995 To 2014. . . . . . . . . . . . . . . . . 193

2. Dr. Kaplan's Post-Astoria Damages Are Speculative . . . . . . . . . . . . . . . 194

a. Fidelity's Goodwill Would Not Have Survived The Astoria Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

b. Astoria Would Have Had No Use For Additional Leverage Capacity From Fidelity's Goodwill . . . . . . . . . . . . . . . 197

c. Dr. Kaplan's Methodology Is Unreliable . . . . . . . . . . . . . . . . . . 200

3. Dr. Kaplan's Pre-1994 Lost Profits Are Unsupported . . . . . . . . . . . . . . 207

4. Dr. Kaplan's Pre-1994 Lost Profits Fail For Lack Of Causation . . . . . . 214

a. No Causation For Pre-FIRREA Damages .. . . . . . . . . . . . . . . . . 214

b. Regulators Would Have Barred Any Growth In Fidelity's Assets Pursuant to RB3a-1 Irrespective Of The Breach . . . . . . . 217

c. Regulatory Concern With Fidelity's Very High Interest Rate Risk Would Have Existed Irrespective Of The Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

d. Regulators Would Have Barred The Growth In The Wholesale Strategy Envisioned By Dr. Kaplan Irrespective Of The Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

e. No Causation Before Or After The Conversion . . . . . . . . . . . . . 225

f. Fidelity Would Not Have Grown Absent The Breach In The Manner Dr. Kaplan Presumes . . . . . . . . . . . . . . . . . . . . . 228

g. Economic Constraints Barred Dr. Kaplan's Growth . . . . . . . . . . 229

h. Other NonBreach Factors Would Have Caused Fidelity To Restrict Its Growth .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

i. Dr. Kaplan Omits Costs Fidelity Would Have Borne In A Non-Breach World . . . . . . . . . . . . . . . . . . . . . . . . . . 234

5. Dr. Kaplan's Lost Profits Claims Fail For Lack Of Foreseeability .. . . . 236

a. Precedent Indicates Damages Nearing The Goodwill Amount Are Unforeseeable . . . . . . . . . . . . . . . . . 236

b. Fidelity's Operations Gave Regulators No Reason To Foresee The Scale Or The Source Of The Damages Dr. Kaplan Posits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

6. Dr. Kaplan's Lost Profits Claims Are Not Reasonably Certain . . . . . . . 239

a. Fidelity's 1989-1994 Lost Profits Are Speculative .. . . . . . . . . . . 239

i. The Composition Of Dr. Kaplan's Non-Breach Bank's Assets And Liabilities Are Uncertain . . . . . . . . . 240

ii. Dr. Kaplan's Assumed Growth Rate Is Unsupportable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

.

A). Dr. Kaplan's Reliance Upon Astoria's Growth Rate Is Unsupported . . . . . . . . . . . . . . . . 246

B). Dr. Kaplan's Reliance Upon The October 1988 Business Plan Is Unsupported . . . . . . . . . . . 249

C). Dr. Kaplan's Use Of Fidelity's Pre-FIRREA Growth Rate Is Unsupported .. . . . . . . . . . . . . . . . 258

D). Dr. Kaplan's Use Of Fidelity's Post-FIRREA Growth Rate Is Unsupported .. . . . . . . . . . . . . . . . 261

iii. Dr. Kaplan's Assumed Spread Is Unsupported .. . . . . . . 263

A). Dr. Kaplan's Spread Assumption Contradicts Fidelity's Actual Experience And Is Methodologically Unsound . . . . . . . . . . . . . . . . 263

B). Dr. Kaplan's 153 Basis-Point Spread Between Wholesale Yields And FHLB Advances Does Not Support His Spread Assumption . . . . . . . . 266

C). Fidelity's Actual Wholesale Spreads Do Not Support Dr. Kaplan's Spread Assumption . . . . . 270

D). Fidelity's Whole Bank Return Does Not Support Dr. Kaplan's Spread Assumption . . . . . 272

E). The 80 Basis-Point Spread Was Not "Generally Available In The Marketplace" . . . . . . . . . . . . . 273

F). Other Alleged Support For Dr. Kaplan's Spread Is Undermined By Competition . . . . . . . 274

b. Dr. Kaplan's Post-Astoria Merger Damages Are Speculative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

c. Dr. Kaplan's Post-Astoria Damages Fail To Adjust For A Non-Breach World . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276

7. Other Winstar Cases Offer No Support For Dr. Kaplan's Methodology . . . . . 276

V. DR. KAPLAN'S "WOUNDED BANK" CLAIMS FAIL . . . . . 279

A. OTS Assessment Claim Is Speculative . . . . . 280

B. FDIC Insurance Premium Claim Is Speculative . . . . . 285

CONCLUSION . . . . . 288

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Aktieselskabet Dampskibsselskabet Svenborg v. United States,
131 Ct. Cl. 399, 130 F. Supp. 363 (1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

American Capital Corp. v. United States,
59 Fed. Cl. 563 (2004),
aff'd in part, rev'd in part, 472 F.3d 859 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

American Fed. Bank, FSB v. United States,
62 Fed. Cl. 185 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Ariadne Fin. Servs. Pty. Ltd. v. United States,
133 F.3d 874 (Fed. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

Astoria Fed. Sav. & Loan Ass'n v. United States,
72 Fed. Cl. 712 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Aurigemma v. Arco Petroleum Prods. Co.,
734 F. Supp. 1025 (D. Conn. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Bank of America, FSB v. United States,
Nos. 2006-5088, -5089, -5090, 2007 WL 2137774 (Fed. Cir. July 26, 2007). . . . . . . . . . . . . 9, 214

Bank United of Texas, FSB v. United States,
50 Fed. Cl. 645 (2001), rev'd in part,
80 Fed. Appx. 663, 2003 WL 22177282 (Fed. Cir. Sept. 22, 2003),
cert. denied, 543 U.S. 916 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189, 190

Bohac v. Dep't of Agriculture,
239 F.3d 1334 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

California Fed. Bank v. United States,
43 Fed. Cl. 445 (1999),
vacated in part on other grounds,
245 F.3d 1342 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

California Fed. Bank, FSB. v. United States,
54 Fed. Cl. 704 (2002),
aff'd, 395 F.3d 1263 (Fed. Cir. 2005), cert. denied, 546 U.S. 817 (2005). . . . . . . . . . . . . . . *passim*

Carley Capital Group v. City of Newport News,
709 F. Supp. 1387 (E.D. Va. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Caroline Hunt Trust Estate v. United States,
65 Fed. Cl. 271 (2005), aff'd in part rev'd in part and remanded,
470 F.3d 1044 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd in part & rev'd in part,
301 F.3d 1328 (Fed. Cir. 2002), cert. denied,
539 U.S. 925 (2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Citizens Fed. Bank, FSB v. United States,
52 Fed. Cl. 561 (2002),
aff'd, 474 F.3d 1314 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144, 187

Citizens Fin. Serv., FSB. v. United States,
64 Fed. Cl. 498 (2005), aff'd,
170 Fed. Appx. 129, 2006 WL 618792 (Fed. Cir. Mar. 9, 2006). . . . . . . . . . . . . . . . . . . . 188, 189

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Comm. Fed. Bank, FSB v. United States,
59 Fed. Cl. 338 (2004), aff'd, 125 Fed. Appx. 1013,
2005 WL 857772 (Fed. Cir. Apr. 8, 2005) (unpublished table decision). . . . . . . . . . . . . . . *passim*

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

Fifth Third Bank of Western Ohio v. United States,
55 Fed. Cl. 223 (2003),
appeals docketed 2006-5128, -5129 (Fed. Cir. Sept. 1, 2006).. . . . . . . . . . . . . . . . . . . . . . . *passim*

Fifth Third Bank of Western Ohio v. United States,
402 F.3d 1221 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

First Fed. Lincoln Bank v. United States,
73 Fed. Cl. 633 (2006), appeals docketed, No. 07-5044 (Fed. Cir. 2007).. . . . . . . . . . . . . . 11, 276

First Fed. Sav. & Loan Ass'n of Rochester v. United States,
76 Fed. Cl. 106 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Franklin Fed. Bank v. United States,
55 Fed. Cl. 108 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144, 169

Franklin Fed. Sav. Bank v. United States,
431 F.3d 1360 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

Glendale Fed. Bank, FSB v. United States,
43 Fed. Cl. 390 (1999), aff'd in part, vacated in part, & remanded,
239 F.3d 1374 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Glendale Fed. Bank, FSB v. United States,
54 Fed. Cl. 8 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

Glendale Fed. Bank, FSB v. United States,
378 F.3d 1308 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Globe Savings Bank, FSB v. United States,
65 Fed. Cl. 330 (2005), aff'd in part, vacated in part,
189 Fed. Appx. 964, 2006 WL 2045776 (Fed. Cir. Jul. 20, 2006). . . . . . . . . . . . . . . . . . . . . . . 189

Granite Mgmt. Corp. v. United States,
58 Fed. Cl. 766 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Granite Mgmt. Corp. v. United States,
416 F.3d 1373 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Granite Mgmt. Corp. v. United States,
74 Fed. Cl. 155, 161-64 (2006)
appeal docketed, No. 2007-5054 (Fed Cir. Feb. 6, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170, 187

Herman Schwabe, Inc. v. United Shoe Mach. Corp.,
297 F.2d 906 (2d Cir. 1962).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

Landmark Land Co. v. United States, 46 Fed. Cl. 261 (2000),
aff'd in part, vacated and remanded,
256 F.3d 1365 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

LaSalle Talman Bank, FSB v. United States,
45 Fed. Cl. 64 (1999),
aff'd in part, vacated in part, & remanded,
317 F.3d 1363 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

LaSalle Talman Bank, FSB v. United States,
64 Fed. Cl. 90 (2005),
aff'd, 462 F.3d 1331 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Long Island Sav. Bank, FSB v. United States,
60 Fed. Cl. 80 (2004), rev'd on other grounds,
476 F.3d 917 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144, 169

Martin v. United States, 126 S.Ct. 2967 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Resolution Trust Corp. v. FSLIC,
25 F.3d 1493 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

S. Nat'l Corp. v. United States, 57 Fed. Cl. 294 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

S. Pac. Comm. Co. v. AT&T, 556 F. Supp. 825 (D.D.C. 1982). . . . . . . . . . . . . . . . . . . . . . . . 188

Southern Cal. Fed. Sav. & Loan Ass'n v. United States,
57 Fed. Cl. 598 (2003), aff'd in part, rev'd in part, & remanded,
422 F.3d 1319 (Fed. Cir.2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189, 190

Standard Fed. Bank v. United States,
62 Fed. Cl. 265 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Suess v. United States,
52 Fed. Cl. 221 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

United States v. Winstar Corp.,
518 U.S. 839 (1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996). . . . . . . . . . 188, 190

Westfed Holdings, Inc. v. United States,
407 F.3d 1352 (Fed. Cir. 2005). . . . . . . . . . 168, 178

## STATUTES, RULES AND REGULATIONS

Financial Institutions Reform, Recovery and Enforcement Act,
Pub. L. 101-73, 103 Stat. 183 (1989). . . . . . . . . . 2

12 C.F.R. § 567.5(a)(1). . . . . . . . . . 93

12 C.F.R. § 567.5(a)(2). . . . . . . . . . 93

12 U.S.C. § 1464(t)(3)(A). . . . . . . . . . 93

12 U.S.C. § 1464(t)(9)(c). . . . . . . . . . 93

## MISCELLANEOUS

3 Daniel B. Dobbs, Law of Remedies § 12.3(1),
at 51-52 (2d ed. 1993). . . . . . . . . . 170

Charles T. McCormick, Damages § 142, at 584 (1935). . . . . . . . . . 170

Restatement (Second) of Contracts § 347, cmt. b (1981). . . . . . . . . . 187

Restatement (Second) of Contracts § 352 (1981). . . . . . . . . . 188

Restatement (Second) of Contracts § 384(1), cmt. a. . . . . . . . . . 165

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,** | |
| **Plaintiff,** | |
| **v.** | **No. 95-468C** |
| | **(Judge Thomas C. Wheeler)** |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**DEFENDANT'S POST TRIAL MEMORANDUM OF FACTS AND LAW**

SUMMARY OF ARGUMENT

In October 1984, Fidelity New York, F.S.B. ("Fidelity"), a thrift located in Long Island, New York, acquired Suburbia Federal Savings and Loan Association ("Suburbia"), another Long Island thrift. Like most thrifts at that time, Suburbia was struggling with interest-rate spread problems.

Fidelity's acquisition of Suburbia was voluntary, as both thrifts anticipated enormous benefits from the transaction. Fidelity paid nothing to acquire Suburbia and obtained millions of dollars in assistance from the Federal Savings and Loan Insurance Corporation ("FSLIC"), tens of millions of dollars in tax benefits, a valuable banking franchise, savings from economies of scale, and increased banking capabilities -- and almost tripled in size. Furthermore, pursuant to the Assistance Agreement between Fidelity and the FSLIC, Fidelity was permitted to utilize the unamortized goodwill created at the time of the acquisition toward its regulatory capital levels.

After acquiring Suburbia, however, Fidelity squandered the opportunities given to it by the Suburbia acquisition. Fidelity, led by Thomas Lovely and Bruno Greco, pursued a deliberate

policy of making high-risk commercial loans, concentrating these loans with just a handful of large developers. In pursuit of this high-risk policy, Fidelity sold off a large amount of the assets it acquired from Suburbia, traditional one-to-four-family mortgages, and it reinvested the proceeds in the risky concentrations. Despite repeated warnings from thrift regulators, by 1986, fully one-fourth of Fidelity's assets were high-risk commercial loans; yet, Fidelity continued underwriting more loans to the same large developers.

In 1987, the bottom fell out of the commercial real estate development market in New York, the result of an overextended market and the repeal of tax laws favorable to real estate investments. Within a year-and-a-half period, from June 1986 to September 1987, Fidelity's classified loans increased exponentially, from $16 to $84 million, with $46 million of these loans constituting nonearning assets. Fidelity's decision to pursue concentrations in high-risk loans had more than backfired; it had placed the institution in a position where regulators felt that the "future viability" of the thrift was at risk.

The extent of Fidelity's problems was revealed in the 1987 examination of the thrift by the Federal Home Loan Bank Board ("FHLBB"), the predecessor to the Office of Thrift Supervision ("OTS"). At the conclusion of the examination, the FHLBB assigned Fidelity a "4," the second lowest rating a thrift can receive and just one numeral above a "5" rating, which signifies that a thrift has an "extremely high immediate probability of failure." At that time -- almost two years before the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA") -- Fidelity was rated highly for its "capital," which included the entire unamortized balance of the goodwill arising from the Suburbia acquisition. Thus, before FIRREA's enactment and wholly apart from

its capital level, regulators found Fidelity to be in a highly unsatisfactory condition with "major and serious problems."

During 1986, Fidelity retained additional upper level management, including Thomas Powderly and William Wesp, and they, too, soon discovered the severity of Fidelity's asset problems. After a period of managerial infighting and turmoil, these new officers finally persuaded Messrs. Lovely and Greco to cease making additional high-risk loans. Unfortunately for Fidelity, however, stopping the issuance of new high-risk loans did not stop the existing loans from getting worse. Between October 1987 and November 1989, Fidelity's classified loans increased by another 20 percent, as the economy in New York continued to decline. In August 1989, Congress passed FIRREA, an act that we have acknowledged breached plaintiff's contract with the Government. Unrelated to FIRREA, however, Fidelity's bad loans continued deteriorating through the early nineties. Ultimately, Fidelity had to set aside more than $80 million in loss allowances for losses incurred between January 1986 and December 1994.

In May 1993, Fidelity converted from a mutual to a stock institution, raising enough capital so that all regulatory restrictions on the thrift's growth were immediately terminated. In January 1995, Fidelity was acquired by Astoria Federal Savings and Loan Association ("Astoria"), an institution that has always maintained large amounts of excess capital.

At trial, Astoria presented four damage theories. First, Astoria claimed restitution damages of $128 million based upon a benefit allegedly conferred by Fidelity to the Government in the form of the avoided costs of liquidating Suburbia. Second, and alternatively, Astoria claimed it is entitled to reliance damages of $141 million based upon Fidelity's alleged assumption of $160 million of Suburbia's net liabilities, calculated by a purchase accounting

mark-to-market of Suburbia's assets and liabilities prior to its acquisition by Fidelity. Third, and also alternatively, Astoria sought $115 million in lost profits that it alleges Fidelity and Astoria would have earned but for the breach. Fourth, and in addition to each of the three theories above, Astoria alleged $1.4 million in "wounded bank" damages, based upon increased examination and insurance premium costs that it alleges Fidelity would not have paid, but for the breach. Based upon the evidence presented at trial and guided by the authority of this Court and the Court of Appeals for the Federal Circuit, it is apparent that Astoria's damage claims are unfounded.

Addressing first Astoria's restitution claim, there is nothing distinguishing this case from any number of restitution claims brought by other plaintiffs in the Winstar litigation, which have all been dismissed, either by this Court, or, upon appeal, by the Federal Circuit. Astoria's restitution claim is premised upon the notion that, if Fidelity did not acquire Suburbia, Suburbia would have been liquidated by the Government. At trial, however, we established that there was essentially no chance that, if Fidelity did not acquire Suburbia, FSLIC would have liquidated Suburbia. The testimony was unanimous that, as of 1984, FSLIC lacked the funds and would not have liquidated a nearly $700 million institution, especially one such as Suburbia, whose difficulties were caused merely by interest rate spread problems.

Rather than liquidate Suburbia, FSLIC would have done any number of things to deal with Suburbia's problems, including extending the grant of regulatory capital certificates and rebidding Suburbia to obtain another acquirer. In fact, plaintiff's expert, Dr. Donald M. Kaplan, admitted that he had no idea what FSLIC would have done if Fidelity's acquisition had not gone forward:

> I can't answer that. FSLIC would have made it a determination on how it felt best for it to proceed. They may have proceeded to liquidate. They may have done, as you suggest, and rebid it. I really don't know what decision they would have made in that instance.

Tr. 3363:5-9 (Kaplan).

As we established at trial, the policy of the regulators was to buy time for the savings and loan industry until interest rates fell. Interest rates did fall, and the interest rate spread problems of thrifts were largely solved. Further, Fidelity, which itself had little or no real equity on a mark-to-market basis at that time, lacked the capacity to provide the Government with the "restitution" benefit claimed by Astoria. Therefore, under no scenario could Fidelity have provided the Government with the avoided liquidation cost benefit claimed by Astoria.

The fact of the matter is that Astoria's restitution claim ploughs through ground previously addressed in a dispositive fashion by the Federal Circuit. As the Federal Circuit stated in Glendale Federal Bank, FSB v. United States, 239 F.3d 1374 (Fed. Cir. 2001), "the action taken by the purchasing S&L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift." Id. at 1382. This is because, again, the FSLIC "lacked sufficient funds to liquidate even a small percentage of the thrifts that became insolvent." Id. at 1377; see also United States v. Winstar Corp., 518 U.S. 839, 847 (1996) (recognizing that "FSLIC lacked the funds to liquidate all of the failing thrifts"). Furthermore, the Glendale Court correctly recognized that regulators did, indeed, have a policy of buying time until interest rates fell. Glendale, 239 F.3d at 1382. As the Glendale Court explained (in a manner consistent with the evidence we presented at trial here), there was no scenario in which acquiring thrifts would confer a significant benefit upon the Government. If

rates declined, then the acquired thrifts' major problem would be solved. If rates did not decline, the entire industry would have failed and the Government would have been responsible for dealing with all of the net liabilities. See Glendale, 239 F.3d at 1382.

In short, Astoria's restitution damage claim based upon an avoided liquidation cost is simply not cognizable, having no foundation in either fact or law.

Astoria's reliance damage claim fares no better.

Just as with its restitution claim, Astoria's reliance claim is barred by binding Federal Circuit precedent. The fundamental premise to Astoria's reliance claim is that the net liabilities of Suburbia -- an accounting mark-to-market calculation of Suburbia's assets versus its liabilities under the interest rates prevailing at the time of Fidelity's acquisition -- represents the amount of the actual cost to Fidelity in acquiring Suburbia. The Federal Circuit instructs, however, that "[a]lthough the assumed liabilities are indeed an accounting cost, . . . they are not a usable measure of either cost to the thrift or benefit to the government[.]" LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1376 (Fed. Cir. 2003). Moreover, the Federal Circuit instructs that, even if net liabilities assumed could be construed to be a cost by an acquirer, that "cost of performance," which stemmed from the poor quality of the thrift's acquired loans, was unrelated to the breach. Thus, a net liabilities assumed "cost" cannot be the source from which a damage award can be constructed. See Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1380 (Fed. Cir. 2005). Thus, Astoria's assertion that Fidelity's assumption of net liabilities constitutes a cost undertaken by Fidelity in reliance upon the contract is incorrect, as a matter of law.

Nor does Astoria's reliance claim make any sense as a matter of fact. Astoria has not identified any actual cash "cost" in paying off any of the net liabilities assumed; and, of course, it

cannot. For one thing, as we demonstrated at trial, Fidelity never generated enough cash earnings to pay off the $160 million of net liabilities assumed. More fundamentally, however, the net liabilities assumed figure, based upon the $160 million of goodwill created at the time of the acquisition, is divorced from reality. With every change in interest rates, the mark-to-market "costs" change; and they change dramatically with a downturn in interest rates (which is precisely what occurred after Fidelity's acquisition of Suburbia). Given that Suburbia's net liabilities were not paid off by Fidelity at the time of its acquisition, but, if at all, years later as the (repriced to market) deposit liabilities came due, any actual costs have little or no correlation to the "net liabilities" figure proposed as damages. Indeed, this is precisely the point made by this Court in Granite Management Corp. v. United States, 58 Fed. Cl. 766 (2003):

> It is inappropriate, however, to argue that the liabilities were paid as they came due and yet include the entire amount of net liabilities assumed on the date of acquisitions in the cost of performance calculation.

Id. at 775.

Finally, in an error duplicated in its restitution claim, plaintiff fails to take into consideration all of the offsetting benefits that Fidelity and Astoria obtained from Fidelity's acquisition of Suburbia. Astoria's reliance claim ignores the tremendous benefits that Fidelity and Astoria received from the contract, including an extensive branch network, and millions of dollars in tax saving benefits, economies of scale, and accretion income. These benefits overwhelm the purported cost of the net liabilities assumed, precluding, even if it were not otherwise barred by binding precedent, Astoria's claim for $140 million in reliance damages -- as well as its claim for restitution damages.

Astoria's lost profits claims are similarly unfounded as a matter of fact and law. To prove lost profits a plaintiff must prove three necessary elements: causation, foreseeability, and reasonable certainty. Astoria failed to prove any of these elements.

To begin with, Astoria failed to prove causation. Specifically, Astoria failed to prove that, but for the breach, Fidelity would have grown at the 8.25 percent annual rate assumed by Dr. Kaplan, and that it would have obtained an 80 basis point return on its incremental growth. Uncontroverted testimony from Government regulators established that, irrespective of the breach, Fidelity's growth would have been restricted -- as it was under the thrift's FIRREA-related capital plan -- because Fidelity was a troubled thrift prior to the breach and would have remained so through the early 1990s irrespective of FIRREA. Regulators testified without contradiction that, under the direction of Messrs. Lovely and Greco,[1] Fidelity had been rated a "4" in 1987, two years before the breach -- i.e., at a time when it had all of the regulatory capital to which it was entitled under the contract -- and that Fidelity would have been rated a "4" rated institution until at least the second half of 1992, even if FIRREA had not been passed. As such, pursuant to a thrift regulatory bulletin that required all thrifts rated a "4" to cease their growth, Fidelity would have been required to restrict its growth with or without the inclusion of goodwill in its regulatory capital. For identical reasons, regulatory restrictions on wholesale leveraging strategies would have also barred Fidelity's pursuit of the wholesale leverage strategy proposed

---

[1] At trial, witnesses employed by both Fidelity and the Government expressed universal disdain, if not contempt, for the leadership qualities and capabilities of Messrs. Lovely and Greco. Yet, Astoria's claim for lost profits is, essentially, a request that the Government now insure Fidelity for their numerous catastrophic business and underwriting decisions.

by Dr. Kaplan in his "modeling" of lost profits. This regulatory bar, too, would have existed irrespective of the breach.

Fidelity's lost profits claim fails the test of causation for numerous other reasons. First, plaintiff claims lost profits damages beginning January 1989, i.e., before even the initial draft of FIRREA, and eight months before FIRREA was passed. As the Federal Circuit has very recently instructed, there could not have been a breach of a Winstar-related contract until after the passage of FIRREA in August 1989 and either the effective date of implementing regulations or demands made upon thrifts to comply with the new regulatory capital regime before those regulations took effect. See Bank of America, FSB v. United States, --- F.3d — , 2007 WL 2137774, at *4 (Fed. Cir. July 26, 2007).[2]

Second, following Fidelity's conversion from a mutual to a stock institution in May 1993 and the corresponding infusion of $57 million into Fidelity, all growth restrictions Fidelity faced relating to its regulatory capital levels under FIRREA were lifted and it was free to grow as it saw fit. Regulators, Fidelity employees, and even Dr. Kaplan admitted this fact. Thus, even if the breach can be said to have cost Fidelity any lost profits, these damages ceased with Fidelity's conversion and, which in effect, mitigated the breach.

Third, wholly apart from the fact of the conversion's mitigative effects, Astoria failed to prove the causation of any damages following Astoria's acquisition of Fidelity. Pursuant to Fidelity's Assistance Agreement with FSLIC, contractual regulatory capital could not transfer to Astoria. Morever, pursuant to generally accepted accounting principles ("GAAP"), all of

---

[2] We disagree with the position that FIRREA's enactment did not breach the contract, and the decision in Bank of America remains appealable.

Fidelity's goodwill had to be written off with Astoria's purchase. Furthermore, we established that Astoria never would have valued or utilized the goodwill to increase its leverage as Dr. Kaplan hypothesizes. Indeed, Astoria is an institution with a long history of being overcapitalized, and thus, would have had no use for additional regulatory capital from Fidelity.

Not only do Fidelity's lost profits claims fail the test of causation (and, accordingly, foreseeability), the methodology presented by plaintiff's expert is grossly speculative and cannot form the basis for any lost profits award. For example, Dr. Kaplan proposes a hypothetical nonbreach thrift whose growth rates and rates of return do not correspond to the actual whole bank's assets or liabilities. Instead, Dr. Kaplan purports to model, for the period 1989 through 1994, a portfolio of a vaguely defined class of shorter-duration adjustable rate mortgage ("ARM") mortgage-backed securities ("MBS"), funded by vaguely identified wholesale borrowings. With little justification other than the conventions of his model, Dr. Kaplan ignores the full array of MBS actually held by Fidelity, including fixed-rate and longer-duration MBS. Furthermore, for the period 1995 through 2014, Dr. Kaplan makes no representation concerning the assets or liabilities he purports to model, merely stating that they could be anything Astoria chose them to be, thus, making his model wholly speculative.

In fact, Dr. Kaplan's lost profits methodology amounts to little more than a black box within which every real world factor affecting growth or profitability is claimed to have been implicitly considered and found to be consistent -- without further analysis -- with the unwavering results of steady growth and certain profitability propounded by Dr. Kaplan. As such, Dr. Kaplan's lost profits methodology amounts to little more than the unsupported assumption that, for thrifts, increased leverage results, necessarily and invariably, in profits.

Dr. Kaplan's modeling of lost profits has been rejected before by this Court in another Winstar-related case -- where Dr. Kaplan appeared as an expert and similarly projected hypothetical leveraging of goodwill into purchases of vaguely identified MBS -- precisely because Dr. Kaplan proposed a but-for thrift that deviated from the actual thrift's performance and plans. See First Fed. Lincoln Bank v. United States, 73 Fed. Cl. 633, 643-45 (2006), appeals docketed, No. 07-5044 (Fed. Cir. 2007). The same result should follow here.

**ISSUES PRESENTED**

1. Are Winstar-related restitution damages measured in relation to purported liquidation costs avoided by the Government precluded by binding precedent of the Federal Circuit?

2. Did FSLIC have any choices, other than liquidation or the approval of Fidelity's acquisition, to address the financial difficulties Suburbia faced in 1984?

3. Given the state of FSLIC's financial condition and the overall condition of the thrift industry in 1984, would Suburbia have been liquidated by FSLIC in the absence of Suburbia's acquisition by Fidelity?

4. Did Fidelity's acquisition of Suburbia relieve FSLIC of its potential liabilities with respect to the deposits of Suburbia?

5. Given the testimony of Mr. Beesley, a former director of FSLIC, that no liquidations involving cash payouts were undertaken by FSLIC after 1981, are Astoria's restitution damages, calculated based upon a cash payout liquidation of Suburbia in 1984, unfounded as a matter of fact?

6. Must all benefits obtained by an acquiring thrift be considered as offsets in computing Winstar-related restitution and reliance damages?

7. Does binding Federal Circuit precedent preclude Winstar-related reliance damages measured in relation to a mark-to-market accounting of the net liabilities, or goodwill, assumed by an acquiring thrift?

8. Does the mark-to-market accounting of an acquired thrift that results in the computation of the net liabilities, or goodwill, assumed by an acquiring thrift, set forth a figure that represents an actual cost to the acquiring institution?

9. Are Winstar-related damages calculated prior to the passage of FIRREA permissible given the precedent of the Federal Circuit concerning the effective date of the FIRREA breach?

10. Did draft legislation and Congressional debate concerning the various provisions of what ultimately became FIRREA constitute an unequivocal repudiation or breach of Fidelity's contract?

11. Given the two alternative dates to begin computing damages presented by plaintiff's expert, January 1, 1989, and January 1, 1990, and given the precedent of the Federal Circuit concerning the effective date of the FIRREA breach, are any lost profits damages permissible in this case prior to January 1, 1990?

12. Given that Fidelity was given a "4" composite MACRO rating nearly two years before the passage of FIRREA based upon its bad loans, which only got worse with time, and given the uncontroverted testimony of regulators on the matter, would Fidelity have been rated a

"4" irrespective of the breach, through at least the mailing of the OTS's 1992 report of examination ("RoE") of the institution?

13. Given the regulatory restrictions in Regulatory Bulletin 3a-1 ("RB3a-1") concerning troubled institutions with a "4" composite MACRO rating or worse, the troubled state in which Fidelity found itself as a result of its large holdings of poor and nonperforming commercial and development loans, and the testimony of OTS regulators concerning Fidelity's likely composite MACRO rating of "4" or worse irrespective of the breach, would the OTS have permitted Fidelity to grow at the 8.25 percent growth rate Dr. Kaplan posits if Fidelity's contract had not been breached?

14. Given the thrift's loss of over $80 million in loans between 1986 and 1994, and the likely loss of many tens of millions of dollars in lost interest income on those loans, what effect would those losses have had upon Fidelity and the regulatory oversight of Fidelity if Fidelity's contract had not been breached?

15. Given regulatory restrictions on the use of wholesale leverage strategies by troubled institutions (with a "4" composite MACRO rating or worse), the testimony of OTS regulators concerning Fidelity's likely composite MACRO rating as "4" or worse irrespective of the breach, and Fidelity's severe interest rate risk, would regulators have permitted Fidelity to grow solely through the wholesale strategy hypothesized by Dr. Kaplan if Fidelity's contract had not been breached?

16. Did Fidelity's conversion in May 1993 mitigate the effect of the breach, such that Fidelity met all of its FIRREA-related capital requirements and was free to pursue the growth and profitability strategies it desired?

17. Given the mitigating effects of Fidelity's conversion in May 1993, are any lost profits damages permissible after that point in time?

18. Is Dr. Kaplan's lost profits methodology, in which he assumes a given result with respect to the growth and profitability of Fidelity and Astoria, and merely assumes that these results take into consideration all nonbreach factors that could have affected that growth and profitability, a speculative method of determining lost profits, which, therefore, presents damage computations that fail the test of reasonable certainty?

19. Given the collapse of the New York real estate market and the further worsening of Fidelity's own commercial and development loans, the economic recession, the upheaval in the capital markets caused by the Gulf War, volatile and inverted yield interest rates, and the change in overall banking regulations set forth in the nonbreaching portions of FIRREA, is Fidelity's October 1988 business plan a useful guide with respect to the growth rates and profitability that Fidelity would have enjoyed if its contract with the Government had not been breached?

20. Given the fact that Fidelity's peers shrank between 1989 and 1991, was it speculative for Dr. Kaplan to posit an annual growth rate of 8.25 percent for his nonbreach Fidelity during this same period of time?

21. Given the fact that Astoria, which always had excess tangible capital and was never constrained by its regulatory capital position, engaged in limited growth between 1989 and 1992, was it speculative for Dr. Kaplan to posit an annual growth rate for his nonbreach Fidelity of 8.25 percent, a rate that far exceeded that of Astoria over this same period of time?

22. Given Dr. Kaplan's pronouncements that the nonbreach incremental wholesale assets Fidelity would have obtained could have been composed of various types of ARM MBS, in numerous, loosely-defined, and at times, contradictory proportions, does Dr. Kaplan's methodology fail for lack of reasonable certainty?

23. Given Fidelity's actual experience before FIRREA, whereby it increased the size of its wholesale portfolio, yet obtained a reduction in net interest margin, is Dr. Kaplan's assumed spread of 80 basis points speculative?

24. What effects on Fidelity's operations and the regulatory rating of Fidelity's capital would have resulted from Fidelity's loss of over $34 million of non-contractual capital, which would have occurred irrespective of the breach, and did Dr. Kaplan's lost profits and wounded bank damage computations fail to take proper consideration of the effects of losing $34 million in non-contractual capital?

25. Given that Fidelity implemented a limited wholesale strategy in reaction to the breach and in accordance with its capital restoration plan, would Fidelity have pursued a greatly expanded version of that strategy in a nonbreach setting, increasing wholesale assets by up to $737 million through 1994?

26. Are Winstar-related damages in almost the same amount as the amount of lost contractual capital unforeseeable and speculative as a matter of law, given the discrepancies in value between an actual dollar (e.g., as presented in a damage claim) and a dollar of goodwill?

27. Given the magnitude and type of lost profits modeled by Dr. Kaplan, which are based solely upon a wholesale strategy, do the lost profits claimed by Astoria fail the test of foreseeability, especially given that, at the time of contracting, Fidelity did not pursue a

wholesale strategy, and, indeed, had no managerial or technical capacity to pursue such a strategy?

28. Are Dr. Kaplan's lost profits calculations for Fidelity speculative given his modeling of only a portion of the whole bank's operations, especially since he only focused upon the thrift's wholesale investments, and even then only the subset that includes just shorter-duration ARM MBS (disregarding Fidelity's longer-term, fixed-rate MBS and other investment instruments), and further given that Fidelity never pursued growth solely in that manner, either before or after the breach?

29. Given Dr. Kaplan's failure to offset his lost profits calculation by increased costs that would have been borne by Fidelity if the contract had not been breached (e.g., increased employment and advertising costs), does his lost profits claim fail the test of reasonable certainty?

30. Given the legal requirements of causation, foreseeability, and reasonable certainty for lost profits claims, are lost profits calculated after Astoria's acquisition of Fidelity too remote from the breach as a matter of law?

31. Could any contractual regulatory capital held by Fidelity in a nonbreach world transfer to Astoria given the prohibition on such transfer in the Assistance Agreement, and the requirement of GAAP that all goodwill in connection with a purchase accounting acquisition be written off?

32. Given Astoria's stated need to deploy its capital in order to increase its earnings ratios, would Astoria have acquired Fidelity in a non-purchase method acquisition in a nonbreach world?

33. Given Astoria's longstanding history of de-leveraging its balance sheet through stock repurchases and dividends, would Astoria have placed any value upon, or utilized Fidelity's goodwill to increase its leverage, assuming such goodwill could be transferred to it in a nonbreach world?

34. Given Astoria's own limited profitability from its wholesale investments relative to its wholesale fundings, where it enjoyed only a 38 basis point spread between 2001 and 2005, does Dr. Kaplan's methodology, which assumes a steady 80 basis point spread during this period, fail the legal requirement of reasonable certainty?

35. Given Astoria's sale of over $520 million of the wholesale assets it obtained from Fidelity soon after the acquisition in the actual world, does Dr. Kaplan's modeling of $963 million in incremental assets held by Astoria during the same period render his lost profits methodology speculative as a matter of law?

36. Given that Dr. Kaplan posits a jump of over $226 million in incremental assets between December 1994 and January 1995, explicable only as the result of Dr. Kaplan's use of differing modeling conventions, does his lost profits methodology fail the requirement of reasonable certainty?

37. Given Dr. Kaplan's statement that the foregone assets held by Astoria in his nonbreach model could be anything Astoria wanted them to be, does Dr. Kaplan's methodology fail the requirement of reasonable certainty?

38. Does increased leverage for a bank result, on average, in steady and certain profitability, as modeled by Dr. Kaplan?

39. Given that Fidelity's large portfolio of poor commercial and development loans would have existed irrespective of the breach, and given the uncontroverted testimony of OTS regulators concerning Fidelity's likely composite MACRO rating as "4" or worse irrespective of the breach, would Fidelity have been charged OTS examination and Federal Deposit Insurance Corporation ("FDIC") insurance fees in amounts similar to the fees Fidelity paid in the actual world?

40. Given that insurance premiums were not risk-based at the time of the contract, was it foreseeable that, if the contract was breached, one consequence of that would be that the thrift might be faced with increased deposit insurance premiums?

## DEFENDANT'S PROPOSED FINDINGS OF FACT

### I. THE WITNESSES WHO TESTIFIED AT TRIAL

**Robert Albanese.** Mr. Albanese is currently the Regional Director for the Northeast Region for the Office of Thrift Supervision ("OTS"); over the course of his career beginning in the early 1970s, Mr. Albanese has held various positions with the OTS, its predecessor, the Federal Home Loan Bank Board ("FHLBB"), and the Federal Home Loan Bank of New York ("FHLB-NY"). Tr. 4113:15-4115:10 (Albanese). Mr. Albanese was Suburbia's and Fidelity's supervisory agent in the early 80s. Tr. 4116:2-12 (Albanese).

**Walter Amend.** Mr. Amend has been a regulator with the FHLB-NY, and after FIRREA, with the OTS since 1972, and is currently an OTS field manager. Tr. 4224:5-4225:7 (Amend). Over the course of his career, he participated in examinations of Fidelity and Astoria, and also had supervisory responsibilities with respect to them. Tr. 4228:18-4230:5 (Amend).

**H. Brent Beesley.** Mr. Beesley was the director of the Federal Savings and Loan Insurance Corporation ("FSLIC") from spring of 1981 to early 1983. Tr. 1142:3-13 (Beesley).

**Vito Caporusso.** Mr. Caporusso was hired by Fidelity as an officer to head the bank's small consumer lending department in September 1986. Tr. 3845:18-19, 3846:19-21, 3847:15-19, 3890:23-3891:2 (Caporusso). Four or five years after he was hired, or around 1991 or 1992, he became a senior vice president responsible for all credit lending. Tr. 3893:11-13 (Caporusso).

**Dr. Andrew Carron.** Dr. Carron was qualified as an expert in the following subject matters: Financial economics, thrift industry structure and performance, mortgage and capital markets and products, thrift industry asset and liability management, economic damages and Government policy toward and regulation of the thrift industry. Tr. 5653:22-5654:3, 5656:11-12 (Carron).[3]

**Henry Drewitz.** Mr. Drewitz was Astoria's president starting in 1974, DX 3491 at 22:19-22 (Drewitz), and its chairman of the board starting in 1975, positions he held until April 1989. DX 3491 at 23:7- 24:1. (Drewitz). Mr. Drewitz remained on Astoria's board as a director until May 1997. Id.

**George Engelke.** Mr. Engelke was Astoria's president, chief executive officer, and chairman of the board of directors of both Astoria and its holding company, Astoria Financial Corporation ("AFC"), Tr. 4336:23-4337:3 (Engelke), and an officer of Astoria from June of

[3] DX 1147 is Dr. Carron's initial expert report, Tr. 5658:11-17 (Carron), and DX 3453 is Dr. Carron's supplemental expert report, Tr. 5659:11-15 (Carron). DX 6001 summarizes Dr. Carron's opinions with respect to Dr. Kaplan's lost profits model, restitution award, reliance damages, and wounded bank damages, and why Astoria was not harmed by the breach. Tr. 5660:11-5663:1 (Carron).

1971, Tr. 4337:8-21 (Engelke), and was trained as a certified public accountant. Tr. 4338:7-11 (Engelke).

**Peter Finn.** Mr. Finn was a vice president of Astoria, and, at the time of Astoria's acquisition of Fidelity, was in charge of mergers and acquisitions at Astoria. Tr. 3984:13-3985:7 (Finn). He did the due diligence review of Fidelity's assets, becoming familiar with Fidelity's condition and history for the period of the last few years prior to its acquisition by Astoria. Tr. 3986:4-3988:9 (Finn). He was also responsible for managing Astoria's relationship with the OTS with respect to safety and soundness examinations. Tr. 3985:8-16 (Finn).

**Carlos Fiol.** Mr. Fiol is employed with the FDIC as a manager of risk analysis in division of resolutions and receiverships. Tr. 289:3-9 (Fiol). He served as a financial analyst in the Analysis and Evaluation Division ("AED") of the FSLIC beginning in 1984. Tr. 290:3-8 (Fiol).

**Bruno Greco.** Mr. Greco began his employment with Fidelity in the fall of 1980 as executive vice president in charge of day-to-day operations, implementation of new systems, and supervising all departments. DX 3488 at 14:19-15:8 (Greco). He served on Fidelity's board of directors. DX 3488 at 15:23-25 (Greco). He became president of Fidelity but stepped down when replaced by Mr. Powderly. DX 3488 at 118:11-16 (Greco). He became vice chairman of Fidelity in 1990, and after serving two or three months, retired from Fidelity. DX 3488 at 8:4-14; 99:7-12 (Greco).

**Andrew Kane, Jr.** Mr. Kane was the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Suburbia prior to its acquisition by Fidelity. His testimony was presented by deposition designation. DX 3490 at 9:3-10:2 (Kane).

**Dr. Donald Kaplan.** Dr. Kaplan is the damages expert presented by Astoria.

**David Kennedy.** Mr. Kennedy was qualified as an expert in the following subject matters: damages, generally accepted accounting principles, accounting as it relates to financial institutions and financial institutions. Tr. 5199:23-5200:2, 5206:10-12 (Kennedy).

**Thomas Lovely.** Mr. Lovely was employed by Fidelity, first as a Director, beginning in about 1973, then as acting CEO in 1980, Tr. 1555:19-1556:8 (Lovely), and later as Chairman and CEO, until 1993-94. Tr. 1552:2-5, 1552:22-1553:7 (Lovely).

**Neal Moran.** Mr. Moran was a financial analyst manager for the OTS in 1990. In 1991, he became the capital markets manager for the OTS. Tr. 4874:2-7 (Moran). As capital markets manager, Mr. Moran provides guidance and expertise to the OTS staff and the thrift industry on financial markets matters, especially interest rate risk, review of investment securities, regulatory capital interpretations and artificial hedging activity. Tr. 4874:14-20 (Moran). Mr. Moran has drafted national guidance on interest rate risk and mortgage-backed securities. Tr. 4874:21-4875:2 (Moran).

**Thomas Powderly.** Mr. Powderly was hired by Fidelity in June 1986 as executive vice president in charge of retail banking, operations, investments, and accounting. Mr. Powderly later became President and CEO. Joint Stipulation of Facts, filed April 2, 2007 ("JSF") ¶63. Mr. Powderly became President of Fidelity in 1990, and became CEO in 1992. Tr. 335:25-336:11. Mr. Powderly also became the chairman of Fidelity's board in 1993. Tr. 336:15-24 (Powderly). Mr. Powderly currently serves on Astoria's board of directors. Tr. 649:23-25 (Powderly).

**Dr. Richard Pratt.** Dr. Pratt was the Chairman of the FHLBB from April 1981 until mid-1983. Tr. 47:10-13, 123:6-11 (Pratt).

**Christopher Quackenbush**. Christopher Quackenbush was a founding partner and investment advisor working at Sandler O'Neill and advised Astoria on the Fidelity acquisition. DX 3489 at 9:2-9 (describing role in transaction), 17:21-18:8 (started at Sandler O'Neill in August 1988 and moved to investment banking function in February 1989) (Quackenbush).

**Dr. David Rochester.** Dr. Rochester is the Chairman and Chief Executive Officer of Capital Resources Group, Inc., Tr. 4982:18-22 (Rochester), a firm that provides investment banking and financial consulting services to financial institutions and other companies nationally. Previously, he was a Visiting Research Scholar at the FHLBB, in or about 1976, Tr. 4992:2-19 (Rochester); FSLIC Senior Financial Economist, in or about 1977-80, Tr. 4994:1-13 (Rochester); Professor and Adjunct Lecturer at several universities, Tr. 4985:11-4986:11, 4998:10-13 (Rochester); Director, Concord Savings Assoc., Tr. 4988:17-20 (Rochester); senior vice president of Kaplan Smith & Associates, 1980, Tr. 4996:9-4998:9 (Rochester); Financial Strategy Group, Founder, Chairman, CEO, 1983-1991. Tr. 4999:2-5005:25 (Rochester). He was admitted as an expert witness in finance and investment banking, specifically with respect to the valuation of depository financial institutions, including the financial analyses that are performed in connection with mergers and acquisitions of banks and thrifts. Tr. 5015:18-24, 5025:24-5026:1 (Rochester).

**Michael Spaid.** Mr. Spaid is a manager in the FDIC's division responsible for closings and deposits. Tr. 155:4-6 (Spaid). He served as a financial analyst in the Mergers and Acquisitions Division ("MAD") of the FSLIC beginning in 1984. Tr. 156:4-18 (Spaid).

**Peter Stearns.** Mr. Stearns was the director of FSLIC between August 1984 and the end of November 1985. Tr. 3935:21-3936:12, 3938:1-3 (Stearns).

**Roger Teurfs.** Mr. Teurfs is a certified public accountant and the former audit partner at Peat Marwick for Suburbia and Fidelity. Tr. 1017:18-1018:12 (Teurfs).

**Angelo Vigna.** Mr. Vigna was a regulator with the FHLB-NY and, after FIRREA, with the OTS, between 1968 and March 1996. He progressed through the ranks and eventually became Northeast Regional Director. Tr. 1245:6-22 (Vigna). From November 1985 until May 1986, Mr. Vigna was Acting Director of FSLIC. Tr. 1513:4-9 (Vigna).

**William Wesp.** Mr. Wesp joined Fidelity in June 1986 as senior vice president of investments. Tr. 1725:24-1726:1, 1726:20-21 (Wesp); PX 986 at AST064264. He later joined Fidelity's board.

## II. HISTORY OF THRIFT RESOLUTION OPTIONS AND LIQUIDATIONS

1. During the early 1980s, thrifts and their regulators were faced with a period of extraordinary difficulty. The economic problems faced by the thrift industry at the time included continued inflation and unprecedented fluctuation in interest rates. PX 10 at 6 (FHLBB annual report for 1980); Tr. 68:19-22 (Pratt). During this period, the prime rate of interest reached 21 percent; the average yield on assets was about 8 percent, and the Federal Government was paying as high as 12 percent or 13 percent upon its risk-free obligations. These factors caused disintermediation (the withdrawal of deposits by passbook savers for higher-yielding returns) and put tremendous pressure on thrifts. Tr. 69:1-16, 70:17-71:25 (Pratt).

2. The high interest rate environment of the early 1980s led to thrifts becoming insolvent. Tr. 1147:14-1149:25 (Beesley). Book accounting, however, masked thrifts' marked-to-market insolvency. Tr. 1150:1-17 (Beesley). To illustrate, institutions had about $500 billion of assets on a nominal [book value] level while their real value was probably $180 or $190 billion less than that. Tr. 66:11-23 (Pratt). Thrifts were failing their regulatory capital requirements on a book basis despite lowered capital requirements. Tr. 1150:18-1151:24 (Beesley). Indeed, a vast majority of thrifts were insolvent on a marked-to-market basis in the early 1980s. Tr. 1202:6-11 (Beesley). Given its outstanding assistance commitments at that time, and given the continuing decline of the health of a large number of thrifts, the FSLIC was effectively near-insolvent. PX 286 at 76.

3. Traditionally, the FSLIC used three primary mechanisms to prevent the default of institutions: the purchase of problem assets; assisted mergers; and capital contributions from the Government. PX 286 at 16 ¶ 1; Tr. 1199:2-1200:4 (Beesley).

4. By 1981, however, the FSLIC understood that its capital reserves were not adequate to deal with the magnitude of problem thrifts with these methods alone. Accordingly, it introduced new alternatives to avoid the default of thrifts: various forms of mergers, including interstate and inter-industry mergers and the use of income capital certificates. PX 286 at 16.

5. In March 24, 1983, the FHLBB and FSLIC issued a memorandum (revising a similar memorandum issued in 1982) setting forth guidelines to facilitate the most efficient resolution of supervisory cases. PX 112 at D3-0006238. Those guidelines, which remained in place until 1986, specified the mechanisms by which the FSLIC and FHLBB intended to resolve thrifts whose problems required regulatory supervision. The resolution solutions were arranged

in order of desirability. The preferred method of resolving thrifts was the introduction of new capital into the thrift from outside the Government. Following that were methods involving various forms of mergers, whereby weak institutions would merge into stronger institutions; the introduction of new capital assistance from the Government; mergers involving Government assistance; and inclusion in the so-called Phoenix program, where several troubled thrifts were combined into a new thrift. The last option considered to resolve a troubled thrift was a liquidation. PX 112 at D3-0006238-43 (Beesley). Regulators consistently specified that liquidation was the last alternative. See PX 35 at OGG036 0002, PX 112 at DX-0006243, and PX 370 at 11; Tr. 1511:22-1513:22 (Vigna).[4]

6. Among the options considered before liquidation was the possibility of a merger with another thrift. One advantage of mergers was that the acquiring thrift benefitted from net "purchase accounting" income in the years immediately following the merger. Tr. 1182:11-1184:15 (Beesley). This "purchase accounting" income helped thrifts buy time until interest rates came down. Tr. 1184:16-1185:13 (Beesley).

---

[4] PX 1341 at 1235 includes a list of preferences with respect to solutions to thrifts' difficulties. The preferences are listed in descending order, starting with that which would be less costly. It is the order that FHLBB would use in dealing with a thrift that needed assistance or was not viable. Tr. 141:15-142:4 (Pratt). Liquidation was the last on the list of preferences because it was the most costly. 142:5-7 (Pratt). Similarly, PX 35, a February 1982 memorandum prepared by Mr. Beesley for FSLIC, lists solutions for supervisory cases in order of preference. This list is consistent with what Dr. Pratt understood to be the FHLBB's preferences at the time. Tr. 147:8-20 (Pratt).

7. In the early 1980s (and for all relevant time periods with respect to the FSLIC's resolution of Suburbia), it was well known that FSLIC had very little capital available to liquidate problem thrifts. Tr. 126:2-6 (discussing 1981-82 time frame) (Pratt). FSLIC could not afford to liquidate thrifts given its lack of funds and the fact that those funds were tied up in long-term investments. Tr. 114:14-21, 128:5-20 (Pratt). In March 1983, PX 1352, a FHLBB report to Congress entitled "Agenda For Reform," at 280, lists FSLIC assets as $6.42 billion in 1982, an inadequate amount of funds to liquidate all of the troubled thrifts. Tr. 57:14-20, 127:9-128:8 (Pratt). If FSLIC had wanted to liquidate all troubled thrifts at one time, it would have taken at least 180 or 190 billion dollars. Tr. 126:25-127:8 (Pratt). In 1983, FSLIC reported that it had 53 cases requiring supervisory resolution with total assets of $17.6 billion, while it had a primary reserve of only $5.7 billion. PX 286 at 17, 76 (Beesley).[5]

8. As set forth in the FSLIC's 1984 Report to Congress, the type of thrift problems facing the FSLIC shifted dramatically from a predomination of interest spread problems in 1982 to asset quality problems in 1984 involving thrifts with real estate investments and other illiquid assets. Tr. 3937:12-25; 3945:21-3946:5 (Stearns); PX 342 at 25 at Chart 3. Asset quality problems were far more costly to resolve than spread problems. See Tr. 3939:20-3940:2, 3942:21-3943:3 (Stearns). By 1984, 70 percent of the cases where FSLIC resolved problem thrifts were asset quality problems. Tr. 3942:21-24 (Stearns); PX 342 at 23. The FSLIC's 1985 Report to Congress again noted the shift in the type of problems affecting the FSLIC's caseload:

---

[5] In a paper published in February 1982, Dr. Carron, one of the Government's experts in this case, predicted that the liquidation costs of the thrift industry would be $44.1 billion, whereas assistance costs would be just $6.14 billion. DX 1147 at 26 ¶ 89.

> Prior to 1983, a large majority of FSLIC problem cases involved interest rate spread difficulties. In the last two years, severe asset quality problems, which are much more complex as well as more expensive to resolve, have predominated.

Tr. 3954:16-21 (Stearns) (quoting PX 375 at 25).

9. Government policy in the early 1980s operated on the assumption that market interest rates would decline and alleviate, at least partially, the problems of the thrift industry. DX 1147 at 25 ¶ 87.[6] As Dr. Pratt testified, the measures FSLIC had available to it at the time were stopgap measures, undertaken in an effort to buy time, in the assumption that interest rates would come down. Tr. 115:15 -116:12 (Pratt). Had interest rates not fallen, no thrifts would have survived. Tr. 128:21-129:10 (Pratt). With interest rates at all-time historical highs, the general consensus was that interest rates would fall. Tr. 1175:21-1176:11 (Beesley). Interest rates did, in fact, decline in the mid-1980s, easing the spread problems for thrifts. Tr. 1238:15-1240:10 (Beesley).

---

[6] Dr. Pratt testified that, at the time, he had stated that, if interest rates stayed the same:

> there's some good news and some bad news. The bad news is that every thrift will fail and go away, it cannot survive. The good news is it will clearly be the smallest problem in the U.S. economy. So had the prime rates stayed at 21 percent, had Treasury bonds stayed at 13, every thrift would have failed, but it wouldn't have even been noticed because of the other havoc that would be wreaked. So our entire tenure [sic] was one assuming that interest rates would come down but not predicting they would. If they didn't come down, there was nothing lost in modernizing the industry. If they did come down, a lot of economic value would return to these balance sheets and they would have a chance of survival.

Tr. 115:19-116:7 (Pratt).

10. By 1983, FSLIC could not afford to liquidate all troubled thrifts. See PX 286 at 76; Tr. 1233:5-1234:6 (Beesley). Specifically, in 1983, at a time when Suburbia had $700 million in assets, the FSLIC liquidated only six small institutions in the entire United States, whose assets cumulatively totaled $295 million, with the average asset size totaling only $49 million. PX 286 at 18, 20-21; Tr. 1234:7-1236:12 (Beesley). None of these institutions were located in the Northeast United States, and the problems that predominated were asset quality problems (e.g., loans that were not being repaid), not interest rate differential or interest "spread" problems.[7] PX 286 at 20-21. In 1983, none of the liquidations involved actual payouts of funds to depositors. Tr. 1230:2-12; Tr. 1231:22-1233:4 (Beesley).

11. In 1984, for the entire United States, the FSLIC liquidated only nine institutions, with combined deposits of $829 million, with the size of the average thrift totaling $92 million. PX 342 at 26. As the FSLIC noted, "severe asset quality problems" predominated as the FSLIC undertook resolution actions in 1984. PX 342 at 23. There were no thrift liquidations in the Northeast in 1984. Tr. 3948:4-19 (Stearns); PX 342 at 26; PX 232 at WOL315 0205; Tr. 1504:17-19 (Vigna).

12. Going into 1985, the FSLIC's concern was very simple: to strengthen the FSLIC fund. Tr. 3948:20-3949:11 (Stearns); PX 342 at 27. Indeed, by the end of 1984, the FSLIC's financial condition was so dire that, when examining the audited financial statements of the FSLIC, the Comptroller General of the United States reported to the FHLBB that there could be

---

[7] "Spread" problems were caused by the high price of short-duration funding sources (e.g., deposits), relative to the low returns on long-term assets (e.g., fixed rate mortgage loans).

no opinion given as to the adequacy of the insurance fund to meet future claims against it. Tr. 3949:12-3950:2 (Stearns); PX 342 at 79.

13. Given the state of FSLIC's finances in 1984 and 1985, the last resolution that the FSLIC would have pursued for Suburbia, an institution of about $700 million in assets that had interest spread problems, would have been liquidation. Tr. 3959:19-3960:4 (Stearns).

14. To deal with these problem thrifts and the FSLIC's lack of capital, FSLIC was "forced . . . to come up with solutions that would prevent cash payouts. We just didn't have the cash available . . . . And so we were forced to find ways to close down the sick institutions without using up cash." Tr. 3939:2-8 (Stearns). FSLIC came up with innovative ways to resolve problem thrifts in a manner avoiding liquidation, "invent[ing] one about every two months." Tr. 3943:19-23 (Stearns); PX 342 at 23. These innovations included the issuance of capital certificates, setting up Phoenix corporations (whereby several troubled thrifts were merged to create a new institution), and management consignment programs. Tr. 3943:15-3944:4 (Stearns); PX 342 at 23.

15. In 1985, as one step to protect the FSLIC's insurance fund, the FHLBB adopted regulatory measures to bring the classification of thrift assets into conformity with commercial bank regulators, requiring increased reserves for classified problem loans. Tr. 3953:10-3954:4 (Stearns); PX 375 at "The Chairman's Report" (p. v.).

16. In 1985, for the entire United States, the FSLIC liquidated only ten institutions, with the average institution liquidated holding $189 million in deposits. PX 375 at 27. None of these institutions were located in the Northeast. Id.

17. Between 1980 and 1989, no New York thrift under Mr. Vigna's supervision was liquidated. Tr. 1503:14-16 (Vigna); Tr. 4127:25-4128:2 (Albanese). When the FSLIC did liquidate thrifts during this time period, it did so primarily where a thrift had bad assets, rather than a mere interest spread problem, which affected the majority of thrifts in the United States.

## III. FIDELITY'S ACQUISITION OF DOLLAR FEDERAL

18. Fidelity acquired Dollar Federal Savings & Loan Association ("Dollar") on June 30, 1982. Tr. 1020:2-7 (Teurfs); Tr. 1396:23-1397:2 (Vigna); JSF ¶ 1. The acquisition of Dollar consisted of a takeover of assets and the assumption of existing liabilities outstanding at the date of acquisition. Fidelity paid no cash or other consideration in connection with the acquisition. PX 1283 at AST060064; JSF ¶ 1. Fidelity acquired approximately $105 million in assets from Dollar; it increased its branches from 4 to 8; and it increased its deposits by almost $70 million, to a total of $273.4 million. JSF ¶ 2; PX 1283 at AST060064; PX 986 at AST064173.

19. Fidelity accounted for the acquisition of Dollar as a purchase. The goodwill generated in the Dollar acquisition, or excess cost over fair market value of the net assets acquired, was $25,815,000. JSF ¶ 3; Tr. 1050:23-25 (discussing PX 1283 at AST060064) (Teurfs). This amount was being amortized to expense over thirty years using the straight-line method. Tr. 1076:23-1077:5 (Teurfs); PX 1283 at AST060064. Regulations existing at the time of the Dollar acquisition permitted Fidelity to utilize this goodwill toward its regulatory capital computations. See United States v. Winstar Corp., 518 U.S. 839, 850 (1996).

20. Fidelity recorded $28 million in discounts on the mortgage loans acquired from Dollar. These discounts were to be accreted into income over ten years using the sum-of-the-months digit method. JSF ¶ 4; PX 1283 at AST060064. Accordingly, when Fidelity undertook

its acquisition of Dollar, it understood that -- at the latest -- ten years after its acquisition, or by 1992, it would face as an expense the continued amortization of the Dollar goodwill without any corresponding accretion of income from the loan discounts to offset that expense.

21. Fidelity acquired, in connection with the Dollar merger, Dollar's loans to condominium/cooperative developers. Tr. 1397:21-1398:8 (Vigna). Fidelity's November 1, 1982 Report of Examination ("RoE"), PX 90, records that Fidelity had an excessive concentration in loans to condo/coop developers, including Gerald Guterman, as a result of the Dollar acquisition. Tr. 1508:22-1509:22 (Vigna). Fidelity experienced substantial losses from these loans to Mr. Guterman and his enterprises -- losses that had nothing to do with the Suburbia acquisition. Tr. 1510:2-8 (Vigna).

22. With the implementation of FIRREA's capital rules, Fidelity was required to phase out the remaining Dollar goodwill on its books as a component of regulatory capital, or approximately $19.3 million, by the end of 1989. PX 526 at AST008365. At that time, the Dollar goodwill, for which plaintiff has no contractual claim, constituted 13.5 percent of the total goodwill set forth on Fidelity's books. PX 1314A at Ex. 15.

## IV. <u>SUBURBIA FACED INTEREST RATE SPREAD PROBLEMS</u>

23. Like Fidelity, Suburbia was a Long Island thrift, but, with almost $700 million in assets, was substantially larger than Fidelity in terms of asset size, deposits and branches. PX 1245 at PAA047 0484.

24. Suburbia had been profitable until around 1979 or 1980, when a negative trend in operating profitability developed due to the high cost of funds, or short term liabilities, relative to the low interest income received on its long-term loans, or assets. This caused an interest

"spread" problem. Like all savings and loans, Suburbia suffered from spread problems. Tr. 1021:6-16 (Teurfs).

25. Suburbia's spread problem "was a consequence of the historical structure of savings and loans, with a balance sheet of long-term fixed-rate assets and a liability side of the balance sheet that was priced at interest rates moving with the market. "At that point in time we were in a period of very high interest rates, and because the assets and returns on the asset side were fixed, most -- many thrifts had a negative spread and were operating at severe losses." Tr. 1502:23-1503:1 (Vigna). Suburbia's operating losses were "due mainly to the high cost of money and a below average yield on assets." DX 3113 at OAA005 2534; Tr. 1502:15-16 (Vigna); see also Tr. 4122:20-4123:11 (Albanese).

26. Suburbia did not have serious asset quality problems. Tr. 4123:12-15 (Albanese); Tr. 1503:2-4 (Vigna). As plaintiff admits: "Suburbia's asset portfolio was mainly thirty-year single family mortgage loans." Pl. Mem. (Feb. 15, 2007) at 11. Suburbia's management team was also not a concern to its regulators. Tr. 4116:2-12, 4123:16-18 (Albanese); PX 145 at AST033085; DX 3141 at WON758 0048. Other than its spread problems, Suburbia had no other problem that significantly affected its performance. DX 3490 at 16:17-17:5, 24:17-25:13 (Kane).

27. Suburbia had operated relatively free of supervisory concern prior to the precipitous upturn in market interest rates in 1979-1980. PX 232 at WOL315 0206. Mr. Kane, Suburbia's CEO and chairman of its board, testified that, if interest rates had come down in the early 1980s, Suburbia would no longer have faced an operating deficit and would have started to return to favorable operating results. DX 3490 at 22:4-17 (Kane).

28. Lower and stable interest rates in 1983 provided a more favorable operating environment for the savings and loan industry. Approximately two-thirds of District II FSLIC-insured institutions operated profitably in the second half of 1983 and the first quarter of 1984, compared to 25% or less in late 1981 to early 1982. The proportion of institutions reporting profits increased during the second quarter of 1984. PX 232 at WOL315 0204 (Vigna).

29. Despite these improved operating prospects, the FHLB of NY found that many institutions remained vulnerable to fluctuations in short-term interest rates. A number of institutions in the FHLB-NY District were suffering, as Suburbia was, from the mismatch in interest rates between their assets and liabilities. Tr. 1274:7-11 (Vigna). This exposure was expected to continue until institutions were able to add additional adjustable rate assets to their portfolios and reduce the disparity between rate sensitive assets and liabilities.

30. In short, Suburbia's problem "wasn't a credit problem," but was an "interest rate" problem. Accordingly, regulators did not feel that there was a crisis with respect to Suburbia but they realized some FSLIC assistance would be needed for the thrift. See PX 237 at AA 0000177; DX 3113 at OAA005 2534. In April, 1982, FSLIC informed Suburbia's board that it would be expected to continue to operate even if it became insolvent on a regulatory basis. PX 52 at AST021839; Tr. 1301:22-1302:4 (Vigna).

31. As of July 1982, the FSLIC was reviewing a proposal to consolidate four Long Island associations, including Suburbia, with assistance. At the same time, the supervisory agent planned to continue to search for merger partners for Suburbia. The FHLBB stated, however, that if an acceptable bid was not received, or if the FSLIC did not approve the consolidation

proposal, Suburbia would likely be merged into the Suffolk County FS&LA, the Long Island "Phoenix." DX 3113 at OAA005 2533-34.

32. In December 1982, the FSLIC held a bidder's conference to solicit proposals for an assisted acquisition of Suburbia. Bidders' packages for Suburbia were distributed to 25 potential acquirers. JSF ¶ 5; PX 232 at WOL315 0206; PX 102 at OAA005 0463; PX 237 at AA 0000178.

33. After the December 1982 bidder's conference, four thrift institutions from New York submitted bids to acquire Suburbia. JSF ¶ 6; PX 237 at AA 0000178; Tr. 1330:3-7 (Vigna). The present value cost estimate of the lowest cost bidder at that time, Anchor Savings Bank, was $17.9 million. JSF ¶ 10; PX 237 at AA 0000178. The present value cost estimate of the proposal of the second lowest bidder at that time, Albany Savings Bank, was $20.6 million. JSF ¶ 8; PX 237 at AA 0000178.

34. After the bidder's conference, new legislation became effective in early 1983 (the Garn-St. Germain Net Worth Capital Assistance Program) providing FSLIC with additional mechanisms to assist thrifts without the expenditure of FSLIC's limited cash resources. While Garn-St. Germain was intended to assist ailing thrifts, it was not intended to allow thrifts to make higher-risk loans without proper underwriting. Tr. 124:4-7 (Pratt); see also Tr. 94:17-23 (Pratt) (noting that the success of commercial lending depends upon the intelligence and execution of business strategy). Thus, Garn St.-Germain did not provide thrifts with unfettered discretion to make commercial and real estate loans regardless of the risk involved. Tr. 125:3-6 (Pratt). Moreover, Garn-St. Germain did not prevent the FHLBB from imposing standards with respect to how loans were made under the new flexibility. Tr. 124:18-125:1 (Pratt). Following the new

legislation, Suburbia applied for and began receiving millions in capital in the form of promissory notes from the FSLIC and approved equity capital to boost its regulatory net worth and allow it to buy time until interest rates declined.[8] Tr. 1346:24-1347:6, 1349:13-20, 2754:3-13, 2755:2-4, 2757:2-2758:1, 2850:17-23 (Vigna) (had Fidelity not acquired Suburbia, it could still have been provided more NWCs); DX 3187 at WOH020 0330; DX 3159; PX 132 at OAA005 2590. In return, Suburbia issued NWCs to the FSLIC.

35. For the semiannual cycle ending June 1983, Suburbia received $2,950,000 in NWCs because Suburbia was experiencing losses. Tr. 4122:8-17 (Albanese). In the semiannual period ending December 1983, Suburbia requested and received an additional $2,825,000 in NWCs. Tr. 4126:18- 4127:2, 4130:10-16 (Albanese); PX 184; PX 214. Through the NWC program, the FSLIC provided Suburbia with $9.2 million in regulatory capital during 1983 and 1984. JSF ¶ 21; PX 237 at AA 0000177. Given this new assistance from the FSLIC, Suburbia chose to continue operating independently, thus rendering a merger with another thrift unnecessary. As a result, efforts to merge the association by the FSLIC were discontinued. JSF ¶ 6; PX 232 at WOL315 0206.

36. Liquidation was not being considered at this point, although Suburbia continued to suffer from operating losses. Tr. 4127:18-24 (Albanese).

---

[8] In connection with the ultimate acquisition of Suburbia in 1984, FSLIC prepared a memorandum, DX 406A (A-memo) that in part discussed the history of "shopping" procedures. This memorandum noted that the bidders conference took place prior to regulatory implementation of the Garn-St Germain legislation, which implemented the Net Worth Certificate ("NWC") program. See Tr. 203:6-12 (Spaid). Suburbia became eligible for NWCs so, instead of accepting a bid, it was sent back to the Office of Evaluation and Supervision. See Tr. 203:13-204:8 (Spaid).

37. NWCs were issued retroactively. Tr. 2755:15-17 (discussing DX 3159) (Vigna). In order to qualify for NWCs, an institution had to maintain capital above 0.5 percent, but it would be able to add into that number the amount of NWCs that it applied for in any particular semiannual period. Tr. 4135:4-18, 4136:3-4138:13 (Albanese); DX 3187 at WOH020 0337-0339. If Fidelity had not merged with Suburbia, the FHLBB could have continued to issue Suburbia NWCs to keep its net worth above the 0.5 percent threshold. Tr. 2757:22-2758:1 (Vigna).

38. Suburbia, however, continued to search for voluntary merger partners on its own. Three months after the bidders conference in December 1982, Suburbia was exploring a voluntary merger with another institution, which was eventually unsuccessful. JSF ¶¶ 22-24; PX 102 at OAA005 0462.

39. At the end of 1983, Suburbia was in discussion with another entity concerning a proposed conversion of Suburbia to a stock form and a purchase but Suburbia ultimately ended discussion with that prospective acquirer. JSF ¶¶ 25-27.

40. In 1984, FSLIC did not have the resources to liquidate Suburbia. Tr. 4185:20-4186:7 (Albanese). Liquidation was not an option. Tr. 4187:5-7 (Albanese). FSLIC regulators responsible for managing Suburbia's potential merger viewed its problem as an interest rate spread problem – paying out more on liabilities than they were taking in on their assets. Tr. 162:18-23, 242:18-245:19 (Spaid); PX 237 at AA0000177. Because it was a spread problem, not a fraud or a severe asset problem, FSLIC did not view Suburbia's problem as a crisis or so particularly urgent that a resolution had to occur immediately. See Tr. 215:2-22 (Spaid); Tr.

319:1-20 (Fiol) If interest rates were to change favorably, Suburbia's condition could improve. Tr. 162:24-163:10 (Spaid).

41. In 1984, Suburbia discussed with regulators the possibility of its participation in FSLIC's Voluntary Assisted Merger Program ("VAMP"). Tr. 1344:16-24 (Vigna); PX 132 at OAA005 2587. In April 1984, Fidelity resolved to pursue a merger with Suburbia, and Suburbia approached regulators concerning a voluntary merger with Fidelity. JSF ¶¶ 28-29.

42. Mr. Kane testified that he did not fear that Suburbia would be liquidated if it did not merge with Fidelity. DX 3490 at 40:16-25 (Kane). Indeed, Mr. Kane never seriously thought that Suburbia would be liquidated. Id. Instead, Mr. Kane explained, "maybe we would have an unfriendly merger set up by the efforts of the FSLIC, [and] have no control over any of our destinies." DX 3490 at 98:9-11 (Kane). Indeed, since Suburbia's problems were primarily due to an interest rate mismatch, Mr. Kane explained, once interest rates declined, Suburbia's operating results were expected to turn positive. DX 3490 at 24:17-25:13 (Kane).

43. Mr. Kane viewed a merger with Fidelity as a "friendly merger," in which "we were going to have some of our directors on a combined board" and "all our management would stay in place." DX 3490 at 98:2-5 (Kane).

44. Mr. Vigna believed that Suburbia would be eligible for the FSLIC's VAMP, and he recommended a maximum assistance allocation of $16 million or 2.5 percent of Suburbia's assets, which he felt would be sufficient to interest one or more potential acquirers and reasonably assure the resultant institution's long-term viability. JSF ¶ 30; PX 169 at OAA005 2713-14. Given the FHLBB's recommendation, Fidelity and Suburbia submitted a VAMP proposal in May 1984. JSF ¶ 31; PX 186 at OAA005 1793; PX 232 at WOL315 0206.

45. After further consideration, the FHLBB decided that Fidelity could not acquire Suburbia under the VAMP because, by regulation, where certain FSLIC assistance (e.g., permission to amortize the value of any intangible assets resulting from the merger over 30 years) would be given in connection with the acquisition, the VAMP was not permitted. JSF ¶ 32; PX 237 at AA0000178-79; DX 406A at WOL315 0368-69.

46. In July 1984, Fidelity submitted another proposal to merge with Suburbia. JSF ¶ 33; PX 185 at OAA005 0820. This second proposal was based upon the earlier VAMP proposal and the related business plan which had been reviewed previously by the FHLBB. Id.; PX 186 at OAA005 1793.

47. In connection with this second proposal, Fidelity requested the same amount of FSLIC cash assistance infusion, $16 million, as had been proposed for the VAMP deal. PX 185 at OAA005 0821.

48. No cash or other consideration was paid by Fidelity in connection with its acquisition of Suburbia. PX 1283 at AST060063.

49. According to Fidelity's July 5, 1985 Report of Examination ("RoE"), Fidelity's total regulatory net worth as of September 30, 1984 was $22.429 million. PX 335 at AST002387. It had less than $23 million in book capital. Id. On a mark-to-market basis, there can be little doubt that its value was far lower than $22 million. DX 1147 at 27 ¶ 92 (Carron). Thus, Fidelity lacked the capacity to relieve the FSLIC of the burden of protecting insured depositors. Id.

## V. THE BENEFITS OF THE FIDELITY AND SUBURBIA MERGER

50. Fidelity acknowledged, in its prospectus for the public offering of its stock, that: "primarily for the purpose of enhancing its retail deposit and lending franchise, the Bank acquired a number of additional branch locations through two federally assisted acquisitions of Dollar [] on July 1, 1982 and Suburbia [] on October 31, 1984." PX 986 at 4 (AST064173).

51. Fidelity began discussions with Suburbia about a potential merger "in late 1982, perhaps 1983 . . . it took a long time." Tr. 1620:23-1621:2 (Lovely). Fidelity's CEO, Mr. Lovely, was already familiar with Suburbia. He was their customer, and believed that Suburbia had a good franchise and operation. Suburbia's franchise was desirable to Fidelity and a valuable franchise to acquire. Tr. 1621:3-16 (Lovely).

52. Fidelity management "was very impressed with [Suburbia's] operation," and thought it would be a "natural growth for us, because the branches are in our general area of Long Island, and they had a very impressive kind of branch system." Tr 1561:10-1562:2 (Lovely). Suburbia was a nice bank with good locations. Tr. 1021:4-5 (Teurfs). "[Suburbia's] buildings, their franchise, their branch personnel all were very, very first class." Tr. 1624:5-6 (Lovely). As reflected in DX 3148, the geographic location of Suburbia was an important benefit to Fidelity. Tr. 1628:2-19 (Lovely). Indeed, because there was benefit from "no overlap of markets" and competing franchises - acquiring Suburbia brought Fidelity new, fresh markets. Tr. 1630:8-22 (Lovely).

53. Suburbia brought Fidelity the benefit of expanding into a new market, Suffolk County, with growth in population, income, and home values. Suburbia's business was located in areas of Suffolk and Nassau County in which Fidelity determined there was no overlapping of

branches. Tr. 1630:8-22 (Lovely); Tr. 5044:19-5050:4 (Rochester); DX 4002. As reflected in the proposed merger plan, DX 3148, the geographic location of Suburbia was an important benefit to Fidelity. Tr. 1628:15-23 (Lovely).

54. Fidelity would not have done a merger or acquisition unless it believed it was reasonably likely to be beneficial to Fidelity. Tr. 1610:19-23 (Lovely).

55. Fidelity's plan for its proposed merger with Suburbia, contains a discussion of the "Benefits of Merger," that indicates, from Fidelity's standpoint, how Fidelity would benefit from the Suburbia merger. Tr. 1624:18-1625:21 (Lovely).[9]

56. Fidelity and Suburbia felt that there were a number of benefits to be obtained through the merger. For example, according to the "Proposed Merger Plan" between Fidelity and Suburbia, the thrifts believed that, by combining the two institutions, services to depositors would be expanded and increased by introducing new services of both institutions to each other's depositors such as: discount brokerage, life insurance, debit cards, statement savings, mortgage banking, consumer loans, business loans, various plans of home improvement loans, student loans, and I.R.A. loans. DX 3148 at PAA090 0101. By offering these additional services, Fidelity felt it could better compete with commercial banks and money market funds and therefore, attract more capital into the thrift. Id. The combination of the services Fidelity and Suburbia could offer to depositors was a benefit to Fidelity that would enable growth of its

[9] PX 185 is Fidelity's proposal to acquire Suburbia. Tr. 1363:15-20 (Vigna). PX 185 was based upon Fidelity's previous VAMP proposal and related business plan, which had already been reviewed by FHLB-NY. Tr. 1364:5-11 (Vigna); PX 185 at OAA005 0820.

franchise in its market. See PX 986 at AST064173; Tr. 1628:20-1629:3, 1664:10-25 (Lovely); DX 3488 at 42:8-23 (Greco).

57. Fidelity, as it was contemplating the acquisition of Suburbia, did not consider engaging in what is sometimes called risk-controlled arbitrage ("RCA"), or a strategy engaging in wholesale borrowing to finance purchases of securities. See Tr. 1653:18-1654:11 (Lovely).

58. Fidelity did not, as it was negotiating with regulators for the acquisition of Suburbia, seek any promise or forbearance accorded with respect to: the way in which regulators would classify assets or require allowances, Tr. 1661:18-1662:10 (Lovely); who would be entitled to be their examiner, Tr. 1663:12-17 (Lovely); the method by which deposit insurance premiums would be charged not changing, Tr. 1663:18-22 (Lovely); the level of capital required could not increase, Tr 1663:23-25 (Lovely); or any waiver of the ability of the FHLBB to have regulations that took into account the thrift's exam results and to regulate its growth based on the exam results. Tr. 1664:1-9 (Lovely).

59. At the time of its merger, Fidelity intended to pursue mortgage banking, increased joint venture activity, commercial and consumer lending, discount brokerage, and equipment leasing. DX 3148 at PAA090 0109. It did not have a plan to increase its holdings of mortgage-backed securities ("MBS"), which totaled only $67.8 million out of total assets of $521.6 million as of February 1984. DX 3148 at PAA090 0118. Nor did it plan to increase its wholesale borrowings, which totaled only about $54 million at that time. Id.

60. Further, Fidelity stated that the management team resulting from the merger of the two associations would be "significantly strengthened." DX 3148 at PAA090 0102 (Vigna). Mr. Kane, for one, believed that Fidelity had weak management, a concern that regulators later

shared with respect to Messrs. Lovely and Greco, and the Fidelity management team then underneath them. DX 3490 at 98:19-99:12 (Kane). Fidelity concluded that Suburbia would bring management talent to Fidelity because Suburbia had competent people in many areas, and that the strengthened management team from Fidelity would add value to the combined Franchise/Suburbia franchise. See Tr. 1628:20-1630:7, 1664:10-25 (Lovely).

61. The "Benefits of Merger" described in Fidelity's proposed merger plan noted that "economies to be achieved by the merger are planned at a minimum of $1 million in overhead, including the attrition of personnel requirements." These economies of scale were projected to reach $1.1 million by 1985. DX 3148 at PAA090 0102; Tr. 1631 (Lovely); Tr. 1515:23-25, 1516:20-24 (Vigna); Tr. 5050:5-5052:3, 5109:1-5111:08 (Rochester).

62. Fidelity reported to the examiners that reductions in operating expenses were being achieved through consolidation and elimination of duplicative departments. PX 335 at AST002383.

63. Dr. Rochester, an expert witness with respect to thrift valuation, testified that the facts of this case do not indicate any reason to conclude that any net incremental additions to management or maintenance expense per unit of deposit resulted after the Suburbia/Fidelity merger. Tr. 5175:24-5176:8 (Rochester).

64. Fidelity's management believed that the Suburbia branches Fidelity acquired were at least as profitable as the Fidelity branches. Tr. 1665:2-6 (Lovely).

65. Fidelity knew that there were other institutions interested in acquiring Suburbia. Tr. 1625:18-1626:7 (Lovely). Fidelity expected that it could sell Suburbia branches and realize a substantial profit. Tr. 1517:6-8 (Vigna). Specifically, Fidelity's proposed merger plan

indicated that it was investigating the potential sale of Suburbia branches, other financial institutions were interested in acquiring Suburbia's branches, and that "a substantial profit could be realized in the event of such a sale." DX3148 at PAA090 0111. Fidelity later elected to retain the Suburbia branches, rather than to sell them. Tr. 5054:5-5055:19 (Rochester).

66. Suburbia contributed the majority of the assets, deposits, and branches to the merged Fidelity/Suburbia. The merger more than doubled Fidelity's asset and deposit bases. Suburbia contributed 58 percent of the assets, over 65 percent of the mortgages and 62 percent of the deposits of the combined entity. Suburbia contributed twelve (12) branches. As a result, Fidelity's total number of branch offices increased from eight (8) to twenty (20). See DX 3148 at PAA090 0102; JSF ¶ 58; Tr. 5041:5-5043:16 (Rochester).

67. Fidelity characterized itself and Suburbia in the merger plan as follows: "Fidelity is currently in the commercial loan market and Suburbia is in the consumer loan market." Tr. 1640:3-1641:15 (Lovely).

68. Deposits at the pre-merger Suburbia branches, relative to pre-merger Fidelity branches, comprise 61.8 percent of total deposits versus 38.2 percent for Fidelity. The share of deposits held by the former Suburbia branches grew absolutely and in share relative to those at the pre-merger Fidelity branches such that, by June 1994, 63.1 percent of total deposits were held in former Suburbia branches, versus 36.9 percent for Fidelity. As of June 30, 2006, the former Suburbia's branches had reached 72.7 percent of total deposits versus 27.3 percent for Fidelity. Tr. 5078:6-5081:6 (Rochester); DX4006, DX4007A-C.

69. As of Fidelity's 1993 mutual to stock conversion, Fidelity retained all of its Suburbia branches. As of the date of trial, 11 of the 12 former Suburbia branches remained in business. In contrast, only five of the eight pre-merger Fidelity branches have been retained. Tr. 5055:20-5058:24 (Rochester).

70. Suburbia contributed $282.4 million of non-time deposits to the combined entity, as compared with $180.5 million of non-time deposits contributed by Fidelity. Tr. 5074:9-5078:1 (Rochester); DX 4005.

71. Suburbia brought to the merger a conservative mortgage lending posture, as measured by its nonperforming assets having been only 0.7 percent of total assets. In contrast, Fidelity at the same time, had 2.3 percent nonperforming assets. Tr. 5072:6-15 (Rochester); DX 4004 (citing June 30, 1984 TFRs for Suburbia, PX 180, and Fidelity, DX 3219).

72. The merger transaction between Suburbia and Fidelity was accounted for under the purchase method of accounting. Suburbia's assets and liabilities acquired by Fidelity were re-priced according to their market value. JSF ¶59.

73. Fidelity recorded $105.5 million in discounts on the first mortgage loans acquired from Suburbia. These discounts were to be accreted to income using the level-yield method over the estimated remaining life of the loans. JSF ¶60.

74. Fidelity stood to benefit through the accretion into income of the loan discounts recognized with the mark-to-market of Suburbia's loans. DX 3148 at PAA090 0197. It was Fidelity's understanding, going into the transaction, DX 3148 at PAA090 0106, that for at least the first eight years, discount accretion income would exceed goodwill amortization. Tr. 1633:22-1634:13 (Lovely). In the 12 months ending June 30, 1985, Fidelity received a $9

million benefit attributable to purchase accounting as a result of the Dollar and Suburbia mergers. Tr. 4253:14-4254:6 (discussing PX 335 at PAA006 1214) (Amend).

75. Fidelity recorded $160.093 million of goodwill as a result of the merger with Suburbia. This amount represented the excess cost over fair market value of net assets acquired. The goodwill recorded was to be amortized over thirty years. JSF ¶ 61.

76. Fidelity also stood to gain benefits from the merger through its use of Suburbia's significant amount of net operating loss carryovers ("NOLs"). DX 3148 at PAA090 0196. Fidelity's proposed merger plan, DX 3148 at PAA090 0196, includes a letter from its auditor, Peat Marwick, dated April 27, 1984, advising regarding Fidelity's ability to carryover Suburbia NOLs. Tr. 1647:14-1650:19 (Lovely). Fidelity's 1984 tax return [i.e., covering the year Suburbia was acquired] shows an entry for a $74 million NOL. DX 3205; Tr. 1651:13-1652:19 (Lovely). These NOLs could be used to shield future profits of Fidelity from taxes. PX 277 at AST068399-400. In fact, between 1987 and 1993 alone, Fidelity used $18.5 million of its NOLs. PX 1283 at AST060064; PX 476 at AST058804; PX 887 at AST59673; PX 1323 at KPMG 012429.

77. Fidelity proposed to acquire Suburbia based on flat to increasing interest rate scenarios used for profit projections in Fidelity's proposed merger plan for FY1984-1986. Tr. 1634:14-1635:22 (Lovely). If, instead, rates dropped two to three hundred basis points in the year after acquiring Suburbia, that would increase the value of the assets Fidelity acquired from Suburbia. Tr. 1638:11-1639:7 (Lovely). These assets would then produce a higher price if Fidelity were to sell them after acquisition. Tr. 1639:8-14 (Lovely).

78. Fidelity's management reported to regulators, post-FIRREA, that the franchise value continued to be maintained, and net deposits continued to grow. Tr. 5110:20-5111:8 (Rochester); PX 787 at PAA006 1583; Tr. 1697:17-24, 1699:8-22 (Lovely); PX 904 at WON 7360654.

79. Fidelity's merger with Suburbia did not benefit FSLIC by relieving it of insurance exposure on Suburbia's net liabilities because the amount of deposits insured, and thus FSLIC potential liability, was not eliminated or reduced as a consequence of the merger. In assessing the merger, FSLIC prepared a pro forma balance sheet for the combined Fidelity and Suburbia, showing that the two thrifts combined would have the same insured deposit liability merged as they did apart. PX 1243 at WFZ009 0025; Tr. 262:18-264:14 (Spaid).

80. Whether Fidelity had sufficient capital to pay the net liabilities, was not a consideration of the FSLIC, because Fidelity was not being asked to pay the liabilities. Tr. 263:11-17 (Spaid).

## VI. REGULATORY ASSESSMENT OF THE PROPOSED MERGER

81. According to a 1984 FHLBB Institution Analysis, the present value cost of merging Suburbia with Fidelity totaled $15,906,000. JSF ¶ 39.

82. FSLIC's AED in 1984 prepared an estimate based in part on the assumptions contained therein that the present value of the total cost to the FSLIC of liquidating Suburbia would be $147.9 million. JSF ¶ 40.

83. On October 15, 1984, the FSLIC, in an "I" memorandum to the FHLBB, recommended that the Board approve Fidelity's proposal for the reasons memorialized therein,

including but not limited to the conclusion that Fidelity's proposal was the least costly option currently available to the Government for resolving Suburbia. JSF ¶ 41.

84. The FSLIC's October 15, 1984 "I" memorandum lists "Liquidation" as an option to resolve the financial problems of Suburbia. As disadvantages of the liquidation option, the memorandum lists the fact that the cost of liquidation exceeds present value cost of the least expensive option by $131.9 million and that liquidation could weaken public confidence in the savings and loan system. The only advantage listed for liquidation is that it would be a "[f]ull solution." JSF ¶ 42; PX 237 at AA0000180.

85. The October 15, 1984 Issues Memorandum lists "Fidelity" as a second option to resolve the financial problems of Suburbia. The memorandum notes that the chance of receiving a lower cost bid was a disadvantage of the Fidelity alternative. The memorandum also lists the advantages of the Fidelity alternative, noting that it was the low cost solution, it avoided the disruptive effect of liquidation, it was a projected viable solution, and that Fidelity was an in-state, mutual form similar to Suburbia. JSF ¶ 43; PX 237 at AA 0000180-81.

86. The disruptive effects of liquidation included the likely loss of Suburbia's franchise value. Moreover, if FSLIC had pursued the alternative of liquidating Suburbia, a $700 million institution which suffered from mere spread problems, the signal to the thrift industry and its customers concerning the type of institutions the FSLIC would liquidate would have been highly negative. Liquidation would have lowered public confidence in the thrift system, so FSLIC wished to avoid liquidation. Tr. 1386:18-24 (discussing PX 237 at AA 0000180) (Vigna).

87. FSLIC had not determined that, if Fidelity's bid had not been accepted, FSLIC would have then liquidated Suburbia. Tr. 265:14-17 (Spaid). FSLIC's case analyst for the Suburbia/Fidelity merger, Mr. Spaid, stated that, in his 13-year career dealing with resolutions, including liquidations, he never liquidated a thrift that had primarily a negative spread problem. Tr. 266:6-9 (Spaid).

88. The FSLIC's October 15, 1984 "I" Memorandum lists "Rebid" as a third option to resolve the financial problems of Suburbia. The memorandum cites several disadvantages of the rebid alternative, noting that Suburbia had already been shopped extensively, that it continued to deteriorate and that there was a possibility of losing the Fidelity deal and gaining a higher cost deal. The memorandum notes, however, that the chance of lower cost bid being received was an advantage of the alternative to rebid the acquisition of Suburbia. JSF ¶ 44.

89. According to an October 5, 1984 S-Memorandum from the FSLIC, Suburbia's outstanding NWCs would survive its merger into Fidelity and be included in the net worth of the resulting association. JSF ¶ 45.

90. The FHLBB approved the plan of merger of Suburbia into Fidelity through its Resolution No, 84-582, dated October 25, 1984. JSF ¶ 46.

91. In FHLBB Resolution No. 84-582, the FHLBB, as operating head of the FSLIC, approved the assumption by Fidelity of Suburbia's NWCs, issued by the FSLIC to Suburbia. JSF ¶ 47.

92. The FHLBB determined that it would be necessary to provide financial assistance to prevent the probable default of Suburbia, as stated in FHLBB Resolution No. 84-582. The

FSLIC agreed to contribute $16 million in cash to Fidelity, as stated in the Assistance Agreement executed by the FSLIC and Fidelity on October 31, 1984. JSF ¶48.

93. The approval of Suburbia's acquisition by Fidelity was, like all such approvals, merely a stop-gap measure intended to buy FSLIC time for interest rates to fall so that thrifts' asset values would no longer be exceeded by their liabilities' costs industry-wide. Tr. 115:7-19:4 (Pratt).

94. FSLIC's liquidation analysis and cost estimate was based upon nine assumptions. Tr. 167:9-24 (Spaid). One of the assumptions was that the recovery of the market value of Suburbia's assets would be lower than their book value, with the reduction in value driven in significant part by interest rates. Tr. 248:5-19 (Spaid); Tr. 316:6-19 (Fiol). Interest rates affect the liquidation cost estimate; the higher the rate, the higher the present value costs. Tr. 316:15-19 (Fiol).

95. FSLIC's 1984 liquidation estimate, DX 406A at WOL315 0548, is a snapshot in time as to what it would cost if all liquidation assumptions were true and FSLIC were to liquidate the thrift on that date. Tr. 318:3-19 (Fiol). If interest rates were to change after the liquidation estimate, that would change the liquidation estimate. Tr. 318:20-25 (Fiol).

96. FSLIC assumed the market interest rate yield for mortgages was 14.73 percent. Tr. 249:7-10 (Spaid); PX 1243 at WFZ009 0021.

97. FSLIC assumed an increasing interest rate scenario in determining whether to rebid, and in preparing its liquidation analysis. PX237 at AA 0000178; Tr. 250:18-21 (Spaid); Tr. 315:13-24 (Fiol).

98. If the assumption of an increasing interest rate scenario proved to be incorrect, FSLIC's liquidation cost estimate would not be reliable. Tr. 250:6-11 (Spaid).

99. Interest rates observed in the mortgage market tend to correlate with the ten-year Treasury rate. Tr. 317:15-318:2 (Fiol). In 1984, when a thrift borrowed money, whether a depositor liability or a CD, those rates generally tended to move in the same direction and at the same speed as Treasury rates. Tr. 318:3-9 (Fiol).

100. Instead of increasing in accordance with the increasing interest rate scenario projected for the proposed merger/liquidation analysis, interest rates dropped about 300 basis points in about a year or less. Tr. 250:22-251:3 (Spaid); Tr. 317:6-22 (Fiol).

101. Thrifts generally borrow short term and lend long term. Tr. 285:12-14 (Spaid). Interest rates affect not only what the bank will earn on assets, but the liabilities side of the balance sheet. Tr. 284:5-10 (Spaid). As interest rates change, it affects the expense of the bank that it has to pay to finance its mortgage assets. Tr. 286:7-10 (Spaid). Short rates tend to correlate most with the borrowing or liabilities side of a bank, like the rates it pays on deposits and CDs. Tr. 285:25-286:4 (Spaid).

102. Although FSLIC had assumed an increasing interest rate scenario with respect to liquidation costs, and in explaining why it elected not to rebid, see PX 237 at AA 0000178, if FSLIC had pursued a rebidding process in the event that Fidelity's bid was not accepted, after October 15, 1984, FSLIC would have been in a scenario in which interest rates were decreasing. Tr. 250:22-251:3, 286:11-22 (Spaid).

103. Whenever a thrift resolution was considered, the FSLIC performed viability and liquidation cost analyses; the liquidation cost analysis was performed not because liquidation

was being considered, but because these analyses were required by law. Tr. 1178:16-1180:7 (Beesley). As part of FSLIC's assessment, FSLIC had to demonstrate that the resolution mechanisms it was recommending (in this case, merger with Fidelity), was lower than the cost of liquidation. Tr. 264:15-265:3 (Spaid); Tr. 314:19-22 (Fiol). Liquidation, therefore, was always mentioned as an alternative in assessments of proposed acquisition transactions provided to the FHLBB by FSLIC. Accordingly, the fact that assessments of resolutions of troubled thrifts were accompanied by cost comparisons to liquidation did not mean FSLIC was actually considering liquidation as more likely than not to occur or even a reasonable possibility -- such comparisons were a procedure required by law. See Tr. 117:23-118:4 (Pratt); Tr. 265:9-13 (Spaid); Tr. 314:23-315:4 (Fiol).

104. FSLIC policy made liquidation in the form of paying out funds to depositors a last alternative. See PX 112 at D3-0006238-43(March 24, 1983 draft memorandum describing official FSLIC policy and describing the options used before liquidation); Tr. 1224:9-1226:14 (Beesley); see also PX 35 (February 2, 1982 pre-liquidation options memorandum). In 1984, liquidation was FSLIC's last option. Tr. 267:13-20 (Spaid).

105. Liquidations were not considered for thrifts that had prospects for growth. Tr. 1193:9-21 (Beesley).

106. There were several forms of resolutions that were known as "liquidations" that fell short of a payout of funds to depositors. Tr. 1197:12-1199:1 (Beesley). After the liquidation of Economy Savings by the FSLIC in 1980, the FSLIC stopped doing liquidations that involved the payment of funds to depositors. Tr. 1170:16-1171:22 (Beesley); Tr. 4341:21-24 (Engelke). Thus, even where liquidation by the FSLIC was chosen, after 1980, the cost of a

payout connected with a liquidation was avoided by the FSLIC during the 1980s. Tr. 1227:16-1228:5 (Beesley). Even after the FSLIC stopped doing payout liquidations, however, it continued to calculate "liquidation cost" in relation to the cost of a payout of funds to depositors, and not the cost of lesser forms of liquidation that it actively pursued after 1980. Tr. 1226:15-24 (Beesley).

107. If a particular alternative to liquidation were adopted but the thrift failed to thrive, FSLIC would not immediately proceed to liquidation. Tr. 1217:11-19 (Beesley). FSLIC continued to insure the surviving thrifts following mergers. Tr. 1217:25-1218:3 (Beesley). If a merger partner could not be found when FSLIC first searched for one, FSLIC could re-bid the thrift, looking for inter-state or inter-industry acquirers. PX 112 at D3-0006246-47; Tr. 1213:13-1215:21 (Beesley). In this case, if Fidelity's bid had not been approved, FSLIC would not have given up on Suburbia and recommended that it be liquidated. Tr. 272:11-22 (Spaid). As Mr. Stearns said: "We had a number of institutions the same size as this one, and there was no way that we could liquidate any of them. I mean, it just wasn't feasible." Tr. 3960:2-4 (Stearns). FSLIC instead would have sought to rebid Suburbia. Tr. 272:11-22 (Spaid).

108. Alternatives to Suburbia's liquidation or 1984 merger with Fidelity were rebidding and do nothing, meaning that Suburbia would continue under the NWC program. Tr. 175:2-23 (Spaid). Prior to the merger, in April 1982, FSLIC had informed Suburbia that it would be expected to continue to operate even if it became insolvent on a regulatory basis. PX 52 at AST021839; Tr. 1301:22-1302:4 (Vigna). Thereafter, given that Suburbia had spread problems, and not asset quality or fraud issues, FSLIC could have simply done nothing had the

Fidelity offer not materialized, or prolonged Suburbia's independent existence through issuance of NWCs, hoping for interest rates to drop. Tr. 1272:4-15, 1278:19-21 (Vigna).

109. FSLIC had a lot of flexibility when it came to rebidding; it could have gone back to one of the four firms that had submitted bids after the December 1982 bid conference, such as the next best bid of approximately $17 million [as compared to Fidelity's bid of approximately $16 million] or rebid among all four prior bidders, or among the 22 or 25 who had shown interest by asking for bid packages, or it could have put together a new list. Tr. 175:19-176:20, 272:11-22 (Spaid).[10]

110. FSLIC would have cleared or qualified as likely viable, the 22 or 25 potential bidders that received bidders packages in connection with the December 1982 bidders conference. Tr. 268:1-269:22 (Spaid).

111. Rebidding was not rejected by FSLIC. FSLIC decided not to pursue rebidding because it had the Fidelity bid, Tr. 212:3-13 (Spaid), and, as set forth in FSLIC's October 15, 1984 "A" memorandum, FSLIC assessed the alternatives for resolving Suburbia and concluded in part that, "[d]ue to Suburbia's deteriorating financial condition and an increasing interest rate scenario, OFSLIC staff believes that rebidding will not result in less costly proposals." DX

---

[10] "Not too much" time and effort would be required if FSLIC decided to negotiate with one of its prior bidders or to rebid Suburbia, which would involve an update to the prior bid package. Tr. 269:15-270:3 (Spaid). FSLIC would not have calculated the cost of rebidding itself, for example the cost of the work of negotiation or bidding. Tr. 176:21-177:25, 270:7-13 (Spaid). FSLIC's analyst for the Fidelity/Suburbia case never recommended that due to the procedural cost of rebidding, FSLIC should liquidate a thrift. Tr. 271:5-8 (Spaid). Similarly, FSLIC's analyst never recommended that, due to the procedural cost of rebidding, or, indeed, for any reason, FSLIC should volunteer to pay the average of the next four highest bids as a means of resolving a troubled thrift. Tr. 271:9-17 (Spaid). Nor was there any evident reason to think that FSLIC would do so. Id.

406A at WOL315 0369. Because of Suburbia's condition and the interest-rate scenario, FSLIC did not at that time think that it would likely obtain less costly proposals if it rebid. Tr. 210:12-212:1 (Spaid).[11]

112. During the period from October 1984 to September 1985, Treasury interest rates decreased from 10.52 to 7.64 percent. DX 514 at AA-NAV-000484; Tr. 260:12-19 (Spaid). A reduction of almost 300 basis points is significant in the thrift industry. Tr. 260:20-25 (Spaid).

113. The assumption of an increasing interest rate, cited in FSLIC's “A” memorandum, and in FSLIC's “I” Memorandum, as a reason FSLIC believed rebidding would not result in less costly bids than Fidelity, was incorrect. Tr. 262:7-17 (Spaid).

114. FSLIC’s “A” memorandum, DX 406A at OAA005 550-51 (Ex. A-6), included a memorandum dated September 6, 1984, reporting that the mortgage discount rate was 14.34 percent and the loan discount rate was 14.23 percent. Tr. 316:24-317:5 (Fiol). FSLIC’s fifth liquidation assumption assumed that the life of a Suburbia receivership would be three years. Tr. 317:6-10 (Fiol). After September 1984, interest rates declined substantially. Tr. 317:1-5 (Fiol). Because the liquidation analysis assumed an increasing interest rate scenario, not decreasing about 300 basis points over the next year, the liquidation analysis was not reliable. Tr. 261:8-19 (Spaid).

---

[11] During the period from FSLIC’s December 1982 bidders conference to its determination that Suburbia had, as of August 31, 1984, a net worth of 1.8 million and had reported an operating loss of $10 million since that conference, interest rates, measured by 6-month maturity Treasury issues, increased from 8.59 percent, to a peak of 11.37 percent in August 1984, no doubt explaining, in part, Suburbia’s operating loss of $10 million since December 1982. DX 514 at AA-NAV-000484; Tr. 258:4-259:8 (Spaid).

## VII. FIDELITY MERGES WITH SUBURBIA

115. As of September 30, 1984, Fidelity had $22,429,000 in total regulatory net worth, which included about $20 million in goodwill from the Dollar acquisition. Tr. 4258:5-20 (discussing PX 335 at PAA006 1219) (Amend). Mr. Amend explained that he saw "no value to the goodwill as far as if you tried to sell it, you couldn't – you couldn't earn anything from it, you couldn't sell it to anyone." Tr. 4724:23-4725:2 (Amend). At that time, Fidelity had a slight deficit in tangible capital, about $2 million. Tr. 4720:21-25, 4724:18 (Amend).

116. Suburbia's problems were mostly its cost of money. Fidelity had the same basic cost of money problems because it was operating in the same market, but Fidelity was performing better because it enjoyed purchase accounting benefits from the Dollar acquisition. Tr. 4732:16-4734:18 (Amend).

117. Fidelity acquired Suburbia on October 31, 1984. PX 986 at AST064173. Fidelity did not pay the Government anything to acquire Suburbia or for the goodwill that it recorded. Tr. 1506:4-9 (Vigna); Tr. 4264:20-22 (Amend). Fidelity did not have the capacity to pay off Suburbia's net liabilities, Tr. 4260:8-11 (Amend), and, in fact, there is a high probability that Fidelity was tangibly insolvent at the time. Tr. 4259:22-23 (Amend).

118. FSLIC provided Fidelity a cash contribution of $16 million. PX 253 at AST000039; PX 1283 at AST060052; PX 274 at AST069020.

119. After the acquisition, the Government still insured the deposits of both Suburbia and Fidelity. Tr. 1506:10-12 (Vigna); Tr. 4260:18-23, 4264:7-12 (Amend).

120. As part of the regulatory approval of the merger, the FHLBB approved the assumption by Fidelity of Suburbia's NWCs, which survived the merger and were included in

Fidelity's regulatory capital computations. PX 232 at WOL315 0212. NWCs requested by Suburbia in the first half of 1984, in the amount of $925,000, were actually issued to Fidelity after the merger. Tr. 4133:18-24, 4134:21-25, 4139:13-4140:5 (Albanese); PX 310; DX 3187 at WOH020 0328, 0337.

121. If Suburbia had not merged with Fidelity, it would have been eligible to apply for more NWCs, assuming the NWCs brought its capital ratio up to .5 percent. Tr. 4138:14-21; 4184:6-18 (Albanese).

122. It is possible that Suburbia was in better condition when it was acquired than it had been previously, because the amounts of NWCs it was issued actually decreased by 1984 (indicating it was in less need of NWCs). Tr. 4195:17-22 (Albanese).

123. It is a "stretch" to assume that the alternatives listed in the FSLIC's "I" memorandum were the only ones available because FHLBB/FSLIC had an obligation to show liquidation alternatives in the "I" memorandum. PX 237 at AA 0000177-81; Tr. 4188:19-4189:12 (Albanese). In fact, the listing of alternatives in the "I" memorandum (PX 237) did not prelude the issuance of additional NWCs. Tr. 4191:10-19 (Albanese).

124. In a forbearance letter sent by the FHLBB to Fidelity after the merger had been approved, the FHLBB notified Fidelity that it could report the value of any intangible assets resulting from the accounting for the merger pursuant to the purchase method. This value could be amortized by Fidelity over a period not to exceed 30 years. PX 274 at AST069020.

125. The forbearance letter, id. at AST069021, states: "this letter does not and shall not be construed to constitute forbearance or waiver by the board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding

paragraphs 1 through 7." Tr. 1519:14-24 (Vigna). The forbearance letter did not waive any of the FHLBB's rights to take into account risk in specifying capital requirements, Tr. 1519:25-1520:3 (Vigna), or to take into account the thrift's examination results in regulating its growth. Tr. 1520:4-7 (Vigna).

126. The forbearance letter did not promise that regulatory capital requirements would never change. Tr. 1520:8-10 (Vigna). Nor did it promise that the FDIC would not become a secondary regulator of the combined institution. Tr. 1520:11-14 (Vigna). Indeed, the Government did not make any promises in the forbearance letter that the level of capital required would not increase, or that the method by which deposit insurance premiums would be calculated would not change, or that there would be no new statutes or regulations enacted. Tr. 1520:15-24 (Vigna).

127. There was likewise nothing in the Assistance Agreement, PX 268, that prevented regulators from holding Fidelity accountable for improper, risky or nonperforming loans. Tr. 1523:17-20 (Vigna).

128. The Assistance Agreement did not permit Fidelity to transfer its goodwill to a third party. Mr. Vigna was not aware of any time the FSLIC consented to the transfer or assignment of goodwill. Tr. 1522:9-15, 1523:7-16 (Vigna). Mr. Amend had no recollection of goodwill or any forbearance being transferred to a third party, Tr. 4264:23-4265:4 (Amend), and Mr. Vigna testified that nothing in the Assistance Agreement would have allowed goodwill to be transferred to another party. Tr. 1526:23-24 (Vigna).

129. Indeed, the Assistance Agreement provided that no right under it could be transferred or vested to any other party "through merger, consolidation or otherwise," without

the prior written consent of the FSLIC. PX 253 at AST000059. Moreover, it expressly stated that all of the provisions of the Assistance Agreement were for the sole benefit of Fidelity and the FSLIC, and that no other entity or person would have "any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions." PX 253 at AST000060. Thus, the goodwill created in the Suburbia acquisition could not have been sold and had no value except to the entity for which it was created. DX 3488 at 63:3-12 (Greco); see Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 162-64 (2006).

130. Immediately after Fidelity's acquisition of Suburbia, interest rates started to plummet. Indeed, in the one-month period between October and November 1984, interest rates declined by more than one hundred basis points (i.e., one percent). DX 514 at OAA013 0023; DX 512 at OAA013 0007; DX 513 at OAA013 0018. By November 1985, interest rates had declined by an additional two hundred basis points (i.e., by another 2 percent). DX 514 at OAA013 0023-24; DX 5112 at OAA013 0007; DX 513 at OAA013 0018. Given that Suburbia's problems were caused by an interest rate spread mismatch, this dramatic decline in interest rates had a dramatic positive effect on the value of its assets now held by Fidelity, and this would have been the case with or without the Fidelity acquisition. This interest rate decline facilitated the sale of Suburbia's assets by Fidelity for gains that it could book toward earnings and capital.

131. At the time of the acquisition of Fidelity, FSLIC insurance was calculated in relation to the size of a thrift's deposits, and not in relation to the riskiness of a thrift's assets.

132. As a result of its acquisition of Suburbia, Fidelity more than doubled in size: its assets mushroomed from $556.3 million to $1.3 billion, its deposits grew from $393.2 million to 1.0 billion, and it added 12 branches, giving it 20 total branches. PX 986 at AST064173.

133. Fidelity accounted for the acquisition of Suburbia under the “purchase” method, by which Suburbia’s assets and liabilities were re-priced according to their market value, and then recorded on the balance sheet of Fidelity. PX 1283 at AST060063. As noted above, high interest rates, which affected most thrifts in the early 1980s, caused the market value of Suburbia’s liabilities to exceed the market value of its assets. Fidelity recorded $105.5 million in discounts on the first mortgage loans acquired from Suburbia. These discounts were to be accreted to income using the level-yield method over the estimated remaining life of the loans. Id. at AST060064. Fidelity recorded the amount of Suburbia’s net liabilities as “goodwill,” an intangible asset. Fidelity counted this goodwill – approximately $160 million[12] – toward its regulatory capital requirements. Id. at AST060063-64.

134. Under then-existing regulatory accounting rules, Fidelity was permitted to amortize goodwill over thirty years, or longer than the offsetting discount accretion period, allowing Fidelity, like other acquirers around this time, to record a “net paper profit” over the initial years following the acquisition. See Winstar, 518 U.S. 838 at 853.[13] Indeed, Fidelity

---

[12] PX 591 at OAA005 2188 identifies the goodwill held by Fidelity. Part of the goodwill that Fidelity held was attributable to its acquisition of Dollar. Tr. 4221:16-4222:13 (Albanese).

[13] Accretion is the accounting flip-side of amortization. Under the purchase method of accounting, the discount on an acquired thrift's below-market loans (the amount by which those loans are marked down to reflect their actual value) is “accreted” -- taken into income -- over the estimated life of the loans. In the 1980s, thrifts were sometimes permitted to accrete the loan discounts at a faster rate than they were required to amortize their goodwill, creating income in the years immediately following a merger. This process is explained in great detail in the

projected that its loan discount accretion income from the Suburbia acquisition would exceed the goodwill amortization from the Suburbia acquisition in each of the first eight years following the merger for a cumulative total of $27.3 million. DX 3148 at PAA090 0106. Fidelity's net purchase accounting adjustments for its acquisition of Suburbia were, however, forecasted to be negative from the ninth year following the acquisition forward. Id. at PAA090 0199. Altogether, Fidelity realized discount accretion income of over $60 million as a direct result of the Suburbia merger, and solely as a result of purchase accounting. DX 1150 at 33.

135. The goodwill created when Suburbia was acquired was not equivalent to real, i.e., tangible, capital. In contrast to the goodwill used to meet Fidelity's regulatory capital requirements, "real" capital protects the deposit insurer from loss and encourages owners of thrifts, whose real capital is at stake, to operate their thrifts prudently. Landmark Land Co. v. United States, 46 Fed. Cl. 261, 273 (2000) ("While goodwill may provide leverage to magnify gains (or losses) from lending operations, it cannot protect a thrift against actual losses as capital does."), aff'd in part, vacated and remanded, 256 F.3d 1365 (Fed. Cir. 2001). Goodwill could not serve those traditional functions of capital, because it was not a "real asset;" instead, it was merely a plug figure, representing the amount by which the acquired thrift's liabilities exceeded its assets. See Cal. Fed. Bank v. United States, 43 Fed. Cl. 445, 459 (1999) (describing goodwill as mere accounting "gimmick"); vacated in part on other grounds, 245 F.3d 1342 (Fed. Cir. 2001).

---

Supreme Court's decision in Winstar, 518 U.S. at 851-53. Accretion and amortization periods normally match, so that "income" is accreted as goodwill is expensed, and no paper income is generated. See id.

## VIII. FIDELITY INVESTED IN RISKY ASSETS THAT RESULTED IN SIGNIFICANT LOSSES

### A. Fidelity Sold Suburbia Assets And Invested In Risky Commercial Real Estate Development Projects

136. Fidelity sold many of Suburbia's assets at a profit after they had been heavily discounted as part of the "mark-to-market" of Suburbia's assets in the acquisition. See PX 986 at AST064173. Indeed, it was Fidelity's plan from the outset to restructure the assets it obtained in the Suburbia acquisition. DX 3148 at PAA090 0109; DX 3488 at 56:19-57:19 (Greco).

137. In 1985 and 1986, for example, Fidelity sold $16.5 million of Freddie Mac securities acquired from Suburbia. DX 3026 at PAA006 1365. During fiscal years 1986, 1988, and 1990, Fidelity sold approximately $179,894,000 of loans acquired from Suburbia. The net purchase discounts associated with these sold loans totaled approximately $44,735,000, and the cumulative gain on the sales was approximately $19,920,000. PX 1283 at AST060066; PX 476 at AST058798. Thus, in Fidelity's sale of Suburbia's loans, it realized nearly $20 million in immediate profits in this manner, but it did so by sacrificing over $45 million in future profits that Fidelity would have earned through the accretion of the $45 million in loan discounts associated with the assets sold. DX 1150 at 34, Table 6. Fidelity then funneled the cash generated by the asset sales into risky lending areas, like commercial real estate, construction and business lending. PX 986 at AST064173. Fidelity continued its sale of Suburbia loans for profits through 1992. PX 707 at WON730 1806; PX 887 at AST059684.

**B. Regulators Warned Fidelity About Its High Concentrations Of Condominium And Cooperative Lending**

138. Fidelity had a much greater concentration in construction loans – which were riskier loans than single family mortgages – compared to Suburbia. Even before Fidelity's acquisition of Suburbia, the FHLBB wrote to Fidelity expressing concern about Fidelity's high concentration of condominium and cooperative lending among three borrowers. PX 183 at AST029213; DX 3488 at 28:11-24 (Greco). Concentration in one area is of concern due to the cyclical nature of markets, and the condo/coop conversion market was risky because the loans were made with very little equity, with high interest reserves and poor control over disbursements, leaving open the possibility that the units would not sell at expected prices and losses would be incurred. Tr. 4144:23-4146:24 (Albanese).

139. Dollar had been involved in commercial real estate lending before it was acquired by Fidelity, and that is how Fidelity became involved with the developer Gerald Guterman. Tr. 1568:15-22, 1578:2-18 (Lovely). By 1982, Fidelity had already become engaged in lending to commercial construction developers, and already had a large project (Fairway Pines) in foreclosure. PX 115; Tr. 1645:13-1647:13 (Lovely).

140. In the December 30, 1983 RoE of Fidelity, examiners commented about loans to one borrower. Fidelity made Mr. Guterman, one of Fidelity's borrowers, its agent to deal with Fairway Pines, PX 1242 at AST029182; Tr. 1670:3-1674:14 (Lovely), even though Mr. Guterman's Glen Oaks Village was listed in the RoE's comments about loan concentration. Tr. 1674:15-1675:11 (Lovely). Indeed, Mr. Lovely admitted that "Fairway Pines was a $5 million

disaster, which made our position very, very vulnerable."[14] Tr. 1670:3-15, 1679:5-1680:20 (Lovely); see also PX 335 at AST002375 (discussing "New Lending Risk Exposure" as Fidelity originated a large volume of ADC loans).

141. On July 10, 1984, Mr. Albanese warned Fidelity about loan concentrations, particularly in multi-unit conversions to condos and coops. PX 183. This illustrates that Fidelity was engaged in such lending prior to acquiring Suburbia. Tr. 1678:1-14 (Lovely).

142. Beginning in 1985, however, with an enhanced cash position that resulted principally from the sale of discounted assets acquired in the Dollar and Suburbia acquisitions, Fidelity accelerated its program of diversifying into commercial real estate, construction and commercial business. PX 986 at AST064218 (Powderly).

143. Fidelity made concentrations of loans to a handful of investors, Mr. Guterman, Coronet, the Minskoff Group, and Louis Evangelista. The majority of these loans were concentrated in condominium and cooperative conversion projects in Manhattan. DX 3488 at 80:3-22, 99:22-100:6 (Greco); DX 63 at WON725 1296. The outstanding loans to just these four developers were equal to approximately 156 percent of Fidelity's net worth at the time. DX 63 at WON725 1296; see also Tr. 1683:15-1685:17 (Lovely).

144. In July 1984, the FHLBB transmitted Fidelity's RoE for December 1983 and advised the board of directors to take corrective action. Tr. 4143:1-13 (Albanese); PX 183. The number one concern was the concentrations of loans Fidelity had undertaken. They had concentrations by borrower, including Mr. Guterman, Coronet and the Minskoff Group. They

[14] Fidelity was still dealing with Fairway Pines as of 1986. Tr. 1705:2-1707:6 (Lovely). Mr. Lovely admitted that it took Fidelity a while to work off or deal with these large developer loans and could take years to resolve them. Tr. 1707:4-6 (Lovely).

also had concentrations by property type, i.e., heavy engagement in coop conversions, condo conversions, and acquisition, development and construction lending. Tr. 4143:21-4144:22 (Albanese). They also had concentrations by geographic area, mainly in New York City. The problem loans were originated by Fidelity. Tr. 4147:15-19 (Albanese).

145. In a letter dated November 7, 1985, from Mr. Albanese to Fidelity (with a draft RoE), the FHLBB raised concerns to raise concerns about the thrift's heavy concentration in the co-op/condo market. DX 63; Tr. 4240:15-4244:2 (Amend).

146. Messrs. Lovely and Greco did not fully grasp the regulator's concerns about loan concentrations. Tr. 4241:23-4242:2 (Amend). Mr. Amend was concerned with the way these loans were underwritten because there was very little borrower equity. Tr. 4242:12-22, 4246:9-20 (Amend). He was concerned that if these projects did not succeed, Fidelity could be in trouble. Tr. 4243:16-4244:23 (Amend).

147. In December of 1985, Mr. Lovely wrote to Mr. Albanese and indicated that Fidelity was working on the problems the thrift was experiencing. The problems were not solved, however, because the problem loans were still on the books. Tr. 4149:14-4150:20 (Albanese); DX 597.

148. The 1985 RoE was the first RoE of Fidelity issued after its acquisition of Suburbia. Tr. 4598:24-25 (Amend). The FHLBB's July 5, 1985 RoE of Fidelity found that, since its last examination in December 1983, Fidelity had become heavily engaged in the origination of acquisition, development and construction ("ADC") loans secured by condominium or cooperative units. PX335 at AST002375. Regulators noted that ADC loans were highly speculative types of investments and involved much higher risks due to the

requirement for initial heavy outlays of capital and because of their inherently volatile nature. Id. These loans also typically require a minimum period of two years for construction completion and successful sellout, during which time market conditions can change. Id. Regulators further reiterated that concentrations in lending exposed Fidelity's financial condition to excessive risk. PX 335 at AST002374.

149. Fidelity's concentration of loans involved developers that had largely been associated with Dollar, but Fidelity increased its exposure with these developers and broadened its involvement to the point where regulatory violations were noted in the FHLBB's 1985 RoE. Tr. 4599:1-22 (Amend). Mr. Amend was concerned that Fidelity's underwriting was lacking. Tr. 4601:25-4602:22 (Amend).

150. Describing his concern with Fidelity's underwriting, Mr. Amend testified:

> The 1985 exam showed that Fidelity's management was restructuring the bank and putting more exposure in this area, which had been performing relatively well, actually performing well. They were earning assets. I was just worried about pretty much the concentration. And by the time I became the field manager in '87, these assets started to exhibit signs of distress as far as their ability to perform and pay interest. As I see from all the final numbers that we brought out, there was a substantial harm to the bank from these assets over the long run, 1994 when significant losses developed.

Tr. 4709:7-18 (Amend).

151. In response to examiners' concerns in 1985 regarding Fidelity's origination of ADC loans, President Greco, who was in charge of the loan department (but admitted he did not monitor the loans himself), stated that Fidelity had concentrated its condominium and

cooperative lending on a small number of borrowers "by design." DX 3488 at 23:2-13, 97:21-98:3 (Greco); PX 335 at AST002381; Tr. 1682:18-1683:14 (Lovely).

152. Mr. Greco attempted to assure regulators that Fidelity had not sought any new involvements that would add to the concentrations of construction loans. Id. However, during the month of September 1986 alone, loans totaling $6.8 million were approved by Fidelity's board to Messrs. Guterman and Evangelista. DX 3344 at AST127418-19. Moreover, in 1986 and 1987, Fidelity made two loans totaling $32 million to Glick Development, another large developer, for development of a major tract of Manhattan real estate, and for the development of a shopping center in Queens, New York. Both loans eventually failed, Fidelity foreclosed, and the properties eventually became real estate owned ("REO") by Fidelity. PX 711 at AST002941-42.

153. Mr. Lovely agreed that PX 360, Mr. Albanese's January 3, 1986 letter, shows that regulators were concerned with extent of Fidelity monitoring developers, and that improvement was needed in Fidelity's monitoring of the developers to whom it had lent. Tr. 1705:2-16 (Lovely).

154. Messrs. Lovely and Greco were not capable of working out the problems Fidelity had. Tr. 1507:5-14 (Vigna). As Mr. Vigna testified:

> [Mr. Lovely's background] was primarily an educator. He did become president and CEO, but that was a time when it was a very vanilla, traditional savings and loan. At this point in time, it was now a very troubled institution with very highly complex workouts to be accomplished within their portfolio of very high-risk loans. He certainly wasn't capable of making judgments on those loans. And in fact, he would have to bear responsibility for the fact that they had so gotten themselves so deeply entrenched in these high-risk loans which went bad.

Tr. 1510:12-23 (Vigna). As far as Mr. Greco, Mr. Vigna testified, "I just felt that since he had been one of the major architects for these loans, didn't have the expertise to work out of them." Tr. 1510:24-1511:1 (Vigna). Mr. Powderly testified that Fidelity did not have internal procedures to monitor the resources of developers when he joined Fidelity, and that he instituted such procedures once he took over the real estate side of the business. Tr. 673:5-674:6 (Powderly).

155. The fact of the matter is that Fidelity's management was roundly criticized by examiners -- and Fidelity's own successor management. For example, Mr. Wesp repeatedly acknowledged the ineptitude of Messrs. Lovely and Greco. When Mr. Wesp arrived at Fidelity, "[t]here was no formal financial planning process at the bank." Tr. 1746:21-22 (Wesp). Fidelity's budgets business plans "were pretty superficial." Tr. 1746:23-1747:4 (Wesp). Fidelity's board members were not sophisticated and included "a dentist and a real estate guy and a restauranteur." Tr. 1768:12-13 (Wesp). When Fidelity needed more than very simple planning document "they didn't know how to do it." Tr. 1768:15-22 (Wesp).

156. Mr. Wesp considered Fidelity's budget projections to be "amateurish" and "absolutely useless," and, at trial, he made it clear that he didn't want the Court to "believe that I was as dumb as all the rest of them," (i.e., Fidelity's existing management). Tr. 1776:1-16 (Wesp). Later Mr. Wesp backtracked and said that while "Dumb may have been the wrong pejorative, but there's some pejorative that would have applied," to Fidelity's existing management. Tr. 2001:21-22 (Wesp). He then said that Messrs. Greco and Lovely "were inexperienced and didn't have a lot of expertise," and that "they were just way over their heads." Tr. 2002:25-2003:3 (Wesp). For example, Mr. Wesp recognized that Mr. Lovely had no interest

or acumen with numbers, that he “became CEO of the bank by accident,” and that he had no experience in banking. Tr. 2002:17-20, 2003:4-6 (Wesp). Moreover, Mr. Wesp faulted Mr. Lovely for not recognizing that Mr. Greco, too, did not have the financial background or ability to run a billion dollar financial institution. Tr. 2003:9-16 (Wesp). Indeed, Mr. Wesp then said that Mr. Greco “was not a sophisticated financial manager,” that he “had a fairly large ego and didn’t like to be told that he was wrong.” Tr. 2001:22-25 (Wesp). In summation, Mr. Wesp agreed that, for the first few years he was at Fidelity, Fidelity’s management was “like a dysfunctional family.” Tr. 2003:17-23 (Wesp).

157. Fidelity did not have “a lot of sophisticated expertise in-house on a lot of subjects that you would have needed to get into new businesses.” Tr. 1797:3-5 (Wesp).

158. As of October 1988, Fidelity “didn’t have . . . a very sophisticated mortgage banking, mortgage origination operation.” Tr. 1820:22-24 (Wesp).

159. Fidelity was criticized by regulators during Mr. Wesp’s tenure at the thrift for inadequate recordkeeping with regard to certain MBS investments. Tr. 1984:2-6 (Wesp). Moreover, more than two years after Mr. Wesp arrived at Fidelity, it still did not have an investment committee. Tr. 1985:20-1986:21 (Wesp).

160. In addition to a lack of investment activity, Fidelity originated few mortgages, having an “amateurish mortgage banking operation.” Tr. 2089:17-2090:1 (Wesp). “Our mortgage origination operation was really Mickey Mouse. We just didn’t originate that much paper. You’re really talking about the difference between making 10 loans and five loans. In a $2 billion bank, it doesn’t mean anything.” Tr. 2185:9-13 (Wesp). Moreover, Fidelity had “no intention of locally originating any mortgages.” Tr. 2090:20-21 (Wesp). “As I said, our internal

origination of any loan, whether it was an auto loan, an adjustable rate loan, a home equity loan, our internal loan generation gets lost in the rounding. It's not a meaningful number." Tr. 2099:9-13 (Wesp).

161. Regulators would later learn that Mr. Greco and Fidelity's chief executive officer, Mr. Lovely, had, undisclosed to Fidelity's board, obtained units for little or no downpayment in a development of Mr. Guterman's, Glen Oaks Village, which was financed with loans from Fidelity. DX 1105 at FAA008 0135-36; DX 1107 at FAA008 0122-23. As the OTS determined through its investigations, "Lovely breach his fiduciary duties to Fidelity New York by entering into personal transactions, during the period from May 2, 1984, to June 21, 1985." DX 1105 at FAA008 0135. A similar determination was made by the OTS with respect to Mr. Greco, with his personal transactions occurring between May 6, 1984, and August 21, 1984. DX 1107 at FAA008 0122. Due to this breach of their fiduciary duties, pursuant to statutory authority, regulators obtained a consent decree from Messrs. Lovely and Greco banning them from the banking industry for life, and requiring their payment of $190,000. DX 1107; DX 1108; DX 1105; DX 1106.

### C. By 1986 Fidelity Had One-Fourth Of Its Assets In Highly Risky Commercial Real Estate Loans

162. By September 30, 1986, Fidelity had approximately $370.9 million -- or about a quarter of the entire thrift -- invested in commercial real estate, construction and commercial business loans. PX 986 at AST064173. In mid-1986, the Bank added to its management team Thomas V. Powderly, William A. Wesp, and Frederick J. Meyer, who brought expertise in

commercial real estate management, development and lending, investment portfolio management and retail banking. PX 986 at AST064190.

163. After joining Fidelity in June 1986, Mr. Powderly reviewed Fidelity's loan portfolio and decided that Fidelity should get out of commercial real estate lending as quickly as it possibly could. JSF ¶ 67; Tr. 340:19-25; 344:4-12 (Powderly). Mr. Powderly agreed that the Tax Reform Act of 1986, which was unrelated to the Suburbia goodwill, "made matters worse." Tr. 666:3-4 (Powderly); see also Tr. 1702:13-1703:15 (acknowledging negative impact of tax legislation on coop and condo market) (Lovely). The Tax Reform Act of 1986 changed the depreciation deduction on real estate investments, thus rendering these investments far less attractive, particularly for high-priced units. Whatever the cause, there is no dispute that New York was in the throes of a real estate recession during the late 1980s and early 1990s. PX 986 at AST064174; Tr. 344:24-345:9, 666:5-17 (Powderly). Mr. Lovely and Mr. Greco ultimately agreed with this decision to exit commercial lending -- after initially resisting it, Tr. 655:14-16 (Powderly) – but not in time to spare Fidelity's operations from the severe effect of its bad loans.

164. In September 1986, Fidelity hired Vito L. Caporusso, a banker with more than twenty-five years as a collection manager, as a vice president. PX 986 at AST064264; PX 383 at AST0705300 (Caporusso); JSF ¶ 66.

165. In July 1986, regulators noted that Fidelity had net operating income of $19 million for the twelve month period ended June 30, 1986. DX 3026 at PAA006 1365; Tr. 675:19-676:1 (Powderly). Over $8 million of this, though, was due to purchase accounting adjustments for discount accretion. DX 3026 at PAA006 1365, Tr. 676:2-677:1 (Powderly).

The remainder of Fidelity's operating profits was due primarily to two factors, the favorable impact of declining market interest rates on its cost of money and increased loan fee income. DX 3026 at PAA006 1365; Tr. 677:2-10 (Powderly).

166. Regulators further determined, however, that other factors would limit the improvement in Fidelity's operating results: the narrowing of the spread between discount accretion and goodwill amortization, and the effects, including the deferral of interest income on ADC loans, caused by the bank's restructuring into riskier assets, including its substantial concentration in the condo/coop conversion real estate development. DX 3026 at PAA006 1363, 1365. In connection with the FHLBB's warnings about Fidelity's concentration of loans, regulators found that Fidelity was inadequately monitoring the financial capabilities of its major borrowers. DX 3026 at PAA006 1364, 1367.

### D. Fidelity's Concentrations Of Commercial Loans Began Collapsing In 1987 And, Facing Catastrophic Losses, Fidelity Belatedly Resolved To Exit That Risky Arena

167. By early 1987, given the grave problems it faced as a result of its commercial loan concentrations, Fidelity determined to cease such lending. PX 986 at AST064174; Tr. 340:19-25; 344:4-12 (Powderly); JSF ¶ 67. Fidelity tried to get out of the commercial real estate business, independent of FIRREA, because they believed a return to traditional thrift activity was less risky and would generate earnings. Fidelity officially adopted this course when it replaced Mr. Greco with Mr. Powderly as president in 1990. Tr. 338:11-24, 343:3-344:23, 348:1-14, 349:1-4, 357:5-13, 362:22-363:5, 365:3-14, 368:23-369:13, 398:15-399:2, 402:12-18, 432:17-24, 454:1-455:12, 492:2-7, 857:9-18, 860:11-24 (Powderly); PX 447 at OAA005 1315.

168. The Manhattan real estate market has always been highly cyclical; with the passage of the Tax Reform Act of 1986 it became clear to Fidelity that there would be "a down cycle in commercial real estate by the end of the 80s," Tr. 1741:25-1742:24 (Wesp), and that Fidelity was going to have problems with its commercial real estate loans to developers with projects in Manhattan. Tr. 1744:2-1745:6 (Wesp). Nevertheless, Fidelity kept making loans to commercial developers until 1987 or 1988, when Messrs. Greco and Lovely were finally "just ruled off the turf, they were just prohibited from making any more commercial loans." Tr. 1795:11-16 (Wesp).

169. The FHLBB's October 1987 examination of the thrift, PX 69A, revealed the extent of the troubles facing Fidelity as a result of its extraordinarily poor underwriting decisions. Regulators assigned Fidelity a "4" composite "MACRO" rating. This composite figure represented regulators' assessment of the five components of a thrift's health: **M**anagement, **A**sset quality, **C**apital, **R**isk management, and **O**perating results, cumulatively referred to as the "MACRO" factors.[15] Each of these MACRO factors was assigned a number from "1" to "5," with "5 " being the worst rating a thrift could received. The composite rating was also on a "1" to "5" scale, with "5" being the worst rating.[16] A "4" composite rating meant that regulators considered a thrift to have "Major and serious problems or unsafe and unsound

---

[15] In 1994, the OTS switched from a MACRO composite rating system to a CAMEL ("**C**apital, **A**ssets, **M**anagement, **E**arnings, and **L**iquidity), a change that had little effect upon the focus of examiners in determining the safety and soundness of institutions. The OTS's 1994 Regulatory plan for Fidelity sets forth the corresponding CAMEL ratings for the thrift (showing the rating for each component) between 1993 and 1987. DX 1448 at WON732 0834.

[16] A "5" rating was given to "institutions with an extremely high immediate or near-term probability of failure." DX 1448 at WON732 0834; PX 509 at AST001970.

conditions . . . which are not being satisfactorily resolved by the institution." PX 509 at AST001970; DX 1448 at WON732 0834. Furthermore, regulators stated that: "Unless prompt action is taken to correct these conditions, they could reasonably develop into a situation that could impair future viability." PX 509 at AST001970.

170. As Mr. Albanese explained at trial, the composite rating will come out of the component ratings, which will "drive" the composite rating. Of the component ratings, management is very important; indeed, Mr. Albanese would give it the greatest weight. Tr. 4164:19-4165:14 (Albanese).

171. At the time that Fidelity received its composite rating of "4," Mr. Amend was field manager on that examination. DX 69A; Tr. 4289:25-4290:5 (Amend). In 1987, its component ratings were "3" for management, "4" for asset quality, "2" for capital, "2" for risk management, and "2" for operating results. As of the 1987 examination, classified assets were at $81.5 million. DX 69A at OAA002 0106; Tr. 4159:23 - 4160:6 (Albanese). From the 1985 to the 1987 examinations, the composite rating had declined from a "3" to a "4." Tr. 4157:21-4158:23 (Albanese); Tr. 4314:10-21 (discussing DX 548 and DX 1411) (Amend).

172. During this examination review period, there was a deterioration in the acquisition, development and construction ("ADC") loans, which had previously been criticized for undue concentration. This deterioration did not have anything to do with the acquisition of Suburbia. Tr. 4294:2 -4295:1 (Amend). Actual realized losses started to occur. Tr. 4295:5-9 (Amend).

173. Indeed, the opening sentences of the FHLBB's 1987 examination spell out the imprudent lending practices and disregard of prior regulator warnings, which resulted in Fidelity having a level of criticized assets well above its peers:

> Despite the various assurances made by management and noted in the previous report of examination, a significant number of major project loans showed no substantial improvement in performance during the review period and are subject to classification or special comment in the current examination report. Also of concern is that loans to a number of major borrowers have significantly deteriorated in performance so that the establishment of specific reserves against several loans were required. Furthermore, a review of several major loan files disclosed a number of imprudent practices utilized by management including extensions of matured loans to avoid delinquency, the granting of various types of concessions to major borrowers, and the granting of loans which are not in accordance with sound underwriting policies.

DX 69A at OAA002 0079.

174. The 1987 RoE found that Fidelity's total criticized assets increased 79.1 percent, from approximately $66,282,000 to $118,684,000 during the fifteen month review period from June 30, 1986, to September 30, 1987. DX 69A at OAA002 0082. The $118,684,000 of criticized assets represented 7.2 percent of Fidelity's total assets, which Mr. Powderly agreed was an unusually high number for a thrift. Id.;Tr. 688:7-689:17, 694:18-695:8 (Powderly). Mr. Powderly agreed that the primary cause of Fidelity's criticized assets in the 1987 examination was Fidelity's commercial real estate portfolio. Tr. 689:18-23 (Powderly). During this same time period, classified assets increased $68.4 million, from $16.2 million to $84.6 million. DX 69A at OAA002 0082, 0086.

175. As of September 1987, Fidelity had approximately $46.3 million in nonearning assets. Regulators found that, if one assumed an average rate of return of 9.0 percent on these assets, the impact on Fidelity's earnings from lost interest income alone on these loans exceeded $4.0 million on an annual basis. DX 69A at OAA002 0086. Mr. Powderly agreed that the nonearning assets that remained nonearning would continue to affect Fidelity's earnings and capital in future years. Tr. 704:5-12 (Powderly).

176. Regulators reiterated their criticisms of Fidelity's decision to concentrate its lending in just a handful of investors, noting that $72.5 million of the total classified assets was attributable to just five borrowers, including Coronet and Messrs. Guterman and Evangelista. Regulators noted that Mr. Guterman had, by this time, defaulted on his total indebtedness and initiated litigation against Fidelity. DX 69A at OAA002 0082; Tr. 695:12-19 (Powderly). The high level of substandard, non-earning assets was, regulators concluded, "having an adverse impact on the bank's operating results." DX 69A at OAA002 0082.

177. In the 1987 RoE, the regulators criticized several management practices, including management's decision to become heavily involved in ADC loans, extension of matured loans to avoid delinquency, granting of various concessions to major borrowers, and granting of loans that were not in accordance with the bank's approved underwriting policy. Mr. Powderly decided to stop these practices once he had the authority to do so. DX 69A at OAA002 0080-81; Tr. 689:24-693:4 (Powderly). The regulators found that Fidelity's general loss allowance was inadequate due to the bank's loan condition, loss experience, and loan underwriting practices; Mr. Powderly agreed that the general loss allowance was not adequate. DX 69A at OAA002 0084; Tr. 699:15-700:8 (Powderly).

178. Also having a negative effect on the thrift's results was its declining accretion income from the Dollar and Suburbia acquisitions. In just one year, that income declined by 50 percent, from $6 million to $4 million, and regulators noted that this accretion income would "continue to decline until 1990 when the bank will eventually have no benefit at all." DX 69A at OAA002 0086; see also Tr. 705:6-21 (Powderly).

179. Also affecting the thrift's future profitability was its decision to sell a substantial amount ($33.5 million) of its high yielding assets, an action undertaken -- like its later asset sales -- "to help mitigate the impact of establishing substantial loan [loss] reserves on earnings." DX 69A at OAA002 0086. Thus, regulators concluded, "management was willing to recognize immediate profits at the expense of adversely affecting the future income stream." Id. Mr. Powderly agreed that these asset sales enabled Fidelity to earn a profit on that sale, but that in future years Fidelity's margin would be lower because Fidelity could not sell the same asset again. Tr. 705:22-707:3 (Powderly). Mr. Powderly also agreed that these asset sales helped Fidelity mitigate the impact of establishing substantial loan loss reserves for the 1987 period. Tr. 706:24-707:9 (Powderly).

180. During the next four years, the severity of Fidelity's asset quality problems deteriorated even further from the already disastrous condition in 1987. DX 1199 at WON738 0780. In the late 1980s and early 1990s, the regulators were concerned about the deteriorating condition of these loans. They demanded that Fidelity take one-time expenses in the form of loan value write-downs and create loan loss reserves, all of which lowered Fidelity's earnings. Tr. 342:6-21, 344:24-345:9, 350:5-24, 699:4-700:8, 701:4-12, 701:18-702:4, 788:2-17 (Powderly); Tr. 1447:9-20 (Vigna) (problem loans "very, very severe"); PX 509 at AST001974-

83, AST002004-40. These problem loans, as they deteriorated, left Fidelity with very slim net interest margins in the years preceding FIRREA. This left Fidelity vulnerable to even one percent swings in interest rates – a factor that had nothing to do with goodwill. PX 509 at AST001986-87; Tr. 847:5-849:25, 852:9-853:11, 872:2-873:23 (Powderly).

181. The bad loans cost Fidelity deeply, and, as Mr. Caporusso admitted, it required the thrift to set a game plan to survive and work through the bad loans. Tr. 3897:6-25 (Caporusso).[17] Fidelity's bad loans had to be paid down as funds were available to do so and Fidelity couldn't solve the problem by growing its lending operations, which could increase the riskiness of the bank's operations. Tr. 3907:8-18 (Caporusso). One cost of holding assets that the thrift had foreclosed upon was that the thrift was responsible for the real estate taxes assessed against the property. Thus, for example, Fidelity was notified that, for one of its loans originally underwritten to Mr. Evangelista, it owed the City of New York $515,000 in back taxes. Tr. 3926:16-3927:24 (Caporusso); DX 622.

182. As of August 1988, Fidelity continued to suffer from the problems created by its lending. PX 436; Tr. 4154:7-4155:14 (Albanese). Criticized assets had increased, to 79.1 percent of capital in a 15-month period, and this was significant. Tr. 4155:20- 4156:2 (Albanese). Although, at this point, Fidelity had ceased lending in the coop and condominium

[17] Even so, Mr. Caporusso was apparently unaware of the full extent of Fidelity's problem loans. For example, he was unaware of the findings of the FHLBB's 1987 report of examination. Tr. 3891:21-3892:2 (Caporusso). Nor did he ever become aware of the cumulative amount of the losses Fidelity experienced from its bad loans, or even losses on some of its major loans. Tr. 3892:23-3894:2, Tr. 3928:15 - 3929:22 (Caporusso). In fact, he admitted that he did not get involved with Fidelity's bad loans until he became a senior vice president four or five years after he was hired. Indeed, Mr. Caporusso admitted that the Government probably knew more about Fidelity's bad loans than he did. Tr. 3898:5-7 (Caporusso).

market, the bad loans originated earlier were still on the books and deteriorating. Tr. 4156:3-23 (Albanese). Moreover, apart from the coop and condominium loans, the FHLB remained concerned about the thrift's decision to increase its commercial lending activity. Tr. 4156:24-4157:20 (Albanese).

### E. Due To Its Collapsing Loans, Fidelity Projects Minimal Growth In Its 1988 Budget

183. Given the deterioration of the Fidelity's financial condition, regulators noted that Fidelity's "budget for 1988 anticipates minimal asset growth to $1.8 billion (an increase of only $132,000 from year end 1987 [i.e., less than 0.1 percent]) and net income of $6.7 million." DX 69A at OAA002 0087; Tr. 707:23-708:9 (Powderly). The budget also included additional reserves of $2.4 million due to losses in Fidelity's loan portfolio, particularly the commercial loans. DX 69A at OAA002 0087; Tr. 708:10-19 (Powderly). Mr. Powderly agreed that the lack of growth was due to the commercial real estate portfolio. Tr. 708:20-25 (Powderly).

184. Apart from the direct impact on its finances, Fidelity's poor loan portfolio was taking up considerable time and effort of Fidelity's entire senior management, as they attempted to monitor major borrowers. DX 69A at OAA002 0081. As Mr. Powderly put it, the commercial loans were "troubled" and "had to be worked very hard" by management. Tr. 688:14-20 (Powderly). Given the impact of the thrift's substantial amount of nonearning assets, regulators concluded that "[t]his budget is deemed realistic" because it "incorporate[s] the impact of the substantial amount of nonearning assets." DX 69A at OAA002 0087; Tr. 708:20-25 (Powderly). Fidelity's 1988 budget called for a 4 percent growth rate, which Mr. Powderly testified was consistent with the regulators' comment in the 1987 examination that Fidelity's

anticipated growth for 1988 was "minimal." DX 1203 at PAA010 1843; DX 69A at OAA002 0087; Tr. 726:16-22 (Powderly).

185. In addition to its bad loans among major borrowers, Fidelity saw its growth being restrained by the "severe competition" facing it in its core operation of traditional one-to-four family mortgage lending.[18] Accordingly, Fidelity began to invest "available funds no longer being used in commercial real estate, construction and commercial lending" in MBS, mortgage-related securities, and United States obligations. Mr. Powderly agreed that Fidelity began this strategy even before Fidelity created the October 1988 business plan, and that it continued the same strategy under the capital plan. PX 986 at AST064174; Tr. 900:9-25 (Powderly). While this practice was in contrast with the traditional thrift practice of originating residential mortgage loans, Fidelity chose this strategy as a means of controlling its overall credit risk and managing interest rate risk. PX 986 at AST064174.

186. As of February 1988, Fidelity also understood that it had to reduce its interest rate risk. Tr. 2025:24-2026:12 (Wesp); DX 1203 at AST004706. In its February 1988 business plan, Fidelity projected little growth in short-term assets, $2 million per year in Freddie Mac ARMs, while it projected growth of $74 million in longer duration (15-year Freddie Mac MBS). Tr. 2032:9-2033:15 (Wesp); DX 1203 at PAA010 1838.

---

[18] For example, Fidelity closed its two (Dollar) branches in Manhattan because it lacked a strong presence in the New York City market, could not effectively compete in that market, and could not withstand the rent increases on its branches. PX 509 at AST001989. By the time Fidelity exited Manhattan in December 1993, its total deposits in Manhattan had decreased from over $90 million to just $26.6 million. DX 3071 at PAA014 2130.

**F. Fidelity's Problems Continued Into 1988 And In Late 1988 Fidelity Prepared A Three-Year Business Plan That Was Based Upon Unrealistic Assumptions Concerning Its Loan Losses And The Condition Of The General Economy**

187. Although Fidelity was not subject to a formal examination in 1988, in August 1988, regulators again criticized Fidelity for "numerous examples" of loan monitoring deficiencies, imprudent lending practices and underwriting weaknesses, while questioning Fidelity's ability to effectively manage its problem assets. PX 436 at AST0129681.

188. As of August 1988, Fidelity's net interest margin, net of accretion income and investment securities, was "less than the peer group average during the past several quarters." Tr. 1780:16-22 (Wesp); PX 436 at AST0129687. Mr. Wesp recalled that the thrift's depressed net interest margin was the result of lower than average interest income, which resulted from a substantial amount of nonperforming loans and other nonearning assets. Tr. 1780:23-1781:6 (Wesp); PX 436 at AST0129687. Mr. Wesp understood that Fidelity's earnings would be negatively affected "by the need to replenish the allowance for general loan losses." Tr. 1780:7-13 (Wesp), PX 436 at AST0129687.

189. On October 12, 1988, Fidelity forwarded its Three Year Business Plan for 1989, 1990, and 1991 ("October 1988 Business Plan") to the FHLBB. PX 447 at OAA005 1312. Fidelity's October 1988 Business Plan calls for an increase in capital and in particular GAAP capital, balance sheet growth of 8 to 10 percent per year, reduced loan concentrations and increased credit quality, and an increased return on assets to a stable 50-70 basis point range. PX 447 at OAA005 1315. Mr. Wesp agreed that Fidelity followed its budget projections

"in terms of realistic planning," while its three year business plan was viewed as "more of a strategic look at where you want to get to down the year." Tr. 1994:21-1995:7 (Wesp).

190. Mr. Wesp repeatedly stated that Fidelity would need to adjust its business plan in reaction to changing conditions. "[N]o business plan and no budget is static. Annual plans are always revised quarterly, and three-year business plans are always revised at least once a year. So these are all moving, viable, live documents as you move through time." Tr. 1751:11-15 (Wesp). Mr. Wesp testified that Fidelity intended to following its October 1988 Business Plan, *"on the day we sent it"* to regulators, but he acknowledged that this intent was subject to "periods of huge volatility and all [of] that kinds of things, knowing full well that a lot of things would change over three years." Tr. 1790:5-11 (emphasis added) (Wesp). As Mr. Wesp stated, "it's the old garbage in, garbage out" problem with projected outcomes, because "[a]ny business plan is only as good as its assumptions." Tr. 1808:22-23 (Wesp). "A business plan is a document that you write which is your <u>best-case scenario</u>, all other things being equal, of . . . where you'd like to get to. And then circumstances change. The world changes, your staff changes, interest rates change, politics change, economics change." Tr. 1824:5-10 (emphasis added) (Wesp). Mr. Powderly also testified that the assumptions in the business plan would be revisited every year, including the growth assumption. Tr. 797:24-798:18, 808:22-25 (Powderly).

191. Mr. Powderly testified that Fidelity considered the 8 to 10 percent growth rate to be "moderate," but conceded that he did not recall what, if any, analysis Fidelity performed to conclude that this was a "moderate" growth rate. Tr. 362:8-18, 718:6-13 (Powderly). Mr. Wesp's 8 to 10 percent growth rate was based upon what he called "probably the 20th century

historical norm," but he admitted "I'm guessing." Tr. 1750:8-9 (Wesp). Mr. Amend, however, did not consider the 8 to 10 percent projected growth in the October 1988 business plan reasonable "with the problems that they had on their books." The examiner "should have recommended that they address those issues. Because the trend was adverse in earnings and in asset quality." Tr. 4802:2-8 (Amend).

192. Fidelity's October 1988 Business Plan forecasted total assets to increase by $652 million during the following three years. That increase was projected to be accomplished primarily by increases in retail assets, specifically, adjustable rate residential mortgages ($330 million) and home equity lines of credit ($126 million), with only a far lesser amount of growth in wholesale assets, specifically, MBS ($73.5 million). Tr. 1751:1-3 (Wesp). Thus, seventy percent of this increase consisted of retail assets. PX 447 at OAA005 1342-43; Tr. 361:20-365:18 (Powderly).

193. In its October 1988 Business Plan, Fidelity projected an increase of about $42 million per year in home equity loans ($10.5 million per quarter), even though Fidelity "had not emphasized" the home equity underwriting area which "was a fairly new product." Tr. 1818:24-1819:20 (Wesp). Fidelity did not want to grow by underwriting fixed rate mortgages because of its own interest rate risk profile. Tr. 1820:16-1821:3 (Wesp). Fidelity also projected that it would maintain the level of its construction loans until the second quarter of 1989, at which time it saw an increase in construction loans of $20 million per year ($5 million per quarter). Tr. 1822:5-1823:11 (Wesp); PX 447 at OAA005 1317 ¶ 7. Fidelity projected that it would grow its consumer lending at a rate of about $45 million per year ($11.25 million per quarter), a goal Fidelity never reached. Tr. 1823:14-25 (Wesp); PX 447 at OAA005 1317 ¶ 8.

194. In its October 1988 Business plan, Fidelity forecasted no earnings from RCA transactions. Mr. Wesp testified that wholesale transactions were essentially RCA transactions. Tr. 1800:12-1801:6 (Wesp). Mr. Wesp claimed that Fidelity's goal to grow its balance sheet 8 to 10 percent was based upon what Mr. Wesp felt was encouragement from the FHLBB to pursue an RCA strategy, Tr. 1793:17-1794:12 (Wesp), but, in fact, Fidelity's October 1988 Business Plan specifically disavowed an RCA strategy. PX 447 at OAA005 1315 ("their [sic] are no forecasted earnings from Risk Controlled Arbitrage transactions"). Fidelity's October 1988 business plan stated that Fidelity did not want to become dependent on RCA transactions "in an environment of volatility and uncertainty." Tr. 1801:11-1802:4 (Wesp); PX 447 at OAA005 1315-16. Mr. Powderly agreed. Tr. 742:6-18 (Powderly).

195. Mr. Wesp explained that, as of October 1988, Fidelity was cognizant of the need for "being very conservative," given "the real estate markets were uncertain, as the New York markets were clearly weakening," bond markets "were very volatile," banks were being forced out of business, "Oil prices were all over the place," and "Interest rates would move in hundreds of basis points up and down." Tr. 1801:15-1802:4 (Wesp); see also Tr. 1808:17-1809:7 (Wesp) (worldwide fixed income markets were expected to remain volatile and dominated by professional trading activity, which itself creates enormous volatility in prices); PX 447 at OAA005 1316 ¶ 2.

196. Increasing assets and liabilities does not guarantee profits. While Fidelity's assets increased each year from 1986 to 1989, its net interest income, operating income, return on average tangible assets and income before taxes declined each year. PX 1283 at AST060055-57; PX 476 at AST058782-84. Between 1988 and 1989, Fidelity grew in size from

$1.66 billion to $1.93 billion, but its net interest income declined from $35.8 million to $30.9 million, a decline of about 15 percent, and its after-tax net income declined from $10.5 million to $6.2 million, a decline of about 40 percent. Tr. 2024:16-2025:14, 2025:21-23 (Wesp); PX 476 at AST058782-83. As Mr. Wesp acknowledged as "absolutely a universal truth," not all growth is good or profitable. Tr. 2219:11-15 (Wesp).

197. As its most critical failure, Fidelity's October 1988 Business Plan completely underestimated the impact that Fidelity's poor portfolio of loans would have on the institution in the future. Indeed, the plan anticipated bad debt expense of only $600,000 for the quarters ended September 30, 1988 and December 31, 1988, and it projected <u>no bad debt expense from January 1, 1989, through June 30, 1991</u>. PX 447 at OAA005 1349. Fidelity's prediction of the future performance of its bad loans was off by tens of millions of dollars. In fact, its aggregate provisions for loan losses from 1989 through 1991 totaled over $34 million, while its cumulative annual loan loss provisions from 1985 through 1994 totaled $82 million. DX 650. These figures do not even include the many millions in lost interest income on the nonperforming loans. Mr. Powderly agreed that Fidelity's bad debt projections did not "pan out." Tr. 765:4-19 (Powderly). Mr. Wesp also acknowledged that one of the reasons the October 1988 Business Plan's forecast became irrelevant was Fidelity's bad loans and need for loan loss reserves. Tr. 1993:15-23 (Wesp). In fact, the thrift's bad loan problems turned out to be far worse than Fidelity anticipated in 1988, with Fidelity writing off far more of its bad loans and holding nonperforming loans far longer than anticipated. Tr. 1996:8-20 (Wesp).

198. Moreover, the plan incorrectly predicted the macro and local economic conditions that would affect its future performance. Indeed, Fidelity predicted that the New York metro regional economy would "remain robust with below national average unemployment rates." PX 447 at OAA005 1316. This would not prove to be the case. Mr. Powderly conceded that business conditions in New York became worse after the enactment of the plan, with commercial real estate entering into a recession. Tr. 718:14-22, 719:8-20, 738:6-8, 742:3-5 (Powderly). Mr. Powderly conceded that, even if Fidelity were operating under the October 1988 business plan in January 1990, if the economic climate was not as good as was projected, Fidelity would have had to revise its growth projections downward. Tr. 798:11:18 (Powderly).

199. Nor did Fidelity accurately predict the future movement of interest rates. In fact, in 1989, an inverted yield curve developed, and as a result, Fidelity ceased growing and ceased its purchase of certain types of securities. For example, during a board meeting in April 1989, Fidelity admitted that it had not grown the balance sheet within the first quarter of 1989 as a direct result of the inverted yield curve. DX 2345 at AST056030. With respect to the effect of an inverted yield curve upon a RCA strategy, Mr. Powderly testified that it was, "very difficult, in my judgment, to make any kind of money in an inverted yield curve." Tr. 734:10-13 (Powderly). Moreover, discussing Fidelity's three year budget, Mr. Wesp recognized that such a budget was "only as good as its interest rate assumptions." Tr. 1995:21 (Wesp). Thus, given that at that time Fidelity was "in one of those [the most] volatile interest rate periods in post-war history," the budget "had to be revised fairly frequently." Tr. 1995:19-22 (Wesp).

200. Mr. Wesp acknowledged that Fidelity had no way to predict an inverted yield curve (and the corresponding lack of growth that results from an inverted yield curve). Tr. 2059:20-2060:16 (Wesp). Moreover, Fidelity understood that "it is almost impossible to remain immune to the effects of the interest rates in the short term." Tr. 2062:10-22 (Wesp); DX 2345 at AST056031 ¶ 8. Even if FIRREA had not been passed, Fidelity would have had to revise its October 1988 Business Plan due to the inverted yield curve that arose. "If we set aside the [FIRREA] legislation . . . when the curve inverted, I would have taken whatever budget we were operating under at the time and I would have revised it, in a very formal way, with all of my people and then forwarded the revision to OTS." Tr. 2062:1-8 (Wesp).

201. The October 1988 Business Plan also did not foresee the Iraqi invasion of Kuwait and the cutoff of the world's oil supply, factors which Mr. Wesp agreed "affect the strategic direction of a thrift." Tr. 2212:13-20 (Wesp). The Iraqi invasion had the effect of a 50 percent increase in the price of oil over a three-week period; moreover, it was anticipated that there would be dramatically higher inflation. DX 2448 at AST030218; DX 2450 at AST0129849 ¶ 3; Tr. 2216:18-2217:25, 2227:6-14 (Wesp). By the fall of 1990, there was a great deal of uncertainty globally as to economic conditions, inflation and interest rates. "It was all up in the air, globally." Tr. 2227:24-2228:2, 2242:21-2243:7 ("everybody in the world stopped doing anything, and I would have stopped too. "); Tr. 2244:12-16 ("the world froze") (Wesp).

**G. By The Fall Of 1988, Fidelity Recognized The Numerous Proposals Being Considered To Ensure That Thrifts Were Adequately Capitalized**

202. By 1988, well before the beginning of the drafting of FIRREA, Fidelity understood that the thrift industry would ultimately move to GAAP accounting, which would

wipe out its goodwill, and it started preparing its own GAAP financial statements that it took to the board but did not share with regulators. Tr. 1791:1-12, 1792:12-14 (Wesp).

203. During 1988, numerous proposals were being discussed by regulators and the thrift industry to improve the financial condition of thrifts. In the "Economic Environment" section of its October 1988 Business Plan, Fidelity stated that it anticipated that at some point during the plan period the FHLBB would adopt, in total or in a somewhat modified version, new Bank for International Settlements ("BIS")/Federal Reserve capital guidelines. PX 447 at OAA005 1316 ¶ 7; Tr. 743:6-14 (Powderly). Mr. Powderly testified that regulatory changes, including changes to risk-based capital, could and did have an effect on Fidelity's growth plans. Tr. 720:6-21 (Powderly).

204. On December 15, 1988, the FHLBB proposed to amend its capital guidelines in accord with the BIS/Federal Reserve guidelines. The proposed rule was, to a greater extent than the then current capital regulations, a risk-based rule. The goal of a risk-based rule was to ensure that sufficient capital supported activities that are riskier to thrifts and to the FSLIC as insurer. DX 537 at AA-NAV-004527. Specifically, the FHLBB proposed the assignment of goodwill to a risk category of 200 percent as a means of recognizing that goodwill offered little value as protection to the FSLIC. DX 537 at AA-NAV-4534. Mr. Powderly testified that Fidelity was anticipating that there would be some kind of additional regulation in December 1988, and that those guidelines would deal with risk-based capital requirements, not the treatment of goodwill. Tr. 743:6-14 (Powderly).

205. Fidelity's awareness of the various capital proposals, including the FIRREA legislation, did not affect its operations during 1989. Mr. Powderly discussed Fidelity's board

minutes from January 1989 through November 1989, and testified that Fidelity was still operating pursuant to the October 1988 Business Plan for each of the corresponding months. DX 2334; DX 2343A; DX 2347; DX 3348; DX 2353; DX 73; DX 75; Tr. 774:12-15, 779:17-20, 781:19-21, 783:3-5, 784:3-5, 785:11-13; 791:6-12, 792:13-22 (Powderly). Mr. Powderly conceded that Fidelity continued operations under the October 1988 Business Plan until the November 15, 1989 board meeting, and that, although Fidelity was anticipating some changes, Fidelity did not know the actual effects of the changes until it saw the regulations. Tr. 792:13-23 (Powderly). Mr. Powderly agreed that a change in Fidelity's business plan would be reflected in its board minutes. Tr. 1002:4-7 (Powderly).

**H. <u>During 1989 Fidelity's Classified Assets Increased In Size And Severity</u>**

206. By October 1989, Fidelity's operations had significantly deteriorated since the FHLBB's previous examination. Fidelity's net income declined for the 21-month period covered by the 1989 examination despite the growth in its assets by $208 million, increasing Fidelity's size to $1.914 billion by October 31, 1989. PX 509 at AST001974; Tr. 827:16-828:7 (Powderly). This deterioration in earnings had nothing to do with the Suburbia acquisition. Tr. 4325:19-21 (Amend).

207. Fidelity's classified assets increased from $81.5 million as of September 30, 1987 to $97.7 million as of October 31, 1989. PX 509 at AST001966, AST001980. This was an increase of 20 percent from the amount of classifications the FHLBB had discovered with its 1987 examination of the thrift. PX 509 at AST001966, AST002000. The increase was due, in most part, to the commercial real estate. Tr. 825:2-25 (Powderly). Fidelity's level of classified assets was 5.1 percent of Fidelity's total assets, well above its peer group average of 2.1 percent.

PX 509 at AST001980. These classified assets were due to Fidelity's "prior involvement in [ADC] projects, condominium/cooperative conversions and land loans." PX 509 at AST001980; see also Tr. 825:2-9 (Powderly).

208. Due to its high level of classified assets and the "declining economic and real estate market within" its lending area, Fidelity was required to record a loan loss provision of over $10 million. PX 509 at AST001983. Mr. Powderly agreed that this $10 million write-off was due to the commercial real estate. Tr. 824:15-825:1 (Powderly).

209. Furthermore, the OTS found that Fidelity's "[o]perations have suffered in recent periods as a result of a declining net interest margin," which the OTS attributed to an increase in interest rates, an increased dependence upon borrowed money, and Fidelity's large volume of nonearning assets. PX 509 at AST001988. The OTS found that Fidelity's net interest margin steadily deteriorated from a high of 2.2 percent at December 31, 1987, to a low of 1.9 percent as of September 30, 1989. PX 509 at AST001988; Tr. 848:18-849:3 (Powderly). The OTS found that Fidelity's net interest margin did not provide sufficient coverage to meet its operating expenses, which were 1.9 percent of average assets as of September 30, 1989. PX 509 at AST001988. Mr. Powderly did not dispute the OTS's assessment. Tr. 847:23-848:5, 848:13-850:11 (Powderly). Mr. Amend testified that the disallowance of goodwill by FIRREA had nothing to do with Fidelity's net interest margin. Tr. 4328:18-20 (Amend).

210. Mr. Vigna testified that the level of Fidelity's nonperforming loans "was a very, very severe problem." Tr. 1447:18 (Vigna). Mr. Amend testified that the asset quality problems would have been a concern even if Fidelity had been allowed to count its goodwill toward regulatory capital. Asset quality is "one of the major areas that we look to for the health of an

institution, credit risk and interest rate risk." Tr. 4327:13-19 (Amend). The deterioration in earnings shown in the 1989 RoE had nothing to do with the Suburbia acquisition. Tr. 4325:19-21 (Amend).

211. The FDIC's assessment of the thrift was even worse than that of the OTS, in large part because the FDIC, as a matter of its internal policy consistent with its oversight of banks, classified Fidelity's collateralized mortgage obligations ("CMO") residuals, whereas the OTS did not. Accordingly, in its September 1989 RoE, the FDIC found that Fidelity's adverse classifications totaled $134.094 million. PX 689 at AST001816, PX 501 at AST057017, AST057043. The FDIC criticized approximately $40 million of Fidelity's CMO residuals. "The FDIC universally criticized CMO residuals. They did not believe they should be eligible investments for anybody." Tr. 2106:5-21, 2114:12-2116:10 (Wesp); PX 689 at AST001816, PX 501 at AST057043. Thus, with or without a change in capital regulations, Fidelity faced the classification of $46 million of its CMO residuals pursuant to the FDIC's oversight of the thrift, just as it faced increased loan classifications and loan loss reserves due to its bad commercial loans, irrespective of the breach. Tr. 2116:6-10 (Wesp).

212. The FDIC also found that, had Fidelity not enjoyed the benefits derived from two nonrecurring sources of income, Fidelity would have incurred a net loss for the period. The FDIC found that earnings continued to be hindered by the large volume of nonperforming loans, decreasing net interest margins and rising overhead expenses. PX 689 at AST001817; PX 501 at AST057018. Mr. Powderly agreed with the FDIC that "substantial efforts [were] needed to reduce problem assets to less alarming levels." Tr. 476:4-7 (Powderly).

213. The OTS and the FDIC both assigned Fidelity a composite rating of "5" in their November 6, 1989 and September 30, 1989 examinations, respectively. PX 509 at AST001969; PX 501 at AST057019, PX 689 at AST001818. Fidelity's individual CAMEL ratings for the OTS's November 6, 1989 examination were as follows: "Capital" - "5," "Asset Quality" - "4," "Management" - "3," "Earnings" - "3," "Liquidity-Asset/Liability Management" - "2." DX 1448 at WON732 0834. Mr. Amend testified that Fidelity's composite rating in 1989 would have been a "4" rather than a "5" if all its Suburbia goodwill had counted toward capital. Tr. 4612:14-4613:2, 4741:2-3 (Amend). The operations rating declined from a "2" to a "3" between the 1987 and 1989 reports of examination. Tr. 4609:3-4 (Amend).

## IX. FIRREA WAS ENACTED AND FIDELITY FELL OUT OF CAPITAL COMPLIANCE

### A. Fidelity Did Not Have Prior Knowledge Of The Content Of FIRREA

214. While Fidelity claims damages for the Government's breach starting in January 1989, Mr. Vigna testified that whether goodwill would be phased out under any legislation was not known until final regulations came out. Tr. 1413:5-8 (Vigna). Mr. Amend did not think the disallowance of goodwill from regulatory capital could have been foreseen before FIRREA was enacted. Tr. 4860:4-11 (Amend).

215. In January 1989, Fidelity was discussing the effect upon Fidelity of proposed capital regulations drafted by the FHLBB, which were issued before January 1989, and thus, could not have been the FIRREA legislation. Tr. 2036:22-2037:14 (Wesp); PX 461 at AST056172. Indeed, Mr. Wesp admitted that Fidelity's discussion at that time concerning proposed FHLBB regulations had "nothing to do with FIRREA." Tr. 2038:2-18 (Wesp).

216. In March 1989, Fidelity discussed the effect of proposed capital regulations on Fidelity's investment portfolio. Tr. 2047:11-20 (Wesp); DX 539 at AST056074 ¶ 7. Mr. Wesp acknowledged that "here, when we're talking about proposed capital regulation [what he is referring to] is the BIS/FRB capital regs." Tr. 2047:17-19 (Wesp).

217. During 1989, there was no clear idea what final form the FIRREA legislation would take. As Mr. Wesp testified, the "regulatory process was in constant flux," the press was in constant state of speculation," while Congress held "press conference after press conference about what was being drafted in the new legislation." Tr. 1828:6-19 (Wesp). "There was very little in the way of official information coming. . . . It was just all hearsay . . . It was kind of like walking on quicksand, you know, I mean, you knew there were a lot of things going on and a lot of things up in the air . . . But there was no reliable source as to what was ultimately going to happen." Tr. 1830:2-13 (Wesp).

218. Prior to the passage of FIRREA, Astoria, too, did not know how FIRREA would affect supervisory goodwill. Tr. 4362:11-25 (Engelke); DX 2341 at AA4008 0030 (no knowledge of specific FIRREA terms as of March 15, 1989); DX 2346 at AA4008 0074 (April 19, 1989); DX 2350 at AA4008 0081 (May 17, 1989); DX 2355 at AA4008 0086 (June 23, 1989).

219. On August 9, 1989, Congress enacted FIRREA. DX 557; Tr. 1407:3-6 (Vigna). Even in October 1989, after FIRREA had been passed, Astoria saw the application of different capital standards as possibilities. Tr. 4374:2-9 (Engelke).

220. FIRREA's implementing regulations were issued on November 7, 1989, and took effect on December 7, 1989. Tr. 1410:7-17 (Vigna); PX 511 at AST0704525. Fidelity did not

receive guidelines for the preparation of its capital plan until December 18, 1989, and Fidelity "did exactly" what the guidelines said. Tr. 1845:23-1846:10, 1847:13-21 (Wesp); PX 520.

221. With FIRREA, the FDIC became Fidelity's backup regulator. The OTS did not need the FDIC's absolute approval but agreed to coordinate with them. Tr. 1445:9-15 (Vigna).

222. FIRREA required the Director of the OTS to promulgate regulations establishing a "tangible" capital requirement, a "leverage" or "core" capital requirement, and a "risk-based" capital requirement for thrifts. DX 557 at AA-NAV-002835. FIRREA required the phase-out of goodwill from capital. Tr. 1404:23-1405:1 (Vigna). Tangible capital, however, did not include any intangible assets, such as goodwill. 12 U.S.C. § 1464 (t)(9)(c). Nevertheless, FIRREA and the regulations permitted a thrift to include certain amounts of "qualifying supervisory goodwill" in the calculation of core capital. This limit was initially 1.5 percent of total assets. The limit declined each year and was phased-out entirely by December 31, 1994. 12 U.S.C. § 1464(t)(3)(A); 12 C.F.R. § 567.5(a)(1-2).

223. In addition to its phase-out and elimination of goodwill, FIRREA eliminated $34.21 million in non-goodwill, pre-FIRREA regulatory capital from Fidelity's tangible and core capital, and $30.2 million from Fidelity's risk-based capital. DX 1150 at 13, Ex. 6.0 (Kennedy).

224. After these deductions, Fidelity failed all three of the new FIRREA regulatory capital standards. Fidelity reported tangible capital of negative $29.4 million as of December 31, 1989, which left it $57.1 million short of its $27.7 million requirement. Fidelity's core capital, which included a portion of Fidelity's goodwill, was a negative $1.7 million, again leaving it $57.1 million short of its requirement of $55.4 million. Fidelity's risk-based capital,

which also included a portion of Fidelity's goodwill, was negative $1.7 million, leaving it $67.5 million short of its requirement of $65.8 million. PX 509 at AST001984.

225. Fidelity's goodwill related to the Dollar merger was $19.33 million at December 31, 1989. PX 526 at AST008366; Tr. 1619:9-11 (Lovely). As of the end of September 1989, Fidelity reported other regulatory capital components on its books that are not the subject of its lawsuit, including $2.266 million in loan discounts, $2.851 million in deferred losses, $1.086 million in loan origination and commitment fees, and general valuation allowances of $4.010 million. PX 502 at WON722 0259-60. It also had net worth certificates of $4.664 million, which Fidelity redeemed in December 1990, in an agreement with the FDIC, as manager of the FRF (the successor in interest to the FSLIC's Assistance Agreements).[1] PX 707 at WON730 1816; PX 643; Tr. 854:9-855:20 (Powderly). As part of that agreement, Fidelity agreed to release "any claims that Fidelity may have under the Notes."[2]

226. Adding these five items to the balance of Fidelity's goodwill from the Dollar acquisition demonstrates that, as of approximately December 1989, Fidelity held $34.207 million in non-contractual regulatory capital, or approximately 25 percent of the total regulatory capital held by the thrift at that time. PX 526 at AST008366; PX 502 at WON722 0259-60.

---

[1] Pursuant to Section 215 of FIRREA, all of the promises contained in the FSLIC Assistance Agreement transferred to the FRF. See Resolution Trust Corp. v. FSLIC, 25 F.3d 1493, 1505-06 (10th Cir. 1994).

[2] Prior to their redemption, Fidelity earned $1.25 million in interest income from the FSLIC on its NWCs. PX 335 at AST002389; PX 1283 at AST060056; PX 1314A at Ex. 5. As part of the redemption agreement, the FSLIC paid Fidelity $2.99 million, and related accrued income payments of $.687 million were cancelled, so that Fidelity recorded a $4.7 million total direct increase to retrained earnings as a result of the redemption agreement. PX 707 at WON730 1816.

FIRREA eliminated the inclusion of these items from Fidelity's regulatory capital computations. Accordingly, to the degree that Fidelity felt an effect from FIRREA's phase out of regulatory capital, 25 percent of that effect can be attributed to its loss of capital not attributable to its contract with the Government.

## X. FIDELITY'S CAPITAL PLAN PROJECTED A CONTINUATION OF THE SAME BUSINESS PLAN IT HAD FOLLOWED SINCE 1987

### A. Fidelity's Capital Plan Was A Continuation Of What The Thrift Had Been Doing Since 1987 Due To Its Loan Problems

227. Despite Fidelity's fall out of capital compliance, the OTS permitted Fidelity to continue to operate while it filed a plan explaining how it intended to regain compliance. In January 1990, Fidelity submitted a Capital Compliance Plan (the "Capital Plan") for approval by regulators. DX 78 is the capital plan. DX 78; PX 533. The Capital Plan was conceived and produced by Fidelity's management. DX 78; PX 986 at AST064176.

228. The OTS was fair with Fidelity in dealing with its capital plan. Indeed, Mr. Wesp testified that Mr. Vigna was "on our side" and that Mr. Vigna informed him that he had always hoped that the thrift would succeed in its capital plan. Tr. 1850:2-24 (Wesp). Mr. Amend had the most hands-on experience and contact of OTS's senior management with Fidelity. Tr. 662:1-4 (Powderly); Tr. 2311:13-16 (Wesp). Mr. Powderly testified that he had a good opinion of Mr. Amend's ability as an examiner. Tr. 661:15-25 (Powderly). As Mr. Wesp testified, "Walter Amend is one of the most competent regulators that I've ever had to deal with, no question about it. . . . He knew exactly what – he understood the loans, he understood the losses, he understood the industry, he understood the markets. I mean, Mr. Amend had all the pieces it took to be a great examiner." Tr. 2311:17-2312:1 (Wesp). In working with Fidelity

under the capital plan, Mr. Amend and Mr. Vigna approved “maybe 80 percent of everything” Fidelity requested as a plan variance. Tr. 2510:17-22 (Wesp). As Mr. Wesp testified, “they were very reasonable people.” Tr. 2510:24-25 (Wesp).

229. The OTS provided Fidelity with a reasonable amount of flexibility, approving certain transactions outside of the parameters of the capital plan. Tr. 1929:9-13 (Wesp). OTS regulators “were gracious and gentlemanly and as fair as they could be on what we’d all been dealt. So looking back, they deserve a lot of credit too.” Tr. 1972:10-12 (Wesp). The “OTS, as I said, they were – you couldn’t have asked for a nicer, more fair and straightforward people – group of people to deal with.” Tr. 1972:19-21 (Wesp).

230. Fidelity wrote the capital plan for the regulators, and its representation that it would “continue doing what we are doing,” was made for “Angelo [Vigna] or Walter Amend or whoever that was going to actually read and approve this thing.” Tr. 1870:22-1871:3 (Wesp); DX 78 at PAA052 2702 ¶ 10. This meant that regulators could “just keep looking for what was always here and you’re just going to see more of it.” Tr. 1871:17-19 (Wesp) (emphasis added).

231. Mr. Vigna relied on the truthfulness of the certification in PX 550 at AST0704214: “Fidelity is in substantial compliance with applicable statutes, regulations, orders and written agreements and directives," and two, that "Fidelity has not engaged in insider dealing, speculative practices or other activities that have or may jeopardize the association's safety and soundness or contributed to impairing the association's capital. Tr. 1535:22-1536:10 (Vigna); see also PX 526 at AST008354, AST008364.

232. The FDIC and OTS had very different views about Fidelity’s capital plan initially but they reconciled and OTS approved the Capital Plan with FDIC support. Tr. 1449:7-18

(Vigna). The FDIC never withdrew insurance from any institution in Fidelity's financial condition. Tr. 1476:19-20 (Vigna). Mr. Vigna testified that the FDIC knew withdrawal of insurance would cause a panic and that is why it never happened. Tr. 1477:5-11 (Vigna). On May 18, 1990, the OTS informed Fidelity that its Capital Plan had been approved. PX 590; Tr. 1455:3-11 (Vigna).

233. Fidelity's Capital Plan set forth a strategy to increase its capital that included no or little growth followed by moderate shrinkage in calendar year 1994. Due to Fidelity's conversion in 1993, this moderate shrinkage never occurred. PX 986 at AST064176; Tr. 904:2-6 (Powderly).

234. The Capital Plan states that Fidelity's management and board of directors considered and rejected nine strategies before deciding upon a tenth strategy: "[c]ontinue doing what we are doing." Tr. 423:2-424:23, 804:4-13 (Powderly); DX 78 at PAA052 2701-02. After FIRREA, Fidelity repeatedly affirmed that the Capital Plan strategy was "effectively the same" as a business plan that Fidelity had been following since 1987. PX 964 at OAA004 2506, 2541; PX 986 at AST064176, AST064193; see also Tr. 804:9-25 (Powderly).

235. Mr. Amend understood the phrase "continue doing what we are doing," at DX 78 at PAA052 2702, to mean that Fidelity was proposing to continue "the type of activities the institution was engaging in prior to the submission of this plan over, say, the prior year or two, they would continue to follow that path, in essence, restrict new lending -- the high-risk lending, work on those assets and concentrate on basically minimal risk asset generation, which is purchasing the mortgage-backed securities, and that was pretty much [it]." Tr. 4321:5-15 (Amend). "So this was a stabilized growth plan, and it looked to generate earnings in a positive

manner from a strategy that already had existed at the bank for at least a year, maybe more." Tr. 4322:21-24 (Amend).

236. Fidelity's publicly-filed documents all confirmed that the Capital Plan was merely a continuation of a business plan that Fidelity had formulated in 1987. In its subscription offering circular, contained in its application to the OTS for permission to convert to a stock institution, for example, Fidelity described the strategy contained in the Capital Plan as "effectively the same business plan under which the Bank had been operating since 1987." PX 964 at OAA004 2541. Elsewhere in that application, Fidelity wrote that the capital plan "in effect formalized a business plan under which the Bank had generally been operating since 1987 . . . ." Id. at OAA004 2483.

237. Specifically, Mr. Powderly testified on re-direct examination that the Capital Plan, which provided for little or no asset growth, "formalized policies under which the bank generally had been operating since 1987" in all respects, including aspects of the bank's operations other than real estate operations:

> Q. Now I'd like you to go ahead in that same document to page 7. Mr. Todor referred you to I guess it's the third full paragraph on that page and the – it's all one sentence, the last sentence in that paragraph that begins "the capital plan, which was developed by Messrs. Powderly, Wesp and Meyer." Do you see that I referred to?
>
> A. Which is the one – number 7?
>
> Q. It's on page 7, and it's the third full paragraph on that page. And in the second half of the paragraph –
>
> A. Yes, I see it.

Q. Okay. And that talks about the capital plan being "to a significant degree" – strike that, let me start that over again. The sentence says the capital plan, which was developed by you, Mr. Wesp and Mr. Meyer, "to a significant degree formalized policies under which the bank generally had been operating since 1987." Was the capital plan in all respects something you had been operating under since 1987?

A. In many respects, yes.

Q. In all respects?

A. Yes, I believe so.

Q. With respect to your real estate operations, when was it that you began cutting off the real estate lending and sending the developers elsewhere?

A. As soon as I – as soon as I got the job of running that portfolio. I would say it was mid-'87.

Q. And does the reference there to 1987 refer to aspects of the bank's operation other than the real estate operations?

MR. TODOR: Objection; leading.

BY MR. EISENHART:

Q. If you know.

THE COURT: I'll allow it.

THE WITNESS: What was the question again?

BY MR. EISENHART:

Q. Does the reference there to the bank's operations since 1987 refer to things other than the real estate operations?

A. Yes.

Tr. 989:21-991:10 (Powderly) (discussing PX 986 at AST064176, which projects "no or little growth followed by moderate shrinkage in calendar year 1994."). See also PX 964 at OAA004 2506, 2541.

238. In its subscription offering circular, Fidelity wrote that the capital plan provided for a strategy that included "no or little growth," "reducing construction and commercial loan balances," "reducing interest rate and credit risk," and "containing operating costs and expenses." Immediately following this language, the capital plan stated that the capital plan "in effect formalized a business plan under which the bank has generally been operating since 1987." PX 964 at OAA004 2483; PX 986 at AST064176; Tr. 2489:25-2490:16 (Wesp). Although Mr. Wesp attempted to disavow the importance of this language, he admitted that "We listed four key components of the capital plan and then said in effect, our operating businesses are about the same as they have been for the few years prior to the plan." Tr. 2492:15-18 (emphasis added) (Wesp).

239. Fidelity explained to potential purchasers of its stock (and the Securities and Exchange Commission ("SEC")) that the strategy in the Capital Plan "to a significant degree formalized policies under which the Bank had been operating since 1987." PX 986 at AST064176, AST064193; Tr. 904:14-22 (Powderly). Mr. Wesp agreed that the statements in the offering circular "were all true," saying "I'd have to be a screwball not to." Tr. 2506:1-11 (Wesp).

240. Fidelity used similar language to describe the Capital Plan in its annual report to the SEC after its conversion. Fidelity stated that the capital plan generally provided for a strategy that included "no or little growth followed by moderate shrinkage in calendar year

1994," "reducing construction and commercial loan balances, and limiting lending to one to four family mortgage, home equity and consumer and student loans," "reducing interest rate risk and credit risk," and "containing operating costs and expenses." DX 3071 at PAA014 2007; Tr. 2502:12-25 (Wesp). The report to the SEC then stated that "[t]his strategy to a significant degree formalized the policies under which the bank had been operating since 1987." Tr. 2503:19-2504:19 (Wesp);[3] DX 3071 at PAA014 2007.

241. Fidelity adopted a wholesale strategy as the means to ensure the results projected in the capital plan. Tr. 1876:17-1877:25 (Wesp). Thus, but for the capital plan, Fidelity may have not pursued its wholesale strategy to the degree it did and may have pursued retail lending operations. These operations would have "come undone," in the post-FIRREA period, given the effect of the Iraqi invasion of Kuwait and the resulting effect on "the economy, the retail market and the interest rate markets." Tr. 1878:1-10 (Wesp). Thus, as Mr. Wesp repeatedly acknowledged, it was, in fact, fortuitous to Fidelity to have concentrated on a wholesale strategy as modeled in its capital plan:

> As I've said before . . . we were lucky enough to have – and I can't say that we were smart enough. We were lucky enough to have picked a capital plan strategy that was pretty much immune to event risk, including recessions. Because we were operating in the wholesale markets.

---

[3] At trial, Mr. Wesp was asked a number of questions concerning Fidelity's annual report to the SEC, and in each instance, Mr. Wesp agreed that the statement set forth in the annual report was true. See, e.g., Tr. 2494:23-2495:14, 2498:6-22, 2499:1-:2500:1, 2500:17-25, 2501:11-2502:1 (Wesp). Nonetheless, Mr. Wesp suggested that the annual report's statement concerning the bank's capital plan strategy as formalizing to a significant degree the policies under which the thrift had been operating since 1987, should not be interpreted literally because "10-Ks and offering documents and stuff are written for totally different purposes than capital plans and budgets that were written in 1988." Tr. 2504:13-19 (Wesp).

Tr. 2353:2-7 (Wesp).

242. The Capital Plan, in fact, benefitted Fidelity by causing it to focus on mortgage securities. "By pure luck, this turned out to be a great strategy to survive one of the worst periods of economic recession and volatility in the post-war history." Tr. 2360:24-2361:1 (Wesp).

### B. Fidelity's Business Problems And High Level Of Classified Assets Continued Through 1991

#### 1. Fidelity Experienced Business Problems Due To The Slowing Economy In 1990 and 1991

243. Fidelity's executives repeatedly testified about the difficulties Fidelity faced after FIRREA due to economic conditions, apart from the loss of the Suburbia goodwill. In its 1993 stock subscription offering circular, Fidelity stated that, "In recent years, the New York City metropolitan area has experienced significant downturns in the market value of real estate, resulting, in part, from layoffs in the financial services industry and corporate relocations, a general weakening in real estate values and a slowdown in home sales and construction." PX 986 at AST064185; Tr. 905:5-12 (Powderly). Mr. Powderly agreed that Fidelity would have had to deal with these issues with or without the Suburbia goodwill. Tr. 905:13-15 (Powderly).

244. Mr. Wesp agreed that, in April 1990, the economic condition in New York was "pretty bad," and the real estate market weak. Tr. 2176:15-18, 2177:12-17 (Wesp). By June 1990, Fidelity recognized the "severe downturn in current real estate values in the 1-4 family housing market." PX 599 at AST048969; Tr. 2189:4-20 (Wesp). Mr. Wesp agreed with the proposition that when there is a severe downturn in real estate values, it is hard for a bank to do much business with respect to traditional loans because when prices decline severely, people

simply don't sell their houses and they stay put until the market improves. Tr. 2189:21-2190:8 (Wesp). Similarly, Mr. Powderly testified that, even with the goodwill, Fidelity would only have leveraged "slightly" under the harsh economic conditions of the early 1990s. Tr. 794:25-795:3 (Powderly).

245. By August 1990, Fidelity's commercial lending department was expending most of its efforts dealing with Fidelity's bad commercial loans, and they were not reaching to put on new loans. DX 2448 at AST030217, AST030218; Tr. 2220:21:5 (Wesp). Indeed, in September 1990, Fidelity reported only one commercial loan application, which Mr. Powderly advised Fidelity not to accept. Tr. 2221:19-2222:2 (Wesp); PX 620 at AST030219. Furthermore, for the preceding month, Fidelity reported only one loan application for a traditional one-to-four family loan, despite the fact that the bank had over 20 branches. Tr. 2222:14-2223:1 (Wesp); PX 620 at AST030220. It only received one consumer loan application over the same period. Tr. 2223:11-25 (Wesp); PX 620 at AST030220.

246. While Mr. Wesp admitted that "the real estate market was slow, no question about that," he incorrectly attributed Fidelity's lack of lending at this time to "zero advertising." Tr. 2224:1-9 (Wesp). Fidelity did, in fact, continue to advertise in the post-FIRREA period, as its capital plan and other documents attest. DX 1945 at WON732 1802; DX 671 at AST101760 1943; DX 674 at AST101515; Tr. 3916:6-23, 3918:24-3919:7, 3922:2–25 (Caporusso).

247. As of November 1990, Fidelity's management reported that housing starts were the lowest they had been since 1982, and they predicted that housing starts would be further reduced in December 1990. Tr. 2237:4-10 (Wesp); DX 2460 at PAA035 1017. Indeed, Fidelity recognized that there was "serious economic weakness" in November and December. "It was

hitting the world . . . . I mean this was ugly." Tr. 2237:24-2238:6 (Wesp). Mr. Wesp further agreed, as "absolutely true," that there "was a general lack of stability in the marketplace at that time." Tr. 2238:11-13 (Wesp). Mr. Wesp repeatedly admitted that, assuming away Fidelity capital plan, (and thus, irrespective of the breach), given the economic weakness in the world markets at this point in time, Fidelity would not have grown. Tr. 2239:18-2240:19 (Wesp):

248. The cessation of economic activity included a lack of lending as Fidelity's customers were "reluctant to borrow in the current economy." Tr. 2244:7-12 (Wesp); DX 2460 at PAA035 1018. As Mr. Wesp stated, "[I]n this particular period here where as I'm saying this is worse than a recession. This is – the world stopped. This was kind of Ayn Rand. The world froze. It just stopped. Nobody did anything." Tr. 2244:12-16 (Wesp). Again, Fidelity's lending department focused its efforts "on the collection as opposed to the production side," with Mr. Lovely noting that "it is apparent delinquencies are increasing rapidly in all parts of the country." DX 2460 at PAA035 1018; Tr. 2244:20-25, 2245:20-24 (Wesp). Furthermore, Fidelity noted that "unemployment has taken its effect," with "individuals . . . attempting to stretch income that has been shrunk." DX 2460 at PAA035 1018; Tr. 2246:21-2247:2 (Wesp). Mr. Wesp could not have been more clear about the economic state of affairs at this point in time. "This was a major U.S. recession or major U.S. economic slowdown because of the war, you know." Tr. 2246:19-20 (Wesp). "I mean, there are a lot of things that are having trouble in December of '90. The world is coming to an end here." Tr. 2249:11-13 (Wesp).

249. Furthermore, Mr. Wesp recognized that by May 1990, Fidelity was feeling the effects of disintermediation, as customers were taking their money out of Fidelity, investing in the stock market and other non-thrift investments. Tr. 2182:18-2183:8 (Wesp); PX 594. The

disintermediation continued; Fidelity reported $1.3 million of disintermediation for December 1990. Tr. 2268:22-2269:8 (Wesp); DX 2475 at PAA035 1029.

250. By the end of November 1990, Fidelity reported an increase in loan payment delinquencies and an increase in bankruptcy proceedings. Tr. 2252:4-10 (Wesp); DX 2466 at PAA035 1019. Furthermore, Fidelity noted that "rather than borrow, many individuals are withdrawing savings they may have to pay current expenses." Tr. 2253:10-19 (Wesp); DX 2466 at PAA035 1020.

251. During early December 1990, Fidelity reviewed several commercial loan applications but found they didn't fit within Fidelity's lending parameters. DX 2467 at PAA035 1021. Indeed, Fidelity was rejecting loan requests about 50 percent of the time due to a lack of "credit worthiness of prospective borrowers." DX 2467 at PAA035 1022; Tr. 2258:10-2259:14 (Wesp).

252. In the middle of December 1990, Fidelity noted that "the economy is deteriorating with a vengeance based on the most recent employment numbers." DX 2470 at PAA113 0067; Tr. 2260:15-24 (Wesp). Fidelity's investment activity was less than at any point in time previously, "[a] reflection of the uncertainties of all markets in the world torn between the Mid East conflict and recession." Tr. 2266:10-17 (Wesp); DX 2470 at PAA113 0067.

253. The problems in the capital markets continued into January 1991. Fidelity recognized that "the current real estate recession makes this an inopportune time to begin purchasing these stocks," because "if the mortgage delinquency numbers were going to be bad, stocks were going down, simple." Tr. 2275:5-2276:3 (Wesp); PX 679 at AST0308389. As Mr. Wesp recognized, as of the middle of January 1991, "the equity markets are a mess." Tr.

2275:10 (Wesp). In short, in January, the economy continued to weaken, and, with money supply zero to negative, it was very hard to grow the economy. Tr. 2290:11-18, 2291:20-2292:5 (Wesp); DX 2478 at PAA035 1032. By 1991, the real estate market in the New York Metro area was moribund. Tr. 1810:5-7 (Wesp).

254. In February 1991, matters only continued to get worse. Tr. 2293:18-2294:2 (Wesp); DX 2486 at PAA035 1039. In March 1991, even with the conclusion of the Gulf War, Fidelity stated that "there is no concrete sense that the recession is over." Tr. 2303:2-6 (Wesp); DX 2492 at PAA035 1046. In April 1991, Fidelity believed that the recession was bottoming out, but that recovery would be slow. Tr. 2303:25-2304:5 (Wesp); DX 2500 at AST030277.[4] In May 1991, Fidelity stated that there "is no sign that the economy is turning, although it has probably bottomed." DX 2510 at AST0308703-04; Tr. 2314:12-20 (Wesp). In June 1991, Fidelity again stated that the recession had bottomed, that "[t]he market is in a holding pattern," and that "[i]t is not at all clear that the Federal Reserve has done enough for the economy to bounce out of the recession." Tr. 2316:16-2317:3 (Wesp); DX 2516. Fidelity also noted that housing starts were under 1 million, and as long as that was the case the housing market would remain in a recession. Tr. 2319:19-2320:1 (Wesp); DX 2522 at PAA035 1076. In September 1991, the economy was still not out of the recession, and the Federal Reserve was continuing to lower interest rates. Tr. 2336:11-21 (Wesp); PX 766 at AST0307035.

---

[4] Also in April 1991, Fidelity acquired the Glick development project at 14th Street in Manhattan (encompassing the Palladium (a rock nightclub), a vacant lot and the cite of the old Luchow's restaurant, then vacant) that had been in long-standing delinquent status. Tr. 2309:14-2311:4 (Wesp); PX 770 at A-12.9 (AST002941); PX721 at AST0308768.

**2. Fidelity's Reports Of Examination Found Problems With Its Bad Loans**

255. The OTS's April 5, 1991 RoE, PX 711, found "[t]hat the level of problem assets was still high, . . . [with] the need to set up additional loss reserves higher than what was previously being estimated." Tr. 4635:7-10 (Amend). As of June 30, 1991, Fidelity had criticized assets totaling $89.7 million, or 4.7 percent of assets. Of these, $76 million were commercial real estate and multi-family mortgage loans which were originated prior to 1988. PX 711 at AST002883, AST002898; Tr. 868:21-869:7 (Powderly). Fidelity had a "series of problems in the years leading up to and following FIRREA with its real estate loans," but "FIRREA itself didn't have much of an effect" on those loans. Tr. 1885:16:23 (Wesp).

256. During the fifteen month period ended March 31, 1991, Fidelity reported net income of only $1,425,000, but even this small figure included the effect of $6.8 million in net gains from the sale of assets. Id. at AST002988; Tr. 867:14-868:3 (Powderly). In short, without the sale of assets, Fidelity would have reported no positive income for that fifteen month period.

257. The OTS also found that Fidelity faced unacceptable interest rate risk. PX 711 at AST002908-10. Mr. Moran reviewed Fidelity's interest rate risk and he reviewed some of its investment activities in connection with the OTS's 1991 examination of the thrift. Tr. 4875:25-4876:7, 4877:6-13 (Moran). Mr. Moran summarized Fidelity's interest rate risk, with a special emphasis on the thrift's interest rate risk relative to the OTS's interest rate risk model, which at the time was called the market value of portfolio equity ("MVPE") model. Tr. 4884:3-7 (Moran); PX 753; PX 770 at AST002908-10. The MVPE model measured the economic value of an institution relative to potential interest rate changes, to assess the impact of interest rates

on the economic value of a thrift. Tr. 4885:4-21. MVPE analysis, although calculated in terms of instantaneous interest rate changes, was a good indicator of the thrift's exposure to market interest rate risk and the thrift's capacity to absorb that risk. Tr. 4953:7-17, 4955:1-4 (Moran).

258. Using the OTS's MVPE model, Mr. Moran determined that Fidelity's interest rate risk was very high. With just a change of 100 basis points or 1 percent, Fidelity would lose almost its entire market value (98 percent), and with a change of 2 percent, it would lose more than 250 percent of its market value. Tr. 4886:3-11 (Moran); Tr. 871:1-873:23 (Powderly); PX 711 at AST002908-10; PX 753 at WON743 1491. Even with a decrease of interest rates, Fidelity faced interest risk problems. Tr. 4889:1-22 (Moran). Indeed, because Fidelity had investments in CMO residuals, which are very volatile and perform very badly with a decrease in interest rates, Fidelity's economic value would actually decrease with a 300 basis point decrease in interest rates. Tr. 4889:4-22 (Moran); PX 753 at WON743 1491; PX 770 at AST002908.

259. Even though the OTS's interest rate risk model (MVPE model) showed the thrift facing potentially disastrous susceptibility to changes in interest rats, the thrift's own model of its interest rate risk, obtained through Salomon Brothers, showed an even worse susceptibility to changes in interest rates. In fact, the Salomon Brothers model showed that the thrift would perform worse than predicted by the OTS in all interest rate movements, other than an increase in interest rates of 100 basis points. Tr. 4891:14-4892:11, 4981:2-10 (Moran); Tr. 1014:7-1015:8 (Powderly); PX 711 at AST002908-10; PX 770 at AST002909. For example, the Salomon Brothers model showed that Fidelity would lose over 120 percent of its market value if interest rates <u>declined</u> 100 basis points. PX 770 at AST002909. Thus, the thrift's own third-

party analysis performed by Salomon Brothers only reinforced the findings by the OTS that the thrift was very susceptible to interest rate risk. Tr. 4892:17-4893:4 (Moran); Tr. 1014:7-1015:8 (Powderly). Because goodwill was not included in assessments of interest rate risk, Tr. 873:21-23 (Powderly), either before or after FIRREA, Fidelity would have faced this interest rate risk with or without the breach.

260. The composite rating assigned to Fidelity by the OTS in its April 5, 1991 RoE was "5." Asset quality remained mired at a "4" rating, while capital remained at the same "5" rating as had existed in 1989. DX 1448 at WON732 0834.

261. In its June 11, 1991 RoE of Fidelity, the FDIC assigned Fidelity a composite rating of "5." DX 3330 at FAA005 1546. The FDIC found that Fidelity's asset quality remained unsatisfactory and objectionable, with excessive volumes of adversely classified assets and past due loans. Id. at FAA005 1545; Tr. 877:14-878:4 (Powderly). The RoE also found that the severity of the loan problems had increased, with Doubtful and Loss classifications exceeding $34 million as compared to $8 million shown for like classifications during the 1989 examination. Id. The FDIC also recognized a depressed real estate market that forced many real estate borrowers to effectively abandon control of their collateral. Id.

262. During 1991 and 1992, Fidelity continued to sell assets, reducing the thrift's exposure to credit risk. DX 1427 at WON732 1530-1531; PX 986 at AST064204. The credit risks developed from a downturn in the economy and the real estate market. Between 1987 and 1991, New York City was in a real estate recession. Id. at AST064174. Due to these asset sales, the OTS determined that Fidelity's net income for the years ended 1990 and 1991

was inflated. In fact, Fidelity's net operating income was negative for years ending December 31, 1990, and December 31, 1991. PX 851 at OAA002 0018.

### 3. Fidelity Faced Further Economic Weakness In 1991 and 1992

263. In its response to the FDIC's 1991 RoE, Fidelity readily acknowledged that its Capital Plan did not contemplate the adverse economic environment that Fidelity was to face over the next several years, which included, among other things, a major war in the Middle East, a recession in the United States, an "uncertain global economic environment," and declining real estate values. Fidelity described these factors as "impossible to contemplate" when it wrote the Capital Plan. PX 787 at AST002748; Tr. 882:14-883:3 (Powderly). Indeed, the New York economy was particularly hard-hit. In 1993, Fidelity told potential shareholders that "[i]n recent years, the New York City metropolitan area has experienced significant downturns in the market value of real estate, resulting, in part, from layoffs in the financial services industry and corporate relocations, a general weakening in real estate values and a slowdown in home sales and construction." PX 986 at AST064185; Tr. 905:5-15 (Powderly).

264. Mr. Powderly agreed that the New York real estate market was "depressed" as of June 1991. Tr. 878:15-22 (Powderly). By January 1992, the economic problems continued with Fidelity recognizing that economic indicators "do not indicate a turn around in the economy," and predicting further reductions of interest rates from the Federal Reserve. DX 2582 at PAA035 1118; Tr. 2346:8-13. In August 1992, Fidelity wrote that "the economy still has not responded to aggressive Federal Reserve policy moves." Tr. 2352:7-12 (Wesp); PX 899 at AST030573. In short, the recession or economic weakness that began in the last quarter of 1990

was lengthy and severe. As Mr. Wesp testified the recession "was ugly and it hung on for a long time." Tr. 2352:17-24 (Wesp).

### C. Following The 1991 Report Of Examination, Fidelity Was Placed Under A Supervisory Agreement Due To Its Failure To Correct Its Deficiencies In Dealing With Its Problem Loans

265. On May 21, 1992, Fidelity entered into a Supervisory Agreement with the OTS. PX 874 at WON736 1015, 1026. The Supervisory Agreement resulted from the OTS's finding, based on its RoE dated April 5, 1991, that Fidelity had violated laws or regulations and had engaged in unsafe and unsound practices. PX 874 at WON736 1015. Fidelity's significant asset quality problems and the criticism it received from regulators concerning its record-keeping forced the Supervisory Agreement in May 1992 because it was viewed as being "unsafe and unsound." Tr. 2780:11-2781:10 (Vigna); PX 874.

266. These violations included a failure to obtain appraisals for properties when transferred to real estate owned or when considered in-substance foreclosures; a failure to adjust the book value of real estate owned properties to reflect the fair market value; a failure to establish valuation allowances to the level required at the previous examination; and a failure to establish specific and general valuation allowances totaling $7,565,000 and $2,059,000, respectively. PX 711 at AST002883, AST002972; Tr. 889:15-21 (Powderly). As a result of these violations, the OTS found that Fidelity had overvalued its assets. Id.

267. In accordance with the Supervisory Agreement, Fidelity agreed to correct these deficiencies and to (1) comply with all applicable laws and regulations; (2) engage in safe and sound practices; and (3) maintain the Association in a safe and sound condition. PX 874 at

WON736 1015. Mr. Powderly testified that the Supervisory Agreement did not affect Fidelity's operations. Tr. 889:22-25 (Powderly).

268. The Supervisory Agreement was terminated in January 1993 after the OTS determined that Fidelity had taken corrective actions and had complied with the terms and conditions of the Supervisory Agreement. DX 3371.

**D. Fidelity's Bad Loans Were Reduced Only Slightly In 1992**

269. As of March 1992, the OTS found that Fidelity's classified assets remained high, totaling $75.3 million. More importantly, the severity of the problems with Fidelity's loans had deepened. Fidelity's non-performing assets increased from $44 million in March 1989 to $66 million as of March 1992. PX 986 at AST064227. As of December 1992, Fidelity still reported over $46 million in REO, which was net of nearly $18 million in losses already recorded.[5] Id. at AST064227. The OTS also found that Fidelity's ratio of classified assets to tangible capital and general valuation allowances (prior to adjustments in that report) was 430.3 percent, "a very high ratio." PX 851 at OAA002 0010. Mr. Kennedy calculated Fidelity's total cumulative losses due to its asset quality problems as $53 million from 1986-89, and $74 million from 1986-94; lost interest income would be in addition to these amounts. Tr. 5398:18-5399:21 (Kennedy).

270. The OTS's April 8, 1992 RoE assigned Fidelity a composite rating of "4." PX 851 at OAA002 0006; DX 1448 at WON732 0834. The "4" rating was based upon the existence of the Capital Plan and the bank's compliance with the projected levels in the Capital

---

[5] REO represents properties the thrift has acquired through foreclosure. Because this real estate generally does not produce any income, the more real estate owned by a thrift, the less profitable it is.

Plan. PX 912 at WON736 0040. Fidelity would have been rated a "3" rather than a "4" on the April 8, 1992 exam, PX 851, if its capital had been rated a "2" instead of a "5." Tr. 4742:5-8, 4853:15-21, 4854:8-13 (Amend).

271. The FDIC, in its April 1992 RoE, found that Fidelity's classified assets stood at $103,401,000, or 705 percent of core capital and reserves at March 31, 1992. The FDIC noted that although classifications had decreased from the last examination's total of $133,759,000, this reduction was attributed solely to the write-down of criticized assets rather than to an improvement in the quality of these assets. PX 912 at WON736 0009.

272. The FDIC continued to criticize the CMO residuals held by Fidelity, stating that "[w]hen held as stand-alone investments, residuals are considered highly speculative because of their substantial prepayment risk characteristics and volatile market values." The FDIC went on to note that if prepayment rates continued to accelerate, the value of the income stream would diminish, resulting in additional loss to Fidelity. Id.

273. The FDIC assigned Fidelity a composite rating of "5" as a result of its April 13, 1992 examination. PX 912 at WON736 0010. The FDIC's composite rating of "5" was based upon Fidelity's severely low capital levels, its excessive level of classified assets in relation to capital and the negative factors adversely affecting earnings performance.

274. In October 1992, Fidelity's management stressed Fidelity's need to reduce its level of nonperforming assets, which were almost all large commercial development loans originally underwritten by Fidelity in the mid-1980s, in order to undertake a successful conversion. Tr. 2364:20-2365:21 (Wesp); DX 2633.

## XI. FIDELITY UNDERWENT A SUCCESSFUL CONVERSION AND REGAINED CAPITAL COMPLIANCE

275. In December 1992, Fidelity's Board of Directors approved the conversion of Fidelity from a mutual form to a stock form of ownership. Fidelity completed its conversion in May 1993 by raising $57 million at $11.50 per share. DX 3071 at PAA014 2007 (Powderly). This influx of capital made Fidelity "well-capitalized" under OTS guidelines, and within days of the conversion Fidelity's capital plan was lifted and it was free to operate its business as it saw fit. Id.; PX 974 (Powderly); DX 3371 at PAA051 1367 (Vigna); PX 1015 (Powderly).

276. Fidelity's decision to convert was in line with many in the thrift industry. Indeed, as of October 1992, 31 thrifts had converted to public ownership, representing the highest level of conversion activity in five years and nearly twice the number of conversions in all of 1991. PX 915 at WON736 0571 (Powderly). The rush of conversions were not by accident. As of October 1992, the market's receptivity to mutual conversions, as well as the general level of the equity market, had translated into healthy offering multiples. Id. at WON736 0572 (Powderly). Accordingly, as Dr. Kaplan acknowledged, with or without the loss of goodwill, "Fidelity would have converted during approximately the same general time frame." PX 1314A at ¶ 44; Tr. 3774:12-21 (Kaplan).

277. As part of its stock offering circular issued in March 1993, Fidelity acknowledged a number of factors that had negatively affected its performance during recent years. These included the fact that the New York City metropolitan area had recently experienced reduced employment as a result of layoffs in the financial services industry and corporate relocations, a general weakening in real estate values and a slowdown in home sales

and construction. PX 986 at AST064185. As the underlying values of properties securing non-performing loans declined, there had been, in some cases, substantial loan losses for financial institutions. Fidelity further noted that the weakness in the area's real estate market, and the related loan losses, resulted in large part from speculative commercial and residential construction projects. Fidelity noted that project failures were attributable to a surplus in commercial and residential space and a reduced demand for such space. As a result, the underlying values of properties securing non-performing loans declined, and "in some cases," this resulted in substantial loan losses for such lending institutions. Id. at AST064220-21. In fact, Fidelity admitted in its stock offering circular that its operating results over the last several years had been adversely affected by its significant levels of non-performing assets, primarily in commercial real estate, construction and commercial loans. Id. at AST064186.

278. On December 19, 1991, the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") became law. DX 3071 at PAA014 2141 (Powderly). FDICIA established five capital zones (well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized and critically undercapitalized). Id. As of December 31, 1993, Fidelity exceeded all regulatory capital requirements and was deemed to be "well-capitalized" under FDICIA's standards. Id. at PAA014 2033, 2141.

## XII. ASTORIA, LIKE FIDELITY, CONVERTED TO A STOCK INSTITUTION IN 1993

### A. Pre-FIRREA Astoria

279. During the 1980s, Astoria Federal Savings and Loan Association ("Astoria") consciously avoided engaging in transactions that resulted in the creation of supervisory

goodwill because President George L. Engelke, Jr. believed that the use of supervisory goodwill was not intelligent or in line with accounting principles, even though it counted towards regulatory capital. Tr. 4348:19-23, 4356:22-4357:6, 4349:7-4350:11, 4352:3-5 (Engelke). Because it was only an accounting entry, Mr. Engelke believed supervisory goodwill put a thrift at greater risk than tangible capital. Tr. 4358:5-14 (Engelke). Thrifts needed cash or other tangible capital, not supervisory goodwill, and a good plan for using that capital, to be viable. Tr. 4351:8-4352:2, 4444:17-4446:1 (Engelke). During the early 1990s, it was tangible capital that helped Astoria weather the recession. Tr. 4394:22-4395:4, 4457:24-4458:6 (Engelke); DX 256 at PAA116 0831.

280. Unlike many other thrifts in the 1980s, Astoria did not become financially troubled because it did not suffer unduly from management selection issues and credit and asset quality problems, thus helping it weather the adverse economic conditions. Tr. 4343:4-20, 4345:2-18 (Engelke).[6] Astoria avoided credit quality problems by concentrating approximately 80 percent of its assets in the 1980s in traditional one-to-four family mortgage loans. Tr. 4346:1-6, 4346:21-4347:8 (Engelke); DX 3491 at 113:10-13 (Drewitz); see also DX 3491 at 122:12-123:20 (Mr. Engelke got Astoria out of commercial lending because it was too risky) (Drewitz).[7] Astoria avoided major involvement in commercial and commercial real estate loans because it was risk-averse and wanted to keep its credit quality high. Tr. 4374:23-4375:13

---

[6] However, to the extent Astoria made condominium loans, Astoria was negatively affected by the collapse of the condominium market. Tr. 4342:4-21, 4420:12-21 (Engelke); DX 253 at PAA116 0261.

[7] In 2000, the percent of assets in traditional one-to-four family mortgages was 88 percent; the number today is 75 percent. Tr. 4375:14-4376:20 (Engelke).

(Engelke). Astoria implemented stringent underwriting standards for commercial real estate and multifamily lending, and required stringent debt coverage ratios to mitigate the risks associated with these types of loans. Tr. 4376:21-25, 4377:10-4378:4 (Engelke); DX 5 at AA1001 0315.

## B. The Real Estate Recession In The Early 1990s Affected Astoria

### 1. Astoria Operated Conservatively Following FIRREA

281. Following the enactment of FIRREA, Astoria was never out of capital compliance, and in fact always had excess capital. DX 6 at WON728 1652 (soundly capitalized as of September 30, 1989, with GAAP capital of 8.2 percent of assets); DX 2399 at AA4008 0248, 0250 (8.3 percent tangible capital to total assets as of February 21, 1990, "well above the industry average and regulatory requirements;" "during this very difficult period, [Astoria's] capital adequacy [was] outstanding"); DX 3237 at FAA006 1741 (March 31, 1990: 7.9 percent tangible capital – $198,546,000 excess; 7.9 percent core capital – $152,097,000 excess; 15.9 percent risk-based capital – $148,774,000 excess); DX 3033 at OAA002 0469 (as of March 31, 1991, tangible, core, risk-based capital ratios of 6.92, 7.31, and 15.12 percent respectively, all in excess of increased 1992 requirements); DX 2962 at AA1001 0402 (June 30, 1993, tangible, core and risk-based capital ratios of 6.53, 6.68, and 17.76 percent respectively); DX 2962 at AA1001 0395 (between December 31, 1988, and June 30, 1993, Astoria's tangible capital to tangible assets ratio was never less than 6.32 percent, and was as high as 7.68 percent). In addition, Astoria never received a MACRO composite rating of lower than "3" following FIRREA's enactment. DX 6 at WON728 1632 ("2" rating in September 25, 1989 OTS Report of Examination); DX 3033 at OAA002 0454 ("3" composite rating in OTS report of examination April 29, 1991).

### 2. Conservative Operations Did Not Shield Astoria From The Recession

282. There was a general decline in the national economy and a weakening of the real estate values in the New York City metropolitan area through 1993. DX 5 at AA1001 0301; DX 2485 at WON750 0980; DX 2590 at WON750 0561; DX 2602 at WON760 0549; Tr. 5248:8-18 (Engelke). Despite its conservative operating strategy, Astoria suffered from an increase in non-performing loans in the early 1990s because of the recession. Tr. 4386:17-21, 4388:1-4390:19 (Engelke); DX 2962 at AA1001 0395 (non-performing loans to total loans: year-end 1988 to 1992 – 0.74 percent, 4.52 percent, 6.85 percent, 4.40 percent, 3.94 percent; June 30, 1993, 4.09 percent; non-performing loans to total assets: year-end 1988 to 1992 – 0.46 percent, 2.88 percent, 4.05 percent, 2.48 percent, 1.91 percent; June 30, 1993, 1.78 percent). These non-performing loans required more loan loss provisions due to their lower property values in a bad economy. Tr. 4393:24-4394:21, 4395:5-13 (Engelke); DX 3033 at OAA002 0450. Astoria suffered increases in loan delinquencies and foreclosures resulting in an increased level of real estate owned. DX 254 at PAA116 0469-70; DX 257B at PAA116 0931; DX 259B at PAA116 1397.

283. Even originations of one-to-four family mortgage loans decreased from 1990 through 1993 due to the softening of the real estate market. Tr. 4437:15-4439:18 (Engelke); DX 251A at PAA116 0093; DX 252A at PAA116 0144; DX 254B at PAA116 0470; DX 255A at PAA116 0727; DX 257B at PAA116 0931; DX 259B at PAA116 1397. Adverse media reports about the savings and loan industry hampered efforts to drum up business as well. DX 253 at PAA116 0260.

284. As noted elsewhere, factors affecting the economic slowdown of the early 1990s included the stock market crash, resistance from home sellers to accept lower prices (leading to significant loan loss reserves), an unpredictable interest rate environment, and uncertainty due to the Gulf War. Tr. 4425:14-4429:5 (Engelke).

**3. <u>Astoria Chose Not To Grow To Handle Non-Performing Loan Issues</u>**

285. Astoria chose not to grow very much from 1988 through 1992 to clean up issues related to its non-performing loans. Tr. 4395:14-4399:15 (Engelke); DX 2962 at AA1001 0394 (annual growth of 0.35 percent in 1989, 9 percent in 1990 – half of which resulted from acquiring Whitestone Federal Savings and Loan Association ("Whitestone"), 2.7 percent in 1991, 4.4 percent in 1992, total growth of only $334 million from 1989 to 1992) (percentages calculated per growth in assets noted); DX 2962 at AA1001 0415. The only significant growth from 1988 through 1992 was the acquisition at a 6.3 percent premium of four Whitestone branches from the Resolution Trust Corporation ("RTC") on November 16, 1990. Tr. 4488:7-13 (Engelke); DX 2962 at AA1001 0415; DX 1937 at WON728 0065. Only in August 1992 did Astoria begin to engage in modest growth again, while keeping a tangible capital ratio of 6.50 percent. DX 258A at PAA116 1108. The modest growth was possible because Astoria successfully dealt with its non-performing loans. Tr. 4464:22-4465:16 (Engelke); DX 259B at PAA116 1397.

286. According to AFC's October 1, 1993 Prospectus, Astoria's total assets as of year-end 1988 through year-end 1992 were $3,075,156,000, $3,085,991,000, $3,363,773,000, $3,273,176,000 and $3,419,838,000, respectively. DX 2962 at AA1001 0394. Excluding the $281.5 million in assets acquired by Astoria in connection with its acquisition of Whitestone in

November 1990, Astoria only added $63.2 million in assets from December 1988 to December 1992. DX 2962 at AA1001 0394, 0415. According to AFC's 1993 Annual Report, AFC's total assets as of December 31, 1993 were $4,121,696,000. PX 1048 at WON727 0430.

**a. Astoria's Statements Respecting The Economy In 1990**

287. In 1990, Astoria's President's Report discussed then-current economic conditions. Astoria reported that the challenges facing financial institutions were primarily due to generally weak economic conditions and the related sharp decline in real estate values. Astoria also addressed the "recessionary environment" and noted that "[t]he market decline in real estate values, which had been most acute in the Southwest in recent years, hit the Northeast and other sections of the nation, albeit somewhat less severely. The decline was the direct result of the cumulative impact of 1986 changes in real estate tax laws, the 1987 stock market crash, and worsening general business conditions." DX 253 at PAA116 0261. Astoria further explained that real estate values were reduced because:

> [t]he soaring home prices of the mid-1980's finally discouraged new home buyers when their confidence was shaken in the latter part of the decade by the decline in the stock market and a worsening in the general business climate. Combined with the resistance of sellers to accept lower prices for their homes, demand continued to shrink, and market prices moved lower. Exacerbating the problem was the Tax Reform Act of 1986 which removed a significant amount of investor capital from the real estate market.

DX 253 at PAA116 0261. Moreover:

> [t]he significant drop in the value of real estate resulted in increased realized loan losses and provisions for estimated future losses for most financial institutions. The problem is particularly acute for those institutions which have been heavily engaged in speculative commercial and multi-family real estate activities in

> recent years. There has even been some effect on institutions with fairly conservative lending policies such as Astoria [.]

DX 253 at PAA116 0261. Astoria concluded its discussion of economic conditions by noting:

> [t]he direction of interest rates and the economy bear heavily on prospects for the real estate market. While there has been some easing of interest rates, including rates charged on mortgage loans, the Federal Reserve remains concerned about continued inflationary pressures which could inhibit the continuation of interest rate softening.

DX 253 at PAA116 0261.

288. As of December 19, 1990, Mr. Engelke reported to Astoria's board that investment opportunities of significance were limited. DX 251A at PAA116 0093. He further reported that Astoria's mortgage flows remained slow, with just slightly over $29 million in mortgage commitments outstanding at the end of November. DX 251A at PAA116 0093.

**b. <u>Astoria's Statements Respecting The Economy in 1991</u>**

289. On January 16, 1991, Mr. Engelke noted that mortgage originations for 1990 totaled $185 million, which reflected the overall malaise in the real estate markets in the Northeast. DX 252A at PAA116 0144. He further noted that Astoria lost approximately $8.5 million in interest income in 1990 due to non-performing assets. He stated that the difference between the net spread on earning investments and the net spread on all investments for year 1990 was 29 basis points compared to seven basis points for 1989. Mr. Engelke concluded that this adverse increase was reflective of the impact of non-performing assets on Astoria's financial statements and on its future earnings potential. DX 252A at PAA116 0145.[8]

---

[8] OTS required Astoria to update its business plan in light of 1991 economic conditions. DX 3033 at OAA002 0453. Astoria frequently updated its business plans in light of changes in the economic and regulatory landscape, which it could not predict with certainty. Tr. 4430:11-

290. As of July 17, 1991, Astoria decided not to consider merger or branch purchase opportunities. The impact on capital ratios and human resources, as well as the need to focus on real estate problems, were the primary reasons for this decision. DX 254B at PAA116 0471.

291. In its December 1991 Business Plan, Astoria projected growth of average assets of $72 million over the following three years, from $3.362 billion in 1991 to $3.434 billion in 1994. DX 1949 at FAA008 0967.

292. Astoria's 1991 President's Report discussed current economic conditions. Astoria noted that there was a "severe recession in the Northeast" and that

> real estate market conditions, particularly with respect to new construction, condominiums, commercial real estate and land, deteriorated significantly, many banks and thrifts in the Northeast experienced increases in loan delinquencies and a severe deterioration in the value of real estate acquired through foreclosure. A substantial portion of the drop in values was caused by the repeal of passive loss tax laws in the Tax Reform Act of 1986, which effectively and instantly removed many investors from the real estate market.

DX 256 at PAA116 0831.

**c. <u>Astoria's Statements Respecting The Economy In 1992</u>**

293. In a March 30, 1992 letter to the FDIC, Astoria stated that it was "certainly in agreement with your comment as to problems with respect to asset quality which have arisen primarily as a result of the severe recession we are experiencing here in the New York area. Dealing with the loan and real estate problems we are experiencing has been designated the number one priority in our current Business Plan." DX 257B at PAA116 0931.

---

4431:22, 4441:13-4442:3, 4582:3-15 (Engelke); DX 2024; DX 3033 at OAA002 0453; DX 254B at PAA116 0469; DX 255A at PAA116 0727-28; DX 258A at PAA116 1108.

294. Astoria's 1992 President's Report discusses then-current economic conditions. Astoria noted the "generally weak economic climate in the communities we serve" and that "our primary service areas continue in the economic doldrums. Unemployment continues high and consumer confidence remains low." DX 259B at PAA116 1397. Astoria also stated that commercial real estate values were still in decline and that mortgage lending for newly purchased homes continued to be lethargic, as could be expected during periods of economic uncertainty. Id.

### d. Astoria's Statements Respecting The Economy In 1993

295. As of March 17, 1993, Astoria was experiencing some difficulties in lowering its liquidity. Accelerated mortgage prepayments, the slow mortgage market and limited quality investment opportunities, based on perceived value within the then-current interest rate environment, were the primary reasons for the increased liquidity. DX 260A at PAA116 1465.

296. As of October 1, 1993, Astoria noted that the then-current low interest rate environment had resulted in an increased number of prepayments of loans and loan refinancing to lower than original interest rates as well as an increase in the prepayments of mortgage-backed and mortgage-related securities. DX 2962 at AA1001 0396, 0414. Astoria accordingly avoided mortgage-backed and mortgage-related securities in autumn of 1993. Tr. 4402:16-4403:25, 4405:13-4406:5 (Engelke). As of October 1993, Astoria had experienced higher levels of prepayments in its loan portfolio due to the relatively low interest rate environment during the previous few years. Borrowers refinanced their loans at lower interest rate loans, primarily 30-year fixed-rate loans. DX 2962 at AA1001 0414.

#### 4. FIRREA Did Not Affect Astoria

297. Following FIRREA's passage, FIRREA did not weaken Astoria, cause Astoria to change its business plans, or affect its capital levels. Tr. 4374:13-22 (Engelke); DX 3491 at 96:1-19, 111:6-10, 139:15-21 (Drewitz); see also Tr. 5315:2-9 (Engelke) (Fidelity acquisition did not cause Astoria a net loss or lack of regulatory capital).

### C. Astoria Converted In 1993 For Reasons Wholly Apart From A Need To Meet Regulatory Capital Requirements

#### 1. Astoria's Capital Position Immediately Prior To Conversion

298. Prior to its 1993 conversion, Astoria had excess capital. Tr. 4481:4-22 (Engelke). Lack of capital was not a constraint to Astoria's growth in the early 1990s and did not delay Astoria's decision to convert to stock form. Tr. 4399:16-4400:12, 4407:21-23, 4447:3-11, 4449:1-8, 4453:6-11, 4455:19-22, 4459:22-4461:4, 4469:9-12 (Engelke); DX 1949 at FAA008 0967 (almost no asset growth predicted in 1991); DX 2399 at AA4008 0248 (tangible capital ratio of 8.3 percent in February 1990, well above industry average); DX 257B at PAA116 0931.

#### 2. The Conversion Transaction

299. Astoria converted to a stock institution on May 19, 1993, DX 2962 at AA1001 0390, and not earlier, because it had to take care of its non-performing loan problems before offering its shares for sale. Tr. 4400:7-20 (Engelke). Benefits from the conversion included increased tangible capital to purchase other thrifts, Tr. 4469:22-4471:1, 4472:18-21, 4498:19-24 (Engelke), and stock option plans for employees. Tr. 4471:16-24 (Engelke). FIRREA's goodwill phaseout did not affect the decision to convert. Tr. 4476:3-6 (Engelke). The

conversion resulted in the creation of AFC, Astoria's holding company, on June 14, 1993. PX 1048 at WON727 0413; DX 2962 at AA1001 0430; see also DX 2962 at AA1001 0390 (OTS approved conversion application October 1, 1993). The conversion raised $322,584,000, $105,000,000 of which was left at the holding company level. PX 1048 at WON727 0454. Astoria's total assets as of year-end 1993 were $4,121,696,000. PX 1048 at WON727 0430. Proceeds of the conversion were used for general business activities, employee stock option plans, investment in mortgage loans, federal funds, and mortgage-backed and mortgage-related securities. DX 2962 at AA1001 0393.

### 3. Astoria's Post-Conversion Operations

#### a. Capital Position

300. The conversion left Astoria with 13 percent capital, making it extremely well-capitalized. Tr. 4472:22-4473:15 (Engelke). Mr. Engelke planned to use the capital judiciously, when high-quality investment opportunities became available. Tr. 4473:22-4475:25 (Engelke). Following the conversion, Astoria maintained capital ratios well in excess of the FIRREA requirements. DX 3070 at PAA039 0240 (year-end excesses 1993: 8.95 percent tangible, 7.56 percent core, 21.99 percent risk-based capital); PX 1186 at WON727 1557 (year end excesses 1994: 8.76 percent tangible, 7.26 percent core, 22.64 percent risk-based); DX 3083 at PAA083 1479 (excess capital even after Fidelity acquisition); DX 1845 at AA0001481 (year-end 1999, Astoria had 4.48 percent tangible capital in excess of requirement, 1.98 percent core capital in excess of requirement, 7.33 percent risk-based capital in excess of requirement); see also Tr. 4558:19-4561:7 (Engelke) (AFC could have downstreamed $125 million in trust preferred share issuance in 1999 had Astoria needed capital); DX 1845 at AA0001420.

**b. Share Repurchases**

301. Following the conversion, AFC used its capital to repurchase its common shares in large numbers. Tr. 4500:25-4501:15 (Engelke) (share repurchases an ongoing practice of Astoria); 4696:12-13 (Amend); PX 1190 at AST0555620 (1,144,042 shares repurchased for $34,252,000 in 1994); PX 1228 at WON735 0078, 0113 (735,876 shares repurchased for $26,592,000 in 1995; fourth stock repurchase plan following repurchase of 1.88 million shares by year-end 1995); DX 32 at PAA083 1347 (1,205,496 shares repurchased for $31,672,000 in 1996); DX 1842 at WON747 0194, 0199 (1,381,997 shares repurchased for $61,718,000 in 1997); DX 1844 at AA0001662 (339,892 shares repurchased for $16,633,000 in 1998); DX 1845 at AA001420, AA0001516, AA0001534 (4,257,200 shares repurchased for $159,367,000 in 1999; sixth repurchase plan announced); DX 3109 at WAA004 0087, 0106 (2,607,946 shares repurchased for $84,553,000 in 2000); DX 3110 at WAA004 0227, 0252 (10,303,600 shares repurchased for $289,087,000 in 2001); DX 3111 at WAA004 0374, 0396 (7,283,400 shares repurchased for $211,103,000 in 2002); DX 3112 at WAA004 0522, 0545 (7,073,800 shares repurchased for $195,471,000 in 2003); DX 285 at WAA005 0754, 0772 (9,067,500 shares repurchased for $225,052,000 in 2004); DX 289 at WAA005 1029, 1046 (6,582,500 shares repurchased for $180,944,000 in 2005).

302. Since AFC's first repurchase program was initiated in 1994 through year-end 2003, AFC repurchased 51.4 million shares of its common stock, at a cost of $1.1 billion, or an average price of $21.45 per share. DX 281 at WAA005 0538.

303. Repurchasing shares was a good option based on returns otherwise available in the market. Tr. 4503:19-4504:3, 4511:24-4512:13 (Engelke); DX 273 at WAA005 0281

(repurchasing common stock is a "favorable long-term investment and a prudent use of capital as an alternative to asset growth"); DX 269 at WAA005 0172 (stock repurchase responded to "challenging interest rate environment" in 2000; repurchasing shares a "positive earnings alternative" to other investments). Repurchasing shares was necessary to lower the amount of unused capital, thus increasing return on equity and increasing shareholder value. Tr. 4581:1-4582:2 (Engelke); PX 1228 at WON735 0078. Goodwill could not be used to repurchase shares. Tr. 4505:7-9 (Engelke).

**c. Measurement Of Value**

304. Throughout the 1990s, Astoria continued to look to tangible equity and cash earnings as accurate measures of its value. DX 32 at PAA083 1305; DX 1842 at WON747 0152; DX 1845 at AA001419. These numbers were more accurate than the GAAP numbers, which included the write-off of the new goodwill figure – a premium – calculated from the purchase accounting of the Fidelity acquisition. Tr. 4527:18-4529:21 (Engelke).

**d. Dividends To AFC**

305. For years after the conversion, AFC received dividends from its subsidiary, Astoria. Tr. 4689:12-4690:5 (Amend) (discussing DX 3050 at WON731 1760); DX 32 at PAA083 1372 ($4,520,000 from Astoria in 1995, $49,362,000 from Astoria in 1995); DX 1845 at AA0001549 ($65,562,000, $50,000,000 and $44,000,000 Astoria cash dividends to AFC in 1997, 1998, and 1999 respectively; 1999 dividends went to repurchase shares); DX 3110 at WAA004 0274 ($137,630,000 and $502,935,000 in Astoria cash dividends to AFC in 2000 and 2001 respectively); DX 3112 at WAA004 0567 ($60,377,000 and $120,377,000 in Astoria cash

dividends to AFC in 2002 and 2003, respectively); DX 289 at WAA005 1061 ($522,470,000 and $200,000,000 in Astoria cash dividends to AFC in 2004 and 2005, respectively).

e. **Conservative Retail Business Strategy**

306. At no time did Astoria ever make a wholesale strategy the dominant focus of its operations and, in fact, Astoria has been reducing its wholesale portfolio in recent years. Tr. 4401:5-4402:15 (Engelke). Astoria had sufficient capital to have added assets through a wholesale strategy after FIRREA but chose not to. Tr. 5612:17-5613:3 (Kennedy). In fact, Astoria chose the opposite approach.

307. Even after the economy improved, Astoria's strategy and assessment of investment opportunities as insufficiently profitable or too risky prevented it from making investments in MBS on numerous occasions in the 1990s. Tr. 4508:23-4511:9 (explaining how MBS has interest rate risk due to duration mismatches, making investments in MBS risky), 4515:21-4516:8 (no guaranteed profits with MBS), 4519:1-17; 4555:10-4556:5, 5275:2-21, 5276:19-5277:3 (Engelke); DX 219 at PAA116 2222 (August 14, 1995); DX 216 at PAA116 2213 (May 15, 1995); DX 221 at PAA116 2228 (October 13, 1995); DX 34 at PAA029 0018-19 (as of July 19, 1995, Astoria would not accept investment spreads of less than 125 basis points); DX 2917 at PAA085 1651 (July 16, 1999); DX 19 at PAA114 0113 (September 20, 1995); DX 2823 at PAA085 0468 (December 13, 1996); see also DX 2904 at PAA114 0053; Tr. 4531:7-4532:6 (Engelke) (possible to lose money on adjustable rate MBS).

f. **Decision Not To Grow By Investment**

308. Astoria's decision not to grow by making investments was not caused by lack of capital. Tr. 4525:5-11 (Engelke). Indeed, Astoria even shrank its size in 2000 for reasons

unrelated to lack of capital and repurchased shares. Tr. 4564:16-4566:8 (repurchase made most sense in light of flat to inverted yield curve in 2000) (Engelke); DX 269 at WAA005 0171 ("rising interest rates and a persistent flat to inverted U.S. Treasury yield curve"); DX 273 at WAA005 0279 (assets decreased $360 million from 1999 to 2000, increased slightly from 2000 to 2001), WAA005 0280-81 (AFC enhanced its core franchise by decreasing securities and increasing traditional thrift assets and repurchasing stock in 2001); DX 281 at WAA005 0525 (assets decreased nearly $1 billion from 2001 to 2002), WAA005 0527 (refinancing activity lowered AFC's 2003 earnings). Astoria has shrunk more since. Tr. 4576:12-14 (Engelke). Astoria's shrinkage did not lead to a lack of profits. Tr. 4570:20-4571:1 ($1.5 billion in profits 1999 through 2001), 4582:16-4583:24 (growth does not guarantee profits, especially if interest rates unfavorable) (Engelke). After 2000, Astoria determined to reduce its investment securities to help increase Astoria's franchise value. Tr. 4567:16-4568:10 (Engelke). Unanticipated pre-payment rates lowered earnings in 2003. Tr. 4573:6-4574:19 (Engelke); DX 281 at WAA005 0527.

## XIII. <u>POST-CONVERSION FIDELITY</u>

309. The OTS examined Fidelity as of April 5, 1993, although the thrift's condition was assessed taking into account the receipt of the conversion proceeds. The OTS found that Fidelity's overall condition was still in need of improvement in "management's assessment of classified assets and analysis of valuation allowances." The OTS also found that Fidelity's asset quality was only marginal, as it continued to be hampered by the nonearning real estate owned portfolio. The OTS specifically directed Fidelity to focus on reducing the level of its foreclosed holdings, or real estate owned. PX 1013 at OAA002 1318. Accordingly, even though Fidelity's

capital was adequate, the OTS determined that Fidelity's operating results were still marginal, with net operating income continuing to be largely represented by noninterest income. Id.

310. In the OTS's April 1993 RoE, the OTS classified $62.6 million of its assets as problem assets, with the bulk represented by property Fidelity had foreclosed upon and owned. Tr. 2373:9-14 (Wesp); PX 996 at FAA005 1053. Indeed, the OTS listed $48 million in properties that were real estate owned. Tr. 2378:19-2379:1 (Wesp); PX 996 at FAA005 1087. In addition, Fidelity was required to increase its loan loss reserves by another $6.1 million, as regulators again criticized Fidelity for having an ineffective loan review function. Tr. 2374:8-20 (Wesp); PX 996 at FAA005 1053. Moreover, examiners noted that the decline in the amount of classified assets from the previous examination was not because the market had improved, but rather that Fidelity had written off another $12.6 million of its bad loans since the prior examination. Tr. 2373:15-20 (Wesp); PX 996 at FAA005 1053.

311. The bad loans held by Fidelity continued to deteriorate. For example, the 14th Street Glick Development loan was appraised at a value of just $10.8 million, even though Fidelity underwrote a $24.5 million loan for the development of that property in 1987. Tr. 2375:9-2376:4 (Wesp); PX 996 at FAA005 1095; DX 703; DX 69A at OAA002 0193. The decline in the property value on 14th Street was unsurprising, given that Mr. Wesp noted that the deserted Luchow's property "was empty and boarded up and full of drug addicts." Tr. 2376:11-15 (Wesp). The bad loans and increased loan loss reserves reduced Fidelity annualized return on assets from .5 percent to .2 percent. Tr. 2379:25-2380:4; 2381:1-10 (Wesp); PX 996 at FAA005 1067. Thus, the nonperforming loans were still having a very significant impact on Fidelity's profitability.

312. Both the OTS and the FDIC assigned Fidelity a composite rating of "3" for their April 1993 RoE. PX 995 at WON738 0675; DX 1448 at WON732 0834. Fidelity would have remained a "3" on the April 5, 1993 OTS exam, PX 996, in the absence of FIRREA. Tr. 4742:9-14, 4854:2-13 (Amend).

313. In the 1993 RoE, the FDIC again noted its classification of Fidelity's CMO residuals. PX 995 at WON738 0674. It also noted that Fidelity's non-interest income had been substantially enhanced by gains on sales of securities of $9.3 million. The FDIC expressed doubt that Fidelity could continue to realize gains on sales of securities in the future. The FDIC also noted that Fidelity's net interest margins from December 1992 and March 1993 of 2.39 percent and 2.33 percent, respectively, remained significantly below peer group figures. Id. at WON738 0673.

314. As of December 1993, Fidelity's ratio of non-performing assets to total assets had decreased to 1.96 percent, from 3.23 percent at December 31, 1992. Fidelity recognized that this was the lowest level of non-performing assets since 1987. DX 1199 at WON738 0780.

315. Wholly apart from its losses before 1989, Fidelity experienced significant expenses between 1989 and 1994 as a result of its poor loans. For the period between March 31, 1989, and December 31, 1994, Fidelity's provision for loan losses was $16,015,000 and the net loan charge-offs totaled $26,367,000. Fidelity's provision for valuation allowance on its REO during this period was $32,252,000 and the net charge-offs for its REO totaled $13,585,000. PX 986 at AST064231; PX 1323 at KPMG 012423.

316. Furthermore, for each of the nonperforming loans, Fidelity lost significant amounts of interest income. In its stock subscription offering circular, Fidelity stated that, "the

operating results of the bank over the last several years have been adversely affected by its significant levels of nonperforming assets, primarily in its commercial real estate, construction and commercial business loan portfolios." PX 986 at AST064227; Tr. 905:20-906:1 (Powderly). Mr. Powderly agreed that Fidelity "[w]ould have been affected just the same if [Fidelity] had Suburbia goodwill." Tr. 906:2-4 (Powderly). For the years ended March 31, 1991 and 1992, foregone interest on non-accrual loans amounted to approximately $5.9 million and $3.4 million respectively. PX 986 at AST064186; Tr. 914:13-19 (Powderly). Mr. Powderly conceded that he did not calculate the total lost interest income, writedowns, general valuation allowances or loan loss reserves Fidelity took on its nonperforming loans. Tr. 914:20-915:4 (Powderly).

317. Despite these problems with its nonperforming loans, Fidelity was not inhibited by regulatory restrictions from following any growth plans it had after its May 1993 conversion. In its response to the 1993 examination, Fidelity stated that, "[t]he May 1993 recapitalization ended a long struggle" with its capital issues; Mr. Powderly agreed that after the conversion, Fidelity's problems with capital were over. PX 1029 at AST062095; Tr. 1001:3-11 (Powderly). Mr. Powderly also agreed that, after the conversion, Fidelity was deemed well-capitalized by the regulators and was not subject to regulatory restriction in its growth. Tr. 917:1-24 (Powderly).

318. Fidelity also stated in its 1993 annual report that its "prospects have been totally transformed by its recapitalization," and that, after its conversion, Fidelity was "correctly capitalized." PX 1249 at WON738 0779; Tr. 925:18-926:13 (Powderly). Mr. Powderly agreed that, after May 1993, Fidelity's growth was not restrained by the capital plan, and there were no regulatory concerns shaping Fidelity's growth plans. Tr. 925:25-926:2, 927:3-11 (Powderly).

## XIV. FIDELITY AND ASTORIA AGREED TO MERGE IN A PURCHASE ACCOUNTING MERGER

### A. Negotiations And Structure Of Transaction

319. In late March 1994, Mr. Powderly called Mr. Engelke to discuss generally whether Astoria would be interested in exploring a transaction. Several days later, Mr. Engelke responded that Astoria was interested in exploring a possible transaction and wished to initiate a due diligence review of Fidelity. DX 2965 at WOL487 0705. The initial discussions between Mr. Powderly and Mr. Engelke focused on the structure and the possible pricing parameters for a potential transaction between Fidelity and Astoria. Astoria wanted to acquire Fidelity for its profitable branch network. Tr. 4500:14-19 (Engelke); 5281:22-5282:8 (Engelke). Mr. Engelke indicated that Astoria would only consider an "acquisition of Fidelity's stock for cash." DX 2965 at WOL487 0705. Astoria paid cash out of a desire to use the excess cash it obtained from its own conversion. Tr. 641:17-642:12 (Powderly); DX 3489 at 9:25-10:21, 20:23-21:11 (Quackenbush). Fidelity also wanted a cash transaction. Tr. 940:3-10 (Powderly).

320. On April 6, 1994, Fidelity, Astoria and AFC entered into a confidentiality agreement, and Astoria and AFC commenced an initial due diligence review of Fidelity. DX 2965 at WOL487 0705.

321. During Fidelity's July 12, 1994 Special Board of Directors meeting, Mr. Powderly summarized the basic business terms of the possible transaction with Astoria, which included a proposed price of $29 per share. PX 1107; PX 1108; Tr. 638:16-639:22, 641:24-643:9 (Powderly). Salomon Brothers opined that the consideration to be received by Fidelity's shareholders in the Astoria merger proposal would be fair from a financial point of view. This

opinion was also included as part of Fidelity's November 16, 1994 Proxy Statement. DX 1108 at AST127826; DX 2965 at WOL487 0779.

322. On July 12, 1994, after extensive negotiations, Fidelity's Board approved the Merger and the Agreement, and shortly thereafter the Agreement and Plan of Merger was executed by Fidelity, Astoria and AFC. DX 2965 at WOL487 0708; PX 1109.

323. AFC's acquisition of Fidelity was completed after the close of business on January 31, 1995. DX 3083 at PAA083 1467. The final cash price Astoria paid for Fidelity was $29 per share. DX 3083 at PAA083 1467 ($157.8 million total price for Fidelity). The $29 per share price was obtained one year after the conversion, in which Fidelity's shares sold at $11.50 per share, resulting in a 152 percent per share price increase. Tr. 641:7-16 (Powderly); see PX 1109 at WON749 2309. Had Fidelity been more valuable at the time of the acquisition, Astoria would have paid more to acquire it. Tr. 5255:6-5256:11 (Engelke).

**B. Astoria Deals With Fidelity's Problem Loans During Merger**

324. Even as late as the Astoria merger, problem loans remained on Fidelity's books, prompting the OTS, and later Astoria, to demand further write-downs of their value. PX 1080 at FAA005 0907, DX 2748 at PAA094 0471 ($5.9 million in additional general reserves on mid-1980s loans); DX 2762 at AA4009 1685 (additional loan loss reserves required by Astoria on 1980s loans as of January 6, 1995); Tr. 664:9-12, 953:6-18, 958:9-960:5 (Powderly); Tr/ 4665:14-4666:13 (Amend). The Suburbia goodwill phase-out had no bearing upon the deteriorating conditions of these loans. Tr. 690:13-25, 722:3-20 (Powderly).

325. In 1994, Fidelity continued to write down of millions of dollars worth of bad loans, particularly those originally underwritten in the mid-1980s. For example, in October

1994, Fidelity wrote down $7.1 million in losses connected with its real estate loans, and it further noted a decline of $5.4 million in the amount of its nonperforming assets, which were disposed of by Fidelity. Tr. 2398:14-2399:16 (Wesp); PX 1166 at AST037537, AST037540. Even though Fidelity owned real estate obtained through foreclosures for several years, Mr. Wesp admitted that Fidelity was "not in the business of holding, owning and managing REO [real estate owned]." Tr. 2400:21-22 (Wesp). Fidelity also noted in October 1994, that additional general reserves of $5.9 million were required. This $5.9 million of additional reserves were specified as follows: $3.1 million for the Glick 14th Street loan; $1.9 million for the Bridgeport loan; and $880,000 for the Setauket loan. DX 2748 at PAA094 0471.

326. According to Peter Finn, who handled the credit review of Astoria's due diligence of Fidelity, Tr. 3986:22-25, 3988:10-3989:2 (Finn), Astoria required Fidelity to set aside additional reserves to address its problem loans, including loans that were still on Fidelity's books from the 1980s. Tr. 3991:21-3992:8, 4003:3-7 (Finn); see also Tr. 4004:5-7 (Finn) (FIRREA had no direct correlation to the loans going bad). In total, Astoria wrote off $9.9 million in value for Fidelity's loans. PX 1191; Tr. 4006:10-13 (Finn). Regulators' market valuations and requests for loan loss reserves had nothing to do with the amount of capital Astoria or Fidelity held but rather was based upon appraisals of the property values. Tr. 4007:5-25 (Finn).

327. According to a January 6, 1995 Memorandum to the record from Andrew Blazek, Fidelity applied "additional reserves" of $256,400. The Memorandum states that total additional GVA reserves as of December 31, 1994 would be $1,198,470 and the total GVA balance would be $2,495,634. PX 1191 at AST0734192, AST0734194.

328. Even after the acquisition was complete, Astoria took additional losses on Fidelity loans. Tr. 4670:2-15 (Amend); see also PX 1191.[9] As of February 15, 1995, Astoria recognized that there might be further write-downs on certain in-substance foreclosure properties acquired from Fidelity with additional reserves anticipated totaling $500,000. PX 1209 at AST092290. As of March 15, 1995, Astoria was informed that, to align Fidelity's valuation and reserve policies to those of Astoria, an additional $2.1 million in reserves would be required for the properties held on Astoria's books as of January 31, 1995. DX 2772 at AA4009 1336.

## C. Treatment Of Fidelity's Goodwill In Merger

329. The merger between Astoria and Fidelity was accounted for as a purchase, with the assets and liabilities of Fidelity marked-to-market. PX 1076 at WON739 1193; DX 2965 at WOL487 0726; DX 3083 at PAA083 1467. The use of cash in acquiring Fidelity as well as Astoria's desire to sell a significant amount of Fidelity's assets, mandated use of the purchase, rather than the pooling method of accounting. Tr. 2809:12-2810:15 (Vigna); Tr. 4499:21-4500:2, 4586:2-5 (Astoria knew it would have to write off Fidelity's goodwill), 4588:13-24, 5292:10-19, 5311:9-13 (would not have used stock to acquire Fidelity) (Engelke); Tr. 1969:6-12 (Wesp) (cash deal required by Astoria because it needed to put excess cash to work to get an improved return on equity); Tr. 5417:25-5420:9, 5425:18-5428:6 (Kennedy); Tr. 5729:2-5

[9] DX 703 shows aggregate write-downs on the 14th Street Associates loan of $15,156,428. Tr. 4671:9-12 (Amend). DX 701 shows the aggregate write-downs on the Glick Bayside Mall Associates loan of $4,679,570. Tr. 4672:25-4672:2 (Amend). DX 650 shows cumulative annual provisions for losses of $81,985,000 for the years ended December 31, 1985 through December 31, 1994. Tr. 4672:16-19 (Amend); 4674:7-9 (Amend). This total does not include lost interest income on the non-performing loans. Tr. 4674:10-12 (Amend). Fidelity also incurred $300,000 in actual principal losses. Tr. 4677:7-14 (Amend).

(Carron); PX 1120 at FAA005 0996; DX 2965 at WOL487 0705; DX 3083 at PAA083 1467; PX 1076 at WON739 1193; DX 538 at AA-NAV-000590-91; see also Tr. 5245:8-5247:13, 5290:12-5291:21 (Engelke) (purchase accounting gave Astoria generous accounting benefit for valuation of sale of Fidelity assets). Accounting Principles Bulletin 16 ("APB 16"), states that, under purchase accounting for acquisitions, "[a]n acquiring corporation should not record as a separate asset the goodwill previously recorded by an acquired company." APB 16 also states that amounts should be assigned "to the individual assets acquired and liabilities assumed, except goodwill." DX 538 at AA-NAV000590-91, ¶ 88. Regulatory accounting principles required application of APB 16. Tr. 5421:16-23 (Kennedy).

330. Under purchase accounting, supervisory goodwill on the books of an acquired thrift would not survive a purchase accounting acquisition, and accordingly Fidelity's goodwill did not survive the acquisition by Astoria. Tr. 4355:19-4356:21, 4359:1-4360:5 (Engelke); Tr. 4009:6-4010:16 (Finn); Tr. 2526:16-19 (Wesp).

**D. Astoria Placed No Value On Fidelity's Goodwill Claim**

331. Despite knowing facts about the Suburbia acquisition, including purchase accounting, and Fidelity's pre- and post-FIRREA performance, Astoria could not value Fidelity's goodwill claim. Tr. 5300:25-5301:3, 5304:16-5305:11, 5329:4-10 (Engelke); Tr. 966:21-967:7 (Powderly); Tr. 4012:2-13 (Finn).[10] Salomon Brothers certified that the $29 per

[10] Consistent with the fact that no value was placed upon Fidelity's claim for the loss of its goodwill, several witnesses testified that goodwill lacked value in a number of ways. No cash is exchanged for supervisory goodwill. Tr. 4359:11-13 (Engelke). Goodwill is a non-earning asset. Tr. 4360:6-8, 4466:7-12 (Engelke); DX 3488 at 63:3-8 (Greco); Tr. 4258:1 ("You can't earn interest on goodwill."), 4719:23-24, 4782:13-19 (goodwill "wasn't real capital[,]" "was paper money," "not an earning asset") (Amend). Goodwill cannot be used to work out real estate problems or invest or improve real estate owned because it is a non-cash asset. Tr. 5624:5-16

share paid by Astoria for Fidelity was a fair price, despite placing zero value upon the potential goodwill lawsuit. Tr. 4590:9-17, 5297:12-18 (Engelke); Tr. 643:6-9 (Powderly);DX 2965 at WOL487 0708; DX 3083 at PAA083 1467 ($157.8 million total price for Fidelity as of January 31, 1995); DX 3491 at 86:4-6, 92:6-12 (Drewitz). At the time of the merger, Astoria placed no value on Fidelity's goodwill because it was regulatory in nature and not GAAP capital. Tr. 4008:23-4009:5 (Finn).

**E. Effect Of Fidelity Merger Upon Astoria**

332. The Fidelity acquisition resulted in accretion to Astoria's earnings, which was immediate and substantial, and significantly enhanced AFC's earnings per share and return on equity. Tr. 4015:4, 4016:2 (Finn); Tr. 5287:2-7 (Engelke). Fidelity was strategically important to Astoria because it added 18 complementary offices to Astoria's Long Island banking network and deposit base. DX 3491 at 73:16-74:1, 90:4-91:4 (Drewitz); see also Tr. 5327:8-14 (Engelke) (costs of branch maintenance taken into account in ascertaining franchise value); Tr. 1968:8-13 (Wesp) (the combination of Fidelity and Astoria "made a great branch network"). Among the branches Astoria acquired were the branches Fidelity had acquired from Suburbia. Tr. 2807:9-11 (Vigna). Acquiring Fidelity increased Astoria's market share of deposits. Tr. 5260:15-5261:7 (Engelke). Astoria also received the benefit of removing Fidelity as a

---

(Kennedy). Goodwill cannot be sold. DX 3491 at 54:13-17 (Drewitz); DX 3488 at 63:9-12 (Greco). Goodwill amortization negatively impacts an institution in the years following the decrease of loan discount accretion income. DX 3488 at 65:25-66:5 (Greco); Tr. 4784:10-21 (Amend) (goodwill a drain on Fidelity regardless of FIRREA). While tangible capital, which excludes goodwill, is an important measure of corporate value, Tr. 4360:14-4361:1 (Engelke), goodwill has no bearing on a thrift's solvency in economic terms. Tr. 5257:3-6 (Engelke); see also Tr. 4785:8-10 (Amend) ("the economics of how an institution operates doesn't change, regardless of goodwill").

competitor in the marketplace. DX 3491 at 98:7-17, 110:22-111:5 (Drewitz); see also Tr. 5258:5-5259:24 (Engelke) (eliminating competition by acquiring competitors generally benefits corporate profits).

333. Fidelity's branch network was very strong, with good office locations, good financial statements, and good management experience; it was healthy and well-capitalized at the time of the acquisition and the acquisition resulted in cost savings. Tr. 5259:21-5260:14, 5267:22-5268:1 (Engelke); PX 1228 at WON735 0073; PX 1076 at WON739 1169. The integration of back office operations and systems and all staff reductions were completed within 60 days after closing; therefore, the full projected annualized cost savings of over $7 million was recognized in Astoria's operating expenses beginning April 1, 1995. PX 1228 at WON735 0073.

334. Astoria recognized that its acquisition of Fidelity was an in-market merger and substantial operating economies were anticipated in connection with merging the two depository institutions. Astoria projected that these savings would primarily result from: (I) elimination of redundant administrative staff; (ii) consolidation of back office / data processing functions, and (iii) significant economies of scale in human resources, internal auditing and compliance, purchasing, financial management, marketing and legal services. Astoria further anticipated that secondary savings would accrue to the acquirer as a result of: (I) the elimination of redundant professional services such as external auditors, legal counsel, insurance brokerage and outside consultants, and (ii) a reduction in SAIF assessment rates, since Fidelity's deposits would be based upon Astoria's assessment rating in the future. PX 1076 at WON739 1204.

335. Astoria believed the Fidelity merger would result in more profitable utilization of Fidelity funds than would otherwise be the case given the enhanced market presence of Astoria and the economies expected to be realized as a result of the merger. PX 1076 at WON739 1176. Astoria anticipated that realizing significant economies would enable it to better serve the combined consumer base because the expected synergies would allow Astoria to be a more efficient and effective provider of financial services than merely the sum of the individual thrifts. PX 1076 at WON739 1169.

336. Astoria was able to cultivate Fidelity's deposit base with new products and marketing, among other things. Tr. 5278:14-5280:18, 5283:20-25, 5285:16-22 (Engelke); PX 1076 at WON739 1176, 1180 (32 percent of Fidelity's general and administrative expenses in cost savings), 1204; see also Tr. 5288:17-5289:1 (Engelke) (clarifying missing word in document).

337. Astoria received the benefit from the sale of $521.1 million of Fidelity's mortgage-related securities, which it used to pay down $417 million in borrowings; had Fidelity had more such securities, Astoria would have sold them as well. Tr. 5270:1-5271:5, 5293:8-21 (Engelke); DX 3080 at WON761 0786; PX 1076 at WON739 1216 (Astoria benefitted from restructuring Fidelity's balance sheet); see also Tr. 5272:17-5273:4 (lower-rated Fidelity securities too risky for Astoria), 5294:4-14 (same) (Engelke). Astoria believed that the balance sheet restructuring contemplated in connection with the merger would benefit the combined entities' portfolio yield, net interest margin and overall profitability. PX 1076 at WON739 1216.

**F. Astoria's Capital Position Following Fidelity Merger**

338. Following the acquisition of Fidelity, Astoria was always in excess of its capital requirements. DX 3270 at PAA062 0445-47 (March 31, 1995: tangible capital of $378,943,000 or 6.37 percent, $289,645,000 in excess of requirement; core capital of $378,943,000 or 6.37 percent, $200,326,000 in excess of requirement; risk-based capital of $384,393,000 or 19.23 percent, $224,446,000 in excess of requirement); DX 3083 at PAA083 1479 (December 31, 1995: tangible capital of 6.08 percent, 4.58 percent ($298 million) in excess of requirement; core capital of 6.08 percent, 3.08 percent ($200.5 million) in excess of requirement; risk-based capital of 18.72 percent, 10.72 percent ($233.2 million) in excess of requirement); DX 1845 at AA0001545 (December 31, 1999: tangible capital of 5.98 percent, $1,031,085,000 in excess of requirement; core capital of 5.98 percent, $455,902,000 in excess of requirement; risk-based capital of 15.33 percent, $694,796,000 in excess of requirement). Astoria was always well-capitalized, even after paying dividends to its parent company. Tr. 4688:15-19, 4703:3-25 (Amend); DX 244 at OAA001 0331.

## DEFENDANT'S CONTENTIONS OF LAW

## I. ASTORIA HAS FAILED TO PROVE ENTITLEMENT TO AN AWARD OF RESTITUTION

In denying the Government's motion for summary judgment respecting Astoria's restitution claim, the Court noted that "[p]laintiff contends with documentary support that the facts of this case are more compelling than in other Winstar-related cases, and that an opportunity to present this evidence should not be foreclosed." Astoria Fed. Sav. & Loan Ass'n v. United States, 72 Fed. Cl. 712, 718 (2006). Having been given the opportunity to present its best case, Astoria has demonstrated no evidence of any kind to distinguish its restitution claim from the claims raised in the cases that reject restitution in Winstar cases.

### A. Description Of Astoria's Restitution Claim

Astoria's expert, Dr. Donald Kaplan, admits that the $128.259 million in restitution he recommends is premised upon the notion that the Government, specifically FSLIC, avoided the cost of liquidating Suburbia. PDX 105; Tr. 3344:2-345:24 (Kaplan); compare JSF ¶ 40 with JSF ¶ 61. Thus, Dr. Kaplan assumes that FSLIC received an economic benefit in the amount of the liquidation cost estimate of $147.936 million, deducts selected benefits Fidelity received -- $16 million in cash assistance from FSLIC and $3.7 million in cash paid to Fidelity in 1990 for redemption of Suburbia's NWCs -- and concludes that Astoria is entitled to $128.259 million in restitution, plus $1.4 million for wounded bank damages. PDX 105. Dr. Kaplan advances this theory even though he admits that it runs counter to repeated decisions of the Federal Circuit. PX 1314A ¶ 93. For the reasons given below, the Court should reject this restitution claim.

**B. Precedent Has Rejected Restitution Claims Premised Upon Avoided Liquidation Costs**

The use of liquidation costs as a basis for a restitution claim has been repeatedly rejected by the Federal Circuit. In Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1382 (Fed. Cir. 2001), the Federal Circuit stated that "the action taken by the purchasing S&L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift. . . . What the Government received in exchange for its promise was time – time to deal with other failing S&Ls, time to see what the market would do before having to commit substantial resources to the problem. Though the value of time was more than zero, there is no proof of what in fact it was worth."

The Glendale Court further stated:

> It is important to remember that, even after Glendale's merger with Broward [the acquired thrift], the Government was not free of potential liability for the failing thrift. Had interest rates not come down, and Broward, and perhaps Glendale as well, failed, the Government's contingent liability would have matured, and the FSLIC would have had to step in at that time and assume the very losses that Glendale now claims were benefits the Government received.

Id. The Federal Circuit also noted that FSLIC had several options other than liquidation that it could have pursued. For all of these reasons, the Federal Circuit concluded that a restitution award based upon the supposed liquidation costs of the acquired thrift was merely a "speculative assessment of what might have been" and therefore vacated the trial court's award based upon that theory. Id.

While no restitution claim premised upon liquidation costs in the Winstar context has ever been sustained, numerous decisions have followed the decision in Glendale. See California

Fed. Bank, FSB v. United States, 245 F.3d 1342, 1351-52 (Fed. Cir. 2000) ("CalFed"); Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1380-81 (Fed. Cir. 2005); Glendale Fed. Bank, FSB. v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); LaSalle Talman Bank, FSB. v. United States, 317 F.3d 1363, 1366-67 (Fed. Cir. 2003); Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 298 (2005), aff'd in part, rev'd in part and remanded, 470 F.3d 1044 (Fed. Cir. 2006); Long Island Sav. Bank, FSB v. United States, 60 Fed. Cl. 80, 96 (2004), rev'd on other grounds, 476 F.3d 917 (Fed. Cir. 2007); Fifth Third Bank of Western Ohio v. United States, 55 Fed. Cl. 223, 245 (2003), appeals docketed 2006-5128, -5129 (Fed. Cir. Sept. 1, 2006); Franklin Fed. Bank v. United States, 55 Fed. Cl. 108, 120 (2003); Citizens Fed. Bank, FSB v. United States, 52 Fed. Cl. 561, 566 (2002), aff'd, 474 F.3d 1314 (Fed. Cir. 2007).

### C. No Record Evidence Renders Astoria's Restitution Claim Viable

Nothing distinguishes this case from the cases rejecting restitution claims premised upon avoided liquidation costs. Indeed, to the extent any factual distinctions exist, those distinctions show that Suburbia was less likely to be liquidated than the average thrift.

#### 1. There Was Nothing In The Record To Distinguish The Economic Or Regulatory Environment Under Which Suburbia Was Operating From That Of The Thrifts In The Other Cases

Like all of the restitution claims rejected by the Federal Circuit and this Court, Astoria's claim erroneously assumes that liquidation was FSLIC's only option had Fidelity not merged with Suburbia. In fact, liquidation was the last of eight options considered by the regulators, and there were several forms of liquidation -- including FSLIC's keeping Suburbia's franchise -- that were less costly than a payout of funds to depositors, the option upon which Astoria bases its liquidation cost estimate. Tr. 292:18-23 (Fiol); Tr. 1159:12-1165:20, 1224:6-1226:14

(Beesley); DX 3490 at 40:16-41:25; 109:16-110:7 (Kane); PX 1341 at 1235; PX 986 at AST064190; PX 112 (explained at Tr. 1512:4-7 (Vigna)); PX 370; see also Tr. 3360:5-13 (Kaplan). Liquidation was the last option because the entire thrift industry was insolvent on a mark-to-market basis at that time. Tr. 1737:10-19, 1748:21-1749:9 (Wesp); Tr. 2713:18-21 (Kaplan).

\ In the early 1980s, FSLIC could not afford to liquidate thrifts given its lack of funds and the fact that the funds it did have were tied up in long-term investments. Tr. 114:17-21, 128:5-20 (Pratt); Tr. 1151:25-1153:23; 1233:14-1234:6 (Beesley); PX 286 at 14, 16, 76; Tr. 2712:23-2713:21, 3373:4-3374:2 (Kaplan); see also United States v. Winstar Corp., 518 U.S. 839, 847 (1996) ("Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of "supervisory mergers.") (citation omitted). Dr. Kaplan acknowledged, in accord with Mr. Beesley's testimony, that after the Economy Savings payout in 1980 or 1981, no liquidations that actually cost FSLIC the entire estimated liquidation cost were undertaken ever again. Tr. 3360:5-13 (Kaplan) (no payout after 1981); Tr. 1170:16-1171:22 (Beesley).

Historically, liquidation is not what FHLBB did. Liquidation was the last alternative, as shown in PX 35, PX 112, and PX 370. Tr. 1511:22-1513:22 (Vigna). FSLIC had a lot of good, creative ways to perform merger these transactions and was not limited to certain types of assistance. Tr. 1316:19-1317:3 (Vigna).

Dr. Kaplan opines that the benefit that the Government obtained from Fidelity's acquisition of Suburbia was that it "avoid[ed] the consequence of a liquidation." Tr. 3185:20-

3186:3 (Kaplan). Dr. Kaplan states that liquidation was an "incredibly expensive last-ditch alternative . . . which everybody wanted to avoid." Tr. 3191:9-14 (Kaplan). Incredibly, although Dr. Kaplan calculates restitution based upon the liquidation cost analysis calculated by FSLIC – based upon a cash payout – he admitted that, with just a "couple of exceptions," after 1981 FSLIC stopped undertaking cash payout liquidations:

> As Mr. Beesley testified, the Economy liquidation in May of 1981 was a payout and the liquidations thereafter, to the best of my recollection, always involved a transfer of the deposit base to another institution, as opposed to a payout.

Tr. 3360:8-12 (Kaplan). Accordingly, even if liquidation were a viable alternative for FSLIC (which it was not), the type of liquidation (a cash payout) that Dr. Kaplan presumes in calculating damages is not the type of liquidation FSLIC was undertaking in 1984. Therefore, his restitution damage calculation -- based upon a cash payout avoided by the Government -- is fundamentally without any foundation.[11]

Testimony from regulators acknowledged that, had interest rates fallen, contrary to FSLIC's contemporaneous interest rate assumptions, FSLIC's liquidation and viability analyses would have been inaccurate. Tr. 247:11-248:19, 249:11-250:24 (Spaid); Tr. 315:13-24, 318:13-25 (Fiol); Tr. 1215:22-1217:10 (Beesley); see also Tr. 3347:5-24, 3351:5-25 (Kaplan) (admitting that interest rates may affect liquidation cost analyses, and that the cost would have been lower with an interest rate assumption of lower than 14.73 percent). Interest rates are notoriously difficult to project, Tr. 278:23-279:23 (Fiol), and in the year following the

---

[11] Furthermore, Dr. Kaplan acknowledged that if Fidelity's acquisition of Suburbia had not gone forward and the thrift had been liquidated, the cost of liquidation faced by FSLIC "would certainly have been different than exactly $148 million," the figure he proposes as the cost avoided by the Government. Tr. 3364:7-11 (Kaplan).

liquidation analysis in this case, short term Treasury rates – which mirror rates on short-term deposits, Tr. 317:7-23 (Fiol) – fell 300 basis points, severely altering the cost of liquidation. Tr. 250:25-251:3, 261:1-19 (Fiol); Tr. 2725:17-24, 3353:5-3354:15 (Kaplan) (interest rates fell "dramatically").

As with the restitution claims rejected in other cases, Astoria's claim ignores FSLIC's contingent liability for insuring deposits after the merger. Tr. 1217:25-1218:3 (Beesley); Tr. 1506:10-12 (Vigna); Tr. 3368:6-12 (Kaplan). It also ignores the speculative nature of the contingent liability, which never came to pass. Tr. 1220:13-1222:8, 1238:15-1240:9 (Beesley). Further, the restitution claim ignores the fact that liquidation would have lowered public confidence in the thrift system, so FSLIC wished to avoid liquidation as an overall policy matter for that reason as well. Tr. 225:1-227:15 (Spaid); Tr. 1386:18-24 (Vigna). Indeed, it also ignores the reality that, had interest rates not fallen, no thrifts would have survived, Tr. 129:6-10 (Pratt), and FSLIC would have been liable as the insurer of the thrift industry's deposits.

The approval of Suburbia's acquisition by Fidelity was, like all such approvals, merely a stop-gap measure intended to buy FSLIC time for interest rates to fall so that thrifts' asset values would no longer be exceeded by their liabilities' costs industry-wide. Tr. 115:14-116:25, 120:16-23 (Pratt); see also Tr. 85:1-4 (Pratt) (interest rates are beyond FSLIC's control). The fact that all resolutions of troubled thrifts were accompanied by cost comparisons to liquidation did not mean FSLIC was actually considering liquidation. Such comparisons were required by law. Tr. 117:15-22 (Pratt); Tr. 265:4-13 (Spaid); Tr. 307:9-308:2 (Fiol); Tr. 3362:4-5 (Kaplan). All of these facts are common to both Astoria's claim and the restitution claims that were rejected in the other cases.

Moreover, a portion of the liquidation cost reflecting the average cost savings of a typical thrift resolution cannot serve as a measure of the cost avoided by the Government in a particular thrift merger, because the cost saved, if any, has to be determined by reference to the particular, and not the average, thrift resolution. Tr. 1228:14-1229:21 (Beesley). It would be hypothetical to assume that the average cost of bids received for a thrift (e.g., Suburbia in 1982) represents the cost avoided by a merger that occurs two years later in 1984. Tr. 1237:2-14 (Beesley).

**2. To The Extent Any Facts Distinguish Suburbia From Other Troubled Thrifts, They Show FSLIC Was Less Likely To Liquidate Suburbia**

**a. The Record Does Not Support Dr. Kaplan's Assumption That FSLIC Would Have Liquidated Suburbia Had Fidelity Not Acquired It**

**(1) FSLIC Did Not Liquidate Thrifts At That Time**

Despite his calculation of avoided liquidation costs, Dr. Kaplan repeatedly agreed that FSLIC had alternatives other than liquidation that it could have utilized to resolve Suburbia. Tr. 3359:20-23 (Kaplan). Moreover, he stated that he did not know what FSLIC would have done if the Fidelity acquisition of Suburbia had not gone forward:

> I can't answer that. FSLIC would have made it a determination on how it felt best for it to proceed. They may have proceeded to liquidate. They may have done, as you suggest, and rebid it. I really don't know what decision they would have made in that instance.

Tr. 3362:24-3363:9 (Kaplan).

Dr. Kaplan acknowledged that FSLIC had the option of rebidding Suburbia:

> One alternative that FSLIC had – and we've heard some testimony about it – is it could have gone back to its now-stale files from the bidders conference in 1982 and taken several months to sort of re-prepare all of those materials and send out an announcement of another national bidders conference – we now would be some number of months into 1985 – and attempt to go through that process again. Now, that was – that's certainly, in the spirit of an option, something they might have done.

Tr. 3195:24-3196:8 (Kaplan). Dr. Kaplan recognized that in 1982, FSLIC had received bids from four other institutions to acquire Suburbia, and that in 1984, the FHLBB identified four thrifts as capable of taking over Suburbia with FSLIC assistance in an amount similar to that provided to Fidelity. Tr. 3365:5-3366:11, 3367:21-3368:2 (Kaplan); PX 169 at OAA005 2714. He further testified that "[a]nother alternative or option they might have had would be to simply, if you will, do nothing and put it into some kind of an open-door – Phoenix, I believe was the term that Mr. Beesley spoke about – simply hoping that at some point down the road there would be some other way to deal with it." Tr. 3196:19-24 (Kaplan).

Having acknowledged that FSLIC had other choices than liquidation, and that he did not know what FSLIC would have done with regard to Suburbia had Fidelity not acquired it, Dr. Kaplan agreed that his analysis of restitution based upon avoided liquidation costs simply "boil[ed] down to the notion that if [FSLIC] couldn't find another choice, they wouldn't have another choice." Tr. 3364:12-17 (Kaplan). Indeed, Dr. Kaplan admitted, "I can't tell you specifically what they would have done. No, I can't." Tr. 3364:25-3365:4 (Kaplan). Furthermore, like every single witness who testified at trial with regard to the matter, Dr. Kaplan acknowledged that "FSLIC's resources were definitely limited, and certainly we know that, in fact, FSLIC ultimately ran out of resources." Tr. 3373:16-18 (Kaplan).

**(2) Interest Rates Declined After The Suburbia Acquisition**

FSLIC's liquidation cost analysis was based upon the prevailing interest rate environment. The level of interest rates at the time the liquidation analysis was performed had a direct bearing upon the estimated liquidation costs. Tr. 3345:21-3346:7 (Kaplan). Therefore, if the liquidation analysis had been performed at another time, after interest rates had changed, the liquidation cost estimate could have been dramatically different. The liquidation cost estimate is therefore affected by the fact that interest rates declined from late 1984 until approximately mid-1987. Tr. 2726:3-6, 3353:5-3354:6 (Kaplan); PDX 6; DX 657 at AA-ROCH-000167.

**(3) Suburbia Would Not Have Been Liquidated**

All of the facts that show any differences between Suburbia's status and that of the average troubled thrift made Suburbia a less likely liquidation candidate. Suburbia had $3.3 million positive RAP capital as of March 1984. Tr. 2905:11-13 (Kaplan). Suburbia's financial problems were largely due to the interest rate mismatch of its assets and liabilities. Tr. 3362:13-17 (Kaplan). Because Suburbia was solvent on a RAP basis and suffered only from interest spread problems, it was less likely to be liquidated than the average troubled thrift.

Although the evidence reveals that, at the time of the merger, Suburbia was not insolvent on a regulatory accounting basis, Tr. 195:18-20 (Spaid) (Suburbia regulatory net worth as of August 31, 1984 was $1.8 million), Tr. 1024:11-21 (Teurfs), Dr. Kaplan emphasizes that Suburbia was insolvent on a book, or GAAP, accounting basis (subtracting the deferred loan losses, appraised equity capital ("AEC"), and NWCs that FHLBB permitted Suburbia to count towards its regulatory net worth) with a negative book net worth of $57,756,000. PDX 100; Tr.

3194:5-10, 3356:15-3357:15 (Kaplan). Dr. Kaplan claims this fact distinguishes this case from all the others in which restitution damages have been rejected. Tr. 3194:5-17 (Kaplan).

That argument fails to comprehend the nature of Suburbia's situation. Suburbia, apart from the inflated (though negative) net worth it had on a book basis, was $160.093 million insolvent on a marked-to-market basis. PDX 100. That amount reflects the liability FSLIC sought to avoid. Yet that $160.093 million amount pales in comparison to the amounts of the mark-to-market capital deficits in other cases where restitution was rejected. In Glendale, 239 F.3d at 1377, the Federal Circuit rejected a restitution claim where the thrift's liabilities exceeded its assets as of November 1981 by $734 million -- that amount is larger than all of Suburbia. In CalFed, 245 F.3d at 1345, 1351, the Federal Circuit rejected a restitution claim where the thrift's liabilities exceeded their assets in two transactions, both in 1982, by a total amount of $620 million. Restitution is no more warranted in this case because of an irrelevant negative book capital amount. Moreover, other Winstar-related cases indicate that institutions with negative book net worth were not liquidated, contrary to Dr. Kaplan's argument. See, e.g., Franklin Fed. Sav. Bank v. United States, 431 F.3d 1360, 1361 (Fed. Cir. 2005).

Other facts in the record that are relevant to the question of whether Suburbia would have been liquidated indicate that Suburbia was less likely to be liquidated than the average troubled thrift. Suburbia was repeatedly found to be a troubled institution prior to the merger with Fidelity, but FSLIC repeatedly gave Suburbia assistance in the form of NWCs and AEC to boost its regulatory net worth and allow it to buy time until interest rates declined. Tr. 1346:9-1347:20, 1349:13-24, 2753:21-2754:13, 2755:2-17, 2757:7-2758:1, 2850:7-23 (Vigna) (had Fidelity not acquired Suburbia, FSLIC could still have provided it more NWCs); DX 3187 at

WOH020 0330; DX 3159; PX 132 at OAA005 2590; see also Tr. 2875:5-21 (Kaplan) (discussing Suburbia's use of another regulatory accounting tool -- deferred loan losses).

Dr. Kaplan agreed with counsel's leading question (and subsequent pronouncement) that NWC assistance would not be available once a thrift was below a half percent capital ratio. Tr. 2898:13-2899:1 (Kaplan). This is simply incorrect, as Messrs. Albanese and Vigna testified, and as the form for requesting assistance clearly states. Tr. 2757:22-2758:1 (Vigna); Tr. 4135:4-18, 4136:3-4138:21 (Albanese).

Regulators also approached Suburbia for participation in the voluntary assisted merger program ("VAMP") in another effort to prevent liquidation. Tr. 1344:11-24 (Vigna); PX 132. Astoria's claim ignores the fact that, in the absence of Fidelity's offer, FSLIC could and would have re-bid Suburbia, choosing to approve the Fidelity offer only because, while a re-bid could still have resulted in a lower cost offer, Fidelity's voluntary proposal was on the table and was good enough to approve, and FSLIC did not want to risk losing it. Tr. 212:4-19, 229:5-17, 232:1-12, 241:2-15, 265:14-17, 272:11-22 (Spaid); Tr. 1213:19-1215:1 (Beesley); PX 112 at D3-0006246-47; see also Tr. 282:18-283:2 (Spaid) (could have been lower cost bids given that each thrift would have its own perspective on the value of Suburbia). Indeed, Mr. Lovely testified that out-of-state acquirers were interested in Suburbia. Tr. 1625:22-1626:7 (Lovely).

Not only was Suburbia not insolvent on a regulatory accounting basis. Tr. 1024:16-17; but see Tr. 1133:9-18 (Teurfs) (cannot opine as to RAP), but it suffered only from cost of money spread problems. Tr. 4732:16-4734:18 (Amend). The thrifts that remained troubled as the 1980s progressed had asset quality problems which, unlike spread problems, did not subside with lower interest rates. Tr. 1237:15-1238:14 (Beesley). Given that Suburbia had spread

problems, and not asset quality or fraud issues, FSLIC could have simply done nothing had the Fidelity offer not materialized, or prolonged Suburbia's independent existence through issuance of NWCs, hoping for interest rates to drop. Tr. 212:14-19, 214:14-215:22, 223:12-25, 235:16-236:5, 266:25-267:25 (Spaid); Tr. 1272:4-1273:23, 1278:14-25, 1298:3-24 (Vigna); Tr. 3362:13-17 (Kaplan); see also Tr. 1237:9-1238:14 (Beesley) (spread problems solved with reduction in interest rates, unlike asset quality problems). Because Suburbia's problems were spread problems, its resolution was hardly urgent for FSLIC. Tr. 162:12-163:10 (Spaid); see also Tr. 1272:4-24, 1306:4-19, 1502:17-1503:16, 1506:13-17 (Vigna) (despite deteriorating condition of Suburbia, FSLIC did not liquidate when the only problems were spread-related); Tr. 1727:5-21 (Wesp).

In addition, Suburbia had an asset size larger than the norm in the early 1980s, which meant that FSLIC was less likely to liquidate it. Tr. 1236:2-1237:1 (Beesley). Indeed, liquidations were not considered for large, $700 million institutions. Tr. 1236:13-1237:1 (Beesley); Tr. 3960:2-4 (Stearns).

FSLIC also did not liquidate thrifts which, like Suburbia, had prospects for growth. Tr. 1193:9-21 (Beesley); Tr. 1298:15-24 (Vigna); see also Tr. 1505:24-1506:3 (Vigna) (Suburbia buyer would be found given Suburbia's franchise value). Suburbia was attractive as a merger partner because it was in a good market, in terms of the demographics. "These communities were middle to high end communities . . . an institution with the appropriate capital and stronger balance sheet could probably market those areas pretty well. So, you know, it had advantages of growth for an acquirer." Tr. 1298:15-24 (Vigna).

FSLIC did not liquidate any New York thrifts from 1980 through 1989. Tr. 1503:14-16 (Vigna). Indeed, FSLIC even informed Suburbia's board that it would be expected to continue to operate even if it became insolvent on a regulatory basis. Tr. 1301:17-1302:4 (Vigna); PX 52 at AST021839. For all of these reasons, Suburbia was less likely to be liquidated than the average thrift. Indeed, Dr. Kaplan has testified that he could not say that FSLIC would have liquidated Suburbia absent the merger. Tr. 3363:2-9 (Kaplan).

The Government did not liquidate Suburbia because liquidation was its last choice. Tr. 1503:8-10 (Vigna). Mr. Vigna testified: "I thought there was some franchise value here that for the right assistance, we could find an acquirer for it." Tr. 1506:1-3 (Vigna). If the Fidelity acquisition of Suburbia had not closed, the alternative would have been to rebid it or put Suburbia into the Phoenix program. Mr. Vigna testified that liquidation was an alternative but probably wouldn't have happened because "I'm sure we could have gotten some kind of proposal less than the cost of liquidation." Tr. 1505:16-23 (Vigna). Mr. Vigna thought the merger option was the most likely to produce a result for Suburbia. Tr. 1297:18-20 (Vigna).

At trial, Dr. Carron summarized his response to Dr. Kaplan's restitution claim. See DX 6005. Dr. Carron testified that he believes that Suburbia would not have been liquidated if the acquisition by Fidelity had not been completed, "[s]o the measure of the predicted liquidation cost is not a good measure for a restitution award." Tr. 5738:3-4 (Carron). He also pointed out that "even if liquidation was contemplated, that's not the value of the institution." Tr. 5738:5-6 (Carron). He also noted that "Fidelity lacked the capacity to provide the claimed benefit . . . . Fidelity had only 22 million of book capital, and . . . had essentially zero tangible capital . . . at the time of the acquisition." Tr. 5738:8-17 (Carron). Furthermore Dr. Carron explained:

> that looking forward, one couldn't foresee a set of circumstances, rising interest rates, declining interest rates . . . . [W]hat reduced the [Government's] exposure to Suburbia was not the acquisition, but the subsequent decline in market interest rates, which made Suburbia's mortgage assets much more valuable in the market relative to its liabilities and thus restored its market value net worth. And finally, that if there were any such costs, Fidelity achieved substantial benefits from the acquisition, from the franchise value of the branches that it acquired.

Tr. 5737:23 -5739:5 (Carron); DX 6006.

**b. Fidelity Lacked The Economic Capacity To Provide A Benefit In The Amount Claimed By Astoria**

The basic premise to Dr. Kaplan's restitution claim – that Fidelity's acquisition of Suburbia saved the Government the cost of liquidation – is unfounded. Even after the acquisition of Suburbia by Fidelity, the Government remained the insurer of Suburbia's deposit base. Had Fidelity failed after it acquired Suburbia, the Government's contingent liability would have, in effect, matured. Tr. 3368:6-16 (Kaplan).

Astoria's claim also ignores Fidelity's inability to have saved Suburbia had interest rates not fallen, given its own mark-to-market insolvency. Tr. 1184:16-1185:2 (Beesley). Not only was Fidelity not being asked to, but it could not afford to cover the gap between Suburbia's liabilities and assets with a payment. Tr. 263:11-20 (Spaid); Tr. 3233:23-3234:1 (Kaplan). Fidelity certainly lacked the economic capacity to provide a benefit in the amount claimed by Astoria. As of August 31, 1984, Fidelity had only $22.1 million in book capital, PX 237 at AA0000177, and that figure was almost certainly overstated. Tr. 1737:10-19, 1748:21-1749:9 (Wesp); Tr. 2713:3-10 (Kaplan) (all thrifts insolvent on a mark-to-market basis). Fidelity could not have provided any benefit to the Government.

Moreover, any benefit to the Government would not have been foreseeable: had interest rates dropped, Suburbia would not have required liquidation, but if they rose, FSLIC would have remained liable for the losses of Suburbia, as well as those of Fidelity. Tr. 1506:4-17 (Vigna); Tr. 5752:13-25 (Carron) (Government still insured deposits of Suburbia after Fidelity acquisition). In reality, following the acquisition, interest rates fell, reducing FSLIC's exposure to any losses.

The Fidelity acquisition of Suburbia did not benefit FSLIC by relieving it of insurance exposure on Suburbia's net liabilities. FSLIC's exposure remained the same before and after the Suburbia merger. FSLIC did not consider whether Fidelity had sufficient capital to pay off Suburbia's liabilities because it was not being asked to do so. Tr. 263:11-20 (Spaid). As Dr. Carron explained, under no circumstances did Fidelity relieve FSLIC of its insurance obligations:

> [A]lthough Fidelity did step in front of the deposit insurance fund, in terms of absorbing losses, it had no capacity to absorb them and simply would have ended up passing them straight through to the deposit insurance fund. Because Fidelity in reality was probably insolvent on a tangible accounting basis and certainly insolvent on a market value basis at that time. So if Suburbia hadn't recovered through lower interest rates, Fidelity wouldn't have done well either and wouldn't have been able to ameliorate the burden on the government under those circumstances.

Tr. 5749:7-18 (Carron).

In fact, the merged Fidelity and Suburbia had the same insured deposit liability as they did when they were separate entities, Tr. 262:18-263:17 (Spaid); PX 1243 at WFZ009 0025. Changes in interest rates did not affect that fact:

> [I]f interest rates went up, both Fidelity and Suburbia would be in trouble and probably couldn't survive. If interest rates went down, both would recover and no government assistance would be required. So either Fidelity can't help the government or in the other case the government doesn't need help. So there is no circumstances under which Fidelity would actually provide that benefit. . . . The FSLIC remained responsible for Suburbia's deposits, even after they went over to Fidelity. So from that point of view, they still had exposure to Suburbia.

Tr. 5752:13-25 (Carron). Dr. Carron further elaborated:

> Assuming that Suburbia had continued as an independent institution, its situation would have improved with the decline in market interest rates. I'm not saying that that could have been predicted at the time, but from the point of view of knowing what happened to interest rates, one can confidently say that an institution with Suburbia's portfolio would have improved its condition as interest rates declined.

Tr. 5776:8-15 (Carron).

The law of this circuit is identical to Dr. Carron's analysis. "The Government's insurance fund lacked sufficient funds to liquidate even a small percentage of the thrifts that became insolvent." Glendale, 239 F.3d at 1377. The policy of the regulators was to buy time until interest rates fell. Rates in fact did fall and the problem was solved. Id. at 1377, 1382. As the Court explained, there was no scenario in which acquiring thrifts would confer a significant benefit on the Government. If rates declined, then the acquired thrifts' major problem would be solved. If rates did not decline, the entire industry would be "doomed" and the Government would be responsible for dealing with all the net liabilities. See Glendale, 239 F. 3d at 1382.

### c. Dr. Kaplan Errs By Ignoring Easily Identifiable Offsetting Benefits

Astoria's restitution claim is subject to offsets reflecting the benefits the Government bestowed upon Fidelity. Despite the ease of identifying these offsets, Dr. Kaplan's methodology ignores them entirely, rendering his restitution claim invalid.

#### (1) Dr. Kaplan's Had No Basis To Ignore Offsets

Dr. Kaplan made the unfounded claim that, if a contract is breached, "it makes no sense, as an economic matter, to be giving the breaching party an offset benefit after the contract is no longer being honored by that party." Tr. 3204:10-12 (Kaplan); see also 3210:11-13, 3375:14-3376:4, 3376:24-3377:6 (Kaplan). Accordingly, Dr. Kaplan opined that even if an offset "otherwise meets a reasonable test," it should nonetheless "terminate at the time of the breach." Tr. 3201:13-15 (Kaplan). The fact of the matter is that Dr. Kaplan's purported "economic" principle is contradicted by elementary legal theory. Contract law is not punitive, but encourages efficient allocation of resources (involving a computation of all benefits and costs to both parties), even when a breach is involved. See American Capital Corp. v. United States, 59 Fed. Cl. 563, 587 (2004), aff'd in part, rev'd in part, 472 F.3d 859 (2006) (discussing efficient breach). Indeed, on cross examination, when he was presented with an elementary example of a breach of contract, Dr. Kaplan could not explain why it is that a breaching party should not obtain the benefit from partial performance of a contract. Tr. 3377:7-24 (Kaplan).

Dr. Kaplan refused to consider the accretion income generated from the purchase accounting of the Suburbia acquisition as an offsetting benefit because, he claimed, accretion income involves "purely transitory accounting benefits." Tr. 3204:18-19 (Kaplan); see also Tr.

3371:17-20 (Kaplan). These "purely transitory accounting benefits . . . arise from the accretion of the discounts and the amortization of the goodwill, which we know that over the time period washout and net against each other over the – over the full course of the time period." Tr. 3204:18-24 (Kaplan). Thus, in Dr. Kaplan's view, the "transitory accounting benefits" of goodwill should be the basis for computing a restitution or reliance damage claim, but the "transitory accounting benefits" of accretion income should not be counted in assessing the net cost of the reliance damages. Put another way, according to Dr. Kaplan, Fidelity "keeps all of the bad along with the good," so it keeps whatever accretion income while claiming as damages the entire amount of net liabilities assumed. Tr. 3270:25-3271:15 (Kaplan). Notably, Dr. Kaplan cites no authority for this facially faulty proposition.

Nor does he refer to any authority for the related proposition that an accounting gain from the sale of discounted assets after an acquisition should not be counted as an offset unless "the magnitude of the gain exceeds the pre-acquisition book value." Tr. 3205:1-3 (Kaplan) see also Tr. 3371:21-3372:7 (no consideration of gains Fidelity booked on the sale of Suburbia's assets as offsetting benefits). Dr. Kaplan's testimony in this regard only further underscores his prior admission that he was not an accountant, has no training as a practicing accountant, and does not have a CPA degree. Tr. 2678:13-21 (Kaplan).

**(2) Dr. Kaplan Ignored Many Of Fidelity's Benefits**

Fidelity was willing to place $160 million of goodwill on its books anticipating there would be a benefit from this acquisition in the form of future earnings streams. Tr. 5039:13-5040:5 (Rochester). In fact, Fidelity received many benefits from the Suburbia acquisition. Tr. 4681:17-4683:9, 4732:1-14 (Amend). In August 1989, Fidelity sold certain securities that it

acquired from Suburbia, providing Fidelity with a pretax profit in excess of $3 million; a profit Fidelity would not have received but for its acquisition of Suburbia. Tr. 2070:14-2071:10 (Wesp); PX 493 at AST055626. In October 1991, Fidelity sold former Suburbia and Dollar loans that were securitized, creating a profit of $2.8 million, of which $2.1 million was nontaxable income; again, the profits it received were, in part, profits that it would not have received but for the acquisition of Suburbia. Tr. 2338:5-18, 2339:8-22 (Wesp); DX 3478 at PAA113 0102 ¶ 4.

Fidelity received numerous benefits as a result of the Suburbia acquisition. See DX 6006. They included the value of the Suburbia franchise; cash, including interest on the NWCs; the Suburbia NOLs; gains from asset sales; and other benefits such as economies of scale. Tr. 5778:17-5780:9 (Carron). Fidelity benefitted from declining interest rates, Tr. 4271:25-4272:9 (Amend),[12] made $11,384,560 and $2,166,911 from two separate sales of Suburbia's assets, Tr. 4273:4-8, 4274:6-11 (Amend), and earned $8.5 million in net purchase accounting income. Tr. 4273:24 (Amend). Moreover, Fidelity received $860,000 in interest income of FSLIC notes. Tr. 4275:19-22 (Amend); DX 3026 at PAA006 1376.[13] Mr. Amend testified that he was "not aware of any losses that [Fidelity] took on Suburbia assets." Tr. 4681:10-11 (Amend).

Although Dr. Kaplan acknowledged that Fidelity received $16 million from FSLIC in connection with its acquisition of Suburbia, he refused to treat any of the income generated from that assistance as an offset. Tr. 3372:8-14 (Kaplan). Nor did he take into account the

---

[12] The change in interest rates would have benefitted Suburbia had it remained independent. Tr. 4276:6-8 (Amend).

[13] DX 3026 at PAA006 1365 shows an improvement in Fidelity's operating performance.

economies of scale cost savings that Fidelity enjoyed as a result of the acquisition of Suburbia. Tr. 3372:17-3373:3 (Kaplan).

**(3) Suburbia's Franchise Was Valuable**

As a result of the Suburbia merger, Fidelity more than doubled the size of its asset and deposit bases and increased its retail offices from eight to twenty. The addition of Suburbia's high quality mortgage loan portfolio and deposit base as well as its large retail office network significantly enhanced Fidelity's revenue and earnings growth potential and, therefore, the combined institution's total franchise value. The addition of such value represented a significant economic benefit to Fidelity that continued beyond the alleged breach date and continues to benefit Astoria in the present. Tr. 5035:13-5036:5 (Rochester) (discussing DX 4000).

Clearly, in 1984, Fidelity's decision to acquire Suburbia was not based upon Suburbia's recent historical operating performance and existing capital position, but upon the enhanced revenue and earnings potential that Suburbia was expected to contribute to Fidelity. From a reasonable business standpoint, Fidelity would not have undertaken the Suburbia merger unless it recognized the value being contributed by Suburbia. Dr. Kaplan's failure to recognize any contribution of value to Fidelity from Suburbia represents a serious flaw in his models. Tr. 5035:13-5036:5 (Rochester) (discussing DX 4000).

Fidelity acquired Suburbia primarily for the purpose of enhancing its retail lending and deposit franchise. PX 986 at AST064173; DX4004. The banking marketplace on Long Island was good, with very high per capita income. Long Island had been on a growing spree, making it a fertile area for loans, mortgages and commercial lending. Tr. 3907:19-3908:12 (Caporusso).

This growth made owning a branch network on Long Island – including the Suburbia branches – very valuable. Tr. 3908:17-23 (Caporusso).

Fidelity's interest in acquiring Suburbia was consistent with the banking industry's recognition of the "franchise value" of a going concern. "Franchise value" represents the amount an acquirer is willing to pay for a financial institution in excess of its tangible book value. In other words, "franchise value" represents the premium an acquirer is willing to pay to reflect the value of the going concern, in excess of its tangible book value. Tr. 5059:7-5060:24 (Rochester) (discussing DX 4003).

According to Dr. Carron, "one of the reasons that the regulators wanted to follow a policy of assisted mergers, . . . is to enable them to keep the franchise value in place." Tr. 5746:14-17 (Carron). He explained that "franchise value is . . . in addition to the liquidation value or what's shown on the balance sheet . . . . [I]ts value was not as big a negative number as its liquidation value. So in other words, if that was the liquidation value, there was a positive franchise value number that would offset that to a greater or lesser extent. " Tr. 5747:3-12 (Carron). As Mr. Amend explained, the value of the franchise is the ongoing relationship with customers:

> [It is the] [a]bility for the bank to sell its products, generate lower-costing inflows of moneys, such as demand accounts, passbook accounts. There's higher priced products such as certificates of deposit, but you're going to be able to bring in lower-costing money and be able to cross-sell some products and generate, as they normally do, fees and charges. That's what you get from your customers. You get fees, charges and can make – eventually sell them products like loans, offer those products to them. That's your franchise, customer base.

Tr. 4650:15-24 (Amend), see also Tr. 4774:21-4775:12 (Amend).

Thrift management, analysts and investors, and even plaintiff's CEO, Mr. George Engelke, consider deposit accounts and depositor relationships as the major source of franchise value. Indeed, Mr. Engelke testified that checking accounts are a "linchpin" of banking relationships. Tr. 4552:10-17 (Engelke). Another component of franchise value is the nature of the market area serviced by a thrift. Tr. 5061:16-24 (Rochester). In fact, Astoria itself has considered deposit premiums in its comparison of thrift valuations. Tr. 5065:5-5069:15 (Rochester); DX 544 at AA-NAV-000626. Astoria's deposit premium methodology measures the market capitalization -- market price – premium over tangible equity, divided by total deposits. Tr. 5068:24-5069:1 (Rochester).

Dr. Rochester testified with respect to the value of Suburbia's deposit base, which Fidelity received in the merger. Dr. Rochester uses deposits as a basis for valuation, just as Astoria has, specifically, using a formula involving the reported prices for thrift acquisitions in excess of tangible equity, divided by core deposits. Tr. 5069:2-5070:11 (Rochester). Although other methods of valuation such as price-to-earnings (P/E) and price-to-book (P/B) exist, Fidelity did not keep separate books for Suburbia after the merger, precluding use of such measures. Deposit records were, however, kept for each branch, permitting Dr. Rochester to determine franchise value for the Suburbia business, based upon deposits. Tr. 5066:5-7, 5146:10-21 (Rochester).

Dr. Rochester undertook three valuation approaches as he sought to quantify the value of Suburbia's deposits to Fidelity -- and ultimately Astoria. In his first valuation approach, Dr. Rochester takes a market price for Fidelity established when Astoria purchased Fidelity for $167 million in 1994 – and allocates to the Suburbia franchise a 60 percent share of this

valuation, or $100.3 million, based upon the share of deposits held in the acquired Suburbia branches relative to the original Fidelity branches. Tr. 5085:19-5087:22 (Rochester); DX 4008, DX 4009. This valuation approach relies upon a price negotiated between two different parties, which is significant because it represents fair market value determined by arms-length bargaining. Tr. 5089:13-5090:9 (Rochester).

Dr. Rochester's second valuation approach utilized a deposit premium-based measure of value, similar to that used by Astoria in its 2004 Form 8-K presentation to its investors, as Astoria describes its own value (which, of course, included the Suburbia business at that time). Tr. 5087:23-5089:11 (Rochester); DX 544 at AA-NAV-000626, 000638; Tr. 4545:7-4546:3, 4551:11-4552:6 (Engelke). Pursuant to this methodology, Dr. Rochester calculated a tangible book premium for the core deposits held in the Suburbia branches, using a median value for reported premiums paid (relative to tangible book divided by core deposits), for New York thrift transactions as of 2001. Tr. 5087:1-5095:19 (Rochester); DX 4009. This valuation approach valued the Suburbia franchise in 2001 at $123 million.

Dr. Rochester performed a third valuation (actually an iteration updating the second valuation approach) using premium data reported through 2006. DX 4010. This third valuation valued the Suburbia franchise as of 2006 at $211.6 million. Tr. 5096:9-5099:14 (Rochester); DX 4009.

In short, Dr. Rochester valued Suburbia's deposit franchise three different times utilizing two different methodologies. His conclusion was that Suburbia's deposit franchise was worth between $100 million (as of 1994), and either $123 million (as of 2001) or $211 million (as of

2006). Implausibly, Dr. Kaplan, however, considers no deposit franchise value benefit resulting from Fidelity's acquisition of Suburbia.

### D. Astoria's Restitution Claim Also Fails To Meet Other Legal Requirements

Another obstacle to Astoria's restitution claim is that it must return the benefits it has received from the contract. See Restatement (Second) of Contracts § 384(1), cmt. a; accord Aktieselskabet Dampskibsselskabet Svenborg v. United States, 131 Ct. Cl. 399, 130 F. Supp. 363, 367 (1955). If those benefits to be returned have been "substantially altered in character," restitution is generally unavailable. See Restatement (Second) of Contracts § 384 (1), cmt. a, accord Aurigemma v. Arco Petroleum Prods. Co., 734 F. Supp. 1025, 1032-33 (D. Conn. 1990). Here, Astoria's restitution claim fails for both reasons.

First, Fidelity received millions of dollars in direct, identifiable benefits from acquiring Suburbia, in the form of accretion of discounts, JSF ¶ 60, DX 3026 at PAA006 1365, 1375-76; see also Tr. 676:9-23 (Powderly), gains on asset sales, DX 3026 at PAA006 1385 (sale of Suburbia's conventional and mortgage-backed securities for a profit); PX 986 at AST064173, and tax benefits. DX 3205 at PAA048 108 ($74 million in net operating loss tax deductions inherited from Suburbia). Astoria also currently retains deposits from former Suburbia branches that are extremely valuable, as Dr. Rochester demonstrated, and as Fidelity's officers recognized. Tr. 821:23-822:7 (Powderly); see also Tr. 1561:17-1562:10, 1566:13-1567:2, 1608:13-20, 1611:7-1612:9 (Lovely) (Suburbia's branch network "impressive"). These benefits combine to exceed any alleged benefit Fidelity conferred upon the Government. Thus, even if restoration to a status quo ante were possible, Astoria would owe the net benefit it and Fidelity received from the contract. Since the benefits Fidelity received exceed the costs that it claims,

there is no basis for Dr. Kaplan's proposed restitution award. Tr. 5781:1-5 (Carron). Thus, even if restoration to the status quo ante were possible, Astoria would owe the net benefit it and Fidelity received from the contract.

Second, of course, returning to the status quo ante is impossible. To quantify all of Fidelity's and Astoria's benefits from the acquisition would require the Court to unwind nearly two decades of Fidelity's and Astoria's business decisions. Dr. Kaplan testified that after the Suburbia merger with Fidelity, "the eggs had been scrambled, and there was no unscrambling of the eggs." Tr. 3192:1-18 (Kaplan); see also Tr. 3264:2-13 (Kaplan). Here, the Government conferred benefits which have been altered beyond recognition. Indeed, Astoria does not keep separate records for the assets and liabilities acquired from Fidelity, let alone from Suburbia. Tr. 5280:19-5281:5, 5311:20-23 (impossible to separate and return to Government benefits from Suburbia) (Engelke). For this reason alone, Astoria's restitution claim fails.

## II. ASTORIA'S RELIANCE CLAIM FAILS AS A MATTER OF LAW AND FACT

### A. Description Of Astoria's Reliance Damages Claim

Dr. Kaplan's reliance damage claim begins with an assumption that the $160.093 million in net liabilities assumed by Fidelity in acquiring Suburbia – an amount that became goodwill when added to Fidelity's books – represented a cost actually incurred by Fidelity. Tr. 3252:4-10 (Kaplan); PDX 106. From this assumed "cost," Dr. Kaplan deducts $16 million in direct cash assistance provided by FSLIC and $3.7 million in cash Fidelity received from the FDIC in December 1990, upon retirement of Fidelity's NWCs, leaving $140.416 million. PDX 106. To that amount, Dr. Kaplan adds the $1.432 million in wounded bank damages he calculated for a total of $141.848 million. PDX 106; Tr. 5447:20-5448:24 (Kennedy).

Dr. Kaplan believes that reliance damages do not need to be limited to cash costs that the thrift actually incurred. Tr. 3231:2-4 (Kaplan). Dr. Kaplan's calculation of reliance damages treats all of the loan discounts obtained through purchase accounting for Fidelity's acquisition of Suburbia as a cost. Tr. 3257:22-3258:4 (Kaplan). The amount of loan discounts that Fidelity recorded was dependent upon and calculated in relation to the interest rates prevailing at the time of the mark-to-market of Suburbia's loans. Tr. 3258:5-9 (Kaplan). Paying off any loans has no effect on Dr. Kaplan's calculation of reliance damages because the goodwill figure created in the purchase accounting "is not an item that gets adjusted over time." Tr. 3256:7-14 (Kaplan).

The unreliability of the goodwill figure as representing the "cost" to Fidelity is underscored by the fact that market rates started declining significantly soon after the mark-to-market of Suburbia's loans in the summer of 1984, and they continued declining until April 1987. Tr. 3261:14-22 (Kaplan); DX 657 at AA-ROCH-000167.[14] Dr. Kaplan admitted that this decline would have actually increased the market value of the loans Fidelity acquired from Suburbia.[15] Nonetheless, because the increase in value of the loans would not have changed the amount of goodwill recorded on Fidelity's books, he opined that this increase in market value of the Suburbia loans would have no effect on his calculation of reliance damages. Tr. 3261:23-3262:13 (Kaplan).

---

[14] See also Def. Cont. Fact. at ¶¶ 96-104, 114-16 (interest rates declined contrary to assumption of "an increasing interest rate scenario" upon which FSLIC's liquidation analysis and decision not to seek rebidding were based).

[15] Similarly, Dr. Kaplan acknowledged that, because Suburbia had a negative gap, its net interest income would have increased because of the decline in interest rates. Tr. 3273:6-3274-8 (Kaplan); PX 232 at WOL315 0208.

Astoria has provided no evidence sufficient to distinguish its reliance claim from those of the numerous Winstar plaintiffs whose net liabilities assumed reliance claims have been rejected. Accordingly, pursuant to binding precedent of the Federal Circuit, Astoria's claim must be denied. Moreover, even if its reliance claim is not barred by binding precedent, the reliance claim presented by Dr. Kaplan is unfounded in fact and law because he ignores required offsets. Thus, for all of these reasons, Astoria's reliance claim should be rejected by this Court.

### B. Precedent Has Rejected Reliance Claims Premised Upon Net Liabilities Assumed

During cross examination, Dr. Kaplan admitted that it is his understanding that a reliance damage claim based upon net liabilities assumed by the acquiring thrift, such as presented in his damage model, is not a valid legal theory of damages pursuant to decisions of the Federal Circuit. Tr. 3250:17-3251:7 (Kaplan). It follows that plaintiff's claim is barred by binding precedent.

Reliance damages claims premised upon the net liabilities assumed by an acquiring thrift have been repeatedly rejected by the Federal Circuit. The Federal Circuit has foreclosed claimed reliance damages premised upon net liabilities assumed because the assumption of net liabilities represented only a potential cost, represented by a paper calculation, and not an actual expenditure. See Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1371 (Fed. Cir. 2005); Glendale, 378 F.3d at 1313; CalFed, 245 F.3d at 1351; Glendale, 239 F.3d at 1382-84.

As stated by the Federal Circuit in LaSalle, 317 F.3d at 1376-77, which addressed a net liabilities assumed restitution claim, "[a]lthough the assumed liabilities are indeed an accounting cost, . . . they are not a usable measure of either cost to the thrift or benefit to the

government, and thus not an appropriate threshold for restitution damages. . . . [T]he accounting rearrangement whereby net liabilities are designated a paper asset does not create a 'cost' subject to restitution for full cash value, reduced only by real cash infusions and real cash profits." Id. at 1377. The same prohibition bars reliance as well as restitution claims premised upon net liabilities assumed because, in this context, prohibited restitution claims premised upon net liabilities assumed can be seen as reliance claims: "When restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages, wherein the non-breaching party is restored to its pre-contract position by returning as damages the costs incurred in reliance on the contract." Id. at 1376; see also Tr. 3341 (Kaplan) (liquidation cost and net liabilities assumed just a matter of "flip[ping] the coin"). Based upon Federal Circuit precedent, this Court has repeatedly dismissed both restitution and reliance claims premised upon the idea that net liabilities assumed represent a cost. See Standard Fed. Bank v. United States, 62 Fed. Cl. 265, 295-99 (2004); Long Island, 60 Fed. Cl. at 96; Granite Mgmt. Corp. v. United States, 58 Fed. Cl. 766, 776 (2003); S. Nat'l Corp. v. United States, 57 Fed. Cl. 294, 300 (2003); Fifth Third, 55 Fed. Cl. at 245-46; Franklin, 55 Fed. Cl. at 120-21; Glendale Fed. Bank, FSB v. United States, 54 Fed. Cl. 8, 13 (2002).

Any argument that the net liabilities did represent costs actually paid falls flat, as other plaintiffs failed when advancing that same argument. As stated by this Court in Granite:

> It is inappropriate, however, to argue that the liabilities were paid as they came due and yet include the entire amount of net liabilities assumed on the date of acquisitions in the cost of performance calculation. . . . While it is possible that plaintiff may have paid off some of the liabilities, it is impossible to

> discern what portion was actually paid out when the entire amount of net liabilities is included as a cost.

Granite, 58 Fed. Cl. at 775-76. Accordingly, because Dr. Kaplan has not identified any actual "cost" as the basis for Astoria's reliance claim in this case, Astoria's claim fails. See also Standard Fed., 62 Fed. Cl. at 298 (denying same claim brought by same expert).

Finally, the Federal Circuit has ruled that, even if the net liabilities assumed did constitute a cost to the acquirer, that cost was incurred prior to FIRREA, and accordingly was unrelated to the breach, making awarding such an amount an impermissible windfall. See Granite, 416 F.3d at 1380.[16]

Moreover, any claimed reliance damages must be offset by any benefits the plaintiff received from the contract. See 3 Daniel B. Dobbs, Law of Remedies § 12.3(1), at 51-52 (2d ed. 1993); Carley Capital Group v. City of Newport News, 709 F. Supp. 1387, 1399 (E.D. Va. 1989); Charles T. McCormick, Damages § 142, at 584 (1935). Reliance damages are subject to the ordinary limitations upon contract remedies, including causation, certainty, and foreseeability. See Granite, 58 Fed. Cl. at 774. In order to be entitled "to reliance damages, a plaintiff must prove that both the magnitude and type of damages were foreseeable" at the time the contract was made. Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (emphasis added). Accordingly, reliance is also barred because Astoria cannot show that Fidelity made net out-of-pocket expenditures that were caused by the phase-out of goodwill, were reasonably certain, and were foreseeable at the time of the Suburbia acquisition.

---

[16] Since windfalls are not permitted as restitution either, this rationale bars a restitution award for net liabilities assumed as well. See Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1315 (Fed. Cir. 2004).

## C. The Record Evidence Does Not Support Astoria's Claim That The Net Liabilities Assumed Represented A Cost To Fidelity

### 1. Same General Factual Scenario Applied To Suburbia Acquisition As The Other Cases Rejecting Identical Reliance Claims

Fidelity did not actually pay Suburbia's excess liabilities of $160 million at the time of the acquisition, nor did it have the capacity to do so. Tr. 3233:19-3234:1 (Kaplan). Indeed, even after the acquisition, Fidelity lacked the capacity to pay off in cash the net liabilities assumed.[17] For example, for the quarters ended December 1984 and March 1985, Fidelity's cash earnings were actually negative $371,000 and $882,000 respectively. Tr. 3280:18-21 (Kaplan); PX 1314A at Ex. 20. For the quarter ended June 1985, Fidelity's cash earnings were only $333,000. Tr. 3282; PX 335 at PAA006 1221. In fact, for the 12-month period ended June 30, 1985, Fidelity suffered a net loss of $269,000, net of adjustments for purchase accounting. Tr. 3284:12-18 (Kaplan); PX 335 at PAA006 1214. Fidelity's lack of profitability during this period was not caused by Suburbia's assets, as is demonstrated by the regulators' note of four factors that adversely affected Fidelity's profitability, none of which were caused by Fidelity's

[17] Further, FSLIC did not request, let alone receive as consideration, a promise that Fidelity would pay off Suburbia's FSLIC's liquidation cost estimate, which was based in part upon a mark-to-market estimate of the liabilities to be paid versus receivership recovery. Fidelity's merger with Suburbia did not benefit FSLIC by relieving it of insurance exposure on Suburbia's net liabilities -- because the amount of deposits insured, and thus FSLIC potential liability was not eliminated or reduced as a consequence of the merger. See Tr. 5752:13-25 (Carron). In assessing the merger, FSLIC prepared a pro forma balance sheet for the combined Fidelity and Suburbia, showing that the two thrifts combined would have the same insured deposit liability merged as they did apart. PX 1243 at 0025; Tr. 262-63 (Spaid). Whether Fidelity had sufficient capital to pay the net liabilities was accordingly not a consideration of the FSLIC, because Fidelity was not being asked to pay the liabilities. Tr. 263:11-17 (Spaid).

acquisition of Suburbia. Tr. 3284:19-3285:14 (Kaplan). Instead, these four factors were all related to Fidelity's assets. Tr. 3285:6-14 (Kaplan).

In the following 12-month period (i.e., through June 1986), Fidelity's cash earnings per quarter dramatically improved, going from $464,000 per quarter prior to its acquisition of Suburbia, to $2.8 million a quarter. Tr. 3287:15-3288:4 (Kaplan); DX 3026 at PAA006 1365. Dr. Kaplan's own analysis shows Fidelity's cash earnings improving every fiscal year between March 1985 and 1988. Tr. 3304:1-25 (Kaplan); PX 1314A at Ex. 21. These facts suggest that Suburbia's acquisition by Fidelity did not hurt Fidelity's earnings, as Dr. Kaplan suggests without foundation (Tr. 3292:1-6 (Kaplan)), but rather helped Fidelity's performance.

As further evidence that Fidelity did not "pay off" the net liabilities of Suburbia, Dr. Kaplan's own report shows a loss of $27.2 million in loan losses between fiscal year 1986 and fiscal year 1990 for Fidelity. Tr. 3294:24-3295:11 (Kaplan); PX 1314A at Ex. 21. Given Fidelity's pre-acquisition quarterly earnings of $464,000 per quarter, Fidelity's earnings were clearly not sufficient to cover its own loan losses, much less cover any cash costs associated with the Suburbia merger. Tr. 3296:16-3297:8 (Kaplan). Furthermore, given Fidelity's increase in general and administrative expenses ("G&A") of about $7.6 million in annual costs between 1986 and 1990, Fidelity was all the more unable to actually "pay off" Suburbia's net liabilities, as Dr. Kaplan asserts it did. Tr. 3298:17-25 (Kaplan); PX 1314A at Ex. 21.[18]

---

[18] Nor can Fidelity's losses in 1989 and beyond be attributed to Suburbia. Dr. Kaplan did not know why Fidelity's net interest income declined between fiscal 1988 and 1989. Tr. 3316:10-22, Tr. 3319:2-13, 3319:25-3320:9 (Kaplan); PX 1314A at Ex. 21. Similarly, he did not know why Fidelity had increased loan losses and less net income between 1989 and 1990. Tr. 3322:18-3324:3 (Kaplan), nor what caused Fidelity's G&A expenses to increase between 1989 and 1990. Tr. 3324:12-19 (Kaplan); PX 1314A at Ex. 21. Indeed, Dr. Kaplan could offer no explanation for the decline in Fidelity's cash earnings after 1988. Tr. 3326:16-19 (Kaplan).

The fact that Fidelity did not “pay off” Suburbia’s net liabilities existent at the time of the acquisition can be demonstrated in another manner. Suburbia’s net liabilities exceeded their market value by $160 million at the time of the Fidelity acquisition. Tr. 3328:9-12 (Kaplan). When combined with Fidelity’s own net liabilities, which at that time were also negative, the net liabilities of the combined institution immediately after the merger was actually even greater than $160 million. Tr. 3329:3-12 (Kaplan). Nonetheless, Dr. Kaplan admitted that Fidelity was, on a mark-to-market basis, insolvent by only $13.3 million as of May 30, 1990. Tr. 3327:11-3328:8 (Kaplan). Accordingly, the excess liabilities that Fidelity assumed when it acquired Suburbia had pretty much been eliminated as of May 1990. We have already demonstrated that, given Fidelity’s modest cash earnings after the acquisition, these liabilities were not eliminated with actual cash earnings generated after the merger. Indeed, Dr. Kaplan admits this act: “I have not suggested that [Fidelity’s] earnings paid down Suburbia’s original liabilities as of that date [May 1990].” Tr. 3330:17-19 (Kaplan). Accordingly, Fidelity did not “pay off” Suburbia’s liabilities.

Nor can the amortization of goodwill be used to posit the “actual payment” of the net liabilities assumed. The amortization of goodwill is a noncash expense, so there is no direct relationship between the amortization of goodwill and the actual cash payment of liabilities. Tr. 3234:11-17 (Kaplan). Dr. Kaplan can point to no evidence of cash payments to Suburbia’s depositors who may have withdrawn their deposits at some point in time after the Fidelity acquisition. Tr. 3235:20-3236:2 (Kaplan). Nor can Dr. Kaplan identify any cash flow used to pay off Suburbia’s excess liabilities. Tr. 3243:23-3244:1 (Kaplan). Indeed, he did not trace any cash flow generated from the Suburbia assets once held by Fidelity, or any other cash flow into

or out of Fidelity as a result of the Suburbia acquisition. Tr. 3264:8-13 (Kaplan). Further, Fidelity's accountant, Mr. Teurfs, acknowledged that a calculation of actual costs paid – Suburbia's liabilities paid when they came due versus the value of the proceeds from Suburbia's assets – is impossible. Tr. 1105:14-20 (Teurfs).

That Dr. Kaplan failed to identify any actual payment by Fidelity for the net liabilities assumed in the Suburbia merger follows naturally from the reality that goodwill is merely a paper accounting entry. Mr. Kennedy, who provided expert testimony with respect to plaintiff's reliance claim, observed that goodwill is an accounting entry unrelated to true costs. Tr. 5447:20-5448:24, 5449:13-5451:16 (Kennedy). Mr. Kennedy noted that goodwill is not connected to true, out-of-pocket cost, and Fidelity did not pay out-of-pocket for Suburbia or its goodwill. Tr. 5452:25-5453:8 (Kennedy). He further testified that Dr. Kaplan's opinion that Fidelity paid off the net liabilities assumed by Fidelity by amortizing the goodwill is inconsistent with the fact that goodwill amortization is a noncash expense; and there is no relationship between the amortization of goodwill and the repayment of a liability. Tr. 5454:1-4, 15-22 (Kennedy). More specifically, Mr. Kennedy explained that whereas cash is needed to pay off liabilities, goodwill amortization is a noncash expense that cannot be used to repay a liability:

> [A] [g]oodwill amortization is an accounting entry that hits the income statement. It does not adjust any liability account at all. And for a liability to be reduced, you're paying it with cash. This is a noncash item. It's amortized, as I mentioned before, over 15 years, in this case 30 years, for capital purposes. And it's simply a paper cost. There is no out-of-pocket cost associated with the amortization.

> Q What do financial institutions such as Fidelity use to repay a liability?
>
> A Typically cash.
>
> Q Where does -- where would Fidelity get the cash to repay liabilities?
>
> A Well, as the liabilities, whether they were Fidelity's or Suburbia's, if they were Suburbia's, they might have gotten it from Suburbia loans being paid off or their own loans being paid off to pay off their own liabilities, or new deposits. As depositors come in and withdraw funds to use those funds, other depositors are depositing funds. And you use both deposits, earnings off of your assets and then cash collections. And in this case the recovery of the loan discounts of 105 million could have been used to pay off liabilities.
>
> Q Can goodwill be used to repay any liability?
>
> A No, it's a noncash asset, and the amortization of it is a noncash event.

Tr. 5454:23-5456:2 (Kennedy).

Further reflecting the disconnect between goodwill and liabilities - Fidelity later restated (wrote-off) goodwill for reasons unrelated to FIRREA, but did not restate liabilities by the same amount. Tr. 5456:10-5457:1 (Kennedy).

As witness testimony repeatedly confirmed, the dollar amount of net liabilities assumed at the time of the merger represented only a paper calculation, not an actual payment. Fidelity's accountant admitted that the dollar amount of net liabilities assumed at the time of the merger was not an actual payment. Tr. 1113:4-15 (Teurfs) (no cash payment in Suburbia transaction). See also Tr. 1566:13-1567:2, 1623:9-14 (Lovely) (goodwill is "phantom money"); Tr. 2053:12-

2054:3 (Wesp) (goodwill insensitive to interest rates, has no impact on net income or asset value); Tr. 3234:2-17 (Kaplan).

The calculation of actual costs paid – Suburbia's liabilities paid when they came due versus the value of the proceeds from Suburbia's assets – is admittedly impossible, Tr. 1105:4-20 (Teurfs), and Dr. Kaplan did not premise his calculated reliance cost upon the liabilities having been paid. Tr. 3233:19-3234:1, 3329:24-3330:20 (Kaplan); see also Tr. 3235:10-3238:1, 3243:23-3244:1 (Kaplan) (reliance model contains no calculation of deposits being paid). Moreover, as Suburbia was acquired for fair market value, no evidence exists to suggest that Fidelity paid any cost when it voluntarily acquired Suburbia.

To the extent that Astoria argues that the goodwill expense after the cross-over point leading to net negative purchase accounting income reflected a payment by Fidelity, 3779:24-3780:23 (Kaplan), that "payment" was merely a paper offset to income that did not reflect any economic reality, and occurred because of an accounting change requested by Fidelity in conjunction with the Suburbia acquisition. Compare PX 185 with PX 303; Tr. 1392:3-17 (Vigna); Tr. 2909:2-22 (Kaplan); see also Tr. 1406:3-20 (Vigna) (goodwill expense not a "drain"); Tr. 3234:11-17 (Kaplan) (goodwill amortization bore no relation to liabilities actually paid). Accordingly, nothing presented by the plaintiffs permits the reliance claim to survive.

Another problem with Dr. Kaplan's reliance damage calculation is that it is based upon the amount of goodwill resulting from a mark-to-market valuation as of the date of acquisition. Tr. 5451:17-5452:8 (Kennedy). That value would differ after the acquisition, due to the declining interest rate environment. Tr. 5452:9-24 (Kennedy). Fidelity's accountant acknowledged that the market value of Fidelity's assets and liabilities changed over time as a

result of interest rate changes and mortgage prepayment speeds. Tr. 1104:3-1106:15 (Teurfs); accord Tr. 5305:20 - 5306:16 (Engelke). It is undisputed that Suburbia's liabilities out-valued its assets at the time of the merger due to high interest rates. When interest rates dramatically declined following the merger, the values of the assets grew and would have been capable of covering the lessened costs of the liabilities, preventing Fidelity from ever needing to incur any cost to pay them. See Tr. 1103:23-1104:22, 1105:4-1106:17 (Teurfs) (asset and liability values change over time with interest rates and mortgage prepayment rates); Tr. 1220:13-1222:8 (Beesley); Tr. 1906:4-13 (Wesp); Tr. 3273:3-11 (Kaplan); DX 3490 at 16:11-17:17, 24:17-25:13, 48:12-49:7, 49:23-50:12, 52:21-54:4, 59:6-18, 82:6-16 (Kane); Tr. 263:11-20 (Spaid) (Fidelity not expected to pay the gap between Suburbia's liabilities and assets). As Mr. Beesley testified, it is not clear how an insolvent acquiring thrift incurred a cost from net liabilities assumed that it could not afford to pay, when interest rates in fact came down over time. Tr. 1220:13 -1222:8 (Beesley).

Dr. Carron also disagrees with Dr. Kaplan's measure of reliance damages, noting that Fidelity did not have to pay off the former Suburbia creditors as the net liabilities came due. "[B]y that time, there were no net liabilities, and I think that it's important to distinguish between liabilities which continued, in other words those were the deposits and the borrowings, and net liabilities, which is the difference between liabilities and assets, which on both an accounting and a market value basis disappeared. So no, it was never necessary to pay the net liabilities." Tr. 5782:7-16 (Carron). There should not be any reliance damages in this case "for either of two reasons, that there was no initial cost, or to the extent that there was the cost that

Dr. Kaplan identifies, it was less than the benefits received." Tr. 5783:4-11 (Carron), discussing DX 6001.

Finally, Dr. Kaplan effectively admitted that the concept behind Astoria's reliance claim was no different from that in the reliance claims in every other case and was unrelated to the specific facts of the thrift involved. Tr. 3256:9-11 (Kaplan) ("[Goodwill] is not an item that gets adjusted over time because of any behavior with regard to the loans that were on the books that were in the mark-to-market.").

In sum, the evidence fails to establish that plaintiff's net liabilities assumed reliance claim actually involved any net cost to Fidelity. In this respect, Fidelity's reliance claim is not distinguishable from identical claims rejected in other cases. See Westfed, 407 F.3d at 1371; Glendale, 378 F.3d at 1313; CalFed, 245 F.3d at 1351; Glendale, 239 F.3d at 1382-84.

### 2. The Facts Demonstrate That Dr. Kaplan Ignores Significant Benefits That Constitute An Offset To His Claimed Reliance Damages

As demonstrated in Section I above, Fidelity's restitution claim failed to credit the offsetting benefits it obtained from the Suburbia acquisition. Similarly, Dr. Kaplan's characterization of the assumption of goodwill as a "cost" constituting reliance damage fails to credit these benefits as an offset to the alleged reliance "cost" of the non-cash goodwill amortization.

#### a. Dr. Kaplan Errs By Ignoring Substantial Direct Benefits Attributable To Suburbia Before The Breach

As Fidelity itself has represented, Suburbia provided a number of benefits to Fidelity. See, e.g., DX 3148 at 102; PX 986 at AST064173. Fact and expert witnesses confirmed the existence of substantial benefits accruing to Fidelity as a result of the merger. As set forth in

Defendant's Contentions of Fact, section IV, and Contentions of Law, Section II, discussing plaintiff's restitution claim, these benefits were substantial and immediate.

First, as Fidelity represented in its Offering Circular, it acquired Suburbia primarily for the purpose of enhancing its retail lending and deposit franchise. PX 986 at 4 (AST064173); DX 4004. A deposit franchise is a very valuable resource because consumer retail deposits are a relatively stable, reliable and in the scheme of things low-cost sources of funds. Tr. 3333:5-10 (Kaplan). Indeed, a deposit franchise is valuable because it is the raw material or fuel that a bank utilizes to move forward. Tr. 3333:11-18 (Kaplan). Suburbia's branch deposits were not different and, in fact, were valuable to Fidelity. Tr. 3334:15-3335:9 (Kaplan). Further, Dr. Kaplan admitted that one could quantify the value of Suburbia's deposit franchise. Tr. 3338:8-11 (Kaplan).

As Dr. Rochester observed, as a result of the Suburbia merger, Fidelity more than doubled the size of its asset and deposit bases and increased its retail offices from eight to twenty. Tr. 5041:23-5043:16 (Rochester); DX 4001; DX 3148 at AST122595; accord Tr. 3337:12-14, Tr. 3338:3-7 (Kaplan) (Fidelity gained $600 million in new deposits and 12 new branches).

Dr. Rochester concluded that the addition of Suburbia's high quality mortgage loan portfolio[19] and deposit base as well as its extensive retail office network significantly enhanced Fidelity's revenue and earnings growth potential and, therefore, the combined institution's total

---

[19] Suburbia brought to the merger a conservative mortgage lending posture, as its nonperforming assets were only 0.7 percent of total assets, and under 1 percent indicates that "you're doing things right." Tr. 5072:12 (Rochester). In contrast, Fidelity at the same time had 2.3 percent nonperforming assets. Tr. 5072:6-15 (Rochester); DX 4004 (citing June 30, 1984 TFRs for Suburbia, PX180, and Fidelity, DX 3219).

franchise value. Clearly, in 1984, Fidelity's decision to acquire Suburbia was not based upon Suburbia's recent historical operating performance and existing capital position, but rather upon the enhanced revenue and earnings potential that Suburbia was expected to contribute to the Fidelity. From a reasonable business standpoint, Fidelity would not have undertaken the Suburbia merger unless it recognized the value being contributed by Suburbia. Dr. Kaplan's failure to recognize any contribution of value to Fidelity from Suburbia represents a serious flaw in his reliance damages models. Tr. 5035:17-5036:17; DX 4000 (Rochester).

Suburbia also permitted Fidelity to enjoy greater economies of scale, providing savings of $1 million per year, while expanding Fidelity's footprint in new markets. Tr. 3336:23-3337:3 (Kaplan); PX 1245 at PAA047 0484. Fidelity's proposal to regulators thus showed that there would not be net cost outlays to manage the combined Suburbia/Fidelity -- just the opposite, cost savings of over $1 million annualized were projected to operate the combined thrifts. Tr. 5110:3-9 (Rochester); DX 4004. Indeed, Fidelity reported to examiners that reductions in operating expenses were achieved through consolidation and elimination of duplicative departments. PX 335 at AST002383.

Further, Dr. Kaplan's reliance damage claim fails to credit as an offset to the alleged "cost" of assuming net liabilities the actual cash that Fidelity realized from Suburbia. As Mr. Kennedy testified, Fidelity's cash collections from Suburbia's loan discounts should be an offsetting benefit. Tr. 5457:11-17 (Kennedy); DX 5018. Loan discounts from the mark-to-market of Suburbia's assets equate to a dollar-for-dollar increase in goodwill, but Fidelity recovers the discount when loans are repaid. Tr. 5457:18-5458:21 (Kennedy). The Suburbia acquisition involved $105.5 million in loan discounts. Tr. 5459:18-21 (Kennedy). As Mr.

Kennedy explained, Dr. Kaplan's testimony that it is inappropriate to credit as an offset loan discounts relied upon a double-counting of goodwill -- first as the starting point for his claimed "cost" damages, and second, as an offset to realized recovery of the loan discount. Tr. 5460:11-5461:10, 5465:4-8 (Kennedy). Goodwill is created in large part by loan discounts, so it is erroneous to treat it as a "cost" but to ignore the discount recovery offsetting that cost. Tr. 5465:18-5466:13, 5467:6-22 (Kennedy). Contrary to Dr. Kaplan, Mr. Kennedy explained that the honoring of deposit withdrawal requests is not relevant to goodwill as an alleged net cost, because, among other things, the thrift could use the recovery of cash on the repayment of discounted loans to fund the request. Tr. 5464:3-5465:1 (Kennedy).

Even assuming that goodwill is a cost, Dr. Kaplan also failed to credit as offsets cash benefits of various kinds realized by Fidelity. These benefits, including gains on loan sales, mortgage loan discounts, gains on securities sales, income from NWCs, and NOLs, totaled $85.28 million as of December 1989. Tr. 5467:23-5468:24 (Kennedy); DX 5019; DX 5020; DX 5021. These benefits grew to $98.7 million as of December 1994, and projected through the December 2014, these benefits will total $102.13 million. Tr. 5467:23-5468:24, Tr. 5469:17-5471:13, Tr. 5471:21-5472:8 (Kennedy); DX 5019; DX 5020; DX 5021.

Viewed individually, one benefit to Fidelity from the Suburbia acquisition that Dr. Kaplan failed to credit is the $2.17 million of cash gains on sales of securities acquired from Suburbia. Tr. 5472:19-23 (Kennedy).

Dr. Kaplan also ignores $1.25 million of income from Suburbia's NWCs that should have been credited as an offset. Although Dr. Kaplan credited a $3.677 million 1990 cash

payment on Suburbia's NWCs (PDX 106), he fails to credit this additional $1.25 million of income from Suburbia's NWCs. Tr. 5472:24-5473:12 (Kennedy); DX 5019.

Further, Dr. Kaplan also failed to credit Fidelity with the benefit of additional cash that it had as a result of savings from taxes avoided through use of Suburbia's NOLs. Tr. 5473:13-5474:7 (Kennedy); DX 5019, DX 5022 ($10.09 million through 1989, $18.5 million through 1994); Tr. 5477:20-5478:10 (Kennedy) (clarifies difference in value based on end of fiscal year in March).

Additional cash benefits to Fidelity from the Suburbia acquisition that Dr. Kaplan failed to credit include the anticipated cost savings from economies of scale of approximately $1 million annually, and income on the investment of the $16 million cash infusion from FSLIC in Suburbia acquisition. Tr. 5474:20-5476:7 (Kennedy).

Further, Dr. Kaplan's attempt to present his goodwill figure as broken out between loan discounts versus "negative net worth" in PDX 100 should be rejected, because mark-to-market accounting for goodwill does not contain such a figure. Suburbia's former capital account -- the negative net worth at time of acquisition -- is "zeroed-out" and not relevant to the calculation of goodwill. Tr. 5478:12-5479:14 (Kennedy). The goodwill would be amortized the same regardless of Dr. Kaplan's presentation. Tr. 5479:15-19 (Kennedy). Accordingly, even assuming that the pre-merger $57.8M negative net worth is a cost, Fidelity did not incur any net reliance damages because of the various offsetting benefits improperly ignored by Dr. Kaplan. Tr. 5481:6-5485:6 (Kennedy).

Finally, as Dr. Kennedy noted, for Dr. Kaplan's conclusion that Fidelity received no offsetting benefits to be valid, the alleged cash losses of Suburbia would have had to exceed the

$85.3 million in direct cash benefits Fidelity received as of December 1989. Such a conclusion is implausible because it would imply that Suburbia generated an average of $16.2 million in cash losses to Fidelity per year. Losses from Suburbia's assets were much lower than that and were mostly due to interest rate problems, which improved with the dramatic decline in interest rates following Fidelity's acquisition of Suburbia. Tr. 5485:7-5487:18 (Kennedy) DX 5018.

**b. Dr. Kaplan Improperly Ignores Economic Benefits That Fidelity And Astoria Received After The Breach**

As demonstrated above, in addition to being foreclosed by precedent and conceptually flawed, Dr. Kaplan's damage claim failed to credit several offsetting benefits that should have been offset against the alleged goodwill "cost" that he claims Fidelity incurred in acquiring Suburbia. Certain of these benefits attributable to Suburbia would continue to accrue after the breach and through the December 2014 period of Dr. Kaplan's reliance damage claim.

These benefits that continued after December 1989, but that Dr. Kaplan failed to credit as offsets, include in part or in whole:

i. Savings from taxes avoided through use of Suburbia's NOLs. Tr. 5473:13-5474:7 (Kennedy); DX 5019; DX 5022 ($10.09M through 1989, $18.5M through 1994); see also Tr. 885:15-886:5 (Powderly) (testifying that Fidelity received of tens of millions of dollars NOL tax deductions from Suburbia); PX 787 at PAA006; Tr. 1110:3-24 (Teurfs). Moreover, the use of NOLs reduced the outstanding balance of Fidelity's goodwill. Tr. 1114:7-17, 1135:3-11 (Teurfs); see also Tr. 2991:10-2992:3 (Kaplan) (NOL exercise reduces goodwill balance).

ii. Cash derived from the sale of discounted Suburbia assets. Tr. 1111:21-25 (Teurfs) ($128 million in Suburbia mortgages sold by Suburbia); Tr. 1728:23-1729:14 (Wesp) ($100 million in cash from sale of Suburbia assets); DX 3478 at AST0129893 ($2.8 million profit in sale of Suburbia assets in 1991); Tr. 676:9-23 (Powderly); DX 3026 at PAA006 1385 (sale of Suburbia's conventional and mortgage-backed securities for a profit); PX 986 at AST064173.

iii. Income Fidelity enjoyed as the result of discount accretion. Tr. 1030:2-17 (Teurfs) (Fidelity "appreciated" purchase accounting income benefit); Tr. 2735:23-2737:5 (Kaplan); see also Tr. 1046:25-1047:19, 1107:8-24, 1109:5-1110:2 (Teurfs). In all, Fidelity obtained $105.47 million of loan discounts with the Suburbia acquisition. Tr. 5471:21-5472:8 (Kennedy); DX 5021 (summarizes mortgage loan discount total, and amounts that would have been taken into income: $51.8 million as of 1989, $56.8 million as of 1994, $60.2M as of 2014).

iv. Additional miscellaneous cash benefits including the anticipated cost savings from economies of scale of approximately $1 million annually, and income on the investment of the $16 million cash infusion from FSLIC in Suburbia acquisition. Tr. 5474:20-5476:7 (Kennedy); DX 3148 at PAA090 0102; Tr. 1516:20-24 (Vigna); Tr. 1632:8-1633:9 (Lovely).

v. The benefit to Fidelity and then Astoria from retaining Suburbia's valuable franchise. Astoria enjoyed the benefit of profits from and the

value of the Fidelity branches. Tr. 4500:14-19; 5281:22-5282:8 (Engelke); Tr. 1517:10-24 (Vigna); Tr. 3263:5-3264:13, 3326:4-12 (Kaplan) (no attempt to calculate benefit from Suburbia franchise); PX 986 at AST064190, JSF ¶ 58. Astoria also currently retains deposits from former Suburbia branches that have "significant value." Tr. 821:23-822:7 (Powderly); DX 78 at PAA052 2754. Dr. Kaplan omitted this offset despite admitting that calculating Suburbia's franchise value was possible, and that the Suburbia franchise had value to Fidelity. Tr. 3334:6-19, 3338:8-15 (Kaplan).

Dr. Kaplan's failure to credit these offsets renders unreliable his claimed reliance "costs" model, even if it is assumed, contrary to fact and Federal Circuit precedent, that net liabilities assumed comprised a cost.

As discussed above, Dr. Rochester testified that Suburbia brought a significant economic benefit to Fidelity that continued beyond the alleged breach date and continues to benefit Astoria in the present. Tr. 5035-36; DX 4000.[20]

---

[20] Moreover, as Dr. Carron testified:

> If there . . . was harm to Fidelity as a result of the government's breach and if that made Fidelity a less profitable, less valuable institution, then Astoria paid a lower price, incurred a lower cost in acquiring Fidelity than it would have in the alternative. And so because . . . Astoria paid a price consistent with the value that it received from the acquisition of Fidelity, at least as perceived at the time of the transaction, Astoria could not have been harmed by anything that happened to Fidelity. Astoria didn't pay the cost of acquiring the but-for institution. It just paid the price of acquiring the actual institution. So from an economic point of view, Astoria was not harmed. And if there were an award to Astoria, that would

Dr. Kaplan argues that, because Suburbia was insolvent at the time of the merger, no benefits could be derived from acquiring it until it regained solvency. Tr. 3264:14-3265:9 (Kaplan) (offset is an "all-in" concept). This is illogical because the initial cost against which the benefits offset (the net liabilities assumed) reflect the measure of the insolvency. Dr. Kaplan's argument means that either (1) Fidelity derived more than the amount of the net liabilities assumed in benefits from Suburbia, in which case there are no damages, or (2) it derived less in benefits than the net liabilities assumed, in which case there are not only damages, but no offset. Because that result runs contrary to the Federal Circuit cases that require offsets be taken into account even where they do not completely offset the entire amount of claimed damages, Dr. Kaplan's argument, like the rest of his reliance damage claim, fails.

## IV. ASTORIA'S EXPECTANCY CLAIMS FAIL AS A MATTER OF LAW AND FACT

### A. Overview Of Astoria's Expectancy Claims

Astoria advances three separate expectancy claims: (1) a claim for allegedly lost profits from 1989 to 1994; (2) a claim for allegedly lost profits from 1995 to 2014; and (3) a "wounded bank" claim for allegedly excessive assessments paid to the OTS and the FDIC.

### B. Legal Standards For Expectancy Damages

To recover expectancy damages, including lost profits, a plaintiff must prove three elements: (1) the lost profits were within the contemplation of the parties because the loss was foreseeable; (2) there would have been a profit but for the breach; and (3) the measure of

---

be a windfall to Astoria.

Tr. 5783-5784:9 (Carron), discussing DX 6001; see also Tr. 5786:8-11, 21-22 (Carron).

damages must be reasonably certain. See California Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005) ("CalFed II").

With respect to causation, the plaintiff must prove that "profits would have been made but for the breach," Id. at 1268, "the causal connection between the breach and the loss of profits must be 'definitely established[,]'" id., and the lost profits must have "inevitably and naturally, not possibly or even probably, flow[ed] from the defendant's breach." Id. at 1267 (citation omitted).[21] Under Federal Circuit precedent, because a lost profits award should not place the plaintiff in a better position than it would have occupied absent the breach, costs that were caused to be borne by factors other than the breach must be subtracted from damages. See Hansen, 367 F.3d at 1315; Restatement (Second) of Contracts § 347, cmt. b (1981).

With respect to foreseeability, "loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Landmark, 256 F.3d at 1378 (citation omitted). Astoria must prove "both the magnitude and the type of damages were foreseeable." Id. (emphasis added). The Court examines whether the alleged loss was foreseeable at the time of contracting. Bohac v. Dep't of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001).

To recover lost profits, plaintiff must prove both the fact of lost profits, and the amount of lost profits, with reasonable certainty. "[I]n order to recover anticipatory profits, it must be 'definitely established' that without the government's breach there would have been a profit."

---

[21] To the extent that Citizens Fed. Bank v. United States, 474 F.3d 1314 (Fed. Cir. 2007), permits this Court to apply the "substantial factor" causation standard at its discretion, Astoria has not provided any reasons why that discretion should be utilized upon the facts in this case.

Rumsfeld v. Applied Cos., 325 F.3d 1328, 1340 (Fed. Cir. 2003) (quoting Cal Fed, 245 F.3d at 1349); Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002); Restatement (Second) of Contracts § 352 (1981).

Alleged lost profits may not be recovered if they emerge from a lost profits model that is unreliable. San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997); Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992). The Federal Circuit has cautioned that "the proof problems [associated with expectancy claims] can in some cases prove to be insurmountable." Glendale, 239 F.3d at 1380. Because Astoria's expectancy models are "based upon a number of critical assumptions, . . . [t]he failure to establish the reasonableness of these assumptions is fatal not only to the damages claim, but to plaintiff's entire case." S. Pac. Comm. Co. v. AT&T, 556 F. Supp. 825, 1076 (D.D.C. 1982); see Herman Schwabe, Inc. v. United Shoe Mach. Corp., 297 F.2d 906, 911-13 (2d Cir. 1962).

In nearly every instance in which this Court or the Federal Circuit has considered a lost profits claim, the claim has been rejected. The Federal Circuit, after surveying the expectancy damage claims in Winstar-related litigation, has observed that the models upon which these claims rest have been "inherently unreliable," and that, although lost profits models have not been barred as a matter of law, such models are largely a "waste of time and effort." Glendale, 378 F.3d at 1313; see also Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996) (lost profits based on hypothetical leverage capacity are "too uncertain and remote").[22]

[22] This Court has repeatedly rejected lost profits models based upon lost leverage capacity. See, e.g., Citizens Fin. Serv., FSB. v. United States, 64 Fed. Cl. 498, 514 (2005), aff'd, 170 Fed. Appx. 129, 2006 WL 618792 (Fed. Cir. Mar. 9, 2006) (affirmed pursuant to Fed. Cir.

This Court has uniformly rejected expectancy damage claims in Winstar-related cases wherein the plaintiff's expert, as here, failed to identify with specificity the investments the thrift would have made in the "but-for" world. See Citizens Fin., 64 Fed. Cl. at 514 (rejecting lost profits claim because, "absent proof of specific investments that would have been held in the world absent FIRREA, a lost profits claim is too speculative"); LaSalle, 64 Fed. Cl. at 106; Standard Fed., 62 Fed. Cl. at 285 (rejecting lost profits claims where the expert did not analyze data underlying "no-breach" assumptions); CalFed, 54 Fed. Cl. at 712 (failure to identify specific "but-for"assets); Fifth Third, 55 Fed. Cl. at 242 (plaintiff's expert did "not identify specific opportunities"). This Court has recognized that the "[l]oss of leverage capacity for an investment that plaintiff has not shown it would have made absent the breach is not sufficient

---

Rule 36); LaSalle Talman Bank, F.S.B. v. United States, 64 Fed. Cl. 90, 106 (2005), aff'd, 462 F.3d 1331 (Fed. Cir. 2006); Standard Fed., 62 Fed. Cl. at 285; LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 101 (1999), aff'd in part, vacated in part, & remanded, 317 F.3d 1363 (Fed. Cir. 2003); Glendale Fed. Bank, F.S.B. v. United States, 43 Fed. Cl. 390 (1999), aff'd in part, vacated in part, & remanded, 239 F.3d 1374 (Fed. Cir. 2001); Castle v. United States, 48 Fed. Cl. 187, 206, 214 (2000), aff'd in part & rev'd in part, 301 F.3d 1328 (Fed. Cir. 2002), cert. denied, 539 U.S. 925 (2003); Bank United of Texas, F.S.B. v. United States, 50 Fed. Cl. 645, 654 (2001), rev'd in part, 80 Fed. Appx. 663, 2003 WL 22177282 (Fed. Cir. Sept. 22, 2003), cert. denied, 543 U.S. 916 (2004); Suess v. United States, 52 Fed. Cl. 221, 228; California Fed. Bank, FSB. v. United States, 54 Fed. Cl. 704, 716 (2002), aff'd, 395 F.3d 1263 (Fed. Cir. 2005), cert. denied, 546 U.S. 817 (2005); Southern Cal. Fed. Sav. & Loan Ass'n v. United States, 57 Fed. Cl. 598, 622 (2003) ("SoCal"), aff'd in part, rev'd in part, & remanded, 422 F.3d 1319 (Fed. Cir. 2005), cert. denied sub nom. Martin v. United States, 126 S.Ct. 2967 (2006); see also Fifth Third, 55 Fed. Cl. at 242 ("Fifth Third"), aff'd in relevant part, 402 F.3d 1221 (Fed. Cir. 2005); S. Nat'l Corp., 57 Fed. Cl. at 306; Columbia First Bank, F.S.B. v. United States, 60 Fed. Cl. 97 (2004); American Fed. Bank, F.S.B. v. United States, 62 Fed. Cl. 185 (2004); but see First Fed. Sav. & Loan Ass'n of Rochester v. United States, 76 Fed. Cl. 106 (2007); Comm. Fed. Bank, F.S.B. v. United States, 59 Fed. Cl. 338 (2004), aff'd, 125 Fed. Appx. 1013, 2005 WL 857772 (Fed. Cir. Apr. 8, 2005) (unpublished table decision); Globe Savings Bank, FSB v. United States, 65 Fed. Cl. 330 (2005), aff'd in part, vacated in part, 189 Fed. Appx. 964, 2006 WL 2045776 (Fed. Cir. Jul. 20, 2006).

support for a lost profits damages claim." Columbia First, 60 Fed. Cl. at 112 (citing Bank United, 50 Fed. Cl. at 655, 664); SoCal., 57 Fed. Cl. at 626; S. Nat'l Corp., 57 Fed. Cl. at 306.

Similarly, the Federal Circuit has rejected as speculative claims which proceed upon the assumption that growth will necessarily result in profits. For example, in Glendale, the Federal Circuit determined that Glendale "reduced its losses" by shrinking to meet capital requirements. Glendale, 239 F.3d at 1378; see also Wells Fargo, 88 F.3d at 1022-23; SoCal., 57 Fed. Cl. at 626 ("most importantly, growth does not necessarily equal profits"); CalFed, 54 Fed. Cl. at 706.

**C. Astoria's Lost Profits Claims Fail**

Astoria's lost profits calculations from 1989 to 1994, and from 1995 to 2014, are factually speculative and legally insufficient. Dr. Kaplan's model has two crucial inputs: an assumed incremental growth rate of two percent per quarter and a return on incremental assets of 80 basis points. With respect to the pre-Astoria 1989 to 1994 period, Messrs. Powderly and Wesp both provided testimony that specifically undercut Dr. Kaplan's assumption that Fidelity, given the goodwill, would have grown as Dr. Kaplan projects. Specifically, Mr. Powderly testified that the Capital Plan, which, contrary to Dr. Kaplan's model, provided for no asset growth, "formalized policies under which the bank generally had been operating since 1987." On re-direct examination, he reaffirmed that Fidelity had been operating under the policies outlined in the Capital Plan since 1987 "in all respects," including "things other than the real estate operations." Tr. 989:21-991:10 (Powderly). Moreover, Mr. Wesp testified that the Capital Plan saved Fidelity by permitting it to survive in desperate economic times: "By pure luck, this turned out to be a great strategy to survive one of the worst periods of economic

recession and volatility in the post-war history." Tr. 2359:23-2361:1 (Wesp). See generally Def. Cont. Fact at § X, supra.

All of this assumes, of course, that Fidelity would have been permitted to grow even with the goodwill. Mr. Amend testified that no permission to grow would have been given -- due to Fidelity's having been rated a "4" in its 1987 examination and deteriorating asset quality as of its 1989 examination. Thus, Fidelity would have been subject to restrictions on its growth under Regulatory Bulletin ("RB") 3a-1 even with the goodwill. Tr. 4660:7-25 (Amend). Furthermore, because regulators precluded troubled thrifts (those rated a "4" or a "5") from engaging in wholesale leverage growth strategies, Fidelity's capacity to pursue the wholesale strategy modeled by Dr. Kaplan would have not existed, irrespective of the breach, as long as it remained a troubled institution. Dr. Kaplan's model also ignores other factors that would have affected its growth irrespective of the breach including its very pronounced interest rate risk, the effect of inverted yield curves during various periods, uncertainty in capital markets, and Fidelity's own business decisions to limit its growth (e.g., as it did prior to its conversion). Furthermore, Dr. Kaplan incorrectly attributes damages from the breach beginning in January 1989, several months before the passage of FIRREA.

With respect to the post-1994 period, Mr. Engelke testified Astoria was never hindered from providing better returns to shareholders due to a lack of regulatory capital. Tr. 5315:6-9 (Engelke). This fact, combined with Astoria's consistently high excess capital levels, defeats any claim that the goodwill would have made any difference in Astoria's growth rate.

With respect to Dr. Kaplan's 80-basis point spread assumption, Dr Kaplan concocts a black-box methodology whereby any and all factors affecting profitability of mortgage-related

securities are presumed taken into account (without any particular mathematical calculations), resulting in a steady average 80 basis point return on incremental assets. As Dr. Carron and Mr. Kennedy testified, the methodology and underlying assumptions behind Dr. Kaplan's model are unfounded, making his 80 basis point return speculative.

### 1. Description Of Astoria's Lost Profits Claims

#### a. Fidelity's Lost Profits From 1989 To 1994

Looking first at the 1989-1994 claim, starting with Fidelity's December 31, 1988 tangible assets, Dr. Kaplan's model – what he describes as a "very simple calculation," Tr. 3045:3-6 (Kaplan) – assumes a two percent per quarter growth rate to calculate the but-for bank's tangible asset size. He subtracts Fidelity's actual tangible assets to calculate forgone assets. PX 1314A at Ex. 9A. Between December 1988 and March 1994, Dr. Kaplan assumes Fidelity's non-breach assets would have increased at his assumed growth rate from December 1988 levels, resulting in a total of $737 million in "forgone assets." PX 1314A at Ex. 9A. After March 1994, Dr. Kaplan stops this growth in "forgone assets" in accordance with Fidelity's real-world constant asset size in anticipation of merging into Astoria. PX 1314A at Ex. 9A. Finally, Dr. Kaplan multiplies forgone assets by an assumed 80 basis point, or 0.80 percent, earnings rate, to calculate lost profits. PX 1314A at Ex. 9A. Also, Dr. Kaplan purports to exclude non-earning assets from his forgone assets figure. PX 1314A at Ex. 9A, note a. Dr. Kaplan's model concludes that Fidelity forewent $22.3 million in lost profits it would have earned had it retained the right to use goodwill in regulatory capital, because it could have grown a profitable wholesale portfolio, involving "primarily" one-year adjustable rate mortgage backed securities ("ARM" "MBS") funded by one-year Federal Home Loan Bank ("FHLB") advances. PX

1314A at Ex. 9A; PDX 72; Tr. 3389:9-22 (Kaplan). Moreover, Dr. Kaplan provides an alternative calculation as a "demonstration" beginning January 1, 1990, using the same methodology and resulting in a $14.3 million damages figure. PX 1314A at Ex. 9B; Tr. 3076:2-19, 3134:17-24 (Kaplan). Dr. Kaplan makes all of these assertions while admitting that it would have been "speculative" to say what Fidelity would have done absent the breach. Tr. 3094:4-16 (Kaplan). Dr. Kaplan further admits that he did not model a "nonbreach" world. Tr. 3524:7-18 (Kaplan).

**b. Astoria's Lost Profits From 1995 To 2014**

Dr. Kaplan's lost profits claim for the period from 1995 through 2014 is similar to the model for his earlier damages period, although even less detailed respecting the basis for his calculations. Assuming, as he does, that Fidelity would have merged with Astoria absent the breach, Tr. 3147:12-19 (Kaplan), he uses Astoria's average leverage between 1995 and 2000 as the factor by which he divides the average balance of goodwill for each of those years. PDX 85. After 2000, he assumes the remaining balance of goodwill would be leveraged at seven percent per year. PDX 85. By dividing the average goodwill balance by the "leverage ratio," Dr. Kaplan arrives at what he terms "forgone earning assets." PDX 85. Dr. Kaplan multiplies the "forgone earning assets" by a hypothetical return on forgone assets of 0.80 percent per year, without any firm identification of the assets purchased or the liabilities funding these assets. PDX 81, 85; see also Tr. 2231:8-2232:8 (Wesp) (cost of funds relevant to determine spread, along with other factors). Dr. Kaplan's calculations result in "lost profits" of $87.687 million from 1995 through 2007, and $9.475 million in lost profits from 2008 through 2014 (discounted

to 2007 dollars at a 10.5 percent rate), for a total of $97.161 million in lost profits from 1995 through 2014. PDX 85.[23]

### 2. Dr. Kaplan's Post-Astoria Damages Are Speculative

#### a. Fidelity's Goodwill Would Not Have Survived The Astoria Acquisition

Dr. Kaplan cannot explain how Astoria would have received the benefit of Fidelity's goodwill absent the breach. No evidence supports Dr. Kaplan's assumption that Fidelity's goodwill or its goodwill forbearance could have transferred to Astoria. Tr. 2526:13-2527:9 (Wesp) (cash transaction meant the "eradication" of acquired institution's goodwill); 2913:6-17 (Kaplan) (net worth of acquired institution extinguished in mark-to-market). This Court has already concluded in another case that goodwill is not transferable, Granite, 74 Fed. Cl. at 161-64, and nothing Astoria has presented in this case undermines that conclusion here. To the contrary, the facts of this case support the conclusion that the goodwill would not have transferred.

One year after the conversion, in which Fidelity's shares sold at $11.50 per share, Astoria paid $29 in cash per share for Fidelity, Tr. 641:7-16 (Powderly), out of a desire to use the excess cash it obtained from its own conversion. Tr. 641:17-642:12 (Powderly); DX 3489 at 9:25-10:21, 20:23-21:11 (Quackenbush). Fidelity also wanted a cash transaction. Tr. 940:3-10 (Powderly). Goodwill does not survive a cash transaction.

---

[23] Dr. Kaplan testified: "My standard practice in this kind of analytic exercise is to try and build up a basis of support for a conclusion that I'm going to reach and adopt." Tr. 3099:22-24 (Kaplan). Dr. Kaplan's analytical method is exactly backwards, reaching his conclusion first and then seeking to justify it. This is the antithesis of scientific analysis. Moreover, given that Dr. Kaplan's model remains unsupported, he failed to live up to the standards of his conclusory methodology.

As our expert, Mr. Kennedy, explained, the use of cash required that the transaction be classified a "purchase" under GAAP. Tr. 5417:25-5418:25, 5421:16-23 (Kennedy) (Accounting Principles Board Opinion ("APB") 16, which had to be applied under regulatory accounting principles, mandated the use of purchase accounting for a cash transaction); see also Tr. 5729:2-5 (Carron) (Fidelity's goodwill "went away" upon Astoria acquisition). Knowledgeable fact witnesses concurred in the conclusion that the use of cash required that the transaction be classified as a purchase, resulting in a write-off of the goodwill of the acquired institution. Tr. 1523:7-16, 1526:18-24, 2809:8-2810:10 (Vigna); 1968:8-13, 1969:6-12, 2526:16-19 (Wesp) (acquisition accounting requires "the restatement or complete eradication of whatever goodwill was remaining on the balance sheet"); 4355:19-4356:21, 4359:1-4360:5, 4499:21-4500:2 (Engelke). Accordingly, absent the breach, Fidelity's goodwill would still have been written off, given Astoria's cash acquisition. Tr. 5420:10-17 (Kennedy).[24]

Moreover, the regulators never granted Fidelity a goodwill forbearance that permitted an acquirer of Fidelity to keep Fidelity's goodwill on its books, contrary to APB 16. Tr. 5423:20-5424:2 (Kennedy). No evidence supports the assumption that any goodwill forbearance, let alone any goodwill, would have survived the acquisition. Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 161-64 (2006) appeal docketed, No. 2007-5054 (Fed Cir. Feb. 6, 2007) (goodwill not transferable in purchase accounting merger).

---

[24] Mr. Kennedy testified that, under APB 16, the alternative accounting method, the pooling method, could not have been used in Astoria's acquisition of Fidelity because the use of that method was barred where the acquirer wished to sell a significant amount of the acquired institution's assets, as Astoria did. Tr. 5425:18-5428:6 (Kennedy).

In addition, under the terms of the goodwill forbearance, regulatory approval was required for the transfer of the right to use goodwill as regulatory capital to Astoria. PX 253 at § 18 ("Successors and Assigns) and § 19 ("Sole Benefit"), Tr. 3675:18-22 (Kaplan). Permission would have been required even if no breach had occurred and Astoria and Fidelity merged using the pooling method of accounting. Tr. 5431:6-13 (Kennedy); 5432:17-5433:1 (Kennedy). Mr. Vigna testified that no such regulatory permission would have been granted. Tr. 1522:4-1523:16 (Vigna).

In response to this obstacle, Dr. Kaplan provided no meaningful response. Dr. Kaplan testified that these transfer restrictions were not the "primary thing" in his thinking. Tr. 3677:7-13 (Kaplan). To escape the plain transfer restrictions of the Assistance Agreement, Dr. Kaplan proposed the notion that the Astoria acquisition of Fidelity could have been accounted for under the pooling method. Tr. 3677:17-21 (Kaplan). As we have shown, however, the testimony in this case was unanimous that the Astoria acquisition had to be done under the purchase method so that Astoria could deploy its excess capital. See, e.g., Tr. 1968:8-13 (Wesp) (combination of Fidelity and Astoria using cash "solved Astoria's overcapitalization problem"). In the face of this uncontradicted testimony, Dr. Kaplan offered only speculation, stating that "we are living in a breach world" where "so many things are different." Tr. 3678:5-12 (Kaplan). Dr. Kaplan's unsupported and wholly contradicted assertions respecting the non-breach world cannot support his claim that the Fidelity goodwill would have survived the Astoria acquisition absent the breach. Accordingly, Astoria cannot demonstrate that it is entitled to any damages for the loss of goodwill after the merger because, even absent the breach, the goodwill would not have counted towards regulatory capital.

**b. Astoria Would Have Had No Use For Additional Leverage Capacity From Fidelity's Goodwill**

Dr. Kaplan's post-1994 damages claim is also thwarted by the fact that Fidelity's goodwill would have been useless to Astoria because Astoria had more capital than it could profitably use. For the lost profits calculation from 1995 forward, Dr. Kaplan calculated the lost profits that Astoria, and not Fidelity, would have suffered. Tr. 3166:23-3167:4 (Kaplan). Dr. Kaplan assumed "that in the non-breach world, Fidelity would have merged with Astoria as it did in the actual world." Tr. 3147:15-19 (Kaplan). He assumed that Astoria had "ample capital," but nonetheless would have put to use, as leverage, the "$98 million of remaining non-breach goodwill." Tr. 3148:4-7 (Kaplan). Moreover, he assumed that Astoria could have earned at least an 80 basis point spread, regardless of how it invested in assets through the use of goodwill as capital, since Astoria "was significantly more profitable than 80 basis points." Tr. 3148:7-11 (Kaplan). Dr. Kaplan further assumed that, once Fidelity was acquired by Astoria in a non-breach world, "we're now talking about . . . Astoria's incremental assets. It's not a continuation of Fidelity's incremental assets, and that is an important point to be understood." Tr. 3158:11-14 (Kaplan). Accordingly, Dr. Kaplan levers the non-breach goodwill transferred in his model to Astoria from Fidelity using Astoria's leverage ratio. Tr. 3158:15-20 (Kaplan). Dr. Kaplan also assumed that Astoria would have used FHLBB borrowings to fund the incremental assets. Tr. 3159:7-9 (Kaplan). This tower of assumptions comes crashing down when tested against Astoria's actions and its attitude towards capital in the real world.

The entire premise of Dr. Kaplan's lost profits claim following the Astoria acquisition is that Fidelity's goodwill would have been valuable to Astoria for the sole purpose of permitting

increased leverage. Tr. 3658:7-11 (Kaplan). In fact, as Dr. Kaplan admits, Astoria was not capital constrained; it had sufficient capital to follow its business plans from 1995 forward. Tr. 3658:12-3659:3 (Kaplan). Dr. Kaplan even admitted that Astoria had so much excess capital that it frequently opted to repurchase stock with it rather than leverage it. Tr. 3659:6-9 (Kaplan); PX 1228 at WON735 0078. As explained by our experts, this observation leads to only one conclusion: Rather than take the risk of using its leverage capacity to borrow funds for investment, Tr. 5730:10-25 (Carron) (explaining leverage and risks), Astoria paid hundreds of millions of dollars in dividends to AFC, and AFC repurchased over a billion dollars worth of its stock, because Astoria did not need goodwill as regulatory capital. Tr. 5731:13-25 (Carron); 5732:3-9 (Carron) (Astoria could not have used goodwill for repurchases, unlike other forms of capital). As further stated by the fact witnesses, because Astoria was flush with capital, Tr. 956:16-22 (Powderly); 1962:9-1963:10, 1968:6-1969:13 (Wesp), any goodwill it could have inherited from Fidelity would have had no value to it. Tr. 2793:22-2794:25, 2801:15-24 (Vigna). Indeed, Astoria viewed repurchasing stock as a desirable alternative to growth. Tr. 5431:6-13 (Kennedy).

In addition, Astoria never viewed its capacity for increased leverage as tied to goodwill, but rather to its tangible capital or cash earnings. Tr. 3662:1-3663:9, 3665:22-3666:4 (Kaplan); DX 1842 at WON747 0152; DX 1845 at AA0001420.

In fact, Astoria had so much excess capital following the Fidelity acquisition that Mr. Kennedy calculated that, had Astoria chosen to use the $1.1 billion Dr. Kaplan admitted that it spent repurchasing shares, Tr. 3670:21-3671:12 (Kaplan); DX 281 at WAA005 0538, on growth, it could have added $15 billion in assets under Dr. Kaplan's 7.7 percent leverage ratio.

Tr. 5433:2-5434:5 (Kennedy). Yet Astoria determined that leveraging in the manner Dr. Kaplan suggested would not have been profitable, and accordingly chose to repurchase shares instead. Tr. 5435:10-22 (Kennedy).

Dr. Kaplan responded to this unequivocal evidence by suggesting that, perhaps, in a non-breach world, Astoria "very well might have managed [its] – all of their sources of capital differently." Tr. 3666:17-18 (Kaplan). Specifically, Dr. Kaplan offered no reasonable explanation for Astoria's repeated stock repurchase program, which is unmistakable evidence that the thrift had decided not to leverage. Tr. 3667:20-3669:6, 3669:23-3670:10 (Kaplan); DX 1845 at AA0001420 ($159 million in repurchases); DX 273 at WAA005 0281. Dr. Kaplan's response was pure speculation. Indeed, Dr. Kaplan admitted that he had no discussions with anyone at Astoria concerning his conclusions in this case. Tr. 3667:19 (Kaplan). Accordingly, Dr. Kaplan's ad hoc conclusions about what Astoria might have done in a non-breach world cannot be given any credence.[25]

Moreover, given its excess capital position, Dr. Kaplan admits that Astoria could have engaged in the kind of growth in wholesale assets and liabilities Dr. Kaplan posits, but chose not to. Tr. 3671:23-3672:1 (Kaplan); 5435:23-5437:6 (Kennedy); 956:16-22 (Powderly); 1962:9-1963:10 (Wesp); 2793:22-24, 2794:11-25, 2801:12-20 (Vigna). Even immediately following its conversion, Fidelity had not turned to the growth in wholesale assets and liabilities that Dr.

[25] Dr. Kaplan admitted that Astoria and Fidelity were very different institutions, with "different management personnel and focus," and, although geographically close in proximity, there were "a lot of differences" between the two institutions. Tr. 3792:24-3793:4 (Kaplan). Dr. Kaplan's recognition of the differences between the institutions further underscores the speculative nature of continuing damages based upon Fidelity's loss of contractual goodwill to the period after the Astoria acquisition.

Kaplan posited. Tr. 2168:2-15 (Wesp). Astoria's decision to avoid wholesale growth undermines Dr. Kaplan's assertion that more regulatory capital would have resulted in growth in a wholesale portfolio in Astoria's hands. Tr. 5432:17-5433:1 (Kennedy). In short, Dr. Kaplan's argument that Astoria would have found Fidelity's $90 million of supervisory goodwill to be valuable insofar as it would permit increased leverage is completely disconnected from the reality of Astoria's operations.

c. **Dr. Kaplan's Methodology Is Unreliable**

Dr. Kaplan's methodology for determining damages in the post-1994 period adds to the many flaws of his pre-1994 damages model. First, Dr. Kaplan's model contains an unexplained jump in the amount of its forgone assets that cannot be explained by anything that would have taken place in the Astoria merger, while simultaneously ignoring events that actually did take place as part of that merger. Second, Dr. Kaplan cannot explain how Astoria would have paid the same price for what he posits would have been a bigger bank absent the breach. Third, the model fails to take into account any of the economic conditions Astoria contended with in the post-1994 period. Fourth, it fails to take into account the effects of increased competition in a non-breach world. Finally, it is so vague as to the composition of the portfolio it identifies Astoria as having in the non-breach world, that any assessment of its realisticness is rendered impossible. These flaws make Dr. Kaplan's post-1994 damages methodology unreliable.

First, Dr. Kaplan cannot explain why, in the non-breach world he models, Fidelity's incremental assets would jump by an implausible $226 million from December 1994 ($737 million) to January 1995 ($963 million), other than to argue that this is so because of the way he models the non-breach world. Tr. 3610:23-3613:25 (Kaplan); PDX 81; PDX 85. "There is a

full stop and a different methodology that produces different lost profits." Tr. 3613:24-25 (Kaplan). "It is a misunderstanding to characterize the new approach that I've used to calculate lost profits for the second period of time as a continuation of the calculation for the preceding period of time." Tr. 3617:5-9 (Kaplan). Accordingly, based upon Dr. Kaplan's own explanation, the discrepancy arises because Dr. Kaplan used two different and unrelated methods to calculate the forgone assets before and after the merger, which, as Dr. Carron testified, cannot be right, rendering Dr. Kaplan's damages calculation internally inconsistent. Tr. 5752:10-23 (Carron).

Oddly, however, though Dr. Kaplan's assets are affected by the merger because of his disconnected methodology, Dr. Kaplan offers no adjustment to his analysis for the fact that, in the actual world, as soon as Astoria acquired Fidelity, it actually sold $521 million of Fidelity's securities and it utilized the proceeds from those sales to repay $417 million in wholesale borrowings. Tr. 3616:1-11 (Kaplan); DX 3080 at WON761 0786. After selling the Fidelity securities, Astoria did not reinvest the proceeds because, as of March 1995, "investment alternatives with sufficient interest rate spreads over borrowings [were] not currently available." Tr. 3625:3-17 (Kaplan); DX 2772 at FAA4009 1334. The failure to indicate that the forgone assets would have been sold instead of getting larger renders Dr. Kaplan's methodology unreliable.

Second, Dr. Kaplan fails to consider the real world economic conditions under which Astoria was operating in deriving the spread assumption in his post-1994 model. For an extended period during 1995, for instance, Astoria found it difficult to obtain acceptable spreads in the wholesale capital investments due to a flattened or inverted yield curve. Tr. 3626:4-

3628:15, 3630:24-3633:14 (Kaplan); DX 2776 at AA4009 1359 (inverted yield curve in June 1995 made it difficult to obtain acceptable spreads); DX 34 at PAA029 0018-19 (inadequate spreads in July 1995); DX 19 at AST0132825 (contracting yield curve in September 1995); DX 2781 at AA4009 1390 (flattening of yield curve in October 1995). Nonetheless, with the extended flattened yield curve period, which was related to seven interest rate increases between 1994 and 1995, Dr. Kaplan posits a steady 80 basis point spread on the incremental assets he asserts Astoria would have held. Tr. 36534:17-3635:16 (Kaplan); PX 1228 at WON735 0073. Again, he claims his methodology permits such a result. Tr. 3635:14-16 (Kaplan).

During 2000, Astoria again faced a "persistent flat to inverted U.S. Treasury yield curve," but again, this fact has no impact on the spread that Dr. Kaplan posits. Tr. 3636:18-3637:5 (Kaplan); DX 269 at WAA005 0171. As with his analysis in the 1989-94 period, Dr. Kaplan assumes that his 80 basis point spread takes into consideration "every blip in the economy, every activity in world events or politics." Tr. 3637:20-3638:4 (Kaplan). Thus, among other things, the challenging interest rate environment that Astoria itself repeatedly acknowledged has no effect on the 80 basis point spread Dr. Kaplan hypothesizes Astoria would have earned on the forgone assets. Tr. 3639:2-6 (Kaplan). Nor do the massive repayments that Astoria experienced – where 50 percent of its assets were redeployed at a lower rate in a single year – have any impact on Dr. Kaplan's non-breach spread. Tr. 3640:12-3641:20; DX 277 at WAA005 0393. Indeed, not even "the perfect storm of interest rates," as Astoria itself characterized interest rates in 2003, has any impact on Astoria's capacity to earn 80 basis point in the non-breach world, according to Dr. Kaplan. Tr. 3642:12-3644:22 (Kaplan); DX 281 at WAA005 0527.

Dr. Kaplan explains his failure to analyze Astoria's wholesale spread or profitability in the period after its acquisition of Fidelity, believing that, given his methodology, it is unnecessary to actually know how Astoria's wholesale assets performed. Tr. 3617:17-3618:7, 3619:22-3620:5 (Kaplan). Dr. Kaplan assumed that his incremental assets are profitable because, citing PDX 84, Astoria's whole bank operations were profitable. Tr. 3618:8-20 (Kaplan). Dr. Kaplan's explanation is at odds with his claim that Fidelity's whole bank profitability does not reflect upon the non-breach thrift's incremental assets' profitability. Tr. 3114:18-22 (85 basis point spread on whole-bank basis from 1989-94), 3488:3 (Kaplan) (spread on whole-bank basis and spread on incremental portfolio "absolutely not the same thing at all").

Fourth, Dr. Kaplan's post-merger lost profits model fails to take into account the all of the effects of a non-breach world. In a non-breach world, other thrifts would have been able to count their goodwill as regulatory capital, and fewer thrifts would have been seized, leading to greater competition in Long Island, one of the country's most competitive thrift markets. Tr. 926:3-13 (Powderly); 945:24-946:23 (Powderly); 1751:16-1752:24 (Wesp); 1965:15-24 (Wesp); PX 1249 at WON738 0779; PX 1155 at AST036415. Such external factors must be taken into account for a lost profits model to meet the reasonable certainty requirement. See S. Nat'l, 57 Fed. Cl. at 305. This error is fatal to Dr. Kaplan's lost profits claim.

Finally, Dr. Kaplan's 80 basis point spread derives from no clear vision of the makeup of his forgone portfolio. Indeed, while Dr. Kaplan initially testified that the incremental assets and liabilities during that period would be "wholesale assets and wholesale liabilities," Tr. 3650:21-3651:3 (Kaplan), he almost immediately corrected that testimony by admitting that the incremental assets and liabilities that he envisions in the post-1994 period could be "anything

that Astoria chooses them to be." Tr. 3652:10-3654:17 (Kaplan).[26] Thus, according to Dr. Kaplan, regardless of the composition of the incremental assets and liabilities in the post-1994 period, the spread on those assets and liabilities would amount to 80 basis points. Tr. 3654:14-17 (Kaplan). Dr. Kaplan obtains this result even though he admits that he did not do any mathematical analysis of Astoria's performance, for example, as set forth in its financial statements. Tr. 3656:4-9 (Kaplan).

During our cross-examination of Dr. Kaplan, we demonstrated that Astoria's actual spread on its wholesale assets and liabilities averaged just 38 basis points between 2001 and 2005. Tr. 3690:11-3704:2 (Kaplan); DX 3110 at WAA004 0189; DX 3111 at WAA004 0338-39; DX 289 at WAA005 0996. To escape the ramifications of this analysis, Dr. Kaplan stated that he "was not exclusively focusing for [his] incremental assets and borrowings on wholesale." Tr. 3704:6-10 (Kaplan). Dr. Kaplan's black-box methodology, with unidentified assets and liabilities, permits any inconsistency with actual facts to be explained away. In short, Dr. Kaplan has merely assumed 80 basis point spread and that is all there is to it.

More specifically, our experts could not evaluate the profitability of the assets and liabilities in Dr. Kaplan's model because he never described them clearly, rendering his lost profits analysis speculative. Tr. 5437:7-5438:10 (Kennedy). Dr. Kaplan's assertion of constant profits from a wholesale portfolio in Astoria's hands ignores periods after the merger in which Astoria had negative spreads on its actual wholesale portfolio. Tr. 5438:14-5439:5 (Kennedy).

---

[26] Indeed, Dr. Kaplan later testified that he did not even examine the composition of Astoria's wholesale assets and liabilities, "but rather simply looked at their profitability and concluded to continue using the 80 basis points for the [Astoria period] calculation." Tr. 3689:16-23 (Kaplan).

Dr. Kaplan's assertion that his estimate of post-merger damages is conservative accordingly fails for the same reason as his assertion that his pre-merger damages calculation is conservative -- Dr. Kaplan fails to provide any analysis of the factors he uses to calculate his 80 basis point spread. Tr. 5439:13-5440:3 (Kennedy).

Indeed, Dr. Kaplan fails to take into account the risks inherent in any portfolio that Astoria might have chosen to invest in. For example, at times, Astoria has had large unrealized losses connected with its mortgage-backed securities investments, indicating that such investments do not result in sure-fire profits. By the end of 1994, Astoria had an unrealized loss of $183 million connected with its portfolio of collateralized mortgage obligations, or nine percent of the book value of those instruments. Tr. 4907:15-21 (Moran); DX 3357. Astoria's unrealized loss was the result of its inability to predict changes in interest rates and reluctance to make adjustments to its portfolio once a loss was involved. Tr. 4977:12-15 (Moran); 4978:2-14 (Moran). Nonetheless, despite real-world evidence to the contrary, to the extent that his damages methodology is premised upon investments in mortgage-backed securities, Dr. Kaplan simply assumes that profits from such investment are a sure thing for seasoned professionals.

Unlike Dr. Kaplan, thrift regulators examine risk. Regulators look not merely to particular instruments held by a thrift, but also the diversity of assets held by the thrift. For example, Mr. Moran criticized Astoria for lacking a diversified portfolio. "In particular, it wasn't a lack of diversification in terms of not having many different securities, but that the securities that they had tended to behave in the same way as interest rates changed." Tr. 4908:3-8 (Moran). The problem for Astoria was that, with the decrease in interest rates in 1993, there were high levels of prepayments, shortening the lives of the securities it held. An increase in

interest rates followed in 1994, extending the average lives of the securities, and lowering the securities' values significantly. Indeed, the interest rate dynamic resulted in non-realized losses of $180 million for Astoria. Tr. 4908:14-4909:1 (Moran); DX 3357.

As Mr. Moran explained, rises in interest rates can affect a thrift's interest rate risk, even when the thrift holds adjustable rate mortgages. That is because, as happened in 1994, the underlying mortgages tend not to prepay, and thus take on a longer duration than originally anticipated, and because the thrift's adjustable rate mortgages can have periodic interest rate caps and teaser rates, which both limit the amount that a thrift can adjust the loan upward as rates go up. Tr. 4910:11-4911:18 (Moran); DX 3358 at OAA010 1381. By the end of 1994, as a result of Astoria's holdings in mortgage-backed securities, Astoria's ability to absorb risk was poor, ranking in the bottom twentieth percentile among thrifts regulated by the OTS. Tr. 4913:2-10 (Moran); DX 3358 at OAA010 1386. The fact that Astoria was facing interest rate risk in the real world follows from the simple fact that a thrift cannot eliminate interest rate risks with a mortgage-related securities portfolio. Tr. 4913:20-4914:21 (Moran). As Mr. Moran explained: "The trouble with a mortgage-related security portfolio is that the duration changes because of prepayments. And they change at the wrong time. When interest rates go up, the duration extends. When interest rates go down, the duration shortens. . . . So the nature of mortgage-related assets really limits how effectively you can eliminate – or that you really can't eliminate the risk, eliminate the interest rate risk." Tr. 4914:2-21 (Moran). There is no entirely safe way to structure a mortgage-backed security portfolio to avoid interest rate risk. Tr. 4916:21-4917:14 (Moran).

With the purchase of Fidelity, Astoria's interest rate risk significantly worsened, decreasing to the bottom tenth percentile among thrifts regulated by the OTS. Tr. 4919:3-17 (Moran); DX 3359 at OAA010 1366. The interest rate risk worsened because of the additional leverage Astoria took on with the acquisition of Fidelity. Id. Nonetheless, Dr. Kaplan ignored interest rate risk concerns entirely, despite the fact that he envisioned Fidelity leveraged up by an additional $737 million in assets.

In the real world, Astoria did not make the same decision to ignore interest rate risks that Dr. Kaplan posits. Astoria at times extended the maturities of its borrowings. Tr. 4921:25-4922:2; 4923:13-18 (Moran); DX 3361 at OAA010 1351. Longer-term fixed rate borrowings can reduce interest rate risk for those institutions exposed to rising interest rates. Tr. 4922:2-6 (Moran). Dr. Kaplan makes no mention of using long-term borrowings in his portfolio to counter interest rate risk. Thus, Dr. Kaplan's model is speculative for failure to take real market risks into account.

For all of these reasons, Dr. Kaplan's methodology is unreliable.

### 3. Dr. Kaplan's Pre-1994 Lost Profits Are Unsupported

Dr. Kaplan's wholesale portfolio pre-1994 is fundamentally unsubstantiated. Indeed, he purports to "model" the performance of highly complex ARM MBS investments in the nonbreach world by simply proposing ARM MBS, a very broad category of investment, as the types of investments he assumes Fidelity would have held. He never specifies which securities Fidelity would have purchased. Tr. 3420:3-3421:14, 3422:6-3423:6, 3427:12-19 (Kaplan) (never modeled a specific securities portfolio).

Nor does Dr. Kaplan provide sufficient identification with respect to the funding sources that would fund the investments he proposes in the nonbreach world, at times stating that these funding sources are "a variety of short-term borrowings," including private market borrowing and FHLB advances. Tr. 3452:8-20 (Kaplan).

Contrary to the wholesale model Dr. Kaplan hypothesizes involving only ARM MBS, Fidelity itself held a wide array of MBS and MBS-related instruments. Tr. 764:2-18, 768:11-769:24 (Powderly), PX 447 at OAA005 1346; PX 599 at AST049054 (Fidelity had different kinds of MBS on its books). At trial, Mr. Wesp repeatedly acknowledged that Fidelity purchased longer duration MBS and non-ARM MBS. See, e.g., Tr. 2124:15-2125:5, 2127:19-2128:3 (discussing DX 590 at PAA033 1506), 2125:19-2126:10 (discussing DX 590 at PAA033 1188), 2131:7-20 (discussing DX 590 at PAA033 1090), 2132:10-2133:2 (discussing DX 590 at PAA033 0865), 2142:9-2143:1 (discussing DX 590 at PAA033 0774, PAA033 0776), 2150:23-2151:4 (discussing DX 590 at PAA038 0721), 2158:7-2159:23 (discussing DX 591 at PAA038 1200-01), 2159:24-2162:8 (discussing DX 591 at PAA038 0337-39), 2162:9-22 (discussing DX 591 at PAA038 1262-63, PAA038 1335), 2163:4-2163:11 (discussing DX 591 at PAA038 0158-60), 2164:12-21 (discussing DX 591 at PAA038 0276-77) (Wesp). Indeed, Mr. Wesp stated he was willing to stipulate that Fidelity purchased securities that were neither ARMs or had short-term duration (Tr. 2164:23-25 (Wesp)), agreeing that Fidelity's purchase of five and seven-year balloon MBS, Ginnie Mae securities, and Freddie Mac Gnomes that were not ARMs, and that Fidelity purchased these kinds of instruments before and after the Capital Plan. Tr. 2166:9-2167:5 (Wesp); see also DX 592, DX 593, DX 589 (with respect to non-ARM MBS and bond transactions for the years 1992, 1993, and 1989, respectively).

Mr. Wesp also acknowledged that Fidelity purchased REMIC MBS, an investment similar to a collateralized mortgage obligation ("CMO"). Indeed, he admitted that "[w]e were buyers and sellers of a lot of different stuff." Tr. 2179:13-20 (Wesp). Thus, at times, Fidelity specifically focused upon increasing (or decreasing) its longer duration assets at various points during the early 1990s. Indeed, Fidelity instigated multiple starts and stops of its program to purchase longer duration assets. For example in July 1990, Fidelity decided it would be prudent to add longer duration assets which, to control for interest rate risk, required the use of interest rate caps and floors. Tr. 2192:24-2193:10 (Wesp); DX 2428 at AST0301984. By August 1990, Fidelity had decided to sell its longer duration assets. Tr. 2212:6-12 (Wesp); DX 2441 at AST048703 at ¶ 2. In November 1990, Fidelity again started a program to buy long-term MBS, "because of the prospects for lower rates due to a weakening economy," with a program of buying up to $100 million of these instruments. Tr. 2250:14-2251:9 (Wesp); DX 2463 at AST0129855-56. By December 1990, Fidelity once again reversed course again and sold its long-term Ginnie Mae securities. Tr. 2262:7-11 (Wesp); DX 2470 at PAA113 0068. At the same time, however, Fidelity purchased seven-year Fannie Mae dwarfs, "15 year securities with a 7-year average life." DX 2470 at PAA113 0068; Tr. 2264:5-16 (Wesp). Although Fidelity engaged in these sales and purchases, due to the worldwide economic uncertainty at that time, it was just "pretty much holding – standing still and tweak[ing] things around the edges." Tr. 2265:1-7 (Wesp). In January 1991, Fidelity reversed course yet again, returning to a plan to purchase up to $100 million in long duration Ginnie Mae stock, contingent upon the United States winning the Gulf War. Tr. 2272:10-25 (Wesp); PX 679 at AST0308388. Thus, following the start of the Gulf War, Fidelity purchased long duration assets, including Ginnie

Maes, Fannie Mae dwarfs and U.S. Treasury bonds, none of which were ARM MBS. Tr. 2295:4-13 (Wesp); DX 2487 at AST0308525. Indeed, at that time Fidelity wanted to be positioned "in every part of the yield curve." DX 2487 at AST0308525. In fact, Fidelity sold $100 million of its ARM MBS and used the funds to purchase $100 million of fixed rate assets. Tr. 2300:21-2301:4 (Wesp); DX 2487 at AST0308528.

In October 1991, Fidelity committed to purchase additional five and seven-year Fannie Mae balloons, in order to lock in longer-term assets to keep the yield higher. Tr. 2337:11-2338:4 (Wesp); DX 3478 at PAA113 0102 ¶ 4. Accordingly, in November 1991, the majority of its investments were in five and seven-year balloons. Tr. 2341:7-11 (Wesp); DX 3479 at PAA113 0106 ¶ 2. Again, in March 1992, Fidelity notes a strategy of purchasing five to seven-year agency balloons. Tr. 2349:1-5 (Wesp); PX 839 at AST0306769. In September 1992, Fidelity sold $52 million of its seven-year balloons, as part of a strategy to sell $75 million of these instruments. PX 909 at AST030598 ¶ 2; Tr. 2358:7-25 (Wesp). In October 1992, Fidelity purchased $39 million and sold $28 million of five and seven-year balloon securities. Tr. 2362:8-16 (Wesp); PX 930 at AST031476.

The purchase of non-ARM, longer duration securities continued in 1993. For example, in October 1993, Fidelity's minutes note its strategy of purchasing five to seven-year balloon securities. PX 1043 at AST031342; Tr. 2383:17-2384:4 (Wesp). In December 1993, Fidelity noted the purchase of seven-year balloons. Tr. 2386:16-23 (Wesp); PX 1045 at AST032128 ¶ 2.

Not only did Fidelity pursue long term assets and liabilities in the actual world, in an important admission, Mr. Wesp testified that, in a nonbreach world where goodwill was restored, Fidelity would have bought additional longer duration assets. Tr. 2390:16-2391:4

(Wesp). Thus, by proposing only short-term assets and liabilities, Dr. Kaplan's non-breach model contradicts both Fidelity's actual operations and Mr. Wesp's statements concerning what Fidelity would have done in a non-breach setting.

The fact that Fidelity owned longer-duration and non-ARM MBS follows from the fact that, as Mr. Wesp testified, the thrift's pursuit of ARMs was merely a "balance sheet plug" when the thrift did not want to or could not participate in some other lending or investment activity. Tr. 2524:21-2525:6 (Wesp). Fidelity's pursuit of MBS was primarily a default strategy, to be used if consumer and home equity lending operations fell short. Tr. 1758:21-25 (Wesp).

Furthermore, unlike the model proposed by Dr. Kaplan, Fidelity obtained long-term wholesale borrowings; it did not just borrow short-term borrowings, but would borrow from "whatever part of the yield curve [that] seemed to make sense." Tr. 2048:14-2049:2 (Wesp); DX 539 at AST056074 ¶ 7. For example, in August 1991, Fidelity noted that it was acquiring longer duration borrowings from the FHLBB. Tr. 2324:8-2325:6 (Wesp); DX 2539 at PAA113 0095. In September 1991, Fidelity began a program to increase its long-term borrowings by $10 million a month through the end of 1991. Tr. 2336:3-8 (Wesp); PX 766 at AST0307034. Indeed, as Mr. Wesp acknowledge, Fidelity did not limit its borrowings to short-term borrowings, but was, instead "pretty opportunistic," and "would do what worked." Tr. 2325:3-6 (Wesp). "So if money was cheap short, I'd borrow it. If money was cheap long, I'd borrow it. You know, if money was cheap in the middle of the curve, I'd borrow it. Whatever worked." Tr. 2325:6-9 (Wesp).

Moreover, contrary to Dr. Kaplan's idea that Fidelity would have used wholesale funding sources, the evidence appears to support the conclusion that Fidelity's MBS were funded in large part in the actual world through ordinary deposits that could not be invested in one-to-four family mortgages. Tr. 728:22-732:13, 769:12-770:21, 796:3-13 (Powderly); Tr. 1758:7-1759:2 (Wesp). Accordingly, Dr. Kaplan's selection of only ARM MBS and short-term funding has no correlation to the actual manner in which Fidelity actually pursued its wholesale investments.

No doubt, Dr. Kaplan's tactic of hypothesizing only ARM MBS funded by short-term borrowings was meant to avoid the complexities involved in modeling the performance of MBS instruments, perhaps in no small part because he admittedly had no experience or expertise in modeling the performance of MBS. Tr. 2681:5-2682:5, 2682:14-23, 2685:12-20 (Kaplan).

Mr. Wesp recognized that, in analyzing the performance of MBS, "The funding and the prepayments are a critical part." Tr. 2145:21-22 (Wesp). Mr. Wesp noted that the analysis also has to take into account interest rate risk (Thrift Bulletin 13), so that "you're building almost a three-dimensional model, because you're dealing with the interest rate risk and prepayment of the asset and the duration of the asset, and then you're dealing with the duration of whatever the liability is. So these relationships become very complex to model." Tr. 2145:21-2146:4 (Wesp). This was especially so where, as in Fidelity's case, "everything on the balance sheet either had a discount or a premium." Tr. 2208:14-15 (Wesp). This meant that "every single asset line had an aggregate prepayment," requiring an understanding of "what the prepayment history of the individual asset had been in the prior 30 days." Tr. 2208:8-18 (Wesp). The

changes in prepayment speeds, whether expected or not, changed the profitability of a MBS investment. Tr. 2208:20-24 (Wesp).

With respect to the consideration of MBS's prepayment risk, Mr. Wesp testified that it is actually "a complex kind of concept, and it gets very – the math gets very complex." Tr. 1759:20-22 (Wesp). This is not an academic concern that can be divorced from a consideration of the post-FIRREA period, breach or no breach. Prepayment risk became an issue during the 1980s and 1990s, when "interest rates were very volatile." Tr. 1760:14-18 (Wesp). Indeed, Fidelity "had quite a lot of prepayment risk in some years." Tr. 1761:3-4 (Wesp). "I know that in the early 1990s, we went through various periods of prepayments. . . . There was enormous volatility in here." Tr. 2091:11-2092:2 (Wesp).

Furthermore, to propose, as Dr. Kaplan suggests, that a hypothetical portfolio could be constructed to eliminate interest rate risk through a hypothetical matching of the durations or maturities of wholesale assets and liabilities, is simply incorrect. As Mr. Wesp acknowledged, wholesale strategies, or risk controlled arbitrage, were "not riskless," and faced the risk of prepayments of the mortgages underlying the MBS. Tr. 1785:3-7 (Wesp). Indeed, he admitted that Fidelity "had interest rate risk and . . . had prepayment risk." Tr. 2231:22-23 (Wesp). Moreover, he acknowledged that, if there were no risk, a wholesale strategy "basically should have no income." Tr. 1786:6-13 (Wesp). "[I]n order to make any money as a bank, you have to arbitrage a position and take some risk somewhere. As to whether it's credit risk, prepayment risk, currency risk or in this case interest rate risk. So the bank was [intentionally] assuming some interest rate risk at this time." Tr. 2027:1-9 (Wesp). Furthermore, even with ARM MBS, changes in interest rates can affect profitability. This is because, as interest rates increase, the

interest rates on the liability or funding side run up faster than the assets; a typical dynamic for a bank, even with respect to ARM MBS, because there is always a lag in price resetting over the short term. Tr. 2062:23-2063:14 (Wesp); PX 477 at AST056031 ¶ 8. Again, however, Dr. Kaplan's model is divorced from the reality of banking investments, and instead is little more than a blind behind which he pronounces constant profitability and growth.

#### 4. Dr. Kaplan's Pre-1994 Lost Profits Fail For Lack Of Causation

Astoria's pre-1994 lost profits claim suffers from three fundamental failures regarding causation. First, Dr. Kaplan cannot explain how alleged pre-FIRREA lost profits could possibly have been caused by the breach. Second, Dr. Kaplan ignores real-world problems constraining Fidelity's growth that were not caused by the breach and that would have constrained Fidelity's growth irrespective of the breach. Finally, Dr. Kaplan cannot show that, after Fidelity's conversion in 1993, it faced any constraints on its growth. Thus, any decision not to grow by using a wholesale strategy after 1993 was not caused by the phase-out of goodwill from regulatory capital, but rather from Fidelity's own independent business decisions.

##### a. No Causation For Pre-FIRREA Damages

In a very recent decision, the Federal Circuit upheld a decision of this Court finding that the earliest date upon which an unambiguous breach occurred related to the passage of FIRREA did not occur until two months after the passage of FIRREA, i.e., in October 1989, when the OTS wrote individual letters to a thrift demanding changes in the thrift's actions consistent with FIRREA. Bank of America, FSB v. United States, --- F.3d ---, 2007 WL 2137774, at *4 (Fed.

Cir. July 26, 2007).[27] No court has held that FIRREA caused a breach before Congress enacted the statute. See Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 880 (Fed. Cir. 1998). Yet this is exactly what Dr. Kaplan proposes, calculating lost profits damages beginning in January 1989. Accordingly, to the extent Astoria continues to believe that damages should be calculated for any pre-FIRREA periods, its claim fails for lack of causation as a matter of law.

Moreover, there is no factual basis to plaintiff's claim of damages beginning in January 1989. To begin with, Dr. Kaplan appears to have blurred the distinction between non-FIRREA regulatory proposals meant to deal with the ailing thrift industry issued in the fall of 1988, and FIRREA. Regulations that were not FIRREA-related were proposed in the fall of 1988 -- months before the FIRREA legislation was even proposed by President Bush in February 1989 -- and would have required additional capital for risky assets, including goodwill. Tr. 2705:17-2706:1; 2715:14-23 (Kaplan). Indeed, if Fidelity was concerned about changing capital regulations in early 1989, which its board minutes do not seem to indicate, see DX 2334, 2338, 2343A, 3348, 2353, 73; Tr. 1001:21-1002:7 (Powderly), it was concerned about the imposition of risk-based capital requirements, not the phaseout of goodwill. PX 447 at OAA005 1315; Tr. 720:6-23, 743:3-14 (Powderly); Tr. 1811:6-1813:22, 1828:6-1830:19 (Wesp); Tr. 2705:5-2706:9, 2715:13-23 (Kaplan). As Dr. Carron testified, there is simply no way that Fidelity could have known, in January 1989, what its officers would only really know after the regulations implementing FIRREA were passed and restrictions put into effect near the end of 1989. Tr. 5690:7-5691:19 (Carron).

[27] It is our position that the date of the breach is the date FIRREA was enacted, and Bank of America remains appealable.

Even after the initial draft of the FIRREA legislation was proposed in February 1989, the final form of the bill, and importantly, the ultimate treatment to be afforded goodwill, was unknown until final regulations came out. Tr. 1411:19-1412:6 (Vigna); Tr. 2037:2-2039:2 (Wesp). As Dr. Kaplan himself acknowledged, by the second quarter of 1989, the regulatory provisions being discussed by Congress as part of the FIRREA legislative process "were obviously not completed. . . . They weren't published, and they weren't adopted. . . . People were speculating. They had assumptions." Tr. 2975:15-22 (Kaplan). Because Fidelity never foresaw the phase-out of goodwill from regulatory capital, that is, the breach of contract, Tr. 1814:8-1815:10 (Wesp) (never expected termination of goodwill as part of FIRREA), the breach could not have motivated any pre-FIRREA activity. Indeed, if Fidelity had foreseen the phase-out of goodwill, one would have expected some evidence of calculations made by Fidelity to assess that effect on its operations. But, as Dr. Kaplan admitted, there is no evidence in this case that Fidelity made any calculations prior to the passage of FIRREA showing what it anticipated with respect to the capital pressure it would be under with the passage of FIRREA. Tr. 3708:6-11 (Kaplan).

Furthermore, even if Fidelity had anticipated the passage of FIRREA, according to the lost profits methodology envisioned by Dr. Kaplan, there would have been no need for it to cease the wholesale activity that Dr. Kaplan presumes would have led to certain lost profits:

> [E]ven if FIRREA were completely anticipated to go into effect in 1990, there was nothing to stop them from adding these assets to the balance sheet, if only for a year. Because the type of asset Dr. Kaplan is talking about, one-year adjustable funded by one-year advances, under his model, you can simply unwind those when the advances mature and the one-year adjustables adjust to a new rate. It should be, under his theory, costless and riskless to

> unwind them one year later. So I don't see how there can be forgone assets during calendar '89.

Tr. 5691:9-19 (Carron). Given that ARM MBS and the wholesale borrowings used to fund them could be obtained at "whatever volume at some price," by merely "pick[ing] up the phone" (Tr. 3046:23-25 (Kaplan)), there was nothing breach-related that prevented Fidelity from pursuing the wholesale strategy Dr. Kaplan hypothesizes during 1989.[28]

Accordingly, there is no basis as a matter of law, fact, or even Dr. Kaplan's own lost profits methodology for the notion that FIRREA caused any forgone profits prior to its passage and the publication of its implementing regulations.

**b. Regulators Would Have Barred Any Growth In Fidelity's Assets Pursuant to RB3a-1 Irrespective Of The Breach**

Of critical importance in this case was Astoria's inability to refute the uncontroverted testimony of Messrs. Vigna and Amend that, even if FIRREA had not been passed, the OTS would have restricted Fidelity's growth pursuant to RB3a-1, just as the capital plan did, because Fidelity was a deeply troubled institution by 1989, with a catastrophic portfolio of failed commercial loans.

In January 1990, a new regulation, RB3a-1, restricted all "4" rated institutions to little or no growth. JSF ¶¶ 88-90; Tr. 2774:12-22 (Vigna), PX 542 at AST0704292-94. Fidelity's October 5, 1987 RoE rated Fidelity a "4" on the five-point MACRO rating scale; it received a "4" for asset quality and a "2" for capital, indicating that asset quality was the driving force

---

[28] Mr. Wesp acknowledged that a wholesale MBS portfolio is highly liquid, permitting a manager to be "very opportunistic." Tr. 1878:16-17 (Wesp). "I probably could have sold two-thirds of the balance sheet on a phone call." Tr. 1841:21-23 (Wesp). "It's one of the things that dealing in a wholesale market allows you to do, because you can buy and sell a lot of things on a phone call." Tr. 1878:17-19 (Wesp).

behind the rating. Tr. 2798:15-2799:2 (Vigna); DX 1448 at WON732 0834. Because Fidelity's asset quality worsened between October 1987 and September 1989, which had nothing to do with the loss of goodwill from regulatory capital, Tr. 1885:16-1886:2 (Wesp), Fidelity would have continued to receive a "4" rating at best even absent the breach.[29] Tr. 2775:2-2776:12 (Vigna); see DX1448 at WON732 0834 (assets rated a "4" through April 1991 RoE; *all* factors other than capital rated a "4" in the OTS's April 1991 RoE).

Regulators impose growth restrictions as "a fundamental supervisory tool to limit exposure to future losses. . . . [W]e don't want institutions to go out and grow the balance sheet and potentially take on more losses than there are now. . . . the theory is let's keep them in place in terms of size and activities until they work out their problems." Tr. 1427:2-13 (Vigna). Accordingly, even in the absence of the breach, regulators would not have permitted Fidelity to grow using a wholesale strategy absent the breach starting in January 1990 until it obtained a "3" MACRO rating. Tr. 4612:14-4615:15, 4765:8-4766:3 (Amend).

In response to plaintiff's question on cross examination as to whether Fidelity would have been restricted under RB3a-1 if it had all of its contractual capital restored and met the capital requirements, Mr. Amend could not have been any clearer:

> I know they would have, because I would have got to make that recommendation or lack of recommendation to Angelo Vigna. . . . That would have been based on the fact that they'd had a high level of nonperforming assets. The trend was still adverse, didn't show signs . . . as abating. And the impact on earnings had – it

---

[29] Apart from its severe asset quality deterioration, Fidelity's capital would have deteriorated irrespective of the breach due to its loss of $34.21 million in non-contractual capital pursuant to the nonbreaching effects of FIRREA. See Tr. 1050:23-25 (Teurfs) (non-contractual capital included $25.815 million in goodwill from Fidelity's acquisition of Dollar Federal Savings and Loan Association).

> was severe and it was getting worse. So we would have asked them to deal with those problems and restrict their growth.

Tr. 4765:8-4766:3 (Amend).

Mr. Amend further testified, "[d]uring at least a major portion of that capital plan period, they would have been a troubled institution and would have had restrictions on them. As far as how they would have profitably operated, from an economic sense, the goodwill wouldn't have helped earnings, actual cash earnings." Thus, because regulatory restrictions on growth would have existed irrespective of the breach, in a real non-breach world, the loss of goodwill had no impact on Fidelity "from the time they entered the capital plan to basically the time they . . . did their stock conversion." Tr. 4660:7-25 (Amend).

#### c. Regulatory Concern With Fidelity's Very High Interest Rate Risk Would Have Existed Irrespective Of The Breach

Not only would Fidelity's growth have been restricted by the regulators pursuant to RB3a-1, limitations on the type of growth envisioned by Dr. Kaplan would have arisen irrespective of the breach from the tremendous interest rate risk that Fidelity faced in the early 1990's due to its lack of tangible capital. Because regulatory assessment of interest rate risk did not take into account goodwill either before of after the passage of FIRREA, this regulatory concern would have existed irrespective of the breach.

As noted above, in the OTS's 1991 RoE of Fidelity, the OTS determined that Fidelity suffered from extreme interest rate risk. See Def. Cont. Fact at § X (B)(2). Indeed, Mr. Wesp admitted that, in its 1991 RoE of Fidelity, the OTS found Fidelity's interest rate risk to be unacceptable, and "rightfully so." Tr. 2199:9-13 (Wesp).

The root cause of the Fidelity's interest rate problem was that it had very little economic value, and thus had very little capacity to absorb the risk from changes in interest rates. Tr. 4886:12-22, 4889:25-4890:5, 4895:19-25 (Moran). The reason that Fidelity had little economic value as measured by the market value of portfolio equity ("MVPE") analysis was that the thrift had a very low level of tangible capital. Tr. 4886:23-4887:8, 4968:1-10 (Moran).

As Mr. Moran explained, Fidelity's interest rate risk would not have been affected, even in a nonbreach setting because goodwill did not count in the OTS's calculation of interest rate risk, either before or after the passage of FIRREA. Tr. 4888:10-23, 4890:6-10, 4897:9-21, 4969:10-11 (Moran); DX 2971A; DX 2971. Goodwill did not figure in the calculation of interest rate risk because goodwill has no economic value, it is not an interest-bearing asset, and it provides no cushion against interest rate risk. Tr. 4890:6-10, 4897:9-21, 4900:5-4901:20 (Moran); DX 2971A at Appendix to Thrift Bulletin 13 at p.2. Indeed, even prior to FIRREA, and prior to the OTS's development of the MVPE model, the OTS's primary model for looking at interest rate risk, a "Gap Analysis," did not consider goodwill in the analysis, again, because goodwill is not an interest-earning asset. Tr. 4898:2-4901:20, 4979:16-4980:23 (Moran). Thus, both before and after FIRREA, goodwill had no affect on the interest rate risk analysis performed by regulators. Id.

Nor can Astoria claim that Fidelity was free from obligations to adhere to sound interest rate risk management regulations. As Mr. Wesp testified, Fidelity understood that it had an obligation to adhere to thrift regulatory bulletins such as Thrift Bulletin 13 ("TB 13"). Tr. 2049:22-25, 2194:9-11 (Wesp); DX 2971; DX 2971A. Mr. Wesp agreed that, in calculating Fidelity's interest rate risk under TB 13, goodwill was not included. Tr. 2051:17-20 (Wesp).

TB 13, which was issued in January 1989, (i.e., even before the introduction of any proposed FIRREA legislation), stated that certain balance sheet entries, such as goodwill, that might have been appropriate under regulatory accounting principles, were to be excluded from the calculation of a thrift's MVPE. Tr. 2051:17-2053:1, 2204:23-2205:2, 2205:10-12, 2206:4-6 (Wesp); DX 2971A at Appendix p. 2. Thus, the lack of inclusion of goodwill in computations of interest rate risk had nothing to do with FIRREA. Tr. 2053:2-16 (Wesp). Mr. Wesp explained that the lack of inclusion of goodwill in interest rate risk calculations makes sense "because goodwill has no interest rate risk. It has no cash flows. It has no duration. It's just an accounting entry. . . . [T]here would be no place in an interest rate risk model to put goodwill." Tr. 2053:12-2054-3; see also Tr. 2054:21-25 (Wesp). Mr. Wesp agreed that, to offset interest rate risk under TB 13, there "has to be a real asset [such as tangible capital], with a duration and cash flow." Tr. 2055:1-6 (Wesp). The fact of the matter is, however, that Fidelity did not have positive tangible capital until November 1991. Tr. 1905:6-14 (Wesp); PX 802; PX 822 at WON736 0203. Its lack of tangible capital would have existed irrespective of the breach, and thus its low MVPE, and extraordinarily high interest rate risk would have existed irrespective of the breach – until Fidelity dramatically improved its tangible capital.

In modeling the growth of the non-breach Fidelity, Dr. Kaplan pays little, if any, attention to the effect of Fidelity's interest rate risk on its capacity to grow. Indeed, Dr. Kaplan admitted that he did not analyze what effect the additional assets and liabilities he hypothesizes would have upon Fidelity's interest rate risk. Tr. 3388:19-23 (Kaplan). Part of this failure can be explained from the fact that Dr. Kaplan admittedly has no experience on the regulatory side of determining the interest rate risk an institution faced outside of the context of a merger. Tr.

2673:6-17 (Kaplan). Part of Dr. Kaplan's error in this regard also comes, however, from his mistaken assumption that a dollar of goodwill counted "for all capital compliance purposes. . . . It's as good as any other kind of capital for whatever purposes Fidelity would have." Tr. 2908:15-19 (Kaplan). Dr. Kaplan is simply incorrect. As noted above, goodwill could never be counted toward the regulatory assessment of an institution's interest rate risk, either before or after FIRREA.

Moreover, there can be no assertion that Dr. Kaplan's growth – of up to $737 million in additional assets – would have no effect on Fidelity's interest rate risk. Without additional MVPE (including tangible capital), the extraordinary interest rate risk Fidelity faced in the actual world would have been greatly exacerbated. Thus, increased size alone would have negatively affected Fidelity's interest rate risk. Apart from the issue of size, the internal interest rate risk embedded in any incremental assets must also be considered. While Dr. Kaplan claims a model of assets and liabilities that present little or no interest rate risk, Fidelity never operated in such a fashion. As Mr. Wesp testified, while you might "make a thrift totally interest rate insensitive if you chose to. It would be a radical – a radical strategy to only assume credit risk or prepayment risk . . . But it's only a theoretical argument. I don't know anybody that's ever tried it . . . [and] I wasn't about to try it." Tr. 2056:3-16 (Wesp).

#### d. Regulators Would Have Barred The Growth In The Wholesale Strategy Envisioned By Dr. Kaplan Irrespective Of The Breach

Dr. Kaplan proposes a rapid growth in incremental wholesale assets and liabilities in his nonbreach world. For example, between March and June 1989, Dr. Kaplan proposes a growth in wholesale incremental assets at over 100 percent. Tr. 3545:5-8 (Kaplan). Dr. Kaplan's

aggressive growth of wholesale assets and liabilities would have been of significant concern to regulators and such growth would have been barred by regulators in a nonbreach world, irrespective of the breach.

Wholesale leveraging, where both the assets and liabilities were obtained through wholesale transactions, was generally a regulatory concern. Tr. 4937:21-4938:4 (Moran). "[T]he basic point was that no matter how you structured it, by the nature of the instruments involved, you know, mortgage-backed securities and borrowings, you can't eliminate the risk. And you don't eliminate a lot of the concerns that you're going to have with taking on a lot of leverage." Tr. 4938:11-16 (Moran). Indeed, if there was no risk in a wholesale MBS, there would not be any earnings, and there might be losses from a wholesale transaction. Tr. 4938:17-4939:4 (Moran). Risks took on many forms, primarily affected by changes in interest rates. For example, prepayment risks, rate cap risks with respect to adjustable rate MBS, credit risk, and liquidity risk. Tr. 4939:5-4940:13 (Moran). In short, wholesale transactions involved "a lot of potential risks. It was not a – it was not in any way a sure thing." Tr. 4940:12-13 (Moran).

Regulators looked at wholesale activity with regard to how much additional risk was involved and how that activity affected a thrift's ability to absorb that risk. Tr. 4940:14-4941:4 (Moran). Again, as with the MVPE analysis, regulators focused on tangible capital as the indicator of whether a thrift could absorb the risk from wholesale transactions. Tr. 4941:5-14 (Moran). As noted above, Fidelity's MVPE analysis demonstrated that the thrift had no capacity to absorb any additional interest rate risk.

During the period of 1990 from 1994, regulators considered an investment strategy that involved the use of short-term wholesale borrowing to purchase short-term mortgage-backed securities that attempt to control for interest rate risk by duration matching of the assets and liabilities to be a risk controlled arbitrage ("RCA") or a wholesale leveraging strategy. Tr. 4945:3-17 (Moran). This is exactly what Dr. Kaplan proposes in his non-breach model.[30]

Generally, a RCA growth strategy was not permissible for thrifts that had an adverse examination rating, that is, an examination composite rating of a "4" or a "5." Tr. 4941:19-22, 4945:18-23 (Moran). Fidelity was given a "4" MACRO rating in connection the FHLBB's October 1987 RoE, with its poor asset quality the driving factor in the poor overall rating. Tr. 2798:15-2799:2 (Vigna); DX 1448 at WON732 0834. Regulatory restrictions on the pursuit of RCA strategies by "4" or "5" rated institutions existed because these institutions were considered to be at greater risk and leveraging transactions would only increase their risk. Tr. 4941:23-4942:1 (Moran). As Mr. Moran testified, "[T]he major risk, in terms of a risk

---

[30] Dr. Kaplan claims that he did not model an RCA strategy (Tr. 3476:11-3477:3 (Kaplan)), but this is merely a matter of semantics. He claims that an RCA strategy necessarily requires a formal hedging function, and he did not consider any hedges in connection with his modeling of the nonbreach Fidelity. From a regulatory point of view, he is simply incorrect. Hedging was not a necessary condition for a wholesale strategies to be considered an RCA transactions. Tr. 4937:11-13, 4949:11-14, 4950:1-3 (Moran). As Mr. Moran testified, regulators considered RCA transactions to involve the purchase of securities funded by some wholesale funding source, such as FHLB advances or reverse repurchase agreements, with an attempt to match the duration of assets and liabilities. Tr. 4930:1-9, 4936:20-4937:11 (Moran). This is exactly what Dr. Kaplan proposes in his model. Mr. Wesp, too, noted, that the Bank Board did not have a general rule that hedging was an essential part of a RCA strategy. A RCA's need for hedging "all depend[ed] on what the asset was and what the liability was." Tr. 1787:1-14 (Wesp). Fidelity's wholesale activity of buying wholesale assets funded by wholesale liabilities met the Bank Board's definition of a RCA. Tr. 1788:7-16 (Wesp). Moreover, the purposes of hedges is to reduce or "hedge" risk. The fact that Dr. Kaplan's portfolio has no such hedges makes it a riskier RCA strategy.

controlled arbitrage or any leveraging strategy, the fundamental risk is the leverage." Tr. 4947:15-17 (Moran). Regulators recognized that "leverage tends to magnify a risk," and the key concern was "not having the capital to support it," which regulators understood to be tangible capital. Tr. 4948:5-16, 4941:8-21 (Moran). The regulatory concerns and prohibition on risk controlled arbitrage for troubled institutions existed both before and after FIRREA. Tr. 4942:2-22 (Moran).[31] Mr. Moran testified that he was aware of no institution that was rated a "4" or a "5" that was permitted to engage in risk controlled arbitrage. Tr. 4945:24-4946:2. Accordingly, there is no basis for Dr. Kaplan's assumption that Fidelity would have been permitted to engage in the wholesale strategy he hypothesizes. Indeed, the evidence is clear that, irrespective of the breach Fidelity would not have been permitted by regulators to undertake the wholesale strategy that Dr. Kaplan proposes.

**e. No Causation Before Or After The Conversion**

During a number of months prior to Fidelity's conversion, and for the entirety of the time following its conversion, Fidelity's growth was not affected by capital restrictions but rather by its own business decisions.

In the period of months preceding the conversion, Fidelity deliberately stopped growing and actually shrank as a business decision in order to facilitate the conversion. Tr. 2704:14-19 (Kaplan). Between year-end 1992 and the time Fidelity went public, Fidelity's management was "trying to hold the balance sheet static, which means we did not want to grow." Tr. 2367:24-2368:14 (Wesp); PX 946 at AST031404 ¶ 2. Because Fidelity's conversion would have

---

[31] The thrift industry was aware of these restrictions prior to the passage of FIRREA, by the way of supervisory memoranda incorporated into thrift activities handbooks which were sent to institutions. Tr. 4943:20-4944:7 (Moran).

occurred at about the same time (May 1993) irrespective of the breach (Tr. 3774:12-21 (Kaplan); PX 1314A ¶ 44), a lack of growth for a period of months preceding the conversion would have occurred irrespective of the breach; thus, causation of injury with respect to growth restrictions cannot be shown during this period. In modeling lost profits damages, Dr. Kaplan ignores this fact.

Following Fidelity's conversion, it was unfettered by regulators and free to grow in the amount set forth in its October 1988 business plan, as Fidelity's own management admitted:

> Q: Did you start to grow again?
>
> A: We did, yes, yes. We did all the things that we couldn't do. . . . So now we had the ability to loosen things up a little and turn it back into a bank.
>
> Q: How did you view your capital situation after the conversion?
>
> A: Our capital after the conversion, obviously, was adequate for regulatory purposes. It was clearly adequate to support the asset base that we then had. And it clearly was adequate to support future growth based on our current earnings, in the kind of range we were talking about, the old 8 to 10 percent range, you know, sufficient to support that kind of growth.

Tr. 1962:2-17 (Wesp). Mr. Powderly agreed that, after May 1993, Fidelity's growth was not restrained by the capital plan, there were no regulatory concerns shaping Fidelity's growth plans, it was deemed well capitalized by the regulators, and Fidelity's problems with capital were "over." Tr. 610:3-11, 912:24-913:2, 917:3-24, 924:18-21, 925:25-926:2, 927:3-11, 1001:3-11 (Powderly).

Dr. Kaplan affirmed the testimony of Messrs. Wesp and Powderly, admitting that Fidelity had no growth restrictions after their conversion in 1993: "[T]hey were able to restart the growth strategy that had been in abeyance for these years since the advent of FIRREA." Tr. 2707:12-15 (Kaplan). "[T]he company resumed its prior growth following the conversion, and that's evident in all of the financial information. It did restart its growth and was, again, growing for a period of time in the 14 to 15 percent range." Tr. 3034:22-25 (Kaplan). See also Tr. 4659:9-19 (once capital plan was lifted (as it was following the conversion) "the bank would have been free of any OTS restrictions on how it would operate.") (Amend).

Other evidence supports the fact that Fidelity's capital problems were cured with its conversion. For example, in its response to the OTS's 1993 RoE, Fidelity stated that, "[t]he May 1993 recapitalization ended a long struggle" with its capital issues. PX 1029 at AST062095; Tr. 1001:3-11 (Powderly). Fidelity also stated in its 1993 annual report that its "prospects have been totally transformed by its recapitalization," and that, after its conversion, Fidelity was "correctly capitalized." PX 1249 at WON738 0779; Tr. 925:18-926:13 (Powderly).

Having relieved itself of any capital constraints by converting to a stock institution in 1993, Tr. 2478:11-2479:12 (Wesp), Fidelity could at that point have invested in Dr. Kaplan's wholesale portfolio had it so desired. Tr. 2149:5-2150:9, 2309:4-9, 2360:5-23 (Wesp). The fact that it chose not to do so underscores that Dr. Kaplan's assumption that Fidelity was interested in pursuing the wholesale portfolio growth he envisions is unfounded speculation. Indeed, as Dr. Carron testified, after the conversion, Fidelity exceeded all of the FIRREA capital standards, and the capital plan was terminated. Tr. 5725:16-18 (Carron). Because of the conversion in May 1993 and the termination of the capital plan, "Fidelity could have grown much more than it

actually did, based on its capital . . . . [I]t wasn't the capital constraints of FIRREA that limited its growth during that period . . . . Since they were in compliance and chose not to take advantage of adding incremental assets at that point, I don't see how there logically can be forgone assets. And if there are no forgone assets, then there are no lost profits." Tr. 5727:2-15 (Carron). See also Comm. Fed., 59 Fed. Cl. at 351-53 (2004) (Winstar-related lost profits denied following thrift's conversion).

Thus, even if lost profits could be shown prior to the conversion, they terminate with Fidelity's conversion in May 1993.

#### f. Fidelity Would Not Have Grown Absent The Breach In The Manner Dr. Kaplan Presumes

Furthermore, the evidence does not support Dr. Kaplan's claim that, absent the breach, Fidelity would have used an aggressive growth strategy in wholesale MBS assets and wholesale liabilities. Mr. Powderly admitted that any growth but for the breach would have likely been in one-to-four family mortgages, not in MBS. Tr. 396:1-25 (Powderly). His testimony is consistent with the fact that the wholesale portfolio strategy described by Mr. Wesp was in reaction to the breach, as Mr. Wesp oriented the thrift toward compliance with the capital plan. Prior to the breach, and in a non-breach world, to the extent MBS purchases were envisioned, they filled a gap in investments from available funding sources when one-to-four family mortgages were unavailable. PX 986 at AST064174; PX 1081 at WON759 1064.

Similarly, unlike the nonbreach operations propounded by Dr. Kaplan, Astoria never invested solely in one-year adjustable-rate mortgage-backed securities. Tr. 5273:5-7 (Engelke). Had Astoria been able to assume Fidelity's goodwill, and chose to leverage it, Astoria would

have invested in the same asset mix as the rest of its portfolio, which is mostly one-to-four family mortgages. Tr. 5295:18-5296:16 (Engelke). Astoria's current strategy has been to reduce investments in mortgage-backed securities from $12 billion in 1999 to $5 billion today. Tr. 5327:18-5328:11 (Engelke).

Contrary to Dr. Kaplan's assertion, Fidelity's managers believed that transactions involving MBS investments were too risky to be undertaken in times of great economic distress. MBS transactions contained interest rate risk, especially when the market faced an inverted yield curve at varying points after the breach. Tr. 733:14-734:24 (Powderly); Tr. 2043:5-2045:24, 2091:3-2092:2 (Wesp); see also Tr. 1787:1-14 (Wesp) (RCA transactions involving MBS ruined New York institutions). The inverted yield curve was, of course, unrelated to FIRREA. Tr. 2058:9-12 (Wesp).

### g. Economic Constraints Barred Dr. Kaplan's Growth

In addition to regulatory constraints, Fidelity was facing both specific and general economic constraints that would not have permitted the growth Dr. Kaplan projects. As of October 31, 1989, Fidelity had nearly $100 million in classified assets, contributing to a significant deterioration in Fidelity's economic vitality since 1987. PX 509 at AST002000. Even as late as the Astoria merger, these problem loans remained on Fidelity's books, prompting Astoria to demand further write-downs of their value. DX 2748 ($5.9 million in additional general reserves on mid-1980s loans); DX 2762 at AA4009 1685 (additional loan loss reserves required by Astoria on 1980s loans as of January 6, 1995); Tr. 664:9-12 (Powderly). The Suburbia goodwill phase-out had no bearing upon the deteriorating conditions of these loans. Tr. 690:13-25, 722:3-20 (Powderly).

Apart from its real estate loan problems, regulators harshly criticized Fidelity for its investments in certain mortgage-related securities, in particular pointing to Fidelity's lack of internal guidelines and controls. PX 509 at AST001974-76; PX 335 at PAA006 1207. Given its internal problems, Mr. Powderly admitted that even with the goodwill, Fidelity would only have leveraged "slightly" under the harsh economic conditions of the early 1990s. Tr. 794:25-795:3 (Powderly). Dr. Kaplan ignores all of these constraints on growth.[32]

General market conditions also would have constrained Fidelity's growth absent the breach. Tr. 2238:1-13 (Wesp). Although some periods were even worse than others, Tr. 2242:7-2243:7, 2244:12-16 (Wesp) ("the whole world froze" for the 90 days before the invasion of Iraq; "worse than a recession"), the entire period from 1990 through 1993 was characterized by Fidelity's own documents as being a recession. PX 564; PX 595; DX 2428 at PAA022 0178; DX 2470 at AST0129858-59; DX 2478 at AST030254; DX 2486; DX 2510 at AST030289; DX 2582 at AST030340; PX 899. In the early 1990s, "[t]he amount of market risk and interest rate risk were both increased in the area of other investments since the price of stock is subject to potentially sharp fluctuations of price[.]" PX 509 at AST0001974.

For example, in October 1990, Fidelity felt that the markets were doing poorly, and because of the Iraqi invasion of Kuwait, "there was not even a glimmer of hope for [the] markets to do better." Tr. 2230:4-11 (Wesp); DX 2454 at AST048512. Accordingly, Fidelity felt it was not a good time to purchase bonds or stocks, and Fidelity felt that the "next few quarters do not bode well." Tr. 2230:24-2231:1 (Wesp); DX 2454 at AST048512. The reason

[32] To the extent Mr. Powderly believed that absent the breach, Fidelity would have been the acquirer of other thrifts, he acknowledged that goodwill would not have helped in acquisitions, because acquirers are expected to have tangible capital. Tr. 947:16-24 (Powderly).

it was not a good time for Fidelity to buy at that time was not price-related but it was because of "the chaos in the world, in the world markets. There was – on October 15, we still had no idea where the world was going. It was very hard to make much of a commitment to getting out of bed in the morning. This was a really tough period in the investment business." Tr. 2232:17-2233:1 (Wesp).

Further exacerbating the poor investment climate, an inverted yield curve arose from 1989 through 1990, followed by volatile movements in interest rates. Tr. 733:20-734:13 (Powderly); Tr. 2043:5-2046:12, 2090:23-2091:10 (Wesp). Mr. Wesp explained that an inverted yield curve is a phenomenon in which short-term rates are higher than long-term rates. Tr. 2043:5-13 (Wesp); DX 539 at AST056073 ¶ 2. "Inverted yield curves cause financial distress in most financial institution balance sheets." Tr. 2043:24-25 (Wesp). Thus, "when the curve has actually inverted, during that period, there's no point in putting many assets on the books, because you're just buying losses." Tr. 2044:15-17 (Wesp). Mr. Wesp recalled that, in addition to the inverted yield curve that existed in 1989, he believed that there was an inverted yield curve in 1991. Tr. 2045:25-2046:12 (Wesp).

Mr. Wesp acknowledged that Fidelity had no way to predict an inverted yield curve, and that "it is almost impossible to remain immune to the effects of the interest rates in the short term." Tr. 2059:20-2060:12, 2062:10-22 (Wesp); PX 477 at AST056031 ¶ 8. Mr. Powderly testified that it was, "very difficult, in my judgment, to make any kind of money in an inverted yield curve." Tr. 734:10-13 (Powderly); see also Tr. 2725:8-16 (Kaplan) (negative yield curves negatively affect a thrift's profitability).

Given the foregoing, Fidelity's investment activities were minimal during periods of inverted yield curves, such as in March 1989. DX 539 at AST056073 ¶ 2. Accordingly, during the first quarter of 1989, financing transactions did not grow Fidelity's balance sheet, as "a direct result of the inverted yield curve." Tr. 2056:25-2057:7 (Wesp); PX 477 at AST056030 ¶3. This lack of growth through financing transactions had nothing to do with the proposed FIRREA legislation. Tr. 2058:22-2059:1 (Wesp). The inverted yield curve's duration extended beyond the first quarter of 1989. By the middle of May 1989, Fidelity's investment committee continued to note that Fidelity's investment activity was "very slow . . . due to the inverted yield." Tr. 2064:5-9 (Wesp); DX 2348 at AST055893 ¶ 2.

Even though Dr. Kaplan recognized that Fidelity's investment committee minutes stated that Mr. Wesp had advised the committee in April 1989 that financing transactions had not grown the balance sheet during the first quarter -- and that this was a direct result of the inverted yield curve -- Dr. Kaplan stated that he believed that there were other considerations that were not discussed in Fidelity's minutes that caused Fidelity's lack of growth at that time. Tr. 3531:14-3532:19 (Kaplan); DX 2345. In other words, rather than accept the plain evidence concerning Fidelity's lack of growth, Dr. Kaplan hypothesizes some other factor as causing that lack of growth, and then proceeds to ignore, in his analysis of Fidelity's non-breach growth, Fidelity's stated reason for a lack of growth at that time – an inverted yield curve.

Apart from inverted yield curve problems, there were periods of time when ARM MBS, the centerpiece of Dr. Kaplan's incremental assets, were not available in the market -- at prices Fidelity was willing to pay. Indeed, Mr. Wesp stated that there was a period when the demand for ARM securities "was far outstripping the supply," driving up prices to unattractive levels.

Tr. 1924:24-1925:3 (Wesp). This occurred in January 1989. Tr. 2011:1-13, 2011:23-2012:23 (Wesp); PX 1333 at AST0129798 ¶ 4. It also occurred in October 1989, as noted in Fidelity's Investment Committee Minutes, which stated that the supply of ARM MBS "is drying up and the prices are moving up." Tr. 2076:5-12, 2077:8-17 (Wesp); DX 2371 at AST055531 ¶ 2. Mr. Wesp recognized that the drying up of ARM MBS had nothing to do with FIRREA. Tr. 2077:8-17 (Wesp). It occurred again in April 1990, when Fidelity noted that "[T]here was currently very little available for purchase in the ARM market." PX 564 at AST049126 ¶ 2; Tr. 2118:2-6 (Wesp). As a result of limited availability in the ARM market, the prices or premiums for ARMs increased, which only increased the risk of losses from prepayments. Tr. 2118:7-23 (Wesp). The shortage of suitably priced ARM MBS continued in June 1990, as Fidelity's Investment Committee minutes noted that the demand for ARMs "is creating a shortage of available supply," i.e., of reasonably priced ARMs that Fidelity would be willing to buy. PX 599 at AST048967; Tr. 2186:24-2187:18 (Wesp). In August 1991, Fidelity again noted the lack of suitable ARM MBS instruments, noting that "there are a number of new purchasers with no supply." DX 2539 at PAA113 0095. Mr. Wesp explained this meant that "I couldn't find anything I wanted to buy," in the ARM market. Tr. 2325:24-2326:12 (Wesp).

**h. Other NonBreach Factors Would Have Caused Fidelity To Restrict Its Growth**

Wholly apart from the foregoing, at various times in the post-FIRREA period, Fidelity would have chosen to restrict its growth for other reasons unrelated to the breach. For example, following the passage of FIRREA, Fidelity's growth would have been affected by its loss of $34.21 million in non-contractual goodwill. The $34.21 million in non-contractual goodwill

included $25.815 million in goodwill from Fidelity's acquisition of Dollar, Tr. 1050:23-25 (Teurfs); PX 1283 at AST060064, for example, as set forth in the October 1988 business plan. Tr. 354:2-21, 704:13-705:5 (Powderly).

Furthermore, to the extent that Fidelity felt constrained to live up to the highest capitalization categories set forth in the Federal Deposit Insurance Corporation Improvement Act ("FDICIA"), Tr. 2344:11-2345:2 (Wesp); see also Tr. 3398:10-21 (Kaplan) (prudent thrifts operate with capital cushion), this too was a non-breach event whose effect was ignored by Dr. Kaplan.

**i. Dr. Kaplan Omits Costs Fidelity Would Have Borne In A Non-Breach World**

In addition to its other flaws, Dr. Kaplan's lost profits model fails to account for costs that Fidelity would have borne but for the breach. These costs include $800,000 in annual salary costs that Fidelity saved as a result of its capital constraints following FIRREA, but which Dr. Kaplan failed to take into account. Tr. 380:4-15, 433:3-23, 816:1-22, 818:9-819:7 (Powderly); Tr. 3603:9-3604:2 (Kaplan). Extrapolated over the period of 1990-1992 (i.e., the period prior to Fidelity's conversion), the avoided costs total $2.4 million. If this period is extended to 1990-1994, (i.e., the period prior to Astoria's acquisition), the avoided costs total $4 million.

While Dr. Kaplan claims that "there would have been increased results" as a consequence of an increased number of employees, he offers no explanation for his comment. Tr. 3604:25-3605:5 (Kaplan). Indeed, Dr. Kaplan's unfounded assertion ignores the fact that the numerous economic problems facing Fidelity (and the majority of all other thrifts) during the

early 1990s would not have been improved with additional manpower. If there is a recession and loans are not being generated, having additional staff adds nothing to the profitability of a thrift. Indeed, Mr. Wesp testified that Fidelity was fortunate to have pursued its wholesale strategy as a result of the breach because its performance was less dependent upon traditional lending operations (affected by the recession) than would have otherwise been the case. Tr. 1878:1-10, 2353:2-7, 2360:24-2361:1 (Wesp).

Similarly, Dr. Kaplan did not expressly take into account costs in advertising that Fidelity's officers claim it would have expended but for the breach. Tr. 2028:9-2029:11, 2030:11-19 (Wesp); DX 1203 at PAA010 1839; see also Tr. 2958:14-21 (Kaplan) (Fidelity always looking for more efficiency). Prior to FIRREA, Fidelity had a budget for and spent about $1.4 million on advertising. DX 1203 at PAA010 1839; Tr. 3905:7-3906:17 (Caporusso). Following FIRREA, Fidelity's marketing budget was significantly less than $1.4 million. Tr. 3912:9-16 (Caporusso). Indeed, the capital plan envisioned an annual advertising budget of $1 million between 1990 and 1992, and an annual budget of $800,000 between 1993 and 1994. Tr. 3915:13-3917:22 (Caporusso); DX 1945 at WON732 1802, 1861. This amount would constitute a reduction in advertising expenditures of $400,000 per year between 1990 and 1992, or a cumulative total of $1.2 million relative to Fidelity's pre-FIRREA advertising budget.[33]

---

[33] In fact, Fidelity appeared to have spent much less than the amounts budgeted for advertising as set forth in the capital plan. Indeed, Mr. Caporusso characterized Fidelity's post-FIRREA advertising budget as "very, very small." Tr. 3914:25-3915:1 (Caporusso). Based upon monthly advertising budgets, Fidelity's records indicate annualized advertising expenditures of less than $700,000 per year in the post-FIRREA period. Tr. 3917:23-3919:6; Tr. 3921:2-3923:18; 3924:2-3925:10 (Caporusso); DX 671 at PAA0837 1943 (May 1990 advertising budget of $57,000); DX 674 at PAA087 1697 (August 1990 advertising budget of $58,000); DX 680 at PAA087 1209 (May 1991 advertising budget of $53,000).

Again, without any foundation, Dr. Kaplan claims that the reduction in advertising led to a reduction in Fidelity's retail operations. Tr. 3606:22-3607:11. He simply ignores the economic recession, the decline in real estate, and the increase in unemployment during the post-FIRREA period, as well as the competitiveness of the Long Island banking market, and assumes that all increased costs in the nonbreach world (totaling millions of dollars), would be covered by increased revenues. In any event, Dr. Kaplan could not opine upon whether additional lending might have led to additional losses. "We certainly can't speak about the – what additional losses, if any, that lending would have generated. It's impossible to answer." Tr. 3719:12-14 (Kaplan). In truth, the profitability of Dr. Kaplan's non-breach bank simply ignores these avoided costs because Dr. Kaplan's focus is selectively limited to a hypothetical wholesale investment strategy. Tr. 3606:22-3607:11 (Kaplan).

### 5. Dr. Kaplan's Lost Profits Claims Fail For Lack Of Foreseeability

Astoria's lost profits claims for both periods fail for lack of foreseeability as well as lack of causation.

#### a. Precedent Indicates Damages Nearing The Goodwill Amount Are Unforeseeable

The Government could not have foreseen the magnitude of damages calculated by Dr. Kaplan at the time of the contract. One real dollar had a substantially higher value than one dollar of "gimmick" capital – goodwill. California Fed. Bank v. United States, 43 Fed. Cl. 445, 459 (1999), vacated in part, 245 F.3d 1342 (Fed. Cir. 2001). Real cash would not only have served the same regulatory function as goodwill, but could have been invested, unlike goodwill. Damages approaching, or, as in this case, almost equal to the book value of goodwill are

unforeseeable. Here, Fidelity seeks lost profits damages almost equal to the amount of contractual capital that was phased out with the passage of FIRREA ($120 million in damages (PDX 107) for the phase out of $123 million in contractual capital (PDX 48)). Given the universal condemnation of goodwill by both Fidelity's management and regulators evidenced at trial,[34] the magnitude of the damages calculated by Dr. Kaplan was unforeseeable by either Fidelity or the Government at the time of the contract.

**b. Fidelity's Operations Gave Regulators No Reason To Foresee The Scale Or The Source Of The Damages Dr. Kaplan Posits**

Fidelity's pre-acquisition operations did not suggest that it would launch massive wholesale portfolio growth. As of February 1984, Fidelity had only $67.8 million in MBS, $30.9 million in FHLB advances, and $23 million in other borrowings, out of total assets of $521.6 million. DX 3148 at PAA090 0109, 0118. Fidelity was not interested in acquiring Suburbia so as to engage in a wholesale growth strategy, but rather to enable Fidelity to enhance its Long Island franchise with Suburbia's valuable branch network. Stip. ¶ 58, PX 986 at AST064190. Indeed, Fidelity's CEO does not recall, as Fidelity was contemplating acquiring Suburbia, any consideration of engaging in what is sometimes called risk controlled arbitrage, Tr. 1653:18-1654:4 (Lovely), or a strategy engaging in wholesale borrowing to finance purchases of securities. Tr. 1654:5-11 (Lovely). Rather, Fidelity said it would completely

---

[34] At trial, witnesses testified without contradiction that the intangible asset known as goodwill was worthless. Tr. 303:2-8 (Fiol) (goodwill had no value), Tr. 413:10-14:15, 420:1-14 (Powderly) (not possible to affect desired stock conversion when Fidelity had goodwill; conversion became possible following goodwill phase-out, as goodwill was unattractive to investors); see also Tr. 416:2-15, 417:2-8, 452:20-453:2, 467:15-23, 747:5-23 (Powderly) (Mr. Powderly would not have done the Suburbia merger with goodwill); Tr. 1800:3-11, 1938:16-23, 2447:25-2448:3, 2539:10-2540:24 (Wesp).

restructure Suburbia's assets and emphasize "mortgage banking, increased joint venture activity, commercial and consumer lending, discount brokerage, and equipment leasing." DX 3148 at PAA090 0109.

The fact of the matter is that a wholesale investment strategy was the furthest thing from Fidelity's mind or its purpose in acquiring Suburbia. Fidelity had no formal investment operation prior to Mr. Wesp's arrival at the thrift. Tr. 1726:12-19 (Wesp). Indeed, Fidelity had very few securities on its balance sheet prior to Mr. Wesp's arrival. Tr. 1727:5-13, 1728:12-22, 1753:7-15 (Wesp). Mr. Wesp stated that, when he came to Fidelity "there was no investment activity at all to speak of. The few investments that they owned were listed on a legal pad. Really, there weren't even actively listed on the general ledger system." Tr. 1984:10-14 (Wesp). Mr. Wesp's statements concerning Fidelity's lack of any investment function or expertise before he arrived was repeated and adamant. Tr. 1730:17-1731:4, 1732:13-24, 1731:17-1732:6, 1987:2-5, 1833:13-15 (Wesp).

Moreover, during the mid-80s, trade in mortgage-backed securities was a "new industry." Tr. 1753:24-25 (Wesp). In part, this was because mortgage securities were not created until there were computer models available and desktop computers with sufficient power to model the complex cash flows, payoffs, and interest associated with mortgage securities every single month. Tr. 1754:12-22 (Wesp). Indeed, it was Fidelity's understanding (per Mr. Wesp), that it was not until August 1988 that regulators believed that wholesale investment strategies were viable for thrifts. Tr. 1784:21-1785:2 (Wesp). Nonetheless, because wholesale strategies involved "very sophisticated transactions . . . . [t]he expertise to do some of these things just didn't exist in the industry at the time." Tr. 1786:19-25 (Wesp). Furthermore,

Mr. Wesp did not have authority to implement a wholesale strategy until early to mid-1988. Tr. 1765:22:-1766:1 (Wesp).

Therefore, there could have been no foreseeability at the time of the contract by either party that the phase-out of goodwill would have any effect on a wholesale investment strategy as envisioned by Dr. Kaplan.

Finally, regarding the post-1994 damages, the regulators could not have foreseen that Fidelity's goodwill would have transferred to a cash purchaser in violation of both GAAP accounting rules and the very terms of the Assistance Agreement. For all of these reasons, Dr. Kaplan's lost profits were unforeseeable.

**6. Dr. Kaplan's Lost Profits Claims Are Not Reasonably Certain**

Just as Mr. Wesp testified that projecting an amount of income in a three-year business plan is "ridiculous," Tr. 1775:12-1776:13 (Wesp), neither period of Dr. Kaplan's lost profits calculations are reasonably certain because they are speculative.

**a. Fidelity's 1989-1994 Lost Profits Are Speculative**

The two basic assumptions of Dr. Kaplan's calculations of Fidelity's "lost profits" from January 1989 (with an alternate start date of January 1990) to December 31, 1994 are: (1) an incremental growth rate of two percent per quarter, resulting in "forgone assets" of $737 million, and (2) a spread of 80 basis points earned by the "forgone assets." The facts presented at trial, many of which are undisputed, contradict both assumptions. As a result, Astoria's calculation of Fidelity's lost profits is speculative.

**i. The Composition Of Dr. Kaplan's Non-Breach Bank's Assets And Liabilities Are Uncertain**

Dr. Kaplan has no experience modeling MBS, having never been engaged in operating or modeling any strategy executed in connection with a wholesale MBS portfolio. Tr. 2681:5-2682:5, 2682:14-23 (Kaplan). Accordingly, for example, Dr. Kaplan can recall of no instance where he ever modeled or analyzed the impact of prepayments on the return of MBS, nor has he ever developed a model to estimate future payments on MBS. Tr. 2685:12-20 (Kaplan). Given the lack of Dr. Kaplan's expertise in a number of areas, plaintiff's counsel offered that Dr. Kaplan would not "go into accounting issues, regulation of thrifts, the assessment of real estate, assessment of loan loss, assistance applications, management of thrifts, modeling of MBS. I really hadn't planned to go in to any of those topics." Tr. 2689:20-25 (Eisenhart). In arriving at his opinions in this case, Dr. Kaplan claims to have spoken with only one employee of Fidelity, Mr. Wesp, who recalled no discussions with Dr. Kaplan. Tr. 2697:2-7 (Kaplan); 2518:15-2520:13 (Wesp).

Dr. Kaplan did not actually model any particular portfolio of wholesale assets and liabilities. Tr. 3388:4-6 (Kaplan). He did not identify any particular MBS that Fidelity would have acquired absent the breach. Tr. 3424:11-14 (Kaplan). "My model isn't a model of a securities portfolio. It is a model of – a very simple model that simply forecasts a growth rate in assets that earn an 80-basis-point yield. There's no securities per se in my model. It's a representation." Tr. 3421:2-6, 3423:5-6 (Kaplan).

In response to the Court's query concerning what his term "incremental assets" means, Dr. Kaplan stated that "it means ARM MBS, adjustable rate mortgage-backed securities."

Tr. 3046:15-19 (Kaplan); see PDX 63 (yield calculated on Adjustable Rate MBS), Tr. 3055:6-11 (Kaplan). Dr. Kaplan repeatedly stated that Fidelity's incremental assets are ARM MBS. Tr. 3084:14-19, 3384:22-25 (Kaplan). Yet ARM MBS composed only 18 percent of Fidelity's assets in March 1988, and only somewhat more by December 1989. Tr. 3082:21-25 (Kaplan); PDX 67. Thus, prior to the breach, Fidelity's ARM MBS was a relatively modest portion of the thrift's assets. Nonetheless, Dr. Kaplan posits that 100 percent of the non-breach Fidelity's incremental assets are ARM MBS.

Dr. Kaplan explains that the wholesale strategy was, in fact, how Fidelity planned to operate under the capital plan. Tr. 3091:25-3092:13 (Kaplan). But he offers little to explain, if this action to pursue only wholesale operations was taken in response to the breach, why a purely wholesale operation should be assumed in a nonbreach setting, especially given Fidelity's pre-breach business plans, which propose significant growth in traditional lending operations.[35]

Dr. Kaplan later further refined his definition of his incremental assets by stating that all of the incremental assets for the period 1989-1994 were "one-year" ARM MBS with its repricing mechanism linked to the short-term Treasury. Tr. 3090:10-19, 3418:9-11 (Kaplan). "Q: Your lost profits calculation assumes that for the period 1989 through 1994, all of the foregone assets are one-year adjustable-rate mortgage-backed securities, correct? A: Yes." Tr. 3423:16-20 (Kaplan). Dr. Kaplan freely admits that his "model is not a whole bank calculation.

[35] One explanation, of course, which plaintiff disavows, is that Fidelity was, through its capital plan, merely continuing to do what it had been doing prior to the breach, as a result of its disastrous loan portfolio, lack of skilled underwriters, and an already deteriorating real estate market.

It is that slice, if you will, the wine-colored slice of just the ARM MBS." Tr. 3095:3-5 (Kaplan), discussing PDX 70.

When challenged at trial, however, Dr. Kaplan changed his description of the incremental assets while on the witness stand. Backtracking, Dr. Kaplan also stated that not all of the ARM MBS he envisions would be one-year ARM: "There would certainly be some that might be monthly adjustments or every -- or six month adjustment periods. And there might be some that would exceed the one-year period." Tr. 3389:18-21 (Kaplan). Indeed, Dr. Kaplan stated that not even a majority of his incremental assets are one-year ARM MBS: "It would not be correct to assume that the majority are. Certainly, a portion of them are. And as I just said, there's a mixture. There will certainly be some monthly adjustable in there. And there may be some three-year adjustable." Tr. 3441:21-3442:5 (Kaplan). Reversing himself yet another time, Dr. Kaplan admitted that, in his deposition given before trial, he stated that his incremental assets are one-year adjustable ARM MBS. Tr. 3457:20-23 (Kaplan). He then said, "And my comment today would be as we have been reviewing this, over the 5-1/2 years, those wholesale assets were predominantly one-year adjustable. But I have hopefully clarified that they are not 100 percent one-year adjustable." Tr. 3457:22-3458:2 (Kaplan). In yet another iteration of his incremental assets, Dr. Kaplan added five-year adjustable MBS to his envisioned portfolio of six-month, one-year, and three-year ARM MBS. Tr. 3470:22-3471:15 (Kaplan).

When asked for clarification as to what point in time he envisioned the incremental assets as involving longer duration ARMs (i.e., those exceeding one-year), he stated that he had always "characterized the damages model as it would be more of what the institution was doing during this period. . . . [T]here would be other things in the portfolio." Tr. 3390:2-15 (Kaplan).

"It's a whole portfolio of adjustables, and as I've just said, that there's a mix of adjustable instruments in that portfolio." Tr. 3391:20-3392:9 (Kaplan). "The foregone assets includes whatever is in Fidelity's adjustable mortgage securities portfolio, and I can't tell you from memory all of the specific items that are in there." Tr. 3424:21-3425:2 (Kaplan).

Dr. Kaplan further opined that there could be agency as well as privately issued ARM MBS. "That's been my point. There's a lot of different things in the portfolio." Tr. 3425:8-21 (Kaplan). Even though agency and private issue ARM MBS have different characteristics in a number of areas (teaser rate durations, coupon rate caps, net margins, lifetime caps, payment delays, etc.), Dr. Kaplan does not believe the mix of agency and private ARM MBS makes any difference to his lost profits analysis. Tr. 3426:1-3427:23 (Kaplan). Nor could it, since he never specified any particular proportion of agency to private-issue ARM MBS, or any other distinguishing characteristics of particular types of ARM MBS. Tr. 3427:16-23 (Kaplan).

While Dr. Kaplan may have envisioned incremental assets composed of various types of ARM MBS, he claims that he did not consider Fidelity's actual wholesale holdings or strategy to be applicable to his model. See Tr. 3396:21-3397:7 (Kaplan) (acknowledging that his incremental assets and liabilities are "just the narrow piece" of the entirety of Fidelity's wholesale strategy "that I've used for the damages calculation"); see also Tr. 3429:2-3432:16 (admitting he did not include non-ARM wholesale investment assets held by Fidelity, including Treasuries, Fannie Mae Dwarfs, Freddie Mac Gnomes, Fannie Mae or Freddie Mac balloons, Fannie Mae and Freddie Mac fixed-rate MBS, CMOs and REMICs). Indeed, Dr. Kaplan's lost profits methodology disregards 40 percent of Fidelity's real-world wholesale investments to focus solely upon ARM MBS. PX 599 at AST049054; Tr. 3429:2-3432:16, 3434:7-15

(Kaplan). Although Dr. Kaplan modeled lost profits damages based upon a wholesale portfolio of ARM MBS, he admitted that Fidelity would have likely added other types of assets in a non-breach setting. Tr. 3084:20-24 (Kaplan). When discussing those alternatives, however, Dr. Kaplan first discussed the activities of Mr. Wesp in the wholesale arena, an area that, even with the inclusion of ARM MBS, composed only about half of Fidelity's assets prior to the breach. Tr. 3084:20-3086:7 (Kaplan); PDX 67. He admitted that his incremental assets and liabilities do not present a "strategy for an institution to pursue as its entire business strategy." Tr. 3397:8-18 (Kaplan). "This has not been offered as a business strategy for a whole bank institution." Tr. 3397:6-7 (Kaplan).

Dr. Kaplan also discussed Fidelity's lending operations in a non-breach world, claiming that by ignoring lending operations (as well as other wholesale assets), he is being conservative as he turns to the calculation of damages based upon an all ARM MBS portfolio. Tr. 3086:2-7, 3086:20-3087:8 (Kaplan). The opposite, however, is the case. Given the underwriting climate in the post-1989 period, where Fidelity faced (along with most other thrifts), an intense economic recession and decline in the real estate market, Dr. Kaplan's tactic of selecting only ARM MBS only increases the likely return of nonbreach assets.[36] Moreover, the wholesale-only assumption sidesteps the significant additional employee payroll and advertising costs that

[36] Dr. Kaplan posits an alternative reason for why he did not include assets other than ARM MBS in his conceptualization of the nonbreach thrift. He states that it would have been speculative to assume the actual asset mix of the nonbreach thrift, and thus, he has decided to "fall back" to what "the bank would have done if they couldn't find anything better." Tr. 3093:24-3094:12 (Kaplan). In fact, however, Dr. Kaplan's reversion to a "fall back" position of only one kind of nonbreach assets is even more speculative than a projection (which he could have easily have adopted), that, absent the breach, Fidelity would have continued to underwrite loans and pursue MBS investments in much the same way and in the same proportions as it did in the actual world.

Fidelity's executives said would have been incurred absent the breach. See above at §III C (4)(h).

Dr. Kaplan's modeling of Fidelity's but-for liabilities or funding sources is equally uncertain. Dr. Kaplan states that his nonbreach liabilities are only composed of short-term wholesale liabilities, "whether they're [FHLB] advances or reverse repurchase agreements." Tr. 3089:24-3090:2 (Kaplan). While he initially stated that the funding sources could be both FHLB advances and reverse repurchase agreements, he then repeatedly stated that he assumes the one-year FHLB advance to be the "primary funding source." Tr. 3116:2-3, 3091:2-3, 3392:16-22, 3461:9-12 (Kaplan).

In any event, Dr. Kaplan's testimony at trial contradicted his testimony given during his deposition prior to trial in which he stated he did not take <u>any position</u> as to what the incremental liabilities would be:

> Q: Isn't it a fact that you testified in 2001 that you didn't make any assumptions about what the mix of foregone liabilities would be?
>
> A: I believe I did say that.

Tr. 3463:11-14 (Kaplan).

That is, like his selected nonbreach assets, Dr. Kaplan's proposed nonbreach liabilities ignore Fidelity's actual retail operations, which on the funding or liability side, are composed of its deposits. Again, rather than being conservative, this assumption sidesteps the fact that, given the economic recession and real estate market decline, retail deposits would not provide a sufficient source of funds for the $737 million of growth that Dr. Kaplan hypothesizes in his model. Furthermore, Dr. Kaplan's erroneous assumption to exclude the actual mix of assets and

liabilities held by Fidelity is merely an attempt (ultimately unsuccessful) to sidestep the issue of interest rate risk. "By focusing, in particular on one-year Federal Home Loan Bank advances, we essentially take out of the picture the interest rate risk issue, because we've matched up the short-term adjustable rate ARMS with the short-term funding source, and that's important in terms of understanding how we have squeezed risk out and the issues it would otherwise raise to the profitability results of the wholesale strategy." Tr. 3091:2-9 (emphasis added), 3116:2-6 ("[B]y choosing to match the one-year advance rate as the primary funding source with the one-year adjustable rate ARM, I've matched maturities and squeezed out therefore, predominantly the interest rate risk that would otherwise be present.") (Kaplan).

### ii. Dr. Kaplan's Assumed Growth Rate Is Unsupportable

Dr. Kaplan bases his two percent per quarter growth assumption upon three factors: (a) Astoria's growth rate between December 1989 and December 1993; (b) Fidelity's October 1988 business plan; and (c) Fidelity's pre-FIRREA and post-conversion growth rates. See PX 1314A ¶¶ 47, 53. None of these three factors supports this assumption.

#### A). Dr. Kaplan's Reliance Upon Astoria's Growth Rate Is Unsupported

Astoria's actual growth rate demonstrates that the 8.25 percent growth rate projected by Dr. Kaplan for Fidelity is implausible. Unlike Fidelity, Astoria had hundreds of millions of dollars in tangible capital, with capital ratios in the top percentiles of its peer institutions for March 1990 (the first quarter after the FIRREA regulations took effect), DX 5010, and March 1994 (the end date for Dr. Kaplan's 8.25% growth), DX 5011, Tr. 5374:17-5375:6 (Kennedy).

Astoria, however, did not grow at an 8.25 percent growth rate, even though it had no capital-related restraints on its growth after FIRREA. Tr. 5375:17-5376:1, 5377:8-16 (Kennedy).

Instead, Astoria increased its total assets at a compounded annual rate of just 5.77 percent between December 31, 1988 (the date Dr. Kaplan begins calculating growth for Fidelity absent the breach) and June 30, 1993 -- from $3.075 billion to $4.072 billion. See DX 2962 at AA1001 0394.

Moreover, between December 31, 1989 (the start date for Dr. Kaplan's alternate calculation in Exhibit 9B to his affidavit) and Fidelity's conversion in May 1993, Astoria's adjusted total assets had grown at a compound annual growth rate of 1.49 percent. See DX 1150 at § 3.1.1 p. 11-12. As Mr. Kennedy explained, Astoria's pre-conversion growth rate was more relevant to the reliability of Dr. Kaplan's 8.25 percent figure than its post-conversion growth rate. Tr. 5616:10-5617:11 (Kennedy). Although Astoria was not constrained by its regulatory capital position between 1989 and 1992, its growth rate was still far lower than Dr. Kaplan's 8.25 percent rate for these years. In fact, Astoria's 1989-1992 growth rate unadjusted for acquisitions was three percent, DX 5012; Tr. 5377:20-5378:21 (Kennedy). Moreover, Astoria's compounded growth rate was slightly under six percent unadjusted for acquisitions from December 1988 to December 1993, and slightly less than three percent through December 1992. DX 5012; Tr. 5378:22-5379:2 (Kennedy).

Astoria's 1989-1992 growth rate adjusted for acquisitions (an analysis Mr. Kennedy performed to match the assumptions in Dr. Kaplan's model) was less than one percent, despite Astoria's having more than sufficient capital to grow at 8.25 percent. DX 5013; DX 1150 at Exhibit 5.0 and p. 11 table 1; Tr. 5380:17-5381:1 (Kennedy). Excluding the $281.5 million in

assets acquired by Astoria from another thrift in November 1990, Astoria's assets increased by only a small amount, $63.5 million, from December 1988 to December 1992. DX 2962 at AA1001 0394, AA1001 0514; Tr. 3603:6-8 (Kaplan). Indeed, Astoria's asset size decreased between 1990 and 1991, and only grew by four-and-a-half percent between 1991 and 1992. Tr. 3602:4-19 (Kaplan); DX 2962 at AA1001 0394. Despite this lack of growth, Astoria had sufficient capital to grow at 8.25 percent during this period if it had chosen to do so. Tr. 5381:16-5382:8, 5612:17-5613:3 (Kennedy). Astoria's modest growth despite ample excess capital thus belies Dr. Kaplan's growth assumption for the less-capitalized Fidelity.

Dr. Kaplan's reliance upon Astoria's growth rate is also undercut by the growth experience of Fidelity's peer group, as shown in Fidelity's OTS reports of examination. According to the OTS April 1991 report of examination (PX 770 at AST 002928), for the year ended 1989, Fidelity's peer group had zero growth. Tr. 5385:7-5386:14 (Kennedy). During 1990 Fidelity's peer group shrank 4.9 percent in 1990. Tr. 3546:25-3547:5 (Kaplan); PX 851 at OAA002 0034. Dr. Kaplan acknowledges that for thrifts, "1990 was an incredibly difficult year." Tr. 3549:2 (Kaplan). Nonetheless, Dr. Kaplan projects that Fidelity's incremental assets would have doubled in 1990, from $152 million to $328 million. Tr. 3549:23-25; PX 1314A at Ex. 9A. Dr. Kaplan tried to explain that it was his methodology and not the facts that provided for the growth of his nonbreach bank in 1990. "The point is that rather than make it, for example, zero percent for 1990 and a higher percentage in 1992, for example, I kept it constant." Tr. 3550:19-22 (Kaplan). During 1991, Fidelity's peers continued shrinking -- by 3.3 percent according to the OTS April 1993 RoE (PX 996 at FAA005 1081). Tr. 5389:10-5390:22 (Kennedy).

Dr. Carron's analysis also confirmed that the industry as a whole was not growing at Dr. Kaplan's 8.25 percent growth rate during these years:

> [B]eginning in 1987, the industry had losses in four straight years. And then in '91 had a small profit . . . . [T]he assets will tell you the same picture, slow growth in '87 and '88 and then the industry is shrinking '89, '90, '91 and for the next several years going forward from that. . . . [T]he national economy [is] a measure of the environment, the market conditions and how those played out with respect to thrift institutions. Because whatever the differences between institutions, they were all operating in a national marketplace, in terms of interest rates and availability of assets like mortgage-backed securities and operating under similar regulations and similar philosophies of their concentration in the mortgage area.

Tr. 5701:13-5702:21 (Carron); DX 1147 at Exhibit 5.

**B). Dr. Kaplan's Reliance Upon The October 1988 Business Plan Is Unsupported**

Dr. Kaplan relies upon the 8 to 10 percent growth rate contained in Fidelity's October 1988 business plan, PX 447, as support for his 8.25% growth rate assumption. PX 1314A ¶ 53. Fidelity's October 1988 Three Year Business Plan called for an increase in capital and in particular GAAP capital, balance sheet growth of 8 to 10 percent per year, reduced loan concentrations and increased credit quality, and an increased return on assets to a stable 50-70 basis point range. PX 447 at OAA005 1315.

Nevertheless, at trial, Dr. Kaplan also hedged on his use of the October 1988 Business Plan. Dr. Kaplan testified that the October 1988 business plan does not support a particular growth rate for Fidelity in the non-breach world, but merely that it was interested in growing within a bracket of growth. Tr. 3554:11-3555:3 (Kaplan). Indeed, Dr. Kaplan claimed that the 1988 business plan was not critical to him as he came to his opinion concerning Fidelity's non-

breach growth rate, "given that I had the opportunity to discuss personally with Mr. Wesp on several occasions the issues in this case." Tr. 3556:2-12 (Kaplan). In any event, Dr. Kaplan agreed that business plan projections can be problematic because sometimes the projections are inaccurate. Tr. 3557:8-16 (Kaplan).

The type of growth projected in the October 1988 Business Plan contradicts Dr. Kaplan's model, because that plan did not focus upon substantial growth through a wholesale strategy with matched durations and maturities, or a so-called risk-controlled arbitrage strategy. Indeed, the October 1988 Business Plan contained "no forecasted earnings from Risk Controlled Arbitrage transactions." PX 447 at OAA005 1315. Fidelity's October 1988 business plan stated that Fidelity did not want to become dependent on RCA transactions "in an environment of volatility and uncertainty." Tr. 1801:11-14 (Wesp); PX 447 at OAA005 1315. Mr. Powderly agreed with that pronouncement. PX 447 at OAA005 1316; Tr. 742:6-18 (Powderly).

Mr. Wesp explained that, as of October 1988, Fidelity was cognizant of the need for "being very conservative," given "the real estate markets were uncertain, as the New York markets were clearly weakening," bond markets "were very volatile," banks were being forced out of business, "[o]il prices were all over the place," and, "[i]nterest rates would move in hundreds of basis points up and down." Tr. 1801:15-1802:4 (Wesp); see also Tr. 1808:17-19, 1809:3-7 (Wesp) (worldwide fixed income markets were expected to remain volatile and dominated by professional trading activity, which itself creates enormous volatility in prices); PX 447 at OAA005 1316 ¶ 2. Nonetheless, in Dr. Kaplan's modeling of the nonbreach world, Fidelity feels no restraint from these factors as he models a dramatic $737 million increase in

the thrift's size due to wholesale transactions, which, as Mr. Wesp stated, were essentially RCA transactions. Tr. 1800:24-1801:6 (Wesp).

While the October 1988 Business plan projected that Fidelity would grow between June 1988 and June 1991, over 70 percent of this growth was projected to come from investments in retail assets (such as mortgage loans, consumer loans, and home equity lending), not wholesale assets. PX 447 at OAA005 1342-43; Tr. 361:20-365:18 (Powderly). Similarly, Fidelity anticipated relying on an increase in deposits to fund this growth, not exclusively wholesale liabilities, as Dr. Kaplan's calculations assume. PX 447 at OAA005 1315. Even where Fidelity did pursue MBS investments, it invested in a wide array of MBS, including long-term fixed rate MBS, and not simply the one-year ARM securities Dr. Kaplan hypothesizes.

Dr. Kaplan presented an analysis of the projected nonbreached growth rates for Fidelity between 1989 and the end of 1991 pursuant to the 1988 Business Plan in PDX 65. PDX 65; Tr. 3063:17-3070:16. (Kaplan). That analysis had a single source, PX 463, which was described as a January 1989 update to the business plan. That document, however, was not disclosed as a document Dr. Kaplan relied upon, Tr. 3065:11-3066:11 (objection), and was never introduced by plaintiffs at trial. Accordingly, there is no documentary evidence in the record to support Dr. Kaplan's opinions set forth in PDX 65 and discussed by him at trial. Furthermore, Dr. Kaplan admitted that he did not know whether the January 1989 update was ever adopted or even considered for adoption by Fidelity's board. Tr. 3551:24-3552:3 (Kaplan).

Further, Dr. Kaplan demonstrates a blind faith in the feasibility of the growth projected in the October 1988 Business Plan, in the face of overwhelming evidence of its implausibility. Dr. Kaplan posits this steady quarterly growth rate regardless of economic

conditions, Fidelity's asset quality problems, the inverted yield curve, changes in interest rates, the Gulf War's effect on capital markets, the price of oil, inflation, the volatility of the financial markets, the loss of Fidelity's non-contractual capital with the passage of FIRREA, and price of available asset, all without attempting to quantify the impact of any of these risks. Tr. 3522:9-3524:6, 3527:1-11; 3527:21-3528:19; 3533:21-3534:2; 3534:15-3535:1 (Kaplan).

Unlike Dr. Kaplan, Fidelity's executives did not claim that their business plans were impervious to market conditions. To the contrary, Mr. Powderly and Mr. Wesp testified that the October 1988 Business Plan did not anticipate macroeconomic events such as a major recession lasting through 1991, war in the Middle East, and a slumping real estate market -- all of which Fidelity described as "impossible to contemplate" when it submitted its capital plan in January 1990. PX 787 at AST002748; PX 795 at WON725 1394; PX 986 at AST064185; Tr. 526:4-17, 741:4-742:5, 798:7-18, 881:3-16, 882:21-883:19, 911:19-912:23 (Powderly), Tr. 1751:5-15, 1790:5-11, 1808:15-25, 1824:1-22, 1991:5-11, 1992:25-1993:14, 1994:21-1995:22 ,2427:15-22 (Wesp); see also DX 1147 at 13 ¶¶ 42-44.

When Fidelity set forth a goal of 8 to 10 percent growth in its October 1988 business plan, it "did not anticipate the severity or the depth of the recession" or the subsequent credit crunch that accompanied the recession. Tr. 2427:4-14 (Wesp); see also Tr. 2168:2-15 (October 1988 business plan an "intellectual exercise"), 2174:2-2175:1 (discussing "event risk"), 2426:5-12 (Wesp) (business plan a "living document"). Mr. Powderly also testified that, even with the goodwill, Fidelity would only have leveraged "slightly" under the harsh economic conditions of the early 1990s. Tr. 794:25-795:3 (Powderly); PX 533; see also Tr. 5393:20-5395:3 (Kennedy) ("dramatic downturn" in economy in early 1990's).

Mr. Powderly testified that goodwill was worthless other than for compliance with regulatory capital levels before FIRREA. Tr. 359:7-12, 413:13-414:15, 865:1-3 (Powderly). Similarly, Mr. Wesp testified that the loss of goodwill had no impact on Fidelity's business plans:

> Goodwill is – in terms of whether it's Fidelity or whether it's IBM, annual budgets and long-term strategic plans are immune to goodwill, because it's an asset that sits on the books, doesn't earn anything, is amortized off on a fixed schedule by your accountants over which you have no control and has absolutely no impact on your current business, whatsoever, no matter what business you're in. So the statement you made is absolutely correct. It had no impact on anything we did.

Tr. 2301:22-2302:5 (Wesp). Moreover, Mr. Wesp agreed that the effects of the recession would have been felt by Fidelity with or without the phase-out of goodwill. "Same answer as I just gave you. Yes. Goodwill has no impact on any business strategy for any corporation ever." Tr. 2303:7-12 (Wesp).

Mr. Powderly testified that even if Fidelity continued to operate under the October 1988 business plan as of January 3, 1990, it would have had to reevaluate its growth plans in connection with the economic climate, and would have had to revise downward its growth projections due to a downturn; Mr. Powderly agreed that the New York real estate market was "depressed" as of June 1991. Tr. 798:11-18, 878:15-22 (Powderly). Mr. Wesp, too, agreed that business plans should be regularly revised if key assumptions in the plan turn out to be incorrect. Tr. 2426:5-8 (Wesp).

Similarly, Fidelity's October 1988 business plan did not contemplate the inverted yield curve in the late 1980s, which required Fidelity to be more careful, and limited the thrift's

growth. PX 734; Tr. 875:14-876:2, 884:18-885:1 (Powderly); Tr. 2058:9-2060:16 (Wesp). Absent the breach, the inverted yield curve would have led to a reevaluation of the business plan as economic conditions changed. Tr. 741:4-742:5, 798:4-18 (Powderly). Nor would the use of a wholesale strategy enable Fidelity to avoid the difficulties with the macroeconomic climate; Mr. Kennedy testified that a wholesale strategy would be very difficult with an inverted yield curve, and Fidelity would still have had to deal with the other economic problems. Tr. 5611:20-5612:16 (Kennedy).

Nor did Dr. Kaplan consider the admissions made by Fidelity to regulators that its previous budget for 1988 envisioned “minimal” asset growth because of the thrift’s tremendous asset quality problems. DX 69A at OAA002 0087; Tr. 707:23-708:9 (Powderly). That budget also included additional reserves of $2.4 million in net income due to losses in Fidelity’s loan portfolio, particularly the commercial loans. DX 69A at OAA002 0087; Tr. 708:10-19 (Powderly). Mr. Powderly agreed that the lack of growth was due to the commercial real estate portfolio. Tr. 708:20-25 (Powderly).

The October 1988 business plan was also rendered obsolete by the change in the overall regulatory environment in the banking industry, i.e., with regard to the non-breach components of the huge piece of legislation comprising FIRREA. As Mr. Wesp testified: “By the time you get to the spring of 89, the ‘88 budget, if it ever had any meaning in the real world, has been thrown in the garbage can. Because by now we know that FIRREA is coming. By now we know that the regulatory environment is going to change significantly.” Tr. 2059:9-13 (Wesp). Mr. Wesp acknowledged that FIRREA changed the overall regulatory landscape so much, that

even if the Suburbia goodwill had been left on Fidelity's books, the 1988 business plan would have been useless:

> A: When FIRREA was passed you would have taken this budget and put it in the garbage can.
>
> Q: Even if you had the Suburbia goodwill on your books?
>
> A: No matter what. You know, if I had made $110 million trading orange juice futures in the meantime, you would have taken the budget and put it in the garbage can.
>
> Q: Why is that?
>
> A: Because FIRREA so changed the landscape, so changed the regulatory environment, that any plan that you had prior was meaningless.

Tr. 2433:8-18 (Wesp).

Also, the October 1988 business plan did not contemplate – and Dr. Kaplan did not consider – the approximately $34.21 million in non-contractual capital that was eliminated from Fidelity's regulatory capital computations after the passage of FIRREA. The $34.21 million of non-contractual capital includes $25.8 million in goodwill from the Dollar acquisition, plus loan discounts and general valuation allowances, and represented 27 percent of Fidelity's pre-breach regulatory capital and 48 percent of Fidelity's pre-breach excess capital. Tr. 5405:1-5408:20 (Kennedy); DX 5015; Tr. 1050:23-25 (Teurfs); Tr. 354:2-21, 704:13-705:5 (Powderly); DX 69A at OAA002 0086; PX 1283 at AST060064. The Dollar goodwill as of December 1989 was $19.3 million, or about 15 percent of Fidelity's total regulatory capital. Tr. 2438:11-2439:18 (Wesp); PX 526 at AST008365.

Moreover, the Dollar goodwill alone (apart from other non-contractual goodwill that Fidelity lost with the passage of FIRREA), constituted about 27 percent of Fidelity's excess capital, resulting in what Mr. Wesp agreed was "a pretty significant reduction in Fidelity's excess capital." Tr. 2441:19-2442:2; PX 502 at WON722 0260 line 990, WON722 0269 line 975. As Mr. Wesp admitted, if a thrift lost even 10 percent of its capital it would be a "big number." Tr. 2436:2-3 (Wesp). He further recognized that excess capital is an important and necessary factor to consider when a thrift is considering its ability to grow, because a thrift would not want to grow itself out of capital compliance. Tr. 2438:2-10 (Wesp). Fidelity's executives admitted that it may have had lower growth projections if the non-breach loss of Dollar goodwill capital were foreseen. Tr. 748:9-20, 756:7-758:13 (Powderly); Tr. 2430:4-7, 2439:2-18, 2441:3-2442:2 (Wesp).

Mr. Kennedy testified that Fidelity still would have written off Dollar goodwill when it did because Fidelity closed the Manhattan branches it acquired from the Dollar acquisition. Tr. 5409:9-5410:9 (Kennedy). Unlike Dr. Kaplan's suggestion that Fidelity could have chosen when to write off the Dollar goodwill, Mr. Kennedy testified that accounting standards required the write-off when Fidelity closed the branches. Tr. 5410:10-5412:1 (Kennedy). The loss of the $34.2 million is relevant because some of Dr. Kaplan's forgone growth would be due to the loss of that component of Fidelity's capital. Tr. 5403:5-14 (Kennedy).

As its most critical failure, however, the October 1988 Business Plan did not forecast any bad debt expenses from January 1989 through June 1991. Although the business plan forecast no bad debt expenses from January 1989 through June 1991, provisions from loan losses between 1985 and 1991 actually totaled over $34 million, <u>not including</u> lost interest

income. DX 69A at OAA002 0083 (unforeseen bad debt write-offs were taken following October 1988 business plan); PX 447 at OAA005 1349; Tr. 765:1-25 (Powderly), Tr. 2430:8-2431:16 (Wesp). Mr. Kennedy calculated Fidelity's total cumulative losses due to its asset quality problems as $53 million from 1986-1989, and $74 million from 1986-1994; lost interest income would be in addition to these amounts. Tr. 5398:18-5399:21 (Kennedy); DX 5019; DX 5020 (sources for gains and losses are Fidelity's financial statements, referred to in DX 1150 at 34 Table 6). Regulators calculated the cumulative loan losses at $82 million between 1985 and 1994. Tr. 4674:7-12 (Amend); DX 650. Nonetheless, the fact that Fidelity recorded over $44 million in loan loss provisions after fiscal 1989 does not change Dr. Kaplan's conclusion regarding Fidelity's nonbreach growth rate. Instead, he purports, without further analysis, to have taken that, and all other factors into account in arriving at an 8.25 percent annual growth rate. Tr. 3558:5-3559:6 (Kaplan); PDX 60.

Moreover, the change in regulatory capital regulations with the passage of FDICIA, which required a five percent core capital level to be classified as "well capitalized" by the FDIC has no effect on Dr. Kaplan's nonbreach growth rate. While Dr. Kaplan testified in another case that there was an industry wide goal of having seven percent core capital following FDICIA, i.e., the 5 percent "well capitalized" level plus a two percent cushion, here he posits growth for the nonbreach Fidelity even when it is far below this industry wide norm. Tr. 3566:6-3567:19, 3745:3-3746:3 (Kaplan); PX 1314A at Ex. 9A. In short, Dr. Kaplan agreed that "there is absolutely nothing that would have prevented Fidelity from growing at least an 8.25 percent per year [growth rate] with respect to its incremental assets absent the breach." Tr. 3524:7-11 (Kaplan).

Another market condition potentially impacting Fidelity's ability to grow at an 8.25 percent rate is whether at times there were shortages of ARM MBS available at a price that would support profitable growth. Mr. Wesp repeatedly acknowledged that there were such times, either driven by supply or a need to sell MBS to cover loan losses. Tr. 2011:1-13, 2011:23-2012:23, 2076:5-12, 2077:8-17, 2118:2-23, 2186:24-2187:18 (Wesp); PX 728 at AST0308702 (MBS sold to cover loan loss reserves). Indeed, Dr. Kaplan acknowledged that, when there were periods of time when the supply of ARM MBS were constrained, Mr. Wesp "simply held back for a period of time." Tr. 3790:23 (Kaplan). Dr. Kaplan, however, recognizes no such period of time ever during the entire period of time that he models.[37]

**C). Dr. Kaplan's Use Of Fidelity's Pre-FIRREA Growth Rate Is Unsupported**

Dr. Kaplan also purports to base his hypothetical 8.25 percent annual growth rate upon Fidelity's track record of growth, and assumes that each dollar of growth would result in an 80 basis-point profit, Tr. 3594:5-14 (Kaplan), even though Fidelity's pre-breach experience shows that its growth did not correlate to increased profits. For example, while Fidelity grew between June 1986 and March of 1989, its net interest income -- the core driver of any institution -- actually declined for fiscal years 1987, 1988 and 1989. Tr. 3594:15-3595:29 (Kaplan); Tr.

---

[37] Dr. Kaplan simply suggests that, even if ARM MBS may not have been available at an acceptable price from time to time in the market, Fidelity could have obtained the amount of incremental ARM MBS he hypothesizes by simply not selling the ARM MBS it held. Tr. 3121:24-3122:3 (Kaplan). His suggestion fails to address two important facts. First, Fidelity sold its securities to obtain gains to cover loan losses, losses which would exist irrespective of the breach. Tr. 399:9-22, 400:10-14, 474:13-20 ("the only time we really sold them and took the gains was to accommodate the loss writedowns on the real estate"), 542:9-21, 560:13-20, 705:22-706:23 (Powderly). Second, Dr. Kaplan ignores the fact that the profitability of Fidelity's investments was based, in the first place, upon an opportunistic strategy of buying and selling, as prices fluctuated in a very volatile market. Tr. 1878:16-19 (Wesp).

5367:20-5368:23 (Kennedy). Moreover, Fidelity's operating income and income before taxes also decreased during this period of time. Tr. 3596:11-17, 3597:6-10 (Kaplan). Indeed, Dr. Kaplan agreed that "in the real world, prior to FIRREA, Fidelity's asset growth did not lead to increased profitability," Tr. 3597:15-18 (Kaplan), and he stated that "[i]t's not automatic that if your assets increase, that your profits go up." Tr. 3596:3-4 (Kaplan). Mr. Kennedy testified that this drop in income is relevant because if Fidelity could always profitably add MBS, Fidelity would have added even more MBS prior to FIRREA instead of letting its income decline. Tr. 5369:21-5371:2 (Kennedy).

The negative consequences of Fidelity's growth before the breach are demonstrated by Fidelity's problem loans. Fidelity's problem loans took years to work out. Tr. 869:1-13 (Powderly); PX 509 at AST001967 ($10.662 million in additional general valuation allowances in early 1990); see also Tr. 891:11-892:11 (Powderly) (lower amounts of classified assets in 1992 due to write-downs previously taken did not mean that the loans improved following the write-downs); DX 2595 at AST030347 (listing nine major loans from middle '80s); PX 996 at FAA005 1053 (3.4 percent of assets classified as of April 5, 1993), at FAA005 1087 (classified asset writedowns lowered return on assets from 0.5 to 0.2 percent); PX 1166 at AST037540. Many problem loans resulted in lawsuits between Fidelity and its borrowers. Tr. 695:12-19, 858:5-23 (Powderly) (Guterman and Evangelista lawsuits).

Even as late as the Astoria merger, these problem loans remained on Fidelity's books, prompting Astoria to demand further write-downs of their value. DX 2748 ($5.9 million in additional general reserves on mid-1980s loans); DX 2762 at AA4009 1685 (additional loan loss reserves required by Astoria on 1980s loans as of January 6, 1995); Tr. 664:9-12

(Powderly). The Suburbia goodwill phase-out had no bearing upon the deteriorating conditions of these loans. Tr. 690:13-25 (Powderly). In sum, the notion in Dr. Kaplan's model that unspecified growth automatically generates profits, Tr. 3594:5-14 (Kaplan), is belied by Fidelity's growth in the mid-1980s, which generated losses. Tr. 825:2-12 (Powderly); PX 476 at AST0528782-83; see also Tr. 2219:5-22, 2274:1-22 (not all growth profitable), 2305:2-19 (when neighboring thrifts Anchor and Crosslands shrank, they increased in profitability) (Wesp).[38]

Fidelity's asset quality problems affect growth because of costs, lack of interest income, higher risk profile, and increased management time devoted to them. Tr. 5391:22-5392:11, 5392:19-5393:11 (Kennedy). As Mr. Kennedy testified, accounting standards require that an institution, in order to take a loan loss reserve on a property, be able to estimate the loss, and it has to be probable. Tr. 5622:2-23 (Kennedy). Thus, contrary to Dr. Kaplan's testimony, Mr. Kennedy testified that Fidelity could not have written down the assets in a different time frame if it had the Suburbia goodwill because the time frame is dictated by the accounting standard, Financial Accounting Standards Board Opinion 5. Tr. 5401:6-5402:22 (Kennedy); Tr. 3776:2-3 (Kaplan).

---

[38] Contrary to the view expressed by Mr. Powderly, law and regulation, and not the lack of goodwill, required regulators to apply stringent valuation allowance guidelines against Fidelity's problem loans. PX 509 at PAA006 0812 (discussing requirements of the Competitive Equality Bank Act); PX 711 at AST002902 (OTS regulation 563.182(c) requiring general valuation allowances); DX 2971 and DX 2971A (Thrift Bulletin 13 interest rate risk calculation and limitations); see also Tr. 1519:13-1520:24 (Vigna) (no forbearances granted against risk-based capital requirements, growth restrictions based on examination results, FDIC regulation, change in deposit insurance requirements, levels of capital increasing, or new statutes).

Mr. Kennedy concluded that Dr. Kaplan did not adequately account for the various non-breach factors impacting its post-FIRREA growth by using the 8.25 percent growth rate, and that it was very common for institutions not to grow in the post-FIRREA period even if they grew in the past. Tr. 5413:9-21 (Kennedy). Moreover, Mr. Kennedy testified that Dr. Kaplan did not provide sufficient explanation of how he accounted for those nonbreach factors to support the use of judgment in reaching his growth opinion. Tr. 5613:17-5614:14 (Kennedy).

Dr. Kaplan's reliance on Fidelity's pre-breach growth pattern is also contradicted by the fact that Fidelity's planning documents for 1989 onward state that it planned to slow its growth for reasons unrelated to the breach. In its Capital Plan, Fidelity told regulators it rejected a number of alternatives before deciding to "[c]ontinue doing what we are doing." Tr. 423:2-424:23, 804:4-13 (Powderly); DX 78 at PAA052 2701-02. After FIRREA, Fidelity repeatedly affirmed that the Capital Plan strategy was "effectively the same" as a business plan that Fidelity had been following since 1987. PX 964 at OAA004 2506, 2541; Tr. 935:2-20 (Powderly). Mr. Powderly testified on re-direct examination that Fidelity's capital plan – a no-growth plan – reflected Fidelity's strategy after 1987 "in all respects," including aspects of the bank's operations other than real estate. Tr. 989:21-991:10 (Powderly); see also PX 964 at OAA004 2506, 2541; PX 986 at AST064176. No evidence supports the adoption of Dr. Kaplan's 8.25 percent growth rate.

**D). Dr. Kaplan's Use Of Fidelity's Post-FIRREA Growth Rate Is Unsupported**

Just as Fidelity's pre-breach growth experience does not support Dr. Kaplan's 8.25 percent growth assumption, nor does Fidelity's growth experience after its May 1993 stock

conversion. As Fidelity was well-capitalized after its conversion, any claim for lost growth opportunities after the conversion is unsupported by the evidence. Although Astoria's witnesses testified that the conversion would have happened in the same general time frame with or without the breach, the conversion still had the effect of mitigating the breach. Indeed, after its May 1993 conversion, Fidelity was not inhibited by regulatory restrictions from following any growth plans it had. See above at § IV (C)(4)(e). Thus, even if the Court were to find lost profits before the conversion, any claim for lost profits should end with the conversion.

Moreover, Fidelity's growth after its conversion occurred under different economic conditions than the period immediately following the breach and therefore does not support an inference that Fidelity would – or should – have grown at that rate before the conversion. The conversion had the effect of mitigating the breach, as it rendered Fidelity free of capital constraints. Thus, there can be no damages following Fidelity's conversion. See Com. Fed., 59 Fed. Cl. at 352-53.

Fidelity's growth experience after its conversion also does not support any claim for lost growth opportunities before the conversion. As discussed above, Astoria and other of Fidelity's peer institutions did not grow at a rate approaching Dr. Kaplan's 8.25 percent rate from the 1989-1993 period despite having excess capital. At trial, plaintiffs also pointed to Fidelity having grown at an annualized rate of 14 percent after the conversion and prior to its decision to stop growing before the Astoria merger. Tr. 5628:1-4 (Kennedy). However, as also discussed above, Fidelity's growth experience after the conversion occurred during more robust economic conditions than those facing Fidelity after the breach. Therefore, Fidelity's growth experience

after the conversion does not demonstrate what its growth rate would have been immediately after the breach.

As Dr. Carron testified, "the constraint of capital was removed through the conversion. Fidelity could have instantaneously added millions and millions of dollars worth of additional assets at that moment, and they didn't do so. So that suggests that it wasn't the goodwill, the lack of goodwill, that was constraining them during the '89 to '93 time period." Tr. 5703:20-5704:1 (Carron). Thus, Dr. Kaplan's 40 percent cumulative but-for asset growth assumption during the period up to the end of 1994 is not supportable from the available data, and "if you don't have forgone assets, then you don't have lost profits damages." Tr. 5704:15-24 (Carron).

**iii. Dr. Kaplan's Assumed Spread Is Unsupported**

As support for his assumed 80 basis point spread, Dr. Kaplan cites three factors: (1) the (newly unveiled at trial) 153-basis point spread between Fidelity's wholesale yields and the cost of one-year FHLB advances; (2) the wholesale spreads earned by Fidelity; 3) Fidelity's actual whole-bank profitability; and (4) returns available to Fidelity in the marketplace. None of these factors supports Dr. Kaplan's assumption.

**A). Dr. Kaplan's Spread Assumption Contradicts Fidelity's Actual Experience And Is Methodologically Unsound**

Dr. Kaplan's assumption that Fidelity could always profitably add MBS at an 80 basis-point return is contradicted by Fidelity's actual experience. Prior to FIRREA, Fidelity's experienced considerable wholesale asset growth, but this growth was not profitable. For example, Fidelity's investment securities and MBS increased by $743.676 million from March 31, 1986 ($160.266 million) to March 31, 1989 ($903.942 million), while its wholesale

borrowings increased by $462.387 million. PX 1314A at Ex. 5. Nevertheless, in the actual world, this increase in wholesale assets funded by wholesale borrowings did not result in increased profits, or, for that matter, even increased net interest income. PX 1314A at Ex. 5; DX 1150 at 17.

While Dr. Kaplan refers to Fidelity's October 1988 Business Plan as support for his growth rate, that plan projects growth in retail, not wholesale, assets to be funded by increased deposits. Tr. 361:20-365:18 (Powderly). Even where Fidelity did pursue MBS, it invested -- and sold -- a broad array of such instruments in varying amounts and at different times, including long-term fixed rate MBS, not the one-year ARM securities Dr. Kaplan hypothesizes as the predominant wholesale investment. Tr. 2014:6-19, 2032:5-2033:15, 2387:17-2391:8 (would have purchased more long-term securities with more capital), 2524:15-2525:6 (Fidelity purchasing ARM securities of all kinds) (Wesp); DX 590 at PAA033 1506 (long-term ARM security investment as explained at Tr. 2124:13-2125:18 (Wesp)); DX 590 at PAA038 1202 ($10 million in long-term bonds purchased), id. at PAA038 0276-77 (large numbers of five to seven year ARM securities purchased); PX 581 at AST049028 (Fidelity a "selective seller" of ARM MBS); PX 599 at AST048966 ("shortage of available ARM securities"); DX 2454 at AST048512 (generally, late 1990 a bad time to purchase MBS); DX 2463 at PAA113 0064 (long-term Ginnie Mae securities purchased); DX 2487 at AST0308527-28 (long-term Fannie Mae stock purchase plan); PX 728 at AST0308702 (MBS sold to cover loan loss reserves); DX 2541 at AST0300431 (seven-year agency balloons purchased); PX 766 at AST030734).

The OTS regulator, Mr. Moran, also explained the various types of mortgage backed-securities, along with their different risk characteristics. Tr. 4879:19-4881:19 (Moran). He

explained that declines in interest rates led to heavy prepayment of loans underlying mortgage-backed securities in 1993, 1995, 1998, and twice since 2000, with corresponding drops in yield. Tr. 4920:21-4921:2, 4925:4-12 (Moran). Moreover, with respect to adjustable rate mortgages, the yield will also go down because the interest rate will adjust downward, assuming the liabilities are longer than the adjustable rate instrument. Tr. 4925:13-16 (Moran). With respect to Fidelity's management of its MBS portfolio, Mr. Moran testified that Fidelity often paid significant premiums in connection with its purchase of adjustable rate MBS, with negative effects on yield. Tr. 4926:15-4927:20 (Moran); see, e.g., DX 591 at PAA038 1335.

As noted above, Dr. Kaplan did not identify his incremental assets with any more specificity than to say that they included ARM MBS (apparently, of all types and in various proportions between categories of types). He also did not identify individual borrowing instruments, agreeing that he has hypothesized just "a mix of private market borrowings and Federal Home Loan Bank advances." Tr. 3452:8-11 (Kaplan). Despite his various inconsistent claims concerning the categories of his incremental assets as including one-year ARM MBS, he did not analyze the yield Fidelity obtained from its one-year ARM MBS, nor did he analyze the yield on any of its other categories of adjustable MBS. Tr. 3458:15-21 (Kaplan).

Given his failure to analyze any particular ARM MBS investments, Dr. Kaplan cannot say whether any ARM MBS actually held by Fidelity in the actual world, if held in his incremental portfolio, would have generated an 80 basis point spread. Tr. 3446:1-3447:10, Tr. 3449:22-3450:2 (Kaplan); PX 599 at AST049054, AST049069. For example, even in the very broad categories of one-year ARM MBS relative to Fidelity's actual FHLBB borrowings, Dr. Kaplan did not determine what Fidelity's actual spread was. Tr. 3475:10-19 (Kaplan).

Nonetheless it is his opinion "that regardless of the mix of the forgone assets and the forgone liabilities, Fidelity would have earned at least an 80 basis point spread." Tr. 3451:23-3452:2 (Kaplan).

**B). Dr. Kaplan's 153 Basis-Point Spread Between Wholesale Yields And FHLB Advances Does Not Support His Spread Assumption**

Dr. Kaplan based his 80 basis point spread on several points of reference or, as he described them, "data points." Tr. 3114:20-22 (Kaplan). One data point Dr. Kaplan claimed he relied upon was his analysis set forth in PDX 72 and PDX 73, where he computed the yield on Fidelity's ARM MBS relative to one-year FHLB advances. Tr. 3106:15-20 (Kaplan); PDX 72. That computation resulted in an average yield of 153 basis points between July 1989 and December 1994. Tr. 3111:1-8 (Kaplan); PDX 72; PDX 73. He then suggested that this spread was actually obtained by Fidelity. "So, that is what actually obtained during this particular period for these securities relative to the one-year advance rate." Tr. 3111:6-8 (Kaplan); see also Tr. 3113:5-12, 3109:22-25, 3454:3-11 (Kaplan); PDX 72. Dr. Kaplan claims that "the 150 basis point spread is relevant, because that's the spread that reflects the interest rate risk having been removed." Tr. 3116:10-13 (emphasis added) (Kaplan). He claims he "backed off" the 150 basis point spread to take into account "the war in Kuwait, . . . economic recessions, . . . local events, . . . retail competition, and the list goes on and on for all of these other factors." Tr. 3116:15-24 (Kaplan). He further claimed that his reduction of the spread was meant to take into account the effect of prepayment risk. Tr. 3117:3-12 (Kaplan).

Dr. Kaplan claims that, while PDX 72 shows Fidelity's yields and costs, he decided to "push that aside and reach a conclusion about what I feel is an appropriate way to calculate

damages." Tr. 3462:24-3463:1 (Kaplan). That is, although he claims to have known what Fidelity's wholesale assets and liabilities would have been, he does not "use those particular results . . . to get to the profitability parameter on the damages calculation." Tr. 3464:16-3465:3 (Kaplan). During cross examination, however, Dr. Kaplan acknowledged that, contrary to his earlier assertions, PDX 72 does not show the actual spread Fidelity earned on its adjustable rate MBS, but rather the spread he believes reflects what Fidelity actually earned. Tr. 3469:22-3470:13 (Kaplan). Indeed, Dr. Kaplan admitted that he didn't know the actual yield on Fidelity's adjustable-rate securities because, among other reasons, his calculation of the life of Fidelity's actual securities was "completely off." Tr. 3752:21-3753:10, 3831:17-25 (Kaplan). It is for this reason that Dr. Kaplan decided not to use "this calculation in my damages calculation." Tr. 3751:14-22, 3752:16-17 (Kaplan).

One fundamental reason why the spread analysis of Fidelity's actual ARM MBS portfolio that Dr. Kaplan presents in his analysis (PDX 72) is not properly comparable to the spread Dr. Kaplan posits is that Fidelity's actual MBS portfolio was not match-funded. Tr. 3491:6-9 (Kaplan). Dr. Kaplan proposes a wholesale strategy where forgone assets and liabilities are match-funded. Tr. 3491:17-20 (Kaplan). Accordingly, as Dr. Kaplan admitted, looking at Fidelity's actual wholesale spreads "doesn't tell us everything," i.e., what the spread would be in his nonbreach world. Tr. 3491:14-15 (Kaplan).

Furthermore, Dr. Kaplan admitted that his method for calculating the yields shown in PDX 72 "is not a complete estimate," or "reasonable estimate," because it does not reflect the prepayment experience that was "unusually high, as we saw, for example, in 1992 and '93." Tr. 3415:10-21, 3751:11-14, 3752:14-15 (Kaplan). Fidelity's actual prepayment risk was less than

Dr. Kaplan's forgone portfolio. As Mr. Kennedy explained, "When you match maturities, then you subject yourself to an increased risk of prepayment." Tr. 5332:5-5333:2, 5348:24-5349:13 (Kennedy). Dr. Kaplan admitted that interest rates declined significantly during the early 1990s, with the one-year Treasury rates (the benchmark to which his ARM MBS are calculated) declining 500 basis points between January 1990 and December 1992 . Tr. 3411:4-3412:8, 3415:1-4 (Kaplan); PDX 6; DX 3484.

Implicitly acknowledging the weakness in his methodology, Dr. Kaplan claimed that, to properly calculate prepayment risk would require a specific analysis of the particular instruments in question. Tr. 3404:20-23 (Kaplan). Moreover, teaser rates would increase prepayment risk, but Dr. Kaplan does not consider teaser rates other than as catch-all. Tr. 5603:15-5604:9 (Kennedy). Indeed, Dr. Kaplan admitted that he did not quantify the prepayment risk embedded in his incremental model. Tr. 3404:12-25 (Kaplan).

To deal with the faulty information set forth in his own calculations, Dr. Kaplan purports to cure this problem by "drop[ping] down" to an 80 basis point spread. Tr. 3751:17-22 (Kaplan). But, as Dr. Carron and Mr. Kennedy explained, Dr. Kaplan's claim that he had considered the relevant risks is unreasonable because Dr. Kaplan did not quantify these risks other than to say that he thought about them. Tr. 5705:16-5706:5 (lack of "quantitative or analytical linkage") (Carron); Tr. 5344:18-5345:17 (discussing DX 5003) (Kennedy). Thus, Dr. Kaplan's assertion that he has taken into account prepayment and other risks is rank speculation. Although Dr. Kaplan claims that the reduction to an 80 basis-point spread adequately addresses this disparity, he does not quantify the risk, making his claim that he had accounted for all risk

factors totally unreliable. Tr. 3402:22-3403:9 (Kaplan); see also Tr. 5347:4-13, 5348:8-20, 5363:8-18 (Kennedy).

Furthermore, contrary to Dr. Kaplan's claim that he had removed interest rate risk from the 153 basis-point figure, Mr. Kennedy demonstrated at trial that the 153 basis-point spread calculation did not remove interest rate risk because the spread varied with changes in interest rates. Tr. 5218:11-24, 5224:16-5225:22; 5226:1-5227:6; 5228:14-5230:11, 5234:12-5235:19 (Kennedy); DX 5002-04. Thus, "by definition what you're looking at is interest rate risk." Tr. 5235:25-5237:2 (Kennedy); PDX 6; PDX 73. If the baseline spread includes interest rate risk, then Dr. Kaplan would need to include hedging costs to account for them, but Dr. Kaplan did not include any hedging costs. Tr. 5233:6-17 (Kennedy).

As Mr. Kennedy also demonstrated at trial, the yields of Fidelity's whole portfolio for each one-year period through 1993 were lower than the yield on ARM MBS as calculated by Dr. Kaplan. Tr. 5337:18-23 (Kennedy); DX 5005. This runs counter to the expectation that the whole portfolio would have a higher yield than an ARM-only portfolio in a falling-rate environment because the whole portfolio also included (riskier and higher yielding) fixed-rate securities. Tr. 5338:9-5339:17 (Kennedy). Dr. Kaplan's PDX 67 shows a "significant" portion of fixed rate securities, confirming the disparity between Fidelity's yields and those propounded by Dr. Kaplan. Tr. 5339:18-5340:17 (Kennedy). Moreover, Fidelity's 153 basis-point spread included significant use of reverse repurchase agreements, which reprice more frequently (30-90 days) than the one-year advances used by Dr. Kaplan, thus adding significant interest rate risk. Tr. 5335:12-5336:21, 5606:16-5607:13 (Kennedy). Mr. Kennedy testified that, although the

precise reason for the disparity was unclear, this disparity shows that Dr. Kaplan's spread calculation is flawed. Tr. 5340:18-5342:18; 5342:23-5343:12 (Kennedy).

Similarly, Mr. Kennedy testified that it was unreasonable for Dr. Kaplan to assume an 80 basis-point spread without taking credit risk and having no or de minimis interest rate risk, one or the other of which would be necessary to generate a return. Tr. 5349:14-5350:14 (Kennedy). As Mr. Kennedy testified, it would require the assumption of a "perfect investment" to generate an 80 basis-point return with no risk, as Dr. Kaplan proposes, but such an assumption is not reasonable. Tr. 5351:11-5352:9; 5605:17-5606:15 (Kennedy). Mr. Kennedy testified that he was not aware of any investments in the wholesale market that involve borrowing money to generate a return without risk. Tr. 5352:11-25 (Kennedy).

**C). Fidelity's Actual Wholesale Spreads Do Not Support Dr. Kaplan's Spread Assumption**

Dr. Kaplan provides another "data point" concerning Fidelity's actual wholesale spread an analysis set forth in his expert report at Exhibit 8A. PX 1314A ¶ 61; Ex. 8A. Dr. Kaplan claims that this analysis shows that Fidelity actual spread was always greater than 78 basis points. Id. This analysis is fundamentally not comparable to Dr. Kaplan's hypothesized wholesale strategy because the yields set forth in Exhibit 8A are based upon all MBS and related instruments held by Fidelity, including its fixed rate and long duration MBS, CMOs, and REMICs, and even CMO residuals. Tr. 3492:23-3494:16 (Kaplan). Fidelity also used a variety of funding sources, including large amounts of its funding from reverse repurchase agreements. Tr. 3500:15-23 (Kaplan), PX 887 at AST059688 ($260 million as of March 1992); Tr. 3498:22-23, 3502:1-7 (Kaplan); PX 707 at WON730 1810 ($390 million as of March 1991). Given the

disparities between the assets and funding that provide Fidelity's actual spread as set forth in Exhibit 8A, as opposed to Dr. Kaplan's forgone portfolio, Dr. Kaplan admitted that the spread analysis he presented in Exhibit 8A does not correlate to the spread he envisions. Tr. 3495:1-8 (Kaplan).

Fidelity's actual wholesale spread was "highly dependent upon which wholesale liabilities were used to fund the mortgage-backed securities." Tr. 5356:1-8, 5359:7-5360:8, 5602:16-5603:10; 5607:14-5608:22 (Kennedy). Assuming FHLB advances as the wholesale liability, the actual spread between Fidelity's actual yield on its entire MBS portfolio and the cost of its FHLB advances was lower than that calculated by Dr. Kaplan's 91 or 114 basis-point yield. Tr. 5356:18-25, 5357:22-5359:6 (Kennedy); DX 5006.

Importantly, the spread calculated by Dr. Kaplan is all the more unreliable and in error given the fact that Dr. Kaplan ignores spreads from fiscal years 1989, 1990, and 1994 -- even though these years comprise half of his damages period. PX 1314A at Ex. 8A. Fidelity's wholesale net spread was actually negative for both fiscal years 1989 and 1990 -- negative 37 basis points in 1989 and negative 30 basis points in 1990 -- unsurprising given the economic conditions at the time. DX 1150 at 17; DX 1147 at 15 ¶¶ 49-52. In addition, while Fidelity's spread for year-end 1994 was positive, it was less than 80 basis points. DX 1150 at 17.

The interest rate risk in Fidelity's actual portfolio was exacerbated by a flat or inverted yield curve from 1989 through 1990, followed by volatile movements in interest rates. Tr. 733:14-734:24 (Powderly). See above at § IV (C)(4)(g). Nevertheless, Dr. Kaplan claimed the 80 basis-point spread would have been available regardless of the existence of an inverted yield curve, which he admitted existed from at least June of 1989 until the second quarter of 1990.

Tr. 3382:6-10, 3383:2-14 (Kaplan); PDX 6; see also Tr. 5611:20-5612:16 (Kennedy); Tr. 5697:23-5698:17 (Carron) (discussing problems with wholesale strategy during inverted yield curve period).[39]

**D). Fidelity's Whole Bank Return Does Not Support Dr. Kaplan's Spread Assumption**

Yet another "data point" Dr. Kaplan relied upon was the thrift's whole bank average spread of 85 basis points between 1989 and 1994. Tr. 3114:18-22 (Kaplan). Unlike a whole bank analysis, however, Dr. Kaplan's spread analysis does not include loan origination fees, account fee income, or proceeds from the sale of assets, as did Fidelity's whole-bank average spread. Tr. 3386:5-3387:2 (Kaplan). Moreover, Fidelity's post-FIRREA earnings resulted, in part, from substantial amounts obtained from the sale of assets, and from nonoperating income. Tr. 3488:4-13 (Kaplan). Accordingly, as Dr. Kaplan admitted, the whole bank spread and the spread he envisions on his incremental assets are conceptually "absolutely not the same thing at all." Tr. 3488:3 (Kaplan). Thus, Dr. Kaplan admitted that the whole bank's performance is "not adequate taken alone to be the basis of a damage calculation," and in fact, he did not adopt the whole-bank return as the basis for his lost profits calculation. Tr. 3482:9-10, 3483:15-18 (Kaplan). Another reason to ignore the thrift's whole bank return is that a wholesale strategy (as Dr. Kaplan models) generally has lower yields than retail assets. Tr. 2871:21-23 (Kaplan). As he stated in his deposition prior to this case, the "whole bank return is not really the relevant thing." Tr. 3482:18-20 (Kaplan).

---

[39] Dr. Kaplan's PDX 68 also shows the use of other borrowings besides FHLB advances. Tr. 5360:9-14 (Kennedy). These other borrowings increase the interest rate risk of the forgone portfolio and make Dr. Kaplan's assumption that Fidelity could have generated an 80 basis-point return without taking such risks all the more implausible. Tr. 5360:17-5361:2 (Kennedy).

Dr. Carron testified that the data Dr. Kaplan relied upon for the whole bank return does not properly address returns that might be obtained from incremental assets. Tr. 5707:17-18 (Carron). Dr. Carron explained that whole bank returns are historical:

> These are the book returns, which means they represent the returns calculated at the time that the assets and liabilities were put on the balance sheet, not what they were returning in market terms at the time. And they include all the assets and liabilities, the ones that were added in that year and the ones that were still there from years past. So for that reason as well, it doesn't really tell you anything about what you would earn on new assets that you've put on at market rates in any of those years.

Tr. 5708:5-15 (Carron). In short, as Dr. Carron concluded, "[T]here's no connection, no financial connection, between those numbers and what would be earned on the type of strategy he's projecting." Tr. 5708:2-4 (Carron).

### E). <u>The 80 Basis-Point Spread Was Not "Generally Available In The Marketplace"</u>

Another point of reference Dr. Kaplan relied upon in arriving at the spread on his incremental assets is his comparison of the 80 basis point spread to the returns "generally available in the marketplace." PX 1314A ¶ 59. Dr. Kaplan initially could not state the period of time for which he analyzed the "returns generally available in the marketplace. . . . So we're talking about I guess the period certainly starting in 1990 and certainly up through 1994. I mean really for – certainly that period and possibly more. I was not – I don't know that I was trying to be specific or limit it to anything in particular." Tr. 3502:20-3503:8 (Kaplan). He then backtracked and stated that the returns he was contemplating were the returns from the "1990

through 1994 period, because those are the years that Fidelity existed after the breach." Tr. 3504:7-9 (Kaplan).[40]

Because Dr. Kaplan's model lacks any specificity respecting the kind of wholesale assets and liabilities it includes, his statement that an 80 basis-point spread could be obtained using products that were readily available in the marketplace is meaningless considering the volatility of interest rates from 1989 through 1994, the differences between available MBS investments, the increased marginal costs of borrowing, and the existence of prepayment risk. Tr. 1759:25-1761:20, 2208:5-2209:14, 2287:14-2288:8 (Wesp); see also Tr. 2274:1-9 (need right timing to be profitable with MBS), 2392:1-5 (can lose money with MBS investments) (Wesp) ; Tr. 2457:4-2458:22 (Wesp). Nevertheless, Dr. Kaplan implausibly claims that Fidelity would have been able to earn at least an average 80 basis point spread irrespective of the interest rate environment. Tr. 3381:15-18 (Kaplan); see also Tr. 5698:20-5699:13 (Carron) (discussing effect of interest rate volatility).

**F). Other Alleged Support For Dr. Kaplan's Spread Is Undermined By Competition**

Another point of reference Dr. Kaplan focused upon in his expert report was his calculation of the spread of ARM MBS in the general marketplace over one-year Treasuries. Tr. 3506:8-25 (Kaplan); PX 1314A ¶ 62. Undermining the significance of that finding, Dr. Kaplan admitted that the spread he calculated did not take into account teaser rates, which erode returns. Tr. 3507:25-3508:12 (Kaplan). Furthermore, Dr. Kaplan claimed that Fidelity would have

---

[40] Kaplan's testimony contradicts his assertion that the breach occurred in January 1989; if that were really the case (which, of course, it is not), then his comparison should have been to the period 1989-1994.

earned the 80 basis point spread he hypothesizes regardless of whether there was "voracious" competition for ARM MBS (affecting the price of those instruments), regardless of economic conditions, and regardless of the effects of the Gulf War. Tr. 3383:18-3384:2 (Kaplan). Indeed, he believes that there is nothing that would have prevented Fidelity from realizing an 80 basis point spread on incremental assets year in and year out over a 25-year period between 1989 and 2014. Tr. 3384:3-14 (Kaplan).

Astoria's experience after acquiring Fidelity also contradicts Dr. Kaplan's 80 basis-point spread assumption. As in the 1989-1994 period, Dr. Kaplan assumes the same 80 basis-point return regardless of the mix of assets and liabilities. Tr. 5437:7-5438:10 (Kennedy); DX 5017. However, Mr. Kennedy found that Astoria actually experienced some periods with negative returns for Astoria on its wholesale portfolio. Tr. 5438:14-5439:5 (Kennedy). Dr. Carron also testified that, since the conversion:

> The market has become much more competitive, which means more players in the market, more lenders, and the competition has driven down the yields that are attainable. . . . So I don't know whether these returns would have been attainable during this period, even if they had been attainable during the earlier period, and I don't believe Dr. Kaplan has done the analysis necessary to show that these returns would have been attainable.

Tr. 5723:4-23 (Carron).

**b. <u>Dr. Kaplan's Post-Astoria Merger Damages Are Speculative</u>**

Dr. Kaplan's calculation of damages for the period following Astoria's acquisition of Fidelity are even more speculative than the damages he invents for the pre-merger period. As explained above, his lost profits depend upon an implausible transfer of goodwill to Astoria and

are based upon an even more speculative methodological assumptions than those assumed for the period 1989-1994. See above at §III C 2.

**c. Dr. Kaplan's Post-Astoria Damages Fail To Adjust For A Non-Breach World**

Dr. Kaplan's post-merger lost profits model fails to take into account the entire non-breach world. In a non-breach world, other thrifts would have been able to count their goodwill as regulatory capital, and fewer thrifts would have been seized, leading to greater competition in Long Island, one of the country's most competitive thrift markets. Tr. 926:3-13, 945:24-946:23 (Powderly); Tr. 1751:16-1752:24, 1965:15-24 (Wesp); PX 1249 at WON738 0779; PX 1155 at AST036415. Such external factors must be taken into account for a lost profits model to meet the reasonable certainty requirement. See S. Nat'l, 57 Fed. Cl. at 305. These error is fatal to Dr. Kaplan's lost profits claims.

**7. Other Winstar Cases Offer No Support For Dr. Kaplan's Methodology**

Recent decisions of this Court involving other damages models prepared by Dr. Kaplan also do not support Astoria's damages claims. See, e.g., Com. Fed., 59 Fed. Cl. 338; First Fed. Lincoln, 73 Fed. Cl. 633; First Fed. Rochester, 76 Fed. Cl. 106 (2007).[41] Although these cases involved damages models prepared by Dr. Kaplan, upon closer inspection, none of the damage awards in these decisions supports Astoria's damages model here.

In Commercial Federal, the trial court granted $5.6 million in lost profits damages based upon the plaintiff thrift's modeling of its "whole bank" portfolio. In Com. Fed., unlike here, the

[41] We respectfully disagree with the trial court's damages decisions in First Federal Lincoln and Rochester. First Federal Lincoln is currently on appeal, and we are currently considering whether to appeal Rochester.

model projected a lower growth rate after FIRREA than had been the case before FIRREA, and had a return on assets assumption that was "consistent with the average returns experienced by plaintiff from 1990-97." Com. Fed., 59 Fed. Cl. at 350. The Court thus found that the calculation of lost profits was "grounded in the actual performance of the bank both pre-FIRREA and post-conversion." Id. at 351.

Here, by contrast, Dr. Kaplan's calculations of Fidelity's growth rates and return on assets for unidentified mortgage-backed securities are not consistent with Fidelity's actual performance before or after the breach. This makes this case analogous to Columbia First, where the Court distinguished Com. Fed. using terms equally applicable here. See Columbia First, 60 Fed. Cl. at 120 ("In Com Fed, the plaintiff offered credible evidence of the availability of investment opportunities, the history of investment practices, and the bank managers' ability to invest for growth. Here, plaintiff's model does not reflect the diversity of its real-world portfolio.") (citations omitted). Dr. Kaplan's model here does not match the diversity of the thrift's real-world portfolio or the thrift's performance before or after the breach, making even the pre-conversion lost profits more speculative than those in Com. Fed.

The Com. Fed. court also rejected the entirety of the plaintiff's lost profits claim after the thrift's conversion to stock form in 1994. That conversion, like Fidelity's, left the thrift with "well-capitalized" status. "If it can be shown that the goodwill would not or could not have been put to use under the actual circumstances by the institution, then despite there being a breach and a loss of goodwill, there is no harm." Com. Fed., 59 Fed. Cl. at 352. Due to the thrift's excess capital following the conversion, the Court found that, "there was no evidence or reason persuasive to the court to believe that plaintiff would have continued to earn a one

percent ROA on the $220,000,000 of "but-for" assets *in addition* to what it did earn upon its actual assets for this period. The court concludes, therefore, that the elimination of the supervisory goodwill caused no actual harm in the period from July 1994 to September 1997." Id. at 353. Here, the same expert as in Com. Fed. is again ignoring a conversion's effect upon his growth model.

Furthermore, in First Federal Lincoln, the Court rejected the damages model presented by Dr. Kaplan based upon lost leverage of goodwill. Despite Astoria's claim that the Court "awarded lost profits," Pl. App. A Br. at 41, the only damages awarded by the Court were a "franchise premium" measured by the actual decline in the thrift's deposit levels over a three-year time span, multiplied by a median premium derived from sales of certain Midwest thrift branches. First Federal, 73 Fed. Cl. at 646. Here, by contrast, Fidelity's deposits did not decline after the breach. The Court specifically distinguished this measure, based on an actual decline in deposits, from Dr. Kaplan's calculation of "foregone deposits due to missed growth opportunities," which the Court found to be "speculative and therefore cannot be factored into the calculation." Id. Although Astoria states that this case is distinguishable from First Federal Lincoln where the Court "rejected the expert's (i.e., Dr. Kaplan's) projections regarding the thrift's post-breach rate of growth, because they deviated from the acquiring thrift's actual pre-breach performance," here the same expert is propounding another model that similarly deviates from Fidelity's, and later Astoria's, actual performance.

Moreover, the First Federal Lincoln Court rejected as speculative Dr. Kaplan's projected rate of return, which, like his model here, was based upon hypothetical investments in adjustable-rate MBS. "[N]or does Dr. Kaplan explain how Lincoln's portfolio would be

structured, the availability of the adjustable rate MBS for Lincoln to invest in, and the impact of risk on Lincoln's investment strategy. The court therefore concludes that the use of the adjustable rate MBS as a proxy in this case does not provide a reasonably certain basis upon which to project Lincoln's yield on forgone deposits following the breach." Id. at 645. Dr. Kaplan's hypothetical Fidelity MBS investments here are as speculative as those in First Federal Lincoln.

Rochester also does not support the forgone asset calculation Dr. Kaplan performed in this case. Although the Court did award damages based upon Dr. Kaplan's forgone asset calculation in Rochester, the Rochester analysis, like Dr. Kaplan's analysis in Com. Fed., was a "whole bank" analysis, unlike his analysis here. In Rochester, Dr. Kaplan projected that the thrift would add $400 million in assets from 1990 to 1997, compared to $737 million from 1989 to 1994 in this case. Rochester I, 76 Fed. Cl. at 119-21. Moreover, the Rochester Court found that, "in the period prior to FIRREA, First Federal's marginal income reflected a return of 200 basis points," compared to much lower margins for Fidelity. Id. at 121. The Rochester Court found that Dr. Kaplan's spread calculation was a "representation of what the company's yield and cost experience actually was," as opposed to the projection based upon a hypothetical return here. Id. Therefore, as in Com. Fed., the Court's finding as to Dr. Kaplan's model in Rochester does not support his model in this case.

## V. DR. KAPLAN'S "WOUNDED BANK" CLAIMS FAIL

Astoria also makes "wounded bank" damage claims in connection with its restitution, reliance, and lost profits claims, for allegedly excessive examination assessments and deposit insurance premiums paid to the OTS and the FDIC, respectively. Dr. Kaplan opines that

Fidelity would have not made these payments absent the breach. According to Dr. Kaplan, absent the phase-out of goodwill, "it is clear that Fidelity would not have paid a premium rate for deposit insurance and OTS assessments, since it would have been a well capitalized institution." PX 1314A ¶ 66. Dr. Kaplan attributes $436,800 to allegedly excessive OTS examination assessments paid by Fidelity from October 1990 to June 30, 1993, and $994,926 for allegedly excessive FDIC deposit insurance assessments paid from January 1993 to December 1994. PDX 89; PDX 91.

Dr. Kaplan's calculations are speculative, without evidentiary support, and cannot form the basis of an award.

**A. <u>OTS Assessment Claim Is Speculative</u>**

OTS examination fees were based upon a "flat fee on the first $1 billion of assets and then an incremental fee assessment for any assets in excess of $1 billion, and both the flat fee and the fee for the excess over a billion dollars both have a sort of normal rate and a rate for troubled institutions." Tr. 3172:3-9 (Kaplan); PDX 87. "Troubled" institutions were assessed a premium rate, while non-troubled thrifts were assessed a general rate. The definition of a "troubled" thrift included a thrift with a MACRO rating of "4" or "5." DX 3407. The assessment rate is then applied to the thrift's total assets, including any subsidiaries.

Dr. Kaplan opined that, in the nonbreach world, Fidelity would not have been troubled and, thus, would have been assessed at a lower general rate. Dr. Kaplan admitted that a thrift had to receive a composite MACRO rating of at least a "3" to be assessed the lower general assessment rate. Tr. 3757:5-15; 3758:2-16 (Kaplan); DX 3407.

Dr. Kaplan makes a number of errors in coming to his conclusion.

First, and most importantly, Dr. Kaplan incorrectly assumes that Fidelity would not have been considered a troubled institution by regulators, and would have received a higher MACRO or CAMEL rating during every review period prior to Astoria's acquisition.[42] Tr. 3181:10-15 (Kaplan). As noted above, Messrs. Amend and Vigna testified that, even if the contractual capital had been restored to Fidelity (as in a nonbreach scenario), the OTS would have continued to rate Fidelity at least a "4" due to Fidelity's asset quality problems. Tr. 4612:14-4615:15 (Amend); Tr. 2775:16-2776:17 (Vigna); DX 1411 at WON722 0419 ("4" rating for "Assets" deciding factor in "4" composite MACRO rating in 1987); DX1448 at WON732 0834 (e.g., all factors other than "Capital" rated a 4 in the OTS's April 1991 RoE); see above at § III C(4)(b) (discussing minimum MACRO rating of "4" for the thrift irrespective of the breach and the effect of RB3a-1 growth restrictions).[43] Moreover, as Mr. Moran testified, Fidelity had a severe interest rate risk problem, a problem that, like its asset quality problem, would have negatively affected Fidelity's MACRO ratings irrespective of the breach. See above at § III C(4)(c). In fact, Fidelity had suffered problems with respect to all of its MACRO factors prior to and following the breach. Tr. 2798:15-2799:2, 2851:10-2853:3 (Vigna); DX 1448 at WON732 0834.

Thus, as Mr. Kennedy noted, Astoria's wounded bank claim is flawed because Dr. Kaplan incorrectly assumed that a MACRO rating was effectively driven by just one factor --

---

[42] A CAMEL rating was the successor to the MACRO rating.

[43] Dr. Kaplan admitted no expertise with respect to the assignment of CAMEL or MACRO ratings to thrifts, having never participated in the assignment or regulatory review of any numerical assignments to any thrift, and having never participated or had any responsibility for the content or issuance of any reports of examination. Tr. 2673:18-2675:18, Tr. 3771:21-3772:1 (Kaplan).

capital -- when that is simply not the case. Tr. 5488:15-5489:18 (Kennedy); DX 1411 at WON722 0419.

Adding more detail regarding the likely MACRO ratings in a world where Fidelity's contractual capital was restored, Mr. Amend testified that Fidelity would not have seen its rating improve to a "3" until the April 1992 OTS RoE (which was not mailed to the FDIC until late July 1992, and thus would not have affected FDIC's assessment of insurance premium until after the end of 1992). Tr. 4854:10-4856:7 (discussing PDX 89) (Amend). Furthermore, Mr. Amend testified that Fidelity would have remained a "3" for the OTS's 1993 and 1994 RoEs. Tr. 4854:2-13, 4857:4-25 (discussing PDX 91) (Amend). Accordingly, even if it was proper for this Court to consider the breach to be causally related to Fidelity's nonbreach MACRO composite rating years after the passage of Fidelity, Dr. Kaplan's wounded bank damages would need to be reduced to conform to Mr. Amend's testimony about Fidelity's ratings in the but-for world. Tr. 4855:13-4857:25 (discussing PDX 89 and PDX 91) (Amend). If the Court agrees with Mr. Amend's testimony that, for all of the time periods through calendar 1992, Fidelity would have been assessed at the premium rate even if supervisory goodwill had counted toward its regulatory capital, then, as Dr. Carron explained, "the only wounded bank damages with respect to examination assessments would be the $80,000 or so for the first six months of 1993, not the $437,000" shown on PDX 89. Tr. 5734:14-25 (Carron);[44] see also DX 5023; Tr. 5489:5-

---

[44] Dr. Carron's comment, though, did not take into consideration the fact that, in a nonbreach setting, the OTS's assessments would have been larger due to the $737 million larger size of the thrift posited by Dr. Kaplan. These additional assessment costs would then need to be deducted from the $80,000 referenced by Dr. Carron here. See below at 284-85.

15 (given Dr. Kaplan's errors with respect to Fidelity's likely nonbreach assessments, there are no damages or they are overstated) (Kennedy).

Second, in assessing the level of capital Fidelity would have had in a nonbreach world, Dr. Kaplan incorrectly assumes that the thrift would have had $143 million of goodwill as of December 1989. Tr. 3175:10-14 (Kaplan). This calculation is in error because it includes the non-contractual Dollar goodwill as contractual capital. Despite the clear evidence demonstrating that Fidelity wrote off the Dollar goodwill due to its impairment, Dr. Kaplan assumes that, but for the breach, the Dollar goodwill would not have been deemed impaired by Fidelity's management and written off.

As a matter of fact, Fidelity wrote off the Dollar goodwill because, pursuant to GAAP, the goodwill was impaired, largely because Fidelity closed its two Dollar branches located in Manhattan. Dr. Kaplan admitted that Fidelity had always accounted for the Dollar goodwill in accordance with GAAP and that Fidelity had no regulatory forbearance that allowed it to account for the Dollar goodwill in a manner that was inconsistent with GAAP. Tr. 3573:8-16 (Kaplan). He further admitted that, under GAAP, if goodwill is deemed impaired, it must be written off. Tr. 3573:17-19 (Kaplan). He then testified that he recalled nothing about Dollar's goodwill being impaired. Tr. 3574:1-2 (Kaplan). After seeing Fidelity's own statement that it had deemed the Dollar goodwill to be impaired "based primarily on a 1990 study of the acquired Dollar Federal branch offices, which resulted in the closing or planned closing of the two Manhattan branches," Dr. Kaplan agreed that the Dollar goodwill was written off because it was determined that it was impaired in accordance with GAAP. Tr. 3576:9-13, Tr. 3578:18-3579:3 (Kaplan); PX 986 at AST064205-06.

Nonetheless, Dr. Kaplan tried to eliminate the effect upon his non-breach Fidelity from this write-off by claiming that this write off was a "subjective decision by management," and one which he believed Fidelity would not have made but for FIRREA. Tr. 3575:22-3576:23, 3579:3-13 (Kaplan). Dr. Kaplan, however has no training as a practicing accountant and his second-guessing of Fidelity's decision to write off the Dollar goodwill is unfounded.[45] His criticism is especially meaningless given that Fidelity's stated reason for the write off – the decision to close its two Manhattan branches – had nothing to do with FIRREA, but rather was, as Mr. Wesp testified, the result of increased office rents and an inability to market effectively because Fidelity had just two branches located in the large Manhattan market. PX 986 at AST064205-06; Tr. 2267:5-2268:7 (Wesp); DX 2472 at PAA035 1026.

In short, by including the Dollar goodwill in Fidelity's nonbreach capital, Dr. Kaplan makes Fidelity's capital position better than it would have been in a nonbreach world. Thus, he overstates the capital he claims Fidelity would have held in a nonbreach setting.

Third, Dr. Kaplan fails to take into consideration, when calculating his lost profits damages, that, in a non-breach world, Fidelity would have been larger and thus would have had higher examination assessment costs simply due to its increased size. Tr. 2498:9-22 (Wesp); DX 3071 at PAA014 2035. Dr. Kaplan presumes that Fidelity would have added nearly $737 million dollars in assets by 1994 absent the phase-out of goodwill. As an institution that would have at best a "4" rating irrespective of the breach, Fidelity would have incurred additional assessments as a result of these additional assets. Any additional nonbreach assessment must be

[45] Dr. Kaplan has no training as a practicing accountant, does not have a CPA degree, and has never performed an audit of a thrift. Tr. 2678:13-21 (Kaplan).

deducted from any potential expectancy-based wounded bank claim. Moreover, if Fidelity added several hundred million dollars more in assets, its risk profile would have been dramatically worse given its poor tangible capital position (see above § III C(4)(c)), which would have caused Fidelity's MACRO rating to decline even further. Dr. Kaplan utterly ignores these factors, and ignoring these factors makes his calculation inherently unreliable.

For these reasons, then, Astoria's claim premised upon supposedly excessive OTS assessments paid by Fidelity is deficient as a matter of law and undisputed fact.

**B. <u>FDIC Insurance Premium Claim Is Speculative</u>**

Dr. Kaplan assumes that Fidelity paid more deposit insurance premiums to the FDIC than it would have paid in the absence of the breach. Again, as with Dr. Kaplan's claim for OTS assessments, the sole underpinning for his opinion that Fidelity paid excessive deposit insurance premiums is that Fidelity "would have been a well capitalized institution" and would have received a higher MACRO rating in the absence of the goodwill phase-out. PX 1314A at ¶ 66; PDX 90; PDX 91. Dr. Kaplan assumes that Fidelity paid $994,926 in allegedly excessive deposit insurance premiums to the FDIC. PDX 91.

Dr. Kaplan's insurance premium claim is flawed for a number of reasons. First, as an expectancy claim, it fails the test of foreseeability. Prior to the passage of FDICIA, the deposit insurance system was not risk based. Tr. 3758:17-24 (Kaplan). Thus, at the time of Fidelity's acquisition of Suburbia, there was no risk based insurance system. Given that fact, neither the Government nor Fidelity could have foreseen at the time the contract that, if Fidelity were to become "troubled" due to a loss of contractual goodwill, its insurance premium would rise in accordance with its risk. The foreseeability gets even murkier because goodwill was never an

asset that could be used to protect the insurance fund, for example, by repaying the depositors in the event of a liquidation. Tr. 3759:4-14 (Kaplan). Accordingly, Fidelity's claim for increased insurance premiums fails the test of foreseeability.

Second, as with Dr. Kaplan's OTS assessment claim, his claim for allegedly excessive FDIC insurance premiums is speculative. Dr. Kaplan ignores all of the other parameters upon which FDIC insurance premiums are based, focusing solely upon capital, despite the existence of nine risk categories and regulator's discretion to re-classify thrifts' capitalization designations. PX 1249 at WON738 0795; Tr. 2498:23-2500:1 (Wesp); DX 3071 at PAA014 2034-39.

The FDIC's insurance premiums are based upon a thrift's MACRO rating and its capital position. Tr. 3172:11-15 (Kaplan). Dr. Kaplan's claim is based upon his assumption that the combination of a better MACRO rating with a "well-capitalized" status for nonbreach Fidelity would have lowered its deposit insurance premiums. Tr. 3760:6-10 (Kaplan).

An analysis of both of these factors demonstrates the speculative nature of Dr. Kaplan's FDIC insurance claim. With respect to the "well-capitalized" designation, regulators had the discretion to re-classify an institution from "well-" to "adequately-" capitalized for reasons unrelated to the sheer amount of its capital. For example, regulators could re-classify an institution if it were engaging in an "unsafe and unsound practice by virtue of having received a less-than satisfactory rating for asset quality, management, earnings or liquidity (or the equivalent MACRO categories). " DX 1199 at WON738 0795; see also DX1150 at 24-26, §3.3.2; Tr. 5491:19-5492:17 (Kennedy). Thus, even if Fidelity's regulatory capital levels qualified it for a "well-capitalized" status, as Dr. Kaplan presumes, the OTS could reclassify

Fidelity to merely an "adequately capitalized" status for non-capital reasons. Moreover, with respect to subgroups below the general "capitalization" designation in the MACRO framework, Dr. Kaplan does not know what supervisory subgroup the FDIC would have placed Fidelity into absent the breach. Tr. 3769:6-9 (Kaplan). As Dr. Kaplan admitted, "in this area, the examiners have the ability to really do as they see fit." Tr. 3762:3-19, 3764:21-24 (Kaplan); DX 1199 at WON738 0795.

With respect to the MACRO rating, Dr. Kaplan admitted that he utilized the Dollar goodwill in his calculation of the nonbreach thrift's capital, even though, as previously discussed, the Dollar goodwill was written off by Fidelity pursuant to GAAP and irrespective of FIRREA. Tr. 3768:12-16 (Kaplan). This fact alone makes his analysis unreliable. Furthermore, he repeats the error in his nonbreach MACRO rating assessment. As we discussed above, regulators would have given Fidelity a lower MACRO rating than Dr. Kaplan posits, irrespective of the breach.[46]

Finally, Dr. Kaplan's analysis fails the test of logic. In the actual world, Fidelity was considered to be a "well-capitalized" thrift during the two semiannual insurance premium assessment periods in 1994. Tr. 3773:6-9 (Kaplan); PDX 91. This "well-capitalized" status is no different in the non-breach world Dr. Kaplan envisions. Id.; PDX 91. That is because Fidelity had already converted in May 1993, obtaining enough capital to bring it into the "well-capitalized" category. Fidelity was also given an OTS MACRO rating of "3" in the actual world

[46] If the Court were to disregard all of the other flaws in Dr. Kaplan's analysis, but accept the testimony of Messrs. Vigna and Amend with respect to the nonbreach MACRO rating, the wounded bank damages shown in PDX 91 should be limited to the $640,000 for calendar year 1993. Tr. 5735:4-24 (Carron).

during the two semiannual assessment periods in 1994. This "3" rating reflects the restoration of Fidelity's capital with the conversion. Dr. Kaplan, however, posits that a nonbreach Fidelity would have received an even higher MACRO rating – a "2." He provides no explanation for his increased MACRO rating above the "well-capitalized" thrift's "3" rating. The explanation cannot be related to capital, because Fidelity was "well-capitalized" at that time, and Dr. Kaplan provided no explanation in his expert report, his direct testimony or upon cross-examination with regard to why the other components of Fidelity's MACRO rating (e.g., assets, management, risk) should have improved in a nonbreach world to such a degree that the composite MACRO rating would rise from a "3" in the actual world to a "2" in a nonbreach world.[47] Thus, the crucial determinant for the 1994 period insurance premium damages is simply unaddressed by Dr. Kaplan; he simply assumes the composite MACRO rating that justifies his damage claim for 1994.

In short, Dr. Kaplan fails to account for factors other than capital in his excess premium claim. His calculations are accordingly speculative.

## CONCLUSION

At trial plaintiff has failed to prove any restitution, reliance, lost profits, or wounded bank damages. Accordingly, we respectfully request that the Court deny all of plaintiff's damage claims and enter judgment for the Government.

---

[47] On redirect examination, Dr. Kaplan claimed, without any analysis or calculation, that Fidelity's MACRO rating could have been improved through the utilization of capital to write off bad assets "in a different time frame." Tr. 3775-3776:5 (Kaplan). Once Fidelity was "well-capitalized" after the conversion, it could have done the same thing (and, indeed, it accelerated its write-off of bad loans in 1994 in anticipation of the Astoria acquisition). Thus, Dr. Kaplan's ad hoc explanation added nothing to explain why in 1994 Fidelity would have had a higher MACRO rating.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson

JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 353-7972
Fax: (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR

August 6, 2007

**CERTIFICATE OF FILING**

I hereby certify that on this 6th day of August, 2007, a copy of the foregoing "DEFENDANT'S POST-TRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson
John H. Roberson