IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 95-468C<br>(Judge Thomas C. Wheeler) |

**DEFENDANT'S POST-TRIAL REPLY BRIEF**

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Assistant Director

JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel. (202) 353-7972
Fax (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR
Trial Attorneys

October 5, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. . . . . . . . . . iv

SUMMARY OF ARGUMENT. . . . . . . . . . 1

ARGUMENT. . . . . . . . . . 4

I. Astoria Should Not Be Awarded Restitution. . . . . . . . . . 4

A. Introduction. . . . . . . . . . 4

B. The Economic Backdrop. . . . . . . . . . 7

C. The Evidence Does Not Support Astoria's Contentions. . . . . . . . . . 7

1. Liquidation Was Not An Alternative Because FSLIC Lacked Fund.. . . . . . . . . . 8

2. Thrifts With Spread Problems Were Not Liquidated.. . . . . . . . . . 8

3. There Were Other Options For Addressing Suburbia's Problems. . . . . . . . . . 11

II. Astoria's Reliance Claim Fails As A Matter Of Law And Fact. . . . . . . . . . 15

A. Astoria's Reliance Claim Depends Upon An Accounting Entry For Net Liabilities Assumed At The Moment Of Acquisition And Is Barred By Federal Circuit Precedent. . . . . . . . . . 15

B. Astoria's Claimed Reliance Cost For "Discharging" Net Liabilities Assumed Is Contrary To Fact . . . . . . . . . . 18

III. Federal Circuit Precedent Requires The Offset Of Benefits That Fidelity Received. . . . 24

IV. Astoria Did Not Establish Causation Of Its Lost Profits Damages. . . . . . . . . . 25

A. Astoria's Lost Profits Claims Lack Foundation In The Record.. . . . . . . . . . 26

1. Regulators Would Have Restricted Fidelity's Growth Irrespective Of The Breach . . . . . . . . . . 26

a. Fidelity Would Have Received A "4" Or Worse After FIRREA Irrespective Of The Breach . . . . . 27

b. Fidelity Could Not Have Improved Its Asset Quality Through The Use Of Goodwill . . . . . 30

c. Prior To FIRREA, Fidelity Had Not Been Pursuing A Growth Strategy . . . . . 34

2. Even Absent The Breach, Numerous Non-Breach Related Events Would Have Caused Fidelity To Curtail Its Growth. . . . . 36

a. Bad Loans Affected Fidelity's Capacity To Grow.. . . . . 38

b. Dr. Kaplan Ignores The Well-Recognized Need For A Capital Cushion. . . . . 42

c. Fidelity's Interest Rate Risk Problems Would Have Affected Its Growth Irrespective Of The Breach . . . . . 43

d. Regulators Would Not Have Permitted The Wholesale Growth Strategy Proposed In Dr. Kaplan's Model Because He Sets Forth A Risk Controlled Arbitrage Strategy .. . . . . 46

3. Fidelity Was Not Restricted To No Growth. . . . . . 47

4. Plaintiff's Claim For Lost Profits Cannot Be Asserted As Beginning In July 1989 . . . . . 47

5. No Causation Leading Up To Or After Fidelity's Conversion. . . . . . 48

6. Astoria Points To No Basis For Restrictions Upon Astoria's Growth. . . 50

B. Astoria Must Definitively Establish "But For" Causation . . . . . 51

C. Astoria's Comparisons To Other Cases Are Unavailing. . . . . . 56

V. Dr. Kaplan's Lost Profits Claims Fail For Lack Of Foreseeability. . . . . . 58

A. Astoria Has Not Rebutted Any Of Our Demonstrations That Dr. Kaplan's Lost Profits Are Unforeseeable. . . . . . 59

B. Dr. Kaplan's Lost Profits Are Not Foreseeable As A Matter Of Law. . . . . . . . . . 59

C. Astoria's Contentions Of Fact Support A Finding Of Unforeseeability. . . . . . . . 61

VI. Astoria's Lost Profits Claims Are Not Reasonably Certain.. . . . . . . . . . . . . . . . . . . . . . . 65

A. Dr. Kaplan Failed To Model The Non-Breach Fidelity. . . . . . . . . . . . . . . . . . . . . 66

B. Dr. Kaplan Failed To Model The Whole Bank Or Even The Whole Wholesale Strategy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

C. Dr. Kaplan Failed To Adequately Specify The Investments Or Funding Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

D. The Non-Breach Growth Rate Fails The Requirement Of Reasonable Certainty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

E. Dr. Kaplan's Assumption Of Unlimited ARM MBS At A Price Fidelity Would Be Willing To Pay Is Unsupported By The Record . . . . . . . . . . . . . . . . . 73

F. Dr. Kaplan's Profit Spread Is Unreliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

G. Astoria's Post-1994 Lost Profits Are Also Uncertain. . . . . . . . . . . . . . . . . . . . . . 76

VII. Astoria's Wounded Bank Claims Fail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

VIII. There Is No Damage Claim Connected With Fidelity's Conversion Properly Before This Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Abbott Labs. v. Brennan,
952 F.2d 1346 (Fed. Cir. 1991). . . . . . . . . . 53

Am. Capital Corp. v. FDIC,
472 F.3d 859 (Fed. Cir. 2006). . . . . . . . . . 5

Bohac v. Dep't of Agric.,
239 F.3d 1334 (Fed. Cir. 2001). . . . . . . . . . 59

Cal. Fed. Bank, FSB v. United States,
245 F.3d 1342 (Fed. Cir. 2000). . . . . . . . . . 5, 16, 18

Cal. Fed. Bank, FSB v. United States,
54 Fed. Cl. 704 (2002). . . . . . . . . . 66

Cal. Fed. Bank, FSB v. United States,
395 F.3d 1263 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 344 (2005). . . . . . . . . . passim

Carley Capital Group v. City of Newport News,
709 F. Supp. 1387 (E.D. Va. 1989). . . . . . . . . . 22

Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271 (2005), aff'd in part, rev'd,
in part and remanded, 470 F.3d 1044 (Fed. Cir. 2006). . . . . . . . . . 6

Cinenega Gardens v. United States,
_ F.3d _, 2007 WL 2778687 (Fed. Cir. Sept. 25, 2007). . . . . . . . . . 36

Citizens Fed. Bank, FSB v. United States,
52 Fed. Cl. 561 (2002), aff'd, 474 F.3d 1314 (Fed. Cir. 2007). . . . . . . . . . 6, 51, 52

Citizens Fin. Servs., FSB v. United States,
64 Fed. Cl. 498 (2005), aff'd, 170 Fed. Appx. 129 (Fed. Cir. 2006). . . . . . . . . . 65

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004). . . . . . . . . . 65

Fifth Third Bank v. United States,
55 Fed. Cl. 223 (2003). . . . . . . . . . 6, 16

First Fed. Lincoln Bank v. United States, 73 Fed. Cl. 633 (2006),
appellate argument scheduled, Nos. 07-5044, -5048 (Fed. Cir. Nov. 8, 2007). . . . . . . . . . . passim

First Fed. Savings and Loan Ass'n of Rochester v. United States,
76 Fed. Cl. 765 (2007), appeal docketed, No. 2007-5161 (Fed. Cir. Aug. 22, 2007) . . . . . . . . . .51

Franklin Fed. Sav. Bank v. United States,
55 Fed. Cl. 108 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Glendale Fed. Bank, FSB v. United States,
54 Fed. Cl. 8 (2002), aff'd, 378 F.3d 1308 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Glendale Fed. Bank, FSB v. United States,
378 F.3d 1308 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16, 66

Globe Sav. Bank v. United States,
65 Fed Cl. 330 (2005) aff'd in relevant part, 189 Fed. Appx. 964 (Fed. Cir. 2006). . . . . 54, 55, 56

Granite Mgmt. Corp. v. United States,
416 F.3d 1373 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 21

Granite Mgmt. Corp. v. United States,
58 Fed. Cl. 766 (2003), aff'd in part, and
remanded on other grounds, 416 F.3d 1373 (Fed Cir. 2005). . . . . . . . . . . . . . . . . . . . . . 16, 20, 21

Granite Mgmt. Corp. v. United States,
74 Fed. Cl. 155 (2006), appeals docketed, No. 2007-5044 (Fed. Cir. Feb. 6, 2007). . . . . . . . 61, 76

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hughes v. United States, 71 Fed. Supp. 284 (2006) rev'd on other grounds,
_ F.3d _ (2007) WL 2433838 (Fed. Cl. 8 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

LaSalle Talman Bank, FSB v. United States,
317 F.3d 1363 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16, 17

LaSalle Talman Bank, FSB v. United States,
64 Fed. Cl. 90 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Landmark Land Co. v. United States,
256 F.3d 1365 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 22, 58, 59

Long Island Sav. Bank, FSB v. Shaw,
60 Fed. Cl. 80 (2004) rev'd on other grounds, 476 F.3d 917 (Fed. Cir. 2007). . . . . . . . . . . . . 6, 16

Menne v. Celotex Corp.,
861 F.2d 1453 (10th Cir.1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

Point Productions A.G. v. Sony Music Entertainment, Inc.,
215 F. Supp. 2d 336 (S.D.N.Y2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

S. Nat'l. Corp. v. United States,
57 Fed. Cl. 294 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Shyface v. Sec'y of Health & Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

Standard Fed. Bank v. United States,
62 Fed. Cl. 265 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20, 21

Wells Fargo Bank v. United States,
88 F.3d 1012 (Fed. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

WestFed Holdings, Inc. v. United States,
407 F3.d 1352 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**RULES AND STATUTES**

15 U.S.C. §77l(a)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
Pub. L. No. 101 -73, 103 Stat. 183 (1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**MISCELLANEOUS**

Charles T. McCormick, Damages § 142, at 584 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Dobbs, Law of Remedies, § 12.3(1) at 51-52 (2d ed. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . 24

Prosser & Keeton, The Law of Torts, 268. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,** <br> **Plaintiff,** <br> **v.** <br> **THE UNITED STATES,** <br> **Defendant.** | **No. 95-468C** <br> **(Judge Thomas C. Wheeler)** |

## DEFENDANT'S POST-TRIAL REPLY BRIEF

## SUMMARY OF THE ARGUMENT

Defendant, the United States, respectfully submits its post-trial reply brief. The initial post-trial brief submitted by plaintiff, Astoria Federal Savings and Loan Association ("Astoria"), does not even attempt to apply law to fact. Rather, the initial brief attempts to demonstrate Astoria's purported entitlement to damages through implications drawn from the facts it alleges, rather than through reliance upon the evidence. As we explain below, these implications fail.

Astoria's restitution claim fails because it is barred as a matter of law, the identical claim having been rejected in numerous Winstar-related cases. Contrary to its apparent assertions, Astoria cannot demonstrate that either it or Fidelity New York, F.S.B. ("Fidelity") paid down the net liabilities acquired from Suburbia Federal Savings and Loan Association ("Suburbia"). Rather, Fidelity assumed from Suburbia a speculative liability that never came to pass. Moreover, Fidelity did not spare the Federal Savings and Loan Insurance Corporation ("FSLIC") the expense of liquidating Suburbia, because, absent Fidelity's acquisition of Suburbia, FSLIC

would not have liquidated. Rather, FSLIC would have fallen back upon any of a variety of options it regularly used to resolve troubled thrifts.

Astoria's reliance claim is similarly flawed. Binding Federal Circuit precedent bars award of alleged reliance costs that were not actually incurred, and the net liabilities assumed from Suburbia – the alleged cost for which Astoria requests compensation – was never incurred. Nor has Astoria demonstrated that either it or Fidelity ever discharged the net liabilities.

In addition, Astoria ignores a variety of offsets that would swamp Astoria's restitution and reliance claims.

Astoria also cannot demonstrate entitlement to any of its claimed expectancy damages. With respect to its lost profits claim, Astoria cannot prove causation, foreseeability, or reasonable certainty. Astoria cannot prove causation because its lost profits are dependent upon Fidelity's growth absent the breach, and the evidence demonstrates that, because of Fidelity's precarious position caused by historic loan losses and the recessionary environment, the regulators would not have permitted the risky wholesale portfolio growth that Astoria posits. Nor can Astoria demonstrate that, had Fidelity been able to retain goodwill as part of regulatory capital, it would have been able to follow through on any desire to grow.

In addition, Astoria cannot be awarded damages for any period when Fidelity's failure to grow was not caused by the breach, including the period before the enactment of the Financial Institutions Reform, Recovery and Enforcement Act, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA"), or the period immediately before or at any time following Fidelity's capital-raising stock conversion.

Furthermore, following its acquisition of Fidelity, Astoria would not have desired to grow to the size or in the manner asserted. Certainly, Astoria cannot seriously maintain that its own failure to grow after acquiring Fidelity was somehow caused by the breach, when it was flush with capital, had no growth restrictions, and returned massive amounts of capital to its shareholders rather than increase its leverage.

Astoria also fails to establish that its claimed lost profits were foreseeable. Among other things, Astoria cannot prove that, at the time of the contract, the Government could have foreseen the magnitude and type of Astoria's claimed damages, because they are based upon the assumption that Fidelity would have grown during a severe economic downturn and would have done so in a portfolio that increased its interest rate risk, especially when the assets in that portfolio did not constitute the bulk of its holdings. Moreover, no party could have foreseen the transfer of Fidelity's goodwill to Astoria with Astoria's acquisition of Fidelity, contrary to both regulatory restrictions in the assistance agreement and generally accepted accounting principles ("GAAP").

Astoria also cannot prove its claimed lost profits with reasonable certainty. Astoria's claimed lost profits do not reflect Fidelity's actual assets or the assets it planned to hold. Nor does the growth rate assumed for the non-breach Fidelity bear any relation to the realities faced by its peers or by Astoria itself. Astoria's lost profits are uncertain in part because its expert, Dr. Donald Kaplan, failed to model the non-breach Fidelity as a whole bank as required by case law, and also failed to fully model the incremental wholesale portfolio that he posits Fidelity and Astoria would have held absent the breach. In modeling the purported foregone portfolio, Dr. Kaplan identified the foregone assets and liabilities with such scant detail as to render it

impossible to assess the credibility of the final claimed lost profits figure. Indeed, it is only Dr. Kaplan's obfuscation that renders his constant 80 basis point profit spread possible.

Astoria's wounded bank claims also fail. Astoria cannot demonstrate that it would have received higher MACRO ratings from the Office of Thrift Supervision ("OTS") absent the breach given its asset quality problems. Moreover, Astoria's claim for increased Federal Deposit Insurance Corporation ("FDIC") premiums fails because, among other things, a risk-based premium structure was unforeseeable at the time of contracting, and because Fidelity could have been assessed the same premiums absent the breach for having been considered unsafe and unsound.

Finally, in response to certain vague assertions respecting Fidelity's stock conversion in Astoria's initial brief, we explain that Astoria is barred from raising any damage claims premised upon the notion that it may have received a different amount of proceeds from the conversion absent the breach.

## ARGUMENT

## I. Astoria Should Not Be Awarded Restitution

### A. Introduction

Astoria seeks restitution of $147.936 million (less certain offsets, which will be addressed in another section, below) because it claims Fidelity saved the Government the cost of liquidating

Suburbia. Plaintiff's Proposed Findings of Fact ("PPFF") ¶ 880.[1] As we have already explained, this claim fails as a matter of law and fact.

We do not dispute the availability of restitution as a remedy in appropriate cases. See Plaintiff's Proposed Conclusions of Law ("PPCL") ¶ 29.[2] For example, in Landmark Land Co. v. United States, 256 F.3d 1365, 1375 (Fed. Cir. 2001), the Court awarded restitution to restore the plaintiff's contractually-required contribution and, in Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1316 (Fed. Cir. 2004), the Court allowed the plaintiff to advance a restitution claim arising out of an exchange of stock. This case differs from those precedents, however, because Fidelity did not pay anything to acquire Suburbia or for the goodwill that it recorded. See Defendant's Post Trial Memorandum of Facts and Law ("DMFL") ¶ 117. Accordingly, there is nothing for this Court to restore by awarding restitution.

As we have previously shown, the theory of restitution that Astoria advances here is barred as a matter of law, having been repeatedly rejected by the Federal Circuit and this Court. DMFL at 143-44 (discussing Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1382 (Fed. Cir. 2001); California Fed. Bank, FSB v. United States, 245 F.3d 1342, 1351-52 (Fed. Cir.

---

[1] Plaintiff's Proposed Findings of Fact ¶ 877 cites PDX 100 as support for a liquidation cost of $147.963 million. That appears to be a typographical error. Elsewhere, plaintiff asserts the cost of liquidation as $147.936 million. See PPFF ¶¶ 155, 880, PDX 105, and PX 1314A, Corrected Exhibit 22. The references to PX 1314 in PPFF ¶¶ 880 and 881 are also errors. PX 1314 was not admitted, Tr. 2618:21-23 (Eisenhart), and PX 1314A was admitted instead. Tr. 2693:22-24 (Court).

[2] Astoria's citation to American Capital Corp. v. FDIC, 472 F.3d 859 (Fed. Cir. 2006), in PPCL ¶ 29 does not support an award of restitution in this case. The Court there explained that "we see no reason why a party's claim for restitution in this case would be different than an alternate claim for reliance damages." American Capital, 472 F.3d at 870. In this case, Astoria makes different claims for restitution and reliance damages, although both are based upon rejected legal theories.

2001); Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1380-81 (Fed. Cir. 2005); Glendale Fed. Bank, FSB. v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); LaSalle Talman Bank, FSB. v. United States, 317 F.3d 1363, 1376-77 (Fed. Cir. 2003); Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 298 (2005), aff'd in part, rev'd in part and remanded, 470 F.3d 1044 (Fed. Cir. 2006); Long Island Sav. Bank, FSB v. United States, 60 Fed. Cl. 80, 96 (2004), rev'd on other grounds, 476 F.3d 917 (Fed. Cir. 2007); Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223, 245 (2003); Franklin Fed. Bank v. United States, 55 Fed. Cl. 108, 120 (2003); Citizens Fed. Bank, FSB v. United States, 52 Fed. Cl. 561, 566 (2002), aff'd, 474 F.3d 1314 (Fed. Cir. 2007)).

Astoria attempts to distinguish these binding precedents by asserting that Fidelity assumed and ultimately paid Suburbia's net liabilities: "Fidelity paid off Suburbia's net liabilities by completely amortizing, with cash earnings, all of the supervisory goodwill put onto its books as a result of the Suburbia acquisition." PPCL ¶ 33. The record does not support this claim.

First, Fidelity did not have the capacity to pay off Suburbia's net liabilities, DMFL at 155, and most likely was tangibly insolvent at the time it acquired Suburbia. DMFL ¶ 117. Fidelity's acquisition of Suburbia did not relieve the Government of insurance exposure on Suburbia's net liabilities, and Fidelity was not required to pay off these liabilities. DMFL ¶¶ 79-80. FSLIC remained contingently liable for insuring Suburbia's deposits after the merger. DMFL at 156, see also Tr. 1217:25-1218:3 (Beesley); Tr. 1506:10-12 (Vigna); Tr. 3368:6-12 (Kaplan).

As in the binding precedents, here Fidelity assumed a speculative contingent liability that never came to pass. Tr. 1220:13-1222:8, 1238:15-1240:9 (Beesley). Accordingly, as in Glendale, 239 F.3d at 1382, the action taken by Fidelity in acquiring Suburbia "did not result in

the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift." Thus, there is no record basis upon which to distinguish this case from precedent.

