IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 95-468C
(Judge Thomas C. Wheeler)

**PLAINTIFF ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION'S RESPONSE TO DEFENDANT'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Frank J. Eisenhart
Counsel of Record
Catherine Botticelli
Tara R. Kelly
Catherine E. Stahl
Craig Falls
Dechert LLP
1775 I Street, NW
Washington, DC 20006

Attorneys for Plaintiff
Astoria Federal Savings and
Loan Association

October 5, 2007

## TABLE OF CONTENTS

**Introduction** ........ 1

**Issues Presented** ........ 4

**Replies to Individual Proposed Findings of Fact** ........ 8

**Plaintiff's Reply to Defendant's Contentions of Law** ........ 271

**I. OVERVIEW**........271

A. The Court Should Not Be Misled By Defendant's Specious Analysis Of Precendent. ........ 271

B. The Law Of Contracts, And No Special *Winstar* Law, Governs This Case. ........ 272

C. The Law Of Contracts Is Extremely Lenient And Accomodating To A Plaintiff's Recovery Once Breach And Fact Of Loss Are Established. ........ 274

1. The Government, As The Breaching Party, Is Responsible For Making Plaintiff Whole. ........ 275

2. The Court Has Broad Powers Under The Law To Fashion A Suitable Award to Make Plaintiff Whole. ........ 275

3. The Plaintiff's Recovery Is Not Precluded By Uncertainty As To The Precise Amount Of Plaintiff's Loss. ........ 276

4. Plaintiff's Fact Of Loss Is Overwhelmingly Established By The Evidence. ........ 277

5. Plaintiff's Amount Of Loss Is Not Made Uncertain By Defendant's Unsupported Speculations. ........ 279

6. Dr. Kaplan's Conservative Measurements Of Plaintiff's Award Could Never Constitute A Windfall For Plaintiff. ........ 280

**II. PLAINTIFF'S RESPONSES TO DEFENDANT'S CONTENTIONS ADDRESSING EXPECTANCY.** ........ 281

A. Defendant's Speculations Do Not Make Plaintiff's Damages Model An Unfair Or Unreasaonble Approximation Of Fidelity's Loss. ........ 281

1. Defendant Has Identified No Legal Impediment To Plaintiff's Recovery. ........ 281

2. Defendant's Speculations About Alternative Scenarios In The But-For World Do Not Make Plaintiff's Damages Estimate Unfair Or Unreasonable. ........ 283

3. Defendant's Speculations About How It Might Have Modeled Plaintiff's Damages Differently Do Not Make Plaintiff's Damages Estimate Unfair Or Unreasonable. ........ 284

B. Plaintiff Is Entitled To Lost Profits. ........ 286

1. It Was Foreseeable At The Time of Contracting That Fidelity Would Lose Profits If The Government Breached The Contract. ........ 286

2. Fidelity's Lost Profits Were Definitely And Substantially Caused By The Government's Breach. .......................................................................................... 290

3. Fidelity's Lost Profits Are Reasonably Certain ...................................................... 292

C. Plaintiff's Responses To Defendant's Factual Arguments Regarding Expectancy. ............ 296

1. Defendant's Speculations About the But-For World Are Not Credible (Causation).296

2. Defendant's Attempts To Create Uncertainty Are Not Credible (Reasonable Certainty).. .......................................................................................................... 305

D. Plaintiff Is Entitled To Wounded Bank Damages............................................................. 312

**III. PLAINTIFF'S RESPONSES TO DEFENDANT'S LEGAL CONTENTIONS REGARDING RESTITUTION.** ................................................................... 315

A. The Use Of Liquidation Costs In The Calculation Of Restitution Is Not Foreclosed By Federal Circuit Precedent............................................................................... 315

1. The Use Of Liquidation Costs In Calculating The Defendant's Subjective Gain Is Not Foreclosed. ............................................................................................................ 316

2. The Use Of Liquidation Costs In Calculating The Objective Value Of Plaintiff's Performance Is Not Foreclosed......................................................................... 316

B. Plaintiff Is Entitled To A Restitution Award. .................................................................... 317

1. A Plaintiff Is Entitled To Restitution By Performing The Contract. ........................ 318

2. The Court May Choose Between Two Alternative Measurements Of Restitution .. 321

3. The Federal Circuit Has Not Foreclosed The Possibility Of Using Liquidation Cost In The Calculation Of The Objective Value Of Plaintiff's Services................................. 323

4. The Federal Circuit's Chief Concerns Regarding The Use Of Liquidation Costs In Calculating The Defendant's Subjective Gain Are Not Present In This Case............... 326

C. Defendant's Contentions On Restatement Section 384 And Offsetting Benefits Are Mistaken …………..……………………………………………………………………...332

1. Defendant's Contentions Regarding Restatement Section 384 Are Mistaken. ........ 332

2. Defendant's Contentions Regarding Offsetting Benefits Are Mistaken.................. 333

D. Plaintiff's Replies To Defendant's Factual Arguments Regarding Restitution. .................. 336

1. The FSLIC Could Affford To Liquidate Suburbia ................................................ 336

2. It Is Irrelevant That Liquidation Is The Last Option When It Is The Only Option…………………………………………………………………………......338

3. Plaintiff's Liquidation Cost Estimate Is Reasonable And Supported By The Record.. ……………………………………………………………………….343

4. Plaintiff Fully Conferred The Benefit On The Government.................................... 344

**IV. PLAINTIFF'S RESPONSES TO DEFENDANT'S CONTENTIONS REGARDING RELIANCE** .......... 345

A. Plaintiff's Reliance Claim Is Not Premised On Net Liabilities Assumed, But On The Real And Significant Costs That Fidelity Incurred In Performing the Contract………….... 345

1. The Government Is Obligated To Reimburse Plaintiff For Foreseeable Costs Incurred In Reliance On The Contract .......... 347

2. Plaintiff's Cost of Amortizing The Suburbia Goodwill Was A Foreseeable Cost Of Performing The Contract And Would Not Have Been Incurred Absent The Contract. 349

3. Plaintiff Not Only Assumed The Supervisory Goodwill, But Fully Amortized It At Great Expense To Fidelity's Profitability And Viability. .......... 350

B. Plaintiff's Responses To Defendant's Factual Arguments Regarding Reliance. .......... 352

**Conclusion**…………… .......... 354

TABLE OF AUTHORITIES

**FEDERAL CASES**

*Acme Process Equip. Co. v. United States*, 171 Ct. Cl. 324 (1965), *rev'd on other grounds*, 385 U.S. 138 (1966)....................319

*Am. Capital Corp. v. FDIC*, 472 F.3d 859 (Fed. Cir. 2006)....................315, 347

*Anchor Sav. Bank v. United States*, 59 Fed. Cl. 126 (2003)....................350

*Ariadne Fin. Servs. Pty., Ltd. v. United States*, 133 F.3d 874 (Fed. Cir. 1998)....................304

*Astoria Fed. Sav. & Loan Assoc. v. United States*, 72 Fed. Cl. 712 (2006)....................315

*Bank of America, FSB v. United States*, 495 F.3d 1366 (Fed. Cir. 2007)....................305

*Bluebonnet Sav. Bank, F.S.B., v. United States*, 266 F.3d 1348 (Fed. Cir. 2001)....................276

*Bluebonnet Sav. Bank v. United States*, 67 Fed. Cl. 231 (2005)....................335

*Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342 (Fed Cir. 2000)....................329

*Cal. Fed. Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005)....................290

*Castle v. United States*, 48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part*, 301 F.3d 1328 (Fed. Cir. 2002)....................288

*Citizens Fed. Bank, FSB v. United States*, 52 Fed. Cl. 561 (2001)....................327, 329

*Citizens Fed. Bank, F.S.B. v. United States*, 474 F.3d 1314 (Fed. Cir. 2007)....................290, 291

*Citizens Fin. Servs., F.S.B. v. United States*, 64 Fed. Cl. 498 (2005)....................288

*Columbia First Bank, F.S.B. v. United States*, 60 Fed. Cl. 97 (2004)....................293

*Comm. Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338 (2004)....................293

*Elec. & Missile Facilities, Inc. v. United States*, 189 Ct. Cl. 237 (1969)....................276, 280

*Far West Fed. Bank, S.B. v. Office of Thrift Supervision*, 119 F.3d 1358 (9th Cir. 1997)....................319, 326

*First Fed. Lincoln Bank v. United States*, 73 Fed. Cl. 633 (2006)....................288, 293

*First Fed. Sav. & Loan Ass'n of Rochester v. United States*, 76 Fed. Cl. 106

(2007).......................................................................................................287, 293-95, 309-11

*Franklin Fed. Bank, F.S.B. v. United States*, 55 Fed. Cl. 108 (2003)........................................350

*Glass v. United States*, 47 Fed. Cl. 316 (2000), *rev'd on other grounds*, 258 F.3d 1349 (Fed. Cir. 2001).......................................................................................................285

*Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374 (Fed. Cir. 2001) ("*Glendale II*")....................................................................273, 275, 316, 319, 326-31, 347, 348

*Glendale Fed. Bank, F.S.B. v. United States*, 54 Fed. Cl. 8 (2002) ("*Glendale III*")..................273

*Globe Sav. Bank, FSB v. United States*, 65 Fed. Cl. 330 (2005), *aff'd in part, rev'd in part*, 189 Fed. Appx. 964 (Fed. Cir. 2006) ....................................................275, 286, 293

*Granite Mgmt. Corp. v. United States*, 416 F.3d 1373 (Fed. Cir. 2005) .......................88, 327, 348

*Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297 (Fed. Cir. 2004) ...................................321

*Hughes v. United States*, 71 Fed. Cl. 284 (2006).......................................................276, 277, 292

*Landmark Land Co. v. FDIC*, 256 F.3d 1365 (Fed. Cir. 2001) ..................................287, 321, 334

*LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64 (1999), *aff'd in part, vacated in part and remanded*, 317 F.3d 1363 (Fed. Cir. 2003) .......................................328, 329

*LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363 (Fed. Cir. 2003).............................................................................277, 282, 323, 326, 354

*LaSalle Talman Bank, F.S.B. v. United States*, 64 Fed. Cl. 90 (2005) ........................286, 287, 289

*La Van v. United States*, 382, F.3d 1340 (Fed. Cir. 2004).........................................................282

*Locke v. United States*, 151Ct. Cl. 262 (1960).............................................................................277

*Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460 (2006) ...................................287

*Ring v. The Dimitrios Chandris*, 43 F. Supp. 829 (E.D. Pa. 1942), *aff'd*, 133 F.2d 124 (3d Cir. 1943)..................................................................................................................350

*S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 57 Fed. Cl. 598 (2003)..................................293

*S. Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2007)...........................277, 280, 282

*Seuss v. United States*, 52 Fed. Cl. 221 (2002)............................................................................277

*Seuss v. United States*, 74 Fed. Cl. 510 (2006).....291

*Slatterly v. United States*, 69 Fed. Cl. 573 (2006).....292, 347, 348

*Specialty Assembling & Packaging, Co. v. United States*, 174 Ct. Cl. 153 (1966).....276

*Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544 (2003), *aff'd in part, rev'd in part*, 407 F.3d 1352 (Fed. Cir. 2005).....328

*United States v. Winstar Corp*., 518 U.S. 839 (1996).....263, 272, 275

**STATE CASES**

*Barnes v. Lozoff*, 123 N.W.2d 543 (Wis. 1963).....320

*Taylor v. Mark*, 376 S.W.2d 927 (Tex. App. 1964).....350

*Wartenbe v. Car-Anth Mfg. & Supply Co.*, 362 S.W.2d 54 (Mo. Ct. App. 1962).....350

**ADDITIONAL AUTHORITIES**

5 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1044 (1964).....348

12 ARTHUR L. CORBIN, CORBIN ON CONTRACTS, Ch. 61, § 1107 (1979).....318

12 ARTHUR L. CORBIN, CORBIN ON CONTRACTS, Ch. 61, § 1112 (1979).....334

12 ARTHUR L. CORBIN, CORBIN ON CONTRACTS, Ch. 61, § 1113 (1979).....325

RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981).....278

RESTATEMENT (SECOND) OF CONTRACTS § 250 (1981).....304

RESTATEMENT (SECOND) OF CONTRACTS § 251 (1981).....304

RESTATEMENT (SECOND) OF CONTRACTS § 253 (1981).....278

RESTATEMENT (SECOND) OF CONTRACTS § 344 (1981).....286, 312. 324, 347

RESTATEMENT (SECOND) OF CONTRACTS § 347 (1981).....275

RESTATEMENT (SECOND) OF CONTRACTS § 348 (1981).....275

RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981).....348, 349, 351

RESTATEMENT (SECOND) OF CONTRACTS § 370 (1981)....................................................317, 330

RESTATEMENT (SECOND) OF CONTRACTS § 371 (1981).............................................316, 320, 322

RESTATEMENT (SECOND) OF CONTRACTS § 384 (1981)....................................................332, 333

**Introduction**

Defendant's "Summary of Argument" attempts to portray Plaintiff as overreaching, making the unsupported suggestion that Fidelity was better off as a result of the contract despite the Government's breach because Fidelity paid nothing to obtain Suburbia and was provided with $16 million in cash. The Record evidence shows that nothing could be further from the truth.

In the 1980s, the FSLIC faced a severe crisis. The Government turned to the private sector to bail out the FSLIC, asking healthy thrifts to discharge the FSLIC's potential obligations on account of failing thrifts. However, the burden of assuming a failing thrift was so high that private thrifts were initially unwilling to assume the Government's burden unless it made an upfront cash assistance payment of approximately 70% of the cost of liquidation so that the merged thrift would have the necessary capital to survive the merger and return to profitability.

The Government was later able to greatly reduce the amount of cash assistance it had to pay for a merger, but only because the Government promised potential acquirers that the Government would give them plenty of time and regulatory leeway to survive the merger and return to profitability. This promise of time and leeway was achieved through an accounting tool called supervisory goodwill, which would enable the thrift to amortize the acquired thrift's excess liabilities slowly over long periods of time and count the unamortized portion of goodwill as an asset towards its capital requirements to keep regulators at bay.

Thus, the Government was able to pay Fidelity only $16 million in cash to perform the service of discharging the Government's enormous obligation for Suburbia's excess liabilities, which were $160 million and growing at the time of the merger despite drastic improvements in

interest rates. But this low $16 million price was expressly conditioned on the Government's promise to honor special forbearances that would allow Fidelity to slowly amortize the $160 million in goodwill over thirty years and count the unamortized portion of goodwill as capital to keep regulators from interfering with Fidelity's profitability while it recovered.

Defendant characterizes the contract as one in which the Government gave Fidelity a free bank and millions in cash assistance in return for nothing, but this characterization is wholly misleading. Rather, Fidelity was hired by the Government to perform the valuable services of operating a failing thrift and permanently discharging its liabilities, while the Government was required to pay only the paltry sum of $16 million for these services because it promised Fidelity that it would have both sufficient time and leeway after the merger to ultimately make the merger profitable.

Only five years into the contract the Government breached these promises, taking away both the time and flexibility that Fidelity needed to be profitable. In breach of the contract, the Government held Fidelity immediately accountable for the tangible capital deficit caused by the Suburbia merger, conditioning Fidelity's very survival on its promise to devote all its efforts to reducing this tangible capital deficit within only five years. Thus, whereas most contracting parties are excused from performance by the other party's breach, Fidelity was instead forced to accelerate its performance, discharging Suburbia's liabilities, not in the remaining twenty-five years as provided in the contract, but in less than five. And Fidelity had to achieve this objective while operating under a restrictive Capital Plan that forced Fidelity to abandon all plans for profitability in favor of focusing entirely on meeting, without variance, interim capital targets and reducing the capital deficit that Fidelity assumed in the merger.

Moreover, through overly critical examination reports and various other regulatory responses to FIRREA, the Government treated Fidelity harshly after the breach, punishing Fidelity as if it had incurred the tangible capital deficit itself and not as a result of the Government's transfer of its obligations to Fidelity. This harsh regulatory treatment only made Fidelity's performance more difficult and costly, driving Fidelity to the brink of failure as the FDIC threatened to terminate Fidelity's deposit insurance.

Only through great expense and sacrifice from both the organization and its employees and through the prudent oversight of the OTS, who saw Fidelity's survival to be in the taxpayers' best interest, was Fidelity able to emerge from the Capital Plan, fully performing its services under the contract to permanently save the Government and taxpayers millions of dollars. (*See* Vigna, Tr. 1500, line 10 to p. 1501, line 2). But Fidelity was so weakened by these sacrifices that upon emergence from the Capital Plan, Fidelity had no choice but to seek an acquirer, selling itself to Astoria less than two years later. With Fidelity essentially driven out of business so that the Government could avoid its enormous obligations for the small sum of $16 million, Defendant's contention that Fidelity received the better end of the deal is absolutely ludicrous.

Defendant has emphasized over and over again in its brief that the law of contracts is not about punishing the breaching party. While this is correct, this does not indicate that the Government is free to breach contracts without repercussions, as the law of contracts demands that the breaching party be held accountable for its breach. Thus, when it regrets a contract, the Government, like any other contracting party, has a choice between paying two costs: the cost of honoring the contract despite the Government's regret, or the cost of compensating the other party for the breach.

Here, Defendant seeks to avoid making either payment, suggesting implausibly that Plaintiff suffered no damage as a result of the breach and that it would be a windfall to the Plaintiff if the Government were to pay any compensation for Fidelity's services. To the contrary, to compensate Plaintiff through any of Dr. Kaplan's conservative damages awards nearly twenty years after the breach, and without pre-judgment interest, would only enhance the windfall that the Government already received long ago.

Thus, while Defendant proposes a number of questions that the Court must answer in determining whether Plaintiff should be compensated for its loss, and while Plaintiff in the same vein has proposed its own series of questions, there is really only one basic question this Court must answer: Did Fidelity suffer a loss as a result of the Government's admitted breach of contract and what is a fair and reasonable approximation of the amount of that loss?

**Issues Presented**

1. Should the Court credit the Department's argument that there is some special body of law applicable to the *Winstar* cases, or should the Court decide this case based on normal principles of contract law, drawing on decisions in other *Winstar* cases only to the extent those cases are consistent with traditional principles of contract law?
2. Can the Department possibly be correct that the Government's admitted breach of contract, which instantly rendered Fidelity capital deficient, and which condemned Fidelity to nearly four years of stagnation under a no-growth Capital Plan in a harsh regulatory environment, does not give rise to even a penny in damages?
3. Why should Astoria, as the acquirer of Fidelity, not be permitted to realize the full value of Fidelity's cause of action against the Government for breach of contract, just as it is

entitled to realize the full value of any of Fidelity's other assets, regardless of what it paid for Fidelity?

4. Does the Court have any reason to be concerned about a "windfall" recovery by the Plaintiff in this case, where any award will take place eighteen or more years after the Government's admitted breach of contract but where the Government has by statute precluded recovery for pre-judgment interest?
5. Should the Court accept the Department's argument that any benefit or potential benefit received by Fidelity as a result of its acquisition of Suburbia be an offset to any damages flowing from the Government's admitted breach of contract, even where those benefits were not conferred on Fidelity by the Government and where they may have been offset wholly or partially by costs or other detriments to Fidelity that flowed from the transaction?
6. Why should Dr. Kaplan's damage calculation be required to mimic in every respect Fidelity's real world mode of operation when the Government's admitted breach of contract forced Fidelity to operate with depleted capital in a manner which it would never have chosen if the breach had not occurred?
7. Why should the Department prevail on its argument that Dr. Kaplan's damage analysis is wrong or is unreliable, when the Department offered no analysis of its own and never tried to demonstrate that a different analysis which took into account other factors or employed other methodology would yield a different result?

8. Why should the Court conclude that the regulators in October 1984 had alternative solutions for dealing with Suburbia other than liquidation or rebidding, when there is no evidence in the contemporary record that such alternatives existed or were considered?

9. Why should the Court find that liquidation of Suburbia was not an alternative in October 1984, when the annual reports of the FSLIC for 1984 and later years consistently reference liquidations of failed thrift institutions?

10. Why should the Court speculate that the regulators could have found a buyer for Suburbia in a timely fashion had the Fidelity deal not gone through, when the previous effort to market Suburbia had produced only four offers, and Suburbia's position had seriously deteriorated in the years since those offers were solicited?

11. Why should the Court speculate that the regulators might have put Suburbia into a Phoenix program as an alternative to the Fidelity merger, when the Phoenix programs were coming to an end in 1984, when the Suffolk Phoenix, the only Phoenix institution on Long Island, had been sold in 1983, and when the testimony of Mr. Stearns, head of the FSLIC in 1984, was that transfer to a Phoenix would have been discussed in the Issues Memorandum presented to the Federal Home Loan Bank Board if it was a viable alternative for Suburbia?

12. Why should the Court speculate that Suburbia could have recovered simply by waiting for falling interest rates, when interest rates had declined in both 1983 and 1984, yet Suburbia continued to lose money in every quarter and was rapidly approaching zero capital even on a regulatory capital basis?

13. Why should the Court credit the Department's speculation that Suburbia could be kept afloat through the issuance of more and more net worth certificates, when the testimony of Angelo Vigna, Suburbia's principal regulator, and the contemporary written record confirm that Suburbia would no longer be eligible for such certificates after it dipped below 0.5 percent of regulatory capital?
14. Why should the Court conclude that an unbreached and fully capitalized Fidelity would have been constrained from growing by its commercial real estate problems in the same way the breached Fidelity was constrained by FIRREA, when the evidence shows that institutions with adequate capital have many more options for dealing with problem loans than do institutions that are undercapitalized?
15. After Fidelity fully amortized the Suburbia goodwill and replenished the capital taken away by the Government's admitted breach of contract, ten years after Suburbia had ceased to exist, what, if any, risk was there that the Government insurance fund would ever have to make any payment on account of liabilities of Suburbia?
16. With Fidelity having eliminated any possibility that the Government insurance fund would ever have to make a payment on account of liabilities of Suburbia, why should that avoided liability not be an appropriate measure of damages in this case?
17. Why should the Court engage in the needless exercise of trying to guess whether, in a non-breach world, Fidelity or Astoria would have chosen to leverage their additional capital to engage in the purchase of mortgage-backed securities funded by borrowings, when Dr. Kaplan made it abundantly clear that he offered such a strategy as a method of calculating lost profits, not as a prediction of what the institutions would actually have

done, and where he testified that had he calculated the damages based on alternative strategies, it would only have served to increase the damages?

18. Why should this Court accept the Department's position that it cannot award any damages to the Plaintiff despite the Government's admitted breach of contract in light of Mr. Vigna's statement that Fidelity's management "did an outstanding job" that avoided the need to liquidate the institution after FIRREA at a probable cost of hundreds of millions and instead produced "a great success story?"
19. Why should the Court view Fidelity's replenishment of its capital through retained earnings and ultimately through the public offering of its stock as full mitigation of damages, when the undisputed evidence is that Fidelity's public offering was far less successful than those of its peers who had been unaffected by FIRREA, and that even after its public offering Fidelity was in a weak competitive position that left it no alternative except to seek an acquirer?

**<u>Replies to Individual Proposed Findings of Fact</u>**

In its Replies to Defendant's Proposed Findings of Fact ("DPFOFs"), the Plaintiff does not give Record citations for quoted material where the quote appears, and can easily be found, in the portions of the Record cited by Defendant in the DPFOF under discussion. However, Record citations are provided whenever reference is made to material outside the scope of the citation offered by Defendant or when the material cited by the Defendant is sufficiently lengthy that the quote might not be easily found.

Some of Defendant's Proposed Findings of Fact are footnoted. Where the footnote is explanatory and is not a substantive part of the Proposed Finding, Plaintiff does not include the

footnote in this Reply. Plaintiff's own explanatory footnotes are set in bold type to distinguish them from Defendant's footnotes.

**DPFOF 1**

During the early 1980s, thrifts and their regulators were faced with a period of extraordinary difficulty. The economic problems faced by the thrift industry at the time included continued inflation and unprecedented fluctuation in interest rates. PX 10 at 6 (FHLBB annual report for 1980); Tr. 68:19-22 (Pratt). During this period, the prime rate of interest reached 21 percent; the average yield on assets was about 8 percent, and the Federal Government was paying as high as 12 percent or 13 percent upon its risk-free obligations. These factors caused disintermediation (the withdrawal of deposits by passbook savers for higher-yielding returns) and put tremendous pressure on thrifts. Tr. 69:1-16, 70:17-71:25 (Pratt).

**Reply:**

Plaintiff makes no objection to DPFOF 1.

**DPFOF 2**

The high interest rate environment of the early 1980s led to thrifts becoming insolvent. Tr. 1147:14-1149:25 (Beesley). Book accounting, however, masked thrifts' marked-to-market insolvency. Tr. 1150:1-17 (Beesley). To illustrate, institutions had about $500 billion of assets on a nominal [book value] level while their real value was probably $180 or $190 billion less than that. Tr. 66:11-23 (Pratt). Thrifts were failing their regulatory capital requirements on a book basis despite lowered capital requirements. Tr. 1150:18-1151:24 (Beesley). Indeed, a vast majority of thrifts were insolvent on a marked-to-market basis in the early 1980s. Tr. 1202:6-11 (Beesley). Given its outstanding assistance commitments at that time, and given the continuing

decline of the health of a large number of thrifts, the FSLIC was effectively near-insolvent. PX 286 at 76.

**Reply:**

The first sentence of DPFOF 2 is overstated. Mr. Beesely testified that over time "more and more" thrifts became insolvent. DPFOF 2 can be read to suggest that all thrifts became insolvent, but the citation does not support that. In fact, Defendant's own witness, Peter Stearns, testified that when he left the FSLIC in 1985, something on the order of 10 percent of thrifts were insolvent, though this number might get closer to 20 percent if "real accounting" were applied. Mr. Stearns described the industry at that time as divided roughly into thirds. A third of the industry was making "record profits." Another third were "surviving all right," and the last third were "dead in the water." (Stearns, Tr. 3938, lines 11-21).

The second sentence is not an accurate summary of what Mr. Beesely said. He made no reference to "book accounting," which in any event is a meaningless term. Mr. Beesely referred to the accounting practice of carrying assets on the books of a savings institution at "book value" (historical cost) rather than market value. He noted that this practice made it difficult to assess the true value of a thrift's assets merely by looking at its financial statements. He did not say the practice "masked thrifts' mark-to-market insolvency" (and the term "mark-to-market insolvency" is another meaningless term).

The third sentence is accurate only to illustrate conceptually a possible difference between the nominal (or book) value of the industry's assets and their economic value. Mr. Pratt gave the numbers from memory and admitted they "may be off a substantial extent."

The fourth sentence is not supported by the Record cites, and Plaintiff does not understand what is meant by “failing [a] regulatory capital requirement on a book basis.”

Plaintiff has no objection to the fifth sentence, though the term is “mark-to-market,” not “marked-to-market.”

The last sentence of DPFOF 2 is nothing but argument by the Department. There is no citation to testimony in support of the statement, and “PX 286 at 76” does not support, and in fact contradicts, the statement. The FSLIC balance sheet that appears at p. 76 shows that in 1983 the FSLIC had $5.7 billion in primary and secondary reserves available for potential losses. (*See*, notes 7 and 10 on p. 77).

**<u>DPFOFs 3 and 4</u>**

Traditionally, the FSLIC used three primary mechanisms to prevent the default of institutions: the purchase of problem assets; assisted mergers; and capital contributions from the Government. PX 286 at 16 ¶ 1; Tr. 1199:2-1200:4 (Beesley).

By 1981, however, the FSLIC understood that its capital reserves were not adequate to deal with the magnitude of problem thrifts with these methods alone. Accordingly, it introduced new alternatives to avoid the default of thrifts: various forms of mergers, including interstate and inter-industry mergers and the use of income capital certificates. PX 286 at 16.

**Reply:**

These two DPFOFs should be joined together for context. Plaintiff has no objection to them, since they are nearly verbatim quotes from PX 286. However, the cited reference to Mr. Beesely’s testimony has nothing to do with the subject and does not support the PFOFs.

**DPFOF 5**

In March 24, 1983, the FHLBB and FSLIC issued a memorandum (revising a similar memorandum issued in 1982) setting forth guidelines to facilitate the most efficient resolution of supervisory cases. PX 112 at D3-0006238. Those guidelines, which remained in place until 1986, specified the mechanisms by which the FSLIC and FHLBB intended to resolve thrifts whose problems required regulatory supervision. The resolution solutions were arranged in order of desirability. The preferred method of resolving thrifts was the introduction of new capital into the thrift from outside the Government. Following that were methods involving various forms of mergers, whereby weak institutions would merge into stronger institutions; the introduction of new capital assistance from the Government; mergers involving Government assistance; and inclusion in the so-called Phoenix program, where several troubled thrifts were combined into a new thrift. The last option considered to resolve a troubled thrift was a liquidation. PX 112 at D3-0006238-43 (Beesley). Regulators consistently specified that liquidation was the last alternative. See PX 35 at OGG036 0002, PX 112 at DX-0006243, and PX 370 at 11; Tr. 1511:22-1513:22 (Vigna).

**Reply:**

Plaintiff does not dispute the description of PX 112, but Plaintiff does challenge the relevance of the document to this case. There was no evidence that PX 112 (or a successor document, PX 35) was ever consulted or specifically followed by the regulators in the course of their decision-making on Suburbia. In fact, Peter Stearns, who chaired the FSLIC when the Fidelity/Suburbia merger was approved, testified at trial that he was not sure he had ever seen PX 112, and at his deposition seven years earlier (when he admitted his recollection was better),

he testified he was sure he had not seen PX 112 but wished he had, because he thought it was "a good memo." (Stearns, Tr. 3965, line 10 to p. 3973, line 5).

**DPFOF 6**

Among the options considered before liquidation was the possibility of a merger with another thrift. One advantage of mergers was that the acquiring thrift benefited from net "purchase accounting" income in the years immediately following the merger. Tr. 1182:11-1184:15 (Beesley). This "purchase accounting" income helped thrifts buy time until interest rates came down. Tr. 1184:16-1185:13 (Beesley).

**Reply:**

The Record citations do not support the first sentence, but Plaintiff does not quarrel with its accuracy. Plaintiff has no objection to the second sentence.

Plaintiff objects to the third sentence. Not only is it not supported by the cited reference to Mr. Beesely's testimony, but his testimony would seem to take issue with it. When he was first asked why purchase accounting was used in these transactions his reply was that it was required by GAAP and there was not much option about using it. (Beesely, Tr. 1182, lines 11-19). He described its usefulness to the acquiring thrifts as allowing the thrift to record income in the early years following the merger in a way that would hopefully offset the negative effects of having to amortize the goodwill. He made no reference to interest rates coming down in this testimony. (Beesely, Tr. 1182, line 20 to p. 1184, line 3).

**DPFOF 7**

In the early 1980s (and for all relevant time periods with respect to the FSLIC's resolution of Suburbia), it was well known that FSLIC had very little capital available to

liquidate problem thrifts. Tr. 126:2-6 (discussing 1981-82 time frame) (Pratt). FSLIC could not afford to liquidate thrifts given its lack of funds and the fact that those funds were tied up in long-term investments. Tr. 114:14-21, 128:5-20 (Pratt). In March 1983, PX 1352, a FHLBB report to Congress entitled "Agenda For Reform," at 280, lists FSLIC assets as $6.42 billion in 1982, an inadequate amount of funds to liquidate all of the troubled thrifts. Tr. 57:14-20, 127:9-128:8 (Pratt). If FSLIC had wanted to liquidate all troubled thrifts at one time, it would have taken at least 180 or 190 billion dollars. Tr. 126:25-127:8 (Pratt). In 1983, FSLIC reported that it had 53 cases requiring supervisory resolution with total assets of $17.6 billion, while it had a primary reserve of only $5.7 billion. PX 286 at 17, 76 (Beesley).

**Reply:**

The first sentence is an example of a clever shell game that the Department has engaged in consistently throughout this case. The question Mr. Pratt was asked was: "But in the 1981-1982 time frame, did the FSLIC have enough funds to liquidate ***all*** the problem thrifts?" (emphasis added). Mr. Pratt replied to that question in the negative. (Pratt, Tr. 126, lines 2-6). However, in DPFOF 7, this has been subtly twisted to say instead that: "FSLIC had very little capital available to liquidate problem thrifts" – not ***all*** problem thrifts (the question posed to Mr. Pratt), but just some (or perhaps ***any***) problem thrifts.

Of course, the only issue really relevant to this case is whether the FSLIC in October 1984 had sufficient funds available to liquidate Suburbia, and the evidence is clear that it did. As of December 31, 1983, the FSLIC had in excess of $8.3 billion and had reserves (primary and secondary) in excess of $6.4 billion. (PX 286 at p. 76). As of December 31, 1984, the FSLIC had total assets of nearly $9 billion and reserves in excess of $5.6 billion. (DX 197 at p. 80).

Moreover, the FSLIC laid out $1.5 billion in cash during 1984 to settle insurance in some nine liquidating receiverships. (*Id.* at p. 23). The FSLIC's 1984 estimated cost of liquidating Suburbia was $147.9 million. (Joint Stipulated Facts ¶ 40). Clearly the FSLIC had enough funds in 1984 to cover the estimated cost of liquidating Suburbia.

The same problem exists in the second sentence. Dr. Pratt was clearly talking about the adequacy of the FSLIC's reserves to liquidate ***all*** troubled thrifts, not to "liquidate thrifts" (as stated in DPFOF 7).

The third and fourth sentences accurately state Dr. Pratt's testimony. They are simply not relevant to this case. The issue is not whether the FSLIC could liquidate all troubled thrifts. The issue is whether it could and did liquidate selected troubled thrifts, and, as noted above, it clearly could and it clearly did.

The fifth sentence compares apples and oranges. The cost of resolving a troubled thrift does not equate to the total assets of the troubled thrift. Suburbia is a good example. The FSLIC's Institutional Analysis showed that as of April 30, 1984 Suburbia had assets of $653 million. However, the FSLIC estimated the present value liquidation cost of Suburbia at $147.9 million. (*See* PX 210).

**<u>DPFOF 8</u>**

As set forth in the FSLIC's 1984 Report to Congress, the type of thrift problems facing the FSLIC shifted dramatically from a predomination of interest spread problems in 1982 to asset quality problems in 1984 involving thrifts with real estate investments and other illiquid assets.

Tr. 3937:12-25; 3945:21-3946:5 (Stearns); PX 342 at 25 at Chart 3.[1] Asset quality problems were far more costly to resolve than spread problems. See Tr. 3939:20-3940:2, 3942:21-3943:3 (Stearns). By 1984, 70 percent of the cases where FSLIC resolved problem thrifts were asset quality problems. Tr. 3942:21-24 (Stearns); PX 342 at 23. The FSLIC's 1985 Report to Congress again noted the shift in the type of problems affecting the FSLIC's caseload:

> Prior to 1983, a large majority of FSLIC problem cases involved interest rate spread difficulties. In the last two years, severe asset quality problems, which are much more complex as well as more expensive to resolve, have predominated.

Tr. 3954:16-21 (Stearns) (quoting PX 375 at 25).

**Reply:**

DPFOF 8 is accurate but irrelevant. Accepting that the FSLIC was starting to see by 1984 more asset quality problems than interest rate problems, there is no evidence that this had any effect on the FSLIC's or FHLBB's decision-making with respect to Suburbia. Suburbia was a critical supervisory issue in 1984, and it had to be resolved. (*See* Plaintiff's Proposed Findings of Fact (hereinafter PPFOFs) 103-127). The fact that the FSLIC had other problem institutions whose problems were of a different nature than Suburbia's problems doesn't change these facts.

**DPFOF 9**

Government policy in the early 1980s operated on the assumption that market interest rates would decline and alleviate, at least partially, the problems of the thrift industry. DX 1147 at 25 ¶ 87.[2] As Dr. Pratt testified, the measures FSLIC had available to it at the time were

---

1 **Defendant includes multiple references in its PFOFs to PX 342, the FHLBB/FSLIC Annual Report for 1984. However, PX 342 was never admitted in evidence. The version of the report admitted into evidence was DX 197.**

2 Dr. Pratt testified that, at the time, he had stated that, if interest rates stayed the same:

stopgap measures, undertaken in an effort to buy time, in the assumption that interest rates would come down. Tr. 115:15 -116:12 (Pratt). Had interest rates not fallen, no thrifts would have survived. Tr. 128:21-129:10 (Pratt). With interest rates at all-time historical highs, the general consensus was that interest rates would fall. Tr. 1175:21-1176:11 (Beesley). Interest rates did, in fact, decline in the mid-1980s, easing the spread problems for thrifts. Tr. 1238:15- 1240:10 (Beesley).

**Reply:**

Plaintiff does not dispute that the first sentence of DPFOF 9 is an accurate quote from Dr. Carron's report (as cited). However, the citation in Dr. Carron's report to pp. 79-80 of "Agenda for Reform," (DX 1147) does not support the conclusion that it was "government policy" to assume that interest rates would come down. That was certainly the hope, because, as both Dr. Pratt and Mr. Beesely noted, the thrift industry might not survive if they did not come down.

More importantly in terms of this case, though, government regulators did not always have the luxury of waiting for interest rates to decline. When an institution's "accounting capital" got to about 2 percent, that institution would be on the FSLIC's "priority list." By the

---

> there's some good news and some bad news. The bad news is that every thrift will fail and go away, it cannot survive. The good news is it will clearly be the smallest problem in the U.S. economy. So had the prime rates stayed at 21 percent, had Treasury bonds stayed at 13, every thrift would have failed, but it wouldn't have even been noticed because of the other havoc that would be wreaked. So our entire tenure [sic] was one assuming that interest rates would come down but not predicting they would. If they didn't come down, there was nothing lost in modernizing the industry. If they did come down, a lot of economic value would return to these balance sheets and they would have a chance of survival.
>
> Tr. 115:19-116:7 (Pratt).

time it got to 1 percent, the FSLIC was hopefully on its way to a resolution. When that capital got to zero percent, something the FSLIC never allowed to happen, it would have been illegal to keep the institution open. (Beesely, Tr. 1154, line 21 to p. 1157, line 2.) Also, regulators recognized, as Mr. Beesely noted, there were always going to be some institutions that were so damaged by high interest rates that they were unlikely to survive even if rates fell. (Beesely, Tr. 1192, line 6 to p. 1194, line 2). Dr. Kaplan believed Suburbia's embedded losses would have been an insurmountable obstacle to its survival no matter what happened to interest rates. (*See*, PPFOF 104). Similarly, Mr. Vigna recognized in October 1984 that the regulators no longer had the luxury of waiting for lower interest rates as a potential solution for Suburbia's problems. He believed Suburbia's situation was critical and required immediate resolution. (*See*, PPFOFs 106 and 127).

**DPFOFs 10 and 11**

By 1983, FSLIC could not afford to liquidate all troubled thrifts. See PX 286 at 76; Tr. 1233:5-1234:6 (Beesley). Specifically, in 1983, at a time when Suburbia had $700 million in assets, the FSLIC liquidated only six small institutions in the entire United States, whose assets cumulatively totaled $295 million, with the average asset size totaling only $49 million. PX 286 at 18, 20-21; Tr. 1234:7-1236:12 (Beesley). None of these institutions were located in the Northeast United States, and the problems that predominated were asset quality problems (e.g., loans that were not being repaid), not interest rate differential or interest "spread" problems. PX 286 at 20-21. In 1983, none of the liquidations involved actual payouts of funds to depositors. Tr. 1230:2-12; Tr. 1231:22-1233:4 (Beesley).

In 1984, for the entire United States, the FSLIC liquidated only nine institutions, with combined deposits of $829 million, with the size of the average thrift totaling $92 million. PX 342 at 26. As the FSLIC noted, "severe asset quality problems" predominated as the FSLIC undertook resolution actions in 1984. PX 342 at 23. There were no thrift liquidations in the Northeast in 1984. Tr. 3948:4-19 (Stearns); PX 342 at 26; PX 232 at WOL315 0205; Tr. 1504:17-19 (Vigna).

**Reply:**

See Plaintiff's replies to DPFOFs 7 through 9.

**DPFOF 12**

Going into 1985, the FSLIC's concern was very simple: to strengthen the FSLIC fund. Tr. 3948:20-3949:11 (Stearns); PX 342 at 27. Indeed, by the end of 1984, the FSLIC's financial condition was so dire that, when examining the audited financial statements of the FSLIC, the Comptroller General of the United States reported to the FHLBB that there could be no opinion given as to the adequacy of the insurance fund to meet future claims against it. Tr. 3949:12-3950:2 (Stearns); PX 342 at 79.

**Reply:**

DPFOF 12 is accurate but irrelevant. Suburbia's condition reached "critical" in 1984, and, as Mr. Vigna recognized, the regulators had no choice but to resolve it when they did. (*See* PPFOFs 106 and 127).

**DPFOF 13**

Given the state of FSLIC's finances in 1984 and 1985, the last resolution that the FSLIC would have pursued for Suburbia, an institution of about $700 million in assets that had interest spread problems, would have been liquidation. Tr. 3959:19-3960:4 (Stearns).

**Reply:**

This is Mr. Stearns's opinion. He had no personal involvement with the Suburbia case, having just arrived at FSLIC, and he had little or no familiarity with it. (Stearns, Tr. 3960, line 15 to p. 3961, line 10). However, the facts belie his conclusion that liquidation of Suburbia in 1984 was not "feasible." (*See* Reply to DPFOF 7). The FSLIC did not have to be in a position to liquidate every troubled thrift in order to liquidate Suburbia.

**DPFOF 14**

To deal with these problem thrifts and the FSLIC's lack of capital, FSLIC was "forced . . . to come up with solutions that would prevent cash payouts. We just didn't have the cash available . . . . And so we were forced to find ways to close down the sick institutions without using up cash." Tr. 3939:2-8 (Stearns). FSLIC came up with innovative ways to resolve problem thrifts in a manner avoiding liquidation, "invent[ing] one about every two months." Tr. 3943:19-23 (Stearns); PX 342 at 23. These innovations included the issuance of capital certificates, setting up Phoenix corporations (whereby several troubled thrifts were merged to create a new institution), and management consignment programs. Tr. 3943:15-3944:4 (Stearns); PX 342 at 23.

**Reply:**

DPFOF 14 is accurate but irrelevant. Mr. Stearns arrived at the FSLIC in August 1984, and, as he noted, the resolution of Suburbia by the FSLIC took place only two months later. He had no involvement in Suburbia's resolution other than to sign the papers and pass them along to the FHLBB. (Stearns, Tr. 3960, line 15 to p. 3961, line 10). Therefore, when he describes "innovative techniques" developed at the FSLIC during his tenure, he is necessarily talking about things that happened after Suburbia was resolved. None of the techniques he mentioned was considered by the FSLIC or the FHLBB as a possible solution for Suburbia. (*See* PPFOFs 158, 159, and 200-205).

**DPFOF 15**

In 1985, as one step to protect the FSLIC's insurance fund, the FHLBB adopted regulatory measures to bring the classification of thrift assets into conformity with commercial bank regulators, requiring increased reserves for classified problem loans. Tr. 3953:10-3954:4 (Stearns); PX 375 at "The Chairman's Report" (p. v.).

**Reply:**

DPFOF 15 accurately summarized Mr. Stearns testimony, but it is irrelevant to the topic being discussed.

**DPFOF 16**

In 1985, for the entire United States, the FSLIC liquidated only ten institutions, with the average institution liquidated holding $189 million in deposits. PX 375 at 27. None of these institutions were located in the Northeast. Id.

**Reply:**

DPFOF 16 is accurate, so far as it goes. Although the 10 institutions liquidated in 1985 represented only a slight increase over 1984, the size and complexity of the operations steadily increased. In 1984 the average liquidation involved deposits of $92 million with the largest case involving deposits of $306 million. In 1985, the average liquidation involved deposits of $189 million – double the 1984 level – and included the largest institution ever in terms of the number of accounts, a thrift with 96,541 accounts totaling $410 million in deposits, and the largest institution ever in terms of deposit base, a thrift with 16,722 accounts totaling $463.2 million in deposits, representing an increase of 51.3 percent over the largest deposit base liquidated in 1984. (PX 375 at p. 27). In its Institution Analysis of Suburbia prior to the Fidelity acquisition, the FSLIC said Suburbia had $602 million in deposits. (PX 1243). Suburbia's deposits were therefore only 30 percent larger than the largest deposit base liquidated in 1985.

**DPFOF 17**

Between 1980 and 1989, no New York thrift under Mr. Vigna's supervision was liquidated. Tr. 1503:14-16 (Vigna); Tr. 4127:25-4128:2 (Albanese). When the FSLIC did liquidate thrifts during this time period, it did so primarily where a thrift had bad assets, rather than a mere interest spread problem, which affected the majority of thrifts in the United States.

**Reply:**

The first sentence of DPFOF 17 accurately summarizes the testimony cited. However, it says nothing about whether Suburbia would have been liquidated had Fidelity not acquired it. (*See* Reply to DPFOF 9).

The second sentence of DPFOF 17 is simply argument. The Department gives no Record cite to support it as a Finding of Fact.

**DPFOF 18**

Fidelity acquired Dollar Federal Savings & Loan Association ("Dollar") on June 30, 1982. Tr. 1020:2-7 (Teurfs); Tr. 1396:23-1397:2 (Vigna); JSF ¶ 1. The acquisition of Dollar consisted of a takeover of assets and the assumption of existing liabilities outstanding at the date of acquisition. Fidelity paid no cash or other consideration in connection with the acquisition. PX 1283 at AST060064; JSF ¶ 1. Fidelity acquired approximately $105 million in assets from Dollar; it increased its branches from 4 to 8; and it increased its deposits by almost $70 million, to a total of $273.4 million. JSF ¶ 2; PX 1283 at AST060064; PX 986 at AST064 173.

**Reply:**

Plaintiff makes no objection to DPFOF 18.

**DPFOF 19**

Fidelity accounted for the acquisition of Dollar as a purchase. The goodwill generated in the Dollar acquisition, or excess cost over fair market value of the net assets acquired, was $25,815,000. JSF ¶ 3; Tr. 1050:23-25 (discussing PX 1283 at AST060064) (Teurfs). This amount was being amortized to expense over thirty years using the straight-line method. Tr. 1076:23-1077:5 (Teurfs); PX 1283 at AST060064. Regulations existing at the time of the Dollar acquisition permitted Fidelity to utilize this goodwill toward its regulatory capital computations. See United States v. Winstar Corp., 518 U.S. 839, 850 (1996).

**Reply:**

Plaintiff makes no objection to DPFOF 19.

**DPFOF 20**

Fidelity recorded $28 million in discounts on the mortgage loans acquired from Dollar. These discounts were to be accreted into income over ten years using the sum-of-the months digit method. JSF ¶ 4; PX 1283 at AST060064. Accordingly, when Fidelity undertook its acquisition of Dollar, it understood that – at the latest – ten years after its acquisition, or by 1992, it would face as an expense the continued amortization of the Dollar goodwill without any corresponding accretion of income from the loan discounts to offset that expense.

**Reply:**

Plaintiff makes no objection to the first sentence of DPFOF 20.

The second sentence of DPFOF 20 is simply argument by the Department. It provides no Record citations which would support it as a finding of fact.

**DPFOF 21**

Fidelity acquired, in connection with the Dollar merger, Dollar's loans to condominium/cooperative developers. Tr. 1397:21-1398:8 (Vigna). Fidelity's November 1, 1982 Report of Examination ("RoE"), PX 90, records that Fidelity had an excessive concentration in loans to condo/coop developers, including Gerald Guterman, as a result of the Dollar acquisition. Tr. 1508:22-1509:22 (Vigna). Fidelity experienced substantial losses from these loans to Mr. Guterman and his enterprises – losses that had nothing to do with the Suburbia acquisition. Tr. 1510:2-8 (Vigna).

**Reply:**

The first sentence of DPFOF 21 is not fully supported by the Record citation, but Plaintiff does not dispute the accuracy of the sentence.

The second sentence is somewhat misleading. The 1982 Report of Examination, PX 90, notes at pages 12 and 12a (AST029158 and 59) that eight loans involving cooperative or condominium developments were considered by the examiner to be "of supervisory interest or concern." Of the eight loans, all of which were noted to be performing satisfactorily, three involved Gerald Guterman.

The third sentence of DPFOF 21 is partly inaccurate. Mr. Vigna did not say that Fidelity suffered substantial losses from "these loans" (i.e., the three Guterman loans referenced in PX 90). Rather he testified that there was "a substantial increase in the number of loans to Mr. Guterman and his enterprises." Some of these loans (i.e., the "substantial increase") failed to perform and resulted in losses to Fidelity. (Vigna, Tr. 1510, lines 2-5). Plaintiff does not challenge Mr. Vigna's conclusion that the Guterman loans had nothing to do with the Suburbia acquisition, except to note that the loans made to Mr. Guterman and to other developers were part of an effort by Fidelity to increase earnings which it would need to amortize the goodwill added in the Suburbia acquisition.

**DPFOF 22**

With the implementation of FIRREA's capital rules, Fidelity was required to phase out the remaining Dollar goodwill on its books as a component of regulatory capital, or approximately $19.3 million, by the end of 1989. PX 526 at AST008365. At that time, the Dollar goodwill, for which Plaintiff has no contractual claim, constituted 13.5 percent of the total goodwill set forth on Fidelity's books. PX 1314A at Ex. 15.

**Reply:**

DPFOF 22 is not supported by the Record citations. Further, DPFOF 22 is irrelevant. Plaintiff has not asserted any claim related to the goodwill from the Dollar Federal transaction, nor has Plaintiff included the Dollar Federal goodwill in any of its damage calculations.

**DPFOF 23**

Like Fidelity, Suburbia was a Long Island thrift, but, with almost $700 million in assets, was substantially larger than Fidelity in terms of asset size, deposits and branches. PX 1245 at PAA047 0484.

**Reply**:

DPFOF 23 is not completely supported by the Record citation, which lists Suburbia's asset size as of February 29, 1984 as $656.1 million. However, it does establish that Suburbia was the larger of the two institutions in terms of assets, savings deposits and number of branches.

**DPFOF 24**

Suburbia had been profitable until around 1979 or 1980, when a negative trend in operating profitability developed due to the high cost of funds, or short term liabilities, relative to the low interest income received on its long-term loans, or assets. This caused an interest "spread" problem. Like all savings and loans, Suburbia suffered from spread problems. Tr. 1021:6-16 (Teurfs).

**Reply:**

DPFOF 24 is not fully supported by the Record citation, however, with the exception of the last sentence, Plaintiff does not dispute the proposed finding. The last sentence misstates Mr.

Teurfs's testimony. He said "many" savings and loans suffered from spread problems in the early 1980s. He did not say "all" savings and loans did so.

**DPFOF 25**

Suburbia's spread problem "was a consequence of the historical structure of savings and loans, with a balance sheet of long-term fixed-rate assets and a liability side of the balance sheet that was priced at interest rates moving with the market. "At that point in time we were in a period of very high interest rates, and because the assets and returns on the asset side were fixed, most – many thrifts had a negative spread and were operating at severe losses." Tr. 1502:23-1503:1 (Vigna). Suburbia's operating losses were "due mainly to the high cost of money and a below average yield on assets." DX 3113 at OAA005 2534; Tr. 1502:15-16 (Vigna); see also Tr. 4122:20-4123:11 (Albanese).

**Reply:**

After the first three words, the entirety of the fist two sentences is a quote from Mr. Vigna's testimony and should be punctuated as such. Also, the quote begins on line 19 of p. 1502, not line 23. Plaintiff has no objection to the substance of DPFOF 25.

**DPFOF 26**

Suburbia did not have serious asset quality problems. Tr. 4123:12-15 (Albanese); Tr. 1503:2-4 (Vigna). As Plaintiff admits: "Suburbia's asset portfolio was mainly thirty-year single family mortgage loans." Pl. Mem. (Feb. 15, 2007) at 11. Suburbia's management team was also not a concern to its regulators. Tr. 4116:2-12, 4123:16-18 (Albanese); PX 145 at AST033085; DX 3141 at WON758 0048. Other than its spread problems, Suburbia had no other problem that significantly affected its performance. DX 3490 at 16:17-17:5, 24:17-25:13 (Kane).

**Reply:**

Plaintiff has no objection to the first two sentences of DPFOF 26. Plaintiff also does not object to the third sentence, although it notes that of the four Record citations given, only the second of the two citations to Mr. Albanese's testimony actually supports the sentence.

Plaintiff has no objection to the last sentence of DPFOF 26 as an expression of Mr. Kane's opinion, but Plaintiff questions seriously the weight that should be accorded to that opinion. Dr. Kaplan testified that by 1984 Suburbia's history of losses, coupled with the riskier loans it was putting on its books in an effort to grow out of its problems, made it highly unlikely that Suburbia could have survived as a stand-alone institution even if interest rates fell and alleviated its spread problem. (*See* PPFOFs 100 through 104). Mr. Vigna also believed that in 1984 Suburbia's condition was such that the regulators no longer had the option of waiting to see if interest rates came down. (*See* PPFOF 106). Finally, even Mr. Kane admitted that if Suburbia had not merged with Fidelity, its capital would eventually have gone negative. (*See* PPFOF 105).

**<u>DPFOF 27</u>**

Suburbia had operated relatively free of supervisory concern prior to the precipitous upturn in market interest rates in 1979-1980. PX 232 at WOL315 0206. Mr. Kane, Suburbia's CEO and chairman of its board, testified that, if interest rates had come down in the early 1980s, Suburbia would no longer have faced an operating deficit and would have started to return to favorable operating results. DX 3490 at 22:4-17 (Kane).

**Reply:**

Plaintiff has no objection to the first sentence of DPFOF 27, which is a direct quote from the S Memorandum.

Plaintiff very much objects to the second sentence of DPFOF 27. Defendant has taken liberties with the context of Mr. Kane's statement. The testimony cited by the Defendant to support the sentence, testimony from Mr. Kane's deposition, was given in the context of a letter Mr. Kane wrote to Mr. Vigna on May 16, 1980.[3] Mr. Kane was asked how he expected Suburbia to return to profitability "at the time [he] wrote that letter." (DX 3490 at p. 22, lines 4 and 5). So, what Mr. Kane actually said was that, in mid-1980, he thought Suburbia could turn around if interest rates came down. That opinion is irrelevant to this case, since we know that interest rates did come down after 1980, but did not restore Suburbia to profitability, and, as noted in the reply to DPFOF 26, by 1984 it was apparent to the regulators and even to Mr. Kane that Suburbia could not survive as a stand-alone institution.

**DPFOF 28**

Lower and stable interest rates in 1983 provided a more favorable operating environment for the savings and loan industry. Approximately two-thirds of District II FSLIC-insured institutions operated profitably in the second half of 1983 and the first quarter of 1984, compared to 25% or less in late 1981 to early 1982. The proportion of institutions reporting profits increased during the second quarter of 1984. PX 232 at WOL315 0204 (Vigna).

---

[3] **The letter was identified as Defendant's Exhibit 109 at the deposition. It was admitted as PX 4 at trial.**

**Reply:**

The first and second sentences of DPFOF 28 are direct quotes from the S Memorandum. The third sentence is not supported by the Record citation, but it may be accurate. However, Plaintiff objects to the relevance of this proposed finding on a stand-alone basis. Since the proposed finding is taken from a memorandum in which the regulators are recommending supervisory action with respect to Suburbia, it is evident that Suburbia was not part of the rosier picture suggested by this language.

**DPFOF 29**

Despite these improved operating prospects, the FHLB of NY found that many institutions remained vulnerable to fluctuations in short-term interest rates. A number of institutions in the FHLB-NY District were suffering, as Suburbia was, from the mismatch in interest rates between their assets and liabilities. Tr. 1274:7-11 (Vigna). This exposure was expected to continue until institutions were able to add additional adjustable rate assets to their portfolios and reduce the disparity between rate sensitive assets and liabilities.

**Reply:**

Plaintiff has no objection to DPFOF 29. Plaintiff would note that the first and last sentences, for which Defendant gives no Record citations, are quotes from the S Memorandum. (PX 232 at p. WOL315 0204).

**DPFOF 30**

In short, Suburbia's problem "wasn't a credit problem," but was an "interest rate" problem. Accordingly, regulators did not feel that there was a crisis with respect to Suburbia but they realized some FSLIC assistance would be needed for the thrift. See PX 237 at AA 0000177;

DX 3113 at OAA005 2534. In April, 1982, FSLIC informed Suburbia's board that it would be expected to continue to operate even if it became insolvent on a regulatory basis. PX 52 at AST021839; Tr. 1301 :22-1302:4 (Vigna).

**Reply:**

The first two sentences of DPFOF 30 are not supported by the Record citations, although Plaintiff does not dispute that Suburbia's problems stemmed from an interest rate mismatch and that the regulators approved assistance for Suburbia. Furthermore, the two sentences are completely non-specific as to time – one of the two record citations is from 1982 and the other is from 1984.

The last sentence of DPFOF 30 has no apparent relevance to any issue in this case.

**DPFOF 31**

As of July 1982, the FSLIC was reviewing a proposal to consolidate four Long Island associations, including Suburbia, with assistance. At the same time, the supervisory agent planned to continue to search for merger partners for Suburbia. The FHLBB stated, however, that if an acceptable bid was not received, or if the FSLIC did not approve the consolidation proposal, Suburbia would likely be merged into the Suffolk County FS&LA, the Long Island "Phoenix." DX 3113 at OAA005 2533-34.

**Reply:**

DPFOF 31 accurately summarized the content of DX 3113, and Plaintiff does not object to it as a summary of where the matter stood in July 1982. Plaintiff notes, however, that by 1984 FSLIC no longer had the option of merging Suburbia into the "Long Island Phoenix." That entity was sold in August 1983 to the Long Island Savings Bank, FSB ("Syosset") in August

1983. (*See The Long Island Savings Bank, FSB and The Long Island Savings Bank of Centereach, FSB v. The United States,* United States Court of Federal Claims, No. 92-517C, Opinion and Order of Judge Lettow (September 15, 2005), p. 3-7 (Syosset began negotiations with the FSLIC for the Long Island Phoenix in 1982, and, after extensive negotiations, the Assistance Agreement was executed and the transaction concluded on August 17, 1983); (Vigna, Tr. 1362, lines 4-23)).

**DPFOF 32**

In December 1982, the FSLIC held a bidder's conference to solicit proposals for an assisted acquisition of Suburbia. Bidders' packages for Suburbia were distributed to 25 potential acquirers. JSF ¶ 5; PX 232 at WOL315 0206; PX 102 at OAA005 0463; PX 237 at AA 0000178.

**Reply:**

Plaintiff does not object to DPFOF 32.

**DPFOF 33**

After the December 1982 bidder's conference, four thrift institutions from New York submitted bids to acquire Suburbia. JSF ¶ 6; PX 237 at AA 0000178; Tr. 1330:3-7 (Vigna). The present value cost estimate of the lowest cost bidder at that time, Anchor Savings Bank, was $17.9 million. JSF ¶ 10; PX 237 at AA 0000178. The present value cost estimate of the proposal of the second lowest bidder at that time, Albany Savings Bank, was $20.6 million. JSF ¶ 8; PX 237 at AA 0000178.

**Reply:**

Plaintiff does not object to DPFOF 33.

**DPFOF 34**

After the bidder's conference, new legislation became effective in early 1983 (the Garn-St. Germain Net Worth Capital Assistance Program) providing FSLIC with additional mechanisms to assist thrifts without the expenditure of FSLIC's limited cash resources. While Garn-St. Germain was intended to assist ailing thrifts, it was not intended to allow thrifts to make higher-risk loans without proper underwriting. Tr. 124:4-7 (Pratt); see also Tr. 94:17-23 (Pratt) (noting that the success of commercial lending depends upon the intelligence and execution of business strategy). Thus, Garn St.-Germain did not provide thrifts with unfettered discretion to make commercial and real estate loans regardless of the risk involved. Tr. 125:3-6 (Pratt). Moreover, Garn-St. Germain did not prevent the FHLBB from imposing standards with respect to how loans were made under the new flexibility. Tr. 124:18-125:1 (Pratt). Following the new legislation, Suburbia applied for and began receiving millions in capital in the form of promissory notes from the FSLIC and approved equity capital to boost its regulatory net worth and allow it to buy time until interest rates declined.[4] Tr. 1346:24-1347:6, 1349:13-20, 2754:3-13, 2755:2-4, 2757:2-2758:1, 2850:17-23 (Vigna) (had Fidelity not acquired Suburbia, it could still have been provided more NWCs); DX 3187 at WOH020 0330; DX 3159; PX 132 at OAA005 2590. In return, Suburbia issued NWCs to the FSLIC.

---

4 In connection with the ultimate acquisition of Suburbia in 1984, FSLIC prepared a memorandum, DX 406A (A-memo) that in part discussed the history of "shopping" procedures. This memorandum noted that the bidders conference took place prior to regulatory implementation of the Garn-St Germain legislation, which implemented the Net Worth Certificate ("NWC") program. See Tr. 203:6-12 (Spaid). Suburbia became eligible for NWCs so, instead of accepting a bid, it was sent back to the Office of Evaluation and Supervision. See Tr. 203:13-204:8 (Spaid).

**Reply:**

Defendant has provided no Record citation to support the first sentence. Plaintiff has no objection to the portion of the sentence that notes the passage of the Garn-St. Germaine Act (which dealt with more than just net worth certificates), but Plaintiff objects to the portion of the sentence beginning with the word "providing" as being simply argument by counsel.

Plaintiff does not object to the second sentence, which reflects Dr. Pratt simply agreeing to a leading question by counsel. However, the parenthetical summary of Dr. Pratt's testimony at Tr. 94, lines 17-23 is ambiguous and potentially misleading as phrased. Dr. Pratt was not referring to the intelligence and business strategy execution of the lender, which is what Defendant seems to be suggesting. Dr. Pratt's point was that, unlike mortgage lending, where rising home prices tended to mitigate the default risk over time, commercial lending involved the assumption of different risks, viz., the risk that ***the borrower*** may not act intelligently or may not successfully execute his business strategy, and the risk of a downturn in local economic conditions.

Plaintiff has no objection to the third and fourth sentences, though they are argumentative.

Plaintiff objects to the balance of DPFOF 34. As phrased, it is a highly vague and misleading summary of what Suburbia "received" under Garn-St. Germaine. Suburbia did not receive "millions." It received permission to count pieces of paper it received from the FSLIC and portions of assets it already owned as regulatory capital. As far as "buy[ing] time until interest rates declined," while that might have been the intent, Suburbia was by 1984 too weak for that to work as a strategy. (*See* Reply to DPFOF 9).

Plaintiff also objects to the parenthetical arguing that Suburbia could have continued to receive "more NWCs" had the Fidelity merger not taken place. The evidence on this issue, on which the Defendant, as the propounding party, has the burden of persuasion, is conflicting. While Mr. Vigna was eventually led by Defense counsel to agree somewhat hesitantly that Suburbia may have been able to continue to get net worth assistance even after it fell below the 0.5 percent statutory threshold, (Vigna, Tr. 2849, line 4 to p. 2851, line 9), he had previously testified to the contrary and was on record in multiple written documents sent to the FSLIC and the FHLBB in 1983 and 1984 that Suburbia would ***not*** be eligible for further net worth assistance once it fell below that threshold. (*See* PPFOFs 121-126). The Defendant has not met its burden of persuasion on this issue.

**DPFOF 35**

For the semiannual cycle ending June 1983, Suburbia received $2,950,000 in NWCs because Suburbia was experiencing losses. Tr. 4122:8-17 (Albanese). In the semiannual period ending December 1983, Suburbia requested and received an additional $2,825,000 in NWCs. Tr. 4126:18- 4127:2, 4130:10-16 (Albanese); PX 184; PX 214. Through the NWC program, the FSLIC provided Suburbia with $9.2 million in regulatory capital during 1983 and 1984. JSF ¶ 21; PX 237 at AA 0000177. Given this new assistance from the FSLIC, Suburbia chose to continue operating independently, thus rendering a merger with another thrift unnecessary. As a result, efforts to merge the association by the FSLIC were discontinued. JSF ¶ 6; PX 232 at WOL315 0206.

**Reply:**

Although DPFOF 35 is a superficial treatment of the subject, Plaintiff has no objection to DPFOF 35 except for the next-to-last sentence (beginning "Given this . . . ."). There is no Record citation to support that sentence, and there is no evidence of which Plaintiff is aware that in 1983 or 1984 Suburbia "chose" to operate independently or that the regulators would have allowed Suburbia to make such a choice. Suburbia's Board had in fact signed a consent resolution giving the regulators power to negotiate a merger or seek some other supervisory solution for Suburbia. (*See* PPFOFs 129-131).

**DPFOF 36**

Liquidation was not being considered at this point, although Suburbia continued to suffer from operating losses. Tr. 4127:18-24 (Albanese).

**Reply:**

As a stand-alone proposed finding, DPFOF 36 is vague to the point of being useless, since it does not specify what "this point" is. If one were to assume "this point" was as of April 6, 1984, the date of DX 647, the document being discussed with Mr. Albanese when he made the remark referenced in DPFOF 36, Plaintiff would have no vagueness objection to DPFOF 36, though its significance is questionable. Plaintiff would note that within a few months after April 6, 1984 the FSLIC was calculating the cost of liquidating Suburbia, PX 1243, and listing "liquidation" as one of the alternative solutions for Suburbia in the I Memorandum sent to the FHLBB, PX 237.

**DPFOF 37**

NWCs were issued retroactively. Tr. 2755:15-17 (discussing DX 3159) (Vigna). In order to qualify for NWCs, an institution had to maintain capital above 0.5 percent, but it would be able to add into that number the amount of NWCs that it applied for in any particular semiannual period. Tr. 4135:4-18, 4136:3-4138:13 (Albanese); DX 3187 at WOH020 0337- 0339. If Fidelity had not merged with Suburbia, the FHLBB could have continued to issue Suburbia NWCs to keep its net worth above the 0.5 percent threshold. Tr. 2757:22-2758:1 (Vigna).

**Reply:**

Plaintiff does not object to the first sentence of DPFOF 37 or to the first half of the second sentence (the portion before "but"). However, for the reasons set forth in its response to DPFOF 34, Plaintiff objects to the balance of DPFOF 37. As noted, the evidence on this point is contradictory, and Defendant fails to meet its burden of persuasion on this issue. Frankly, Plaintiff also believes the written statements made by Mr. Vigna in his communications to the FSLIC and the FHLBB in 1983 and 1984 that Suburbia would not be eligible for net worth assistance once its net worth ratio dropped below 0.5 percent (*see* PPFOFs 121-126) constitute the more persuasive evidence.

**DPFOF 38**

Suburbia, however, continued to search for voluntary merger partners on its own. Three months after the bidders conference in December 1982, Suburbia was exploring a voluntary merger with another institution, which was eventually unsuccessful. JSF ¶¶ 22-24; PX 102 at OAA005 0462.

**Reply:**

Plaintiff objects to the first sentence of DPFOF 38 which is vague in terms of time and which is unsupported by the Record citations. Plaintiff does not object to the remainder of DPFOF 38.

**DPFOF 39**

At the end of 1983, Suburbia was in discussion with another entity concerning a proposed conversion of Suburbia to a stock form and a purchase but Suburbia ultimately ended discussion with that prospective acquirer. JSF ¶¶ 25-27.

**Reply:**

Plaintiff has no objection to DPFOF 39 except to note that Joint Stipulation of Facts ¶ 27 is unrelated to the possible stock conversion and acquisition.

**DPFOF 40**

In 1984, FSLIC did not have the resources to liquidate Suburbia. Tr. 4185:20- 4186:7 (Albanese). Liquidation was not an option. Tr. 4187:5-7 (Albanese). FSLIC regulators responsible for managing Suburbia's potential merger viewed its problem as an interest rate spread problem – paying out more on liabilities than they were taking in on their assets. Tr. 162:18-23, 242:18-245:19 (Spaid); PX 237 at AA0000177. Because it was a spread problem, not a fraud or a severe asset problem, FSLIC did not view Suburbia's problem as a crisis or so particularly urgent that a resolution had to occur immediately. See Tr. 215:2-22 (Spaid); Tr. 3 19:1-20 (Fiol) If interest rates were to change favorably, Suburbia's condition could improve. Tr. 162:24-163:10 (Spaid).

**Reply:**

Plaintiff objects to the first two sentences of DPFOF 40. Mr. Albanese addressed the FSLIC's reserves in terms of "liquidating institutions" (plural), not in terms of "liquidating Suburbia" (singular). In order to make the transition between the two, one has to assume that if the FSLIC liquidated Suburbia it would have to liquidate every institution with a capital deficiency, and there is no evidentiary support for such an assumption. Indeed, the Record demonstrates that the FSLIC looked at the options available for Suburbia and would presumably do so for any other institution. If Mr. Albanese, whose 2007 views are the basis of the Department's support for these statements felt strongly in 1984 that liquidation was not an option for Suburbia, he did not voice that opinion in the S Memorandum (PX232) that gave the Bank Board the views of the supervisory personnel at the FHLB-NY (of which Mr. Albanese was a part) or in the I Memorandum (PX 237) in which "liquidation" was listed as one of the three alternatives for resolving Suburbia.

With respect to the balance of DPFOF 40, the Department substantially misstates or exaggerates its Record citations. Mr. Spaid, to whose testimony the Department repeatedly cites, was hardly "a regulator[] responsible for managing Suburbia's potential merger." He graduated from the University of Maryland in 1982, worked at "Gray Drug Fair" for two years, then joined the FSLIC as a financial analyst in July 1984, three months before the merger took place. (Spaid, Tr. 155, line 12 to p. 156, line 13). With respect to the Fidelity/Suburbia merger, Mr. Spaid could not recall what definition of "insolvency" would have been applied to Suburbia at the time of the merger, noting "I'm not a supervisor." Nor could he recall any discussions as to whether Suburbia's condition was such that the FSLIC had to act or whether "doing nothing"

was still an option. (Spaid, Tr. 214, line 14 to p. 215, line 22). Intending no disrespect to Mr. Spaid, it would be far more accurate to describe Mr. Spaid's role as a "staff contact," which is exactly how his name is listed in the Executive Summary that accompanied the FSLIC's recommendations to the FHLBB. (PX 238).

Mr. Fiol, whose testimony is also referenced, did a "viability analysis" of the proposed Fidelity/Suburbia merger. He recognized the style of the viability analysis as "familiar," but he had no recollection of having done the one for the Fidelity Suburbia merger, and he had no recollection of the merger. (Fiol, Tr. 293, lines 15-18; Tr. 294, line 19 to p. 295, line 9; Tr. 299, line 21 to p. 300, line 3).

**DPFOF 41**

In 1984, Suburbia discussed with regulators the possibility of its participation in FSLIC's Voluntary Assisted Merger Program ("VAMP"). Tr. 1344:16-24 (Vigna); PX 132 at OAA005 2587. In April 1984, Fidelity resolved to pursue a merger with Suburbia, and Suburbia approached regulators concerning a voluntary merger with Fidelity. JSF ¶¶ 28-29.

**Reply:**

Plaintiff has no objection to DPFOF 41.

**DPFOF 42**

Mr. Kane testified that he did not fear that Suburbia would be liquidated if it did not merge with Fidelity. DX 3490 at 40:16-25 (Kane). Indeed, Mr. Kane never seriously thought that Suburbia would be liquidated. Id. Instead, Mr. Kane explained, "maybe we would have an unfriendly merger set up by the efforts of the FSLIC, [and] have no control over any of our destinies." DX 3490 at 98:9-11 (Kane). Indeed, since Suburbia's problems were primarily due to

an interest rate mismatch, Mr. Kane explained, once interest rates declined, Suburbia's operating results were expected to turn positive. DX 3490 at 24:17-25:13 (Kane).

**Reply:**

Plaintiff objects to DPFOF 42 for the reasons set forth earlier in its Replies to DPFOF 26 and 27. While Mr. Kane may have hoped Suburbia would turn profitable, it did not. Its losses mounted, and by 1984 Mr. Vigna, its primary regulator, concluded that he no longer had the luxury of time to wait for interest rate movement and had to seek a solution for a badly deteriorated Suburbia. (*See* PPFOFs 103-106).

**DPFOF 43**

Mr. Kane viewed a merger with Fidelity as a "friendly merger," in which "we were going to have some of our directors on a combined board" and "all our management would stay in place." DX 3490 at 98:2-5 (Kane).

**Reply:**

Plaintiff does not object to DPFOF 43 as a representation of what Mr. Kane may have thought at the time of the merger.

**DPFOF 44**

Mr. Vigna believed that Suburbia would be eligible for the FSLIC's VAMP, and he recommended a maximum assistance allocation of $16 million or 2.5 percent of Suburbia's assets, which he felt would be sufficient to interest one or more potential acquirers and reasonably assure the resultant institution's long-term viability. JSF ¶ 30; PX 169 at OAA005 2713-14. Given the FHLBB's recommendation, Fidelity and Suburbia submitted a VAMP proposal in May 1984. JSF ¶ 31; PX 186 at OAA005 1793; PX 232 at WOL315 0206.

**Reply:**

Plaintiff has no objection to DPFOF 44.

**DPFOF 45**

After further consideration, the FHLBB decided that Fidelity could not acquire Suburbia under the VAMP because, by regulation, where certain FSLIC assistance (e.g., permission to amortize the value of any intangible assets resulting from the merger over 30 years) would be given in connection with the acquisition, the VAMP was not permitted. JSF ¶ 32; PX 237 at AA0000178-79; DX 406A at WOL315 0368-69.

**Reply:**

Plaintiff has no objection to DPFOF 45.

**DPFOF 46**

In July 1984, Fidelity submitted another proposal to merge with Suburbia. JSF ¶ 33; PX 185 at OAA005 0820. This second proposal was based upon the earlier VAMP proposal and the related business plan which had been reviewed previously by the FHLBB. Id.; PX 186 at OAA005 1793.

**Reply:**

Plaintiff has no objection to DPFOF 46.

**DPFOF 47**

In connection with this second proposal, Fidelity requested the same amount of FSLIC cash assistance infusion, $16 million, as had been proposed for the VAMP deal. PX 185 at OAA005 0821.

**Reply:**

Plaintiff has no objection to DPFOF 47.

**DPFOF 48**

No cash or other consideration was paid by Fidelity in connection with its acquisition of Suburbia. PX 1283 at AST060063.

**Reply:**

Plaintiff does not object to DPFOF 48, so far as it goes. However, the cited document also notes that Fidelity assumed Suburbia's excess liabilities in the transaction and undertook the liability to charge off (amortize) those excess liabilities against its earnings.

**DPFOF 49**

According to Fidelity's July 5, 1985 Report of Examination ("RoE"), Fidelity's total regulatory net worth as of September 30, 1984 was $22.429 million. PX 335 at AST002387. It had less than $23 million in book capital. Id. On a mark-to-market basis, there can be little doubt that its value was far lower than $22 million. DX 1147 at 27 ¶ 92 (Carron). Thus, Fidelity lacked the capacity to relieve the FSLIC of the burden of protecting insured depositors. Id.

**Reply:**

Plaintiff does not dispute that the referenced document states that Fidelity's regulatory net worth as of September 30, 1984 was $22.429 million. Plaintiff sees no reference on that page to "book capital." However, if Defendant intends by that term to refer to "Net Undistributed Income," Plaintiff agrees that number is less than $23 million. Dr. Carron apparently equates Fidelity's "market value" with its $22.4 million of net undistributed income. He gives no justification for that in his report and cites no authority for that assumption.

Plaintiff very much disputes Dr. Carron's assumption that Fidelity lacked the capacity to provide any benefit to the Government. As Dr. Carron later conceded, the regulators approved Fidelity as Suburbia's acquirer despite its capital position, because the regulators viewed the merger as a way of getting Suburbia off their hands. (Carron, Tr. 5807, line 3 to p. 5808, line 1). The merger relieved the regulators of the ongoing need to deal with Suburbia, and ultimately the merger was successful, and the FSLIC never had to deal with any of Suburbia's net losses. (Carron, Tr. 5807, line 14 to p. 5808, line 6).

**DPFOF 50**

Fidelity acknowledged, in its prospectus for the public offering of its stock, that: "primarily for the purpose of enhancing its retail deposit and lending franchise, the Bank acquired a number of additional branch locations through two federally assisted acquisitions of Dollar [] on July 1, 1982 and Suburbia [] on October 31, 1984." PX 986 at 4 (AST064173).

**Reply:**

Plaintiff agrees that the quote is accurate and that this may have been the intention of Fidelity's management at the time of the merger. However, the prospectus goes on to describe many other aspects of Fidelity's business plans and operations in subsequent years that have little to do with retail deposits or a retail lending franchise. See, for example, the discussion on the following page of Fidelity's diversification into mortgage-backed securities and its de-emphasis of traditional one to four family loans. (PX 986 at AST064174).

**DPFOF 51**

Fidelity began discussions with Suburbia about a potential merger "in late 1982, perhaps 1983 . . . it took a long time." Tr. 1620:23-1621:2 (Lovely). Fidelity's CEO, Mr. Lovely, was

already familiar with Suburbia. He was their customer, and believed that Suburbia had a good franchise and operation. Suburbia's franchise was desirable to Fidelity and a valuable franchise to acquire. Tr. 1621:3-16 (Lovely).

**Reply:**

Plaintiff has no objection to DPFOF 51.

**DPFOF 52**

Fidelity management "was very impressed with [Suburbia's] operation," and thought it would be a "natural growth for us, because the branches are in our general area of Long Island, and they had a very impressive kind of branch system." Tr 1561:10-1562:2 (Lovely). Suburbia was a nice bank with good locations. Tr. 1021:4-5 (Teurfs). "[Suburbia's] buildings, their franchise, their branch personnel all were very, very first class." Tr. 1624:5-6 (Lovely). As reflected in DX 3148, the geographic location of Suburbia was an important benefit to Fidelity. Tr. 1628:2-19 (Lovely). Indeed, because there was benefit from "no overlap of markets" and competing franchises - acquiring Suburbia brought Fidelity new, fresh markets. Tr. 1630:8-22 (Lovely).

**Reply:**

Though DX 3148 discusses a number of prospective advantages of the Fidelity/Suburbia merger, Plaintiff does not dispute that the Suburbia branch network was one such prospective advantage and that in 1984 it appealed to Fidelity's then current management.

**DPFOF 53**

Suburbia brought Fidelity the benefit of expanding into a new market, Suffolk County, with growth in population, income, and home values. Suburbia's business was located in areas of

Suffolk and Nassau County in which Fidelity determined there was no overlapping of branches. Tr. 1630:8-22 (Lovely); Tr. 5044:19-5050:4 (Rochester); DX 4002. As reflected in the proposed merger plan, DX 3148, the geographic location of Suburbia was an important benefit to Fidelity. Tr. 1628:15-23 (Lovely).

**Reply:**

Plaintiff has no objection to DPFOF 53.

**DPFOF 54**

Fidelity would not have done a merger or acquisition unless it believed it was reasonably likely to be beneficial to Fidelity. Tr. 1610:19-23 (Lovely).

**Reply:**

DPFOF is rather self-evident, and Plaintiff has no objection to it on that basis. However, the Record citation actually talks about what Mr. Lovely as Chairman would do rather than what Fidelity would do.

**DPFOF 55**

Fidelity's plan for its proposed merger with Suburbia, contains a discussion of the "Benefits of Merger," that indicates, from Fidelity's standpoint, how Fidelity would benefit from the Suburbia merger. Tr. 1624:18-1625:21 (Lovely).[5]

**Reply:**

Plaintiff has no objection to DPFOF 55.

---

5 PX 185 is Fidelity's proposal to acquire Suburbia. Tr. 1363:15-20 (Vigna). PX 185 was based upon Fidelity's previous VAMP proposal and related business plan, which had already been reviewed by FHLB-NY. Tr. 1364:5-11 (Vigna); PX 185 at OAA005 0820.

**DPFOF 56**

Fidelity and Suburbia felt that there were a number of benefits to be obtained through the merger. For example, according to the "Proposed Merger Plan" between Fidelity and Suburbia, the thrifts believed that, by combining the two institutions, services to depositors would be expanded and increased by introducing new services of both institutions to each other's depositors such as: discount brokerage, life insurance, debit cards, statement savings, mortgage banking, consumer loans, business loans, various plans of home improvement loans, student loans, and I.R.A. loans. DX 3148 at PAA090 0101. By offering these additional services, Fidelity felt it could better compete with commercial banks and money market funds and therefore, attract more capital into the thrift. Id. The combination of the services Fidelity and Suburbia could offer to depositors was a benefit to Fidelity that would enable growth of its franchise in its market. See PX 986 at AST064173; Tr. 1628:20-1629:3, 1664:10-25 (Lovely); DX 3488 at 42:8-23 (Greco).

**Reply:**

Plaintiff has no objection to DPFOF56 except for the last sentence. The Record references to the merger plan and to Mr. Lovely's testimony are all forward-looking, i.e., these are benefits Fidelity hoped to obtain from merging with Suburbia. None of these support the last sentence which makes the conclusory claim that Fidelity in fact received this benefit. The Record citation to Mr. Greco's testimony actually does not support any of DPFOF 56. He simply recalled that "we wanted to grow" but could not recall any details other than the fact that Suburbia "was in our back yard."

**DPFOF 57**

Fidelity, as it was contemplating the acquisition of Suburbia, did not consider engaging in what is sometimes called risk-controlled arbitrage ("RCA"), or a strategy engaging in wholesale borrowing to finance purchases of securities. See Tr. 1653:18-1654:11 (Lovely).

**Reply:**

Plaintiff objects to DPFOF 57. Mr. Lovely did not know what "risk controlled arbitrage" was, and, after he was given an inaccurate definition by Defendant's counsel, he stated: "I have no such memory." Such testimony proves nothing.

**DPFOF 58**

Fidelity did not, as it was negotiating with regulators for the acquisition of Suburbia, seek any promise or forbearance accorded with respect to: the way in which regulators would classify assets or require allowances, Tr. 1661:18-1662:10 (Lovely); who would be entitled to be their examiner, Tr. 1663:12-17 (Lovely); the method by which deposit insurance premiums would be charged not changing, Tr. 1663:18-22 (Lovely); the level of capital required could not increase, Tr 1663:23-25 (Lovely); or any waiver of the ability of the FHLBB to have regulations that took into account the thrift's exam results and to regulate its growth based on the exam results. Tr. 1664:1-9 (Lovely).

**Reply:**

Plaintiff objects to DPFOF 58 as irrelevant to any issue in this case. In addition, the Record citations to Mr. Lovely's testimony provide little support for DPFOF 58. Mr. Lovely simply said he could not recall such discussions, though with respect to the last item listed he

said it didn't sound like something he would agree to, which raises a question of how well he even understood what was being asked.

**DPFOF 59**

At the time of its merger, Fidelity intended to pursue mortgage banking, increased joint venture activity, commercial and consumer lending, discount brokerage, and equipment leasing. DX 3148 at PAA090 0109. It did not have a plan to increase its holdings of mortgage-backed securities ("MBS"), which totaled only $67.8 million out of total assets of $521.6 million as of February 1984. DX 3148 at PAA090 0118. Nor did it plan to increase its wholesale borrowings, which totaled only about $54 million at that time. Id.

**Reply:**

Plaintiff objects to DPFOF 59 as irrelevant. The Record support for the first sentence is three lines in a large multi-page plan produced by Fidelity's then current management in early 1984 when it was trying to promote a voluntary merger with Suburbia. (*See* PPFOFs 184-190). It is possible management actually intended to do these things, but there is no evidence in the Record that would support that. Fidelity began to invest in mortgage-backed securities financed through wholesale borrowings after the arrival of Mr. Wesp in 1986. (*See* PPFOFs 249, 252, 348-349,361-362, 369-373 and 375-385). Whether Fidelity had any interest in this type of investment in 1984 is meaningless, since it would not then have had the expertise to acquire and manage such a portfolio. (*See* PPFOFs 361-362).

**DPFOF 60**

Further, Fidelity stated that the management team resulting from the merger of the two associations would be "significantly strengthened." DX 3148 at PAA090 0102 (Vigna). Mr.

Kane, for one, believed that Fidelity had weak management, a concern that regulators later shared with respect to Messrs. Lovely and Greco, and the Fidelity management team then underneath them. DX 3490 at 98:19-99:12 (Kane). Fidelity concluded that Suburbia would bring management talent to Fidelity because Suburbia had competent people in many areas, and that the strengthened management team from Fidelity would add value to the combined Franchise/Suburbia franchise. See Tr. 1628:20-1630:7, 1664:10-25 (Lovely).

**Reply:**

Plaintiff objects to DPFOF 60. Again, the statement in the proposed merger plan is devoid of detail and is more characteristic of a hope than a plan. The same can be said of the cited testimony by Mr. Lovely. Fidelity hoped that the Suburbia acquisition would strengthen its management, but Defendant provides no Record support for the proposition that this in fact happened.

Mr. Kane did not describe Fidelity's management as "weak." He said it was "shallow" in that it included only Mr. Lovely and Mr. Greco with no depth beyond them. There is nothing in the Record citations to support the statement that "regulators later shared" Mr. Kane's concerns.

**DPFOF 61**

The "Benefits of Merger" described in Fidelity's proposed merger plan noted that "economies to be achieved by the merger are planned at a minimum of $1 million in overhead, including the attrition of personnel requirements." These economies of scale were projected to reach $1.1 million by 1985. DX 3148 at PAA090 0102; Tr. 1631 (Lovely); Tr. 1515:23-25, 1516:20-24 (Vigna); Tr. 5050:5-5052:3, 5109:1-5111:08 (Rochester).

**Reply:**

Plaintiff objects to DPFOF 61 as irrelevant. The referenced "economies of scale" were projections – nothing more. If the Defendant intends to rely on "economies of scale" to provide some sort of offsetting benefit, it needs to prove actual, not projected economies. There is no evidence in the Record of whether these economies or any economies were actually achieved.

**DPFOF 62**

Fidelity reported to the examiners that reductions in operating expenses were being achieved through consolidation and elimination of duplicative departments. PX 335 at AST002383.

**Reply:**

Plaintiff objects to DPFOF 62 for some of the same reasons it objected to DPFOF 61. The statement referenced simply refers to "reductions in operating expenses." It does not attempt to quantify those reductions in any way. This finding furnishes no support for a claim of an offsetting benefit.

**DPFOF 63**

Dr. Rochester, an expert witness with respect to thrift valuation, testified that the facts of this case do not indicate any reason to conclude that any net incremental additions to management or maintenance expense per unit of deposit resulted after the Suburbia/Fidelity merger. Tr. 5175:24-5176:8 (Rochester).

**Reply:**

Plaintiff objects to DPFOF 63 as vague. It is not at all clear, either from DPFOF 63 or from the testimony cited in support of DPFOF 63, what Dr. Rochester was asked and what his answer was.

At best, however, DPFOF 63 is an opinion expressed by Dr. Rochester concerning the ongoing maintenance cost of branches acquired in the Suburbia acquisition. The relevance of such an opinion is not apparent, since in giving his opinion concerning offsetting benefit, Dr. Rochester simply used the increase in deposits at the former Suburbia branches without taking into account the cost of running the branches. He admitted that Fidelity, and later Astoria, would have to manage the branches and incur the cost of operating and maintaining them. However, he made no effort to determine what portion of the increased value of those branches was attributable to the management of those branches by Fidelity or later by Astoria. (Rochester, Tr. 5106, line 10 to p. 5108, line 25; Tr. 5113, line 10 to p. 5114, line 18).

**DPFOF 64**

Fidelity's management believed that the Suburbia branches Fidelity acquired were at least as profitable as the Fidelity branches. Tr. 1665:2-6 (Lovely).

**Reply:**

Plaintiff does not dispute the accuracy of DPFOF 64, but its relevance to any issue in this case is questionable. If the Defendant is trying to prove an offsetting benefit based on the value of branches, DPFOF 64 adds nothing.

**DPFOF 65**

Fidelity knew that there were other institutions interested in acquiring Suburbia. Tr. 1625:18-1626:7 (Lovely). Fidelity expected that it could sell Suburbia branches and realize a substantial profit. Tr. 1517:6-8 (Vigna). Specifically, Fidelity's proposed merger plan indicated that it was investigating the potential sale of Suburbia branches, other financial institutions were interested in acquiring Suburbia's branches, and that "a substantial profit could be realized in the event of such a sale." DX3148 at PAA090 0111. Fidelity later elected to retain the Suburbia branches, rather than to sell them. Tr. 5054:5-5055:19 (Rochester).

**Reply:**

Plaintiff objects to DPFOF 65 as both unfounded and irrelevant.

Mr. Lovely is the sole source cited for the first sentence, but he does not or cannot identify any of the allegedly "interested" institutions, and it appears he may have been relying on a chance comment by Suburbia's Robert Miller (who is deceased and never gave testimony in this case).

Fidelity's proposed merger plan does mention the possibility of selling one or more Suburbia branches. However, as with other things talked about in that document, there is no evidence Fidelity ever seriously considered selling any Suburbia branches. Thus, there is no real basis for Dr. Rochester's conclusion that Fidelity "decided to keep them all." It is a bit like saying of a happily married couple, "they decided not to divorce."

**DPFOF 66**

Suburbia contributed the majority of the assets, deposits, and branches to the merged Fidelity/Suburbia. The merger more than doubled Fidelity's asset and deposit bases. Suburbia

contributed 58 percent of the assets, over 65 percent of the mortgages and 62 percent of the deposits of the combined entity. Suburbia contributed twelve (12) branches. As a result, Fidelity's total number of branch offices increased from eight (8) to twenty (20). See DX 3148 at PAA090 0102; JSF ¶ 58; Tr. 5041:5-5043:16 (Rochester).

**Reply:**

Plaintiff objects to DPFOF 66 as phrased. Suburbia was acquired in a supervisory merger. The verb "contribute" suggests something different.

More significantly, however, Defendant cites as references three entirely different sets of figures. They cannot all be right. Plaintiff would have no objection to using the figures stipulated to by the parties:

> Fidelity's acquisition of Suburbia on October 31, 1984 caused its assets to increase from $556.6 million to $1.3 billion and its deposits from $393.2 million to $1.0 billion. Fidelity also added 12 branches, giving it 20 total branches.

Joint Stipulation of Facts ¶ 58.

**DPFOF 67**

Fidelity characterized itself and Suburbia in the merger plan as follows: "Fidelity is currently in the commercial loan market and Suburbia is in the consumer loan market." Tr. 1640:3-1641:15 (Lovely).

**Reply:**

Plaintiff questions the relevance of DPFOF 67 to any issue in the case. Also, Mr. Lovely agreed to the characterization with some reservation, since Fidelity also did some consumer lending.

**DPFOF 68**

Deposits at the pre-merger Suburbia branches, relative to pre-merger Fidelity branches, comprise 61.8 percent of total deposits versus 38.2 percent for Fidelity. The share of deposits held by the former Suburbia branches grew absolutely and in share relative to those at the pre-merger Fidelity branches such that, by June 1994, 63.1 percent of total deposits were held in former Suburbia branches, versus 36.9 percent for Fidelity. As of June 30, 2006, the former Suburbia's branches had reached 72.7 percent of total deposits versus 27.3 percent for Fidelity. Tr. 5078:6-5081:6 (Rochester); DX4006, DX4007A-C.

**Reply:**

Plaintiff objects to DPFOF 68. The referenced figures, which are all Dr. Rochester's are suspect. The deposit figures stipulated to by the parties would put deposits at the time of the merger 39.3 percent in Fidelity branches versus 60.7 percent in Suburbia branches.

More significantly, however, the point the Defendant tries to make with these statistics is completely invalid. Dr. Rochester assumed that the former Suburbia branches just grew on their own, and he claimed all deposit growth in those branches as a "benefit" realized by Fidelity and Astoria from the acquisition of Suburbia. (DX 507, ¶¶ 18, 20, 26 and Ex. 4; DX 654). In making that assumption, Dr. Rochester ignored any investment in or management of those branches by Fidelity and Astoria. (Rochester, Tr. 5113, line 10 to p. 5114, line 18; Tr. 5137, line 23 to p. 5138, line 22). He was dismissive of huge increases in deposits under Fidelity or Astoria management at branches that had evidenced only little to moderate growth under Suburbia's management. (Rochester, Tr. 5129, line 10 to p. 5133, line 6). He also ignored extrinsic events that affected the deposit base at specific former Suburbia branches. For example, Dr. Rochester

credited large jumps in deposits in 1998 and 1999 at two former Suburbia branches to the value of the Suburbia franchise, when actually they resulted from Astoria's acquisition of Long Island Savings Bank and the consolidation of some of its branches with the former Suburbia branches then owned by Astoria. (Rochester, Tr. 5117, line 19 to p. 5127, line 24).

**DPFOF 69**

As of Fidelity's 1993 mutual to stock conversion, Fidelity retained all of its Suburbia branches. As of the date of trial, 11 of the 12 former Suburbia branches remained in business. In contrast, only five of the eight pre-merger Fidelity branches have been retained. Tr. 5055:20-5058:24 (Rochester).

**Reply:**

Plaintiff does not dispute the accuracy of DPFOF 69 except to note that in the first sentence the reference should be to "former Suburbia branches." However, for the reasons set forth in its Reply to DPFOF 68, Plaintiff objects to the relevance of DPFOF 69.

**DPFOF 70**

Suburbia contributed $282.4 million of non-time deposits to the combined entity, as compared with $180.5 million of non-time deposits contributed by Fidelity. Tr. 5074:9- 5078:1 (Rochester); DX 4005.

**Reply:**

Plaintiff objects to the relevance of DPFOF 70. Although DPFOF is not time-specific, the Record citations show it to be data as of February 1984. Such data is of marginal relevance to a merger that took place in October 1984, and is of no relevance whatsoever to the alleged

value of the Suburbia franchise to Fidelity in years after 1984 or to Astoria in years after 1994 for the reasons set forth in Plaintiff's Reply to DPFOF 68.

**DPFOF 71**

Suburbia brought to the merger a conservative mortgage lending posture, as measured by its nonperforming assets having been only 0.7 percent of total assets. In contrast, Fidelity at the same time, had 2.3 percent nonperforming assets. Tr. 5072:6-15 (Rochester); DX 4004 (citing June 30, 1984 TFRs for Suburbia, PX 180, and Fidelity, DX 3219).

**Reply:**

Plaintiff objects to DPFOF 71 on the grounds of both relevance and accuracy.

Preliminarily, the first sentence is inaccurate when it uses the term "mortgage lending." The figures used by Dr. Rochester are for all lending at the institutions.

More fundamentally, however, comparative figures as of a date several months before the acquisition and projections in a merger plan created at least eight months before the acquisition do not establish that Fidelity actually received any benefit following the acquisition from Suburbia's loan portfolio, much less a benefit conferred by the Government. Although Dr. Rochester was dismissive of the point, is not surprising that Suburbia's loan portfolio, particularly its mortgage loans, had low delinquency rates. Those loans carried rates of interest which were well below prevailing market rates. Borrowers knew that they could not get replacement financing at rates anywhere close to what they had. That provided a powerful incentive for borrowers to keep their loans current. (Rochester, Tr. 5149, line 18 to p. 5152, line 2). Notwithstanding this, Dr. Rochester looks at the book value (not the market value) of Suburbia's loans and claims these as a "benefit" to Fidelity.

In addition, Dr. Kaplan found that Suburbia, in the pre-acquisition period, was increasing its credit risk by taking on riskier types of loans in an effort to "grow its way out of its problem." (*See* PPFOFs 100-102).

DPFOF 72

The merger transaction between Suburbia and Fidelity was accounted for under the purchase method of accounting. Suburbia's assets and liabilities acquired by Fidelity were re-priced according to their market value. JSF ¶ 59.

**Reply:**

Plaintiff has no objection to DPFOF 72.

**DPFOF 73**

Fidelity recorded $105.5 million in discounts on the first mortgage loans acquired from Suburbia. These discounts were to be accreted to income using the level-yield method over the estimated remaining life of the loans. JSF ¶ 60.

**Reply:**

Plaintiff has no objection to DPFOF 73.

**DPFOF 74**

Fidelity stood to benefit through the accretion into income of the loan discounts recognized with the mark-to-market of Suburbia's loans. DX 3148 at PAA090 0197. It was Fidelity's understanding, going into the transaction, DX 3148 at PAA090 0106, that for at least the first eight years, discount accretion income would exceed goodwill amortization. Tr. 1633:22-1634:13 (Lovely). In the 12 months ending June 30, 1985, Fidelity received a $9

million benefit attributable to purchase accounting as a result of the Dollar and Suburbia mergers. Tr. 4253:14-4254:6 (discussing PX 335 at PAA006 1214) (Amend).

**Reply:**

The first sentence of DPFOF 74 is not supported by the Record citation. There is no discussion in the letter cited of loan discount accretion, and nowhere in the letter is this described by Peat Marwick as a "benefit." In fact, loan discount accretion is simply one part of purchase accounting. The second sentence is accurate, although as the transaction was actually structured, discount accretion exceeded goodwill amortization for less than eight years. Plaintiff does not contest the assertion that loan discount accretion for the 12 months ending June 30, 1985 totaled approximately $9 million. However, Plaintiff contests the characterization of that as a "benefit." It is simply part of the purchase accounting process.

**DPFOF 75**

Fidelity recorded $ 160.093 million of goodwill as a result of the merger with Suburbia. This amount represented the excess cost over fair market value of net assets acquired. The goodwill recorded was to be amortized over thirty years. JSF ¶ 61.

**Reply:**

Plaintiff has no objection to DPFOF 75.

**DPFOF 76**

Fidelity also stood to gain benefits from the merger through its use of Suburbia's significant amount of net operating loss carryovers ("NOLs"). DX 3148 at PAA090 0196. Fidelity's proposed merger plan, DX 3148 at PAA090 0196, includes a letter from its auditor, Peat Marwick, dated April 27, 1984, advising regarding Fidelity's ability to carryover Suburbia

NOLs. Tr. 1647:14-1650:19 (Lovely). Fidelity's 1984 tax return [i.e., covering the year Suburbia was acquired] shows an entry for a $74 million NOL. DX 3205; Tr. 1651:13-1652:19 (Lovely). These NOLs could be used to shield future profits of Fidelity from taxes. PX 277 at AST068399-400. In fact, between 1987 and 1993 alone, Fidelity used $18.5 million of its NOLs. PX 1283 at AST060064; PX 476 at AST058804; PX 887 at AST59673; PX 1323 at KPMG 012429.

**Reply:**

Plaintiff does not contest that Fidelity was able to carry forward and use Suburbia's net operating losses, nor does it contest that Fidelity's 1984 tax return shows $74 million in net operating losses, at least some portion of which came from Suburbia. Plaintiff cannot derive the $18.5 million figure in the last sentence from the Record citations given, nor is Plaintiff aware of any evidence that would tie such a number to net operating losses incurred by Suburbia and transferred to Fidelity in the merger. Plaintiff also objects to any attempt by Defendant to use net operating losses as an "offsetting benefit" to Plaintiff's damage claims. Defendant presented no evidence that Suburbia's net operating losses were a specific benefit conferred by the Government as part of the assisted merger. Fidelity acquired these net operating benefits as a matter of course, just like any other asset or liability of Suburbia.

**DPFOF 77**

Fidelity proposed to acquire Suburbia based on flat to increasing interest rate scenarios used for profit projections in Fidelity's proposed merger plan for FY1984-1986. Tr. 1634:14-1635:22 (Lovely). If, instead, rates dropped two to three hundred basis points in the year after acquiring Suburbia, that would increase the value of the assets Fidelity acquired from Suburbia.

Tr. 1638:11-1639:7 (Lovely). These assets would then produce a higher price if Fidelity were to sell them after acquisition. Tr. 1639:8-14 (Lovely).

**Reply:**

What Mr. Lovely actually said was that, since nobody can predict what interest rates will do, Fidelity, as part of its due diligence, looked at the proposed merger under a flat interest rate scenario, a rising interest rate scenario, and a falling interest rate scenario. The merger worked under all three scenarios. Plaintiff does not dispute the accuracy of the last two sentences of DPFOF 77. However, Plaintiff does dispute the notion that any benefit realized by Fidelity from falling interest rates represents some kind of "offsetting benefit" to any of Plaintiff's damage claims. When it acquired Suburbia, Fidelity undertook the risk of interest rate movements. While it is true that some of Suburbia's assets would increase in value if interest rates declined, it is equally true that those assets would decline in value if rates increased. As Mr. Lovely noted, Fidelity could not predict what interest rates would do.

**DPFOF 78**

Fidelity's management reported to regulators, post-FIRREA, that the franchise value continued to be maintained, and net deposits continued to grow. Tr. 5110:20-5111:8 (Rochester); PX 787 at PAA006 1583; Tr. 1697:17-24, 1699:8-22 (Lovely); PX 904 at WON 7360654.

**Reply:**

Although some of Defendant's Record citations are not precisely on point, Plaintiff does not dispute that Fidelity, both pre-FIRREA and post-FIRREA, maintained and increased the value of its franchise. Plaintiff also does not dispute that net deposits at Fidelity branches overall continued to grow post-FIRREA. Plaintiff does dispute, for reasons set forth in its Reply to

DPFOF 68, that any increase in deposits at former Suburbia branches can constitute an "offsetting benefit" to any of Plaintiff's damage claims. These deposit increases are not benefits conferred by the Government. They are a result of Fidelity's, and later Astoria's, investment in and management of the institution's branch network.

**DPFOF 79**

Fidelity's merger with Suburbia did not benefit FSLIC by relieving it of insurance exposure on Suburbia's net liabilities because the amount of deposits insured, and thus FSLIC potential liability, was not eliminated or reduced as a consequence of the merger. In assessing the merger, FSLIC prepared a pro forma balance sheet for the combined Fidelity and Suburbia, showing that the two thrifts combined would have the same insured deposit liability merged as they did apart. PX 1243 at WFZ009 0025; Tr. 262:18-264:14 (Spaid).

**Reply:**

As Mr. Spaid carefully noted, there was no expectation by the FSLIC in 1984 that Fidelity would "pay off" Suburbia's liabilities in the merger. Rather, Fidelity eliminated those net liabilities over time by fully amortizing the goodwill (excess liabilities) put on its books as a result of the Suburbia merger.

**DPFOF 80**

Whether Fidelity had sufficient capital to pay the net liabilities, was not a consideration of the FSLIC, because Fidelity was not being asked to pay the liabilities. Tr. 263:11-17 (Spaid).

**Reply:**

Mr. Spaid was speaking only to the notion of Fidelity paying off Suburbia's excess liabilities at the time of the merger. Plaintiff agrees there was no expectation that Fidelity would

do that. However, Fidelity did take on the obligation to pay off Suburbia's excess liabilities over time, and Fidelity did fully discharge that obligation.

**DPFOF 81**

According to a 1984 FHLBB Institution Analysis, the present value cost of merging Suburbia with Fidelity totaled $15,906,000. JSF ¶ 39.

**Reply:**

Plaintiff has no objection to DPFOF 81.

**DPFOF 82**

FSLIC's AED in 1984 prepared an estimate based in part on the assumptions contained therein that the present value of the total cost to the FSLIC of liquidating Suburbia would be $147.9 million. JSF ¶ 40.

**Reply:**

Plaintiff has no objection to DPFOF 82.

**DPFOF 83**

On October 15, 1984, the FSLIC, in an "I" memorandum to the FHLBB, recommended that the Board approve Fidelity's proposal for the reasons memorialized therein, including but not limited to the conclusion that Fidelity's proposal was the least costly option currently available to the Government for resolving Suburbia. JSF ¶ 41.

**Reply:**

Plaintiff has no objection to DPFOF 83.

**DPFOF 84**

The FSLIC's October 15, 1984 "I" memorandum lists "Liquidation" as an option to resolve the financial problems of Suburbia. As disadvantages of the liquidation option, the memorandum lists the fact that the cost of liquidation exceeds present value cost of the least expensive option by $131.9 million and that liquidation could weaken public confidence in the savings and loan system. The only advantage listed for liquidation is that it would be a "[f]ull solution." JSF ¶ 42; PX 237 at AA0000180.

**Reply:**

Plaintiff has no objection to DPFOF 84.

**DPFOF 85**

The October 15, 1984 Issues Memorandum lists "Fidelity" as a second option to resolve the financial problems of Suburbia. The memorandum notes that the chance of receiving a lower cost bid was a disadvantage of the Fidelity alternative. The memorandum also lists the advantages of the Fidelity alternative, noting that it was the low cost solution, it avoided the disruptive effect of liquidation, it was a projected viable solution, and that Fidelity was an in-state, mutual form similar to Suburbia. JSF ¶ 43; PX 237 at AA 0000180-81.

**Reply:**

Plaintiff has no objection to DPFOF 85.

**DPFOF 86**

The disruptive effects of liquidation included the likely loss of Suburbia's franchise value. Moreover, if FSLIC had pursued the alternative of liquidating Suburbia, a $700 million institution which suffered from mere spread problems, the signal to the thrift industry and its

customers concerning the type of institutions the FSLIC would liquidate would have been highly negative. Liquidation would have lowered public confidence in the thrift system, so FSLIC wished to avoid liquidation. Tr. 1386:18-24 (discussing PX 237 at AA 0000180) (Vigna).

**Reply:**

Plaintiff objects in part to DPFOF 86. The first two sentences are not supported by the Record citations. Plaintiff has no objection to the third sentence.

**DPFOF 87**

FSLIC had not determined that, if Fidelity's bid had not been accepted, FSLIC would have then liquidated Suburbia. Tr. 265:14-17 (Spaid). FSLIC's case analyst for the Suburbia/Fidelity merger, Mr. Spaid, stated that, in his 13-year career dealing with resolutions, including liquidations, he never liquidated a thrift that had primarily a negative spread problem. Tr. 266:6-9 (Spaid).

**Reply:**

While DPFOF 87 accurately describes the cited testimony by Mr. Spaid, that testimony is not the only evidence on the subject. The fact is that Suburbia in 1984 was in critical condition. It was losing money quarter after quarter. In "real" capital terms its capital was negative. It had embedded losses in excess of $57 million, and it was pursuing riskier loans in an effort to grow out of its problems. It was unlikely that Suburbia could recover no matter what happened with interest rates, and its principal regulator, Mr. Vigna, thought Suburbia had run out of time and needed to be resolved then and there. (*See* PPFOFs 99-106 and 121-127).

**DPFOF 88**

The FSLIC's October 15, 1984 "I" Memorandum lists "Rebid" as a third option to resolve the financial problems of Suburbia. The memorandum cites several disadvantages of the rebid alternative, noting that Suburbia had already been shopped extensively, that it continued to deteriorate and that there was a possibility of losing the Fidelity deal and gaining a higher cost deal. The memorandum notes, however, that the chance of lower cost bid being received was an advantage of the alternative to rebid the acquisition of Suburbia. JSF ¶ 44.

**Reply:**

DPFOF 88 accurately paraphrases the discussion in the I Memo of the so-called "rebid option." However, the FSLIC staff believed that any other bids the FSLIC got for Suburbia in 1984 were unlikely to be lower than the Fidelity's bid. (*See* PPFOFs 145-46).

**DPFOF 89**

According to an October 5, 1984 S-Memorandum from the FSLIC, Suburbia's outstanding NWCs would survive its merger into Fidelity and be included in the net worth of the resulting association. JSF ¶ 45.

**Reply:**

Plaintiff has no objection to DPFOF 89.

**DPFOF 90**

The FHLBB approved the plan of merger of Suburbia into Fidelity through its Resolution No, 84-582, dated October 25, 1984. JSF ¶ 46.

**Reply:**

Plaintiff has no objection to DPFOF 90.

**DPFOF 91**

In FHLBB Resolution No. 84-582, the FHLBB, as operating head of the FSLIC, approved the assumption by Fidelity of Suburbia's NWCs, issued by the FSLIC to Suburbia. JSF ¶ 47.

**Reply:**

Plaintiff has no objection to DPFOF 91.

**DPFOF 92**

The FHLBB determined that it would be necessary to provide financial assistance to prevent the probable default of Suburbia, as stated in FHLBB Resolution No. 84-582. The FSLIC agreed to contribute $16 million in cash to Fidelity, as stated in the Assistance Agreement executed by the FSLIC and Fidelity on October 31, 1984. JSF ¶ 48.

**Reply:**

Plaintiff has no objection to DPFOF 92.

**DPFOF 93**

The approval of Suburbia's acquisition by Fidelity was, like all such approvals, merely a stop-gap measure intended to buy FSLIC time for interest rates to fall so that thrifts' asset values would no longer be exceeded by their liabilities' costs industry-wide. Tr. 115:7- 19:4 (Pratt).

**Reply:**

DPFOF 93 is a distortion of the cited testimony of Dr. Pratt. Dr. Pratt left the Federal Home Loan Bank Board in mid-1983, more than a year before the Bank Board's approval of the Fidelity/Suburbia merger. He had no personal knowledge of the merger. (Pratt, Tr. 123, lines 6-20). Dr. Pratt also agreed that there were times when the regulators could no longer delay the

resolution of a troubled institution, and he described his reference to "buying time" as referring to the industry in general and not to particular institutions. (Pratt, Tr. 116, lines 8-25).

**DPFOF 94**

FSLIC's liquidation analysis and cost estimate was based upon nine assumptions. Tr. 167:9-24 (Spaid). One of the assumptions was that the recovery of the market value of Suburbia's assets would be lower than their book value, with the reduction in value driven in significant part by interest rates. Tr. 248:5-19 (Spaid); Tr. 316:6-19 (Fiol). Interest rates affect the liquidation cost estimate; the higher the rate, the higher the present value costs. Tr. 316:15-19 (Fiol).

**Reply:**

Plaintiff has no objection to DPFOF 94.

**DPFOF 95**

FSLIC's 1984 liquidation estimate, DX 406A at WOL315 0548, is a snapshot in time as to what it would cost if all liquidation assumptions were true and FSLIC were to liquidate the thrift on that date. Tr. 318:3-19 (Fiol). If interest rates were to change after the liquidation estimate, that would change the liquidation estimate. Tr. 318:20-25 (Fiol).

**Reply:**

Plaintiff has no objection to the first sentence of DPFOF 95, although it is based more on a leading question by defense counsel than on testimony by Mr. Fiol. The second sentence is potentially misleading. Mr. Fiol was asked only about a change in interest rates, *i.e.*, about a change in only one of the nine assumptions on which the liquidation cost estimate is based. It is unrealistic to look only at interest rates. Had the liquidation cost estimate been performed

subsequent to 1984, it is likely that many, if not all of the components of the analysis would have changed. As a result, even if there was a benefit from falling interest rates, that benefit might well be reduced or offset entirely by changes in other components of the analysis. (Kaplan, Tr. 3344, line 22 to p. 3351, line 22).

**DPFOF 96**

FSLIC assumed the market interest rate yield for mortgages was 14.73 percent. Tr. 249:7-10 (Spaid); PX 1243 at WFZ009 0021.

**Reply:**

Plaintiff does not object to DPFOF 96, although it is poorly phrased. It should note that this is the interest rate assumed in the 1984 liquidation cost analysis for Suburbia.

**DPFOF 97**

FSLIC assumed an increasing interest rate scenario in determining whether to rebid, and in preparing its liquidation analysis. PX237 at AA 0000178; Tr. 250:18-21 (Spaid); Tr. 315:13-24 (Fiol).

**Reply:**

Plaintiff believes the cited reference to an "increasing interest rate scenario" in the I Memo is ambiguous as to time. However, Plaintiff agrees that the cited testimony by Messrs. Spaid and Fiol do appear to support DPFOF 97. Plaintiff notes that, in determining how a rebid analysis or liquidation cost analysis might change over time, it is unrealistic to look solely at interest rates. (*See* Plaintiff's Reply to DPFOF 95).

**DPFOF 98**

If the assumption of an increasing interest rate scenario proved to be incorrect, FSLIC's liquidation cost estimate would not be reliable. Tr. 250:6-11 (Spaid).

**Reply:**

*See* Plaintiff's responses to DPFOFs 95 and 97.

**DPFOF 99**

Interest rates observed in the mortgage market tend to correlate with the ten-year Treasury rate. Tr. 317:15-318:2 (Fiol). In 1984, when a thrift borrowed money, whether a depositor liability or a CD, those rates generally tended to move in the same direction and at the same speed as Treasury rates. Tr. 318:3-9 (Fiol).

**Reply:**

Plaintiff does not object to DPFOF 99 as an accurate summary of Mr. Fiol's opinion and observations. However, Mr. Fiol was neither offered nor qualified as an expert on interest rates, and this opinion testimony should be accorded little weight.

**DPFOF 100**

Instead of increasing in accordance with the increasing interest rate scenario projected for the proposed merger/liquidation analysis, interest rates dropped about 300 basis points in about a year or less. Tr. 250:22-251:3 (Spaid); Tr. 317:6-22 (Fiol).

**Reply:**

Plaintiff objects to DPFOF 100. The cited testimony by Messrs. Spaid and Fiol is vague and anecdotal. Defendant put in evidence Federal Reserve Board interest rate tables, (Spaid, Tr. 251, line 18 to p. 257, line 16; DX 512-514). If Defendant wants to prove how specific interest

rates moved over specific time periods, it should use the data from those sources, not hazy and inconsistent recollections by witnesses.

**DPFOF 101**

Thrifts generally borrow short term and lend long term. Tr. 285:12-14 (Spaid). Interest rates affect not only what the bank will earn on assets, but the liabilities side of the balance sheet. Tr. 284:5-10 (Spaid). As interest rates change, it affects the expense of the bank that it has to pay to finance its mortgage assets. Tr. 286:7-10 (Spaid). Short rates tend to correlate most with the borrowing or liabilities side of a bank, like the rates it pays on deposits and CDs. Tr. 285:25-286:4 (Spaid).

**Reply:**

Plaintiff does not object to DPFOF 101.

**DPFOF 102**

Although FSLIC had assumed an increasing interest rate scenario with respect to liquidation costs, and in explaining why it elected not to rebid, see PX 237 at AA 0000178, if FSLIC had pursued a rebidding process in the event that Fidelity's bid was not accepted, after October 15, 1984, FSLIC would have been in a scenario in which interest rates were decreasing. Tr. 250:22-251:3, 286:11-22 (Spaid).

**Reply:**

While DPFOF 102 is more or less faithful to what defense counsel led Mr. Spaid to say, the implication that the overall cost of rebidding or liquidation would have gone down after 1984 if interest rates went down is not accurate. (*See* Plaintiff's Replies to DPFOFs 95 and 97).

**DPFOF 103**

Whenever a thrift resolution was considered, the FSLIC performed viability and liquidation cost analyses; the liquidation cost analysis was performed not because liquidation was being considered, but because these analyses were required by law. Tr. 1178:16-1180:7 (Beesley). As part of FSLIC's assessment, FSLIC had to demonstrate that the resolution mechanisms it was recommending (in this case, merger with Fidelity), was lower than the cost of liquidation. Tr. 264:15-265:3 (Spaid); Tr. 314:19-22 (Fiol). Liquidation, therefore, was always mentioned as an alternative in assessments of proposed acquisition transactions provided to the FHLBB by FSLIC. Accordingly, the fact that assessments of resolutions of troubled thrifts were accompanied by cost comparisons to liquidation did not mean FSLIC was actually considering liquidation as more likely than not to occur or even a reasonable possibility – such comparisons were a procedure required by law. See Tr. 117:23-118:4 (Pratt); Tr. 265:9-13 (Spaid); Tr. 314:23-315:4 (Fiol).

**Reply:**

The first sentence of DPFOF 103 partially misstates Mr. Beesley's testimony. His testimony did not include the portion that reads, "the liquidation cost analysis was performed not because liquidation was being considered." That is editorializing by the Defendant.

The same is true with respect to the subsequently cited testimony by Dr. Pratt. He merely noted, as did Mr. Beesley, that any proposed solution must, by statute, be less than the cost of liquidation. The only cited witnesses who said liquidation costs would be calculated whether or not liquidation was viewed as an alternative were Messrs. Spaid and Fiol, and they simply agreed with leading questions by defense counsel.

So, while the point the Defendant seeks to make may be accurate, it is at best marginally supported by the Record citations offered.

**DPFOF 104**

FSLIC policy made liquidation in the form of paying out funds to depositors a last alternative. See PX 112 at D3-0006238-43(March 24, 1983 draft memorandum describing official FSLIC policy and describing the options used before liquidation); Tr. 1224:9-1226:14 (Beesley); see also PX 35 (February 2, 1982 pre-liquidation options memorandum). In 1984, liquidation was FSLIC's last option. Tr. 267:13-20 (Spaid).

**Reply:**

As noted in its Reply to DPFOF 5, Plaintiff does not dispute the accuracy of Defendant's description of what is in the memoranda, but it does dispute their relevance to this case based on the absence of any evidence the memos were ever consulted or followed in connection with the Fidelity/Suburbia merger and the testimony by Mr. Stearns, Director of FSLIC at the time of the merger, that he did not believe he ever saw these memos.

**DPFOF 105**

Liquidations were not considered for thrifts that had prospects for growth. Tr. 1193:9-21 (Beesley).

**Reply:**

Plaintiff objects to DPFOF 105 as totally unsupported by the cited testimony of Mr. Beesley. He neither said nor implied what is stated in DPFOF 105.

**DPFOF 106**

There were several forms of resolutions that were known as "liquidations" that fell short of a payout of funds to depositors. Tr. 1197:12-1199:1 (Beesley). After the liquidation of Economy Savings by the FSLIC in 1980, the FSLIC stopped doing liquidations that involved the payment of funds to depositors. Tr. 1170:16-1171:22 (Beesley); Tr. 4341:21- 24 (Engelke). Thus, even where liquidation by the FSLIC was chosen, after 1980, the cost of a payout connected with a liquidation was avoided by the FSLIC during the 1980s. Tr. 1227:16- 1228:5 (Beesley). Even after the FSLIC stopped doing payout liquidations, however, it continued to calculate "liquidation cost" in relation to the cost of a payout of funds to depositors, and not the cost of lesser forms of liquidation that it actively pursued after 1980. Tr. 1226:15-24 (Beesley).

**Reply:**

DPFOF 106 is largely, though not completely accurate. It glosses over Mr. Beesely's testimony that, although the Economy Federal liquidation was the last "payout" type liquidation done while he was at the FSLIC, it might have done "one or two" since then (though he did make the point that such "payout" type liquidations are "very expensive and very rare"). (Beesley, Tr. 1197, lines 12-19; Beesley, Tr. 1227, line 16 to p. 1228, line 5).

**DPFOF 107**

If a particular alternative to liquidation were adopted but the thrift failed to thrive, FSLIC would not immediately proceed to liquidation. Tr. 1217:11-19 (Beesley). FSLIC continued to insure the surviving thrifts following mergers. Tr. 1217:25-1218:3 (Beesley). If a merger partner could not be found when FSLIC first searched for one, FSLIC could re-bid the thrift, looking for inter-state or inter-industry acquirers. PX 112 at D3-0006246-47; Tr. 1213:13-1215:21

(Beesley). In this case, if Fidelity's bid had not been approved, FSLIC would not have given up on Suburbia and recommended that it be liquidated. Tr. 272:11-22 (Spaid). As Mr. Stearns said: "We had a number of institutions the same size as this one, and there was no way that we could liquidate any of them. I mean, it just wasn't feasible." Tr. 3960:2-4 (Stearns). FSLIC instead would have sought to rebid Suburbia. Tr. 272:11-22 (Spaid).

**Reply:**

While the text of DPFOF 107 accurately summarizes the snippets of testimony cited, little weight should be attached to DPFOF 107. Mr. Beesely left the FSLIC more than a year before the Fidelity/Suburbia merger, and he had nothing to do with the merger. (Beesley, Tr. 1142, lines 3-13; Tr. 1176, lines 12-21). However, Mr. Beesley acknowledged that there came a time when regulators no longer had the luxury of time in the case of a severely troubled institution, and he noted further that some institutions were in such bad shape that they could not be saved, even if interest rates fell. (*See* Plaintiff's Reply to DPFOF 9). As noted in the Reply to DPFOF 40, Mr. Spaid was only two years out of college and newly arrived at the FSLIC at the time of the Fidelity/Suburbia merger. He would not have been the decision-maker on what to do about Suburbia if the Fidelity merger came off the table. While Mr. Stearns did head up the FSLIC at the time of the merger, he was newly arrived at the agency and had little experience, and it is simply not accurate to say that the FSLIC could not have liquidated Suburbia. (*See* Plaintiff's Replies to DPFOFs 7 and 13). Mr. Vigna, on the other hand, was a senior regulator who was deeply involved in the resolution of Suburbia, and it was his view that the regulators had run out of time with Suburbia by October 1984. (*See* PPFOF 106).

**DPFOF 108**

Alternatives to Suburbia's liquidation or 1984 merger with Fidelity were rebidding and do nothing, meaning that Suburbia would continue under the NWC program. Tr. 175:2-23 (Spaid). Prior to the merger, in April 1982, FSLIC had informed Suburbia that it would be expected to continue to operate even if it became insolvent on a regulatory basis. PX 52 at AST021839; Tr. 1301:22-1302:4 (Vigna). Thereafter, given that Suburbia had spread problems, and not asset quality or fraud issues, FSLIC could have simply done nothing had the Fidelity offer not materialized, or prolonged Suburbia's independent existence through issuance of NWCs, hoping for interest rates to drop. Tr. 1272:4-15, 1278:19-21 (Vigna).

**Reply:**

DPFOF 108 is highly misleading. Mr. Spaid was vague to the point of evasiveness on whether or how the FSLIC could have rebid Suburbia, and it is clear from his testimony that the FSLIC had never looked at what the cost of rebidding would be. (Spaid, Tr. 175, line 15 to p. 181, line 7; Tr. 229, line 9 to p. 231, line 25). The regulators never told Suburbia it should continue to operate indefinitely even after it was insolvent on a regulatory basis. It told Suburbia it should continue to operate ***until it was told otherwise***. The Record citations do not support the last sentence. However, as previously noted, Mr. Vigna gave conflicting testimony on the issue of whether Suburbia could have continued to be kept alive by the issuance of new net worth certificates, and his advice to the FHLBB contemporaneous with the merger was that it could not. (*See* Plaintiff's Reply to DPFOF 34).

**DPFOF 109**

FSLIC had a lot of flexibility when it came to rebidding; it could have gone back to one of the four firms that had submitted bids after the December 1982 bid conference, such as the next best bid of approximately $17 million [as compared to Fidelity's bid of approximately $16 million] or rebid among all four prior bidders, or among the 22 or 25 who had shown interest by asking for bid packages, or it could have put together a new list. Tr. 175:19-176:20, 272:11-22 (Spaid).[6]

**Reply:**

Plaintiff objects to DPFOF 109. Mr. Spaid was all over the map on the subject of rebidding, and his testimony on the issue is not highly credible. (Spaid, Tr. 175, line 15 to p. 181, line 7; Tr. 229, line 9 to p. 231, line 25). It was obvious that if the FSLIC chose to rebid Suburbia in 1984 it was not going to get bids anywhere near so favorable as those it received two years earlier, given Suburbia's continued deterioration in those two years. (Spaid, Tr. 211, line 6 to p. 212, line 1; Tr. 230, line 18 to p. 232, line 12; Vigna, Tr. 1385, line 16 to p. 1386, line 24).

---

[6] "Not too much" time and effort would be required if FSLIC decided to negotiate with one of its prior bidders or to rebid Suburbia, which would involve an update to the prior bid package. Tr. 269:15-270:3 (Spaid). FSLIC would not have calculated the cost of rebidding itself, for example the cost of the work of negotiation or bidding. Tr. 176:21-177:25, 270:7-13 (Spaid). FSLIC's analyst for the Fidelity/Suburbia case never recommended that due to the procedural cost of rebidding, FSLIC should liquidate a thrift. Tr. 271:5-8 (Spaid). Similarly, FSLIC's analyst never recommended that, due to the procedural cost of rebidding, or, indeed, for any reason, FSLIC should volunteer to pay the average of the next four highest bids as a means of resolving a troubled thrift. Tr. 271:9-17 (Spaid). Nor was there any evident reason to think that FSLIC would do so. Id.

**DPFOF 110**

FSLIC would have cleared or qualified as likely viable, the 22 or 25 potential bidders that received bidders packages in connection with the December 1982 bidders conference. Tr. 268:1-269:22 (Spaid).

**Reply:**

DPFOF 110 is potentially misleading but, in any event, irrelevant. What Mr. Spaid actually said was that ***prior to the bidders' conference in December 1982***, there would have been some preliminary screening of potential bidders for Suburbia to make sure they were "viable" bidders. That has no relevance to the FSLIC's options or prospects, if any, in 1984 had it decided to seek new bids for Suburbia in lieu of the Fidelity deal. (Spaid, Tr. 268, line 10 to p. 269, line 1).

**DPFOF 111**

Rebidding was not rejected by FSLIC. FSLIC decided not to pursue rebidding because it had the Fidelity bid, Tr. 212:3-13 (Spaid), and, as set forth in FSLIC's October 15, 1984 "A" memorandum, FSLIC assessed the alternatives for resolving Suburbia and concluded in part that, "[d]ue to Suburbia's deteriorating financial condition and an increasing interest rate scenario, OFSLIC staff believes that rebidding will not result in less costly proposals." DX 406A at WOL315 0369. Because of Suburbia's condition and the interest-rate scenario, FSLIC did not at that time think that it would likely obtain less costly proposals if it rebid. Tr. 210:12- 212:1 (Spaid).[7]

---

[7] During the period from FSLIC's December 1982 bidders conference to its determination that Suburbia had, as of August 31, 1984, a net worth of 1.8 million and had reported an operating loss of $10 million since that conference, interest rates, measured by 6- month

**Reply:**

Rebidding was not listed as an option in the "A Memo." The only options listed in that memo were the Fidelity proposal or liquidation. (DX 406A at p. WOL315 0369). Plaintiff otherwise has no objection to DPFOF 111.

**DPFOF 112**

During the period from October 1984 to September 1985, Treasury interest rates decreased from 10.52 to 7.64 percent. DX 514 at AA-NAV-000484; Tr. 260:12-19 (Spaid). A reduction of almost 300 basis points is significant in the thrift industry. Tr. 260:20-25 (Spaid).

**Reply:**

Plaintiff does not dispute that the 6 Month Treasury Constant Maturity Rate was as stated on October 1, 1984 and September 1, 1985. Plaintiff also does not dispute that defense counsel led Mr. Spaid, who was not established to have any particular expertise on interest rates, to agree that this was "significant." The relevance of DPFOF 112 is not apparent, and Plaintiff therefore objects to it.

**DPFOF 113**

The assumption of an increasing interest rate, cited in FSLIC's "A" memorandum, and in FSLIC's "I" Memorandum, as a reason FSLIC believed rebidding would not result in less costly bids than Fidelity, was incorrect. Tr. 262:7-17 (Spaid).

---

maturity Treasury issues, increased from 8.59 percent, to a peak of 11.37 percent in August 1984, no doubt explaining, in part, Suburbia's operating loss of $10 million since December 1982. DX 514 at AA-NAV-000484; Tr. 258:4-259:8 (Spaid).

**Reply:**

Mr. Spaid did in fact agree with defense counsel that an assumption that there would be an increasing interest rate scenario after 1984 turned out to be incorrect. However, as previously noted, a variety of factors, of which interest rates were only one, governed the likely future costs of liquidations, and any decrease in liquidation cost due to lower interest rates could be offset or surpassed by increased costs based on other factors. (*See* Plaintiff's Reply to DPFOF 95). Multiple factors would determine the amount of future bids for Suburbia as well, and there is no evidence from which the Court could conclude that a drop in interest rates alone would have lowered the cost of resolving Suburbia had the regulators attempted to rebid it after 1984.

**DPFOF 114**

FSLIC's "A" memorandum, DX 406A at OAA005 550-51 (Ex. A-6), included a memorandum dated September 6, 1984, reporting that the mortgage discount rate was 14.34 percent and the loan discount rate was 14.23 percent. Tr. 316:24-317:5 (Fiol). FSLIC's fifth liquidation assumption assumed that the life of a Suburbia receivership would be three years. Tr. 317:6-10 (Fiol). After September 1984, interest rates declined substantially. Tr. 317:1-5 (Fiol). Because the liquidation analysis assumed an increasing interest rate scenario, not decreasing about 300 basis points over the next year, the liquidation analysis was not reliable. Tr. 261:8-19 (Spaid).

**Reply:**

See Plaintiff's Reply to DPFOF 95. A liquidation estimate is by definition a snapshot in time, and it would be pure coincidence if another snapshot done on a different date would yield the same number. That does not mean the liquidation estimate is not "reliable," nor, as noted,

does it mean that the estimate would go down merely because one component, interest rates, had declined.

**DPFOF 115**

As of September 30, 1984, Fidelity had $22,429,000 in total regulatory net worth, which included about $20 million in goodwill from the Dollar acquisition. Tr. 4258:5-20 (discussing PX 335 at PAA006 1219) (Amend). Mr. Amend explained that he saw “no value to the goodwill as far as if you tried to sell it, you couldn’t – you couldn’t earn anything from it, you couldn’t sell it to anyone.” Tr. 4724:23-4725:2 (Amend). At that time, Fidelity had a slight deficit in tangible capital, about $2 million. Tr. 4720:21-25, 4724:18 (Amend).

**Reply:**

Plantiff agrees that the Report of Examination cited by Defendant shows Fidelity had regulatory net worth in the amount of $22,429,000 as of September 30, 1984. However, the Record citations offered by Defendant do not support the statement that $20 million of this was goodwill from the Dollar Federal acquisition. Mr. Amend’s testimony on Fidelity’s capital was difficult to follow and was not always consistent. For instance, he said at one point Fidelity had about $20 million of goodwill from the Dollar Federal merger and at another point it had $24 to $26 million of goodwill. (Amend, Tr. 4724, line 23). Mr. Amend also had difficulty with the concept of regulatory capital and the protection it provided to the institution even if it was intangible, but he did concede that post-FIRREA Fidelity’s lower capital provided it less protection against losses and writedowns than did its much higher pre-FIRREA capital. (Amend, Tr. 4721, line 10 to p. 4731, line 25).

**DPFOF 116**

Suburbia's problems were mostly its cost of money. Fidelity had the same basic cost of money problems because it was operating in the same market, but Fidelity was performing better because it enjoyed purchase accounting benefits from the Dollar acquisition. Tr. 4732:16-4734:18 (Amend).

**Reply:**

While Plaintiff does not take issue with DPFOF 116, Defendant very much understates Mr. Amend's testimony. Mr. Amend noted that the purchase accounting benefits Fidelity received from the Dollar transaction and then from the Suburbia transaction put Fidelity in a much stronger position. It could take on the lower-yielding assets from Suburbia knowing it would have to restructure them, but also knowing it had the capital cushion to do so. Fidelity's condo conversion loans, which were then performing, also gave it a higher yield on its assets. (Amend, Tr. 4732, line 10 to p. 4737, line 8).

**DPFOF 117**

Fidelity acquired Suburbia on October 31, 1984. PX 986 at AST064173. Fidelity did not pay the Government anything to acquire Suburbia or for the goodwill that it recorded. Tr. 1506:4-9 (Vigna); Tr. 4264:20-22 (Amend). Fidelity did not have the capacity to pay off Suburbia's net liabilities, Tr. 4260:8-11 (Amend), and, in fact, there is a high probability that Fidelity was tangibly insolvent at the time. Tr. 4259:22-23 (Amend).

**Reply:**

Plaintiff has no objection to the first sentence of DPFOF 117. With respect to the second sentence and the use of the word "pay," see Plaintiff's Reply to DPFOF 48. With respect to the

third sentence, Fidelity was not asked to "pay off" Suburbia's liabilities at the time of the acquisition. The deal was specifically structured to allow Fidelity to pay them off over time. That was the essence of the purchase accounting aspect of the merger.

**DPFOF 118**

FSLIC provided Fidelity a cash contribution of $16 million. PX 253 at AST000039; PX 1283 at AST060052; PX 274 at AST069020.

**Reply:**

Plaintiff does not object to DPFOF 118.

**DPFOF 119**

After the acquisition, the Government still insured the deposits of both Suburbia and Fidelity. Tr. 1506:10-12 (Vigna); Tr. 4260:18-23, 4264:7-12 (Amend).

**Reply:**

Plaintiff does not take issue with DPFOF 119, though it would point out that, thanks to a stellar performance by Fidelity's management under very difficult conditions, the Government never had to pay out a dime on "Suburbia's deposits," thereby saving the taxpayers millions of dollars. (Vigna, Tr. 1500, line 10 to p. 1501, line 2; Albanese, Tr. 4219, lines 6-14; Amend, Tr. 4708, line 11 to p. 4711, line 17).

**DPFOF 120**

As part of the regulatory approval of the merger, the FHLBB approved the assumption by Fidelity of Suburbia's NWCs, which survived the merger and were included in Fidelity's regulatory capital computations. PX 232 at WOL315 0212. NWCs requested by Suburbia in the first half of 1984, in the amount of $925,000, were actually issued to Fidelity after the merger.

Tr. 4133:18-24, 4134:21-25, 4139:13-4140:5 (Albanese); PX 310; DX 3187 at WOH020 0328, 0337.

**Reply:**

Plaintiff does not object to DPFOF 120.

**DPFOF 121**

If Suburbia had not merged with Fidelity, it would have been eligible to apply for more NWCs, assuming the NWCs brought its capital ratio up to .5 percent. Tr. 4138:14-21; 4184:6-18 (Albanese).

**Reply:**

Plaintiff objects to DPFOF 121. (*See* Plaintiff's Reply to DPFOF 34).

**DPFOF 122**

It is possible that Suburbia was in better condition when it was acquired than it had been previously, because the amounts of NWCs it was issued actually decreased by 1984 (indicating it was in less need of NWCs). Tr. 4195:17-22 (Albanese).

**Reply:**

DPFOF 122 is nothing but rank speculation. Defendant also ignores the fact that Mr. Albanese qualified his speculation no less than four times by saying "I don't know" and that he needed to look at "reports" or "financials" before he could say whether or not Suburbia was doing any better. (Albanese, Tr. 4195, lines 2-22).

**DPFOF 123**

It is a "stretch" to assume that the alternatives listed in the FSLIC's "I" memorandum were the only ones available because FHLBB/FSLIC had an obligation to show liquidation

alternatives in the "I" memorandum. PX 237 at AA 0000177-81; Tr. 4188:19- 4189:12 (Albanese). In fact, the listing of alternatives in the "I" memorandum (PX 237) did not prelude the issuance of additional NWCs. Tr. 4191:10-19 (Albanese).

**Reply:**

DPFOF 123 is a distortion of Mr. Albanese's testimony. He did not say it was a "stretch" to assume there were no other alternatives. He said it was a "stretch" to assume liquidation was being considered as an alternative just because it was listed as an alternative. His reason for that was that there were no liquidations taking place. (Albanese, Tr. 4189, lines 3-15). However, he is wrong about that. There were increasing numbers of liquidations occurring in the early to mid-1980s, and the size of the institutions being liquidated was increasing year by year. (*See* PPFOFs 54-64).

With respect to continued issuance of Net Worth Certificates to Suburbia, Mr. Albanese made it clear that he was not saying certificates would be issued, only that it was a "possibility." (Albanese, Tr. 4191, lines 10-15). Whether that really was a possibility is very much in doubt. (*See* Plaintiff's Reply to DPFOF 34).

**DPFOF 124**

In a forbearance letter sent by the FHLBB to Fidelity after the merger had been approved, the FHLBB notified Fidelity that it could report the value of any intangible assets resulting from the accounting for the merger pursuant to the purchase method. This value could be amortized by Fidelity over a period not to exceed 30 years. PX 274 at AST069020.

**Reply:**

Plaintiff does not object to DPFOF 124.

**DPFOF 125**

The forbearance letter, id. at AST069021, states: "this letter does not and shall not be construed to constitute forbearance or waiver by the board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 1 through 7." Tr. 1519:14-24 (Vigna). The forbearance letter did not waive any of the FHLBB's rights to take into account risk in specifying capital requirements, Tr. 1519:25- 1520:3 (Vigna), or to take into account the thrift's examination results in regulating its growth. Tr. 1520:4-7 (Vigna).

**Reply:**

Plaintiff does not take issue with the accuracy of DPFOF 125. However the proposed finding is irrelevant to any issue in this case. Plaintiff has never claimed any such waivers.

**DPFOF 126**

The forbearance letter did not promise that regulatory capital requirements would never change. Tr. 1520:8-10 (Vigna). Nor did it promise that the FDIC would not become a secondary regulator of the combined institution. Tr. 1520:11-14 (Vigna). Indeed, the Government did not make any promises in the forbearance letter that the level of capital required would not increase, or that the method by which deposit insurance premiums would be calculated would not change, or that there would be no new statutes or regulations enacted. Tr. 1520:15-24 (Vigna).

**Reply:**

DPFOF 126 is irrelevant to any issue in this case. Plaintiff has never claimed that any such promises were made.

**DPFOF 127**

There was likewise nothing in the Assistance Agreement, PX 268, that prevented regulators from holding Fidelity accountable for improper, risky or nonperforming loans. Tr. 1523:17-20 (Vigna).

**Reply:**

DPFOF 127 is irrelevant to any issue in this case. Plaintiff has never claimed that the Assistance Agreement affected normal regulatory functions. Plaintiff also objects to the argumentative characterization of Fidelity's loans. Although Defendant attributes that characterization to Mr. Vigna, the words are counsel's words, not Mr. Vigna's words.

**DPFOF 128**

The Assistance Agreement did not permit Fidelity to transfer its goodwill to a third party. Mr. Vigna was not aware of any time the FSLIC consented to the transfer or assignment of goodwill. Tr. 1522:9-15, 1523:7-16 (Vigna). Mr. Amend had no recollection of goodwill or any forbearance being transferred to a third party, Tr. 4264:23-4265:4 (Amend), and Mr. Vigna testified that nothing in the Assistance Agreement would have allowed goodwill to be transferred to another party. Tr. 1526:23-24 (Vigna).

**Reply:**

DPFOF 128 is based simply on the opinions of Mr. Vigna and Mr. Amend, perhaps influenced by some very suggestive and leading questions by defense counsel. DPFOF 128 has no relevance to any issue in this case. In a but-for world where FIRREA had not taken away Fidelity's right to count the Suburbia goodwill as capital for regulatory purposes, Fidelity might never have merged with Astoria, Astoria and Fidelity might have found a way to combine in a

way that would allow the goodwill to continue to count as capital, or the regulators might have granted an exception to allow the transfer of the goodwill capital even under circumstances where it otherwise would have been extinguished. In the real world, where FIRREA did take away Fidelity's right to count the Suburbia goodwill as capital for regulatory purposes, there was never any occasion to explore these possibilities.

**DPFOF 129**

Indeed, the Assistance Agreement provided that no right under it could be transferred or vested to any other party "through merger, consolidation or otherwise," without the prior written consent of the FSLIC. PX 253 at AST000059. Moreover, it expressly stated that all of the provisions of the Assistance Agreement were for the sole benefit of Fidelity and the FSLIC, and that no other entity or person would have "any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions." PX 253 at AST000060. Thus, the goodwill created in the Suburbia acquisition could not have been sold and had no value except to the entity for which it was created. DX 3488 at 63:3-12 (Greco); see Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 162-64 (2006).

**Reply:**

This argumentative proposed finding starts out by assuming that the prior consent of the FSLIC to the transfer of any rights under the Assistance Agreement would never be granted. One can understand why the Department might make such an assumption given its own history of "take no prisoners" opposition to every aspect of this case. However, in the real world parties act, and are as a matter of law expected to act, in good faith and consents are given. (*Granite Mgmt. Corp. v. United States*, 74 Fed. Cl. 155, 161 (2006) (Under the doctrine of good faith and

fair dealing the regulators could not have withheld consent to a transfer of goodwill unreasonably)). Indeed, the possibility of FSLIC consent is apparent from the opening lines of paragraph 18 of the Assistance Agreement where it says: "All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors, and assigns." (PX 253 at AST 000059). If there was no possibility that the FSLIC would consent to a transfer or assignment, this reference to "transferees, successors and assigns" would clearly be surplussage.

However, whether or not a transfer of goodwill would have happened in the real world is irrelevant to the real issue before the Court, which involves a lost profits damages calculation done in a "but for" world. Dr. Kaplan explained repeatedly to defense counsel during his very lengthy and aggressive cross-examination that he did not try to project what would happen to Fidelity in the real world. He performed a ***damages calculation*** that was necessarily set in a "but for" world. (Kaplan, Tr. 3524, lines 7-18). That calculation had to look at years which, in the real world, were after Fidelity had been acquired by Astoria. Dr. Kaplan never offered any opinion that in the real world Fidelity would be able to transfer or assign its goodwill to Astoria or anyone else.

**DPFOF 130**

Immediately after Fidelity's acquisition of Suburbia, interest rates started to plummet. Indeed, in the one-month period between October and November 1984, interest rates declined by more than one hundred basis points (i.e., one percent). DX 514 at OAA013 0023; DX 512 at OAA013 0007; DX 513 at OAA013 0018. By November 1985, interest rates had declined by an additional two hundred basis points (i.e., by another 2 percent). DX 514 at OAA013 0023-24;

DX 5112 at OAA013 0007; DX 513 at OAA013 0018. Given that Suburbia's problems were caused by an interest rate spread mismatch, this dramatic decline in interest rates had a dramatic positive effect on the value of its assets now held by Fidelity, and this would have been the case with or without the Fidelity acquisition. This interest rate decline facilitated the sale of Suburbia's assets by Fidelity for gains that it could book toward earnings and capital.

**Reply:**

DPFOF 130 is argument by defense counsel unsupported by the testimony of any knowledgeable witness. The 6 Month and 1Year Treasury Constant Maturity rates did decline by more than 100 basis points between October 1 and November 1, 1984. The 3 Year Treasury Constant Maturity rate declined by less than 100 basis points in that same time period. All three rates continued to decline between November 1, 1984 and January 1, 1985, but all three rates then began to climb again as of February 1 and March 1, 1985. (DX 514 at OAA013 0023; DX 512 at OAA0013 0007; DX 513 at OAA013 018).

Of the three interest rates, only the 3 Year Treasury Constant Maturity had declined 200 basis points or more between November 1, 1984 and November 1, 1985. All three rates had declined further as of November 1, 1986, but they then started to climb again. By November 1, 1989 all three rates were back up to approximately where they were on November 1, 1985. (DX 514 at OAA013 0023; DX 512 at OAA0013 0007; DX 513 at OAA0013 018).

It is not surprising that the Defendant cites no Record support for the conclusions expressed in the last two sentences of DPFOF 130. They are nothing but wild speculation based on simplistic reasoning and no evidence whatsoever.

**DPFOF 131**

At the time of the acquisition of Fidelity, FSLIC insurance was calculated in relation to the size of a thrift's deposits, and not in relation to the riskiness of a thrift's assets.

**Reply:**

Plaintiffs object to DPFOF 131. It was not the subject of any stipulation, and it is unsupported by any Record citation.

**DPFOF 132**

As a result of its acquisition of Suburbia, Fidelity more than doubled in size: its assets mushroomed from $556.3 million to $1.3 billion, its deposits grew from $393.2 million to 1.0 billion, and it added 12 branches, giving it 20 total branches. PX 986 at AST064173.

**Reply:**

Plaintiff does not object to the substance of DPFOF 132. Its only objection is to the argumentative "mushroomed."

**DPFOF 133**

Fidelity accounted for the acquisition of Suburbia under the "purchase" method, by which Suburbia's assets and liabilities were re-priced according to their market value, and then recorded on the balance sheet of Fidelity. PX 1283 at AST060063. As noted above, high interest rates, which affected most thrifts in the early 1980s, caused the market value of Suburbia's liabilities to exceed the market value of its assets. Fidelity recorded $105.5 million in discounts on the first mortgage loans acquired from Suburbia. These discounts were to be accreted to income using the level-yield method over the estimated remaining life of the loans. Id. at AST060064. Fidelity recorded the amount of Suburbia's net liabilities as "goodwill," an

intangible asset. Fidelity counted this goodwill – approximately $160 million[8] – toward its regulatory capital requirements. Id. at AST060063-64.

**Reply:**

Plaintiff does not object to the first sentence of DPFOF 133.

Plaintiff does object to the second sentence. It is unsupported by any Record citation, and, although high interest rates may have been one reason why Suburbia's liabilities exceeded its assets, it is not the only reason. (*See* PPFOFs 100-104).

Plaintiff has no objection to the remainder of DPFOF 133, though there is no need to approximate the amount of the goodwill. The parties have stipulated that the amount of the goodwill was $160,093,000. (Joint Stipulation of Facts ¶ 61).

**DPFOF 134**

Under then-existing regulatory accounting rules, Fidelity was permitted to amortize goodwill over thirty years, or longer than the offsetting discount accretion period, allowing Fidelity, like other acquirers around this time, to record a "net paper profit" over the initial years following the acquisition. See Winstar, 518 U.S. 838 at 853.[9] Indeed, Fidelity projected that its

[8] PX 591 at OAA005 2188 identifies the goodwill held by Fidelity. Part of the goodwill that Fidelity held was attributable to its acquisition of Dollar. Tr. 4221:16-4222:13 (Albanese).

[9] Accretion is the accounting flip-side of amortization. Under the purchase method of accounting, the discount on an acquired thrift's below-market loans (the amount by which those loans are marked down to reflect their actual value) is "accreted" – taken into income – over the estimated life of the loans. In the 1980s, thrifts were sometimes permitted to accrete the loan discounts at a faster rate than they were required to amortize their goodwill, creating income in the years immediately following a merger. This process is explained in great detail in the Supreme Court's decision in Winstar, 518 U.S. at 85 1-53. Accretion and amortization periods normally match, so that "income" is accreted as goodwill is expensed, and no paper income is generated. See id.

loan discount accretion income from the Suburbia acquisition would exceed the goodwill amortization from the Suburbia acquisition in each of the first eight years following the merger for a cumulative total of $27.3 million. DX 3148 at PAA090 0106. Fidelity's net purchase accounting adjustments for its acquisition of Suburbia were, however, forecasted to be negative from the ninth year following the acquisition forward. Id. at PAA090 0199. Altogether, Fidelity realized discount accretion income of over $60 million as a direct result of the Suburbia merger, and solely as a result of purchase accounting. DX 1150 at 33.

**Reply:**

The first sentence of DPFOF 134 accurately summarizes what was said in the *Winstar* decision about the amortization/accretion process. However, the Fidelity/Suburbia situation was not the typical case being discussed in *Winstar* in that the amounts of the goodwill and the loan discount were not equal. The goodwill to be amortized totaled $160,093,000, while the loan discount to be accreted was only $105,500,000. (Joint Stipulation of Facts ¶¶ 60 and 61). Quite apart from the effect of any timing differences, therefore, Fidelity faced an approximately $55 million amortization expense for which there would be no offsetting accretion income.

The projections referred to in the second and third sentences were made in connection with Fidelity's earlier VAMP merger proposal and were based on financial data as of the end of February 1984. Those projections were out-of-date as of the time of the actual merger, as witnessed by the fact that the goodwill and loan discount numbers used in the projections ($127,141,000 and $76,866,000 respectively) differ substantially from the actual goodwill and loan discount numbers ($160,093,000 and $105,500,000 respectively). (DX 3148 at PAA090 0106).

The last sentence of DPFOF 134 may or may not be accurate. It is based on a calculation by Mr. Kennedy, one of the Defendant's experts. He never says Fidelity ***did*** realize $60 million in loan discount accretion income. He says Fidelity ***"should have"*** realized that amount (assuming Mr. Kennedy's calculations are correct). (DX 1150 at 33). In any event, whether Fidelity realized discount accretion income and what the amount of that income was is of little relevance to any issue in this case. The Government cannot claim it as an "offsetting benefit," since it would be a normal result of the purchase accounting process and not a benefit supplied by the Government.

**DPFOF 135**

The goodwill created when Suburbia was acquired was not equivalent to real, i.e., tangible, capital. In contrast to the goodwill used to meet Fidelity's regulatory capital requirements, "real" capital protects the deposit insurer from loss and encourages owners of thrifts, whose real capital is at stake, to operate their thrifts prudently. Landmark Land Co. v. United States, 46 Fed. Cl. 261, 273 (2000) ("While goodwill may provide leverage to magnify gains (or losses) from lending operations, it cannot protect a thrift against actual losses as capital does."), aff'd in part, vacated and remanded, 256 F.3d 1365 (Fed. Cir. 2001). Goodwill could not serve those traditional functions of capital, because it was not a "real asset;" instead, it was merely a plug figure, representing the amount by which the acquired thrift's liabilities exceeded its assets. See Cal. Fed. Bank v. United States, 43 Fed. Cl. 445, 459 (1999) (describing goodwill as mere accounting "gimmick"); vacated in part on other grounds, 245 F.3d 1342 (Fed. Cir. 2001).

**Reply:**

Plaintiff objects to DPFOF 135. It is simply argument, not a proposed finding of fact.

**DPFOF 136**

Fidelity sold many of Suburbia's assets at a profit after they had been heavily discounted as part of the "mark-to-market" of Suburbia's assets in the acquisition. See PX 986 at AST064173. Indeed, it was Fidelity's plan from the outset to restructure the assets it obtained in the Suburbia acquisition. DX 3148 at PAA090 0190; DX 3488 at 56: 19-57 :19 (Greco).

**Reply:**

The cited document does not support Defendant's statement that Suburbia's assets were "heavily" discounted. While loans on Suburbia's books at the time of the merger were marked to market, it is unclear what the Government means by the term "heavily discounted." The process of discounting the loans by marking them to market is part of purchase accounting. It is not something that was a matter of discretion on the part of Fidelity.

Plaintiff objects in part to the second sentence. While Fidelity certainly intended to restructure the assets and liabilities it acquired from Suburbia, the cited references, a Proposed Merger Plan, which was submitted to the Bank Board in May 1984, and the testimony of Mr. Greco, are an overly simplistic summary and are not definitive statements of Fidelity's plans for operation of the combined institutions.

**DPFOF 137**

In 1985 and 1986, for example, Fidelity sold $16.5 million of Freddie Mac securities acquired from Suburbia. DX 3026 at PAA006 1365. During fiscal years 1986, 1988, and 1990, Fidelity sold approximately $179,894,000 of loans acquired from Suburbia. The net purchase

discounts associated with these sold loans totaled approximately $44,735,000, and the cumulative gain on the sales was approximately $19,920,000. PX 1283 at AST060066; PX 476 at AST058798. Thus, in Fidelity's sale of Suburbia's loans, it realized nearly $20 million in immediate profits in this manner, but it did so by sacrificing over $45 million in future profits that Fidelity would have earned through the accretion of the $45 million in loan discounts associated with the assets sold. DX 1150 at 34, Table 6. Fidelity then funneled the cash generated by the asset sales into risky lending areas, like commercial real estate, construction and business lending. PX 986 at AST064173. Fidelity continued its sale of Suburbia loans for profits through 1992. PX 707 at WON730 1806; PX 887 at AST059684.

**Reply:**

Plaintiff does not object to the first sentence, except to state that the $16.5 million figure is rounded to the nearest hundred thousand. The second and third sentences are not supported by the documents because Defendant does not provide any citation for the 1990 figures, though Plaintiff does not dispute their accuracy.

Plaintiff objects to the fourth sentence. The Government derived the "nearly $20 million in immediate profits" from DX 1150, Table 6 to Mr. Kennedy's Expert Report. That table purports to show data concerning Fidelity's sales of loans acquired from Suburbia. The Government appears to refer to the $19.92 million in gains on sales in the years 1986, 1988, and 1990. (The table does not present any data for 1987 or 1989.) Even assuming Mr. Kennedy's figures are accurate, it is not clear what the Government means by characterizing the profits as "immediate" since they would have been realized 2, 4, or 6 years, respectively, after Fidelity acquired Suburbia. It is also unclear what the Government means by writing that Fidelity

"sacrificed" future discount accretions on these (and other) loans. When a discounted loan is sold, the discount is not "lost." Rather, the full discount is realized immediately, rather than being accreted over time.

The fifth sentence is argumentative and not a statement of fact. Defendant's characterization of Fidelity "funneling cash" into "risky" lending areas is not supported anywhere in the cited source, a page from Fidelity's Stock Offering Circular. That document states that Fidelity used funds realized principally from the sale of discounted assets acquired in the Dollar Federal merger (which is not at issue in this case) and the Suburbia merger to accelerate its program of asset diversification. The areas of diversification that are mentioned include "commercial real estate, construction and commercial business lending in [Fidelity's] lending area, and to some extent consumer lending." The Offering Circular does not describe these as "risky lending areas," and the Government offers no authority for that characterization. As was repeatedly noted during the trial by witnesses for both Plaintiff and Defendant, ***all*** lending involves risk.

Plaintiff has no objection to the final sentence.

**DPFOF 138**

Fidelity had a much greater concentration in construction loans – which were riskier loans than single family mortgages – compared to Suburbia. Even before Fidelity's acquisition of Suburbia, the FHLBB wrote to Fidelity expressing concern about Fidelity's high concentration of condominium and cooperative lending among three borrowers. PX 183 at AST029213; DX 3488 at 28:11-24 (Greco). Concentration in one area is of concern due to the cyclical nature of markets, and the condo/coop conversion market was risky because the loans

were made with very little equity, with high interest reserves and poor control over disbursements, leaving open the possibility that the units would not sell at expected prices or losses would be incurred. Tr. 4144:23-4146:24 (Albanese).

**Reply:**

Plaintiff objects generally to DPFOF 138 through 161 because they gloss over the very significant fact that regulators encouraged Fidelity, and other thrifts, to take advantage of new regulations and seek lending opportunities that had previously been open only to commercial banks. (*See* PPFOFs 43-46 and 274-280). The types of projects encouraged by the regulators included construction and development projects such as condominiums and shopping centers, which gave thrifts the opportunity to generate higher income. (Wesp, Tr. 1740, line 11 to p. 1741, line 3; Greco, Dep. Tr. 170, lines 4-15; Powderly, Tr. 339, lines 12-25; Powderly, Tr. 340, lines 1-18). As a result, commercial real estate lending in condominiums and cooperative units was a common practice among thrifts, including, for example, Astoria, during the mid-1980s. (Finn, Tr. 4017, line 14 to p. 4018, line 13).

Specifically as to DPFOF 138, the first sentence, which is unsupported by any references to testimony or exhibits, is objectionable in part. Plaintiff is unaware of any evidence that a construction loan is *per se* “riskier” than a single family mortgage loan. However, Plaintiff does not dispute that Fidelity, post-merger, came to have a higher concentration in construction-related lending than Suburbia historically had.

The second sentence is overly simplistic and misleading. Whatever concerns the regulators had pre-merger about Fidelity’s loan “concentrations” were not so serious as to affect the regulators’ view of Fidelity as a strong institution that was an acceptable potential merger

partner for Suburbia. Notably, there is no mention in the I-Memo of Fidelity's condo and co-op lending concentration (PX 237 at AA 0000180-AA 0000181), and Mr. Vigna testified that he had "no reservations" about Fidelity as a potential acquirer. (Vigna, Tr. 1370, lines 4-14). Even though Mr. Albanese testified that, in his opinion, Fidelity did a "lousy job" making loans and there were several red flags, Fidelity was still permitted to acquire Suburbia. (Albanese, Tr. 4200, line 10 to p. 4201, line 5). In fact, the regulators told Mr. Lovely that Fidelity was a relatively strong institution. (Lovely, Tr. 1711, line 3 to p. 1712, line 2).

Plaintiff objects to the third sentence as misleading and partially inaccurate. Mr. Albanese's cited testimony does not discuss the possibility that units would not sell at expected prices and losses would result. Also, Mr. Albanese's cited testimony discusses concentrations by property type and geographic area; not the concentrations by borrower mentioned in the second sentence.

**<u>DPFOF 139</u>**

Dollar had been involved in commercial real estate lending before it was acquired by Fidelity, and that is how Fidelity became involved with the developer Gerald Guterman. Tr. 1568:15-22, 1578:2-18 (Lovely). By 1982, Fidelity had already become engaged in lending to commercial construction developers, and already had a large project (Fairway Pines) in foreclosure. PX 115; Tr. 1645:13-1647:13 (Lovely).

**Reply:**

Plaintiff has no objection to the first sentence.

Plaintiff has no objection to the second sentence, except to echo the statements made in its general objection to Part B. and to note that Defendant provides no support for its statement

that Fairway Pines was a "large" project. Plaintiff notes that Mr. Lovely testified that Fairway Pines was successfully resolved. (Lovely, Tr. 1646, line 17).

In addition, Plaintiff refers the Court to the general objection it made in response to DPFOF 138.

**DPFOF 140**

In the December 30, 1983 RoE of Fidelity, examiners commented about loans to one borrower. Fidelity made Mr. Guterman, one of Fidelity's borrowers, its agent to deal with Fairway Pines, PX 1242 at AST029182; Tr. 1670:3-1674:14 (Lovely), even though Mr. Guterman's Glen Oaks Village was listed in the RoE's comments about loan concentration. Tr. 1674:15-1675:11 (Lovely). Indeed, Mr. Lovely admitted that "Fairway Pines was a $5 million disaster, which made our position very, very vulnerable."[10] Tr. 1670:3-15, 1679:5-1680:20 (Lovely); see also PX 335 at AST002375 (discussing "New Lending Risk Exposure" as Fidelity originated a large volume of ADC loans).

**Reply**:

Plaintiff does not object to the first sentence. However, there were no rules in the 1980s that limited the amount of an institution's capital that could be loaned to one borrower. (Wesp, Tr. 1745, line 25 to p. 1746, line 8).

Plaintiff does not object to the first half of the second sentence, even though Defendant does not cite to the relevant discussion in the RoE about the Fairway Pines project at

---

Fidelity was still dealing with Fairway Pines as of 1986. Tr. 1705:2-1707:6 (Lovely). Mr. Lovely admitted that it took Fidelity a while to work off or deal with these large developer loans and could take years to resolve them. Tr. 1707:4-6 (Lovely).

AST029190. Plaintiff objects to the second half of the second sentence as wholly irrelevant to any issue in this case.

The third sentence accurately describes Mr. Lovely's testimony at Tr. 1670, although it fails to include his testimony that Fairway Pines was ultimately successfully resolved. (Lovely, Tr. 1646, line 17). The additional citations offered for the third sentence are irrelevant.

In addition, Plaintiff refers the Court to the general objection it made in response to DPFOF 138.

Plaintiff does not object to the footnote contained in DPFOF 140.

**DPFOF 141**

On July 10, 1984, Mr. Albanese warned Fidelity about loan concentrations, particularly in multi-unit conversions to condos and coops. PX 183. This illustrates that Fidelity was engaged in such lending prior to acquiring Suburbia. Tr. 1678:1-14 (Lovely).

**Reply:**

Plaintiff has no objection to the first sentence. Plaintiff does not dispute that Fidelity was involved in this type of lending prior to the Suburbia merger; however, the Defendant's citation only supports Mr. Lovely's personal belief and is not a definitive statement. As noted above, the regulators had no reservations about the suitability of Fidelity as an acquirer for Suburbia. So, either the "warnings" were not so dire as the Department now tries to suggest, or the regulators were so desperate to find an acquirer for Suburbia that they would approve a potential acquirer involved in highly risky activities.

In addition, Plaintiff refers the Court to the general objection it made in response to DPFOF 138.

**DPFOF 142**

Beginning in 1985, however, with an enhanced cash position that resulted principally from the sale of discounted assets acquired in the Dollar and Suburbia acquisitions, Fidelity accelerated its program of diversifying into commercial real estate, construction and commercial business. PX 986 at AST064218 (Powderly).

**Reply:**

DPFOF 142 is accurate and is a nearly verbatim quote from PX 986, except that it omits the reference to diversification in consumer lending that appears in the cited sentence. Defendant's reference to Mr. Powderly appears to be an error since there is no cite to the transcript. In addition, Plaintiff refers the Court to the general objection it made in response to DPFOF 138.

**DPFOF 143**

Fidelity made concentrations of loans to a handful of investors, Mr. Guterman, Coronet, the Minskoff Group, and Louis Evangelista. The majority of these loans were concentrated in condominium and cooperative conversion projects in Manhattan. DX 3488 at 80:3-22, 99:22-100:6 (Greco); DX 63 at WON725 1296. The outstanding loans to just these four developers were equal to approximately 156 percent of Fidelity's net worth at the time. DX 63 at WON725 1296; see also Tr. 1683: 15-1685:17 (Lovely).

**Reply:**

Aside from renewing the general objection it made in response to DPFOF 138, Plaintiff has only one objection to DPFOF 143. There is an inconsistency between the two references cited for the first and second sentences. The question posed to Mr. Greco mentioned the four

developers listed in DPFOF 143. However, the four developers mentioned in the referenced exhibit did not include "the Minskoff Group" but did include a developer named "Gold."

**<u>DPFOF 144</u>**

In July 1984, the FHLBB transmitted Fidelity's RoE for December 1983 and advised the board of directors to take corrective action. Tr. 4143:1-13 (Albanese); PX 183. The number one concern was the concentrations of loans Fidelity had undertaken. They had concentrations by borrower, including Mr. Guterman, Coronet and the Minskoff Group. They also had concentrations by property type, <u>i.e.</u>, heavy engagement in coop conversions, condo conversions, and acquisition, development, and construction lending. Tr. 4143:21-4144:22 (Albanese). They also had concentrations by geographic area, mainly in New York City. The problem loans were originated by Fidelity. Tr. 4147:15-19 (Albanese).

**Reply:**

Plaintiff refers the Court to the general objection it made in response to DPFOF 138.

Plaintiff has no objection to the first sentence. Plaintiff has no objection to the second through sixth sentences because they are an accurate reflection of Mr. Albanese's testimony.

**<u>DPFOF 145</u>**

In a letter dated November 7, 1985, from Mr. Albanese to Fidelity (with a draft RoE), the FHLBB raised concerns to raise concerns about the thrift's heavy concentration in the co-op/condo market. DX 63; Tr. 4240:15-4244:2 (Amend).

**Reply:**

Aside from renewing the general objection it made in response to DPFOF 138, Plaintiff has no objection to DPFOF 145.

**DPFOF 146**

Messrs. Lovely and Greco did not fully grasp the regulator's concerns about loan concentrations. Tr. 4241:23-4242:2 (Amend). Mr. Amend was concerned with the way these loans were underwritten because there was very little borrower equity. Tr. 4242:12-22, 4246:9-20 (Amend). He was concerned that if these projects did not succeed, Fidelity could be in trouble. Tr. 4243:16-4244:23 (Amend).

**Reply:**

Plaintiff does not dispute that DPFOF 146 accurately paraphrases Mr. Amend's testimony. However, any lack of real estate expertise on the part of Messrs. Lovely and Greco does not appear to have been a problem for the regulators when they encouraged Fidelity to become more involved in commercial lending in the early 1980s. (Powderly, Tr. 830, line 10 to p. 831, line 12). In addition, Plaintiff refers the Court to the general objection it made in response to DPFOF 138.

**DPFOF 147**

In December of 1985, Mr. Lovely wrote to Mr. Albanese and indicated that Fidelity was working on the problems the thrift was experiencing. The problems were not solved, however, because the problem loans were still on the books. Tr. 4149:14-4150:20 (Albanese); DX 597.

**Reply:**

Mr. Lovely did not claim the "problems" were solved. Plaintiff has no other objections to DPFOF 147, aside from renewing the general objection it made in response to DPFOF 138.

**DPFOF 148**

The 1985 RoE was the first RoE of Fidelity issued after its acquisition of Suburbia. Tr. 4598:24-25 (Amend). The FHLBB's July 5, 1985 RoE of Fidelity found that, since its last examination in December 1983, Fidelity had become heavily engaged in the origination of acquisition, development and construction ("ADC") loans secured by condominium or cooperative units. PX 335 at AST002375. Regulators noted that ADC loans were highly speculative types of investments and involved much higher risks due to the requirement for initial heavy outlays of capital and because of their inherently volatile nature. Id. These loans also typically require a minimum period of two years for construction completion and successful sellout, during which time market conditions can change. Id. Regulators further reiterated that concentrations in lending exposed Fidelity's financial condition to excessive risk. PX 335 at AST002374.

**Reply:**

Plaintiff refers the Court to the general objection it made in response to DPFOF 138.

Plaintiff does not object to the first or second sentence.

Plaintiff objects to the third sentence, because PX 335 does not mention the "inherently volatile nature" of ADC loans. The examiner believed that Fidelity's overall risk exposure was excessive because of a "higher" risk in ADC lending (he did not explain what type of lending he was comparing it to), a lack of borrower equity in some projects, and "the varied transitional stages of the numerous outstanding projects."

Plaintiff does not object to the fourth or fifth sentences.

**DPFOF 149**

Fidelity's concentration of loans involved developers that had largely been associated with Dollar, but Fidelity increased its exposure with these developers and broadened its involvement to the point where regulatory violations were noted in the FHLBB's 1985 RoE. Tr. 4599:1-22 (Amend). Mr. Amend was concerned that Fidelity's underwriting was lacking. Tr. 4601:25-4602:22 (Amend).

**Reply:**

Aside from renewing the general objection it made in response to DPFOF 138, Plaintiff has no objection to DPFOF 149 because it accurately describes Mr. Amend's testimony.

**DPFOF 150**

Describing his concern with Fidelity's underwriting, Mr. Amend testified:

> The 1985 exam showed that Fidelity's management was restructuring the bank and putting more exposure in this area, which had been performing relatively well, actually performing well. They were earning assets. I was just worried about pretty much the concentration. And by the time I became the field manager in '87, these assets stated to exhibit signs of distress as far as their ability to perform and pay interest. As I see from all the final numbers that we brought out, there was a substantial harm to the bank from these assets over the long run, 1994 when significant losses developed.

Tr. 4709:7-18 (Amend).

**Reply:**

Plaintiff does not object to DPFOF 150 because it accurately reflects Mr. Amend's testimony. It is notable that, despite the Department's claims that the loans were excessively risky and "inherently volatile," Mr. Amend testified that in 1985 they were performing "well" and that it was not until 1987 (*i.e.*, after the 1986 Tax Reform Act) that the loans "started to

exhibit signs of distress." Plaintiff also refers the Court to the general objection it made in response to DPFOF 138.

**DPFOF 151**

In response to examiners' concerns in 1985 regarding Fidelity's origination of ADC loans, President Greco, who was in charge of the loan department (but admitted he did not monitor the loans himself), stated that Fidelity had concentrated its condominium and cooperative lending on a small number of borrowers "by design." DX 3488 at 23:2-13, 97:21-98:3 (Greco); PX 335 at AST002381; Tr. 1682:18-1683:14 (Lovely).

**Reply:**

Plaintiff objects to DPFOF 151 because it mischaracterizes Mr. Greco's testimony. First, although Mr. Greco did not monitor the loans himself, the loans were monitored by Fidelity's loan officer, Robert Hinck, who reported directly to Mr. Greco. (DX 3488 at 71, lines 9-25). Second, Mr. Greco's complete statement in PX 335 explains that Fidelity concentrated on a small number of borrowers by design because their substantial net worth afforded Fidelity a higher degree of protection.

Plaintiff also renews the general objection it made in response to DPFOF 138.

**DPFOF 152**

Mr. Greco attempted to assure regulators that Fidelity had not sought any new involvements that would add to the concentrations of construction loans. Id. However, during the month of September 1986 alone, loans totaling $6.8 million were approved by Fidelity's board to Messrs. Guterman and Evangelista. DX 3344 at AST127418-19. Moreover, in 1986 and 1987, Fidelity made two loans totaling $32 million to Glick Development, another large

developer, for development of a major tract of Manhattan real estate, and for the development of a shopping center in Queens, New York. Both loans eventually failed, Fidelity foreclosed, and the properties eventually became real estate owned ("REO") by Fidelity. PX 711 at AST002941-42.

**Reply:**

Plaintiff does not object to the first sentence. Plaintiff objects to the second sentence to the extent that it is unclear from the cited document that the Guterman and Evangelista loans were construction loans. Plaintiff objects to the third sentence because Defendant provides no citation to support the fact that these two loans were made. As a result, Plaintiff objects to the final sentence because PX 711 does not make clear that the two properties referenced are the "major tract of Manhattan real estate" and the "shopping center in Queens, New York."

Plaintiff also refers the Court to the general objection it made in response to DPFOF 138.

**DPFOF 153**

Mr. Lovely agreed that PX 360, Mr. Albanese's January 3, 1986 letter, shows that regulators were concerned with extent of Fidelity's monitoring developers, and that improvement was needed in Fidelity's monitoring of the developers to whom it had lent. Tr. 1705:2-16 (Lovely).

**Reply:**

Aside from renewing the general objection it made in response to DPFOF 138, Plaintiff has no objection to DPFOF 153. These are among the concerns that led Fidelity to hire (in 1986) Mr. Powderly, whose extensive real estate experience was the key to Fidelity's successful resolution of its problem real estate loans.

**DPFOF 154**

Messrs. Lovely and Greco were not capable of working out the problems Fidelity had. Tr. 1507:5-14 (Vigna). As Mr. Vigna testified:

> [Mr. Lovely's background] was primarily an educator. He did become president and CEO, but that was a time when it was a very vanilla, traditional savings and loan. At this point in time, it was now a very troubled institution with very highly complex workouts to be accomplished within their portfolio of very high-risk loans. He certainly wasn't capable of making judgments on those loans. And in fact, he would have to bear responsibility for the fact that they had so gotten themselves so deeply entrenched in these high-risk loans which went bad.

Tr. 1510:12-23 (Vigna). As far as Mr. Greco, Mr. Vigna testified, "I just felt that since he had been one of the major architects for these loans, didn't have the expertise to work out of them." Tr. 1510:24-1511:1 (Vigna). Mr. Powderly testified that Fidelity did not have internal procedures to monitor the resources of developers when he joined Fidelity, and that he instituted such procedures once he took over the real estate side of the business. Tr. 673:5-674:6 (Powderly).

**Reply:**

Plaintiff does not object to DPFOF 154 because it accurately reflects Mr. Vigna's and Mr. Powderly's testimony. However, this hindsight criticism by the regulators (though not by Mr. Powderly) ignores the fact that the regulators pushed Fidelity into commercial real estate lending in the early 1980s, despite the fact that Messrs. Lovely and Greco may have lacked real estate lending expertise. (Powderly, Tr. 830, line 14 to p. 831, line 12). Plaintiff also refers the Court to the general objection it made in response to DPFOF 138.

**DPFOF 155**

The fact of the matter is that Fidelity's management was roundly criticized by examiners – and Fidelity's own successor management. For example, Mr. Wesp repeatedly acknowledged the ineptitude of Messrs. Lovely and Greco. When Mr. Wesp arrived at Fidelity, "[t]here was no formal financial planning process at the bank." Tr. 1746:21-22 (Wesp). Fidelity's budgets business plans "were pretty superficial." Tr. 1746:23-1747:4 (Wesp). Fidelity's board members were not sophisticated and included "a dentist and a real estate guy and a restaurateur." Tr. 1768:12-13 (Wesp). When Fidelity needed more than very simple planning document "they didn't know how to do it." Tr. 1768:15-22 (Wesp).

**Reply:**

DPFOF 155 is unspecific as to time and therefore is of doubtful relevance. It also does not include any specific "criticism" by the examiners or any members of Fidelity's successor management team, other than Mr. Wesp.

DPFOF 155 is also overly argumentative. The fact that Mr. Wesp criticized Fidelity's financial planning does not mean its management was "inept." In fact, the regulators had not set any parameters about how serious and meaningful a savings institution's budget and business plans needed to be. (Wesp, Tr. 1746, line 17 to p. 1748, line 12). Likewise, Fidelity's board members may not have been "sophisticated" by the Wall Street standards Mr. Wesp was used to, but there is no evidence that the regulators had ever objected to the composition of Fidelity's Board or that the composition of the Board is in any way relevant to the issues in this case. As earlier noted, the regulators had no reservations about approving Fidelity as the acquirer of Suburbia. Plaintiff also renews the general objection it made in response to DPFOF 138.

**DPFOF 156**

Mr. Wesp considered Fidelity's budget projections to be "amateurish" and "absolutely useless," and, at trial, he made it clear that he didn't want the Court to "believe that I was as dumb as all the rest of them," (i.e., Fidelity's existing management). Tr. 1776:1-16 (Wesp). Later Mr. Wesp backtracked and said that while "Dumb may have been the wrong pejorative, but there's some pejorative that would have applied," to Fidelity's existing management. Tr. 2001:21-22 (Wesp). He then said that Messrs. Greco and Lovely "were inexperienced and didn't have a lot of expertise," and that "they were just way over their heads." Tr. 2002:25-2003:3 (Wesp). For example, Mr. Wesp recognized that Mr. Lovely had no interest or acumen with numbers, that he "became CEO of the bank by accident," and that he had no experience in banking. Tr. 2002:17-20, 2003:4-6 (Wesp). Moreover, Mr. Wesp faulted Mr. Lovely for not recognizing that Mr. Greco, too, did not have the financial background or ability to run a billion dollar financial institution. Tr. 2003:9-16 (Wesp). Indeed, Mr. Wesp then said that Mr. Greco "was not a sophisticated financial manager," that he "had a fairly large ego and didn't like to be told that he was wrong." Tr. 2001:22-25 (Wesp). In summation, Mr. Wesp agreed that, for the first few years he was at Fidelity, Fidelity's management was "like a dysfunctional family." Tr. 2003:17-23 (Wesp).

**Reply:**

While Plaintiff agrees that the quotes from Mr. Wesp's testimony are accurate, the overall impression of DPFOF 156 is misleading and is of doubtful relevance to the issues in this case. A more fair reading of his testimony would be that Messrs. Lovely and Greco were not stupid or incompetent, but they did lack the financial sophistication and acumen to run a billion

dollar institution, which, by virtue of the Suburbia merger, Fidelity had become. (Wesp, Tr. 2001, line 5 to p. 2003, line 16). The need to augment Fidelity's management team in the wake of the Suburbia merger was, of course, precisely why Messrs. Powderly, Wesp and Meyer were hired. (*See* PPFOFs 248-252).

Plaintiff also renews the general objection it made in response to DPFOF 138.

**DPFOF 157**

Fidelity did not have "a lot of sophisticated expertise in-house on a lot of subjects that you would have needed to get into new businesses." Tr. 1797:3-5 (Wesp).

**Reply:**

Plaintiff does not believe DPFOF 157, though accurate, is relevant to any issue in this case. This was precisely the reason why Fidelity stated in its October 1988 Business Plan that it did not plan to enter any new lines of business. (Wesp, Tr. 1796, line 23 to p. 1797, line 11). Plaintiff also refers the Court to the general objection it made in response to DPFOF 138.

**DPFOF 158**

As of October 1988, Fidelity "didn't have…a very sophisticated mortgage banking, mortgage origination operation." Tr. 1820:22-24 (Wesp).

**Reply:**

DPFOF 158, while accurate, is not relevant to any issue in this case. Plaintiff also renews the general objection it made in response to DPFOF 138.

**DPFOF 159**

Fidelity was criticized by the regulators during Mr. Wesp's tenure at the thrift for inadequate recordkeeping with regard to certain MBS investments. Tr. 1984:2-6 (Wesp).

Moreover, more than two years after Mr. Wesp arrived at Fidelity, it still did not have an investment committee. Tr. 1985:20-1986:21 (Wesp).

**Reply:**

Plaintiff objects to the first sentence of DPFOF 156, because the time period and context of the alleged criticism are completely unclear. Also, there is no issue in this case related to recordkeeping for MBS investments, so such criticism, had it occurred, would be irrelevant. The specific incident being discussed in the testimony cited by Defendant is a critical memo by an internal auditor at Fidelity about recordkeeping for CMO residuals. Mr. Wesp explained that this criticism was unwarranted and resulted from a lack of understanding by the auditor of the process of accounting for these transactions. (Wesp, Tr. 1984, line 2 to p. 1985, line 12).

Plaintiff objects to the second sentence, because it mischaracterizes Mr. Wesp's testimony. Prior to Mr. Wesp's arrival at Fidelity, Fidelity had no investment securities, and as a result, no investment committee was necessary. (Wesp, Tr. 1987, lines 2-5). When Mr. Wesp first joined Fidelity, he formed a management investment committee of himself, Mr. Powderly, Mr. Greco, and Mr. Russell to launch Fidelity's investment function. (Wesp, Tr. 1986, line 24 to p. 1987, line 2). At the first investment committee meeting, Mr. Wesp formalized the process by appointing directors to the committee. (Wesp, Tr. 1987, lines 6-10).

Plaintiff also renews the general objection it made in response to DPFOF 138.

**DPFOF 160**

In addition to a lack of investment activity, Fidelity originated few mortgages, having an "amateurish mortgage banking operation." Tr. 2089:17-2090:1 (Wesp). "Our mortgage origination operation was really Mickey Mouse. We just didn't originate that much paper.

You're really talking about the difference between making 10 loans and five loans. In a $2 billion bank, it doesn't mean anything." Tr. 2185:9-13 (Wesp). Moreover, Fidelity had "no intention of locally originating any mortgages." Tr. 2090:20-21 (Wesp). "As I said, our internal origination of any loan, whether it was an auto loan, an adjustable rate loan, a home equity loan, our internal loan generation gets lost in the rounding. It's not a meaningful number." Tr. 2099:9-13 (Wesp).

**Reply:**

DPFOF 160 is highly misleading. Mr. Wesp in fact testified that from about 1987 onward Fidelity had no intention of originating any appreciable amount of mortgages in the local market. Its plan was to buy mortgages wholesale through the purchase of mortgage-backed securities. (Wesp, Tr. 2089, line 1 to p. 2090, line15; *see* PPFOFs 375-376 and 378-380). So, the fact that Fidelity's mortgage banking operation may have been "amateurish" or "Mickey Mouse" was irrelevant to Fidelity's performance and is irrelevant to any issue in this case. Plaintiff also renews the general objection it made in response to DPFOF 138.

**DPFOF 161**

Regulators would later learn that Mr. Greco and Fidelity's chief executive officer, Mr. Lovely, had, undisclosed to Fidelity's board, obtained units for little or no downpayment in a development of Mr. Guterman's, Glen Oaks Village, which was financed with loans from Fidelity. DX 1105 at FAA008 0135-36; DX 1107 at FAA008 0122-23. As the OTS determined through its investigations, "Lovely breached his fiduciary duties to Fidelity New York by entering into personal transactions, during the period from May 2, 1984, to June 21, 1985." DX 1105 at FAA008 0135. A similar determination was made by the OTS with respect to Mr.

Greco, with his personal transactions occurring between May 6, 1984, and August 21, 1984. DX 1107 at FAA008 0122. Due to this breach of their fiduciary duties, pursuant to statutory authority, regulators obtained a consent decree from Messrs. Lovely and Greco banning them from the banking industry for life, and requiring their payment of $190,000. DX 1107; DX 1108; DX 1105; DX 1106.

**Reply:**

Plaintiff objects to DPFOF 161 because it is wholly irrelevant to any issue involved in this case. The OTS did not come into existence until after the passage of FIRREA, so this investigation took place well after the Government breached its contract with Fidelity. The Government has not alleged that anything done by Mr. Lovely or Mr. Greco had anything to do with the contract at issue in this case and has not pleaded any affirmative defense based on fraud or any other wrongdoing by Messrs. Lovely or Greco. The matters discussed in DPFOF 161 do not impact in any way the damage analysis or calculations set forth by either party. The Department repeatedly raised this issue at trial as a distraction and "smear tactic," and has revisited it in the proposed findings of fact.

DPFOF 161 is particularly inappropriate in the case of Mr. Greco. Due to his poor health, he was unable to testify at trial, so the only testimony introduced in evidence from Mr. Greco was excerpts from his deposition. He was never asked about any of this at his deposition, so the Court has never heard Mr. Greco's side of the story.

There is absolutely no evidence that Messrs. Lovely and Greco engaged in any wrongdoing. Mr. Lovely has always maintained that his conduct was proper, and he continues to believe he did nothing wrong. (Lovely, Tr. 1578, line 19 to p. 1583, line 14; Tr. 1601, lines 9-

18). Mr. Lovely explained during his trial testimony that he settled with the OTS to avoid paying increasingly high legal fees at a time when he was retired and had children in graduate school, despite the fact that he believed he had done nothing wrong. (Lovely, Tr. 1592, line 22 to p. 1593, line 12; Lovely, Tr. 1595, line 2 to p. 1596, line 11). He agreed to a settlement with the OTS because the legal fees he would have to pay to defend himself exceeded the amount for which he could settle, because he was retired and had no intention of further engaging in the banking business, and because the settlement documents made it clear that he did not admit to any OTS allegations of wrongdoing. (Lovely, Tr.1595, line 1 to p. 1598, line 24; DX 1105).

Plaintiff objects specifically to the first sentence of DPFOF 161 because there is no evidence that Messrs. Lovely and Greco obtained the units they purchased "for little or no downpayment." In fact, Mr. Lovely testified that the Glen Oaks Village properties were heavily advertised to the public, that he was not offered any type of special deal, and that he paid the same price as any member of the public for the units he purchased (approximately $18,000 per unit). (Lovely, Tr. 1579, line 21 to p. 1580, line 10; Lovely, Tr. 1581, line 22 to p. 1582, line 15). Mr. Lovely further testified that he never made any concessions to Mr. Guterman as a result of his ownership of the units, nor did he direct anyone at Fidelity to do so. (Lovely, Tr. 1583, lines 4-11).

Plaintiff objects to all of the allegations concerning OTS "findings" or "determinations." The Department presented no evidence concerning the OTS investigations of Messrs. Lovely and Greco or any specific findings or determinations made by OTS. It did not present testimony from the OTS lawyer who conducted the investigation, and it neither produced in discovery nor introduced at trial any documents describing the investigation. It presented only the voluntary

settlement agreements with Messrs. Lovely and Greco in which there are merely "allegations" by the OTS, which are neither admitted nor denied. (DX 1105 and DX 1007).

Plaintiff objects to the final sentence of DPFOF 161 as misleading. The ***total*** amount of restitution paid Messrs. Lovely and Greco was $190,000. Mr. Lovely paid $100,000 in restitution and Mr. Greco paid $90,000. In addition, at the time of the OTS consent order, both gentlemen had long since ceased to be officers or employees of Fidelity and both had officially retried, so a lifetime ban from the banking industry did not impose any real sanction on either individual. (DX 1108; DX 1106).

Finally, Plaintiff also renews the general objections it made in response to DPFOF 138.

**DPFOF 162**

By September 30, 1986, Fidelity had approximately $370.9 million – or about a quarter of the entire thrift – invested in commercial real estate, construction and commercial business loans. PX 986 at AST064173. In mid-1986, the Bank added to its management team Thomas V. Powderly, William A. Wesp, and Frederick J. Meyer, who brought expertise in commercial real estate management, development and lending, investment portfolio management and retail banking. PX 986 at AST064190.

**Reply:**

Plaintiff objects to the first sentence because it may not be entirely accurate. The cited reference says that "commercial real estate" includes "multi-family lending." In addition, the next page of the Offering Circular explains that when Fidelity reduced its commercial real estate, construction, and commercial business lending in early 1987, in part because of the effects of the Tax Reform Act of 1986, Fidelity "significantly reduced its existing portfolio of commercial real

estate, construction, commercial business and ***certain related loans*** from $370.9 million at September 30, 1986 to $207.9 million at December 31, 1989," and finally to $36.7 million as of December 31, 1992 (emphasis added). This reduction was part of an overall re-alignment of Fidelity's lending activities by its new management team. (PX 986 at AST064174). So it would appear that the $370.9 million figure cited by Defendant includes unspecified amounts of multi-family loans and unspecified amounts of "certain related loans," whatever they are.

Plaintiff does not object to the second sentence of DPFOF 162.

**DPFOF 163**

After joining Fidelity in June 1986, Mr. Powderly reviewed Fidelity's loan portfolio and decided that Fidelity should get out of commercial real estate lending as quickly as it possibly could. JSF ¶ 67; Tr. 340:19-25; 344:4-12 (Powderly). Mr. Powderly agreed that the Tax Reform Act of 1986, which was unrelated to the Suburbia goodwill, "made matters worse." Tr. 666:3-4 (Powderly); see also Tr. 1702:13-1703:15 (acknowledging negative impact of tax legislation on coop and condo market) (Lovely). The Tax Reform Act of 1986 changed the depreciation deduction on real estate investments, thus rendering these investments far less attractive, particularly for high-priced units. Whatever the cause, there is no dispute that New York was in the throes of a real estate recession during the late 1980s and early 1990s. PX 986 at AST064174; Tr. 344:24-345:9, 666:5-17 (Powderly). Mr. Lovely and Mr. Greco ultimately agreed with this decision to exit commercial lending – after initially resisting it, Tr. 655:14-16 (Powderly) – but not in time to spare Fidelity's operations from the severe effect of its bad loans.

**Reply:**

Plaintiff has no objection to the first sentence.

Plaintiff does not object to the second and third sentences, though portions of them are not supported by the cited references.

Plaintiff agrees that New York experienced a downturn or recession in the real estate market in the late 1980s and early 1990s, which was exacerbated by the effect of the Tax Reform Act of 1986.

With respect to the first part of the final sentence, Mr. Wesp did not testify that Mr. Lovely and/or Mr. Greco ultimately agreed with this decision, and it is not entirely clear that they did. However, the new management team did prevail and eventually replaced Messrs. Lovely and Greco as the managers of Fidelity. The second half of the final sentence is pure argument, and Defendant provides no evidence to support it. However, Plaintiff does not dispute the fact that Fidelity, like many other thrifts, suffered for a period of years from the effects of non-performing commercial real estate loans. (Finn, Tr. 4004, line 8 to p. 4005, line 13).

**DPFOF 164**

In September 1986, Fidelity hired Vito L. Caporusso, a banker with more than twenty-five years as a collection manager, as a vice president. PX 986 at AST064264; PX 383 at AST0705300 (Caporusso); JSF ¶ 66.

**Reply:**

Plaintiff objects to DPFOF 164 to the extent that it implies that Mr. Caporusso's prior banking experience was limited to being a "collection manager." Defense counsel tried this same demeaning tactic at trial and Mr. Caporusso corrected him. Although Mr. Caporusso had begun his banking career in the collection field, his responsibilities broadened as he gained experience, and he was exposed to, and eventually came to manage, all aspects of a consumer

credit operation. He also worked in branch operations and had exposure to virtually all areas of consumer banking. He was hired by Fidelity specifically to manage and to expand its consumer banking operations, including the development of new products and services keyed toward the consumer. (Caporusso, Tr. 3841, line 13 to p. 3846, line 18; Tr. 3889, line 19 to p. 3890, line 15; Tr. 3890, line 20 to p. 3891, line 20).

**DPFOF 165**

In July 1986, regulators noted that Fidelity had net operating income of $19 million for the twelve month period ended June 30, 1986. DX 3026 at PAA006 1365; Tr. 675:19-676:1 (Powderly). Over $8 million of this, though, was due to purchase accounting adjustments for discount accretion. DX 3026 at PAA006 1365, Tr. 676:2-677:1 (Powderly). The remainder of Fidelity's operating profits was due primarily to two factors, the favorable impact of declining market interest rates on its cost of money and increased loan fee income. DX 3026 at PAA006 1365; Tr. 677:2-10 (Powderly).

**Reply:**

Plaintiff does not object to DPFOF 165, except to question the relevance of the citations to Mr. Powderly's testimony. Mr. Powderly was not at the bank at the time under discussion. He could only affirm the text of DX 3026; he could not add any of his own insight.

**DPFOF 166**

Regulators further determined, however, that other factors would limit the improvement in Fidelity's operating results: the narrowing of the spread between discount accretion and goodwill amortization, and the effects, including the deferral of interest income on ADC loans, caused by the bank's restructuring into riskier assets, including its substantial concentration in

the condo/coop conversion real estate development. DX 3026 at PAA006 1363, 1365. In connection with the FHLBB's warnings about Fidelity's concentration of loans, regulators found that Fidelity was inadequately monitoring the financial capabilities of its major borrowers. DX 3026 at PAA006 1364, 1367.

**Reply:**

Plaintiff objects to the first sentence of DPFOF 161. The cited portions of DX 3026 do not say Fidelity was "restructuring into riskier assets." That is mere argument by defense counsel.

Plaintiff objects to the second sentence of DPFOF 161. The Examination report did not say Fidelity was not monitoring the financial condition of major borrowers. It merely explained there was insufficient documentation of such efforts. Also the Examination Report did not make a connection between loan concentrations and monitoring of major borrowers. Again, that is just argument by defense counsel.

**DPFOF 167**

By early 1987, given the grave problems it faced as a result of its commercial loan concentrations, Fidelity determined to cease such lending. PX 986 at AST064174; Tr. 340:19-25; 344:4-12 (Powderly); JSF ¶ 67. Fidelity tried to get out of the commercial real estate business, independent of FIRREA, because they believed a return to traditional thrift activity was less risky and would generate earnings. Fidelity officially adopted this course when it replaced Mr. Greco with Mr. Powderly as president in 1990. Tr. 338:11-24, 343:3-344:23, 348:1-14, 349:1-4, 357:5-13, 362:22-363:5, 365:3-14, 368:23-369:13, 398:15-399:2, 402:12-18, 432:17-24, 454:1-455:12, 492:2-7, 857:9-18, 860:11-24 (Powderly); PX 447 at OAA005 1315.

**Reply:**

Plaintiff objects generally to DPFOFs 167-182 because they ignore two significant facts. First, involvement in commercial real estate lending was prevalent in the thrift industry in the early-1980s and was not a practice unique to Fidelity. (Finn, Tr. 4017, line 14 to p. 4018, line 13). In the late 1980s, when many of these loans became non-performing and began to generate losses, many institutions suffered from problems similar to Fidelity's. (Finn, Tr. 4004, line 8 to p. 4005, line 13). Plaintiff also objects to Defendant's contention that Fidelity "belatedly" ceased commercial lending. When Mr. Powderly refused to renew balloon loans to commercial real estate borrowers starting in late 1986, the borrowers were easily able to find financing from other thrifts who were still engaged in such lending activities. (Powderly, Tr. 342, lines 6-18). Even as late as 1989, other thrifts believed diversification away from residential mortgages was the only way thrifts would continue to be profitable in the future. (Powderly, Tr. 369, lines 8-13; PX 465 at AST0703799).

Second, DPFOFs 167 through 182 do not adequately credit the tremendous effort put forth by Mr. Powderly and others on Fidelity's senior management team to resolve Fidelity's commercial real estate problems and the significant achievements made in this area. Mr. Powderly stopped all of Fidelity's commercial real estate lending by 1987, including the small number of loans he was contractually obligated to extend through late 1987. (Powderly, Tr. 348, line 1 to p. 349, line 4; Powderly, Tr. 668, lines 1-5). As a result of Mr. Powderly's efforts, Fidelity significantly reduced its commercial loan portfolio between September 1986 and the start of FIRREA in December 1989. (PX 986 at AST064174).

Specifically as to DPFOF 167, Plaintiff objects to the first sentence because it is not supported by any of the cited sources. The sources indicate that Fidelity ceased commercial lending because it foresaw potential problems due to the Tax Reform Act of 1986 and the related downturn in the real estate market. There is no evidence that Fidelity stopped commercial lending because of problems with loan concentrations.

Plaintiff objects in part to the second sentence. Although the cited references to Mr. Powderly's testimony indicate that he curtailed commercial lending prior to FIRREA, they also make it clear that those efforts continued post-FIRREA under the Capital Plan.

Plaintiff objects to the third sentence because it is misleading. Fidelity's efforts to reduce its commercial real estate lending began well before Mr. Powderly became president in 1990. Fidelity had completely stopped commercial lending in late 1987, after it fulfilled all its existing contractual obligations. (Powderly, Tr. 348, lines 1-14).

**DPFOF 168**

The Manhattan real estate market has always been highly cyclical; with the passage of the Tax Reform Act of 1986 it became clear to Fidelity that there would be "a down cycle in commercial real estate by the end of the 80s," Tr. 1741:25-1742:24 (Wesp), and that Fidelity was going to have problems with its commercial real estate loans to developers with projects in Manhattan. Tr. 1744:2-1745:6 (Wesp). Nevertheless, Fidelity kept making loans to commercial developers until 1987 or 1988, when Messrs. Greco and Lovely were finally "just ruled off the turf, they were just prohibited from making any more commercial loans." Tr. 1795:11-16 (Wesp).

**Reply:**

While Plaintiff does not object to the first sentence of DPFOF 168, the sentence is potentially misleading because the problems in commercial real estate that resulted from the Tax Reform Act of 1986 were not limited to Manhattan, or even New York, but were an extensive problem throughout the country. (Finn, Tr. 4004, line 8 to p. 4005, line 2).

The second sentence of DPFOF 168 is quite misleading. Mr. Powderly, who was in charge of the real estate lending operations, made it clear that after 1987 Fidelity engaged in commercial lending only where it was bound by some prior contractual obligation to do so. (Powderly, Tr. 348, line 1 to p. 349, line 4). Mr. Wesp, who was not involved in real estate lending operations, said a similar thing in the testimony cited by Defendant, but Mr. Wesp was unclear about when commercial lending was halted.

Finally, Plaintiff renews the general objection it made in response to DPFOF 167.

**DPFOF 169**

The FHLBB's October 1987 examination of the thrift, PX 69A, revealed the extent of the troubles facing Fidelity as a result of its extraordinarily poor underwriting decisions. Regulators assigned Fidelity a "4" composite "MACRO" rating. This composite figure represented regulators' assessment of the five components of a thrift's health: **M**anagement, **A**sset quality, **C**apital, **R**isk management, and **O**perating results, cumulatively referred to as the "MACRO" factors.[11] Each of these MACRO factors was assigned a number from "1" to "5," with "5" being

[11] In 1994, the OTS switched from a MACRO composite rating system to a CAMEL ("**C**apital, **A**ssets, **M**anagement, **E**arnings, and **L**iquidity), a change that had little effect upon the focus of examiners in determining the safety and soundness of institutions. The OTS's 1994 Regulatory plan for Fidelity sets forth corresponding CAMEL ratings for the

the worst rating a thrift could received. The composite rating was also on a "1" to "5" scale, with "5" being the worst rating.[12] A "4" composite rating meant that regulators considered a thrift to have "Major and serious problems or unsafe and unsound conditions…which are not being satisfactorily resolved by the institution." PX 509 at AST001970; DX 1448 at WON732 0834. Furthermore, regulators stated that: "Unless prompt action is taken to correct these conditions, they could reasonably develop into a situation that could impair future viability." PX 509 at AST001970.

**Reply:**

Plaintiff objects to the first sentence. Assuming Defendant intended to cite DX 69A (not PX 69A), there is not a reference to "extraordinarily poor underwriting decisions" in the cited report. This is just argument by Defendant.

Defendant provides no support for the second, third, and fourth sentences, but Plaintiff does not contest their accuracy. Likewise, the two footnotes to DPFOF 169 are not fully supported by the cited references, but Plaintiff does not contest them.

Plaintiff does not object to the last two sentences.

Plaintiff renews the general objection that it made in response to DPFOF 167.

**DPFOF 170**

As Mr. Albanese explained at trial, the composite rating will come out of the component ratings, which will "drive" the composite rating. Of the component ratings, management is very

---

thrift (showing the rating for each component) between 1993 and 1987. DX 1448 at WON732 0834.

[12] A "5" rating was given to "institutions with an extremely high immediate or near-term probability of failure." DX 1448 at WON732 0834; PX 509 at AST001970.

important; indeed, Mr. Albanese would give it the greatest weight. Tr. 4164:19-4165:14 (Albanese).

**Reply:**

The first sentence of DPFOF 170 somewhat misstates Mr. Albanese's testimony. While Mr. Albanese did twice use the word "drive," he made it clear that the composite rating is determined independently of the component ratings, that the examiner exercises considerable judgment in assigning a composite rating, and that the composite rating is not an "average" of the component ratings. (Albanese, Tr. 4164, line 17 to p. 4165, line 14).

Plaintiff does not dispute the accuracy of Mr. Albanese's testimony in the second sentence even though Defendant's transcript reference to his testimony does not include it. However, Mr. Albanese made it clear that this was only his opinion. It is apparent that different regulators can and do view different components as the most important. Mr. Vigna, for example, seemed to believe that "Capital" was a key driver of the composite rating. He testified that if an institution had a "4" in "Capital," its composite rating would be a "4" even if it was rated a "2" on all the other components of the MACRO rating. (Vigna, Tr. 2797, line 8 to p. 2798, line 12).

Plaintiff also renews the general objection it made in response to DPFOF 167.

**DPFOF 171**

At the time that Fidelity received its composite rating of "4," Mr. Amend was field manager on that examination. DX 69A; Tr. 4289:25-4290:5 (Amend). In 1987, its component ratings were "3" for management, "4" for asset quality, "2" for capital, "2" for risk management, and "2" for operating results. As of the 1987 examination, classified assets were at $81.5 million. DX 69A at OAA002 0106; Tr. 4159:23 – 4160:6 (Albanese). From the 1985 to the

1987 examinations, the composite rating had declined from a "3" to a "4." Tr. 4157:21-4158:23 (Albanese); Tr. 4314:10-21 (discussing DX 548 and DX 1411) (Amend).

**Reply:**

Aside from renewing the general objection it made in response to DPFOF 167, Plaintiff does not object to DPFOF 171, though it is not fully supported by the Record citations provided by Defendant.

**DPFOF 172**

During this examination review period, there was a deterioration in the acquisition, development and construction ("ADC") loans, which had previously been criticized for undue concentration. This deterioration did not have anything to do with the acquisition of Suburbia. Tr. 4294:2 -4295:1 (Amend). Actual realized losses started to occur. Tr. 4295:5-9 (Amend).

**Reply:**

Aside from renewing the general objection it made in response to DPFOF 167, Plaintiff does not object to DPFOF 172, though it should be noted that the "review period" being referenced is 1985 to 1987.

**DPFOF 173**

Indeed, the opening sentences of the FHLBB's 1987 examination spell out the imprudent lending practices and disregard of prior regulator warnings, which resulted in Fidelity having a level of criticized assets well above its peers:

> Despite the various assurances made by management and noted in the previous report of examination, a significant number of major project loans showed no substantial improvement in performance during the review period and are subject to classification or special comment in the current examination report. Also of special concern is that loans to a number of major borrowers have significantly deteriorated in performance so that the establishment of specific reserves against

> several loans were required. Furthermore, a review of several major loan files disclosed a number of imprudent practices utilized by management including extensions of matured loans to avoid delinquency, the granting of various types of concessions to major borrowers, and the granting of loans which are not in accordance with sound underwriting policies.

DX 69A at OAA002 0079.

**Reply:**

DPFOF 173 accurately quotes from the 1987 examination report. However, Plaintiff notes that, as previously discussed, the 1985 report largely talked about loan concentrations, not loan performance. The quoted paragraph also makes no reference to the effects of the 1986 Tax Reform Act and to the overall downward cycle of the real estate market, particularly the New York real estate market, which affected many institutions in addition to Fidelity. One detects in the quoted paragraph a certain defensiveness on the part of the examiners.

Plaintiff also renews the general objection it made in response to DPFOF 167.

**DPFOF 174**

The 1987 RoE found that Fidelity's total criticized assets increased 79.1 percent, from approximately $66,282,000 to $118,684,000 during the fifteen month review period from June 30, 1986 to September 30, 1987. DX 69A at OAA002 0082. The $118,684,000 of criticized assets represented 7.2 percent of Fidelity's total assets, which Mr. Powderly agreed was an unusually high number for a thrift. Id.; Tr. 688:7-689:17, 694:18-695:8 (Powderly). Mr. Powderly agreed that the primary cause of Fidelity's criticized assets in the 1987 examination was Fidelity's commercial real estate portfolio. Tr. 689:18-23 (Powderly). During this same time period, classified assets increased $68.4 million, from $16.2 million to $84.6 million. DX 69A at OAA002 0082, 0086.

**Reply:**

Aside from renewing the general objection it made in response to DPFOF 167, Plaintiff does not object to DPFOF 174 except to note that DX 69A at OAA002 0082 does not support the final sentence.

DPFOF 175

As of September 1987, Fidelity had approximately $46.3 million in nonearning assets. Regulators found that, if one assumed an average rate of return of 9.0 percent on these assets, the impact on Fidelity's earnings from lost interest income alone on these loans exceeded $4.0 million on an annual basis. DX 69A at OAA002 0086. Mr. Powderly agreed that the nonearning assets that remained nonearning would continue to affect Fidelity's earnings and capital in future years. Tr. 704:5-12 (Powderly).

**Reply:**

Plaintiff objects to the first sentence because DX 69A does not describe the lost income as being interest income or income that would occur on an annual basis. Plaintiff has no objection to the second sentence. Plaintiff also renews the general objection it made in response to DPFOF 167.

**DPFOF 176**

Regulators reiterated their criticisms of Fidelity's decision to concentrate its lending in just a handful of investors, noting that $72.5 million of the total classified assets was attributable to just five borrowers, including Coronet and Messrs. Guterman and Evangelista. Regulators noted that Mr. Guterman had, by this time, defaulted on his total indebtedness and initiated litigation against Fidelity. DX 69A at OAA002 0082; Tr. 695:12-19 (Powderly). The high level

of substandard, non-earning assets was, regulators concluded, "having an adverse impact on the bank's operating results." DX 69A at OAA002 0082.

**Reply:**

Plaintiff objects to the first sentence because DX 69A includes no specific criticism of Fidelity's decision to concentrate its lending in just a handful of investors. Plaintiff has no objection to the second or third sentences.

Plaintiff also renews the general objection it made in response to DPFOF 167.

**DPFOF 177**

In the 1987 RoE, the regulators criticized several management practices, including management's decision to become heavily involved in ADC loans, extension of matured loans to avoid delinquency, granting of various concessions to major borrowers, and granting of loans that were not in accordance with the bank's approved underwriting policy. Mr. Powderly decided to stop these practices once he had the authority to do so. DX 69A at OAA002 0080-81; Tr. 689:24-693:4 (Powderly). The regulators found that Fidelity's general loss allowance was inadequate due to the bank's loan condition, loss experience, and loan underwriting practices; Mr. Powderly agreed that the general loss allowance was not adequate. DX 69A at OAA002 0084; Tr. 699:15-700:8 (Powderly).

**Reply:**

Plaintiff objects to the first and second sentences because they are misleading. The 1987 Report of Examination of Fidelity was received on June 3, 1988. Fidelity had stopped all commercial real estate lending by 1987, with the exception of a small amount of lending that was

compelled by contractual obligations. (Powderly, Tr. 348, line 1 to p. 349, line 4; Powderly, Tr. 668, lines 1-5).

Plaintiff objects to the third sentence. DX 69A states that Fidelity's general loss allowance as of January 31, 1988 was inadequate "[b]ased on the bank's current loan composition, its recent loss experience, the uncertain general economic conditions and the bank's imprudent practice of extending matured loans to avoid delinquency."

Plaintiff also renews its general objection that it made in response to DPFOF 167.

**DPFOF 178**

Also having a negative effect on the thrift's results was its declining accretion income from the Dollar and Suburbia acquisitions. In just one year, that income declined by 50 percent, from $6 million to $4 million, and regulators noted that this accretion income would "continue to decline until 1990 when the bank will eventually have no benefit at all." DX 69A at OAA002 086; see also Tr. 705:6-21 (Powderly).

**Reply:**

Plaintiff objects to DPFOF 178 as misleading. Fidelity knew, and the regulators knew, that at a certain point, the crossover point, amortization of goodwill would begin to exceed accretion income from loan discounts. (Vigna, Tr. 1369, line 3 to p. 1370, line 3). Fidelity planned to have sufficient earnings to cover this deficit, hence its goal in the October 1988 Business Plan to grow 8 to 10% per year. (Wesp, Tr. 1748, line 21 to p. 1750, line 17).

Plaintiff also renews the general objection it made in response to DPFOF 167.

**DPFOF 179**

Also affecting the thrift's future profitability was its decision to sell a substantial amount ($33.5 million) of its high yielding assets, an action undertaken – like its later asset sales – "to help mitigate the impact of establishing substantial loan [loss] reserves on earnings." DX 69A at OAA002 0086. Thus, regulators concluded, "management was willing to recognize immediate profits at the expense of adversely affecting the future income stream." Id. Mr. Powderly agreed that these asset sales enabled Fidelity to earn a profit on that sale, but that in future years Fidelity's margin would be lower because Fidelity could not sell the same asset again. Tr. 705:22-707:3 (Powderly). Mr. Powderly also agreed that these asset sales helped Fidelity mitigate the impact of establishing substantial loan loss reserves for the 1987 period. Tr. 706:24-707:9 (Powderly).

**Reply:**

Plaintiff objects to DPFOF 179. The first two sentences are an incomplete, inaccurate, and argumentative summary of the Operating Results section of the October 5, 1987 Report of Examination. That Report goes on to note that Fidelity's financial ratios compared favorably to peer group data, but its operating results as of the end of 1987 had declined somewhat relative to the prior year. The Report acknowledged that Fidelity's year-to-date operating results compared favorably to budget projections and Fidelity expected net income after establishment of loan loss reserves of approximately $7 million for 1988. (DX 69A).

Plaintiff agrees that the final two sentences accurately paraphrase Mr. Powderly's answers to certain questions on cross-examination, including the silly question as to whether one can sell the same asset twice. The more salient point is that Fidelity, for a variety of reasons,

including the likely punitive treatment of goodwill capital, had a need to raise funds, and its management made informed decisions as to which assets needed to be sold to accomplish that.

Plaintiff also renews the general objection it made in response to DPFOF 167.

**DPFOF 180**

During the next four years, the severity of Fidelity's asset quality problems deteriorated even further from the already disastrous condition in 1987. DX 1199 at WON738 0780. In the late 1980s and early 1990s, the regulators were concerned about the deteriorating condition of these loans. They demanded that Fidelity take one-time expenses in the form of loan value write-downs and create loan loss reserves, all of which lowered Fidelity's earnings. Tr. 342:6-21, 344:24-345:9, 350:5-24, 699:4-700:8, 701:4-12, 701:18-702:4, 788:2-17 (Powderly); Tr. 1447:9-20 (Vigna) (problem loans "very, very severe"); PX 509 at AST001974-83, AST002004-40. These problem loans, as they deteriorated, left Fidelity with very slim net interest margins in the years preceding FIRREA. This left Fidelity vulnerable to even one percent swings in interest rates – a factor that had nothing to do with goodwill. PX 509 at AST001986-87; Tr. 847:5-849:25, 852:9-853:11, 872:2-873:23 (Powderly).

**Reply:**

The first sentence of DPFOF 180 is not supported and is, in fact, contradicted by Fidelity's 1993 Annual Report (DX 1199). The cited document provides numerical data on non-performing assets for the years 1990-1993 only. Furthermore, the Defendant's reference describes Fidelity's significant achievements in reducing Fidelity's level of non-performing assets, resulting in Fidelity's lowest level of non-performing assets since 1987.

Plaintiff objects to the second sentence since Defendant provides no citation to the Record and does not specify the loans about which the regulators were concerned.

Plaintiff does not object on accuracy grounds to the remainder of DPFOF 180. However, the proposed finding is misleading to the extent it completely ignores the profound effects of FIRREA and the consequent depletion of Fidelity's capital. These events monumentally compounded Fidelity's difficulties in dealing with its real estate problems. (*See* PPFOFs 703-720).

Plaintiff also renews the general objection it made in response to DPFOF 167.

**DPFOF 181**

The bad loans cost Fidelity deeply, and, as Mr. Caporusso admitted, it required the thrift to set a game plan to survive and work through the bad loans. Tr. 3897: 6-25 (Caporusso).[13] Fidelity's bad loans had to be paid down as funds were available to do so and Fidelity couldn't solve the problem by growing its lending operations, which could increase the riskiness of the bank's operations. Tr. 3907:8-18 (Caporusso). One cost of holding assets that the thrift had foreclosed upon was that the thrift was responsible for the real estate taxes assessed against the property. Thus, for example, Fidelity was notified that, for one of its loans originally

---

[13] Even so, Mr. Caporusso was apparently unaware of the full extent of Fidelity's problem loans. For example, he was unaware of the findings of the FHLBB's 1987 report of examination. Tr. 3891:21-3892:2 (Caporusso). Nor did he ever become aware of the cumulative amount of the losses Fidelity experienced from its bad loans, or even losses on some of its major loans. Tr. 3892:23-3894:2, Tr. 3928:15 – 3929:22 (Caporusso). In fact, he admitted that he did not get involved with Fidelity's bad loans until he became a senior vice president four or five years after he was hired. Indeed, Mr. Caporusso admitted that the Government probably knew more about Fidelity's bad loans than he did. Tr. 3898:5-7 (Caporusso).

underwritten to Mr. Evangelista, it owed the City of New York $515,000 in back taxes. Tr. 3926:16-3927:24 (Caporusso); DX 622.

**Reply:**

Plaintiff objects to DPFOF 181 in its entirety as both misleading and irrelevant. Commercial lending was not Mr. Caporusso's area of responsibility at Fidelity. He was hired by Fidelity in 1986 to run its consumer lending operations. (Caporusso, Tr. 3893, lines 4-16; PPFOF 253). Fidelity had a Senior Vice-President who was responsible for its commercial lending operation. *Id.* Mr. Caporusso did not have any responsibility for commercial lending until four or five years after he was hired when he became a senior vice president in charge of all credit lending. *Id*. It is therefore hardly surprising that his knowledge of commercial lending in general or of particular commercial loans was quite limited. If Defendant had serious questions to ask about Fidelity's commercial loans, it should have posed those questions to Mr. Powderly, who was the Fidelity officer in charge of commercial lending.

Plaintiff also renews the general objection it made in response to DPFOF 167.

**DPFOF 182**

As of August 1988, Fidelity continued to suffer from the problems created by its lending. PX 436; Tr. 4154:7-4155:14 (Albanese). Criticized assets had increased, to 79.1 percent of capital in a 15-month period, and this was significant. Tr. 4155:20- 4156:2 (Albanese). Although, at this point, Fidelity had ceased lending in the coop and condominium market, the bad loans originated earlier were still on the books and deteriorating. Tr. 4156:3-23 (Albanese). Moreover, apart from the coop and condominium loans, the FHLB remained concerned about the thrift's decision to increase its commercial lending activity. Tr. 4156:24-4157:20 (Albanese).

**Reply:**

Plaintiff objects to DPFOF 182 as misleading because it reflects only Mr. Albanese's impression of the situation. In an August 12, 1988 letter to Fidelity, Mr. Lavelle acknowledged that his office understood that "it [was] the deterioration of co-operative/condominium loans originated in the 1983-1985 period which [was] substantially responsible for the increase in [Fidelity's] classified assets." Mr. Lavelle also acknowledged that Fidelity had already stopped this type of lending and thus "a discussion concerning the bank's involvement in this market would not serve any useful purpose." (PX 436 at AST0129682). Plaintiff objects to the final sentence because it is not clear what type of "commercial lending activity" is at issue, since it obviously does not refer to continued co-op/condominium lending.

Plaintiff also renews the general objection it made in response to DPFOF 167.

**DPFOF 183**

Given the deterioration of the Fidelity's financial condition, regulators noted that Fidelity's "budget for 1988 anticipates minimal asset growth to $1.8 billion (an increase of only $132,000 from year end 1987 [i.e., less than 0.1 percent]) and net income of $6.7 million." DX 69A at OAA002 0087; Tr. 707:23-708:9 (Powderly). The budget also included additional reserves of $2.4 million due to losses in Fidelity's loan portfolio, particularly the commercial loans. DX 69A at OAA002 0087; Tr. 708:10-19 (Powderly). Mr. Powderly agreed that the lack of growth was due to the commercial real estate portfolio. Tr. 708:20-25 (Powderly).

**Reply:**

Plaintiff objects to DPFOF 183 as both misleading and irrelevant.

The references cited for the first sentence make no mention of a deteriorating financial condition as a growth constraint. Also, given the date of DX 69A, it is reasonable to assume the "budget" it refers to was the business plan produced by Mr. Greco in February 1988 (DX 1203). That plan projected that assets would grow during 1988 from $1.769 billion to $1.839 billion, which represents a 4 percent growth rate. (DX 1203 at p. PAA000 1843). DX 69A also notes that Fidelity projects a 4 percent growth rate for 1988. (DX 69A at p. OAA002 0087).

The more detailed business plan done by Mr. Wesp in October 1988 (PX 477) called for 8 to 10 percent annual growth. Mr. Wesp testified that this is a fairly minimal and readily achievable growth rate. (*See* PPFOFs 331 and 332).

DPFOF 183 is also misleading, because although growth fluctuates from year to year, Fidelity demonstrated consistently strong growth in the years leading up to FIRREA. From December 31, 1984 through December 31, 1988, Fidelity's total assets grew an average of 12.5% annually. (Kaplan, Tr. 2952, line 25 to p. 2954, line 3).

**DPFOF 184**

Apart from the direct impact on its finances, Fidelity's poor loan portfolio was taking up considerable time and effort of Fidelity's entire senior management, as they attempted to monitor major borrowers. DX 69A at OAA002 0081. As Mr. Powderly put it, the commercial loans were "troubled" and "had to be worked very hard" by management. Tr. 688:14-20 (Powderly). Given the impact of the thrift's substantial amount of nonearning assets, regulators concluded that "[t]his budget is deemed realistic" because it "incorporate[s] the impact of the substantial amount of nonearning assets." DX 69A at OAA002 0087; Tr. 708:20-25 (Powderly). Fidelity's 1988 budget called for a 4 percent growth rate, which Mr. Powderly testified was consistent with

the regulators' comment in the 1987 examination that Fidelity's anticipated growth for 1988 was "minimal." DX 1203 at PAA010 1843; DX 69A at OAA002 0087; Tr. 726:16-22 (Powderly).

**Reply:**

The first sentence is based on a comment in the examination report attributed to Mr. Greco, but it is not accurate. Mr. Powderly testified that the statement was inaccurate. Mr. Powderly was the only member of senior management at Fidelity working on the troubled loans and monitoring major borrowers, though he could call on the assistance of others from time to time as needed. (Powderly, Tr. 691, lines 9-24; Tr.693, line 15 to p. 694, line 4).

Plaintiff objects to the second sentence, because Mr. Powderly was referring specifically to the $118 million in criticized assets noted in the 1987 Report of Examination and not Fidelity's commercial loan portfolio in general. In addition, Mr. Powderly's testimony refers only to his own efforts and not the efforts of Fidelity's management team.

The third and fourth sentences are merely "sound bites" from the 1987 examination report, and they are not factually meaningful. As noted in its response to DPFOF 183, Plaintiff does not dispute that Mr. Greco's February 1988 business plan projected 4 percent growth in 1988 (not 0.1 percent growth as Defendant had tried to suggest in DPFOF183), although the more detailed business plan produced by Mr. Wesp in October 1988 called for 8 to 10 percent growth.

**DPFOF 185**

In addition to its bad loans among major borrowers, Fidelity saw its growth being restrained by the "severe competition" facing it in its core operation of traditional one-to-four

family mortgage lending.[14] Accordingly, Fidelity began to invest "available funds no longer being used in commercial real estate, construction and commercial lending" in MBS, mortgage-related securities, and United States obligations. Mr. Powderly agreed that Fidelity began this strategy even before Fidelity created the October 1988 business plan, and that it continued the same strategy under the Capital Plan. PX 986 at AST064174; Tr. 900:9-25 (Powderly). While this practice was in contrast with the traditional thrift practice of originating residential mortgage loans, Fidelity chose this strategy as a means of controlling its overall credit risk and managing interest rate risk. PX 986 at AST064174.

**Reply:**

Plaintiff objects to the first sentence because it is not supported by the Record. The language in quotation marks comes from the section of Fidelity's Stock Offering Circular quoted below. However, that document does not say that competition in the mortgage market constrained Fidelity's growth. Competition in the mortgage market simply caused Fidelity to switch to a more profitable strategy of purchasing mortgages in the wholesale market in the form of mortgage-backed securities.

Plaintiff objects to the second sentence of DPFOF 185. It is misleading because it tries to twist Fidelity's deliberate business decision to move away from originating home mortgages and instead buy those mortgages in the form of securities into an act of desperation in reaction to

[14] For example, Fidelity closed its two (Dollar) branches in Manhattan because it lacked a strong presence in the New York City market, could not effectively compete in that market, and could not withstand the rent increases on its branches. PX 509 at AST001989. By the time Fidelity exited Manhattan in December 1993, its total deposits in Manhattan had decreased from over $90 million to just $26.6 million. DX 3071 at PAA014 2130.

"severe competition." The complete paragraph from same cited page in the Stock Offering Circular provides important context:

> Also, beginning in 1987, management began to invest available funds no longer being used in commercial real estate, construction and commercial business lending in high quality mortgage-backed and mortgage-related securities and U.S. government obligations. Management chose this strategy as a means of controlling the Bank's overall credit risk and managing interest rate risk. At the same time management determined to deemphasize traditional one-to-four-family mortgage lending as a result of severe competition in its market area, which made the returns generated by securitized mortgage assets more attractive. Thus, from December 31, 1987 to December 31, 1992, the Bank's portfolio of one-to-four-family mortgage loans declined from $526.7 million to $272.6 million, and the Bank does not currently actively solicit such loans. ***Instead of pursuing the traditional thrift practice of originating residential mortgage loans, the Bank has chosen effectively to purchase them in the form of high quality mortgage-backed and mortgage-related securities.*** (emphasis added).

Plaintiff does not object to the third sentence of DPFOF 185.

Plaintiff objects in part to the fourth sentence of DPFOF 185. As is obvious from the paragraph set forth above, that while Fidelity did adopt its wholesale strategy as a means of controlling its overall credit risk and managing interest rate risk, it also did so because it believed there was more profit potential in buying the mortgages wholesale than originating them itself in a highly competitive marketplace.

Plaintiff does not object to the content of the first sentence of the footnote contained in DPFOF 185 even though the cited document does not support it. Plaintiff does objects to its second sentence. The cited document provides no evidence that deposits were originally over $90 million. In addition, $26.6 million is the amount by which deposits declined, not the final amount of deposits.

**<u>DPFOF 186</u>**

As of February 1988, Fidelity also understood that it had to reduce its interest rate risk. Tr. 2025:24-2026:12 (Wesp); DX 1203 at AST004706. In its February 1988 business plan, Fidelity projected little growth in short-term assets, $2 million per year in Freddie Mac ARMs, while it projected growth of $74 million in longer duration (15-year Freddie Mac MBS). Tr. 2032:9-2033:15 (Wesp); DX 1203 at PAA010 1838.

**Reply:**

Defendant didn't get much right when it drafted DPFOF 186.

It has omitted from the first sentence the words "where appropriate." These are rather important if the goal is to state accurately what was set out in the February 1988 business plan.

With respect to the second sentence, Fidelity planned to purchase $2 million ***per month*** in Freddie Mac ARMs, not "$2 million per year." Mr. Wesp even pointed this out to defense counsel in the cited testimony, but apparently the correction did not register with Defendant.

The $74 million of MBS Fidelity planned to purchase in 1988 was therefore comprised of $24 million of short-term Freddie Mac ARMs ($2 million a month) and $50 million of 15 year Freddie Mac MBS. With respect to the latter, Mr. Wesp also pointed out to defense counsel that mortgage-backed securities tend to have durations of half or less of their nominal maturities. A 15 year MBS, which Mr. Wesp would not consider to be a "long" maturity, would therefore be expected to have a duration of only 6 or 7 years. (Wesp, Tr. 2032, line 23 to p. 2033, line 9).

**<u>DPFOF 187</u>**

Although Fidelity was not subject to a formal examination in 1988, in August 1988, regulators again criticized Fidelity for "numerous examples" of loan monitoring deficiencies,

imprudent lending practices and underwriting weaknesses, while questioning Fidelity's ability to effectively manage its problem assets. PX 436 at AST0129681.

**Reply:**

DPFOF 187 is misleading in one important respect. The document cited as the source for the proposed finding is a letter transmitting an examination report. While this letter and the report were sent to Fidelity in August 1988, the report concerned an examination that was commenced in October 1987. Many of the comments in this report and letter would therefore have entailed events and conditions occurring far earlier than August 1988.

Addressing DPFOF 187 through DPFOF 201 broadly, Plaintiff has a general objection to the Defendant's characterization of its October 1988 Business Plan. Fidelity's October 1988 Business Plan was relatively conservative and called for "no quantum leaps forward, just steady growth." (PX 447 at OAA005 1315). Fidelity recognized that any business plan is a living document that needs to change as circumstances change. Thrift institutions regularly re-evaluate business plans when unanticipated events occur. (Powderly, Tr. 970, lines 16-19). However, re-evaluations of a business plan do not necessarily result in a change in the plan and when a thrift has sufficient capital, it is generally protected from having to change course due to unanticipated events. (Powderly, Tr. 971, line 14 to p. 973, line 5). Fidelity's October 1988 Business Plan was a serious business plan under which Fidelity planned to operate for the next three years. (Powderly, Tr. 365, lines 19-25).

**DPFOF 188**

As of August 1988, Fidelity's net interest margin, net of accretion income and investment securities, was "less than the peer group average during the past several quarters." Tr. 1780: 16-

22 (Wesp); PX 436 at AST0129687. Mr. Wesp recalled that the thrift's depressed net interest margin was the result of lower than average interest income, which resulted from a substantial amount of nonperforming loans and other nonearning assets. Tr. 1780:23-1781:6 (Wesp); PX 436 at AST0129687. Mr. Wesp understood that Fidelity's earnings would be negatively affected "by the need to replenish the allowance for general loan losses." Tr. 1780:7-13 (Wesp); PX 436 at AST0129687.

**Reply:**

Plaintiff does not object to the first sentence except to note that, as stated in the reply to DPFOF 187, it is not at all clear that the comment really refers to events "as of August 1988."

However, it is important to note that Fidelity also worked to address the regulators' concerns about net interest margins by committing to "[i]ncrease [the] return on assets to a stable 50-70 basis point range" in the October 1988 Business Plan. (PX 447 at OAA005 1315).

Plaintiff objects to the second sentence because it is misleading. Both PX 436 and Mr. Wesp's cited testimony contain the statement that the nonearning assets included goodwill.

Plaintiff has the same objection to the third sentence. Assuming Defendant meant to cite Mr. Wesp's testimony at Tr. 1781, both the Record citations also refer to goodwill amortization's negative effect on earnings.

Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 189**

On October 12, 1988, Fidelity forwarded its Three Year Business Plan for 1989, 1990, and 1991 ("October 1988 Business Plan") to the FHLBB. PX 447 at OAA005 1312. Fidelity's October 1988 Business Plan calls for an increase in capital and in particular GAAP capital,

balance sheet growth of 8 to 10 percent per year, reduced loan concentrations and increased credit quality, and an increased return on assets to a stable 50-70 basis point range. PX 447 at OAA005 1315. Mr. Wesp agreed that Fidelity followed its budget projections "in terms of realistic planning," while its three year business plan was viewed as "more of a strategic look at where you want to get to down the year." Tr. 1994:21-1995:7 (Wesp).

**Reply:**

Plaintiff has no objection to the first or second sentence of DPFOF 189.

It is not completely clear what point Defendant is trying to make in the third sentence. Mr. Wesp carefully distinguished between an annual budget, which is closely adhered to on a quarter-by-quarter basis with departments expected to address specifically any significant variances, and a three-year business plan, which by necessity is a more dynamic document that will be revised in light of changing conditions. However, when defense counsel attempted to analogize the business plan to a "wish list," Mr. Wesp emphatically disagreed with that characterization and said that Fidelity had every intention of following the three-year business plan. (Wesp, Tr. 1995, lines 8-16).

Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 190**

Mr. Wesp repeatedly stated that Fidelity would need to adjust its business plan in reaction to changing conditions. "[N]o business plan and no budget is static. Annual plans are always revised quarterly, and three-year business plans are always revised at least one a year. So these are all moving, viable, live documents as you move through time." Tr. 1751: 11-15 (Wesp). Mr. Wesp testified that Fidelity intended to follow its October 1988 Business Plan, "*on the day we*

*sent it*" to regulators, but he acknowledged that this intent was subject to "periods of huge volatility and all [of] that kinds of things, knowing full well that a lot of things would change over three years." Tr. 1790:5-11 (emphasis added) (Wesp). As Mr. Wesp stated, "it's the old garbage in, garbage out" problem with projected outcomes, because "[a]ny business plan is only as good as its assumptions." Tr. 1808:22-23 (Wesp). "A business plan is a document that you write which is your <u>best-case</u> <u>scenario</u>, all other things being equal, of…where you'd like to get to. And then circumstances change. The world changes, your staff changes, interest rates change, politics change, economics change." Tr. 1824:5-10 (emphasis added) (Wesp). Mr. Powderly also testified that the assumptions in the business plan would be revisited every year, including the growth assumption. Tr. 797:24-798:18, 808:22-25 (Powderly).

**Reply:**

While DPFOF 190 accurately sets forth snippets of Mr. Wesp's testimony, it does so in a way that is calculated to give a misleading impression of Fidelity's intent with respect to the October 1988 Business Plan. (*See* Plaintiff's comments at the outset of this section and Plaintiff's reply to DPFOF189). The 8 to 10 percent annual growth objective in the October 1988 Business Plan was one that Mr. Wesp characterized as a fairly minimal and readily achievable growth rate. (*See* PPFOFs 331 and 332).

Plaintiff objects to the final sentence of DPFOF 190, because some of Mr. Powderly's cited testimony at Tr. 797 refers to the Capital Plan, not the October 1988 Business Plan.

Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 191**

Mr. Powderly testified that Fidelity considered the 8 to 10 percent growth rate to be "moderate," but conceded that he did not recall what, if any, analysis Fidelity performed to conclude that this was a "moderate" growth rate. Tr. 362:8-18, 718:6-13 (Powderly). Mr. Wesp's 8 to 10 percent growth rate was based upon what he called "probably the 20th century historical norm," but he admitted "I'm guessing." Tr. 1750:8-9 (Wesp). Mr. Amend, however, did not consider the 8 to 10 percent projected growth in the October 1988 business plan reasonable "with the problems that they had on their books." The examiner "should have recommended that they address those issues. Because the trend was adverse in earnings and in asset quality." Tr. 4802:2-8 (Amend).

**Reply:**

Plaintiff objects to the first sentence as incomplete. Mr. Powderly testified that the 8 to 10 percent growth assumption was both "moderate" and "achievable." (Powderly, Tr. 362, lines 8-21).

Defendant appears to be suggesting in the second sentence that Mr. Wesp was merely guessing when he chose 8 to 10 percent as the growth target in the October 1988 Business Plan. While the word "guessing" does appear in the cited testimony, Mr. Wesp's entire answer makes it clear that Defendant uses the word vastly out of context and that Mr. Wesp's use of 8 to 10 percent as Fidelity's projected growth rate was no "guess":

> 8 to 10 percent growth in a financial institution is probably the 20th century historical norm. I'm guessing, but if you went back and looked…it's probably where you'd wind up.
>
> CitiGroup uses an internal financial target, and has for the last 10 or 15 years, of 12 percent. John Reed for a while tried to get it to 15 but couldn't hit it. Below 8

> percent and if you have shareholders or a constituency that cares, they're going to accuse you of playing too much golf.

(Wesp, Tr. 1750, lines 8-17).

Plaintiff objects to the third and fourth sentences, because Mr. Amend went on to state that he would have no objection to an 8 to 10 percent growth rate "if the institution was operating in a good, profitable manner and those interest rate and credit risks were at reasonable levels." (Amend, Tr. 4802, lines 9-12). In addition, Mr. Amend's testimony ignores the reality of Fidelity's situation. Fidelity had exceeded an 8 to 10% growth rate in the years prior to 1988, which is an average growth rate for the thrift industry. (Kaplan, Tr. 2956, lines 3-25). Fidelity considered this growth rate to be modest and easily achievable, even with a very conservative growth strategy based in one-to-four family mortgages and mortgage-backed securities, which typically earned only a 50 to 70 basis point spread. (PX 447 at OAA005 1315; Powderly, Tr. 361, line 20 to p.362, line 21; Powderly, Tr. 365, lines 7-18; Powderly, Tr. 648, line 21 to p. 649, line 7). Even the regulators considered 10% to be a fairly conservative growth rate because regulator's characterized Fidelity's 10% post- Capital Plan growth as "moderate" in the 1994 Report of Examination. (PX 1065 at OAA002 1278).

Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 192**

Fidelity's October 1988 Business Plan forecasted total assets to increase by $652 million during the following three years. That increase was projected to be accomplished primarily by increases in retail assets, specifically, adjustable rate residential mortgages ($330 million) and home equity lines of credit ($126 million), with only a far lesser amount of growth in wholesale

assets, specifically, MBS ($73.5 million). Tr. 1751:1-3 (Wesp). Thus, seventy percent of this increase consisted of retail assets. PX 447 at OAA005 1342-43, Tr. 361:20-365:18 (Powderly).

**Reply:**

The financial appendices to the October 1988 Business Plan (PX447) are partially illegible, so Plaintiff is unable to verify Defendant's statement that total assets were forecasted to increase by $652 million over the three year period. However, that number would represent a 33 to 34 percent increase over the total assets at the start of the period, so it would be in line with the stated goal of 8 to 10 percent growth per year.

Plaintiff would also agree that, as set forth in the plan, home equity lines of credit and adjustable rate mortgages were projected to grow more than mortgage-backed securities, although again Plaintiff cannot verify the numbers suggested by Defendant. However, this is not meaningful.

It is instructive to note that the Plan includes under the broad heading "Mortgages" not only conventional home mortgages, commercial mortgages and commercial lines of credit, but also mortgage-backed securities. (PX 447 at OAA005 1342, next-to-last line, which totals those three categories). This is consistent with the Plan's stated goal of remaining flexible and being prepared to take advantage of conditions which exist in the markets:

> The plan has the potential for great flexibility. Either the wholesale or retail market can be used to add assets to the balance sheet. For instance, there will be periods when it is more cost efficient to buy mortgage backed securities rather than to originate [conventional mortgages] at punitive teaser rates. It is our intention to utilize the more efficient market.

(PX 447 at OAA005 1316).

Asked about this language, Mr. Wesp confirmed this intent to remain flexible:

> [W]e had identified some areas that we had some expertise in that we could be very flexible. You know, you could duck – we were very opportunistic as well as flexible. You could duck in and out of places that made sense.
>
> And so yeah, it was part of the plan.

(Wesp, Tr. 1816, lines 12-18).

Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 193**

In its October 1988 Business Plan, Fidelity projected an increase of about $42 million per year in home equity loans ($10.5 million per quarter), even though Fidelity "had not emphasized" the home equity underwriting area which "was a fairly new product." Tr. 1818:24-1819:20 (Wesp). Fidelity did not want to grow by underwriting fixed rate mortgages because of its own interest rate risk profile. Tr. 1820:16-1821:3 (Wesp). Fidelity also projected that it would maintain the level of its construction loans until the second quarter of 1989, at which time it saw an increase in construction loans of $20 million per year ($5 million per quarter). Tr. 1822:5-1823:11 (Wesp); PX 447 at OAA005 1317 ¶ 7. Fidelity projected that it would grow its consumer lending at a rate of about $45 million per year ($11.25 million per quarter), a goal Fidelity never reached. Tr. 1823:14-25 (Wesp); PX 447 at OAA005 1317 ¶ 8.

**Reply:**

See Plaintiff's reply to DPFOF 192. The significance of the October 1988 Business Plan was that it documented Fidelity's plan for consistent growth. The details of how Fidelity would achieve that growth are relatively less important, because it was clear that they would change

from time to time to adapt to changes in the economic and competitive environment. (*See* PPFOFs 348 to 360.)

Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 194**

In its October 1988 Business plan, Fidelity forecasted no earnings from RCA transactions. Mr. Wesp testified that wholesale transactions were essentially RCA transactions. Tr. 1800:12-1801:6 (Wesp). Mr. Wesp claimed that Fidelity's goal to grow its balance sheet 8 to 10 percent was based upon what Mr. Wesp felt was encouragement from the FHLBB to pursue an RCA strategy, Tr. 1793:17-1794:12 (Wesp), but, in fact, Fidelity's October 1988 Business Plan specifically disavowed an RCA strategy. PX 447 at OAA005 1315 ("their [sic] are no forecasted earnings from Risk Controlled Arbitrage transactions"). Fidelity's October 1988 business plan stated that Fidelity did not want to become dependent on RCA transactions "in an environment of volatility and uncertainty." Tr. 1801:11-1802:4 (Wesp); PX 447 at OAA005 1315-1316. Mr. Powderly agreed. Tr. 742:6-18 (Powderly).

**Reply:**

The first sentence, while accurate, does not tell the whole story. Even though Fidelity did not forecast any earnings from RCA transactions, it did acknowledge that the bank would take advantage of such transactions when the yield curve and market spread allowed. (PX 447 at OAA005 1315; Wesp, Tr. 1800, line 12 to 1802, line 4).

Plaintiff objects to the second sentence because it misstates Mr. Wesp's testimony. Mr. Wesp testified that some wholesale transactions could be considered RCA, but he did not testify that the two were identical. (Wesp, Tr. 1800, line 12 to p. 1801, line 6). Indeed, Mr. Wesp had

earlier testified that even though most banking transactions were in some sense a risk controlled arbitrage, the Federal Home Loan Bank Board in 1988 had a specialized definition of that term which specifically involved the purchase of mortgage-backed securities using borrowed funds and employing interest rate swaps to hedge interest rate risk. (Wesp, Tr. 1783, line 9 to p. 1786, line 25).

Plaintiff objects to the first half of the third sentence, because it is not supported by the cited reference. There was a suggestion by Mr. Lavelle of the FHLBB in August 1988 that Fidelity consider engaging in Risk Controlled Arbitrage (in the specialized sense the Bank Board used that term) (PX 436 at AST0129688), but there is no evidence that Fidelity ever acted on that suggestion. Plaintiff objects to the second half of the third sentence because it is misleading. The complete excerpt from PX 447, as noted above, explains that Fidelity might take advantage of RCA transactions under certain circumstances. However, Fidelity did not include them as a specific strategy in the plan because of the "environment of volatility and uncertainty."

Plaintiff does not object to the fourth and fifth sentences.

DPFOF 194 reflects a general disagreement between Plaintiff and Defendant throughout the trial over what constitutes "risk-controlled arbitrage." The regulatory definition involved not only the matching of assets and liabilities, but also hedging, which was essential to an RCA transaction. (Vigna, Tr. 1777, line 11 to p. 1779, line 9; Moran, Tr. 4949, line 5 to p. 4950, line 9; Wesp, Tr. 1783, line 9 to p. 1786, line 25). The regulators never considered Fidelity's strategy of increasing its mortgage-backed securities portfolio through wholesale borrowings to be an RCA strategy. (Moran, Tr. 4946, line 19 to p. 4949, line 4). Nor did Fidelity's management

consider the operation of its wholesale strategy to constitute risk-controlled arbitrage. (Powderly, Tr. 800, lines 5-11; Powderly, Tr. 935, lines 6-20).

Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 195**

Mr. Wesp explained that, as of October 1988, Fidelity was cognizant of the need for "being very conservative," given "the real estate markets were uncertain, as the New York markets were clearly weakening," bond markets "were very volatile," banks were being forced out of business, "Oil prices were all over the place," and "Interest rates would move in hundreds of basis points up and down." Tr. 1801:15-1802:4 (Wesp); see also Tr. 1808:17-1809:7 (Wesp) (worldwide fixed income markets were expected to remain volatile and dominated by professional trading activity, which itself creates enormous volatility in prices); PX 447 at OAA005 1316 ¶ 2.

**Reply:**

Plaintiff does not object to DPFOF 195, except to renew its general objection to DPFOF 187.

**DPFOF 196**

Increasing assets and liabilities does not guarantee profits. While Fidelity's assets increased each year from 1986 to 1989, its net interest income, operating income, return on average tangible assets and income before taxes declined each year. PX 1283 at AST060055-57; PX 476 at AST058782-84. Between 1988 and 1989, Fidelity grew in size from $1.66 billion to $1.93 billion, but its net interest income declined from $35.8 million to $30.9 million, a decline of about 15 percent, and its after-tax net income declined from $10.5 million to $6.2 million, a

decline of about 40 percent. Tr. 2024:16-2025:14, 2025:21-23 (Wesp); PX 476 at AST058782-83. As Mr. Wesp acknowledged as "absolutely a universal truth," not all growth is good or profitable. Tr. 2219: 11-15 (Wesp).

**Reply:**

The first sentence of DPFOF 196 is simply argument by truism.

Plaintiff objects in part to the second sentence. PX 1283 and PX 476 to not appear to support Defendant's statements regarding operating income and return on average tangible assets.

Plaintiff has no objection to the third or fourth sentence. Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 197**

As its most critical factor, Fidelity's October 1988 Business Plan completely underestimated that impact that Fidelity's poor portfolio of loans would have on the institution in the future. Indeed, the plan anticipated bad debt expense of only $600,000 for the quarters ended September 30, 1988 and December 31, 1988, and it projected no bad debt expense from January 1, 1989, through June 30, 1991. PX 447 at OAA005 1349. Fidelity's prediction of the future performance of its bad loans was off by tens of millions of dollars. In fact, its aggregate provisions for loan losses from 1989 through 1991 totaled over $34 million, while its cumulative annual loan loss provisions from 1985 through 1994 totaled $82 million. DX 650. These figures do not even include the many millions in lost interest income on the nonperforming loans. Mr. Powderly agreed that Fidelity's bad debt projections did not "pan out." Mr. Wesp also acknowledged that one of the reasons the October 1988 Business Plan's forecast became

irrelevant was Fidelity's bad loans and need for loan loss reserves. Tr. 1993:15-23 (Wesp). In fact, the thrift's bad loan problems turned out to be far worse than Fidelity anticipated in 1988, with Fidelity writing off far more of its bad loans and holding nonperforming loans far longer than anticipated. Tr. 1996: 8-20 (Wesp).

**Reply:**

Portions of DPFOF 197 are argumentative and several sentences are unsupported by Record citations. However, Plaintiff does not dispute that the magnitude and duration of Fidelity's loan losses were not apparent in 1988 when the three-year business plan was developed. That is not unusual. As previously noted, business plans are by their nature dynamic and subject to frequent revision to reflect changing circumstances. With respect to the last sentence, Mr. Wesp actually testified that he made no attempt in 1988 to predict how long it would take Fidelity to dispose of troubled assets. Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 198**

Moreover, the plan incorrectly predicted the macro and local economic conditions that would affect its future performance. Indeed, Fidelity predicted that the New York metro regional economy would "remain robust with below national average unemployment rates." PX 447 at OAA005 1316. This would not prove to be the case. Mr. Powderly conceded that business conditions in New York became worse after the enactment of the plan, with commercial real estate entering into a recession. Tr. 718: 14-22, 719:8-20, 738:6-8, 742:3-5 (Powderly). Mr. Powderly conceded that, even if Fidelity were operating under the October 1988 business plan in

January 1990, if the economic climate was not as good as was projected, Fidelity would have had to revise its growth projections downward. Tr. 798:11:18 (Powderly).

**Reply:**

While DPFOF 198 is somewhat accurate, Plaintiff does object to the characterization of Mr. Powderly's testimony in the third sentence. Mr. Powderly consistently answered questions in the context of the "commercial real estate" market. He did not give any more general testimony concerning "business conditions in New York."

Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 199**

Nor did Fidelity accurately predict the future movement of interest rates. In fact, in 1989, an inverted yield curve developed, and as a result, Fidelity ceased growing and ceased its purchase of certain types of securities. For example, during a board meeting in April 1989, Fidelity admitted that it had not grown the balance sheet within the first quarter of 1989 as a direct result of the inverted yield curve. DX 2345 at AST056030. With respect to the effect of an inverted yield curve upon a RCA strategy, Mr. Powderly testified that it was, "very difficult, in my judgment, to make any kind of money in an inverted yield curve." Tr. 734:10-13 (Powderly). Moreover, discussing Fidelity's three year budget, Mr. Wesp recognized that such a budget was "only as good as its interest rate assumptions." Tr. 1995: 21 (Wesp). Thus, given that at the time Fidelity was "in one of those [the most] volatile interest rate periods in post-war history," the budget "had to be revised fairly frequently." Tr. 1995: 19-22 (Wesp).

**Reply:**

While DPFOF 199 is substantially accurate, Plaintiff does object in part to the fourth sentence. Mr. Powderly qualified his statement with the fact that he was not an accountant or an "investment guy" and did not understand why an inverted yield curve would make it difficult to execute a successful RCA strategy. (Powderly, Tr. 734, lines 10-24).

Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 200**

Mr. Wesp acknowledged that Fidelity had no way to predict an inverted yield curve (and the corresponding lack of growth that results from an inverted yield curve.) Tr. 2059:20-2060: 16 (Wesp). Moreover, Fidelity understood that "it is almost impossible to remain immune to the effects of the interest rates in the short term." Tr. 2062: 10-22 (Wesp); DX 2345 at AST056031 ¶ 8. Even if FIRREA had not been passed, Fidelity would have had to revise its October 1988 Business Plan due to the inverted yield curve that arose. "If we set aside the [FIRREA] legislation…when the curve inverted, I would have taken whatever budget we were operating under at the time and I would have revised it, in a very formal way, with all of my people and then forwarded the revision to OTS." Tr. 2062: 1-8 (Wesp).

**Reply:**

Plaintiff objects to the first sentence because Mr. Wesp's testimony makes no reference to the effect an inverted yield curve has on growth.

Plaintiff does not object to the second, third, or fourth sentence.

Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 201**

The October 1988 Business Plan also did not foresee the Iraqi invasion of Kuwait and the cutoff of the world's oil supply, factors which Mr. Wesp agreed "affect the strategic direction of a thrift." Tr. 2212:13-20 (Wesp). The Iraqi invasion had the effect of a 50 percent increase in the price of oil over a three-week period; moreover, it was anticipated that there would be dramatically higher inflation. DX 2448 at AST030218; DX 2450 at AST0129849 ¶ 3; Tr. 2216:18-2217:25, 2227:6-14 (Wesp). By the fall of 1990, there was a great deal of uncertainty globally as to economic conditions, inflation and interest rates. "It was up in the air, globally." Tr. 2227:24-2228:2, 2242:21-2243:7 ("everybody in the world stopped doing anything, and I would have stopped too."); Tr. 2244:12-16 ("the world froze") (Wesp).

**Reply:**

Plaintiff has no objection to the first sentence, even though Defendant provides no support for the proposition that the October 1988 Business Plan did not foresee the Iraqi invasion of Kuwait and its effect on the oil supply.

Plaintiff has no objection to the second or third sentence.

Plaintiff objects to the fourth sentence on two grounds. First, Mr. Wesp's comment about how "everybody in the world stopped doing anything" referred specifically to the 90 day period of military action in the Middle East. In addition, Mr. Wesp testified that unforeseen events such as the Gulf War could present opportunities as well if you were "opportunistic" and "very fast on your feet." He offered as an example of this the fact that the US dollar and US assets had become very cheap, and so the night the Allied invasion began, "as the first cruise missile went past Wolf Blitzer's window," he was able to execute trades on the London market in Ginnie Mae

securities that wound up making good profits for Fidelity. (Wesp, Tr. 1878, line 11 to p. 1879, line 11).

Plaintiff also renews the general objection it made to DPFOF 187.

**DPFOF 202**

By 1988, well before the beginning of the drafting of FIRREA, Fidelity understood that the thrift industry would ultimately move to GAAP accounting, which would wipe out its goodwill, and it started preparing its own GAAP financial statements that it took to the board but did not share with regulators. Tr. 1791:1-12, 1792:12-14 (Wesp).

**Reply:**

Plaintiff does not dispute that, by October 1988, when he listed an increase in GAAP capital as one of the goals of Fidelity's Business Plan, it was clear to Mr. Wesp that the industry was eventually going to transition to GAAP accounting. However, Plaintiff objects to DPFOF 202 because Mr. Wesp's cited testimony contradicts the statement that the events took place "well before the beginning of the drafting of FIRREA." (Wesp, Tr. 1792, lines 10-13). Mr. Wesp testified that "we're not that far away from the beginning of the drafting of FIRREA." It was clear to Mr. Wesp that any unfavorable treatment of goodwill would be in connection with the new legislation being proposed and not some independent phenomenon in the thrift industry.

**DPFOF 203**

During 1988, numerous proposals were being discussed by regulators and the thrift industry to improve the financial condition of thrifts. In the "Economic Environment" section of its October 1988 Business Plan, Fidelity stated that it anticipated that at some point during the plan period the FHLBB would adopt, in total or in a somewhat modified version, new Bank for

International Settlements ("BIS")/Federal Reserve capital guidelines. PX 447 at OAA005 1316 ¶ 7; Tr. 743: 6-14 (Powderly). Mr. Powderly testified that regulatory changes, including changes to risk-based capital, could and did have an effect on Fidelity's growth plans. Tr. 720:6-21 (Powderly).

**Reply:**

Plaintiff does not object to DPFOF 203.

**DPFOF 204**

On December 15, 1988, the FHLBB proposed to amend its capital guidelines in accord with the BIS/Federal Reserve guidelines. The proposed rule was, to a greater extent than the then current capital regulations, a risk-based rule. The goal of a risk-based rule was to ensure that sufficient capital supported activities that are riskier to thrifts and to the FSLIC as insurer. DX 537 at AA-NAV-004527. Specifically, the FHLBB proposed the assignment of goodwill to a risk category of 200 percent as a means of recognizing that goodwill offered little value as protection to the FSLIC. DX 537 at AA-NAV-4534. Mr. Powderly testified that Fidelity was anticipating that there would be some kind of additional regulation in December 1988, and that those guidelines would deal with risk-based capital requirements, not the treatment of goodwill. Tr. 743:6-14 (Powderly).

**Reply:**

Plaintiff has no objection to the first, second, or third sentence.

Plaintiff objects to the fourth sentence. The 200 percent category encompassed all intangible assets except purchased or excessive mortgage servicing rights and real estate owned. With respect to goodwill acquired in an acquisition, what the proposal actually said was this:

> It is difficult to estimate the value that an intangible asset such as goodwill provides to an institution or the FSLIC due to the difficulty inherent in assessing its future benefit. (DX 537 at AA-NAV-004534).

That hardly translates to "goodwill offered little value as protection to the FSLIC."

Plaintiff also objects to the final sentence. Although Mr. Powderly may not have predicted that this particular change would affect goodwill, Fidelity was clearly aware that unfavorable treatment of goodwill was a strong possibility. In the October 1988 Business Plan, Fidelity noted that the most significant risk to achieving the goals of the plan was the possibility of "unfavorable treatment of goodwill" which could have a "significant negative impact on capital levels and thus plan results." (PX 447 at OAA005 1316). Also, the third sentence of DPFOF 204 contradicts Defendant's contention that Mr. Powderly did not anticipate any unfavorable treatment of goodwill. That goodwill was assigned a 200% risk factor served as a signal to everyone in the industry that a regulation providing for adverse treatment of goodwill was coming. (Kaplan, Tr. 2705, line 12 to p. 2706, line 9; Tr. 2715, line 13 to p. 2716, line 5).

**DPFOF 205**

Fidelity's awareness of the various capital proposals, including the FIRREA legislation, did not affect its operations during 1989. Mr. Powderly discussed Fidelity's board minutes from January 1989 through November 1989, and testified that Fidelity was still operating pursuant to the October 1988 Business Plan for each of the corresponding months. DX 2334; DX 2343A; DX 2347; DX 3348; DX 2353; DX 73; DX 75; Tr. 744:12-15, 779:17-20, 781:19-21, 783:3-5, 784:3-5, 785:11-13, 791:6-12, 792:13-22 (Powderly). Mr. Powderly conceded that Fidelity continued operations under the October 1988 Business Plan until the November 15, 1989 board meeting, and that, although Fidelity was anticipating some changes, Fidelity did not know the

actual effects of the changes until it saw the regulations. Tr. 792:13-23 (Powderly). Mr. Powderly agreed that a change in Fidelity's business plan would be reflected in its board minutes. Tr. 1002:4-7 (Powderly).

**Reply:**

DPFOF 205 is simply not true.

Although it was Fidelity's goal to adhere to the October 1988 Business Plan for the remainder of 1989, Fidelity knew it would have to modify its operations to deal with the new legislation. According to Mr. Powderly's testimony at Tr. 791-792, Fidelity anticipated changes in the regulations as early as August of 1989 and by November of 1989, Fidelity knew that the new regulations would be "Draconian" and that Fidelity would have to make substantial changes to its operations. As early as the August 1989 Board Meeting, Mr. Powderly advised Fidelity's management to "operate from a position of strength for whatever our future may hold." (Powderly, Tr. 786, line 9 to p. 787, line 18; DX 73 at AST12878). By September 1989, Fidelity knew it was going to have to file a Capital Plan in January 1990. (Wesp, Tr. 1838, line 5 to p. 1841, line 6). In fact, Fidelity had already begun to make changes in its operations by November of 1989, fully abandoned the October 1988 Business Plan, and concentrated on a new plan focused primarily on raising capital. (Powderly, Tr. 366, line 1 to p. 367, line 4; Powderly, Tr. 791, line 6 to p. 793, line 2; DX 75 at AST127900).

**DPFOF 206**

By October 1989, Fidelity's operations had significantly deteriorated since the FHLBB's previous examination. Fidelity's net income declined for the 21-month period covered by the 1989 examination despite the growth in its assets by $208 million, increasing Fidelity's size to

$1.914 billion by October 31, 1989. PX 509 at AST001974; Tr. 827:16-828:7 (Powderly). This deterioration in earnings had nothing to do with the Suburbia acquisition. Tr. 4325:19-21 (Amend).

**Reply:**

Plaintiff generally objects to DPFOFs 206 through 213. First, even though Fidelity continued to suffer the effects of problem loans after it had ceased commercial real estate lending, Mr. Powderly and Fidelity were making significant progress in eliminating Fidelity's problem holdings. Second, had Fidelity not lost capital due to FIRREA, Fidelity would have been better able to manage its troubled real estate assets because it would have had more options to dispose of problem loans. (Vigna, Tr. 2827, line 25 to p. 2830, line 7; Albanese, Tr. 4213, lines 2-5).

Although DPFOF 206 is not fully supported by the cited references, Plaintiff does not otherwise object to it.

**DPFOF 207**

Fidelity's classified assets increased from $81.5 million as of September 30, 1987 to $97.7 million as of October 31, 1989. PX 509 at AST001966, AST001980. This was an increase of 20 percent from the amount of classifications the FHLBB had discovered with its 1987 examination of the thrift. PX 509 at AST001966, AST002000. The increase was due, in most part, to the commercial real estate. Tr. 825:2-25 (Powderly). Fidelity's level of classified assets was 5.1 percent of Fidelity's total assets, well above its peer group average of 2.1 percent. PX 509 at AST001980. These classified assets were due to Fidelity's "prior involvement in

[ADC] projects, condominium/cooperative conversions and land loans." PX 509 at AST001980; see also Tr. 825:2-9 (Powderly).

**Reply:**

Plaintiff objects to the first sentence because it is misleading. The increase to $97.7 million was entirely attributable to the inclusion of two loans. Plaintiff also notes that the two pages cited by Defendant provide inconsistent figures. PX 509 at AST001966 supports Defendant's statement that Fidelity's classified assets were $81.5 million as of September 30, 1987. However, PX 509 at AST001980 indicates that Fidelity's classified assets were $84.6 million at the beginning of the review period.

The fourth sentence is wrong in asserting that Fidelity's peer group had classified assets of 2.1%. The page referenced by Defendant has no figure at all. The peer group figure is found at AST002000, and it is 2.9 percent, not 2.1 percent.

Notably, as a percentage of total assets, Fidelity's level of classified assets had actually decreased slightly from 5.2% at the prior examination. Also, the composition of Fidelity's classified assets provides important context. Fidelity's level of classified assets exceeded its peer group almost entirely due to "Substandard Assets," the least serious of the three categories of classified assets, where Fidelity's 4.7% exceeded the peer group's 2.7%. The Fidelity versus peer group comparison of the two more serious categories, "Doubtful" and "Loss," showed Fidelity at or very close to Peer Group Averages (.3% compared to .2% for "Doubtful" and both at .1% for "Loss"). (PX 509 at AST002000).

Plaintiff objects to the final sentence because it mischaracterizes the 1989 Report of Examination. The Report actually stated that "[t]he continued high level of classified assets"

was due to the cited causes, not that all classified assets were due to those causes. The Report also noted some success by Fidelity's management in reducing prior levels of classified assets through workouts and chargeoffs.

Plaintiff renews the general objection it made in response to DPFOF 206.

**DPFOF 208**

Due to its high level of classified assets and the "declining economic and real estate market within" its lending area, Fidelity was required to record a loan loss provision of over $10 million. PX 509 at AST001983. Mr. Powderly agreed that this $10 million write-off was due to the commercial real estate. Tr. 824:15-825:1 (Powderly).

**Reply:**

Plaintiff does not object to DPFOF 208, except to renew the general objection it made in response to DPFOF 206.

**DPFOF 209**

Furthermore, the OTS found that Fidelity's "[o]perations have suffered in recent periods as a result of a declining net interest margin," which the OTS attributed to an increase in interest rates, an increased dependence upon borrowed money, and Fidelity's large volume of nonearning assets. PX 509 at AST001988. The OTS found that Fidelity's net interest margin steadily deteriorated from a high of 2.2 percent at December 31, 1987, and to a low of 1.9 percent as of September 30, 1989. PX 509 at AST001988; Tr. 848:18-849:3 (Powderly). The OTS found that Fidelity's net interest margin did not provide sufficient coverage to meet its operating expenses, which were 1.9 percent of average assets as of September 30, 1989. PX 509 at AST001988. Mr. Powderly did not dispute the OTS's assessment. Tr. 847:23-848:5, 848:13-850:11 (Powderly).

Mr. Amend testified that the disallowance of goodwill by FIRREA had nothing to do with Fidelity's net interest margin. Tr. 4328:18-20 (Amend).

**Reply:**

Plaintiff has no objection to DPFOF 209, except to renew its general objection from its response to DPFOF 206.

**DPFOF 210**

Mr. Vigna testified that the level of Fidelity's nonperforming loans "was a very, very severe problem." Tr. 1447:18 (Vigna). Mr. Amend testified that the asset quality problems would have been a concern even if Fidelity had been allowed to count its goodwill toward regulatory capital. Asset quality is "one of the major areas that we look to for the health of an institution, credit risk and interest rate risk." Tr. 4327:13-19 (Amend). The deterioration in earnings shown in the 1989 RoE had nothing to do with the Suburbia acquisition. Tr. 4325:19-21 (Amend).

**Reply:**

Plaintiff objects to DPFOF 210. Although asset quality problems may have continued to be a concern, had Fidelity retained the capital lost due to FIRREA, Fidelity would have had substantially more options to resolve its problem assets. An institution with sufficient capital has a greater opportunity to absorb losses and write bad loans off the books. (Albanese, Tr. 4205, line 19 to p. 4206, line 23). A thrift could take possession of a piece of real estate securing a non-performing loan through foreclosure, and if the real estate could not be sold in the current market at an acceptable price, it could hold the property until the market rebounded. (Powderly, Tr. 346, lines 14-21; Powderly, Tr. 349, lines 5-13; Powderly, Tr. 352, line 23 to p. 353, line 5).

Plaintiff renews the general objection it made in response to DPFOF 206.

**DPFOF 211**

The FDIC's assessment of the thrift was even worse than that of the OTS, in large part because the FDIC, as a matter of its internal policy consistent with its oversight of banks, classified Fidelity's collateralized mortgage obligations ("CMO") residuals, whereas the OTS did not. Accordingly, in its September 1989 RoE, the FDIC found that Fidelity's adverse classifications totaled $134.094 million. PX 689 at AST001816, PX 501 at AST057017, AST057043. The FDIC criticized approximately $40 million of Fidelity's CMO residuals. "The FDIC universally criticized CMO residuals. They did not believe they should be eligible investments for anybody." Tr. 2106:5-21, 2114:12-2116:10 (Wesp); PX 689 at AST001816, PX 501 at AST057043. Thus, with or without a change in capital regulations, Fidelity faced the classification of $46 million of its CMO residuals pursuant to the FDIC's oversight of the thrift, just as it faced increased loan classifications and loan loss reserves due to its bad commercial loans, irrespective of the breach. Tr. 2116:6-10 (Wesp).

**Reply:**

Despite the FDIC's belief that CMO residuals were unacceptable investments, investing in CMO residuals was an incredibly successful strategy for Fidelity. Fidelity earned double-digit returns on its CMO residual portfolio. (Powderly, Tr. 475, line 17 to p. 476, line 3; PX 703 at AA005 1638; PX 795 at WON725 1396). With respect to the final sentence, Plaintiff also notes that Mr. Wesp's testimony refers to the classification of CMO residuals only and does not mention increased loan classifications, loan loss reserves, or commercial loans.

More fundamentally, however, the FDIC was consistently harsh, to the point of being vindictive and mean-spirited, in its examinations of Fidelity. It argued against approval of Fidelity's Capital Plan, and it repeatedly took issue with the OTS over allowing Fidelity to continue to operate. It repeatedly threatened to revoke Fidelity's deposit insurance. (*See* PPFOFs 587, 592, and 596-621). FDIC examination reports were of little or no use to Fidelity. Mr. Powderly described the FDIC as usually being "nine months behind the curve." (Powderly, Tr. 514, line 23 to p. 520, line 1). The information in their examination reports was typically obsolete by the time Fidelity ever got those reports. (*See* PPFOFs 593 to 596).

Plaintiff renews the general objection it made in response to DPFOF 206.

**DPFOF 212**

The FDIC also found that, had Fidelity not enjoyed the benefits derived from two nonrecurring sources of income, Fidelity would have earned a net loss for the period. The FDIC found that earnings continued to be hindered by the large volume of nonperforming loans, decreasing net interest margins and rising overhead expenses. PX 689 at AST001817; PX 501 at AST057018. Mr. Powderly agreed with the FDIC that "substantial efforts [were] needed to reduce problem assets to less alarming levels." Tr. 476:4-7 (Powderly).

**Reply:**

While Plaintiff does not dispute the accuracy of DPFOF 212, it does question its relevance to any issue in this case, given the consistent hostility and unfairness displayed by the FDIC in its dealings with Fidelity. (*See* Plaintiff's reply to DPFOF 211). The OTS was Fidelity's primary regulator, not the FDIC.

Plaintiff renews the general objection it made in response to DPFOF 206.

**DPFOF 213**

The OTS and the FDIC both assigned Fidelity a composite rating of "5" in their November 6, 1989 and September 30, 1989 examinations, respectively. PX 509 at AST001969; PX 501 at AST057019, PX 689 at AST001818. Fidelity's individual CAMEL ratings for the OTS's November 6, 1989 examination were as follows: "Capital" – "5," "Asset Quality" – "4," "Management" – "3," "Earnings" – "3," "Liquidity-Asset/Liability Management" – "2." DX 1448 at WON732 0834. Mr. Amend testified that Fidelity's composite rating in 1989 would have been a "4" rather than a "5" if all its Suburbia goodwill had counted toward capital. Tr. 4612:14-4613:2, 4741:2-3 (Amend). The operations rating declined from a "2" to a "3" between the 1987 and 1989 reports of examination. Tr. 4609:3-4 (Amend).

**Reply:**

Plaintiff does not dispute the accuracy of DPFOF 213. However, Plaintiff does respectfully disagree with Mr. Amend's opinion that Fidelity would still have received a "4" rating in 1989 even if it was fully capitalized. A fully capitalized Fidelity would have had options for dealing with its real estate problems that a capital depleted Fidelity simply did not have. (*See* PPFOFs 703 to 720).

Plaintiff renews the general objection it made in response to DPFOF 206.

**DPFOF 214**

While Fidelity claims damages for the Government's breach starting in January 1989, Mr. Vigna testified that whether goodwill would be phased out under any legislation was not known until final regulations came out. Tr. 1413:5-8 (Vigna). Mr. Amend did not think the

disallowance of goodwill from regulatory capital could have been foreseen before FIRREA was enacted. Tr. 4860:4-11 (Amend).

**Reply**:

Defendant's paraphrasing of Mr. Vigna's testimony misses the essence of his testimony on this point. Mr. Vigna actually testified that everyone in the industry was certain that changes to capital requirements were coming "…like a train, you know, at the end of a tunnel," but that no one knew what the specific changes were going to be (Vigna, Tr. 1413, lines 10-12; Vigna, Tr. 1412, line 15 to p. 1413, line 8). That is, Mr. Vigna acknowledged that the industry knew that there were impending and inevitable changes regarding regulatory capital.

In the second sentence of DPFOF 214, Defendants presented Mr. Amend's testimony correctly; however, earlier in Mr. Amend's redirect examination, when asked when he first knew that goodwill would be phased out from regulatory capital, he responded, among other things, that "somebody else maybe was following it a lot more closely than I was." This statement, along with Mr. Amend's testimony that he took notice of the goodwill change only when it actually impacted the institutions he regulated (Amend, Tr. 4858, line 16 to p. 4859, line 2), suggest that Mr. Amend was not focused on the impending regulations at the time and might not be as reliable a bellweather for the foreseeability of the change in capital requirements as, for example, Tom Powderly (testifying that, in 1988, he expected FIRREA to have a detrimental effect on the treatment of supervisory goodwill). (Powderly, Tr. 353, line 12 to p. 355, line 10).

**DPFOF 215**

In January 1989, Fidelity was discussing the effect upon Fidelity of proposed capital regulations drafted by the FHLBB, which were issued before January 1989, and thus, could not

have been the FIRREA legislation. Tr. 2036:22-2037:14 (Wesp); PX 461 at AST056172. Indeed, Mr. Wesp admitted that Fidelity's discussion at that time concerning proposed FHLBB regulations had "nothing to do with FIRREA." Tr. 2038:2-18 (Wesp).

**Reply**:

The first sentence of DPFOF 215 generally states Mr. Wesp's testimony accurately, but Defendant engages in editorializing ("and thus, could not have been the FIRREA legislation") that is not supported by the testimony nor the document that it cites. Plaintiff has no objection to the second sentence of DPFOF 215. The point is not whether the proposed regulations were or were not "FIRREA." The point is whether it was becoming obvious that there would be regulations affecting capital, and it was.

**DPFOF 216**

In March 1989, Fidelity discussed the effect of proposed capital regulations on Fidelity's investment portfolio. Tr. 2047:11-20 (Wesp); DX 539 at AST056074 ¶ 7. Mr. Wesp acknowledged that "here, when we're talking about proposed capital regulation [what he is referring to] is the BIS/FRB capital regs." Tr. 2047:17-19 (Wesp).

**Reply**:

Defendant has truncated Mr. Wesp's testimony without properly indicating that it has done so in DPFOF 216. The complete sentence reads: "But what I am referring to, I would assume here, when we're talking about proposed capital regulations is the BIS/FRB capital regs, ***which are eventually going to become incorporated into FIRREA***." (emphasis added). (Wesp, Tr. 2047, lines 17-20). The industry knew that there were impending regulatory changes likely affecting capital requirements. The joint BIS/Federal Reserve taskforce's proposed set of risk-

adjusted capital requirements were circulating on Wall Street in 1988, and therefore Mr. Wesp had some idea what the likely outcome would be.

**DPFOF 217**

During 1989, there was no clear idea what final form the FIRREA legislation would take. As Mr. Wesp testified, the "regulatory process was in constant flux," the press was in constant state of speculation, while Congress held "press conference after press conference about what was being drafted in the new legislation." Tr. 1828:6-19 (Wesp). "There was very little in the way of official information coming….It was all just hearsay…It was kind of like walking on quicksand, you know, I mean, you knew there were a lot of things going on and a lot of things up in the air…But there was no reliable source as to what was ultimately going to happen." Tr. 1830:2-13 (Wesp).

**Reply**:

Plaintiff does not object to DPFOF 217, but there are several typographic errors in Defendant's quotations of Mr. Wesp's testimony. The errors, though perhaps individually minor, are not technically accurate representations of Mr. Wesp's testimony and may change the meaning of his testimony. The typographical errors include:

- The omission of open quotation marks before the phrase "the press was in constant state of speculation";
- The transposition of the words "all" and "just" in the third sentence of the paragraph;
- The omission of punctuation mark after the ellipsis after the "hearsay" phrase, which fails to indicate that the quoted sentence ends after omitted words in the original transcript;
- The replacement of the period that appears in the transcript with a comma between the phrases "walking on quicksand, you know" and "I mean." This misquoting error inaccurately represents the two separate sentence in the transcript as one sentence; and
- The omission of final punctuation mark after the ellipsis following the phrase "a lot of things up in the air," which once again inaccurately represents two separate sentences as one sentence.

**DPFOF 218**

Prior to the passage of FIRREA, Astoria, too, did not know how FIRREA would affect supervisory goodwill. Tr. 4362:11-25 (Engelke); DX 2341 at AA4008 0030 (no knowledge of specific FIRREA terms as off March 15, 1989); DX 2346 at AA4008 0074 (April 19, 1989); DX 2350 at AA4008 0081 (May 17, 1989); DX 2355 at AA4008 0086 (June 23, 1989).

**Reply**:

Two of Defendant's three exhibit citations in DPFOF 218 do not remotely support the statement that Astoria did not know how FIRREA would affect supervisory goodwill. In DX 2350 at AA4008 0081, for example, far from supporting its statement that Astoria did not know how FIRREA would affect supervisory goodwill, the cited passage actually provides relatively specific projections about Astoria's expectations regarding the proposed legislation. The relevant section of that page reads:

> President Engelke discussed in general terms proposed FSLIC legislation, which in his opinion, would have little effect on Astoria Federal. Mr. Engelke noted however that he believes legislation, especially with its more stringent capital standards, will dramatically effect marginal association and eliminate many over the years to come.

Further, Defendant's citation to DX 2355 at AA4008 0086 does not support DPFOF 218. The relevant passage on the cited page reads:

> President Engelke reported that the House of Representative passed their versions of the FSLIC restructuring bill overwhelmingly this past week. The House and Senate will meet in Conference Committee starting July 11, 1989 to iron out their legislative differences. Mr. Engelke advised that with the stricter capital standards enacted, many in our industry will be under regulatory scrutiny, but in his opinion, troubled organizations with a solid business plan will be given a reasonable opportunity to succeed. Mr. Engelke once again reiterated that Astoria Federal certainly will be a survivor and is in excellent financial condition.

Plaintiff further notes that Astoria's foreknowledge of FIRREA is utterly irrelevant to the assessment of Fidelity's damages.

**DPFOF 219**

On August 9, 1989, Congress enacted FIRREA. DX 557; Tr. 1407:3-6 (Vigna). Even in October 1989, after FIRREA had been passed, Astoria saw the application of different capital standards as possibilities. Tr. 4374:2-9 (Engelke).

**Reply**:

The phrase "Astoria saw the application of different capital standards as possibilities" is not clear. Plaintiff has no other objections to DPFOF 219.

**DPFOF 220**

FIRREA's implementing regulations were issued on November 7, 1989, and took effect on December 7, 1989. Tr. 1410:7-17 (Vigna); PX 511 at AST0704525. Fidelity did not receive guidelines for the preparation of its Capital Plan until December 18, 1989, and Fidelity "did exactly" what the guidelines said. Tr. 1845:23-1846:10, 1847:13-21 (Wesp); PX 520.

**Reply**:

Plaintiff has no objection to DPFOF 220.

**DPFOF 221**

With FIRREA, the FDIC became Fidelity's backup regulator. The OTS did not need the FDIC's absolute approval but agreed to coordinate with them. Tr. 1445:9-15 (Vigna).

**Reply**:

Plaintiff has no objection to DPFOF 221.

**DPFOF 222**

FIRREA required the Director of the OTS to promulgate regulations establishing a "tangible" capital requirement, a "leverage" or "core" capital requirement, and a "risk-based" capital requirement for thrifts. DX 557 at AA-NAV-002835. FIRREA required the phase-out of goodwill from capital. Tr. 1404:23-1405:1 (Vigna). Tangible capital, however, did not include any intangible assets, such as goodwill. 12 U.S.C. § 1464 (t)(9)(c). Nevertheless, FIRREA and the regulations permitted a thrift to include certain amounts of "qualifying supervisory goodwill" in the calculation of core capital. This limit was initially 1.5 percent of total assets. The limit declines each year and was phased-out entirely by December 31, 1994. 12 U.S.C. § 1464(t)(3)(A); 12 C.F.R. § 567.5(a)(1-2).

**Reply**:

Plaintiff has no objection to DPFOF 222.

**DPFOF 223**

In addition to its phase-out and elimination of goodwill, FIRREA eliminated $34.21 million in non-goodwill, pre-FIRREA regulatory capital from Fidelity's tangible and core capital, and $30.2 million from Fidelity's risk-based capital. DX 1150 at 13, Ex. 6.0 (Kennedy).

**Reply**:

Mr. Kennedy in his expert report argued that FIRREA's elimination of non-breach-related components from Fidelity's regulatory capital should have adversely affected the 8.25% growth rate in Dr. Kaplan's model. At trial, Defendant and Mr. Kennedy did not articulate this argument—neither explaining exactly how the elimination of these figures would affect the rate, nor quantifying what Mr. Kennedy would expect the change in Dr. Kaplan's model to be.

Therefore, while these numbers accurately reflect the figures cited in DX 1150 and Ex. 6.0 of Mr. Kennedy's report, Plaintiff responds that the non-breach-related sums that FIRREA might have eliminated are irrelevant to this matter. If they were relevant, Defendant should have addressed them at trial.

**DPFOF 224**

After these deductions, Fidelity failed all three of the new FIRREA regulatory capital standards. Fidelity reported tangible capital of negative $29.4 million as of December 31, 1989, which left it $57.1 million short of its $27.7 million requirement. Fidelity's core capital, which included a portion of Fidelity's goodwill, was a negative $1.7 million, again leaving it $57.1 million short of its requirement of $55.4 million. Fidelity's risk-based capital, which also included a portion of Fidelity's goodwill, was negative $1.7 million, leaving it $67.5 million short of its requirement of $65.8 million. PX 509 at AST001984.

**Reply**:

The numbers that Defendant cites in DPFOF 224 are correct; however, Defendant's comment that Fidelity's risk-based capital "also included a portion of Fidelity's goodwill" is not supported by PX 509 at AST001984. Only the paragraph focused on core capital indicates that goodwill is included: "Core capital is defined as retained earnings plus qualifying supervisory goodwill and other qualifying intangible assets." There is nothing in PX 509 at AST001984 to indicate that a portion of Fidelity's goodwill was contained in its risk-based capital.

Further, Defendant's use of the phrase "after these deductions," which presumably refers to the amounts listed in DPFOF 244, is gratuitous and irrelevant.

**DPFOF 225**

Fidelity's goodwill related to the Dollar merger was $19.33 million at December 31, 1989. PX 526 at AST008366; Tr. 1619:9-11 (Lovely). As of the end of September 1989, Fidelity reported other regulatory capital components on its books that are not the subject of its lawsuit, including $2.266 million in loan discounts, $2.851 million in deferred losses, $1.086 million in loan origination and commitment fees, and general valuation allowances of $4.010 million. PX 502 at WON722 0259-60. It also had net worth certificates of $4.664 million, which Fidelity redeemed in December 1990, in an agreement with the FDIC, as manager of the FRF (the successor in interest to the FSLIC's Assistance Agreements).[15] PX 707 at WON730 1816; PX 643; Tr. 854:9-855:20 (Powderly). As part of that agreement, Fidelity agreed to release "any claims that Fidelity may have under the Notes."[16]

**Reply**:

Plaintiff is mystified about the origin of Defendant's $4.664 million figure for the Net Worth Certificates that Fidelity redeemed in December 1990. None of the three pieces of evidence to which Defendant cites supports the figure; in fact, all three attest to Fidelity's being

---

[15] Pursuant to Section 215 of FIRREA, all of the promises contained in the FSLIC Assistance Agreement transferred to the FRF. See Resolution Trust Corp. v. FSLIC, 25 F.3d 1493, 1505-06 (10th Cit. 1994).

[16] Prior to their redemption, Fidelity earned $1.25 million in interest income from the FSLIC on its NWCs. PX 335 at AST002389; PX 1283 at AST060056; PX 1314A at Ex. 5. As part of the redemption agreement, the FSLIC paid Fidelity $2.99 million, and related accrued income payments of $.687 million were cancelled, so that Fidelity recorded a $4.7 million total direct increase to retrained [sic] earnings as a result of the redemption agreement. PX 707 at WON730 1816.

paid $2.99 million for the Net Worth Certificates it redeemed in December 1990. The two exhibits that Defendant cites indicate that $687,000 was additionally paid to Fidelity at the redemption, to reimburse Fidelity for accrued income. The $2.99 million together with the $687,000 accrued income payment, though, add up to $3,677,000, which is nearly a million dollars off of Defendant's figure.

In addition, Defendant has omitted any citation to support its statement that Fidelity released any potential claims under the Notes and though the sentence appears to contain a direct quotation, there is actually no citation. Plaintiff does not contest the sentence's substance.

Plaintiff does not object to the other statements in the main text of DPFOF 225.

Plaintiff does not object to the first footnote contained in DPFOF 225, but it does object to the second footnote. The last sentence of the second footnote contains the same mathematical error as the related paragraph DPFOF 225 does: the figures $2.99 million and $0.687 million do not add up to $4.7 million. If Defendant is using for its calculations a secret formula to get to the $4.7 million figure, it should have shared those calculations with the Court and Plaintiff at trial.

**DPFOF 226**

Adding these five items to the balance of Fidelity's goodwill from the Dollar acquisition demonstrates that, as of approximately December 1989, Fidelity held $34.207 million in non-contractual regulatory capital, or approximately 25 percent of the total regulators capital held by the thrift at that time. PX 526 at AST008366; PX 502 at WON722 0259-60. FIRREA eliminated the inclusion of these items from Fidelity's regulatory capital computations. Accordingly, to the degree that Fidelity felt an effect from FIRREA's phase out of regulatory

capital, 25 percent of that effect can be attributed to its loss of capital not attributable to its contract with the Government.

**Reply**:

There are errors in Defendant's calculations and process that cause DPFOF 226 to be inaccurate and misleading. First, as Plaintiff pointed out previously in its response to DPFOF 225, the $4.667 million figure representing the amount that Fidelity received for the Net Worth Certificates in December 1990 is incorrect, even when one includes the separate accrued interest payments associated with the Net Worth Certificates. Subsequent calculations based on that figure are incorrect.

Second, Defendant has taken liberty with the realities of time: it cites a supporting document dated September 1989 (PX 502) to bolster its statement about what regulatory capital Fidelity held in December 1989. Defendant's conclusion that 25% of the effect that Fidelity suffered from FIRREA's elimination of supervisory goodwill is attributable to causes other than the Government's breach of contract is therefore flawed and inaccurate.

Defendant is apparently striving to make new arguments out of old documents. There does not appear to have been any testimony at trial on this calculation.

**DPFOF 227**

Despite Fidelity's fall out of capital compliance, the OTS permitted Fidelity to continue to operate while it filed a plan explaining how it intended to regain compliance. In January 1990, Fidelity submitted a Capital Compliance Plan (the "Capital Plan") for approval by regulators. DX 78 is the Capital Plan. DX 78; PX 533. The Capital Plan was conceived and produced by Fidelity's management. DX 78; PX 986 at AST064176.

**Reply:**

It would have been illogical for the OTS to shut down thrifts while their Capital Plans were pending approval. On this point the OTS's only concession to Fidelity, if it can be characterized that way, is that the OTS acquiesced to Fidelity's request to begin operating under the strictures of the Capital Plan while the Plan was still pending approval. Although the Capital Plan's restrictions were tight, Fidelity wanted to begin on the path toward regulatory health as soon as it could.

Plaintiff has no other objections to DPFOF 227.

**DPFOF 228**

The OTS was fair with Fidelity in dealing with its capital plan. Indeed, Mr. Wesp testified that Mr. Vigna was "on our side" and that Mr. Vigna informed him that he had always hoped that the thrift would succeed in its capital plan. Tr. 1850:2 24 (Wesp). Mr. Amend had the most hands-on experience and contact of OTS's senior management with Fidelity. Tr. 662:1-4 (Powderly); Tr. 2311:13-16 (Wesp). Mr. Powderly testified that he had a good opinion of Mr. Amend's ability as an examiner. Tr. 661:15-25 (Powderly). As Mr. Wesp testified, "Walter Amend is one of the most competent regulators that I've ever had to deal with, no question about it. . . . He knew exactly what – he understood the loans, he understood the losses, he understood the industry, he understood the markets. I mean, Mr. Amend had all the pieces it took to be a great examiner." Tr. 2311:17-2312:1 (Wesp). In working with Fidelity under the capital plan, Mr. Amend and Mr. Vigna approved "maybe 80 percent of everything" Fidelity requested as a plan variance. Tr. 2510:17-22 (Wesp). As Mr. Wesp testified, "they were very reasonable people." Tr. 2510:24-25 (Wesp).

**Reply**:

Mr. Wesp's testimony is far more circumspect than Defendant represents in DPFOF 228. For example, Mr. Wesp testified that Mr. Vigna was "***probably*** on our side" (Wesp, Tr. 1850, lines 16-17) (emphasis added), and Mr. Wesp points out that Mr. Vigna only made the statement about his hope that Fidelity would succeed ***after*** Fidelity did succeed with the Capital Plan. (Wesp, Tr. 1850, 2-24). Defendants did not quote from the section of that passage in which Mr. Wesp said, "I mean, you know, the regulatory process was in effect trying to put us out of business…." (Wesp, Tr. 1850, lines 5-6).

Defendant has also overstated the OTS's enthusiasm for approving Fidelity's requested plan variances. Mr. Wesp's testimony on that point emphasized that the relatively high approval of granted variances was because Fidelity only asked for reasonable variances, not because of the largess or bias of Messrs. Amend or Vigna: "***I only asked for things that made sense and that I felt strongly about***. So as a result of that, in the end, I would say they approved—you can ask Mr. Amend or Mr. Vigna or whoever shows up here someday, but my guess would be they approved 75 percent of everything I sent in, maybe 80 percent of everything I sent in, ***because the requests were pretty reasonable to begin with***." (Wesp, Tr. 2510, lines 15-22 (emphasis added)).

**DPFOF 229**

The OTS provided Fidelity with a reasonable amount of flexibility, approving certain transactions outside of the parameters of the capital plan. Tr. 1929:9-13 (Wesp). OTS regulators "were gracious and gentlemanly and as fair as they could be on what we'd all been dealt. So looking back, they deserve a lot of credit too." Tr. 1972:10-12 (Wesp). The "OTS, as I

said, they were – you couldn't have asked for a nicer, more fair and straightforward people – group of people to deal with." Tr. 1972:19-21 (Wesp).

**Reply:**

Despite the slant that Defendant injects into DPFOF 228 and 229, the relationship between Fidelity management and the OTS was not all roses and chocolate. DPFOF 229's first sentence is based on Mr. Wesp's comment that***, within the narrow strictures of the Capital Plan,*** Fidelity management and the OTS had a successful relationship: "[I]t was a successful give and take inside this very tight capital plan." (Wesp, Tr. 1929, lines 12-13). As Mr. Wesp testified, "It was pretty much understood that we were not allowed any slack….[T]he parameters were very, very tight." (Wesp, Tr. 1879, line 12 to p. 1880, line 1).

The second sentence of DPFOF 229 is technically accurate. It would be a more complete statement, however, if it included Mr. Wesp's testimony seconds earlier in which he said of the OTS regulators, "They were straightforward. They were tough, but they were fair." (Wesp, Tr. 1972, lines 6-7).

**DPFOF 230**

Fidelity wrote the capital plan for the regulators, and its representation that it would "continue doing what we are doing," was made for "Angelo [Vigna] or Walter Amend or whoever that was going to actually read and approve this thing." Tr. 1870:22-1871:3 (Wesp); DX 78 at PAA052 2702 ¶ 10. This meant that regulators could "just keep looking for what was always here and you're just going to see more of it." Tr. 1871:17-19 (Wesp) (emphasis added).

**Reply**:

The first sentence of DPFOF 230 is a distorted statement of Mr. Wesp's actual testimony on this point. First, Mr. Wesp had earlier testified that, "…[W]e didn't really know who we were sending this document to. We knew we were sending it to Angelo's office, but we didn't really know who was going to read it and whether they had any affiliation or knew anything about us." (Wesp, Tr. 1860, lines 8-12). Because Fidelity's management did not know the precise audience of its Capital Plan proposal, it deliberately wrote the Capital Plan proposal to be easy to approve.

The second point contained in DPFOF 230's first sentence—that Fidelity intended to "continue doing what we are doing"—follows this fact. Fidelity had anticipated many of FIRREA's restrictions, and began preparing its balance sheet for the likely possibility that Fidelity would have to submit to a Capital Plan in the wake of FIRREA. Fidelity started preparing its balance sheet for a Capital Plan in the summer of 1989, before FIRREA was enacted. (Wesp, Tr. 1842, lines 12-19). Fidelity's management identified strategies and ran models to learn the effects of interest rate fluctuations. "So when the instructions [for the capital plan proposal] finally showed up, we were close to ready to deal with what we had to deal with." (Wesp, Tr. 1843, lines 16-17).

"For the most part, I think we anticipated most of what was in the bill. We anticipated that we would have a new set of capital requirements that would mirror the BIS/ Federal Reserve capital requirements that we talked about earlier." (Wesp., Tr. 1841, lines 9-13). "Anything we did throughout most of the second—all of the second half—second, third, and fourth quarters of '89 was aimed at a year-end balance sheet." (Wesp, Tr. 1838, line 24 – page 1839, line 1). "So

anything that's going on in the summer of—spring, summer, fall of '89, anything that's going on has only one focus, it's to create what we think is the maximum starting point at December 31, 1989 to start this capital plan process." (Wesp, Tr. 1835, lines 20-24). "…[T]here were a lot of things that we were doing in anticipation of the tough years that were coming." (Wesp., Tr. 1840, lines 2-4).

DPFOF 230's second sentence also does not present an accurate snapshot of Mr. Wesp's testimony. Mr. Wesp actually testified that when Fidelity wrote its Capital Plan proposal, Fidelity had already been conforming to what it expected the regulators' restrictions would be.

Mr. Wesp's comment that Fidelity was going to continue what it was already doing refers to the specific preparations that Fidelity had been undertaking in anticipation of FIRREA—not the regular operating business strategies articulated in Fidelity's pre-FIRREA business plan. As Mr. Wesp described it, Fidelity's "continue what we are doing" comment was prompted by Fidelity management's anticipation of the regulators

> reviewing those documents, knowing that there are—that there's nothing new from what you've been looking at in Fidelity's financial statements for the last year or so, because as we have just been talking about, we had been working towards the ultimate balance sheet to start this plan, then if you say there's nothing new, just take what you've been looking at and keep running it forward, that it makes it much easier to assimilate what it is you're reading and what you're looking at. Why make it hard for whoever it is that you're trying to get to approve this document for you? So it's kind of a road sign that says just keep looking for what was always here and you're just going to see more of it.

(Wesp, Tr. 1871, lines 6-19).

**<u>DPFOF 231</u>**

Mr. Vigna relied on the truthfulness of the certification in PX 550 at

AST0704214: “Fidelity is in substantial compliance with applicable statutes, regulations, orders and written agreements and directives," and two, that "Fidelity has not engaged in insider dealing, speculative practices or other activities that have or may jeopardize the association's safety and soundness or contributed to impairing the association's capital. Tr. 1535:22-1536:10 (Vigna); see also PX 526 at AST008354, AST008364.

**Reply:**

DPFOF 231 is both inappropriate and irrelevant to any issue in this case. The Court sustained Plaintiff’s objection to the question and to the line of questioning: “[I]t seems to be pretty speculative what he may or may not have done, had he known at the time of the certification, what he may have thought or what may have happened. So I’ll sustain the objection.” (Wheeler, Tr. 1537, lines 11-15). Given the Court’s unequivocal position, DPFOF 231 is not proper material for a proposed finding.

**DPFOF 232**

The FDIC and OTS had very different views about Fidelity’s capital plan initially but they reconciled and OTS approved the Capital Plan with FDIC support. Tr. 1449:7-18 (Vigna). The FDIC never withdrew insurance from any institution in Fidelity’s financial condition. Tr. 1476:19-20 (Vigna). Mr. Vigna testified that the FDIC knew withdrawal of insurance would cause a panic and that is why it never happened. Tr. 1477:5-11 (Vigna). On May 18, 1990, the OTS informed Fidelity that its Capital Plan had been approved. PX 590; Tr. 1455:3-11 (Vigna).

**Reply**:

Plaintiff objects to DPFOF 232 because it is incomplete. Although Mr. Vigna testified that the FDIC did not withdraw insurance from institutions that were in Fidelity's financial condition, Fidelity's management had no way of knowing that the FDIC's threats were hollow.

What Fidelity's management knew was that the FDIC had threatened to revoke Fidelity's deposit insurance in June 1991, October 1991, April 1992, and September 1992, and the FDIC actually formally recommended the commencement of proceedings to revoke Fidelity's deposit insurance in May 1992. The FDIC's threats and the recommendation of proceedings to revoke Fidelity's deposit insurance certainly did not come with disclaimers that the FDIC was merely saber-rattling. (PX 735 at AST001855; PX 798 at AST002105; PX 866 at AST097644; PX 877; PX 912 at WON736 0004-05). The FDIC's threats were very real to Fidelity. Had the FDIC terminated Fidelity's deposit insurance, it would have put Fidelity out of business. (Powderly, Tr. 482, line 8 to p. 483, line 6).

**<u>DPFOF 233</u>**

Fidelity's Capital Plan set forth a strategy to increase its capital that included no or little growth followed by moderate shrinkage in calendar year 1994. Due to Fidelity's conversion in 1993, this moderate shrinkage never occurred. PX 986 at AST064176; Tr. 904:2- 6 (Powderly).

**Reply:**

The testimony and exhibit cited in DPFOF 233 support the first sentence. The cited sources, however, do not support the second sentence. In fact, neither even mentions the projected moderate shrinkage or the conversion's effect on that intended path.

**DPFOF 234**

The Capital Plan states that Fidelity's management and board of directors considered and rejected nine strategies before deciding upon a tenth strategy: "[c]ontinue doing what we are doing." Tr. 423:2-424:23, 804:4-13 (Powderly); DX 78 at PAA052 2701-02. After FIRREA, Fidelity repeatedly affirmed that the Capital Plan strategy was "effectively the same" as a business plan that Fidelity had been following since 1987. PX 964 at OAA004 2506, 2541; PX 986 at AST064176, AST064193; see also Tr. 804:9-25 (Powderly).

**Reply:**

DPFOF 234 technically is supported by its citations. However, the paragraph ignores the nuances of Mr. Powderly's testimony. Mr. Powderly agreed that the Capital Plan strategy was to "continue doing what we are doing ***at the time***" (Powderly, Tr. 423, lines 18-22) (emphasis added); but he notes immediately after that he is not including, *i.e.*, Fidelity's projected growth rate in that statement. (Powderly, Tr. 424, lines 20-23). Mr. Powderly testified that the capital plan contained many of the main strategies that were in practice at Fidelity at the time (retaining earnings; amortizing goodwill; taking measured gains out of the portfolio; and reducing credit and interest rate risk). (Powderly, Tr. 423, line 18 to p. 424, line 4). These were steps that Fidelity was already employing to protect its balance sheet from harm from interest rate swings and the softening New York real estate market before FIRREA was enacted.

**DPFOF 235**

Mr. Amend understood the phrase "continue doing what we are doing," at DX 78 at PAA052 2702, to mean that Fidelity was proposing to continue "the type of activities the institution was engaging in prior to the submission of this plan over, say, the prior year or two,

they would continue to follow that path, in essence, restrict new lending -- the high-risk lending, work on those assets and concentrate on basically minimal risk asset generation, which is purchasing the mortgage-backed securities, and that was pretty much [it].” Tr. 4321:5-15 (Amend). “So this was a stabilized growth plan, and it looked to generate earnings in a positive manner from a strategy that already had existed at the bank for at least a year, maybe more.” Tr. 4322:21-24 (Amend).

**Reply:**

Plaintiff notes that Mr. Amend’s complete testimony on the matter includes his comment: “I believe they had no other choice but to have a plan like this anyway. They were—had to do a plan. This is what a regulator would like to see, which is controlled growth, work on your problems, do not increase credit risk to any marked degree, and carefully manage your interest rate risk.” (Amend, Tr. 4321, line 21 to p. 4322, line 1).

Plaintiff also refers the Court to its responses to DPFOFs 230, 234, and 240.

**DPFOF 236**

Fidelity’s publicly-filed documents all confirmed that the Capital Plan was merely a continuation of a business plan that Fidelity had formulated in 1987. In its subscription offering circular, contained in its application to the OTS for permission to convert to a stock institution, for example, Fidelity described the strategy contained in the Capital Plan as “effectively the same business plan under which the Bank had been operating since 1987.” PX 964 at OAA004 2541. Elsewhere in that application, Fidelity wrote that the capital plan “in effect formalized a business plan under which the Bank had generally been operating since 1987 . . . .” Id. at OAA004 2483.

**Reply:**

Plaintiff refers the Court to its responses to DPFOFs 230, 234, and 240.

**DPFOF 237**

Specifically, Mr. Powderly testified on re-direct examination that the Capital Plan, which provided for little or no asset growth, "formalized policies under which the bank generally had been operating since 1987" in all respects, including aspects of the bank's operations other than real estate operations:

Q. Now I'd like you to go ahead in that same document to page 7. Mr. Todor referred you to I guess it's the third full paragraph on that page and the – it's all one sentence, the last sentence in that paragraph that begins "the capital plan, which was developed by Messrs. Powderly, Wesp and Meyer." Do you see that I referred to?
A. Which is the one – number 7?
Q. It's on page 7, and it's the third full paragraph on that page. And in the second half of the paragraph –
A. Yes, I see it.
Q. Okay. And that talks about the capital plan being "to a significant degree" – strike that, let me start that over again. The sentence says the capital plan, which was developed by you, Mr. Wesp and Mr. Meyer, "to a significant degree formalized policies under which the bank generally had been operating since 1987." Was the capital plan in all respects something you had been operating under since 1987?
A. In many respects, yes.
Q. In all respects?
A. Yes, I believe so.
Q. With respect to your real estate operations, when was it that you began cutting off the real estate lending and sending the developers elsewhere?
A. As soon as I – as soon as I got the job of running that portfolio. I would say it was mid-'87.
Q. And does the reference there to 1987 refer to aspects of the bank's operation other than the real estate operations?
MR. TODOR: Objection; leading.
BY MR. EISENHART:
Q. If you know.
THE COURT: I'll allow it.
THE WITNESS: What was the question again?
BY MR. EISENHART:
Q. Does the reference there to the bank's operations since 1987 refer to things other than the real estate operations?

A. Yes.

Tr. 989:21-991:10 (Powderly) (discussing PX 986 at AST064176, which projects "no or little growth followed by moderate shrinkage in calendar year 1994."). See also PX 964 at OAA004 2506, 2541.

**Reply:**

Plaintiff refers the Court to its responses to DPFOFs 230, 234, and 240.

**DPFOF 238**

In its subscription offering circular, Fidelity wrote that the capital plan provided for a strategy that included "no or little growth," "reducing construction and commercial loan balances," "reducing interest rate and credit risk," and "containing operating costs and expenses." Immediately following this language, the capital plan stated that the capital plan "in effect formalized a business plan under which the bank has generally been operating since 1987." PX 964 at OAA004 2483; PX 986 at AST064176; Tr. 2489:25-2490:16 (Wesp). Although Mr. Wesp attempted to disavow the importance of this language, he admitted that "We listed four key components of the capital plan and then said in effect, our operating businesses are about the same as they have been for the few years prior to the plan." Tr. 2492:15-18 (emphasis added) (Wesp).

**Reply:**

Plaintiff refers the Court to its responses to DPFOFs 230, 234, and 240.

**DPFOF 239**

Fidelity explained to potential purchasers of its stock (and the Securities and Exchange Commission ("SEC")) that the strategy in the Capital Plan "to a significant degree formalized

policies under which the Bank had been operating since 1987." PX 986 at AST064176, AST064193; Tr. 904:14-22 (Powderly). Mr. Wesp agreed that the statements in the offering circular "were all true," saying "I'd have to be a screwball not to." Tr. 2506:1-11 (Wesp).

**Reply:**

Plaintiff refers the Court to its responses to DPFOFs 230, 234, and 240.

As to the point in DPFOF 239 that Mr. Wesp's testimony affirming that the statements in the offering circular were all true, it should be noted that the Defendant had asked Mr. Wesp several times in the minutes leading up to that question about the accuracy of similarly-worded statements. (Wesp, Tr. 2502, lines 22-25; Wesp, Tr. 2504, lines 1-3; Wesp, Tr. 2506, lines 12-14.) Mr. Wesp's tone might have reflected that the Defendant's questioning had focused tirelessly on whether Mr. Wesp perceived certain statements to be accurate. (Wesp, Tr. 2493, lines 17-20; Wesp, Tr. 2494, lines 12-14; Wesp, Tr. 2497, lines 1-18; Wesp, Tr. 2499, line 25 to p. 2500, line 1; Wesp, Tr. 2500, lines 24-25; Wesp, Tr. 2501, line 23 to p. 2502, line 1.)

**DPFOF 240**

Fidelity used similar language to describe the Capital Plan in its annual report to the SEC after its conversion. Fidelity stated that the capital plan generally provided for a strategy that included "no or little growth followed by moderate shrinkage in calendar year 1994," "reducing construction and commercial loan balances, and limiting lending to one to four family mortgage, home equity and consumer and student loans," "reducing interest rate risk and credit risk," and "containing operating costs and expenses." DX 3071 at PAA014 2007; Tr. 2502:12-25 (Wesp). The report to the SEC then stated that "[t]his strategy to a significant degree formalized the

policies under which the bank had been operating since 1987." Tr.2503:19-2504:19 (Wesp);[17] DX 3071 at PAA014 2007.

**Reply:**

Although there are documents that state that the Capital Plan contained many of the strategies articulated the 1988 Business Plan, Defendant's statement that it was "merely" a continuation ignores the testimony by Messrs. Wesp and Powderly regarding the tight control that OTS and the FDIC wielded over Fidelity throughout the Capital Plan's operation: the consequences of even slight variances from the targets, the required permission for operational details, etc. The Capital Plan ***was*** a continuation of many of the steps that Fidelity had begun to undertake to protect its balance sheet from the instability following interest rate volatility and New York real estate market changes. It was certainly not a carbon copy of the pre-FIRREA business plan that Fidelity had drafted, though, and the essential components of projection (growth rate, plans to pursue new business) were near opposites.

Plaintiff objects to the footnote contained in DPFOF 240. Mr. Wesp did attest to the accuracy of all the statements, and his comment cited in the footnote was merely a reminder to

---

[17] At trial, Mr. Wesp was asked a number of questions concerning Fidelity's annual report to the SEC, and in each instance, Mr. Wesp agreed that the statement set forth in the annual report was true. See, *e.g.*, Tr. 2494:23-2495:14, 2498:6-22, 2499:1-:2500:1, 2500:17-25, 2501:11-2502:1 (Wesp). Nonetheless, Mr. Wesp suggested that the annual report's statement concerning the bank's capital plan strategy as formalizing to a significant degree the policies under which the thrift had been operating since 1987, should not be interpreted literally because "10-Ks and offering documents and stuff are written for totally different purposes than capital plans and budgets that were written in 1988." Tr. 2504:13-19 (Wesp).

the Court that the documents are written for different purposes and different audiences. There is nothing sinister in Mr. Wesp's observation.

**DPFOF 241**

Fidelity adopted a wholesale strategy as the means to ensure the results projected in the capital plan. Tr. 1876:17-1877:25 (Wesp). Thus, but for the capital plan, Fidelity may have not pursued its wholesale strategy to the degree it did and may have pursued retail lending operations. These operations would have "come undone," in the post-FIRREA period, given the effect of the Iraqi invasion of Kuwait and the resulting effect on "the economy, the retail market and the interest rate markets." Tr. 1878:1-10 (Wesp). Thus, as Mr. Wesp repeatedly acknowledged, it was, in fact, fortuitous to Fidelity to have concentrated on a wholesale strategy as modeled in its capital plan:

> As I've said before . . . we were lucky enough to have – and I can't say that we were smart enough. We were lucky enough to have picked a capital plan strategy that was pretty much immune to event risk, including recessions. Because we were operating in the wholesale markets.

Tr. 2353:2-7 (Wesp).

**Reply:**

Plaintiff has no objection to the first sentence of DPFOF 241.

The second sentence, however, is conjecture and not supported by the Record. Fidelity had begun using a wholesale strategy well before it submitted the Capital Plan. In fact, Mr. Wesp was hired specifically to create an investment portfolio. (Wesp, Tr.1726, lines 2-19; Wesp, Tr. 1728, lines 23 to 1729, line 14). Fidelity began to phase out its practice of originating loans with deposits and instead began purchasing securitized mortgages as early as 1987. (PX 618 at AST001646; PX 986 at AST064174; PX 462 at AST0703558). While Fidelity's use of a

wholesale strategy might have indeed been fortuitous, as Mr. Wesp noted, it was a strategy that the bank had already begun to launch before FIRREA was enacted in 1989.

DPFOF 241's third sentence, standing alone, is an accurate statement of Mr. Wesp's testimony, to the extent that Mr. Wesp commented on the difficulties thrifts during that time would have experienced had they not employed a wholesale strategy.

DPFOF 241's fourth sentence is nearly accurate. The sentence does not acknowledge that Fidelity had already begun to use a wholesale strategy before FIRREA was enacted: it was smaller in scale than what the capital plan proposed, but it was a wholesale strategy nonetheless. DPFOF 241's fourth sentence implies that, without the Capital Plan with its wholesale strategy, Fidelity would not have been able to survive the following years. Not only was Fidelity "smart" and "lucky" enough to have used a wholesale strategy in its Capital Plan, it was "smart" and "lucky" enough to have recognized the wholesale strategy as a successful one well before the breaching regulations were enacted.

**DPFOF 242**

The Capital Plan, in fact, benefitted Fidelity by causing it to focus on mortgage securities. "By pure luck, this turned out to be a great strategy to survive one of the worst periods of economic recession and volatility in the post-war history." Tr. 2360:24-2361:1 (Wesp).

**Reply:**

See Plaintiff's response to DPFOF 241.

**DPFOF 243**

Fidelity's executives repeatedly testified about the difficulties Fidelity faced after FIRREA due to economic conditions, apart from the loss of the Suburbia goodwill. In its 1993

stock subscription offering circular, Fidelity stated that, "In recent years, the New York City Metropolitan area has experienced significant downturns in the market value of real estate, resulting, in part, from layoffs in the financial services industry and corporate relocations, a general weakening in real estate values and a slowdown in home sales and construction." PX 986 at AST064185; Tr 905:5-12 (Powderly). Mr. Powderly agreed that Fidelity would have had to deal with these issues with or without the Suburbia goodwill. Tr. 905: 13-15 (Powderly).

**Reply**:

The first two sentences of DPFOF 243 are accurate statements. As for the final sentence, Plaintiff notes that although Fidelity had to deal with the difficult economic elements whether or not it had Suburbia's goodwill on its books, Fidelity would have had a much easier time fighting for its survival if the Suburbia goodwill had counted toward its regulatory requirements.

**DPFOF 244**

Mr. Wesp agreed that, in April 1990, the economic condition in New York was "pretty bad," and the real estate market was weak. Tr. 2176:15-18, 2177:12-17 (Wesp). By June 1990, Fidelity recognized the "severe downturn in current real estate values in the 1-4 family housing market." PX 599 at AST048969; Tr. 2189:4-20 (Wesp). Mr. Wesp agreed with the proposition that when there is a severe downturn in real estate values, it is hard for a bank to do much business with respect to traditional loans because when prices decline severely, people simply don't sell their house and they stay put until the market improves. Tr. 2189:21-2190:8 (Wesp). Similarly, Mr. Powderly testified that, even with the goodwill, Fidelity would only have leveraged "slightly" under the harsh economic conditions of the early 1990s. Tr. 794:25-795:3 (Powderly).

**Reply**:

The first three sentences of DPFOF 244 are accurate. Although the fourth sentence is an accurate summary of that part of Mr. Powderly's testimony, it is completely irrelevant to the rest of DPFOF 244. (*See* PPFOFs 703 to 720).

**DPFOF 245**

By August 1990, Fidelity's commercial lending department was expending most of its efforts dealing with Fidelity's bad commercial loans, and they were not reaching to put on new loans. DX 2448 at AST030217, AST030218; Tr. 2220:21:5 (Wesp). Indeed, in September 1990, Fidelity reported only one commercial loan application, which Mr. Powderly advised Fidelity not to accept. Tr. 2221:19-222:2 (Wesp); PX 620 at AST030219. Furthermore, for the preceeding month, Fidelity reported only one loan application for a traditional one-to-four family loan, despite the fact that the bank had over 20 branches. Tr. 222:14-223:1 (Wesp); PX 620 at AST030220. It only received one consumer loan application over the same period. Tr. 2223: 11-25 (Wesp); PX 620 at AST030220.

**Reply:**

The first sentence of DPFOF 245 is not wholly accurate. The committee meeting minutes do state that the commercial lending department was focusing its efforts on problem loans, but the document states that the consumer lending department—not the commercial lending department—is carefully considering its loans: "Consumer lending is staying put, looking at all applications on a conservative basis. We do not wish to pass up good business but do not wish to reach to put on loans we really do not want." (DX 2448 at AST030218).

Defendant's citation to "Tr. 2221:21:5 (Wesp)" after the first sentence is indecipherable.

Finally, Fidelity's cautious approach to making new loans was a deliberate strategy at the time. As Mr. Wesp testified, "We did it on purpose….We were chasing all of the credit risk out of the institution, and we were going to operate on modest interest rates at very tight spreads and work our way through the capital plan." (Wesp, Tr. 2223, lines 5-10). Mr. Wesp addressed a question about the low number of loan applications Fidelity received by stating: "We were intentionally doing that…. We were not encouraging any lending. And lots of other institutions in the neighborhood were." (Wesp, Tr. 2223, line 25 – p. 2224, line 4).

**DPFOF 246**

While Mr. Wesp admitted that "the real estate market was slow, no question about that," he incorrectly attributed Fidelity's lack of lending at this time to "zero advertising." Tr. 2224:1-9 (Wesp). Fidelity did, in fact, continue to advertise in the post-FIRREA period, as its capital plan and other documents attest. DX 1945 at WON732 1802; DX 671 at AST101760 1943; DX 674 at AST101515; Tr. 3916:6-23, 3918:24-3919:7, 3922:2-25 (Caporusso).

**Reply:**

Mr. Wesp's testimony about the radical budget cuts to the advertising budget illustrates his use of hyperbole, just as he did in other areas of testimony. See, for example, Mr. Wesp's comment that "the world stopped" to describe the economic troubles facing the equity markets in the early 1990's. (Wesp, Tr. 2244, lines 12-16).

Setting aside quibbles about Mr. Wesp's word choice, however, Fidelity's advertising budget dropped 40-50% under the Capital Plan compared to 1988 budget projections. (Caporusso, Tr. 3917, lines 15-22; Tr. 3925, lines 3-10). Under the much-reduced ad budget of

the Capital Plan, Fidelity completely dissolved its advertising department and ultimately turned to outsourcing for its few advertising needs.

**DPFOF 247**

As of November 1990, Fidelity's management reported that housing starts were the lowest they had been since 1982, and they predicted that housing starts would be further reduced in December 1990. Tr. 2237:4-10 (Wesp); DX 2460 at PAA035 1017. Indeed, Fidelity recognized that there was "serious economic weakness" in November and December. "It was hitting the world….I mean this was ugly." Tr. 2237:24-2238:6 (Wesp). Mr. Wesp further agreed, as "absolutely true," that there "was a general lack of stability in the marketplace at that time." Tr. 2238:11-13 (Wesp). Mr. Wesp repeatedly admitted that, assuming away Fidelity capital plan, (and thus, irrespective of the breach), given the economic weakness in the world markets at this point in time, Fidelity would not have grown. Tr. 2239:18-2240:19 (Wesp).

**Reply:**

Mr. Wesp's actual testimony on this point is not as sweeping as Defendant would like it to be.

The first four sentences of DPFOF 247 are technically accurate representations of the Record. The final sentence of DPFOF 247, however, is misleading. Mr. Wesp specifically testified that Fidelity would not have grown "***for a quarter***" or ***"for a couple of months"*** (Wesp, Tr. 2240, lines 10-14 and lines 17-19), so paraphrasing his testimony by saying that Fidelity simply "would not have grown" implies a sweeping, open-ended sentiment not supported by the Record.

**DPFOF 248**

The cessation of economic activity included a lack of lending as Fidelity's customers were "reluctant to borrow in the current economy." Tr. 2244:7-12 (Wesp); DX 2460 at PAA035 1018. As Mr. Wesp stated, "[I]n this particular period here where as I'm saying this is worse than a recession. This is—the world stopped. This was kind of Ayn Rand. The world froze. It just stopped. Nobody did anything." Tr. 2244:12-16 (Wesp). Again, Fidelity's lending department focused its efforts "on the collection as opposed to the production side," with Mr. Lovely noting that "it is apparent delinquencies are increasing rapidly in all parts of the country." DX 2460 at PAA035 1018; Tr. 2244:20-25; 2245:20-24 (Wesp). Furthermore, Fidelity noted that "unemployment has taken its effect," with "individuals …attempting to stretch income that has been shrunk." DX 2460 at PAA035 1018; TR. 2246:21-2246:2 (Wesp). Mr. Wesp could not have been more clear about the economic state of affairs at this point in time. "This was a major U.S. recession or major U.S. economic slowdown because of the war, you know." Tr. 2246:19-20 (Wesp). "I mean, there are a lot of things that are having trouble in December of '90. The world is coming to an end here." Tr. 2249:11-13 (Wesp).

**Reply:**

Plaintiff has no objection to DPFOF 248, except to note that the testimony cited to support the third and fourth sentences are not actually Mr. Wesp's testimony on the matter, but rather Mr. Wesp's acknowledgement that the Defendant had read from the exhibit correctly.

**DPFOF 249**

Furthermore, Mr. Wesp recognized that by May 1990, Fidelity was feeling the effects of disintermediation, as customers were taking their money out of Fidelity, investing in the stock

market and other non-thrift investments. Tr. 2182:18-2183:8 (Wesp); PX 594. The disintermediation continued; Fidelity reported $1.3 million of disintermediation from December 1990. Tr. 2268:22-2269:8 (Wesp); DX 2475 at PAA035 1029.

**Reply:**

Plaintiff has no objection to DPFOF 249.

**<u>DPFOF 250</u>**

By the end of November 1990, Fidelity reported an increase in loan payment delinquencies and an increase in bankruptcy proceedings. Tr. 2252:4-10 (Wesp); DX 2466 at PAA035 1019. Furthermore, Fidelity noted that "rather than borrow, many individuals are withdrawing savings they may have to pay current expenses." Tr. 2253:10-19 (Wesp); DX 2466 at PAA035 1020.

**Reply:**

Plaintiff has no objection to DPFOF 250.

**<u>DPFOF 251</u>**

During early December 1990, Fidelity reviewed several commercial loan applications but found they didn't fit within Fidelity's lending parameters. DX 2467 at PAA035 1021. Indeed, Fidelity was rejecting loan requests about 50 percent of the time due to a lack of "credit worthiness of prospective borrowers." DX 2467 at PAA035 1022; Tr. 2258:10-2259:14 (Wesp).

**Reply:**

The first sentence of DPFOF 251 is accurate. The second sentence is technically accurate, but Mr. Wesp's testimony is merely his agreement that the document says what it says.

**<u>DPFOF 252</u>**

In the middle of December 1990, Fidelity noted that "the economy is deteriorating with a vengeance based on the more recent employment numbers." DX 2470 at PAA113 0067; Tr. 2260:15-24 (Wesp). Fidelity's investment activity was less than at any point in time previously, "[a] reflection of the uncertainties of all markets in the world torn between the Mid East conflict and recession." Tr. 2266:10-17 (Wesp); DX 2470 at PAA113 0067.

**Reply:**

The first sentence of DPFOF 252 is an accurate representation of the exhibit and Mr. Wesp's testimony. The second sentence is also technically accurate, but it is important to note that Mr. Wesp's testimony on Fidelity's decreased investment activity is limited only to December 1990.

**<u>DPFOF 253</u>**

The problems in the capital markets continued into January 1991. Fidelity recognized that "the current real estate recession makes this an inopportune time to begin purchasing these stocks," because "if the mortgage delinquency numbers were going to be bad, stocks were going down, simple." Tr. 2275:5-2276:3 (Wesp); PX 679 at AST0308389. As Mr. Wesp recognized, as of the middle of January 1991, "the equity markets are a mess." Tr. 2275:10 (Wesp). In short, in January, the economy continued to weaken, and, with money supply zero to negative, it was very hard to grow the economy. Tr. 2290:11-18; 2291:20-2292:5 (Wesp); DX 2478 at PAA035 1032. By 1991, the real estate market in New York Metro area was moribund. Tr. 1810:5-7 (Wesp).

**Reply:**

Plaintiff has no objection to DPFOF 253.

**DPFOF 254**

In February 1991, matters only continued to get worse. Tr. 2293: 18-2294:2 (Wesp); DX 2486 at PAA035 1039. In March 1991, even with the conclusion of the Gulf War, Fidelity stated that "there is no concrete sense that the recession is over." Tr. 2203:2-6 (Wesp); DX 2492 at PAA035 1046. In April 1991, Fidelity believed that the recession was bottoming out, but that recovery would be slow. Tr. 2303:25-2304:5 (Wesp); DX 2500 at AST030277. [18] In May 1991, Fidelity stated that there "is no sign that the economy is turning, although it has probably bottomed." DX 2510 at AST0308703-04: Tr. 2314:12-20 (Wesp). In June 1991, Fidelity again stated that the recession had bottomed, that "[t]he market is in a holding pattern," and that "[i]t is not at all clear that the Federal Reserve has done enough for the economy to bounce out of the recession." Tr. 2316:16-2317:3 (Wesp); DX 2516. Fidelity also noted that housing starts were under 1 million, and as long as that was the case the housing market would remain in a recession. Tr. 2319:19-2320:1 (Wesp); DX 2522 at PAA035 1076. In September 1991, the economy was still not out of the recession, and the Federal Reserve was continuing to lower interest rates. Tr. 2336:11-21 (Wesp); PX 766 at AST0307035.

[18] Also in April 1991, Fidelity acquired the Glick development project at 14th Street in Manhattan (encompassing the Palladium (a rock nightclub), a vacant lot and the cite of the old Luchow's restaurant, then vacant) that had been in a long-standing delinquent status. Tr. 2309:14-2311:4 (Wesp); PX 770 at A-12.9 (AST002941); PX 721 at AST0308768.

**Reply:**

Plaintiff has no objection to DPFOF 254.

**DPFOF 255**

The OTS's April 5, 1991 RoE, PX 711, found "[t]hat the level of problem assets was still high, … [with] the need to set up additional loss reserves higher than what was previously estimated." Tr. 4635:7-10 (Amend). As of June 30, 1991, Fidelity had criticized assets totaling $89.7 million, or 4.7 percent of assets. Of these, $76 million were commercial real estate and multi-family mortgage loans which were originated prior to 1988. PX 711 at AST002883, AST002898; Tr. 868:21-869:7 (Powderly). Fidelity had a "series of problems in the years leading up to and following FIRREA with its real estate loans," but "FIRREA itself didn't have much of an effect" on those loans. Tr. 1885:16:23 (Wesp).

**Reply:**

DPFOF 255's first sentence is accurate, but incomplete. Mr. Amend testified in that same passage that the RoE regulators "note[d] that the institution was capable of generating some core profitability." (Amend, Tr. 4365, lines 11-12).

Plaintiff has no objection to the second and third sentences of DPFOF 255. The fourth sentence, while technically accurate, leaves out important sections of Mr. Wesp's testimony. Mr. Wesp continued his testimony by explaining what effect FIRREA did have on Fidelity's real estate loans. FIRREA created the Resolution Trust Corporation, or the RTC, which was the entity that assumed the assets of liquidated institutions. In the years immediately following FIRREA, the RTC depressed real estate prices through its process of liquidating large numbers of properties in concentrated neighborhoods over a short period of time. Fidelity had to write

down some of its assets to very low values because of the RTC's rock-bottom sales of nearby properties. The write-downs that Fidelity had to take on its properties in turn impacted the appraisal process and required Fidelity to post additional reserves that it had not anticipated adding. (Wesp, Tr. 1885, line 23 - p. 1888, line 6).

**DPFOF 256**

During the fifteen month period ended March 31, 1991, Fidelity reported net income of only $1,425,000, but even this small figure included the effect of $6.8 million in net gains from the sale of assets. Id. at AST002988; Tr. 867:14-868:3 (Powderly). In short, without the sale of assets, Fidelity would have reported no positive income for that fifteen month period.

**Reply:**

Plaintiff has no objection to the first sentence of DPFOF 256. The second sentence is mere argument; it has no citation to the Record.

**DPFOF 257**

The OTS also found that Fidelity faced unacceptable interest rate risk. PX 711 at AST002908-10. Mr. Moran reviewed Fidelity's interest rate risk and he reviewed some of its investment activities in connection with the OTS's 1991 examination of the thrift. Tr. 4875:25-4876:7, 4877:6-13 (Moran). Mr. Moran summarized Fidelity's interest rate risk, with a special emphasis on the thrift's interest rate risk relative to the OTS's interest rate risk model, which at the time was called the market value of portfolio equity ("MVPE") model. Tr. 4884:3-7 (Moran); PX 753; PX 770 at AST002908-10. The MVPE model measured the economic value of an institution relative to potential interest rate changes, to assess the impact of interest rates on the economic value of a thrift. Tr. 4885:4-21. MVPE analysis, although calculated in terms of

instantaneous rate changes, was a good indicator of the thrift's exposure to market interest rate risk and the thrift's capacity to absorb that risk. Tr. 4953:7-17, 4955:1-4 (Moran).

**Reply:**

The first sentence of DPFOF 257 overstates the evidence. The document said that Fidelity's interest rate risk "would be considered acceptable for a well-capitalized institution. However, the institution's deficient capital position … provides an inadequate cushion to absorb even modest interest rate changes." (PX 711 at AST008910). Although the Defendant would prefer to ignore it, the pages of the document that the Defendant cites also stated that "[t]he institution's interest rate risk stems ***primarily from its lack of capital rather than the composition of its assets and liabilities***." (PX 711 at AST008910) (emphasis added).

The second, third, and fourth sentences of DPFOF 257 are not objectionable.

The fourth sentence of DPFOF 257, in which the MVPE analysis is cited as a "good indicator of the thrift's exposure to market interest rate risk and the thrift's capacity to absorb that risk" is outweighed by the OTS's criticism of its own model on the basis that quarter-to-quarter volatility detracted from the model's reliability. (DX 2053 at WOL458 0430).

In fact, Mr. Moran himself sent a memorandum to Angelo Vigna criticizing the MVPE analysis for producing false positives in 8 of 14 institutions in the Northeast region that were found to have "excessive" interest rate exposure. (Vigna, Tr. 2842, line 6 to p. 2843, line 23; DX 2053). As Mr. Vigna explained at trial, the MVPE analysis was particularly troublesome with institutions that were capital deficient. Both Mr. Vigna and Mr. Moran believed that there were reliability problems with the MVPE analysis. (Vigna, Tr. 2843, lines 14 to p.2844, line 10; DX 2053).

**DPFOF 258**

Using the OTS's MVPE model, Mr. Moran determined that Fidelity's interest rate risk was very high. With just a change of 100 basis points or 1 percent, Fidelity would lose almost its entire market value (98 percent), and with a change of 2 percent, it would lose more than 250 percent of its market value. Tr. 4886:3-11 (Moran); Tr. 871:1-873:23 (Powderly); PX 711 at AST002908-10; PX 753 at WON743 1491. Even with a decrease of interest rates, Fidelity faced interest risk problems. Tr. 4889:1-22 (Moran). Indeed, because Fidelity had investments in CMO residuals, which are very volatile and perform very badly with a decrease in interest rates, Fidelity's economic value would actually decrease with a 300 basis point decrease in interest rates. Tr. 4889:4-22 (Moran); PX 753 at WON743 1491; PX 770 at AST002908.

**Reply:**

Plaintiff objects to the first sentence of DPFOF 258 on two grounds: first, it has no citation; and second, it does not make clear that Fidelity's interest rate risk appeared high ***when it was evaluated as a percentage of the market value of portfolio equity***. As Mr. Moran said, "If you looked at their change as a percentage of assets, it wasn't especially high. It was actually somehat below average for thrifts at that time." (Moran, Tr. 4885, lines 25 to p. 4886, line 2).

Plaintiff objects to the second sentence of DPFOF 258 because the numeral "250" is incorrect. According to the trial transcript and the exhibits, the number should be 255. (*See* Moran, Tr. 4886, lines 7-8). In addition, citing to Mr. Powderly's testimony on this subject hardly seems advantageous for Defendant. When asked about the MVPE numbers, Mr. Powderly noted, "I don't remember it. I don't remember how the calculations are done, and I don't remember the comparisons."

The third sentence of DPFOF 258 neglects to include the qualifying phrase "under the highly stylized restrictions of the MVPE model."

The fourth sentence technically represents the Record accurately.

Plaintiff also refers the Court to its response to DPFOF 257.

**DPFOF 259**

Even though the OTS's interest rate risk model (MVPE model) showed the thrift facing potentially disastrous susceptibility to changes in interest rats, the thrift's own model of its interest rate risk, obtained through Salomon Brothers, showed an even worse susceptibility to changes in interest rates. In fact, the Salomon Brothers model showed that the thrift would perform worse than predicted by the OTS in all interest rate movements, other than an increase in interest rates of 100 basis points. Tr. 489:14-4892:11, 4981:2-10 (Moran); Tr. 1014:7-1015:8 (Powderly); PX 711 at AST002908-10; PX 770 at AST002909. For example, the Salomon Brothers model showed that Fidelity would lose over 120 percent of its market value if interest rates declines 100 basis points. PX 770 at AST002909. Thus, the thrift's own third-party analysis performed by Salomon Brothers only reinforced the findings by the OTS that the thrift was susceptible to interest rate risk. Tr. 4892:17-4893:4 (Moran); Tr. 1014:7-1015:8 (Powderly). Because goodwill was not included in the assessments of interest rate risk, Tr. 873:21-23 (Powderly), either before or after FIRREA, Fidelity would have faced this interest rate risk with or without the breach.

**Reply:**

Plaintiff objects to the first sentence on two grounds: first, the discussion should be about interest RATES, not interest RATS; and second, as there is no citation for the sentence, it should be dismissed as mere argument.

Plaintiff does not object to the second, third, or fourth sentences, except to note once again that Mr. Powderly's testimony on this topic (cited to support both the second and fourth sentences) is hedged at best: "It appears to be, but for me to discuss this in an intellectually sound manner, I would have to study this and I would have to talk to some people that really understand this modeling system." (Powderly, Tr. 1015, lines 2-5).

As for the fifth sentence, Plaintiff does not object to the first half of the sentence, but the second half of the sentence is mere argument. It contains no supporting citation, and it makes a leap of logic that is specious. The "risk" that Defendant asserts Fidelity faced would not be the sudden 100 to 400 basis point swings in interest rate used by the MVPE model: even Defendant's own witnesses testified that interest rates have never experienced such radical shifts over a short time like the MVPE models. (Moran, Tr. 4953, lines 18 to p. 4956, line 21).

**DPFOF 260**

The composite rating assigned to Fidelity by the OTS in its April 5, 1991 RoE was "5." Asset quality remained mired at a "4" rating, while capital remained at the same "5" rating as had existed in 1989. DX 1448 at WON732 0834.

**Reply:**

Plaintiff has no objection to DPFOF 260.

**DPFOF 261**

In its June 11, 1991 RoE of Fidelity, the FDIC assigned Fidelity a composite rating of "5." DX 3330 at FAA005 1546. The FDIC found that Fidelity's asset quality remained unsatisfactory and objectionable, with excessive volumes of adversely classified assets and past due loans. Id. at FAA005 1545: Tr. 877:14-878:4 (Powderly). The RoE also found that the severity of the loan problems had increased, with Doubtful and Loss classifications exceeding $34 million as compared to $8 million shown for like classifications during the 1989 examination. Id. The FDIC also recognized a depressed real estate market that forced many real estate borrowers to effectively abandon control of their collateral. Id.

**Reply:**

Plaintiff has no objection to the first, third, and forth sentences of DPFOF 261.

The second sentence of DPFOF 261, however, is not supported by the citation to Mr. Powderly's testimony. In fact, in his testimony on this topic, Mr. Powderly said that he had reason to doubt the FDIC's conclusions because, as he termed it, the regulators at FDIC were always "nine months behind the curve." Further, Mr. Powderly's subsequent testimony agreeing that the OTS found increasing criticized assets during that time does not support the overblown "excessive volume" and "unsatisfactory and objectionable" language of the sentence.

**DPFOF 262**

During 1991 and 1992, Fidelity continued to sell assets, reducing the thrift's exposure to credit risk. DX 1427 at Won732 1530-1531; PX 986 at AST064204. The credit risks developed from a downturn in the economy and the real estate market. Between 1987 and 1991, New York City was in a real estate recession. Id. at AST04174. Due to these asset sales, the OTS

determined that Fidelity's net income for the years ended 1990 and 1991 was inflated. In fact, Fidelity's net operating income was negative for years ending December 31, 1990, and December 31, 1991. PX 851 at OAA002 0018.

**Reply:**

Plaintiff has no objection to the first, third, and fifth sentences of DPFOF 262.

The second and fourth sentences of DPFOF 262 both lack citations. Moreover, the fourth sentence is incorrect. While that sentence asserts that Fidelity's net income for 1990 and 1991 was inflated, the evidence cited actually states that it was inflated in some ways and depressed in some ways:

> Net income for the years ended 1990 and 1991 was inflated from the sale of assets ***and depressed*** from the experiences noted for goodwill amortization and the need for additional loan loss provisions.(emphasis added).

**DPFOF 263**

In its response to the FDIC's 1991 RoE, Fidelity readily acknowledged that its Capital Plan did not contemplate the adverse economic environment that Fidelity was to face over the next several years, which included, among other things, a major war in the Middle East, a recession in the United States, an "uncertain global economic environment," and declining real estate values. Fidelity described these factors as "impossible to contemplate" when it wrote the Capital Plan. PX 787 at AST002748; TR. 882:14-883:3 (Powderly). Indeed, the New York economy was particularly hard-hit. In 1993, Fidelity told potential shareholders that "[i]n recent years, the New York City metropolitan area has experienced significant downturns in the market value of real estate, resulting, in part, from layoffs in the financial services industry and

corporate relocations, a general weakening in real estate values and a slowdown in home sales and construction." PX 986 at AST064185; Tr. 905:5-15 (Powderly).

**Reply:**

Plaintiff has no objection to DPFOF 263, except to note that the first and third sentences lack citations.

**DPFOF 264**

Mr. Powderly agreed that the New York real estate market was "depressed" as of June 1991. Tr. 878:15-22 (Powderly). By January 199, the economic problems continued with Fidelity recognizing that economic indicators "do not indicate a turn around in the economy," and predicting further reductions of interest rates from the Federal Reserve. DX 2582 at PAA035 1118; Tr. 2346:8-13. In August 1992, Fidelity wrote that "the economy still has not responded to aggressive Federal reserve policy moves." Tr. 2352:7-12 (Wesp); PX 899 at AST030573. In short, the recession or economic weakness that began in the last quarter of 1990 was lengthy and severe. As Mr. Wesp testified the recession "was ugly and it hung on for a long time." Tr. 2352:17-24 (Wesp).

**Reply:**

Plaintiff has no objections to the first, second, and fifth sentences of DPFOF 264.

The third sentence, regarding the economy's lack of response to the Federal Reserve, came from a passage in Mr. Wesp's testimony when he said that he doubted that anyone at the Federal Reserve knew what FIRREA was, and as a result, there was no connection between the Federal Reserve's policy and FIRREA. (Wesp, Tr. 2352, lines 12-15).

There is no citation supporting the fourth sentence. It is mere argument.

**DPFOF 265**

On May 21, 1992, Fidelity entered into a Supervisory Agreement with the OTS. PX 874 at WON736 1015, 1026. The Supervisory Agreement resulted from the OTS's finding, based on its RoE dated April 5, 1991, that Fidelity had violated laws or regulations and had engaged in unsafe and unsound practices. PX 874 at WON736 1015. Fidelity's significant asset quality problems and the criticism it received from regulators concerning its record-keeping forced the Supervisory Agreement in May 1992 because it was viewed as being "unsafe and unsound." Tr. 2780:11-2781:10 (Vigna); PX 874.

**Reply:**

Plaintiff has no objections to the first sentence of DPFOF 265.

The second sentence is not quite accurate. The cited section of the agreement does not say that the OTS thought that Fidelity had ***both*** "violated regulations" ***and*** was "unsafe and unsound." The agreement states that "[t]he OTS …is of the opinion that the Association has engaged in acts and practices in operating the business of the Association that: (i) have resulted in violations of certain laws and regulations to which the Association is subject ***and/or*** (ii) are considered to be unsafe and unsound." (emphasis added).

The third sentence is unsupported by the cited transcript and exhibit. Mr. Vigna did not testify that Fidelity's practices were "unsafe and unsound": his recollection is merely that it was regulatory policy at the time to draft a formal document for corrective action for institutions that rated 4 or 5 on exams. (Vigna, Tr. 2781, lines 7-10).

**DPFOF 266**

These violations included a failure to obtain appraisals for properties when transferred to real estate owned or when considered in-substance foreclosures; a failure to adjust the book value of real estate owned properties to reflect the fair market value; a failure to establish specific and general valuation allowances totaling $7,565,000 ad $2,059,000, respectively. PX 711 at AST002993, AST002972; Tr. 889:15-21 (Powderly). As a result of these violations, the OTS found that Fidelity had overvalued its assets. Id.

**Reply:**

The Report of Examination that Defendant cites to support the first sentence of DPFOF 266 is not as negative as Defendant presents. The opening paragraph on one of the pages that Defendant cites to support DPFOF 266 notes that "the institution is in compliance with the overall operating strategies stated in the Capital Plan…." (PX 711 at AST002883).

The supporting evidence cited to support DPFOF's second sentence is "id," which does not indicate which of the previous cites it relies on. The electronic version of Defendant's brief links to Mr. Powderly's testimony. That page of Mr. Powerly's testimony, though, contains nothing at all about the accusation that Fidelity overvalued its assets.

**DPFOF 267**

In accordance with the Supervisory Agreement, Fidelity agreed to correct these deficiencies and to (1) complied with all applicable laws and regulations; (2) engage in safe and sound practices; and (3) maintain the Association in a safe and sound condition. PX 874 at WON736 1015. Mr. Powderly testified that the Supervisory Agreement did not affect Fidelity's operations. Tr. 889:22-25 (Powderly).

**Reply:**

Plaintiff has no objection to DPFOF 267.

**DPFOF 268**

The Supervisory Agreement was terminated in January 1993 after the OTS determined that Fidelity had taken corrective actions and had complied with the terms and conditions of the Supervisory Agreement. DX 3371.

**Reply:**

Plaintiff has no objection to DPFOF 268.

**DPFOF 269**

As of March 1992, the OTS found that Fidelity's classified assets remained high, totaling $75.3 million. More importantly, the severity of the problems with Fidelity's loans had deepened. Fidelity's non-performing assets increased from $44 million in March 1989 to $66 million as of March 1992. PX 986 at AST064227. As of December 1992, Fidelity still reported over $46 million in REO, which was net of nearly $18 million in losses already recorded.[19] Id. at AST064227. The OTS also found that Fidelity's ratio of classified assets to tangible capital and general valuation allowances (prior to adjustments in that report) was 430.3 percent, "a very high ratio." PX 851 at OAA002 0010. Mr. Kennedy calculated Fidelity's total cumulative losses due to its asset quality problems as $53 million from 1986-89, and $74 million from 1986-94; lost interest income would be in addition to these amounts. Tr. 5398:1805399:21 (Kennedy).

[19] REO represents properties the thrift has acquired through foreclosure. Because this real estate generally does not produce any income, the more real estate owned by a thrift, the less profitable it is.

**Reply:**

Plaintiff objects to the first sentence of DPFOF 269 because it has no citation, and the next citation asserted (following the third sentence) does not support the sentence. In fact, the citation states that the total classified assets as of March 31, 1992 were $70,464,000--and ***not*** the $75.3 million stated in DPFOF 269.

Plaintiff objects to the second sentence of DPFOF 269 because it is unsupported by any citation.

Plaintiff has no objection to the third sentence of DPFOF 269.

The fourth sentence of DPFOF 269 is partially accurate. It correctly quoted the exhibit as stating that Fidelity had over $46 million in real estate owned. The second part of the sentence ("which was net of nearly $18 million in losses already recorded"), however, does not seem to have originated in the cited material.

The fifth sentence of DPFOF 269 has been stated accurately. Plaintiff notes that the information was extracted from a paragraph that otherwise had two very positive things to say about Fidelity's situation: first, that Fidelity had a one-year drop of $11.1 million in classified assets; and second, that Fidelity's 3.9% ratio of classified assets to total assets compared favorably to the peer ratio of 7.2%.

Finally, Plaintiff objects to the sixth sentence of DPFOF 269 because it misrepresents Mr. Kennedy's confused testimony on this point. Mr. Kennedy first testified that the cumulative loss for after fiscal year 1989 is $53 million ("And then I note that the cumulative losses due to the asset quality problems after fiscal year 1989 totaled $53 million." (Kennedy, Tr. 5398, lines 23-

25). In the next breath, however, Mr. Kennedy testified that the amount was approximately $74 million.

> Mr. Todor: "And Mr. Kennedy, have you reached a conclusion as to Fidelity's cumulative losses due to asset quality problems after fiscal year 1989?"
>
> Mr. Kennedy: "Yes. For—approximately in excess of $70 million, it is approximately $74 million."

Kennedy, Tr. 5399, lines 11-15.

The troubled final sentence of DPFOF 269 cites a section of the transcript that includes both these answers by Mr. Kennedy. It gets both these passages wrong. It is unclear from Mr. Kennedy's testimony which number represents which category and over what amount of time. Moreover, Defendant failed to cite to an exhibit that might illuminate the confusion, so the mystery stands unresolved.

**DPFOF 270**

The OTS's April 8, 1992 RoE assigned fidelity a composite rating of "4." PX 851 at OAA002 0006; DX 1448 at WON732 0834. The "4"rating was based upon the existence of the Capital Plan and the bank's compliance with the projected levels in the Capital Plan. PX 912 at WON736 0040. Fidelity would have been rated a "3" rather than a"4" on the April 8, 1992 exam, PX 851, if its capital had been rated a "2" instead of a "5." Tr. 4727:5-8, 4853:15-21; 4854:8-13 (Amend).

**Reply:**

Plaintiff does not object to DPFOF 270.

In fact, Plaintiff agrees that Fidelity's composite MACRO ratings were driven by the "Capital" component rating. The OTS Report on Examination dated November 6, 1989 (PX

509), for example, describes the criteria for a "5" rating: "Institutions with negative regulatory capital and those with negative…GAAP capital and experiencing operating losses would normally be assigned this rating." Fidelity met the first two requirements (negative regulatory capital and negative GAAP capital) wholly because of FIRREA.

Fidelity could have earned a "4" rating if it met one of two tests: 1. It would have to have a positive net worth, though not meeting the FIRREA capital requirements; or 2. It could be profitable and meet FIRREA capital requirements, but have negative tangible capital (that is, capital minus goodwill and deferred losses). Solely because of FIRREA and its effect on Fidelity's capital, Fidelity was unable to meet the two criteria required.

**DPFOF 271**

The FDIC, in its April 1992 RoE, found that Fidelity's classified assets stood at $103,401,000, or 705 percent of core capital and reserves at March 31, 1992. The FDIC noted that although classifications had decreased from the last examination's total of $133,759,000, this reduction was attributed solely to the write-down of criticized assets rather than to an improvement in the quality of these assets. PX 912 at WON736 0009.

**Reply:**

Plaintiff has no objection to DPFOF 271.

**DPFOF 272**

The FDIC continued to criticize the CMO residuals held by Fidelity, stating that "[w]hen held as stand-alone investments, residuals are considered highly speculative because of their substantial prepayment risk characteristics and volatile market values." The FDIC went on to

note that it prepayment rates continued to accelerate, the value of the income stream would diminish, resulting in additional loss to Fidelity. Id.

**Reply:**

Plaintiff has no objection to DPFOF 272, but it notes that, just like CMOs, all investments have vulnerabilities to factors such as interest rate fluctuation.

**DPFOF 273**

The FDIC assigned Fidelity a composite rating of "5" as a result of its April 13, 1992 examination. PX 912 at WON736 0010. The FDIC's composite rating of "5" was based upon Fidelity's severely low capital levels, its excessive level of classified assets in relation to capital and the negative factors adversely affecting earnings performance.

**Reply:**

Plaintiff has no objection to the first sentence of DPFOF 273. The second sentence, however, is mere argument: it has no citation, and the first sentence's citation contains nothing to supports the second sentence.

**DPFOF 274**

In October 1992, Fidelity's management stressed Fidelity's need to reduce its level of nonperforming assets, which were almost all large commercial development loans originally underwritten by Fidelity in the mid-1980s, in order to undertake a successful conversion. Tr. 2364:20-2365:21 (Wesp); DX 2633.

**Reply:**

Plaintiff has no objection to DPFOF 274.

**DPFOF 275**

In December 1992, Fidelity's Board of Directors approved the conversion of Fidelity from a mutual form to a stock form of ownership. Fidelity completed its conversion in May 1993 by raising $57 million at $11.50 per share. DX 3071 at PAA014 2007 (Powderly). This influx of capital made Fidelity "well-capitalized" under OTS guidelines, and within days of the conversion Fidelity's capital plan was lifted and it was free to operate its business as it saw fit. Id., PX 974 (Powderly); DX 3371 at PAA051 1367 (Vigna); PX 1015 (Powderly).

**Reply:**

Plaintiff has no objection to the first, second, or third sentences of DPFOF 275, but Plaintiff points out that the citation to "DX 3371 at PAA051 1367" for the third sentence is misplaced. The document identified as DX 3371 is the January 26, 1993 letter from Robert Albanese regarding the Supervisory Agreement; it is not related to Fidelity's "well capitalized" status or the capital plan's ending.

**DPFOF 276**

Fidelity's decision to convert was in line with many in the thrift industry. Indeed, as of October 1992, 31 thrifts had converted to public ownership, representing the highest level of conversion activity in five years and nearly twice the number of conversions in all of 1991. PX 915 at WON736 0571 (Powderly). The rush of conversions were not by accident. As of October 1992, the market's receptivity to mutual conversions, as well as the general level of the equity market, had translated into healthy offering multiples. Id. at WON736 0572 (Powderly). Accordingly, as Dr. Kaplan acknowledged, with or without the loss of goodwill, "Fidelity would

have converted during approximately the same general time frame." PX 1314A at ¶ 44; Tr. 3774:12-21 (Kaplan).

**Reply**:

The first and third sentences of DPFOF 276 have no citations and are not supported by the other citations in the paragraph. They are mere argument and not findings of fact.

Plaintiff has no objections to the second, fourth, and fifth sentences in DPFOF 276.

**DPFOF 277**

As part of its stock offering circular issued in March 1993, Fidelity acknowledged a number of factors that had negatively affected its performance during recent years. These included the fact that the New York City metropolitan area had recently experienced reduced employment as a result of layoffs in the financial services industry and corporate relocations, a general weakening in real estate values and a slowdown in home sales and construction. PX 986 at AST064185. As the underlying values of properties securing non-performing loans declined, there had been, in some cases, substantial loan losses for financial institutions. Fidelity further noted that the weakness in the area's real estate market, and the related loan losses, resulted in large part from speculative commercial and residential construction projects. Fidelity noted that project failures were attributable to a surplus in commercial and residential space and a reduced demand for such space. As a result, the underlying values of properties securing non-performing loans declined, and "in some cases," this resulted in substantial loan losses for such lending institutions. Id. at AST064220-21. In fact, Fidelity admitted in its stock offering circular that its operating results over the last several years had been adversely affected by its significant levels

of non-performing assets, primarily in commercial real estate, construction and commercial loans. Id. at AST064186.

**Reply:**

Plaintiff does not object to the seven sentences of DPFOF 277, except to note that the paragraph does not distinguish well those comments in the Stock Offering Circular that were specific to Fidelity and those that were general comments about the financial industry at the time.

**DPFOF 278**

On December 19, 1991, the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") became law. DX 3071 at PSS014 2141 (Powderly). FDICIA established five capital zones (well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized and critically undercapitalized). Id. As of December 31, 1993, Fidelity exceeded all regulatory capital requirements and was deemed to be "well-capitalized" under FDICIA's standards. Id. at PAA014 2033, 2141.

**Reply:**

Plaintiff has no objection to DPFOF 278.

**DPFOF 279**

During the 1980's, Astoria Federal Savings and Loan Association ("Astoria") consciously avoided engaging in transaction that resulted in the creation of supervisory goodwill because President George L. Engelke, Jr. believed that the use of supervisory goodwill was not intelligent or in line with accounting principles, even though it counted towards regulatory capital. Tr. 4348:19-23, 4356:22-4357:6, 4349:7-4350:11, 4352:3-5 (Engelke). Because it was only an accounting entry, Mr. Engelke believed supervisory goodwill put a thrift at greater risk

than tangible capital. Tr. 4358:5-14 (Engelke). Thrifts needed cash or other tangible capital, not supervisory goodwill, and a good plan for using that capital, to be viable. Tr. 4351:8-4352:2, 4444:17-4446:1 (Engelke). During the early 1990s, it was tangible capital that helped Astoria weather the recession. Tr. 4394:22-4395:4, 4457:24-4458:6 (Engelke); DX 256 at PAA116 0831.

**Reply:**

DPFOF 279 is irrelevant. Plaintiff has no other objection to DPFOF 279.

**DPFOF 280**

Unlike many other thrifts in the 1980s, Astoria did not become financially troubled because it did not suffer unduly from management selection issues and credit and asset quality problems, thus helping it weather the adverse economic conditions. Tr. 4343:4-20, 4345:2-18 (Engelke).[20] Astoria avoided credit quality problems by concentrating approximately 80 percent of its assets in the1980s in traditional one-to-four family mortgage loans. tr. 4346:1-6, 4346:21-4347:8 (Engelke); DX 3491 at 113:10-13 (Drewitz); see also DX 4591 at 122:12-123:20 (Mr. Engelke got Astoria out of commercial lending because it was too risky) (Drewitz).[21] Astoria avoided major involvement in commercial and commercial real estate loans because it was risk-averse and wanted to keep its credit quality high. Tr. 4374:23-4375:13 (Engelke). Astoria implemented stringent underwriting standards for commercial real estate and multifamily

[20] However, to the extent Astoria made condominium loans, Astoria was negatively affected by the collapse of the condominium market. Tr. 4342:4-21, 4420:12-21 (Engelke); DX 253 at PAA116 0261.

[21] In 2000, the percent of assets in traditional one-to-four family mortgages was 88 percent; the number today is 75 percent. tr. 4375:14-4376:20 (Engelke).

lending, and required stringent debt coverage rations to mitigate the risks associated with these types of loans. Tr. 4376:21-25, 4377:10-4378:4 (Engelke); DX 5 at AA1001 0315.

**Reply:**

There are several problems with DPFOF 280.

First, Defendant overreaches on the first sentence of DPFOF 280. Mr. Engelke did not testify that those were the reasons that Astoria avoided the trouble that its peer thrifts did in the 1980s. Instead, Mr. Engelke testified that:

1. Astoria was managed "somewhat" differently than other thrifts at the time;

2. He agreed that troubled thrifts were affected by adverse economic conditions;

3. He agreed with Mr. Yerawadekar that ***some*** of the troubled thrifts at the time had management selection issues;

4. Mr. Engelke agreed that the troubled thrifts had credit quality and asset problems.

Mr. Engelke then went on to state that "The economy made everything bad, whether you were a good lender, which we thought we were and we had our problems too in the 1980s—late 80s and early 90s." (Engelke, Tr. 4345, lines 9-12).

Second, the Defendant cites to the deposition transcript of Mr. Drewitz to support a parenthetical in the citation supporting the second sentence. Although Defendants called Mr. Engelke to the stand for two days of testimony, Defendant does not offer any comment by Mr. Engelke supporting this statement.

Finally, although the rest of the paragraph discusses the economic situation during the 1980s, the fourth sentence cites to Mr. Engelke's testimony on the changes to Astoria's underwriting standards, which did not occur until the 1990s. When asked about Astoria's

changes to its underwriting standards, Mr. Engelke testified that "I do not remember exactly when and exactly what it is now and it was three, five, six, or seven years ago. But it is in the ballpark." (Engelke, Tr. 4377, lines 14-17). Mr. Engelke's recollection would place the underwriting standards changing in the mid-1990s. The earliest exhibit that Defendant found to support the change in underwriting standards was DX 5, which is dated August 12, 1993.

**DPFOF 281**

Following the enactment of FIRREA, Astoria was never out of capital compliance, and in fact always had excess capital. DX 6 at WON728 1652 (soundly capitalized as of September 30, 1989, with GAAP capital of 8.2 percent of assets); DX 2399 at AA4008 0248, 0250 (8.3 percent tangible capital to total assets as of February 21, 1990, "well above the industry average and regulatory requirements;" "during this very difficult period, [Astoria's] capital adequacy [was] outstanding"); DX 3237 at FAA006 1741 (March 31m 1990: 7.9 percent tangible capital--$198,546,000 excess; 7.9 percent core capital--$152,097,000 excess; 15.9 percent risk-based capital--$148,774,000 excess); DX 3033 at OAA002 0469 (As of March 31, 1991, tangible, core, risk-based capital ratios of 6.92, 7.31, and 15.12 percent respectively, all in excess of increased 1992 requirements); DX 2962 at AA1001 0402 (June 30, 1993, tangible, core and risk-based capital ratios of 6.53, 6.68, and 17.76 percent respectively); DX 2962 at AA1001 0395 (between December 31, 1988 and June 30, 1993, Astoria's tangible capital to tangible assets ratio was never less than 6.32 percent, and was as high as 7.68 percent). In addition, Astoria never received a MACRO composite rating of lower than "3" following FIRREA's enactment. DX 6 at WON728 1632 ("2" rating in September 25, 1989 OTS Report of Examination); DX 3033 at OAA002 0454 ("3" composite rating in OTS report of examination April 29, 1991).

**Reply:**

Plaintiff has never challenged the fact of Astoria's capital compliance or its positive MACRO ratings after FIRREA. Plaintiff objects to DPFOF 281 on the ground that it is irrelevant to any issue in this case.

**DPFOF 282**

There was a general decline in the national economy and a weakening of the real estate values in the New York City metropolitan area through 1993. DX 5 at AA1001 0301; DX 2485 at WON750 0980; DX 2590 at WON750 0561; DX 2602 at WON760 0549; Tr. 5248:8-18 (Engelke). Despite its conservative operating strategy, Astoria suffered from an increase in non-performing loans in the early 1990s because of the recession. Tr. 4386:17-21, 4388:1-4390:19 (Engelke); DX 2962 at AA1001 0395 (non-performing loans to total loans: year-end 1988 to 1992—0.74 percent, 4.52 percent, 6.85 percent, 4.40 percent, 3.94 percent; June 30, 1993, 4.09 percent; non-performing loans to total assets: year-end 1988 to 1992—0.46 percent, 2.88 percent, 4.05 percent, 2.48 percent, 1.91 percent; June 30, 1993, 1.78 percent). These non-performing loans required more loan loss provisions due to their lower property values in a bad economy. Tr. 4393:24-4395:21, 4395:5-13 (Engelke); DX 3033 at PAA002 0450. Astoria suffered increases in loan delinquencies and foreclosures resulting in an increased level of real estate owned. DX 254 at PAA116 0469-70; DX 257B at PAA116 0931; DX 259B at PAA116 1397.

**Reply:**

Aside from a general relevance objection to all of DPFOF 282, Plaintiff does not object to the first, second, and third sentences of DPFOF 282. The final sentence, however, is not supported by the cited sources.

DPFOF 282 is irrelevant because this case is about quantifying the damages that Fidelity incurred from the Government's breach of contract. That legal question does not implicate Astoria's business strategies and relative financial health.

**DPFOF 283**

Even originations of one-to-four family mortgage loans decreased from 1990 through 1993 due to the softening of the real estate market. Tr. 4437:15-4439:18 (Engelke); DX 251A at PAA116 0093; DX 353A at PAA116 0144; DX 254B at PAA116 0470; DX 255A at PAA116 0727; DX 257B at PAA116 0931; DX 259B at PAA116 1397. Adverse media reports about the savings and loan industry hampered efforts to drum up business as well. DX 253 at PAA116 0260.

**Reply:**

DPFOF 283 is irrelevant to the issues of this case.

Moreover, the first sentence of DPFOF 283 is not supported by any of its seven cited sources. While the sources variously state that, for example, economic changes and increased loan delinquencies caused Astoria to shift its resources away from mortgage origination (Engelke, Tr. 4437-4439) or reflect Astoria's statement that "mortgage flows remain slow" (DX 251A), there is not support for the actual substance of DPFOF 293.

Aside from reasserting the relevancy objection, Plaintiff does not object to the second sentence of DPFOF 283.

**DPFOF 284**

As noted elsewhere, factors affecting the economic slowdown of the early 1990s included the stock market crash, resistance from home sellers to accept lower prices (leading to significant

loan loss reserves), an unpredictable interest rate environment, and uncertainty due to the Gulf War. Tr. 4425:14-4429:5 (Engelke).

**Reply:**

Although it is an accurate recitation of Mr. Engelke's testimony, DPFOF 284 is irrelevant.

**DPFOF 285**

Astoria chose not to grow very much from 1988 through 1992 to clean up issues related to its non-performing loans. Tr. 4395:14-4399:15 (Engelke); DX 2962 at AA1001 0394 (annual growth of 0.35 percent in 1989, 9 percent in 1990—half of which resulted from acquiring Whitestone Federal Savings and Loan Association ("Whitestone"), 2.7 percent in 1991, 4.4 percent in 1992, total growth of only $334 million from 1989 to 1992 (percentages calculated per growth in assets noted); DX 2962 at AA1001 0415. The only significant growth from 1988 through 1992 was the acquisition at a 6.3 percent premium of four Whitestone branches from the Resolution Trust Corporation ("RTC") on November 16, 1990. Only in August 1992 did Astoria begin to engage in modest growth again, while keeping a tangible capital ratio of 6.50 percent. DX 258A at PAA116 1108. The modest growth was possible because Astoria successfully dealt with its non-performing loans. Tr. 4464:22-4465:16 (Engelke); DX 259B at PAA116 1397.

**Reply:**

DPFOF 285 is irrelevant. In addition, several of the cited sources do not support their related assertion.

In the first sentence, the parenthetical "annual growth of 0.35 percent in 1989, 9 percent in 1990—half of which resulted from acquiring Whitestone Federal Savings and Loan

Association…percentages calculated per growth in assets noted" is not supported by the source cited. There is no indication where the figures in DPFOF 285 have come from. There is no mention of the Whitestone acquisition on this cited page. There is also no explanation of the muddled term "percentages calculated per growth in assets noted."

The final citation for the first sentence, in fact, directly contradicts its purported statement. The cited page reads: "The Association has increased its growth primarily by merging with or acquiring relatively smaller financial institutions or their offices….Management will continue to explore opportunities to expand its retail franchise in the metropolitan New York City metropolitan area…."

The second sentence also exhibits a breakdown between the statement and the citation. Although the sentence asserts that "[t]he only significant growth from 1988 through 1992 was the acquisition at a 6.3 % premium of four Whitestone branches from the Resolution Trust Corporation on November 16, 1990," none of the three sources addresses this.

Plaintiff does not have objections to the third sentence, besides its general relevance objection to this entire section.

The fourth sentence of DPFOF 285 is written in a misleading way. Mr. Engelke testified that two factors made it possible for Astoria to enjoy modest growth: 1. that it had successfully dealt with its problem loans and 2. that Astoria had the capital, after being bruised by the real estate problems, to grow. (Engelke, Tr. 4465, lines 12-16).

**DPFOF 286**

According to AFC's October 1, 1993 Prospectus, Astoria's total assets as of year-end 1988 through year-end 1992 were $3,075,156,000, $3,085,991,000, $3,363,773,000,

$3,273,176,000 and $3,419,838,000, respectively. DX 2962 at AA1001 0394. Excluding the $281.5 million in assets required by Astoria in connection with its acquisition of Whitestone in November 1990, Astoria only added $63.2 million in assets from December 1988 to December 1992. DX 2962 at AA1001 0394, 0415. According to AFC's 1993 Annual Report, AFC's total assets as of December 31, 1993 were $4,121,696,000. PX 1048 at WON727 0430.

**Reply:**

Defendant has necessarily engaged in some calculations to create the numbers in the second sentence of DPFOF 286, and Plaintiff finds that they are not replicable. Because the proposed finding does not explain the discrepancy, Plaintiff objects to DPFOF 286. Plaintiff has no specific objection to the first and third sentences of DPFOF 286 aside from a general relevance objection to all of DPFOF 286.

**DPFOF 287**

In 1990, Astoria's President's Report discussed then-current economic conditions. Astoria reported that the challenges facing financial institutions were primarily due to generally weak economic conditions and the related sharp decline in real estate values. Astoria also addressed the "recessionary environment" and noted that "[t]he market decline in real estate values, which had been most acute in the Southwest in recent years, hit the Northeast and other sections of the nation, albeit somewhat less severely. The decline was the direct results of the cumulative impact of 1986 changes in real estate tax laws, the 1987 stock market crash, and worsening general business conditions." DX 253 at PAA116 0261. Astoria further explained that real estate values were reduced because:

> [t]he soaring home prices of the mid-1980's finally discouraged new home buyers when their confidence was shaken in the latter part of the decade by the decline in the stock

> market and a worsening in the general business climate. combined with the resistance of sellers to accept lower prices for their homes, demand continued to shrink, and market prices moved lower. Exacerbating the problem was the Tax Reform Act of 1986 which removed a significant amount of investor capital from the real estate market.

DX 253 at PAA001 0661. Moreover:

> [t]he significant drop in the value of real estate resulted in increased realized loan losses and provisions for estimated future losses for most financial institutions. The problem is particularly acute for those institutions which have been heavily engaged in speculative commercial and multi-family real estate activities in recent years. There has even been some effect on institutions with fairly conservative lending policies such as Astoria[.]

DX 253 at PAA116 0261. Astoria concluded its discussion of economic conditions by noting:

> [t]he direction of interest rates and the economy bear heavily on prospects for the real estate market. While there has been some easing of interest rates, including rates charged on mortgage loans, the Federal Reserve remains concerned about continued inflationary pressures which could inhibit the continuation of interest rates softening.

DX 253 at PAA116 0261.

**Reply:**

This is a case about Fidelity's damages in the wake of the Government's breach of contract by way of FIRREA. Astoria's statements respecting the economy in 1990, 1991, 1992, and 1993 are irrelevant. Comparisons of Astoria and Fidelity are of very limited use: Astoria was a different institution, had different management, a different business model, different strategies, size, and goals than Fidelity.

DPFOF 287, like DPFOFs 279 through 308, is irrelevant.

**<u>DPFOF 288</u>**

As of December 19, 1990, Mr. Engelke reported to Astoria's board that investment opportunities of significance were limited. DX 251A at PAA116 0093. He further reported that

Astoria's mortgage flows remained slow, with just slightly over $29 million in mortgage commitments outstanding at the end of November. DX 251A at PAA116 0093.

**Reply:**

DPFOF 288 accurately reflects the cited points, but it is irrelevant. See the response to DPFOF 287.

**DPFOF 289**

On January 16, 1991, Mr. Engelke noted that mortgage originations for 1990 totaled $185 million, which reflected the overall malaise in the real estate markets in the Northeast. DX 252A at PAA116 0144. he further noted that Astoria lost approximately $8.5 million in interested income in 1990 due to non-performing assets. He stated that the difference between net spread on earning investments and the net spread on all investments for year 1990 was 29 basis points compares to seven basis points for 1989. Mr. Engelke concluded that this adverse increase was reflective of the impact of non-performing assets on Astoria's financial statements and on its future earnings potential. DX 252A at PAA116 0145.[22]

**Reply:**

The text and footnote of DPFOF 289 are accurate, but irrelevant.

[22] OTS required Astoria to update its business plan in light of 1991 economic conditions. DX 3033 at OAA002 0453. Astoria frequently updated its business plans in light of changes in the economic and regulatory landscape, which it could not predict with certainty. Tr. 4430:11-4431:22, 4441:13-4442:3, 4582:3-15 (Engelke); DX 2024, DX 3033 at OAA002 0453; DX 254B at PAA116 0469; DX 255A at PAA116 0727-28; DX 258A at PAA116 1108.

**DPFOF 290**

As of July 17, 1991, Astoria decided not to consider merger or branch purchase opportunities. The impact on capital ratios and human resources, as well as the need to focus on real estate problems, were the primary reasons for this decision. DX 254B at PAA116 0471.

**Reply:**

DPFOF 290 is accurate, but irrelevant. See the response to DPFOF 287.

**DPFOF 291**

In its December 1991 Business Plan, Astoria projected growth of average assets of $72 million over the following three years, from $3.362 billion in 1991 to $3.434 billion in 1994. DX 1949 at FAA008 0967.

**Reply**:

DPFOF 291 is accurate, but irrelevant. See the response to DPFOF 287.

**DPFOF 292**

Astoria's 1991 President's Report discussed economic conditions. Astoria noted that there was a "severe recession in the Northeast" and that

> Real estate market conditions, particularly with respect to new construction, condominiums, commercial real estate and land, deteriorated significantly, many banks and thrifts in the Northeast experienced increases in loan delinquencies and a severe deterioration in the value of real estate acquired through foreclosure. A substantial portion of the drop in values was caused by the repeal of passive loss tax laws in the Tax Reform Act of 1986, which effectively and instantly removed many investors from the real estate market.

DX 256 at PAA116 0831.

**Reply:**

DPFOF 292 is accurate, but irrelevant. See the response to DPFOF 287. DPFOF 292 also reiterates a point that was repeated by the Defendant many times at trial and in these findings.

**DPFOF 293**

In a March 30, 1992 letter to the FDIC, Astoria stated that it was "certainly in agreement with your comment as to problems with respect to asset quality which have arisen primarily as a result of the severe recession we are experiencing here in the New York area. Dealing with the loan and real estate problems we are experiencing had been designated the number one priority in our current Business Plan." DX 257B at PAA116 0931.

**Reply:**

DPFOF 293 is accurate, but irrelevant. See the response to DPFOF 287.

**DPFOF 294**

Astoria's 1992 President's Report discusses then-current economic conditions. Astoria noted the "generally weak economic climate in the communities we serve" and that "out primary service areas continue in the economic doldrums. Unemployment continues high and consumer confidence remains low." DX 259B at PAA116 1397. Astoria also stated that commercial real estate values were still in decline and that mortgage lending for newly purchased homes continued to be lethargic, as could be expected during periods of economic uncertainty. Id.

**Reply:**

DPFOF 294 is irrelevant. In addition, the second part of DPFOF 294's fourth sentence ("mortgage lending for newly purchased homes….economic uncertainty") is not supported by its citation.

**DPFOF 295**

As of March 17, 1993, Astoria was experiencing some difficulties in lowering its liquidity. accelerated mortgage prepayments, the slow mortgage market and limited quality investment opportunities, based on perceived value within the then-current interest rate environment, were the primary reasons for the increased liquidity. DX 260A at PAA116 1465.

**Reply**:

DPFOF 295 is accurate, but irrelevant. See the response to DPFOF 287.

**DPFOF 296**

As of October 1, 1993, Astoria noted that the then-current low interest rate environment had resulted in an increased number of prepayments of loans and loan refinancing to lower than original interest rates as well as an increase in the prepayments of mortgage-backed and mortgage-related securities. DX 2962 at AA1001 0396, 0414. Astoria accordingly avoided mortgage-backed and mortgage-related securities in autumn of 1993. Tr. 4402:16-4403:25, 4405:13-4406:5 (Engelke). As of October 1993, Astoria had experienced higher levels of prepayments in its loan portfolio due to the relatively low interest rate environment during the previous few years. Borrowers refinanced their loans at lower interest rate loans [sic], primarily 30-year fixed rate loans. DX 2962 at AA1001 0414.

**Reply:**

DPFOF 296 is irrelevant. See the response to DPFOF 287.

The first, third, and fourth sentences of the proposed finding are relatively accurate recitations of the Record. The second sentence, however, is not supported by its cited source. Mr. Engelke did not testify on the cited pages that Astoria avoided mortgage-backed and mortgage-related securities in fall of 1993. Rather, in the cited passage, Mr. Engelke first explained what interest rate risk management was, and then he testified how mortgage-backed and mortgage-related securities are affected by interest rate risk and prepayment risk. There is nothing in the cited passages that suggest that Astoria avoided mortgage-backed and mortgage-related securities in autumn 1991. Defendants improperly supplied that leap and rendered DPFOF 296 unreliable.

**DPFOF 297**

Following FIRREA's passage, FIRREA did not weaken Astoria, cause Astoria to change its business plans, or affect its capital levels. Tr. 4374:13-22 (Engelke); DX 3491 at 96:1-19, 111:6-10, 139:15-21 (Drewitz); see also Tr. 5315:2-9 (Engelke) (Fidelity acquisition did not cause Astoria a net loss or lack of regulatory capital).

**Reply:**

DPFOF 297 is irrelevant**.** While Astoria may not have been directly affected by FIRREA, Astoria purchased Fidelity, and Fidelity ***was*** severely wounded by FIRREA. FIRREA was responsible for Fidelity's smaller size, lower purchase price, its capital position, smaller market share—as well as the very fact that Fidelity was in the market to be acquired.

**<u>DPFOF 298</u>**

Prior to its 1993 conversion, Astoria had excess capital. Tr. 4481:4-22 (Engelke). Lack of capital was not a constraint to Astoria's growth in the early 1990s and did not delay Astoria's decision to convert to stock form. Tr. 4399:16-4400:12, 4407:21-23, 4447:3-11, 4449:1-8, 4452:6-11, 4455:19-22, 4459:22-4461:4, 4469-12 (Engelke); DX 1949 at FAA008 0967 (almost no asset growth predicted in 1991); DX 2399 at AA4008 0248 (tangible capital ratio of 8.3 percent in February 1990, well above industry average); DX 257B at PAA116 0931.

**Reply:**

The fact that Astoria had excess capital before and after its conversion has been thoroughly established.

DPFOF 298 is irrelevant. See the response to DPFOF 287.

**<u>DPFOF 299</u>**

Astoria converted to a stock institution on May 19, 1993, DX 2962 at AA1001 0390, and not earlier, because it had to take care of its non-performing loan problems before offering its shares for sale. Tr. 4400:7-20 (Engelke). Benefits from the conversion included increased tangible capital to purchase other thrifts, Tr. 4469:22-4471:1, 4472:18-21, 4498:19-24 (Engelke), and stock option plans for employees. Tr. 4471:16-24 (Engelke). FIRREA's goodwill phaseout did not affect the decision to convert. Tr. 4476:3-6 (Engelke). The conversion resulted in the creation of AFC, Astoria's holding company, on June 14, 1993. PX 1048 at WON727 0413; DX 2962 at AA1001 0430; <u>see also</u> DX 2962 at AA1001 0390 (OTS approved conversion application October 1, 1993). The conversion raised $322,584,000, $105,000,000 of which was left at the holding company level. PX 1048 at WON727 0454. Astoria's total assets as of year-

end 1993 were $4,121,696,000. PX 1048 at WON727 0430. Proceeds of the conversion were used for general business activities, employee stock option plans, investment in mortgage loans, federal funds, and mortgage-backed and mortgage-related securities. DX 2962 at AA1001 0393.

**Reply:**

Plaintiff does not object to the first, second, fourth, sixth, and seventh sentences of DPFOF 299, aside from a general relevance objection.

The third sentence suffers from imprecision: Mr. Engelke's testimony was that the goodwill phaseout did not ***cause*** Astoria to convert, not the Defendant's broader statement here that the goodwill phaseout did not ***affect*** the decision to convert. The absence of a causal effect does not necessarily exclude any other effect.

In the fifth sentence, the exhibit cited notes that the dollar amount raised in the conversion was ***approximately*** $322,584,000, but that qualifier is not conveyed in the Defendant's sentence.

**DPFOF 300**

The conversion left Astoria with 13 percent capital, making it extremely well-capitalized. Tr. 4472:22-4473:15 (Engelke). Mr. Engelke planned to use the capital judiciously, when high-quality investment opportunities became available. tr. 4473:22-4475:25 (Engelke). Following the conversion, Astoria maintained capital ratios well in excess of the FIRREA requirements. DX 3070 at PAA039 0240 (year-end excesses 1993: 8.95 percent tangible, 7.56 percent core, 21.99 percent risk-based capital); PX 1186 at WON727 1557 (year end excesses 1994: 8.76 tangible, 7.26 percent core, 22.64 percent risk-based); DX 3083 at PAA083 1479 (excess capital even after Fidelity acquisition); DX 1845 at AA0001481 (year-end 1999, Astoria had 4.48

percent tangible capital in excess of requirement, 1.98 percent core capital in excess of requirement, 7.33 percent risk-based capital in excess of requirement); see also Tr. 4558:19-4561:7 (Engelke) (AFC could have downstreamed $125 million in trust preferred share issuance in 1999 had Astoria needed capital); DX 1845 at AA0001420.

**Reply:**

Although it agrees with the substance of the second sentence, Plaintiff notes that the testimony cited to support the second sentence of DPFOF 300 does not go as far as it needs to support the statement.

Further, although it does not dispute the figures, the fourth cited source for the support of the third sentence uses the term "leverage capital ratio," which Defendant has refashioned to "core capital" in the DPFOF.

Finally, the sixth cited source in support of the third statement seems to be in error. The cited source (a page in AFC's 1999 annual report and 10K) had no mention whatsoever of Astoria's regulatory capital in relation to the FIRREA requirements.

**DPFOF 301**

Following the conversion, AFC used its capital to repurchase its common shares in large numbers. Tr. 4500:25-4501:15 (Engelke) (share repurchases an ongoing practice of Astoria); 4696:12-13 (Amend); PX 1190 at AST0555620 (1,144,042 shares repurchased for $34,252,000 in 1994); PX 1228 at WON735 0078, 0113 (735,876 shares repurchased for $26,592,000 in 1995; fourth stock repurchase plan following repurchase of 1.88 million shares by year-end 1995); DX 32 at PAA083 1347 (1,205,496 shares repurchased for $31,672,000 in 1996); DX 1842 at WON747 0194, 0199 (1,381,997 shares repurchased for $61,718,000 in 1997); DX 1844

at AA0001662 (339,892 shares repurchased for $16,633,000 in 1998); DX 1845 at AA001420, AA0001516, AA0001534 (4,257,200 shares repurchased for $159,367,000 in 1999; sixth repurchase plan announced); DX 3109 at WAA004 0087, 0106 (2,607,946 shares repurchased for $84,553,000 in 2000); DX 3110 at WAA004 0227, 0252 (10,303,600 shares repurchased for $289,087,000 in 2001); DX 3111 at WAA004 0374, 0396 (7,283,400 shares repurchased for $211,103,000 in 2002); DX 3112 at WAA004 0522, 0545 (7,073,800 shares repurchased for $195,471,000 in 2003); DX 285 at WAA005 0754, 0772 (9,067,500 shares repurchased for $225,052,000 in 2004); DX 289 at WAA005 1029, 1046 (6,582,500 shares repurchased for $180,944,000 in 2005).

**Reply:**

Plaintiff has no objection to the accuracy of DPFOF 301, except to note that AFC's stock repurchases are not relevant to the question of what damages Fidelity suffered as a result of the Government's breach. See the response to DPFOF 287.

**DPFOF 302**

Since AFC's first repurchase program was initiated in 1994 through year-end 2003, AFC repurchased 51.4 million shares of its common stock, at a cost of $1.1 billion, or an average price of $21.45 per share. DX 281 at WAA005 0538.

**Reply:**

Plaintiff does not object to the accuracy of DPFOF 302. The proposed finding, however, is irrelevant to this case. How Astoria has chosen to use its assets since 1994 is simply not related to the issue of quantifying Fidelity's loss from the breach of contract. See the response to DPFOF 287.

**DPFOF 303**

Repurchasing shares was a good option based on returns otherwise available in the market. Tr. 4503:19-4504:3, 4511:24-4512:13 (Engelke); DX 273 at WAA005 0281 (repurchasing common stock is a "favorable long-term investment and a prudent use of capital as an alternative to asset growth"); DX 269 at WAA005 0172 (stock repurchase responded to "challenging interest rate environment" in 2000; repurchasing shares a "positive earnings alternative" to other investment). Repurchasing shares was necessary to lower the amount of unused capital, thus increasing return on equity and increasing shareholder value. Tr. 4581:1-4582:2 (Engelke); PX 1228 at WON735 0078. Goodwill could not be used to repurchase shares. Tr. 4505:7-9 (Engelke).

**Reply:**

Defendant has taken some liberties with its drafting of DPFOF 303. In the first sentence, the cited passage of Mr. Engelke's testimony actually emphasizes the fluidity of Astoria's asset decisions, instead of making a blanket statement about what a good option stock repurchase plans were, as Defendants represent. "We're married to doing the best thing we can do with the opportunities in the market today. And tomorrow may be very different and we're going to do the best thing in the markets for ourselves tomorrow, which may be very different than today."

The second sentence implies a faulty precision. Although the sentence says that the repurchasing shares "was ***necessary***" to lower the amount of unused capital, Mr. Engelke actually testified that the share repurchase "enabled" the capital levels to lower. Mr. Engelke's testimony does not reflect the sense of necessity on the stock repurchases that Defendant represented.

The final sentence, while it might be true, goes beyond what Mr. Engelke testified. He stated that Astoria could not have used Fidelity's goodwill to repurchase stock, but Defendants have broadened that statement to claim generally that goodwill could not be used to repurchase stock.

Moreover, the Court should not lose sight of what goodwill really is. While it is not tangible capital, goodwill has a true and palpable effect on an institution's balance sheet. Goodwill must be amortized or paid down; Fidelity amortized its goodwill balance with cash earnings. While a company's goodwill might not have been able to be "used" in a stock repurchase program in the sense that it did not represent cash, the goodwill can nonetheless have a powerful impact on the institution's balance sheet, just as in Fidelity's case.

**DPFOF 304**

Throughout the 1990s, Astoria continued to look to tangible equity and cash earnings as accurate measures of its value. DX 32 at PAA083 1305; DX 1842 at WON747 0152; DX 1845 at AA001419. These numbers were more accurate than the GAAP numbers, which included the write-off of the new goodwill figure—a premium calculated from the purchase accounting of the Fidelity acquisition. Tr. 4527:18-4529:21 (Engelke).

**Reply:**

Mr. Engelke never testified that the tangible equity and cash earnings figures were more "accurate" than GAAP numbers. In fact, the Defendant suggested that term to Mr. Engelke in his direct examination, and Mr. Engelke rejected it, describing instead the tangible capital and cash earnings numbers as "more informative."

Aside from a general relevancy objection, Plaintiff has no other objections to DPFOF 304.

**DPFOF 305**

For years after the conversion, AFC received dividends from its subsidiary, Astoria. Tr. 4689:12-4690:5 (Amend) (Discussing DX 3050 at WON731 1760): DX 32 at PAA083 1372 ($4,520,000 from Astoria in 1995, $49,362,000 from Astoria in 199); DX 1845 at AA0001549 ($65,562,000, $50,000,000 and $44,000,000 Astoria cash dividends to AFC in 1997, 1998, and 1999 respectively; 19 dividends went to repurchase shares); DX 3110 at WAA004 0274 ($137,630,000 and $502,935,000 in Astoria cash dividends to AFC in 2000 and 2001 respectively); DX 3112 at WAA004 0567 ($60,377,000 and $120,377,000 in Astoria cash dividends to AFC in 2002 and 2003, respectively); DX 289 at WAA005 1061 ($522,470,000 and $200,000,000 in Astoria cash dividends to AFC in 2004 and 2005, respectively).

**Reply:**

Plaintiff does not object to the accuracy of DPFOF 305, but notes that Astoria's subsidiary dividends from 1995 to 2005 are irrelevant to this case. See the response to DPFOF 287.

**DPFOF 306**

At no time did Astoria ever make a wholesale strategy the dominant focus of its operations and, in fact, Astoria has been reducing its wholesale portfolio in recent years. Tr. 4401:5-4402:15 (Engelke). Astoria had sufficient capital to have added assets through a wholesale strategy after FIRREA but chose not to. Tr. 5612:17-5613:3 (Kennedy). In fact, Astoria chose the opposite approach.

**Reply:**

Plaintiff does not object to the accuracy of the proposed finding. The substance of DPFOF 306, however, is irrelevant. See the response to DPFOF 287.

**DPFOF 307**

Even after the economy improved, Astoria's strategy and assessment of investment opportunities as insufficiently profitable or too risky prevented it from making investments in MBS on numerous occasions in the 1990s. Tr. 4508:23-4511:9 (explaining how MBS has interest rate risk due to duration mismatches, making investments in MBS risky), 4515:21-4516:8 (no guaranteed profits with MBS), 4519:1-17; 4555:10-4556:5; 5275:2-21, 5276:19-5277:3 (Engelke); DX 219 at PAA116 2222 (August 14, 1995); DX 216 at PAA116 2213 (May 15, 1995); DX 221 at PAA116 2228 (October 13, 1995); DX 34 at PAA029 0018-19 (as of July 19, 1995, Astoria would not accept investment spreads of less than 125 basis points); DX 2917 at PAA085 1651 (July 16, 1999); DX 19 at PAA114 0113 (September 20, 1995); DX 2823 at PAA085 0468 (December 13, 1996); see also DX 2904 at PAA114 0053; Tr. 4531:7-4532:6 (Engelke) (possible to lose money on adjustable rate MBS).

**Reply:**

Defendant's characterization of Mr. Engelke's testimony in the parenthetical of the first citation overreaches. Mr. Engelke does not state that investments in MBS are "risky." Rather, Mr. Engelke emphasized that Astoria considers myriad characteristics when evaluating investments, and that the investment decision is driven by what is best for Astoria at the moment in the marketplace.

Aside from a general relevance objection, Plaintiff has no other objections to DPFOF 307.

**DPFOF 308**

Astoria's decision not to grow by making investments was not caused by lack of capital. Tr. 4525:5-11 (Engelke). Indeed, Astoria even shrunk its size in 2000 for reasons unrelated to lack of capital and repurchased shares. Tr. 4564:16-4566:8 (repurchase made most sense in light of flat to inverted yield curve in 2000) (Engelke); DX 269 at WAA005 0171 ("rising interest rates and a persistent flat to inverted U.S. Treasury yield curve"); DX 273 at WAA005 0279 (assets decreased $360 million from 1999 to 2000, increased slightly from 2000 to 2001), WAA005 0280-81 (AFC enhanced its core franchise by decreasing securities and increasing traditional thrift assets and repurchasing stock in 2001); DX 281 at WAA005 0525 (assets decreased nearly $1 billion from 2001 to 2002); WAA005 0527 (refinancing activity lowered AFC's 2003 earnings). Astoria has shrunk more since. Tr. 4576:12-14 (Engelke). Astoria's shrinkage did not lead to a lack of profits. Tr. 4570:20-4571:1 ($1.5 billion in profits 1999 through 2001), 4582:16-4583:24 (growth does not guarantee profits, especially if interest rates unfavorable)(Engelke). After 2000, Astoria determined to reduce its investment securities to help increase Astoria's franchise value. Tr. 4567:16-4568:10 (Engelke). Unanticipated pre-payment rates lowered earnings in 2003. Tr. 4573:6-4574:19 (Engelke); DX 281 at WA005 0527.

**Reply**:

Plaintiff does not contest the accuracy of DPFOF 308. The proposed finding, however, is irrelevant to the quantification of Fidelity's damages due to the Government's breach. That

Astoria, as part of its business strategy, chose not to grow bolsters Plaintiff's argument that Astoria and Fidelity were two very different institutions, and that it is inappropriate to use Astoria as a stand-in for Fidelity. See the response to DPFOF 287.

**DPFOF 309**

The OTS examined Fidelity as of April 5, 1993, although the thrift's condition was assessed taking into account the receipt of the conversion proceeds. The OTS found that Fidelity's overall condition was still in need of improvement in "management's assessment of classified assets and analysis of valuation allowances." The OTS also found that Fidelity's asset quality was only marginal, as it continued to be hampered by the nonearning real estate owned portfolio. The OTS specifically directed Fidelity to focus on reducing the level of its foreclosed holdings, or real estate owned. PX 1013 at OAA002 1318. Accordingly, even though Fidelity's capital was adequate, the OTS determined that Fidelity's operating results were still marginal, with net operating income continuing to be largely represented by noninterest income. Id.

**Reply:**

While DPFOF 309 accurately states portions of the April 1993 OTS Report of Examination, it, like the examination report itself, paints a highly misleading picture of Fidelity at that point in its history. Mr. Powderly testified that he and Fidelity's Board were "bewildered" by the comments in the examination report that are referenced in DPFOF 309, which seemed to focus more on past history that on anything having to do with the Fidelity that existed in 1993. (Powderly, Tr. 977, line 4 to p. 980, line 4).

In a stinging rebuttal to this OTS examination report on July 21, 1993 (PX1029), Mr. Powderly, with the full backing of Fidelity's Board of Directors, noted this series of accomplishments that the OTS seemed to have overlooked:

While this examination was underway, Fidelity concluded, in May 1993, its successful conversion from mutual to stock form and its initial public offering of shares. An institution, which less than four years previously had been on the brink of failure, emerged from that offering fully capitalized.

Fidelity reduced its goodwill from $90 million in 1989 to $11 million.

Fidelity's ratio of non-performing loans to net loans fell from 6.28 percent in March 1990 to 3.6 percent in December 1992.

Fidelity's non-performing assets had been reduced to less than 3.4 percent of assets, versus a peer group average of 7.8 percent.

Fidelity's operating margins were strong, 242 basis points as of June 1993, and it forecase $10 to $12 million of income for fiscal 1993.

Commercial loan exposure had been reduced from $350 million in 1987 to $32 million (1.7 percent of assets) as of June 30, 1993.

Fidelity's asset quality was strong, and it had not had any new classified assets since 1991.

Fidelity's interest rate risk was minimal and appropriate to the current point in the interest cycle.

Fidelity's common stock had been purchased and was being held by some of the nation's largest and most prestigious mutual fund complexes, including Fidelity Management, T. Rowe Price, and First Manhattan.

Mr. Powderly went on to note in considerable detail the many findings of Fidelity's 1992 examination that directly contradicted the negative comments made in the 1993 examination report. Suffice it to say, Fidelity disagreed in the strongest possible terms with the negative findings in the 1993 OTS Report of Examination.

**DPFOF 310**

In the OTS's April 1993 RoE, the OTS classified $62.6 million of its assets as problem assets, with the bulk represented by property Fidelity had foreclosed upon and owned. Tr. 2373:9-14 (Wesp); PX 996 at FAA005 1053. Indeed, the OTS listed $48 million in properties that were real estate owned. Tr. 2378:19-2379:1 (Wesp); PX 996 at FAA005 1087. In addition, Fidelity was required to increase its loan loss reserves by another $6.1 million, as regulators again criticized Fidelity for having an ineffective loan review function. Tr. 2374:8-20 (Wesp); PX 996 at FAA005 1053. Moreover, examiners noted that the decline in the amount of classified assets from the previous examination was not because the market had improved, but rather that Fidelity had written off another $12.6 million of its bad loans since the prior examination. Tr. 2373:15-20 (Wesp); PX 996 at FAA005 1053.

**Reply:**

See Plaintiff's reply to DPFOF 309. Fidelity took very strong issue with the 1993 OTS examination report, and, based on its ability to successfully complete its recapitalization with a public offering of its shares, the marketplace appeared to have sided with Fidelity and not with OTS in its assessment of Fidelity's fitness.

Plaintiff also objects to Defendant's calculated use of Mr. Wesp's testimony as "support" for this proposed finding. Mr. Wesp was not the most knowledgable person concerning

Fidelity's real estate portfolio, and in most instances he could only testify that he had no reason to disagree with specific numbers that appeared in the examination report. Defendant carefully steers away from the testimony of Mr. Powderly, who ***was*** the most knowledgable person on real estate matters and who, as noted, strongly disagreed with the 1993 examination report.

**DPFOF 311**

The bad loans held by Fidelity continued to deteriorate. For example, the 14th Street Glick Development loan was appraised at a value of just $10.8 million, even though Fidelity underwrote a $24.5 million loan for the development of that property in 1987. Tr. 2375:9-2376:4 (Wesp); PX 996 at FAA005 1095; DX 703; DX 69A at OAA002 0193. The decline in the property value on 14th Street was unsurprising, given that Mr. Wesp noted that the deserted Luchow's property "was empty and boarded up and full of drug addicts." Tr. 2376:11-15 (Wesp). The bad loans and increased loan loss reserves reduced Fidelity annualized return on assets from .5 percent to .2 percent. Tr. 2379:25-2380:4; 2381:1-10 (Wesp); PX 996 at FAA005 1067. Thus, the nonperforming loans were still having a very significant impact on Fidelity's profitability.

**Reply:**

The first sentence of DPFOF 311 is a sweeping generalization that is not supported by the alleged decline of value of one property. Indeed, the discussion of that one property in the examination report is more suggestive of quibbling over appraisal methodology that of any objective evidence of a continued decrease in the value of the property. This particular property

had significantly declined in value, but Defendant presented no evidence that it was continuing to decline in any way that was material to the issues in this case.

Again, the use of Mr. Wesp's testimony on real estate issues is suspect. When it comes to properties, Mr. Wesp noted that he was "out of his league" and that Mr. Powderly was the person the Defendant should talk to. Indeed, with respect to the 14th Street property (the old Luchow's restaurant), Mr. Wesp said he had last been there "as a kid" for dinner. He had driven by in recent years when the property was supposedly "boarded up and full of drug addicts" but he would not regard that as an examination of the property. He had never seen any of the appraisal reports, and his comments about property values were reflective of trends in Manhattan not of any particular piece of property. (Wesp, Tr. 2376, line 5 to p. 2378, line 12).

Plaintiff objects to the fourth sentence. PX 996 does not mention "bad loans" and further explains that "future earnings should not be severly impacted by additional provisions for loan/REO losses."

Plaintiff objects to the final sentence because the example of one loan and a quote from a report of examination explaining that Fidelity's future earnings would not be severly impacted clearly do not support the statement.

**DPFOF 312**

Both the OTS and the FDIC assigned Fidelity a composite rating of "3" for their April 1993 RoE. PX 995 at WON738 0675; DX 1448 at WON732 0834. Fidelity would have remained a "3" on the April 5, 1993 OTS exam, PX 996, in the absence of FIRREA. Tr. 4742:9-14, 4854:2-13 (Amend).

**Reply:**

Fidelity objects to DPFOF 312. See Plaintiff's reply to DPFOF 309. As previously noted, Mr. Powderly and the Board were "bewildered" by much of what was in the 1993 OTS examination report, which did not seem to them to reflect reality. Mr. Powderly could not understand why Fidelity had been rated a "3" and not a "1" or a "2." (Powderly, Tr. 2376, line 5 to p. 2378, line 12).

In addition, had Fidelity not had its capital taken away by FIRREA, it would have had more options for managing its real estate problems. (***See*** PPFOFs 703 to 720). This would potentially have raised its "Asset Quality" rating in 1993 in addition to its "Capital" rating.

**DPFOF 313**

In the 1993 RoE, the FDIC again noted its classification of Fidelity's CMO residuals. PX 995 at WON738 0674. It also noted that Fidelity's non-interest income had been substantially enhanced by gains on sales of securities of $9.3 million. The FDIC expressed doubt that Fidelity could continue to realize gains on sales of securities in the future. The FDIC also noted that Fidelity's net interest margins from December 1992 and March 1993 of 2.39 percent and 2.33 percent, respectively, remained significantly below peer group figures. Id. at WON738 0673.

**Reply:**

Plaintiff objects to DPFOF 313 as irrelevant to any issue in this case. There is no evidence the FDIC's 1993 Report of Examination was ever sent to Fidelity. In addition, given the FDIC's consistently poor judgment concerning Fidelity and its prospects for survival post-FIRREA (***see*** PPFOFs 587 to 621) there is no reason why the Court should assign any credibility to FDIC opinions about Fidelity in 1993.

**DPFOF 314**

As of December 1993, Fidelity's ratio of non-performing assets to total assets had decreased to 1.96 percent, from 3.23 percent at December 31, 1992. Fidelity recognized that this was the lowest level of non-performing assets since 1987. DX 1199 at WON738 0780.

**Reply:**

Plaintiff does not object to DPFOF 314. As Fidelity also noted, this was a "considerable achievement" of which Fidelity was justifiably proud.

**DPFOF 315**

Wholly apart from its losses before 1989, Fidelity experienced significant expenses between 1989 and 1994 as a result of its poor loans. For the period between March 31, 1989, and December 31, 1994, Fidelity's provision for loan losses was $16,015,000 and the net loan charge-offs totaled $26,367,000. Fidelity's provision for valuation allowance on its REO during this period was $32,252,000 and the net charge-offs for its REO totaled $13,585,000. PX 986 at AST064231; PX 1323 at KPMG 012423.

**Reply:**

Plaintiff objects to DPFOF 315 because the figures cited by the Defendant are not apparent on the face of the document.

**DPFOF 316**

Furthermore, for each of the nonperforming loans, Fidelity lost significant amounts of interest income. In its stock subscription offering circular, Fidelity stated that, "the operating results of the bank over the last several years have been adversely affected by its significant

levels of nonperforming assets, primarily in its commercial real estate, construction and commercial business loan portfolios." PX 986 at AST064227; Tr. 905:20-906:1 (Powderly). Mr. Powderly agreed that Fidelity "[w]ould have been affected just the same if [Fidelity] had Suburbia goodwill." Tr. 906:2-4 (Powderly). For the years ended March 31, 1991 and 1992, foregone interest on non-accrual loans amounted to approximately $5.9 million and $3.4 million respectively. PX 986 at AST064186; Tr. 914:13-19 (Powderly). Mr. Powderly conceded that he did not calculate the total lost interest income, writedowns, general valuation allowances or loan loss reserves Fidelity took on its nonperforming loans. Tr. 914:20-915:4 (Powderly).

**Reply:**

This proposed finding is based solely on the referenced document (though some of the page references are wrong). Mr. Powderly's testimony consists mainly of agreeing that the document said what defense counsel said it said.

In an effort to make the lost interest income numbers in the next-to-last sentence sound worse, Defendant left out the foregone income for the nine months ending December 31, 1992. For that nine months the lost income was only $0.1 million. (PX 986 at AST064227). In other words, as Fidelity continued to work through its real estate issues in 1991 and 1992 and make significant improvements, the interest income lost due to these non-performing assets declined dramatically.

**DPFOF 317**

Despite these problems with its nonperforming loans, Fidelity was not inhibited by regulatory restrictions from following any growth plans it had after its May 1993 conversion. In its response to the 1993 examination, Fidelity stated that, "[t]he May 1993 recapitalization ended

a long struggle" with its capital issues; Mr. Powderly agreed that after the conversion, Fidelity's problems with capital were over. PX 1029 at AST062095; Tr. 1001:3-11 (Powderly). Mr. Powderly also agreed that, after the conversion, Fidelity was deemed well-capitalized by the regulators and was not subject to regulatory restriction in its growth. Tr. 917:1-24 (Powderly).

**Reply:**

Plaintiff does not object to the first sentence even though Defendant provides no evidence to support it. Plaintiff objects to the second sentence to clarify that Fidelity's statement about ending "a long struggle against difficult odds" did not refer solely to capital issues. Also, Fidelity's regulatory issues with capital were technically over, but FIRREA had a lasting impact on Fidelity's ability to effectively compete in the marketplace. Fidelity's management did not consider Fidelity's 5% level of capitalization to be competitive when other thrifts had much higher levels of core capital in the range of 14 to 17%. (Powderly, Tr. 622, line 19 to p. 623, line 15; PX 1155 at AST036416).

In addition, regulators continued to be concerned about Fidelity's capital levels after the conversion. The FDIC noted that Fidelity's capital level was only slightly above the OTS's minimum capital requirements and that Fidelity's "capital position was unduly limited to cushion the bank from any unexpected reversals." (PX 995 at WON738 0673). Plaintiff does not object to the third sentence except to add that "well-capitalized" is a regulatory term of art from the Federal Deposit Insurance Corporation Improvement Act ("FDICIA"). It was not how Fidelity's management viewed its capital position.

**DPFOF 318**

Fidelity also stated in its 1993 annual report that its "prospects have been totally transformed by its recapitalization," and that, after its conversion, Fidelity was "correctly capitalized." PX 1249 at WON738 0779; Tr. 925:18-926:13 (Powderly). Mr. Powderly agreed that, after May 1993, Fidelity's growth was not restrained by the capital plan, and there were no regulatory concerns shaping Fidelity's growth plans. Tr. 925:25-926:2, 927:3-11 (Powderly).

**Reply:**

Plaintiff has no objection to the first sentence. Plaintiff objects to the second sentence because, even though Fidelity did resume growing after the conversion and was "well capitalized" under FDICIA, Fidelity had no meaningful capital cushion and was limited in its operating and strategic options. (Powderly, Tr. 917, lines 17-24; Kaplan, Tr. 3034, line 18 to p. 3035, line 8; PDX 59).

**DPFOF 319**

In late March 1994, Mr. Powderly called Mr. Engelke to discuss generally whether Astoria would be interested in exploring a transaction. Several days later, Mr. Engelke responded that Astoria was interested in exploring a possible transaction and wished to initiate a due diligence review of Fidelity. DX 2965 at WOL487 0705. The initial discussions between Mr. Powderly and Mr. Engelke focused on the structure and the possible pricing parameters for a potential transaction between Fidelity and Astoria. Astoria wanted to acquire Fidelity for its profitable branch network. Tr. 4500:14-19 (Engelke); 5281:22-5282:8 (Engelke). Mr. Engelke indicated that Astoria would only consider an "acquisition of Fidelity's stock for cash." DX 2965 at WOL487 0705. Astoria paid cash out of a desire to use the excess cash it obtained from its

own conversion. Tr. 641:17-642:12 (Powderly); DX 3489 at 9:25-10:21, 20:23-21:11 (Quackenbush). Fidelity also wanted a cash transaction. Tr. 940:3-10 (Powderly).

**Reply:**

Plaintiff has no objection to the first, second, and third sentences, assuming Defendant intended to cite DX 2965 to support the third sentence.

Plaintiff objects to the fourth sentence. Mr. Engelke did not state that Astoria wanted to acquire Fidelity for its branch network. He merely observed that branches can have value to the bank that owns them.

Plaintiff does not object to the fifth sentence.

Plaintiff does not object to the sixth sentence, although Mr. Powderly's cited testimony does not support the statement.

Plaintiff has no objection to the final sentence.

**DPFOF 320**

On April 6, 1994, Fidelity, Astoria and AFC entered into a confidentiality agreement, and Astoria and AFC commenced an initial due diligence review of Fidelity. DX 2965 at WOL487 0705.

**Reply:**

Plaintiff does not object to DPFOF 320.

**DPFOF 321**

During Fidelity's July 12, 1994 Special Board of Directors meeting, Mr. Powderly summarized the basic business terms of the possible transaction with Astoria, which included a proposed price of $29 per share. PX 1107; PX 1108; Tr. 638:16-639:22, 641:24-643:9

(Powderly). Salomon Brothers opined that the consideration to be received by Fidelity's shareholders in the Astoria merger proposal would be fair from a financial point of view. This opinion was also included as part of Fidelity's November 16, 1994 Proxy Statement. DX 1108 at AST127826; DX 2965 at WOL487 0779.

**Reply:**

Plaintiff has no objection to DPFOF 321.

**DPFOF 322**

On July 12, 1994, after extensive negotiations, Fidelity's Board approved the Merger and the Agreement, and shortly thereafter the Agreement and Plan of Merger was executed by Fidelity, Astoria and AFC. DX 2965 at WOL487 0708; PX 1109.

**Reply:**

Plaintiff has no objection to DPFOF 322.

**DPFOF 323**

AFC's acquisition of Fidelity was completed after the close of business on January 31, 1995. DX 3083 at PAA083 1467. The final cash price Astoria paid for Fidelity was $29 per share. DX 3083 at PAA083 1467 ($157.8 million total price for Fidelity). The $29 per share price was obtained one year after the conversion, in which Fidelity's shares sold at $11.50 per share, resulting in a 152 percent per share price increase. Tr. 641:7-16 (Powderly); see PX 1109 at WON749 2309. Had Fidelity been more valuable at the time of the acquisition, Astoria would have paid more to acquire it. Tr. 5255:6-5256:11 (Engelke).

**Reply:**

Plaintiff has no objection to the first or second sentence.

Plaintiff does not object to the third sentence, although the Record citations support only the $29 per share price.

Plaintiff objects to the final sentence. Mr. Englke's testimony was that if Fidelity had not lost its regulatory capital as a result of FIRREA it would have been able to grow and would have become a more valuable institution.

**DPFOF 324**

Even as late as the Astoria merger, problem loans remained on Fidelity's books, prompting the OTS, and later Astoria, to demand further write-downs of their value. PX 1080 at FAA005 0907, DX 2748 at PAA094 0471 ($5.9 million in additional general reserves on mid-1980s loans); DX 2762 at AA4009 1685 (additional loan loss reserves required by Astoria on 1980s loans as of January 6, 1995); Tr. 664:9-12, 953:6-18, 958:9-960:5 (Powderly); Tr. 4665:14-4666:13 (Amend). The Suburbia goodwill phase-out had no bearing upon the deteriorating conditions of these loans. Tr. 690:13-25, 722:3-20 (Powderly).

**Reply:**

Plaintiff objects to the first sentence. None of the Record citations provide specific information on the loans the prompted the write-downs. It is also unclear whether the loan loss reserves required to conform to Astoria's policy were due to problem loans or due to differences between the internal underwriting policies of Fidelity and Astoria. Also, the OTS Report of Examination explains that although additional general reserves were required, the report "reflects steady improvement" and that "management operates the bank in a capable and efficient manner with effective board oversight," and that "the corrective actions outlined in the prior report of examination have been addressed."

Plaintiff objects to the final sentence because the Defendant has taken Mr. Powderly's remarks completely out of context. The first citation to Mr. Powderly's testimony refers to the OTS's 1987 Report of Examination, which was clearly pre-FIRREA and before Fidelity had to eliminate the Suburbia goodwill. The second citation is wholly unrelated to the Defendant's statement (it refers to the October 1988 Business Plan).

**DPFOF 325**

In 1994, Fidelity continued to write down of millions of dollars worth of bad loans, particularly those originally underwritten in the mid-1980s. For example, in October 1994, Fidelity wrote down $7.1 million in losses connected with its real estate loans, and it further noted a decline of $5.4 million in the amount of its nonperforming assets, which were disposed of by Fidelity. Tr. 2398:14-2399:16 (Wesp); PX 1166 at AST037537, AST037540. Even though Fidelity owned real estate obtained through foreclosures for several years, Mr. Wesp admitted that Fidelity was "not in the business of holding, owning and managing REO [real estate owned]." Tr. 2400:21-22 (Wesp). Fidelity also noted in October 1994, that additional general reserves of $5.9 million were required. This $5.9 million of additional reserves were specified as follows: $3.1 million for the Glick 14th Street loan; $1.9 million for the Bridgeport loan; and $880,000 for the Setauket loan. DX 2748 at PAA094 0471.

**Reply:**

Plaintiff objects to DPFOF 325, which seeks to put a wholly false face on the activities described. The sales and writedowns referred to in DPFOF 325 all took place during the period between the signing of the Astoria/Fidelity merger agreement and the closing of that deal. During that time, Fidelity was making these changes in consultation with Astoria and was

essentially doing what it was instructed to do by Astoria. (Wesp, Tr. 2398, line 14 to p. 2400, line 10). Defendant has omitted this piece of information, which is rather important to an accurate understanding of what was really going on.

**DPFOF 326**

According to Peter Finn, who handled the credit review of Astoria's due diligence of Fidelity, Tr. 3986:22-25, 3988:10-3989:2 (Finn), Astoria required Fidelity to set aside additional reserves to address its problem loans, including loans that were still on Fidelity's books from the 1980s. Tr. 3991:21-3992:8, 4003:3-7 (Finn); see also Tr. 4004:5-7 (Finn) (FIRREA had no direct correlation to the loans going bad). In total, Astoria wrote off $9.9 million in value for Fidelity's loans. PX 1191; Tr. 4006:10-13 (Finn). Regulators' market valuations and requests for loan loss reserves had nothing to do with the amount of capital Astoria or Fidelity held but rather was based upon appraisals of the property values. Tr. 4007:5-25 (Finn).

**Reply:**

Plaintiff does not object to the first sentence because it accurately reflects Mr. Finn's testimony. For context, one of the reasons Astoria asked Fidelity to increase its reserves was because Astoria was a more conservative institution than Fidelity in the way it carried real estate values. (Finn, Tr. 3991, line 15 to p. 3992, line 17). Plaintiff has no objection to the second or third sentences.

**DPFOF 327**

According to a January 6, 1995 Memorandum to the record from Andrew Blazek, Fidelity applied "additional reserves" of $256,400. The Memorandum states that total additional

GVA reserves as of December 31, 1994 would be $1,198,470 and the total GVA balance would be $2,495,634. PX 1191 at AST0734192, AST0734194.

**Reply:**

Plaintiff has no objection to DPFOF 327. However, Plaintiff would note that Mr. Blazek is an Astoria employee, and his Memorandum states in its opening lines that the intention in setting these reserves was to "bring Fidelity Federal Savings in compliance with AFS [Astoria Federal Savings] reserve policy." (PX 1191 at AST0734192).

**DPFOF 328**

Even after the acquisition was complete, Astoria took additional losses on Fidelity loans. Tr. 4670:2-15 (Amend); see also PX 1191.[23] As of February 15, 1995, Astoria recognized that there might be further write-downs on certain in-substance foreclosure properties acquired from Fidelity with additional reserves anticipated totaling $500,000. PX 1209 at AST092290. As of March 15, 1995, Astoria was informed that, to align Fidelity's valuation and reserve policies to those of Astoria, an additional $2.1 million in reserves would be required for the properties held on Astoria's books as of January 31, 1995. DX 2772 at AA4009 1336.

[23] DX 703 shows aggregate write-downs on the 14th Street Associates loan of $15,156,428. Tr. 4671:9-12 (Amend). DX 701 shows the aggregate write-downs on the Glick Bayside Mall Associates loan of $4,679,570. Tr. 4672:25-4672:2 (Amend). DX 650 shows cumulative annual provisions for losses of $81,985,000 for the years ended December 31, 1985 through December 31, 1994. Tr. 4672:16-19 (Amend); 4674:7-9 (Amend). This total does not include lost interest income on the non-performing loans. Tr. 4674:10-12 (Amend). Fidelity also incurred $300,000 in actual principal losses. Tr. 4677:7-14 (Amend).

**Reply:**

Plaintiff objects to the first sentence of DPFOF 328. It is not clear precisely what "additional losses" Defendant refers to in the first sentence. The writedowns referenced in Mr. Blazek's Memorandum (PX 1191) took place ***before*** the acquisition was complete. Mr. Amend could only say that Mr. Engelke told him he had taken some additional "losses" (writedowns) on Fidelity assets, but Mr. Amend didn't know any of the details.

Plaintiff has no objection to the footnote contained in DPFOF 328, except that Mr. Amend had no independent recollection of the amounts of the write-downs and losses. Defendant suggests no reason for these writedowns, and it is quite likely they were simply a further attempt at bringing Fidelity books and practices in line with those of Astoria.

**DPFOF 329**

The merger between Astoria and Fidelity was accounted for as a purchase, with the assets and liabilities of Fidelity marked-to-market. PX 1076 at WON739 1193; DX 2965 at WOL487 0726; DX 3083 at PAA083 1467. The use of cash in acquiring Fidelity as well as Astoria's desire to sell a significant amount of Fidelity's assets, mandated use of the purchase, rather than the pooling method of accounting. Tr. 2809:12-2810:15 (Vigna); Tr. 4499:21-4500:2, 4586:2-5 (Astoria knew it would have to write off Fidelity's goodwill), 4588:13-24, 5292:10-19, 5311:9-13 (would not have used stock to acquire Fidelity) (Engelke); Tr. 1969:6-12 (Wesp) (cash deal required by Astoria because it needed to put excess cash to work to get an improved return on equity); Tr. 5417:25-5420:9, 5425:18-5428:6 (Kennedy); Tr. 5729:2-5 (Carron); PX 1120 at FAA005 0996; DX 2965 at WOL487 0705; DX 3083 at PAA083 1467; PX 1076 at WON739 1193; DX 538 at AA-NAV-000590-91; see also Tr. 5245:8-5247:13, 5290:12-5291:21 (Engelke)

(purchase accounting gave Astoria generous accounting benefit for valuation of sale of Fidelity assets). Accounting Principles Bulletin 16 ("APB 16"), states that, under purchase accounting for acquisitions, "[a]n acquiring corporation should not record as a separate asset the goodwill previously recorded by an acquired company." APB 16 also states that amounts should be assigned "to the individual assets acquired and liabilities assumed, except goodwill." DX 538 at AA-NAV000590-91, ¶ 88. Regulatory accounting principles required application of APB 16. Tr. 5421:16-23 (Kennedy).

**Reply:**

DPFOF 329 accurately states the treatment of goodwill in a transaction done under purchase accounting rules, which, in the real world, were the rules used to account for Astoria's acquisition of Fidelity. However, in the "but for" world in which Fidelity does not have its regulatory capital taken away, other possibilities exist. One is that the merger between Astoria and Fidelity might never have occurred, since Fidelity would have been a stronger and more competitive institution. Another is that some method of accounting other than the purchase method might have been used to combine Fidelity and Astoria.

**DPFOF 330**

Under purchase accounting, supervisory goodwill on the books of an acquired thrift would not survive a purchase accounting acquisition, and accordingly Fidelity's goodwill did not survive the acquisition by Astoria. Tr. 4355:19-4356:21, 4359:1-4360:5 (Engelke); Tr. 4009:6-4010:16 (Finn); Tr. 2526:16-19 (Wesp).

**Reply:**

Plaintiff does not disagree with DPFOF 330, except to note that Mr. Engelke was not certain of the proper treatment of goodwill in a purchase accounting acquisition. However, see Plaintiff's reply to DPFOF 329.

**DPFOF 331**

Despite knowing facts about the Suburbia acquisition, including purchase accounting, and Fidelity's pre- and post-FIRREA performance, Astoria could not value Fidelity's goodwill claim. Tr. 5300:25-5301:3, 5304:16-5305:11, 5329:4-10 (Engelke); Tr. 966:21-967:7 (Powderly); Tr. 4012:2-13 (Finn).[24] Salomon Brothers certified that the $29 per share paid by Astoria for Fidelity was a fair price, despite placing zero value upon the potential goodwill lawsuit. Tr. 4590:9-17, 5297:12-18 (Engelke); Tr. 643:6-9 (Powderly);DX 2965 at WOL487 0708; DX 3083 at PAA083 1467 ($157.8 million total price for Fidelity as of January 31, 1995); DX 3491 at 86:4-6, 92:6-12 (Drewitz). At the time of the merger, Astoria placed no value on

---

[24] Consistent with the fact that no value was placed upon Fidelity's claim for the loss of its goodwill, several witnesses testified that goodwill lacked value in a number of ways. No cash is exchanged for supervisory goodwill. Tr. 4359:11-13 (Engelke). Goodwill is a non-earning asset. Tr. 4360:6-8, 4466:7-12 (Engelke); DX 3488 at 63:3-8 (Greco); Tr. 4258:1 ("You can't earn interest on goodwill."), 4719:23-24, 4782:13-19 (goodwill "wasn't real capital[,]" "was paper money," "not an earning asset") (Amend). Goodwill cannot be used to work out real estate problems or invest or improve real estate owned because it is a non-cash asset. Tr. 5624:5-16 (Kennedy). Goodwill cannot be sold. DX 3491 at 54:13-17 (Drewitz); DX 3488 at 63:9-12 (Greco). Goodwill amortization negatively impacts an institution in the years following the decrease of loan discount accretion income. DX 3488 at 65:25-66:5 (Greco); Tr. 4784:10-21 (Amend) (goodwill a drain on Fidelity regardless of FIRREA). While tangible capital, which excludes goodwill, is an important measure of corporate value, Tr. 4360:14-4361:1 (Engelke), goodwill has no bearing on a thrift's solvency in economic terms. Tr. 5257:3-6 (Engelke); see also Tr. 4785:8-10 (Amend) ("the economics of how an institution operates doesn't change, regardless of goodwill").

Fidelity's goodwill because it was regulatory in nature and not GAAP capital. Tr. 4008:23-4009:5 (Finn).

**Reply:**

Plaintiff objects to DPFOF 331 as irrelevant to any issue in this case. The merger between Asotoria and Fidelity was negotiated in the first half of 1994. It was not until mid-1996 that the United States Supreme Court held in *United States v. Winstar Corp.*, 518 U.S. 839 (1996), that the passage of FIRREA breached contracts made by the Government with institutions that acquired failing institutions in supervisory mergers. Prior to the *Winstar* decision, it was not clear whether Fidelity or any other institution similarly situated had any claim at all, much less how such a claim could or should be valued. (Engelke, Tr. 5298, line 17 to p. 5300, line 1; Engelke, Tr. 5323, lines 3-10; PX 1359, Quackenbush, Dep. Tr. 28, line 13 to p. 29, line 8; Powderly, Tr. 642, line 13 to p. 643, line 2; Wesp, Tr. 1969, line 17 to p. 1971, line 7). Astoria must have ascribed some value to the claim, since Astoria made a decision to file a complaint based on Fidelity's goodwill claim after the merger. (Finn, Tr. 4042, lines 9-12).

Plaintiff objects to the first sentence of the footnote contained in DPFOF 331. For the reasons mentioned in the above paragraph, Astoria did not place a zero value on Fidelity's goodwill claim because it thought it was worthless. It did so because it was not able to value it at the time.

Also, although goodwill is an intangible asset, it still has value, and this value was a key component of the Fidelity-Suburbia merger. As Mr. Lovely explained at trial, "goodwill is goodwill. It doesn't jingle in your pocket, but it's there in your drawer. When I first learned

about it, I thought it was phantom money, but it made the deal possible." (Lovely, Tr. 1623, lines 9-14). The supervisory goodwill acquired in the merger transaction was "first class capital" and for regulatory purposes, was as good as any other kind of capital Fidelity had. (Kaplan, Tr. 2908, lines 7-19).

Plaintiff has no specific objections to the second or third sentence of the footnote contained in DPFOF 331. Fidelity objects to the fourth sentence, because having the supervisory goodwill would have had a tremendous effect in helping Fidelity work out its real estate problems because a capital cushion would have given Fidelity more options in dealing with problem assets. (Powderly, Tr. 352, lines 14-22; Kaplan, Tr. 3775, line 13 to p. 3776, line 5). Plaintiff objects to the fifth sentence because Mr. Drewitz's testimony does not support the statement since he did not know whether or not goodwill could be sold. Also, Mr. Greco's testimony continued to explain that the goodwill was valuable to Fidelity, because it increased Fidelity's capital position. Plaintiff objects to the sixth sentence, because the interplay between goodwill amortization and loan discount accretion is a natural accounting occurrence of which Fidelity was clearly aware. Fidelity knew that at a certain point, the crossover point, amortization of goodwill would begin to exceed income from loan discounts. (Vigna, Tr. 1369, line 3 to p. 1370, line 3). Nonetheless, the Defendant continues to attach some sinister meaning to this basic accounting principle. Fidelity was aware of it and planned for it. Plaintiff has no objection to the final sentence of the footnote.

**DPFOF 332**

The Fidelity acquisition resulted in accretion to Astoria's earnings, which was immediate and substantial, and significantly enhanced AFC's earnings per share and return on equity. Tr. 4015:4, 4016:2 (Finn); Tr. 5287:2-7 (Engelke). Fidelity was strategically important to Astoria because it added 18 complementary offices to Astoria's Long Island banking network and deposit base. DX 3491 at 73:16-74:1, 90:4-91:4 (Drewitz); see also Tr. 5327:8-14 (Engelke) (costs of branch maintenance taken into account in ascertaining franchise value); Tr. 1968:8-13 (Wesp) (the combination of Fidelity and Astoria "made a great branch network"). Among the branches Astoria acquired were the branches Fidelity had acquired from Suburbia. Tr. 2807:9-11 (Vigna). Acquiring Fidelity increased Astoria's market share of deposits. Tr. 5260:15-5261:7 (Engelke). Astoria also received the benefit of removing Fidelity as a competitor in the marketplace. DX 3491 at 98:7-17, 110:22-111:5 (Drewitz); see also Tr. 5258:5-5259:24 (Engelke) (eliminating competition by acquiring competitors generally benefits corporate profits).

**Reply:**

Plaintiff objects on relevance grounds to the parenthetical description of Mr. Engelke's alleged testimony concerning branch maintenance costs. That testimony referred specifically to instances where Astoria acquired branches in purchase transactions. Such purchases would bear no relationship to a situation such as the Fidelity/Suburbia or Astoria/Fidelity mergers which were acquisitions of whole institutions. The Government cannot claim as a "benefit" some hypothetical value of the former Suburbia branches without also taking into account the costs associated with maintaining and developing those branches over a period of many years.

Plaintiff has no objection further to DPFOF 332, except to note that Mr. Englke testified that had Fidelity remained a competitor of Astoria, it would not have materially affected Astoria's earnings. (Engelke, Tr. 5258, line 25 to p. 5259, line 16).

**DPFOF 333**

Fidelity's branch network was very strong, with good office locations, good financial statements, and good management experience; it was healthy and well-capitalized at the time of the acquisition and the acquisition resulted in cost savings. Tr. 5259:21-5260:14, 5267:22-5268:1 (Engelke); PX 1228 at WON735 0073; PX 1076 at WON739 1169. The integration of back office operations and systems and all staff reductions were completed within 60 days after closing; therefore, the full projected annualized cost savings of over $7 million was recognized in Astoria's operating expenses beginning April 1, 1995. PX 1228 at WON735 0073.

**Reply:**

Plaintiff does not object to the first sentence of DPFOF 333.

Plaintiff agrees the second sentence is an accurate quote from an Astoria Annual Report. However, there is no evidence as to what is comprised in the "annualized cost saving" or what relevance, if any, such figure has to any issue in this case.

**DPFOF 334**

Astoria recognized that its acquisition of Fidelity was an in-market merger and substantial operating economies were anticipated in connection with merging the two depository institutions. Astoria projected that these savings would primarily result from: (I) elimination of redundant administrative staff; (ii) consolidation of back office / data processing functions, and (iii) significant economies of scale in human resources, internal auditing and compliance,

purchasing, financial management, marketing and legal services. Astoria further anticipated that secondary savings would accrue to the acquirer as a result of: (I) the elimination of redundant professional services such as external auditors, legal counsel, insurance brokerage and outside consultants, and (ii) a reduction in SAIF assessment rates, since Fidelity's deposits would be based upon Astoria's assessment rating in the future. PX 1076 at WON739 1204.

**Reply:**

DPFOF 334 is an accurate quote from an Astoria Annual Report. However, Plaintiff objects to DPFOF 334 as irrelevant to any issue in this case. Plaintiff also notes that Defendant, in what was surely an accident, left off the last sentence of the quote, which reads: "Since no branch closings are anticipated in connection with the Merger, direct expense savings from the retail branch network are not anticipated."

**DPFOF 335**

Astoria believed the Fidelity merger would result in more profitable utilization of Fidelity funds than would otherwise be the case given the enhanced market presence of Astoria and the economies expected to be realized as a result of the merger. PX 1076 at WON739 1176. Astoria anticipated that realizing significant economies would enable it to better serve the combined consumer base because the expected synergies would allow Astoria to be a more efficient and effective provider of financial services than merely the sum of the individual thrifts. PX 1076 at WON739 1169.

**Reply:**

DPFOF 335 is an accurate quote from the H-(e)3 application to OTS for approval of the Astoria/Fidelity merger. However, Plaintiff objects to DPFOF 335 as irrelevant to any issue in this case.

**DPFOF 336**

Astoria was able to cultivate Fidelity's deposit base with new products and marketing, among other things. Tr. 5278:14-5280:18, 5283:20-25, 5285:16-22 (Engelke); PX 1076 at WON739 1176, 1180 (32 percent of Fidelity's general and administrative expenses in cost savings), 1204; see also Tr. 5288:17-5289:1 (Engelke) (clarifying missing word in document).

**Reply:**

DPFOF 336 is an accurate quote from the H-(e)3 application to OTS for approval of the Astoria/Fidelity merger. However, Plaintiff objects to DPFOF 336 as irrelevant to any issue in this case.

**DPFOF 337**

Astoria received the benefit from the sale of $521.1 million of Fidelity's mortgage-related securities, which it used to pay down $417 million in borrowings; had Fidelity had more such securities, Astoria would have sold them as well. Tr. 5270:1-5271:5, 5293:8-21 (Engelke); DX 3080 at WON761 0786; PX 1076 at WON739 1216 (Astoria benefited from restructuring Fidelity's balance sheet); see also Tr. 5272:17-5273:4 (lower-rated Fidelity securities too risky for Astoria), 5294:4-14 (same) (Engelke). Astoria believed that the balance sheet restructuring contemplated in connection with the merger would benefit the combined entities' portfolio yield, net interest margin and overall profitability. PX 1076 at WON739 1216.

**Reply:**

Plaintiff objects generally to DPFOF 337 as irrelevant to any issue in this case.

Plaintiff objects specifically to the cited portion of PX 1076, because it does not support the contention that "Astoria benefited from restructuring Fidelity's balance sheet." PX 1076 is a pre-merger document. The relevant portion states that "[b]alance sheet restructuring ***contemplated*** in connection with the Merger will benefit the former FDNY's portfolio yield, net interest margin and overall profitability." (emphasis added). Plaintiff also objects to Defendant's characterization of AA-rated securities as risky. Although Astoria only invested in AAA-rated securities, AA securities are far from risky and are still relatively safe investments.

**DPFOF 338**

Following the acquisition of Fidelity, Astoria was always in excess of its capital requirements. DX 3270 at PAA062 0445-47 (March 31, 1995: tangible capital of $378,943,000 or 6.37 percent, $289,645,000 in excess of requirement; core capital of $378,943,000 or 6.37 percent, $200,326,000 in excess of requirement; risk-based capital of $384,393,000 or 19.23 percent, $224,446,000 in excess of requirement); DX 3083 at PAA083 1479 (December 31, 1995: tangible capital of 6.08 percent, 4.58 percent ($298 million) in excess of requirement; core capital of 6.08 percent, 3.08 percent ($200.5 million) in excess of requirement; risk-based capital of 18.72 percent, 10.72 percent ($233.2 million) in excess of requirement); DX 1845 at AA0001545 (December 31, 1999: tangible capital of 5.98 percent, $1,031,085,000 in excess of requirement; core capital of 5.98 percent, $455,902,000 in excess of requirement; risk-based capital of 15.33 percent, $694,796,000 in excess of requirement). Astoria was always well-

capitalized, even after paying dividends to its parent company. Tr. 4688:15-19, 4703:3-25 (Amend); DX 244 at OAA001 0331.

**Reply:**

Plaintiff has no accuracy objection to DPFOF 338, though it does object to it on relevance grounds.

# PLAINTIFF'S REPLY TO DEFENDANT'S CONTENTIONS OF LAW

## I. OVERVIEW

Before responding individually to each of Defendant's contentions of law, Plaintiff takes this opportunity to provide a general response to Defendant's legal contentions as a whole so as to provide context for Plaintiff's individual replies.

### A. The Court Should Not Be Mislead By Defendant's Specious Analysis Of Precedent.

Plaintiff observes that Defendant's nearly 150-page Contentions of Law offers only a scarce and highly superficial discussion of the legal authority applicable to this case. Instead of examining and applying the legal principles that govern Plaintiff's recovery, Defendant attempts to bury these controlling principles under lists of *Winstar* cases with outcomes favorable to the Government. Completely ignoring the rationale of those cases, Defendant merely cites to favorable holdings and points out factual similarities between those cases and Plaintiff's claim.[25] Thus, Defendant's legal contentions amount to no more than invitation for the Court to dispense

[25] The Court need look no further than the Defendant's section headings to view this slotting technique. The Defendant merely: (A) places Plaintiff's claim in a category; (B) announces that the Federal Circuit has often rejected claims in that category; and (C) argues that Plaintiff's claim is based on the same general factual scenario as those cases in which the claim was rejected. (*See, e.g.*, Def.'s Contentions of Law at I. A.-C.; II. A.-C.).

Plaintiff also notes that Defendant often seeks to characterize Dr. Kaplan's testimony as an admission that Plaintiff's claims are foreclosed under the Federal Circuit precedent. (*See, e.g.*, Def.'s Contentions of Law at pp. 142, 168). Even if Dr. Kaplan's testimony could be construed as such, Plaintiff objects to these references, which essentially ask the Court to abdicate to Dr. Kaplan, an expert in finance and economics, the Court's authority to decide the legal questions in this case.

with a reasoned analysis of the applicable law in favor of a sorting exercise by which Plaintiff's claim is lumped into the group of cases favorable to the Defendant.

However, a careful analysis of the *rationale* behind the *Winstar* cases, and the multitude of other contract cases decided by the Federal Circuit, reveals that the great weight of precedent favors Plaintiff's recovery in this case. Therefore, in replying to Defendant's Contentions of Law, Plaintiff does not only address the accuracy of Defendant's cursory statements about outcomes in different *Winstar* cases, but also endeavors to pierce through those statements to identify for the Court the core legal principles that should govern the outcome in *this* case.

**B. The Law Of Contracts, And No Special *Winstar* Law, Applies To This Case.**

The large number of *Winstar* cases that have been tried and the common factual basis of these cases can create the false impression that such cases are to be governed by a unique body of Federal Circuit law that applies only to such cases. *Winstar* cases, however, are no different from any other contract case and must not be treated as such. *See United States v. Winstar Corp*. (518 U.S. 839, 895 (1996) ("[W]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.")).

Following the Supreme Court's holding, the early *Winstar* cases sought to apply the long-standing principles of contract law as embodied in the Restatement of Contracts and the leading cases of the Federal Circuit. Yet, over time, subsequent *Winstar* cases came to rely solely on earlier *Winstar* cases, such that *Winstar* decisions gained a trajectory of their own that, in some cases, diverged from the well established contract principles that the leading cases were

attempting to apply. As such, some later cases came to view *Winstar* precedent as a body of law separate from contract law.

An example of this sort of divergence can be found in *Glendale Fed. Bank, F.S.B. v. United States* (54 Fed. Cl. 8 (2002)) ("*Glendale III*"), in which the plaintiff presented the Court with authority indicating that the Federal Circuit Court of Appeals may have erred in *Glendale Fed. Bank, F.S.B. v. United States* (239 F.3d 1374, (Fed. Cir. 2001)) ("*Glendale II*") by holding that an assumption of liabilities does not represent a cost for the purposes of reliance damages. Although the court in *Glendale III* was bound by the law-of-the-case doctrine to apply *Glendale II's* holding on remand even if that holding was in error, the court went further to suggest, in direct contradiction of the Supreme Court's holding in *Winstar*, that a different standard of law should apply in *Winstar* cases than in contract cases between private parties.

> The court is cognizant of the cases cited by plaintiff that hold that a contractually-binding assumption of a debt not yet due is a cost for purposes of contract damages. But the court is also aware that the framework for the calculation of reliance damages as articulated by the Federal Circuit focuses on actual out-of-pocket losses, not paper calculations of losses …. *If this were a dispute between two private parties the plaintiff's argument would have greater force.* But the law of the case on this point is clear: plaintiff's assumption of Broward's deficit was not a cost.

*(Glendale III,* 54 Fed. Cl. at 13-14) (emphasis added).

Plaintiff respectfully submits that the leading *Winstar* cases never intended to create a separate body of law but only to apply long-standing principles of contract law in the *Winstar* context. Therefore, these cases are properly followed not by blind adherence to their holdings, but by identifying and correctly applying the principles of contract law that those cases were attempting to apply. Thus, in its replies, Plaintiff endeavors to show how the rationale behind the *Winstar* cases supports the underlying principles of contract law, and in the few instances

where it does not, Plaintiff respectfully notes the divergence, so that the Court may properly apply the law.

### C. The Law Of Contracts Is Extremely Lenient And Accommodating To A Plaintiff's Recovery Once Breach And Fact Of Loss Are Established.

Defendant's contentions of law attempt to portray the law in *Winstar* cases as restrictive and hostile to a plaintiff's recovery. To the contrary, an analysis of Federal Circuit precedent shows that the law of contracts is lenient and accommodating to a plaintiff's recovery in breach of contract cases. Plaintiff thus takes this opportunity to place in appropriate legal context the Government's responsibility for making Plaintiff whole.

Under the law of contracts, the breaching party is responsible for paying a sum necessary to compensate the injured party for its loss. Once the defendant's liability for breach and the plaintiff's ***fact*** of loss have been established, the Court has wide latitude to choose among a number of different methods through which it may fashion an appropriate award. Moreover, the Court is not required to determine the ***amount*** of plaintiff's loss with any precision but need only reach a fair and reasonable approximation of that loss.

Therefore, notwithstanding the complexities of the underlying fact pattern or the inherently speculative nature of what may have occurred had a defendant not breached the contract, a Court is duty-bound to fashion an award sufficient for a plaintiff's recovery when, as in this case, a plaintiff establishes both breach and loss and provides the Court with enough evidence to make a fair and reasonable approximation of the loss.

The primary restriction on a plaintiff's award under the law of contracts is that the award must not be so speculative as to constitute a windfall to the plaintiff. In this case, however, where Fidelity forever saved the Government and taxpayers millions of dollars at great expense

to Fidelity's earnings and its ultimate viability, to compensate Plaintiff for this service under any of the conservative awards proposed by Dr. Kaplan could never constitute a windfall to the Plaintiff. In fact, to provide this award nearly twenty years later and without any prejudgment interest only enhances the windfall that the Government and taxpayers received long ago.

### ***1. The Government, As The Breaching Party, Is Responsible For Making Plaintiff Whole.***

When the Government breaches a contract, the Government, like any other breaching party, must pay the consequences imposed by the law for the purpose of making the non-breaching party whole. (*Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001)). Defendant has admitted in this case that it breached its contract with Plaintiff. (*See* Def.'s Mem. of Contentions of Fact and Law, Mar. 15, 2007 (stating, "In August 1989, FIRREA was passed by Congress, an act that breached plaintiff's contract with the Government."); *see also United States v. Winstar Corp.*, 518 U.S. 839, 843 (1996) (confirming that FIRREA breached the Government's merger agreements)). Thus, it is conclusively established in this case that the Government is responsible for making Plaintiff whole, and the only issue remaining is the sum of money the Government must pay to achieve that purpose.

### ***2. The Court Has Broad Powers Under The Law To Fashion A Suitable Award To Make Plaintiff Whole.***

In determining Plaintiff's award, the law provides this Court with broad powers to fashion a suitable remedy, allowing the Court to grant an award on three different bases: expectancy; restitution; and reliance. (*See Globe Sav. Bank, FSB v. United States*, 65 Fed. Cl. 330, 345 (2005)). Further, within these three principal forms of recovery, the court has wide discretion in how to measure the award. (*See* RESTATEMENT (SECOND) OF CONTRACTS §§ 347-48 (1981) (listing multiple alternatives for measuring expectancy damages); *Id*. at § 371

(providing that restitution may be measured by either the objective value of the plaintiff's performance or the extent to which the defendant was subjectively enriched by that performance); *Id*. at § 349 (providing that damages for detrimental reliance are not limited to costs of performance and preparation for performance, but can also include collateral costs taken in reliance on the contract)). And, even if the above measurements of loss are not practicable under the facts, the Court should award "jury damages" if there is clear proof of injury and evidence sufficient to enable the court to make a fair and reasonable approximation of the loss. (*Bluebonnet Sav. Bank, F.S.B., v. United States*, 266 F.3d 1348, 1357 (Fed. Cir. 2001)).

#### ***3. The Plaintiff's Recovery Is Not Precluded By Uncertainty As To The Precise Amount Of Plaintiff's Loss.***

The law of contracts not only provides the Court with multiple methods by which to fashion an award suitable for plaintiff's recovery, but also provides the Court with great latitude to determine the amount of the award. Thus, the Court is not required to identify the amount of Plaintiff's loss with precision, but only required to reach a fair and reasonable approximation of that loss.

> The ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: "It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation."

(*Elec. & Missile Facilities, Inc. v. United States*, 189 Ct. Cl. 237, 257 (1969)(*quoting Specialty Assembling & Packaging, Co. v. United States*, 174 Ct. Cl. 153, 184 (1966) (emphasis omitted); *see also Hughes v. United States*, 71 Fed. Cl. 284, 303 (2006) (quoting this standard and applying it in the *Winstar* context)).

Therefore, in *Winstar* cases, as in all contract cases, if a plaintiff can establish a reasonable probability that it has suffered a loss, the plaintiff's recovery is not precluded by any uncertainty as to the amount of the loss. (*Hughes v. United States*, 71 Fed. Cl. 284, 303 (2006)). Rather, once the reasonable probability of damage is established, a court is "duty-bound" to fashion an appropriate award. (*See Seuss v. United States*, 52 Fed. Cl. 221, 226 (2002)).

This rule provides for a measure of justice, because it is often the defendant's breach of contract that creates uncertainties as to the amount of loss. Accordingly, this Court recently held that, "[a] defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable." (*S. Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 432-33 (2007) (*quoting Locke v. United States*, 151 Ct. Cl. 262, 267 (1960)). And even when uncertainties are unrelated to the breach but inherent in the complexities of the facts, it would be an injustice to have those complexities favor the party that wrongfully breached the contract, and, therefore, the breaching party bears the risk that the award may be imprecise or overcompensate the injured party. (*See LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003) ("When damages are hard to estimate, the burden of imprecision does not fall on the innocent party.")). Therefore, it is no defense to a breaching party's liability that the injured party's damages are difficult to calculate with precision.

#### ***4. Plaintiff's Fact Of Loss Is Overwhelmingly Established By The Evidence.***

In this case, not only is the Government's breach conclusively established, but the evidence also overwhelmingly supports Plaintiff's fact of loss. Defendant's contentions of law would have this Court believe that Plaintiff was better off as a result of its contract with the

Government, even after the breach (*See, e.g.,* Def. Cont. of Law at pp. 165-66 (suggesting that Plaintiff would owe the Government money under a restitution analysis)), but such a conclusion is simply not supported by the evidence and borders on the ludicrous.

The evidence shows that Fidelity, a healthy thrift before the merger, assumed on behalf of the Government net liabilities in excess of $160 million, and that Fidelity's only hope of avoiding a loss as a result of this contract was to count this $160 million as goodwill against its capital requirements and to amortize this cost slowly over thirty years. The evidence also shows that unlike some thrifts who were later relieved from their burden by falling interest rates, Fidelity continued to carry this burden throughout the entire contract period. In fact, it was precisely because of the continued existence of this burden that Fidelity was deemed to have deficient capital after Defendant's breach.

Whereas a non-breaching party is typically excused from future performance once the other party breaches (*see* RESTATEMENT (SECOND) OF CONTRACTS §§ 237, 253 (1981)), in this case, Fidelity was not relieved from amortizing the supervisory goodwill after the Government's breach but was instead forced to amortize the goodwill at a much accelerated pace, further increasing the severity of Plaintiff's loss. Moreover, as a result of the capital deficiency caused by the breach, Fidelity was forced to operate under a restrictive Capital Plan that focused entirely on increasing Fidelity's capital at the expense of profit-making opportunities and growth of Fidelity's franchise value. As a result of these restrictive operations and the loss of its capital leverage, Fidelity was so weakened when it emerged from the Capital Plan that it had no choice but to seek an acquirer. Thus, the Government's breach of contract not only caused Fidelity to incur greater costs and forego opportunities for profit, but permanently damaged Fidelity's

viability. As such, there can be no doubt that Fidelity suffered loss in this case, and Defendant's contentions to the contrary are simply not credible.

***5. Plaintiff's Amount Of Loss Is Not Made Uncertain By Defendant's Unsupported Speculations.***

As noted further above, once the breach and fact of loss are established, the Court need not identify the amount of loss with any precision but need only reach a fair and reasonable approximation of that loss. Nonetheless, in an attempt to create uncertainty as to the amount of Plaintiff's loss, Defendant's 150-page Contentions of Law consists almost entirely of Defendant's unsupported speculations about what would have happened in the but-for world.

For example, Defendant speculates that the Government would not have liquidated Suburbia absent the merger, but it fails to point to any evidence suggesting that the Government had any viable alternatives to liquidation. (*See* Def. Contentions of Law § I.C.1-2.). Likewise, without offering any evidence, Defendant speculates that changes in interest rates would have lessened the benefit conferred on the Government by Fidelity's performance when evidence shows that Suburbia's precarious financial condition was only getting worse in the years preceding the merger despite drastic improvements in interest rates. (*See* Def. Contentions of Law § I.C.2.a.(2)). Additionally, Defendant makes a number of unsupported speculations about factors that might have occurred absent the breach that would have limited Fidelity's lost profits to zero. (*See* Def. Contentions of Law § IV.C.4).

Thus, by speculating about the but-for world, Defendant attempts to create uncertainty as to Plaintiff's damages. But if mere speculation about alternative scenarios in the but-for world were sufficient to preclude a plaintiff's recovery, no defendant would ever be held liable for breach. Therefore, not only are Defendant's speculations entirely unconvincing, but even if such

speculation could create uncertainty as to plaintiff's loss, it would not bar plaintiff's recovery, as a breaching party cannot insulate himself from liability to the injured party by demanding proof which is unobtainable by reason of his breach. (*S. Nuclear Operating Co.*, 77 Fed. Cl. 396, 432-33).

Rather, so long as Plaintiff provides the Court with enough evidence to reach a fair and reasonable approximation of its loss, Plaintiff's recovery is not precluded. (*Elec. & Missile Facilities, Inc.*, 189 Ct. Cl. at 257). Plaintiff has done just this, presenting the Court with several models that provide this Court with fair, reasonable, and ***conservative*** measures of Plaintiff's loss. While Defendant has also spent considerable effort in its Contentions of Law in an attempt to undermine the precision of these models (*See, e.g.,* Def. Contentions of Law § IV.C.6.), Plaintiff's models were never intended to model precisely a world that was forever foreclosed by Defendant's breach, but only to provide the Court with a fair and reasonable approximation of that world. Having offered no alternative models of its own, Defendant cannot summarily destroy the fairness and reasonableness of Plaintiff's models by merely pointing out ways in which the Defendant would have modeled the loss differently. Therefore, because Defendant's numerous criticisms of Dr. Kaplan's models in its Contentions of Law do not in any way make Plaintiff's proposed awards unfair or unreasonable, they are also irrelevant to Plaintiff's recovery.

#### ***6. Dr. Kaplan's Conservative Measurements Of Plaintiff's Award Could Never Constitute A Windfall For Plaintiff.***

The only limitation on a plaintiff's recovery is that the award must not be so speculative as to constitute a windfall to the plaintiff. In this case, even if the Court were to award Plaintiff

the highest of the conservative awards recommended by Dr. Kaplan, such an award could never constitute a windfall to the Plaintiff but only to the Government.

As noted above, Fidelity suffered enormous losses as a result of the Government's breach of the merger contract. Through the contract, the Government essentially transferred its own enormous obligation for Suburbia's excess liabilities to Fidelity, and through the breach of the contract, forced Fidelity to discharge those liabilities in less than a third of the time called for by the contract. Although Fidelity survived the breach, its future viability was so damaged that it was forced to seek an acquirer after emerging from the Capital Plan.

Thus, Fidelity was essentially driven out of business so that the Government and taxpayers could avoid millions of dollars of liability. As such, to compensate Fidelity for this service nearly twenty years later, based on Dr. Kaplan's *conservative* estimates of the loss, and without prejudgment interest, could never constitute a windfall to the Plaintiff, but only to the Government. Therefore, the Court need not be concerned with the prospect of a windfall in this case, but only with choosing the award that it believes most fairly approximates Plaintiff's loss.

## II. PLAINTIFF'S RESPONSES TO DEFENDANT'S CONTENTIONS ADDRESSING EXPECTANCY.

### A. Defendant's Speculations Do Not Make Plaintiff's Damages Model An Unfair Or Unreasonable Approximation Of Fidelity's Loss.

#### *1. Defendant Has Identified No Legal Impediment To Plaintiff's Recovery.*

Although Defendant contends that Plaintiff's expectancy claims fail as a matter of both law and fact, Defendant does not actually raise any legal impediment to Plaintiff's recovery. Rather, the only significant legal contention that Defendant makes in nearly 100 pages of its contentions of law on expectancy is that expectancy damages must be reasonably certain. Thus,

the crux of Defendant's legal argument is that it is difficult for plaintiffs to meet the reasonable certainty standard in the *Winstar* context and that a number of plaintiffs have failed to do so. (*See* Def.'s Cont. of Law at pp. 186-89).

As noted in the introduction to Plaintiff's replies, however, the law of contracts is extremely lenient and accommodating to a plaintiff's recovery once the breach and fact of loss are established, and thus ***reasonable*** certainty only requires that the plaintiff provide the court with sufficient evidence to make a fair and reasonable approximation of the amount Plaintiff's loss. (*See La Van v. United States,* 382 F.3d 1340, 1351 (Fed. Cir. 2004) (once "the fact that there would have been a profit is definitely established," the plaintiff need only provide the court with "some basis on which a reasonable estimate of the amount of profit can be made.")).

Moreover, while it is true that expectancy damages are not intended to put the plaintiff in a better position that it would have occupied had the defendant performed the contract, when the underlying facts are complex, the risk that the award may be less than precise or overcompensate the plaintiff is entirely borne by the party that chose to breach the contract. (*See LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003) ("When damages are hard to estimate, the burden of imprecision does not fall on the innocent party.")). Thus, a defendant cannot itself procure a windfall by breaching a contract and then demanding that the plaintiff perfectly model the world that was permanently foreclosed by the defendant's breach. *S. Nuclear Operating Co. v. United States,* 77 Fed. Cl. 396, 432-33 (2007) ("A defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable.").

### 2. *Defendant's Speculations About Alternative Scenarios In The But-For World Do Not Make Plaintiff's Damages Estimate Unfair Or Unreasonable.*

Despite the lenient standards that apply to Plaintiff's recovery, the overwhelming bulk of Defendant's contentions of law consist of factual arguments designed to undermine the reliability of Plaintiff's damages estimates.

Addressing causation, Defendant's first tactic is to speculate as to a number of alternative scenarios that may have occurred to limit Fidelity's lost profits to zero even if the Government had not breached the contract. Somewhat conspicuously, Defendant avoids contending that the Government's breach was not the cause of Plaintiff's losses or that there was some other more substantial cause of those losses, but only that certain alternative scenarios may have occurred in the but-for world that would have resulted in Fidelity suffering the same exact loss that it suffered in the real-world as a result of the breach.

As will be discussed in detail below, not only are these speculations unsupported or contradicted by the evidence, but the necessary conclusion of these speculations, that Fidelity suffered no loss whatsoever as a result of the Government's breach, is ludicrous. Thus, viewing Defendant's arguments as a whole, they essentially amount to a statement that even if Fidelity:

- had plenty of regulatory capital to free up its tangible capital for additional investments;
- was permitted to amortize Suburbia's $160 million of excess liabilities slowly over thirty years instead of rapidly in less than ten years;
- did not have to operate under a restrictive Capital Plan that completely restricted growth and provided no ability for Fidelity to advertise or otherwise increase its franchise value; and

- was not forced to operate under a conservative investment strategy designed to safely meet interim capital targets at the expense of profitability,

Fidelity ***still*** would not have been any more profitable than it was while operating in a survival mode as a result of the Government's breach. Such a conclusion is simply not credible.

#### *3. Defendant's Speculations About How It Might Have Modeled Plaintiff's Damages Differently Do Not Make Plaintiff's Damages Estimate Unfair Or Unreasonable.*

Addressing reasonable certainty, Defendant's second tactic under its contentions of law on expectancy is to point out a number of additional variables and inputs that Dr. Kaplan could have possibly included in his damages model. Yet, to avoid admitting to Plaintiff's enormous losses, Defendant has not proposed any damages model of its own. Instead it merely suggests ways in which Dr. Kaplan's model may have been more precise. Dr. Kaplan, however, never intended to, nor could he possibly, perfectly recreate the world that was forever foreclosed by Defendant's breach. Rather, Dr. Kaplan has presented the Court with an understandable and conservative damages estimate that provides the Court with sufficient evidence to reach a fair and reasonable approximation of Plaintiff's loss.

In fact, if Dr. Kaplan had included many of the inputs that Defendant now demands, Defendant would surely have objected to those inputs as speculative. For example, Defendant objects that Dr. Kaplan's model is based on Adjustable Rate Mortgage-Backed Securities ("ARM MBS") when Fidelity also had in its portfolio a few fixed-rate and other securities. (*See* Def.'s Cont. of Law at pp. 207-214). But if Dr. Kaplan had included every peripheral and one-off investment that Fidelity had on its books, Defendant would certainly object that Dr. Kaplan's model was skewed by these outliers.

Instead, to prevent the damages model from being skewed, Dr. Kaplan has taken a conservative approach, modeling his estimate on Fidelity's core investments under the very conservative strategy that Fidelity actually employed during its operation under the Capital Plan, and basing his spread calculations on the lowest spread that Fidelity ***actually*** obtained during this period, which was far below the spreads achieved by fully capitalized thrifts. Thus, where precision has been sacrificed in Dr. Kaplan's model, it has been done in favor of reliability and conservatism and at the expense of Plaintiff's ultimate recovery. (*See* Kaplan, Tr. 3093, line 5 to p. 3094, line 16).

Any defendant can infinitely speculate as to how damages might be estimated, and even well-accomplished and respected experts can have reasonable differences of opinion on how damages should be modeled, but if these speculations or disagreements were enough to defeat reasonable certainty, no plaintiff would ever recover its loss. Such a restrictive rule of recovery would essentially allow a contracting party to breach its obligations without recourse whenever it regretted a contract, or worse, saw the strategic opportunity to reap a windfall by denying compensation to the plaintiff once the plaintiff had already performed or, as in this case, where the plaintiff was forced to perform even after the defendant's breach. (*See Glass v. United States*, 47 Fed. Cl. 316, 330 (2000), *rev'd on other grounds*, 258 F.3d 1349 (Fed. Cir. 2001)("it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.")).

Thus, as will be noted in greater detail below, the Federal Circuit does not require the plaintiff to perfectly recreate the non-breach world, but only to provide a reasonable approximation of the plaintiff's loss. Thus, damages calculations are rejected only when the

plaintiff's model marks a significant departure from the thrift's actual experience, and courts will find a model to be fair and reasonable as long as it reasonably tracks the plaintiff's actual operations. As such, Defendant's numerous objections to Dr. Kaplan's model amount to no more than the same picayune and substance-less objections that Defendant has repeatedly exhibited throughout this trial.

**B. Plaintiff Is Entitled To Lost Profits.**

Expectancy damages are intended to provide the injured party the benefit of his bargain by awarding it a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed. (RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981)). One aspect of the injured party's expectation interest is the consequential losses that the plaintiff suffered as a result of the breach, including lost profits. (*Id*. at § 347(b)). To show entitlement to lost profits, a plaintiff need only show that (1) the loss of profits caused by the breach was within the contemplation of the parties at the time of the contracting; (2) the loss was the proximate result of the breach; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty. (*Globe Sav. Bank, F.S.B. v. United States*, 65 Fed. Cl. 330, 345 (2005)).

Plaintiff meets all three requirements in this case.

***1. It Was Forseeable At The Time Of Contracting That Fidelity Would Lose Profits If The Government Breached The Contract.***

**(a) Legal Standard For Foreseeability.**

Lost profits are foreseeable if they follow from the breach of contract in the ordinary course of events or if they are the result of special circumstances, beyond the ordinary course of events that the party in the breach had reason to know. (*See LaSalle Talman Bank, F.S.B. v.*

*United States*, 64 Fed. Cl. 90, 98 (2005); *Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460, 480 (2006)). Thus, "[f]oreseeability requires only reason to foresee, not actual foresight." (*First Fed. Sav. & Loan Ass'n of Rochester v. United States*, 76 Fed. Cl. 106, 122 (2007) (quoting *Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl. 126, 146 (2003) (further citations omitted))). As such, a plaintiff need not show that the defendant either implicitly or expressly promised to pay for lost profits in case of breach. (*See id.).*

Foreseeability does not require that the lost profits should have been foreseen to a dead certainty, but only that the injury be one of such kind and amount as a prudent person would have realized to be a probable result of the breach. (*See Precision Pine*, 72 Fed. Cl. at 480). Defendant claims that both the ***magnitude*** and ***type*** of damages must be foreseeable (Def.'s Cont. of Law at p. 187), but cites to *Landmark Land Co. v. FDIC* (256 F.3d 1365, 1378 (2001)) for this proposition, which was addressing not the foreseeability of lost profits but the foreseeability of costs incurred in reliance on the contract. Thus, all that is required under forseeability of lost profits is that the lost profits were "of an amount that is not beyond the bounds of reasonable prediction." (*LaSalle*, 64 Fed. Cl. at 98 n. 10).

**(b) Plaintiff's Lost Profits Were Foreseeable.**

In this case, Fidelity assumed, on behalf of the Government, $160 million of Suburbia's excess liabilities, immediately rendering Fidelity insolvent. The only way that this arrangement could ever prove profitable to Fidelity would be if the Government honored its contractual forbearances to allow Fidelity to count the unamortized portion of goodwill as capital and to amortize the cost slowly over thirty years. (*See* PPFOF 192, 220, 452-53). Accordingly, Fidelity demanded these non-standard forbearances as a condition to the merger. (*See* PPFOF 188-92).

Thus, at the time of the merger, it was abundantly clear to the Government that Fidelity's ability to operate profitability was dependent on the Government honoring the forbearances under the contract. It was at least foreseeable, if not actually foreseen, that Fidelity would lose profits if the Government were to breach the contract.

This conclusion is in harmony with the holdings of numerous other supervisory goodwill cases in the Court of Federal Claims and Federal Circuit, which have had no difficulty finding that the Government should have known that the plaintiffs expected to profit as a result of the supervisory goodwill and that the plaintiffs would suffer a loss of profits if the Government breached the contract. (*See, e.g.*, *Winstar*, 518 U.S. at 839, 850-51, 900-903 (finding that the treatment of supervisory goodwill as regulatory capital was forseeably profitable and that the abrogation of this treatment was forseeably unprofitable); *First Fed. Lincoln Bank v. United States*, 73 Fed. Cl. 633, 650 (2006) (finding it foreseeable that a thrift would have to shrink its assets to improve its capital position after the breach and that this would lead to lost profits); *Citizens Fin. Servs., F.S.B. v. United States*, 64 Fed. Cl. 498, 504 (2005) (finding it foreseeable that a bank would leverage its supervisory goodwill to make profits); *Castle v. United States*, 48 Fed. Cl. 187, 205 (2000), *aff'd in part, rev'd in part*, 301 F.3d 1328 (Fed. Cir. 2002) (holding that "the government cannot credibly maintain that the potential for profit, without which plaintiffs would have had no incentive to complete the deal, was not within its contemplation.")).

**(c) Defendant's Arguments That The Government Could Not Have Foreseen The Magnitude Or Source Of The Lost Profits Are Not Credible.**

Defendant makes two primary arguments against the foreseeability of Plaintiff's lost profits. The first argument is that the magnitude of the damages is unforeseeable because the

$120 million lost profits estimate is only $40 million less than the $160 million in supervisory goodwill. (Def.'s Cont. of Law at p. 236-37). This is a strange argument. First, it is largely irrelevant. Second, Fidelity would never have entered into the contract if it did not expect to make profits in *excess* of the cost of amortizing the $160 million of supervisory goodwill. Thus, the Government should have foreseen that Fidelity's total profits as a result of the merger would be ***more*** than $160 million, and where the Government repudiated only five years into the contract, it is not unforeseeable that Fidelity's ***lost*** profits would fall somewhere near Fidelity's total expenditures on the contract. Thus, this figure is not "beyond the bounds of reasonable prediction." (*LaSalle*, 64 Fed. Cl. at 98 n. 10).

Defendant's second argument is that the Government would not have foreseen that Fidelity would have made profits through a wholesale strategy involving mortgage-backed securities. (Def.'s Cont. of Law at p. 237-39). This is also a strange and largely irrelevant argument. Investing in mortgages is precisely what thrifts have always done. The fact that Fidelity sought to limit its credit risk by investing in mortgage-backed securities instead of originating mortgages in its local area should not have come to any surprise to the Government. Additionally, at the time of the merger, the Government was encouraging thrifts to engage in numerous high-risk ventures such as commercial real estate and risk-controlled arbitrage in an attempt to increase the thrifts' yields. (*See* PPFOF 274-76). Therefore, if anything, the Government at the time of contracting would have expected Fidelity to be more profitable than it actually was under its conservative wholesale strategy. And, because thrifts were engaging in a number of new investment opportunities after Garn-St Germain, Defendant's argument that the

Government could not foresee the "new industry" of mortgage-backed securities is simply irrelevant: the Government had no fixed expectation of how those thrifts would operate.

### 2. *Fidelity's Lost Profits Were Definitely And Substantially Caused By The Government's Breach.*

#### (a) Legal Standard For Causation.

The Court has discretion to apply a causation standard that best suits the facts of a particular case. (*Citizens Fed. Bank, F.S.B. v. United States*, 474 F.3d 1314, 1318-19 (Fed. Cir. 2007)). Among the causation standards that the Court may apply are the "substantial-factor," "definitely-established" and "but-for" standard. (*See id.)*.

Among these standards, the but-for standard appears to be the least applicable to the complicated factual patterns inherent in *Winstar* cases. Under a strict but-for standard, a plaintiff would not recover unless the defendant's breach was the sole cause of the plaintiff's lost profits. While such a standard might have a suitable application in a less complex case, such as when a retailer loses sales as a result of a shipper's failure to deliver a good, to apply such an inflexible but-for standard to the much more complicated relationship between capital and a thrift's profits would only lead to unjust results.

Thus, even those *Winstar* cases that have relied on the but-for standard have not applied it strictly. For example, in *Cal. Fed. Bank v. United States* (395 F.3d 1263, 1268 (Fed. Cir. 2005)), the Federal Circuit held that the inability to prove that profits would have been made ***but for*** the breach will preclude recovery. However, the Court of Appeals did not actually apply a strict but-for standard, but more of a definitely-established standard, requiring only that the plaintiff definitely establish a causal connection between the breach and the loss of profits. (*Id.)*. Further, the court clarified that the breach need not be the sole cause of the loss, stating that "the

existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." (*Id.)*.

Under the substantial-factor standard, a plaintiff need only show that the defendant's breach was a substantial causal factor in plaintiff's losses. *(Citizens Fed. Bank*, 474 F.3d at 1318-20). This much more flexible standard allows the Court greater latitude in protecting a plaintiff's recovery in cases where it is clear that the plaintiff was damaged as a result of the defendant's breach but where the impact of other factors would prevent the plaintiff's recovery under a strict but-for standard. Thus, as noted in *Citizens Fed. Bank*, this standard has been adopted in numerous *Winstar* cases. (*Id.* at 1320). For the same reason, some courts have adopted a hybrid of the definitely-established and substantial-factor standard by which the Court will apply a substantial-factor test once the plaintiff definitely establishes that its losses were caused at least in part by the defendant's breach. (*See Seuss v. United States*, 74 Fed. Cl. 510, 517 (2006)).

**(b) Plaintiff's Lost Profits Were Definitely And Substantially Caused By Defendant's Breach.**

As noted in greater detail in Plaintiff's Proposed Findings of Facts and Plaintiff's Conclusions of Law, the record evidence overwhelmingly shows that Fidelity lost profits as a result of the Government's breach of the supervisory goodwill forbearance. (*See* PPFOFs 17-21). Rather than repeat those conclusions in detail, Plaintiff merely notes that, given the effect of the breach on Fidelity's growth rate, staffing levels; advertising budget; branch operations; ability to take on risk; ability to handle problem assets; pace of amortization; and franchise value, there can be no doubt that the Government's breach had an effect on Fidelity's profitability.

In fact, Defendant's contentions of law do not dispute that the Government's breach caused these consequences, nor that these consequences caused Fidelity to lose profits. Rather, Defendant contentions take a different approach, suggesting that, even if the Government honored the contract, Fidelity would not have been any more profitable than it was as a result of the breach. Thus, there is no question that the Government's breach was, in reality, both a substantial and definitely-established causal factor in Plaintiff's lost profits.

Therefore, to the extent it is relevant, the only question is what might have also caused Fidelity to lose these profits in the imagined but-for scenario wherein Defendant performed the contract. Plaintiff takes issue with each of the Defendant's speculations about this but-for world in greater detail in Section B.1 below.

### *3. Fidelity's Lost Profits Are Reasonably Certain.*

#### (a) Legal Standard For Reasonable Certainty.

As noted earlier in this reply, the law of contracts takes a lenient and accommodating stance towards a plaintiff's recovery once the breach and fact of loss are established. Thus, the reasonable certainty requirement is easily satisfied as long as the plaintiff provides the court with sufficient evidence to reach a fair and reasonable approximation of the plaintiff's loss. (*Slatterly v. United States*, 69 Fed. Cl. 573, 576 (2006); *Hughes v. United States*, 71 Fed. Cl. 284, 303 (2006) ("The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision.")).

Because lost profits and other expectancy damages are determined by modeling a but-for world that was forever foreclosed by the Defendant's breach, the law does not require such

necessarily hypothetical models to be perfect forecasts of what a plaintiff would have actually done in the but-for world, but only a reasonable approximation of the profits the plaintiff would have been able to make absent the breach. (*See First Fed. Sav. & Loan Ass'n of Rochester*, 76 Fed. Cl. at 123 (noting that Dr. Kaplan's testimony about "what would have happened in a world that never was" was a "sufficient and sound basis" for the court's assessment of lost profits)).

In the *Winstar* context, the Federal Circuit courts typically find a plaintiff's model to be unreasonable only when the model is based on assumptions that constitute a significant departure from the plaintiff's actual business model. For example, in *Columbia First*, the court found plaintiff's lost profits model too speculative because it was based on a completely hypothetical business strategy that differed substantially from the strategy actually employed by the injured thrift. (*Columbia First Bank, F.S.B. v. United States*, 60 Fed. Cl. 97, 121 (2004)). Similarly, in *Southern Cal. Fed. Sav. & Loan Ass'n v. United States*, 57 Fed. Cl. 598, 626 (2003), a lost profits model was rejected because the rate of return in the damages model was based on an average of the rates of other thrifts and in no way related to the bank's actual return on its investments.

In contrast, this Court found in *Comm. Fed. Bank, F.S.B. v. United States* (59 Fed. Cl. 338, 351 (2004)), that the plaintiff's model was reasonable because, "[a]lthough plaintiff's model uses a process of projection, it is grounded in the actual performance of the bank both pre-FIRREA and post-conversion." (*See also First Fed. Lincoln Bank v. United States*, 73 Fed. Cl. 633, 645 (2006) (explaining that the *Comm. Fed*. court determined that the plaintiff's projections of yield were reasonable because they were based on the actual performance of investments the thrift actually maintained.)). Similarly, in *Globe Sav. Bank, F.S.B. v. United States*, 65 Fed. Cl.

330, 351 (2005), *aff'd in part, rev'd in par*t, 189 Fed. Appx. 964 (Fed. Cir. 2006), the Court found that the growth rate in the plaintiff's damages model was reasonable when based on the thrift's operations and business plan prior to the breach.

A recent case that demonstrates the application of this standard to a lost profits model nearly identical to Plaintiff's model is *First Fed. Sav. & Loan Assoc. of Rochester, v. United States* (76 Fed. Cl. 106 (2007)). In *First Fed. Rochester*, the plaintiff's expert, the same Dr. Kaplan that performed the damages estimates in this case, created a model to estimate the profits that the plaintiff in that case could have generated from foregone assets had the Government not breached the plaintiff's merger contract. (*Id*. at 112-23). The lost profits model contained two key assumptions: the plaintiff's growth rate absent the breach; and the plaintiff's profitability or "spread" on investments. (*Id*.). Dr. Kaplan estimated the plaintiff's growth rate by looking to both its historical growth rates and plans for growth prior to the breach. (*Id*. at 114-19). To determine the plaintiff's profitability, Dr. Kaplan conservatively looked to the actual yields that plaintiff experienced during the breach period on plaintiff's lowest yielding assets and highest-cost source of funds, reaching a conservative spread of 87 basis points. (*Id*. at 119-20).

Because Dr. Kaplan based his model on historically-documented yields that the plaintiff actually realized during the breach period on assets that the plaintiff had historically acquired, this Court found Dr. Kaplan's approach to be sound and reliable, and it rejected the Government's argument that the model did not adequately account for economic conditions and other variables present during the breach period. (*Id*. at 120-121). In total, this Court held that, despite the inability to precisely mathematically model exactly what the plaintiff would have

done absent the breach, Dr. Kaplan's model was a sufficiently fair and reasonable approximation of the profits that plaintiff actually lost as a result of the breach:

> Necessarily, Dr. Kaplan was unable to establish lost profits with mathematical certainty. He was required to opine on what would have happened in a world that never was. Nonetheless, Dr. Kaplan's testimony and analysis, together with other contemporaneous evidence of what First Federal had projected in terms of growth of assets and income in the non-breach world, constituted a sufficient and sound basis for the Court to make a "fair and reasonable approximation" of [plaintiff's] lost profits caused by the Government's breach.

(*Id.* at 123 (internal citations omitted)).

**(b) Dr. Kaplan's Model Presents A Fair And Reasonable Approximation Of Fidelity's Lost Profits.**

The design of Dr. Kaplan's model in this case is almost identical to the one he used in *First Fed. Rochester*. Unlike those cases in which the plaintiff's model marked a significant departure from the plaintiff's experience, Dr. Kaplan's model is based entirely on Fidelity's actual experience during the relevant time period. For example, Dr. Kaplan's growth rate of 8.25% is conservatively estimated on Fidelity's actual plans for 8%-10% growth, notwithstanding the fact that this was a very conservative growth rate in the thrift industry and Fidelity's actual growth rate was much higher than this both before and after the breach period. (*See* PPFOFs 264, 332, 334). Similarly, Dr. Kaplan's estimate of Fidelity's spread is conservatively based on an analysis of the historical yields that Fidelity actual achieved on its lowest yielding MBS during the period and the cost of FHLB advances, which were the highest-cost source of funds that Fidelity used during the period, and even this spread has been conservatively adjusted downward to take into lower spreads that Fidelity received on other investments during the period. (*See* PPFOFs 843, 845).

While Defendant has a number of objections to the inputs in Dr. Kaplan's model, which Plaintiff will answer individually in Section B.2 below, Defendant cannot legitimately contend that Dr. Kaplan's model is inconsistent with the facts or that it marks a departure from Fidelity's actual experience. Thus, while Dr. Kaplan has never purported to, and never could, precisely model what exactly Fidelity would have done absent the Government's breach, he has provided an extremely conservative model of what Fidelity could have easily done based on Fidelity's actual operating results during the period, and Defendant's objections do not in any way reveal any unfairness or unreasonableness in this model.

### C. Plaintiff's Responses To Defendant's Factual Arguments Regarding Expectancy.

#### *1. Defendant's Speculations About The But-For World Are Not Credible (Causation).*

As noted above, Defendant has not provided any evidence to suggest that the Government's breach did not cause Fidelity's losses or that Plaintiff's losses were substantially caused by some other factor. Rather, Defendant speculates about events that may have happened in the but-for world that may have caused Fidelity to stop growing or that would have prevented Fidelity from investing additional assets in MBS. As will be discussed below, these speculations are either unsupported or contradicted by the evidence.

##### (a) Defendant's Speculation About The Effect Of Economic Conditions On Fidelity's Growth Is Contradicted By The Evidence.

Defendant first speculates that, even if the Government performed its obligations under the contract, Fidelity would not have increased its assets in line with previous growth because of the economic conditions that prevailed after FIRREA and the First Gulf War. (Def.'s Cont. of

Law at § IV.C.3.g.) This speculation is contradicted by the evidence. While it is true that local economic conditions in the New York region were generally poor after FIRREA, Fidelity's wholesale portfolio, which assumed interest rate risk instead of credit risk, was largely immune to these conditions. (*See* PPFOF 503-04). As proven by Fidelity's actual yields during the breach period, Fidelity was able to profit from its wholesale portfolio despite downturns in the economy and the effects of the Gulf War. (*See id*.). Thus, Fidelity would not have been deterred by local retail conditions from pursuing profits available in the wholesale markets.

Additionally, because the cost of amortizing the Suburbia goodwill was growing larger, Fidelity had to increase assets to generate sufficient earnings to remain profitable despite this expense. Thus, Fidelity had little choice but to grow assets at a conservative 8-10% rate. (PPFOF 366-67). Because Fidelity wanted to grow in an orderly way and not invest its additional assets in risky new ventures, Fidelity would likely have merely increased the scale of the wholesale investments that were already providing Fidelity with profitable returns. (*See id*.).

**(b) Defendant's Speculation About The Regulators' Response To Fidelity's Interest Rate Risk Is Contradicted By The Evidence.**

Defendant speculates that even if the Government honored Fidelity's capital forbearance, it would have prevented Fidelity's growth because regulators were concerned about Fidelity's interest rate risk. (Def.'s Cont. of Law at § IV.C.3.d.). This speculation is also contradicted by the evidence.

The record evidence shows that Fidelity had removed all credit risk from its books and had one of the lowest interest rate sensitivities of any thrift after FIRREA. (*See* PPFOF 635, 636, and 646). Regulators also recognized Mr. Wesp as a competent investment manager and had no concerns about his ability to assume this low level of risk. (Vigna, Tr. 1454, lines 4-14).

The only concern that regulators had in regard to Fidelity's interest rate risk was that Fidelity did not have sufficient tangible capital to absorb the hypothetical shock that might occur if there were an unprecedented large and instantaneous shift in interest rates. (*See* PPFOF 647). Given these facts, Defendant's speculation has two major flaws.

First, it was in the Government's interest for acquiring thrifts to be profitable after a supervisory merger because the acquiring thrift's profits would help reduce the deficit in tangible capital created by the merger, thereby reducing the Government's contingent exposure were the acquiring thrift itself to fail after the merger. And, because a thrift cannot be profitable unless it assumes some risk (Moran, Tr. 4947, lines 15-25; Wesp, Tr. 1786, lines 5-13, Wesp, Tr. 1857, lines 5-9; Wesp, Tr. 1783, line 24 to p. 1784, line 5) the Government would have to allow the acquiring thrift to take on sufficient risk to generate earnings in excess of the cost of amortizing the supervisory goodwill if the Government wanted the acquiring thrift to survive. Thus, whereas Fidelity, at the time of FIRREA, needed to grow its assets to generate sufficient earnings to absorb the cost of amortizing the Suburbia goodwill and thereby raise Fidelity's tangible capital levels, it is highly unlikely that regulators would stand in the way of this profitability, especially given the fact that Fidelity had a capable investment manager in Mr. Wesp, had zero credit risk, and only an extremely conservative level of interest rate risk.

Second, the very purpose of the capital forbearance in the Fidelity-Suburbia Merger Agreement was to prevent regulators from restricting Fidelity's operations after the merger on the basis of the tangible capital deficit created by Suburbia's excess liabilities. Thus, it is difficult to imagine how the Government would continue to honor its contractual obligations to

Fidelity if it were to restrict Fidelity's operations on the basis that Fidelity did not have enough tangible capital as a result of the merger to take on even a conservative level of interest rate risk.

**(c) Defendant's Speculation About The Regulators' Response To Fidelity's Asset Problems Is Contradicted By The Evidence.**

Defendant also speculates that even if the Government honored the contract, regulators would have restricted Fidelity's growth based on the asset problems Fidelity experienced with its commercial real estate portfolio. (Def. Cont. of Law § IV.C.3.b). The crux of Defendant's argument is that: regulators gave Fidelity a "4" composite rating in the 1987 examination in part because of Fidelity's real estate problems; Fidelity would continue to receive such poor ratings even if the Government honored the capital forbearance; and regulators would therefore be forced to restrict Fidelity's growth under regulation RB3a-1. Again, this speculation is contradicted by the evidence.

First, even if the Government could restrict Fidelity's growth under RB3a-1, the OTS Regional Director had the discretion to allow growth under the regulation. (*See* PPFOF 444). As noted above, regulators had a keen interest in ensuring that Fidelity grew its assets sufficiently to generate the earnings necessary to absorb the cost of goodwill amortization and increase Fidelity's tangible capital levels. And, given that the OTS regional director, Mr. Vigna, had exceptional confidence in Fidelity's management team of Messrs. Wesp and Powderly, (Vigna, Tr. 1447, lines 9-20; Vigna, Tr. 1461, lines 1-5), and had generally approved their requests for exceptions even under the restrictive Capital Plan (Wesp, Tr. 2510, lines 10-25), it is likely that Mr. Vigna would have allowed Fidelity's growth in a world in which the Government honored both the capital forbearance and the spirit of that forbearance, which was to give

Fidelity sufficient regulatory leeway to profitably survive the burden of merging with Suburbia. Thus, while regulators may have not have allowed Fidelity to grow by investing more assets in commercial real estate, it is unlikely that they would have objected to Fidelity using additional assets to make investments in MBS where Fidelity had only a low level of risk and a proven record of profits.

Second, if the Government had honored the contract, it is unlikely that Fidelity would have been rated a "4" or worse in thrift examinations during the breach period. Fidelity's growth, therefore, would not have been restricted by RB3a-1. Composite ratings are largely subjective, because thrift examiners assign those ratings based on a number of criteria without applying any particular formula for weighting the factors. (Albanese, Tr. 4164, line 17 to p. 4165, line 14; *see also* Reply to DPFOF 170). Asset quality is one of the factors considered, but examiners also look to the quality of management, earnings, liquidity and other factors. (*See* DPFOF 169 and corresponding Reply). Because one significant purpose of the examination is to assess the Government's exposure to the thrift's failure, the most critical factor in the composite rating is the thrift's capital levels. (*See* PPFOF 460). For example, even though Astoria suffered many of the same asset quality problems that Fidelity experienced, Astoria received much higher composite ratings in its examinations because, unlike Fidelity, Astoria had plenty of capital as a result of its policy to avoid supervisory mergers. (*See* PPFOF 665-673). Thus, with more capital, Fidelity's asset problems would not have been so influential on its examination ratings.

Although Fidelity received a "4" for its 1987 examination (the review period encompassed 1985 through 1987) on the basis of its asset quality problems, even before the

breach, Fidelity had only recently stopped its commercial lending and just started to work out its non-performing loans at the time of the examination. (*See* PPFOF 297, 298, and 313). Thus, in 1987, it was not clear to regulators that Fidelity had already stopped this program of lending, and regulators did not have the benefit of reviewing the success with which Mr. Powderly was resolving these problem assets. (*See, e.g.,* PPFOF 298, 300, 301; DX 69A at OAA002 0079-0081).

Third, absent the breach, regulators would not have criticized Fidelity's assets so severely in subsequent examinations. The record evidence shows that regulators took an overly aggressive stance in assessing the value of Fidelity's assets once Fidelity was considered capitally deficient as a result of the Government's breach. Given that the breach pushed Fidelity to the brink of failure, regulators were extremely conservative in valuing Fidelity's loans and real estate owned, forcing Fidelity to post large reserves for these loans and causing Fidelity to take large write downs for its assets. (*See* PPFOF 710-716). Additionally, the regulators' assessments of property values were skewed by the breach because the regulators would assess the value of property, not by its market value, but by the fire-sale value that the Government received for similar properties in RTC liquidations. (Wesp, Tr. 1842, lines 1-4; Wesp, Tr. 1885, line 23 to p. 1888, line 6; Wesp, Tr. 2543, lines 1-23).

Moreover, because Fidelity's continued existence was contingent on the regulators' continued approval after the breach, Fidelity was in no position to dispute the regulators' low-ball assessments. (*See* PPFOF 716). In contrast, whereas Astoria had plenty of capital after FIRREA by virtue of its policy to avoid supervisory mergers, it was able to push back not only on asset values but on examination ratings themselves, as evidenced by Astoria's ability to

renegotiate its composite rating for the 1992 examination. (*See* PPFOF 673). Thus, if the Government honored Fidelity's capital forbearance, it would be unlikely that Fidelity's asset quality would have been so harshly rated by thrift examiners, and Fidelity therefore would have received higher examination ratings in this category.

Fourth, with more capital, Mr. Powderly would have been able to resolve Fidelity's asset problems more rapidly and efficiently. Fidelity could have used the capital lost in the breach to increase the value of its real-estate-owned by improving and advertising the properties, and could have also afforded to immediately write down the properties to zero. (*See* PPFOF 706 and 709). Not only would these write-downs have immediately resolved the regulators' concerns about the value of Fidelity's property, but Fidelity would have ultimately realized large profits if it could have afforded to wait for the New York real estate market to rebound before selling these properties. (*See* PPFOF 704, 708, and 709). Similarly, with the lost capital, Fidelity would have been able to immediately afford the regulators' requirements for valuation reserves on non-performing loans and would not have had to sell valuable assets to meet these requirements. (*See* PPFOF 718). Thus, with sufficient capital, Fidelity would have been able to quickly take the actions necessary to alleviate the regulators' concerns and therefore would not have remained poorly rated by thrift examiners on the basis of asset quality.

**(d) Defendant's Speculation About Astoria's Use Of Fidelity's Supervisory Goodwill Is Not Reasonable.**

Defendant speculates that Fidelity's goodwill would not have survived the Astoria merger and that even if it did, Astoria would not have used the extra leverage provided by that capital. (Def.'s Cont. of Law § IV.C.2.). This contention only reflects the reality of what happened ***as a result*** of the breach, and does not reflect what would have happened absent the

breach. Absent the breach, Fidelity, would not have been forced to amortize the Suburbia goodwill so rapidly to regain capital compliance, and thus the amount of supervisory goodwill remaining at the time of the breach would have been significant. (*See* PPFOF 692-695). It is unreasonable to think that Astoria would have not found a way to make use of this capital. Astoria's CEO, Mr. Engelke, described Astoria's view of capital as "more is better" and explained that Astoria would take more capital anytime it could get it and could always have found a use for more capital. (*See* PPFOF 783).

Moreover, the use of this capital was not necessarily foreclosed by the merger. Given the inherent value of this capital in the non-breach world, it is likely that Astoria would have found a way to structure the merger to maintain Fidelity's legal identity, as is often done in mergers in which the purchased thrift has intellectual property licenses, contractual rights, or other intangible property that cannot be transferred to another legal entity. As Mr. Engelke testified, there was no reason the Astoria / Fidelity merger could not have been performed using the pooling method. (Engelke, Tr. 5291, line 22 to p. 5292, lines 1-4). It is against reason to suggest that Astoria would have merely disposed of this valuable intangible property in the non-breach world, simply because it did as a result of the breach. (*See also* Response to DPFOF 129).

**(e) Defendant's Causation Argument Concerning Fidelity's Pre-FIRREA Damages Is Contradicted By The Evidence.**

Defendant argues that Fidelity could not have lost profits prior to the enactment of FIRREA, because those losses would not have been caused by the Defendant's breach, which did not occur officially until FIRREA was enacted by Congress. However, Defendant has offered no

evidence of any alternative cause of Fidelity's abrupt change of operations during 1989, when the impending enactment of FIRREA hung over the thrift industry.

The evidence shows to the contrary that Fidelity in early 1989 abandoned its plans for growth, sold off profitable assets, and generally sacrificed profitability in favor of focusing entirely on increasing its tangible capital as much as possible prior to the enactment of FIRREA. (*See* PPFOF 409-425). As Mr. Wesp testified, this was not an independent change in operating strategy, but a direct survival response to Fidelity's expectation that FIRREA would punitively treat the goodwill obtained in the Suburbia merger. (*See* PPFOF 409). Fidelity took such drastic steps because its management knew what a powerful impact FIRREA would have on its balance sheet if there was, as rumored, a punitive treatment of supervisory goodwill. (*Id.)* Thus, as a factual matter there is no other possible explanation for Fidelity's lost profits during this period.

Nor is there a legal impediment to Fidelity's claim that it was damaged by FIRREA before the statute was officially enacted. The law of contracts does not require a party to continue enhancing its detrimental reliance on the contract when it is clear that the other party will no longer perform. Where one party repudiates the contract by making a statement indicating that he will not perform his obligations under the contract, the other party has a claim for damages as a result of this repudiation alone, even if the repudiation occurs long before the breach and even if the repudiating party never actually breaches the contract. (*See* RESTATEMENT (SECOND) OF CONTRACTS §§ 250, cmt. a., 251, cmt. a. (1981)).[26]

---

[26] Defendant's reliance on *Ariadne Fin. Servs. Pty., Ltd. v. United States*, 133 F.3d 874, 880 (Fed. Cir. 1998) is misplaced, because the Court of Appeals in that case declined to determine which act constituted the Government's repudiation, looking only to a much

Here it is clear that the Government made several statements during the course of 1989 indicating that it would not honor its obligations under the supervisory goodwill contracts and that Fidelity was aware of such statements. (*See* PPFOF 389-408; PDX 38). While the final form of the statute was not known until it was enacted, this does not mean that the effect of the statute was unknown prior to that date. As noted by Mr. Vigna, "[S]omething was coming, like a train, you know, at the end of the tunnel." (Vigna, Tr. 1409, line 15 to p. 1413, line 12). Fidelity was scrambling as early as second quarter 1989 to protect its balance sheet from FIRREA's punitive treatment of goodwill. (Wesp, Tr. 1838, line 20 through p. 1840, line 6). Thus, whereas Fidelity engaged in some of its more drastic retrenchment actions during the period between the Government's repudiation and the actual breach, the profits lost as a result of these actions are entirely compensable under the law of contracts.

### *2. Defendant's Attempts To Create Uncertainty Are Not Credible (Reasonable Certainty).*

As noted above, Defendant has made a number of criticisms of Dr. Kaplan's damages models without itself modeling those damages. None of these criticisms make Dr. Kaplan's model an unfair or unreasonable approximation of Fidelity's lost profits.

---

later date to show that even a liberal application of the statute of limitations analysis barred the plaintiff's claim in that case.

A similar statute of limitations argument applied in the *Bank of America, FSB v. United States*, 495 F.3d 1366 (Fed. Cir. 2007), but the court suggested that, for the purposes of determining the statute of limitations, the clock started when the thrift was subjectively convinced that supervisory goodwill was no longer available to it. Assuming *arguendo* that this standard should apply to the question of the start date for damages calculations, it is clear by Fidelity's retrenchment actions taken in early 1989 that Fidelity knew that supervisory goodwill would be no longer available long before the statute was enacted.

**(a) Defendant's Criticisms Of Dr. Kaplan's Growth Assumption Do Not Make Dr. Kaplan's Model Unfair Or Unreasonable.**

Defendant objects to Dr. Kaplan's assumption that Fidelity could have grown at the conservative rate of 2% growth per quarter, or 8.25% of growth per year during the breach period. Defendant's objection is not credible.

Defendant bases its objection on the suggestion that because Fidelity's Subscription Offering Circular stated that the Capital Plan "to a significant degree formalized policies under which the Bank had generally been operating since 1987" and because the Capital Plan restricted Fidelity's growth to zero, Fidelity must have been operating under a zero-growth policy since 1987. (Def.'s Cont. of Law at p. 190). Defendant reads this broad statement about Fidelity's general operating policies far too literally. While it is true that Fidelity's pre-breach plans were similar to the Capital Plan to the extent that Fidelity reduced commercial lending, invested in ARM MBS, and lowered operating costs, the evidence shows that Fidelity both planned and did grow at a conservative rate between 1987 and the Government's repudiation.

Fidelity's thrift financial reports reveal that Fidelity actually grew at 14.7% between the time of the Suburbia merger and the enactment of FIRREA, leveling off only when the Government repudiated the capital forbearance in early 1989. (*See* PDX 64; PPFOFs 268-269). Additionally, Fidelity grew again at 14.8% after emerging from the Capital Plan, reducing its asset levels only after it was required to keep its balance sheet clean in anticipation of the merger with Astoria. (*See* PDX 64; PPFOF 271). Based on Fidelity's actual experience of 14-15% growth, then, it is reasonable for Dr. Kaplan to assume that Fidelity could grow at a much lower rate of 8.25% during the breach period if the Government had honored the contract.

Dr. Kaplan's growth assumption is also supported by Fidelity's plans for growth. As Mr. Wesp testified, it was absolutely necessary for Fidelity to grow its balance sheet, because Fidelity needed more assets to generate the level of earnings necessary to bear the cost of amortizing the Suburbia goodwill. (PPFOF 365). Thus, Fidelity's October 1988 business plan shows that only shortly before the Government's repudiation, Fidelity planned to grow at a rate of at least 8-10% per year. (PPFOF 331). While Defendant attempts to portray this 8-10% growth as an unrealistic aspiration out of line with the rest of the business plan, the evidence shows that this was historically a very conservative growth rate. As Mr. Wesp testified, 8-10% growth was the historical norm for the thrift industry and a modest and easily achievable rate of growth for Fidelity. (*See* PPFOFs 332-334, 366). The regulators apparently agreed with Mr. Wesp because, when Fidelity resumed a 10% rate of growth after emerging from the Capital Plan, the OTS examiners characterized Fidelity's growth rate as "modest" in the 1994 Report of Examination. (PPFOF 334). Therefore, it is much more reasonable to view Fidelity's projected 8-10% growth rate as a conservative measure in perfect harmony with the other conservative measures in the 1988 business plan, which called for "no quantum leaps forward, just steady growth." (PPFOF 344).

**(b) Defendant's Criticisms Of Dr. Kaplan's Assumption About Investments In ARM MBS Do Not Make Dr. Kaplan's Model Unfair Or Unreasonable.**

Dr. Kaplan models Fidelity's lost profits based on foregone investments in one-year ARM MBS. Defendant takes a number of exceptions about this assumption, but does not show why this assumption is an unfair or unreasonable basis for measuring Fidelity's lost profits.

First, the evidence shows that when Mr. Powderly stopped Fidelity's commercial lending in 1987, Fidelity switched its focus to investing in traditional one-to-four family loans. (PPFOF 339). But, as noted by the Defendant in great detail, because local economic conditions were difficult, because there was strong competition in the local market, and because Fidelity was attempting to reduce its operating costs, it was preferable for Fidelity to invest in wholesale mortgages instead of originating the loans itself. (*See* PX 986 at AST064174; PPFOFs 367, 376). Dr. Kaplan purposely chose ARM MBS because they were so readily available. (PPFOF 825). Mr. Wesp testified that because the MBS market was deep and liquid, there were always MBS available for purchase. (PPFOF 372). Moreover, Fidelity's documents show overwhelmingly that Fidelity was continuously reallocating assets into its MBS portfolio whenever they became available. (*See* PPFOF 835; PDX 69). Thus, where Fidelity was reallocating more and more of its portfolio to MBS investments, it is highly reasonable for Dr. Kaplan to assume that Fidelity would invest incremental assets in MBS securities as opposed to another area of investment. In fact, Defendant's contention that Fidelity would have invested incremental assets in retail mortgages is not credible given that Fidelity's actual results show that it was steadily reducing this area of investment during the breach period. (*See* PDX 67). And if Dr. Kaplan were to have based his model on the higher yields received on retail mortgages and other investments, it would have only increased plaintiff's damages. (*See* PDX 70; Kaplan, Tr. 3086, line 20 to p. 3087, line 8).

Second, Fidelity was concentrating its investments primarily in ARM MBS of short duration, because these investments enabled Fidelity to better manage its interest rate risk. (PPFOFs 380, 385). Thus, the evidence shows that the bulk of Fidelity's portfolio consisted of

these types of assets. (*See* PDX 67; PFOF 835; Powderly, Tr. 470, lines 2-23). It is true that Fidelity would occasionally invest in other types of MBS to take advantage of opportunities in the markets (Wesp, Tr. 2079, lines 3-9; Wesp, Tr. 2295, lines 4-20; Wesp, Tr. 2312, lines 2-17), but these other forms of MBS did not form the core of Fidelity's investment strategy. (*See* PDX 67; PPFOF 835). Thus, it is again highly reasonable for Dr. Kaplan to base his model on one-year ARM MBS given the central role of these securities in Fidelity's actual portfolio.

In fact, it would be unreliable for Dr. Kaplan to base his damage calculations on the peripheral and one-off investments that Defendant cites to in its contentions of law. (See Def.'s Cont. of Law at p. 208-09). Surely, the Government would have objected if Dr. Kaplan would have considered the yields on these outliers as they would have skewed Dr. Kaplan's calculations. Moreover, because short-duration ARM MBS typically have yields much lower than fixed-rate or longer-duration MBS where more risk is inherent in the investment, to the extent that Dr. Kaplan's assumption has sacrificed any precision, it has done so for the sake of conservatism and at the expense of Plaintiff's damages award. (*See* Kaplan, Tr. 3084, line 20 to p. 3086, line 7; *see also First Fed. Rochester*, 76 Fed. Cl. at 120 (noting with approval Dr. Kaplan's choice to conservatively model damages based on the assets that historically yielded the lowest average return)).

**(c) Defendant's Criticisms Of Dr. Kaplan's Assumption Regarding Fidelity's Source Of Funds Do Not Make Dr. Kaplan's Model Unfair Or Unreasonable.**

Defendant also objects to Dr. Kaplan's use of FHLB advances to calculate lost profits. Again, Defendant does not show why this assumption is unfair or unreasonable.

In his analysis, Dr. Kaplan noted that Fidelity had a number of sources for its funds. (See PDX 68). When considering which funds to use for the purposes of the lost profits calculations, Dr. Kaplan looked to Fidelity's FHLB advances for several reasons. (PFOF 840). First, Fidelity could more easily obtain these advances than raise additional deposits. (*See* PPFOFs 382-383). Second, given that the one-year duration of these borrowings matches up to Fidelity's one-year ARM MBS assets, it would help Fidelity manage its interest rate risk to fund its one-year ARM MBS purchases with this source of funding. (*See* Kaplan, Tr. 3090, line 20 to p. 3091, line 13). Finally, this source of funding is more costly than deposits and reverse repurchase agreements and would therefore serve as the most conservative basis for calculating Fidelity's lost profits. (*See* PDX 70). Thus, by basing his lost profits calculations on FHLB advances, Dr. Kaplan has again favored reliability and conservatism at the expense of Plaintiff's recovery to make the model more fair and reasonable. (*See First Fed. Rochester*, 76 Fed. Cl. at 120 (noting with approval Dr. Kaplan's choice to conservatively model damages based on the highest-costs source of funds)).

**(d) Defendant's Criticisms Of Dr. Kaplan's Assumption Regarding Fidelity's Spread Do Not Make Dr. Kaplan's Model Unfair Or Unreasonable.**

Defendant objects to Dr. Kaplan's assumption regarding the spread that Fidelity could have achieved on its incremental assets, but fails to show how Dr. Kaplan's conservative 80 basis point spread is an unfair or unreasonable basis on which to calculate Fidelity's lost profits.

Dr. Kaplan first looked to the spread between Fidelity's *actual* yields on one-year MBS and the published cost of one-year FHLB advances and reached a spread of 153 basis points. (*See* PDX 72; PPFOF 843). But, for the sake of conservatism, Dr. Kaplan also considered a

number of spreads that Fidelity realized during the breach period on other asset groups. One of these was the 114 basis point average spread that Fidelity achieved on its entire MBS portfolio during the breach period. (*See* PDX 71; PPFOF 844). Another was the 85 basis point spread that Fidelity achieved on all tangible assets after the breach. (*See* PDX 60; PPFOF 844). Viewing these various ***actual*** spreads, Dr. Kaplan chose a spread of 80 basis points for his calculations because this conservative number was a fair and reasonable approximation of the very lowest spread Fidelity could have realized on its foregone assets during the time. (PPFOF 846).

Defendant does not object that Dr. Kaplan's spread is unrealistic, unsupported by Fidelity's actual experience, or that it unfairly inflates Plaintiff's damages. Instead, Defendant objects to this spread on the basis that it does not mathematically model the various effects of the recession, interest rate changes, prepayments, and other variables. (See Def.'s Cont. of Law at pp. 212-24, 266). This objection is misplaced, however, because Dr. Kaplan's damages model is not a forecast of the future or some new business venture or other investment where the results are unknown. Rather, Dr. Kaplan merely looks to the yields that Fidelity actually experienced on the investments Fidelity actually made during the breach period. (PPFOF 822, 851; *see also* Kaplan, Tr. 3405, lines 7-17). Thus, by looking to ***actual*** historical yields and spreads, Dr. Kaplan's spread assumption already accounts for all of these factors with much more precision than any mathematical model of those factors ever could. (*See First Fed. Rochester*, 76 Fed. Cl. at 120-21 (rejecting the Government's criticism that Dr. Kaplan's model did not mathematically model credit risk and other economic factors, because Dr. Kaplan's spread assumption was based on the plaintiff's actual yield-cost experience in that case)).

The only exception to this principle is that Dr. Kaplan's calculation of the 153 basis point spread on the incremental ARM MBS portfolio does not fully take into account excessive (*i.e.*, higher than normal) prepayments. (PPFOF 845, Kaplan, Tr. 3420, line 13 to p. 3423, line 6). Although Dr. Kaplan noted that Mr. Wesp's investment prowess enabled Fidelity to realize profits on MBS despite periods of excessive prepayments (Kaplan, Tr. 3415, line 5 to p. 3418, line 8; PFOF 832), to favor a conservative estimation of Plaintiff's damages, Dr. Kaplan did not rely solely on the 153 basis point calculation, but looked to the other spreads that Fidelity actually achieved during this period, all of which took into account the effect of excessive prepayments (PPFOF 829, 845). Because these other spreads all averaged over 80 basis points, Dr. Kaplan concluded that it would be fair and reasonable to base his damages model on a conservative assumption of an 80 basis point spread as representing the lowest spread Fidelity would have likely realized. Thus, Dr. Kaplan has again sacrificed Plaintiff's total recovery in favor of conservatism and reliability and Defendant cannot credibly claim that Dr. Kaplan's conservative model is an unfair or unreasonable approximation of Fidelity's loss.

**D. Plaintiff Is Entitled To Wounded Bank Damages.**

Expectancy damages are intended to provide the injured party the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed. (RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981)). One aspect of the injured party's expectation interest is the consequential losses that the plaintiff suffered as a result of the breach, including costs incurred as a consequence of the breach. (*Id.* at § 347(b)). Thus, whereas lost profits compensate the injured party for foreseeable opportunities lost as a consequence of the breach, wounded bank

damages compensate the injured party for foreseeable costs incurred as a consequence of the breach.[27] Plaintiff seeks wounded bank damages for the out-of-pocket costs Fidelity suffered when it was required to pay inflated OTS assessments and FDIC insurance premiums as a consequence of Defendant's breach.

Fidelity acquired Suburbia based on certain promises from the Government. One of the promises was the Government's assurance of a forbearance permitting Fidelity to count the unamortized goodwill toward its regulatory capital. By allowing Fidelity to count the unamortized goodwill toward its regulatory capital, the forbearance ensured that Fidelity's profitability would be unharmed despite its assumption of Suburbia's sizable liability.

It was this aspect of the breach that caused Fidelity's wounded bank damages. Rather than respecting the forbearances it promised to Fidelity, after FIRREA the Government switched gears to pursuing aggressively Fidelity's newly-created regulatory weakness: its capital deficiency.

---

27 Plaintiff respectfully submits that some courts have occasionally mischaracterized wounded bank damages as reliance damages, relating wounded bank damages to reliance damages because both remedies focus on costs incurred. But, whereas reliance damages compensate a party for costs incurred in detrimental reliance on the breached ***promise***, expectancy damages compensate a party for costs incurred as a consequence of the ***breach itself***.

No party voluntarily incurs higher examination costs and insurance premiums in reliance on the other party's promise, but only as an involuntary consequence of the damage caused by the other party's breach. Thus, Plaintiff respectfully submits that wounded bank damages are not a form of reliance damages, but really a form of expectancy damages that puts the injured party in the position it would occupy, had the defendant performed by compensating the plaintiff for losses suffered as a consequence of the defendant's breach.

Both the OTS and the FDIC base their fees on their respective evaluations of an institution's risk. The regulators' assessments of thrifts were strongly influenced by the thrifts' level of capital. (*See* PPFOF 665-673).

There is no evidence suggesting that, absent the breach, Fidelity would have been in a "bad" capital position. Plaintiff reminds the Court that, at the time Fidelity submitted its Capital Plan in January 1990, there was nothing fundamentally wrong with the institution; Fidelity had been profitable for each of the ten previous years. (*See* PPFOF 494). Fidelity had a "2" capital rating in its 1987 exam, which was the last pre-FIRREA exam it underwent. (Amend, Tr. 4738, line 7 to p.4742, line 14; DX 1448). Mr. Amend acknowledged that Fidelity's failing capital rating of "5" in the 1989 exam, the first exam post-FIRREA, was because Fidelity was deficient in each of the three new capital standards. (*See* PPFOF 653).

Fidelity diligently worked to improve its capital situation after FIRREA. It would be inconsistent with past practice for Fidelity, absent FIRREA, to have deliberately moved away from its strong capital position. Fidelity's management specifically operated with the goal to increase capital, rather than to maximize earnings, during the years following FIRREA. (*See* PPFOF 554). Regulators eventually acknowledged Fidelity's hard work and progress in the capital area. According to the Record, regulators noted that Fidelity's capital replenishment plans were sustainable, based only on Fidelity's core earnings (PX 851 at OAA002 0005).

In addition, there is clear evidence contradicting what the Defendant represents as Mr. Moran's testimony that Fidelity "had a severe interest rate risk problem" that would have negatively affected the MACRO rating despite the breach. Fidelity's interest rate problem, to the extent that it had one, was caused by its lack of capital. According to regulators at the time,

Fidelity's "***interest rate risk stems primarily from its lack of capital*** rather than the composition of its assets and liabilities." (*See* Plaintiff's Reply to DPFOF 257; PX 711; *see also* Section II.C.1.(b) regarding interest rate risk)(emphasis added).

Regulators awarded Fidelity high capital ratings before FIRREA. Fidelity was rendered capitally deficient by FIRREA, and thereafter it suffered poor capital ratings. As capital was a very important (if not the most important) component of the composite rating, it follows that—but for FIRREA—Fidelity would have continued to receive good capital ratings, and consequently higher composite scores, in turn retaining consistent low-risk fee levels for the OTS assessments and FDIC deposit premiums.

## III. PLAINTIFF'S RESPONSES TO DEFENDANT'S LEGAL CONTENTIONS REGARDING RESTITUTION.

### A. The Use Of Liquidation Costs In The Calculation Of Restitution Is Not Foreclosed By Federal Circuit Precedent.

Defendant's contentions of law on restitution essentially amount to a cursory statement that *Winstar* plaintiffs have never recovered on the basis of liquidation costs, and that there is no reason why the Court should treat Plaintiff's claim differently in this case.

A more careful analysis of Federal Circuit precedent, however, reveals that the Federal Circuit has never categorically denied the use of liquidation cost as basis for calculating a restitution award. As held by this Court when denying Defendant's motion for summary judgment, "… the [Plaintiff's] restitution claim has a legal basis, and may be grounds for award if properly proven. The cited precedent does not reject restitution claims as a matter of law, but only because the requisite factual support could not be shown." (*Astoria Fed. Sav. & Loan Assoc. v. United States*, 72 Fed. Cl. 712, 718 (2006); *see also Am. Capital Corp. v. FDIC*, 472

F.3d 859, 870 (Fed. Cir. 2006) (holding that the trial court erred by holding that restitution is unavailable in *Winstar* cases)).

### ***1. The Use Of Liquidation Costs In Calculating The Defendant's Subjective Gain Is Not Foreclosed.***

Rather, the Federal Circuit courts have only found, as a factual matter, that the full cost of liquidation was not a reasonable approximation of the gain realized by the Government in those cases in which (1) the Government had viable alternatives to liquidation, or (2) the plaintiff failed to fully perform its obligation to discharge the Government's contingent obligation for the acquired thrift's liabilities. (*See Glendale Fed Bank, F.S.B. v. United States*, 239 F.3d 1374, 1382 (Fed. Cir. 2001)). Thus, in this case, where the Government did not have viable alternatives to the liquidation of Suburbia at the time of merger and where Fidelity did not only assume but fully and permanently ***discharged*** the Government's contingent obligations for Suburbia, the Government's estimated cost of those liabilities at the time of merger ***does*** represent a reasonable approximation of the gain that the Government realized as a result of Fidelity's full performance of the contract.

### ***2. The Use Of Liquidation Costs In Calculating The Objective Value Of Plaintiff's Performance Is Not Foreclosed.***

Additionally, the Federal Circuit has never foreclosed the use of liquidation costs in calculating restitution by determining the objective price that a defendant would have to pay another party to obtain the services rendered by the plaintiff. (*See* RESTATEMENT (SECOND) OF CONTRACTS § 371 (1981) (providing that restitution may be measured by either the objective value of the plaintiff's performance or the defendant's subjective gain as a result of that performance)). In this case, the service rendered by Fidelity was the full discharge of Suburbia's

excess liabilities. Thus, irrespective of any increase in the Government's wealth, the benefit conferred upon the Government by the Plaintiff in this case may be measured by the amount of cash that the Government, at the time of contracting, would have had to pay, absent the availability of supervisory goodwill, for another thrift to discharge Suburbia's excess liabilities. Because the price charged for such a service would be directly related to the cost of discharging Suburbia's excess liabilities, the Government's estimated costs of liquidating Suburbia also serves as a fair and reasonable approximation of this measurement of Plaintiff's restitution interest. (*See* PX 1314A at ¶ 96-100 for Dr. Kaplan's calculations of this price).

**B. Plaintiff Is Entitled To A Restitution Award.**

A discussion of the law of restitution as a contract remedy is presented here to fully explain the contentions above.

The contract remedy of "restitution" restores the injured party to the position it would have occupied absent the contract by returning to it a benefit it conferred on the breaching party. *(See Glendale Fed. Bank, F.S.B. v. United States,* 239 F.3d 1374, 1380 (Fed. Cir. 2001)). In other words, an injured party is entitled to restitution to the extent that it has conferred a benefit on the breaching party by part performance of the contract or actions taken in reliance on the contract.[28] (RESTATEMENT (SECOND) OF CONTRACTS § 370 (1981)).

---

28 The use of the word "reliance" here does not indicate that restitution and reliance are the same remedy, but only that actions taken in reliance as opposed to performance of the contract can entitle the plaintiff to restitution so long as the actions taken in reliance confer a benefit on the breaching party.

Thus, recovery for actions taken in reliance under *restitution* damages should not be confused with recovery for actions taken in reliance under *reliance* damages as the former is limited by the extent to which the reliance confers a benefit and the latter is limited to the extent that the reliance was foreseeable. See footnote 29 infra.

### *1. A Plaintiff Is Entitled To Restitution By Performing The Contract.*

When restitution is granted as a remedy for breach of contract, a plaintiff's entitlement to restitution damages is established by merely rendering the performance that the breaching party bargained for, and the plaintiff therefore need not show that the defendant has in any way realized a net benefit as a result of that performance. As noted by Professor Corbin in his treatise on contracts:

> In order to create a right to restitution, all that is necessary is that the plaintiff shall have rendered a part of the performance that was the agreed exchange for the performance promised by the defendant.
>
> ***
>
> [Thus] the restitutionary remedy is available to a real estate agent who has rendered services in finding a purchaser, even though no sale is made, to an author who has written part of a work that is never published, and to an architect who has made plans and drawings that are never used.
>
> It is clear that the availability of restitution as a remedy for breach of contract does not depend wholly upon the idea that the defendant has been unjustly enriched by the part performance rendered by the plaintiff. There need be no addition to his material wealth, either permanent or temporary. This is true, at least in those cases in which the part performance of the plaintiff is a part of the very performance for which the defendant bargained.

(12 Arthur L. Corbin, Corbin on Contracts, Ch. 61, § 1107 (1979)). Thus, for the purpose of entitlement to contract restitution, the "benefit conferred" on the defendant is not to be equated with the defendant's ultimate gain or loss on the contract, but with the valuable services rendered by the plaintiff at the defendant's request.

> Where services have been rendered under a contract for an employer who commits a total breach, the amount that is recoverable on the theory of restitution is the reasonable value of the services without regard to how much the product of the service may have been worth. The service itself is the commodity to be valued, and not the product. Indeed there may be no product at all and the wealth

> of the employer may not have been increased at all; but nevertheless he has received service that he has requested, for which the plaintiff could have obtained a price in the market. This value the employer must restore to the plaintiff; and it is immaterial how successful the employer may have been in making use of the service to increase his wealth.

(*Id.* at § 1112).

This rule is not only a well-accepted principle of contract law, but was also expressly adopted by the Federal Circuit in *Acme Process Equip. Co. v. United States* (171 Ct. Cl. 324, 359 (1965), *rev'd on other grounds*, 385 U.S. 138 (1966)).

> …[R]estitution is permitted as an alternative remedy for breach of contract in an effort to restore the innocent party to its precontract status quo, and not to prevent the unjust enrichment of the breaching party. Judgment will be given for the value of service …rendered, *even though the product created thereby has been lost or destroyed by the defendant, and even though there never was any product created by the service that added to the wealth of the defendant.* … if the promisee has performed so far as he has gone, and the promisor breaks his promise, the promisee may abandon the contract and sue for restitution, in which he can recover the reasonable value of his services, measured by what he could have got for them in the market, and not by their benefit to the promisor.

(*Id*. at 530 (internal quotations, citations and emphasis omitted) (new emphasis added); *see also Far West Fed. Bank, S.B. v. Office of Thrift Supervision*, 119 F.3d 1358, 1366 (9th Cir. 1997) ("In short, [plaintiffs] do not have to prove that their investment *actually* prevented the ultimate failure of [the failing thrift] in order to recover restitution.") (emphasis in original)).

The above rule of contract restitution makes perfect sense because the party who breaches a contract often does so precisely because the services he bargained for are no longer as valuable to him as they were at the time of contracting. In such cases, the breach is only efficient to all parties if the plaintiff can recover the reasonable value of his performance. To hold otherwise would encourage inefficient gamesmanship, effectively allowing the defendant to pay

a discounted rate or nothing at all whenever his contracts prove unprofitable to him. Moreover, such a rule would reverse the allocation of risk in most contracts, making the non-breaching party the bearer of the risk that his compensation, if any, will be entirely contingent on the other party's profitability, over which he has no control. No two parties at the time of contracting would ever agree to such an allocation of risk.

The Supreme Court of Wisconsin explained this rationale in *Barnes v. Lozoff* (123 N.W.2d 543 (1963)). In *Barnes*, the court held that the plaintiff, an engineer, was entitled to the value of his services in rendering motel plans at the request of the defendant real-estate developer even though the developer was ultimately unable to obtain the financing necessary to build the motel. In explaining why the plaintiff's recovery was not contingent on the defendant's use of the plaintiff's services, the court looked to the allocation of risks in the contract, finding that the defendant entirely assumed the risk that the requested performance would provide him with a gain or loss.

> No purpose …would be served by modifying the basic risks of gain or loss imposed by the original contract, as would occur if some kind of additional showing were required that the transfer, act or abstention 'requested' produced some net advantage to the defaulting promisor. There is transferred to the restitution remedy, in other words, an underlying assumption of a regime of free contract, that the reasons motivating private exchanges and the calculation of advantages to be secured thereby are left to individual determination. This assumption is strongly confirmed by adopting as the *measure* of benefit a market value standard[.] It therefore becomes unnecessary to inquire whether the performance 'requested' or 'bargained for' produced net gain of any kind. There are many illustrations. As instructive as any are the numerous cases where architects are promised reimbursement, usually on a basis of percentage-of-cost, for preparing plans for a structure that is never built, so that the plans are useless.

(*Id*. at 547 (emphasis and quotation marks in original)).

Thus, in this case, while Plaintiff's performance enabled the Government to avoid forever the cost of paying even a single dollar of Suburbia's significant excess liabilities, Plaintiff's entitlement to restitution is established merely by the fact that Plaintiff performed the service that the Government requested, and is not dependent in any way on whether the Government realized any net advantage as a result of that performance.

***2. The Court May Choose Between Two Alternative Measurements Of Restitution.***

Once a plaintiff establishes entitlement to an award of restitution by showing that it rendered a service that was requested by the defendant, the Court must determine the value of the plaintiff's restitution award. In determining the measurement of restitution, the Court has the discretion to measure the amount of the award by either:

> (a) the reasonable value to the other party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position, or
>
> (b) the extent to which the other party's property has been increased in value or his other interests advanced.

*(Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1314 (Fed. Cir. 2004) (*quoting* RESTATEMENT (SECOND) OF CONTRACTS § 371 (1979))). In other words, the Court has discretion to award a plaintiff either the objective value of his services, or the subjective amount by which the defendant was enriched as a result of those services.

When the plaintiff's performance consists simply of paying a sum of money to the defendant, there is no difficulty in determining the amount of the plaintiff's restitution award, as the value of the award is the same under either measurement. (*See* RESTATEMENT (SECOND) OF CONTRACTS § 371, comment a). Thus, the Federal Circuit has had no problem in determining

and granting restitution awards in *Winstar* cases in which the plaintiff's performance consists of an infusion of capital or other property into the failing thrift. (*See, e.g., Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed. Cir. 2001) (granting restitution of the plaintiff's cash contribution to the acquired thrift after the merger)).

In contrast, in the great multitude of contract cases in which the plaintiff's performance consists of a service rendered, the measurement of the plaintiff's restitution award is naturally more difficult to determine, and thus the law provides the courts with wide discretion to choose the appropriate method for determining the sum of money necessary to protect the Plaintiff's restitution interest. Moreover, the courts are not limited in their measurements to the gains ***actually*** realized by the breaching party, but may also consider the extent to which the defendant's ***potential*** for gain had been enhanced as a result of the plaintiff's performance.

> To the extent that the benefit may reasonably be measured in different ways, the choice is within the discretion of the court. ***Thus a court may take into account the value of opportunities for benefit even if they have not been fully realized in the particular case***.
>
> An especially important choice is that between the reasonable value to a party of what he received in terms of what it would have cost him to obtain it from a person in claimant's position and the addition to the wealth of that party as measured by the extent to which his property has been increased or his other interests advanced. In practice, the first measure is usually based on the market price of such a substitute. Under the rule stated in this Section, the court has considerable discretion in making the choice between these two measures of benefit. ***Under either choice, the court may properly consider the purposes of the recipient of the benefit when he made the contract, even if those purposes were later frustrated or abandoned***.

(RESTATEMENT (SECOND) OF CONTRACTS § 371, comment a (emphasis added)).

Given the courts' broad power to fashion a restitution award when the plaintiff performs a service, it is somewhat surprising that the Federal Circuit has had so much difficulty granting

restitution awards in *Winstar* cases in which the plaintiffs performed a service instead of infusing a sum of money into a failing thrift.

### ***3. The Federal Circuit Has Not Foreclosed The Possibility Of Using Liquidation Cost In The Calculation Of The Objective Value Of Plaintiff's Services.***

*Winstar* cases have almost universally analyzed restitution under the subjective gain realized by the defendant as a result of a plaintiff's performance. Plaintiff has found only one case in which the Federal Circuit attempted to analyze the objective value of the services rendered by the plaintiff. In this case, *LaSalle Talman Bank v. United States* (317 F.3d 1363 (Fed. Cir. 2003)), the Court of Appeals looked to the value of the plaintiff's services, holding that "[t]he amount of recovery… is not invariably determined by the value of what is received. In some cases the value of what is given is determinative." (*Id.* at 1376).

In addressing the reasonable value of the plaintiff's performance, however, the *LaSalle* court, prompted by the plaintiff's expert, measured the reasonable value of the plaintiff's services not, as directed by the Restatement, in terms of what it would have cost the Government to obtain those services from another in plaintiff's position, but by the plaintiff's cost of performance. (*See id.).* Therefore, plaintiff respectfully submits that the *LaSalle* court, in following the lead of the plaintiff's expert, misapplied the law of restitution by looking to the plaintiff's ***cost*** of performance instead of the ***price*** that the Government would have to pay for another to render the same performance, thus collapsing the remedies of restitution and reliance.[29] In fact, the *La Salle* court said as much when it held that "[w]hen restitution damages

---

[29] While restitution and reliance remedies overlap, they are not interchangeable. Both restitution and reliance restore the injured party to the position it would have occupied absent the contract, but restitution does so by returning to the injured party the benefit it conferred whereas reliance does so by reimbursing the injured party for foreseeable

are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages….”). (*Id*.). Thus, the Federal Circuit has yet to address recovery for restitution in a *Winstar* case based on the ***price*** that the Government would have to pay to have another thrift operate a failing thrift and discharge its liabilities.

Dr. Kaplan, however, has considered the objective value of Fidelity's performance and has provided this Court with a fair and reasonable approximation of that value. Prior to the

---

expenditures. *See* RESTATEMENT (SECOND) OF CONTRACTS § 344 (1979). Thus, restitution is measured by the value of what is given, and reliance is measured by the cost of what is spent. These two figures are related but rarely the same as the reasonable value of what is given often incorporates both cost ***and*** a margin for profit.

Part of the confusion may be based on the fact that both restitution and reliance can be based on actions taken in reliance on the contract as well as on actions taken in performance of the contract. *See id*. at § 371 (a party may obtain restitution for benefit conferred through part performance or reliance). But this does not indicate that the reliance remedy is a subset of restitution, but only that the injured party can obtain compensation for benefits conferred either through performance of the contract or benefits conferred through actions taken in reliance on the contract.

Thus, where a plaintiff contracts to purchase a car from the defendant for cash and thereafter fixes the car before the defendant breaches, the plaintiff can recover in restitution both the cash paid for the car (performance) and the increase in the car's value resulting from the repairs (reliance on the contract). But, if the plaintiff also purchased a new radio for the car but never installed it, the plaintiff cannot recover the value of the radio, even if such an expenditure was foreseeable, because that action did not confer a benefit on the defendant.

Similarly, the restitution award for the repairs will be based on the increase in the car's value, not the cost of repairs, such that if the repairs cost $200 but the car's value only increased by $150, the plaintiff can only recover $150.

In contrast, the plaintiff could recover in reliance, the full $200 cost of the repairs and the full price paid for the radio regardless of any benefit conferred, so long as these expenditures were foreseeable.

availability of supervisory goodwill,[30] the FSLIC resolved troubled thrifts by offering significant amounts of cash to induce healthy thrifts to merge with failing institutions. The amount of cash the Government was required to spend to resolve the thrifts was approximately 70% to 75% of the cost of liquidation. (*See* PX 1314A at ¶ 97-98; PX 1352 at p. 16; PX 113 at p. 13). Therefore, the price that a thrift in Fidelity's position would ask to discharge Suburbia's liabilities absent the availability of supervisory goodwill would be about 70% of the cost of liquidating Suburbia. This price would be established at the time of contracting and thus would depend on an estimate of liquidation cost at that time.

As such, Dr. Kaplan has proposed a fair and reasonable damages award of $103.53 million based on 70% of the Government's $147.9 million present value estimated cost of liquidating Suburbia at the time of the merger contract. (PX 1314A at ¶100). As noted by Dr. Kaplan, this proposed award is almost identical to the FSLIC's own estimate of what it would cost to liquidate Suburbia on a cash basis instead of a present value basis. (PX 1314A at ¶¶ 95, 100).

---

[30] Note that the reasonable value of the alternative performance should be based on its full stand alone value, and should not be based on the contract prices that Fidelity and other bidders offered, which were heavily discounted due to the availability of the supervisory goodwill forbearance, which was later breached. *See* 12 Arthur L. Corbin, Corbin on Contracts, ch. 61, § 1113 (1979) ("There are many elements that enter into the making of an agreement fixing a contract price; and the price so fixed may be very different from the market value or from what is often described as 'reasonable value.'"). Absent the breached promise of the supervisory goodwill forbearance, the cash amount that the Government would have had to pay to obtain Fidelity's performance would have been much higher. As noted by Dr. Kaplan, the FSLIC's own documents show that it had historically made such cash payments at approximately 70% of the cost of liquidation in the years before supervisory goodwill was available. (*See* PX 1314A at ¶¶ 96-100).

### *4. The Federal Circuit's Chief Concerns Regarding The Use Of Liquidation Costs In Calculating The Defendant's Subjective Gain Are Not Present In This Case.*

As noted above, the Federal Circuit has almost always looked to the Government's subjective gain when analyzing restitution damages. In doing so, the courts have readily found that the Government received a gain as a result of the plaintiff's performance. (*See, e.g., Hansen Bancorp*, 367 F.3d 1297, 1316-17 (Fed. Cir. 2004) ("…there is no doubt that the merger was desirable from the FSLIC's point of view. By assuming the liabilities of [the failing thrift], the [plaintiff] allowed the FSLIC to avoid the high cost of bailing out another insolvent thrift."); *LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1376 (Fed. Cir. 2003) (agreeing with the trial court that "the government obviously benefited from [plaintiff's] assumption of the obligations of the failing thrifts, for this spared the FSLIC the liquidation cost of $912.6 million in depositor obligations."); *Glendale* 239 F.3d 1374, 1381-82 (2001) (rejecting the government's argument that the plaintiff thrift conferred zero value on the government by assuming the liabilities of the failing thrift); *see also Far West Fed. Bank v. Office of Thrift Supervision*, 119 F.3d 1358, 1366 (9th Cir. 1997) ("…without the prospect of savings on the part of the government, there would have been no incentive for the government to contract with the plaintiffs.")).

Yet despite finding that the Government received an increase in wealth as a result of the plaintiff's assumption of the failing thrift's liabilities, courts have been reluctant to grant a restitution award based on the full amount of liabilities assumed by the plaintiff when the Government had viable alternatives to liquidation at the time of contracting or when the plaintiff merely assumed the failing thrift's liabilities but did not later perform its duty of discharging

those liabilities. The case of *Glendale Fed. Bank, F.S.B. v. United States* (239 F.3d 1374 (Fed. Cir. 2001)) provides a good illustration of the Federal Circuit's concerns in these two scenarios.

**(a) Glendale's First Concern.**

The first concern of the *Glendale* court is that when the Government has viable alternatives to liquidation—such as waiting for the market conditions to change, selling the thrift to competing bidders, or installing new management in the thrift—the gain realized by the Government as a result of the plaintiff's performance is not the full dollar value of an avoided liquidation, but only some lesser and indeterminate value of having more time to seek a more permanent solution.

> …[T]he action taken by the purchasing S&L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift. For one, it is not at all clear that but for Glendale's purchase of Broward the Government would have been called upon to make up that deficit then and there. Glendale was only one of a number of potential acquirers of Broward. Alternatively, rather than approve a merger, the Government had open to it the option of hiring new and better management to run Broward and make a go of it, just as Glendale itself did. In a very real sense, what the Government received in exchange for its promise was time--time to deal with other failing S&Ls, time to see what the market would do before having to commit substantial resources to the problem. Though the value of time was more than zero, there is no proof of what in fact it was worth.

*(Glendale*, 239 F.3d at 1382. *See also Granite Mgmt. Corp. v. United States*, 416 F.3d 1373, 1380-81 (Fed. Cir. 2005) (holding that the cost of liquidation was not an appropriate measurement of damages when the government had alternative methods for dealing with the acquired thrifts); *Citizens Fed. Bank, FSB v. United States*, 52 Fed. Cl. 561, 566 (2001) (finding that the government may not have had to bail out the acquired thrift, because it could have sold the thrift to another bidder or installed better management)).

Unfortunately for most plaintiffs, when the Federal Circuit courts are unwilling to grant a restitution award for the full cost of liquidation, the courts are also unlikely to grant any other restitution award. As noted in *Glendale*,

> This case, then, presents an illustration of the problem in granting restitution based on an assumption that the non-breaching party is entitled to the supposed gains received by the breaching party, when those gains are both speculative and indeterminate. We do not see how the restitution award granted by the trial court, measured in terms of a liability that never came to pass, and based on a speculative assessment of what might have been, can be upheld; accordingly we vacate the trial court's damage award on this theory.

(*Glendale*, 239 F.3d at 1382).[31]

Consistent with the rationale in *Glendale*, however, where the Government truly has no other viable alternative to liquidation at the time of the merger, the value of the benefit conferred on the Government ***is*** the full avoided cost of liquidating the acquired thrift. In accord with this logic, this Court held in *Westfed Holdings, Inc. v. United States* (55 Fed. Cl. 544, 561 (2003), *aff'd in part, rev'd in part*, 407 F.3d 1352 (Fed. Cir. 2005)), that a plaintiff "could recover loss avoidance restitution if it proved at trial that liquidation was the defendant's only alternate method of disposal of the acquisition by the plaintiff."

**(b) Glendale's Second Concern**.

The *Glendale* court's second concern is that the mere assumption of liabilities by the plaintiff at the time of the merger would not necessarily confer on the Government the full

---

31 While the *Glendale* court's concerns about overcompensating the plaintiff are somewhat understandable in these circumstances, the court's willingness to provide a windfall for the Government by denying any recovery whatsoever for the plaintiff is somewhat surprising, given that the law of contracts places the burden of imprecision on the breaching party. *See LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003) ("When damages are hard to estimate, the burden of imprecision does not fall on the innocent party.).

benefit of an avoided liquidation because the Government would remain secondarily liable for the excess liabilities of the acquired thrift if the plaintiff failed. Similarly, if the excess liabilities of the acquired thrift were erased by favorable market conditions after the merger, the plaintiff would never have been burdened with the task of discharging the Government's net obligations, and the plaintiff would thus be overcompensated if the court restored to it the full value of a benefit it never conferred. As stated in *Glendale*,

> It is important to remember that, even after [the supervisory] merger …, the Government was not free of potential liability for the failing thrift. Had interest rates not come down, and [the thrifts] failed, the Government's contingent liability would have matured, and the FSLIC would have had to step in at that time and assume the very losses that [the plaintiff] now claims were benefits the Government received.
>
> Fortunately for both the industry and the Government, the facts of the case are that interest rates did come down, market forces allowed the thrift industry to escape impending doom, and neither [plaintiff] nor the Government was called upon to pay the potential losses the fear of which was the motivation for the scenario in the first place.

*(Glendale*, 239 F.3d at 1382. *See also Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1351 (Fed Cir. 2000) (rejecting restitution damages because favorable changes to interest rates after the merger erased the plaintiff's assumed excess liabilities and thus the plaintiff had not been harmed by its assumption of the excess liabilities of the acquired thrifts); *LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64, 185-90 (1999), *aff'd in part, vacated in part and remanded*, 317 F.3d 1363 (Fed. Cir. 2003) (holding that, although the Government avoided the cost of liquidating the acquired thrifts, the plaintiff was not entitled to restitution because it "did not incur any net cost from its assumption of the liabilities of the four thrifts…."); *Citizens Fed.*, 52 Fed. Cl. at 566 (noting that the actual liability discharged by the plaintiff was only $17 million of the $253 million claimed)).

This second concern of *Glendale* is not remarkable. It simply restates the basic rule of restitution that "a party is entitled to restitution … ***only to the extent that he has conferred a benefit on the other party by way of part performance*** …." RESTATEMENT (SECOND) OF CONTRACTS § 370 (1981) (emphasis added)). A plaintiff that merely assumes an obligation to pay the excess liabilities of the acquired thrift has not performed, therefore, and is not entitled to restitution. In contrast, where a plaintiff does expend its own effort and resources after the merger agreement to discharge the Government's obligations, it would be an injustice not to grant that party recovery for the loss it suffered in conferring that benefit on the Government.

Moreover, as in the present case, where the plaintiff ***fully*** discharges the Government's obligations by completely amortizing the goodwill produced in the merger, and where the plaintiff's burden in discharging those liabilities was not reduced by changing interest rates, but only grew larger as time passed,[32] the gain realized by the Government was ***at least*** the full value of the cost of liquidation at the time of the merger. Thus, in such a case, the Government cannot complain, as in *Glendale*, that the calculation of liabilities at the time of the merger was "at most a paper calculation ... which ignores the reality of subsequent events as they impacted all the parties," (239 F.3d. at 1383), because to the extent that such a calculation ignores subsequent events, it does so only to the detriment of Plaintiff's recovery. Therefore, there can be no

---

[32] *Compare* PDX 6 (showing a drastic reduction in interest rates in the years prior to the Suburbia merger) *with* PDX 16 (showing Suburbia's massive losses in these same years). *See* PX 113 at p. 4 (noting that the dramatic decline in interest rates starting in the second half of 1982 had made the thrift industry profitable in the aggregate by December 1982, but that this change in interest rates came too late for some thrifts). *See also* discussion infra at Section III.D.(a).

question that an award based on that amount would be a fair and reasonable approximation of Plaintiff's much greater actual loss.

**(c) Neither Of Glendale's Concerns Apply To This Case.**

As will be discussed in greater detail in Plaintiff's replies to Defendant's factual contentions under this section, such a scenario exists in the present case. The Government's own documents show that it had no viable alternative to the liquidation of Suburbia at the time of the Fidelity-Suburbia merger: (i) there were no viable bidders for Suburbia other than Fidelity; (ii) Suburbia's financial problems could not be fixed by replacing management; and (iii) the Government did not have the luxury of waiting for improved market conditions because Suburbia was continuing to lose net worth each quarter ***despite*** greatly improved interest rates in the years before the merger. Thus, the benefit Fidelity conferred upon the government was ***at least*** the $147.9 million avoided cost of liquidating Suburbia at the time of the merger. (See PX 1314A at ¶¶ 89-95). Under these facts, the *Glendale* court's first concern, that the value of the actual benefit conferred is some indeterminate amount less than the full cost of liquidation, simply does not apply.

The evidence also shows that Fidelity did not only assume Surburbia's excess liabilities but fully performed its obligation to discharge those liabilities, amortizing the full value of Suburbia's excess liabilities, and forever discharging the Government from its secondary obligation to pay Suburbia's excess liabilities. Thus, the *Glendale* court's second concern, that the actual gain realized by the Government as a result of plaintiff's post-merger performance, may be something less than the full value of the avoided liquidation, also does not apply under the facts of this case.

And unlike the plaintiffs in *Glendale* and *Cal. Fed.*, Fidelity was not relieved of its duty to discharge the excess liabilities of Suburbia by improving market conditions. In fact, Fidelity's continued obligation to satisfy Suburbia's enormous excess liabilities was the very reason that Fidelity was capitally deficient and had to operate under the threat of imminent closure after the Government's breach. Yet, by continuing to amortize the goodwill after FIRREA to the severe detriment of Fidelity's earnings and future viability, Fidelity fully performed its contractual obligation. There can be no valid complaint, therefore, that the Plaintiff's restitution claim in this case is removed from the "reality of events as they impacted the plaintiff," or that the claim "exhibit[ed] a barely discernible association with plaintiff's actual experience." (*Astoria*, 72 Fed. Cl. at 717-18).

As such, it would not overcompensate Plaintiff to award its restitution interest in the Government's gain. If anything, it would provide the Government with a windfall to allow it to reap the benefit of Fidelity's performance without any compensation, and such a result would be exceptionally unjust given that the breach did not excuse Fidelity from its performance but instead made that performance all the more difficult and costly.

### C. Defendant's Contentions On Restatement Section 384 And Offsetting Benefits Are Mistaken.

#### *1. Defendant's Contentions Regarding Restatement Section 384 Are Mistaken.*

At the end of Defendant's contentions of law regarding restitution, Defendant contends that Plaintiff's restitution claim is barred by Restatement Section 384(1) because the benefits that the Defendant allegedly conferred on the Plaintiff have been substantially altered in character. This contention is incorrect. Even if this Court were to find that the Government did provide

Fidelity with offsetting benefits other than those acknowledged by Dr. Kaplan, Plaintiff's restitution claim would not be barred by Restatement Section 384.

Section 384 provides that a party seeking restitution must return or offer to return any interest in property that it has received in substantially as good condition as when it was received by the injured party. (RESTATEMENT (SECOND) OF CONTRACTS § 384(1) (1981)). However, this provision applies only if the property can actually be returned. As the provision provides, if the property could not, from the time of receipt, have been returned, or if it has been used or disposed of prior to the plaintiff's knowledge of the grounds for restitution, the rule does not apply, and a payment can be returned in the place of this property. (*Id.* at § 384(2)(b)). The Federal Circuit rejected a similar Section 384 argument in *Hansen Bancorp, Inc. v. United States* (367 F.3d 1297 (Fed. Cir. 2004)), in which the Court of Appeals held that the plaintiff's restitution claim was not barred by Section 384 because the "inherent nature of the merger transaction … makes it impossible to return [any conferred benefit as required under § 384(1)(a)]." (*Id.* at 1318-19).

***2. Defendant's Contentions Regarding Offsetting Benefits Are Mistaken.***

Defendant claims that Fidelity's restitution award should be offset by benefits that Fidelity received as a result of the Government's performance of the contract. While Dr. Kaplan's proposed restitution award has already taken into account the $16 million in cash assistance and the cash payment made to redeem the Suburbia Net Worth Certificates (PX 105), Defendant suggests that this is not enough, and that Fidelity should also have to reduce its recovery by the value of earnings and gains on sales of Suburbia's

assets, tax benefits of net operating losses, economies of scale, accretion income, and Suburbia's franchise value. (Def.'s Cont. of Law at pp. 160-64).

While an award of restitution may be reduced by the value of benefits conferred on the plaintiff, these benefits must actually be conferred by the defendant and not by some other source. (*See Landmark*, 256 F.3d at 1373-74). Even following Defendant's misguided view that the items listed above were "benefits" that Fidelity received, there is no way to cast these "benefits" as being conferred by the Defendant. The Government is not entitled to offset Plaintiff's restitution damages as a result of value conferred by Plaintiff itself or by other forces.

For this reason, the law of restitution provides that, when the benefit conferred consists of goods or other property (as opposed to services rendered), the value of that property is to be determined ***at the time it was transferred***. (*See* 12 Arthur L. Corbin, Corbin on Contracts, § 1112 (1964) ("If the part performance received by the defendant consisted of goods or other property transferred to him, the judgment should be for the reasonable value of the goods or other property at the time ***when they were received*** by the [other party].") (emphasis added)). This rule makes sense because it shifts the risk of gain or loss on those assets to the party that has the power to maintain, improve, or neglect those assets. Thus, the Government may recover an offset for the value of the assets it gave to Fidelity as measured at the time of the merger, but not subsequent income or gains on those assets, which may be have been caused by Fidelity's own efforts. Similarly, Fidelity cannot reduce the value of the offset by any subsequent losses it incurred while those assets were under Fidelity's management.

Under the facts of this case, the Government's own estimate of the cost of liquidating Suburbia showed that the value of the assets that Fidelity would received in the merger were

exceeded by $147.9 million in excess liabilities that Fidelity would have to discharge as a result of the merger. Thus, Fidelity's restitution claim for its discharge of $147.9 million in ***net*** liabilities is already discounted for the value of the assets that Fidelity received from the Government. In fact, this figure overcompensates the Government for the value of the assets Fidelity received in the merger, because the subsequent goodwill calculation shows that Suburbia's assets declined in value between the time of the liquidation estimate and merger, and caused Suburbia's net liabilities to grow to $160 million at the time Fidelity actually received Suburbia's assets. Thus, the claimed benefits that were the result of Fidelity's subsequent use of Suburbia's assets are not compensable offsets.

Assuming for the sake of argument that, despite Suburbia's demise, there may have been some intangible value remaining in Suburbia's franchise at the time of the merger that would not be accounted for in the Government's liquidation estimate, Defendant has entirely failed to meet its burden of proving the value of that asset at the time it was conferred upon Fidelity. (*See Bluebonnet Sav. Bank v. United States*, 67 Fed. Cl. 231, 236 (Ct. Cl. 2005) (holding that the burden of proving an offset is on the defendant)). Instead, Defendant's expert has made several calculations of what portion of Fidelity and Astoria's franchise value in 1994, 2001, and 2006 might be related to the descendents of the Suburbia deposits received at the time of the merger. (*See* Def.'s Cont. of Law at pp. 163-64). These calculations, needless to say, fall well short of answering the question of what the values were at the time the "benefits" were conferred.

Moreover, similar to the income and gains on Suburbia's assets, these calculations fail because the values were not conferred by the Government (or even Suburbia) at the time of the merger. Rather, the value of the franchise was determined by forces operating after the merger,

including market forces, but more importantly, Fidelity's own investments in operating branches, advertising, and maintaining customer relationships. (*See* Responses to DPFOFs 56, 60-64, 66, 68-70). Similarly, Defendant has failed to meet its burden of showing the value of any economies of scale that Fidelity realized as a result of the merger and to what extent those economies were conferred by the Government as opposed to Fidelity's own efforts in reducing operating costs.

Therefore, none of the offset calculations of Defendant's expert are reliable because they credit to the Government value that was almost entirely contributed by Plaintiff itself.

**D. Plaintiff's Replies To Defendant's Factual Arguments Regarding Restitution.**

The bulk of Defendant's contentions of law regarding restitution consist of repetition of Defendant's factual arguments. (*See* DPFOF 1-17, 23-114 and corresponding Replies). Instead of responding again to each one of these factual statements, Plaintiff seeks to address a few of Defendant's more misleading contentions.

***1. The FSLIC Could Afford To Liquidate Suburbia.***

Defendant contends that liquidation was not a viable alternative for the FSLIC because the FSLIC could not afford to liquidate thrifts at the time of the merger. (Def. Cont. of Law at pp. 144-46).

To the contrary, the FSLIC's own documents show that "[w]hen all other solutions for settling a troubled institution have been exhausted, the FSLIC must settle [deposit] insurance." (PX 286 at 18). Therefore, liquidation was ***always*** a viable option for the FSLIC. In fact, because the FSLIC was statutorily required to prevent a thrift from reaching a level of zero

capital, for thrifts with rapidly growing negative net worth like Suburbia, the FSLIC did not have time to pursue any options except liquidation. (PPFOF 51-53).

Moreover, the FSLIC could afford to liquidate thrifts when it was necessary. As conclusively shown in Plaintiff's replies, Defendant's conclusion that the FSLIC could not liquidate ***any*** failing thrift, because it could not afford to liquidate ***all*** failing thrifts defies both reason and the evidence. (Pl.'s Reply to DPFOF 7). Mr. Stearns testified that the FSLIC was financially able to cover the costs of liquidation when it was necessary to resort to that solution. (PPFOF 25). The historical experience of the FSLIC supports Mr. Stearns's statement; the total number of cases resolved by the FSLIC were increasing in both number and value of assets by 1984 (PPFOF 22), and the FSLIC liquidated 6 thrifts in 1983, 9 thrifts in 1984 and 10 thrifts in 1985 at a substantially increasing cost to the insurance fund. (*See* PPFOF 57, 60, 61, 62, 64).

The Record clearly demonstrates, therefore, that the FSLIC had sufficient funds available to liquidate Suburbia. In fact, as of December 31, 1983, the FSLIC had in excess of $8.3 billion and had reserves (primary and secondary) in excess of $6.4 billion. (PX 286 at p. 76). As of December 31, 1984, the FSLIC had total assets of nearly $9 billion had reserves in excess of $5.6 billion. (DX 197 at p. 80). Whereas the FSLIC laid out $1.5 billion in cash during 1984 to settle insurance in some nine liquidating receiverships (*id.* at p. 23), the FSLIC's 1984 estimated cost of liquidating Suburbia was only $147.9 million. (Joint Stipulated Facts ¶ 40). Therefore, Defendant's contention that the FSLIC did not have enough funds to cover the estimated cost of liquidating Suburbia is overwhelmingly contradicted by the evidence.

### 2. *It Is Irrelevant That Liquidation Is The Last Option When It Is The Only Option.*

Defendant suggests that the FSLIC would not have liquidated Suburbia because that was the last option of several resolution methods that the FSLIC could use. The evidence shows, however, that while liquidation may have been the FSLIC's least preferred option, it was the FSLIC's only option in regard to Suburbia in 1984.

Although the FHLBB prioritized other resolutions for failing thrifts above liquidation, it did not always apply the straight sequential order of preference because not every option was feasible. (PPFOF 34). In fact, a close inspection of the various resolution alternatives that the Government had available shows that the Government really only had three resolution options other than liquidation: (1) seek a capital infusion from a third party; (2) seek a third party to merge with the failing thrift; or (3) place the thrift in a Phoenix institution. (*See* PX 35). Suburbia's rapidly deteriorating financial condition at the time of the merger effectively foreclosed the first option, and given that there was no Phoenix institution at the time, and that the Government had no alternative merger options, the only valid option for the Government in 1984 was to liquidate Suburbia. In fact, the Government has not produced any evidence to suggest that the regulators had ever calculated or even seriously considered the cost of any alternative to the Fidelity acquisition other than liquidation. (*See* Spaid, Tr. 240, lines 10-13).

#### (a) The FSLIC Was Out Of Time With Suburbia.

Mr. Spaid testified that regulators in 1984 only considered three alternatives to the Suburbia-Fidelity merger: re-bidding, "doing nothing," and liquidation. (Spaid, Tr. 175, lines 8-14). By mid-1984, it was evident that "doing nothing" was not a valid solution to the Government's liability for Suburbia. Thus, this possibility was not even considered as an

alternative in the Issues Memorandum. (PPFOF 159). Rather, in 1984,Government regulators viewed Suburbia as a serious regulatory concern that required immediate action. (PPFOF 106).

Suburbia had suffered repeated operating losses and depletion of capital, and its financial structure suggested little prospect of turnaround despite the drastic improvements in interest rates in recent years. (*See* PPFOFs 103, 106; PDX 16). Additionally, Suburbia was, or soon would be, ineligible for any additional net worth certificates to prop up Suburbia's net worth with artificial capital. (*See* PPFOF 121-127). As a result, Mr. Vigna recognized that the regulators no longer had the luxury of waiting for lower interest rates as a potential solution for Suburbia's problems, believing instead that Suburbia's situation was critical and required immediate resolution. (*See* PPFOF 106 and 127).

Moreover, the evidence overwhelmingly suggests that changes in interest rates would not have solved Suburbia's financial problems. Regulators recognized that there were always going to be some institutions that were so damaged by high interest rates that they were unlikely to survive even if rates fell. (Beesely, Tr. 1192, line 6 to p. 1194, line 2; *see also* FN 32 above). Suburbia was one of these institutions. As noted by Dr. Kaplan, Suburbia's embedded losses would have been an insurmountable obstacle to its survival no matter what happened to interest rates. (*See* PPFOF 104). Additionally, by 1984, Suburbia's history of losses, coupled with the riskier loans it was putting on its books in an effort to grow out of its problems, made it highly unlikely that Suburbia could have survived as a stand-alone institution even if interest rates alleviated Suburbia's spread problem. (*See* PPFOF 100 through 104).

**(b) A Capital Infusion Was Not A Viable Option.**

By early 1982, there were not many investors who were willing to infuse new capital into failing savings and loans. (Vigna, Tr. 1296, line 25 to p. 1297, line 17; PX 36 at AST 021741-42). Given Suburbia's rapidly declining financial conditions in 1984, seeking a capital infusion for Suburbia was not a viable option, and therefore was not even mentioned in the Issues Memorandum. (PPFOF 159).

**(c) Placing Suburbia In A Phoenix Was Not A Valid Option.**

Although Defendant suggests that Suburbia could have been placed in a Phoenix institution, the evidence shows that there was no Phoenix available in 1984 and the Government has produced no evidence to show that the Government had even considered this option for Suburbia. By 1984, the Phoenix programs were coming to an end. (Stearns, Tr. 5851, line 23 to p. 5852, line 2). Furthermore, the Issues Memorandum for the Fidelity-Suburbia merger was a "totally complete" document. If a "Phoenix" had been a viable alternative for Suburbia, it would have been discussed in the memorandum. (Stearns, Tr. 5852, lines 13-22). Specifically, the FSLIC no longer had the option of merging Suburbia into the "Long Island Phoenix." That entity was sold in August 1983 to the Long Island Savings Bank, FSB ("Syosset") in August 1983. (*See The Long Island Savings Bank, FSB and The Long Island Savings Bank of Centereach, FSB v. The United States,* United States Court of Federal Claims, No. 92-517C, Opinion and Order of Judge Lettow (September 15, 2005), p. 3-7 (Syosset began negotiations with the FSLIC for the Long Island Phoenix in 1982, and, after extensive negotiations, the Assistance Agreement was executed and the transaction concluded on August 17, 1983); (Vigna, Tr. 1362, lines 4-23)).

**(d) Re-Bidding Suburbia Was Not A Valid Option.**

The only alternative discussed in the Issues Memorandum, re-bidding Suburbia, was not a viable solution for Suburbia in 1984. First, the regulators themselves did not think re-bidding would be successful, given the significantly deteriorating financial condition of Suburbia and the fact that it had already been extensively shopped. (PX 237 at AA0000180). This was a reasonable assessment because, by 1984, Suburbia had sustained additional operating losses in excess of $10 million after the last bidders' conference, which was held in 1982. (PPFOF 144). As such, the FSLIC staff did not believe that re-bidding Suburbia would result in offers as good as the proposals received at the 1982 bidders' conference. (PPFOF 145-146). These earlier bids, made when Suburbia was significantly more healthy, required higher cash assistance figures than Fidelity requested and at least one was contingent on Suburbia having positive net worth at the time of the merger. (PPFOF 139). Thus, even assuming that these institutions would be interested in Suburbia in 1984 despite the further demise of Suburbia's condition, there is no reason to believe that these bidders or any other thrifts similarly situated would require anything but significantly higher amounts of cash assistance.[33]

---

33 Moreover, even if the FSLIC could have re-bid Suburbia, the ultimate cost of this re-bidding process would not have been significantly less than the cost of liquidation in 1984. As noted further above, in addition to the incidental costs of the bidding process, the Government would have to pay about 70% the cost of liquidation in upfront cash assistance if it did not promise a capital forbearance.

Alternatively, if the Government paid a discounted cash assistance price based on the availability of a capital forbearance, when that promise was later breached by FIRREA, the Government would ultimately have to pay the thrift's damages claims. And if that thrift failed as a result of the breach, the Government would have had to pay both the cost of liquidating the thrift's assets and its damages claims.

**(e) Liquidation Was The ONLY Valid Alternative To The Fidelity-Suburbia Merger.**

Defendant argues without support that the FSLIC would have specifically chosen not to liquidate Suburbia because of its size and location. First, this argument is largely irrelevant. While Plaintiff does not doubt that regulators would have preferred not to liquidate Suburbia due to its size, regulators did not have any other choice in 1984.

Second, Suburbia was not significantly larger than the thrifts actually liquidated by the FSLIC. The size and complexity of the institutions liquidated had steadily increased from 1984 to 1985. In 1984 the average liquidation involved deposits of $92 million with the largest case involving deposits of $306 million. (PFOF 59). In 1985, the average liquidation involved deposits of $189 million – double the 1984 level – and included the largest institution ever in terms of the number of accounts, a thrift with 96,541 accounts totaling $410 million in deposits, and the largest institution ever in terms of deposit base, a thrift with 16,722 accounts totaling $463.2 million in deposits, representing an increase of 51.3 percent over the largest deposit base liquidated in 1984. (PX 375 at p. 27). In its Institution Analysis of Suburbia prior to the Fidelity acquisition, the FSLIC said Suburbia had $602 million in deposits. (PX 1243). Suburbia's deposits were therefore only 30 percent larger than the largest deposit base liquidated in 1985.

Finally, Defendant's argument that none of the other thrifts liquidated came from the Northeast Region or New York is completely irrelevant to any issue in this case.

---

Thus, the idea that the Government would have avoided the cost of liquidation by paying only the cash assistance price of the next lowest bidder does not accurately capture the full cost that the Government would bear even if it could re-bid Suburbia.

### *3. Plaintiff's Liquidation Cost Estimate Is Reasonable And Supported By The Record.*

Defendant argues that the FSLIC's liquidation estimate is not a reliable basis for calculating damages, because the figure would change depending on movements in interest rates. This argument is unfounded. First, as Dr. Kaplan noted, it is unrealistic for the Government to argue that the cost would have been lessened solely on the basis of interest rate changes. Had the liquidation cost estimate been performed subsequent to 1984, it is likely that many, if not all of the components of the analysis would have changed. As a result, even if there was a benefit from falling interest rates, that benefit might well be reduced or offset entirely by changes in other components of the analysis. (Kaplan, Tr. 3344, line 22 to p. 3351, line 22). Second, as detailed in the previous section, Suburbia suffered massive losses in the years prior to the merger despite drastic improvements in interest rates and there is no reason to believe that this would change in the years after the merger. In fact, Suburbia's attempts to survive as long as it did so weakened the thrift that its overall financial condition was unlikely to improve no matter what interest rates did. Thus, the Government's $148 million liquidation estimate represents a fair and reasonable approximation of the ***least*** amount of savings the Government realized by not having to liquidate Suburbia. Therefore, whereas the Government paid only $16 million to forever avoid the obligation of paying even a single dollar for Suburbia's growing liabilities while, in contrast, Fidelity was driven to the brink of failure as a result of the cost of discharging these liabilities, it could never constitute a windfall for this Court to award Plaintiff a recovery based on the conservative $148 million estimate.

### *4. Plaintiff Fully Conferred The Benefit On The Government.*

Given that Fidelity fully performed its obligations under the contract, and, as a result of the breach, did so in one-third of the time required by the contract, it is strange that Defendant challenges Fidelity's economic capacity to confer the benefit. (Def.'s Cont. of Law at p. 155). Defendant first argues that the Government retained a contingent liability for Suburbia's excess liabilities. While this might be relevant to the question of whether Fidelity's mere ***assumption*** of those liabilities conferred a benefit, given that Fidelity fully performed the contract and forever discharged the Government's contingent liability, there can be no doubt that the benefit was fully conferred. Thus, the fact that the Government had a contingent liability that was steadily reduced as Fidelity performed the contract does not in any way reduce the value of the benefit that Fidelity conferred upon the Government by its performance.

Second, Defendant argues that Fidelity did not have the capacity to confer the benefit in 1984. This is also irrelevant. The remedy of restitution is not limited to those parties that perform on the same day the contract is formed but applies to all contracts, the bulk of which involve an exchange of executory promises. Further, it was precisely because Fidelity's performance would be so costly and the benefit conferred so great that Fidelity was promised that it would have thirty years to perform its obligation under the contract. Defendant cannot credibly argue that the Government ever had to settle any insurance for a Suburbia deposit, that Fidelity ever failed to pay a liability as it came due, or that Fidelity ever failed to amortize the Suburbia goodwill. Thus, Defendant's challenge to Fidelity's capacity to confer the benefit is simply irrelevant and unsupported.

Finally, Defendant's contention that the benefit was not foreseeable is both irrelevant and incorrect. First, the law of restitution does not have a foreseeability limitation; the breaching party must return whatever value was conferred on it by the plaintiff's performance. Second, even if foreseeability was a requirement for restitution damages, it is odd for the Defendant to argue that it was not foreseeable to the Government that Fidelity would do exactly what the Government asked it to do under the contract – discharge all of Suburbia's excess liabilities. Although it is irrelevant whether or not the Government thought that Fidelity could succeed, the Government's own viability analysis shows that it did expect Fidelity to fully discharge the liabilities. (PPFOF 172).

## IV. PLAINTIFF'S RESPONSES TO DEFENDANT'S CONTENTIONS REGARDING RELIANCE.

### A. Plaintiff's Reliance Claim Is Not Premised On Net Liabilities Assumed, But On The Real And Significant Costs That Fidelity Incurred In Peforming The Contract.

Defendant's contentions of law on reliance essentially amount to a statement that the Federal Circuit has foreclosed reliance damages premised on net liabilities assumed. Plaintiff's claim, however, is not premised on a mere assumption of liabilities, but on the costs that Plaintiff actually incurred in performance of the contract by amortizing the entire amount of the supervisory goodwill produced in the merger.

While Defendant attempts to characterize this cost as an illusory paper transaction,[34] the record evidence shows that this cost was real and significant. Not only was the amortization of the supervisory goodwill a fair and reasonable approximation of the out-of-pocket costs that Fidelity incurred in discharging Suburbia's excess liabilities as they came due, but the amortization expense itself represented a real and significant cost because Fidelity's cash earnings each quarter were significantly and detrimentally impacted by this expense. Additionally, after Defendant's breach, when Fidelity's continued operation was contingent on its ability to raise capital by realizing cash earnings in excess of this amortization cost, this cost was a significant drag on Fidelity's profitability and also on Fidelity's very existence. Moreover, whereas most contracting parties are relieved from the costs of performance as a result of Defendant's breach, Fidelity was not relieved of its obligation to amortize the goodwill, and, in fact, had to incur this cost in one-third of the time required by the contract.

Under such facts, there can be no doubt that Fidelity's amortization of the supervisory goodwill was a real and foreseeable cost that Plaintiff incurred as a direct result of its contract with the Government. The Government is not free to breach that contract without compensating Plaintiff for this cost.

Moreover, this fully ascertainable cost is in no way speculative but concrete and measurable. Further, it provides only a conservative approximation of the full loss that Plaintiff

---

[34] Although Defendant has been quick to condemn goodwill amortization as a "paper transaction" and not a real cost, it takes a very different view of its counterpart, loan discount accretion. In DPFOF 137, for example, Defendant complains that Fidelity, in choosing to sell some Suburbia assets, realized a $20 million immediate profit but in so doing "sacrifice[ed] over $45 million in future profits that Fidelity would have earned through the accretion of the $45 million in loan discounts associated with the assets sold."

actually suffered as a result of the Government's breach. Thus, to allow Plaintiff to recover this cost of performance could never constitute a windfall to Plaintiff, but only a minimal and long overdue form of compensation for the Plaintiff's extremely costly performance of the contract that the Government breached.

***1. The Government Is Obligated To Reimburse Plaintiff For Foreseeable Costs Incurred In Reliance On The Contract.***

The contract remedy of reliance places an injured party in the position it would have occupied absent the contract by reimbursing it for losses incurred in reliance on the contract. (RESTATEMENT (SECOND) OF CONTRACTS § 344(b) (1981)). Where the Government induces another party to enter into a contract by promising to perform a return obligation, the Government is not free to avoid that obligation unless it compensates the injured party for the injured party's detrimental reliance on the breached promise. (*See Slattery v. United States*, 69 Fed. Cl. 573, 576 (2006) ("The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise.") (*quoting in part*, *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1382 (Fed. Cir. 2001)).

A plaintiff's detrimental reliance on a contract can take an infinite number of forms. The scope of a plaintiff's recovery under reliance damages is limited to the detriment that the plaintiff would foreseeably incur in reliance on the promise that was breached. (*See Am. Capital Corp. v. FDIC*, 472 F.3d 859, 867 (Fed. Cir. 2006)). Another requirement related to foreseeability is the "causation" requirement, but this requirement is easily satisfied as long as the plaintiff can show that its detriment was incurred in reliance on the breached promise and not for some other reason

independent of the contract.[35] (*See Slattery v. United States*, 69 Fed. Cl. 573, 577 (2006) ("In the context of reliance damages, "causation" refers to Plaintiff's burden showing that its expenditures were incurred as a result of the contract.").

Because a party to a contract is expected to incur costs in performing the contract, where the plaintiff's reliance damages are based on the plaintiff's cost of performance, both the

---

35 Plaintiff respectfully submits that a few courts of this Circuit have confused this "causation" principle. Instead of analyzing whether the plaintiff's ***loss*** was caused by the breach of contract, these courts have focused on whether the plaintiff's ***reliance*** was caused by the breach of contract.

Thus, these courts have effectively replaced the requirement that the Plaintiff's costs be made in reliance on the ***contract*** that was breached, with a requirement that the plaintiff's cost be made in reliance on the ***breach itself***. *See, e.g., Granite Mgmt. Corp. v. United States*, 416 F.3d 1373, 1380 (Fed. Cir. 2005) (refusing to grant the plaintiff the cost of performing its obligations under the merger contract, because those costs were incurred as a result of the acquisitions and not the result of the Government's breach.).

This cannot be the rule, however, as the archetypical forms of reliance damages, the plaintiff's "cost of performance" and "cost of preparation for performance," are typically incurred before the breach and in reliance on the breaching party's promise, ***not*** at the time of the breach and in reliance on the breach. *See* RESTATEMENT (SECOND) OF CONTRACTS § 349 (1979); *see also Glendale*, 239 F.3d at 1383 (reliance damages are available for injuries incurred both before and after the breach). In fact, to incur such costs after the other party breaches would violate the mitigation principle in most circumstances.

Rather, if the *Granite* holding is to be construed as establishing a rule that allows a plaintiff to recover only for costs incurred in response to the defendant's breach, the effect of such rule is to reduce "reliance damages" to "incidental damages." *See* 5 Arthur L. Corbin, Corbin on Contracts, § 1044 (1964) (defining incidental damages as "special losses that a party incurs in a reasonable effort to avoid losses resulting from a breach."). Certainly, the *Granite* court did not intend to limit the law of reliance damages to this small subset of damages.

Thus, Defendant's statement on p. 170 of its Contentions of Law, suggesting that Fidelity is barred by *Granite* from recovering costs incurred in reliance on the merger agreement because they were incurred prior to the breach caused by FIRREA is simply incorrect as a matter of law.

foreseeability and causation element are easily established. (*See* RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981) (Reliance damages are available for expenditures made in preparation for performance or in performance)). Thus, in this case, the Government is responsible for reimbursing Plaintiff for any costs that Fidelity would have foreseeably incurred as a result of Fidelity's reliance on the breached Merger Agreement, especially those costs Fidelity incurred in performing its obligations under the contract.

***2. Plaintiff's Cost Of Amortizing The Suburbia Goodwill Was A Foreseeable Cost Of Performing The Contract And Would Not Have Been Incurred Absent The Contract.***

In 1984, to avoid the cost of liquidating Suburbia itself, the Government sought to have Fidelity take responsibility for discharging Suburbia's $160 million in excess liabilities. (*See generally* PX 232 (S Memo); PX 237 (I Memo); PPFOF 221). In exchange for this performance, the Government promised Fidelity that it would: pay Fidelity $16 million in cash assistance; count Suburbia's $160 million in excess liabilities as supervisory goodwill against Fidelity's capital requirements; and allow Fidelity to bear the cost of amortizing this goodwill slowly over thirty years. (*See* PPFOF 220). These terms of the contract were so critical to Fidelity that it refused to engage in the contract absent these terms, and thus had to seek special Government approval of the contract. (*See* PPFOFs 189-91, 452-53).

Fidelity's reliance claim is based on the costs that Fidelity incurred in performing its obligation to amortize the $160 million of supervisory goodwill created in the Suburbia-Fidelity merger. Because it was known to the Government at the time of contracting that Fidelity would bear this cost, and because Fidelity would never have borne this cost absent the contract, both causation and foreseeability are easily established under the facts of this case. The Government

was not free to breach the contract, therefore, without compensating Fidelity for this foreseeable expense caused by Fidelity's reliance on the Government-breached promise.

### *3. Plaintiff Not Only Assumed The Supervisory Goodwill, But Fully Amortized It At Great Expense To Fidelity's Profitability And Viability.*

Although there is some precedent outside the Federal Circuit suggesting that the assumption of a legal obligation alone constitutes a cost for the purpose of reliance damages,[36] the Federal Circuit has been reluctant to grant reliance awards based solely on the assumption of an acquired thrift's excess liabilities. The Federal Circuit's chief concern with granting a reliance award in such cases is that the mere assumption of a liability does not necessarily translate into a realized cost that is concrete and measurable.

For example, this Court in *Anchor Sav. Bank v. United States* (59 Fed. Cl. 126, 161 (2003)) held that the mere recording of an assumed debt on a thrift's balance sheet does not constitute a cost for the purposes of reliance damages until that debt is paid. The Court clarified, however, that when a loss is specified and realized, that cost does qualify as a cost for the purposes of reliance damages, suggesting that this standard is met by an "actual cash outlay," "payment made," or other "concrete and measurable cost." (*Id.*; *see also Franklin Fed. Bank, F.S.B. v. United States*, 55 Fed. Cl. 108, 120-21 (2003) (holding that a plaintiff could recover for liabilities assumed as long as the plaintiff can show that those liabilities later became "concrete,

---

36 *See, e.g.*, *Taylor v. Mark*, 376 S.W.2d 927, 928 (Tex. App. 1964) (holding that the injured party's "measure of damage is not contingent on his actual payment for the [good]."); *Wartenbe v. Car-Anth Mfg. & Supply Co.*, 362 S.W.2d 54, 56-57 (Mo. Ct. App. 1962) (holding that "…if …debts were incurred and were properly attributable to defendant's breach of contract, then plaintiffs were entitled to recover for them whether or not they had paid them."); *Ring v. The Dimitrios Chandris*, 43 F. Supp. 829, 832-33 (E.D. Pa. 1942), *aff'd*, 133 F.2d 124 (3d Cir. 1943) (holding that the injured party's liability for a fine caused by the breach is a recoverable cost even if the fine might later be reduced).

measurable losses")). This concern of the Federal Circuit courts is not remarkable, but only reiterates the basic principle that a party may not recover in reliance unless it has actually incurred a detriment in reliance on the contract. (*See* RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981)).

In this case, Fidelity not only record Suburbia's excess liabilities on its books, but fully discharged those liabilities, and did so not only through out-of-pocket expenditures, but at the concrete and measurable cost of quarterly amortization expenses totaling the full $160 million supervisory goodwill value. The record evidence shows that this expense was not just a paper calculation of a ***potential*** liability but a ***fully realized*** and ascertainable cost that represented a significant detriment on Fidelity's operations, earnings and future viability. (*See* PPFOF 231-47). As noted by Mr. Vigna, if the Government had put Fidelity out of business after FIRREA and reassumed this burden, it would have cost the taxpayers hundreds of millions of dollars. Because Fidelity continued to bear this cost on behalf of the Government, the taxpayers were spared this substantial expense. (Vigna, Tr. 1500, line 10 to p. 1501, line 2).

It was precisely because this expense was so real and significant that, at the time of contracting, Fidelity demanded from the Government a forbearance allowing Fidelity to amortize the goodwill over thirty years. (PPFOF 189, 191). Yet not only did the Government breach the forbearance that allowed Fidelity to count the supervisory goodwill as capital, but the effect of that breach was to cause Fidelity to be deemed capitally deficient, forcing it to fully amortize the remaining balance of the goodwill in less than five years to attain capital compliance. (PPFOF 449-454). Thus, the effect of the breach of the capital forbearance was to also effectively breach the Government's forbearance regarding the thirty-year amortization period. The impact of that

accelerated amortization of the goodwill was devastating on Fidelity's operations, earnings, and, ultimately, its future viability. (PPFOF 695).

Additionally, because of Defendant's breach, Fidelity had to operate under a Capital Plan after FIRREA under which Fidelity's continued operation was entirely contingent on its ability to reach specific interim capital targets without significant variance. (PPFOF 522-25). Because Fidelity's compliance with these targets was a function of obtaining earnings in excess of the cost of the goodwill amortization expense, this expense did not only represent a detriment upon Fidelity's profitability, but a threat to Fidelity's very existence. (*See* PPFOF 500).

Under the facts of this case, there can be no doubt that Fidelity's expenditures in amortizing the supervisory goodwill represented a fully realized detriment that Fidelity foreseeably and actually suffered as a result of its reliance on the breached contract. Therefore, under the law of reliance damages, the Government is liable for compensating Plaintiff for this expense. Additionally, because the exact amount of this cost is concrete and measurable, there can be no concern that this cost is speculative. Finally, because this reliance cost only represents Fidelity's expenditures and does not capture the true loss that Fidelity suffered as a result of amortizing the goodwill in less than ten years instead of thirty, there is no possibility that granting Plaintiff its reliance interest will result in a windfall.

### B. Plaintiff's Responses To Defendant's Factual Arguments Regarding Reliance.

Defendant makes a number of factual arguments about why Fidelity should not be entitled to reliance damages. These arguments are either irrelevant or not credible.

Defendant first argues that Fidelity did not pay off the $160 million of excess liabilities at the time of the merger and that it did not have the capacity to do so. (Def.'s Cont. of Law at pp.

171-72). This argument is irrelevant. Reliance damages are not limited to costs incurred on the day the contract is formed, but also cover the costs incurred in performance of the contract. Fidelity had thirty years under the contract to pay off the $160 million of excess liabilities, and did in fact pay that expense in only ten years as a result of the Government's breach. (*See* PPFOFs 247, 469, 694). Therefore, the Government cannot credibly claim that Fidelity did not actually bear this cost of performing the contract.

Defendant claims that Fidelity's amortization of the goodwill is a non-cash expense and does not represent the cash payments that Fidelity made in discharging Suburbia's excess liabilities. This is irrelevant for several reasons. First, reliance damages are not limited to cash payments made in performance of the contract, but to foreseeable losses caused by the plaintiff's detrimental reliance on the contract. As noted in greater detail above, the goodwill amortization expense was itself a real cost that Fidelity had to bear to the severe detriment of both its earnings and viability. Thus, a portion of the much greater loss that Fidelity actually incurred in performance of the contract can be directly and accurately measured by the amount of goodwill Fidelity had to amortize.

Second, Defendant has admitted that it would be impossible to calculate the actual cash payments made as Suburbia's liabilities came due. (Def.'s Cont. of Law at p. 174). Thus, even assuming for the sake of argument that the law of contracts limits Fidelity's reliance damages to cash payments made in performance of the contract, there is no more fair and reasonable approximation of those cash payments than Fidelity's goodwill amortization expense, which is precisely why accountants use this calculation.

As noted in the introduction, when damages are difficult to calculate, the risk that the damages may be imprecise or overcompensate the injured party is entirely borne by the party that chose to breach the contract. (*See LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003)). Therefore, if the plaintiff's damages estimate is a fair and reasonable approximation of its loss and does not constitute a windfall to the plaintiff, the defendant cannot procure for itself a windfall by refusing to compensate the plaintiff on the grounds of imprecision. (*See S. Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 432-33 (2007)).

Finally, the Government makes an offsetting benefits argument, but this argument fails for all the same reasons that it fails under a restitution analysis. (See discussion above at Section III.C.2).

**Conclusion**

For the reasons discussed above, Plaintiff respectfully requests that the Court enter judgment in its favor and award damages resulting from the breach in the form of lost profits; restitution of the reasonable value of the benefits that Fidelity conferred upon the Government by meetings its obligations under the agreement; reimbursement of reliance damages; Fidelity's out-of-pocket, wounded bank damages; and any further relief that the Court deems appropriate.

October 5, 2007

Respectfully submitted,

/s/ Frank J. Eisenhart
Frank J. Eisenhart
*Counsel of Record*
Catherine Botticelli
Tara R. Kelly
Catherine Stahl
Craig Falls
Dechert LLP
1775 I Street, NW
Washington, DC 20006
202.261.3300
202.261.3333 (Fax)

*Attorneys for Plaintiff*
*Astoria Federal Savings & Loan Association*

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2007, a copy of the foregoing **Plaintiff Astoria Federal Savings & Loan Association's Reponse To Defendant's Proposed Findings of Fact and Conclusions of Law** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Frank J. Eisenhart

October 5, 2007