# In the United States Court of Federal Claims

No. 95-468C

(Filed: January 8, 2008)

| | |
|---|---|
| ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION, Plaintiff, v. THE UNITED STATES, Defendant. | *Winstar* Damages Claim; Expectancy, Restitution and Reliance Damages; Causation, Foreseeability, and Reasonable Certainty of Lost Profits; "Wounded Bank" Damages. |

*Frank J. Eisenhart*, with whom were *Catherine Botticelli, Tara R. Kelly, Catherine Stahl,* and *Craig Falls*, Dechert LLP, Washington, D.C., for Plaintiff.

*John H. Roberson*, with whom were *Michael F. Hertz,* Deputy Assistant Attorney General, *Jeanne E. Davidson,* Director, and *Kenneth M. Dintzer,* Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., *Arlene Pianko Groner, Elizabeth M. Hosford, Brian A. Mizoguchi, John J. Todor,* and *Sameer Yerawadekar*, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.[1]

In this *Winstar* case, the Court must determine the damages due Plaintiff from Congress's passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA"). The legal theory in *Winstar*

---

[1] This case was transferred to Judge Thomas C. Wheeler on June 1, 2006, pursuant to Rule 40.1(b) of the Rules of the Court of Federal Claims.

cases is that FIRREA's restrictions on the inclusion of goodwill in regulatory capital constitute a breach of the Government's Assistance Agreement created when one thrift institution acquired another during the savings and loan industry crisis in the 1980s. See United States v. Winstar Corp., 518 U.S. 839 (1996). The present case arises from the October 31, 1984 acquisition of Suburbia Federal Savings & Loan Association ("Suburbia") by Fidelity New York, F.S.B. ("Fidelity"). Plaintiff, Astoria Federal Savings & Loan Association ("Astoria") later merged with Fidelity on January 31, 1995, and in so doing, acquired the right to assert the present claim on behalf of Fidelity. These three institutions were based on Long Island, New York.

The parties have stipulated to the existence of a contract between the Government and Fidelity, and the Government does not contest Plaintiff's breach of contract claim involving the accounting treatment of goodwill and a capital credit. (Stipulation, filed February 21, 2003). Plaintiff thus has established Defendant's liability for breach of contract. The remaining disputes concern the amount of damages to be awarded to Plaintiff because of Defendant's breach.[2]

The Court conducted a 28-day trial in Washington, D.C. during the period April 19, 2007 through May 29, 2007. The Court's evidentiary record consists of the testimony of 20 witnesses, 750 exhibits, and 5,886 transcript pages. The Court accepted the deposition testimony of four other witnesses who were deceased or unable to testify at trial. The parties filed post-trial briefs on August 6, 2007, and reply briefs on October 5, 2007. The Court heard closing arguments on November 2, 2007.

The 20 trial witnesses in order of appearance were: Dr. Richard Pratt, former Chairman of the Federal Home Loan Bank Board ("FHLBB"); Michael Spaid, a financial analyst from the Federal Savings & Loan Insurance Corporation ("FSLIC"); Carlos Fiol, an FSLIC financial analyst; Thomas Powderly, a Fidelity executive; Roger Teurfs, a certified public accountant from Peat Marwick; H. Brent Beesley, former Director of the FSLIC; Angelo Vigna, a regulator from the Federal Home Loan Bank of New York ("FHLB-NY") and the Office of Thrift Supervision ("OTS"); Thomas Dixon Lovely, a Fidelity executive; William Wesp, a Fidelity executive; Dr. Donald Kaplan, Plaintiff's expert; Vito Caporusso, a Fidelity executive; Peter Stearns, former Director of the FSLIC; Robert Albanese, a regulator from the FHLB-NY and OTS; Peter Finn, an Astoria executive; Walter Amend, a regulator from the FHLB-NY and OTS; George Engelke, an Astoria executive; Neal Moran, a financial analyst from OTS; and three defense experts, Dr. David Rochester, David

[2] In an earlier decision, issued on August 22, 2006, the Court denied Defendant's motion for summary judgment on Plaintiff's damages claims. Astoria Fed. Sav. & Loan Ass'n v. United States, 72 Fed. Cl. 712 (2006).

Kennedy, and Dr. Andrew Carron. The four witnesses whose deposition testimony the Court received were: Henry Drewitz, an Astoria executive; Bruno Greco, a Fidelity executive; Andrew Kane, Jr., a Suburbia executive; and Christopher Quackenbush, an investment advisor to Astoria.

In acquiring Suburbia on October 31, 1984, Fidelity recorded on its books approximately $160 million in supervisory goodwill that it intended to amortize on a straight line basis over 30 years, through 2014. The Government agreed that Fidelity could count the goodwill as regulatory capital in meeting its capital requirements. Five years later, however, the Government breached its agreement with Fidelity. When FIRREA became effective on December 7, 1989, Fidelity could no longer include the goodwill in regulatory capital as it had done previously, and it had to phase out all of the goodwill before the end of 1994. The new law immediately rendered Fidelity capital deficient and a "troubled thrift." Fidelity operated under a restrictive, government-monitored Capital Plan from January 1990 until May 1993, when Fidelity raised approximately $57 million in new capital in a successful conversion from mutual-to-stock ownership. In a partially rehabilitated state following the conversion, but still not as strong as its major Long Island competitors, Fidelity merged with Astoria on January 31, 1995.

Plaintiff claims breach of contract damages under three alternative theories of recovery. First, Plaintiff seeks expectancy damages of $115.1 million in lost profits, consisting of $17.9 million for the period prior to the 1995 merger, and $97.2 million for the years 1995-2014. Second, Plaintiff claims restitution damages of $128.3 million, intended to compensate Fidelity for the benefit it conferred upon the Government in acquiring Suburbia. This benefit is measured in net avoided liquidation costs that the Government did not incur. Third, Plaintiff claims reliance damages of $140.4 million, to put Fidelity in as good a position as if the contract had not been made. This amount is measured in terms of Fidelity's cost of net liabilities assumed in acquiring Suburbia, and consists of the supervisory goodwill recorded on Fidelity's books less the cash assistance received from the Government. Plaintiff also claims $1,431,730 in "wounded bank" damages under each of the alternative theories of recovery.

For the reasons explained below, the Court grants Plaintiff's expectancy damages claim in part, but rejects Plaintiff's restitution and reliance claims as being legally and factually deficient under the circumstances presented. The Court concludes that Plaintiff may recover a total of $16,042,887, consisting of $14,611,157 in expectancy damages, and $1,431,730 in "wounded bank" damages. The expectancy damages are lost profits for the period January 1, 1990 through January 31, 1995. This period begins when the Government required Fidelity to operate under a Capital Plan as a "troubled thrift," and extends until Astoria merged with Fidelity five years later. The Court finds that the lost profits during this

period were the proximate result of the Government's breach, that the lost profits were foreseeable, and that Plaintiff proved the damages with reasonable certainty. See Globe Sav. Bank, FSB v. United States, 65 Fed. Cl. 330, 345 (2005), and cases cited therein. Lost profits beyond January 31, 1995 are not recoverable, because both the existence and amount of additional damages are speculative. Even in the absence of the Government's breach, Fidelity would not have been permitted to transfer its supervisory goodwill to Astoria when the two entities merged. Any expected benefit to Fidelity from counting the goodwill as regulatory capital would have ended on January 31, 1995.

The "wounded bank" damages of $1,431,730 are to compensate Fidelity for the actual costs it paid to the OTS for higher examination assessments, and to the Federal Deposit Insurance Corporation ("FDIC") for insurance premiums, when Fidelity was a "troubled thrift." Fidelity would not have been a "troubled thrift" if the Government had not breached its contract with Fidelity through passage of FIRREA.

## Findings of Fact[3]

### A. The 1980s Crisis in the Savings & Loan Industry

Beginning in late 1979, the Federal Reserve Board allowed interest rates to rise in an effort to combat inflation. (Beesley, Tr. 1147-49).[4] The prime interest rate peaked at an all-time high of 21.5 percent in 1981. (Pratt, Tr. 69-71). While thrift institutions were realizing an average yield of eight percent on long-term mortgages, the Federal Government was paying 12 or 13 percent on risk-free obligations. Id. Consequently, passbook savers at banks and savings and loan institutions began to withdraw their deposits to invest in higher-yielding money market and other investment options. Id. Thrift institutions attempted to stem the loss of depositors by raising their deposit interest rates, and soon began paying more money in depositors' interest rates than they were earning in long-term mortgages. (Beesley, Tr. 1147-49). The losses associated with paying higher deposit interest rates, and losing depositors

---

[3] This statement of the facts constitutes the Court's principal findings of fact under Rule 52(a) of the Court. Other findings of fact and rulings on mixed questions of fact and law are set forth in the later analysis.

[4] In this opinion, the Court will refer to the trial transcript by witness and page as "Name, Tr. __," and to trial exhibits as "PX __" for Plaintiff's exhibits, and "DX__" for Defendant's Exhibits. The expert witnesses presented their expert analyses through demonstrative exhibits, which the Court will refer to as "PDX __" for Plaintiff, and "DDX __" for Defendant. The parties' pretrial stipulations of fact, filed on April 2, 2007, are referred to as "Stip. __." For lengthy exhibits, page citations include the last four digits of Bates numbers where available, or otherwise an actual page number.

to other investment options, caused a reduction in capital and directly impacted a thrift's capital account. Id.

The FHLBB required thrifts to maintain a minimum capital level, and prohibited thrifts from operating with a negative capital account. (Beesley, Tr. 1150-51). Many thrifts insured by the FSLIC in the early 1980s had less capital than indicated on their books. (Beesley, Tr. 1154-55). Specifically, the asset amounts shown on a thrift's balance sheet were not an accurate assessment of the assets' true value. (Beesley, Tr. 1150). For example, thrifts carried loans on their balance sheets at the original book value or historical cost, instead of at fair market value. Id. If the loans had been evaluated using their true value, the capital to assets ratio of thrifts would have been substantially less, or negative. (Beesley, Tr. 1151).

The FSLIC evaluated a thrift's solvency based upon the percentage of capital held in relation to its assets, and intervened to assist troubled or failing institutions. (Beesley, Tr. 1147, 1151). If a savings and loan institution did fail, the FSLIC insured the accounts of depositors so that they would not suffer a loss. (Beesley, Tr. 1144-45). The FSLIC managed an insurance fund comprised of premiums paid by member institutions and income earned from invested assets. (Beesley, Tr. 1152). This insurance fund did not contain any government or taxpayer money. Id.

Avoiding a complete thrift industry failure would have required a massive bailout from Congress or falling interest rates. (Beesley, Tr. 1152-54). Government policy in the early 1980s assumed that market interest rates eventually would decline and alleviate in part the problems in the thrift industry. (DX 1147 at 25). Decreased interest rates alone, however, would not have reduced insolvency problems for all thrifts, as asset quality problems also existed. (Beesley, Tr. 1241). Moreover, some thrifts had been so weakened by the stress of interest rate volatility that their survival remained precarious even when interest rates began to fall. (Beesley, Tr. 1193).

The FSLIC employed "stopgap" measures in an effort to buy time until interest rates declined. (Pratt, Tr. 115-16). In 1982, the FSLIC maintained a list of alternatives for dealing with troubled or failing thrifts, which included in order of preference: (1) the introduction of new capital into the thrift from outside the Government; (2) various forms of mergers, whereby weak institutions would merge into stronger institutions; (3) the introduction of new capital assistance from the Government; (4) mergers involving Government assistance; (5) the "Phoenix Program," where two or more troubled thrifts were combined into a new thrift; and (6) liquidation. (See PX 35 at 0002; PX 112 at 6239-43; PX 1341 at 1235; Pratt, Tr. 141, 147; Vigna, Tr. 1511-13).

From 1982 through 1984, the FSLIC did not have sufficient funds to consider liquidating all troubled thrifts. (Pratt, Tr. 128). In March 1983, for example, the FSLIC reported assets of $6.42 billion, but if the FSLIC had wanted to liquidate all troubled thrifts at one time, it would have required at least $180 billion. (PX 1352 at 280; Pratt, Tr. 126-27). Later in 1983, the FSLIC reported that it had 53 cases requiring supervisory resolution with total assets of $17.6 billion, but the FSLIC's primary reserve was only $5.7 billion. (PX 286 at 17, 76).

In dealing with the savings and loan crisis, the FSLIC employed liquidation only as a last resort, and generally only for smaller institutions. In 1982, the FSLIC placed 14 institutions into receivership, with deposits totaling $3.7 billion. (PX 113 at 13; Beesley, Tr. 1190-91). In 1983, the FSLIC liquidated only six small institutions, whose assets cumulatively totaled $295 million. (PX 286 at 18, 20-21; Beesley, Tr. 1234-36). In 1984, the FSLIC liquidated only nine institutions with combined deposits of $829 million. (PX 342 at 1356). In 1985, the FSLIC liquidated only ten institutions, with an average of $189 million in deposits. (PX 375 at 27). None of these institutions were located in the Northeast. Id. Between 1980 and 1989, the FSLIC did not liquidate any New York-based thrifts under Mr. Vigna's supervision. (Vigna, Tr. 1503; Albanese, Tr. 4127-28).

In July 1981, Congress began exploring ways of expanding lending and investment alternatives available to the savings and loan industry. Among the alternatives considered were: broadening thrifts' real estate powers, expanding consumer and commercial lending, engaging in equipment leasing, increasing service corporation investments, and allowing greater flexibility for mutual and stock conversions. (Pratt, Tr. 85-89; PX 1336 at 51-56). In 1982, Congress passed the "Garn-St. Germain Depository Institutions Act," Pub. L. No. 97-320, 96 Stat. 1469 (1982). (Pratt, Tr. 92, 104; PX 1352B).

Pursuant to this new statute, the FHLBB authorized the issuance of Net Worth Certificates for thrifts to count as capital. As Dr. Pratt explained, "[w]e didn't have the cash to inject, so we created paper, that's what the Net Worth Certificates were." (Pratt, Tr. 107). Under the net worth certificate program, a failing thrift could issue certificates to the FSLIC in exchange for promissory notes. The thrift could count the certificate toward its capital requirements. The FSLIC ultimately had to repay the thrift in cash. (Beesley, Tr. 1171-73). The FSLIC also created a new asset called Appraised Equity Capital to allow thrifts to book the appreciated value of real property without selling the property. (Beesley, Tr. 1174-75). This strategy also assisted thrifts in staying afloat. Id. Even with the adoption of these measures, however, many thrifts still were in jeopardy of not surviving. (Pratt, Tr. 98-99).