**B. The Economic Backdrop**

We do not dispute Astoria's showing in PPFF § I(A) that the savings and loan industry suffered economic distress in the 1980s. However, we do dispute as misleading and incomplete PPFF ¶ 6, which asserts that the Federal Home Loan Bank Board ("FHLBB") prohibited thrifts from operating with a negative capital account. As shown in DMFL ¶¶ 1-2, the vast majority of thrifts were insolvent on a marked-to-market basis in the early 1980s, Tr. 1202:6-11 (Beesley), including Fidelity. DMFL ¶ 117. Reported regulatory capital was somewhat meaningless because the true value of a thrift's assets and liabilities was substantially negative in virtually every case. Tr. 1151:20-24 (Beesley).

**C. The Evidence Does Not Support Astoria's Contentions**

Astoria asserts that its restitution claim is based upon "the net costs that the Government avoided when Fidelity merged with Suburbia," PPCL ¶ 30, because liquidation was the only alternative to the Fidelity acquisition that was "seriously considered" by the regulators. PPCL ¶ 31 (citing PPFF §§ I(H)-(N)). The record does not support this contention. Rather, the evidence is overwhelming that liquidation was not the real alternative to Fidelity's acquisition of Suburbia. See DMFL ¶¶ 40, 42, 87, 107.

**1. Liquidation Was Not An Alternative Because FSLIC Lacked Funds**

First of all, we dispute as misleading Astoria's claim, PPFF § I(C), that FSLIC had sufficient funds to liquidate Suburbia in 1984. Given its outstanding assistance commitments at that time, and the continuing decline of the health of a large number of thrifts, FSLIC was effectively near-insolvent, and anything that would cost money was a last resort for FSLIC. Tr. 5848:22-23 (Stearns); see DMFL ¶¶ 2, 7, 10-17. We do not dispute that FSLIC was charged with insuring the thrift industry, PPFF § I(B), but it lacked the capital reserves to accomplish its mission. See DMFL ¶¶ 4, 7, 10-17.

In PPFF § I(G), Astoria contends that the number of thrifts liquidated increased significantly in the 1980s. However, in PPFF ¶ 62, Astoria overstates the cash payout to depositors. The exhibit cited, PX 375 at 27, Table 5, shows a $2.2 billion cash payout to depositors in 1985, not $42.2 billion as Astoria claims. PPFF ¶ 64 also misstates the cited testimony, which actually indicates that the average size of the institutions liquidated – not the cost of liquidations – grew exponentially between 1983 and 1985, approximately doubling each year from involving deposits of $49 million in 1983 to $92 million in 1984 and $189 million in 1985.

**2. Thrifts With Spread Problems Were Not Liquidated**

We do not dispute that, in the 1980s, FSLIC developed several low-cost strategies for resolving failing thrifts, and considered liquidation the last option. PPFF § I(D); see DMFL ¶¶ 4-17. In 1984, the FSLIC liquidated only nine institutions, with combined deposits of $829 million, none of which were in the Northeast region, and all with "severe asset quality problems." DMFL ¶¶ 10-11. Given the state of FSLIC's finances in 1984 and 1985, liquidation

was the last alternative that the FSLIC would have pursued for Suburbia, an institution of about $700 million in assets that had interest spread rather than asset quality problems. DMFL ¶ 13.

Plaintiff's Proposed Findings of Fact ¶¶ 17 and 18 are therefore misleading. As a general matter, institutions with spread problems improved when interest rates dropped. Tr. 1241:7-12 (Beesley). It was harder for FSLIC to solve asset quality problems. Tr. 1238:13-14 (Beesley); see DMFL ¶¶ 8-9. While Mr. Beesley did testify that some institutions had been so weakened that their survival remained precarious even when interest rates fell, he attributed their precarious state to many variables, not simply the stress of interest rate volatility. Tr. 1193:3-1194:2 (Beesley).

It therefore makes sense that FSLIC used net worth certificates ("NWCs") to help Suburbia cope with its spread problem. We do not dispute Astoria's showing in PPFF § I(E) that the use of NWCs and appraised equity capital was authorized by the Garn St. Germain Act, see DMFL ¶ 34, or its showing in PPFF § I(J) that FSLIC kept Suburbia solvent with artificial capital. Indeed, it was pursuant to that statute that Suburbia was authorized to issue NWCs to boost its regulatory net worth and buy time until interest rates declined. DMFL ¶¶ 34-35.

Astoria incorrectly claims in PPFF § I(F), however, that FSLIC always took action before a thrift's capital level reached zero. We have shown that nearly all thrifts had negative net worth on an economic basis in the early 1980s. DMFL ¶¶ 1-2. Testimony that FSLIC prevented a thrift's accounting capital from reaching zero, Tr. 1156:19-1157:2 (Beesley), does not support Astoria's claim in PPFF § I(K) that Suburbia's eligibility for future NWCs was questionable. Rather, as we previously explained, DMFL ¶ 37, NWCs were issued retroactively to maintain

Suburbia's capital above 0.5 percent.[3] Had Fidelity not acquired Suburbia, NWCs could have kept Suburbia afloat until interest rates declined and its spread problems were ameliorated.[4] We therefore dispute Astoria's claim in PPFF ¶ 124 that Suburbia would not have received additional NWCs had it not merged with Fidelity.

The evidence does not support Astoria's claim that FSLIC would have liquidated Suburbia, an institution of about $700 million in assets. See DMFL ¶ 13. Such a liquidation would have lowered public confidence in the thrift system, which FSLIC wished to avoid as an overall policy matter. Tr. 225:1-227:15 (Spaid); Tr. 1386:18-24 (Vigna). Rather, the record makes clear that FSLIC would not have liquidated Suburbia had Fidelity not acquired it. See DMFL ¶¶ 16-17, 40, 87, 105, 107-08.

---

[3] Astoria cites Mr. Vigna's testimony in PPFF ¶ 117 for the proposition that Suburbia would not have been eligible for further assistance if its net worth dipped below 0.5 percent but ignores his subsequent correction of this testimony. Tr. 2755:15-17, 2757:22-2758:1, 2848:11-12 (Vigna); see also Tr. 4135:4-18, 4136:3-4138:13 (Albanese). PPFF ¶ 125 is also incorrect in asserting that, as of August 31, 1984, Suburbia was not eligible for any further Garn-St. Germain financial assistance. It did, in fact, receive such assistance in the form of NWCs, which were issued retroactively. DMFL ¶ 37.

[4] We do not dispute that Suburbia's capital condition suffered and that it became a serious regulatory concern as a result of negative interest rate spreads. PPFF §§ I(H)-(I). However, we disagree with Mr. Kane's speculation, cited in PPFF ¶ 105, that Suburbia's capital level would have eventually gone negative had it not merged with Fidelity. Indeed, this testimony is contradicted by Mr. Albanese's testimony that it is possible that Suburbia was in better condition when it was acquired than it had been previously because the amounts of net worth certificates it was issued actually decreased by 1984. Tr. 4195:17-22 (Albanese). Thus, as shown above, positive regulatory capital could have been maintained through NWCs until interest rates dropped or another acquirer could have been identified. Since such strategies were available, PPFF ¶ 106 is misleading. FHLBB and FSLIC did not have to choose between liquidation and waiting to see if interest rates came down.

### 3. There Were Other Options For Addressing Suburbia's Problems

As was the case in each of the restitution claims rejected by the Federal Circuit and this Court, FSLIC had other options to Fidelity's acquisition of Suburbia which were less costly than a payout of funds to depositors, the option upon which Astoria bases its liquidation cost estimate. As Mr. Vigna testified: "I'm sure we would have gotten some kind of proposal less than the cost of liquidation." Tr. 1505:22-23 (Vigna).

It is true that Suburbia had been shopped extensively in 1982. PPFF § I(L); see also DMFL ¶¶ 32-33. While the supervisory merger with Fidelity was Suburbia's best option in April 1984, we dispute Astoria's claim in PPFF ¶ 165 that Fidelity was its only option for a capital infusion. We also dispute Astoria's claim in PPFF § I(M) that the Fidelity merger, liquidation and rebidding were the options available to the regulators in 1984. FSLIC had "a lot of good, creative and not only financial but regulatory" ways to resolve troubled thrifts. Tr. 1316:19-1317:3 (Vigna). FSLIC had significant flexibility and could have gone back to one of the four firms that had submitted bids after the December 1982 bid conference, approached all four prior bidders, contacted the two dozen firms that had shown interest by asking for bid packages, or could have put together a new solicitation. DMFL ¶ 109; see also Tr. 1505:19-22 (Vigna). Indeed, in PPFF ¶ 148, Astoria itself identifies another option, based upon Mr. Spaid's testimony, "doing nothing." Mr. Spaid testified that what he meant by "doing nothing" was allowing Suburbia to continue under the NWC program. Tr. 175:5-7 (Spaid).

Astoria acknowledges in PPFF § I(M) that rebidding was considered as an option to resolve the financial problems of Suburbia. See also DMFL ¶ 88. The chance of a lower cost bid being received was identified as an advantage of this option. Joint Stipulations of Fact ("JSF")

¶ 44. We therefore dispute as incomplete and misleading PPFF ¶ 146. Mr. Spaid testified that FSLIC did not think the Government would get less costly proposals if it rebid Suburbia because of the condition of Suburbia and the interest rate scenario at the time. Tr. 211:24-212:1 (Spaid). The availability of NWCs would have allowed the FSLIC to wait until interest rates declined and Suburbia's condition improved before soliciting additional bids, which might have resulted in higher bids.

It is also inappropriate for Astoria to dismiss the Phoenix option based upon Mr. Stearns' testimony. See PPFF ¶ 150 (citing Tr. 5852:13-22 (Stearns)). Mr. Stearns testified that the Suburbia transaction was a fait accompli when he arrived at FSLIC, Tr. 5852:5-12 (Stearns), and that he had no idea whether a Phoenix would have been a viable alternative for Suburbia. Tr. 5852:22 (Stearns). Although we objected to the question that Astoria cites as speculation, Tr. 5852:17 (Roberson), the Court did not rule on the objection after the witness responded, "I have no idea." Tr. 5852:22 (Stearns). The Court should therefore reject as unsupported PPFF ¶ 150. Instead, the Court should credit the testimony of Mr. Vigna, who testified that Suburbia could have been placed in the Phoenix program. Tr. 1505:16-23 (Vigna).

In PPFF ¶ 34, Astoria also incorrectly claims that the FHLBB did not follow its sequential order of preference. In the omitted words from the cited passage, Dr. Pratt explained that one or more of the options might not be feasible in a particular case so the FHLBB might have to undertake a less preferred alternative. Tr. 152:16-21 (Pratt). He did not suggest that the FHLBB could deviate from the sequential order of preference. In PPFF ¶ 28, Astoria likewise used ellipses to omit critical words that show the limited use of the liquidation alternative. The quoted sentence from PX 112 at D3-0006243 (emphasis added) actually states: "A traditional

liquidation, accompanied by the cash payment of insurance, will only be used when and if there is no less costly or less disruptive alternative available."

Astoria posits that the record in this case "belies" the argument that the calculated cost of restitution is meaningless as a cost comparison. PPCL ¶ 32 (citing I (D-N)). According to Astoria, the Government "avoid[ed] a sizable net cost and reap[ed] a substantial benefit when Fidelity acquired Suburbia" which it should return to the plaintiff. PPCL ¶ 35. That is not the case. Liquidation costs were calculated simply to determine the legal maximum FSLIC could spend in resolving a troubled institution. Tr. 1179:6-10 (Beesley). The fact that all resolutions of troubled thrifts were accompanied by cost comparisons to liquidation did not mean FSLIC was actually considering liquidation. Such comparisons were required by law. Tr. 117:15-22 (Pratt); Tr. 265:4-13 (Spaid); Tr. 307:9-308:2 (Fiol); Tr. 3362:4-5 (Kaplan). All of these facts are common to both Astoria's claim and the restitution claims that were rejected in other Winstar-related cases.

There is also no record support for Dr. Kaplan's speculation, PPFF ¶ 30, that the ultimate cost of liquidating Suburbia might well have been higher than the 1984 liquidation estimate had Fidelity not acquired Suburbia. The policy of the regulators was to buy time for the savings and loan industry until interest rates fell. The reality was that, had interest rates not fallen, no thrifts would have survived, Tr. 129:6-10 (Pratt), and FSLIC would have been liable as the insurer of the thrift industry's deposits. Interest rates did fall, however, and the interest rate spread problems of thrifts eased. Tr. 1238:15-1240:10 (Beesley). Accordingly, Suburbia's spread problem would have been resolved even if Fidelity had not acquired it. As Mr. Kane testified, if interest rates had come down, Suburbia would no longer have faced an operating deficit and

would have started to return to favorable operating results. DX 3490 at 22:4-17 (Kane). See DMFL ¶¶ 24-30.

As an alternative for calculating restitution, Astoria suggests that the Court could evaluate the four 1982 bids for Suburbia, and speculates that "any new bid in 1984 would have almost certainly resulted in a higher cost to the FSLIC." PPCL ¶ 34 (citing §§ I (L)-(N)). We have already shown in DMFL ¶¶ 33, 109 that this exercise makes no sense. The present value of the lowest bid in 1982 was $17 million, as compared to Fidelity's bid of approximately $16 million. Had the Government continued to rely upon NWCs until interest rates declined, thereby allowing Suburbia's condition to improve before soliciting additional bids, FSLIC might very well have received lower bids. See DMFL ¶ 88. Indeed, as we explained, DMFL at 148, it would be hypothetical to assume that the average cost of bids received for a thrift (e.g., Suburbia in 1982) represents the cost avoided by a merger that occurred two years later in 1984.

Finally, Astoria cites Mr. Vigna's testimony about Fidelity's successful operations under its capital plan as evidence that "Fidelity's assumption of Suburbia's liabilities saved the Government substantial capital." PPCL ¶ 36 (citing PPFF ¶ 714 [sic, ¶ 685]). Fidelity's operations under the capital plan – after the breach – have nothing to do with restitution, which is designed to restore the parties to the positions they occupied before the contract. See Hansen, 367 F.3d at 1316; Glendale, 239 F.3d at 1380-81.

Thus, the evidence makes clear that Fidelity did not save the Government the cost of liquidating Suburbia. As the Federal Circuit explained in Glendale, "the action taken by the purchasing S&L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift." Id. at 1382. Since FSLIC had

several options other than liquidation that it could have pursued, the Federal Circuit concluded that a restitution award based upon the supposed liquidation costs of the acquired thrift was merely a "speculative assessment of what might have been." Id. The same is true in this case, and Astoria's claim for restitution fails.

## II. Astoria's Reliance Claim Fails As A Matter Of Law And Fact

Astoria's reliance claim is premised upon a net liability figure assumed at the moment of Fidelity's Suburbia acquisition – an accounting mark-to-market calculation of Suburbia's assets versus its liabilities under the interest rates prevailing at the time. We demonstrated that Astoria's characterization of this net liabilities assumed figure as damages is barred by binding Federal Circuit precedent. DMFL at 166-70. Astoria failed to present any argument or evidence distinguishing its net liabilities assumed claim from prior such claims rejected by this Court and the Federal Circuit. Even assuming, contrary to Federal Circuit precedent, that Astoria's claim is not barred as a matter of law, the evidence at trial showed that Fidelity did not pay or otherwise incur a net cost of $160 million based upon the net liability figure assumed at the moment of acquisition. DMFL at 170-186.

### A. Astoria's Reliance Claim Depends Upon An Accounting Entry For Net Liabilities Assumed At The Moment Of Acquisition And Is Barred By Federal Circuit Precedent

As we confirmed at trial, Astoria's reliance claim depends upon the premise that the approximately $160 million net liability figure assumed at the moment of Fidelity's Suburbia acquisition – reflecting a marked-to-market valuation of Suburbia's assets and liabilities under the interest rates prevailing at that instant – was an actual cost Fidelity incurred to "discharge" the net liability. DMFL at 166-67. However, this Court, and the Federal Circuit, consistently

have rejected such net liabilities assumed claims as a basis for damage, whether characterized as restitution or reliance damages. Id.[5]

In its post-trial brief, Astoria does not even attempt to distinguish this case from the Federal Circuit precedents such as LaSalle that we consistently have cited as barring Astoria's reliance claim. See PPCL ¶¶ 42-48. Accordingly, Astoria's claim should be dismissed as a matter of law.

Further, Astoria made virtually no effort to tie the facts of this case to its claim. Astoria's brief concerning reliance consists primarily of a few general propositions of law, with no indication how they relate to the facts of this case. E.g., PPCL ¶¶ 42-47.[6] The sum of Astoria's

---

[5] The same prohibition bars reliance as well as restitution claims premised upon net liabilities assumed because, in this context, prohibited restitution claims premised upon net liabilities assumed can be seen as reliance claims:

> When restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages, wherein the non-breaching party is restored to its pre-contract position by returning as damages the costs incurred in reliance on the contract.

LaSalle, 317 F.3d at 1376; see also Tr. 3341:5-17 (Kaplan) (liquidation cost and net liabilities assumed just a matter of "flip[ping] the coin"). The Federal Circuit and this Court have repeatedly dismissed both restitution and reliance claims premised upon the argument that net liabilities assumed represent a cost. See Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1371 (Fed. Cir. 2005); Glendale, 378 F.3d at 1313; CalFed, 245 F.3d at 1351; Glendale, 239 F.3d at 1382-84; Standard Fed. Bank v. United States, 62 Fed. Cl. 265, 295-99 (2004); Long Island, 60 Fed. Cl. at 96; Granite Mgmt. Corp. v. United States, 58 Fed. Cl. 766, 776 (2003), aff'd in relevant part, 416 F.3d 1373 (Fed. Cir. 2000); S. Nat'l Corp. v. United States, 57 Fed. Cl. 294, 300 (2003); Fifth Third, 55 Fed. Cl. at 245-46; Franklin, 55 Fed. Cl. at 120-21; Glendale Fed. Bank, FSB v. United States, 54 Fed. Cl. 8, 13 (2002), aff'd, 378 F.3d 1308 (Fed. Cir. 2004).

[6] Astoria also discusses Hughes v. United States, 71 Fed. Cl. 284, 309 (2006), rev'd on other grounds, __ F.3d __, 2007 WL 2433838 (Fed. Cir. Aug. 29, 2007), as an example of the consideration of reliance and restitution as "related concepts." PPCL ¶ 47. However, the

discussion of the facts underlying its reliance claim may be found in a single conclusory statement:

> Plaintiff's damages arise not from merely assuming Suburbia's net liabilities, but from actually discharging them – dollar by dollar, and at great cost to its regulatory standing and marketplace competitiveness. See generally, Proposed Findings of Fact, Section V (D).

PPCL ¶ 48. The "Proposed Findings of Fact, Section V (D)" that Astoria cited as support for its net liabilities assumed reliance claim, PPCL ¶48, simply relates to the booking of goodwill amortization. See PPFF at ¶¶ 692-702. Moreover, given that Astoria's references to goodwill amortization cite to figures exceeding $160 million,[7] such amortization plainly includes matters unrelated to Suburbia or the breach, such as goodwill amortization associated with the acquisition of Dollar Federal Savings and Loan Association ("Dollar"). There was only $160.093 million in goodwill created as a result of Fidelity's acquisition of Suburbia. PPFF ¶ 221.