B. Fidelity's Acquisition of Dollar Federal

Fidelity acquired a Long Island thrift known as Dollar Federal Savings & Loan Association ("Dollar Federal") on June 30, 1982. Fidelity's acquisition of Dollar Federal consisted of a takeover of assets and the assumption of liabilities existing as of the date of the acquisition. (Stip. 1). At the time of this acquisition, Dollar Federal had approximately $105 million in assets. As a result of the Dollar Federal acquisition, Fidelity increased its branch offices from four to eight, and increased its deposits from $204.7 million to $273.4 million. (Stip. 2). In this merger, Fidelity acquired Dollar Federal's real estate loans to condominium developers. (Vigna, Tr. 1397-98). Fidelity experienced losses on these and other commercial real estate loans in later years. (Vigna, Tr. 1508-10).

Fidelity accounted for the acquisition of Dollar Federal as a purchase. The goodwill generated in this acquisition, or the excess cost over fair market value of Dollar Federal's net assets acquired, was $25.815 million. (Stip. 3; Teurfs, Tr. 1050; PX 1283 at 0064). Fidelity planned to amortize this amount as an expense over 30 years using the straight line method. (Stip. 3; Teurfs, Tr. 1076-77; PX 1283 at 0064). Fidelity recorded $28.041 million in discounts on the mortgage loans acquired from Dollar Federal. These discounts were to be accreted to income over ten years using the sum-of-the-months digit method. (Stip. 4; PX 1283 at 0064).

In 1989, FIRREA's capital restrictions required Fidelity to phase out the remaining Dollar Federal goodwill on its books as a component of regulatory capital. (PX 526 at 8365). The remaining Dollar Federal goodwill at the end of 1989 was approximately $19.3 million. Id. FIRREA thus negated Fidelity's plan to amortize Dollar Federal's goodwill over 30 years. Astoria has no claim from Fidelity's loss of Dollar Federal's goodwill.

C. Fidelity's Acquisition of Suburbia

Like Fidelity, Suburbia was a Long Island thrift. In 1983, Suburbia had approximately $656 million in assets. (PX 1245 at 0484). Suburbia was larger than Fidelity in terms of assets, savings, mortgages, and branches. Id. Suburbia had been profitable until 1979 or 1980, when it began experiencing "interest rate spread," where the cost of obtaining funds through deposits was exceeding its low interest return on long-term loans. Because of interest rate spread, Suburbia, like many other thrifts, began operating at severe losses which was "fairly rapidly eroding capital." (Vigna, Tr. 1249-50, 1502-03; Albanese, Tr. 4122-23; DX 3113 at 2534). Suburbia also faced an extremely competitive Long Island market. (Kane Dep., Tr. 21-22).

Suburbia did not have any serious asset quality problems, and its management team was not a concern to federal regulators. (Vigna, Tr. 1503; Albanese, Tr. 4123; DX 3141 at

0008). Yet, due to the effects of interest rate spread, Suburbia began to experience mounting losses after 1979. (Kane Dep., Tr. 16-17, 24-25). Mr. Kane, Suburbia's CEO and Chairman of the Board, testified that, if interest rates had declined in the early 1980s, Suburbia would not have faced an operating deficit and would have returned to favorable operating results. (Kane Dep., Tr. 22).

Suburbia sustained net losses in each of its fiscal years 1980 through 1984 as follows: 1980 – $1.666 million, 1981 – $6.869 million, 1982 – $17.547 million, 1983 – $9.167 million, and 1984 – $7.427 million. (Stip. 35). Each of these Suburbia net losses reduced Suburbia's capital. (Stip. 36). Suburbia's regulatory net worth would have been negative $12.4 million as of August 31, 1984 if Net Worth Certificates and Appraised Equity Capital were excluded from the calculation of Suburbia's net worth. (Stip. 37, 38).

On December 20, 1982, FSLIC held a bidder's conference to solicit proposals for the assisted acquisition of Suburbia. FSLIC distributed bidders' packages to 22 associations and individuals, and later to three other potential acquirers. (Stip. 5; PX 102 at 0463; PX 232 at 0206; PX 237 at 0178). Four New York thrift institutions submitted bids to acquire Suburbia: Albany Savings Bank, Anchor Savings Bank, Long Island Savings Bank, and Poughkeepsie Savings Bank. (Stip. 6, 7; Vigna, Tr. 1330; PX 237 at 0178). FSLIC estimated the present value cost of these bids between $17.9 million (Anchor) and $33.9 million (Long Island). (Stip. 8, 10, 12, 14; Spaid, Tr. 202; PX 237 at 0178). The present value cost estimate for the second low bidder, Albany Savings Bank, was $20.6 million. (Stip. 8; PX 237 at 0178). The bidders also requested cash or other assistance from FSLIC. (Stip. 9, 11, 13, 15). Suburbia, however, became eligible for capital assistance from FSLIC through the Garn-St. Germain Act, and efforts to negotiate a merger with the four bidders were discontinued. The FHLBB and FSLIC did not accept any of the four bids. (Stip. 6).

On February 18, 1983, Suburbia's Board of Directors passed a resolution that Suburbia was eligible for FSLIC assistance through Net Worth Certificates, and that it was in the best interests of Suburbia to apply for such assistance. (Stip. 16). On March 21, 1983, Suburbia entered into a Master Agreement with FSLIC for issuance of Net Worth Certificates. (Stip. 17). As a participant in the Garn-St. Germain Net Worth Capital Assistance Program, Suburbia issued Net Worth Certificates totaling $9.2 million through August 31, 1984. (Stip. 21).

Suburbia's Board of Directors explored the prospects of a merger with Heritage Federal Savings & Loan Association ("Heritage") as early as September 1982. (Stip. 22). At Suburbia's March 18, 1983 Board of Directors meeting, Mr. Kane reported on the progress of the Suburbia-Heritage merger application. (Stip. 23). On June 1, 1983, the FHLBB denied the Suburbia-Heritage merger application. (Stip. 24).

In 1984, the FSLIC did not have the resources to liquidate Suburbia, and thus liquidation was not a viable option. (Albanese, Tr. 4185-87). On February 17, 1984, Suburbia's Board of Directors unanimously approved a resolution for management to continue investigating a proposed merger with another financial institution. (Stip. 27). On April 25, 1984, Fidelity's Board of Directors approved the pursuit of a merger or acquisition with Suburbia under FSLIC's Voluntary Assisted Merger Program ("VAMP"). (Stip. 28). In May 1984, Suburbia and Fidelity submitted to the FHLBB Supervisory Agent a proposal for a voluntary VAMP merger. (Stip. 31; PX 186 at 1793; PX 232 at 0206). Mr. Vigna thought that Suburbia would be eligible for VAMP assistance, and he recommended a maximum FSLIC contribution of $16 million, or 2.5 percent of Suburbia's assets. (PX 169 at 2713-14).

Mr. Kane did not fear that Suburbia would be liquidated if it did not merge with Fidelity. (Kane Dep., Tr. 40). Mr. Kane explained instead that "maybe we would have an unfriendly merger set up by the efforts of the FSLIC, [and] have no control over any of our destinies." (Kane Dep., Tr. 98). Mr. Kane viewed a merger with Fidelity as a "friendly merger," in which "we were going to have some of our directors on a combined board" and "all our management would stay in place." Id.

The FHLBB could not approve the Fidelity-Suburbia VAMP merger proposal because Fidelity requested certain accounting forbearances that the Principal Supervisory Agent ("PSA") could not grant. Specifically, the PSA could not approve Fidelity's request that the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method be amortized by the straight line method over 30 years. (Stip. 32; PX 237 at 0178-79; DX 406A at 0368-69). The PSA also could not approve Fidelity's request that FSLIC's cash contribution to the resulting association be booked as a credit to net worth. Id.

In July 1984, Fidelity submitted another proposal to merge with Suburbia. (Stip. 33; PX 185 at 0820). This proposal was based upon the earlier VAMP proposal and the related business plan which the FHLBB had reviewed previously. (PX 186 at 1793). Fidelity requested the same $16 million cash assistance from FSLIC, as Fidelity had proposed for the VAMP merger. (See PX 185 at 0821). Fidelity did not pay any cash in the acquisition of Suburbia. (Teurfs, Tr. 1112; PX 1283 at 0063).

According to a 1984 FHLBB Institutional Analysis, the present value cost to FSLIC of merging Suburbia with Fidelity was $15.906 million. (Stip. 39; Spaid, Tr. 174; PX 1243 at 0022). In contrast, the present value cost to FSLIC of liquidating Suburbia was $147.9 million. (Stip. 40; Spaid, Tr. 170; PX 1243 at 0021). Fidelity was willing to merge with Suburbia, despite the fact that Suburbia's liabilities exceeded its assets, because of the favorable treatment of supervisory goodwill. (Greco Dep., Tr. 66).

The FHLBB approved the merger plan for Suburbia and Fidelity through Resolution No. 84-582, dated October 25, 1984. (Stip. 46). FSLIC agreed to contribute $16 million in cash to Fidelity as stated in the FSLIC-Fidelity Assistance Agreement dated October 31, 1984. (Stip. 48, 51). The FHLBB determined that it needed to provide financial assistance to prevent the probable default of Suburbia. The FSLIC regarded Fidelity's proposal as the least costly option for resolving the problem of Suburbia's mounting losses. (Stip. 41). Acceptance of Fidelity's proposal would benefit the Government in avoiding the expense and disruption of Suburbia's possible liquidation. (Vigna, Tr. 1386). For a $700 million thrift such as Suburbia suffering mainly from the effects of interest rate spread, liquidation was not an acceptable option. Id.; see also PX 237 at 180-81.

Fidelity's acquisition of Suburbia on October 31, 1984 increased Fidelity's assets from $556.6 million to $1.3 billion, and its deposits from $393.2 million to $1.0 billion. (Stip. 58). Fidelity also added 12 Suburbia branch offices, giving Fidelity a total of 20 branch offices. Id.

Fidelity accounted for the Suburbia merger transaction under the purchase method of accounting in which Suburbia's assets and liabilities were re-priced according to their market value. (Stip. 59). Fidelity recorded $160.093 million of goodwill as a result of the merger with Suburbia. (Stip. 61). This amount represented the excess cost over fair market value of net assets acquired. The goodwill was to be amortized over 30 years using the straight line method. Id. The FHLBB sent a forbearance letter to Fidelity after the merger had been approved confirming these terms. (PX 274 at 9019-21).

The key terms of Fidelity's acquisition of Suburbia, agreed upon by the Government, were: (1) Fidelity received a $16 million cash payment from the Government; (2) Fidelity was permitted to count the $16 million payment as regulatory capital; (3) Previous notes issued to Suburbia and related Net Worth Certificates totaling $9.2 million were transferred to Fidelity and counted toward Fidelity's regulatory capital; (4) The $160 million in goodwill created by the use of the purchase method of accounting was to be amortized on a straight line basis over 30 years; (4) Goodwill was not to be deducted from Fidelity's net worth to determine capital compliance; and (5) Discounts on Suburbia's loans and securities resulting from a mark-to-market valuation process, totaling $105 million, were to be accreted to income over the remaining lives of the assets. (Kaplan, Tr. 2907, 2916; PDX 20, 22). The accounting firm of Peat Marwick provided an opinion regarding the key components of the Fidelity-Suburbia merger. (Teurfs, Tr. 1027, 1042-43; PX 1247A at 7226).

Fidelity derived benefits from its merger with Suburbia. Fidelity's management was familiar with Suburbia, and Fidelity's CEO believed that Suburbia was a valuable franchise. (Lovely, Tr. 1621). The merger more than doubled Fidelity's asset and deposit bases. (DX 3148 at 0101). Fidelity acquired branch offices in new locations, particularly in Suffolk

County, Long Island, an area with growing population, income, and home values. (Lovely, Tr. 1630). By combining with Suburbia, Fidelity could expand services to depositors, such as: discount brokerage services, life insurance, debit cards, statement savings, mortgage banking, consumer loans, business loans, home improvement loans, student loans, and individual retirement account loans. (DX 3148 at 0101). Through these additional services, Fidelity could compete with commercial banks and money market funds, and attract more capital into the thrift. Id. Fidelity also reduced operating expenses through consolidation and elimination of duplicative departments. (PX 335 at 2383). Fidelity anticipated that the accretion income from loan discounts would exceed goodwill amortization, at least for the first 8-10 years after the merger. (Lovely, Tr. 1633-34; Wesp, Tr. 1748-50; Teurfs, Tr. 1108-10).

D. Fidelity's Growth Prior to FIRREA

Earnings in the thrift industry tend to be cyclical, fluctuating upward and downward generally in correlation to interest rate movements. When interest rates were at historical highs in 1981 and 1982, thrift industry earnings were negative, but earnings turned positive when interest rates fell. Interest rates increased again in 1987-1990, causing negative earnings, but earnings improved when interest rates again started to fall. (Kaplan, Tr. 2731-33; PDX 7). Fidelity's earnings, however, were positive each year from 1980 to 1993. Fidelity was profitable even when the thrift industry as a whole was not profitable. (Kaplan, Tr. 2735-38; PDX 7, 8). From 1979 to 1989, Fidelity grew from a $200 million thrift to a $2 billion thrift. (PDX 4). Fidelity's compound annual growth rate from December 1979 to June 1989 was 28.9 percent. Id. Even without the Dollar Federal and Suburbia acquisitions, Fidelity still achieved an internal growth rate during this period of approximately 14-15 percent. (Kaplan, Tr. 2701-04).

Dollar Federal had been involved in commercial real estate lending before being acquired by Fidelity. (Lovely, Tr. 1568, 1578). When Fidelity acquired Dollar Federal, it took over Dollar Federal's real estate loans to commercial real estate developers such as Gerald Guterman. (Lovely, Tr. 1568, 1578, 1670-74; PX 1242 at 9182). In 1984, prior to Fidelity's merger with Suburbia, the FHLBB urged Fidelity not to concentrate commercial loans with just three or four borrowers. (Greco Dep., Tr. 28, Albanese, Tr. 4143-44; PX 183 at 9213). Commercial real estate loans are more risky than single-family mortgages. (Powderly, Tr. 379). In 1985, with an enhanced cash position following its acquisition of Dollar Federal and Suburbia, Fidelity expanded its commercial real estate loan business. (PX 986 at 4218). The majority of these loans were concentrated in condominium and cooperative conversion projects in Manhattan. (Greco Dep., Tr. 80, 99-100; DX 63 at 1296). Ultimately, some of Fidelity's real estate loans failed, Fidelity foreclosed, and the properties became real estate owned ("REO") by Fidelity. (PX 711 at 2941-42).