Astoria's goodwill assumed and "discharg[ed]" claim is indistinguishable from net liabilities assumed claims that are barred by Federal Circuit precedent. To illustrate, the Federal Circuit in LaSalle entertained the appeal of a plaintiff claiming – just as Astoria claims here – that it "was obligated to pay the assumed liabilities as they became due and . . . did substantially reduce these liabilities, either through payment or by sale of the underlying asset, before the breach." LaSalle, 317 F.3d at 1376. The Federal Circuit considered and then rejected this claim:

---

plaintiffs in Hughes, unlike this case, sought restitution and reliance damages for real estate assets that had been actually contributed to a new thrift, see Hughes, 71 Fed. Cl. at 309, as distinguished from Astoria's net liabilities assumed claim.

[7] See, e.g., PPFF ¶ 697, citing $170 million in goodwill.

> However, the calculation of restitution damages based on the treatment of assumed "goodwill" liabilities as a cost of performance was generally resolved in Glendale, 239 F.3d at 1382-83, where this court held that damages are not properly keyed to "a liability that was at most a paper calculation." Although the assumed liabilities are indeed an accounting cost, as LaSalle stresses, we agree with the Court of Federal Claims they are not a usable measure of either cost to the thrift or benefit to the government, and thus not an appropriate threshold for restitution damages. See also Cal. Fed. Bank, 245 F.3d at 1351.

Id.

Further, during cross examination, Dr. Kaplan admitted that it is his understanding that a reliance damage claim based upon net liabilities assumed by the acquiring thrift, such as presented in his damage model, is not a valid legal theory of damages pursuant to decisions of the Federal Circuit. Tr. 3250:17-3251:7 (Kaplan).

It follows that Astoria's claim is barred by binding Federal Circuit precedent and thus should be dismissed.

### B. Astoria's Claimed Reliance Cost For "Discharging" Net Liabilities Assumed Is Contrary To Fact

Even assuming, for purposes of argument, that Astoria's net liabilities assumed reliance claim was not barred, as it is, by Federal Circuit precedent, the facts of this case contradict Astoria's claim that it was damaged by $160 million of "cost," because Astoria did not prove that it incurred an actual cash cost in paying off any of the net liabilities assumed. Further, Astoria ignored the offsetting benefits that it secured with Fidelity's acquisition of Suburbia.

First, as we demonstrated at trial: (1) Fidelity did not actually pay Suburbia's excess liabilities of $160 million at the time of acquisition, and did not have the capacity to do so;

(2) FSLIC did not request, let alone receive as consideration, a promise that Fidelity would pay Suburbia's net liabilities and permanently discharge FSLIC's insurance liability; and (3) Fidelity never generated enough cash earnings to permanently discharge the $160 million of net liabilities assumed in connection with the Suburbia acquisition. DMFL at 171-72.

That Fidelity never paid Suburbia's net liabilities is evident from the fact that, although the net liabilities of the combined institution immediately after the merger was actually greater than $160 million, Tr. 3329:3-12 (Kaplan), Fidelity was, on a mark-to-market basis, insolvent by only $13.3 million as of May 30, 1990. Tr. 3327:11-3328:8 (Kaplan). Accordingly, the excess liabilities that Fidelity assumed when it acquired Suburbia had largely been eliminated as of May 1990 – a point in time when, given Fidelity's modest cash earnings after the acquisition, the net liabilities could not have been paid with actual cash earnings generated after the merger. Indeed, Dr. Kaplan admits as much: "I have not suggested that [Fidelity's] earnings paid down Suburbia's original liabilities as of that date [May 1990]." Tr. 3330:17-19 (Kaplan). In sum, Fidelity did not "pay off" Suburbia's liabilities. DMFL at 173.

Second, goodwill amortization cannot be posited as an actual payment of the net liabilities assumed. Astoria's proposed findings of fact rely, erroneously, upon Mr. Teurfs (who was not qualified as an expert, Tr. 1068:22-24, 1123:3-4; 1132:17-18) to support an opinion that "[t]here is an opportunity cost when an institution has to amortize goodwill . . . ." PPFF ¶ 244. Astoria alleged that "[t]he money used to amortize goodwill cannot be used for other types of investments, such as loans. (Teurfs, Tr. 1138, lines 9-12)." PPFF ¶ 244 (emphasis added). Astoria's contention is based upon inadmissible testimony and, in any event, is plainly erroneous. As is recorded immediately after the cited testimony, the Court sustained our objection to

Mr. Teurfs's testimony. Tr. 1138:13-14. Contrary to plaintiff's contention that there was "money used to amortize goodwill," we demonstrated that the amortization of goodwill is a noncash accounting entry that was not tied to the actual payoff of liabilities assumed with Suburbia – whether as a matter of accounting or as a matter of fact. DMFL at 173-76.

Third, in reality the net liabilities assumed figure, based upon the $160 million of goodwill created at the moment of the acquisition, certainly did not remain fixed at that amount and, thus, was not a "cost" actually paid in that amount. As confirmed at trial, with every change in interest rates, the mark-to-market "costs" change; and would change – decrease as the value of assets increased and liabilities decreased – dramatically with a downturn in interest rates. DMFL at 176-78. This is precisely what occurred after Fidelity's acquisition of Suburbia. Id. Given that Suburbia's net liabilities were not paid off by Fidelity at the time of its acquisition, but, if at all, years later as the (repriced to market) deposit liabilities came due, any actual costs that hypothetically were incurred (although not proven at trial) would have little or no correlation to the "net liabilities" figure Astoria proposed as damages. Indeed, this is precisely the point made by this Court in rejecting the same net liabilities assumed/discharged argument in Granite:

> It is inappropriate, however, to argue that the liabilities were paid as they came due and yet include the entire amount of net liabilities assumed on the date of acquisitions in the cost of performance calculation. . . . While it is possible that plaintiff may have paid off some of the liabilities, it is impossible to discern what portion was actually paid out when the entire amount of net liabilities is included as a cost.

58 Fed. Cl. at 775-76. Accordingly, because plaintiff has not identified any actual "cost" as the basis for its reliance claim, its claim fails. See also Standard Fed., 62 Fed. Cl. at 298 (denying same reliance claim sponsored by same expert).

Fourth, even if net liabilities assumed could be construed to be a cost by an acquirer, the alleged "cost" – i.e. goodwill – stems from the quality of the assets and liabilities reflected by their mark-to-market, at the moment of acquisition. That alleged "cost" of performance is a function of the asset and liability valuation assumed at the moment of acquisition, and is unrelated to the later FIRREA breach of contact. See Granite, 416 F.3d at 1380. Because the mark-to-market value at the time of acquisition is a figure not generated or caused to have been incurred by FIRREA, awarding such an amount would provide Astoria with an impermissible windfall. See id.[8] The Federal Circuit's observation in Granite points up another flaw in Astoria's claim for net liabilities assumed as damages: as discussed below, the acquisition of marked-to-market Suburbia brought to Fidelity a bundle of associated and offsetting benefits.

Finally, reliance damages are subject to the ordinary limitations upon contract remedies, including causation, certainty, and foreseeability. See Granite, 58 Fed. Cl. at 774. Any reliance damages must be the net cost caused to be suffered from attempted performance of the contract, i.e., costs must be netted against offsetting benefits the plaintiff received from the contract:

> Given that no one disputes that as a consequence of tax benefits from acquiring Bell, Bell's "purchase price was zero," we conclude that the trial court clearly erred in finding that Westfed actually sustained a loss of $20 million in connection with the purchase of Bell, for which it should be compensated. See Glendale, 239 F.3d at 1382; Dan B. Dobbs, Law of Remedies, § 12.3(1) at 51-52 (2d ed. 1993) ("The reliance damages recovery is a recovery for net reliance loss, so the defendant is credited with any benefit the plaintiff receives from the expenditure in reliance.").

---

[8] Since windfalls are not permitted as restitution either, this rationale bars a restitution award for net liabilities assumed as well. See Hansen, 367 F.3d at 1315.

Westfed, 407 F.3d at 1369; see also Carley Capital Group v. City of Newport News, 709 F. Supp. 1387, 1399 (E.D. Va. 1989); Charles T. McCormick, Damages § 142, at 584 (1935). Further, in order to be entitled "to reliance damages, a plaintiff must prove that both the magnitude and type of damages were foreseeable" at the time the contract was made. Landmark, 256 F.3d at 1378 (emphasis added).

In this case, reliance is barred because Astoria cannot show that Fidelity made net out-of-pocket expenditures that were caused by the phase-out of goodwill, were reasonably certain, and were foreseeable at the time of the Suburbia acquisition. As we demonstrated at trial, plaintiff's claim counts only the alleged "cost" assumed at the moment of acquisition, while failing to credit the multitude of offsetting benefits that Fidelity and Astoria obtained from Fidelity's acquisition of Suburbia. In its post-trial proposed findings of fact, plaintiff claims that "FIRREA . . . took away the benefits of the deal," citing Tr. 1572:4-1573:9 (Lovely). PPFF ¶ 452. Plaintiff misstated the evidence. The cited testimony at Tr. 1572:18-19 is that "goodwill" – not "benefits" – allegedly was taken. Further, the evidence is plain that Fidelity received and retained a multitude of benefits as a result of its assisted acquisition of Suburbia.

As Fidelity represented in its Offering Circular, it acquired Suburbia "primarily for the purpose of enhancing its retail deposit and lending franchise[.]" PX 986 at AST064173; DX 4004. Plaintiff's expert conceded that a deposit franchise is valuable.[9] Utilizing a valuation

---

[9] A deposit franchise is a very valuable resource because consumer retail deposits are a relatively stable, reliable and low-cost sources of funds. Tr. 3333:4-10 (Kaplan). Indeed, a deposit franchise is valuable because it is the raw material or fuel that a bank utilizes to move forward. Tr. 3333:11-18 (Kaplan). Suburbia's branch deposits were not different and, in fact, were valuable to Fidelity. Tr. 3334:15-3335:9 (Kaplan). Further, Dr. Kaplan admitted that one could quantify the value of Suburbia's deposit franchise. Tr. 3338:8-11 (Kaplan).

method similar to that employed by plaintiff Astoria to quantify its franchise value, we demonstrated that plaintiff benefitted and continues to benefit from the value of Suburbia's franchise, in amounts offsetting the initial net liabilities assumed. See DMFL at 161-65, 178-80; Tr. 5035:17-5036:17 (Rochester).

Astoria's claim also ignores the benefits of cash savings and cash received from the Suburbia acquisition. As we detailed, plaintiff secured from the Suburbia acquisition millions of dollars in cash gains on sale of Suburbia's assets, savings from economies of scale, and tax benefits (i.e., the same kind of benefits that the Federal Circuit in Westfed, 407 F.3d at 1369-70, required be netted against alleged reliance costs). DMFL at 180-86. These benefits overwhelm the purported cost of the net liabilities assumed, precluding, even if it were not otherwise barred by binding precedent, Astoria's claim for $140 million in reliance damages – as well as its claim for restitution damages.

As we demonstrated at trial, plaintiff's expert relied upon a double-counting of goodwill – first as an alleged cost to Fidelity, and then again, as an offset to the offset for gains on the sale of discounted loans. Id. at 180-81. Similarly, plaintiff attempted to resurrect the pre-merger $57 million accounting deficit at Suburbia (an accounting entry eliminated by the very mark-to-market that created the post-merger net liability assumed), to attempt to avoid crediting offsets to the alleged cost of net liabilities assumed. Id. at 182. Plaintiff's arguments in this regard are illogical and reflect erroneous accounting. Id. at 180-82. Plaintiff's expert also argues that no offset should be allowed until Fidelity returned to solvency. That is contrary to the Federal Circuit's description of reliance damages as a "net" loss, requiring that "any" benefit be credited as an offset: "[T]he reliance damages recovery is a recovery for net reliance loss, so the

defendant is credited with any benefit the plaintiff receives from the expenditure in reliance." Westfed, 407 F.3d at 1369, (quoting Dobbs, Law of Remedies, § 12.3(1) at 51-52) (emphasis added).

Accordingly, pursuant to binding precedent of the Federal Circuit, Astoria's claim must be denied. Moreover, even if its reliance claim had not been barred by binding precedent, the reliance claim presented by Dr. Kaplan is unfounded in fact and law for the reasons we have described, including his failure to take into account the net alleged cost after credit for any benefits obtained. Thus, for all of these reasons, Astoria's reliance claim should be rejected.

## III. Federal Circuit Precedent Requires The Offset Of Benefits That Fidelity Received

Plaintiff's brief concludes with an argument that no offsets should be credited. See PPCL ¶¶ 49-50. Plaintiff cites Hansen, a case in which dividends paid by a thrift to a capital contributor were not deemed an offsetting benefit for restitution purposes, as the basis for its argument that no offset should be allowed upon a reliance claim. Plaintiff misplaces its reliance upon Hansen because it is factually and legally inapposite. As the Federal Circuit made plain in Westfed, 407 F.3d at 1369, recovery must be "net" of "any" benefit. In Westfed, for example, the acquired thrift – Bell – had net operating loss carryforwards that accrued to Westfed as a result of acquiring the thrift. Id. As we demonstrated, DMFL at 158-65, 178-86, plaintiff here likewise benefitted, receiving from the Government-assisted acquisition Suburbia's franchise, discounted assets (and resulting accretion income and gains on sale), and tax benefits, et al., all of which Fidelity retained and from which it benefitted. In sum, with respect to reliance and restitution, respectively, the value and cash realized from the acquisition of Suburbia's franchise

and assets plainly were benefits that must be credited as offsets to alleged costs of net liabilities assumed or as offsets against the benefit of liquidation avoidance allegedly conferred by Fidelity.

## IV. Astoria Did Not Establish Causation Of Its Lost Profits Damages

Astoria's lost profits claims fail for lack of causation, foreseeability, and reasonable certainty. We address each of these elements in turn.

In its proposed conclusions of law, Astoria claims that it established causation through the testimony of "Fidelity's senior managers, Mr. Wesp and Mr. Powderly, and its expert witness Dr. Kaplan, about Fidelity's pre-FIRREA operations and business plans and the comparison with post-FIRREA life under the Capital Plan." PPCL ¶ 17 (citations omitted). Specifically, Astoria argues that, "[t]he Record shows that pre-FIRREA, Fidelity was healthy and well-managed and was dealing with its real estate challenges. The record further shows that after FIRREA, Fidelity was unhealthy, capital deficient, and existing at the whim of its regulators." PPCL ¶ 19 (citations omitted).

Contrary to Astoria's claims, however, the record shows that the breach did not cause Fidelity to forego growth at any period. See generally DMFL ¶¶ 227-74; DMFL at 214-36. As we demonstrated in our proposed conclusions of law, Dr. Kaplan's damages model suffers from several flaws, including: no support for damages beginning before the passage of FIRREA (id. at 214-17); the testimony that regulators would have barred Fidelity's growth pursuant to regulations RB3a-1 (id. at 217-19), concern with its interest rate risk (id. at 219-22) and restrictions regarding wholesale investment strategies (id. at 222-25); Fidelity's activities leading up to and after its conversion being unchanged by the breach (id. at 225-28); Dr. Kaplan's wholesale growth strategy being inconsistent with Fidelity's actual practices before the breach

(id. at 228-29); economic constraints barring Fidelity's pre-1994 growth (id. at 229-33); the loss of Fidelity's non-contractual goodwill (id. at 233-34); and the non-breach costs Fidelity would have incurred in the but-for world (id. at 234-36).

Astoria's proposed findings do not address these issues directly, but instead rely upon after-the-fact characterizations of testimony that ignore the key documents and admissions we established at trial. Astoria thus has failed to establish causation for the reasons we previously demonstrated, and which we discuss below. See generally DMFL ¶¶ 227-74; DMFL at 214-36.

**A. Astoria's Lost Profits Claims Lack Foundation In The Record**

Astoria bases its pre-1994 lost profits damages claim upon Dr. Kaplan's assumption that Fidelity would have grown at a rate of 8.25 percent per year after the breach, and that its was prevented from doing so by a lack of regulatory capital after the breach. The record, however, demonstrates that both of these assumptions are incorrect. Absent the breach, Fidelity still would have been prevented from growing for most or all of the period prior to its conversion because of growth restrictions imposed by RB3a-1 based upon Fidelity's asset quality before FIRREA.

Furthermore, economic conditions and Fidelity's asset quality problems would have restricted Fidelity's growth after the breach apart from regulatory restrictions. Lastly, Fidelity would have ceased growth in preparation for its 1993 conversion, and faced no capital-related restraints upon its growth after the conversion. After Fidelity's merger with Astoria, Astoria continues its lost profits projections, but offers no support in its proposed findings for any capital-related restraint upon Astoria's growth. Therefore, Astoria has not demonstrated expectancy damages.

### 1. Regulators Would Have Restricted Fidelity's Growth Irrespective Of The Breach

The regulators' testimony at trial was unequivocal that, due to Fidelity's large portfolio of troubled loans, regulators would have required it to cease growth pursuant to RB3a-1, irrespective of the breach. As Mr. Amend testified:

> Our concern really was a climbing level of nonearning assets, earnings performance kept deteriorating, and we didn't see an end in sight. And at that point, the market was soft. We wanted them to deal with those problems, rather than to go into a growth mode. And Tom Powderly said I want to focus on dealing with these problems. We were on the same page, as far as that aspect.

Tr. 4767:7-14 (Amend).

Nevertheless, Astoria mistakenly discusses RB3a-1 in a section headed, "FIRREA Prohibited Fidelity's Growth," thus implying that the growth restrictions from RB3a-1 were due to the breach. PPFF ¶¶ 442-46. This is simply incorrect. As we demonstrated at trial, the OTS's imposition of restrictions on Fidelity's growth after the breach would have occurred with or without the breach due to Fidelity's pre-breach "4" rating, which was driven by its asset quality problems.

#### a. Fidelity Would Have Received A "4" Or Worse After FIRREA Irrespective Of The Breach

As we demonstrated at trial, Fidelity would have been given a composite MACRO rating of at least a "4," in 1989 and 1991, irrespective of the breach, just as it was in 1987, prior to the breach. DMFL at 217-19. Astoria cannot demonstrate how the unequivocal testimony of Messrs. Vigna and Amend in this regard was in error; indeed, it makes no attempt to do so. Instead, Astoria suggests that only one factor in the MACRO composite rating mattered: capital.

Astoria refers to a single component of the MACRO rating, the "2" capital rating that Fidelity received in 1987, comparing that "2" rating to the "5" rating it received for capital in 1989, with the difference "entirely due to FIRREA." PPFF ¶ 653. Rather than support its claims for lost profits damages, however, this statement actually underscores our assertion that, irrespective of the breach, Fidelity would have been given at least a "4" composite MACRO rating in 1989 and 1991. In 1987, even when Fidelity was given a "2" for its capital component, it was still given a "4" composite rating, based primarily on its bad assets. Those assets only further deteriorated in 1989, and they remained severely criticized in 1991.

Even though the"4" composite rating for Fidelity in the 1987 Report of Examination ("RoE") was given when Fidelity's capital was rated a "2," Astoria suggests that "4" rated institutions are those that "generally have an inadequate level of capital." PPFF ¶ 660. This clearly was not the case for Fidelity in 1987. At that time, as later, Fidelity's poor composite rating was driven by its very severe asset quality problems.