Fidelity's chief executives during this period, Thomas Dixon Lovely and Bruno Greco, began managing Fidelity when it was a "vanilla, traditional savings and loan." (Vigna, Tr. 1510). Mr. Lovely's background was in education, and the regulators at the FSLIC and the FHLBB questioned the experience and ability of Mr. Lovely and Mr. Greco to run a billion dollar financial institution. (Vigna, Tr. 1510-11). As Fidelity expanded into more sophisticated business transactions, Mr. Lovely recognized the need to strengthen Fidelity's management. (Lovely, Tr. 1556-57). In mid-1986, Fidelity hired Thomas V. Powderly, William A. Wesp, and Frederick J. Meyer. These new managers quickly saw that Fidelity's planning, budgeting, and management controls needed substantial improvement. (Wesp, Tr. 1746-47).

Fidelity hired Mr. Powderly in June 1986 as Executive Vice-President in charge of retail banking, operations, investments, and accounting. Mr. Powderly later became President and Chief Executive Officer. (Stip. 63). Fidelity hired Mr. Meyer in July 1986, and he became Executive Vice-President in December 1986, responsible for the savings division, facilities management, office services, and marketing functions. (Stip. 64). Fidelity hired Mr. Wesp in June 1986 as a Senior Vice-President in charge of investments and financial planning. (Stip. 65). Fidelity also hired Vito L. Caporusso in September 1986 as a Vice-President. (Stip. 66). These persons brought expertise to Fidelity in commercial real estate management, development and lending, investment portfolio management, and retail banking. (Stip. 62).

In the Viability Analysis performed prior to Fidelity's merger with Suburbia, the FSLIC projected that the combined institution would grow at a rate of 6.8 to 8.5 percent per year for the ten years following the merger. (PX 210 at 0028). From November 1984 through 1988, Fidelity's growth exceeded the FSLIC's projections. (Kaplan, Tr. 2936-41; PDX 30).[5] Fidelity's earnings and capital ratios also exceeded the FSLIC's projections during 1984 through 1989. (Kaplan, Tr. 2942-46). During this period, Fidelity's total assets grew by an average of 12.6 percent annually, its tangible assets grew annually by an average of 14.7 percent, its deposits and borrowings grew annually by an average of 11.9 percent, and its mortgage-backed securities (all types) grew annually by an average of 41 percent. (Kaplan, Tr. 2952-54; PDX 35).

Fidelity's success was more pronounced after the arrival of the new management team. In the two years after the Suburbia acquisition, 1985 and 1986, Fidelity grew at a rate of 9 percent. (Kaplan, Tr. 2939; PDX 30). During the following two years, 1987 and 1988,

---

[5] The FSLIC's projections assumed that loan discounts would be accreted to income on a level yield basis over 30 years, rather than over the life of the loan, as Fidelity elected to do. This accounting change had the effect of accelerating income recognition in the early years after Fidelity's merger with Suburbia. (Kaplan, Tr. 2942-44).

after the change in management, Fidelity's growth rate accelerated to 16 percent annually. (Kaplan, Tr. 2939-40; PDX 30).

The FHLBB employed a "MACRO" rating system in its periodic examinations of thrift institutions. The regulators assessed a thrift with ratings of "1" to "5" in five component areas: Management, Asset Quality, Capital, Risk Management, and Operating Results. The term "MACRO" is an acronym comprised of the first letters of the five component areas. A "1" rating is the highest, and is seldom used, while "4" and "5" ratings are the lowest, and indicate material regulator concerns. A "5" rating was reserved for "institutions with an extremely high immediate or near-term probability of failure." (DX 1448 at 0834; PX 509 at 1970). A "4" rating was defined as "[m]ajor and serious problems and unsound conditions . . . which are not being satisfactorily resolved by the institution." Id.

In its October 1987 examination of Fidelity, the regulators assigned Fidelity a composite MACRO rating of "4." (DX 1411 at 0419). The individual component ratings were "3" for management, "4" for asset quality, "2" for capital, "2" for risk management, and "2" for operating results. Id. The regulators based the composite "4" rating on the concentration of problem commercial real estate loans where Fidelity had classified assets of $81.5 million. (Albanese, Tr. 4159-60; DX 69A at 0106; DX 1411 at 0419).[6]

After joining Fidelity in June 1986, Mr. Powderly reviewed Fidelity's loan portfolio and decided that Fidelity should terminate its commercial real estate lending as promptly as possible. (Stip. 67). Mr. Lovely and Mr. Greco initially resisted Mr. Powderly's efforts to stop Fidelity's commercial real estate lending, but Mr. Powderly gained the support of Fidelity's Board of Directors and eventually became Fidelity's President in 1990 replacing Mr. Greco. (Powderly, Tr. 353-55, 655-56). In early 1987, Fidelity's augmented management team recognized the potential for problems in developing Fidelity's commercial real estate, construction, and commercial business loan portfolios, in part as a result of the

[6] The assignment of ratings by the federal regulators appears to have been an inexact and subjective process. (Albanese, Tr. 4164). As is shown by the October 1987 ratings for Fidelity, a simple average of equally weighted component scores would have produced a composite rating of "2.6," not "4." Accepting that a "1" rating is seldom used, Fidelity actually received high "2" ratings in three of the five categories. The record does not contain a credible explanation of how the components may have been weighted, or why the "4" rating for asset quality should have driven the overall composite rating for Fidelity.

Tax Reform Act of 1986.[7] (Stip. 68). Through Mr. Powderly's efforts, Fidelity reduced its commercial loan portfolio from $370.9 million in September 1986 to $207 million in December 1989. (PX 986 at 4174).

In 1987, as Fidelity moved away from commercial real estate loans, it began to invest available funds in high quality mortgage-backed and mortgage-related securities, and U.S. Government obligations. This practice was in contrast with the traditional thrift practice of originating residential mortgage loans. (Stip. 69). Fidelity's management chose this strategy as a means of controlling its overall credit risk and managing interest rate risk. Id. Fidelity's management also decided to de-emphasize traditional one-to-four-family mortgage lending due to severe competition in its market area, which made the returns generated by securitized mortgage assets more attractive. Id.

In October 1988, Fidelity adopted a three-year Business Plan that had the following principal objectives: (1) an increase in capital, and particularly GAAP capital;[8] (2) balance sheet growth of 8-10 percent per year; (3) reduced loan concentrations and increased credit quality; and (4) an increased return on assets to a stable 50-70 basis points[9] range. (Stip. 70). Fidelity regarded an 8-10 percent growth rate as a realistic and modest growth rate, typical of the thrift industry. Fidelity had exceeded this growth rate in years prior to 1988. (Powderly, Tr. 361–62; Kaplan, Tr. 2956). Increasing profitability to a stable 50-70 basis points also was a readily achievable goal. (Kaplan, Tr. 2957).

At the time it adopted the October 1988 Business Plan, Fidelity had been maintaining a positive earnings spread by borrowing from depositors, Wall Street, or the Federal Home Loan Bank at low interest levels, by making safe returns on investments in residential mortgages through loan originations or the purchase of mortgage-backed securities, and by

---

[7] The Tax Reform Act of 1986 ("the Act") took away the tax advantages for investors who purchased co-operative units, making it less attractive to hold highly leveraged commercial real estate. (Powderly, Tr. 332-33; Wesp, Tr. 1742; PX 986). The Act was "the number one reason" why commercial real estate loans became problem assets in the late 1980s. The Act changed the economic viability of the projects funded by the loans. (Finn, Tr. 4004).

[8] "GAAP capital" is capital determined in accordance with Generally Accepted Accounting Principles. Fidelity's Mr. Wesp expected the thrift industry to move toward GAAP accounting which would have the effect of eliminating Fidelity's goodwill. (Wesp, Tr. 1790-91, 1827).

[9] A "basis point" is a unit of measure used in finance to describe the percentage change in the value or rate of a financial instrument. A "basis point" is 1/100th of one percent. Thus, there are 100 basis points in one percent.

significantly reducing operating expenses. (Powderly, Tr. 358-61). Fidelity provided its October 1988 Business Plan to the FHLBB as requested. (Wesp, Tr. 1789; PX 447 at 1312). Mr. Wesp included a statement in the Business Plan calling for "no quantum leaps forward, just steady growth." (PX 447 at 1315). Mr. Wesp added this phrase to communicate that Fidelity did not intend to mimic thrifts that were growing too large too fast and likely would need to be bailed out. (Wesp, Tr. 1798-99).

Fidelity included in the October 1988 Business Plan its intention to use wholesale markets. When commenting on the economic environment that Fidelity was likely to face, the Business Plan states:

> Either the wholesale or retail market can be used to add assets to the balance sheet. For instance, there will be periods when it is more cost efficient to buy mortgage backed securities rather than to originate [loans] at punitive teaser rates. It is our intention to utilize the more efficient market.

(PX 447 at 1316). Mr. Wesp's market expertise allowed Fidelity to be "very opportunistic as well as flexible." (Wesp, Tr. 1815-16).

Fidelity recognized that any business plan must be altered to account for changed circumstances. Thrifts regularly re-evaluate business plans when unanticipated events occur. (Powderly, Tr. 970). However, when a thrift has enough capital, it is generally protected from having to change course due to unanticipated events. (Powderly, Tr. 971-73).

Mr. Wesp developed a plan to invest approximately $100 million that Fidelity had acquired through the sale of Suburbia's loans. (Wesp, Tr. 1728-29). Mr. Wesp began investing in conservative notes and bonds from entities such as General Motors, IBM, and General Electric. (Wesp, Tr. 1729-31). Mr. Wesp focused his investment strategy on meeting the 8-10 percent annual growth projection in the October 1988 Business Plan. (Wesp, Tr. 1750-53). To achieve ten percent annual growth, Fidelity used a combination of consumer loans, adjustable rate mortgage home equity loans, and conservative investments. (Wesp, Tr. 1758-59). In the competitive Long Island market, Fidelity could not meet its annual growth projections using only the traditional one-to-four family home mortgages. (Wesp, Tr. 1750-53).

Mortgage-backed securities are marketable securities that are secured by a pool of mortgages. The Government National Mortgage Association ("GNMA" or "Ginnie Mae"), Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"), and Federal National Mortgage Association ("FNMA" or "Fannie Mae") are issuers of mortgage-backed

securities. (Wesp, Tr. 1756-58). Fidelity began investing in mortgage-backed securities as a way to add significant earnings to its balance sheet. (Wesp, Tr. 1758-61). Mortgage-backed securities had the same interest rate risk as other investment vehicles, such as notes or bonds from government or corporate securities. (Wesp, Tr. 1759). As Fidelity curtailed its commercial real estate loans, it expanded investments in mortgage-backed securities to achieve growth. (PX 462 at 3558; PX 618 at 1646; PX 986 at 4174).

Fidelity funded its purchases of mortgage-backed securities first with the proceeds from selling Suburbia's loans, and then with customer deposits and borrowings from the Federal Home Loan Bank and Wall Street. (Wesp, Tr. 1761-62, 1787). Using the investment talents of Mr. Wesp, Fidelity achieved higher returns through mortgage-backed securities than it could through traditional loans. (Powderly, Tr. 396-97). Such investments could be made without the pressures of local market competition, and without incurring added overhead or branch costs. (Wesp, Tr. 1763-65).

By October of 1988, Mr. Wesp was "anticipating a whole new set of risk-based capital requirements, [and] a huge piece of legislation out of Congress." (Wesp, Tr. 1814; PX 447 at 1316). In this regard, Fidelity's October 1988 Business Plan stated:

> We view the area of most significant risk to the forecast to [be those] issues dominated by the U.S. Congress as it grapples with the recapitalization of the FSLIC in the spring of 1989. At this time it is impossible to forecast what quid pro quos might be extracted from the thrift industry but almost certainly, the agenda will include new regulation and additional financial support for the FSLIC. We will follow these developments closely.

Id. As Fidelity's Mr. Wesp recalled at trial, "I knew that we weren't going to like the goodwill treatment. I just never actually believed that [they] would make us write it off on one day." (Wesp, Tr. 1814).

Fidelity discussed the substance of the potential FIRREA legislation only once during its six Board of Directors meetings from January 1989 through June 1989. (Powderly, Tr. 772-786; DX 2334, 2338, 2347, 3348, 2353). At no time prior to the August 9, 1989 passage of FIRREA did Fidelity's Board ever discuss whether it should change its business plan to react to the potential legislation. Id. Even after FIRREA's passage, Fidelity did not know how the December regulations would affect the treatment of goodwill capital. (Powderly, Tr. 792). At the August 1989 Board meeting after FIRREA's passage, Mr. Powderly urged Fidelity's management to "operate from a position of strength for whatever our future may hold." (Powderly, Tr. 786; DX 73 at 2878). Fidelity continued to focus on implementing the

four main points of its October 1988 business plan, but modified its 8-10 percent growth plan to a low-risk no-growth strategy. (Powderly, Tr. 356-57, 791; Wesp, Tr. 1842-43). Only after FIRREA's implementing regulations were issued on November 7, 1989 did Fidelity see how its goodwill capital would be affected and "make some changes." (Powderly, Tr. 792; Vigna, Tr. 1410; PX 511 at 4525).

E. Changes Required by FIRREA

Congress enacted FIRREA on August 9, 1989. (Vigna, Tr. 1407; DX 557 at 2718). As part of FIRREA, the OTS replaced the FHLBB as the primary regulator of thrifts, and the FDIC became the OTS's back-up regulator. (Vigna, Tr. 1445). FIRREA required the Director of OTS to promulgate regulations establishing "tangible" capital requirements, "core" capital requirements, and "risk-based" capital requirements for thrift institutions. (DX 557 at 2835). The OTS issued implementing regulations on November 8, 1989 and they became effective on December 7, 1989. (Vigna, Tr. 1410; PX 511; Stip. 73).

FIRREA required a savings institution to maintain tangible capital in an amount not less than 1.5 percent of the institution's adjusted total assets. 12 U.S.C. § 1464(t)(2)(B); 12 C.F.R. § 567.9(a). Id. Tangible capital could not include any intangible assets, such as goodwill. 12 U.S.C. § 1464(t)(9)(c). (Stip. 74).

FIRREA and its regulations required an institution to maintain core capital of three percent of its adjusted total assets. 12 U.S.C. § 1464(t)(9)(A); 12 C.F.R. § 567.8. (Stip. 75). Core capital was defined to exclude any unidentifiable intangible assets, including goodwill. 12 U.S.C. § 1464(t)(9)(A); 12 C.F.R. § 567.5(a)(1)-(2). (Stip. 76).

FIRREA permitted a thrift to include specified amounts of "qualifying supervisory goodwill" in the calculation of core capital. Such goodwill initially was limited to 1.5 percent of total assets. The permitted amount of goodwill declined gradually each succeeding year and was phased out entirely by December 31, 1994. 12 U.S.C. § 1464(t)(3)(A); 12 C.F.R. § 567.5(a)(1)-(2). (Stip. 77).