In discussing the period of time between 1993 and 1994, Astoria argues in a subheading caption that "Fidelity's Composite Examination Rating Was Determined By Its Level Of Capital." PPFF ¶¶ 661-64. Astoria's argument in its heading is unsupported by the subsequent paragraphs of its findings of fact. Rather than focus solely upon capital, regulators looked at other factors, including asset quality, as the 1987 RoE's MACRO rating attests. Indeed, in an earlier contention of fact, Astoria cited to the testimony of Mr. Albanese who testified that management was the most important component of the composite rating, "with asset quality, capital, and operating results . . . equally important." Tr. 4165:23-24 (Albanese) (emphasis added); PPFF ¶ 651.

In addition to its asset quality, Fidelity's earnings would have also been poor during this period irrespective of the breach. During 1991, for example, Fidelity's earnings were generated by the sale of assets – not core operations – and they totaled only $1.425 million, despite taking into account $6.8 million in earnings from asset sales. PPFF ¶ 655. Moreover, Fidelity's amortization of goodwill would have continued irrespective of the breach, also negatively affecting its earnings. Accordingly, irrespective of the breach, Fidelity would have faced problems with the "earnings" component of its CAMEL ratings (or "operating results" of the MACRO rating).

It was not until after the OTS's 1992 examination of the thrift that Fidelity's asset quality, although still exhibiting significant weaknesses, had nonetheless improved enough such that, in a non-breach world Fidelity would have been given a "3" composite rating, rather than the "4" MACRO rating it actually received following that examination. Both parties agree to this fact. See PPFF ¶ 658.

Astoria also attempts to avoid the unambiguous testimony of Messrs. Amend and Vigna that Fidelity would have been given a "4" rating through the issuance of the 1992 RoE, by arguing that if Fidelity had contractual goodwill it "would have used the capital to manage these [problem real estate] assets such that Fidelity would not have been deemed a troubled institution on the basis of its real estate problems." PPFF ¶ 862. Astoria bases its proposed finding of "fact" upon the mere opinion of Dr. Kaplan, which, of course, cannot be used to establish any fact. The referenced passage of Dr. Kaplan's testimony involves nothing more than Dr. Kaplan's recollection of Mr. Powderly's vague testimony that Fidelity would have written off or managed

the troubled assets differently, or that Fidelity "could have done any number of things differently than what [it] was allowed to do[.]" See Tr. 3177:24-3178:12 (Kaplan).

**b. Fidelity Could Not Have Improved Its Asset Quality Through The Use Of Goodwill**

Reviewing Astoria's other allegations in this regard further demonstrates the lack of substance to its claim that Fidelity would have had a higher composite MACRO rating if it had its goodwill restored to its capital. For example, Astoria asserts that Mr. Powderly testified that "Fidelity did not have enough capital to allow it to develop Fidelity's real estate owned." PPFF ¶ 703 (citing Tr. 352:14-22 (Powderly)) (emphasis added). This assertion is incorrect. Mr. Powderly testified that Fidelity did not have enough "money" to fix up the real estate owned properties. See Tr. 352:14-22 (Powderly) (emphasis added). As Mr. Powderly later admitted, goodwill, which, of course, is not "money," could not be used for loan loss reserves, to fix up properties, or to invest in properties. Tr. 714:3-20 (Powderly). Yet this is exactly what Astoria is suggesting – that, in a non-breach setting the goodwill could have been used to fix up the real estate owned so that Fidelity could have sold or better managed the fixed-up properties. See also Tr. 5572:7-21 (Kennedy) (the only way having more capital could help a thrift manage its troubled assets is if having more capital allowed management to "put more money into a project to build it out further. But then the goodwill capital is not cash capital[.]") (emphasis added)).

Astoria presents another unfounded opinion of Dr. Kaplan as a "fact,"[10] arguing that, if Fidelity's contractual goodwill had been restored, Fidelity could "have reduced its problem assets to a level that would have earned it a '3' in its MACRO rating in the years in which it in fact received a '4.'" PPFF ¶ 707 (citing Tr. 3776:6-3777:15 (Kaplan)). To reduce its problem assets in a non-breach setting would still, however, require the write-down of the problem assets. It is this fact which, as detailed below, is fatal to plaintiff's argument.

First, Astoria's argument suggests an elective quality to the decision to write-down troubled loans. This is not the case. As Mr. Kennedy testified, pursuant to GAAP, write-downs occur when an asset is deemed impaired; they cannot be taken without justification. Tr. 5401:6-5402:2 (Kennedy). Therefore, Fidelity could not have written off its bad loans without actual justification.

Second, Dr. Kaplan has no expertise in the write-off of loans and was barred by the Court from opining in this area, given his lack of any expert credentials in this area. See Tr. 3178:13-3179:1 (objection sustained with regard to Dr. Kaplan not being qualified in the assessment of real estate or loan losses) (Roberson). Indeed, during voir dire, Dr. Kaplan admitted that he had

---

[10] Throughout Astoria's proposed findings of facts, Astoria sets forth opinions and arguments that cannot, under any reading, be properly considered factual. For example, Astoria claims as a fact that Dr. Kaplan minimizes credit and interest rate risk in his model. PPFF ¶ 841. We do not agree with this opinion. Indeed, Dr. Kaplan's "model" is essentially a "black box" without specific assets and liabilities modeled, so there is no real way to ascertain whether credit or interest rate risk is minimized or not. There are numerous other examples of such other improper characterizations of opinion and argument in Astoria's contentions. See, e.g., PPFF ¶ 839 (Fidelity would not "have earned less that [sic] the lost profits calculated by Dr. Kaplan"); PPFF ¶ 822 (Dr. Kaplan's assumed rate of growth); PPFF ¶ 823 (Dr. Kaplan's spread assumption); PPFF ¶ 824 (Dr. Kaplan's lost profits multiplication formula).

never made loan approval, underwriting or write-off decisions, and had no experience in the workout of real estate problems. Tr. 2680:7-23 (Kaplan).

Third, even assuming the incorrect premise that loan write-offs were merely elective, Astoria makes no attempt to quantify the amount of bad loans that would have had to have been written off in order to improve Fidelity's asset quality level from what it was in the real world. As it was, between 1986 and 1994, Fidelity wrote off $82 million in bad loans, DX 650 – and still maintained its poor asset quality ratings through the early nineties.

Importantly, too, Astoria makes no attempt to quantify the effect on Fidelity's non-breach capital rating from write-offs of its bad assets. If Fidelity expanded its write-off of its bad loans in a non-breach setting, then the tens of millions in losses from its bad loans would have been taken off against its non-breach capital. If Fidelity's asset quality is improved in a non-breach setting as a result of greater loan loss write-offs, Fidelity's capital quality would have been that much worse – and far worse than that assumed by Dr. Kaplan. For example, if Fidelity wrote off all of its $97.7 million in classified assets in 1989, PX 509 at PAA006 0795; Tr. 383:25-384:4 (Powderly), Fidelity would have had a $97.7 million decrease in its capital level. Thus, contrary to the vague suggestions of Astoria, in a non-breach world Fidelity cannot escape the effect of its bad loans. Either its asset quality or its capital would have been negatively affected, thus, negatively affecting its non-breach composite MACRO rating either in the capital or asset component.

Alternatively, Astoria suggests that, with more goodwill capital, Fidelity could have held its foreclosed upon properties "until the market rebounded." PPFF ¶ 709. This is, however, exactly what Fidelity did with regard to a number of its major loans, including its disastrous loan

for the 14th Street property in Manhattan. But the market never "rebounded" for that property (composed of a nightclub, vacant lot, and vacant restaurant) prior to Fidelity's sale of itself to Astoria. As Mr. Powderly admitted, some real estate owned is not re-saleable at all times. Tr. 353:4-5 (Powderly). Indeed, even the well-capitalized Astoria did not wait for the market "rebound," choosing to sell the 14th Street property not long after its acquisition of Fidelity. Tr. 4000:8-19, 4003:3-4004:7 (Finn); PX 1191.

Mr. Powderly bemoaned the fact that Astoria sold off the 14th Street property, suggesting it was because Astoria didn't have the capital to hold the asset. In fact, Astoria, which never lacked sufficient levels of capital, made its own business decision to quickly sell the 14th Street property, for reasons that had nothing to do with goodwill. Tr. 4000:8-19, 4003:3-4004:7 (Finn); PX 1191. Thus, Mr. Powderly's suggestion that with sufficient capital "you can hold [bad loans] forever," is correct (and was indeed, what Fidelity did with many of its bad loans), but it misses the point. The real issue in deciding whether to foreclose upon properties concerns what the value of the property is in the market, relative to other opportunities that could be pursued with funds obtained from the sale of the property. Cf., e.g., Tr. 4006:14-4007:4 (Finn) (valuation of a given property based upon perception of where the market would be and potential cash flow).[11]

---

[11] Elsewhere, Astoria asserts that "institutions with excess capital sometimes chose just to write the [troubled] loan off its books by taking a charge to its capital." PPFF ¶ 704. Citing the testimony of Mr. Vigna, Astoria concluded that "[t]his . . . allows the institution to hold onto real estate or other collateral taken for the loan and sell it at a later date on terms that might be more favorable than terms available in the present market." PPFF ¶ 704 (citing Tr. 2827:25-2830:7 (Vigna)). Again, Astoria has mischaracterized the testimony of a fact witness. In fact, Mr. Vigna stated, with respect to a larger capital cushion, that "I don't necessarily agree that it changes how you deal with [troubled loans]." Tr. 2829:3-4 (Vigna). Indeed, Mr. Vigna suggested that lower capitalized thrifts tend to manage, rather than write-off troubled assets, while "[s]ome institutions" with excess capital will "just sell [troubled loans] off their books." Tr. 2829:4-5 (Vigna).

Astoria also suggests that regulator appraisals of Fidelity's real estate owned were not fair because regulators "typically assessed the value of the property significantly lower than the thrift." PPFF ¶ 710. Even if this were the case, however, the fact that regulators may have valued Fidelity's property differently than Fidelity did has nothing to do with the breach of plaintiff's contract. As Mr. Finn admitted with respect to Astoria, regulator decisions concerning the loan loss reserves requested by regulators (which followed from valuations of properties), had nothing to do with the amount of capital held, but rather was based upon the appraisals of property values. Tr. 4006:10-4007:25 (Finn).

Finally, in suggesting that Fidelity could have better managed its troubled loans but for the breach, Astoria is really attempting to sidestep the crucial point – which is that Fidelity's bad loans were not caused by FIRREA, but rather by Fidelity's own poor business, underwriting, and management decisions.

#### c. Prior To FIRREA, Fidelity Had Not Been Pursuing A Growth Strategy

In its contentions of fact, Astoria suggest that, when Fidelity stated that it intended to "continue doing what we are doing," in devising its Capital Plan, Fidelity was only referring to efforts undertaken in 1989 in anticipation of FIRREA. PPFF ¶ 512. This contradicts the statements of Fidelity's own witnesses and its securities filings. See generally DMFL ¶¶ 227-42. Astoria's after-the-fact characterizations should thus be rejected.

Astoria cites the testimony of Mr. Wesp in support of this proposed finding of fact. Mr. Wesp, however, testified that his intent in writing that Fidelity would "continue doing what it was doing" was to inform regulators that they could "just keep looking for what was always

here[.]" Tr. 1870:22-1871:19 (Wesp) (emphasis added). By referring to what was "always here" in January 1990, Mr. Wesp was clearly referring to a longer period than 1989. The more plausible interpretation of the communication was that Fidelity would continue doing what it was doing since Mr. Wesp and Mr. Powderly assumed significant managerial control of Fidelity's strategic plans during 1988, well before the initial draft of FIRREA. Fidelity's efforts to restrain its growth to deal with its real estate problems certainly existed in 1988, as was evidenced by Fidelity's budget for 1988, which projected growth of less than 0.1 percent growth. DX 69A at OAA002 0087 (increase in size of only $132,000 on a $1.8 billion institution); Tr. 707:23-708:9 (Powderly); DMFL ¶ 183.

Moreover, Astoria's characterization of the capital plan as merely an effort to "continue" efforts taken in 1989 in anticipation of the Capital Plan directly contradicts Fidelity's securities filings. In its subscription offering circular, contained in its application to the OTS for permission to convert to a stock institution, Fidelity described the strategy contained in the Capital Plan as "effectively the same business plan under which the Bank had been operating since 1987." PX 964 at OAA004 2541. Similarly, in its offering circular, Fidelity explicitly stated that the Capital Plan "to a significant degree formalized policies under which the Bank had generally been operating since 1987[.]" PX 986 at AST064176, AST064193; see also Tr. 904:14-22 (Powderly). Mr. Powderly reaffirmed on re-direct examination that the Capital Plan was a continuation of the bank's operations since 1987 "in all respects[,]" including "aspects of the bank's operation other than the real estate operations[.]" Tr. 989:21-991:10 (Powderly) (emphasis added). This statement directly contradicts Astoria's assertion that the Capital Plan was merely a continuation of policies that it claims were adopted "throughout much of 1989, in

anticipation of FIRREA . . . ." PPFF ¶ 512. Fidelity's statements in the Capital Plan and in its securities filings override Astoria's after-the-fact efforts at reinterpretation.

In Cienega Gardens v. United States, __ F.3d __, 2007 WL 2778687 (Fed. Cir. Sept. 25, 2007), the Federal Circuit recently reaffirmed the weight that the Court should place upon the truth of statements in securities filings as compared to parties' contrary representations after the fact:

> The plaintiffs argue that the prospectus only described the expectations of the limited partners and not the partnership as a whole. This argument is unavailing. Under the securities laws the prospectuses were required to be truthful. See 15 U.S.C. § 771(a)(2). In this respect, the prospectuses are particularly reliable. Under the securities laws, the prospectus cannot contain any "untrue statement of a material fact or omit[] . . . a material fact." Id. This includes misstatements and omissions about the general partner's interest in the properties. Accordingly, the prospectuses must contain any material information about both the limited and the general partners' interest in the properties, and are the most reliable indication of the relative importance of the anticipated benefits.

Id. at *19 (citation omitted).

Thus, here, as in Cienega Gardens, Astoria's contrary after-the-fact characterizations in its post-trial brief should not be permitted to override the statements of its own witnesses or of Fidelity's securities filings, which were "required to be truthful[,]" and "must contain any material information[.]" Id.

### 2. Even Absent The Breach, Numerous Non-Breach Related Events Would Have Caused Fidelity To Curtail Its Growth

Astoria claims that, "Fidelity's October 1988 Business Plan was a serious business plan under which Fidelity planned to operate for the next three years." PPFF ¶ 360. Astoria cites to

the testimony of Mr. Wesp, as support for its claim that, but for the breach, Fidelity would have grown at a rate of 8-10 percent. PPFF ¶ 527. Astoria makes no attempt to square Mr. Wesp's testimony on direct examination with his later testimony obtained during cross examination, in which he admitted that there were a number of real world factors, including the non-breaching provisions of FIRREA, that would have caused Fidelity to abandon the 8-10 percent growth rate as set forth in Fidelity's October 1988 Business Plan irrespective of the breach. See, e.g., Tr. 2433:8-18 (Wesp) ("When FIRREA was passed you would have taken this budget and put it in the garbage can."); see generally DMFL at 249-58.

Moreover, Mr. Powderly and Mr. Wesp testified that the October 1988 Business Plan did not anticipate macroecnomic events such as a major recession lasting through 1991, war in the Middle East, and a slumping real estate market – all of which Fidelity described as "impossible to contemplate" when it submitted its Capital Plan in January 1990. PX 787 at PAA006 1583; see also PX 795 at WON725 1394; Tr. 526:4-17 (Powderly); Tr. 1751:5-15 (Wesp). Mr. Powderly agreed that, if Fidelity were operating under the October 1988 Business Plan as of January 3, 1990, it still would have had to revise its growth plans downward due to a poorer-than-expected economic climate, and would have leveraged only "slightly" under the harsh economic conditions of the early 1990s. Tr. 798:11-18, 794:25-795:3 (Powderly). Mr. Wesp also testified that by 1991, "it was a totally different world" from when Fidelity drafted the October 1988 Business Plan, and that one reason "clearly would be reserves" on its bad loans. Tr. 1992:25-1993:23 (Wesp). All of these factors mean that Astoria's unswerving reliance upon the 8.25% growth rate projected by Dr. Kaplan is unsupported by the record.

#### a. Bad Loans Affected Fidelity's Capacity To Grow

Astoria incorrectly posits that "there was nothing fundamentally wrong" with Fidelity at the beginning of 1990 (i.e., at the time that Fidelity submitted its capital plan). PPFF ¶ 494. Astoria suggests that Fidelity's only problem was a capital problem, which was caused by the loss of goodwill "attributable to the Suburbia merger[,]" which it calculated as $93 million minus the $19.3 million related to the Dollar merger, or the loss of $73.7 million of goodwill as of January 1990. Id. ¶ 495. Astoria is wrong on two accounts.

First, Astoria has incorrectly (and inconsistently) quantified the amount of contractual capital phased out as a result of the breach. At PPFF ¶ 495, Astoria claims that, in January 1990, just after the date of FIRREA's implementation, Fidelity had "$93 million of supervisory goodwill that could no longer be accorded full regulatory capital treatment." Id. At PPFF ¶ 855, Astoria asserts that the amount of Suburbia supervisory goodwill outstanding prior to Fidelity's merger with Astoria in 1995 was $98.783 million, an increase of more than $5 million from the $93 million figure as of January 1990. PPFF ¶ 855. Given that the supervisory goodwill was amortizing, the balance clearly could not have increased between 1989 and 1995. According to Dr. Kaplan, however, Suburbia's supervisory goodwill totaled $123.7 million as of December 1989. PDX 48. Astoria made no effort to reconcile its contrasting figures.[12]

Second, and more importantly, the OTS's 1987 and 1989 RoEs of Fidelity belie Astoria's assertion that there was nothing fundamentally wrong with Fidelity at the time Fidelity submitted

[12] We believe that the inconsistency in Astoria's supervisory goodwill numbers can be explained as follows. The $93 million figure cited in PPFF ¶ 495 is a GAAP goodwill number, which utilized a shorter amortization period, whereas the figure cited in PPFF ¶ 855 is based upon a 30 year amortization period as allowed in the forbearance (as is Dr. Kaplan's figure). See PDX 51, line 2 "Less: GAAP Supervisory Goodwill" of $93 million.

its Capital Plan. See DX 69A at OAA002 0082 (1987 RoE finding that Fidelity had $119 million in criticized assets); DMFL ¶¶ 173-82, 206-13; PX 509 at PAA006 0795, PAA006 0809 (1989 RoE finding that Fidelity had $97.7 million in classified assets). Indeed, the OTS's approval of Fidelity's Capital Plan was based, in part, on Mr. Vigna's assessment that Mr. Powderly would clean up "the non-conforming loans, which was a very, very severe problem." Tr. 1447:12-20 (Vigna). Mr. Powderly admitted that Fidelity was experiencing losses in 1989 and 1990: "[W]e were taking real estate losses, significant real estate losses." Tr. 450:1-2 (Powderly). It is simply incorrect to suggest, as Astoria does, that, by the time of FIRREA's passage, Fidelity's bad loan portfolio was under control. See, e.g., PPFF ¶ 635 ("Since 1987, Fidelity was taking steps to reduce its credit risk to virtually zero by switching its assets from commercial real estate[.]"). In fact, as was well documented at trial, Fidelity's loan problems continued through the early nineties, as is attested in OTS's 1991, 1992 and 1993 RoEs. See, e.g., PX 711 at AST002883, AST002898 (as of June 1991, Fidelity had criticized assets totaling $89.7 million); DMFL ¶¶ 255-57; PX 986 at AST064227 (as of March 1992, Fidelity's real estate owned totaled $47.4 million); PX 912 at WON736 0009 (as of April 1992, FDIC found

$103 million in classified assets);[13] PX996 at FAA005 1053 (as of April 1993, OTS classified $62.6 million in classified assets); DMFL ¶¶ 310-11.