FIRREA required savings institutions to maintain risk-based capital in an amount greater than or equal to 6.4 percent of risk-weighted assets at December 31, 1989, 7.2 percent of risk-weighted assets as of December 31, 1990, and 8.0 percent of risk-weighted assets as of December 31, 1992. 12 U.S.C. § 1464(t)(2)(c); 12 C.F.R. §§ 567.2(a)(1)-(b), 567.6. (Stip. 78). As with core capital, specified amounts of qualifying supervisory goodwill initially could be counted towards the risk-based capital requirement, but would be phased out over five years. 12 U.S.C. § 1464(t)(2)(c). (Stip. 79).

The new OTS District Director, Mr. Vigna, notified Fidelity of FIRREA's capital requirements on November 13, 1989. (PX 511). The new regulations required each thrift institution to meet three capital criteria: tangible capital, core capital, and risk-based capital. Id. Prior to the passage of FIRREA, Fidelity was in compliance with applicable capital regulations, having a capital-to-assets ratio of 5.44 percent. (PX 618 at 1642; Powderly, Tr. 392). On December 6, 1989, the day before FIRREA's capital requirements became effective, Fidelity had $125 million in regulatory capital and $62 million of GAAP capital. (DX 78 at 5445).

When FIRREA took effect on December 7, 1989, Fidelity did not meet any of the three capital requirements. (Powderly, Tr. 379, 392, 408; DX 78 at 5445; PX 509 at 1966; PX 618 at 1642-43). As of December 31, 1989, Fidelity's tangible capital was negative $29.686 million. Under FIRREA and its regulations, Fidelity was required to have tangible capital of $27.456 million. Fidelity's tangible capital deficit therefore was $57.142 million. (Stip. 82). Fidelity's core capital, including the permitted portion of supervisory goodwill, was negative $2.230 million. Fidelity was required to have core capital of $54.912 million. Fidelity's core capital deficit therefore was $57.142 million. (Stip. 83). Fidelity's risk-based capital, including the permitted portion of supervisory goodwill, was negative $2.230 million. Fidelity was required to have risk-based capital of $59.271 million. Fidelity's risk-based capital deficit therefore was $61.501 million. (Stip. 84). FIRREA instantly turned Fidelity from a profitable institution into an unprofitable institution. (Greco Dep., Tr. 89).[10]

Consistent with the above capital shortfalls caused by FIRREA, the newly created FDIC determined that as of September 30, 1989, a $57.8 million capital infusion would be necessary to bring Fidelity into capital compliance with the capital and core capital requirements prescribed by FIRREA. (Stip. 80). In a September 30, 1989 Report of Examination, the FDIC gave Fidelity a composite rating of "5," placing Fidelity in a category reserved for institutions with an "extremely high" immediate or near term probability of failure. (Stip. 81). FIRREA caused the "Capital" component of Fidelity's rating to drop from a "2" to a "5." (DX 1411 at 419; Vigna, Tr. 2764-66, 2832-33).

---

[10] Some of the regulatory capital that Fidelity lost through FIRREA is non-contractual, and is unrelated to Fidelity's merger with Suburbia. The goodwill acquired in the Dollar Federal merger, for example, amounted to $19.33 million at December 31, 1989, but is not at issue in this lawsuit. Approximately 25 percent, or $34.207 million, of Fidelity's regulatory capital was non-contractual as of December 31, 1989. (PX 502 at 259-60; PX 526 at 8366; Lovely, Tr. 1619).

F. Fidelity's Operations After FIRREA

On December 18, 1989, OTS sent a memorandum to each thrift institution, including Fidelity, that was projected to fail one or more of the new capital standards. (Vigna, Tr. 1419-23; PX 520). Attached to the memorandum were Thrift Bulletin 36, containing instructions for preparation of a Capital Plan, and Thrift Bulletin 36-1, providing guidance on interest rates, prepayment rates, and loan origination rates that could be used in preparing a Capital Plan. (PX 520). The OTS required Fidelity to submit a Capital Plan by January 7, 1990. (Vigna, Tr. 1423–24; PX 520 at 4305).

Thrift Bulletin 36 specified that a thrift filing a Capital Plan must show that it could achieve capital compliance within a reasonable time, but not later than December 31, 1994. (Vigna, Tr. 1430-37; PX 520 at 4311-4314). Thrifts were cautioned not to rely upon consultants to develop Capital Plans. Id. Thrifts were required to submit a report to OTS within 20 days after the end of each quarter listing any variances from the Capital Plan, and comparing actual capital to target capital. Id.

Fidelity's Board of Directors adopted the Capital Compliance Plan on January 3, 1990, and submitted it for approval to OTS. (Stip. 85, 86). This Plan described how Fidelity intended to comply with the capital requirements of FIRREA. (Stip. 86). Fidelity's Plan stated that "[t]he Plan contains zero growth and modest shrinkage in 1993/94." (Stip. 87). Due to Fidelity's mutual-to-stock conversion in 1993, this moderate shrinkage never occurred. (Powderly, Tr. 904; PX 986 at 4176).

Fidelity filed its Capital Plan on January 8, 1990. (PX 539). On February 2, 1990, the OTS notified Fidelity that it was "insolvent" as defined in Regulatory Bulletin 3a-1, entitled "Policy Statement on Growth for Savings Associations" ("RB 3a-1"). Under RB3a-1, "associations 'requiring more than normal supervision' or 'subject to greater restrictions' will be permitted little to no growth under this policy, subject to District Director discretion and waiver authority." (Stip. 89). RB3a-1 defined associations "requiring more than normal supervision" as "those with a composite MACRO rating of 4 or 5, associations failing any one of their minimum regulatory capital requirements, or associations otherwise identified as in need of more than normal supervision by supervisory personnel." (Stip. 90). RB3a-1 defined associations "subject to greater restrictions" as associations that were insolvent, among other things. (Stip. 91).

As an insolvent institution, Fidelity was not permitted to make new loans or investments without the permission of the OTS District Director. (Vigna, Tr. 1439-41). FIRREA also jeopardized Fidelity's opportunity to borrow in the capital markets because Fidelity lacked sufficient net worth. (Greco Dep., Tr. 164).

Fidelity likely would not have participated in the Suburbia merger had it known that FIRREA would later take away Fidelity's ability to count the goodwill toward capital requirements. (Lovely, Tr. 1572-73). From the standpoint of Fidelity's management, the Government enticed Fidelity to acquire Suburbia by promising that it would be stronger as a result of the merger, but through FIRREA, the Government took away the benefits of its agreement with Fidelity. Id. In effect, FIRREA left Fidelity with the burdens of Suburbia's excess liabilities, but not the offsetting supervisory goodwill for Fidelity to avoid violations of capital requirements as a result of the merger. Id. Fidelity would not have been able to acquire Suburbia if the goodwill generated had been amortized in accordance with GAAP, and not counted toward its regulatory capital requirements. (Teurfs, Tr. 1048).

Mr. Wesp was the principal drafter of Fidelity's Capital Plan, but he obtained consensus agreement from Fidelity's management and employees. (Wesp, Tr. 1850-52). The key features of Fidelity's Capital Plan were: (1) achieve capital compliance by December 1993; (2) realize no balance sheet growth, with slight shrinkage in 1993 to attain capital compliance; (3) eliminate risk by reducing non-performing assets, undertaking no new commercial real estate loans or business lending, increasing short term and adjustable rate assets, and avoiding new lines of business; (4) reduce retail mortgage lending and emphasize a wholesale strategy of purchasing short term and adjustable rate securities; (5) control operating expenses; (6) manage assets and liabilities to reduce earnings variability and keep earnings within tight tolerances; and (7) reject strategies such as asset growth, higher risk but more profitable lending, raising capital through private or public sources, or merging with another institution. (Kaplan, Tr. 3002-04; PDX 50).

To achieve this Capital Plan, Fidelity intended to operate on modest interest rates at very tight spreads. Fidelity hoped to reduce credit risk by making essentially no new loans, not buying any securities that were rated less than A or AA, and not adding any long-duration assets. (Wesp, Tr. 1856-59, 2198-99, 2223). Mr. Wesp planned to follow a "plain vanilla" banking strategy of adding short-term borrowings and short-term adjustable rate securities, so that earnings would increase and goodwill could be amortized. Id.

On May 18, 1990, OTS informed Fidelity that its January 1990 Capital Plan had been approved. (Stip. 92; PX 590). The OTS approved Fidelity's Capital Plan subject to certain conditions, which were to remain in effect until the District Director determined that Fidelity had met its capital requirements for two consecutive quarters. Id.

The OTS letter approving Fidelity's Capital Plan outlined a series of restrictions on Fidelity's activities while the plan remained in effect. Fidelity could not, without advance approval by the OTS District Director, take any of the following actions: (1) increase its assets in excess of the levels in the plan, and in no event by more than interest credited; (2)

make capital distributions; (3) pay executive officers and directors more than $900 per month without regulatory approval; (4) pay bonuses; (5) make or extend any loans secured by real estate; (6) make any commercial loans; (7) make any investments in real estate or equity securities; (7) enter into joint ventures or limited partnerships; (8) enter into contracts or purchase anything, even in the ordinary course of business, in excess of $10,000; (9) borrow money, except to maintain liquidity; (10) incur any material obligation or contingent liability not specifically permitted; (11) employ any new officers, directors, or senior managers; (12) hire any employee whose employment was not terminable at will; (13) open any new branch office; or (14) accept any uninsured deposit. (PX 590 at 358-64).

While Fidelity operated under the Capital Plan, Mr. Amend and Mr. Vigna approved "maybe 80 percent of everything" that Fidelity requested as a plan variance. (Wesp, Tr. 2510). Mr. Wesp testified that Mr. Amend and Mr. Vigna "were very reasonable people." Id. Mr. Wesp further observed that "Walter Amend is one of the most competent regulators that I ever had to deal with . . . . [H]e understood the loans, he understood the losses, he understood the industry, he understood the markets . . . . [He] had all the pieces it took to be a great examiner." (Wesp, Tr. 2311-12).

After FIRREA, Fidelity could not achieve the objectives of its October 1988 Business Plan because Fidelity no longer had sufficient capital to sustain the growth levels projected under the plan. (Powderly, Tr. 366). Fidelity had to reduce staff by approximately 25 percent to lower expenses. (Powderly, Tr. 380). By reducing staff from approximately 400 to 300 employees, Fidelity reduced payroll by $800,000 in 1990. (Powderly, Tr. 469; PX 686 at 0660). Fidelity could not grant salary increases or bonuses. According to Fidelity's Mr. Caporusso, "survival was the name of the game." (Caporusso, Tr. 3897-99). Fidelity had to pay its executives much less than other thrifts that were not operating under a Capital Plan. (Powderly, Tr. 529-30; 968-69). Many of the Fidelity employees who lost their jobs after FIRREA had difficulty finding new employment. (Powderly, Tr. 380). Fidelity would not have made these staffing cuts absent FIRREA's impact on Fidelity's regulatory capital. (Powderly, Tr. 862).

Fidelity had planned to expand its consumer lending and home equity loan portfolios in the years following 1988. Mr. Caporusso's February 1988 memorandum, included in Fidelity's budget, forecasted a 36 percent increase in consumer credit loans, and 52 percent increase in home equity loans. (Caporusso, Tr. 3849; DX 1203 at 1831). To implement this aggressive approach, Fidelity planned to rely upon advertising, new programs and products, and management support. (Caporusso, Tr. 3849, 3859). Fidelity also aspired to establish a telephone hotline to process loan applications and address customer service issues quickly, like some of its competitors. (Caporusso, Tr. 3853-55). After FIRREA, however, Fidelity had to curtail this strategy significantly. (Caporusso, Tr. 3860). Instead of spending

resources to create new loans, Fidelity had to sell its assets to generate earnings. (Wesp, Tr. 2373-81; PX 996 at 1053). In 1991, Fidelity sold a large portion of its home equity loans to Shawmut Bank. (Caporusso, Tr. 3886; PX 744). By abandoning its consumer lending plan, Fidelity hoped to reduce risk and expenses, including advertising costs. (Caporusso, Tr. 3861-62).

On April 12, 1990, Fidelity submitted to the OTS District Director, Mr. Vigna, its first quarter report of operation under the Capital Plan. Fidelity slightly exceeded all of its balance sheet and capital goals for this quarter. Fidelity also reported favorable developments for its real estate lending portfolio and its non-earning assets. (PX 562). Mr. Powderly communicated often with Mr. Vigna to keep him apprised of Fidelity's progress. (Vigna, Tr. 1443).

On July 20, 1990, Fidelity reported on its first six months of operations under the Capital Plan. As of June 30, 1990, Fidelity had no material variances from the assets or capital targets specified in the Capital Plan. (PX 611; Vigna, Tr. 1457). Fidelity submitted a letter and quarterly report to the OTS District Director at the conclusion of every quarter of its operations under the Capital Plan. (Vigna, Tr. 1457-58). Throughout 1990 and 1991, Fidelity was ahead of all interim capital targets. (Powderly, Tr. 457-60, 510-11; DX 2035; PX 509 at 1983; PX 785 at 1403).

On December 27, 1991, Fidelity reported to Mr. Vigna on its second year of operating under the Capital Plan. Fidelity's tangible capital was now positive, and approximately $3 million ahead of its plan. Fidelity continued to improve its asset quality and was current on the posting of loan loss reserves. (Vigna, Tr. 1469-74; PX 806A).

For the first quarter of 1992, Fidelity again achieved positive variances for all three capital requirements, including a $4 million positive variance in risk-based capital. (Powderly, Tr. 539-41; PX 852 at 8029; PX 864). Similarly, Fidelity maintained positive variances in all three capital categories for the second quarter of 1992, despite having to post an additional $1.8 million in reserves. (Powderly, Tr. 556-57; PX 851 at 0005; PX 894 at 0673). Fidelity continued its favorable performance for the third and fourth quarters of 1992, maintaining positive variances in all three capital categories. (PX 923 at 1266; PX 958 at 4443). In the two years from June 30, 1990 to June 30, 1992, Fidelity had increased tangible capital by $31.4 million. (PX 851 at 0005).