Astoria makes other arguments as it attempts to avoid the severity of the problems Fidelity faced as a result of its nonperforming loans. It argues, in the heading to one section of its proposed findings of fact, that "Regulators' Overall Assessments Of Thrifts With Asset Quality Problems Were Strongly Influenced By The Thrift's Level Of Capital." PPFF ¶¶ 665. Astoria's argument plays upon an ambiguity in the word "capital," implying that regulators – and thrifts – viewed all "capital" equally as they assessed an institution's asset quality and risks. For example, citing the testimony of Mr. Finn, Astoria suggests that "[c]apital helps to minimize the loss on a non-performing loan by giving the thrift the flexibility to hold on to the collateral longer and avoid a distress sale." PPFF ¶ 705. In the cited supporting testimony of Mr. Finn, however, Mr. Finn was referring expressly to tangible capital. See 4022:24-4023:6 (Finn).

---

[13] The difference between the OTS's and FDIC's total of classified assets is based upon the fact that the FDIC classified mortgage-backed securities ("MBS") derivatives while the OTS did not. Astoria incorrectly asserts that FDIC "arrive[d] at the same numbers as the OTS in their Reports of Examination[.]" PPFF ¶ 612. This allegation is rebutted by Astoria's own brief, just three paragraphs later. At ¶ 615 Astoria admits that the FDIC classified $46 million in CMO residuals held by Fidelity, whereas OTS did not. PPFF ¶ 615. Thus, there was a very significant difference between the FDIC and OTS with respect to their assessments of the level of Fidelity's classified assets.

In more general terms, Astoria makes much ado in its contentions of fact and law about FDIC's oversight of the thrift (PPFF ¶¶ 597-607). Belying the purported importance of FDIC's oversight, Astoria failed to call a single FDIC witness at trial to explain FDIC's position with respect to Fidelity. Moreover, contrary to Astoria's assertion of an imminent threat of the removal of FDIC insurance, Mr. Vigna testified that was not the case: "Again, I don't think [FDIC] ever felt that they were going to issue the 8A [termination of insurance.]" Tr. 1487:11-12 (Vigna).

Mr. Finn repeatedly acknowledged that it was tangible capital that Astoria looked at in assessing its capacity to deal with bad loans, Tr. 4022:14-4023:6 (Finn), and it was tangible capital that protected Astoria from severe business conditions. Tr. 4033:20-23 (Finn). FIRREA had no effect on the amount of tangible capital held by Fidelity because goodwill is an intangible asset and has never been considered tangible capital. In another example that shows Astoria's attempt to play upon the ambiguity in the word "capital," Astoria again cites to Mr. Finn, arguing that "[c]apital provides a thrift with more of a cushion to absorb losses on loans because the thrift is better able to put up additional reserves to cover the loss." PPFF ¶ 708. Once again, however, Mr. Finn was testifying with respect to tangible capital. See Tr. 4022:20-23 (Finn); see also Tr. 4033:20-23, 4047:22-4048:14 (tangible capital offers protection and was an ameliorating factor when Astoria had loan losses) (Finn).

Moreover, Fidelity's comparison of its situation to Astoria's after the breach, PPFF ¶¶ 665-73, which it cites as evidence for its claim that "Fidelity's regulator's criticisms flowed from and were intertwined with its reduced capital position in the wake of the Government's breach[,]" PPCL ¶ 20, does not support Astoria's position. Despite being unaffected by FIRREA, and having tangible capital levels well in excess of the regulatory minimums, Astoria still chose not to grow after the breach at rates remotely resembling the 8.25 percent annual growth rate posited by Dr. Kaplan. See DMFL ¶¶ 279-97; DMFL at 246-49. Astoria's comparison of Fidelity's situation with Astoria's after the breach illustrates its inability to demonstrate causation.

### b. Dr. Kaplan Ignores The Well-Recognized Need For A Capital Cushion

In its contentions of fact, Astoria states that Fidelity's operating and strategic options were limited due to a lack of a capital cushion. PPFF ¶ 757. As Dr. Kaplan admitted in another Winstar-related case, however, thrifts view excess capital over minimum regulatory capital levels as necessary to pursue full growth. Specifically, Dr. Kaplan testified that there was an industry-wide goal of having seven percent core capital following FDICIA, i.e., the five percent "well capitalized" level plus a two percent cushion. Here, however, he posits growth for the non-breach Fidelity even when it is far below this industry wide norm. Tr. 3566:6-3567:19, Tr. 3745:3-3746:3 (Kaplan); DX 3486; PX 1314A at 69, Ex. 9A. By ignoring the need for Fidelity to maintain a capital cushion, even after its conversion in May 1993, Dr. Kaplan's model exaggerates (even assuming his flawed methodology) the lost profits purportedly caused by the loss of goodwill.

Astoria reiterates its blurring of the difference between goodwill capital and tangible capital by arguing that, even after the conversion, Fidelity "did not have enough capital to go and make a cash offer for another institution." PPFF ¶ 769. This would have been the case irrespective of the breach because goodwill is not cash, and could not itself be used to go and make a cash offer for another institution. Plaintiff presented no testimony suggesting that thrifts or investment bankers valued goodwill and that thrifts with goodwill were viewed more favorably than those without goodwill. Indeed, Mr. Engelke repeatedly expressed his disdain for goodwill. Tr. 4348:19-23, 4356:22-4357:6, 4349:7-4350:11, 4352:3-5; 4358:5-14 (Engelke). Furthermore, it is pure speculation to suggest what Fidelity might have done even if it had more

"capital." Indeed, in sustaining our objection to one of plaintiff's questions, the Court stated that "If [Mr. Powderly] has recollection of particular things that he thought about or considered. Just to say today what he might have done is speculation." Tr. 624:17-20.

#### c. Fidelity's Interest Rate Risk Problems Would Have Affected Its Growth Irrespective Of The Breach

In our post trial brief we demonstrated that limitations on the type of growth envisioned by Dr. Kaplan would have arisen irrespective of the breach due to the significant interest rate risk Fidelity faced in the early 1990s due to a lack of tangible capital. DMFL at 219-22. In modeling damages and in discussing Fidelity's historical performance, Astoria attempts to avoid the interest rate risk problems Fidelity faced in the actual world – which it would also face in a non-breach world. For example, Astoria suggests that Fidelity did not take on interest rate risk because Fidelity's Capital Plan was intended "to keep interest rate risk as minimal as possible by not adding any long-duration assets." PPFF ¶ 503 (emphasis added). As we established at trial, it is plainly incorrect to suggest that Fidelity did not add long-duration assets during the period of the Capital Plan. In fact, it added tens of millions of such assets, having plans at different times to add up to $100 million in long-duration assets. DMFL at 208-11, 264.

In any event, Mr. Wesp admitted that, rather than assume little or no interest rate risk, Fidelity assumed interest rate risk intentionally. Tr. 2199:1-5 (Wesp). Mr. Albanese affirmed that statement, noting that Fidelity, in reaction to its large portfolio of troubled loans, moved away from credit risk "and instead substituted strategies that carried interest rate risk." Tr. 4213:11-13 (Albanese).

Nor can there be any debate concerning whether the amount of interest rate risk Fidelity assumed was acceptable to regulators. Mr. Wesp admitted that the amount of interest rate risk Fidelity faced in 1991 was not considered acceptable by the OTS – and "rightfully so." Tr. 2199:9-13 (Wesp).

Astoria suggests that Fidelity did not have a high interest rate risk profile because it increased its risk based capital in the post-FIRREA period. PPFF ¶ 601. This is misleading. The interest rate risk which was discussed by Mr. Moran during his testimony and which we discussed in our memorandum of facts and law, concerned not risk-based capital levels, but the overall interest rate risk of the institution based upon an assessment of the thrift's assets and liabilities. DMFL at 219-22.

Further, Astoria attempts to discredit the interest rate risk analysis and findings of the OTS concerning Fidelity's interest rate risk. Astoria argues that, because the Federal Reserve "has tended to change interest rates by small increments, and never by 2, 3 or 4 % at one time," PPFF ¶ 626, the OTS's interest rate shock model (upon which OTS based its interest rate risk analysis) was unreliable. PPFF ¶ 627. In making its argument, however, Astoria misrepresented the testimony of Mr. Moran, the OTS regulator who testified with respect to the OTS's capital markets and interest rate risk analysis. Astoria claims that Mr. Moran believed that the OTS MVPE model did not serve "as a predictor of actual interest rate risk." PPFF ¶ 627. This is incorrect. While Mr. Moran conceded that the model value of portfolio equity ("MVPE") was not a predictor of interest rates, he testified that it was an "indicator of interest rate risk . . . of the thrift's exposure to rising interest rates and its ability to absorb that." Tr. 4953:7-12 (Moran) (emphasis added).

In fact, Fidelity's interest rate risk problems were real and severe. Its interest rate risk problems cannot be attributed to the particularly characteristics of the OTS's MVPE analysis. Indeed, Fidelity had an analysis of its interest rate risk performed by a third party, Salomon Brothers. Mr. Powderly agreed that Fidelity engaged Salomon Brothers to provide an interest rate risk analysis "which will have some meaning." Tr. 985:2-12 (Powderly). Salomon Brothers analysis concluded, however, that Fidelity's interest rate risk was worse than the interest rate risk shown by the OTS's MVPE analysis. Tr. 4891:5-4893:4 (Moran); PX 770 at AST002908-10; DMFL at 107-109. Astoria admits that "Fidelity employed a model designed by Salomon Brothers in 1991 that was even less favorable [than the OTS] in assessing Fidelity's level," but it suggests, without any basis, that Salomon Brothers' analysis was not a "third-party risk assessment." PPFF ¶ 642. It was. As Mr. Moran testified, "Fidelity New York had a third-party analysis done by Salomon Brothers to evaluate their market value of portfolio equity and their exposure to interest rate risk." Tr. 4891:23-4892:1 (Moran).

Furthermore, in its discussion of interest rate risk, Astoria ignores the fact that Fidelity's interest rate risk problems existed both before and after FIRREA and had nothing to do with the amount goodwill held by the institution. DMFL at 219-22. In fact, as Mr. Moran testified, the interest rate risk analysis performed by regulators before the passage of FIRREA (and for some time afterwards) was a "Gap" analysis that did not consider goodwill in the analysis. DMFL at 220. Similarly, with the implementation of Thrift Bulletin 13, which was enacted in January 1989 and continued to be in force through the post-FIRREA period, goodwill was, again, not part of the OTS's interest rate risk analysis. Id. at 220-21. Accordingly, plaintiff's claim that Fidelity's interest rate risk was "due to Fidelity's lack of capital" cannot be interpreted to suggest

that a restoration of goodwill to Fidelity's capital would have had any effect on the institution's interest rate risk.[14] Like its commercial real estate loan problems, Fidelity's interest rate risk problems would have existed irrespective of the breach. Thus, irrespective of the breach, the severe regulatory criticisms of Fidelity's interest rate risk would have been present.

**d. Regulators Would Not Have Permitted The Wholesale Growth Strategy Proposed In Dr. Kaplan's Model Because He Sets Forth A Risk Controlled Arbitrage Strategy**

Astoria argues that Dr. Kaplan's lost profits model does not set forth a risk controlled arbitrage ("RCA") strategy because, "as that term is used in the financial industry," an "RCA is a strategy in which longer maturity assets are funded with shorter maturity liabilities and a hedging strategy is used to adjust for the difference in maturities." PPFF ¶ 821. As we demonstrated in our contentions of fact and law, Astoria is incorrect. See DMFL at 224-25. Mr. Moran, an OTS specialist with respect to capital markets instruments, testified that, from a regulatory point of view, hedging was not a necessary condition for a wholesale strategy to be considered an RCA. Tr. 4937:11-13, 4949:11-14, 4950:1-3 (Moran). Mr. Wesp agreed. Tr. 1788:7-16 (Wesp) (RCA included hedging only "as appropriate").

Moreover, Mr. Moran testified that an RCA strategy involves the use of short-term wholesale borrowing to purchase short-term MBS that attempt to control for interest rate risk by duration matching of assets and liabilities. Tr. 4945:3-17 (Moran). This is exactly what Dr. Kaplan proposes in his non-breach model. Accordingly, because RCA growth strategies were not permissible for thrifts that had an adverse examination rating (i.e., either a "4" or "5"

[14] Fidelity makes no claim, nor could it, that its Assistant Agreement provided for any type of agreement with respect to manner in which regulators viewed the thrift's interest rate risk.

MACRO rating), Fidelity would not have been permitted by regulators to grow through the wholesale strategy Dr. Kaplan posits, even in a non-breach world, until its rating improved to at least a "3," (which we established would not have occurred until after the results of the OTS's 1992 examination were published to the institution). DMFL at 222-25; PPFF ¶ 658.

### 3. Fidelity Was Not Restricted To No Growth

In one heading to a section of its brief, Astoria states that "The Capital Plan Restricted Fidelity's Growth To Zero." PPFF at 132. Contrary to plaintiff's assertions that Fidelity was restricted under the Capital Plan to no growth, regulators permitted Fidelity to grow, beginning in January 1991, in the amount of the interest credited to its depositors. Tr. 421:23-422:12, 430:5-18 (Powderly). Indeed, Astoria even admits this. See PPFF ¶ 528. For example, if interest payments to depositors averaged five percent, under the Capital Plan, Fidelity would be permitted five percent growth assuming the interest payments once made were not withdrawn by the depositor. 802:13-803:18 (Powderly). While Mr. Powderly stated that he did not know how much of the interest credited stayed in customers' accounts, plaintiff incorrectly states that "zero" growth was permitted under the Capital Plan. In modeling lost profits, Dr. Kaplan fails to take this fact into consideration.

### 4. Plaintiff's Claim For Lost Profits Cannot Be Asserted As Beginning In July 1989

On April 30, 2007, twelve days after the trial began, Astoria attempted to introduce, for the first time in this case, a claim that Fidelity's lost profits did not begin on January 1, 1989, but rather on July 1, 1989. We objected to the attempted introduction of that new theory of damages, and, as Astoria admits, the Court sustained our objection to a lost profits damage claim beginning

in July 1989. PPFF ¶ 834. As a result of the Court's ruling, Astoria withdrew its calculation of lost profits beginning in July 1989 (PDX 79). Thus, there are no calculations in the record showing purported lost profits damages beginning in July 1989 (even though there are several demonstratives remaining in the record that were not redacted, but which merely set forth a conclusory damage figure based upon a July 1989 lost profits damage number).

Despite our objection and the Court's ruling, and despite the fact that there are no calculations in the record to support its claim, Astoria has the temerity to present in its post-trial brief, a claim for damages of "$18 million if damages are measured from July 1, 1989." PPFF ¶ 850. This is improper. Astoria enjoys no privilege to ignore this Court's rulings or the record of evidence in this case. Moreover, Astoria's claim for damages beginning in July 1989 has not been proposed by its own expert, Dr. Kaplan, who argued at trial, as Astoria admits, that damages should be calculated beginning January 1989. PPFF ¶ 852. Even worse, plaintiff attempts to validate its damage claim by incorrectly stating that the Government's counsel "admitted" the computation of damages beginning in July 1989. PPFF ¶ 853 (citing Tr. 3080:11-20) (Roberson). Government's counsel was not making plaintiff's case; instead, the quoted statement merely is Government counsel's recitation of plaintiff's own unsubstantiated figure during a renewed objection to Astoria's improperly asserted claim for damages beginning in July 1989. Tr. 3080:11-20 (Roberson).

**5. No Causation Leading Up To Or After Fidelity's Conversion**

Even if the Court were to conclude that Fidelity's growth was restricted by the breach prior to its conversion, the facts we demonstrated at trial show its growth ceased to be restricted by the breach at the time it began the conversion process. By November or December of 1992,

Fidelity's growth was restricted for another reason – its anticipation of its conversion – which would have continued through Fidelity's conversion in May 1993. As plaintiff acknowledges, in November 1992, Fidelity was well on its way in the planning of its conversion, and on December 9, 1992, its plan for conversion was approved by its board. PPFF ¶ 738. Fidelity's conversion did not occur until May 1993. Mr. Wesp admitted that, for the period prior to the conversion, Fidelity would not have grown. Tr. 2367:24-2368:14 (Wesp); PX946 at AST031404 ¶ 2; DMFL at 225-26. In the actual world, Fidelity deliberately stopped growing and actually shrank as a business decision made to facilitate the conversion. Tr. 2704:14-19 (Kaplan). Because the conversion would have occurred in the non-breach world at about the same time, Tr. 3774:15-21 (Kaplan), the same cessation of growth would have occurred in the non-breach world as occurred in the actual world. Accordingly, irrespective of the breach, Fidelity would not have grown between December 1992, and May 1993. Astoria's purported lost growth calculation ignores this uncontroverted fact. See DMFL at 226-28.

Similarly, Fidelity's decision to expedite its amortization of goodwill would have occurred in the non-breach setting as well. As Mr. Powderly admitted, Fidelity had a goal through the Capital Plan, to get its capital to a level that the thrift was attractive in a conversion. Tr. 414:16-417:8 (Powderly). This would have required the expedited amortization of the goodwill. PX 770 at AST002890 ("management was compelled by the external auditors to accelerate the amortization of goodwill").

Moreover, we established at trial that Fidelity faced no regulatory restrictions after its conversion in May 1993. See DMFL at 225-28. For example, as Mr. Wesp testified, with the conversion "We could do all kinds of things that, you know, we hadn't done in years." Tr.

1961:23-24 (Wesp). He further stated that, after the conversion, Fidelity started to grow again and it "did all the things that we couldn't do." Tr. 1962:2-4 (Wesp) (emphasis added). Indeed, Astoria acknowledges this fact, admitting that, "After the public offering, Fidelity began to grow again and do the things that it could not do while it was operating under the Capital Plan." PPFF ¶ 761. Mr. Powderly also testified that, after the conversion, Fidelity's capital problems were "over." Tr. 1001:3-11 (Powderly). Accordingly, under no circumstances can causation of lost profits be found for the post-conversion period. See DMFL at 226-28.

**6. Astoria Points To No Basis For Restrictions Upon Astoria's Growth**

Despite making a claim for $95.7 million in damages for the years 1995 to 2014, Astoria provides virtually no analysis of its claim that Astoria was inhibited in its growth as a consequence of the breach following its acquisition of Fidelity. See PPFF ¶¶ 773-80, 855-59. Astoria asserts that Astoria could have chosen to structure its acquisition of Fidelity as a pooling of interests rather than as a purchase (which had the effect of eliminating Fidelity's pre-existing goodwill), PPFF ¶ 780, but provides no support for this proposition other than Mr. Engelke's testimony that Astoria could have chosen to use pooling. Tr. 5291:22-5292:4 (Engelke). However, Mr. Engelke testified immediately following that testimony that Astoria wanted to use cash for the Fidelity transaction. Tr. 5292:10-19 (Engelke). Moreover, as we demonstrated at trial, accounting principles would have prohibited the use of pooling in any event if Astoria did not meet several accounting requirements, and received a regulatory forbearance permitting the transfer of the goodwill. See DMFL at 194-96. Astoria has not attempted to make such a showing.