During the years 1990 through 1994, while operating under the Capital Plan, Fidelity's average annual return on tangible assets (before taxes and purchase accounting) was 0.85 percent (85 basis points). Fidelity achieved this level of profitability even as a breached bank. (Kaplan, Tr. 3038-44; PDX 60; PX 1314A, Exhibit 6). Under the Capital Plan,

Fidelity restructured its assets by originating fewer loans and emphasizing investments in mortgage-backed securities. This approach helped Fidelity lower its ratio of classified assets to total assets, and to lower credit risk and interest rate risk. (Amend, Tr. 4847-50; PX 851 at 0005, 0010, 0016). By July 1993, Fidelity had reduced non-performing loans to 3.4 percent of assets, which compared favorably to its peer group average of 7.8 percent. (PX 1029 at 2093). In Fidelity's 1993 Report of Examination, the OTS credited Fidelity with "making substantial progress in reducing problem assets." (PX 1020 at 2717).

Fidelity could have managed its classified assets more effectively if it had owned more capital. The capital of an institution absorbs losses and creates a buffer between assets and liabilities. (Beesley, Tr. 1154). Capital helps to minimize the loss on non-performing loans by allowing a thrift to hold the collateral longer and avoid a distress sale. (Finn, Tr. 4022-23). Even with the loss of capital due to FIRREA, Fidelity successfully managed its classified assets and was able to survive. (Powderly, Tr. 648-49, 807, 912-13).

While under the Capital Plan, Fidelity made some management changes that the OTS regarded as positive developments. On December 10, 1990, Mr. Greco retired, and Mr. Powderly replaced him as Fidelity's President. At approximately the same time, Mr. Wesp became Fidelity's Executive Vice President. Mr. Vigna believed that Mr. Powderly and Mr. Wesp could lead Fidelity to the successful completion of the Capital Plan. (Vigna, Tr. 1459-61; PX 659). On February 28, 1992, Mr. Powderly succeeded Mr. Lovely as Fidelity's CEO. Mr. Vigna again viewed this change favorably. (Vigna, Tr. 1474-75; PX 830 at 9002-03). Later, on September 23, 1993, Mr. Powderly replaced Mr. Lovely as Fidelity's Chairman of the Board of Directors. (Powderly, Tr. 635; PX 1038).

The federal regulators also viewed Mr. Wesp very favorably. Mr. Vigna thought he was a "very, very sound portfolio manager." (Vigna, Tr. 1454). Mr. Amend testified that Mr. Wesp was "a very knowledgeable CFO, maybe the most knowledgeable CFO I had come across," and that he helped Fidelity "dramatically." (Amend, Tr. 4622). Overall, Mr. Vigna thought that Fidelity's management "did an outstanding job" in operating under the Capital Plan. (Vigna, Tr. 1500). Considering the history of thrifts during the savings and loan crisis where "a lot of taxpayer money was spent for the insolvent institutions . . . [Fidelity] was a great success story." (Vigna, Tr. 1500-01). If Fidelity had failed after FIRREA, the taxpayers would have been responsible for the loss. (Albanese, Tr. 4219).

G. Fidelity's Mutual-to-Stock Conversion

On November 17, 1992, Fidelity informed Mr. Vigna that it planned to convert to stock ownership. Fidelity requested Mr. Vigna to approve contracts with four outside advisers who were being retained to assist in the public offering of Fidelity's stock. Mr.

Vigna approved the contracts, and supported Fidelity's public offering. (Vigna, Tr. 1488-91; PX 927; PX 932).

Thrifts convert to stock ownership as a way to raise capital. (Powderly, Tr. 585-86; PX 915 at 0572). According to a December 1992 Salomon Brothers presentation to Fidelity, thrift mutual-to-stock conversion activity had increased dramatically in recent months, raising $802.1 million of equity capital for the industry in 1992 and providing an average market return of 60.8 percent to stock conversion investors. (Stip. 100). Since the beginning of 1991, 36 thrifts had converted to public ownership, representing the highest level of conversion activity in five years and more than twice the number of conversions in 1991. Id.

Fidelity's management was concerned that the Capital Plan's restrictions and other caveats to be placed in the offering circular would cause Fidelity to fall short of achieving a full subscription for its offered shares. (Powderly, Tr. 587; PX 986 at 4183-85). Due to the increased pace of thrift conversions in 1992, Fidelity's management also feared that the market would be saturated by the time Fidelity was in a position to make a public offering. (Powderly, Tr. 592-93; PX 915 at 0573). Fidelity had considered converting from mutual to stock ownership in 1986, and had engaged in discussions with investment bankers. Fidelity concluded that it was not feasible to convert at that time for a variety of market-related reasons. (Kaplan, Tr. 3026-27). To make conversion feasible, Fidelity believed that it had to become capitalized at a level of at least five percent. (Powderly, Tr. 418-19; DX 78 at 5446, 5448).

While operating under the Capital Plan, Fidelity remained in contact with Salomon Brothers. (Wesp, Tr. 1939). Fidelity monitored other mutual-to-stock conversions and initial public offerings within the thrift industry to gauge the pricing of Fidelity's public offering. (Wesp, Tr. 1939-40). Fidelity began to discuss a possible stock conversion with Salomon Brothers in October 1992. (Powderly, Tr. 580-82; PX 915). By November 1992, Fidelity's management believed they had attained sufficient capital and that market conditions were right to initiate a public offering. (Wesp, Tr. 1940-42; PX 932 at 1234). Fidelity's Board of Directors approved the conversion plan on December 9, 1992. (Powderly, Tr. 594-98; PX 941 at 7683-85; PX 943A).

Salomon Brothers acted as lead underwriter on the offering, and Fidelity later hired Merrill Lynch to act as co-manager. Kaplan Associates, Inc. served as the appraiser. Cleary Gottlieb was Fidelity's outside legal counsel, and KPMG Peat Marwick acted as independent auditors. (Wesp, Tr. 1941-42, 1947-48; Powderly, Tr. 595; PX 932).

Fidelity submitted to the OTS an Application for Conversion on January 28, 1993, which the OTS approved. (Stip. 102, 106). Kaplan Associates valued Fidelity as of January 25, 1993 between $38.250 million and $51.750 million. (Stip. 104).

On January 26, 1993, the OTS informed Fidelity that, upon successful recapitalization of the institution, OTS would terminate the operating restrictions imposed upon Fidelity under the terms of the Capital Plan and the Capital Plan approval letter. (Stip. 109).

On May 3, 1993, Mr. Powderly reported to the OTS that Fidelity's stock offering had closed. Fidelity had sold 5,170,839 shares of stock at $11.50 per share. Mr. Powderly anticipated that net proceeds from the public offering would total approximately $57 million, which would complete Fidelity's recapitalization. (Vigna, Tr. 1498-99; PX 1012). Mr. Powderly also requested the OTS to terminate Fidelity's Capital Plan. (Stip. 110). On May 14, 1993, the OTS notified Fidelity that, as a result of its successful conversion from mutual to stock ownership, and full compliance with the capital standards approved in the Capital Plan, the OTS terminated the conditional approval of the Capital Plan and all related operating restrictions. (Vigna, Tr. 1500; PX 1015; Stip. 111).

In recognition that Fidelity's employees had endured a difficult period while the Capital Plan was in effect, Fidelity's management allocated stock options to its employees in connection with the subscription offering. (Wesp, Tr. 1966-68).

H. Astoria's Acquisition of Fidelity

After its successful public offering, Fidelity began to grow again as the restrictions of the Capital Plan had been lifted. Whereas Fidelity had been operating as a "tightly wound short-term bond fund," after the Capital Plan, it began to operate like a bank again. (Wesp, Tr. 1960-62). Although Fidelity had adequate capital following the stock conversion, its management perceived that it would be at a disadvantage in competing with other larger banks in its Long Island market that had excess capital. While Fidelity had a capital ratio of 6-7 percent, its competitors like Astoria and Roslyn Savings Bank had capital ratios of 12-13 percent. (Wesp, Tr. 1962-64). Thrifts with higher core capital levels than Fidelity were able to grow through acquisitions of other institutions. (Powderly, Tr. 623-24). Moreover, Astoria had avoided mergers with troubled thrifts in the 1980s that created supervisory goodwill. (Engelke, Tr. 4345-49, 4374). FIRREA's restrictions on the treatment of goodwill therefore did not affect Astoria. Id.

In 1994, Fidelity's management concluded that Fidelity could not compete with the larger Long Island banks, and therefore that Fidelity should pursue a merger where it would be acquired by another bank. (Wesp, Tr. 1964-65). Fidelity viewed this approach as being

in the best interests of its depositors, shareholders, and employees. Id. In preparation for a merger, Fidelity put in place a generous retention and severance policy for its employees so that, if the bank were sold, the employees would have a financial bridge to finding a new job. (Wesp, Tr. 1966-68).

After considering its options, Fidelity's management viewed Astoria as the best potential acquirer of Fidelity. Mr. Powderly contacted Astoria's CEO, George Engelke, to determine if Astoria had any interest in acquiring Fidelity. (Wesp, Tr. 1968). Mr. Engelke responded favorably, and Fidelity and Astoria began negotiations in June or July 1994. Astoria wanted to acquire Fidelity because of its profitable branch network. (Engelke, Tr. 4500, 5281-82). Fidelity's branch network was strong, with good office locations, good financial statements, and good management experience. (Engelke, Tr. 5259-60, 5267-68; PX 1228 at 0073; PX 1076 at 1169). Both entities began managing their balance sheets in anticipation of a merger, so that the combination of the entities would be as seamless as possible. (Wesp, Tr. 1971, 2525-27; PX 1117 at 3002).

Fidelity signed a definitive merger agreement with Astoria on July 12, 1994, which the parties announced by press release on July 13, 1994. (Powderly, Tr. 637-38; PX 1065 at 1275; PX 1109 at 2309-10; PX 1113). Astoria acquired Fidelity in a cash purchase transaction at a price of $29.00 per share. (Powderly, Tr. 641; PX 1109 at 2309; PX 1113 at 7675). Closing occurred on January 31, 1995. (Wesp, Tr. 1968-69, 1971; DX 3083 at 1467).

In the absence of FIRREA, Fidelity could not have transferred its remaining goodwill to Astoria as part of the merger. The Government's Assistance Agreement prohibited the assignment of goodwill to Astoria without FSLIC's consent. (PX 253 at 1160, ¶¶ 18, 19; Kaplan, Tr. 3674-77). Accounting Principles Bulletin ("APB") 16 states that, under purchase accounting for acquisitions, "[a]n acquiring corporation should not record as a separate asset the goodwill previously recorded by an acquired company." APB 16 also states that amounts should be assigned "to the individual assets acquired and liabilities assumed, except goodwill." (DX 538 at 0590-91, ¶ 88). Fidelity's goodwill did not survive the acquisition by Astoria. (Vigna, Tr. 1521-26; Engelke, Tr. 4355-56, 4359-60; Finn, Tr. 4009-10; Wesp, Tr. 2526; DX 294 at 516).

At the time of Astoria's acquisition of Fidelity, the parties discussed a potential claim that Fidelity might have against the Government due to the enactment of FIRREA, but they could not place a value on the claim. There was not enough information to know how to quantify such a claim. (Wesp, Tr. 1969-71). Neither party ascribed any value to the so-called "goodwill" claim at the time of the acquisition. (Engelke, Tr. 5298-300, 5323; Powderly, Tr. 642-43; Quackenbush Dep., Tr. 28).

Astoria had converted from a mutual association to a stock institution in November 1993, providing Astoria with a significant increase in capital. (Engelke, Tr. 4469-70; PX 1048 at 0454). Astoria raised more than $300 million in capital when it converted, issuing 13,180,852 shares at $25.00 per share. (Engelke, Tr. 4484, 5315-16; PX 1048 at 0454). Like Fidelity, Astoria also encountered problems in managing commercial real estate loans during the 1980s and early 1990s. With more capital, Astoria had a greater ability to resolve its real estate problems successfully. (Finn, Tr. 4017-32; Engelke, Tr. 4342-45, 4388; DX 3031 at 0025-26; DX 3332 at 1524-26). As evidence that Astoria consistently had excess capital, Astoria often used its capital to repurchase shares of common stock during 1994 through 2005. (Engelke, Tr. 4500-01; Amend, Tr. 4696; PX 1190 at 5620; PX 1228 at 0113; DX 32 at 1347; DX 1842 at 0199; DX 1844 at 1662; DX 1845 at 1420, 1516, 1534; DX 3109 at 0087, 0106; DX 3110 at 0227, 0252; DX 3111 at 0374, 0396; DX 3112 at 0522, 0545; DX 285 at 0754, 0772; DX 289 at 1029, 1046).

I. Expert Witnesses

1. Plaintiff's Expert, Dr. Donald Kaplan

Dr. Donald Kaplan testified as an expert witness for Plaintiff. Dr. Kaplan was educated at the University of California, Los Angeles (UCLA). He received a Bachelor of Science degree in 1965, a Masters degree in Business Administration ("MBA") in 1966, and a doctorate degree in Finance in 1969. He became a faculty member at the Harvard Business School, concentrating on the MBA program where he taught corporate financial management. He began doing consulting work for financial institutions while teaching at Harvard. (Kaplan, Tr. 2631-32; PX 1314A, Exhibit 1).

In 1970, Dr. Kaplan began doing consulting work at the FHLBB. Dr. Kaplan and Dr. Pratt participated in an instructional program for financial analysts who were slated to become examiners. (Kaplan, Tr. 2632-33). In 1973, Dr. Kaplan joined the FHLBB as Deputy Director of the Office of Economic Research. He also served as adviser to the Bank Board's members and to the FSLIC on economic and financial matters. (Kaplan, Tr. 2632-35).

In late 1977, Dr. Kaplan started his own consulting business, Kaplan Smith & Associates. His firm worked with thrift institutions on business strategies, growth plans, geographic expansion, branch network expansion, profitability and capital compliance. (Kaplan, Tr. 2639-41; PX 1314A, Exhibit 2). In 1987, First Boston Corporation, a New York investment bank, acquired Kaplan Smith. Dr. Kaplan became involved in capital raising transactions for thrifts, principally doing conversion appraisals. In 1991, Dr. Kaplan ended his relationship with First Boston, then known as Credit Suisse First Boston, and

started Kaplan Associates. Dr. Kaplan has remained with Kaplan Associates to the present time. (Kaplan, Tr. 2648; PX 1314A, Exhibit 1).

Dr. Kaplan's firm has been involved in approximately 130 thrift merger transactions, advising both buyers and sellers. (Kaplan, Tr. 2645-46). Although he is not an accountant, Dr. Kaplan has spent most of his career working with regulatory accounting concepts and the financial statements of thrift institutions. He has an understanding of accounting principles and techniques used in mergers of financial institutions. (Kaplan, Tr. 2648). Dr. Kaplan also has been involved in the purchase and sale of bank or thrift branches, fairness opinions for various transactions, preparation of business plans, capital plans for thrift institutions, and mortgage banking. (Kaplan, Tr. 2657-63; PX 1314A, Exhibit 2). He has been retained both by federal agencies and private entities as an expert witness in litigation. Some of this work has involved issues stemming from FIRREA. (Kaplan, Tr. 2650-53). Dr. Kaplan has testified in other *Winstar* cases. (Kaplan, Tr. 2653-55; PX 1314A, Exhibit 1 at 7-8).