Moreover, Astoria makes no effort to establish that Astoria's growth was inhibited after the Fidelity acquisition other than to say that, "Astoria would have had $98.783 million of additional capital which Astoria could leverage to put on additional assets and earn additional profits, using the same 80 basis point spread as a measure of profitability." PPFF at ¶ 895. As voluminous evidence demonstrated at trial, however, Astoria had, and continues to have, substantial excess capital, and any claim that it has been inhibited from growth due to capital after its acquisition of Fidelity is completely unfounded. See DMFL at 197-200. Dr. Kaplan also makes no effort to compensate for the higher sales price Astoria would have had to pay for Fidelity if it had additional capital, switches methodology to a leverage-based model that results in an unexplained overnight increase of more than $225 million in the amount of foregone assets, makes no effort to address the changed economic and competitive conditions in the post-1995 world, and does not even attempt to model the actual assets Astoria would have held absent the breach. See DMFL at 200-07. Astoria's half-hearted attempt to claim damages after the Astoria acquisition should thus be rejected.

**B. Astoria Must Definitively Establish"But For" Causation**

Astoria argues, citing Citizens Federal Bank, F.S.B. v. United States, 474 F.3d 1314, 1318-19 (Fed. Cir. 2007), that "the Court of Federal Claims has discretion to choose the causation theory that best suits a particular case," and that the Court should employ a "substantial factor" test of causation. PPCL ¶¶ 11-16. However, the Citizens Federal panel can not overrule the earlier panel decision in California Federal Bank, F.S.B. v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir.), cert. denied, 126 S.Ct. 344 (2005) ("CalFed II"), which held that the "substantial factor" test was inappropriate. See First Fed. Savings and Loan Ass'n of Rochester

v. United States, 76 Fed. Cl. 765, 767 (2007), appeal docketed, No. 2007-5161 (Fed. Cir. Aug. 22, 2007), (citing Citizens Federal only for the proposition that a trial judge has discretion in adopting a damages model). The CalFed II Court held that the plaintiff must prove that "profits would have been made but for the breach," "the causal connection between the breach and the loss of profits must be 'definitively established,'" and that the lost profits must have "inevitably and naturally, not possibly or even probably, flow[ed] from the defendant's breach." Id. at 1267-68 (citation omitted). "Thus, the Court of Federal Claims correctly rejected the 'substantial factor' test advocated by CalFed." Id. at 1268. Astoria has not demonstrated that the Citizens Federal decision had the effect of overruling CalFed II, nor could it.

Moreover, even if the Court were to conclude that Citizens Federal requires it to decide whether to apply the "substantial factor" test – a conclusion with which we respectfully disagree – the "substantial factor" test should not yield a different result from the "but for" test. The "substantial factor" test originated in tort law to analyze concurrent cause cases. See Keeton et al., Prosser and Keeton On The Law Of Torts, 266-68 (5th ed. 1984). In tort law, the "substantial factor" test requires a showing of "but-for" causation. Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988); Point Productions A.G. v. Sony Music Entertainment, Inc. 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002); Shyface v. Sec'y of Health and Human Servs., 165 F.3d 1344, 1352 (Fed. Cir. 1999).

When the "substantial factor" test is properly applied, the causation requirement is met when the plaintiff proves that defendant's conduct was a substantial factor in bringing about the injury without which the harm would not have occurred. A plaintiff must prove that the alleged conduct played a substantial part in bringing about the injury, and that the injury was either a

direct result or a reasonably probable consequence of the conduct. The substantial factor test has not "replaced the need for each liable defendant to be a but-for and substantial contributor to the indivisible injury," Menne, 861 F.2d at 1461, and courts have made clear that, when the claimed damages could have resulted from multiple factors, the plaintiff "must establish . . . that [the] breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Productions A.G., 215 F. Supp. 2d at 344. Indeed, to recover damages, plaintiffs must satisfy both the substantial factor and the but-for tests. Shyface, 165 F.3d at 1352. Thus, the "substantial factor" test may only be applied in place of a "but for" test if doing so would "generally yield identical results." Abbott Labs. v. Brennan, 952 F.2d 1346, 1353 (Fed. Cir. 1991).

This Court in Abbott observed that the "substantial factor" test is more rigorous than the "but for" test. Id. at 1353. This Court explained that "no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it . . ." Id. (quoting Prosser & Keeton, The Law of Torts, 268). This Court's precedents make clear that, when correctly used, the substantial factor test is no less demanding than the "but for" standard for determining causation as, even under the substantial factor test, courts require a plaintiff to show that the breach was the primary or predominant cause of the loss. To satisfy the substantial factor test, the non-breaching party must show that the breach was a substantial cause of the damages. In other words, if the breaching party's conduct happens to be the straw that breaks the camel's back, thereby satisfying the but-for test (because without that straw, the camel's back would not have been broken), the non-breaching party is still not entitled to damages. The breaching party's conduct must still be the substantial factor in causing the

damages, not simply the straw. The law of this circuit unambiguously requires a but-for, and not simply a substantial factor, test: "A plaintiff must show that but for the breach, the damages alleged would not have been suffered." San Carlos Irr. and Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997).

In the alternative, Astoria mistakenly claims that "some recent cases seem to have employed a blend of the 'definitively established' and 'substantial factor' standard, holding that once the causal link is 'definitively established,' the breach need not be the sole factor or cause of the harm." PPCL ¶ 15. This claim is contradicted by the cases Astoria cites in support of this proposition. In CalFed II, the Court held that, although the "but for" standard does not preclude other factors "operating in confluence with the breach," the breach still needs to be a sufficient factor to have caused the damages on its own:

> The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach. However, lost profits are "a measurement of what a party would have received absent the breaching party's action," i.e., those losses that would not have occurred but for the breach. The inability to prove by a preponderance of the evidence that profits would have been made but for the breach will therefore preclude recovery on a lost profits theory.

CalFed II, 395 F.3d at 1268 (citations omitted).

Similarly, Astoria erroneously argues that in Globe Savings Bank v. United States, 65 Fed. Cl. 330, 346 (2005), aff'd in relevant part, 189 Fed. Appx. 964 (Fed. Cir. 2006), this Court somehow "suggest[ed]" a substantial factor test for causation by stating that the breach was the was "'the definite, direct, and primary cause'" of the plaintiff's asset shrink. PPCL ¶ 15; Globe,

65 Fed. Cl. at 346. To the contrary, this Court's holding in Globe based its causation finding upon the "but for" standard from CalFed II and cited it for support:

> Globe has proved by a preponderance of the evidence that the losses it claims as expectancy damages were the proximate result of the government's breach of contract, i.e., the causal connection between the breach and those losses has been "'definitely established.'" . . . In sum, Globe has proved by a preponderance of the evidence that but for the breach, it would not have shrunk to the point of liquidation and that it would have maintained its pre-FIRREA operations. The breach was the definite, direct, and primary cause of Globe's shrinkage to ultimate liquidation. See California Fed., 395 F.3d at 1267-68.

Globe, 65 Fed. Cl. at 346-47 (citation omitted).

As the context of the holding illustrates, the Globe Court's description of the breach as "primary" cause meant that it would have caused the shrink "but for" the breach, not that it was only a "primary" factor that would not have caused it on its own. Hence, the Globe Court's description of the breach as the "definite, direct, and primary cause" did not "suggest[] that it applied a standard that contains an element of the 'substantial factor' test," but merely applied the "but for" test dictated by CalFed II.

Furthermore, even assuming, for the sake of argument, that the Court has discretion to choose whether to apply the "substantial factor" test as opposed to the "definitively established" test, Astoria has not met its burden of demonstrating why the Court should choose to apply the "substantial factor" test based upon the facts of this case. Its proposed conclusions of law do not explain why one test would be more appropriate than another as a general matter, and do not explain why the facts of this case would call for the "substantial factor" test. Moreover, as we have previously demonstrated, Astoria has not demonstrated that the breach either "definitively

established" or was a "substantial factor" in causing any damages to Fidelity. Therefore, under either standard, Astoria has failed to establish causation.

### C. Astoria's Comparisons To Other Cases Are Unavailing

Astoria argues that the breach caused lost profits by comparing its case to Globe and First Federal Lincoln Bank v. United States, 73 Fed. Cl. 633 (2006), appellate argument scheduled, No. 07-5044, -5048 (Fed. Cir. Nov. 8, 2007). PPCL ¶¶ 18-21. Neither comparison supports Astoria's claim. Astoria cites Globe for the proposition that "the Court found that plaintiff's damages were 'definitely established' because the Regulators themselves admitted (in examination reports) that the enactment of FIRREA had made the thrift's capital position 'grossly inadequate,' and that the thrift had to shrink its assets because it was out of capital compliance." PPCL ¶ 18 (citing Globe, 65 Fed. Cl. at 346). Astoria further argues that, "[s]imilar comments were made in Fidelity examination reports, and the Record contains letters from regulators complaining repeatedly that Fidelity's problem (post-FIRREA) was that it was under-capitalized." PPCL ¶ 18 (citing PPFF ¶¶ 616, 776).[15]

Here, however, Fidelity did not shrink in response to the breach, so the harm found in Globe did not occur in this case. Moreover, as we have previously demonstrated, the record demonstrates that Fidelity's problems were driven by its poor asset quality both before and after

---

[15] The two findings plaintiff cites, however, do not support the proposition that Fidelity's problems were due to lack of capital. The FDIC's treatment of collateralized mortgage obligations ("CMO") residuals (cited in PPFF ¶ 616) would have happened with or without the breach, as Astoria concedes. See PPFF ¶ 615 ("Whereas the FDIC classified CMO residuals as unacceptable assets, the OTS did not."); see also DMFL ¶ 272. The other paragraph Astoria cites, PPFF ¶ 776, deals with severance payments for Fidelity employees in connection with the Astoria merger and thus has no connection to a claim that regulators stated that Fidelity's problems were due to a lack of capital.

the breach. See, e.g., DMFL at 107-113, 217-25; Tr. 4765:12-4766:3 (Amend) (in the absence of the breach, regulators would have been restricted under RB3a-1 "based on the fact that they'd had a high level of nonperforming assets."). Astoria's comparison to Globe thus does not support its claim of causation.

Likewise, a comparison of the facts between Fidelity and First Federal Lincoln underscores the lack of causation in this case. Despite its claim that "pre-FIRREA, Fidelity was healthy and well-managed and was dealing with its real estate challenges," PPCL ¶ 19, the record shows that Fidelity was not healthy before FIRREA. In its last exam before the breach, Fidelity received a composite rating of "4," signalling that regulators considered Fidelity to have "[m]ajor and serious problems or unsafe and unsound conditions . . . which are not being satisfactorily resolved by the institution." DX 69A; PX 509 at AST001970; DX 1448 at WON732 0834; see generally DMFL at 71-78. Astoria argues that "[l]ike First Federal Lincoln, Fidelity was soundly criticized about its capital asset ratios as soon as FIRREA took effect," citing Fidelity's "5" rating after the breach. PPCL ¶ 20.[16] Astoria does not mention, however, that "[p]rior to the breach in February of 1989, the FHLBB assigned Lincoln a composite rating of "2," deeming the institution "fundamentally sound" and free from material weaknesses." First Fed. Lincoln, 73 Fed. Cl. at 640. Thus, Astoria's comparison is incorrect because, unlike First Federal Lincoln, Fidelity did not receive a "healthy" rating before the breach.

---

16 Astoria misreads First Federal Lincoln in several ways. Regulators did not criticize Lincoln until more than a year after the breach, and those criticisms were directed at Lincoln's low earnings and high levels of criticized assets. Thus, the Court only concluded that capital criticisms were intertwined with these other factors.

Equally incorrect is Astoria's argument that Fidelity's "plan of rigid non-growth" supports a finding of causation as compared to First Federal Lincoln's activities after the breach. PPCL ¶ 21. To the contrary, in First Federal Lincoln, the Court explicitly rejected the claim, as presented by Dr. Kaplan, that the thrift suffered damages due to foregone growth opportunities. To the contrary, the Court found that, "Lincoln's pre-and post-breach performance does not provide a basis upon which to accept Dr. Kaplan's projection of the thrift's post-breach deposit growth rate, and therefore rejects as speculative Dr. Kaplan's projection that Lincoln would have grown its deposits by $250 million but for the breach." First Fed. Lincoln, 73 Fed. Cl. at 644-45. Instead, the Court only found that, "the extent of Lincoln's post-breach shrink – undertaken to improve the thrift's capital ratios – would have lessened if the thrift's capital account was increased by $13.9 million." Id. at 642. Thus, the only basis for damages found in First Federal Lincoln – the actual shrinkage in deposit size – is wholly inapplicable here because, by its own admission, Fidelity did not shrink after the breach. For all of those reasons, Astoria has not proven any alleged lost profits caused by the breach.

## V. Dr. Kaplan's Lost Profits Claims Fail For Lack Of Foreseeability

Astoria's lost profits claim also fails for lack of foreseeability. Astoria agrees that for lost profits damages to be foreseeable, they must be "a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Landmark, 256 F.3d at 1378 (citation omitted) (emphasis added); see also PPCL ¶ 3. Precedent further requires that "both the magnitude and type of damages" must be foreseeable at the time of

contracting. Id. (emphasis added); Bohac v. Dep't of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001). Under these standards, Dr. Kaplan's lost profits claims are not foreseeable.

### A. Astoria Has Not Rebutted Any Of Our Demonstrations That Dr. Kaplan's Lost Profits Are Unforeseeable

We demonstrated in our initial brief that the magnitude of Astoria's claimed lost profits was unforeseeable at the time of contracting because Dr. Kaplan claims lost profits in an amount larger than the dollar amount of the eliminated goodwill. DMFL at 236-37. We demonstrated that Astoria's claimed lost profits were not of the type that the Government could have foreseen because Fidelity had no interest in growing in wholesale assets and liabilities, and because the use of mortgage-backed securities as thrift assets was novel at the time of contracting. DMFL at 236-38. Finally, we showed that Astoria's claimed lost profits for the 1995 to 2014 period could not have been foreseen as "a probable result of the breach" because no one could have contemplated that Fidelity's goodwill could have transferred to Astoria in a purchase transaction in violation of generally accepted accounting principles ("GAAP"). DMFL at 239.[17] Nothing in Astoria's post-trial brief rebuts any of these conclusions. Thus, Astoria has not demonstrated the foreseeability of any lost profits following the Astoria acquisition, or the magnitude or type of Astoria's claimed lost profits from 1989 to 1995.

### B. Dr. Kaplan's Lost Profits Are Not Foreseeable As A Matter Of Law

Failing to rebut any of our showings of unforeseeability, Astoria suggests that lost profits are nevertheless the foreseeable result of the elimination of goodwill from regulatory capital as a

---

[17] Astoria's factual statements respecting Dr. Kaplan's qualifications underscore his lack of expertise regarding the transferability of goodwill. See PPFF ¶ 811 (accountants – not Dr. Kaplan – created the financial statements in his consulting practice); ¶ 813 (Dr. Kaplan is not an accountant).

matter of law. PPCL ¶¶ 5-10. That argument fails. While it is indeed foreseeable that the loss of supervisory goodwill from regulatory capital could lead a thrift to replace the goodwill with other capital or to shrink, First Fed. Lincoln, 73 Fed. Cl. at 650, that does not mean that it is foreseeable that such a replacement or shrink would cause a thrift to lose profits. To meet that burden, a plaintiff must prove that it was foreseeable to the breaching party that the breach would cause the magnitude and the type of lost profits – not mere replacement or shrinkage – that the plaintiff claims.

Here, Fidelity cannot prove that the Government could have foreseen that the breach would have caused Fidelity lost profits in an amount greater than the dollar amount of its goodwill, or that the breach would have cost Fidelity lost profits derived from wholesale growth, or that the breach would have caused Fidelity to lose profits after a merger in which its goodwill would have evaporated despite the breach.

In addition, the Government could not have foreseen that the breach would have caused Fidelity lost profits because Fidelity's inability to grow (and the attendant lost profits Dr. Kaplan hypothesizes) were caused by its problem loans – not FIRREA. Tr. 4765:8-4766:3 (Amend) (regulators would have restricted growth due to problem loans absent FIRREA). Put another way, the Government could not have foreseen that growth restrictions would only have been imposed upon a thrift with loan problems if FIRREA were enacted.

In addition, Astoria's own loan loss problems demonstrate that the recessionary economy – not FIRREA – motivated thrifts to cease growth, because growth did not lead to profits in that economy. PPFF ¶ 791 ("No thrift that originates loans is immune from a downturn in its local real estate market."). The Government could not have foreseen that eliminating goodwill from

regulatory capital would have caused Fidelity to lose profits in the midst of a recessionary economy. Indeed, it would be especially unforeseeable that eliminating goodwill from regulatory capital would have caused Fidelity lost profits in "one of the worst periods of economic recession and volatility in post-war history." Tr. 2359:23-2361:1 (Wesp). Accordingly, Astoria's attempt to demonstrate foreseeability as a matter of law fails.

### C. Astoria's Contentions Of Fact Support A Finding Of Unforeseeability

Astoria's factual contentions do not demonstrate that Dr. Kaplan's lost profits claims are foreseeable. If anything, Astoria's contentions add support to the position that Dr. Kaplan's claims are unforeseeable.

First, Astoria's factual contentions demonstrate that Fidelity's goodwill could never have transferred to Astoria in a purchase transaction, rendering any lost profits after the Astoria acquisition unforeseeable as results of the breach. Astoria admits that use of the purchase method involves marking to market the assets and liabilities of the acquired entity, PPFF ¶ 812, thus eviscerating goodwill. See Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 160-64 (2006), appeal docketed, No. 2007-5054 (Fed. Cir. Feb. 6, 2007); Tr. 2526:13-2527:9 (Wesp); 2913:6-17 (Kaplan). There is no dispute that Astoria and Fidelity were only interested in a cash acquisition. Tr. 641:17-642:12 (Powderly); 5292:5-19 (purchase method had to be used in an all-cash merger) (Engelke); DX 3489 at 9:25-10:21, 20:23-21:11 (Quackenbush).

Second, Astoria's factual contentions demonstrate that it was not foreseeable that Fidelity or Astoria would have used additional leverage capacity for wholesale growth.[18] Astoria asserts

[18] Dr. Kaplan's semantic argument that his wholesale portfolio is not a RCA portfolio, PPFF at ¶ 821, neither changes its risk profile nor demonstrates that Fidelity would have been more likely to engage in it. Indeed, Dr. Kaplan's assertion is clouded by Mr. Wesp's

that adjustable rate mortgage ("ARM") MBS were always available. PPFF at ¶¶ 784, 825. If that is so, then the failure of Fidelity and Astoria to shift their focus to wholesale growth throughout the 1980s and 1990s demonstrates that the Government could not have foreseen such growth in either entity at the time of contracting. See Tr. 4507:19-4508:1 (Astoria did not want to invest in MBS in 1995) (Engelke).