The Court found Dr. Kaplan to be a credible expert witness. The Court agrees with the assessment of Dr. Kaplan in another *Winstar* case that he "proved himself to be a knowledgeable, thorough and credible witness" whose demeanor under cross-examination was "calm, business-like, confident, and careful." First Fed. Sav. & Loan Ass'n of Rochester v. United States, 76 Fed. Cl. 106, 121 (2007).

2. Defendant's Experts

Defendant presented the testimony of three experts: Dr. David Rochester, Mr. David Kennedy, and Dr. Andrew Carron.

Dr. Rochester is the Chairman and CEO of Capital Resources, Inc., a firm that provides investment banking and consulting services to financial institutions and other companies nationally. (Rochester, Tr. 4982-83). Dr. Rochester received his undergraduate degree from Clemson University in 1968, majoring in economics. (Rochester, Tr. 4984). He received a masters degree in economics from North Carolina State University in 1970, and a PhD in Finance from the University of Georgia in 1974. Id. In 1976, he was a Visiting Research Scholar at the FHLBB, and in 1977-1980, he was a Senior Financial Economist at the FSLIC. (Rochester, Tr. 4992-94). He served also as a Professor and Adjunct Lecturer at major universities, a Director at Concord Savings Association, a Senior Vice President at Kaplan Smith & Associates (1980), and a founder, Chairman, and CEO of the Financial Strategy Group (1983-1991). (Rochester, Tr. 4998-5005; DX 654, Exhibit 1). The Court accepted Dr. Rochester as an expert in finance and investment banking, specifically in the area of valuation of depository financial institutions, including the financial analyses that are performed in mergers and acquisitions of banks and thrifts. (Rochester, Tr. 5015, 5025-26).

Mr. Kennedy is CEO of a firm called alseT IP fund. (Kennedy, Tr. 5196). Mr. Kennedy received his undergraduate degree from the University of Georgia in 1985, majoring in accounting. He is a certified public accountant. (Kennedy, Tr. 5185). Mr. Kennedy worked in the financial institutions practice area and the financial advisory services group for Coopers & Lybrand from 1985 through 1992. (Kennedy, Tr. 5185-86, 5189). He participated in many thrift mergers and acquisitions while at Coopers & Lybrand. (Kennedy, Tr. 5187). Mr. Kennedy joined Peterson Consulting in 1992 to head that firm's Atlanta office. (Kennedy, Tr. 5191). Mr. Kennedy's duties at Peterson Consulting included the management of contracts and assets for the Resolution Trust Corporation ("RTC") and the FDIC. He examined the resources of "over a hundred different institutions" while serving the RTC and FDIC. (Kennedy, Tr. 5192). In 1998, Mr. Kennedy became involved in venture capital, and later started a firm called Intellectual Property Asset Corporation, assisting other companies in maximizing the value of intellectual property. (Kennedy, Tr. 5195). He has testified in other cases as an expert witness, including *Winstar* cases. (Kennedy, Tr. 5197-98). The Court accepted him as an expert in damages, generally accepted accounting principles, and accounting as it relates to financial institutions. (Kennedy, Tr. 5199-200, 5206).

Dr. Carron is President of NERA Consulting, a firm engaged in micro-economics consulting work internationally. (Carron, Tr. 5646). He received his undergraduate degree in economics from Harvard University in 1973. He has a masters degree and a PhD in economics from Yale University, received in 1977 and 1980 respectively. (Carron, Tr. 5634; DX 1147, Exhibit 1). After graduating from Harvard, and again after completing his doctorate, Dr. Carron worked at the Brookings Institution in Washington, D.C. (Carron, Tr. 5635-36). He has authored many books and articles relating to the thrift industry. (Carron, Tr. 5636-37; DX 1147, Exhibit 1). He testified before the Senate Banking Committee in 1982 and 1983, in hearings leading to the passage of the Garn–St. Germain Act. (Carron, Tr. 5638). He has testified before Congressional committees on other occasions as well. (Carron, Tr. 5638-39). From 1984 to 1986, he worked for Lehman Brothers in the mortgage finance area, and then he moved to the firm that is now known as Credit Suisse. (Carron, Tr. 5641). He has testified as an expert witness on many occasions, including *Winstar* cases. (Carron, Tr. 5646; DX 6000). The Court accepted him as an expert in financial economics, thrift industry structure and performance, mortgage and capital markets and products, thrift industry asset and liability management, economic damages, and government policy and regulation of the thrift industry. (Carron, Tr. 5653-54, 5656).

As with Dr. Kaplan, the Court found all three of Defendant's experts to be credible, experienced, and knowledgeable witnesses. All of the expert witnesses were helpful to the Court in analyzing the damages issues presented.

## Analysis

A party asserting a claim for breach of contract generally may recover under any of three damages theories: (1) expectancy damages, which are intended to put the injured party in as good a position as it would have been in had the contract been performed; (2) restitution damages, which are intended to restore to the injured party the benefit it has conferred on the other party; and (3) reliance damages, which are intended to put the injured party in as good a position as it would have been in if the contract had not been made. Globe Sav. Bank, FSB v. United States, 65 Fed. Cl. 330, 345 (2005) (citing Restatement (Second) of Contracts, § 344 (1981)).

Plaintiff asserts alternative damages claims in this case using each of the three theories identified above. Plaintiff claims expectancy damages in the form of lost profits that Fidelity and Astoria would have realized through 2014 if the contract had been completely performed. Plaintiff claims restitution damages measured by the net benefit that Fidelity conferred on the Government in not having to liquidate Suburbia. Plaintiff claims reliance damages measured by the net liabilities assumed when Fidelity acquired Suburbia, treating the $160 million in goodwill as an expense incurred by Fidelity. Plaintiff also has asserted "wounded bank" damages as a component under each of the three alternative damages claims. The Court will address each of Plaintiff's three theories of recovery below.

### A. Lost Profits

#### 1. Requirements – Causation, Foreseeability, and Reasonable Certainty

Damages for lost profits are recoverable where a plaintiff demonstrates that: (1) the loss was the proximate result of the breach; (2) the loss of profits resulting from the breach was foreseeable; and (3) the damages can be proven with reasonable certainty. La Van v. United States, 382 F.3d 1340, 1351 (Fed. Cir. 2004); Bluebonnet Sav. Bank, FSB v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001); Holland v. United States, 75 Fed. Cl. 483, 489 (2007); Globe Sav. Bank, 65 Fed. Cl. at 345; Commercial Fed. Bank, FSB v. United States, 59 Fed. Cl. 338, 344 (2004). The determination of the existence of lost profits and the calculation of the amount are questions of fact. Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1350 (Fed. Cir. 2001).

The first requirement is a showing of causation. The Federal Circuit has enunciated three potential causation standards under which a plaintiff can show that the lost profits were the proximate result of the breach: the "but for" test, the "substantial factor" test, and the "definitely established" test. Recently, the Federal Circuit held that any of these three causation standards may be appropriate in *Winstar* cases. The Court stated:

> There have been a number of *Winstar*-related cases in which this court, in sustaining the Court of Federal Claims' award or rejection of lost profits damages, approved that court's use of the "but for" theory of causation. See, e.g., First Heights Bank, FSB v. United States, 422 F.3d 1311 (Fed. Cir. 2005); La Van v. United States, 382 F.3d 1340 (Fed. Cir. 2004). We do not read those cases, however, as announcing any broad rule that the "but for" theory of causation must always, or even generally, be used in determining damages in *Winstar*-related cases or prohibiting the trial court from using the "substantial factor" test in appropriate cases.
>
> California Federal Bank v. United States, 395 F.3d 1263 (Fed. Cir. 2005) is not inconsistent with this analysis and conclusion. There the Court of Federal Claims applied a "definitely established" standard of causation.

Citizens Fed. Bank, FSB v. United States, 474 F.3d 1314, 1319 (Fed. Cir. 2007). The Court also observed that "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." Id. at 1318. See also Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005) ("Damages for breach of contract are recoverable where . . . the breach is a substantial causal factor in the damages."); Bluebonnet Sav. Bank, 266 F.3d at 1356 (In *Winstar* case, "the Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs."); First Fed. Sav. & Loan Ass'n of Rochester, 76 Fed. Cl. 106, 113 (2007) (noting the trial court's discretion to select appropriate causation standard).

Even when the "but for" causation standard is applied, the law does not require the plaintiff to show that the breach was the sole cause for the loss of profits. In California Federal Bank v. United States, 395 F.3d 1263 (Fed. Cir. 2005), the Court explained that the "but for" standard does not strictly preclude lost profits that are the result of the breach and other elements "operating in confluence with the breach." Id. at 1268 (citing E. Allan Farnsworth, Contracts § 12.1, at 150-51 (3d ed. 2004)).

With regard to foreseeability, damages are foreseeable if they "follow from the breach of contract in the ordinary course of events" or if they are the result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know. LaSalle Talman Bank, FSB v. United States, 64 Fed. Cl. 90, 98 (2005); Home Sav. of Am., FSB v. United States, 57 Fed. Cl. 694, 706 (2003); see also Precision Pine & Timber, Inc. v. United States, 72 Fed. Cl. 460, 480 (2006) ("The rule does not require that anything should have

been foreseeable to a dead certainty . . . . The rule merely requires that the injury must be one of such a kind and amount as a prudent person would have realized to be a probable result of the breach.") (quoting 11 Corbin on Contracts § 56.7 (1964)).

In *Winstar* cases, the Court has held that the foreseeability requirement is satisfied where regulators knew or should have known that a bank intended to leverage its supervisory goodwill and capital credit. Citizens Fin. Servs., FSB v. United States, 64 Fed. Cl. 498, 504 (2005). The cases acknowledge that government regulators expected thrifts to profit from the use of supervisory goodwill on their books after government-assisted mergers. LaSalle Talman, 64 Fed. Cl. at 98. In Commercial Federal Bank, FSB v. United States, 59 Fed. Cl. 338 (2004), the Court observed:

> . . . [I]t was foreseeable that as a result of the elimination of goodwill from regulatory capital, plaintiff would need either to replace the supervisory goodwill with another form of capital or shrink its assets to maintain its capital cushion . . . . These consequences were not only foreseeable, they were a basic reason for the enactment of the breaching provisions of FIRREA.

Id. at 354; see also First Fed. Lincoln Bank v. United States, 73 Fed. Cl. 633, 650 (2006) (holding that bank needed either to "replace the supervisory goodwill with another form of capital or shrink its assets to improve its capital position, in order to be as well off as it would have been had the contract been fully performed."). The Court accepts the rather obvious proposition that Fidelity valued the ability to count $160 million in supervisory goodwill toward its regulatory capital, and that Fidelity would not have acquired Suburbia in 1984 without this provision. (Lovely, Tr. 1572-73, 1622-23). Both parties understood that recording the goodwill as capital was central to the transaction.

The requirement for reasonable certainty is satisfied "if the evidence adduced enables the court to make a fair and reasonable approximation of the damages." Slattery v. United States, 69 Fed. Cl. 573, 576 (2006) (citing Locke v. United States, 151 Ct. Cl. 262, 267, 283 F.2d 521, 524 (1960)). In *Winstar* cases, the Federal Circuit has observed that "[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." Bluebonnet Sav. Bank, 266 F.3d at 1355. The Federal Circuit embraces the principle that "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1374 (Fed. Cir. 2003); see also Hughes v. United States, 71 Fed. Cl. 284, 303 (2006) (same).

Breach of contract damages often are determined hypothetically, where the Court must examine what would have happened in the absence of the breach. See First Fed. Sav. & Loan Ass'n of Rochester, 76 Fed. Cl. at 123 (noting that Dr. Kaplan's testimony regarding "what would have happened in a world that never was" provided a "sufficient and sound basis" for the Court's assessment of lost profits). A lost profits model is more likely to gain acceptance where it is based upon the assumed continuation of actual demonstrated performance prior to the breach. Commercial Fed. Bank, 59 Fed. Cl. at 351 ("Although plaintiff's model uses a process of projection, it is grounded in the actual performance of the bank both pre-FIRREA and post-conversion.").

2. Dr. Kaplan's Methodology

Plaintiff's expert, Dr. Kaplan, developed a lost profits model to represent an estimate of the profits Fidelity likely would have realized in the absence of the Government's breach of contract. Dr. Kaplan's lost profits model is based on four underlying assumptions: (1) the volume of the incremental assets that could have been added if the breach of contract had not occurred and Fidelity had more capital than it did (the assumed growth rate); (2) the composition of the incremental assets and the source of the funds used to purchase those assets; (3) the profitability of the incremental assets (the interest rate "spread" between the rate of return on the assets and the interest rate associated with the cost of funds used to purchase the assets); and (4) the availability of the incremental assets for investment. (Kaplan, Tr. 3044-47).

Dr. Kaplan did not construct his lost profits model as a strategy for running an entire thrift institution. He developed the model simply to quantify the incremental earnings that Fidelity could have earned if it had not lost capital due to the Government's breach. (Kaplan, Tr. 3396-98; 3422-23). The incremental lost profits portfolio is not a "risk controlled arbitrage" ("RCA") as that term is used in the financial industry. An RCA is a strategy in which longer maturity assets are funded with shorter maturity liabilities, and a hedging strategy is used to adjust for the difference in maturities. (Kaplan, Tr. 3475-77).

Dr. Kaplan calculated the volume of incremental assets by subtracting Fidelity's actual tangible assets for a specific period from the tangible assets it would have had if the breach had not occurred. These assets are known as the "but-for tangible assets." To calculate the "but-for tangible assets," Dr. Kaplan used an assumed rate of growth. (Kaplan, Tr. 3052-53; PDX 63).

Dr. Kaplan's net interest spread represents a conservative estimate of the minimum rate of return that Fidelity would have earned on the incremental assets. Dr. Kaplan did not preclude the possibility that Fidelity would earn a higher rate of return, but he based his

calculation on the minimum rate Fidelity would expect to earn. (Kaplan, Tr. 3053-54). Multiplying the incremental assets for a particular period times the interest rate spread yields the lost profits for that period. (Kaplan, Tr. 3054).