Third, Astoria introduces another dimension to the unforeseeability of Dr. Kaplan's lost profits when it insists that Fidelity began losing profits prior to FIRREA's enactment. PPFF ¶ 834. Even if one assumes that it would be foreseeable that Fidelity may have had knowledge of specific provisions of that legislation that would be enacted prior to its enactment (knowledge not borne out by the evidence, see Tr. 1001:21-1002:7 (Powderly); DX 2334, 2338, 2343A, 3348, 2353), the Government could not possibly have foreseen that the breach would have caused lost profits before the breach even occurred.[19]

Fourth, Dr. Kaplan's constant yet allegedly "conservative" profit production absent the breach, PPFF ¶ 823, unaffected by any of the economic variables affecting all participants in the economy, is unforeseeable given Astoria's factual assertions, which demonstrate that businesses regularly react to changing economic conditions, resulting in changing profitability. For instance, Astoria admits that leverage ratios "will vary from institution to institution[,]" PPFF

---

testimony that he thought Fidelity's wholesale portfolio in the early 1990s was, in effect, an RCA. Tr. 1800:12-1801:6 (Wesp).

[19] Astoria's factual recitation highlights an inconsistency in Dr. Kaplan's 1989 to 1994 lost profits model. Although Dr. Kaplan argues that Fidelity's growth (and accordingly its lost profits) was affected by the breach starting in January 1989, in assessing the reasonableness of his non-breach growth, he reviews Fidelity's growth through June of 1989, which includes a period for which he posits that the breach had already affected Fidelity's growth. PPFF ¶ 826.

¶ 856, and change over time given a thrift's economic experience. Tr. 3150:6-19 (Kaplan). Also, Astoria was affected by the poor commercial real estate market in the late 1980s and early 1990s, causing not just diminished profits but losses. PPFF ¶¶ 791-94. Indeed, in light of economic changes and the existence of market risk, the very notion that Fidelity could have definitively earned money from its wholesale portfolio at an 80 basis point spread, PPFF ¶ 829, is plainly unforeseeable. As Astoria's factual contentions demonstrate, interest rate risk, credit risk, and prepayment risks do not represent the risk that one's earnings will be "conservative," but rather represent risk of loss. See PPFF ¶ 787 (Astoria recognized the riskiness of Fidelity's lower-rated MBS and sold them); ¶¶ 791-94 (Astoria lost money from commercial real estate investment due to credit risk). Dr. Kaplan's constant, "conservative," lost profits, unaffected by economic conditions or market risk, accordingly represent an unforeseeable type of damages.

Fifth, the Government could not have foreseen that Fidelity's ability to manage its loan problems would have been impacted by the elimination of goodwill from regulatory capital. Astoria makes the irrelevant suggestion that its loan losses were less severe because it had excess capital and, perhaps, intends to imply that Fidelity's losses would have been less severe, if Fidelity had goodwill capital. PPFF ¶¶ 796-99. In the first place, that suggestion is contradicted by Astoria's own factual assertions.[20] When Dr. Kaplan explained how he performed his appraisals of various thrifts, he did not indicate that he relied upon a thrift's level of capital to determine the value of its assets. PPFF ¶ 810. Rather, he "look[ed] at all aspects of the

[20] The suggestion that Fidelity was harmed because its capital deficit made it harder to deal with its loan losses is irrelevant because Astoria has never premised any damages upon this notion, and has not provided any proof that it is true, other than conclusory statements of its former officers and its expert.

institution and its performance as well as the equity markets in general and thrifts in particular." Id. Regulators testified that their categorization of problem loans is independent of the level of a thrift's regulatory capital. Tr. 4765:8-4766:3 (Amend) (more regulatory capital would not have affected assessment of loan quality). The Government could not have foreseen that eliminating goodwill from regulatory capital would have worsened the classification of Fidelity's problem loans. Moreover, it is undisputed that the only kind of capital capable of absorbing loan losses is tangible capital. See, e.g., Tr. 4445:23-4446:1 (Astoria valued tangible capital) (Engelke); 4022:18-23 (tangible capital provided a cushion for loan losses) (Finn). The Government could never have foreseen that Fidelity's inability to count goodwill in regulatory capital would prevent Fidelity from absorbing those losses.[21]

Sixth, Astoria's factual contentions demonstrate that it was always abundantly capitalized and only leveraged capital conservatively, PPFF ¶¶ 788, 796, so the Government could not have foreseen that Astoria would have leveraged any additional non-breach capital in the enormous wholesale growth Dr. Kaplan posits. Tr. 4473:13-14 (Astoria had more capital than it needed) (Engelke); 4469:13-4470:19 (conversion left Astoria with "excessive capital") (Engelke).

Finally, Astoria's admitted inability to measure the magnitude and type of its damages even after the 1995 merger, PPFF ¶¶ 800-02, weighs against a finding that the Government could have foreseen the magnitude and type of Astoria's claimed lost profits at the time of the contract.

For all of these reasons, Dr. Kaplan's lost profits damages are unforeseeable.

---

[21] The FDIC RoE cited by Astoria at PPFF ¶ 799 does not support its contention that even Astoria's relatively high level of tangible capital was sufficient to absorb the commercial real estate loan losses that it and other thrifts were suffering due to the recession. DX 3034 at FAA009 0002 ("Improvement in earnings is essential to stem the erosion in the [Astoria's] capital level.").

## VI. Astoria's Lost Profits Claims Are Not Reasonably Certain

Astoria's lost profits damages claims fail, wholly apart from a lack of foreseeability and causation, because the evidence it presented at trial does not permit this Court to make a fair and reasonable approximation of damages. Contrary to Astoria's suggestion (PPCL ¶¶ 22-23), its damages calculation are not merely lacking some measure of precision or approximation; the very premises to its lost profits modeling are irreconcilably flawed. Moreover, the flaw is not because the proof or data concerning Fidelity and Astoria are unavailable "by reason of [defendant's] breach," as they suggest in their contentions of law (PPCL ¶ 23), but, rather, because the assumptions and methodology chosen by Dr. Kaplan are inherently unreliable. For example, Dr. Kaplan chose not to model the whole thrift in a non-breach setting, but rather just a narrow portion of the thrift's wholesale portfolio. This fact alone is fatal to Astoria's lost profits damage claims. See Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 120 (2004) (rejecting plaintiff's lost profits model because "plaintiff's model does not reflect the diversity of its real-world portfolio."). Indeed, Dr. Kaplan's black box methodology, in which he merely posits a vague portfolio of MBS with a given rate of growth and rate of return on incremental assets, has been properly rejected by this Court in another Winstar-related case. See First Fed. Lincoln, 73 Fed. Cl. at 645 ("the use of the adjustable rate MBS as a proxy in this case does not provide a reasonably certain basis upon which to project Lincoln's yield on forgone deposits following the breach."); see also Citizens Fin. Servs. v. United States, 64 Fed. Cl. 498, 514 (2005) (rejecting lost profits claim because, "absent proof of specific investments that would have been held in the world absent FIRREA, a lost profits claim is too speculative); LaSalle

Talman Bank, FSB v. United States, 64 Fed. Cl. 90, 106 (2005); California Fed. Bank v. United States, 54 Fed. Cl. 704, 712-15 (2002) (failure to identify specific "foregone" assets).

In its contentions of law, Astoria makes little attempt to tie the legal requirements of reasonable certainty to the actual methodology and conclusions set forth by Dr. Kaplan. Nor could it. Indeed, the lost profits claim expounded by Dr. Kaplan at trial suffers from a multitude of methodological and factual infirmities. As the Federal Circuit warned, expectancy damage claims in the Winstar-litigation have been based upon models that have been "inherently unreliable," such that these models are largely a "waste of time and effort." Glendale, 378 F.3d at 1313; see also Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996) (lost profits based on hypothetical leverage capacity are "too uncertain and remote."). As we detailed in our contentions of fact and law and as we further discuss below, Astoria's lost profits claims fail the requirement of reasonable certainty. Accordingly, its lost profits claim must be denied.

## A. Dr. Kaplan Failed To Model The Non-Breach Fidelity

Astoria's lost profits claims suffer from innumerable problems precluding the necessary showing that its lost profits damage claims meet the test of reasonable certainty. One fundamental problem with Dr. Kaplan's model is that it is actually an extrapolation of a portion of what the thrift did in reaction to the breach, namely focus on a wholesale strategy involving MBS investments. It is not a valid model of what Fidelity's overall likely operational activities would have been in a non-breach world. Indeed, Astoria acknowledges the differences between the non-breach Fidelity modeled by Dr. Kaplan and the non-breach Fidelity that would have existed in a non-breach world. For example, Astoria admits that, in a non-breach world, ARM

MBS, which compose Dr. Kaplan's hypothetical lost profits portfolio, would not be "the only type of incremental assets that Fidelity would add in a non-breach world." PPFF ¶ 838. In modeling a non-breach Fidelity whose growth only occurs in ARM MBS, Dr. Kaplan ignored the evidence that, but for the breach, it is not the MBS portfolio alone that Fidelity would have enhanced, but also its normal lending operations. Indeed, Mr. Wesp testified that if Fidelity had excess capital (e.g., as following a conversion), "We would have been good consumer loan lenders. We would have been good home equity loan lenders. I probably would have acquired a small mortgage banking operation." Tr. 1975:20-1976:1 (Wesp). By focusing only on a subset of the incremental assets Astoria claims Fidelity would hold in a non-breach world, Dr. Kaplan has presented an unrealistic model of Fidelity in a non-breach setting.

Further underscoring that Dr. Kaplan's non-breach Fidelity is based upon the thrift's reaction to the breach, Astoria acknowledges that a wholesale strategy is put into place "when a thrift is not growing" because such a strategy lets an institution buy assets when funds are available (i.e., when the funds are generated from the normal cash flows of the institution). PPFF ¶ 504. Dr. Kaplan, however, takes the wholesale strategy used "when a thrift is not growing," and turns it into the strategy in the non-breach world when the thrift is, in his opinion, growing rapidly. It was, as Astoria admits, Fidelity's Capital Plan (which was required as a result of the thrift's lack of capital), that called for cash flows in excess of loan originations to be invested in MBS. PPFF ¶ 848.

### B. Dr. Kaplan Failed To Model The Whole Bank Or Even The Whole Wholesale Strategy

As another indication that the non-breach Fidelity modeled by Dr. Kaplan is different than the non-breach Fidelity that would have existed but for the breach, Astoria admits that Dr. Kaplan's lost profits model is not a model of the whole institution in a non-breach setting: "Dr. Kaplan's lost profits was not constructed, and is not offered in this case, as a strategy for running an entire institution." PPFF ¶ 820 (citing Tr. 3396:3-3398:9 (Kaplan) (admitting that he used a narrow piece of Fidelity's wholesale strategy and did not model a whole bank business strategy)). Indeed, Dr. Kaplan admitted that he does not believe his non-breach strategy is one that other institutions should adopt. Tr. 3398:6-9 (Kaplan).

Not only did Dr. Kaplan not attempt to model the whole bank in a non-breach world, he did not even attempt to model Fidelity's entire wholesale investment portfolio. Indeed, Dr. Kaplan admits that his model involves an extrapolation of just a "narrow piece," of Fidelity's actual wholesale strategy. See DMFL at 243. In fact, Dr. Kaplan's model disregards 40 percent of Fidelity's real-world wholesale investments, PX 599 at AST049054, to focus solely upon vaguely defined ARM MBS. DMFL at 243-44; Tr. 3429:2-3432:16, 3434:7-15 (Kaplan). Furthermore, relative to the whole bank, Fidelity's ARM MBS portfolio constituted only a small part of its assets prior to FIRREA, only 18 percent in March 1988, and only somewhat more by December 1989. Tr. 3082:15-25 (Kaplan); DMFL at 240-41.

On the funding side of the wholesale strategy, Astoria admits that borrowings from the Federal Home Loan Bank ("FHLB") was just "a funding source" Fidelity used (PPFF ¶ 840), effectively acknowledging that FHLB borrowings did not constitute the entirety of the funding

sources Fidelity actually used in its wholesale strategy (e.g., reverse repurchase agreements). See Tr. 3396:21-24 (Kaplan). Thus, as Dr. Kaplan admits, his lost profits model is not even a model of the thrift's wholesale investment strategy (Tr. 3396:3-3398:9; 3423:5-6 (Kaplan)), which is true on both the investment or funding side of the equation.

### C. Dr. Kaplan Failed To Adequately Specify The Investments Or Funding Sources

In our post-trial brief and at trial we demonstrated that the lost profits model proposed by Dr. Kaplan fails the requisite test of reasonable certainty because it failed to adequately identify the composition of the non-breach thrift's assets and liabilities (or funding sources). DMFL at 240-46. This fatal lack of adequate identification is reiterated in Astoria's post-trial contentions of fact and law. Astoria merely identifies the non-breach assets as "ARM MBS" (PPFF ¶¶ 825, 837), and the non-breach funding source for these hypothetical assets as "borrowings from the [FHLB]." PPFF ¶ 840. Astoria claims that Dr. Kaplan chose these categories of instruments because they provided a match of assets and liabilities. PPFF ¶ 840 ("the longer maturities of the [FHLB] borrowings are a better match to the maturities of the ARM MBS."). This artifice of Dr. Kaplan's model falls apart once it becomes apparent that, Dr. Kaplan has actually not assumed (per his "black box" methodology) that all of his ARM MBS are of a single duration. Indeed, Dr. Kaplan admitted that his ARM MBS were meant to include all sorts of durations or interest rate reset periods, including short-term (e.g., monthly) and long-term duration (e.g., five-year) ARM MBS, even though he also testified at one point that all of the incremental assets for the non-breach Fidelity were one-year ARM MBS. Tr. 3090:10-19, 3418:9-11 (Kaplan). Indeed, in a flat contradiction of himself, Dr. Kaplan testified that not even the majority of the incremental

assets he envisions are one-year ARM MBS. See DMFL at 242; Tr. 3441:21-3442:5 (Kaplan). In short, there is no basis to concluded, in looking at Dr. Kaplan's vaguely identified portfolio of ARM MBS, that the ARM MBS are maturity matched with FHLB borrowings. The effect of this mismatch of asset and liability durations is the presence of interest rate risk (which can negatively affect a thrift's expected returns), a risk that Dr. Kaplan (incorrectly) claims his "black box" methodology has eliminated.

Dr. Kaplan's numerous methodological errors, contradictions, and omissions are, in many respects, unsurprising, given the fact that he has no expertise in constructing, operating or modeling any strategy executed in connection with a wholesale MBS portfolio. DMFL at 240; Tr. 2681:5-2682:5, 2682:14-23 (Kaplan).

### D. The Non-Breach Growth Rate Fails The Requirement Of Reasonable Certainty

In our discussion of causation, we discussed a number of reasons why the growth rate presumed by Dr. Kaplan for the non-breach Fidelity fails the requirement of reasonable certainty. For example, we demonstrated that, irrespective of the breach, regulators would have enforced growth restrictions (both generally, and specifically to a wholesale RCA strategy) because the thrift would have been considered to be a troubled institution irrespective of the phase-out of goodwill from regulatory capital computations. See DMFL at 217-225.

Wholly apart from these factors, however, Dr. Kaplan's presumed growth rate fails to meet the required showing of reasonable certainty. Astoria attempts to justify the 8.25 percent growth rate assumed by Dr. Kaplan by referring to Fidelity's whole bank growth in the pre-FIRREA period. PPFF ¶ 826. For example, Astoria asserts that Fidelity grew 14.7 percent after

the date of Suburbia's acquisition in October 1984, to June 1989. Id. This comparison offers no support for the growth envisioned by Dr. Kaplan. There are several reasons for this.

First, of course, it is wrong to compare a whole institution's growth rate to that of a "narrow piece" of the institution, namely, the ARM MBS section of the thrift's wholesale portfolio. Underscoring the non-comparable nature of the two categories (whole bank versus the "narrow piece"), is the fact that, while the whole bank grew between its fiscal years 1987 through 1989, its net interest income, operating income, and income before taxes actually declined for each year. DMFL at 258-59. Given that Dr. Kaplan envisions constant profitability for his ARM MBS portfolio, a comparison to the growth rate of the whole institution (which resulted in reduced profitability) as a basis for the incremental assets growth rate is unfounded.

Second, under any reading of history, the two periods (pre-1990 and post-1990) are fundamentally different. It is in the post-1990 period that a recession ensues, there is a pronounced and extended upheaval in capital markets, the Gulf War is fought, there is a spike in oil prices, the collapse of the real estate market occurs, and there is a complete revision of the regulatory regime affecting thrifts (wholly apart from the breaching provisions of FIRREA).[22] All of these factors had a significant impact on the capacity of the institution to continue growing as it had during the 1980s. See DMFL at 252-56 (discussing these factors in demonstrating why the growth rate in the October 1988 Business Plan was an unreliable indicator of the institution's likely growth in the early 1990s).

---

[22] One important non-breaching effect of FIRREA was the loss of 27 percent of Fidelity's non-contractual capital, which constituted 48 percent of its pre-breach capital (i.e., the capital necessary to grow). DMFL at 255; see also id. at 218 n.29, 233-34.

One need look no further than to Fidelity's peers to verify that the 8.25 percent growth rate envisioned by Dr. Kaplan completely fails the test of reasonable certainty. Fidelity's peers actually shrank by 4.9 percent in 1990, and 3.3 percent in 1991. DMFL at 248. Moreover, Astoria, which (unlike Fidelity) always enjoyed a well-capitalized status, grew at a very modest rate during that time. Indeed, Astoria's 1989-1992 growth rate (adjusted to remove the non-comparable acquisition-related growth), was only 1.49 percent on an annual basis. DMFL at 247.

For the same reasons that Fidelity's pre-FIRREA whole bank growth rate offers no support for the non-breach Fidelity's growth rate, Fidelity's October 1988 Business Plan can provide no guidance for Fidelity's likely growth rate but for the breach. There was a host of unpredictable events that would have caused Fidelity to abandon its use of that Plan as a guide to future growth. Indeed, Mr. Wesp admitted that the overall non-breaching change in banking regulations alone would have been sufficient to cause Fidelity to take its October 1988 Business Plan "and put it in the garbage can." Tr. 2433:2-18 (Wesp); DMFL at 254-55.[23] Critically, too, the October 1988 Business Plan did not forecast any bad debt expense from January 1989 through June 1991. This proved to be a totally unrealistic projection, especially given that, at the time the October 1988 Business Plan was drafted, Fidelity had tens of millions in classified assets. It could not have been a complete surprise at that time, that Fidelity would likely

---

[23] Astoria claims that Dr. Kaplan's 2 percent per quarter growth rate "was based upon Fidelity's October 1988 Business Plan which had called for 8 to 10 % annual growth." PPFF ¶ 827. Dr. Kaplan actually testified, however, that the October 1988 Business Plan did not support a particular rate of growth for Fidelity in the non-breach world (Tr. 3553:11-3555:3 (Kaplan)), and it was not critical to him as he came to his opinion concerning Fidelity's non-breach growth rate. Tr. 3556:2-12 (Kaplan); DMFL at 249-50.

experience substantial real estate losses, even if the thrift's management did not fully appreciate what the ultimate magnitude of its losses ($34 million) would be over a six-year period including a period covered by the Plan. DMFL at 256-57. Correspondingly, the October 1988 Business Plan did not take into account the millions of lost interest income from the huge portfolio of non-performing assets. These facts make the October 1988 Business Plan a totally unreliable source for Fidelity's rate of growth in a non-breach setting.