Dr. Kaplan assumed that Fidelity's incremental assets would be adjustable rate mortgage-backed securities. Dr. Kaplan did not preclude the possibility that Fidelity would choose to invest in other types of tangible assets on which it might earn a higher rate of return, but he chose adjustable rate mortgage-backed securities because of testimony that these securities always were available for investment. (Kaplan, Tr. 3046-47). Fidelity regularly invested in mortgage-backed securities. From March 1988 to December 1994, Fidelity increased its investment in adjustable rate mortgage-backed securities from 18 to 55 percent of its earning assets. (Kaplan, Tr. 3080-82; PDX 67). This change in asset mix reflected Fidelity's increased reliance on a "wholesale strategy." Fidelity's strategy reduced credit risk, and made the institution less vulnerable to the risks of such factors as war, recession, and other economic disruptions. (Kaplan, Tr. 3083; PDX 67).

It is relevant to consider Fidelity's actual growth rate during the decade preceding FIRREA. From December 1979 to June 1989, Fidelity's compound annual growth rate was 28.2 percent. However, this growth calculation includes Fidelity's growth by the acquisition of Dollar Federal on June 30, 1982, and the acquisition of Suburbia on October 31, 1984. Looking only at growth from operations, Fidelity grew at an annual rate of 16.5 percent from December 1979 to the date of the Dollar Federal acquisition. Fidelity then grew at the rate of 13.9 percent from July 1, 1982 to the date of the Suburbia acquisition. Fidelity then grew at the rate of 14.7 percent from October 31, 1984 to June 1989. (Kaplan, Tr. 3055-61; PDX 64; PX 1314A, ¶¶ 53, 54).

In his lost profits model, Dr. Kaplan used an assumed growth rate of two percent per quarter. Although this growth rate is less than Fidelity's actual experience from December 1979 to June 1989, it is consistent with the projections in Fidelity's October 1988 Business Plan calling for annual growth of 8-10 percent. The assumed growth rate also is consistent with Fidelity's budget projections in January 1989. (Kaplan, Tr. 3062-70; PDX 65; PX 1314A, ¶¶ 32, 33). Dr. Kaplan applied his two percent quarterly growth rate to tangible assets. (Kaplan, Tr. 3075-76).

Prepayment risk exists both in loans and mortgage-backed securities. An experienced thrift manager such as Fidelity's Mr. Wesp knows that such risk exists and he manages the institution's portfolio of mortgage securities to minimize this risk. To account for prepayment and other risks, Dr. Kaplan selected an 80 basis point spread for his incremental portfolio rather than the higher spreads that Fidelity historically had achieved. (Kaplan, Tr. 3402-03, 3473-74).

The mortgage market experienced four prepayment surges between 1991 and 1994. Despite these surges, and despite operating under the restrictions of the Capital Plan in 1991-1993, Fidelity still achieved significant profitability. Mr. Wesp, a seasoned financial manager, dealt successfully with prepayment risks. (Kaplan, Tr. 3415-18; DX 666 at 4930).

Dr. Kaplan used borrowings from the Federal Home Loan Bank as the funding source for his hypothetical portfolio of incremental assets. These borrowings are more expensive than other sources of funding, but the longer maturities of Federal Home Loan Bank borrowings are a better match to the mortgage-backed securities investments. As with the selection of assets, Dr. Kaplan chose a funding source that Fidelity already was using. (Kaplan, Tr. 3087-91; PDX 68). Thus, Dr. Kaplan minimized interest rate risk in the portfolio by using a funding source that was not the least costly, but whose loans matched closely the duration of the assets purchased. Dr. Kaplan also minimized credit risk in the hypothetical portfolio by using government agency and AA-rated mortgage-backed securities. (Kaplan, Tr. 3090-91).

From March 1990 to September 1994, Fidelity's actual yield on its mortgage-backed securities less the cost of all of its borrowings averaged 1.14 percent, or 114 basis points. (Kaplan, Tr. 3095-3102; PDX 71). From July 1989 to December 1994, Fidelity's actual spread on its adjustable rate mortgage-backed securities and the cost of one-year advances from the Federal Home Loan Bank of Des Moines was 1.53 percent or 153 basis points. Dr. Kaplan used the rates from the Federal Home Loan Bank of Des Moines because it had published data for the complete period, whereas the Federal Home Loan Bank of New York did not. Dr. Kaplan determined that there was no significant difference between the rates of the two banks. (Kaplan, Tr. 3106-12; PDX 72, 73).

Taking into account Fidelity's 85 basis point return on all of its tangible assets, Fidelity's 114 basis point return on all of its mortgage-backed securities, and the 153 basis point spread between adjustable rate mortgage-backed securities and one-year Federal Home Loan Bank borrowings, Dr. Kaplan made the judgment that 80 basis points was the proper return for his hypothetical portfolio of incremental assets. (Kaplan, Tr. 3112-18; PX 1314A, ¶ 59). In selecting an 80 basis point spread, Dr. Kaplan made allowance for factors beyond Fidelity's control, such as the economic effects of the First Gulf War, a recession, retail competition, local market conditions, and prepayment risk. (Kaplan, Tr. 3115-17). The Court finds the 80 basis point spread to be fair, reasonable, and conservative. Fidelity likely would have earned more.

Dr. Kaplan also concluded that Fidelity would have had no difficulty purchasing up to $1 billion of incremental mortgage-backed securities to implement the hypothetical incremental portfolio. Fidelity historically had purchased and sold mortgage-backed

securities in these amounts. (Kaplan, Tr. 3118-24). Fidelity's Capital Plan and 1994 Business Plan called for cash flow in excess of loan originations to be invested in mortgage-backed securities. Fidelity considered "cash flow" to include wholesale borrowings. (DX 78 at 5450; PX 1081 at 1064). The capital markets provided an adequate supply of mortgage-backed securities to meet Fidelity's investment needs. (Powderly, Tr. 1006; PX 1081 at 1064).

3. Dr. Kaplan's Model Meets the Requirements for Lost Profits Recovery.

The Court is persuaded that Dr. Kaplan's lost profits model meets the requirements of causation, foreseeability, and reasonable certainty. Dr. Kaplan's model is especially convincing because it is based on the assumed continuation of Fidelity's wholesale investment strategy utilized before the breach. It is not difficult to see that, but for the Government's breach, Fidelity could have continued investing in mortgage-backed securities under Mr. Wesp's direction, and could have realized an 80 basis point level of earnings at an assumed growth rate of two percent per quarter.

The Court reaches this conclusion under either the "but for" or the "substantial factor" standard of causation. Defendant has maintained throughout these proceedings that Fidelity's ill-advised commercial real estate loans would have rendered Fidelity a "troubled thrift" regardless of the passage of FIRREA, but the Court does not accept this proposition. Despite the commercial real estate loans, Fidelity always showed earnings year after year. Although the commercial real estate loans were not insignificant, they were at all times a relatively small percentage of Fidelity's overall asset portfolio. Fidelity managed these problem loans effectively, especially after the arrival of Mr. Powderly and Mr. Wesp in 1986.

Moreover, some of the commercial real estate loans already were a part of Fidelity's portfolio when the Government approved of the Fidelity-Suburbia merger in October 1984. (Albanese, Tr. 4196-4201). The Government was pleased to have Fidelity as a willing purchaser that would rescue Suburbia from its downward spiral. Fidelity's commercial real estate ventures did not dissuade the Government from proceeding with Fidelity when the Government's interests in saving Suburbia were at stake. The Court cannot accept the contention that Fidelity was good enough for the Government in 1984 when needed to bail out a failing Suburbia, but not good enough to merit a damages award after the Government's breach. Under either causation standard, the Court finds that the passage of FIRREA caused damage to Plaintiff that can be measured with reasonable certainty through Dr. Kaplan's lost profits model.

4. The Period for Recovery

Dr. Kaplan has calculated lost profits using three alternative starting dates, depending upon the Court's findings of when Fidelity first altered its operations as a result of impacts from FIRREA. The first date is January 1, 1989, reflecting Dr. Kaplan's view that Fidelity was aware of and was reacting to legislative developments even before the enactment of FIRREA. (Kaplan, Tr. 3144). The second date is January 1, 1990, the beginning of the quarter immediately after FIRREA took effect. Id. The third date, offered for the first time at trial, is July 1, 1989, representing an intermediate beginning point to calculate lost profits. Defendant objected to the July 1, 1989 start date as a "new damages theory" and the Court sustained this objection. (Tr. 2548-2611).

As between January 1, 1989 and January 1, 1990, the Court finds that the later start date for calculating lost profits is more reasonable. By January 1, 1990, FIRREA was in effect, and the OTS had directed Fidelity to submit a highly restrictive Capital Plan for the regulators' approval. In the absence of FIRREA, Fidelity would not have had a low MACRO rating, and would not have been a "troubled thrift." Fidelity's regulatory capital would have met pre-FIRREA capital requirements. Fidelity would not have been forced to operate under a Capital Plan. The effective date of FIRREA, December 7, 1989, is the point where the Government's breach began having a significant restrictive impact on Fidelity's operations. Although many of the components of Fidelity's October 12, 1988 Business Plan appear similar or identical in material respects to the January 3, 1990 Capital Plan (*compare* PX 447 *and* DX 78), Fidelity had scrapped the planned growth rate of 8-10 percent annually. Without the restrictions of the 1990 Capital Plan, Fidelity could have continued its pursuit of the growth patterns of the previous decade.

Plaintiff has argued for the earlier January 1, 1989 date to begin its lost profits calculation, asserting that Fidelity had anticipated the passage of FIRREA when, on December 15, 1988, the FHLBB issued a notice of proposed rule-making to amend the capital guidelines for thrift institutions. (PX 511). Legal authority certainly exists to warrant the award of pre-breach damages, where there is evidence of an anticipatory repudiation, and the injured party reasonably undertakes efforts to mitigate damages. The Federal Circuit has recognized that damages in *Winstar* cases may pre-date the actual passage of FIRREA. In Bluebonnet Savings Bank, FSB v. United States, 466 F.3d 1349 (Fed. Cir. 2006), the Court noted trial testimony that the impending enactment of FIRREA caused a "pre-breach chill," and approved of the trial court's holding that the "harm extended to a pre-FIRREA time-frame." Id. at 1357. The recovery of pre-breach damages stems from the injured party's obligation to mitigate damages "[o]nce a party has reason to know that performance by the other party will not be forthcoming." Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1375 (Fed. Cir. 2005) (quoting Restatement (Second) of Contracts, § 350, cmt. b

(1981)); see also Hughes Comm. Galaxy, Inc. v. United States, 271 F.3d 1060, 1066-68 (Fed. Cir. 2001) (affirming award of injured party's pre-breach mitigation costs); S. Nuclear Operating Co. v. United States, 77 Fed. Cl. 396, 407 (2007) ("The critical factor in determining . . . a plaintiff's duty to mitigate is whether the method he employed to avoid consequential injury was reasonable under the circumstances existing at the time." (internal citations omitted)).

Here, however, the evidence is at best inconclusive. No clear statement exists of the Government's anticipatory repudiation. In the highly regulated thrift industry, notices of proposed rule-making and draft legislation appear frequently. The record in this case alone is replete with proposed regulatory changes and recommendations. It is not plausible that an affected thrift would begin mitigating damages upon first seeing drafts of new rules or legislation. The Court is mindful of Mr. Vigna's testimony that "[s]omething was coming, like a train . . . at the end of the tunnel." (Vigna, Tr. 1413). However, industry rumors and draft proposals are not enough to constitute an anticipatory repudiation. The passage of FIRREA on August 9, 1989 constituted the first firm guidance on which a prudent thrift could rely in beginning its mitigation efforts, but even then our Court has observed that strict compliance with FIRREA was not yet mandated:

> . . . FIRREA did not legally require plaintiffs to act in any certain way before the effective date of the regulations. Until that time, plaintiffs could legally conduct themselves in accordance with the forbearance agreements, even if the agreements were directly contradicted by the terms of FIRREA. While common sense and business judgment would undoubtedly lead the affected thrifts to prepare to meet the new standards, this does not transform an anticipatory breach into an actual one. Many, if not most, anticipatory breaches lead the opposing party to prepare for an actual breach. But that preparation derives from common sense, not legal obligation.

Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 184 (1997). The Court simply has no evidence of an anticipatory repudiation prior to the August 9, 1989 passage of FIRREA. Not until that date did a thrift have reason to know that performance by the Government would not be forthcoming. See Restatement (Second) of Contracts, § 350, cmt. b (1981).

Similarly, the Court has no compelling evidence that Fidelity began preparing for FIRREA as early as January 1, 1989. Aside from the fact that Fidelity could not have known

in advance what FIRREA's timing or capital requirements would be,[11] no business record exists to show that Fidelity reacted in early 1989 in anticipation of new capital requirements. The most that could be said is that Fidelity's management generally was trying to amass capital as part of an overall business strategy. The fact that such a strategy coincidentally would be consistent with anticipating FIRREA is not a basis to award pre-breach damages.

The most reasonable end date for the calculation of Fidelity's lost profits is January 31, 1995, the date on which Fidelity merged with Astoria. Even in the absence of FIRREA, Fidelity could not have counted its goodwill as regulatory capital upon merging with Astoria. See PX 253 at 1160, ¶¶ 18, 19 (Assistance Agreement prohibited assignment of goodwill to Astoria without the consent of the Government). Moreover, the applicable Accounting Principles Bulletin provides that goodwill should not transfer to an acquiring company as a recorded asset. (DX 538 at 0590-91, ¶ 88). All witnesses who addressed this issue agree that Fidelity's goodwill did not survive the acquisition by Astoria. (Wesp, Tr. 2526-27) (cash transaction meant the "eradication" of the acquired institution's goodwill); (Kaplan, Tr. 2913) (net worth of acquired institution extinguished in mark-to-market evaluation process); see also Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 161-64 (2006) (on facts presented, supervisory goodwill and Assistance Agreements were not transferable even absent a breach), aff'd, No. 2007-5054, slip op. at 1 (Fed. Cir. Jan. 8, 2007). Moreover, the evidence overwhelmingly supports a conclusion that Astoria never lacked for capital, as evidenced by the many occasions when it used excess capital to repurchase shares of outstanding stock.

A possible earlier date for ending the lost profits calculation is May 1993, when Fidelity successfully raised $57 million in new capital from its public stock offering. At that point, Fidelity became capital compliant with all regulatory requirements, and the regulators terminated Fidelity's Capital Plan. Fidelity was then free to pursue its business operations as it could have prior to FIRREA. However, Fidelity still was not as strong as it might have been in May 1993 if it had not endured the Government's Capital Plan for 3-1/2 years. In the absence of the Government's breach, Fidelity could have set a higher price per share in its public offering, and could have raised more than $57 million in new capital. Therefore, the Court finds that Plaintiff's lost profits should not end as of the date of the mutual-to-stock conversion, but should continue through January 31, 1995, the date of Fidelity's merger with Astoria.