**E. Dr. Kaplan's Assumption Of Unlimited ARM MBS At A Price Fidelity Would Be Willing To Pay Is Unsupported By The Record**

Furthermore, the growth rate envisioned in Dr. Kaplan's model fails because it is based on the presumption that there would always be plentiful ARM MBS at a price Fidelity was willing to pay. To obtain the additional nearly billion dollars in ARM MBS projected in his model of the non-breach bank, Dr. Kaplan argued that Fidelity could have simply not sold as much MBS as it did in the actual world. Tr. 3121:24-3122:3 (Kaplan); see also PPFF ¶ 847 (claiming that Fidelity would have no trouble purchasing up to a billion dollars of incremental ARM MBS because "Fidelity had owned and sold over a billion dollars of ARM MBS"). Fidelity's selling of its MBS over the years was not undertaken in the course of normal buying and selling, but rather, was motivated by a need to generate capital gains as a result of its need to cover losses on its bad loans. Indeed, Mr. Powderly testified that the "only time [Fidelity] . . . sold [MBS] . . . was to accommodate the loss writedowns on the real estate." Tr. 474:18-20 (Powderly) (emphasis added); see also Tr. 401:1-12 (Powderly) (Fidelity sold MBS to cover loan losses). Because Fidelity's bad loans would have existed irrespective of the breach, these MBS sales would have been required irrespective of the breach. Therefore, Dr. Kaplan's explanation

that Fidelity could have obtained an additional nearly billion dollars in ARM MBS by simply not selling them is not supported by the evidence presented at trial. DMFL at 258 & n.37.

**F. Dr. Kaplan's Profit Spread Is Unreliable**

Astoria argues that the 80 basis point spread envisioned by Dr. Kaplan as the spread that would have been earned for each and every quarter between 1989 and 2014 is the "minimum rate of return Fidelity would have earned." PPFF ¶ 823; see also id. ¶ 846. Like the other components of his model, the 80 basis point spread is an assumed figure by Dr. Kaplan through which he purports to explain away all real world events and risks negatively affecting Fidelity's profitability. Thus, Astoria claims that the 80 basis point spread takes into account "prepayment and other risks," PPFF ¶ 829, while it "control[s] for market conditions and market volatility." PPFF ¶ 831. Astoria further alleges that "By using an 80 basis point spread on the hypothetical portfolio of incremental assets . . . Dr. Kaplan was making allowance for factors beyond the control of Fidelity such as the economic effects of the First Gulf War, a recession, local events, retail competition, the phenomena of prepayments, etc." PPFF ¶ 845.

Dr. Kaplan's 80 point basis point spread suffers from a number of flaws, not the least of which is that he admitted that he could not say whether any ARM MBS actually held by Fidelity in the actual world would have generated an 80 basis point spread if held by the non-breach bank. Tr. 3446:1-3447:10, 3449:22-3450:2 (Kaplan); DMFL at 265. Moreover, even in the broad category of one-year ARM MBS, Dr. Kaplan ultimately admitted that had not determined what Fidelity's actual spread was. See DMFL at 265; Tr. 3475:10-19 (Kaplan). Initially, Dr. Kaplan testified that he had calculated the spread actually obtained by Fidelity. Tr. 3111:1-8 (Kaplan); DMFL at 266. He claimed that the actual spread averaged 153 basis points between July 1989

and December 1994. Tr. 3111:1-8 (Kaplan). By calculating the spread on his incremental assets at 80 basis points, Astoria claims that Dr. Kaplan's model controlled for prepayments risks. PPFF ¶ 829. In reality, however, the effect of prepayments was so significant that, on cross-examination, Dr. Kaplan admitted that, contrary to his earlier assertions, the 153 basis point spread he calculated was not Fidelity's actual spread on its ARM MBS. See DMFL at 267. Indeed, he admitted that part of the reason for the unreliability of the 153 basis point figure he calculated was that it did not take into consideration the "unusually high" prepayments of mortgages in 1992 and 1993. Tr. 3415:10-21, 3751:11-14, 3752:14-15 (Kaplan); DMFL at 267. Despite Dr. Kaplan's admission on cross-examination, Astoria, in its post-trial contentions of fact, repeated the incorrect statement that Fidelity actually earned a 153 basis point spread on its ARM MBS between 1989 and 1994. PPFF ¶ 843. This is simply incorrect, as Dr. Kaplan himself acknowledged.

To address this failure to consider prepayment risks (and all the other problems with his analysis uncovered in our cross-examination), Dr. Kaplan simply proclaims that he set his spread amount at a "conservative" 80 basis point spread.[24] But, as Dr. Carron and Mr. Kennedy explained, Dr. Kaplan's methodology is unreasonable because he did not quantify the effect of

[24] Astoria further claims that Dr. Kaplan minimized interest rate risk in his model with a duration match between the assets and liabilities. PPFF ¶ 841. This is merely, however, a bald pronouncement; there is no analysis of the spectrum of ARM MBS that Dr. Kaplan claims Fidelity would have held relative to specific durations of FHLB borrowings. Again, Dr. Kaplan merely proposes a "black box" into which faith must be placed that the durations of assets and liabilities are, indeed, matched to reduce interest rate risk. In any event, however, Dr. Kaplan's claim for his non-breach Fidelity contradicts the admitted objectives of Fidelity's management. Mr. Wesp acknowledged, and regulators recognized, that Fidelity's strategy was to intentionally take on interest rate risk in order to obtain profits. Tr. 2199:1-5 (Wesp); Tr. 4213:11-13 (Albanese).

the multiple factors affecting spread, and, instead, merely stated in conclusory fashion that he had thought about them. See DMFL at 268; Tr. 5705:14-5706:5 (lack of "quantitative or analytical linkage") (Carron); Tr. 5344:18-5345:17 (Kennedy). In short, Dr. Kaplan's model is based upon pure speculation that Fidelity would have earned 80 basis points for every quarter between 1989 and 2014.

To illustrate the factual infirmity of Dr. Kaplan's assumption of an unwavering 80 basis point spread, we demonstrated, using readily available information, that Astoria's actual spread on its wholesale assets and liabilities averaged just 38 basis points between 2001 and 2005. DMFL at 204. Thus, not only did Dr. Kaplan not undertake any quantitative analysis to determine the effect of a multitude of real-world factors on his assumed spread, he disregarded actual real world evidence demonstrating that an 80 basis point spread was not a reasonable assumption. Such a methodology cannot meet the requirements of reasonable certainty.

### G. Astoria's Post-1994 Lost Profits Are Also Uncertain

In addition to sharing the methodological flaws of Dr. Kaplan's pre-1994 lost profits claim, Astoria's post-1994 lost profits claim also fails because it depends upon an implausible transfer of goodwill to Astoria. No evidence supports Dr. Kaplan's assumption that Fidelity's goodwill or its goodwill forbearance could have transferred to Astoria. See Tr. 2526:13-2527:9 (Wesp) ("acquisition accounting . . . would require . . . the complete eradication of whatever goodwill was remaining on the balance sheet"); 2913:6-17 (Kaplan). Indeed, this Court has determined that goodwill in purchase transactions such as the Astoria acquisition of Fidelity would not transfer. See Granite, 74 Fed. Cl. at 160-64.

Astoria's post-1994 lost profits are also uncertain because Astoria had no use for additional leverage capacity. In the real world, Astoria had an abundance of excess capital, and used much of it to reduce its outstanding shares. Tr. 5731:14-25 (Carron). It is uncertain to say the least that, had Astoria managed to retain even more capital upon acquiring Fidelity, it would have chosen to leverage it aggressively as Dr. Kaplan posits.

Finally, Dr. Kaplan's post-1994 lost profits model contains a number of other implausible assumptions that make his damage claims unreliable. These include an unexplained jump of more than $225 million in the amount of its foregone assets that cannot be explained by anything that took place in acquiring Fidelity; an assumption that, absent the breach, Astoria would have paid the same amount for what Dr. Kaplan asserts would have been a much larger Fidelity; a failure to account for any of the economic conditions Astoria faced; a failure to account for increased competition that would have accompanied a non-breach world; and vagueness as to the composition of its portfolio such that any assessment of its realisticness is rendered impossible. Like its claimed pre-1994 lost profits, Astoria's claimed post-1994 lost profits fail for lack of reasonable certainty and should likewise be rejected.

## VII. Astoria's Wounded Bank Claims Fail

As with its other claims, Astoria's wounded bank damages claims fail. As the lynch-pin to its wounded bank damages claims, Astoria claims that Fidelity's MACRO ratings would have been higher than a "4" for all times from 1989 forward, and it would have been ranked even higher than the "3" it received in 1993 and 1994. See, e.g., PPFF ¶¶ 860, 864 (alleging that Fidelity would not have been "troubled" absent FIRREA). At trial, however, we demonstrated that, irrespective of the loss of goodwill, Fidelity would have been given a "4" MACRO rating

through the OTS's 1992 examination of the thrift, at which time it would have been rated and would have remained a "3" for all relevant time periods connected with Astoria's wounded bank claim. See DMFL at 279-88. As we discussed above in connection with the RB3a-1 growth restrictions that would have occurred irrespective of the breach, the continued "4" rating of the thrift would have occurred because of the thrift's large portfolio of bad loans and its interest rate risk and its earnings problems. Furthermore, Fidelity's capital component would have remained negatively affected by the loss of the Dollar goodwill – which was non-contractual goodwill that was written off because it was impaired pursuant to GAAP. DMFL at 283. Dr. Kaplan, who has no training as an accountant, disregards GAAP (and Fidelity's own determination that the Dollar goodwill was impaired for reasons that had nothing to do with FIRREA), and he includes the Dollar goodwill in his post-FIRREA capital computations. DMFL at 283-84. In so doing, Dr. Kaplan overstates the capital he claims Fidelity would have had in a non-breach setting, making his assessment of the non-breach composite rating (and wounded bank damages) all the more unreliable. For these reasons, Astoria's claim that Fidelity would not have been a troubled institution in a non-breach world, PPFF ¶¶ 860-61, is simply unfounded. Fidelity was considered a troubled institution in 1987 – long before the breach – and that status would have only continued through the early 1990s given the continued deterioration of its bad loans, its interest rate risk and earnings problems, and the loss of its non-contractual regulatory capital, which constituted 27 percent of its pre-FIRREA capital. See DMFL at 281-83.

The first examination in which Fidelity's MACRO rating might have risen such that the thrift would not have been considered a troubled institution in a non-breach world would have been the OTS's 1992 examination of the thrift. The OTS's 1992 examination results, however,

were not released until July 1992 (i.e., after the start of the second half of the year), and, accordingly, would not have affected the OTS assessment or FDIC insurance premiums until after the end of 1992. Tr. 4854:10-4856:7 (Amend). Thus, for the practical purposes of assessing wounded bank damages, Fidelity's MACRO rating would have remained a "4" until at least the beginning of 1993. As a result, (even assuming an additional fundamental error in Dr. Kaplan's reasoning (which we detail below)), Dr. Carron explained, "the only wounded bank damages with respect to [OTS] examination assessments would the $80,000 or so for the first six months of 1993, not the $437,000," (the total assessments Dr. Kaplan proposes on PDX 89). Tr. 5734:14-25 (Carron). The additional error in Dr. Kaplan's analysis, however, is that Dr. Kaplan did not take into consideration the fact that in a non-breach setting, the OTS's assessments would have been greater due to the larger size of the thrift as posited by Dr. Kaplan. Because the OTS assessments were based upon an incremental fee for any assets in excess of $1 billion, Tr. 3172:3-9 (Kaplan); PDX 88, a non-breach Fidelity that was as much as $737 million larger would have incurred additional assessments, even if calculated at the lower general rate of non-troubled institutions. DMFL at 280, 284-85. Based upon the additional incremental assets set forth in Dr. Kaplan's model, the additional assessments at the lower general rate amount to $331,000.[25] Accordingly, taking into consideration the higher assessment costs resulting from

---

[25] The calculation supporting this amount is seen in the following chart:

| Assessment Period | | Incremental Assets | OTS Assessment Rate | Additional Assessment ('000) |
|---|---|---|---|---|
| Oct-90 | Dec-90 | $ 328,000 | 0.0041% | $ 13 |
| Jan-91 | Mar-91 | 361,000 | 0.0030% | 11 |
| Apr-91 | Jun-91 | 394,000 | 0.0030% | 12 |

the increased size of the non-breach Fidelity, there can be no damages awarded to Astoria for Fidelity's increased OTS assessments.[26]

Similarly, Dr. Kaplan's increased FDIC insurance premium claim cannot withstand scrutiny. First, the claim fails the requirement of foreseeability. There were no risk-based insurance premiums for thrifts at the time the contract was formed in 1984. Indeed, risk-based insurance premiums did not arise for another nine years, with the implementation of a new insurance regime in 1993 under the Federal Deposit Insurance Corporation Improvement Act. DMFL at 285. Accordingly, neither the Government nor plaintiffs could have foreseen that a breach would have led to higher insurance premiums. Id. at 285-86.

Second, the claim fails because Astoria failed to show that Fidelity's insurance premiums would have been different in a non-breach world than they were in the actually world. FDIC insurance premiums were not based solely upon a thrift's MACRO rating, but also upon whether

| | | | | | |
|---|---|---|---|---|---|
| Jul-91 | Sep-91 | 442,000 | 0.0029% | | 13 |
| Oct-91 | Dec-91 | 484,000 | 0.0029% | | 14 |
| Jan-92 | Jun-92 | 575,000 | 0.0061% | | 35 |
| Jul-92 | Dec-92 | 682,000 | 0.0061% | | 42 |
| Jan-93 | Jun-93 | 779,000 | 0.0064% | | 50 |
| Jul-93 | Dec-93 | 736,000 | 0.0064% | | 47 |
| Jan-94 | Jun-94 | 737,000 | 0.0064% | | 47 |
| Jul-94 | Dec-94 | 737,000 | 0.0064% | | 47 |
| | Additional Assessments | | | $ | 331 |

The chart was calculated by taking Dr. Kaplan's incremental assets at PX 1314A, Ex. 9 (Revised) (Damages Begin in 1989), column (c), "Foregone Tangible Assets," for each period set forth in PDX 89, and multiplying by the assessment rate derived from PDX 89 at column (f), "Incremental Assessment Rate."

[26] This calculation not only precludes an award of increased OTS assessments, but the $331,000 of additional OTS no-breach assessments offsets any lost profits damages, because the same increase in asset size that gives rise to Dr. Kaplan's lost profits also increases the amount of the assessments.

the institution was well capitalized, a determination that was based, in part, on a number of factors, including whether the institution was deemed to be engaging in unsafe and unsound practices. Dr. Kaplan admitted that he did not know how the FDIC would have considered Fidelity absent the breach (i.e., to what supervisory subgroup the FDIC would have placed Fidelity absent the breach), Tr. 3769:6-9; DMFL at 286-87, and Astoria called no FDIC witness to obtain testimony in this regard.

Furthermore, contrary to Dr. Kaplan's assumption, Fidelity's MACRO rating would not have improved in 1993 from the "3" rating it actually received. Fidelity received a "3" rating after Fidelity converted in May 1993. At that time it was considered well-capitalized, with a "2" rating for the capital component of the MACRO rating. DX 1448 at WON732 0834. That well capitalized rating would not have improved with the addition of goodwill to its capital. DMFL at 287-88. The reason for Fidelity's problems remained its still sizeable portfolio of bad loans in 1993, and regulatory criticisms of management and earnings, leading to "3" component ratings for assets, management and earnings. DX 1448 at WON732 0834; Tr. 2835:4-24 (Vigna). These "3" component ratings would have remained the same irrespective of the breach, leading to the same "3" MACRO composite rating that the thrift actually received in 1994. Thus, for this reason, and for the other reasons set forth above and in our contentions of fact and law, Astoria's wounded bank damages claims fail.

## VIII. There Is No Damage Claim Connected With Fidelity's Conversion Properly Before This Court

Months before trial, we filed a motion seeking to bar Astoria from presenting any damage claim based upon the amount of capital raised by Fidelity through its conversion from a mutual to

stock form of ownership. Def. Mot. In Limine to Exclude Evidence Concerning Plaintiff's Abandoned and Disavowed Damage Claims (Dec. 7, 2006). In response, Astoria stated that it has "never made" a claim for damages connected with Fidelity's conversion from a mutual to stock institution. Pl. Resp. (Dec. 13, 2006). In its Order following the briefing on our motion in limine, this Court acknowledged that Astoria was not pursuing a conversion proceeds claim. Order (Dec. 21, 2006).

At trial, Astoria's counsel represented that Astoria was submitting no damage claim connected with lost conversion proceeds or increased conversion proceeds. Tr. 3030:19-22, 3033:4-16 (Eisenhart). Moreover, Astoria presented no reliable evidence connected with any claim based upon the amount of proceeds Fidelity obtained from its conversion in May 1993. Dr. Kaplan testified that he had not undertaken any calculation with respect to potential increased conversion proceeds but for the breach. Tr. 3031:8-10 (Kaplan). Moreover, while Mr. Wesp discussed the issue of Fidelity's conversion in a non-breach world, he admitted that he could not say how much capital Fidelity would have raised in a conversion if FIRREA was not passed. Tr. 2477:1-13 (Wesp).[27] Accordingly, there is no damage claim properly before this Court connected with any purported lost or reduced conversion proceeds.

---

[27] Further, while Mr. Wesp cited Roslyn Savings Bank and Astoria as examples of thrifts that raised more capital in their conversion than Fidelity, Mr. Wesp admitted that he was unaware of both institution's asset quality relative to Fidelity or whether those institutions had been engaged in condominium loans, as had Fidelity. Tr. 2466:13-2467:1 (Wesp).

Nonetheless, in its post-trial contentions of fact and law Astoria set forth irrelevant allegations concerning Fidelity's conversion.[28] Given the foregoing, all such allegations should be disregarded by this Court for the purposes of assessing any damages in this case.

---

[28] For example, Astoria argues that Fidelity believed it could not convert before it reached a well capitalized level of five percent. See PPFF ¶ 733. In support of this purported fact, Astoria cites the testimony of Mr. Powderly. Astoria, however, has misread Mr. Powderly's testimony. In the passages of Mr. Powderly's testimony cited by Astoria, Mr. Powderly actually stated that when Fidelity reached a level of two-and-a-half percent, a "level that made sense," it entertained the idea of going public. Tr. 418:23-419:1 (Powderly). Indeed, Mr. Powderly testified that he did not believe Fidelity would have to achieve full capital compliance before it converted. Tr. 419:2-4 (Powderly). What Mr. Powderly did say is that after the conversion he wanted the thrift to be well-capitalized. Tr. 419:5-10 (Powderly). Astoria's assertion is also contradicted by another of its own proposed contentions of fact. At paragraph 736, Astoria states that Fidelity's conversion could proceed "once the institution had positive tangible capital of some amount and the market was receptive to thrift and bank equity." PPFF ¶ 736 (emphasis added).

## CONCLUSION

Astoria has failed to prove any restitution, reliance, lost profits, or wounded bank damages. Accordingly, we respectfully request that the Court deny all of plaintiff's damage claims and enter judgment for the Government.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
by /s/ Jeanne E. Davidson

KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson

JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 353-7972
Fax: (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
BRIAN A. MIZOGUCHI
JOHN J. TODOR
SAMEER YERAWADEKAR
Trial Attorneys

October 5, 2007

**CERTIFICATE OF FILING**

I hereby certify that on this 5th day of October, 2007, a copy of the foregoing "DEFENDANT'S POST-TRIAL REPLY BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Sameer Yerawadekar
Sameer Yerawadekar