---

[11] Defendant's expert, Dr. Carron, testified that there was no way for Fidelity's management to know, in January 1989, what requirements would be imposed by FIRREA's regulations in December 1989. (Carron, Tr. 5690-91). Mr. Vigna testified that the ultimate treatment of goodwill was unknown until the final regulations came out. (Vigna, Tr. 1411-13).

Using the data provided by Dr. Kaplan, Fidelity may recover lost profits from January 1, 1990 through January 31, 1995. Dr. Kaplan's calculation is shown in PX 1314A, Exhibit 9B (Revised). In this exhibit, Dr. Kaplan calculates lost profits through December 1994, which is the end of a three-month reporting period. To add lost profits for January 1995, the Court applied one-third of Dr. Kaplan's last quarterly entry for lost profits, $1,048,468, to arrive at an amount for one month, $349,489. This amount for January 1995 is added to the total lost profits of $14,261,668 shown on Dr. Kaplan's Exhibit 9B, for a revised total of $14,611,157.

B. "Wounded Bank" Damages

Fidelity's claim for "wounded bank" damages is based on the higher assessments paid to the OTS and the higher insurance premiums paid to the FDIC. The higher assessments and insurance premiums are attributable to Fidelity being considered a "troubled" institution following the Government's breach of contract. (Kaplan, Tr. 3170-71; PDX 87).

Between October 1, 1990 and June 30, 1993, the OTS made assessments for a thrift's examination at two levels, a General Rate and a Premium Rate. Due to the passage of FIRREA, and Fidelity's inability to treat supervisory goodwill as regulatory capital, the OTS treated Fidelity as a "troubled" institution, and charged Fidelity at the Premium Rate for its examination assessments. If Fidelity had been permitted to count its supervisory goodwill as capital, Fidelity would not have been undercapitalized, and would have been charged at the General Rate. The difference between these two rates for the period October 1, 1990 and June 30, 1993 is $436,804. (Kaplan, Tr. 3170-75; PDX 89; PX 1314A, Exhibit 10).

Defendant contends that Fidelity, with its "4" MACRO rating, would have been charged the Premium Rate even aside from the Government's breach, but the Court does not accept this proposition. As noted earlier, the Government's composite rating of Fidelity as a "4" in October 1987 (DX 69A) does not appear justified. In the five individual categories, Fidelity received three "2's," one "3" for management, and one "4" for asset quality. A simple average of equally weighted components would produce a composite rating of "2.6" instead of "4," and a good case could be made for a management rating of "2" instead of "3" in light of the uniformly favorable impression of Messrs. Powderly, Wesp, and Meyer. Further, if Fidelity had continued to count goodwill as regulatory capital, it would have had an increased ability to address its commercial real estate loans more effectively. Fidelity could have managed its problem assets in a way that it would not have been deemed a troubled institution. (Kaplan, Tr. 3175-78).

The FDIC's Savings Association Insurance Fund ("SAIF") premiums are based on a combination of the institution's capitalization status and the overall rating the institution

received on its most recent OTS examination. (Kaplan, Tr. 3179-80; PDX 90). Due to the Government's breach of contract, the FDIC deemed Fidelity to be "undercapitalized" for the SAIF assessment periods January through June 1993, and July through December 1993. If the Government had not breached the contract through passage of FIRREA, the FDIC would have deemed Fidelity "well capitalized" for each of these periods. Moreover, if the Government had not breached the contract, Fidelity's rating likely would have been at least one level higher in each of the four assessment periods from January 1993 through December 1994. (Kaplan, Tr. 3179-82; PDX 90; PDX 91; PX 1314A, Exhibit 11).

Due to the Government's breach of contract, Fidelity paid higher SAIF assessments in each of the four assessment periods from January 1993 through December 1994. The total of Fidelity's excess assessments was $994,926. Id. Total "wounded bank" damages are $1,431,730.

C. Restitution

Plaintiff's $128.259 million restitution claim is premised upon the assumption that, by acquiring Suburbia in October 1984, Fidelity spared the Government the cost of liquidating Suburbia. (Kaplan, Tr. 3344-45; PDX 105). Plaintiff arrives at this amount by assuming that the FSLIC received an economic benefit of $147.936 million, the estimated cost of liquidating Suburbia, less the $16 million in cash assistance that Fidelity received, and $3.677 million in cash paid to Fidelity for redemption of Suburbia's Net Worth Certificates. (PDX 105).

The availability of restitution as a damages remedy in general has been recognized in *Winstar* cases. See Am. Capital Corp. v. FDIC, 472 F.3d 859, 870 (Fed. Cir. 2006) (restitution permits a plaintiff to recover "any benefit that he has conferred on the repudiating party by way of part performance or reliance.") (quoting Mobil Oil Exploration & Producing S.E., Inc. v. United States, 530 U.S. 604, 608 (2000)); see also Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1316-17 (Fed. Cir. 2004). The Court has discretion to measure the benefit conferred on the repudiating party in a variety of ways. See Restatement (Second) of Contracts, § 371, cmt. a (1981).

However, the use of the estimated liquidation costs as a basis for restitution has not fared well in *Winstar* cases. For example, in Glendale Federal Bank, FSB v. United States, 239 F.3d 1374 (Fed. Cir. 2001), the Federal Circuit stated:

> . . . [T]he action taken by the purchasing S&L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift .

> . . . [What the Government received in exchange for its promise was time – time to deal with other failing S&Ls, time to see what the market would do before having to commit substantial resources to the problem. Though the value of time was worth more than zero, there is no proof of what in fact it was worth.
>
> It is important to remember that, even after Glendale's merger with Broward, the Government was not free of potential liability for the failing thrift. Had interest rates not come down, and Broward, and perhaps Glendale as well, failed, the Government's contingent liability would have matured, and the FSLIC would have had to step in at that time and assume the very losses that Glendale now claims were benefits the Government received.

Id. at 1382. The Federal Circuit concluded that a restitution claim based upon the estimated liquidation costs of the acquired thrift was a "speculative assessment of what might have been," and it therefore vacated the trial court's award based on that theory. Id. The Federal Circuit and our Court have rejected other similar restitution claims. See, e.g., Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1380-81 (Fed. Cir. 2005) (damages measured in terms of a liability "that never came to pass" are "too speculative and indeterminate" to succeed) (quoting Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1382 (Fed. Cir. 2001)); LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1376 (Fed. Cir. 2003) (avoided Government liquidation cost of $912.6 million is not "a meaningful measure of plaintiff's costs."); California Fed. Bank, FSB v. United States, 245 F.3d 1342, 1351 (Fed. Cir. 2001) (supposed FSLIC gains in not having to pay liquidation costs are "speculative and indeterminate."); Long Island Sav. Bank, FSB v. United States, 60 Fed. Cl. 80, 96 (2004), rev'd on other grounds, 476 F.3d 917 (Fed. Cir. 2007) (avoided liquidation costs are "not a usable measure of . . . benefit to the Government, and thus not an appropriate threshold for restitution damages." (quoting LaSalle Talman Bank, FSB, 317 F.3d at 1376)); Citizens Fed. Bank, FSB v. United States, 52 Fed. Cl. 561, 566 (2002), aff'd 474 F.3d 1314 (Fed. Cir. 2007) (damages sought for "benefits conferred" were too uncertain and thus precluded as a matter of law).

Examining the evidence in this case, the Court cannot conclude that liquidation of Suburbia would have been the only option for the FSLIC if Fidelity had not acquired Suburbia. As a matter of FSLIC policy, liquidation always was the last option considered by the regulators. (Fiol, Tr. 292; Beesley, Tr. 1159-65, 1224-26; Vigna, Tr. 1512-13; DX 3490 at 90; PX 35; PX 112; PX 370; PX 986 at 4190). The FSLIC simply did not have adequate funds available to consider liquidating failing thrifts. (Pratt, Tr. 114, 128; Beesley, Tr. 1151-53, 1233-34; PX 286 at 14, 16, 76); see also United States v. Winstar Corp., 518

U.S. 839, 847 (1996) ("Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of 'supervisory mergers.'") (internal citations omitted). Liquidation of large thrifts also would have severely damaged public confidence in the thrift system. (Spaid, Tr. 225-27; Vigna, Tr. 1386). The fact that the FSLIC evaluated the cost of liquidation for Suburbia did not mean that the FSLIC was actually considering liquidation. Such cost comparisons were required at the FSLIC in evaluating the various options for failing thrifts. (Pratt, Tr. 117; Spaid, Tr. 265; Fiol, Tr. 307-08). The FSLIC did not seriously consider the liquidation of $700 million institutions like Suburbia. (Beesley, Tr. 1236-37). The FSLIC did not liquidate any New York-based institutions from 1980 through 1989. (Vigna, Tr. 1503).

The evidence confirms that the FSLIC had alternatives other than liquidation if Fidelity had not acquired Suburbia. In 1982, the FSLIC had received bids from four other thrifts capable of taking over Suburbia, with FSLIC assistance similar to that provided to Fidelity. The FSLIC could have rebid Suburbia in 1984 to these and other thrifts, although prompt action likely would have been required. (Spaid, Tr. 212, 229-32, 241, 265, 272, 282-83; Beesley, Tr. 1213-15). Even if new bids in 1984 would have been more costly to the FSLIC because of Suburbia's deteriorating condition, the higher costs would not have approached the cost of liquidation. Suburbia was an attractive target to prospective buyers because it had quality assets and sound management. Its losses were primarily attributable to interest rate spread. (Amend, Tr. 4732-34). As Mr. Vigna observed, "I thought there was some franchise value here that for the right assistance, we could find an acquirer for it." (Vigna, Tr. 1506). The FSLIC repeatedly provided assistance to Suburbia in the form of Net Worth Certificates to allow Suburbia more time until interest rates declined. (Vigna, Tr. 1346-47, 1349, 2753-58, 2850; DX 3187 at 0330; DX 3159; PX 132 at 2590).

Moreover, Fidelity was not capable of providing a benefit to the Government in the amount claimed. As of August 31, 2004, two months before acquiring Suburbia, Fidelity had $22.1 million in book capital. (Wesp, Tr. 1737, 1748-49; Carron, Tr. 5738). Fidelity's acquisition of Suburbia did not eliminate the Government's potential liability for the costs of liquidation, and the success or failure of the merged entity heavily depended upon interest rate activity. If interest rates had risen, the Government would have remained liable for the losses of both Suburbia and Fidelity. (Vigna, Tr. 1506; Carron, Tr. 5752). Fidelity's acquisition of Suburbia did not relieve the FSLIC of its insurance obligations. (Carron, Tr. 5749). In reality, interest rates fell following the acquisition, which reduced the FSLIC's exposure to any losses.

For all of the above reasons, Plaintiff's restitution claim is too speculative and indeterminate, and must be denied.

D. Reliance

Plaintiff's reliance damages claim begins with an assumption that the $160.093 million in goodwill from Fidelity's acquisition of Suburbia represented a cost actually incurred by Fidelity. (Kaplan, Tr. 3252; PDX 106). From this assumed cost, Plaintiff deducts the $16 million in cash assistance that Fidelity received, and the $3.677 million in cash that Fidelity received in redemption of Suburbia's Net Worth Certificates, leaving a balance of $140.416 million. (PDX 106). This is the same calculation that Plaintiff performed for its restitution claim, except with a different starting point.

Reliance damages are meant to reimburse the injured party "for loss caused by reliance on the contract by being put in as good a position as [it] would have been in had the contract not been made." Restatement (Second) of Contracts, § 344 (1981). Reliance damages, however, have not been awarded where the claim is premised upon the net liability, or goodwill, assumed by an acquiring thrift. The Federal Circuit has ruled that net liabilities assumed represented only a potential cost to the acquiring thrift, represented by a paper calculation, and not an actual expenditure. See Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1371 (Fed. Cir. 2005) (plaintiff never made any payments from which it could be said to have sustained an actual loss due to the Government's breach); Glendale, 239 F.3d at 1382 (Court rejected damages claim based upon non-provable paper costs).

In LaSalle Talman, involving a net liabilities assumed restitution claim, the Federal Circuit stated:

> Although the assumed liabilities are indeed an accounting cost . . . we agree with the Court of Federal Claims that they are not a usable measure of either cost to the thrift or benefit to the government, and thus not an appropriate threshold for restitution damages.
>
> . . . [T]he accounting rearrangement whereby net liabilities are designated a paper asset does not create a "cost" subject to restitution at full cash value, reduced only by real cash infusions and real cash profits.

LaSalle Talman, 317 F.3d at 1376-77. Our Court similarly has rejected the idea that net liabilities assumed represented a cost that could support either a restitution or reliance claim. See, e.g., Standard Fed. Bank v. United States, 62 Fed. Cl. 265, 295-99 (2004); Long Island Sav. Bank, 60 Fed. Cl. at 96; S. Nat'l Corp. v. United States, 57 Fed. Cl. 294, 300 (2003) (Federal Circuit's prohibition against a restitution award premised on assumed net liabilities applies "with equal force to a reliance calculation based on the same principle.").

Examining the evidence, the record does not support Plaintiff's claim that the net liabilities assumed represented a cost to Fidelity. In the acquisition of Suburbia, Fidelity did not actually pay any cash. (Teurfs, Tr. 1112). Rather, Fidelity recorded as supervisory goodwill the $160 million of net liabilities assumed, with the intention of amortizing the goodwill on a straight line basis over 30 years. The amortization of goodwill is a non-cash expense, and thus there is no direct relationship between the amortization of goodwill and the actual cash payment of liabilities. (Kaplan, Tr. 3234; Kennedy, Tr. 5454-56).

To the extent that the goodwill amortization might be regarded as an annual cost to be offset against revenues received, the value of Suburbia's loan discounts accreted to Fidelity's income must be considered. (Kennedy, Tr. 5465-67). During the first 8-10 years of the planned amortization, accretion of loan discounts to income exceeded the goodwill amortization. (Lovely, Tr. 1633-34; Wesp, Tr. 1748-50; Teurfs, Tr. 1108-10; Vigna, Tr. 1391-92; Kennedy, Tr. 5457-60). Fidelity received other benefits through the Suburbia acquisition, such as gains on sales of Suburbia's loans and securities, and tax savings based upon Suburbia's net operating losses. Plaintiff did not include any of these benefits in the calculation of reliance damages. Accordingly, this claim is denied.

## Conclusion

Based upon the foregoing, the Court awards damages to Plaintiff of $16,042,887, consisting of $14,611,157 in expectancy damages, and $1,431,730 in "wounded bank" damages. The Clerk shall enter judgment for Plaintiff in the amount stated. Costs are awarded to Plaintiff.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge